**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **UMG RECORDINGS, INC., et al.,** | § | |
| | § | |
| **V.** | § | **CAUSE NO. A-17-CA-365-LY** |
| | § | |
| **GRANDE COMMUNICATIONS** | § | |
| **NETWORKS, LLC, and PATRIOT** | § | |
| **MEDIA CONSULTING, LLC** | § | |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

TO:    THE HONORABLE LEE YEAKEL
        UNITED STATES DISTRICT JUDGE

Before the Court are Defendant Grande Communications Networks LLC's Motion to Dismiss for Failure to State a Claim (Dkt. No. 28); Plaintiffs' Response (Dkt. No. 33); and Grande's Reply (Dkt. No. 37), as well as Patriot Media Consulting, LLC's Motion to Dismiss for Failure to State a Claim (Dkt. No. 29); Plaintiff's Response (Dkt. No. 34); and Patriot's Reply (Dkt. No. 38). The District Court referred the motions to the undersigned Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. §636(b) and Rule 1(c) of Appendix C of the Local Rules.

## I. BACKGROUND

Because the case is before the Court on a motion to dismiss for failure to state a claim, the facts set forth here, taken from Plaintiff's Original Complaint (Dkt. No. 1), are presumed true. Plaintiffs—who the Court will refer to collectively as "UMG"—are a collection of record companies that produce and distribute commercial sound recordings in the United States. Dkt. No. 1 at ¶ 2. They seek damages and injunctive relief regarding alleged infringements of various copyrights they claim to own or have exclusive rights to. They attach a "a non-exhaustive, illustrative list" of these recordings to the Complaint. *Id.* at ¶¶ 6, 34, 37 & Exhibit A. Grande is an internet service provider

that provides internet access to subscribers in portions of Texas. *Id.* at ¶ 3. UMG alleges that Grande has received, through UMG's agent Rightscorp, millions of notices of direct copyright infringement allegedly committed by Grande subscribers. *Id.* at ¶¶ 4, 47-49. UMG complains that these Grande subscribers use peer-to-peer file sharing applications like BitTorrent[1] to share copyrighted material without authorization. *Id.* at ¶¶ 4, 38, 39, 43, 45, 48. UMG alleges that Grande is secondarily liable for these activities because it continued to provide the subscribers with internet access after receiving these notices. *Id.* at ¶ 56; *see also* Dkt. No. 28 at § I.B.

Patriot is a management consulting firm which provides certain management services to Grande. *Id.* at ¶¶ 4, 52. In addition to seeking to hold Grande secondarily liable for infringement, UMG also sues Patriot, contending that "Patriot's infringing conduct includes, among other things, formulating and implementing the business policies, procedures, and practices that provide repeat infringers with continued internet service through Grande." *Id.* at ¶ 55.

---

[1]The Fourth Circuit recently provided a helpful description of BitTorrent:

BitTorrent is not a software program, but rather describes a protocol—a set of rules governing the communication between computers—that allows individual computers on the Internet to transfer files directly to other computers. This method of file sharing is commonly known as "peer-to-peer" file sharing, and contrasts with the traditional method of downloading a file from a central server using a Web browser. Although peer-to-peer file sharing is not new, what makes BitTorrent unique is that it allows a user to download a file from multiple peers at the same time—even peers who only have a piece of the file, rather than the complete file. In other words, as soon as a user has downloaded a piece of the file, he or she can begin sharing that piece with others (while continuing to download the rest of the file). This innovation makes sharing via BitTorrent particularly fast and efficient. Although BitTorrent can be used to share any type of digital file, many use it to share copyrighted music and video files without authorization.

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 298-99 (4th Cir. 2018).

Both Grande and Patriot move to dismiss UMG's Complaint for failure to state a claim. The Court addresses each motion separately.

## II. LEGAL STANDARD

Rule 8 of the Federal Rules of Civil Procedure "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the [nonmovant]." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks omitted), *cert. denied*, 552 U.S. 1182 (2008).

While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations in order to avoid dismissal, the plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. A plaintiff's obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* The Supreme Court has explained that a court need not accept as true conclusory allegations or allegations stating a legal conclusion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("mere conclusions[ ] are not entitled to the assumption of truth"). A complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the [nonmovant] pleads factual content that allows the court to draw the reasonable inference that the [movant] is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

## III. GRANDE'S MOTION TO DISMISS

Grande asserts that UMG's claims for secondary copyright infringement should be dismissed because: (1) the Complaint fails to plead any instances of direct copyright infringement, which is a prerequisite to a claim of secondary infringement; and (2) providing a "staple article of commerce" such as internet service cannot give rise to a claim of secondary copyright infringement. Additionally, Grande more generally asserts that UMG's claims for contributory and vicarious liability are insufficiently pled and fail to state a claim.

