

# Transcript of Lamar Horton

**Date:** February 21, 2018
**Case:** UMG -v- Grande

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

73

1  red.
2       Do you see that?
3  **A. Numbers in red.**
4  Q. Yes, sir.  Number one --
5  **A. Oh, yes.**
6  Q. -- letter or email.
7  **A. Yes.  Yes.**
8  Q. So the outline proceeds, underneath "Need to
9  build communication procedure" (as read):  Number 1,
10 letter or email.
11      Do you see that?
12 **A. Yes.**
13 Q. And it states (as read):  Current process can
14 be followed, just need to ensure letter has been mailed.
15      Do you see that?
16 **A. Yep.**
17 Q. Do you recall discussions about whether or not
18 letters were actually not being mailed, even though the
19 system was calling for them to be mailed?
20 **A. That's the wrong context.  The context is, as**
21 **it gets to the point of working through a repeat**
22 **violation, ensuring that a letter was received by the**
23 **customer so that we are not making any assumptions and**
24 **any mistakes because it's leading to a customer**
25 **communication.**

74

1  Q. Okay.  So you remember what this means?
2  **A. I -- I -- I know the context of what this is,**
3  **yes.**
4  Q. Okay.  How do you know the context of what this
5  is?
6  **A. Through general discussions.**
7  Q. With whom?
8  **A. Various Grande employees.**
9  Q. Okay.  And your understanding of what that
10 means is need to ensure the letter's been mailed.  If
11 the company's going to take action on the letter that
12 was sent to a customer, you want to make sure the letter
13 went out to the customer?
14 **A. Correct.**
15 Q. Is that because there were times where the
16 company went to take action against a customer based on
17 a letter that you thought went out and then the customer
18 said, "Hey, I never received that"?
19 **A. Not to my knowledge, but I -- I believe the**
20 **intention was to avoid that particular scenario.**
21 Q. Number two, underneath "Communication
22 Procedure" (as read):  Contact customer by phone.
23      Do you see that?
24 **A. Yes.**
25 Q. And -- strike that.

75

1       Underneath "Contact customer by phone," it
2  states (as read):  Determination of contact built on
3  Excess Violations2 SSRS report.
4       Do you see that?
5  **A. I do.**
6  Q. An SSRS report is a -- is a document generated
7  by Grande's information system; correct?
8  **A. Yes.**
9  Q. And this is referring to a report reflecting
10 Grande customers that Grande has evidence have excessive
11 violations of copyright infringement.
12      MR. HOWENSTINE: Objection.  Vague.
13 Confusing.
14 **A. I can only assume that's accurate, yes.**
15 Q. (BY MR. O'BEIRNE)  Okay.
16 **A. But I don't know.**
17 Q. Well, you just testified you were familiar with
18 the context of this conversation regarding making
19 sure --
20 **A. I am.  The particular report.**
21 Q. I'm sorry.  Let me finish the question.
22      You testified you were familiar with the
23 context of what it meant to ensure the letter has been
24 mailed; right?
25 **A. Yes.**

76

1  Q. Your understanding is that the excess
2  violations to SSRS report is a report generated by
3  Grande, containing information about customers that
4  Grande has determined have received an excessive amount
5  of copyright infringement notices.
6       MR. HOWENSTINE: Objection.  Vague.
7  **A. Yes; however, I cannot explain the details of**
8  **that report.**
9       (Exhibit 57 marked.)
10 Q. (BY MR. O'BEIRNE)  I'm handing you PX 57.
11      Do you see this is a binder-clipped
12 printout of an Excel spreadsheet?
13      Is that fair?
14 **A. Yes.**
15 Q. I'm certainly not asking you to read this
16 entire document, but I want to ask you some questions
17 about it and first put a couple things in the record.
18      You'll turn to the last page and see, if
19 you would, please, that the last page is a piece of
20 paper with a Bates number on the bottom, GRANDE0000155.
21      Do you see that?
22 **A. Yes.**
23 Q. And then the text in the middle says (as read):
24 This document was provided in native format upon
25 request.

Transcript of Lamar Horton
Conducted on February 21, 2018

265

1 via certified mail.
2      Do you see that?
3    A. Yes.
4    Q. It then says (as read):  If Grande receives
5 subsequent notices of potential infringement regarding
6 the same account, that subscriber's Internet service
7 with Grande is permanently terminated.
8      Do you see that?
9    A. I do.
10    Q. Turning back to Exhibit 84 and the tally we
11 were just looking at, we'd flipped to where the tally
12 count switches from four to three.
13      Do you remember that?
14    A. Yes.
15    Q. I'll represent to you that's at line 1593 in
16 the Excel file.
17    A. Okay.
18    Q. Do you think 1500 customers receiving more than
19 three notices of infringement in 2015 is a relatively
20 small amount of customers?
21    A. Compared to what?
22    Q. So your email to your boss said (as read):  My
23 gut is that a relatively small group of users drive it.
24      So I'm asking you:  Do you think 1593 users
25 would qualify as a relatively small group?

266

1    A. From a ballpark perspective, yes, I do.
2    Q. How many of those users were kicked off for
3 copyright infringement by Grande in 2015?
4    A. To the best of my knowledge, none.
5    Q. 2016?
6    A. Also none.
7      (Exhibit 85 marked.)
8    Q. (BY MR. O'BEIRNE)  I'm handing you PX 85.  This
9 is a document produced by Grande in this case; right?
10    A. Yes.
11    Q. This is an email Stephanie Christianson sent to
12 you August 15, 2016; right?
13    A. Yes.
14    Q. She cc'd Mr. Jordan?
15    A. Yes.
16    Q. It's titled "DMCA Notification Letters/Emails."
17      Right?
18    A. Yes.
19    Q. Her email states (as read):  Good afternoon,
20 Lamar.  I wanted to touch base with you on a call I
21 received Friday afternoon from Ruth Ann Welsh, RCN's
22 project manager.
23      Do you see that?
24    A. Yes.
25    Q. Who is Ruth Ann Welsh?

267

1    A. Ruth Ann Welsh is an RCN project manager.
2    Q. I had a feeling you were going to say that.
3 Other than being an RCN -- strike that.
4      What is your familiarity with the role that
5 Ruth Ann Welsh fulfills at RCN?
6    A. Ruth Ann manages a myriad of projects in RCN's
7 company, many of which have included Grande because we
8 have certain operations that are synchronized or same
9 technologies or whatever the case may be.
10    Q. Keep in mind this email's August 15, 2016.
11 Right?
12    A. Yes.  Yes.
13    Q. Are you testifying that Grande and RCN had
14 operations that were synchronized prior to August 15th,
15 2016?
16    A. Sure.
17    Q. So were there times where RCN project managers
18 were directing Grande employees on Grande projects?
19    A. "Directing" may not be the right word.
20 "Involved with" is how I'd probably quantify it.
21    Q. Were there times when RCN project managers were
22 managing Grande employees on Grande projects?
23    A. Again, I would say working with, but that
24 direction would only come from Patriot, meaning, if
25 there was a project to be executed and Patriot wanted

268

1 Grande to, for example, do the same thing that RCN's
2 doing and let one of RCN's employees help manage it for
3 us, that would be at the direction of Patriot.
4    Q. Stephanie continues (as read):  According to
5 her, Ruth Ann Welsh, Rob R. and Bill S. requested she
6 contact me to get some statistical information re our
7 DMCA email notification process.
8      That's what she says; right?
9    A. Yes.
10    Q. Who's Rob R.?
11    A. Rob Roeder.
12    Q. Who's Bill S.?
13    A. That would be Bill Sievers.
14    Q. What does Bill Sievers do?
15    A. Bill Sievers manages the call centers at both
16 RCN and Grande.
17    Q. Is Bill Sievers a Grande employee or an RCN
18 employee?
19    A. Bill Sievers is not a Grande employee.  I do --
20 I believe he's an RCN employee.
21    Q. For how long has Bill Sievers managed Grande's
22 call center?
23    A. Directly, since we merged the company under
24 TPG.
25    Q. Prior to -- I'm sorry.  Strike that.

Transcript of Lamar Horton
Conducted on February 21, 2018

297

1      Q.  So let's say that were February 15th, 2017.
2  I'm not saying that's when it was, but let's just assume
3  that that's the date.
4          How did your responsibilities change from
5  the day before you became the DMCA agent to the day
6  after you became the DMCA agent?
7      **A.  From my perspective, other than being listed as**
8  **a contact to the outside world, my responsibilities did**
9  **not change.**
10     Q.  No additional oversight over the DMCA process?
11     **A.  No.**
12     Q.  No additional responsibilities to quality check
13 the DMCA process?
14     **A.  No.**
15     Q.  No responsibilities to be trained on the latest
16 developments of the DMCA process?
17     **A.  No.**
18     Q.  No responsibilities to brief senior management,
19 anybody senior to you, on the status of the DMCA
20 process?
21     **A.  Not after the date of being named the agent,**
22 **no.**
23     Q.  So, to the extent that you were already
24 briefing your superiors on network issues in general,
25 you continue doing so?

298

1      **A.  That is correct.**
2      Q.  It didn't change in any way with your
3  additional title as DMCA agent?
4      **A.  That is correct.**
5      Q.  How often does the Grande -- well, strike that.
6          So you report to Mr. Rohre?
7      **A.  Yes.**
8      Q.  Who else reports directly to Mr. Rohre?
9      **A.  Five or six other vice presidents.**
10     Q.  And what do you call, colloquially, the group
11 of vice presidents that report to Mr. Rohre?  Other than
12 vice president, is there a term, like, "senior staff" or
13 "senior leadership team," or is there some way that you
14 would refer to that group of direct reports to
15 Mr. Rohre?
16     **A.  Not specifically.  Maybe it loosely references**
17 **the executive team, but there's no alias or a group**
18 **name.**
19     Q.  And Mr. Kramp is not one of those six
20 people; right?
21     **A.  That reports to Matt?**
22     Q.  Yes.
23     **A.  No.**
24     Q.  Correct, he's not?
25     **A.  Correct.**

299

1      Q.  How often does Mr. Rohre and the six VPs sit
2  down and talk about leadership issues at Grande?
3      **A.  We meet weekly or biweekly to have general**
4  **staff meetings.**
5      Q.  When you say "staff meetings," that would
6  normally entail Mr. Rohre and the VPs?
7      **A.  Yes.**
8      Q.  And at those staff meetings -- strike that.
9          Those staff meetings occur weekly,
10 sometimes more than weekly?
11     **A.  They're usually weekly, sometimes biweekly,**
12 **every other week.**
13     Q.  How often is the DMCA process discussed at
14 those meetings?
15     **A.  That process is not discussed at those**
16 **meetings.**
17     Q.  You have never attended a staff meeting with
18 Mr. Rohre where the topic of the DMCA process has come
19 up?
20     **A.  Not that I recall.**
21     Q.  How long have you been attending those
22 meetings?
23     **A.  Since I've reported to him, which would be**
24 **2015-ish.**
25     Q.  So, since 2015, at the weekly staff meetings,

300

1  the subject of the DMCA process at Grande has never been
2  discussed, to your recollection?
3      **A.  Not that I recall.  And -- and, if it was, it**
4  **was not a -- there was no details or making decisions or**
5  **policy-type discussions.  Our perspective is that what**
6  **we're doing or not doing was started with ABB and**
7  **transitioned to Patriot.**
8          (Exhibit 92 marked.)
9      Q.  (BY MR. O'BEIRNE)  I'm handing you Plaintiffs'
10 Exhibit 92.  If you turn to the last document -- strike
11 that.
12         If you turn to the last page of Plaintiffs'
13 Exhibit 92, you'll see that it has a Bates number slip
14 sheet reflecting that it's a native Excel that was
15 produced in connection with this case.
16         Do you see that?
17     **A.  Yes.**
18     Q.  Do you see that this one does have row numbers?
19     **A.  Yes.**
20     Q.  If you turn back to the first page, the title
21 of this Excel spreadsheet is "Specific Account DMCA
22 Violations."
23         Do you see that?
24     **A.  I do.**
25     Q.  Have you seen a report like this in the past?

Transcript of Lamar Horton

76 (301 to 304)

Conducted on February 21, 2018

301

1    A. I do not recall seeing a report like this.
2    Q. Are you aware of Grande's ability to run such a
3  report?
4    A. Well, it's a logical assumption that if Grande
5  provided this that we generated the report.
6    Q. I understand that.  I'm not asking you to
7  assume anything.  I'm -- I'm asking you something a
8  little different.
9       I'm saying:  What is your understanding of
10 Grande's ability to generate a report like this?
11   A. I think we've seen other examples today of
12 being able to query the database and provide reports of
13 this information.
14   Q. So is your testimony that whatever knowledge
15 you have about reports like this has been gleaned
16 sitting here with me, looking at exhibits I've been
17 showing you?
18   A. I would not quantify it that way.
19   Q. All right.  So what -- what understanding do
20 you have, sitting here today, about Grande's ability to
21 generate this report?
22   A. As I stated, we have the ability to generate
23 these reports.  We've seen examples of them today.
24   Q. Who generates them?
25   A. I don't know why these reports are generated.

302

1    Q. Do you see that, Plaintiffs' Exhibit 92, there
2  is an Entity column on the right-hand side?
3    A. I do.
4    Q. And Exhibit 92 lists, as specific account DMCA
5  violations, numerous ticket numbers with the source
6  entity as Rightscorp Inc.
7    A. I do.
8    Q. Please bear with me for a second.
9       MR. O'BEIRNE:  That's all the questions I
10 have for Mr. Horton at this time.  I pass the witness.
11      MR. HOWENSTINE:  I have no questions of the
12 witness.
13      THE VIDEOGRAPHER:  The time is 6:47 p.m.,
14 on February 21st, 2018.  This completes the video
15 deposition of Lamar Horton.
16      THE REPORTER:  Would you like to order a
17 copy of the transcript?
18      MR. HOWENSTINE:  Yes, I would.
19   (Deposition concluded at 6:47 p.m.)
20
21
22
23
24
25

303

1         CERTIFICATE OF SHORTHAND REPORTER
2    I, CANDICE ANDINO, the officer before whom the
3  foregoing deposition was taken, do hereby certify that
4  the foregoing transcript is a true and correct record of
5  the testimony given; that said testimony was taken by me
6  stenographically and thereafter reduced to typewriting
7  under my direction; that reading and signing was not
8  requested; and that I am neither counsel for, related
9  to, nor employed by any of the parties to this case and
10 have no interest, financial or otherwise, in its
11 outcome.
12    IN WITNESS WHEREOF, I have hereunto set my hand
13 this 5th day of March, 2018.
14
15    _____
      CANDICE ANDINO
16    TX CSR No. 9332, RMR
17
18
19
20
21
22
23
24
25