**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

UMG RECORDINGS, INC., et al.,

      Plaintiffs,

vs.

GRANDE COMMUNICATIONS
NETWORKS LLC and
PATRIOT MEDIA CONSULTING, LLC,

      Defendants

_____

§
§
§
§
§
§
§
§
§
§
§
§

Civil Action No. 1:17-cv-00365-LY

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO
GRANDE COMMUNICATIONS NETWORKS LLC'S
<u>DMCA SAFE HARBOR DEFENSE</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION ............................................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS...................................................3

LEGAL STANDARD.......................................................................................................8

    A.   Summary Judgment .............................................................................8

    B.   DMCA Safe Harbor ...........................................................................8

ARGUMENT ...................................................................................................................9

   GRANDE IS INELIGIBLE FOR THE DMCA SAFE HARBOR .........................................9

    A.   Grande Did Not Reasonably Implement a Repeat Infringer Policy. ...........................10

    B.   Grande Cannot Deny That Appropriate Circumstances Existed to Terminate Repeat
Infringers..........................................................................................15

CONCLUSION ................................................................................................................18

# TABLE OF AUTHORITIES

**Cases**

*ALS Scan, Inc. v. RemarQ Communities, Inc.*,
239 F.3d 619 (4th Cir. 2001) ............................................................................. 8, 9

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................................. 8

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
149 F. Supp. 3d 634 (E.D. Va. 2015)
*aff'd in part, rev'd in part on other grounds*, 881 F.3d 293 (4th Cir. 2018) ......... 10, 13, 14, 15

*Capitol Records, Inc. v. MP3tunes, LLC*,
821 F. Supp. 2d 627 (S.D.N.Y. 2011),
*aff'd sub nom., EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
844 F.3d 79 (2d Cir. 2016),
*cert. denied*, No. 16-1227, 2017 WL 1365643 (U.S. June 19, 2017) .................... 10

*Capitol Records, LLC v. Escape Media Grp., Inc.*,
No. 12–CV–6646, 2015 WL 1402049 (S.D.N.Y. Mar. 25, 2015) ...................... 9, 13

*Capitol Records, LLC v. Vimeo, LLC*,
826 F.3d 78 (2d Cir. 2016) .................................................................................. 9

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................................................ 8

*Disney Enterprises, Inc. v. Hotfile Corp.*,
No. 11-20427-CIV, 2013 WL 6336286 (S.D. Fla. Sept. 20, 2013) ....................... 9

*In re Aimster Copyright Litig.*,
252 F. Supp. 2d 634 (N.D. Ill. 2002),
*aff'd*, 334 F.3d 643 (7th Cir. 2003) ................................................................. 13, 14

*Mavrix Photographs, LLC v. LiveJournal, Inc.*,
853 F.3d 1020 (9th Cir. 2017) ........................................................................... 8, 9

*Perfect 10 v. CCBill*,
488 F.3d 1102 (9th Cir. 2007) ............................................................................ 10

*Turner v. Baylor Richardson Med. Ctr.*,
476 F.3d 337 (5th Cir. 2007) .............................................................................. 8

**Statutes**

17 U.S.C. § 512 ............................................................................................. passim

**Rules**

Fed. R. Civ. Proc. 56(a)...........................................................................................................8

**Legislative History**

H.R. Rep. 105-551(II) (1998)....................................................................................................9

S. Rep. 105-190 (1998) ............................................................................................................9

## INTRODUCTION

Grande's chief defense to Plaintiffs' case—the Digital Millennium Copyright Act ("DMCA") limited "safe harbor" from secondary copyright infringement liability—fails as a matter of law. The undisputed record evidence is devastating to Grande, and confirms that Grande cannot meet its burden of establishing its entitlement to the safe harbor. Plaintiffs are entitled to partial summary judgment as to this defense.

- While the DMCA safe harbor requires an internet service provider ("ISP"), like Grande, to adopt *and* reasonably implement a policy for terminating the accounts of repeat copyright infringers, Grande's Rule 30(b)(6) corporate representative and other senior executives expressly admitted that Grande had ***no such policy from October 2010 through 2016, the seven years at the heart of this case***.

- Indeed, the documents and testimony demonstrate that rather than a policy for terminating repeat infringers, Grande consciously chose the opposite: a policy allowing ***unlimited infringement by its subscribers***.

- Grande's documents and witnesses confirm that the company has known for years of its subscribers' infringing conduct, and ***has received well over a million notices of copyright infringement during that time frame***.

- Yet, as Grande's discovery responses, documents and witnesses all confirm, Grande ***never terminated a single repeat infringing subscriber from October 2010 until June 2017—<u>after this lawsuit was filed</u>***—and even since then, Grande has terminated a paltry twelve subscribers despite tracking thousands of repeat infringers.

For years, Grande claimed in its online "Acceptable Use Policy" that it had a policy of terminating repeat infringers. Grande continued to assert that claim in its pleadings and written

discovery responses in this suit.  None of that was true.  The undisputed record evidence establishes that Grande's Acceptable Use Policy was a sham.  Despite its supposed online "policy," Grande did not have—let alone reasonably implement—an actual policy of terminating repeat infringing customers from October 2010 through 2016.[1]

From October 2010 until June 2017, Grande did not terminate a single subscriber for repeat infringement, even though it received more than one million copyright infringement notices.  In fact, the undisputed evidence shows that from October 2010 through October 2016, Grande actually had a policy of ***never terminating users*** for copyright infringement in any circumstances, regardless of the evidence of infringement that Grande received.  As Grande senior executive and registered DMCA agent, Lamar Horton, testified: ***"Q. After the change in policy that you recall was sometime in 2010 or 2011, Grande was not terminating subscribers for copyright infringement until the current DMCA policy in 2017?  A. To the best of my knowledge, that's true."***[2]  Numerous Grande witnesses—including its Rule 30(b)(6) corporate representative designated on its DMCA safe harbor defense, its registered DMCA agent, and its General Manager—all testified that Grande did not have a policy of terminating repeat infringers during the time period at the heart of this case.  And in internal emails, Grande's own employees acknowledged that the company had no process to terminate repeat infringers, and no limits on

---

[1] Ex. A, App'x p. 1; Ex. B, S. Christianson 30(b)(6) Dep. (Vol. II) at 322:22-323:14.  Because Grande has marked certain of its documents and deposition testimony as Confidential or Highly Confidential, Plaintiffs are filing that evidence under seal. Plaintiffs have prepared an Appendix as Exhibit A (also being filed under seal) that cites the relevant portions of the documents and testimony supporting this motion. To be clear, Plaintiffs do not agree with Grande's confidentiality assertions.

[2] Ex. C, Horton Dep. at 142:8-12; *see also id.* at 147:24-148:9 (agreeing that this policy change occurred in October 2010); Ex. A, App'x p. 1; Ex. D, PX 90. Emphasis is added throughout unless otherwise indicated.

how many instances of infringement a customer could engage in—and thus, Grande was not complying with the law.

Grande has also admitted that its current so-called "DMCA Policy & Procedure" ("DMCA Policy") did not go into effect until February 2017, after the $25 million (plus $8 million in attorneys' fees) copyright infringement verdict against another ISP, Cox Communications.[3] Grande did not terminate any customers for copyright infringement under its new supposed DMCA Policy until June 2017—after Plaintiffs filed this lawsuit—and since then, Grande has only terminated a paltry twelve customers for copyright infringement, while still providing thousands of other known repeat infringers continued use of Grande's internet service.[4]

Grande's wholesale failure to adopt and reasonably implement a repeat infringer policy disqualifies it from the DMCA's safe harbor.  The Court should grant Plaintiffs partial summary judgment that Grande is not entitled to the DMCA safe harbor defense as a matter of law.[5]  Doing so will significantly streamline the issues in this case and promote a speedy resolution of the dispute.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      Grande is a Texas-based ISP that provides internet services to customers in Austin, Dallas, San Antonio, and other locations throughout the state.[6]

---

[3] *BMG Rights Management (US), LLC v. Cox Commc'ns, Inc.*, No. 1: 2014-cv-01611 (E.D. Va.).
[4] Ex. A, App'x p. 1-2; Ex. E, Grande Resps. to Pls' Second Reqs. For Admissions, p. 3; Ex. F, PX 57 (excerpt); Ex. G, S. Christianson 30(b)(6) Dep. (Vol. I) at 31:11-14, Ex. B, S. Christianson 30(b)(6) Dep. (Vol. II) at 305:16-306:10; Ex. H, PX 60 at 1-3; Ex. I, Rohre Dep. at 90:13-91:8.
[5] The parties agreed to extend the deadline for filing dispositive motions—originally July 20, 2018—to September 11, 2018.  But recognizing the Court's need for adequate time to review dispositive motions, responses, and replies and rule before trial, Plaintiffs are filing this motion well in advance of the agreed-upon deadline.
[6] Ex. A, App'x p. 2; Compl. [Dkt. 1] ¶ 3; Answer [Dkt. 80] ¶ 3.

2.      Grande asserts the DMCA safe harbor as an affirmative defense in this case: "The safe harbor under 17 U.S.C. § 512(a) & (i) bars Plaintiffs' claims against Grande.  As a service provider, Grande has adopted and reasonably implemented, and has informed subscribers and account holders of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders alleged to be repeat copyright infringers."[7]

3.      The two policies that Grande claims entitle it to the DMCA safe harbor under § 512(a) are Grande's Acceptable Use Policy and Grande's DMCA Policy.[8]

4.      Stephanie Christianson has been a Technical Project Manager for Grande since early 2016, and was designated by Grande under FRCP 30(b)(6) as its corporate representative to testify on the implementation of its DMCA policy and procedure.[9]

5.      Matt Rohre became the General Manager at Grande in 2004, has been Grande's General Manager and Senior Vice President of Operations since January 2015, and is the most senior person in Grande's corporate structure.[10]

6.      Lamar Horton has been Grande's Vice President of Network Engineering and Operations since 2009 and has been Grande's registered DMCA agent since May 13, 2016.[11]

7.      Colin Bloch has been a Grande employee for 18 years, and has been Grande's Manager of Internet Systems since 2003.[12]

---

[7] Answer [Dkt. 80] p. 9.
[8] Ex. A, App'x p. 2; Ex. J, Grande's Third Am. Resp. to Pl. First Interrogs., pp. 6-8.
[9] Ex. A, App'x p. 2-3; Ex. G, S. Christianson 30(b)(6) Dep. (Vol. I) at 13:6-11, 17:2-20.
[10] Ex. A, App'x p. 3; Ex. I, Rohre Dep. at 17:13-18:7, 19:21-20:7, 119:22-24.
[11] Ex. A, App'x p. 3; Ex. C, Horton Dep. at 15:13-18, 45:19-24.
[12] Ex. A, App'x p. 3-4; Ex. K, Bloch Dep. at 10:25-11:5.

8.      Since at least the early 2000s, Grande has been aware of its subscribers using Grande's service to engage in online copyright infringement of music and movies, as a result of its receipt of copyright infringement notices from companies that detect and send such notices.[13]

9.      Grande received at least 1.2 million notices of alleged copyright infringement between 2011 and 2016.[14]  Based on these notices of infringement, Grande sent more than 200,000 letters to its customers regarding the alleged copyright infringement reflected in these notices.[15]

10.     For years, Grande received hundreds of thousands of notices of copyright infringement from Rightscorp, a company that detects online copyright infringement, but failed to forward those notices to its customers.  Grande decided to forward Rightscorp notices sometime in 2016.[16]

11.     Before October 2010, Grande had a policy in place to suspend (and then potentially terminate) all users for whom Grande received an infringement notice.[17]

12.     In October 2010, Grande changed that policy to a new policy of not terminating any of its customers for copyright infringement.[18]

13.     From October 2010 until October 2013, Grande had no policy providing for the termination of subscribers and accountholders who were repeat copyright infringers.  In fact, during this time period, Grande's policy was not to terminate subscribers for copyright infringement.[19]

---

[13] Ex. A, App'x p. 4; Ex. K, Bloch Dep. at 10:25-11:1, 38:14-39:4, 44:16-23, 110:21-111:1.
[14] Ex. A, App'x p. 4; Ex. G, S. Christianson 30(b)(6) Dep. (Vol. I) at 67:7-11.
[15] Ex. A, App'x p. 4; Ex. B, S. Christianson 30(b)(6) Dep. (Vol. II) at 304:15-18.
[16] Ex. A, App'x p. 4-5; Ex. G, S. Christianson 30(b)(6) Dep. (Vol. I) at 183:19-22.
[17] Ex. A, App'x p. 5; Ex. C, Horton Dep. at 141:20-142:12.
[18] *Id.*
[19] *Id.*

14.     In October 2013, Grande adopted the current version of its Acceptable Use Policy.[20]

The Acceptable Use Policy purports to prohibit copyright infringement and states in relevant part:

> Grande Communications may terminate the Service provided to any customer or user who is either found to infringe third party copyright or other intellectual property rights, including repeat infringers, or who Grande Communications believes in its sole discretion is infringing these rights. Grande Communications may terminate the Service at any time with or without notice for any affected customer or user.[21]

15.     Notwithstanding the text of the Acceptable Use Policy, from October 2013 through October 2016, Grande had no actual policy providing for the termination of subscribers and accountholders who were repeat copyright infringers.[22]  In fact, during this time period, Grande's actual policy remained not to terminate subscribers for copyright infringement.[23]

16.     From October 2010 through October 2016, there was no limit to the number of notices of copyright infringement that Grande could receive with respect to any of its subscribers before Grande would terminate that subscriber, because Grande's policy was not to terminate anyone for copyright infringement.[24]  During this time period, pursuant to its actual policy, Grande did not terminate any subscribers for copyright infringement or alleged copyright infringement, regardless of the source, content, or volume of any notices of infringement it received.[25]

---

[20] Ex. A, App'x p. 5; Ex. G, S. Christianson 30(b)(6) Dep. (Vol. I) at 41:15-22.
[21] Ex. L, PX 103, p. 4.
[22] Ex. A, App'x p. 6; Ex. B, S. Christianson 30(b)(6) Dep. (Vol. II) at 322:21-323:14.
[23] Ex. A, App'x p. 6; Ex. C, Horton Dep. at 141:20-142:7, 142:8-12.
[24] Ex. A, App'x p. 6; Ex. C, Horton Dep. at 288:4-24, 293:16-19.
[25] Ex. A, App'x p. 6-7; Ex. B, S. Christianson 30(b)(6) Dep. (Vol. II) at 32:10-33:4; Ex. E, Grande's Resps. to Pls.' Second Set of Reqs. For Admissions, p. 3; Ex. D, PX 90.

17.     Grande was aware that if it merely sent emails to its customers who were the subject of DMCA infringement notices, without terminating repeat infringing customers, that could render it ineligible for the DMCA safe harbor.[26]

18.     Grande first published its DMCA Policy on its website in November 2016.[27]

19.     Grande did not terminate any users under this new policy until June 2017.  Since June 2017, Grande has terminated twelve users for copyright infringement (eleven in 2017 and one in 2018).[28]

20.     Grande admits that there was no possibility that Grande might terminate a customer for copyright infringement or alleged copyright infringement from October 2010 until June 2017.[29]

21.     Grande tracks a list of subscribers for whom Grande had received more than one notice of infringement on its DMCA "Excessive Violations" Report.[30]

22.     The same system that Grande used to terminate twelve accounts since June 2017 could have been used for terminations from 2011 through May 2017 based on notices Grande received during those years.[31]

23.     Before 2017, Grande could have implemented a DMCA policy like its current policy, given that Grande's information about infringement activity is the same now as it was then; and no technical barriers prevented Grande from implementing its DMCA policy sooner.[32]

---

[26] Ex. A, App'x p. 7; Ex. M, PX 91; Ex. K, Bloch Dep. at 79:22-80:1.

[27] Ex. A, App'x p. 7-8; Ex. G, S. Christianson 30(b)(6) Dep. (Vol. I) at 30:1-6, 36:12-22.

[28] Ex. A, App'x p. 8; Ex. G, S. Christianson 30(b)(6) Dep. (Vol. I) at 31:11-14, Ex. B, S. Christianson 30(b)(6) Dep. (Vol. II) at 305:16-306:10; Ex. H, PX 60 at 1-3; Ex. I, Rohre Dep. at 90:13-91:8.

[29] Ex. A, App'x p. 8; Ex. B, S. Christianson 30(b)(6) Dep. (Vol. II) at 284:10-285:2.

[30] Ex. A, App'x p. 8-9; Ex. C, Horton Dep. at 84:18-24.

[31] Ex. A, App'x p. 9; Ex. H, PX 60 at 1-3; Ex. I, Rohre Dep. at 149:9-21.

[32] Ex. A, App'x p. 9; Ex. I, Rohre Dep. at 147:10-148:10; Ex. B, S. Christianson 30(b)(6) Dep. (Vol. II) at 300:5-301:5.

## LEGAL STANDARD

### A.    Summary Judgment

A party may move for summary judgment as to a "part of each claim or defense."  Fed. R. Civ. Proc. 56(a).  Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.; Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).  A factual dispute is genuine only if there is sufficient evidence for a reasonable jury to find for the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-249, 252 (1986) (a "mere existence of a scintilla of evidence…[is] insufficient" to oppose summary judgment).  "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'"  *Turner*, 476 F.3d at 343 (citing *Anderson*).

### B.    DMCA Safe Harbor

The DMCA offers limited safe harbors to ISPs as a compromise to protect copyright holders from massive online infringement while also protecting innocent ISPs whose services are used by others to infringe copyrights.  *See, e.g., Mavrix Photographs, LLC v. LiveJournal, Inc.*, 853 F.3d 1020, 1027-27 (9th Cir. 2017) (discussing background of DMCA).  "The DMCA's protection of an innocent service provider disappears at the moment the service provider loses its innocence, i.e., at the moment it becomes aware that a third party is using its system to infringe." *ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 625 (4th Cir. 2001).

Among other requirements, the DMCA's safe harbor only protects an ISP from claims of copyright infringement if the ISP has:

> …adopted and reasonably implemented, and informed subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers.

17 U.S.C. § 512 (i)(1)(A).  The purpose of Section 512(i) is to ensure that "those who repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others should know that there is a realistic threat of losing that access."  H.R. Rep. 105-551(II), at 61 (1998); S. Rep. 105-190, at 62 (1998).

"[T]he DMCA's safe harbor, as with all immunities from liability[,] should be narrowly construed."  *Capitol Records, LLC v. Escape Media Grp., Inc.*, No. 12–CV–6646, 2015 WL 1402049 at *10 (S.D.N.Y. Mar. 25, 2015) (quotation marks omitted; alterations in original).  This narrow construction, and the DMCA safe harbor's strict eligibility rules, are intended to ensure that immunity "is not presumptive, but granted only to 'innocent' service providers…."  *ALS Scan*, 239 F.3d at 625.

Grande, like any "party asserting [the] DMCA's safe harbor as an affirmative defense to a claim of copyright infringement[,] has the burden of demonstrating entitlement to its protections."  *Disney Enters., Inc. v. Hotfile Corp.*, No. 11–20427–CIV, 2013 WL 6336286 at *19 (S.D. Fla. Sept. 20, 2013).  *See also Capitol Records, LLC v. Vimeo, LLC*, 826 F.3d 78, 94 (2d Cir. 2016) ("The defendant undoubtedly bears the burden of raising entitlement to the safe harbor and of demonstrating that it has…taken the steps necessary for eligibility.").  Grande "must establish 'beyond controversy every essential element,'" of the DMCA safe harbor, "and failure to do so will render [the ISP] ineligible for the…safe harbor's protection."  *Mavrix Photographs*, 853 F.3d at 1027-27 (citations omitted).

## ARGUMENT

### GRANDE IS INELIGIBLE FOR THE DMCA SAFE HARBOR

Grande cannot come close to meeting its burden of establishing eligibility for the safe harbor.  The facts conclusively establish that Grande did not "adopt[] and reasonably implement[]

… a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." 17 U.S.C. § 502(i).  Grande's own witnesses have admitted that Grande made a conscious decision in 2010 ***to stop terminating <u>any</u> users for copyright infringement***, irrespective of the source, content or volume of infringement notices Grande received.  Indeed, Grande did not terminate a single user for copyright infringement from October 2010 until June 2017, and since that time has terminated a scant twelve customers despite having knowledge of thousands of repeat infringers.

### A.  Grande Did Not Reasonably Implement a Repeat Infringer Policy.

"The requirement that service providers implement a repeat infringer policy is a 'fundamental safeguard for copyright owners' and 'essential to maintain[ing] the strong incentives for service providers to prevent their services from becoming safe havens or conduits for known repeat copyright infringers.'"  *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 653 (E.D. Va. 2015).[33]

"To implement the repeat infringer policy contemplated by § 512(i), the penalty imposed by service providers must be termination."  *Id.  See also Disney Enters., Inc. v. Hotfile Corp.*, No. 11-20427-CIV, 2013 WL 6336286, at \*23 (S.D. Fla. Sept. 20, 2013) ("[B]y its plain language, Section 512(i) requires user termination, thereby targeting future infringement from an individual who is deemed likely to recidivate.").  *Perfect 10 v. CCBill*, 488 F.3d 1102, 1109-1110 (9th Cir. 2007) (ISP must "terminate…users who repeatedly or blatantly infringe copyright").  Indeed, Grande concedes that it is required by law to terminate repeat infringers.  *See* Grande's DMCA

---

[33] *aff'd in part, rev'd in part on other grounds,* 881 F.3d 293 (4th Cir. 2018) (quoting *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 637 (S.D.N.Y. 2011) (alteration in original), *aff'd sub nom., EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79 (2d Cir. 2016), *cert. denied*, No. 16-1227, 2017 WL 1365643 (U.S. June 19, 2017)).

Policy, FAQ (Grande "is obligated under federal law to adopt, reasonably implement and inform Internet access subscribers of, a policy that provides for the termination in appropriate circumstances of Internet access subscribers who repeatedly violate the copyright laws.").[34]

Grande cannot meet this fundamental requirement of the safe harbor.  It has known for years, based upon its receipt of DMCA notices from companies that detect and send notices of copyright infringement, that thousands of its subscribers have been engaging in repeated online copyright infringement.[35]  Nevertheless, there is no dispute that Grande did not terminate *any* users from October 2010 through May 2017.  "Q. So it's fair to say that Grande did not terminate any subscribers for copyright infringement or alleged copyright infringement between at least October 2010 and May 2017, correct? A. Correct."[36]  Although Grande (1) received at least 1.2 million notices of copyright infringement from 2010 to 2016, (2) was tracking over 9,000 customers on its DMCA Excessive Violations Report by late 2016, and (3) specifically tracked infringing users by the number of notices received,[37] Grande terminated no users for copyright infringement during this time.

Contemporaneous internal emails confirm that Grande personnel knew of the many repeat infringing subscribers on Grande's network.[38]  One Grande customer received 13,958 notices from Rightscorp in 2015.[39]  Another received 12,953.[40]  Yet Grande's General Manager Matt Rohre conceded that Grande has no evidence that it terminated any subscriber for copyright infringement

---

[34] Ex. N, PX 53 at 5.
[35] *See supra* Statement of Undisputed Material Facts, ¶ 8 & p. 5 n.13.
[36] Ex. G, S. Christianson 30(b)(6) Dep. (Vol. I) at 31:15-20.
[37] Ex. A, App'x p. 10; Ex. C, Horton Dep. at 84:18-24; Ex. I, Rohre Dep. at 87:1-20.
[38] Ex. A, App'x p. 10-11; *see* Ex. O, PX 84.
[39] Ex. A, App'x p. 11; Ex. I, Rohre Depo. at 137:8-11.
[40] Ex. A, App'x p. 11; Ex. I, Rohre Depo. at 141:8-16.

between 2011 and June 28, 2017.[41]  And Grande has confirmed its witnesses' testimony, admitting that it did not terminate any customer based on copyright infringement notices from 2011 until after Plaintiffs filed this lawsuit.[42]

Prior to October 2010, Grande suspended users based on copyright infringement notices, and some suspensions led to terminations.  However, that policy changed in October 2010.  After that date, Grande stopped terminating repeat infringers:

> Q. Grande was not terminating subscribers for copyright infringement in 2011?
> A. This is where I need to clarify that somewhere -- and I don't have an exact date nor point of reference to point to -- in 2010 or 2011, which I believe was 2010, when we were previously managed by ABB, *we had a policy in place of turning off all subscribers upon copyright violation notice*, requiring the customer to then contact Grande to discuss the issue, understand what happened, inform the customer of why they'd been shut off, and take appropriate action from there. *In 2010 or 2011, in that time period, ABB implemented a change to that policy*.[43]

Grande's new policy, adopted in October 2010,[44] was not to terminate any user for copyright infringement: "Q. After the change in policy that you recall was sometime in 2010 or 2011, Grande was not terminating subscribers for copyright infringement until the current DMCA policy in 2017? A. To the best of my knowledge, that's true."[45] Grande's 30(b)(6) corporate representative on Grande's supposed entitlement to the safe harbor, confirmed Mr. Horton's description.[46]

---

[41] Ex. A, App'x p. 11; Ex. I, Rohre Dep. at 97:15-21, 146:1-6.

[42] Ex. A, App'x p. 11; Ex. E, Grande Resps. to Pls' 2d Reqs. For Admissions, p. 3.

[43] Ex. C, Horton Dep. at 141:20-142:7.

[44] Email correspondence refreshed Mr. Horton's recollection that this change in policy occurred in October 2010.  *See* Ex. C, Horton Dep. at 147:24-148:9 ("What Mr. Bloch is describing as the completed changes to the abuse management system were complete by October 25th, 2010; right? A. To the best of my knowledge, reading this, yes, I agree. Q. And does that refresh your recollection as to the time period in which the policy changed from terminating repeat infringers to not terminating repeat infringers? A. Yes. And so when I said earlier 2010, 2011, this looks like a refined date.").

[45] *Id.* at 142:8-12.

[46] Ex. A, App'x p. 12; Ex. B, S. Christianson 30(b)(6) Dep. (Vol. II) at 322:21-323:14.

Grande's policy was the opposite of terminating access to repeat infringers—rather, it permitted unlimited infringement without consequence ***no matter how much evidence of infringement Grande received.***[47]   Based on these undisputed facts, Grande cannot "establish that it adopted a policy providing for the termination of access for repeat infringers" from October 2010 through 2016.  *Escape Media Grp., Inc., LLC,* 2015 WL 1402049, at *11.

Despite its failure to terminate a single subscriber, Grande claims that it is entitled to the safe harbor because its Acceptable Use Policy had the "***concomitant potential***" of termination for repeat infringers.[48]  But "an ISP has not 'reasonably implemented' a repeat infringer policy if the ISP fails to enforce the terms of its policy in any meaningful fashion."  *BMG Rights Mgmt. (Us) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 303 (4th Cir. 2018).  Adopting a repeat infringer policy that is not "carried out is not an 'implementation' as required by § 512(i)."  *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 659 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th Cir. 2003).

"[T]he relevant question is whether [the ISP] ***actually terminates*** the uploading privileges of repeat infringers under appropriate circumstances."  *Escape Media Grp., Inc.*, 2015 WL 1402049, at *12.  It is beyond argument that from October 2010 through 2016, Grande never reasonably implemented its Acceptable Use Policy because it never terminated ***any*** users, regardless of the volume, content or source of any notices of copyright infringement.  Not only did Grande refuse to terminate any users for more than a six-year period no matter how many times such users engaged in copyright infringement, but Grande did not even ***consider*** terminating the accounts of any of the thousands of repeat infringers.[49]  Grande's General Manager agreed that he

---

[47] *See supra* Statement of Undisputed Material Facts, ¶ 16 & p. 6 n.25.

[48] Ex. A, App'x p. 12; Ex. J, Grande's Third Am. Resp. to Pls.' Interrog., p. 7.

[49] Ex. A, App'x p. 12; Ex. B, S. Christianson 30(b)(6) Dep. (Vol. II) at 284:17-285:2.

could not identify a single customer for whom this "concomitant potential" became a reality.[50] That is because the potential for termination did not exist.

*BMG Rights Mgt. (US) LLC v. Cox Commc'ns, Inc.* is instructive on the question of whether an ISP has reasonably implemented a repeat infringer policy. BMG sought to hold the defendant-ISP Cox liable for copyright infringement occurring over its high-speed internet service, based on notices sent to Cox by Rightscorp. On summary judgment, the district court found that Cox had not reasonably implemented a repeat infringer policy because Cox did not actually terminate users, regardless of the alleged sanction present in its "policy." *Cox Commc'ns*, 149 F. Supp. 3d at 655; *see also id.* at 658 (ISP's "bare assertion" that "'its policy has always been to terminate account holders in appropriate circumstances'" was "not enough to defeat summary judgment."). The Fourth Circuit agreed. 881 F.3d at 305 (affirming summary judgment against Cox on safe harbor defense where "Cox failed to follow through on its own policy," which "le[ft] it essentially with no policy").

Grande did not even do as much as Cox. From October 2010 through 2016, Grande failed to enforce its Acceptable Use Policy's prohibition on copyright infringement **in any fashion whatsoever**. Grande's alleged repeat infringer policy was an "absolute mirage" and such a mirage cannot qualify an ISP for the safe harbor. *See In re Aimster Copyright Litig.*, 252 F. Supp. at 659. In fact, Grande knew at the time that it had no process for addressing repeat infringement and that its failure to terminate repeat infringers could deprive it of the safe harbor, as internal emails show.[51]

---

[50] Ex. A, App'x p. 13; Ex. I, Rohre Dep. at 146:11-15.
[51] *See supra* Statement of Undisputed Material Facts, ¶ 17 & p. 7 n.26.

And even after this lawsuit was filed, Grande's fig leaf efforts to appear as if it satisfies the safe harbor cannot, as a matter of law, constitute "reasonably implementing" its supposed DMCA Policy. From 2017 to the present, Grande has known of, and tracked, thousands of repeat infringers on its Excess Violations Report, yet has only terminated twelve such subscribers. The failure to terminate a single repeat infringer from October 2010 until June 2017 is plainly insufficient to constitute adopting, and reasonably implementing, a policy qualifying for the safe harbor; and the termination of a handful of subscribers since then does not change that conclusion. *Cox Commc'ns, Inc.*, 881 F.3d at 304 (affirming summary judgment against DMCA defense; four terminations for infringement over a two-year period was an insufficient implementation of repeat infringer policy as a matter of law, depriving defendant of eligibility for safe harbor).

### B.   Grande Cannot Deny That Appropriate Circumstances Existed to Terminate Repeat Infringers.

As a last-ditch effort to save its safe harbor defense, Grande claims that "appropriate circumstances" warranting termination of repeat infringers never arose.[52] This is plainly a post-hoc excuse without any merit, as shown by undisputed facts in the record.

***First***, Grande's self-serving litigation position notwithstanding, Grande was well aware that the notices it received were legitimate and demonstrated repeat copyright infringement by its users. Grande persistently refused to terminate ***in spite of*** evidence warranting such termination, not in the absence of such evidence. Grande's Rule 30(b)(6) corporate representative testified that Grande received 1.2 million notices of copyright infringement between 2011 and 2016. There is not a shred of evidence that Grande doubted the accuracy or reliability of these notices. To the

---

[52] Ex. A, App'x p. 13; Ex. P, Grande's Supp. Resp. to Interrogs. 11 and 15, p. 2.

contrary, Grande admits that it never felt the need to investigate a single Rightscorp notice,[53] never concluded that any Rightscorp notice was inaccurate in any way,[54] and never communicated with Rightscorp to raise any issue about any of its notices.[55]   Indeed, Grande's Manager of Internet Systems, Colin Bloch, the employee who first identified more than a decade ago that customers were using Grande's service to engage in online copyright infringement, acknowledged that Grande has known about its subscribers' infringing activity for years, through notices from online infringement detection companies like Rightscorp.[56] And numerous contemporaneous emails between Grande and its customers receiving notices reflect Grande's awareness of its subscribers' infringement as it was being detected.[57]

*Second*, in 2017 and 2018, Grande tracked what it terms "Excess Violations" and terminated twelve repeat infringers based on precisely the same kind of infringement notices that Grande received during the 2010-2016 time period, when it terminated no users for copyright infringement.   Grande's corporate representative and its General Manager both confirmed that Grande terminated these customers because Grande concluded that they were repeat copyright infringers and termination was appropriate on that basis.   "Q. So I'm asking, did Grande terminate the 12 infringers it's terminated since May 2017 under its DMCA policy and procedure? A. Yes. *Q. And Grande did so because it determined the circumstances were appropriate to terminate*

---

[53] Ex. A, App'x p. 13; Ex G, S. Christianson 30(b)(6) Dep. (Vol. I) at 69:17-20, Ex B, S. Christianson 30(b)(6) Dep. (Vol. II) at 223:9-13.

[54] Ex. A, App'x p. 13-14; Ex. G, S. Christianson 30(b)(6) Dep. (Vol. I) at 70:13-21, 222:8-24.

[55] Ex. A, App'x p. 14; "Grande states that it is not aware of any communications between itself and any Plaintiff or with Rightscorp."  Ex. J, Grande's Third Am. Resp. to Pl. Interrogs., p. 6.

[56] *See supra* Statement of Undisputed Material Facts, ¶ 8 & p. 5 n.13.

[57] Ex. A, App'x p. 14; Ex. Q, PX 69 (Grande customer service representative telling Grande sales executive "This is a notice that someone at that facility using the Grande provided data connection (GMAN), *has illegally downloaded copyrighted content*."); Ex. R, PX 169; Ex. S, PX 137.

***them as repeat copyright infringers under its DMCA policy and procedure?*** MR. BROPHY:

Objection, vague, calls for speculation, outside the scope of the topics, but you can answer. ***A.***

***Yes.***[58]   Grande made this determination based on notices of infringement received from third

parties.  "Q. Each of those 12 were terminated based on notices received by Grande, right? A. Yes.

Q. The notices served as the basis for termination, right? A. Yes."[59]

Significantly, Grande's General Manager conceded that if Grande's current policy had

been in effect from 2010 through 2016, then the subscribers for whom Grande received repeated

infringement notices ***from Rightscorp*** during that time period ***would have been terminated then***:

"Q. If you can look down one more under that one, a person at 12,953 notices; is that correct? A.

Correct. Q. Should that person have been kicked off in 2015? A. Same answer as above. Given the

current policy, they would be terminated. Q. Is that person a repeat infringer? A. Yes."[60]   Shown

Grande's own records tracking hundreds of Grande's customers who each generated more than

100 notices from Rightscorp, Mr. Rohre admitted that these users were repeat infringers.[61]   If the

notices were sufficient to establish appropriate circumstances to terminate repeat infringers in 2017

and 2018, they were sufficient in prior years too.  In other words, the circumstances warranting

infringement did not change; only Grande's policy did.[62]

Grande did not start terminating repeat infringers until after this case was filed in 2017,

and Grande's handful of terminations since then have been based on the same kind of

---

[58] Ex. G, S. Christianson 30(b)(6) Dep. (Vol. I) at 35:2-13; Ex. I, Rohre Dep. at 106:14-20 ("Q. And you've kicked off 11 people in 2017? A. Since this policy changed, that's correct, to the best of my knowledge.  Q. They were repeat infringers? A. (Nods head.) Q. Is that a yes? A. Yes.").
[59] Ex. G, S. Christianson 30(b)(6) Dep. (Vol. I) at 109:7-12.
[60] Ex. I, Rohre Depo. at 141:8-16.
[61] *Id.* at 142:12-17 ("Q. All repeat infringers, every one of them? MR. HOWENSTINE: Again, objection, calls for a legal conclusion. BY MR. MISSNER: Q. You can answer. A. Correct. Under our current policy.").
[62] Ex. A, App'x p. 15; Ex. K, Bloch Dep. at 79:22-80:1.

information—notices from Rightscorp and other similar companies—that Grande received, but failed to act on, for years.  These undisputed facts of Grande's conduct before, and after, Plaintiffs filed this lawsuit, further confirm that no genuine issue of material fact exists.  Grande is not eligible for the safe harbor defense.

## CONCLUSION

Grande's failure to adopt and reasonably implement a repeat infringer policy renders Grande ineligible for the DMCA safe harbor.  The Court should grant Plaintiffs' motion for partial summary judgment and reject Grande's DMCA safe harbor defense as a matter of law.

August 8, 2018

Respectfully submitted,

By:  */s/ Philip J. O'Beirne*
Pat A. Cipollone, P.C. (admitted *pro hac vice*)
Jonathan E. Missner (admitted *pro hac vice*)
Robert B. Gilmore (admitted *pro hac vice*)
Philip J. O'Beirne (admitted *pro hac vice*)
**Stein Mitchell Cipollone Beato & Missner LLP**
901 15th Street, N.W., Suite 700
Washington, DC 20005
Telephone: (202) 737-7777
Facsimile: (202) 296-8312
pcipollone@steinmitchell.com
jmissner@steinmitchell.com
rgilmore@steinmitchell.com
pobeirne@steinmitchell.com

Daniel C. Bitting (State Bar No. 02362480)
Paige A. Amstutz (State Bar No. 00796136)
**Scott Douglass & McConnico LLP**
303 Colorado Street, Suite 2400
Austin, TX 78701
Telephone: (512) 495-6300
Facsimile: (512) 495-6399
dbitting@scottdoug.com
pamstutz@scottdoug.com

***Attorneys for Plaintiffs***

18

**DRAFT        ATTORNEY CLIENT PRIVILEGED AND CONFIDENTIAL        DRAFT**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that, on August 8, 2018, all counsel of record who are deemed to have consented to electronic service are being served with through the Court's ECF system.


*/s/ Daniel C. Bitting*
Daniel C. Bitting