# Exhibit C



# Transcript of Lamar Horton

**Date:** February 21, 2018
**Case:** UMG -v- Grande

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

---

**Page 1**

```
              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
                         AUSTIN DIVISION
- - - - - - - - - - - - - x
UMG RECORDINGS, INC.,      :
et al.,                    :
      Plaintiffs,          :
                           :
   vs.                     :   Civil Action No.
                           :   1:17-cv-00365-LY
GRANDE COMMUNICATIONS      :
NETWORKS LLC and           :
PATRIOT MEDIA              :
CONSULTING, LLC,           :
                           :
      Defendants.          :
- - - - - - - - - - - - - x

              Deposition of LAMAR HORTON
                     Austin, Texas
               Wednesday, February 21, 2018
                       10:06 a.m.
```

Job No.: 178593
Pages: 1 - 303
Reported By: Candice Andino, TX CSR No. 9332, RMR

---

**Page 2**

Deposition of LAMAR HORTON, held at the offices of:

KELLY HART & HALLMAN LLP
303 Colorado Street, Suite 2000
Austin, Texas 78701
(512) 495-6400

Pursuant to notice, before Candice Andino, Certified Shorthand Reporter in and for the State of Texas.

---

**Page 3**

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:
  PHILIP J. O'BEIRNE, ESQUIRE
  JONATHAN E. MISSNER, ESQUIRE
  STEIN MITCHELL CIPOLLONE BEATO & MISSNER LLP
  1100 Connecticut Avenue, NW, Suite 1100
  Washington, DC 20036
  (202) 737-7777
  pobeirne@steinmitchell.com
  jmissner@steinmitchell.com

ON BEHALF OF THE DEFENDANTS:
  ZACHARY C. HOWENSTINE, ESQUIRE
  MAGGIE SZEWCZYK, ESQUIRE
  ARMSTRONG TEASDALE LLP
  7700 Forsyth Boulevard, Suite 1800
  St. Louis, Missouri 63105
  (314) 621-5070
  zhowenstine@armstrongteasdale.com
  mszewczyk@armstrongteasdale.com

ALSO PRESENT:
  TOM KRAUSE, Videographer

---

**Page 4**

C O N T E N T S

| EXAMINATION OF LAMAR HORTON | PAGE |
|---|---|
| BY MR. O'BEIRNE | 10 |

E X H I B I T S

(Attached to transcript.)

| HORTON DEPOSITION EXHIBITS | PAGE |
|---|---|
| Exhibit 51  Notice of Deposition of Lamar Horton | 10 |
| Exhibit 52  Printout of DMCA Designated Agent Directory for Grande Communications Networks LLC | 49 |
| Exhibit 53  Document entitled "DMCA Policy and Procedure" (GRANDE0002050 - 0002056) | 50 |
| Exhibit 54  Defendant Grande Communications Networks LLC's Third Amended Objections and Responses to Plaintiffs' First Set of Interrogatories | |
| Exhibit 55  Email from Jerry Horne to Emily Buck and Lisa Tyler, dated April 14, 2017 (GRANDE0816590 - 0816591) | 64 |
| Exhibit 56  Email from Stephanie Christianson to Lamar Horton, James Jordan, Richard Fogle, Lars Christianson, Jimmy Quigley, and Robert Creel, dated April 14, 2017 (GRANDE0813928 - 0813931) | 70 |
| Exhibit 57  Excel Spreadsheet entitled "DMCA Excessive ViolationsV2 from 1/1/2017 - 1/31/2017" (GRANDE0000155) | 76 |

**Page 13**

1  Q. Is that fair?
2  A. Yes.
3  Q. We will promptly --
4  A. I will say I'm starting to lose my voice, so I
5  may have to repeat myself a few times if it's not --
6  Q. No problem.
7  A. -- clear. Just let me know.
8  Q. Yeah, no problem. And I'm sure the
9  videographer and the court reporter will let us know if
10 we need to speak up or slow down.
11 A. Okay.
12 Q. I'm occasionally --
13 A. Sure.
14 Q. -- told to slow down. And, by "occasionally,"
15 I mean every time. And we will, inevitably, talk over
16 each other and interrupt each other, but let's try our
17 best to go one at a time.
18 A. Uh-huh.
19 Q. Great. And give yes-or-no answers or -- or
20 verbal answers.
21     I think you stated, at the beginning, your
22 name was put on the record. But just to be clear, could
23 you state your full name for the record.
24 A. Lamar Horton.
25 Q. No middle name?

**Page 14**

1  A. Alexander. Lamar Alexander Horton.
2  Q. And what's your residence?
3  A. 249 Hamburg Avenue, New Braunfels, Texas.
4  Q. How far is New Braunfels from Austin?
5  A. From Austin? About 45 minutes.
6  Q. So you're local?
7  A. Yes.
8  Q. Okay. A couple other kind of housekeeping
9  matters. If you need to take a break for any reason --
10 you mentioned you losing your voice -- or, you know, if
11 you're not feeling well or you need to go to the
12 bathroom or something, just let me know and I'll do my
13 best to accommodate if there's a natural time we can
14 take a break.
15 A. Okay.
16 Q. I don't mean to probe, so without giving any
17 details, I presume you're not on any medication or
18 anything that would impact your ability to recall or --
19 or to testify fully today?
20 A. No.
21 Q. "No" meaning "yes," you are not on such?
22 A. I am not.
23 Q. Right. So is there any reason why you can't
24 provide full and complete testimony in response to this
25 notice today, that you're aware of?

**Page 15**

1  A. No.
2  Q. Okay. I'm going to presume, if you answer my
3  question, that you understood it.
4     Is that fair?
5  A. Yes.
6  Q. So if any of the questions I ask you, you don't
7  understand or you'd like me to clarify, please do so.
8  A. Okay.
9  Q. And, otherwise, I'll presume you understood it
10 and that your answer was based on my question.
11 A. Okay.
12 Q. What is your current occupation and job title?
13 A. Vice president of network engineering and
14 operations.
15 Q. For who?
16 A. Grande Communications.
17 Q. How long have you had that position?
18 A. That title? Since 2009.
19 Q. So you're distinguishing between the title and
20 the position. So the position's remained the same, but
21 the title changed over time?
22 A. My roles and responsibilities have changed in
23 the company since I've been employed.
24 Q. Okay.
25 A. I've been the vice president -- in the position

**Page 16**

1  of vice president since 2009.
2  Q. So, since 2009, you've been the VP for network
3  engineering and operations?
4  A. Uh-huh.
5  Q. That's a "yes"?
6  A. Yes.
7  Q. And then the responsibilities that you had in
8  that role might have changed over time from 2009 to now,
9  but the title was the same?
10 A. Sure. Yes.
11 Q. Taking a step back, if you could just start
12 with your educational background, and then we'll work
13 through the positions you had up until today.
14 A. Sure.
15 Q. So you -- tell me: Did you go to high school
16 around here?
17 A. I went to high school in San Antonio, right
18 outside of San Antonio.
19 Q. Okay.
20 A. Graduated 1993.
21 Q. After high school, what did you do?
22 A. I went to college at Texas State University for
23 a couple years and then graduated from DeVry University
24 in Dallas in '98.
25 Q. Where is Texas State?

41

1 answer that affirmatively.
2    Q. So, sitting here, you're -- you're not aware of
3 times where Grande customer support personnel will reach
4 out to make affirmative contact with a customer about an
5 issue?
6    A. Can you define what "affirmative" means in your
7 question.
8    Q. Grande calls the customer, not the customer
9 calling Grande.
10    A. I can't answer that question. I would be
11 speculating. I would be guessing if I answered that
12 question. I don't know.
13    Q. In your role as the DMCA agent, what
14 responsibilities do you have over any processes whereby
15 Grande customer service personnel contact customers?
16    A. In that capacity, I don't have that
17 responsibility.
18    Q. Who, other than you, that you're aware of,
19 would have better knowledge about any process underneath
20 Grande's DMCA procedures that would involve a customer
21 service employee reaching out to a customer about a DMCA
22 issue?
23        MR. HOWENSTINE: Objection. Vague.
24    A. Only the call center management team could
25 explain when we reach out affirmatively to contact a

42

1 customer.
2    Q. (BY MR. O'BEIRNE) Who is the customer service
3 management team?
4    A. That would be Robert Creel and/or his
5 management, Dawn Blydenburgh.
6    Q. What -- strike that.
7        In your role as the VP of network
8 engineering, do you or your team provide information
9 that is input into the custom -- sorry. I misspoke.
10 Strike that.
11        In your role as the VP of network
12 engineering, do you or people you supervise provide
13 information that is put into the Compass system for use
14 by customer service employees?
15    A. Generally speaking, yes.
16    Q. What kinds of information do you provide that
17 is put into Compass for the use of the customer service
18 employees?
19    A. Typically, it would be technical information,
20 such as these modems work correctly for these products
21 or, you know, maybe helping develop an FAQ for how to
22 explain something to a customer that's tech- -- very
23 technical. Typically, it's product related or product
24 support related.
25    Q. Is there a process whereby you work with

43

1 whomever is running Compass to ensure that they have the
2 most updated information in a way that they can
3 effectively communicate it to the customers?
4    A. Not that I'm aware of, no.
5    Q. So do you ever provide information to the
6 Compass system and then get questions back, "We don't
7 understand what this means. What do we tell people if
8 they call and ask, you know, X, Y, Z?"
9    A. Could you restate the question?
10    Q. Sure.
11        I'm just trying to understand if there is
12 an iterative back-and-forth process between people
13 providing the information that's going into Compass and
14 the people using the Compass information to talk to the
15 customers.
16    A. I would -- I would state it as the call center
17 manages the content that's in Compass. That -- that's
18 the call center's system. If they see the need to
19 populate content, they would reach out to us, if it was
20 our area, to say, "Can you help us develop an FAQ for
21 this?" or "Can you give us some information that
22 pertains to that?"
23    Q. So when they reach out to you and ask you to
24 help them populate content in Compass, what is the
25 process whereby you provide the content that they asked

44

1 you for?
2    A. I would generalize it as there is no process,
3 no defined process. It could be a phone call. It could
4 be a hallway conversation. It could be an email
5 request. It could be anything.
6    Q. So -- I'm just trying to understand. So, as an
7 example, somebody who's -- has responsibility over
8 Compass might see you in the hall and say, "Hey, we're
9 hearing this abbreviation. We want to have an entry in
10 it in Compass so we can tell customers what it means.
11 What does it mean?"
12        And, if you know what it means, you might
13 say, "Oh, it means such and such."
14    A. That's a fair example.
15    Q. Or it might be a formal process where they send
16 a written request describing the input that they need
17 for the system and your team assesses it and provides
18 information?
19    A. That could be fair as well.
20    Q. And it could be anywhere in between?
21    A. Sure. Yes.
22    Q. What input have you had into Compass
23 information, including frequently asked questions, about
24 Grande's DMCA policy?
25    A. I don't recall having any involvement with

**Page 45**

that.

Q. So, sitting here today, as the DMCA agent, what can you tell me about what is in the Compass system to answer frequently asked questions from customers about Grande's DMCA policy?

A. Can you restate that, please?

Q. Sure.

Sitting here today, as the DMCA agent, what can you tell me about the information that is in Compass to answer frequently asked questions from customers about Grande's DMCA policy?

A. I don't know what's currently in the system. I couldn't quantify that. I seem to recall at one time we had an article that explained to customers -- excuse me. Let me restate that -- explained to the call center agent, if a customer receives a letter like this, this is what this means, in a way to explain to the customer and get them to the right team to support that customer.

Q. What is your understanding of your responsibilities as the DMCA agent?

A. My understanding of being the DMCA agent is that I am a point of contact for the outside world of copyright holders to provide notice or a contact to reach out to.

Q. Do you have any -- setting -- strike that.

**Page 46**

Setting aside the role of a point of contact to receive information, what responsibilities do you understand you have, as the DMCA agent, to monitor or otherwise oversee DMCA procedures internal to Grande?

A. I don't believe that I have that responsibility.

Q. What training did you receive in connection with being made the DMCA agent?

A. I did not receive any training.

Q. What description was provided to you as to what the role would entail?

A. As --

MR. HOWENSTINE: And I'll jump in and caution you. To the extent it involves communications with attorneys, inside attorneys, you should not disclose any of those communications.

Q. (BY MR. O'BEIRNE) Let me rephrase the question.

Other than any legal advice provided to you by counsel, what explanation was provided to you, in connection with your being made the DMCA agent, as to the responsibilities you would have?

A. I don't -- nothing.

Q. Do you attend periodic internal DMCA meetings in your role as the DMCA agent?

**Page 47**

A. I do not.

Q. Do you review notices sent to Grande -- strike that.

Do you review information that Grande receives from the outside world pursuant to the DMCA policy?

MR. HOWENSTINE: Objection. Vague.

A. I agree. I don't understand what you're asking.

Q. (BY MR. O'BEIRNE) Sure.

So I understood you to testify that you -- your responsibility is to be a point of contact to the outside world, for them, to provide information.

Is that fair?

A. Generally speaking, yes.

Q. Okay. So whatever you meant by get information from the outside world as a point of contact, I'm asking you: What review do you do of information that you receive as the point of contact to the outside world for DMCA purposes?

A. To the best of my knowledge, I've never received anything directly from an outside entity about DMCA.

Q. Is it your understanding that Grande has received information about the DMCA but not you

**Page 48**

personally?

A. I don't understand that question. What is about the DMCA?

Q. Have you ever received a notice of alleged infringement -- copyright infringement, personally?

A. No.

Q. Are you aware that Grande has received notices of alleged copyright infringement in the last year?

A. Yes.

Q. And in 2016?

A. Yes.

Q. 2015?

A. Yes.

Q. What review do you conduct of notices of alleged copyright infringement received by Grande in your role as the DMCA agent?

A. Are you asking do I review all notices that come through the system or come into Grande?

Q. My question is: What review do you conduct of notices of alleged copyright infringement received by Grande in your role as the DMCA agent?

A. I do not review individual copyright notices.

Q. Do you review reports or summaries of notices that have been received?

A. Only upon periods of reviewing the system or a

**Page 73**

1  red.
2      Q. Do you see that?
3      A. Numbers in red.
4      Q. Yes, sir. Number one --
5      A. Oh, yes.
6      Q. -- letter or email.
7      A. Yes. Yes.
8      Q. So the outline proceeds, underneath "Need to
9  build communication procedure" (as read): Number 1,
10 letter or email.
11     Do you see that?
12     A. Yes.
13     Q. And it states (as read): Current process can
14 be followed, just need to ensure letter has been mailed.
15     Do you see that?
16     A. Yep.
17     Q. Do you recall discussions about whether or not
18 letters were actually not being mailed, even though the
19 system was calling for them to be mailed?
20     A. That's the wrong context. The context is, as
21 it gets to the point of working through a repeat
22 violation, ensuring that a letter was received by the
23 customer so that we are not making any assumptions and
24 any mistakes because it's leading to a customer
25 communication.

**Page 74**

1      Q. Okay. So you remember what this means?
2      A. I -- I -- I know the context of what this is,
3  yes.
4      Q. Okay. How do you know the context of what this
5  is?
6      A. Through general discussions.
7      Q. With whom?
8      A. Various Grande employees.
9      Q. Okay. And your understanding of what that
10 means is need to ensure the letter's been mailed. If
11 the company's going to take action on the letter that
12 was sent to a customer, you want to make sure the letter
13 went out to the customer?
14     A. Correct.
15     Q. Is that because there were times where the
16 company went to take action against a customer based on
17 a letter that you thought went out and then the customer
18 said, "Hey, I never received that"?
19     A. Not to my knowledge, but I -- I believe the
20 intention was to avoid that particular scenario.
21     Q. Number two, underneath "Communication
22 Procedure" (as read): Contact customer by phone.
23     Do you see that?
24     A. Yes.
25     Q. And -- strike that.

**Page 75**

1      Underneath "Contact customer by phone," it
2  states (as read): Determination of contact built on
3  Excess Violations2 SSRS report.
4      Do you see that?
5      A. I do.
6      Q. An SSRS report is a -- is a document generated
7  by Grande's information system; correct?
8      A. Yes.
9      Q. And this is referring to a report reflecting
10 Grande customers that Grande has evidence have excessive
11 violations of copyright infringement.
12     MR. HOWENSTINE: Objection. Vague.
13 Confusing.
14     A. I can only assume that's accurate, yes.
15     Q. (BY MR. O'BEIRNE) Okay.
16     A. But I don't know.
17     Q. Well, you just testified you were familiar with
18 the context of this conversation regarding making
19 sure --
20     A. I am. The particular report.
21     Q. I'm sorry. Let me finish the question.
22     You testified you were familiar with the
23 context of what it meant to ensure the letter has been
24 mailed; right?
25     A. Yes.

**Page 76**

1      Q. Your understanding is that the excess
2  violations to SSRS report is a report generated by
3  Grande, containing information about customers that
4  Grande has determined have received an excessive amount
5  of copyright infringement notices.
6      MR. HOWENSTINE: Objection. Vague.
7      A. Yes; however, I cannot explain the details of
8  that report.
9      (Exhibit 57 marked.)
10     Q. (BY MR. O'BEIRNE) I'm handing you PX 57.
11     Do you see this is a binder-clipped
12 printout of an Excel spreadsheet?
13     Is that fair?
14     A. Yes.
15     Q. I'm certainly not asking you to read this
16 entire document, but I want to ask you some questions
17 about it and first put a couple things in the record.
18     You'll turn to the last page and see, if
19 you would, please, that the last page is a piece of
20 paper with a Bates number on the bottom, GRANDE0000155.
21     Do you see that?
22     A. Yes.
23     Q. And then the text in the middle says (as read):
24 This document was provided in native format upon
25 request.

**Page 77**

1  A. Yes.
2  Q. Do you see that?
3      So you can't Bates-stamp an Excel
4  spreadsheet because it's produced in native format, so a
5  placeholder is given to us with a Bates number to show
6  that this was produced by Grande. I represent to you
7  that that's what occurred in this case. Okay?
8  A. Okay.
9  Q. So this is a printout of the Excel spreadsheet
10 that was produced at GRANDE0000155.
11     Do you understand?
12 A. Yes.
13 Q. Now, looking at Exhibit 57 -- Plaintiffs'
14 Exhibit 57 -- I'll start over.
15     Looking at Plaintiffs' Exhibit 57, it says,
16 at the bottom middle (as read): DMCA Excessive
17 ViolationsV2 from 1/1/2017 to 1/31/2017.
18     Do you see that?
19 A. I do.
20 Q. This is one of the SSRS Excess Violations2
21 report -- reports that was being mentioned in the
22 touchpoint process outline; right?
23     MR. HOWENSTINE: Objection. Calls for
24 speculation. I believe he already testified that he
25 wasn't familiar with the details of those reports.

**Page 78**

1  Q. (BY MR. O'BEIRNE) You can go ahead and answer.
2  A. It appears to be.
3      MR. O'BEIRNE: I'd ask counsel just to put
4  a form objection on and avoid speaking objections.
5  Q. (BY MR. O'BEIRNE) You would agree with me
6  that, if you turn to the last Excel page, which is the
7  page before the native page, you see there the end of
8  the Excel spreadsheet columns?
9  A. I do.
10 Q. And this document appears to have 5,337 lines
11 in it. Hold on. Okay. Let's take a step back.
12     Do you see that, on page 1 of Plaintiffs'
13 Exhibit 57, there's three columns, A, B, and C?
14 A. Yes.
15 Q. Please turn for me -- it's about halfway
16 through the document -- you'll see the end of the line
17 numbers is 5,337, and there's those three full columns,
18 A, B, and C, reflected there.
19 A. Yes.
20 Q. And then, starting after that, the next page
21 has a column D, starting over at 1.
22     Do you see that?
23 A. Yes.
24 Q. I'll represent to you, somewhat frustratingly,
25 the D column was not printed next to the C columns, and,

**Page 79**

1  therefore, it ended up being a whole second -- section
2  of the document but that that natively appears next to
3  the C column.
4  A. Yes.
5  Q. Okay. So, staying there, you'll agree with me
6  that the last line that has a column A, B, and C, the
7  number of that line is 5,337?
8  A. It is.
9  Q. So there appear to be 5,337 entries on this
10 DMCA Excessive ViolationsV2 report.
11 A. It appears to be, yes.
12 Q. If you go back to the first page, the column
13 headings are "Account Days" and "Weighted Infringement."
14     Do you see that?
15 A. I do.
16 Q. And then, underneath Account, there is a column
17 with numbers, all of which have the same number of
18 digits in it.
19     Do you see that?
20 A. Yes.
21 Q. Do you understand those to be customer account
22 numbers?
23 A. I do.
24 Q. And then there's a number of days associated
25 with each customer account.

**Page 80**

1      Do you see that?
2  A. I see that column, yes.
3  Q. And then the column next to that, Weighted
4  Infringement.
5  A. Uh-huh.
6  Q. You -- you see that column there?
7  A. I do.
8  Q. What does "weighted infringement" mean?
9  A. I don't -- I don't know the answer to that
10 question. I can generically tell you that this was our
11 attempt at trying to develop a -- a scoring method that
12 aligned with our management team's executed plan.
13 Q. Executed plan to deal with repeat infringers on
14 your network?
15 A. Correct.
16 Q. Tracking customers by number and then
17 associating a weighted infringement score and a number
18 of days for which they've been tracked in some way?
19 A. Yes, some type of methodology.
20 Q. And this is the report from January 1st, 2017,
21 to January 31st, 2017?
22 A. It appears so.
23 Q. So it's a capability of the SR -- strike that.
24     It's a capability of Grande's system to
25 issue reports from the SSRS system for a given month or

**81**

1  other period of time?
2       MR. HOWENSTINE: Objection. Calls for
3  speculation.
4       A. Yes. I don't know how this report was created,
5  so I can't answer that.
6       Q. (BY MR. O'BEIRNE) At the bottom of the first
7  page, you see the report states it was executed at
8  3:11 p.m., on April 13, 2017? Do you see that?
9       A. I do.
10      Q. And that's the day before the Friday call
11 dealing with customers in violation of certain copyright
12 rules that we looked at in PX 55; right?
13      A. It would appear so, yes.
14      Q. And PX 55 references an Excess Violations2 SSRS
15 report; correct?
16      A. It does.
17         (Exhibit 58 marked.)
18      Q. (BY MR. O'BEIRNE) I'm handing you Plaintiffs'
19 Exhibit 58. This is also a printout of an Excel
20 spreadsheet produced in this case, with a Bates number
21 on the last page; correct?
22      A. Yes.
23      Q. And this is the DMCA Excessive Violations
24 Report from October 1st, 2016, through December 31st,
25 2016.

**82**

1       A. It would appear so.
2       Q. And it also states it was executed at
3  4/13/2017, 2:07 p.m.
4       A. It does.
5       Q. By "also," I meant the previous exhibit we just
6  looked at was also executed on that date. I'm not sure
7  it was the exact same time, but this report appears to
8  have been executed on April 13th, 2017; correct?
9       A. It appears so, yes, sir.
10      Q. And this is PX 58.
11         MR. MISSNER: Fifty-eight.
12      Q. (BY MR. O'BEIRNE) Now, happily, column D ended
13 up where it's supposed to be on this sheet.
14         You see that; right?
15      A. I do.
16      Q. Turn with me, if you would, please -- actually,
17 you know what? Bear with me for one second.
18         So I represent to you PX 58 had two sheets
19 in it, a first sheet and a second sheet. And, again,
20 not being able to -- to have it Bates-stamped or have
21 that be reflected in some way, if you turn halfway
22 through, about halfway through the document, until you
23 get to the row number -- rows numbering in the 8,000s,
24 you'll see that the pages stop that have "Excessive
25 Violations" written at the bottom.

**83**

1       Do you see that?
2       A. I do.
3       Q. And then, when you turn to the next page, this
4  is the second sheet in the native Excel that was
5  produced to us, which doesn't bear any description on
6  the bottom.
7          Do you see that?
8       A. I do.
9       Q. Take my binder clip off there.
10         And you'll see that the count starts
11 over -- the row count starts over at 1 on this first
12 page of the second sheet.
13         Do you see that?
14      A. I do.
15      Q. I'm going to talk to you first about the first
16 sheet, so if you could just, you know, put something in
17 there to hold the place, and that way we can try to
18 minimize the flipping back and forth that we both have
19 to do.
20         This report also has the column headings
21 "Account Days" and "Weighted Infringement."
22         Do you see that?
23      A. I do.
24      Q. This also -- D has "Status."
25         Do you see that?

**84**

1       A. I do.
2       Q. And then, underneath "Status," there's "Blank
3  equals active," "A equals active," and "Star equals
4  unknown."
5          Do you see that?
6       A. I do.
7       Q. And I think D on the other one said the same
8  thing. We just didn't look at it.
9          And, just like PX 57, PX 58 has Grande
10 customer account numbers underneath column A; right?
11      A. It does.
12      Q. With a number of days reflected in
13 column B; right?
14      A. Yes.
15      Q. And a weighted infringement assessment in
16 column C?
17      A. Yes.
18      Q. And, if you turn to the last page of this first
19 sheet, Grande's tracking 9,014 customers on its DMCA
20 excessive violations from October 1st, 2016, through
21 December 31st, 2016, report; correct?
22         MR. HOWENSTINE: Objection. Calls for
23 speculation.
24      A. It appears so.
25      Q. (BY MR. O'BEIRNE) And this was also generated

---

Page 85

1 the day before the April 14th, 2017, conference
2 regarding dealing with customers in violation of certain
3 copyright rules; correct?
4     A. It would appear so.
5     Q. If you turn to the second sheet, the last page
6 reveals the same number of customer account lines,
7 9,014.
8         Do you see that?
9     A. Yes.
10    Q. And this has several more columns -- or at
11 least seems to have two sets of the columns we've looked
12 at, Accounts, Days, and Weighted Infringement for the
13 fourth quarter of 2016 and for the first quarter of
14 2017.
15        Do you see that?
16    A. Yes.
17    Q. And it appears, in the second sheet, that
18 Grande is tracking the infringement from 2016 into 2017
19 of 9,014 customers.
20        MR. HOWENSTINE: Objection. Calls for
21 speculation.
22    A. It would appear so.
23        (Exhibit 59 marked.)
24    Q. (BY MR. O'BEIRNE) I'm handing you Plaintiffs'
25 Exhibit 59. You can put 58 aside for the time being.

Page 86

1         Turn to the last page. This is also a
2 document produced natively by Grande with a slip sheet
3 bearing Bates number GRANDE0000194; correct?
4     A. Yes.
5     Q. I'll represent to you there were three sheets
6 in this Excel, and they appear sequentially -- printed
7 sequentially, as they did in Exhibit 58. Let's start
8 with the first sheet.
9         Do you see, at the bottom of the first page
10 of the document, this appears to be the Grande DMCA
11 Excessive Violations report from January 1st, 2017,
12 through March 31st, 2017? Do you see that?
13    A. I do.
14    Q. And this was also executed on April 13th, 2017.
15    A. Yes.
16    Q. Which is the day before the meeting we've been
17 discussing.
18    A. Uh-huh.
19    Q. That's a "yes"? Sorry.
20    A. It wasn't a question. Yes.
21    Q. You would agree with me that this was executed
22 on April 13th, 2017, which is the day before the
23 April 14th meeting we've been discussing; correct?
24    A. It would appear so, yes.
25    Q. If you would please turn to -- it appears there

Page 87

1 are not row numbers on this document for some reason.
2 If you would flip about a quarter of the way through, it
3 changes over from having four columns with no color to
4 having six columns in color.
5         Do you see that?
6     A. I do.
7     Q. All right. So that's the second sheet. And
8 that appears to be the same kind of quarter-to-quarter
9 information that we saw in the previous exhibit; right?
10    A. It appears to be, yes.
11    Q. And then, if you flip -- if you turn that
12 about -- to about three-quarters of the way through the
13 document, the third sheet is printed in landscape.
14        Do you see that?
15    A. I do.
16    Q. And this reflects three different sets of
17 columns -- actually, excuse me. Strike that.
18        This third sheet has four sets of columns
19 of account numbers with days and weighted infringement
20 scores.
21        Do you see that?
22    A. Yes.
23    Q. Appearing to be -- the first quarter of 2017 is
24 the first one; right?
25    A. Yes.

Page 88

1     Q. And then the second, third, and fourth columns
2 are the January, February, and March 2017 information?
3     A. Yes.
4     Q. The row numbers didn't print for some reason.
5 I represent to you, for the record, that there are 5,331
6 rows on the first sheet, which, obviously, you're not in
7 a position to confirm or not, but I just wanted to put
8 that on the record.
9         You can put aside PX 59 for the time being.
10        Turning back to PX 55, which is the outline
11 underneath Jerry Horne's email.
12        Do you see that?
13    A. I do.
14    Q. Under number 2, where it references excess
15 violations SSRS reports, it suggests comparing two
16 iterations of report data.
17        Do you see that?
18    A. I do.
19    Q. And then A is (as read): Report covering
20 previous three-month period to confirm higher levels of
21 repeated offense.
22        Do you see that?
23    A. I do.
24    Q. Does it appear that the third SSR report we
25 just looked at had such a three-month comparison in the

137

1  A. I do know that there are time periods where
2  Rightscorp did not comply, but I couldn't, off the top
3  of my head, tell you what time periods those were.
4  Q. You're not aware that one of those time periods
5  included June 2017?
6  A. I'm not sure. I -- I do not know. I would
7  need to clarify. I would need to verify.
8  Q. What's your best recollection as to when any
9  such time periods were?
10  A. Going from memory, which may not be accurate,
11  with the implement- -- implementation of this policy, I
12  believe that Rightscorp was not providing the
13  requirements to process at the time of implementation.
14  What I am not a hundred percent sure of is whether there
15  was a time period that that changed or varied back and
16  forth, and I would need to confirm that.
17  Q. When you say "this process," you mean the DMCA
18  policy implemented in February 2017?
19  A. Yes.
20  Q. In what ways do you recall that -- strike that.
21      Sitting here today, what is your
22  understanding of what ways the Rightscorp notices
23  provided at any time in 2017 failed to satisfy,
24  allegedly, the DMCA requirements in your policy?
25  A. My recollection is that the -- the digital

138

1  signature requirements were not met with Rightscorp
2  specifically.
3  Q. What do you mean "the digital signature
4  requirements"?
5  A. The public key. And I'd have to review the
6  policy to accurately state this.
7  Q. Please feel free to do so.
8      You're looking at PX 53?
9  A. Yes. Yes. I -- it's the notification
10  requirement that Grande requires that each notification
11  be in a PGP format or compatible standard and must be
12  digitally signed to verify the identif- -- identity of
13  the sender. I recall that that was the requirement that
14  was not met specifically by Rightscorp.
15  Q. When was that requirement instituted?
16  A. With this policy.
17  Q. February 2017?
18  A. At least, yes.
19  Q. So it was not a requirement under the previous
20  acceptable use policy?
21  A. I do not recall whether it was in there or not,
22  to be honest.
23  Q. That policy speaks for itself, though.
24  Whatever was in there, was in there?
25  A. That's a true statement.

139

1  Q. You mentioned that Grande's system will only
2  continue to process through notices that meet the DMCA
3  policy requirements.
4      What happens to them once that assessment's
5  been made?
6  A. For one that is valid or invalid?
7  Q. Valid. I'm sorry. Let me ask again.
8      What is the process by which a notice that
9  has been deemed valid moves through the Rightscorp
10  system after being assigned a ticket number?
11  A. The Grande system?
12  Q. What is the -- I apologize. Strike that.
13      What is the process by which a notice
14  received by Grande of copyright infringement moves
15  through Grande's system after the system determines it
16  meets the requirements of the DMCA policy?
17  A. At that point, the -- the notification to the
18  customer is automated. So it would flow through the
19  system we described here. That would then go to a
20  system that correlates who the customer is and how to
21  notify that customer of the alleged infringement.
22  Q. And, in the early part of the implementation of
23  this policy, sometime after February 2017, that process
24  was by CSG, in paper letters still; right?
25  A. That's correct.

140

1  Q. And then, at some point, it became OSG sending
2  electronic notices?
3  A. Along with paper, if necessary.
4  Q. Understood.
5      But, in both instances, it was automatic?
6  A. Yes.
7  Q. So no Grande person is sitting there going
8  notice by notice and saying, "This one is good; send it
9  to the customer. This one is not good; don't send it"?
10  A. That is correct.
11  Q. Provided a notice satisfies the requirements
12  laid out in the DMCA policy, it's going to get
13  forwarded?
14  A. Generally speaking, that is correct. I'm not
15  aware of any other situation.
16  Q. Understood.
17      Prior to the implementation of the current
18  DMCA policy in February 2017, Grande was sending paper
19  notices of infringement but was not terminating
20  subscribers for copyright infringement; correct?
21      MR. HOWENSTINE: Objection. Vague.
22  A. To answer that more accurately, I'd need the
23  time frame defined there.
24  Q. (BY MR. O'BEIRNE) Sure.
25      So let's start in 2016. In 2016, Grande

Transcript of Lamar Horton
Conducted on February 21, 2018

36 (141 to 144)

---

141

1  was still operating under the old system of CSG, sending
2  out paper letters in response to notices of copyright
3  infringement that Grande received; correct?
4      A. That is correct.
5      Q. And Grande was not terminating subscribers for
6  copyright infringement in 2016?
7      A. To my knowledge, that is correct.
8      Q. Grande was not terminating subscribers for
9  copyright infringement in 2015?
10     A. To my knowledge, that is correct.
11     Q. Grande was not terminating subscribers for
12 copyright infringement in 2014?
13     A. To my knowledge, that is correct.
14     Q. Grande was not terminating subscribers for
15 copyright infringement in 2013?
16     A. To my knowledge, that is correct.
17     Q. Grande was not terminating subscribers for
18 copyright infringement in 2012?
19     A. To my knowledge, that is correct.
20     Q. Grande was not terminating subscribers for
21 copyright infringement in 2011?
22     A. This is where I need to clarify that
23 somewhere -- and I don't have an exact date nor point of
24 reference to point to -- in 2010 or 2011, which I
25 believe was 2010, when we were previously managed by

---

142

1  ABB, we had a policy in place of turning off all
2  subscribers upon copyright violation notice, requiring
3  the customer to then contact Grande to discuss the
4  issue, understand what happened, inform the customer of
5  why they'd been shut off, and take appropriate action
6  from there. In 2010 or '11, in that time period, ABB
7  implemented a change to that policy.
8      Q. After the change in policy that you recall was
9  sometime in 2010 or 2011, Grande was not terminating
10 subscribers for copyright infringement until the current
11 DMCA policy in 2017?
12     A. To the best of my knowledge, that's true.
13     Q. Prior to the change in policy that you recall
14 occurred in 2010 or 2011, ABB was at least suspending
15 customers for copyright infringement?
16     A. To be more accurate, Grande had always done
17 that up until that point. So Grande existed before ABB.
18 After ABB came in, a change was made to that policy.
19     Q. I see.
20         So Grande did terminate subscribers for
21 copyright infringement prior to 2011?
22     A. Yes. And it -- it's hard for me to describe
23 exactly that process because that was a long time ago,
24 and I -- I was not involved in it directly at the time.
25     Q. I understand. But you are generally aware as

---

143

1  to whether the practice of terminating subscribers was
2  ongoing or not?
3      A. I am generally aware that we were shutting down
4  subscribers based on copyright violations, yes.
5      Q. Prior to 2011?
6      A. Yes.
7      Q. And then, after a change in policy in 2011,
8  that practice ceased?
9      A. To the best of my knowledge, yes.
10         MR. O'BEIRNE: Please bear with me a
11 second. I got lost in my documents. We've been going
12 about an hour five. Would now be a good time for a
13 comfort break?
14         MR. HOWENSTINE: Yes.
15         MR. O'BEIRNE: Great.
16         THE VIDEOGRAPHER: Time is 2:19 p.m. We're
17 going off the record.
18         (A recess was taken from 2:19 p.m.
19          to 2:36 p.m.)
20         THE VIDEOGRAPHER: Time is 2:36 p.m. We're
21 back on the record.
22     Q. (BY MR. O'BEIRNE) Mr. Horton, you understand
23 you're still under oath?
24     A. Yes.
25     Q. Did you discuss your testimony with anybody at

---

144

1  the break?
2      A. No.
3      Q. Okay. Let's proceed with some more questions.
4  We were talking about Grande's historic treatment of
5  allegations of copyright infringement. And I recall you
6  talking about a change in policy that you estimated
7  occurred between 2010 and 2011, sometime in that time
8  frame.
9         That's fair?
10     A. That's correct.
11     Q. And when did ABB take over management
12 responsibilities for Grande?
13     A. Late 2009. I want to say September of 2009.
14     Q. So there was a period during which ABB was
15 performing management services for Grande in which
16 Grande continued to suspend all subscribers for which
17 Grande received a notice of copyright infringement?
18     A. That is correct, to the best of my knowledge.
19     Q. And, at some point in time after ABB took
20 over, there was a policy change, and the practice of
21 suspending or terminating subscribers who were repeat
22 infringers ceased?
23     A. That is my understanding, yes.
24     Q. And for the entire time we're discussing, late
25 2009, 2010, 2011 and forward, you were in your current

---

Page 145

```
 1  role as VP?
 2      A. Yes.
 3          (Exhibit 63 marked.)
 4      Q. (BY MR. O'BEIRNE) I'm handing you Plaintiffs'
 5  Exhibit 63. This is an email produced by Grande. There
 6  is a Bates number in the bottom right-hand
 7  corner; right?
 8      A. Yes.
 9      Q. This email, Exhibit 63, is an email from
10  Colin Bloch to you, dated October 25th, 2010; right?
11      A. It is.
12      Q. The title of the email is "Systems Report,
13  10/25/2010."
14          Correct?
15      A. Yes.
16      Q. Did Mr. Bloch routinely send you systems report
17  emails summarizing work that had occurred at or near the
18  time of the -- of the email regarding different systems
19  projects?
20      A. Yes. Generally as, like, a weekly report.
21      Q. So this is a Monday one. Do you understand
22  that was -- would have been describing what happened the
23  week before or in the coming week or just in general
24  around a week's time frame?
25      A. In general, around that week's time frame.
```

Page 146

```
 1      Q. Okay. The first bullet -- or I should --
 2  strike that.
 3          The email in Plaintiffs' Exhibit 63
 4  includes a numbered list of items.
 5          Do you see that?
 6      A. Yes.
 7      Q. The first item, number 1, Mr. Bloch informs you
 8  (as read): Completed changes to the abuse management
 9  system to allow DMCA notices for residential customers
10  to be placed in a queue, which will be processed by CSG
11  for the purposes of sending out a letter.
12          Do you see that?
13      A. Yes.
14      Q. In October 2010, would this have been under the
15  new policy of not terminating or suspending repeat
16  infringers but sending out a paper letter from CSG?
17      A. Yes.
18      Q. It goes on (as read): Provided a script that
19  the CSG team can use to pull the data automatically.
20          Do you see that?
21      A. Yes.
22      Q. (As read): We have now stopped placing tickets
23  in the TSC queue and all future DMCA notices will go out
24  as letters from CSG.
25          That's what it says; right?
```

Page 147

```
 1      A. Yes.
 2      Q. And that's also what you were describing.
 3  Prior to the change in policy, notices of infringement
 4  would go into a TSC queue for Grande to contact the
 5  customer regarding the copyright infringement.
 6      A. More specifically, the customer would contact
 7  us as to why their service was shut down. And that
 8  ticket would be the representing information that the
 9  TSC would then understand why the customer's service was
10  shut down.
11      Q. Right. So Grande was shutting down the service
12  and then, when the customer called to inquire as to why
13  the service had been shut down, Grande would inform them
14  about the copyright infringement information reflected
15  in the TSC queue?
16      A. Correct.
17      Q. You were aware that this was the process in
18  place in October 2010?
19          MR. HOWENSTINE: Objection. Vague.
20      Q. (BY MR. O'BEIRNE) You can answer.
21      A. The process that changed? Is that what you're
22  saying?
23      Q. Sorry. I'll -- I'll -- I'll ask it again.
24          What Mr. Bloch is describing as the
25  completed changes to the abuse management system were
```

Page 148

```
 1  complete by October 25th, 2010; right?
 2      A. To the best of my knowledge, reading this, yes,
 3  I agree.
 4      Q. And does that refresh your recollection as to
 5  the time period in which the policy changed from
 6  terminating repeat infringers to not terminating repeat
 7  infringers?
 8      A. Yes. And so when I said earlier 2010, 2011,
 9  this looks like a refined date.
10      Q. So you think it's fair to say it's about this
11  time period, late 2010, when the policy changed from
12  terminating repeat infringers to not terminating repeat
13  infringers?
14      A. Yes, it would appear so.
15          To clarify that statement, we were -- we
16  were disconnecting all offenders, not just repeat
17  offenders.
18          (Exhibit 64 marked.)
19      Q. (BY MR. O'BEIRNE) I'm handing you Plaintiffs'
20  Exhibit 64. This is an email from Waylon Endsley to
21  you, dated February 14th, 2017; right?
22      A. Yes.
23      Q. Who is Mr. Endsley?
24      A. Waylon works as part of the billing team as a
25  database administrator.
```

**Page 285**

A. That appears to be his opinion in this email, yes.

Q. All right. Have you discussed this opinion with Mr. Creel?

A. I have not.

Q. Are you aware of any decision Grande made to ignore notices from the company referenced here?

A. I am not.

Q. Would you agree that it would be improper for Grande to refuse to accept notices from a particular source if they otherwise comply with the DMCA policy requirements?

MR. HOWENSTINE: Objection. Calls for a legal conclusion.

A. Assuming they comply and there was nothing unique that made people feel the need to get a legal team to review, yes, we would process them.

(Exhibit 89 marked.)

Q. (BY MR. O'BEIRNE) I'm handing you Plaintiffs' Exhibit 89.

MR. HOWENSTINE: How are we doing on time here?

THE VIDEOGRAPHER: Got one hour left.

Q. (BY MR. O'BEIRNE) Plaintiffs' Exhibit 89 is a document produced by Grande in this case; right?

**Page 286**

A. Yes.

Q. It's an email from Mr. Fogle to you, on October 10th, 2016; right?

A. Yes.

Q. And the earlier email in the chain is from Arthur DeLeon @mygrande.com.

Do you see that?

A. I do.

Q. Who is Arthur?

A. I'm going to assume he works in the call center, but I do not know.

Q. The To address that he sent this email to is @internetsystems or abbreviated ISYS@mygrande.com.

Do you see that?

A. Yes.

Q. Who does that group email address go to?

A. I believe that goes to Colin, Sam, Lars, and Rich.

Q. And that's how Rich would have gotten it to forward it to you?

A. Yes.

Q. And Arthur's question is (as read): Good morning. I had a simple question about the DMCA abuse notices that go out to customers. How many notices does a customer get before they are removed from Grande's

**Page 287**

network?

Do you see that?

A. I do.

Q. Now, the date on this is Monday, October 10th, 2016; right?

A. Uh-huh.

Q. At that --

A. Yes.

Q. Sorry. Let's just get that, again, clean.

The -- the date on Arthur's question in PX 89 is October 10th, 2016; right?

A. Yes.

Q. And he's asking, on October 10th, 2016, how many notices does a customer get before they're removed from the Grande network; right?

A. Yes.

Q. Now, the answer to that question on October 10th, 2016, is an unlimited amount of notices; right?

A. Technically, yes.

Q. Not just technically. Actually; right?

A. Yes.

Q. In every respect, the answer to that question is yes?

MR. HOWENSTINE: Objection. Asked and

**Page 288**

answered.

Q. (BY MR. O'BEIRNE) No?

A. Yes.

Q. Okay. So you would agree with me, in October 2016, there was no limit to the number of notices a Grande subscriber could receive --

A. Yes.

Q. -- before getting removed; right?

A. Yes. Yes.

Q. Because Grande wasn't removing anybody?

A. Yes.

Q. Similarly, there was no limit to the number of notices a Grande subscriber could receive in 2015; right?

A. Yes.

Q. Same for 2014?

MR. HOWENSTINE: Objection. Asked and answered.

A. Yes. As we've covered earlier, yes.

Q. (BY MR. O'BEIRNE) So, if Grande received 25,000 notices regarding a particular subscriber, they would not have been kicked off in October 2016?

MR. HOWENSTINE: Same objection.

A. Answer's still yes.

Q. (BY MR. O'BEIRNE) Mr. Fogle forwards this

289

1 question to you without further comment, just sends you
2 the email. You see that; right?
3    A. Yes.
4    Q. What was your response to him?
5    A. I do not recall.
6       (Exhibit 90 marked.)
7    Q. (BY MR. O'BEIRNE) I'm showing you Plaintiffs'
8 Exhibit 90. This is an email produced by Grande in this
9 case; right?
10   A. Yes.
11   Q. It's GRANDE0000001?
12   A. Yes.
13   Q. This is an email Mr. Fogle sent to
14 Roberto Chang and Robert Creel in April 2013; right?
15   A. Yes.
16   Q. He cc's Lars Christianson and Jimmy
17 Quigley; right?
18   A. Yep. Yes.
19   Q. And it's titled "DMCA Notices"; right?
20   A. Yes.
21   Q. He says (as read): Roberto, Robby, we
22 currently send out DMCA notifications through mail for
23 what we take in with our abuse system.
24      Do you see that?
25   A. I do.

290

1    Q. He goes on to say (as read): However, there
2 are no limits here. We have some customers that are up
3 to their 54th notice.
4       He says that; right?
5    A. Yes.
6    Q. That's consistent with what Grande's policy
7 was, at the time, of not terminating anybody; right?
8    A. Yes.
9    Q. (As read): Understand that the DMCA law
10 requires us to expeditiously notify customers, and we
11 can't have knowledge of the content being shared, but
12 there is no three strikes law or anything that we
13 follow, like some ISPs.
14      That's what he says; right?
15   A. Yes.
16   Q. (As read): Also, we don't have any verbiage
17 other than "may terminate the service at any time" in
18 our residential AUP policy.
19      Right? That's what he says?
20   A. That's what he said.
21   Q. And AUP means acceptable use policy?
22   A. Yes.
23   Q. He says (as read): Question: We have users
24 who are racking up DMCA takedown requests and no process
25 for remedy in place.

291

1       That's what he tells Roberto and
2 Robert; right?
3    A. Yes. Sorry.
4    Q. (As read): I don't know if I'm seeing a broken
5 process or compliance with the letter of the law. Do
6 you guys have insight or knowledge on this?
7       That's what his email asks; right?
8    A. Yes.
9    Q. Do you recall having discussions with
10 Mr. Fogle, April 2013, about users racking up DMCA
11 takedown requests and no process for remedy in place?
12   A. I do not recall, no.
13   Q. Do you recall having conversations with
14 Mr. Chang about that in 2013?
15   A. I do not.
16   Q. Mr. Creel?
17   A. I do not.
18   Q. Mr. Fogle forwarded you, in 2016, the question
19 from the call center as to how many notices one could
20 receive before getting terminated; right?
21   A. Yes.
22   Q. So this is a question that Mr. Fogle was
23 raising internally at Grande as far back as
24 2013; correct?
25   A. Yes, he was.

292

1       (Exhibit 91 marked.)
2    Q. (BY MR. O'BEIRNE) I'm handing you Plaintiffs'
3 Exhibit 91. This is an email produced by Grande in this
4 case; correct?
5    A. Yes.
6    Q. It's Bates number GRANDE0000009; right?
7    A. Yes.
8    Q. If you turn to the second page of Exhibit 91,
9 at the bottom, you'll see that the original email in
10 this chain is Mr. Fogle's email of April 11th,
11 2013; right?
12   A. Yes.
13   Q. Turning back to the first page, the middle
14 email of April 11th, from Mr. Chang, at 5:27 p.m., do
15 you see that?
16   A. On the first page?
17   Q. On the first page.
18   A. Yes.
19   Q. Mr. Chang says (as read): Richard, who is
20 responsible for the DMCA notification process? Do we
21 call customers, question mark.
22      Do you see that?
23   A. Yes.
24   Q. He concludes his email (as read): If we do
25 nothing more that emails, as I think you mentioned, we

293

1 might lose our safe harbor status.
2     Do you see that?
3 **A. I do.**
4     Q. What safe harbor do you understand him to be
5 talking about?
6     MR. HOWENSTINE: Objection. Calls for
7 speculation.
8 **A. I'm assuming he means the copyright safe harbor**
9 **for Internet providers.**
10     Q. (BY MR. O'BEIRNE) The DMCA safe harbor?
11 **A. Yes.**
12     Q. Mr. Fogle responds (as read): We aren't doing
13 this today, from what I can gather.
14     Do you see that?
15 **A. I do.**
16     Q. And, again, as we've covered, Grande was not
17 terminating anybody for copyright infringement in
18 2013; right?
19 **A. That is correct.**
20     Q. (As read): ISYS owns the DMCA abuse process.
21 They provide what automation we have today. Snail mail
22 warnings are automatically sent out by CSG from an
23 upload process.
24     That's what he explains; right?
25 **A. Yes.**

294

1     Q. Are you aware of any other conversations
2 between Mr. Fogle and Mr. Chang regarding loss of the
3 DMCA safe harbor in 2013?
4 **A. I am not.**
5     Q. Did you have discussions with anybody at Grande
6 about Grande's losing any purported protection from the
7 DMCA safe harbor in 2013?
8 **A. Not that I recall.**
9     MR. O'BEIRNE: Let's take a quick break.
10     THE VIDEOGRAPHER: The time is 6:27 p.m.
11 We're going off the record.
12     (A recess was taken from 6:27 p.m.
13     to 6:36 p.m.)
14     THE VIDEOGRAPHER: The time is 6:36 p.m.
15 We're back on the record.
16     Q. (BY MR. O'BEIRNE) Mr. Horton, you understand
17 you're still under oath?
18 **A. Yes.**
19     Q. Did you discuss your testimony with anybody at
20 the break?
21 **A. No.**
22     Q. What are your roles and responsibilities as
23 Grande's DMCA agent?
24 **A. I'm listed as the contact for third parties to**
25 **reach out to Grande in terms of DMCA and copyright**

295

1 notification.
2     Q. Are there any other responsibilities you're
3 aware of that you have as Grande's DMCA agent?
4 **A. Directly, no.**
5     Q. And just going back to your answer. So having
6 your name on a piece of paper is sort of not a
7 responsibility. That's -- that's just a fact. But are
8 there any responsibilities that you have that flow from
9 the fact that your name is on the DMCA policy?
10 **A. Not directly, no.**
11     Q. In what respect, then, if not directly?
12 **A. I would sim- -- just simply say that, you know,**
13 **my responsibility is to ensure that the systems we have**
14 **are running and are operated. Policy procedure is not**
15 **my responsibility.**
16     Q. I -- okay. I'm not sure I understand that.
17     So are you testifying that, to the extent
18 that Grande has a DMCA procedure, it's your
19 responsibility, as the agent, to ensure that it's
20 running?
21     MR. HOWENSTINE: Objection. Misstates the
22 testimony.
23 **A. Please restate that.**
24     Q. (BY MR. O'BEIRNE) Yeah, sure. I'm just trying
25 to understand what your -- what your testimony is.

296

1 **A. Sure.**
2     Q. So you mentioned your name is on the policy.
3 We established that.
4 **A. Yes.**
5     Q. I'm asking: What's your understanding of your
6 responsibilities for anything that flow from the fact
7 that your name is on the policy?
8 **A. From the fact that my name's on the policy, I**
9 **don't feel like anything is directly related to that**
10 **internally to Grande. I am a point of contact as an**
11 **agent; thus I have to be responsive to anything that**
12 **comes to me from that channel.**
13     **From a Grande employee perspective, I have**
14 **had the responsibility to ensure the system we have in**
15 **place is running and is operational.**
16     Q. When you say "Grande employee perspective," you
17 mean what your employment responsibilities were prior to
18 becoming the DMCA agent?
19 **A. Generally speaking, as an operating engineer at**
20 **Grande, one of my responsibilities is to make sure our**
21 **systems function. One of those systems is the abuse**
22 **system.**
23     Q. Let me ask it a different way. There was a
24 point in time in which you became the DMCA agent; right?
25 **A. Yes.**

301

1   A. I do not recall seeing a report like this.
2   Q. Are you aware of Grande's ability to run such a
3   report?
4   A. Well, it's a logical assumption that if Grande
5   provided this that we generated the report.
6   Q. I understand that. I'm not asking you to
7   assume anything. I'm -- I'm asking you something a
8   little different.
9       I'm saying: What is your understanding of
10  Grande's ability to generate a report like this?
11  A. I think we've seen other examples today of
12  being able to query the database and provide reports of
13  this information.
14  Q. So is your testimony that whatever knowledge
15  you have about reports like this has been gleaned
16  sitting here with me, looking at exhibits I've been
17  showing you?
18  A. I would not quantify it that way.
19  Q. All right. So what -- what understanding do
20  you have, sitting here today, about Grande's ability to
21  generate this report?
22  A. As I stated, we have the ability to generate
23  these reports. We've seen examples of them today.
24  Q. Who generates them?
25  A. I don't know why these reports are generated.

302

1   Q. Do you see that, Plaintiffs' Exhibit 92, there
2   is an Entity column on the right-hand side?
3   A. I do.
4   Q. And Exhibit 92 lists, as specific account DMCA
5   violations, numerous ticket numbers with the source
6   entity as Rightscorp Inc.
7   A. I do.
8   Q. Please bear with me for a second.
9       MR. O'BEIRNE: That's all the questions I
10  have for Mr. Horton at this time. I pass the witness.
11      MR. HOWENSTINE: I have no questions of the
12  witness.
13      THE VIDEOGRAPHER: The time is 6:47 p.m.,
14  on February 21st, 2018. This completes the video
15  deposition of Lamar Horton.
16      THE REPORTER: Would you like to order a
17  copy of the transcript?
18      MR. HOWENSTINE: Yes, I would.
19      (Deposition concluded at 6:47 p.m.)
20
21
22
23
24
25

303

1   CERTIFICATE OF SHORTHAND REPORTER
2       I, CANDICE ANDINO, the officer before whom the
3   foregoing deposition was taken, do hereby certify that
4   the foregoing transcript is a true and correct record of
5   the testimony given; that said testimony was taken by me
6   stenographically and thereafter reduced to typewriting
7   under my direction; that reading and signing was not
8   requested; and that I am neither counsel for, related
9   to, nor employed by any of the parties to this case and
10  have no interest, financial or otherwise, in its
11  outcome.
12      IN WITNESS WHEREOF, I have hereunto set my hand
13  this 5th day of March, 2018.
14
15                          _____
                            CANDICE ANDINO
16                          TX CSR No. 9332, RMR
17
18
19
20
21
22
23
24
25