# Exhibit G



# Transcript of Stephanie Christianson, Designated Representative

**Date:** June 27, 2018

**Case:** UMG Recordings, Inc., et al. -v- Grande Communications Networks, LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

## Page 1

```
          IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TEXAS
                     AUSTIN DIVISION
UMG RECORDINGS, INC.,    §
et al.                   §
                         §
VS.                      §   CIVIL ACTION NUMBER
                         §   1:17-cv-0365-LY
GRANDE COMMUNICATIONS    §
NETWORKS LLC and         §
PATRIOT MEDIA            §
CONSULTING, LLC          §

              30(b)(6) Deposition of
         Grande Communications Networks LLC
      By and Through its Designated Representative
                  STEPHANIE CHRISTIANSON
             And in Her Individual Capacity
                      Austin, Texas
                      June 27, 2018
                       9:53 a.m.
                     Volume 1 of 2
Job No.: 193712
Pages: 1 - 238
Reported by: Micheal A. Johnson, RDR, CRR
```

## Page 2

```
     Deposition of STEPHANIE CHRISTIANSON, held
at the location of:


        Kelly Hart & Hallman LLP
        303 Colorado Street, Suite 2000
        Austin, Texas 78701




     Pursuant to Notice, before Micheal A.
Johnson, Registered Diplomate Reporter and
Certified Realtime Reporter.
```

## Page 3

```
                  A P P E A R A N C E S
FOR PLAINTIFFS:
     Philip J. O'Beirne
     STEIN MITCHELL CIPOLLONE
     BEATO & MISSNER LLP
     1100 Connecticut Avenue, N.W., Suite 1100
     Washington, D.C. 200036
     (202) 661-0900
     pobeirne@steinmitchell.com

ON BEHALF OF DEFENDANTS:
     Richard L. Brophy
     Margaret R. Szewczyk
     ARMSTRONG TEASDALE LLP
     7700 Forsyth Boulevard, Suite 1800
     St. Louis, Missouri 63105
     (314) 342-4159
     rbrophy@armstrongteasdale.com
     mszewczyk@armstrongteasdale.com

VIDEOGRAPHER:
     Leyhbert Sharp
```

## Page 4

```
                         INDEX
                  STEPHANIE CHRISTIANSON
                     June 27, 2018
APPEARANCES                                   3
PROCEEDINGS                                   8

 EXAMINATION OF STEPHANIE CHRISTIANSON:
     BY MR. O'BEIRNE                          9

ACKNOWLEDGMENT OF DEPONENT                  236
REPORTER'S CERTIFICATION                    238
```

13

1  Q. And your date of birth?
2  A. September 15, 1976.
3  Q. And your current address?
4  A. 1055 Pinnacle Parkway, New Braunfels,
5  Texas 78132.
6  Q. And what is your current position with
7  Grande?
8  A. I am a technical project manager.
9  Q. How long have you been a technical project
10 manager?
11 A. Approximately two and a half years.
12 Q. And who do you report to?
13 A. James Jordan.
14 Q. Do you have individuals that report
15 directly to you?
16 A. I do not.
17 Q. Okay. Another housekeeping item.
18 Yesterday Mr. Christianson was deposed, you may be
19 aware?
20 A. I am.
21 Q. And in front of you are exhibits that we
22 entered during his deposition. And to save paper
23 and for convenience, if I'm going to use again an
24 exhibit I used yesterday, my plan is just to hand
25 you the exhibit from the pile we used and that way

14

1  you'll have it in front of you and counsel already
2  has a copy.
3      MR. O'BEIRNE: And I understand counsel
4  has no objection to us proceeding that way.
5      MR. BROPHY: That's correct.
6  BY MR. O'BEIRNE:
7  Q. So if you could slide me that stack of
8  exhibits, which are unchanged and untouched from
9  yesterday, and all I'll do is flip through and
10 find whatever I want to talk to you about so that
11 we'll be on the same page.
12 A. Sounds good.
13 Q. Okay. With that, I am handing you what
14 was admitted yesterday as Plaintiffs' Exhibit 188.
15 Please take a moment to review the first page of
16 that document.
17     (Witness reviews document.)
18 BY MR. O'BEIRNE:
19 Q. This is the notice of 30(b)(6) deposition
20 that plaintiffs served on Grande. Have you seen
21 this document before?
22 A. I have.
23 Q. And you are here to provide 30(b)(6)
24 testimony in response to the topics -- some of the
25 topics listed in here, correct?

15

1  A. Correct.
2  Q. We have the list from counsel. I think
3  we're all on the same page as to which topics they
4  are, but I just wanted to make sure to have that
5  in front of us as we go forward this morning.
6  Okay?
7  A. Sure.
8      MR. BROPHY: Counsel, just one point of
9  clarification on that. Topic 41, which we
10 originally designated Ms. Christianson for, I
11 think we're going to be able to find a more
12 appropriate witness for that topic. So if you're
13 okay with it, we would like to de-designate her
14 for Topic 41 and provide someone else for that
15 topic. She can speak to it to some extent, but I
16 think there's likely someone else who's better
17 suited for responding to that topic.
18     MR. O'BEIRNE: Okay. Can we table that
19 until a break, because I think we have some other
20 topics for which Ms. Christianson is not
21 designated and I want to follow up with you about
22 that too.
23     MR. BROPHY: Certainly.
24     MR. O'BEIRNE: Let's huddle up, but for
25 now I won't ask questions on 41.

16

1      MR. BROPHY: Sounds good.
2  BY MR. O'BEIRNE:
3  Q. Ms. Christianson, I'm handing you what was
4  introduced previously as Plaintiffs' Exhibit 54.
5  Please take a moment to review that.
6      (Witness reviews document.)
7  BY MR. O'BEIRNE:
8  Q. That is one of Grande's responses to
9  written discovery in this case that are called
10 "interrogatories." Have you reviewed this
11 document before?
12 A. No.
13 Q. Okay. One of the topics in your
14 deposition regards -- I guess several of them do,
15 acceptable use policies and DMCA policies that
16 have been adopted by Grande. You generally
17 understand that, right?
18 A. Yes.
19 Q. Okay. And if you look at interrogatory --
20 if you turn to page 12 of PX54, you'll see there's
21 an Interrogatory 11, "Describe in detail the
22 complete factual and legal bases for your
23 contention that you are entitled to safe harbor
24 protection under the DMCA."
25     Do you see that?

**17**

1   A. Yes, I do.
2   Q. Then if you turn to Topic 13 of the
3   notice, which is one of the topics I understand
4   for which you've been offered by Grande, the topic
5   is, "The factual basis (or bases) for Grande's
6   assertion to entitlement to the DMCA safe harbor
7   from copyright infringement liability (referenced
8   in Grande's response to Plaintiffs'
9   Interrogatory 11), to include 'each policy that
10  provides for the termination of subscribers and
11  account holders who are repeat copyright
12  infringers' Grande references, the effective date
13  and period of application of such a policy, the
14  implementation of such a policy, and the number of
15  repeat infringers terminated under that policy."
16      You see that?
17  A. I do.
18  Q. Are you prepared to provide testimony on
19  behalf of Grande on Topic 13?
20  A. I am.
21  Q. Okay.
22      (Deposition Exhibit 190 marked for
23  identification.)
24  BY MR. O'BEIRNE:
25  Q. I'm handing you what I've just marked as

**18**

1   PX190. I'm sorry, I accidentally handed you two
2   copies of it. PX190 is a supplemental response to
3   Interrogatories 11 and 15 served by Grande on
4   plaintiffs in this case. Do you see that from the
5   title?
6   A. I do.
7   Q. And so we've got in front of us the third
8   supplemental responses to all the interrogatories
9   and then the supplemental response to 11.
10      In PX190, if you look at the bottom of
11  page 2 -- bear with me, I'm sorry. I lost my --
12  sorry -- at the top of page 3. So we're looking
13  at PX190, the top of page 3, the third line down
14  starts a sentence, "The document titled DMCA
15  Policy and Procedure, which has already been
16  produced, has been available at" -- and there's a
17  link to Grande's DMCA policy -- "since
18  November 30, 2016." Do you see that?
19  A. I do.
20  Q. And then it also says, "Grande's
21  Acceptable Use Policy, which has already been
22  produced, has been available at" -- and then
23  there's another link -- "since at least
24  March 2014."
25      Do you see that?

**19**

1   A. Yes, I do.
2   Q. All right. I would like to ask you now
3   about Grande's acceptable use policies over time
4   and its DMCA policy. Okay?
5   A. Sure.
6   Q. I'm handing you what's previously been
7   admitted as PX103. Do you recognize that
8   document?
9       (Witness reviews document.)
10  A. Yes.
11  BY MR. O'BEIRNE:
12  Q. What is that?
13  A. It is the acceptable use policy that's on
14  our Internet.
15  Q. And what was the effective date of that
16  policy?
17  A. It is dated October 1st, 2013.
18  Q. I see that at the top. So I understand
19  you to be testifying that that policy became
20  effective October 1st, 2013?
21  A. That is what it says.
22  Q. Again, so -- and I'm glad you mentioned it
23  that way so we can clarify. Throughout the day
24  there may be documents that have information in
25  them and I may ask you, does this document say X

**20**

1   or Y or Z, like you just said what -- words are
2   written on the top of the document. That's one
3   kind of question. Another kind of question is
4   setting aside what the document says, what
5   knowledge does Grande have about the document, the
6   circumstances of it, the meaning of it, et cetera.
7   Do you understand that distinction?
8   A. I do.
9   Q. So Topic 13 we looked at is the factual
10  basis for Grande's assertion to entitlement to the
11  safe harbor to include the effective date of any
12  policy that Grande believes entitles it to the
13  safe harbor.
14      So what was the effective date of that
15  policy?
16  A. I can't answer that. I'm not sure.
17  Q. Okay. Is that the current Grande
18  acceptable use policy for residential users?
19      (Witness reviews document.)
20  BY MR. O'BEIRNE:
21  Q. Ms. Christianson, are you reviewing that
22  in detail to ensure that's an accurate copy of the
23  one that was effective 2013 or to determine
24  whether there's a subsequent one?
25  A. I'm trying to see if there's some clue in

**Page 29**

1  provided for the termination of subscribers or
2  account holders who are repeat copyright
3  infringers?
4  **A. I can't speak to that either.**
5  Q. Did Grande have a policy in 2011 that
6  provided for the termination of subscribers or
7  account holders who are repeat copyright
8  infringers?
9  **A. I can't speak to that.**
10 Q. Did Grande have a policy in 2012 that
11 provides for the termination of subscribers and
12 account holders who are repeat copyright
13 infringers?
14 **A. Repeat the question, please.**
15 Q. Did Grande have a policy in 2012 that
16 provided for the termination of subscribers and
17 account holders who are repeat infringers?
18 **A. That provided for the termination, is that**
19 **what you're asking?**
20 Q. Yes.
21 **A. Not that I'm aware of.**
22 Q. Did Grande have a policy in 2014 that
23 provided for the termination of subscribers and
24 account holders who were repeat infringers?
25 **A. Not that I'm aware of.**

**Page 30**

1  Q. Grande did not have a policy that provided
2  for the termination of subscribers and account
3  holders who were repeat infringers until, at the
4  earliest, the DMCA policy and procedure published
5  in 2016, correct?
6  **A. Yes.**
7  MR. O'BEIRNE: Did you need to break now
8  or at 10:30?
9  MR. BROPHY: If it's okay -- if now is
10 okay.
11 MR. O'BEIRNE: Now is okay. Can we huddle
12 up real quick before you disappear?
13 MR. BROPHY: Sure.
14 MR. O'BEIRNE: Let's go off the record.
15 THE VIDEOGRAPHER: Let's go off the record
16 at 10:27.
17 (Recess taken from 10:27 a.m. to
18 11:05 a.m.)
19 THE VIDEOGRAPHER: We're going back on the
20 record at 11:05.
21 BY MR. O'BEIRNE:
22 Q. Ms. Christianson, you understand you're
23 still under oath?
24 **A. I do.**
25 Q. Did you discuss the substance of your

**Page 31**

1  testimony with anybody at the break?
2  **A. No.**
3  Q. Okay. Before we broke, we were discussing
4  Grande's historical handling of allegations of
5  copyright infringement. Do you recall that?
6  **A. I do.**
7  Q. And we've established that prior to --
8  well, strike that.
9     Between 2010 -- I'm sorry, strike that
10 again. I'm going to take this in a sensible way.
11    The 12 subscribers that Grande has
12 terminated for copyright infringement were all
13 terminated after June 2017, correct?
14 **A. Yes.**
15 Q. So it's fair to say that Grande did not
16 terminate any subscribers for copyright
17 infringement or alleged copyright infringement
18 between at least October 2010 and May 2017,
19 correct?
20 **A. Correct.**
21 Q. That was based on a decision made by
22 Grande in 2010, right?
23    MR. BROPHY: I'll object as outside the
24 scope of the topics.
25

**Page 32**

1  BY MR. O'BEIRNE:
2  Q. You can answer.
3  **A. Yes.**
4  Q. And from October 2010 through May 2017,
5  Grande was not terminating any users for copyright
6  infringement or alleged copyright infringement
7  regardless of the source of any notice of
8  copyright infringement, right?
9  **A. Sorry, can you repeat that?**
10 Q. Sure, that's fine. From October 2010
11 through May 2017, Grande was not terminating any
12 users for copyright infringement or alleged
13 copyright infringement regardless of the source of
14 any notice of alleged copyright infringement that
15 it received, right?
16 **A. Correct.**
17 Q. And from 2010 through May 2017, Grande was
18 not terminating any users for copyright
19 infringement or alleged copyright infringement
20 regardless of the content of any notice of alleged
21 copyright infringement that it received, right?
22 **A. Correct.**
23 Q. And from 2010 through May 2017, Grande was
24 not terminating any users for copyright
25 infringement or alleged copyright infringement

**33**

1 regardless of the volume of notices regarding
2 copyright infringement that it received for a
3 given customer?
4    A. Correct.
5    Q. So from 2010 through May 2017, there was
6 no possibility that any Grande subscriber would be
7 terminated for copyright infringement, right?
8       MR. BROPHY: Objection, vague, calls for
9 speculation, outside the scope of the topics.
10      You can answer in your personal capacity
11 if you're aware.
12   A. I am not aware.
13 BY MR. O'BEIRNE:
14   Q. There was no possibility that a Grande
15 subscriber for whom Grande received a notice of
16 copyright infringement, would be terminated for
17 copyright infringement from 2010 through May 2017,
18 right?
19      MR. BROPHY: Objection, vague, calls for
20 speculation and outside the scope of the topics.
21      You can answer in your personal capacity
22 if you're aware.
23   A. I can't answer that.
24 BY MR. O'BEIRNE:
25   Q. You agreed with me that Grande wasn't

**34**

1 terminating anybody for copyright infringement
2 during that period, right?
3       MR. BROPHY: Objection, mischaracterizes
4 the testimony.
5    A. To my knowledge.
6 BY MR. O'BEIRNE:
7    Q. And you're here as Grande's witness as to
8 the factual bases for any entitlement to the safe
9 harbor, right?
10   A. Yes.
11   Q. Grande terminated the 12 people it has
12 terminated since May 2017 because the
13 circumstances were appropriate to terminate them
14 as repeat copyright infringers, correct?
15      MR. BROPHY: Objection, outside the scope
16 of the topics, vague, calls for speculation.
17      You can answer in your personal capacity
18 if you're aware.
19      MR. O'BEIRNE: Hold on, I would just like
20 to clarify the record. Topic No. 13, the factual
21 basis for Grande's assertion to entitlement to the
22 DMCA safe harbor, including, but not limited to,
23 the implementation of such a policy and the number
24 of repeat infringers terminated under the policy.
25

**35**

1 BY MR. O'BEIRNE:
2    Q. So I'm asking, did Grande terminate the 12
3 infringers it's terminated since May 2017 under
4 its DMCA policy and procedure?
5    A. Yes.
6    Q. And Grande did so because it determined
7 the circumstances were appropriate to terminate
8 them as repeat copyright infringers under its DMCA
9 policy and procedure?
10      MR. BROPHY: Objection, vague, calls for
11 speculation, outside the scope of the topics, but
12 you can answer.
13   A. Yes.
14 BY MR. O'BEIRNE:
15   Q. When was the DMCA -- strike that.
16      Grande's DMCA policy and procedure was
17 implemented, at the earliest, February 2017,
18 right?
19      MR. BROPHY: Object as vague, but you can
20 answer.
21   A. So the DMCA policy when it was put in
22 place and on the website, is the date on which it
23 would've been enforced.
24 BY MR. O'BEIRNE:
25   Q. When was it put on the website?

**36**

1    A. It looks like it was November of 2016.
2    Q. But nobody was terminated under the policy
3 until June 2017, right?
4    A. June 2017 was the first termination.
5    Q. Okay. So it's your testimony that the
6 earliest that the DMCA policy and procedure was
7 implemented was November 2016?
8       MR. BROPHY: Objection, vague.
9    A. That was when the policy was put on the
10 website and it was enforced.
11 BY MR. O'BEIRNE:
12   Q. So my specific question is, what is the
13 earliest date on which the DMCA policy and
14 procedure was implemented? And I understand you
15 to be testifying that the earliest date of
16 implementation of the DMCA policy and procedure
17 was November 2016.
18      MR. BROPHY: Objection, vague.
19 BY MR. O'BEIRNE:
20   Q. Do you agree with that?
21   A. November 2016 is when it was posted on the
22 website.
23   Q. Okay. I'm handing you what's previously
24 been admitted as PX53. Do you see that?
25   A. Yeah. Yes.

---

**Page 37**

1  Q. That is Grande's current policy titled
2  "DMCA Policy and Procedure," correct?
3  A. Yes.
4  Q. So as we're talking today, when I refer to
5  Grande's DMCA policy and procedure, I'm referring
6  to that document. You understand?
7  A. Yes.
8  Q. Okay. As opposed to, say, the acceptable
9  use policy effective October 1st, 2013. Okay?
10 A. Yes.
11 Q. All right. When was that DMCA policy and
12 procedure, PX53, first implemented by Grande?
13 A. It would've been November of 2016, when it
14 was posted to the website.
15 Q. You would agree with me that prior to the
16 posting -- strike that.
17     I would like to talk about two periods
18 now. The period before November 2016 -- strike
19 that.
20     I would like to talk to you about the time
21 period between 2010 and November 2016, that's one
22 time period, and then the time after November 2016
23 is the second period. Is that fair?
24 A. Yes.
25 Q. All right. You've already testified that

**Page 38**

1  Grande did not have a policy that provided for the
2  termination of subscribers and account holders who
3  were repeat infringers until, at the earliest,
4  that DMCA policy and procedure, right?
5     MR. BROPHY: Objection, mischaracterizes
6  her earlier testimony and also vague.
7     You can answer.
8  A. I did say that.
9  BY MR. O'BEIRNE:
10 Q. So you would agree with me that prior
11 to -- strike that.
12     You would agree with me that between at
13 least 2010 and November 2016, there is no factual
14 basis for Grande to assert an entitlement to the
15 DMCA safe harbor?
16     MR. BROPHY: I'm sorry, Counsel. Would
17 you mind repeating that question? I apologize.
18 BY MR. O'BEIRNE:
19 Q. You would agree with me that between at
20 least 2010 and November 2016, there is no factual
21 basis for Grande to assert an entitlement to the
22 DMCA safe harbor?
23     MR. BROPHY: Objection as outside the
24 scope of the 30(b)(6) topics, calling for
25 speculation and vague.

**Page 39**

1  A. I don't know that I can say that I would
2  agree with you on that.
3  BY MR. O'BEIRNE:
4  Q. What factual basis exists for Grande to
5  assert entitlement to the safe harbor under the
6  DMCA for any period between October 2010 and
7  November 2016?
8     MR. BROPHY: Same objections.
9     MR. O'BEIRNE: Hold on. To be clear,
10 Topic 13 says the factual basis for Grande's
11 assertion to entitlement to the DMCA safe harbor
12 from copyright infringement liability.
13 BY MR. O'BEIRNE:
14 Q. So I'm asking, Ms. Christianson, please
15 tell me the factual basis, as Grande's corporate
16 witness, for Grande to assert an entitlement to
17 the DMCA safe harbor for any time period between
18 October 2010 and November 2016.
19    MR. BROPHY: Just to be clear, this topic
20 addresses the factual bases for it, not
21 Ms. Christianson's understanding of the law and
22 how those facts apply to the law. So I'm going to
23 continue to object as outside of the scope of the
24 topics for that reason.
25    MR. O'BEIRNE: Okay. I'll give you -- the

**Page 40**

1  objection's in the record. Can I just re-read the
2  question for the benefit of the witness?
3     MR. BROPHY: Yeah.
4     MR. O'BEIRNE: So understanding your
5  objection to the scope.
6  BY MR. O'BEIRNE:
7  Q. Ms. Christianson, here's my question:
8  Please tell me the factual basis or bases as
9  Grande's corporate witness, for Grande to assert
10 an entitlement to the DMCA safe harbor for any
11 time period between October 2010 and
12 November 2016?
13 A. I can't answer that.
14 Q. You have in front of you PX -- I think
15 it's 182, the 2013 -- it's 103. Sorry. PX103 in
16 front of you, the 2013 acceptable use policy; you
17 see that?
18 A. Yes.
19 Q. You would agree with me that that is the
20 acceptable use policy in place at Grande from
21 October 1st, 2013, through the present, correct?
22 A. If this is the one that's posted on the
23 website, yes.
24 Q. Okay. And prior to the implementation of
25 the DMCA policy and procedure document that we've

**Page 41**

1  looked at, that is the only policy at Grande
2  governing copyright infringement allegations
3  against Grande subscribers, right?
4      MR. BROPHY: Objection, vague.
5  A. I'm sorry. Can you repeat it?
6  BY MR. O'BEIRNE:
7  Q. Sure. Let's just break it down. You
8  understand the DMCA policy and procedure addresses
9  alleged copyright infringement by Grande
10 subscribers, right?
11 A. Yes.
12 Q. And the acceptable use policy also
13 addresses copyright infringement, right?
14 A. Yes.
15 Q. So prior to the DMCA policy and procedure
16 document that we've looked at, the 2013 acceptable
17 use policy was the only policy at Grande
18 addressing allegations of copyright infringement
19 submitted by third parties to Grande based on
20 conduct of -- by Grande subscribers, right?
21     MR. BROPHY: Same objection.
22 A. Yes.
23 BY MR. O'BEIRNE:
24 Q. So if I'm a Grande subscriber in
25 January 2014 and I want to know what I'm allowed

**Page 42**

1  to do with Grande's Internet service, I would look
2  to that document, right?
3      MR. BROPHY: Objection, vague; also
4  outside the scope of the topics, calls for
5  speculation.
6  A. This acceptable use policy is where we
7  would have that information. What a customer
8  would do, I cannot speak to.
9  BY MR. O'BEIRNE:
10 Q. Okay. But it's fair to say this Internet
11 acceptable use policy governed the acceptable use
12 of Grande's Internet service by its customers?
13 A. Yes.
14 Q. Okay. And if I were a third-party
15 copyright owner and I wanted to submit a notice of
16 copyright infringement by a Grande subscriber in
17 January 2014, what would I look at of Grande's
18 policies to figure out how to do that?
19 A. The acceptable use policy.
20 Q. Okay. Between October 2013 -- well,
21 strike that.
22     During the time that this acceptable use
23 policy was in effect and prior to the DMCA policy
24 and procedure, what e-mail addresses did Grande
25 have set up to receive notices of copyright

**Page 43**

1  infringement by its subscribers?
2  A. Repeat the question for me one more time.
3  Q. Sure. Again, I'm trying to differentiate
4  between November 2016 and forward under the new
5  DMCA policy and procedure and the time when just
6  this policy was in effect.
7      So my question is, during the time this
8  policy was in effect in PX103 but before the DMCA
9  policy and procedure, what e-mail addresses was
10 Grande using to accept notices of alleged
11 copyright infringement by its subscribers?
12 A. It was abuse@ -- I believe it was
13 grandecom.com at the time.
14 Q. Also dmca@grandecom.com?
15 A. Yes.
16 Q. And I've seen at various times e-mail
17 suffixes of @mygrande.com, @grandecom.com. Is it
18 your understanding that those all go to the same
19 place?
20 A. Yes, ultimately. We migrated everything.
21 Q. So an e-mail sent to dmca@mygrande.com for
22 the time when that e-mail was active and
23 dmca@grandecom.com, those would both go into the
24 system?
25 A. Yes.

**Page 44**

1  Q. The abuse system?
2  A. Say that one more time.
3  Q. The abuse system?
4  A. Yes.
5  Q. Other than the dmca@ and the abuse@
6  addresses that we've discussed, was there any
7  other e-mail address at which Grande was accepting
8  and processing notices of alleged copyright
9  infringement from October 2013 until
10 November 2016?
11     MR. BROPHY: Objection, vague.
12 A. Repeat the question for me, please.
13 BY MR. O'BEIRNE:
14 Q. Sure. Other than the dmca@ and the abuse@
15 e-mail addresses that you've referenced, was there
16 any other e-mail address at which Grande was
17 accepting and processing notices of alleged
18 copyright infringement from October 2013 until
19 November 2016?
20 A. Not that I'm aware of.
21 Q. As Grande's corporate witness you're not
22 aware of any other, right?
23     MR. BROPHY: Same objection.
24 A. No.
25

**Page 65**

1 is, right?
2   MR. BROPHY: I'll object as outside the
3 scope of the topics and vague.
4   A. In general terms, yes.
5 BY MR. O'BEIRNE:
6   Q. Okay. And obviously Topic 2, I would like
7 to discuss with you Grande's knowledge of its
8 customers' or users' use of Grande's Internet
9 service to infringe copyrighted sound recordings.
10 So obviously we're going to be discussing what
11 "infringing sound recordings" means.
12   MR. BROPHY: I'll object as outside the
13 scope of the topics.
14 BY MR. O'BEIRNE:
15   Q. Okay. Ma'am, do you believe that you
16 understand what "infringe copyrighted sound
17 recordings" means sufficient to testify about
18 Topic No. 2?
19   A. Yes.
20   Q. Okay. You understand that copyrighted
21 sound recordings can be infringed by various kinds
22 of activities?
23   MR. BROPHY: Same objections.
24   A. What kind of activities are you referring
25 to?

**Page 66**

1 BY MR. O'BEIRNE:
2   Q. Well, for example, you could take a CD and
3 burn a bunch of copies of a CD. That could be
4 copyright infringement, right?
5   A. Yes.
6   Q. Or you could make digital copies of an
7 electronic sound recording. That could be
8 copyright infringement?
9   A. Yes.
10   Q. And one of the ways that copyrighted sound
11 recordings are infringed is through online file
12 sharing, right?
13   MR. BROPHY: Object as outside the scope
14 of the topics and also vague, calling for
15 speculation.
16   A. I suppose it's one of the ways, yes.
17 BY MR. O'BEIRNE:
18   Q. Well, you don't just have to suppose,
19 right? I mean you generally understand people
20 share files over, say, peer-to-peer networks like
21 BitTorrent, right?
22   MR. BROPHY: Same objections.
23   A. I understand that it's a thing, yes.
24 BY MR. O'BEIRNE:
25   Q. That occurs?

**Page 67**

1   A. Sure, it can.
2   Q. Well, you understand that's what this case
3 is about, is that users of Grande's services,
4 plaintiffs allege, infringed plaintiffs' works
5 over BitTorrent, right?
6   A. Yes.
7   Q. Okay. And you -- how many notices of
8 alleged infringement did Grande receive between
9 2011 and 2016?
10   A. Notices of alleged infringement is about
11 1.2 million.
12   Q. And you understand that those notices
13 largely deal with peer-to-peer file sharing
14 infringement?
15   A. Allegedly, yes.
16   Q. Right. Sitting here today, what evidence
17 do you have, as Grande's representative on Topic
18 No. 2, that any particular notice received by
19 Grande did not accurately describe the factual
20 information contained in that notice?
21   MR. BROPHY: I'll object as outside the
22 scope of the topics, calling for speculation and
23 vague.
24   A. I'm sorry, what do you mean? Repeat the
25 question.

**Page 68**

1 BY MR. O'BEIRNE:
2   Q. Sure. Well, in topic --
3   A. Rephrase.
4   Q. Sure. Topic No. 1 is "Communications,
5 information and documents concerning copyright
6 infringement of sound recordings through your
7 customers' use of your Internet service."
8     And then Topic No. 2 talks about Grande's
9 knowledge of the use of the service, infringement.
10    So I'm just asking you, you just testified
11 Grande's testimony is that it received at least
12 1.2 million, approximately, notices of -- what you
13 called "alleged infringement," between 2011 and
14 2016, right?
15   A. Yes.
16   Q. Sitting here today, what evidence do you
17 have, as Grande's representative, that any
18 particular one of those notices contained a
19 description of alleged infringement that was
20 inaccurate?
21   MR. BROPHY: Object as outside the scope
22 of the 30(b)(6) topics and vague.
23   A. I can only report that we've received the
24 notices.
25

**Page 69**

BY MR. O'BEIRNE:
Q. Topic 29 is "Grande's receiving, forwarding, developing, conceiving, drafting, implementing, or disseminating to customers, users or other third parties, any notice."
  Do you see that?
A. I do.
Q. Grande does not independently investigate the contents of any notice of copyright infringement that it receives, does it?
A. Investigate how?
Q. In any way.
A. Can I ask you to rephrase that? I want to make sure I've got the correct question you're asking.
Q. Sure. Let me repeat my question.
  Grande does not independently investigate the contents of any notice of copyright infringement that it receives, correct?
A. Investigate the content, no.
Q. Sitting here today, can you tell me of any instance in which Grande received a notice alleging copyright infringement and determined that the factual event described in the notice that the sender alleged constituted copyright

**Page 70**

infringement did not occur as detailed in the notice?
  MR. BROPHY: Objection as outside the scope of the topics, calling for speculation.
A. I can't concretely answer that.
BY MR. O'BEIRNE:
Q. Is it fair to say that -- well, let's think of it this way. Grande receives a notice from a copyright holder saying at such and such a time, this IP address copied this song. Those are the kinds of notices Grande receives, right?
A. Yes.
Q. Sitting here today, can you tell me any time that Grande determined using any means at its disposal, that a notice describing an event alleged to be copyright infringement did not occur as described in the notice?
  MR. BROPHY: I'll object as outside the scope of the topics and calling for speculation.
A. Not that I could speak to. I don't know that.
BY MR. O'BEIRNE:
Q. I'm handing you what's previously been marked as PX169, a document produced by Grande in this case with a Bates number ending 474. Do you

**Page 71**

see that, ma'am?
A. I do.
Q. This is an e-mail chain from March 2016, right?
A. Yes.
Q. At the bottom of the e-mail there's -- strike that.
  The bottom of the first page of PX169 has an e-mail from david.pattee@grifols.com to Paul Morgan and chris.doyle@mygrande.com. Do you see that?
A. Yes.
Q. And he's forwarding an e-mail that's titled "Notice of Claimed Infringement - Case ID 413176005." Do you see that?
A. I do.
Q. And he says, "Paul and Chris, Can you clarify the abuse e-mail below that we received from Grande?"
  Do you see that?
A. Yes.
Q. And this is being sent by an enterprise customer, right, because they would've received an e-mail as opposed to a written letter as of March 22nd, 2016?

**Page 72**

A. Yes.
Q. Mr. Morgan responds -- actually, strike that.
  Mr. Morgan forwards the e-mail at the bottom of the first page of PX169 to @OSC and Robert Creel asking, "All, Was an abuse ticket created for Girfols or Biomet? See below e-mail chain. Is this legit or what is it about?"
  Do you see that?
A. I do.
Q. He then says, "Their IT guy e-mailed me this today asking what is going on?"
  Do you see that?
A. Yes.
Q. William Rannefeld responds to Mr. Morgan's e-mail at 2:23 p.m. on March 22nd, 2016. Do you see that?
A. I do.
Q. He says, "Paul, This is an e-mail generated from our abuse system."
  Do you see that?
A. Yes.
Q. He says, "I pulled up the actual abuse ticket and it is also random numbers and letters."
  Do you see that?

Page 105

1  on the record, Exhibit 198.
2     MR. O'BEIRNE:  Oh, sorry.  Thank you.  My
3  apologies.  I've got to put my hand on the other
4  ones we looked at.
5  BY MR. O'BEIRNE:
6     Q.  Let's look at 69.  It's the e-mail from
7  Mr. Lomax.  Remember that?
8     A.  Yes.
9     Q.  So Mr. Lomax in Exhibit 69 says, "This is
10 a notice that someone has illegally downloaded
11 copyrighted content."
12    Do you recall that?
13    A.  Yes.
14    Q.  And you've testified, I understood you to
15 be testifying that perhaps Mr. Lomax didn't fully
16 understand the meaning of the information in
17 Grande's abuse system.  Is that your testimony?
18    A.  Yes.
19    Q.  Now, we've covered this, I think, but
20 Mr. Horton clearly understands the abuse system,
21 right?
22    MR. BROPHY:  Object as outside the scope
23 of the topics.
24    A.  Yes.
25

Page 106

1  BY MR. O'BEIRNE:
2     Q.  Mr. Bloch clearly understands the abuse
3  system, right?
4     MR. BROPHY:  Same objection.
5     A.  Mr. Bloch's part of the team that actually
6  processes the alleged infringement notices.  So to
7  that portion of the process, yes, he does.
8  BY MR. O'BEIRNE:
9     Q.  Mr. Creel certainly understands the abuse
10 process, right?  He's the director of network and
11 technical support.
12    MR. BROPHY:  Objection, outside the scope
13 of the topics, calling for speculation; also
14 vague.
15    A.  Mr. Creel would understand a portion of it
16 at least.  I can't speak to how much of the
17 process he understands and knows.
18 BY MR. O'BEIRNE:
19    Q.  Mr. Murphy, the president of the company,
20 is certainly in a position to provide accurate
21 information about what Grande knows in March 2014,
22 right, ma'am?
23    MR. BROPHY:  Objection, calls for
24 speculation, outside the scope of the topics.  I
25 just caution the witness not to speculate.

Page 107

1     A.  I don't know what Mr. Murphy knows.
2  BY MR. O'BEIRNE:
3     Q.  He was the president of the company in
4  2014.  We've established that, right, ma'am?
5     A.  That is true.
6     MR. O'BEIRNE:  Do we have an answer on
7  198, Counsel?
8     MR. BROPHY:  I'm sorry?
9     MR. O'BEIRNE:  Do we have an answer on the
10 clawback of 198?
11    MR. BROPHY:  198 does need to be clawed
12 back, yes.
13    MR. O'BEIRNE:  Does --
14    MR. BROPHY:  Does.
15    MR. O'BEIRNE:  -- affirmatively need to be
16 clawed back?
17    MR. BROPHY:  Yes.
18    MR. O'BEIRNE:  I'm not in a position now
19 to say whether it's also been used in other
20 depositions.  I just don't remember.  Sometimes
21 docs have appeared a couple of times as exhibits
22 or whatnot, so we can address that.  And I'm
23 not -- let's table that because if it has been, I
24 want to discuss it.  But I will put it aside just
25 so I don't actually reference it again.

Page 108

1     MR. BROPHY:  I appreciate it.
2  BY MR. O'BEIRNE:
3     Q.  Ms. Christianson, as Grande's corporate
4  representative on Topic 2, you would agree with me
5  that Mr. Bloch's statement, that they know they
6  downloaded the referenced content each time, is
7  evidence that the notices Grande receives give an
8  actual knowledge of specific acts of infringement
9  described in those notices, right, ma'am?
10    MR. BROPHY:  Objection, calls for
11 speculation, vague and asked and answered.
12    A.  I don't know what Colin was referring to
13 in that e-mail.
14 BY MR. O'BEIRNE:
15    Q.  Grande has terminated customers based on
16 these notices, right?
17    A.  Yes.
18    Q.  The only customers Grande has ever
19 terminated were based on -- strike that.
20    Grande has only ever terminated customers
21 for copyright infringement based on notices it
22 received from third parties, right?
23    MR. BROPHY:  Objection, vague.
24 BY MR. O'BEIRNE:
25    Q.  Let me withdraw that question and see if I

---

**Page 109**

can come at it a different way.
    Grande has, since 2011, terminated a total of 12 customers for copyright infringement, right?
    MR. BROPHY: Objection, vague.
    A. Alleged copyright infringement.
BY MR. O'BEIRNE:
    Q. Each of those 12 were terminated based on notices received by Grande, right?
    A. Yes.
    Q. The notices served as the basis for termination, right?
    A. Yes.
    Q. It's not that the 12 people came in apropos of nothing and confessed to copyright infringement and then Grande terminated them. That's not what happened, right?
    A. Correct.
    Q. A third party sent a notice to Grande's abuse system, and based on notices received from the abuse system, Grande terminated these customers?
    A. Yes.
    Q. I'm handing you -- actually, you may have it in front of you, PX53. You do, I think, the DMCA policy and procedure. Can you find that,

**Page 110**

ma'am? You looked at it earlier. Do you see that?
    A. Yes.
    Q. Do you see in the first paragraph of this document it states, about halfway down starting on the far right, "Grande Communications Networks, LLC, will terminate the subscriptions of repeat copyright infringers"?
    Do you see that?
    A. I do.
    Q. Grande terminated those people because they determined them to be repeat copyright infringers, right?
    MR. BROPHY: Objection, vague.
    A. Because we received multiple copies of the notification of alleged infringement.
BY MR. O'BEIRNE:
    Q. Based on those notices, Grande determined those 12 customers to be repeat copyright infringers, right?
    MR. BROPHY: Same objection.
    A. Grande simply received multiple notices of alleged infringement for those customers.
BY MR. O'BEIRNE:
    Q. Grande terminated 12 customers under this

**Page 111**

DMCA policy, right?
    A. Yes.
    Q. You would agree with me that Grande terminated those 12 customers because Grande determined that those 12 customers were repeat copyright infringers?
    MR. BROPHY: Same objection; also asked and answered.
    A. Grande terminated the subscribers because we received repeated notices of allegation of infringement for their accounts.
BY MR. O'BEIRNE:
    Q. Does the policy say, "We will terminate you even if you're not a repeat infringer if we receive allegations that you infringed"? Does it say that?
    (Witness reviews document.)
    A. No.
BY MR. O'BEIRNE:
    Q. It doesn't say that, does it?
    A. No.
    Q. It does say "Grande will terminate the subscriptions of repeat copyright infringers." How many repeat copyright infringers has Grande terminated the subscriptions of?

**Page 112**

    MR. BROPHY: Objection, vague.
BY MR. O'BEIRNE:
    Q. Under -- let me qualify that. Since this policy was implemented, how many repeat copyright infringers has Grande terminated the subscriptions of pursuant to this policy?
    MR. BROPHY: Objection, vague, calls for speculation; also outside the scope of the topics.
    A. Grande has terminated 12 accounts based on alleged infringement.
BY MR. O'BEIRNE:
    Q. Because the subscribers of those accounts were repeat copyright infringers in Grande's determination?
    MR. BROPHY: Same objections.
    A. Because we received repeated alleged infringement notifications.
BY MR. O'BEIRNE:
    Q. Ma'am, you received repeated alleged infringement notifications for thousands of accounts, right?
    A. I don't have the exact number off the top of my head.
    Q. You know it's at least several thousand, right?

Page 177

1  Q. And looking at PX62, which is one of the
2  documents Grande pointed us to as representing
3  actions taken against subscribers, it lists from
4  row 15 to row 37, notices Grande received from
5  Rightscorp for this account, right?
6  A. Yes.
7  Q. PX62 does not list any other entity for
8  which Grande received a notice for this account on
9  June 15th, does it?
10  A. It does not.
11  Q. So Grande sent a notice to account ending
12  6380 on June 15th based on a Rightscorp notice it
13  received, right?
14     (Witness reviews document.)
15  A. I can't say that conclusively. I would
16  need more information.
17  BY MR. O'BEIRNE:
18  Q. Ma'am, I understand your reluctance to say
19  that that's what happened, but isn't that obvious
20  from these documents?
21     MR. BROPHY: Object as vague.
22  A. It's not obvious. There could be
23  additional information.
24  BY MR. O'BEIRNE:
25  Q. Grande prepared written discovery

Page 178

1  responses to us that told me that this document
2  reflects actions taken against this customer who
3  you terminated, and you're going to say under oath
4  that you didn't take action against this customer
5  based on Rightscorp notices?
6     MR. BROPHY: I'll object to the extent
7  that it mischaracterizes the interrogatory and
8  defendants' response to that interrogatory.
9  A. I can't speak to why this document was
10  included.
11  BY MR. O'BEIRNE:
12  Q. Did you have anything to add to that
13  answer, ma'am? I don't want to interrupt you, but
14  it seemed like you were going to continue
15  testifying.
16  A. No.
17     MR. O'BEIRNE: I would just like to note
18  for the record, the witness considered that answer
19  for a minute and ten seconds before answering and
20  to a prior question, reviewed the document for
21  two minutes and 20 seconds prior to answering.
22  BY MR. O'BEIRNE:
23  Q. The basis of your testimony that Grande
24  does not process Rightscorp notices is the PGP
25  digital signature issue you mentioned previously,

Page 179

1  right?
2  A. Yes.
3  Q. Prior to Grande changing its DMCA policy
4  and procedure to expressly request notices be
5  signed with a PGP digital signature, Grande did
6  process Rightscorp notices, correct?
7     MR. BROPHY: Objection, vague.
8     Counsel, I don't mean to interrupt you,
9  but I think the record will be clearer if we
10  established what "processing" means. I'm
11  concerned that there's some significant lack of
12  clarity developing in the record because of that.
13  Feel free to ignore that, but I'll throw it out
14  there. I think it might help everyone.
15  BY MR. O'BEIRNE:
16  Q. I'll withdraw the question for one second.
17  Please bear with me, ma'am, while I scroll back
18  through.
19     Your testimony previously was, "the
20  alleged notifications we get from Rightscorp have
21  not been processed." That's what you said, right?
22  A. Yes.
23  Q. What did you mean by "have not been
24  processed"?
25  A. Meaning we take them into our abuse queue

Page 180

1  for counts, but they don't get processed. They
2  don't formulate a notification to the subscriber.
3  Q. Turned into a letter by the abuse system?
4  A. Correct.
5  Q. Prior to Grande updating its DMCA policy
6  to expressly request notices be signed with a PGP
7  digital signature, Grande did process all the way
8  through and generate a letter based on Rightscorp
9  notices it received, correct?
10  A. That is my understanding, yes.
11  Q. Your understanding as Grande's corporate
12  witness on the topic of notices?
13  A. Yes.
14  Q. Other than Grande's policy change, sitting
15  here today, can you tell me any difference between
16  the Rightscorp notices Grande received prior to
17  requesting a PGP and after requesting a PGP?
18  A. Repeat that.
19  Q. Sure. There was a time, before Grande
20  requested that notices be digitally signed by PGP,
21  where it was sending letters based on Rightscorp
22  notices, right?
23  A. Yes.
24  Q. And then your testimony is, Grande stopped
25  sending letters based on Rightscorp notices after

**Page 181**

1  it updated its DMCA policy, to ask senders to
2  digitally sign it with PGP, right?
3      A. Yes.
4      Q. And that happened in April 2017, right?
5      A. Yes.
6      Q. Sitting here today, can you tell me any
7  difference in the notices from Rightscorp from
8  before that change and after the change?
9  Rightscorp was sending the same information in the
10 notices, right?
11     A. I don't know of any changes.
12         MR. O'BEIRNE: I think this may be a good
13 time for a quick break.
14         MR. BROPHY: Sure.
15         MR. O'BEIRNE: Maybe a quick comfort
16 break, but let's keep it quick.
17         MR. BROPHY: Okay.
18         THE VIDEOGRAPHER: Please stand by. We're
19 going off the record at -- we're going off the
20 record at 1719.
21         (Recess taken from 5:19 p.m. to 5:31 p.m.)
22         THE VIDEOGRAPHER: We're going back on the
23 record at 1731.
24 BY MR. O'BEIRNE:
25     Q. Ms. Christianson, you understand you're

**Page 182**

1  still under oath, right, ma'am?
2      A. Yes.
3      Q. Did you discuss the substance of your
4  testimony with anybody at the break?
5      A. No.
6      Q. Did you call anybody to discuss your
7  testimony at the break?
8      A. No.
9      Q. I'm handing you what's been previously
10 marked PX173 that we discussed with
11 Mr. Christianson yesterday. That is a document
12 based on an 8400-page PDF produced to plaintiffs
13 with the beginning Bates number GRANDE2542672. Do
14 you recognize that chart?
15     A. No.
16     Q. Did you assist in the generation of a CSV
17 file or an Excel file with this information to be
18 turned into this chart?
19     A. I may have requested the information.
20     Q. Who did you request it from?
21     A. My first go-to would've been Lars for this
22 information. Although it mentions "letters," so
23 I'm not sure he would have that.
24     Q. You understand that this reflects
25 information in Grande's system of what was

**Page 183**

1  provided to CSG for the purpose of sending letters
2  to Grande customers, right, ma'am?
3      A. Yes.
4      Q. And the column in the far left has the
5  account number of the subscriber that goes with
6  the letter, right?
7      A. Yes.
8      Q. And then on the far right, there's the
9  information of when the letter was sent, right?
10     A. Yes.
11     Q. Then in the letter column, it's which of
12 the two letter templates, 550 or 551 was sent?
13     A. Yes.
14     Q. And then there's a company that sent the
15 original notice, and then in ticket 1, 2, 3,
16 there's information regarding what copyrighted
17 work was included in the notice, right, ma'am?
18     A. Yes.
19     Q. And so this record reflects letters sent
20 to Grande customers based on notices received by
21 Grande, correct?
22     A. Yes.
23     Q. And I'll represent to you that's a
24 one-page version of this 8400-page PDF. For ease
25 of use, we just created smaller portions of it so

**Page 184**

1  we could discuss it. If you turn to the second
2  page of that two-page document, PX173, you'll see
3  that there's a subsequent page with a different
4  Bates number, I think ending 6001. Do you see
5  that, ma'am?
6      A. Yes.
7      Q. And on there, do you also see entries
8  reflecting letters sent to customers based on
9  notices received by Grande from Rightscorp?
10     A. Yes.
11     Q. So you would agree with me, then, that if
12 there's an entry in this document stating that the
13 company is Rightscorp with information in the
14 letter sent column, that indicates that a letter
15 was sent to a Grande customer by Grande based on a
16 notice received for that account from Rightscorp,
17 correct?
18     A. Yes, that's what it looks like.
19     Q. And that's your understanding based on
20 Grande's -- knowledge as Grande's corporate
21 witness?
22     A. Yes.
23     Q. Sitting here, can you tell me how many
24 letters Grande sent to customers from 2011 to 2017
25 based on Rightscorp notices?

**Page 221**

BY MR. O'BEIRNE:
Q. Was there ever a time when Grande determined that conduct engaged in by an IP address listed in one of its notices had, in fact, not been engaged in by that IP address?
A. No, we don't have the ability to tell you what our customers are doing on their IP addresses.
Q. Rightscorp is telling you what your customers are doing. What I'm asking you is, whether Grande was ever in any single instance able to conclude that what Rightscorp was telling you your customers were doing was inaccurate?
    MR. BROPHY: Object as outside the scope of the topics and vague and also mischaracterizing Rightscorp's notices.
A. Rightscorp is giving us the allegation of what our customer is doing. We have no way of confirming or denying that.
BY MR. O'BEIRNE:
Q. And you would agree with me that Grande cannot point to a single instance in which it concluded that the alleged activity reflected in the Rightscorp notice, in fact, did not occur?
    MR. BROPHY: Same objections.

**Page 222**

A. Grande would have no way of knowing that.
BY MR. O'BEIRNE:
Q. That's not what I'm asking you, ma'am. And you have given me the same nonresponsive answer several times and I need an answer to this question. So I'm just going to ask you to please listen to the question.
    You would agree with me Grande cannot point to a single instance in which it concluded that the alleged activity reflected in any Rightscorp notice, in fact, did not occur?
    MR. BROPHY: Same objections; also asked and answered.
A. Yes.
BY MR. O'BEIRNE:
Q. Sitting here today, you cannot point to -- as Grande's -- strike that.
    As Grande's corporate representative on Topics 30, 32 and 33, you cannot point to a single Rightscorp notice that Grande concluded was inaccurate in any respect?
    MR. BROPHY: Objection, outside the scope of the topics, vague; also asked and answered.
A. I cannot.

**Page 223**

BY MR. O'BEIRNE:
Q. You would agree with me, that Grande did not meaningfully investigate any notice it received from Rightscorp, correct?
    MR. BROPHY: Objection, vague.
A. The alleged infringement notices? We don't have a way of investigating that.
BY MR. O'BEIRNE:
Q. So you would agree with me, Grande did not meaningfully investigate notices alleging infringement that it received from Rightscorp?
    MR. BROPHY: Same objection.
A. Yes.
BY MR. O'BEIRNE:
Q. It did not meaningfully investigate them when it was generating letters based on them prior to the PGP change, right?
A. Yes.
Q. And it did not meaningfully investigate them after the PGP change when it only accepted them but did not send letters based on them, right?
A. Correct.
Q. The level of scrutiny or investigation Grande applied to Rightscorp notices did not

**Page 224**

change in any way when Grande went from sending letters based on Rightscorp notices to not sending letters, right?
A. Correct.
Q. The only thing that changed was that Grande updated the DMCA policy and procedure in 2017, to request senders digitally sign notices with a PGP, right?
A. That is correct.
Q. And based on that policy change, Grande ceased sending letters based off Rightscorp notices that it had been sending letters based on up till that policy change, right?
A. Yes.
Q. What specific additional concerns did Grande have as to the authenticity of notices it received from Rightscorp following the PGP change?
    MR. BROPHY: Counsel, sorry to interrupt. Which topic is this?
    MR. O'BEIRNE: Thirty, 32 and 33, Grande's understanding of Rightscorp's policies, practices and capabilities.
    MR. BROPHY: Okay. I'll object as outside the scope of the topics.
    MR. O'BEIRNE: Also communications