# Exhibit I



## Planet Depos
*We Make It Happen*™

# Transcript of Matt Rohre

**Date:** February 22, 2018
**Case:** UMG Recordings, Inc., et al -v- Grande Communications Networks LLC, et al

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

## Page 1

```
1       IN THE UNITED STATES DISTRICT COURT
2         FOR THE WESTERN DISTRICT OF TEXAS
3                   AUSTIN DIVISION
4  UMG RECORDINGS, INC., et §
5  al.                      §
6                           §
7  VS.                      §   CIVIL ACTION NUMBER
8                           §   1:17-cv-0365-LY
9  GRANDE COMMUNICATIONS    §
10 NETWORKS LLC and PATRIOT §
11 MEDIA CONSULTING, LLC    §
12                          §
13
14
15              Deposition of
16                MATT ROHRE
17              Austin, Texas
18            February 22, 2018
19                9:09 a.m.
20
21
22
23 Job No.: 178598
24 Pages: 1 - 251
25 Reported by: Micheal A. Johnson, RDR, CRR
```

## Page 2

```
1       Deposition of MATT ROHRE, held at the
2  location of:
3
4
5
6       Kelly Hart & Hallman LLP
7       303 Colorado Street, Suite 2000
8       Austin, Texas 78701
9
10
11
12
13      Pursuant to Notice, before Micheal A.
14 Johnson, Registered Diplomate Reporter and Certified
15 Realtime Reporter.
```

## Page 3

```
1              A P P E A R A N C E S
2  FOR PLAINTIFFS:
3       Jonathan E. Missner
4       Philip J. O'Beirne
5       STEIN MITCHELL CIPOLLONE
6       BEATO & MISSNER LLP
7       1100 Connecticut Avenue, N.W., Suite 1100
8       Washington, D.C. 20036
9       (202) 661-0956
10      jmissner@steinmitchell.com
11      pobeirne@steinmitchell.com
12
13 ON BEHALF OF DEFENDANTS:
14      Zachary C. Howenstine
15      Maggie Szewczyk
16      ARMSTRONG TEASDALE LLP
17      7700 Forsyth Boulevard, Suite 1800
18      St. Louis, Missouri 63105
19      (314) 621-5070
20      zhowenstine@armstrongteasdale.com
21      mszewczyk@armstrongteasdale.com
22
23 VIDEOGRAPHER:
24      Tom Krause
25
```

## Page 4

```
1                     INDEX
2                   MATT ROHRE
3                February 22, 2018
4  APPEARANCES                              3
5  PROCEEDINGS                             11
6
7  EXAMINATION OF MATT ROHRE:
8       BY MR. MISSNER                     12
9       BY MR. HOWENSTINE                 243
10      BY MR. MISSNER                    248
11
12 CERTIFICATE OF REPORTER                251
```

---

**17**

1   A. I don't necessarily remember.
2   Q. Gotcha. Gotcha. What's your date of birth?
3   A. 12/14/71.
4   Q. What is your educational background? Where
5   did you go to school? What degrees do you have?
6   A. I have a bachelor of arts in
7   interdisciplinary studies from The University of
8   Texas at Dallas.
9   Q. Great. What year did you graduate?
10  A. Well, it was 2003, I believe.
11  Q. Okay. Any other degrees?
12  A. No.
13  Q. What is your current occupation and job
14  title?
15  A. I am the senior vice president of operations
16  and general manager.
17  Q. At?
18  A. At Grande Communications.
19  Q. Are you the highest ranking executive at
20  Grande?
21  A. At Grande in Texas, yes.
22  Q. Okay. So in your building where Grande is,
23  you are the most senior person there?
24  A. Well, we have multiple buildings across the
25  state, but --

**18**

1   Q. Fair enough.
2   A. Yes.
3   Q. But in --
4   A. Yes.
5   Q. As a corporation, corporate structure,
6   Grande Communications, you are the top person?
7   A. Correct.
8   Q. Okay. Can we go through your history of
9   employment. Let's just start actually from when you
10  graduated in 1993, everything -- your resumé, if you
11  will; where you've worked, your titles.
12  A. Graduated from college --
13  Q. Just from when --
14  A. -- that was in --
15  Q. '03.
16  A. -- 2003.
17  Q. Oh, sorry about that.
18  A. So I graduated from high school in 1989.
19  Q. Okay.
20  A. I went to college for a few years, took the
21  proverbial year off and ended up graduating from
22  college ten years later. Was employed as a
23  technician with the cable company in the North Texas
24  area for many years, then was employed as a systems
25  engineer with a telecommunications equipment

**19**

1   supplier and then --
2   Q. What were they called?
3   A. They were called -- at the time I was hired,
4   it was called Marconi.
5   Q. If you could just tell me the years you
6   worked where you worked, if you remember.
7   A. So Marconi would've been probably 2000 to
8   when I came to work at Grande, which was in 2002.
9   Q. So you came to Grande in 2002?
10  A. Correct.
11  Q. And you've been there ever since?
12  A. Yes.
13  Q. Take me through, at Grande starting in 2002,
14  what roles, responsibilities and titles you had and
15  what years.
16  A. Okay. I was hired as the director of field
17  operations for the Austin and San Marcos markets,
18  and that was in -- from 2002, at the time I was
19  hired, until 2004.
20  Q. Okay.
21  A. In 2004, I was promoted to the general
22  manager for the Waco market. We moved to Waco after
23  we acquired a company called Clearsource. I was the
24  general manager in that market until 2010. At the
25  end of 2010, I assumed additional responsibility for

**20**

1   our Dallas market. Sometime around 2011 or early
2   2012, I assumed responsibility for our
3   Midland/Odessa market, all the way until 2015,
4   whereby our previous president left the company and
5   I was promoted to senior vice president of
6   operations and general manager overseeing all the
7   markets here in Texas.
8   Q. The person who left, what was his name?
9   A. Matt Murphy.
10  Q. And what was Matt Murphy's title when he
11  left?
12  A. President.
13  Q. President. And when you took over for Matt
14  Murphy, your title was not president?
15  A. No.
16  Q. Okay. So if there were some news stories
17  that called you "interim president," they were
18  mistaken?
19  A. My title was -- they were probably mistaken,
20  yes. I was never referred to or had any title that
21  was "interim president."
22  Q. Okay.
23  A. But when Matt left in two thousand -- the
24  end of 2014, I guess it was, I was at -- in that
25  role from an interim perspective from -- until

85
1  answers has not changed since we received them in
2  November of 2017 and you signed them January of
3  2018?
4     A. That is correct.
5     Q. Okay.
6        MR. MISSNER: I want to apologize because I
7  didn't have to read -- we had this as Plaintiffs'
8  Exhibit 54 yesterday and I meant to do it that way,
9  so I should not have reintroduced it, but it is --
10       MR. HOWENSTINE: But here we are.
11       MR. MISSNER: But here we are. So I should
12 look at my own notes.
13 BY MR. MISSNER:
14    Q. So that is -- the first one I handed you
15 is --
16    A. 100.
17    Q. -- 100 and 101. I apologize for that.
18 PX-101.
19       MR. MISSNER: Because we had not entered the
20 second one yesterday.
21 BY MR. MISSNER:
22    Q. So in Plaintiffs' Exhibit 100, if you could
23 turn, please, to page 9, Interrogatory No. 8. Tell
24 me when you're ready.
25    A. Ready.

86
1     Q. Okay. Interrogatory No. 8 reads, "Describe
2  in detail all actions you have taken in response to
3  each of the Notices and/or any other reports or
4  notices of copyright infringement allegations
5  requested to be identified in the preceding
6  interrogatory, including without limitation, whether
7  you forwarded the notice to the Customer or User
8  associated with the IP address contained in the
9  notice or report, and if so, when and how you
10 forwarded the notice and which notices pertained the
11 Plaintiffs' Copyrighted Works."
12       Is that what that says?
13    A. Yes.
14    Q. Great. And if you turn the page to page 10,
15 on "Amended Response," three sentences down, it
16 reads, "As Plaintiffs are aware, Grande has received
17 millions of such notices, making a description of
18 the response to each impossible."
19       Are you referring to millions of DMCA
20 notices?
21    A. Yes.
22    Q. Okay. If you can turn to page 12. So
23 Grande has indeed received millions of notices of
24 copyright infringement -- I'm going backwards.
25 Forget about 12. Sorry about that. I just want to

87
1  make sure I heard you correctly. What you're saying
2  is Grande has received millions of notices of
3  copyright infringement?
4     A. We've received e-mails of allegations of
5  copyright infringement.
6     Q. So you've -- but you've received millions of
7  notices alleging copyright infringement?
8     A. E-mails.
9     Q. E-mails.
10    A. As far as I know.
11    Q. Millions?
12    A. Yes.
13    Q. Okay. On page -- your answer says "such
14 notices" and you continue to say "e-mails." So you
15 only have received e-mails?
16    A. To the best of my knowledge.
17    Q. It doesn't say "e-mails," right? It says
18 "notices"?
19    A. It says "notices," but I believe that we
20 received them via e-mail.
21    Q. "As plaintiffs are aware, Grande has
22 received millions of such notices, making a
23 description of the response to each notice
24 impossible."
25       It says "notice" a few times, correct?

88
1     A. Sure.
2     Q. And you signed these?
3     A. Yes.
4     Q. Okay. If you could please turn to page 12,
5  interrogatory 11 reads, "Describe in detail the
6  complete factual and legal bases for your contention
7  that you are entitled to safe harbor protection
8  under the DMCA."
9        And on page 13 -- that is what it says,
10 correct, the question?
11    A. On page 13?
12    Q. Sorry. On page 12, the question I just
13 read --
14    A. Yes.
15    Q. -- Interrogatory No. 11? Thank you.
16       And on page 13, there's a sentence a few
17 sentences down -- about eight sentences down, "Out
18 of an abundance of caution." Do you see that?
19    A. Correct.
20    Q. I'm going to read it if you can just assert
21 if I read it correctly. "Out of an abundance of
22 caution and operating at a level above Grande's
23 obligation under the DMCA, Grande does process
24 allegations of copyright infringement it receives
25 from third parties in the manner described in its

**89**

 1  response to Interrogatory No. 6. Through the
 2  processing of such notices, Grande has permanently
 3  terminated subscribers.
 4      "A list of terminated subscribers is being
 5  produced herewith and marked as Confidential. This
 6  document is evidence of subscribers that have been
 7  terminated under the above policy."
 8      Did I read that correctly?
 9      A. Yes.
10      Q. Great. And you indicated that you were
11  providing a list of terminated subscribers --
12      A. Correct.
13      Q. -- correct? Okay.
14      So we have in the big pile there, if you go
15  to Plaintiffs' Exhibit 60. I think that's it with
16  the red.
17      A. Yeah.
18      Q. Okay. This is a printout on Excel --
19      MR. MISSNER: You know, why don't -- is this
20  a good time to take a break?
21      MR. HOWENSTINE: Sure.
22      MR. MISSNER: Let's take a break.
23      THE VIDEOGRAPHER: The time is 11:02 a.m.
24  and this completes DVD No. 1 in the deposition of
25  Matt Rohre.

**90**

 1      (Recess taken from 11:02 a.m. to
 2  11:14 a.m.)
 3      THE VIDEOGRAPHER: The time is 11:14 a.m.
 4  and this is DVD No. 2 of the video deposition of
 5  Matt Rohre.
 6  BY MR. MISSNER:
 7      Q. Mr. Rohre, you understand you're still under
 8  oath?
 9      A. Yes.
10      Q. Did you talk to anyone about your testimony
11  during the break?
12      A. No.
13      Q. We were looking at Plaintiffs' Exhibit 60,
14  and as I was saying, this is a printout of the Excel
15  spreadsheet produced to us in conjunction with the
16  interrogatory responses which you signed in
17  January 2018. This is a list of the terminated
18  subscribers discussed in Interrogatory 11. Does
19  that appear to be the case to you?
20      A. Yes.
21      Q. This list includes all subscribers
22  terminated for copyright infringement under Grande's
23  DMCA policy up to the time of this response of your
24  interrogatory; is that correct?
25      A. To the best of my knowledge.

**91**

 1      Q. So to be clear, there are 11 names, and feel
 2  free to count, in red on this sheet?
 3      A. That's right.
 4      Q. So up through October 2017, Grande has
 5  terminated a total of 11 people for copyright
 6  infringement?
 7      A. That is correct, to the best of my
 8  knowledge.
 9      Q. And the dates of termination are reflected
10  next to each user?
11      A. Yes.
12      Q. For user terminated it says, "Service
13  Disconnected"?
14      A. And then it says, "Setting account to
15  unserviceable."
16      Q. Okay.
17      A. "Do not reconnect."
18      Q. Okay. So to be clear, in each one, the last
19  line says "Service Disconnected. Setting account to
20  unserviceable. Do not reconnect"?
21      A. That is correct.
22      Q. Okay. And the dates of termination are
23  indeed reflected next to its user?
24      A. Yes.
25      Q. And all the dates of termination are after

**92**

 1  June 2017?
 2      A. Yes.
 3      Q. So prior to these 11 people being terminated
 4  post-June 2017, Grande did not terminate any
 5  subscribers for copyright infringement?
 6      A. We did --
 7      MR. HOWENSTINE: Objection, vague.
 8      A. We did terminate subscribers at periods of
 9  time in the history of the company for copyright
10  infringement.
11  BY MR. MISSNER:
12      Q. Do you know approximately when in the
13  history of the company you terminated subscribers
14  for copyright infringement?
15      A. Prior to whenever our policy changed with
16  Atlantic Broadband. So from -- just to call it the
17  inception of the company, in 2000 through 2010, I
18  don't know specifically when we changed that. It
19  wasn't part of my job responsibilities, but I do
20  know that we did terminate customers.
21      Q. So to be clear, your testimony is that from
22  2000 to 2010, you did terminate subscribers for
23  copyright infringement?
24      A. To the best of my recollection.
25      Q. And you agree with the statement that from

93

1  2010 until 2017, you terminated no subscribers for
2  copyright infringement?
3      A. I was not made aware that we had terminated
4  any subscribers. We had a different policy that was
5  put in place whereby we were notifying and educating
6  customers. Whether or not there were any
7  terminated, I cannot say definitively one way or the
8  other.
9      Q. But you signed that document in which you
10 have access to that type of information, correct,
11 the interrogatory?
12     A. In this interrogatory, I had received -- I
13 signed that document because I knew that we had
14 terminated subscribers under this policy.
15     Q. Sitting here today, you cannot testify that
16 Grande terminated a single customer for copyright
17 infringement in 2012?
18     A. I cannot testify either way.
19     Q. 2013?
20     A. I cannot testify either way.
21     Q. So it's possible that in 2012, you
22 terminated a customer for copyright infringement?
23     A. It's possible.
24     Q. What evidence do you have of that?
25     A. I don't have any.

94

1      Q. Do you have any knowledge if you terminated
2  anyone for copyright infringement in 2014?
3      A. No.
4      Q. No, you don't have any evidence?
5      A. I don't have any evidence.
6      Q. Did you kick off anyone in 2014 for
7  copyright infringement?
8      A. I do not know the answer to that.
9      Q. 2015?
10     A. I do not know the answer to that.
11     Q. I may have heard you incorrectly, but I
12 thought you said that a policy changed sometime
13 around 2010.
14     A. That's correct.
15     Q. And you said before that, you had terminated
16 people for copyright infringement?
17     A. To the best of my knowledge, we had
18 terminated people. As management companies have
19 changed, as legal teams, regulatory teams have
20 changed, policies have changed.
21     Q. You are not aware of any termination for
22 copyright infringement between 2011 and 2017?
23     A. I cannot say that there was -- terminated --
24 there was copyright infringement termination or -- I
25 do not know the answer to that.

95

1      Q. So let me ask you again. Okay. Strike
2  that.
3         MR. MISSNER: Do you want me to put this
4  into evidence, the document -- I don't -- I mean,
5  I'm going to, but I don't know how you want to
6  handle it. We were -- what number are we on?
7  Sorry.
8         (Deposition Exhibit 102 marked for
9  identification.)
10 BY MR. MISSNER:
11     Q. I'm going to hand you Plaintiffs' Exhibit
12 102. We were just given this this morning. Have
13 you seen this?
14     A. This spreadsheet?
15     Q. No, sorry, the document I just handed you.
16     A. No, this is the first time I've seen it.
17     Q. It's a verification for documents produced
18 in response to interrogatories referring
19 specifically to this Excel spreadsheet that we've
20 been talking about.
21     A. Uh-huh.
22     Q. Have you -- did you talk to Stephanie -- who
23 is Stephanie Christianson?
24     A. She is a project manager for Grande
25 Communications.

96

1      Q. Who does she report to?
2      A. James Jordan.
3      Q. Did you speak to her about this spreadsheet?
4      A. Not this spreadsheet in particular.
5      Q. What did you speak to her about?
6      A. The fact that she had a tracking mechanism
7  and that she was tracking these subscribers that we
8  were disconnecting.
9      Q. When did you discuss that with her?
10     A. I don't remember.
11     Q. In the last week?
12     A. No.
13     Q. Do you have any reason to doubt the accuracy
14 of the document that was produced to us?
15     A. No. I rely on Stephanie and other employees
16 for these types of things all the time.
17     Q. So this is accurate as far as you know?
18     A. As far as I know.
19     Q. Have you spoken to her about this
20 spreadsheet between January 2nd and today?
21     A. Not this spreadsheet in particular. I just
22 know that there's a tracking mechanism that she
23 uses.
24     Q. Your sworn interrogatory response --
25 responses, state that Grande engaged in a diligent

**97**

1  effort to answer these interrogatories, correct?
2      A. That's correct.
3      Q. So what evidence do you have of the
4  termination of any subscriber between 2011 and 2017
5  that was uncovered in your diligent effort for
6  copyright infringement?
7      A. I get an e-mail from Stephanie every time we
8  disconnect these subscribers. So I have e-mails of
9  dates and names and account numbers when we
10 disconnected these.
11     Q. Let me ask you that again. Between 2011 and
12 2017, what evidence -- before we were talking about
13 these 11 people. Between 2011 and 2017 --
14     A. Well okay, before 2017.
15     Q. Let me finish the question. Between 2011
16 and 2017, in your diligent effort, what evidence do
17 you have of the termination of any subscriber for
18 copyright infringement?
19     A. I do not have any.
20     Q. You have no evidence?
21     A. I have no evidence.
22     Q. Okay. We have previously marked Plaintiffs'
23 Exhibit 53. If you can get it out. It's entitled
24 DMCA Policy and Procedure. Plaintiffs' Exhibit 53.
25 Do you have it?

**98**

1      A. Yes.
2      Q. Great.
3         MR. HOWENSTINE: If you could give me a
4  moment.
5         MR. MISSNER: I have an extra one if you
6  want it.
7         MR. HOWENSTINE: I got it.
8  BY MR. MISSNER:
9      Q. Is this a copy of Grande's DMCA policy and
10 procedure?
11     A. Yes, it appears to be.
12     Q. This was implemented in February 2017,
13 right?
14     A. Correct.
15     Q. What is your understanding of what the DMCA
16 is?
17        MR. HOWENSTINE: Objection, vague.
18     A. It is a copyright protection policy for
19 digital media.
20 BY MR. MISSNER:
21     Q. What does that mean?
22        MR. HOWENSTINE: Same objection.
23 BY MR. MISSNER:
24     Q. I'm not asking for a legal interpretation.
25     A. Right. No, I mean, that's what it is. It's

**99**

1  a copyright protection mechanism for digital media.
2      Q. What protections? What's your understanding
3  of what protections are provided?
4      A. To protect copyright holders from unlawful
5  distribution of their material.
6      Q. In your role as -- for today, if I say
7  "GM" --
8      A. Sure, that's fine.
9      Q. -- you understand I mean you're the most
10 senior employee?
11     A. Right.
12     Q. So in your role as GM of Grande, what's your
13 understanding of what Grande does pursuant to your
14 obligations under this DMCA policy that went into
15 effect in February of 2017 at Grande?
16     A. That we notify customers via mail when they
17 meet our criteria. And then after a certain number
18 of infringements over a certain period of time, we
19 send certified letters to those customers and then
20 we disconnect their service.
21     Q. And the DMCA policy was implemented in
22 February 2017?
23     A. I believe it was amended.
24     Q. Let's go -- what does that mean, "amended"?
25     A. I believe that we had a policy prior to

**100**

1  2017.
2      Q. Since when?
3      A. I believe we had that policy out there for
4  as long as I can remember, but I don't -- I don't
5  know.
6      Q. You think you had a DMCA policy for as long
7  as you can remember?
8      A. I think it was posted on our website.
9      Q. Are you referring to your acceptable use
10 policy?
11     A. Acceptable use policy has always been on
12 there.
13     Q. So you think the DMCA policy has been on
14 there as long as you can remember?
15     A. I don't -- I don't remember.
16     Q. Let's turn back for a second to Plaintiffs'
17 Exhibit 100, your interrogatories that you signed.
18     A. Uh-huh.
19     Q. Page 16. Last line starting with "Subject
20 to these objections." Can you read the next line
21 after "objections."
22     A. In the amended response, is that what you're
23 asking?
24     Q. Page 16, amended response to Interrogatory
25 No. 15, very bottom of the page starts with "Subject

105
1  Q. So if we can turn back to the interrogatory
2  responses, Plaintiffs' Exhibit 101, which were the
3  amended questions 5 and 11, you wrote at the bottom
4  of page 1 of Plaintiffs' Exhibit 101, "Grande has
5  adopted and reasonably implemented a policy that
6  provides for the termination of subscribers and
7  account holders who are repeat copyright
8  infringers."
9      Does it say that?
10  A. Where are we? What paragraph?
11  Q. Let's start again. So if you turn to the
12 first page, very bottom, last line on the page. The
13 response to "Describe in detail the complete factual
14 and legal bases for your contention that you were
15 entitled to safe harbor protection under the DMCA."
16 Your answer somewhat through the first sentence
17 says, "Grande has adopted and reasonably implemented
18 a policy that provides for the termination of
19 subscribers and account holders who are repeat
20 copyright infringers."
21      Does it say that?
22  A. It is -- it does.
23  Q. And is that Grande's statement, that it is
24 entitled to the safe harbor, including terminating
25 those 11 people in red, and that is the basis for

106
1  what you believe entitles you to the safe harbor?
2      MR. HOWENSTINE: Objection, calls for a
3  legal conclusion.
4  BY MR. MISSNER:
5  Q. You can answer.
6  A. Yes.
7  Q. And those --
8  A. The fact that we have always had a policy,
9  ever since this company has been in existence, we've
10 gone to great expense to implement that policy. We
11 spend money notifying customers of these
12 infringements and educating customers on these
13 infringements on behalf of the DMCA.
14  Q. And you've kicked off 11 people in 2017?
15  A. Since this policy changed, that's correct,
16 to the best of my knowledge.
17  Q. They were repeat infringers?
18  A. (Nods head.)
19  Q. Is that a yes?
20  A. Yes.
21  Q. Going back to the DMCA policy -- I'm sorry,
22 strike that.
23      If we can turn back to the same Plaintiffs'
24 Exhibit 100, your interrogatory responses we were
25 just looking at -- actually, I'm sorry, if you can

107
1  go to Plaintiffs' Exhibit 101 right there. And if
2  you could turn to page 2. In the same answer to
3  interrogatory 11, which we were just speaking about,
4  it says, almost at the very bottom before
5  supplemental response, it starts with "Out of an
6  abundance of caution." Do you see that?
7  A. Correct.
8  Q. "Out of an abundance of caution and
9  operating at a level above Grande's obligation under
10 the DMCA, Grande does process allegations of
11 copyright infringement it receives from third
12 parties in the manner described in its response to
13 Interrogatory No. 6. Through the processing of such
14 notices, Grande has permanently terminated
15 subscribers."
16     Is that what it says?
17  A. Yes.
18  Q. Where in the DMCA policy does it say "we
19 will kick you off if you don't engage in copyright
20 infringement in an abundance of caution"?
21  A. Sorry, repeat that question.
22  Q. Where in the DMCA policy that was
23 implemented in February of 2017 by Grande does it
24 say "we are going to terminate you if you don't
25 engage in copyright infringement in an abundance of

108
1  caution"?
2  A. It does not say that.
3  Q. Do you kick people off for no reason?
4  A. No.
5  Q. You don't advertise anywhere that "We will
6  terminate you without having a reason"?
7  A. Well, it's in our acceptable use policy
8  that...
9  Q. So indeed you do -- sorry. Finish.
10  A. That's it.
11  Q. So you do have reasons to terminate people,
12 right?
13  A. We do.
14  Q. And you kicked those people off for
15 copyright infringement, correct?
16     MR. HOWENSTINE: Objection, asked and
17 answered.
18 BY MR. MISSNER:
19  Q. Those 11 people you kicked off for copyright
20 infringement, right?
21  A. Yes.
22  Q. Okay. So the list of 11 people we've been
23 talking about are the very first people to be
24 terminated under this DMCA policy?
25  A. To the best of my knowledge.

**Page 117**

that. I apologize.
    If you turn over the new exhibit that I just handed you, which was Plaintiffs' Exhibit 91, you have the original e-mail that we just talked about and then there's a series of responses.
    A. Correct.
    Q. Now, if you turn to page -- the front page, on that same day at 5:27 p.m., there's an e-mail from Roberto Chang. Who is Roberto Chang again?
    A. He was a marketing employee.
    Q. So he asks, "Richard, Who is responsible for the DMCA" -- sorry -- "DMCA notification process? Do we call customers?"
    It says that, right?
    A. Yes.
    Q. The answer is no, Grande was not calling customers, right? I'm asking you.
    A. I don't know the answer to that.
    Q. You don't know if in 2013, under the DMCA notification process, if Grande was calling customers or not?
    A. I know that we were sending notices and customers were calling us.
    Q. Okay. These guys are saying in this e-mail that they don't. I'll give you a second to read it.

**Page 118**

The very top, first sentence. "We aren't doing this today from what I gather. ISYS owns the DMCA/abuse process - they provide what automation we have today. Snail mail warnings are automatically sent out by CSG from an upload process."
    Does it say that?
    A. Yes.
    Q. And going back to Richard's e-mail, in the middle, the third sentence says, "If we do nothing more" -- I assume he meant "then" than "that," but "If we do nothing more than e-mails (as I think you mentioned) we might lose our safe harbor status."
    Does it say that?
    A. It does.
    Q. No matter how many notices they got, it appears as if you weren't terminating anybody, right?
    MR. HOWENSTINE: Objection, asked and answered.
    A. I can't say one way or the other.
BY MR. MISSNER:
    Q. Is this why you instituted the DMCA policy in February 2017?
    A. This policy has changed, as I said, with whoever is our legal and regulatory counsel over the

**Page 119**

course of the years with the company.
    Q. Because Grande concluded that its previous policies did not entitle it to the DMCA safe harbor, Grande changed its DMCA policy in February 2017; is that correct?
    A. I don't know that it was specifically because of the safe harbor, but I do know that we changed our policies in the beginning of 2017.
    Q. Why?
    MR. HOWENSTINE: And I would just remind you not to divulge any communications that you might have had with counsel on that subject.
    A. THE WITNESS: Right.
    MR. HOWENSTINE: If you have any -- if you had any.
    A. I don't -- I don't know that I did and I wasn't part of the decision-making process on changing the policy. That was done with Patriot employees and folks that actually operationalize it every day.
BY MR. MISSNER:
    Q. You're the most senior person in the Grande operation, correct?
    A. Correct.
    Q. List all the reasons for me that Grande

**Page 120**

instituted a new DMCA policy in February 2017.
    MR. HOWENSTINE: Objection, asked and answered.
    A. To deal with the DMCA.
BY MR. MISSNER:
    Q. What does that mean?
    A. Good companies revise their policies all the time. We're continually looking at the way things change and revising our policies.
    Q. Why in 2017?
    A. I don't know.
    Q. Why not in 2016?
    A. I don't know.
    Q. Okay. If we can turn back, please, to Plaintiffs' Exhibit 100, the interrogatories that you signed. If you could please turn to page 7. At the very bottom -- well, first, let me tell you what we're reading. We're reading Interrogatory No. 6, which is asking to, "Describe in detail any DMCA Policy, Repeat Infringer Policy, Acceptable Use Policy, and/or any policies and/or procedures concerning Grande's receipt, review, forwarding to Customers and/or User, response to, and resolution of, copyright infringement allegations involving Grande's Internet services, since January 1, 2010."

Transcript of Matt Rohre
Conducted on February 22, 2018

34 (133 to 136)

---

133

BY MR. MISSNER:
Q. What's the range?
   MR. HOWENSTINE: Objection, vague.
A. I don't have -- I don't have a range of relatively small. This was, what -- Lamar's opinion.
BY MR. MISSNER:
Q. I understand that. I'm now asking you your opinion as the GM, on your 80/20 rule, what you think a relatively small amount of users that drive up -- should we just take 20 percent of the amount of users and that's your number?
A. No. I don't know what "relatively small" means in this context.
Q. Okay.
   (Deposition Exhibit 105 marked for identification.)
BY MR. MISSNER:
Q. Let me hand you Plaintiffs' Exhibit 105. This is an e-mail from Lamar Horton to you, four days after the last e-mail we were just looking at; is that correct?
A. That's correct.
Q. Copying James Jordan and Jimmy Quigley, correct?

---

134

A. Correct.
Q. Subject line, "RightsCorp," with an attachment, "rightscorp.xls," correct?
A. Correct.
Q. This seems to be a list of the RightsCorp DMCA notices received by year; is that correct?
A. Appears to be.
Q. And on the cover note, it says, 2011, tally 27, RightsCorp DMCA notices received by year; is that correct?
A. That's correct.
Q. And in 2012, Grande received 111,000 -- I'm sorry, 11,184 RightsCorp notices -- RightsCorp DMCA notices; is that correct?
A. That's correct.
Q. And in 2013, Grande received 31,075 RightsCorp DMCA notices; is that correct?
A. Correct.
Q. And in 2014, Grande received 143,603 RightsCorp DMCA notices; is that correct?
A. Correct.
Q. How many RightsCorp notice -- how many RightsCorp DMCA notices did Grande receive in 2015, according to this?
A. 246,322.

---

135

Q. And in the period January 1st, presumably to the time of this e-mail, some 42 days later, plus or minus, another 3,688 RightsCorp DMCA notices appear to have been received?
A. Correct.
Q. Okay. And he is sending this to you in February 2016, talking about the entire year before 2015; is that correct?
A. That would be my assumption.
Q. Okay. And at the bottom it says, "File attached shows Tally by account of RightsCorp notices for all of 2015."
   Would you agree that it says that --
A. Yes.
Q. -- in the e-mail? If you can now please turn, and if we could just indicate, because I didn't at the beginning, this was produced by Grande and under 8199. Would you agree? The Bates number at the bottom --
A. Correct.
Q. -- of 819 -- great. So if we can turn the page. What does this seem to you to appear as?
   MR. HOWENSTINE: Objection, vague.
BY MR. MISSNER:
Q. Okay. I'll ask it a different way. You see

---

136

"tally" on the left and you see an account number. Do you believe that's a single account number?
A. Could be.
Q. Well, previously you testified that that's --
A. Yeah, this is a single account number.
Q. Thank you.
A. I don't know what the "tally" represents.
Q. Gotcha. Grande received 13,958 notices from RightsCorp for copyright infringement for that specific account in 2015, correct?
A. It looks like we received 13,958 notices of alleged copyright infringement for that account, assuming that that's what "tally" means on this spreadsheet.
Q. Well, let's go back to the page before. "RightsCorp DMCA notices received by year." Is that what the e-mail says from Lamar to you?
A. Correct.
Q. You trust Lamar's giving you accurate information?
A. To the best of his ability.
Q. Okay. And at the bottom does it say, "File attached shows Tally by account of RightsCorp notices for all of 2015"? Is that what it says?

**137**

1  A. Correct.
2  Q. Okay. So let's turn the page again under
3  the word "tally," where it says "13,958" and an
4  account number. Do you have reason to believe that
5  this is different than the description that your
6  employee wrote to you?
7  A. I do not.
8  Q. Okay. So Grande received 13,598 [sic]
9  notices from RightsCorp for copyright infringement
10 for that specific account in 2015?
11  A. It would appear so.
12  Q. Sitting here today, what information are you
13 aware of as the GM of Grande, that that account that
14 we just talked about was terminated in 2015?
15  A. I do not have any information that it was
16 terminated.
17  Q. So to the best of your knowledge, that
18 account was not terminated?
19  A. I don't know if it was or was not.
20  Q. Did you terminate anyone for copyright
21 infringement in 2015, to the best of your knowledge?
22  A. I was not directly informed of it.
23  Q. You're the GM of the company. That's
24 correct?
25  A. Correct.

**138**

1  Q. Do you have any evidence that this account
2  was terminated that I just asked you about?
3  A. I do not.
4     MR. HOWENSTINE: Objection, asked and
5  answered.
6  BY MR. MISSNER:
7  Q. You can answer.
8  A. I do not.
9  Q. That account should have been kicked off,
10 right?
11    MR. HOWENSTINE: Objection, argumentative.
12 BY MR. MISSNER:
13  Q. Do you believe, as GM of the company, that
14 that account should have been terminated?
15  A. Potentially. I mean, these are alleged
16 violations.
17  Q. You testified that your DMCA policy is fair,
18 right?
19  A. I did.
20  Q. And that it's the right thing to do?
21  A. Yeah.
22  Q. Yes?
23  A. Agreed.
24  Q. Your current policy from February 2017 is
25 the fair policy -- is a fair policy, correct?

**139**

1  A. Agreed.
2  Q. And you terminate repeat infringers?
3  A. We do.
4  Q. And I think you testified earlier something
5  to the effect of repeat infringers deserve to be
6  kicked off?
7  A. I agree.
8  Q. And you terminate them if they receive three
9  notices, correct?
10  A. Correct.
11  Q. You kicked off Martinez, who we looked at
12 before, after three notices, correct?
13  A. Correct.
14  Q. Okay. And in your interrogatory response,
15 we can go back to Plaintiffs' Exhibit 100, bottom of
16 page 7. I'll give you a second. To remind you, you
17 said Grande's -- or you signed, "Grande's current
18 internal policy for handling the receipt of notices
19 alleging copyright infringement involves the
20 transmission of a letter to a subscriber upon
21 receipt of an allegation of copyright infringement
22 relating to that subscriber's account."
23    Right?
24  A. Right.
25  Q. After the transmission of three electronic

**140**

1  notices, Grande sends a hard-copy notice letter
2  reminding the subscriber, that they "will be
3  terminated if additional complaints of alleged
4  infringement are received relating to their
5  account."
6    Right?
7  A. Correct.
8  Q. "This 'final notice' letter is sent via
9  certified mail." Yes?
10  A. Yes.
11  Q. "If Grande receives subsequent notices of
12 potential infringement regarding the same account,
13 that subscriber's Internet service with Grande is
14 permanently terminated."
15    Correct?
16  A. Correct.
17  Q. So I'll ask you again. Should that customer
18 that we just read, 13,958, should that customer have
19 been kicked off in 2015, right?
20  A. Under the current policy, yes.
21  Q. But he should've been in 2015 also, right?
22    MR. HOWENSTINE: Objection, asked and
23 answered.
24 BY MR. MISSNER:
25  Q. You can answer.

---

141

A. Our policy at that time said that we reserve the right to terminate people. I don't know how many letters we mailed to this person. 13,000 letters potentially.

Q. 13,958.

A. Correct. I think we've established under our current policy, this person would be terminated.

Q. If you can look down one more under that one, a person at 12,953 notices; is that correct?

A. Correct.

Q. Should that person have been kicked off in 2015?

A. Same answer as above. Given the current policy, they would be terminated.

Q. Is that person a repeat infringer?

A. Yes.

Q. If you scroll down and you turn a bunch of pages, you see the numbers go down. There's a point at which it gets to 100 and then goes to 99. You see that?

A. Yes.

Q. So everyone from that account up, according to this, received at least 100 notices?

A. According to this.

Q. So they're all repeat infringers?

---

142

MR. HOWENSTINE: Objection, calls for a legal conclusion.

BY MR. MISSNER:

Q. You can answer.

A. Okay. Alleged.

Q. They should've been kicked off?

MR. HOWENSTINE: Objection, asked and answered.

A. Per the policy today, they would be kicked off, potentially.

BY MR. MISSNER:

Q. All repeat infringers, every one of them?

MR. HOWENSTINE: Again, objection, calls for a legal conclusion.

BY MR. MISSNER:

Q. You can answer.

A. Correct. Under our current policy.

Q. And they weren't kicked off in 2015, right?

A. I cannot say one way or the other.

Q. Do you have any evidence to believe that any one of these people were kicked off in 2015?

A. I do not.

Q. They're not numbered here, but from 100 notices up, that's -- sorry about that. Would you agree that it's more than 1200 accounts in 2015 that

---

143

received ten or more infringement notices?

A. That received ten or more?

Q. Yes.

A. Yes.

Q. So 1200 accounts in 2015 received ten or more?

A. Correct.

Q. And in 2015 not a single one of those accounts was terminated for copyright infringement?

A. I can't say one way or the other.

Q. Do you have any evidence to -- that would --

A. I do not.

Q. Do you have any evidence that any of those people were kicked off who got ten notices or more in 2015?

A. I do not.

Q. We just read that your current policy is you terminate people after three notices in your DMCA policy; is that correct?

A. That's a -- correct. That's a generalization of the policy.

Q. So all of the people -- all the 1200 specific accounts in 2015 that received ten or more repeat infringer notices, in today's policy, would all be terminated?

---

144

A. Depending on how they reacted to the policy.

Q. I don't understand what that means?

A. If we sent them a certified letter and they had no further infringement.

Q. Ten is more than three times, correct?

A. Agreed.

Q. So I just want to be clear. Ten notices is more than three times the amount that warrants termination under your procedure for addressing allegations of copyright infringement?

A. Correct.

Q. Today?

A. Correct.

Q. If you can go back to Plaintiffs' Exhibit 53, which is the DMCA policy and procedure -- strike that.

Let's move to another -- sorry. Let's go back to Plaintiffs' Exhibit 100, which is the interrogatory responses.

A. Correct.

Q. If you can please turn to page 7. In the middle of the page after amended response, third paragraph, that starts "Since at least 2013."

A. Correct.

Q. Can you please read just the first sentence

**Page 145**

1 to me.
2  A. "Grande's policy for handling
3 allegations"--
4  Q. No, no, not that. You're on page -- you're
5 on page 7?
6  A. I am.
7  Q. Since at least -- oh, okay. Start with --
8 sorry about that. Start with "Since at least."
9  A. "Since at least 2013" --
10  Q. Yeah.
11  A. -- "Grande's policy for handling allegations
12 of copyright infringement has consistently included
13 the transmission of notice letters
14 to subscribers" --
15    THE REPORTER: Slow it down.
16  A. -- "in the concomitant potential for
17 termination if a subscriber is determined to be
18 conducting repeat copyright infringement through
19 Grande's network."
20 BY MR. MISSNER:
21  Q. What does "concomitant potential for" mean?
22  A. The likely following.
23  Q. "Concomitant" you believe means "following"?
24  A. Means it's -- the likely following that
25 there will be a potential for termination.

**Page 146**

1  Q. Your sworn testimony is that there was a
2 likelihood that repeat infringers would be
3 terminated between 2011 and 2017?
4  A. That's correct.
5  Q. You have no evidence that a single one was?
6  A. I do not.
7  Q. So no potential for termination because it
8 never happened?
9  A. I don't know that it didn't happen. I just
10 don't have any evidence that it happened.
11  Q. So you can't tell me about one person for
12 who that concomitant potential became a reality?
13    MR. HOWENSTINE: Objection, asked and
14 answered many times over at this point.
15  A. No.
16 BY MR. MISSNER:
17  Q. Okay. So we just looked at this RightsCorp
18 chart, that in February 2016, Grande's system was
19 tracking notices received from RightsCorp by
20 customer account, correct?
21  A. Correct.
22  Q. And Grande had the ability to review its
23 system to determine which accounts had received the
24 most notices, correct?
25  A. Correct.

**Page 147**

1  Q. How long does it take to run a query like
2 that in your system?
3  A. I don't know. I don't run those queries.
4  Q. Do you ask people to run queries for you?
5  A. Sure. Depends on the difficulty of the
6 query.
7  Q. Do you think this would be a difficult query
8 to run?
9  A. I don't know. I don't run them.
10  Q. The current procedure that you have today
11 for processing notices of copyright infringement
12 could have been implemented in 2015?
13  A. Technically implemented? Potentially.
14  Q. In 2014?
15  A. Potentially.
16  Q. 2013?
17  A. Yes.
18  Q. Why potentially?
19  A. I believe that we had the ability to do it.
20 And the billing system was the same. I think the
21 bottom line is we were sending the notices to
22 people. We were talking to customers.
23  Q. But you could've implemented this policy in
24 2016, but you didn't?
25  A. I suppose we could have.

**Page 148**

1  Q. Could you have implemented the policy in
2 2015?
3  A. Yes.
4  Q. 2014?
5  A. Yes.
6    MR. HOWENSTINE: Objection, asked and
7 answered.
8 BY MR. MISSNER:
9  Q. 2013?
10  A. Yes.
11  Q. Okay. The information being provided by
12 RightsCorp didn't change over time, did it?
13  A. It's my understanding that the e-mail
14 address changed that RightsCorp was presenting these
15 from.
16  Q. But the information itself, besides that?
17  A. I don't know.
18  Q. Do you have any reason to believe it
19 changed?
20  A. No, I don't have any reason to believe it
21 did.
22  Q. Have you done any of the analysis of the
23 RightsCorp notices from 2014 to '16 to determine if
24 they provided the exact same information as in 2017,
25 when you kicked 11 people off because of their

**149**

1  notices?
2  A. I have not.
3  Q. So just to be clear, I've asked you why
4  Grande changed the policy. You didn't change it
5  because the availability of some new technological
6  mechanism to process these notices?
7  A. No, it was a change in management
8  philosophy.
9  Q. So going back to that list, Plaintiffs'
10 Exhibit 60, with the red 11 that you terminated, the
11 mechanism to kick off those 11 could have been done
12 based on notices in 2011?
13     MR. HOWENSTINE: Objection, asked and
14 answered.
15  A. Yes.
16 BY MR. MISSNER:
17  Q. 2012?
18  A. To my understanding.
19  Q. Every year up through 2017 when you did kick
20 them off?
21  A. Yes.
22     MR. HOWENSTINE: Same objection.
23 BY MR. MISSNER:
24  Q. Okay.
25

**150**

1      (Deposition Exhibit 106 marked for
2  identification.)
3  BY MR. MISSNER:
4      Q. So about ten minutes after you received the
5  e-mail we were just looking at from Lamar Horton to
6  you on the RightsCorp DMCA notices, it appears as if
7  Lamar sent you another e-mail. It's in the middle
8  of the page at 12:12 p.m. Would you agree with
9  that?
10  A. Where are we?
11  Q. Actually, wait a minute. Sorry. Let me get
12 my bearings straight.
13     MR. HOWENSTINE: And as long as we're
14 getting bearings, what exhibit number are we on
15 right now?
16     MR. MISSNER: This is 106.
17     MR. HOWENSTINE: 106.
18     MR. MISSNER: Sorry. They're printed from
19 different time zones.
20 BY MR. MISSNER:
21  Q. Let me -- let me ask this a different way.
22 This e-mail that I just gave to you on the back, not
23 the attachment, just the back of the e-mail, that is
24 the e-mail we were just talking about, right?
25  A. Correct.

**151**

1  Q. Okay. And then Lamar sends you another
2  e-mail that says, hey, "Last Stat. This is all
3  DMCA/ABUSE notices by year from all sources." Is
4  that correct?
5  A. That is correct.
6  Q. And by "all sources," did you take that to
7  mean not just RightsCorp?
8  A. Yes.
9  Q. Okay. So in 2014, it appears as if about
10 90,000 came from sources other than RightsCorp. And
11 if you want to do the math, you can, before you
12 agree or disagree?
13  A. What year did you say?
14  Q. 2014. It appears --
15  A. That's correct.
16  Q. Okay. And in 2015, it appears as if from
17 all sources, Grande received "DMCA/ABUSE" notices of
18 365,569, of which 246,322 were RightsCorp, correct?
19  A. That's correct.
20  Q. So total notices, you received about a
21 thousand a day on average; is that correct?
22  A. Correct.
23  Q. And then on that same day, you forwarded
24 that information to Deborah Rankin; is that correct?
25  A. Correct.

**152**

1  Q. And in February 2016, Grande and RCN were
2  not one company; is that correct?
3  A. That's correct.
4  Q. But you sent this information to Deborah
5  Rankin at RCN, correct?
6  A. Correct.
7  Q. Why were you sending her the letters?
8  A. Because she works for the Patriot legal
9  counsel.
10  Q. I thought she worked for RCN?
11  A. At the direction of Patriot.
12  Q. The direction of Patriot was to send this
13 information to RCN?
14  A. I don't know what the -- I don't remember
15 what the direction here was. All I could tell you
16 is I sent it to Deborah Rankin, as the e-mail shows.
17  Q. Patriot manages you in 2016?
18  A. Correct.
19  Q. Not RCN?
20  A. Patriot manages both companies.
21  Q. Did you send this information to any other
22 ISPs besides RCN?
23  A. Not that I'm aware of.
24  Q. So Patriot instructs you to send this kind
25 of information to another ISP that is not merged

249

ask you?
A. For a portion of the time.
Q. So you heard some of these questions ahead of time?
A. I walked in and they were writing on a pad.
Q. Did you hear what they discussed?
A. No, I didn't hear all of what they discussed.
Q. Did you hear part of what they discussed?
A. No.
Q. You didn't hear anything of what they discussed?
A. No.
Q. You mentioned the double play and how you recognize revenue for the Internet. Did you do the exact consistent thing on the cost side?
A. The costs are direct on the Internet side. They're allocated only to pure transit.
Q. So you're still making between 95 and 97 percent profit margin on the Internet, correct?
A. Correct. I don't argue that.
Q. And cutting customers would become all the more valuable before when they go from -- into a double play into Internet only; is that correct?
A. Sorry, repeat that question.

250

Q. You said something about cutting the cord.
A. Cord cutting.
Q. Yeah.
A. Correct. Yeah, customers who don't take cable TV anymore.
Q. So they become a more valuable, on a profit margin standpoint, customer to you at that point from a direct cost to profit margin, both in absolute terms and in percentages; is that not correct?
A. No, that's not correct, not in all cases, not in absolute terms.
Q. But a cord cutting customer now buys your most valuable highest margin service a la carte; is that correct?
A. That's correct.
MR. MISSNER: That's all I've got.
MR. HOWENSTINE: Nothing further from me.
THE VIDEOGRAPHER: The time is 4:22 p.m. on February 22nd, 2018, and this concludes the video deposition of Matt Rohre.
(Deposition concluded at 4:22 p.m.)
--oOo--

251

CERTIFICATE OF REPORTER
I, Micheal A. Johnson, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;
That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;
That before completion of the deposition, review of the transcript [ ] was [x] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.
I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.
Dated: 27th day of February, 2018

_____
MICHEAL A. JOHNSON, RDR, CRR
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS