# Exhibit A
# Attorneys' Eyes Only
[To be filed under seal]

APPENDIX – EVIDENCE IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO GRANDE COMMUNICATIONS NETWORKS LLC'S DMCA SAFE HARBOR DEFENSE

| FOOTNOTE | FACTUAL ASSERTION | EXHIBIT | RELEVANT EXCERPT (emphasis added) |
|---|---|---|---|
| 1 Introduction | "Despite its supposed online 'policy,' Grande did not have—let alone reasonably implement—an actual policy of terminating repeat infringing customers from October 2010 through 2016." | Ex. B, S. Christianson 30(b)(6) Dep. at 322:22-323:14 | "**Q. You would agree with me that Grande did not have a policy that provided for the termination of subscribers and account holders who were repeat copyright infringers in 2010, right?** A. To my knowledge, yes. Q. Same answer for 2011? A. Yes.  Q. 2012?  A. Yes.  Q. 2013?  A. Yes.  Q. 2014?  A. Yes.  Q. 2015?  A. Yes.  Q. And 2016?  A. Yes." |
| 2 Intro. | "In fact, the undisputed evidence shows that from October 2010 through October 2016, Grande actually had a policy of *never terminating users* for copyright infringement in any circumstances, regardless of the evidence of infringement that Grande received." | Ex. C, Horton Dep. at 142:8-12 | "*Q. After the change in policy that you recall was sometime in 2010 or 2011, Grande was not terminating subscribers for copyright infringement until the current DMCA policy in 2017?* A. To the best of my knowledge, that's true." |
|  |  | Ex. D, PX 90 | "We currently send out DMCA notifications through mail for what we take in with our abuse system.  *However, there are no limits here – we have some customers that are up to their 54th notice*. Understand that the DMCA law requires us to expeditiously notify customers and we can't have knowledge of the content being shared, but there is no 'three strikes' law or anything that we follow like some ISPs. Also, we don't have any verbiage here other than '… may terminate the Service at any time …' in our residential AUP policy.  *Question - we have users who are racking up DMCA take down requests and no process for remedy in place*. I don't know if I'm seeing a broken process or compliance with the letter of the law. Do you guys have insight or knowledge on this?" |
|  | (agreeing that this policy change occurred in October 2010) | Ex. C, Horton Dep. at 147:24-148:9 | "What Mr. Bloch is describing as the completed changes to the abuse management system were complete by October 25th, 2010; right?  A. To the best of my knowledge, reading this, yes, I agree.  Q. And does that refresh your recollection as to the time period in which the policy changed from terminating repeat infringers to not terminating repeat infringers?  A. Yes. And so when I said earlier 2010, 2011, this looks like a refined date." |
| 4 Intro. | "Grande did not terminate any customers for copyright infringement under its new supposed DMCA Policy until June 2017—after Plaintiffs filed this lawsuit—and since then, Grande has only terminated a paltry twelve customers for copyright infringement, while still providing thousands of other known repeat | Ex. E, Grande Resps. to Pls' Second Reqs. For Admissions, p. 3 | "Grande admits that from 2011 to April 2017 it did not terminate any subscriber based on an allegation of copyright infringement…" |
|  |  | Ex. G, S. Christianson 30(b)(6) Dep. at 31:11-14 | "The 12 subscribers that Grande has terminated for copyright infringement were all terminated after June 2017, correct?  A. Yes." |
|  |  | Ex. B, S. Christianson | "Q. You would agree the number of customers suspended for copyright infringement or alleged infringement in 2012 was zero?  A. Yes.  Q. 2013 it was zero?  A. Yes.  Q. 2014 it was zero?  A. Yes.  Q. 2015 it was zero?  A. Yes.  Q. |

1

**APPENDIX – EVIDENCE IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO GRANDE COMMUNICATIONS NETWORKS LLC'S DMCA SAFE HARBOR DEFENSE**

| FOOTNOTE | FACTUAL ASSERTION | EXHIBIT | RELEVANT EXCERPT (emphasis added) |
|---|---|---|---|
| | infringers continued use of Grande's internet service." | 30(b)(6) Dep. at 305:16-306:10 | 2016 it was zero? **A.** Yes. **Q.** 2017 it was 12? **A.** 2017 it was 11. **Q.** It was 11. 2018 so far, one? **A.** Yes. **Q.** 2011 it was zero, right? **A.** Yes. **Q.** 2010? **A.** To my knowledge, 2010 is zero." |
| | | Ex. I, Rohre Dep. at 90:17-91:8 | "This is a list of the terminated subscribers discussed in Interrogatory 11. Does that appear to be the case to you? **A.** Yes. **Q.** This list includes all subscribers terminated for copyright infringement under Grande's DMCA policy up to the time of this response of your interrogatory; is that correct?  To the best of my knowledge. **Q.** So to be clear, there are 11 names, and feel free to count, in red on this sheet? **A.** That's right. **Q.** So up through October 2017, Grande has terminated a total of 11 people for copyright infringement? **A.** That is correct, to the best of my knowledge." |
| 6 Statement of Undisputed Material Facts, ¶ 1 | "Grande is a Texas-based ISP that provides internet services to customers in Austin, Dallas, San Antonio, and other locations throughout the state." | Compl. [Dkt. 1] ¶ 3 | "3.  Defendant Grande is a Texas Internet Service Provider ("ISP") that provides internet services to customers in Austin, Dallas, San Antonio, and other locations throughout the state." |
| | | Answer [Dkt. 80] ¶ 3 | "Grande admits the allegations in the first sentence of Paragraph 3." |
| 7 SUMF, ¶ 2 | "Grande asserts the DMCA safe harbor as an affirmative defense in this case" | Answer [Dkt. 80] p. 9 | "The safe harbor under 17 U.S.C. § 512(a) & (i) bars Plaintiffs' claims against Grande.  As a service provider, Grande has adopted and reasonably implemented, and has informed subscribers and account holders of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders alleged to be repeat copyright infringers." |
| 8 SUMF, ¶ 3 | "The two policies that Grande claims entitle it to the DMCA safe harbor under § 512(a) are Grande's Acceptable Use Policy and Grande's DMCA Policy." | Ex. J, Grande's Third Am. Resp. to Pl. First Interrogs., pp. 6-8 | "Grande identifies the following documents as Grande's current policies: http://mm.mygrande.com/pdf/GRANDE-DMCA-Policy-5%20-19-2016.pdf and http://mm.mygrande.com/pdf/Grande_Acceptable_Use_Policy_10-31-13.pdf." |
| 9 SUMF, ¶ 4 | "Stephanie Christianson has been a Technical Project Manager for Grande since early 2016, and was designated by Grande under FRCP 30(b)(6) as its corporate representative to testify on the implementation of its DMCA policy and procedure." | Ex. G, S. Christianson 30(b)(6) Dep. at 13:6-11 | "**Q.** And what is your current position with Grande? **A.** I am a technical project manager. **Q.** How long have you been a technical project manager? **A.** Approximately two and a half years." |
| | | *Id.* at 17:2-20 | "**Q.** Then if you turn to Topic 13 of the notice, which is one of the topics I understand for which you've been offered by Grande, the topic is, **'The factual basis (or bases) for Grande's assertion to entitlement to the DMCA safe harbor from copyright infringement liability** (referenced in Grande's |

2

APPENDIX – EVIDENCE IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO GRANDE COMMUNICATIONS NETWORKS LLC'S DMCA SAFE HARBOR DEFENSE

| FOOTNOTE | FACTUAL ASSERTION | EXHIBIT | RELEVANT EXCERPT (emphasis added) |
|---|---|---|---|
| | | | response to Plaintiffs' Interrogatory 11), **to include** 'each policy that provides for the termination of subscribers and account holders who are repeat copyright infringers' Grande references, **the implementation of such a policy**, the effective date and period of application of such a policy, and the number of repeat infringers terminated under that policy.' You see that?  A. I do.  **Q. Are you prepared to provide testimony on behalf of Grande on Topic 13?  A. I am.**" |
| 10 SUMF, ¶ 5 | "Matt Rohre became the General Manager at Grande in 2004, has been Grande's General Manager and Senior Vice President of Operations since January 2015, and is the most senior person in Grande's corporate structure." | Ex. I, Rohre Dep. at 17:13–18:7 | "Q. What is your current occupation and job title?  **A. I am the senior vice president of operations and general manager.**  Q. At?  A. At Grande Communications.  Q. Are you the highest ranking executive at Grande?  **A. At Grande in Texas, yes.**  Q. Okay. So in your building where Grande is, you are the most senior person there?  A. Well, we have multiple buildings across the state, but –  Q. Fair enough.  A. Yes.  Q. But in –  A. Yes.  **Q. As a corporation, corporate structure, Grande Communications, you are the top person?  A. Correct.**" |
| | | Ex. I, Rohre Dep. at 19:21–20:7 | "**A. In 2004, I was promoted to the general manager** for the Waco market. We moved to Waco after we acquired a company called Clearsource. I was the general manager in that market until 2010. At the end of 2010, I assumed additional responsibility for our Dallas market. Sometime around 2011 or early 2012, I assumed responsibility for our Midland/Odessa market, **all the way until 2015, whereby our previous president left the company and I was promoted to senior vice president of operations and general manager** overseeing all the markets here in Texas." |
| | | Ex. G, Rohre Dep. at 119:22-24 | "**Q. You're the most senior person in the Grande operation, correct?  A. Correct.**" |
| 11 SUMF, ¶ 6 | "Lamar Horton has been Grande's Vice President of Network Engineering and Operations since 2009 and has been Grande's registered DMCA agent since May 13, 2016." | Ex. C, Horton Dep. at 15:13–18 | "Q. What is your current occupation and job title?  A. **Vice president of network engineering and operations.**  Q. For who?  A. Grande Communications.  Q. How long have you had that position?  A. That title?  **Since 2009.**" |
| | | Ex. C, Horton Dep. at 45:19-24 | "Q. What is your understanding of your responsibilities as the DMCA agent?  **A. My understanding of being the DMCA agent is that I am a point of contact for the outside world of copyright holders to provide notice or a contact to reach out to.**" |
| 12 SUMF, ¶ 7 | "Colin Bloch has been a Grande employee for 18 years, and has been | Ex. K, Bloch Dep. at 10:25–11:5 | "Q. You've worked for Grande for 18 years?  A. Yes.  Q. What is your current job at Grande?  A. My title is manager of Internet systems.  Q. How |

3

**APPENDIX – EVIDENCE IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO GRANDE COMMUNICATIONS NETWORKS LLC'S DMCA SAFE HARBOR DEFENSE**

| FOOTNOTE | FACTUAL ASSERTION | EXHIBIT | RELEVANT EXCERPT (emphasis added) |
|---|---|---|---|
| 13<br>SUMF, ¶ 8 | Grande's Manager of Internet Systems since 2003." | Ex. K, Bloch Dep. at 10:25-11:1 | "Q. …long have you had that position? A. I would say about **15 years**, maybe longer."<br>"Q. You've worked for Grande for 18 years? A. Yes." |
|  | "Since at least the early 2000s, Grande has been aware of its subscribers using Grande's service to engage in online copyright infringement of music and movies, as a result of its receipt of copyright infringement notices from companies that detect and send such notices." | Ex. K, Bloch Dep. at 38:14-39:4 | "Q. And at some point in time, the abuse… process came to include copyright infringement? A. It did. Q. About when did that happen? A. Well, it happened the moment that we became aware of copyright infringement happening, when the organizations popped up. Q. About when did Grande become aware of copyright infringement happening by Grande subscribers? MS. HOEKEL: Object to the form. A. I don't recall the exact date, man. BY MR. GILMORE: Q. It was some point early in your career at Grande? A. Yes." |
|  |  | Ex. K, Bloch Dep. at 44:16-23 | "Q. Mr. Bloch, earlier you said Grande became aware of copyright infringement happening when the organizations popped up. Can you tell me – are you referring to companies that detect and send notices of copyright infringement? Is that the organizations you were referring to? MS. HOEKEL: Object to the form. A. Yes." |
|  |  | Ex. K, Bloch Dep. at 110:21-111:1 | "Q. Well, you've been aware for years about this problem of customers using Internet service to share music and movies online illegally for years, right? MS. HOEKEL: Object to the form. A. I'm aware that existed." |
| 14<br>SUMF, ¶ 9 | "Grande received at least 1.2 million notices of alleged copyright infringement between 2011 and 2016." | Ex. G, S. Christianson 30(b)(6) Dep. at 67:7-11 | "Q. Okay. And you – how many notices of alleged infringement did Grande receive between 2011 and 2016? A. Notices of alleged infringement is about 1.2 million." |
| 15<br>SUMF, ¶ 9 | "Based on these notices of infringement, Grande sent more than 200,000 letters to its customers regarding the alleged copyright infringement reflected in these notices." | Ex. B, S. Christianson 30(b)(6) Dep. at 304:15-18. | "Q. How many were sent for this time frame? A. Over 200,000. Q. 200,000 letters were sent to customers? A. Yes." |
| 16<br>SUMF, ¶ 10 | "For years, Grande received hundreds of thousands of notices of copyright infringement from Rightscorp, a company that detects online copyright infringement, but failed to forward those notices to its | Ex. G, S. Christianson 30(b)(6) Dep. at 183:19-22 | "Q. And so this record reflects letters sent to Grande customers based on notices received by Grande, correct? A. Yes." |

4

APPENDIX – EVIDENCE IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO GRANDE COMMUNICATIONS NETWORKS LLC'S DMCA SAFE HARBOR DEFENSE

| FOOTNOTE | FACTUAL ASSERTION | EXHIBIT | RELEVANT EXCERPT (emphasis added) |
|---|---|---|---|
| | customers. Grande decided to forward Rightscorp notices sometime in 2016." | | |
| 17, 18, & 19<br>SUMF, ¶ 11<br>SUMF, ¶ 12<br>SUMF, ¶ 13 | "Before October 2010, Grande had a policy in place to suspend (and then potentially terminate) all users for whom Grande received an infringement notice."<br><br>"In October 2010, Grande changed that policy to a new policy of not terminating any of its customers for copyright infringement."<br><br>"From October 2010 until October 2013, Grande had no policy providing for the termination of subscribers and accountholders who were repeat copyright infringers. In fact, during this time period, Grande's policy was not to terminate subscribers for copyright infringement." | Ex. C, Horton Dep. at 141:20-142:12 | "**Q.** Grande was not terminating subscribers for copyright infringement in 2011? **A.** This is where I need to clarify that somewhere -- and I don't have an exact date nor point of reference to point to -- in 2010 or 2011, which I believe was 2010, when we were previously managed by ABB, *we had a policy in place of turning off all subscribers upon copyright violation notice*, requiring the customer to then contact Grande to discuss the issue, understand what happened, inform the customer of why they'd been shut off, and take appropriate action from there. *In 2010 or 2011, in that time period, ABB implemented a change to that policy.* **Q.** *After the change in policy that you recall was sometime in 2010 or 2011, Grande was not terminating subscribers for copyright infringement until the current DMCA policy in 2017?* **A.** *To the best of my knowledge, that's true.*" |
| 20<br>SUMF, ¶ 14 | "In October 2013, Grande adopted the current version of its Acceptable Use Policy." | Ex. G, S. Christianson 30(b)(6) Dep. at 41:15-22. | "**Q.** So prior to the DMCA policy and procedure document that we've looked at, the 2013 acceptable use policy was the only policy at Grande addressing allegations of copyright infringement submitted by third parties to Grande based on conduct of – by Grande subscribers, right? MR. BROPHY: Same objection. **A.** Yes." |
| 21<br>SUMF, ¶ 14 | "The Acceptable Use Policy purports to prohibit copyright infringement" | Ex. L, PX 103, p. 4 | "Grande Communications may terminate the Service provided to any customer or user who is either found to infringe third party copyright or other intellectual property rights, including repeat infringers, or who Grande Communications believes in its sole discretion is infringing these rights. Grande Communications may terminate the Service at any time with or without notice for any affected customer or user." |

5

**APPENDIX – EVIDENCE IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO GRANDE COMMUNICATIONS NETWORKS LLC'S DMCA SAFE HARBOR DEFENSE**

| FOOTNOTE | FACTUAL ASSERTION | EXHIBIT | RELEVANT EXCERPT (emphasis added) |
|---|---|---|---|
| 22 SUMF, ¶ 15 | "Notwithstanding the text of the Acceptable Use Policy, from October 2013 through October 2016, Grande had no actual policy providing for the termination of subscribers and accountholders who were repeat copyright infringers." | Ex. B, S. Christianson 30(b)(6) Dep. at 322:22-323:14. | "You would agree with me that Grande did not have a policy that provided for the termination of subscribers and account holders who were repeat copyright infringers in 2010, right?  **A.** To my knowledge, yes.  **Q.** Same answer for 2011?  **A.** Yes.  **Q.** 2012?  **A.** Yes.  **Q.** 2013?  **A.** Yes.  **Q.** 2014?  **A.** Yes.  **Q.** 2015?  **A.** Yes.  **Q.** And 2016?  **A.** Yes." |
| 23 SUMF, ¶ 15 | "In fact, during this time period, Grande's actual policy remained not to terminate subscribers for copyright infringement." | Ex. C, Horton Dep. at 141:20-142:7, 142:8-12 | "**Q.** Grande was not terminating subscribers for copyright infringement in 2011?  **A.** This is where I need to clarify that somewhere -- and I don't have an exact date nor point of reference to point to -- in 2010 or 2011, which I believe was 2010, when we were previously managed by ABB, we had a policy in place of turning off all subscribers upon copyright violation notice, requiring the customer to then contact Grande to discuss the issue, understand what happened, inform the customer of why they'd been shut off, and take appropriate action from there. In 2010 or '11, in that time period, ABB implemented a change to that policy.  **Q.** After the change in policy that you recall was sometime in 2010 or 2011, Grande was not terminating subscribers for copyright infringement until the current DMCA policy in 2017?  **A.** To the best of my knowledge, that's true." |
| 24 SUMF, ¶ 16 | "From October 2010 through October 2016, there was no limit to the number of notices of copyright infringement that Grande could receive with respect to any of its subscribers before Grande would terminate that subscriber, because Grande's policy was not to terminate anyone for copyright infringement." | Ex. C, Horton Dep. at 288:4-24 | "**Q.** Okay. So you would agree with me, in October 2016, there was no limit to the number of notices a Grande subscriber could receive –  **A.** Yes.  **Q.** -- before getting removed; right?  **A.** Yes. Yes.  **Q.** Because Grande wasn't removing anybody?  **A.** Yes.  **Q.** Similarly, there was no limit to the number of. notices a Grande subscriber could receive in 2015; right?  **A.** Yes.  **Q.** Same for 2014?  MR. HOWENSTINE: Objection. Asked and answered.  **A.** Yes. As we've covered earlier, yes.  **Q.** (BY MR. O'BEIRNE) So, if Grande received 25,000 notices regarding a particular subscriber, they would not have been kicked off in October 2016?  MR. HOWENSTINE: Same objection.  **A.** Answer's still yes." |
| | | Ex. C, Horton Dep. at 293:16-19 | "**Q.** And, again, as we've covered, Grande was not terminating anybody for copyright infringement in 2013; right?  **A.** That is correct." |
| 25 SUMF, ¶ 16 | "During this time period, pursuant to its actual policy, Grande did not terminate any subscribers for copyright infringement or alleged copyright infringement, regardless | Ex. G, S. Christianson 30(b)(6) Dep. at 32:10-33:4 | " … From October 2010 through May 2017, Grande was not terminating any users for copyright infringement or alleged copyright infringement regardless of the source of any notice of alleged copyright infringement that it received, right?  **A.** Correct.  **Q.** And from 2010 through May 2017, Grande was not terminating any users for copyright infringement or alleged copyright infringement |

**APPENDIX – EVIDENCE IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO GRANDE COMMUNICATIONS NETWORKS LLC'S DMCA SAFE HARBOR DEFENSE**

| FOOTNOTE | FACTUAL ASSERTION | EXHIBIT | RELEVANT EXCERPT (emphasis added) |
|---|---|---|---|
| | | | of the source, content, or volume of any notices of infringement that it received, right? A. Correct. Q. And from 2010 through May 2017, Grande was not terminating any users for copyright infringement or alleged copyright infringement. regardless of the volume of notices regarding copyright infringement that it received for a given customer? A. Correct." |
| | | Ex. E, Grande's Resps. to Pls.' Second Set of Reqs. For Admissions, p. 3 | "Grande admits that from 2011 to April 2017 it did not terminate any subscriber based on an allegation of copyright infringement…" |
| | | Ex. D, PX 90 | "We currently send out DMCA notifications through mail for what we take in with our abuse system. *However, there are no limits here - we have some customers that are up to their 54th notice.* Understand that the DMCA law requires us to expeditiously notify customers and we can't have knowledge of the content being shared, but there is no 'three strikes' law or anything that we follow like some ISPs. Also, we don't have any verbiage here other than '… may terminate the Service at any time …' in our residential AUP policy. *Question - we have users who are racking up DMCA take down requests and no process for remedy in place*. I don't know if I'm seeing a broken process or compliance with the letter of the law. Do you guys have insight or knowledge on this?" |
| 26 SUMF, ¶ 17 | "Grande was aware that if it merely sent emails to its customers who were the subject of DMCA infringement notices, without terminating repeat infringing customers, that could render it ineligible for the DMCA safe harbor." | Ex. M, PX 91 | Roberto Chang email to Richard Fogle stating "If we do nothing more that [sic] emails (as I think you mentioned) *we might lose our safe harbor status*." |
| | | Ex. K, Bloch Dep. at 79:22–80:1 | "*Q. At some point in time, though, after receiving multiple notices, you still thought that Grande had an obligation to terminate customers at some point? A. Yes.*" |
| 27 SUMF, ¶ 18 | "Grande first published its DMCA Policy on its website in November 2016." | Ex. G, S. Christianson 30(b)(6) Dep. at 30:1-6 | "Q. Grande did not have a policy that provided for the termination of subscribers and account holders who were repeat infringers until, at the earliest, the DMCA policy and procedure published in 2016, correct? A. Yes." |
| | | Ex. G, S. Christianson 30(b)(6) Dep. at 36:12-22 | "Q. So my specific question is, **what is the earliest date on which the DMCA policy and procedure was implemented?** And I understand you to be testifying that the earliest date of implementation of the DMCA policy and procedure was November 2016. MR. BROPHY: Objection, vague. BY MR. |

APPENDIX – EVIDENCE IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO GRANDE COMMUNICATIONS NETWORKS LLC'S DMCA SAFE HARBOR DEFENSE

| FOOTNOTE | FACTUAL ASSERTION | EXHIBIT | RELEVANT EXCERPT (emphasis added) |
|---|---|---|---|
| | | | O'BEIRNE: **Q. Do you agree with that?  A. November 2016 is when it was posted on the website.**" |
| **28** SUMF, ¶ 19 | "Grande did not terminate any users under this new policy until June 2017.  Since June 2017, Grande has terminated twelve users for copyright infringement (eleven in 2017 and one in 2018)." | Ex. G, S. Christianson 30(b)(6) Dep. at 31:11-14 | "The 12 subscribers that Grande has terminated for copyright infringement were all terminated after June 2017, correct?   A. Yes." |
| | | Ex. B, S. Christianson 30(b)(6) Dep. at 305:16-306:10 | "**Q.** You would agree the number of customers suspended for copyright infringement or alleged infringement in 2012 was zero?   A. Yes.   Q. 2013 it was zero?   A. Yes.   Q. 2014 it was zero?   A. Yes.   Q. 2015 it was zero?   A. Yes.   Q. 2016 it was zero?   A. Yes.   **Q. 2017 it was 12?   A. 2017 it was 11.   Q. It was 11.  2018 so far, one?   A. Yes.   Q.** 2011 it was zero, right?   A. Yes.   Q. 2010?   A. To my knowledge, 2010 is zero." |
| | | Ex. I, Rohre Dep. at 90:13-91:8 | "**Q.** We were looking at Plaintiffs' Exhibit 60, and as I was saying, this is a printout of the Excel spreadsheet produced to us in conjunction with the interrogatory responses which you signed in January 2018.  This is a list of the terminated subscribers discussed in Interrogatory 11.  Does that appear to be the case to you?   A. Yes.   Q. This list includes all subscribers terminated for copyright infringement under Grande's DMCA policy up to the time of this response of your interrogatory; is that correct?   A. To the best of my knowledge.   Q. So to be clear, there are 11 names, and feel free to count, in red on this sheet?   A. That's right.   **Q. So up through October 2017, Grande has terminated a total of 11 people for copyright infringement?   A. That is correct, to the best of my knowledge.**" |
| **29** SUMF, ¶ 20 | "Grande admits that there was no possibility that Grande might terminate a customer for copyright infringement or alleged copyright infringement from October 2010 until June 2017." | Ex. B, S. Christianson 30(b)(6) Dep. at 284:10-285:2 | "**Q.** Sure. Prior to switching over to sending e-mails, the process was that hard copy letters regarding copyright infringement were going out but nobody was getting terminated for copyright infringement or alleged copyright infringement, right?   MR. BROPHY: Objection, vague.   A. The final warning notifications started going out in June of 2017.  That is when we started the view or, you know, assessment of whether we were going to terminate the customers.   **Q. That was when the possibility that Grande might terminate a customer for copyright infringement or alleged copyright infringement began?** MR. BROPHY: Objection, vague.   **A. Yes.**" |
| **30** SUMF, ¶ 21 | "Grande tracks a list of subscribers for whom Grande had received more than one notice of | Ex. C, Horton Dep. at 84:18-24 | "Q. And, if you turn to the last page of this first sheet, **Grande's tracking 9,014 customers on its DMCA excessive violations** from October 1st, 2016, through |

8

APPENDIX – EVIDENCE IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO GRANDE COMMUNICATIONS NETWORKS LLC'S DMCA SAFE HARBOR DEFENSE

| FOOTNOTE | FACTUAL ASSERTION | EXHIBIT | RELEVANT EXCERPT (emphasis added) |
|---|---|---|---|
| | infringement on its DMCA 'Excessive Violations' Report." | | December 31st, 2016, report; correct?  MR. HOWENSTINE: Objection. Calls for speculation.  **A. It appears so.**" |
| **31** SUMF, ¶ 22 | "The same system that Grande used to terminate twelve accounts since June 2017 could have been used for terminations from 2011 through May 2017 based on notices Grande received during those years." | Ex. I, Rohre Dep. at 149:9-21 | "**Q.** So going back to that list, Plaintiffs' Exhibit 60, with the red 11 that you terminated, the mechanism to kick off those 11 could have been done based on notices in 2011?  MR. HOWENSTINE: Objection, asked and answered.  **A.** Yes.  BY MR. MISSNER:  **Q.** 2012?  **A.** To my understanding.  **Q.** Every year up through 2017 when you did kick them off?  **A. Yes.**" |
| **32** SUMF, ¶ 23 | "Before 2017, Grande could have implemented a DMCA policy like its current policy, given that Grande's information about infringement activity is the same now as it was then; and no technical barriers prevented Grande from implementing its DMCA policy sooner." | Ex. I, Rohre Dep. at 147:10-148:10 | "**Q.** The current procedure that you have today for processing notices of copyright infringement could have been implemented in 2015?  **A.** Technically implemented? Potentially.  **Q.** In 2014?  **A.** Potentially.  **Q.** 2013?  **A.** Yes.  **Q.** Why potentially?  **A. I believe that we had the ability to do it. And the billing system was the same.** I think the bottom line is we were sending the notices to people. We were talking to customers.  **Q. But you could've implemented this policy in 2016, but you didn't?**  **A. I suppose we could have.  Q. Could you have implemented the policy in 2015?  A. Yes.  Q. 2014?  A. Yes.**  MR. HOWENSTINE: Objection, asked and answered. BY MR. MISSNER:  **Q.** 2013?  **A. Yes.**" |
| | | Ex. B, S. Christianson 30(b)(6) Dep. at 300:5-301:5 | "Grande could have implemented the e-mails and final termination letter process that it implemented sometime in 2017 in previous years, right?  MR. BROPHY: Objection, vague and outside the scope of the topics. You can answer.  **A.** Hypothetically, yes.  BY MR. O'BEIRNE: **Q.** Well, not just hypothetically. **The information that Grande has in its possession now that it uses to generate these e-mails and termination letters, it had that same kind of information about notices -- DMCA notices that it received in previous years, right?  A. The information is the same.  Q. So there was no technical barrier that you're aware of, sitting here, that would've prevented Grande from implementing this process sooner, is there?**  MR. BROPHY: Object as vague.  **A. No.** BY MR. O'BEIRNE: **Q. You would agree with me, no, there is no such barrier?  A. Yes, I would agree with you.**" |
| **34** Argument, § A | "Grande concedes that it is required by law to terminate repeat infringers." | Ex. N, PX 53 at 5. | Grande "'is obligated under federal law to adopt, reasonably implement and inform Internet access subscribers of, a policy that provides for the termination in appropriate circumstances of Internet access subscribers who repeatedly violate the copyright laws.'" |

9

**APPENDIX – EVIDENCE IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO GRANDE COMMUNICATIONS NETWORKS LLC'S DMCA SAFE HARBOR DEFENSE**

| FOOTNOTE | FACTUAL ASSERTION | EXHIBIT | RELEVANT EXCERPT (emphasis added) |
|---|---|---|---|
| 35<br>Arg., § A | "[Grande] has known for years, based upon its receipt of DMCA notices from companies that detect and send notices of copyright infringement, that thousands of its subscribers have been engaging in repeated online copyright infringement." | Ex. K, Bloch Dep. at 10:25-11:1 | "Q. You've worked for Grande for 18 years?  A. Yes." |
|  |  | Ex. K, Bloch Dep. at 38:14-39:4 | "Q. And at some point in time, the abuse process came to include copyright infringement?  A. It did.  Q. About when did that happen?  A. Well, it happened the moment that we became aware of copyright infringement happening, when the organizations popped up.  Q. About when did Grande become aware of copyright infringement happening by Grande subscribers?  MS. HOEKEL: Object to the form.  I don't recall the exact date, man.  BY MR. GILMORE: Q. It was some point early in your career at Grande?  A. Yes." |
|  |  | Ex. K, Bloch Dep. at 44:16-23 | "Q. Mr. Bloch, earlier you said Grande became aware of copyright infringement happening when the organizations popped up. Can you tell me – are you referring to companies that detect and send notices of copyright infringement? Is that the organizations you were referring to?  MS. HOEKEL: Object to the form.  A. Yes." |
|  |  | Ex. K, Bloch Dep. at 110:21-111:1 | "Q. Well, you've been aware for years about this problem of customers using Internet service to share music and movies online illegally for years, right?  MS. HOEKEL: Object to the form.  A. I'm aware that existed." |
| 36<br>Arg., § A | "Nevertheless, there is no dispute that Grande did not terminate any users from October 2010 through May 2017." | Ex. G, S. Christianson 30(b)(6) Dep. at 31:15-20. | "Q. So it's fair to say that Grande did not terminate any subscribers for copyright infringement or alleged copyright infringement between at least October 2010 and May 2017, correct?  A. Correct." |
| 37<br>Arg., § A | "Although Grande (1) received at least 1.2 million notices of copyright infringement from 2010 to 2016, (2) was tracking over 9,000 customers on its DMCA Excessive Violations Report by late 2016, and (3) specifically tracked infringing users by the number of notices received…." | Ex. C, Horton Dep. at 84:18-24 | "Q. And, if you turn to the last page of this first sheet, **Grande's tracking 9,014 customers on its DMCA excessive violations from October 1st, 2016, through December 31st, 2016, report; correct?**  MR. HOWENSTINE: Objection. Calls for speculation.  A. It appears so." |
|  |  | Ex. I, Rohre Dep. at 87:1-20 | "What you're saying, is Grande has received millions of notices of copyright infringement?  A. We've received e-mails of allegations of copyright infringement.  Q. So you've – but you've received millions of notices alleging copyright infringement?  A. E-mails.  Q. E-mails.  A. As far as I know.  Q. Millions?  A. Yes.  Q. Okay. On page -- your answer says 'such notices' and you continue to say 'e-mails.'  So you only have received e-mails?  A. To the best of my knowledge.  Q. It doesn't say 'e-mails,' right? It says 'notices'?  A. It says 'notices,' but I believe that we received them via e-mail." |
| 38<br>Arg., § A | "Contemporaneous internal emails confirm that Grande personnel knew | Ex. O, PX 84 | Feb. 22, 2016 L. Horton email providing a list of "Rightscorp DMCA notices received by year." |

**APPENDIX – EVIDENCE IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO GRANDE COMMUNICATIONS NETWORKS LLC'S DMCA SAFE HARBOR DEFENSE**

| FOOTNOTE | FACTUAL ASSERTION | EXHIBIT | RELEVANT EXCERPT (emphasis added) |
|---|---|---|---|
| | of the many repeat infringing subscribers on Grande's network." | | |
| 39 & 40 Arg., § A | "One Grande customer received 13,958 notices from Rightscorp in 2015. Another received 12,953." | Ex. I, Rohre Depo. at 137:8-11 | "So Grande received 13,598 [sic] notices from RightsCorp for copyright infringement for that specific account in 2015? A. It would appear so." |
| | | Ex. I, Rohre Depo. at 141:8-16 | "Q. If you can look down one more under that one, a person at 12,953 notices, is that correct? A. Correct.  Q. Should that person have been kicked off in 2015? A. Same answer as above. Given the current policy, they would be terminated.  Q. Is that person a repeat infringer? A. Yes." |
| 41 Arg., § A | "Yet Grande's General Manager Matt Rohre conceded that Grande has no evidence that it terminated any subscriber for copyright infringement between 2011 and June 28, 2017." | Ex. I, Rohre Dep. at 97:15-21 | "Between 2011 and 2017, in your diligent effort, what evidence do you have of the termination of any subscriber for copyright infringement? A. I do not have any.  Q. You have no evidence? A. I have no evidence. |
| | | Ex. I, Rohre Depo. at 146:1-6 | "Q. Your sworn testimony is that there was a likelihood that repeat infringers would be terminated between 2011 and 2017? A. That's correct.  Q. You have no evidence that a single one was? A. I do not." |
| 42 Arg., § A | "And Grande has confirmed its witnesses' testimony, admitting that it did not terminate any customer based on copyright infringement notices from 2011 until after Plaintiffs filed this lawsuit." | Ex. E, Grande Resps. to Pls' 2d Reqs. For Admissions, p. 3 | "Grande admits that from 2011 to April 2017 it did not terminate any subscriber based on an allegation of copyright infringement…" |
| 43 Arg., § A | "Prior to October 2010, Grande suspended users based on copyright infringement notices, and some suspensions led to terminations. However, that policy changed in October 2010.  After that date, Grande stopped terminating repeat infringers" | Ex. C, Horton Dep. at 141:20-142:7 | "Q. Grande was not terminating subscribers for copyright infringement in 2011? A. This is where I need to clarify that somewhere -- and I don't have an exact date nor point of reference to point to -- in 2010 or 2011, which I believe was 2010, when we were previously managed by ABB, *we had a policy in place of turning off all subscribers upon copyright violation notice, requiring the customer to then contact Grande to discuss the issue, understand what happened, inform the customer of why they'd been shut off, and take appropriate action from there. In 2010 or 2011, in that time period, ABB implemented a change to that policy."* |
| 44 Arg., § A | "Email correspondence refreshed Mr. Horton's recollection that this change in policy occurred in October 2010." | Ex. C, Horton Dep. at 147:24-148:9 | "What Mr. Bloch is describing as the completed changes to the abuse management system were complete by October 25th, 2010; right? A. To the best of my knowledge, reading this, yes, I agree.  Q. And does that refresh your recollection as to the time period in which the policy changed from terminating repeat infringers to not terminating repeat infringers? A. Yes. And so when I said earlier 2010, 2011, this looks like a refined date." |

11

**APPENDIX – EVIDENCE IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO GRANDE COMMUNICATIONS NETWORKS LLC'S DMCA SAFE HARBOR DEFENSE**

| FOOTNOTE | FACTUAL ASSERTION | EXHIBIT | RELEVANT EXCERPT (emphasis added) |
|---|---|---|---|
| **45** Arg., § A | "Grande's new policy, adopted in October 2010, was not to terminate any user for copyright infringement" | Ex. C, Horton Dep. at 142:8-12. | "**Q.** After the change in policy that you recall was sometime in 2010 or 2011, Grande was not terminating subscribers for copyright infringement until the current DMCA policy in 2017? **A.** To the best of my knowledge, that's true." |
| **46** Arg., § A | "Grande's 30(b)(6) corporate representative on Grande's supposed entitlement to the safe harbor, confirmed Mr. Horton's description." | Ex. B, S. Christianson 30(b)(6) Dep. at 322:21-323:14 | "You would agree with me that Grande did not have a policy that provided for the termination of subscribers and account holders who were repeat copyright infringers in 2010, right? **A.** To my knowledge, yes. **Q.** Same answer for 2011? **A.** Yes. **Q.** 2012? **A.** Yes. **Q.** 2013? **A.** Yes. **Q.** 2014? **A.** Yes. **Q.** 2015? **A.** Yes. **Q.** And 2016? **A.** Yes." |
| **47** Arg., § A | "Grande's policy was the opposite of terminating access to repeat infringers—rather, it permitted unlimited infringement without consequence *no matter how much evidence of infringement Grande received.*" | Ex. G, S. Christianson 30(b)(6) Dep. at 32:10-33:4 | "From October 2010 through May 2017, Grande was not terminating any users for copyright infringement or alleged copyright infringement regardless of the source of any notice of alleged copyright infringement that it received, right? **A.** Correct. **Q.** And from 2010 through May 2017, Grande was not terminating any users for copyright infringement or alleged copyright infringement regardless of the content of any notice of alleged copyright infringement that it received, right? **A.** Correct. **Q.** And from 2010 through May 2017, Grande was not terminating any users for copyright infringement or alleged copyright infringement regardless of the volume of notices regarding copyright infringement that it received for a given customer? **A.** Correct." |
| **48** Arg., § A | "Despite its failure to terminate a single subscriber, Grande claims that it is entitled to the safe harbor because its Acceptable Use Policy had the *"concomitant potential"* of termination for repeat infringers." | Ex. J, Grande's Third Am. Resp. to Pls.' Interrog., p. 7 | "Since at least 2013, Grande's policy for handling allegations of copyright infringement has consistently included the transmission of notice letters to subscribers and the concomitant potential for termination if a subscriber is determined to be conducting repeat copyright infringement through Grande's network." |
| **49** Arg., § A | "Not only did Grande refuse to terminate any users for more than a six-year period no matter how many times such users engaged in copyright infringement, but Grande did not even *consider* terminating the accounts of any of the thousands of repeat infringers." | Ex. B, S. Christianson 30(b)(6) Dep. at 284:17-285:2 | "**A.** The final warning notifications started going out in June of 2017. That is when we started the view or, you know, assessment of whether we were going to terminate the customers. BY MR. O'BEIRNE: **Q.** That was when the possibility that Grande might terminate a customer for copyright infringement or alleged copyright infringement began? MR. BROPHY: Objection, vague. **A.** Yes." |

APPENDIX – EVIDENCE IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO GRANDE COMMUNICATIONS NETWORKS LLC'S DMCA SAFE HARBOR DEFENSE

| FOOTNOTE | FACTUAL ASSERTION | EXHIBIT | RELEVANT EXCERPT (emphasis added) |
|---|---|---|---|
| **50** Arg., § A | "Grande's General Manager agreed that he could not identify a single customer for whom this "concomitant potential" became a reality." | Ex. I, Rohre Dep. at 146:11-15 | "Q. So you can't tell me about one person for who that concomitant potential became a reality? MR. HOWENSTINE: Objection, asked and answered many times over at this point. A. No." |
| **51** Arg., § A | "In fact, Grande knew at the time that it had no process for addressing repeat infringement and that its failure to terminate repeat infringers could deprive it of the safe harbor, as internal emails show." | Ex. M, PX 91. | "If we do nothing more that [sic] emails (as I think you mentioned) *we might lose our safe harbor status*." |
| **52** Arg., § B | "As a last-ditch effort to save its safe harbor defense, Grande claims that 'appropriate circumstances' warranting termination of repeat infringers never arose." | Ex. P, Grande's Supp. Resp. to Interrogs. 11 and 15, p. 2. | "Grande states that it has never been given notice of any actual infringement taking place on its network, let alone repeat actual infringement. As a result, there has never been an instance in which it was necessary to terminate a subscriber for 'repeat infringement' under the applicable provisions of Section 512 of the Digital Millennium Copyright Act." |
| **53** Arg., § B | "Grande admits that it never felt the need to investigate a single Rightscorp notice, never concluded that any Rightscorp notice was inaccurate in any way, and never communicated with Rightscorp to raise any issue about any of its notices." | Ex G, S. Christianson 30(b)(6) Dep. at 69:17-20 | "Grande does not independently investigate the contents of any notice of copyright infringement that it receives, correct?  A. Investigate the content, no." |
| | | Ex G, S. Christianson 30(b)(6) Dep. at 223:9-13 | "Q. So you would agree with me, Grande did not meaningfully investigate notices alleging infringement that it received from Rightscorp?  MR. BROPHY: Same objection. A. Yes." |
| **54** Arg., § B | "[Grande] never concluded that any Rightscorp notice was inaccurate in any way" | Ex G, S. Christianson 30(b)(6) Dep. at 70:13-21. | "Q. Sitting here today, **can you tell me any time that Grande determined using any means at its disposal, that a notice describing an event alleged to be copyright infringement did not occur as described in the notice?** MR. BROPHY: I'll object as outside the scope of the topics and calling for speculation.  A. Not that I could speak to. I don't know that." |
| | | Ex G, S. Christianson 30(b)(6) Dep. at 222:8-24. | "**You would agree with me Grande cannot point to a single instance in which it concluded that the alleged activity reflected in any Rightscorp notice, in fact, did not occur?** MR. BROPHY: Same objections; also asked and answered.  A. Yes. BY MR. O'BEIRNE:  Q. …. As Grande's corporate representative on Topics 30, 32 and 33, you cannot point to a single Rightscorp notice that Grande concluded was inaccurate in any respect? MR. BROPHY: |

13

**APPENDIX – EVIDENCE IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO GRANDE COMMUNICATIONS NETWORKS LLC'S DMCA SAFE HARBOR DEFENSE**

| FOOTNOTE | FACTUAL ASSERTION | EXHIBIT | RELEVANT EXCERPT (emphasis added) |
|---|---|---|---|
| | | | Objection, outside the scope of the topics, vague; also asked and answered. A. I cannot." |
| **55** Arg., § B | "[Grande] never communicated with Rightscorp to raise any issue about any of its notices." | Ex. J, Grande's Third Am. Resp. to Pl. Interrogs., p. 6. | "Grande states that it is not aware of any communications between itself and any Plaintiff or with Rightscorp." |
| **56** Arg., § B | "Indeed, Grande's Manager of Internet Systems, Colin Bloch, the employee who first identified more than a decade ago that customers were using Grande's service to engage in online copyright infringement, acknowledged that Grande has known about its subscribers' infringing activity for years, through notices from online infringement detection companies like Rightscorp. | Ex. K, Bloch Dep. at 10:25-11:1 | "Q. You've worked for Grande for 18 years?  A. Yes." |
| | | Ex. K, Bloch Dep. at 38:14-39:4 | "Q. And at some point in time, the abuse process came to include copyright infringement?  A. It did.  Q. About when did that happen?  A. Well, it happened the moment that we became aware of copyright infringement happening, when the organizations popped up.  Q. About when did Grande become aware of copyright infringement happening by Grande subscribers?  MS. HOEKEL: Object to the form.  A. I don't recall the exact date, man.  BY MR. GILMORE:  Q. It was some point early in your career at Grande?  A. Yes." |
| | | Ex. K, Bloch Dep. at 44:16-23 | "Q. Mr. Bloch, earlier you said Grande became aware of copyright infringement happening when the organizations popped up. Can you tell me – are you referring to companies that detect and send notices of copyright infringement? Is that the organizations you were referring to?  MS. HOEKEL: Object to the form.  A. Yes." |
| | | Ex. K, Bloch Dep. at 110:21-111:1 | "Q. Well, you've been aware for years about this problem of customers using Internet service to share music and movies online illegally for years, right?  MS. HOEKEL: Object to the form.  A. I'm aware that existed." |
| **57** Arg., § B | "And numerous contemporaneous emails between Grande and its customers receiving notices reflect Grande's awareness of its subscribers' infringement as it was being detected." | Ex. Q, PX 69 | Grande customer service representative telling Grande sales executive "This is a notice that someone at that facility using the Grande provided data connection (GMAN), *has illegally downloaded copyrighted content*." |
| | | Ex. R, PX 169 | Grande technician telling executive that the customer who received the infringement notice Grande had forwarded "*need[s] to find out who on their network has downloaded the video and is sharing it and remove it.*" |
| | | Ex. S, PX 137 | Mr. Bloch telling Grande employee Robert Creel that the infringement detection company's "settlement system is legit in the sense that people can indeed respond and pay up (and *believe me, they know they downloaded the referenced content each time*)." |
| **58** Arg., § B | "Grande's corporate representative and its General Manager both confirmed that Grande terminated | Ex. G, S. Christianson | "Q. So I'm asking, did Grande terminate the 12 infringers it's terminated since May 2017 under its DMCA policy and procedure?  A. Yes.  *Q. And Grande did so because it determined the circumstances were appropriate to terminate* |

14

APPENDIX – EVIDENCE IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO GRANDE COMMUNICATIONS NETWORKS LLC'S DMCA SAFE HARBOR DEFENSE

| FOOTNOTE | FACTUAL ASSERTION | EXHIBIT | RELEVANT EXCERPT (emphasis added) |
|---|---|---|---|
| | these customers because Grande concluded that they were repeat copyright infringers and termination was appropriate on that basis." | 30(b)(6) Dep. at 35:2-13 | ***them as repeat copyright infringers under its DMCA policy and procedure?*** MR. BROPHY: Objection, vague, calls for speculation, outside the scope of the topics, but you can answer. **A.** ***Yes.***" |
| | | Ex. I, Rohre Dep. at 106:14-20 | "**Q.** And you've kicked off 11 people in 2017? **A.** Since this policy changed, that's correct, to the best of my knowledge.   **Q.** They were repeat infringers? **A.** (Nods head.) **Q.** Is that a yes? **A.** Yes." |
| 59<br>Arg., § B | "Grande made this determination based on notices of infringement received from third parties." | Ex. G, S. Christianson 30(b)(6) Dep. at 109:7-12 | "**Q.** Each of those 12 were terminated based on notices received by Grande, right? **A.** Yes. **Q.** The notices served as the basis for termination, right? **A.** Yes." |
| 60<br>Arg., § B | "Significantly, Grande's General Manager conceded that if Grande's current policy had been in effect from 2010 through 2016, then the subscribers for whom Grande received repeated infringement notices from Rightscorp during that time period would have been terminated then" | Ex. I, Rohre Depo. at 141:8-16. | "**Q.** If you can look down one more under that one, a person at 12,953 notices; is that correct? **A.** Correct. **Q.** Should that person have been kicked off in 2015? **A.** Same answer as above. Given the current policy, they would be terminated. **Q.** Is that person a repeat infringer? **A.** Yes." |
| 61<br>Arg., § B | "Shown Grande's own records tracking hundreds of Grande's customers who each generated more than 100 notices from Rightscorp, Mr. Rohre admitted that these users were repeat infringers." | Ex. I, Rohre Depo. at 142:12-17 | **Q.** All repeat infringers, every one of them? MR. HOWENSTINE: Again, objection, calls for a legal conclusion. BY MR. MISSNER: **Q.** You can answer. **A.** Correct. Under our current policy." |
| 62<br>Arg., § B | "If the notices were sufficient to establish appropriate circumstances to terminate repeat infringers in 2017 and 2018, they were sufficient in prior years too.  In other words, the circumstances warranting infringement did not change; only Grande's policy did." | Ex. K, Bloch Dep. at 79:22-80:1 | "**Q.** At some point in time, though, after receiving multiple notices, you still thought that Grande had an obligation to terminate customers at some point?  **A.** Yes." |