# Exhibit B
# Attorneys' Eyes Only
[To be filed under seal]



# Transcript of Stephanie Christianson, Designated Representative, Volume 2

**Date:** June 28, 2018

**Case:** UMG Recordings, Inc., et al. -v- Grande Communications Networks, LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

237
```
 1        ACKNOWLEDGMENT OF DEPONENT
 2      I, STEPHANIE CHRISTIANSON, do hereby
 3  acknowledge that I have read and examined the
 4  foregoing testimony, and the same is a true,
 5  correct and complete transcription of the
 6  testimony given by me and any corrections appear
 7  on the attached Errata sheet signed by me.
 8
 9
10  _____   _____
11   (DATE)           (SIGNATURE)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

238
```
 1        REPORTER'S CERTIFICATION
 2      I, Micheal A. Johnson, the officer before
 3  whom the foregoing deposition was taken, do hereby
 4  certify that the foregoing transcript is a true
 5  and correct record of the testimony given; that
 6  said testimony was taken by me stenographically
 7  and thereafter reduced to typewriting under my
 8  direction; that reading and signing was requested;
 9  and that I am neither counsel for, related to, nor
10  employed by any of the parties to this case and
11  have no interest, financial or otherwise, in its
12  outcome.
13      IN WITNESS WHEREOF, I have hereunto set my
14  hand this 1st day of July, 2018.
15
16
17  _____
18      MICHEAL A. JOHNSON, RDR, CRR
19      NOTARY PUBLIC IN AND FOR
20      THE STATE OF TEXAS
21
22
23
24
25
```

Transcript of Stephanie Christianson, Designated Representative, Volume 2 (1 to 4)
Conducted on June 28, 2018

---

239

```
1        IN THE UNITED STATES DISTRICT COURT
2         FOR THE WESTERN DISTRICT OF TEXAS
3                   AUSTIN DIVISION
4   UMG RECORDINGS, INC.,   §
5   et al.                  §
6                           §
7   VS.                     §   CIVIL ACTION NUMBER
8                           §   1:17-cv-0365-LY
9   GRANDE COMMUNICATIONS   §
10  NETWORKS LLC and        §
11  PATRIOT MEDIA           §
12  CONSULTING, LLC         §
13
14           30(b)(6) Deposition of
15      Grande Communications Networks LLC
16   By and Through its Designated Representative
17             STEPHANIE CHRISTIANSON
18          And in Her Individual Capacity
19                 Austin, Texas
20                 June 28, 2018
21                   9:35 a.m.
22                 Volume 2 of 2
23  Job No.: 193712
24  Pages:  239 - 359
25  Reported by:  Micheal A. Johnson, RDR, CRR
```

240

```
1       Deposition of STEPHANIE CHRISTIANSON, held
2   at the location of:
3
4
5       Kelly Hart & Hallman LLP
6       303 Colorado Street, Suite 2000
7       Austin, Texas 78701
8
9
10
11
12       Pursuant to Notice, before Micheal A.
13  Johnson, Registered Diplomate Reporter and
14  Certified Realtime Reporter.
```

241

```
1               A P P E A R A N C E S
2   FOR PLAINTIFFS:
3       Philip J. O'Beirne
4       STEIN MITCHELL CIPOLLONE
5       BEATO & MISSNER LLP
6       1100 Connecticut Avenue, N.W., Suite 1100
7       Washington, D.C. 200036
8       (202) 661-0900
9       pobeirne@steinmitchell.com
10
11  ON BEHALF OF DEFENDANTS:
12      Richard L. Brophy
13      ARMSTRONG TEASDALE LLP
14      7700 Forsyth Boulevard, Suite 1800
15      St. Louis, Missouri 63105
16      (314) 342-4159
17      rbrophy@armstrongteasdale.com
18
19  VIDEOGRAPHER:
20      Leyhbert Sharp
```

242

```
1                       INDEX
2               STEPHANIE CHRISTIANSON
3                   June 28, 2018
4   APPEARANCES                             241
5   PROCEEDINGS                             245
6
7     EXAMINATION OF STEPHANIE CHRISTIANSON:
8         BY MR. O'BEIRNE                   245
9         BY MR. BROPHY                     353
10        BY MR. O'BEIRNE                   354
11
12  ACKNOWLEDGMENT OF DEPONENT              357
13  REPORTER'S CERTIFICATION                359
```

**Page 283**

to answer the question.
A. I can't recall exactly why we held.
BY MR. O'BEIRNE:
Q. Was this project ever completed?
     MR. BROPHY: Same caution regarding disclosure of attorney-client privileged and work-product materials.
A. Yes.
BY MR. O'BEIRNE:
Q. When was this project completed?
A. When we started sending e-mails.
Q. Followed by the hard copy warning letters, right?
A. Yes.
Q. When did you start sending e-mails -- strike that.
     When did Grande start sending e-mails as you just described?
A. I don't have the start date off the top of my head.
Q. As Grande's corporate representative about the implementation of its DMCA policy, what is your best description of when Grande started sending e-mails as described in this document and your testimony?

**Page 284**

A. We switched over to sending e-mails mid-2017.
Q. Prior to switching over to sending e-mails, the process was that hard copy letters were going out but nobody was getting terminated, right?
     MR. BROPHY: Objection, vague.
A. Repeat that question for me one more time.
BY MR. O'BEIRNE:
Q. Sure. Prior to switching over to sending e-mails, the process was that hard copy letters regarding copyright infringement were going out but nobody was getting terminated for copyright infringement or alleged copyright infringement, right?
     MR. BROPHY: Objection, vague.
A. The final warning notifications started going out in June of 2017. That is when we started the view or, you know, assessment of whether we were going to terminate the customers.
BY MR. O'BEIRNE:
Q. That was when the possibility that Grande might terminate a customer for copyright infringement or alleged copyright infringement began?

**Page 285**

     MR. BROPHY: Objection, vague.
A. Yes.
BY MR. O'BEIRNE:
Q. What was Patriot's role in the decision to begin sending out e-mail notifications?
     MR. BROPHY: So again I'll caution the witness not to disclose attorney-client privileged communications or work-product materials.
     Counsel, if I could ask for a clarification. Which topic do you believe this falls under, specifically Patriot's role?
     MR. O'BEIRNE: Communications, information and documents exchanged between Grande and Patriot concerning any of the following topics, any DMCA Policy --
     MR. BROPHY: Got it. Understood.
A. I don't know.
BY MR. O'BEIRNE:
Q. Sitting here today as Grande's corporate representative, you can't tell me Patriot's role, if any, in the decision to have Grande start sending out e-mails?
     MR. BROPHY: And I'll caution the witness not to disclose attorney-client privileged communications.

**Page 286**

A. No, I can't.
BY MR. O'BEIRNE:
Q. Ma'am, the reason Grande decided to update its policies in 2016 was that it became aware that Cox lost safe harbor protection for its conduct in December 2015, right?
     MR. BROPHY: I will instruct the witness not to answer that question on the grounds of attorney-client privilege.
BY MR. O'BEIRNE:
Q. Ma'am, Grande became aware in December 2015, that Cox Cable Company was denied protection under the DMCA safe harbor because they did not have a sufficient policy, right?
     MR. BROPHY: Counsel, which topic does this fall under, specifically knowledge of the Cox litigation?
     MR. O'BEIRNE: No. Considerations for any DMCA policy.
     MR. BROPHY: I'll object as outside the scope of the topics.
     MR. O'BEIRNE: Hold on. I'll get you a more specific one. "Any policy, practice or capability that Grande considered, formulated or adopted for taking adverse action against

299

1  as part of determining the basis for your 30(b)(6)
2  testimony today?
3      MR. BROPHY:  I'll just caution you not to
4  disclose attorney-client privileged
5  communications.  Other than that, you may answer.
6      A.  So my testimony has been on the knowledge
7  I have in my daily job and I deal with lots of
8  people on a daily basis regarding DMCA.  There's
9  lots of interactions had to get answers that helps
10 provide this testimony.
11 BY MR. O'BEIRNE:
12     Q.  Sure.  And I don't mean to be confusing.
13 I don't mean -- I mean before you knew you were
14 ever going to be a 30(b)(6) witness, you were just
15 interacting with people doing your job, right?
16     A.  Correct.
17     Q.  What I'm saying is, specifically, once you
18 got these topics, my understanding is you talked
19 to Mr. Horton briefly and then you called Ruth Ann
20 at a break yesterday.  Is it fair to say those are
21 the only two conversations you had that were
22 specifically caused by this 30(b)(6) notice to go
23 get facts to support your testimony?
24     A.  Yes.
25     Q.  Okay.  I don't mean to jump around, ma'am,

300

1  I'm trying to work through the remaining things I
2  have on my list, so please bear with me.  I know
3  there's some things that we've talked about, but I
4  just want to make sure your testimony's clear.
5      Grande could have implemented the e-mails
6  and final termination letter process that it
7  implemented sometime in 2017 in previous years,
8  right?
9      MR. BROPHY:  Objection, vague and outside
10 the scope of the topics.
11     You can answer.
12     A.  Hypothetically, yes.
13 BY MR. O'BEIRNE:
14     Q.  Well, not just hypothetically.  The
15 information that Grande has in its possession now
16 that it uses to generate these e-mails and
17 termination letters, it had that same kind of
18 information about notices -- DMCA notices that it
19 received in previous years, right?
20     A.  The information is the same.
21     Q.  So there was no technical barrier that
22 you're aware of, sitting here, that would've
23 prevented Grande from implementing this process
24 sooner, is there?
25     MR. BROPHY:  Object as vague.

301

1      A.  No.
2  BY MR. O'BEIRNE:
3      Q.  You would agree with me, no, there is no
4  such barrier?
5      A.  Yes, I would agree with you.
6      Q.  How does Ruth Ann Walsh -- strike that.
7      Is it Walsh or Welsh?
8      A.  Welsh.
9      Q.  Sorry.  How does Ruth Ann Welsh at RCN
10 determine who should receive a final warning
11 certified letter?
12     A.  She reviews the output of our accounts
13 that receive alleged infringement notices and the
14 accounts of those notices over a period of time.
15 We sort by total count and then usually it's in
16 the double digits, 15 or so and higher, those are
17 our higher count alleged infringers, that is who
18 gets targeted for the warning notice or the final
19 warning notice.
20     Q.  And you know that from discussions with
21 Ruth Ann?
22     A.  We have worked together on it.
23     Q.  So is there a set number, 15, or is it up
24 to her discretion as she does this ad hoc review?
25     A.  We usually -- there is no set number right

302

1  now.  It is double digits and usually in the 12 to
2  15 range.
3      Q.  Do you discuss each one with her?
4      MR. BROPHY:  Objection, vague.  When you
5  say "each one," you mean each termination,
6  Counsel?
7      MR. O'BEIRNE:  Sorry.  I'll rephrase.
8  BY MR. O'BEIRNE:
9      Q.  Do you discuss each instance in which
10 someone has received double digits sufficient to
11 warrant a final termination warning?
12     A.  We don't discuss them.  At that point we
13 are looking at counts.
14     Q.  Is it your testimony that only 12 Grande
15 customers have received double digit DMCA notices
16 since November of 2016?
17     A.  No, that's not the case.
18     Q.  Many more than 12 Grande subscribers have
19 received double digit DMCA notices since
20 November 2016, right, ma'am?
21     MR. BROPHY:  Objection, vague.
22     A.  I don't have a count.
23 BY MR. O'BEIRNE:
24     Q.  Let's look at Topic 47 in Exhibit 188.
25 "The number of warnings you sent to customers or

303

1 users for violation of any provision of any DMCA
2 Policy, Acceptable Use Policy, Repeat Infringer
3 Policy and/or for allegations of copyright
4 infringement, for the years 2012, 2013, 2014,
5 2015, 2016, and 2017."
6     Do you see that, ma'am?
7 A. I do.
8 Q. And you understand you've been offered as
9 Grande's corporate representative on this topic,
10 right?
11 A. I do.
12 Q. How many warnings did Grande send to
13 customers regarding allegations of copyright
14 infringement in the year 2012?
15 A. I don't have the number off the top of my
16 head per year.
17 Q. Setting aside having it off the top of
18 your head, did you bring with you the report from
19 Grande's system sufficient to provide that
20 information?
21 A. No.
22 Q. You could have, right, ma'am? Grande
23 could run a report to answer the question, "How
24 many warnings were sent to customers based on
25 allegations of copyright infringement for the year

304

1 2012"? Grande has that information, right?
2 A. We do.
3 Q. How many warnings did Grande send to
4 customers for allegations of copyright
5 infringement for the year 2013?
6 A. Same answer set applies.
7 Q. Okay. So you would agree you can't tell
8 me, sitting here today, how many were sent in
9 2013, right?
10 A. What I have is the total number of notices
11 that were sent over this timespan. I don't have
12 the breakdown of how many per year.
13 Q. And you could get it?
14 A. Yes.
15 Q. How many were sent for this time frame?
16 A. Over 200,000.
17 Q. 200,000 letters were sent to customers?
18 A. Yes.
19 Q. Hard copy letters?
20 A. Some of the 2017 ones could be e-mails.
21 Q. Okay. So up till 2016, it was hard copy
22 letters?
23 A. Yes.
24 Q. With stamps and envelopes and everything?
25 A. Yes.

305

1 Q. And up through 2016, how many subscribers
2 of Grande were terminated based on any one of
3 these letters?
4 A. Zero.
5 Q. How many notices did Grande receive of
6 alleged copyright infringement from the years 2012
7 to 2017?
8 A. 1.2 million.
9 Q. Looking at Topic 46, "The number of
10 customers or cruisers whose accounts you suspended
11 or terminated for violation of any provision of
12 any DMCA Policy" -- et cetera -- "and/or for
13 allegations of copyright infringement."
14     You see it's the same years, right, ma'am?
15 A. Yes.
16 Q. You would agree the number of customers
17 suspended for copyright infringement or alleged
18 infringement in 2012 was zero?
19 A. Yes.
20 Q. 2013 it was zero?
21 A. Yes.
22 Q. 2014 it was zero?
23 A. Yes.
24 Q. 2015 it was zero?
25 A. Yes.

306

1 Q. 2016 it was zero?
2 A. Yes.
3 Q. 2017 it was 12?
4 A. 2017 it was 11.
5 Q. It was 11. 2018 so far, one?
6 A. Yes.
7 Q. 2011 it was zero, right?
8 A. Yes.
9 Q. 2010?
10 A. To my knowledge, 2010 is zero.
11 Q. You would agree with me that Grande only
12 sends hard copy -- strike that.
13     Prior to the current process that involved
14 e-mail, Grande was sending hard copy letters,
15 right?
16 A. Correct.
17 Q. From CSG as a result of information
18 flowing through Grande's abuse system?
19 A. Correct.
20 Q. And Grande would only send a letter to a
21 customer through this process if the original
22 notice came from a known entity?
23     MR. BROPHY: Objection, vague.
24 A. Can you clarify that?
25

Transcript of Stephanie Christianson, Designated Representative, Volume 2
Conducted on June 28, 2018

---

319

1 record at 12:11.
2     (Recess taken from 12:11 p.m. to
3 12:20 p.m.)
4     THE VIDEOGRAPHER: Here begins the media
5 No. 6 in the videotaped deposition of Stephanie
6 Christianson. We are going back on the record at
7 12:20.
8 BY MR. O'BEIRNE:
9   Q. Ma'am, when we went off the record, we
10 were discussing Grande's policy of not terminating
11 infringers from 2010 to 2016. Do you recall that?
12   **A. Yes.**
13   Q. I'm just trying to understand who was in
14 charge of that policy for that period, from 2010
15 to 2013 when ABB was still helping manage Grande.
16 ABB was responsible for that policy; is that
17 accurate?
18     MR. BROPHY: I'll just caution you not to
19 disclose attorney-client privileged
20 communications. Otherwise you can answer. Also
21 object as outside the scope of the topics.
22   **A. I'm not sure who was in charge.**
23 BY MR. O'BEIRNE:
24   Q. Either at Grande or at ABB?
25   **A. I'm just not sure who drove it.**

---

320

1   Q. And under the topic of communications
2 between Patriot and Grande regarding DMCA
3 policies, copyright infringement, when Patriot
4 took over management responsibilities for Grande
5 in 2013, what discussions did Patriot have with
6 Grande about its current practice of not
7 terminating any subscribers for copyright
8 infringement or alleged copyright infringement?
9     MR. BROPHY: I'll instruct the witness not
10 to answer those questions on the basis of
11 attorney-client privilege.
12 BY MR. O'BEIRNE:
13   Q. Setting aside what was contained in any
14 such communication, did Grande and Patriot have
15 communications, privileged or nonprivileged, about
16 the termination of subscribers for copyright
17 infringement in 2013?
18     MR. BROPHY: And you may answer in a
19 yes/no capacity.
20   **A. I don't know.**
21 BY MR. O'BEIRNE:
22   Q. Sitting as Grande's corporate
23 representative for Topic No. 7, communications
24 exchanged between Grande and Patriot concerning
25 Grande or Patriot's potential legal exposure for

---

321

1 copyright infringement in the DMCA and the DMCA
2 policy, peer-to-peer file sharing, et cetera,
3 you're not able to tell me whether Patriot and
4 Grande engaged in any communications whatsoever in
5 2013 on any of the topics listed in Topic 7?
6     MR. BROPHY: I'll caution you not to
7 disclose attorney-client privileged
8 communications.
9     Just to be clear -- sorry, Counsel, but I
10 want to make sure we're clear on this. You're
11 allowed to say yes or no as to whether a
12 communication took place between attorneys, but
13 simply not disclose the subject matter of that
14 communication. Does that make sense?
15   **A. THE WITNESS: Yes.**
16     MR. BROPHY: So its existence is okay to
17 talk about, the subject matter of it is not.
18   **A. THE WITNESS: Okay.**
19 BY MR. O'BEIRNE:
20   Q. Did Grande and Patriot have communications
21 about the termination of subscribers for copyright
22 infringement in 2013?
23   **A. I can't -- I don't know.**
24   Q. Is it fair to say you also don't know
25 whether Grande and Patriot had any other

---

322

1 communications -- had any -- strike that.
2     Is it also fair to say you don't know,
3 sitting here as Grande's representative on Topic
4 No. 7, whether Grande and Patriot had
5 communications concerning any of the other topics
6 listed in Topic 7 in 2013?
7     MR. BROPHY: Same cautions.
8   **A. Yes. I don't know of any discussions that**
9 **occurred in 2013.**
10 BY MR. O'BEIRNE:
11   Q. But as Grande's 30(b)(6) witness, you are
12 confident that Grande's policy of not terminating
13 subscribers for copyright infringement or alleged
14 copyright infringement regardless of notices
15 received continued after Patriot took over
16 management responsibilities in 2013?
17   **A. Yes, our policy, our process did not**
18 **change until later on.**
19   Q. Until 2017?
20   **A. Correct.**
21   Q. I think we've covered this clearly, but
22 just to make sure we have a clean record. You
23 would agree with me that Grande did not have a
24 policy that provided for the termination of
25 subscribers and account holders who were repeat

Transcript of Stephanie Christianson, Designated Representative, Volume 2
Conducted on June 28, 2018

**Page 323**

1  copyright infringers in 2010, right?
2  A. To my knowledge, yes.
3  Q. Same answer for 2011?
4  A. Yes.
5  Q. 2012?
6  A. Yes.
7  Q. 2013?
8  A. Yes.
9  Q. 2014?
10 A. Yes.
11 Q. 2015?
12 A. Yes.
13 Q. And 2016?
14 A. Yes.
15 Q. Ruth Ann Welsh is not an attorney,
16 correct, ma'am?
17     MR. BROPHY: Objection, calls for
18 speculation; also outside the scope of the topics.
19 BY MR. O'BEIRNE:
20 Q. Do you have any reason to believe Ruth Ann
21 is a lawyer?
22     MR. BROPHY: Same objections.
23 A. No.
24 BY MR. O'BEIRNE:
25 Q. She's a project manager, right?

**Page 324**

1     MR. BROPHY: Same objections.
2  A. I'm not sure what her title is.
3  BY MR. O'BEIRNE:
4  Q. I thought I recall you saying earlier in
5  your testimony that you and she have similar
6  roles. Her role at RCN is similar to your role at
7  Grande. Is that fair?
8  A. It's similar, but she has a different
9  title.
10 Q. Sitting here today, you're not sure what
11 that title is?
12 A. Correct.
13 Q. Okay. Ma'am, I have like I said some
14 miscellaneous questions just to get through here
15 before we finish, so please bear with me.
16     Is Grande's abuse database used
17 exclusively to track DMCA violations?
18     MR. BROPHY: Objection, vague.
19 A. To my knowledge, the database housing the
20 counts of alleged infringement notices we have is
21 separate.
22 BY MR. O'BEIRNE:
23 Q. Okay. I appreciate that. I'm asking you
24 something slightly differently, though. There is
25 an abuse system that intakes DMCA notices, right?

**Page 325**

1  A. Yes.
2  Q. That come -- one of the addresses they
3  come to is abuse@mygrande.com?
4  A. That's the older address, yes.
5  Q. And that routes to dmca@mygrande.com?
6  A. Yes.
7  Q. Other violations than just DMCA violations
8  are also sent to abuse@mygrande.com, correct?
9  A. That is correct.
10 Q. So Grande's abuse database, aside from
11 processing DMCA notices, also processes other
12 kinds of communications, right?
13 A. There is an abuse front end that handles a
14 variety of other things as well.
15 Q. The abuse front end is like a funnel,
16 right? That's fair?
17 A. Yes.
18 Q. It intakes both DMCA-related notices and
19 notices that don't relate to the DMCA, right?
20 A. Correct.
21 Q. And then what happens to a particular
22 subject matter notice depends on Grande's system?
23 A. Correct.
24 Q. Were all DMCA notices sent to
25 abuse@mygrande and dmca@mygrande from 2010 to 2017

**Page 326**

1  loaded into this abuse database?
2  A. Yes.
3  Q. Were reports from the abuse database
4  generated in the normal course of Grande's
5  business?
6     MR. BROPHY: I'll object as outside the
7  scope of the topics and calling for a legal
8  conclusion and calling for speculation.
9     You can answer in your personal capacity
10 if you're able to.
11 A. I'm not sure which reports were pulled out
12 of there.
13 BY MR. O'BEIRNE:
14 Q. Sitting here today, can you explain any
15 kind of routine generation of reports Grande
16 engaged in of information in the abuse database
17 from 2010 to 2016?
18 A. I'm not aware of any routine reports.
19 Q. Please describe what, if any, routine
20 monitoring or tracking of the information in the
21 abuse database Grande was engaged in from 2010
22 through 2016.
23     MR. BROPHY: Object as outside the scope
24 of the topics and vague.
25 A. Can you be more specific, please.

```
                                                          359
 1        REPORTER'S CERTIFICATION
 2        I, Micheal A. Johnson, the officer before
 3   whom the foregoing deposition was taken, do hereby
 4   certify that the foregoing transcript is a true
 5   and correct record of the testimony given; that
 6   said testimony was taken by me stenographically
 7   and thereafter reduced to typewriting under my
 8   direction; that reading and signing was requested;
 9   and that I am neither counsel for, related to, nor
10   employed by any of the parties to this case and
11   have no interest, financial or otherwise, in its
12   outcome.
13        IN WITNESS WHEREOF, I have hereunto set my
14   hand this 4th day of July, 2018.
15
16   [signature]
17   _____
18        MICHEAL A. JOHNSON, RDR, CRR
19        NOTARY PUBLIC IN AND FOR
20        THE STATE OF TEXAS
21
22
23
24
25
```