### A.    Secondary Infringement Claims

There are two types of liability for copyright infringement: direct and secondary.  Direct copyright infringement requires proof that the plaintiff  "(1) owns a valid copyright and (2) the defendant copied constituent elements of the plaintiff's work that are original." *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012).  "Copying" includes infringing on any of the five exclusive rights set forth in 17 U.S.C. § 106: the right to reproduce, distribute, publicly display, perform, or create derivative works of the copyrighted work.  Secondary liability applies when a defendant is held responsible for a third party's acts of infringement, even though the defendant herself did not engage in the infringing activity. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 435 (1984).  There are two types of secondary infringement:  contributory and vicarious.  *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*, Ltd., 545 U.S. 913, 930 (2005).  Contributory copyright infringement occurs where a defendant "intentionally induc[ed] or encourag[ed] direct infringement." *Id.*  Vicarious infringement occurs when a defendant "profits directly from the infringement and has a right and ability to supervise the direct infringer, even if the defendant initially lacks knowledge of the infringement." *Id.* at 931 n.9.

4

### 1.    Pleading of Direct Infringement

As stated above, direct copyright infringement requires a plaintiff to allege that "(1) [it] owns a valid copyright and (2) the defendant copied constituent elements of the plaintiff's work that are original." *Baisden,* 693 F.3d at 499.  Grande argues that UMG cannot plead a claim for secondary copyright infringement because they have failed to identify instances of actual direct infringement—the actual copying of copyrighted materials by Grande subscribers.  There cannot be secondary infringement without direct infringement. *Phoenix Entm't Partners LLC v. Boyte*, 247 F. Supp. 3d 791, 799 (S.D. Tex. 2017).

In the Complaint, UMG states:

> The notifications Grande received were based upon a software system Rightscorp developed and employed. The system identifies specific actual infringements of various copyrighted works and the users of BitTorrent networks who infringe these copyrighted works.
>
> Through this process, Grande has been put on notice and informed of more than one million infringements, and that thousands of subscriber accounts have engaged in repeated acts of copyright infringement. Prior to the filing of this complaint, Grande received notice that 1,840 of its customers had each engaged in infringement at least one hundred times.  At least 456 of Grande's customers had generated 500 notices of infringement.  More than 208 customers each generated at least 1,000 notices of infringement.  And some of Grande's customers generated more than 2,000 notices of infringement each.  Because Rightscorp can only observe a small percentage of the overall activity of Grande subscribers, upon information and belief, the infringement Rightscorp reported to Grande likely is merely a small fraction of the infringing activity occurring over Grande's network.

Compl., ¶ 48-49.  The Complaint furthers states:

> As detailed herein, users of the Grande service are engaged in repeat and pervasive infringement of Plaintiffs' exclusive rights to reproduce, distribute, and publicly perform their Copyrighted Sound Recordings.

Compl., ¶ 61.

Grande maintains that despite UMG's assertion that Rightscorp notified Grande of more than a million acts of direct infringement, the Rightscorp system is incapable of tracking or recording instances of actual copyright infringement. Instead, the Rightscorp system is only capable of detecting when the copyrighted material is "available for distribution," which Grande asserts is insufficient to establish that direct infringement has taken place because it does not show the copyrighted material was ever requested or downloaded—and therefore copied—by a third party.

Grande further argues that UMG has failed to identify a particular instance of direct infringement of a particular copyrighted work, and instead has vaguely alleged Rightscorp identified millions of instances of infringement. Grande asserts that this amounts to a general assertion "that infringement happens on the internet," and is insufficient to withstand dismissal in the absence of a concrete allegation of direct infringement of one of its copyrights by a third party. In support of these arguments, Grande relies upon various cases standing for the proposition that making copyrighted material available for download or copying is insufficient to support infringement.

UMG responds that Grande's argument is an improper factual assault on the Complaint and further, that the Complaint adequately alleges actual infringement. It cites to the following language in the Complaint to support its claim that it has alleged actual infringement:

> A non-exhaustive, illustrative list of Plaintiffs' federally copyrighted sound recordings that Defendants have illegally reproduced, distributed, and/or publicly performed for their users is attached hereto as Exhibit A (the "Copyrighted Sound Recordings").

Compl., ¶ 37.

> Rightscorp has developed a technological system that identifies actual infringements and the perpetrators of these infringements (by IP address, port number, time, and date). It does so by monitoring BitTorrent systems and extracting information about the infringing activity, including, inter alia, the IP address, the ISP, the infringing

content, and the suspected location of the host computer accessing BitTorrent networks. Rightscorp's system also has the capability to acquire entire files from the infringing host computers. Using this system, Rightscorp has notified ISPs, including Grande, of specific instances of first-time and repeat copyright infringement committed by their account holders and has requested that the ISPs, including Grande, notify their account holders of these infringements.

Compl., ¶ 43.

The notifications Grande received were based upon a software system Rightscorp developed and employed. This system identifies specific actual infringements of various copyrighted works and the users of BitTorrent networks who infringe these copyrighted works. At its most basic level, the software searches for specific copyrighted content. When it communicates with a host computer using BitTorrent that acknowledges it has specific copyrighted content available for unauthorized distribution, the software will log certain identifying information (e.g., the IP address and port number of the host computer, the date and time the host computer offered the content, the name of the host computer's ISP, and information about the infringing file). Upon collecting this information, Rightscorp sends a notice of infringement to Grande, detailing the exact nature of the infringement(s). Each notice requests that Grande forward the notice to the corresponding Grande subscriber, because only Grande, as the ISP, can identify and contact the account holder. Thereafter, Grande's network is continuously monitored to determine if the same subscriber is a repeat infringer who continues to infringe copyrighted works. If repeat infringement is detected, Grande is further notified.

Compl., ¶ 48. UMG asserts that the facts more than adequately plead direct infringement.

Grande frames the issue as a legal one—whether making a work available for copying qualifies as "actual infringement." UMG in turn frames the issue as a primarily factual one—whether the Rightscorp system detects "actual infringement," and whether they have adequately pled facts showing actual infringement (specifically, they contend that making a copyrighted work available for copying is sufficient circumstantial evidence of actual infringement). The parties do not quarrel over the basic fact that the Rightscorp system identifies "specific copyrighted content *available* for unauthorized distribution," logs that information, creates a notice, and forwards that notice to Grande.

The caselaw on this point is sparse. As the Copyright Office recently noted,

> A . . . widespread area of disagreement is the question of whether a party can infringe the distribution right by offering a copyrighted work to the public for download, or whether evidence of an actual download is an essential element of such a violation. To date, neither the U.S. Supreme Court nor any of the circuit courts has had occasion to directly rule on the issue, and the district courts that have considered the question have come to differing conclusions. Several of the district courts to consider the issue have found, at least preliminarily, that offering copyrighted material online for download, without actual evidence of third party downloads, may be sufficient to support a claim for unauthorized distribution. In contrast, other district courts have held that evidence of an actual download is required to support a finding of infringement of the right to distribute. Among the courts adopting this latter view, some have concluded that plaintiffs nevertheless are not required to offer direct proof of a download to establish distribution, but may do so through circumstantial or investigator evidence from which it reasonably can be inferred that a download took place.

U.S. Copyright Office, THE MAKING AVAILABLE RIGHT IN THE UNITED STATES at 22-23 (2016)

https://www.copyright.gov/docs/making_available/making-available-right.pdf.

UMG relies mainly on *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 661–62 (E.D. Va. 2015), *aff'd in part, rev'd in part,vacated in part, and remanded*, 881 F.3d 293 (4th Cir. 2018), for the proposition that copyright holders may establish direct infringement through circumstantial evidence. In *BMG*, the trial court denied summary judgment, finding that BMG had presented sufficient circumstantial evidence of possible direct infringement. The trial court stated:

> In sum, to establish a direct infringement of its distribution right, BMG must show an actual dissemination of a copyrighted work. BMG contends that even under this standard, it has produced more than enough evidence to show actual dissemination. First, Rightscorp identified Cox subscribers sharing torrents that Rightscorp had also found on torrent indexing websites. Because each torrent contains a unique "hash," an identifying code that is only created once, BMG argues these Cox users must have downloaded the torrents at some point. Second, Rightscorp downloaded over 700,000 copies of copyrighted works from Cox subscribers using Cox's internet service and 100,000 of those copies were of the works at issue in this case. Third, Rightscorp

says it identified 2.5 million instances in which Cox users made available the copyrighted works for downloading. BMG argues that even if this "making available" evidence is not direct evidence of distribution, it is circumstantial evidence that the works were in fact downloaded given the way a BitTorrent protocol operates. The Court finds BMG has demonstrated that there is a genuine issue of material fact as to whether its distribution right was directly infringed.

*Id.* at 670 (internal citations omitted). (The Fourth Circuit's recent opinion reviewing the judgment in this case did not address this pleading issue.) However, it is generally accepted that circumstantial evidence can be used to pove a copyright infringement claim.[2]

UMG also points the Court to *Arista Records v. Greubel*, 453 F. Supp. 2d 961, 971 (N.D. Tex. 2006). In *Greubel*, the defendant was accused of copyright infringement based upon his use of an online media distribution system to illegally download copyrighted recordings, and then offer them to others for copying. With their complaint, the plaintiffs submitted a list of specific copyrighted works they asserted they owned. Additionally, they submitted a list of 1,087 files allegedly found on Greubel's computer; however, the plaintiffs did not identify which of Greubel's files they claimed to own. Greubel argued the complaint failed to state a claim because it failed to sufficiently identify the copyrighted works allegedly infringed or the ownership of the copyright for each work. Rejecting that argument, the Court found that "although Plaintiffs have not identified

---

[2] *See Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1225 (D. Minn. 2008) (stating that although dissemination needs to be proven to meet the distribution standard in the act, the proof need not be direct and can come from circumstantial evidence); *see also Atl. Recording Corp. v. Howell*, 554 F. Supp. 2d 976, 983 (D. Ariz. 2008) ("[E]vidence that a defendant made a copy of a work available to the public might, in conjunction with other circumstantial evidence, support an inference that the copy was likely transferred to a member of the public."). *See generally* 2 Melville B. Nimmer and David Nimmer, NIMMER ON COPYRIGHT § 8.11[D][5][b] (Matthew Bender, rev. ed.) ("Given the rarity of direct evidence in copyright litigation that defendant at bar copied from plaintiff's work, the classic case of copyright infringement relies on circumstantial evidence. . . . Along similar lines, it has been held that circumstantial evidence suffices to establish actual distribution. There is nothing exceptional about that conclusion.")

every copyrighted recording by name, the inclusion of a partial song list and a printout of allegedly offending files on Greubel's computer provides Greubel of sufficient notice of the basis of Plaintiffs' complaint for copyright infringement." *Id.* at 965. Many courts have reached similar conclusions. *See, e.g.*, *Warner Bros. v. Payne,* 2006 WL 2844415 (W. D. Tex. July 17, 2006) (denying motion to dismiss and finding that a listing of unauthorized copies of sound recordings available through an online file-sharing system was sufficient evidence to plead a violation of the copyright owner's exclusive right of distribution); *Alticor Inc. v. UMG Recordings, Inc.*, 2015 WL 8536571 (M.D. Fla. Dec. 11, 2015) (holding that the act of making a copyrighted work available for the use of a direct infringer is relevant to the Plaintiffs' indirect infringement claims).

For its part, Grande relies on a number of cases standing for the general proposition that simply making a copyrighted work available for copying is not enough to prove infringement. *See, e.g.*, *BWP Media USA, Inc. v. T & S Software Assocs.*, Inc., 852 F.3d 436, 439 (5th Cir. 2017), *cert. denied,* 138 S.Ct. 236 (2017) (affirming grant of summary judgment). Though the Court could fill ten or more pages with a discussion of the subtleties of this issue, given the stage of the proceedings, that would be a waste of time. The question before the Court is whether UMG has pled enough facts to make a plausible claim that Grande's subscribers are infringing on its copyrights and distributing copies of works to others through use of the BitTorrent protocol. The facts pled in the Complaint do that. As the trial court in the *BMG* case concluded, a plaintiff may rely on pleadings incorporating circumstantial evidence of copying to plead the direct infringement needed to support a claim of secondary infringement. *BMG*, 149 F. Supp. 3d at 661–62. Further, given the lack of clarity in the law regarding this issue, and the obvious difference of opinion regarding even what the Complaint

alleges and what the Rightscorp notices say,[3] the current record is incomplete. It would be inappropriate to dismiss the case based on factual allegations Grande makes about the Rightscorp notices and system, without any evidence to back those up. As noted at the outset, in reviewing a Rule 12(b)(6) motion, the Court accepts the well-pleaded allegations of the complaint as true. UMG has adequately pled direct infringement.

### 2. "Staple Article of Commerce"

Grande argues alternatively that even if UMG has properly alleged a secondary infringement claim, the case should still be dismissed under the "staple article of commerce" doctrine. That doctrine had its origins in the Supreme Court's decision in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), which addressed Sony's Betamax video recorders. As *Sony* articulated it, under the doctrine,

> the sale of copying equipment, like the sale of other articles of commerce, does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes. Indeed, it need merely be capable of substantial noninfringing uses.

464 U.S. at 442. Grande asserts that "it is beyond dispute" that Internet service has numerous non-infringing uses and therefore, qualifies as a "staple article of commerce." Dkt. No. 28 at 8 n.3.

UMG argues that the doctrine does not apply here, because unlike in *Sony*, Grande did not design a product and then place it in the stream of commerce, but instead it provides a **service** to its

---

[3]At the hearing on the motion, Grande contended that the Complaint never alleges any actual direct infringement. UMG, on the other hand, explained that the Rightscorp system, in addition to identifying files available for download, also "will sometimes download the whole file to show proof beyond any doubt that the actual entire file is being shared by that person. And we have those for all 1500, as we plead that Exhibit A represents a sample of the copyrighted sound recordings actually downloaded, actually copied, actually distributed." Dkt. No. 64 at 31-32. So UMG contends that it in fact *has* pled actual infringement by subscribers.

subscribers, and maintains an ongoing relationship with them.  Sony had no ongoing relationship with the buyers of its Betamax recorders, and thus no reason to know how those customers used the recorders.  UMG contends that the Supreme Court's application of the "staple article of commerce" doctrine to copyright law is limited to arm's length transactions of a product, and is inapplicable here.  Dkt. No. 33 at 15.  In the *BMG* case, the trial court reached the same conclusion, finding that because Cox had an ongoing relationship with its allegedly infringing subscribers, and the ability to suspend or terminate their services once they were made aware the subscribers were using the service to infringe, the staple article of commerce doctrine did not apply.  *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958, 976 (E.D. Va. 2016), *aff'd in part, rev'd in part, vacated in part, and remanded*,  881 F.3d 293 (4th Cir. 2018).  Other courts have reached similar results in cases involving the provision of internet services.[4]

Grande responds that its argument is not as expansive as BMG contends, and that it is not contending that *Sony* provides it a complete defense, but instead is arguing that *Sony*, as applied and interpreted by the Supreme Court in *Grokster*, only allows the imposition of secondary liability when the defendant takes some sort of affirmative action.  In *Grokster*, the product in issue was free software that allowed users to share electronic files (much like the BitTorrent protocol at the heart of this case).  *Grokster,* 545 U.S. 913.  The District Court granted summary judgment on the

---

[4] *See, e.g., Capitol Records, Inc. v. MP3tunes, LLC*, 821 F.Supp.2d 627, 649 (S.D.N.Y.2011) (rejecting defendants' reliance on substantial noninfringing uses because "the defendants were aware of the specific infringement at issue and had a continuing relationship with users");  *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 156 (S.D.N.Y.2009) (rejecting defendants invocation of *Sony* as a complete defense and finding noninfringing uses "immaterial" where there was an ongoing relationship with users); *CoStar Grp. Inc. v. LoopNet, Inc.*, 164 F. Supp. 2d 688, 706 (D. Md. 2001) ("In the current case, unlike *Sony*, LoopNet maintained control over access to the site and could deny access or block materials after gaining knowledge of infringement."), *aff'd*, 373 F.3d 544 (4th Cir. 2004).

contributory and vicarious liability claims based upon the staple article of commerce doctrine from *Sony*. The Supreme Court reversed, finding that the court had misread *Sony* to mean that when a product is capable of a substantial lawful use, the producer cannot be held contributorily liable for third parties' infringing use, full stop. *Id.* at 915. The Court explained that *Sony* did not displace other secondary liability in cases where the evidence showed that the defendant made statements or took actions that promoted the infringement. *Id.* at 935. Thus, the Court held that whether a product qualified as a staple article of commerce was not enough by itself to excuse secondary liability, if the defendant distributed the product with the object of promoting its use to infringe copyright, explaining that "nothing in *Sony* requires courts to ignore evidence of intent to promote infringement if such evidence exists." *Id.* at 914.

As Grande presents it, the issue is therefore whether UMG has alleged that Grande took any affirmative acts to encourage or promote subscribers to use its internet services to infringe UMG's copyrights. Grande contends that the Complaint does not make any such allegations, but instead only alleges that Grande *failed to act* when UMG made it aware its subscribers were engaged in infringement on Grande's network. It contends that under *Grokster*, this is not enough to show liability. It points to *Grokster's* focus on the need for "active steps"—"Evidence of active steps taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe." *Id.* The *Grokster* Court stated:

> For the same reasons that *Sony* took the staple-article doctrine of patent law as a model for its copyright safe-harbor rule, the inducement rule, too, is a sensible one for copyright. We adopt it here, holding that one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of

infringement by third parties. We are, of course, mindful of the need to keep from trenching on regular commerce or discouraging the development of technologies with lawful and unlawful potential. Accordingly, just as *Sony* did not find intentional inducement despite the knowledge of the VCR manufacturer that its device could be used to infringe, mere knowledge of infringing potential or of actual infringing uses would not be enough here to subject a distributor to liability. Nor would ordinary acts incident to product distribution, such as offering customers technical support or product updates, support liability in themselves. The inducement rule, instead, premises liability on purposeful, culpable expression and conduct, and thus does nothing to compromise legitimate commerce or discourage innovation having a lawful promise.

*Id.* at 936-37 (citation omitted). Grande further points to a number of other cases in support of its position.[5] Grande argues that because UMG has failed to plead Grande took active steps encouraging infringement by its customers, UMG cannot state a contributory infringement claim.

UMG responds that Grande misreads *Grokster*. It argues that the portion of *Grokster* referring to "evidence of active steps taken to encourage direct infringement" relates only to an inducement claim, and does not apply to other theories of secondary liability, such as "causing or materially contributing" to infringing conduct. UMG cites to *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971) for the proposition that "contributory infringement" has various kinds, of which inducement is only one: "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." The Ninth Circuit has also

---

[5] *Luvdarts LLC v. AT & T Mobility, LLC*, 2011 WL 997199 (C.D. Cal. 2011), *aff'd*, 710 F.3d 1068 (9th Cir. 2013) (wireless carrier was not contributarily liable because evidence merely showed a failure to take affirmative steps to prevent infringement); *Dallas Buyers Club, LLC v. Doughty*, 2016 WL 1690090 (D. Or. Apr. 27, 2016) (mere knowledge of actual infringement or the potential to infringe is not enough to subject a defendant to liability); *Elf-Man, LLC v. Brown*, 996 F. Supp. 2d 1056, 1059 (E.D. Wash. 2014) ("*Grokster* effectively forecloses any argument that private consumers have an affirmative obligation to prevent others from using their internet access for illegal copyright infringement").

adopted this standard. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1171 (9th Cir. 2007); *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 786, 796 (9th Cir. 2007). UMG notes that it alleges that Grande both "induced" and "materially contributed" to its subscribers' infringement, and even if it cannot make out an inducement claim, it still has stated a valid contributory infringement claim.

Grande disagrees. It contends *Sony* and *Grokster* apply generally to all secondary copyright infringement claims, including those based upon a theory of material contribution. *See Grokster*, 545 U.S. at 933 (stating the *Sony* rule, where applicable, "bar[s] secondary liability."). Grande maintains that *Grokster* conclusively refutes UMG's contention that "the continued provision of internet services to known infringers is exactly the 'affirmative conduct' [which] must be present to impose liability on an ISP." Dkt. No. 37 at 8. *Grokster* stated, "one infringes contributorily by intentionally inducing or encouraging direct infringement." 545 U.S. at 930. In her concurrence, Justice Ginsburg explained:

> At bottom, however labeled, the question in this case is whether Grokster and StreamCast are liable for the direct infringing acts of others. Liability under our jurisprudence may be predicated on actively encouraging (or inducing) infringement through specific acts (as the Court's opinion develops) or on distributing a product distributees use to infringe copyrights, if the product is not capable of "substantial" or "commercially significant" noninfringing uses. While the two categories overlap, they capture different culpable behavior. Long coexisting, both are now codified in patent law. *Compare* 35 U.S.C. § 271(b) (active inducement liability) *with* § 271(c) (contributory liability for distribution of a product not "suitable for substantial noninfringing use").

*Id.* at 942 (some citations omitted). In his concurrence, Justice Breyer stated, "I agree with the Court that the distributor of a dual-use technology may be liable for the infringing activities of third parties where he or she actively seeks to advance the infringement." *Id.* at 949.

The most recent court to address this question was the Fourth Circuit in its decision three weeks ago. The issue presented in that case is the precise issue presented here—can liability be imposed on an ISP that is made aware of continuing, frequent infringement by specific subscribers and then fails or refuses to act on that knowledge to stop the subscribers' use of the services for such infringement? Presented with that question, the Fourth Circuit found that contributory liability for copyright infringement could be imposed based on willful blindness, holding that Cox's failure to act, once in receipt of the Rightscorp notices, was sufficient to show the required intent identified in *Grokster*. *BMG*, 881 F.3d at 308.[6] The Court acknowledges that this is not yet a well-defined area of the law, and that there are good arguments on both sides of this issue. However, at this point in the case, the Court is persuaded that UMG has pled a plausible claim of secondary infringement based on Grande's alleged failure to act when presented with evidence of ongoing, pervasive infringement by its subscribers.

## B.     Vicarious Copyright Infringement Claim

To show vicarious infringement, a plaintiff must prove that a defendant: (1) has a direct financial interest in the infringing activity; and (2) has the right and ability to supervise the activity which causes the infringement. *Grokster*, 505 U.S. at 930. Intent or knowledge of the infringement is not an element of a claim for vicarious liability. *Peer Int'l Corp. v. Luna Records, Inc.*, 887 F.Supp. 560, 565 (S.D.N.Y.1995). Grande argues that the Complaint fails to plausibly allege either element of vicarious infringement.

---

[6]*See also, In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003) ("Willful blindness is knowledge, in copyrightlaw as it is in the law generally.") (internal citations omitted).

### 1. Right and Ability to Supervise

Grande asserts that UMG has inadequately pled that Grande has the ability to supervise and control the purported infringement, because UMG has based its allegations on Grande's failure to terminate subscribers suspected of engaging in repeated copyright infringement. Dkt. No. 1 at ¶ 4. Grande asserts that its ability to terminate subscribers does not translate into an ability to stop alleged infringers from committing acts of infringement. To show a defendant has the right or ability to supervise infringement requires proof of both "a legal right to stop or limit the directly infringing conduct . . . [and] the practical ability to do so." *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 730 (9th Cir. 2007). Grande asserts that because it cannot block access to the peer-to-peer software used to infringe the copyrights here, it cannot stop or limit the infringing conduct taking place by its subscribers. Additionally, Grande argues that, even if it terminates subscribers, such action will only indirectly affect the infringing conduct, as Internet access is ubiquitous, and the subscribers can simply obtain the service from another ISP. The Court disagrees. Grande can stop or limit the infringing conduct by terminating its subscribers' internet access. *BMG*, 149 F. Supp. 3d at 674. This is clearly sufficient to state a claim on the first element of vicarious liability.

### 2. Direct Financial Interest

A "[f]inancial benefit exists where the availability of infringing material acts as a draw for customers." *Ellison v. Robertson*, 357 F.3d at 1072, 1078 (9th Cir. 2004). Indeed, "[t]he essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps. . . ." *Id.* at 1079. ("There are . . . cases in which customers value a service that does not 'act as a draw.' . . . [T]he central question of the 'direct financial benefit' inquiry . . . is whether the infringing activity constitutes a draw for

subscribers, not just an added benefit."). Thus, in order to adequately allege vicarious copyright infringement, UMG in this case must plead that customers subscribed to Grande's services because of the specific infringing material at issue. *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 674 (9th Cir. 2017); *see Ellison*, 357 F.3d at 1079. Grande asserts that UMG's only basis to establish a direct financial benefit in its pleadings is Grande's receipt of flat monthly internet service subscription fees and higher monthly fees for higher bandwidth. *See* Dkt. No. 1 at ¶¶ 44, 45, 51, 53, and 57. Grande contends that because UMG failed to plead that Grande gained or lost customers based on the infringement, it has failed to state a claim that it had a direct financial interest in the infringement.

This is a motion to dismiss under Rule 12(b)(6), and the Court thus takes the plausible, non-conclusory allegations of the Complaint as true. The closest that the Complaint comes to addressing this issue is the allegation that "the availability of music —and particularly UMG's music— acts as a powerful draw for user's of Grande's service, who use that service to download infringing music files using BitTorrent protocols." Dkt. No. 1 at ¶ 66. This is not sufficient to show the "direct financial interest" necessary to support a vicarious infringement claim. There are no allegations that Grande's actions in failing to adequately police their infringing subscribers is a draw to subscribers to purchase its services, so that they can then use those services to infringe on UMG's (and others') copyrights. Instead UMG only alleges that the existence of music and the BitTorrent protocol is the draw. But that would impose liability on every ISP, as the music at issue is available on the Internet generally, as is the BitTorrent protocol, and is not something exclusively available through Grande's services. Accordingly, the Court finds that UMG has failed to plead facts showing that Grande receives a direct financial benefit from its subscribers' infringing conduct, and that UMG's vicarious copyright infringement claim should be dismissed for failure to state a claim.

## IV. PATRIOT'S MOTION TO DISMISS

In addition to seeking dismissal based on the same arguments Grande has raised, Patriot also argues that UMG has failed to state claim against it because UMG has failed to allege any tenable legal theory on which a management company can be held responsible for the actions of the company simply because it provides management services to that company. It further argues that UMG is effectively seeking to impose third tier infringement liability on it, which is not available under copyright law.

Patriot asserts that UMG bases its claim of liability on an impermissible "tertiary theory" of liability, where Patriot would be held responsible for the alleged secondary infringement by Grande, based upon Grande's provision of internet access to direct infringers. Patriot notes that courts have repeatedly rejected this theory. In the *Napster* litigation, the court described this theory as, "Napster users are the direct infringers, Napster is the secondary infringer, and the individual defendants [who had various connections to Napster's operations] are tertiary infringers." The court held that there was "no support for this legal proposition." *In re Napster Inc.*, 2001 WL 36593841, at *2 (N.D. Cal. July 9, 2001). *See also David v. CBS Interactive Inc.*, 2012 WL 12884914, at *4 (N.D. Cal. July 13, 2012). Patriot asserts because it does not provide internet access to infringers, but instead provides management services to Grande, there is no cognizable basis for imposing liability on Patriot. Patriot also argues that permitting UMG to pursue a claim against Patriot based on Grande's alleged actions would lead to absurd and inequitable results because Patriot, unlike Grande, would not be entitled to invoke the safe harbor protections that the Digital Millennium Copyright Act grants to ISPs, as Patriot only provides management services to Grande, and thus does not qualify as a "service provider" under the statute. 17 U.S.C. § 512(k)(1).

UMG responds that they do not allege another layer of causation or relationship that somehow distances Patriot from the infringing conduct giving rise to secondary liability. Instead, it contends Patriot's active involvement with, and direction of, Grande's wrongful activity renders it liable along with Grande, under well-established law that "'[a]ll participants in copyright infringement are jointly and severally liable as tortfeasors.'" *Broad. Music, Inc. v. Armstrong*, 2014 WL 2440556, at *8 (W.D. Tex. May 30, 2014) (citations omitted), *aff'd*, 915 F.2d 1567 (5th Cir. 1990). UMG argues that Patriot affirmatively performs executive, general counsel, and management functions for Grande, and thus is directly involved in the actions and inactions of Grande that gave rise to the infringement. UMG maintains that Patriot formulates and implements the policies and practices as to how Grande responds, or fails to respond, to notices of infringing activity. In support of their response, UMG cites to *UMG Recordings, Inc. v. Bertelsmann AG*, 222 F.R.D. 408 (N.D. Cal. 2004) and *Capitol Records, Inc. v. MP3tunes, LLC*, 48 F. Supp. 3d 703, 713 (S.D.N.Y. 2014), cases where courts rejected defendants' attempts to recast claims of secondary infringement as so-called "tertiary" liability.

The problem with UMG's argument is that nowhere does the Complaint allege that Patriot itself, as an entity, was involved in the decisions or actions on which UMG bases its claim. Instead, it only alleges that employees of Patriot, who were also employees of Grande, may have assisted in formulating Grande's policies in dealing with the underlying infringement as issue here. This is a far cry from showing that *Patriot* as an entity was an active participant in the alleged secondary infringement. UMG concedes that Grande is a valid legal entity. Thus, whatever decisions Grande made that might impose liability on it, they were made by Grande, not Patriot. UMG's claims against Patriot are a very poorly disguised attempt to ignore Grande's corporate form, and to impose

liability on Patriot solely because it provides services to Grande. The relationship between the alleged direct infringers and Patriot is too attenuated to support a claim against Patriot.

## V. RECOMMENDATION

In light of the foregoing the undersigned **RECOMMENDS** that the district judge **GRANT IN PART and DENY IN PART** Defendant Grande Communications Networks LLC's Motion to Dismiss for Failure to State a Claim (Dkt. No. 28). The Court **RECOMMENDS** that the District Judge **GRANT** the motion as to UMG's vicarious copyright infringement claim, and **DENY** it as to all other claims.

The undersigned **FURTHER RECOMMENDS** that the district judge **GRANT** Patriot Media Consulting, LLC's Motion to Dismiss for Failure to State a Claim (Dkt. No. 29), and dismiss all of the claims against it **WITH PREJUDICE.**

## V. WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the

District Court. *See* 28 U.S.C. § 636(b)(1)(c); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED this 28th of February, 2018.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE