# Exhibit K
# Attorneys' Eyes Only
[To be filed under seal]



# Transcript of Colin Bloch

**Date:** June 20, 2018

**Case:** UMG Recordings, Inc., et al. -v- Grande Communications Networks, LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

### Page 1

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
                     AUSTIN DIVISION

UMG RECORDINGS, INC.,   §
et al.                  §
    Plaintiffs,         §
VS.                     §   CIVIL ACTION NUMBER
                        §   1:17-cv-0365-LY
GRANDE COMMUNICATIONS   §
NETWORKS LLC and        §
PATRIOT MEDIA           §
CONSULTING, LLC         §
    Defendants.

                    Deposition of
                     COLIN BLOCH
                    Austin, Texas
                    June 20, 2018
                      9:30 a.m.




Job No.: 193707
Pages: 1 - 113
Reported by: Micheal A. Johnson, RDR, CRR
```

### Page 2

```
    Deposition of COLIN BLOCH, held at the
location of:



    Scott Douglass & McConnico, LLP
    303 Colorado Street, Suite 2400
    Austin, Texas 78701




    Pursuant to Notice, before Micheal A.
Johnson, Registered Diplomate Reporter and
Certified Realtime Reporter.
```

### Page 3

```
                 A P P E A R A N C E S
FOR PLAINTIFFS:
    Robert B. Gilmore
    STEIN MITCHELL CIPOLLONE
    BEATO & MISSNER LLP
    1100 Connecticut Avenue, NW, Suite 1100
    Washington, D.C. 20036
    (202) 737-7777
    rgilmore@steinmitchell.com

ON BEHALF OF DEFENDANTS:
    Jennifer E. Hoekel
    Margaret R. Szewczyk
    ARMSTRONG TEASDALE LLP
    7700 Forsyth Boulevard, Suite 1800
    St. Louis, Missouri 63105
    (314) 342-4162
    jhoekel@armstrongteasdale.com
    mszewczyk@armstrongteasdale.com

VIDEOGRAPHER:
    Sam Swain
```

### Page 4

```
                      INDEX
                    COLIN BLOCH
                   June 20, 2018
APPEARANCES                                  3
PROCEEDINGS                                  7

  EXAMINATION OF COLIN BLOCH:
        BY MR. GILMORE                       8
        BY MS. HOEKEL                      106
        BY MR. GILMORE                     110

ACKNOWLEDGMENT OF DEPONENT                 111
REPORTER'S CERTIFICATION                   113
```

Transcript of Colin Bloch
Conducted on June 20, 2018

3 (9 to 12)

---

**Page 9**

1   A. I don't know.
2   Q. Which company sued Grande; do you know?
3   A. I don't remember.
4   Q. And in general terms, why were you deposed
5   in that case?
6   A. I was a system administrator over a team
7   who deployed the software.
8   Q. How many years have you worked at Grande?
9   A. Eighteen.
10  Q. I'm going to ask you some more background.
11  I know you've been deposed once, but I just want
12  to go over some ground rules as a refresher on how
13  depositions work. It's my job to ask you
14  questions that you understand. Okay?
15  A. Yes.
16  Q. It's important that you give a verbal
17  answer rather than a head shake or nod so that --
18  since it's being transcribed. Okay?
19  A. Yeah.
20  Q. If you don't understand one of my
21  questions, it's probably going to happen at some
22  point during the day, just ask me to -- just let
23  me know, I'll try and rephrase it. Okay?
24  A. Cool. Thanks.
25  Q. Let's see. If you need to take a break,

**Page 10**

1   just let us know. I'll probably take a break
2   about every hour. If I've just asked a question,
3   I'd ask that you answer my question before we go
4   on break. Fair?
5   A. Yes.
6   Q. If you answer my question, I'm going to
7   assume that you understood it. Understand?
8   A. Yes.
9   Q. If at any point during the deposition you
10  realize that like an answer that you previously
11  gave is incomplete or inaccurate in any way, just
12  let me know and you can clarify it on the record.
13  Okay?
14  A. Okay.
15  Q. Is there -- you understand that you were
16  just sworn in so this testimony that you're going
17  to give today is under oath just as it would be if
18  you were in court?
19  A. Yes.
20  Q. Is there any reason that you can't give
21  truthful and accurate testimony today?
22  A. No.
23  Q. Okay. Your current employer is Grande?
24  A. Yes.
25  Q. You've worked for Grande for 18 years?

**Page 11**

1   A. Yes.
2   Q. What is your current job at Grande?
3   A. My title is manager of Internet systems.
4   Q. How long have you had that position?
5   A. I would say about 15 years, maybe longer.
6   Q. Before you held this position, what was
7   your position at Grande?
8   A. Senior system administrator.
9   Q. Can you describe what your job
10  responsibilities are as the manager of Internet
11  systems?
12  A. That will keep us here for a while. You
13  know, when people ask me what I do, I tell them
14  I'm in telecom because it's easier than describing
15  all the responsibilities I have, but I'd say, just
16  boil it down as short as possible, I manage the
17  systems that provide the experience for our retail
18  Internet, phone and cable customers.
19  Q. And can you give me some more detail about
20  what it means to manage the systems that provide
21  experience for Grande's Internet, phone and cable
22  customers, retail customers?
23  A. At the core of it, I'm a UNIX system
24  administrator. So my specialty is running UNIX
25  systems, which are the core of our server

**Page 12**

1   environment which provides all the services to the
2   customers, e-mail, authentication, cable modem
3   provisioning, digital phone provisioning,
4   et cetera.
5   Q. Do you have people who report to you?
6   A. No, I don't.
7   Q. Who do you report to?
8   A. I report to Pete Jacoby.
9   Q. And who is Mr. Jacoby? What is his job at
10  Grande?
11  A. He is actually at RCN Corporate in Boston
12  and he is primarily network-side focused, in the
13  sense that most of his employees are router
14  engineers, IP telecom, actual transit engineers.
15  Q. How long have you reported to Mr. Jacoby
16  at RCN?
17  A. Less than one year.
18  Q. Before you started reporting to Mr. Jacoby
19  at RCN, who did you report to?
20  A. Richard Fogle.
21  Q. And what was Mr. Fogle's position?
22  A. At the time, I believe he was director of
23  IT.
24  Q. What is his -- strike that.
25     Is he currently at Grande, Mr. Fogle?

---

Page 37

1 responsibility?
2     MS. HOEKEL: Object to the form.
3  A. Five years.
4 BY MR. GILMORE:
5  Q. Before that, who had that responsibility?
6  A. Keith Crabtree.
7  Q. And before that, did you have that
8 responsibility?
9  A. No. I don't recall who had it before.
10  Q. Was there some point in time that you had
11 that responsibility?
12  A. Yes.
13  Q. And that was in the 2000s?
14  A. Very early 2000s, yes.
15  Q. When you say "early in the 2000s," do you
16 mean like sort of the first half of the decade or
17 the --
18  A. I started in September 2000, and I handled
19 that process for at least a couple of years.
20  Q. Was that before you had developed the
21 automated process that you were telling me about
22 earlier?
23  A. Yes.
24  Q. So tell me what you remember about when
25 you handled the abuse process. Actually, let me

---

Page 38

1 stop. First -- I'll withdraw that question.
2     You used the phrase "abuse process."
3  A. Uh-huh.
4  Q. What does that phrase mean?
5  A. It's a legacy phrase dating back to
6 describing any kind of illicit activity that could
7 happen on your network. In the timespan of the
8 mid-'90s to the early 2000s, it more meant people
9 being belligerent in chat rooms, perhaps, you
10 know, perpetrating IP DOS attacks towards other
11 IRC chat relay customers, maybe sending
12 objectionable e-mails, et cetera. Any complaint
13 would come in through abuse.
14  Q. And at some point in time, the abuse
15 process came to include copyright infringement?
16  A. It did.
17  Q. About when did that happen?
18  A. Well, it happened the moment that we
19 became aware of copyright infringement happening,
20 when the organizations popped up.
21  Q. About when did Grande become aware of
22 copyright infringement happening by Grande
23 subscribers?
24     MS. HOEKEL: Object to the form.
25  A. I don't recall the exact date, man.

---

Page 39

1 BY MR. GILMORE:
2  Q. It was some point early in your career at
3 Grande?
4  A. Yes.
5  Q. And is that around the time when your
6 responsibilities included developing the process
7 for -- developing the process regarding the
8 notices of infringement that Grande was receiving,
9 what Grande was doing with those?
10     MS. HOEKEL: Object to the form.
11  A. Yes --
12 BY MR. GILMORE:
13  Q. From a technical standpoint at least?
14     MS. HOEKEL: Object to the form.
15  A. Yeah, could you say that one again?
16 BY MR. GILMORE:
17  Q. Sure. You told me it was early in your
18 career that Grande became aware of copyright
19 infringement happening by Grande subscribers. Is
20 that when your responsibilities included
21 developing sort of technical solutions for dealing
22 with that?
23     MS. HOEKEL: Object to the form, misstates
24 the prior testimony.
25     You can answer.

---

Page 40

1  A. That was never a part of my
2 responsibility. I just insisted on it.
3 BY MR. GILMORE:
4  Q. You insisted on it?
5  A. Yes.
6  Q. Tell me why you insisted on it.
7  A. Well, that kind of activity was a drain on
8 our technical resources and it was also
9 disparaging to our reputation. Both of those
10 things could lead to service deficiencies in other
11 areas, so we had no desire for it.
12  Q. Tell me how copyright infringement is a
13 drain on Grande's technical resources.
14     MS. HOEKEL: Object to the form.
15  A. By virtue of them using new technologies
16 to use more bandwidth than they would normally be
17 capable of.
18 BY MR. GILMORE:
19  Q. Was one of those technologies BitTorrent,
20 peer-to-peer file sharing?
21  A. It was.
22  Q. Tell me what you know about BitTorrent.
23  A. I know that it is used more for the wrong
24 reasons than the right.
25  Q. Has Grande ever -- well, strike that.

Transcript of Colin Bloch
Conducted on June 20, 2018

11 (41 to 44)

**Page 41**

1  Does Grande have the technical ability to
2  block access to BitTorrent sites?
3  MS. HOEKEL: Object to the form, calls for
4  speculation.
5  A. That probably is outside of my area, since
6  it's like -- would be an IP function, so I
7  couldn't really say for sure.
8  BY MR. GILMORE:
9  Q. When you say "IP," do you mean
10 intellectual property or some other --
11 A. Sorry. Internet protocol, as in
12 networking related rather than UNIX systems. That
13 would be at a network level, I believe.
14 Q. And who has responsibility for the
15 Internet protocol or network level functions
16 within Grande?
17 A. I know that it all boils up eventually to
18 Lamar Horton, but he has several IP engineers.
19 Q. Can you tell me who those people are?
20 A. I know one of them is Vito Ciminello. And
21 I know there's Lynn Buegeler. That's about all
22 I've got offhand.
23 Q. So understanding that this isn't part of
24 your job responsibility, but you seem like you are
25 someone who has some technical expertise. Fair?

**Page 42**

1  A. Yes.
2  Q. Are you aware of Internet service
3  providers -- strike that.
4  Are you aware of technical capabilities
5  that exist for an Internet service provider to
6  block its subscribers from accessing certain
7  websites?
8  MS. HOEKEL: Object to the form, calls for
9  expert testimony, incomplete hypothetical.
10 A. Yes.
11 BY MR. GILMORE:
12 Q. Tell me what you know about the technical
13 capabilities that exist for Internet service
14 providers to block subscribers from accessing
15 websites.
16 MS. HOEKEL: Same objections, calls for
17 expert testimony.
18 A. I know it's possible.
19 BY MR. GILMORE:
20 Q. How do you know it's possible?
21 A. We do it on some level.
22 Q. Tell me what Grande does to block
23 subscribers from accessing certain websites.
24 A. Well, we have a corporate third-party
25 product, which does not allow any employees to get

**Page 43**

1  to a known list of blocked sites. Now, how it
2  does that, I couldn't tell you specifically. And
3  then we've had a retail instance of that too,
4  where we had a service filtered for customers too
5  so -- where we could keep them from objectionable
6  websites.
7  Q. Has Grande ever, to your knowledge,
8  considered blocking BitTorrent websites?
9  MS. HOEKEL: Object to the form, calls for
10 speculation.
11 A. I don't know if it's been considered.
12 BY MR. GILMORE:
13 Q. Do you know if Grande blocks its employees
14 from accessing BitTorrent websites or other
15 peer-to-peer file sharing websites?
16 A. I don't -- I don't know, although I need
17 it, so I would hope not. We download a lot of
18 corporate software that way.
19 Q. Through BitTorrent?
20 A. Yes.
21 Q. Does Grande block its customers -- sorry,
22 strike that.
23 Does Grande block its employees from
24 downloading or uploading music or movies through
25 peer-to-peer file sharing sites?

**Page 44**

1  MS. HOEKEL: Object to the form.
2  A. I don't know. I don't think any of us
3  would try that.
4  MS. HOEKEL: We've been going about an
5  hour.
6  MR. GILMORE: Yeah, we can go take our
7  first break now.
8  MS. HOEKEL: Okay.
9  THE VIDEOGRAPHER: Off the record at
10 10:23.
11 (Recess taken from 10:23 a.m. to
12 10:34 a.m.)
13 THE VIDEOGRAPHER: Back on the record at
14 10:34.
15 BY MR. GILMORE:
16 Q. Mr. Bloch, earlier you said Grande became
17 aware of copyright infringement happening when the
18 organizations popped up. Can you tell me -- are
19 you referring to companies that detect and send
20 notices of copyright infringement? Is that the
21 organizations you were referring to?
22 MS. HOEKEL: Object to the form.
23 A. Yes.
24 BY MR. GILMORE:
25 Q. I didn't ask you, what did you do to

Page 45

```
1   prepare for today's deposition?
2     A. Not a lot.
3     Q. Did you meet with attorneys --
4     A. Yes.
5     Q. -- in advance?
6     A. Yes.
7     Q. For about how many hours?
8     A. Two.
9     Q. Did you review any documents to prepare
10  for today's deposition?
11    A. No.
12    Q. Have you spoken with any other Grande
13  employees who have been deposed?
14    A. No.
15    Q. About their depositions, I mean?
16    A. No.
17    Q. Has anyone, other than attorneys,
18  described those depositions to you?
19    A. No.
20    Q. Earlier you had said that you had insisted
21  on adding to the abuse process responding to
22  notices of copyright infringement; am I right?
23    A. Yes.
24    Q. Okay. And I think you said that the
25  infringement that was going on might be a drain on
```

Page 46

```
1   Grande's technical resources.
2     A. Yes.
3     Q. What did you know about the infringement
4   that was going on by Grande subscribers that led
5   you to insist on adding to the abuse process
6   responding to copyright infringement?
7       MS. HOEKEL: Object to the form and calls
8   for a legal conclusion.
9     A. Restate again. Sorry.
10  BY MR. GILMORE:
11    Q. Sure. Tell me about -- what information
12  did you know about the infringement that was going
13  on by Grande subscribers that led you to insist on
14  adding to the abuse process a response to notices
15  of copyright infringement?
16      MS. HOEKEL: Objection, calls for a legal
17  conclusion and form.
18    A. We -- when we -- around the time we
19  received allegations of infringement, we also had
20  similar fluctuations in bandwidth usage and
21  attributed them potentially to one another and
22  addressed it.
23  BY MR. GILMORE:
24    Q. Describe that for me, the fluctuations in
25  bandwidth usage.
```

Page 47

```
1     A. Increased usage.
2     Q. Were you able to match up increased usage
3   by a customer to a notice that identified this IP
4   address as --
5     A. Not at that time.
6     Q. Let me just complete that sentence.
7     A. Sorry.
8     Q. So initially, was Grande able to match up
9   increased usage by a customer to a notice of
10  infringement that identified an IP address?
11      MS. HOEKEL: Same objection.
12    A. That's not a yes/no answer there. I hope
13  you can restate it differently so I can --
14  BY MR. GILMORE:
15    Q. Well, sure. So I want to just understand.
16  You had said that you -- that Grande -- strike
17  that.
18      You had said, "Around the time we received
19  allegations of infringement, we also had similar
20  fluctuations in bandwidth usage and attributed
21  them potentially to one another and addressed it."
22      So that was your prior answer, and I just
23  want to ask you some questions about that. Okay?
24    A. Yes.
25    Q. So you saw -- you said the fluctuations
```

Page 48

```
1   involved increased usage of bandwidth?
2     A. Yes.
3     Q. And was that -- was Grande able to match
4   that up to specific customers?
5     A. No. It was a trend.
6     Q. So overall, Grande saw that increased
7   bandwidth was being used at the same time it was
8   receiving notices of infringement?
9       MS. HOEKEL: Object to the form.
10  BY MR. GILMORE:
11    Q. Is that right?
12    A. We had received complaints at the time of
13  those, yes.
14    Q. Okay. And Grande concluded -- strike
15  that.
16      You and others at Grande concluded that
17  the increased bandwidth usage corroborated the
18  notices of copyright infringement?
19      MS. HOEKEL: Object to the form.
20  BY MR. GILMORE:
21    Q. Is that right?
22    A. No, they potentially supported the notion.
23    Q. And that potential support of the notices
24  of infringement led you and others at Grande to
25  develop a process for processing these notices of
```

**77**

1  A. Yes, I believe so.
2  Q. What interactions have you had with
3  Patriot?
4  A. Almost none.
5  Q. So almost none. What are the interactions
6  that you have had with them?
7  A. I believe once or twice a member of their
8  team might have spoke at a corporate huddle or
9  something, but I've never had a one-on-one
10 interaction with any of them.
11 Q. Who are the Patriot people that you -- the
12 members of the team that you had interactions
13 with?
14 A. I couldn't even begin to remember their
15 names.
16 Q. Now, I want to ask you about this -- about
17 your e-mail, still looking at Plaintiffs'
18 Exhibit 68. The e-mail that you send back to
19 Robby Creel originally, it's at the top of
20 page 116 in this exhibit.
21 A. Okay.
22 Q. Do you see there's a statement where you
23 say, "No telling how many people probably got
24 spooked and paid. In our case, as far as I know,
25 our obligation is simply to pass the requests on

**78**

1  intact to the customers, although we only pass on
2  DMCA-type violations to known entities, of which
3  this particular one evidently is in our abuse
4  system."
5     Do you see that?
6  A. Yes.
7  Q. The statement you're making there, that we
8  only pass on DMCA-type violations to known
9  entities, what are you referring to there?
10 A. It was a typo. It should say "from known
11 entities."
12 Q. And is that referring to the process that
13 we were talking about earlier in your deposition,
14 where Grande verifies that this company, in fact,
15 is legitimate in some sense and Grande will
16 process its notices?
17 A. Yes.
18 Q. What did you mean by "as far as I know,
19 our obligation is simply to pass the requests on
20 intact to the customers"?
21 A. Because our obligation doesn't fall within
22 my purview. So letting them know, if you want to
23 know what our actual obligations are, you'll have
24 to ask somebody else.
25 Q. At this point in time in 2014, did you not

**79**

1  think that Grande had obligations to terminate
2  customers at some point who receive multiple DMCA
3  notices?
4     MS. HOEKEL: Object to the form.
5  A. Well, I'm sorry, I don't know whether I
6  should say yes or no. Ask that again.
7  BY MR. GILMORE:
8  Q. Yeah, sure, it was a confusing question.
9  A. Yeah.
10 Q. I'm just trying to understand. You say
11 "our obligation is simply to pass the requests on
12 intact to the customers." I'm asking, does that
13 mean you -- at this point in time, you didn't
14 think Grande also had an obligation to terminate
15 customers about whom it had received multiple
16 notices?
17    MS. HOEKEL: Object to the form.
18 A. Relative to what is in this text, our
19 obligation initially was to forward it on. That's
20 what I was telling him.
21 BY MR. GILMORE:
22 Q. At some point in time, though, after
23 receiving multiple notices, you still thought that
24 Grande had an obligation to terminate customers at
25 some point?

**80**

1  A. Yes.
2     MS. HOEKEL: Object to the form.
3  BY MR. GILMORE:
4  Q. And you thought that at the time you sent
5  this e-mail in 2014?
6  A. I thought what?
7  Q. That at some point after receiving
8  multiple notices for a customer, Grande had an
9  obligation to terminate?
10 A. Yes.
11    MS. HOEKEL: Object to the form.
12 BY MR. GILMORE:
13 Q. And you still think that today?
14 A. Yes.
15    MR. GILMORE: Been going about an hour.
16 Want to take a break?
17    THE VIDEOGRAPHER: Off the record at
18 11:28.
19    (Recess taken from 11:28 a.m. to
20 12:40 p.m.)
21    THE VIDEOGRAPHER: Back on the record at
22 12:40. This begins tape No. 2.
23 BY MR. GILMORE:
24 Q. Mr. Bloch, are you aware of any instance
25 where the infringement asserted in a copyright

109

1  Q. Is peer-to-peer file sharing against the
2  AUP?
3  A. No.
4  Q. When you said earlier that you believed
5  Grande might be able to block BitTorrent, what did
6  you mean by that?
7  A. They could block the default ports, which
8  there are nine of.
9  Q. Can you eradicate BitTorrent use through
10 the -- blocking nine ports?
11 A. No. There's 65,000-plus other ports.
12 Q. And if you blocked certain ports that
13 Grande might believe BitTorrent was using, is it
14 possible that would compromise other websites?
15 A. Possibly.
16 Q. Okay. Are you an expert on BitTorrent?
17 A. No.
18 Q. Are you an expert on peer-to-peer file
19 sharing?
20 A. No.
21 Q. Would you defer to an expert on the
22 technicalities of BitTorrent?
23 A. Yes.
24 Q. Would you defer to an expert on the
25 technicalities of peer-to-peer file sharing?

110

1  A. Yeah.
2  Q. You looked at Exhibits 92, 173 and 172.
3  A. Okay. Let me just get one -- okay.
4  Q. Have you ever seen these documents before?
5  A. I have not.
6  Q. Are these documents that you have
7  interacted with in the course of your job?
8  A. No.
9     MS. HOEKEL: That's all I have.
10       FURTHER EXAMINATION
11 BY MR. GILMORE:
12 Q. Grande has known about this problem of
13 customers using Internet service to share music
14 and movies online illegally for years, right?
15    MS. HOEKEL: Object to the form.
16 A. I don't know how much Grande, as a
17 company, is aware -- was aware. When you say
18 that, do you mean every individual in the company
19 or just management or --
20 BY MR. GILMORE:
21 Q. Well, you've been aware for years about
22 this problem of customers using Internet service
23 to share music and movies online illegally for
24 years, right?
25    MS. HOEKEL: Object to the form.

111

1  A. I'm aware that existed.
2     MR. GILMORE: No further questions.
3     MS. HOEKEL: No further questions. We'll
4  read and sign.
5     THE VIDEOGRAPHER: Off the record at 1:25.
6     (Deposition concluded at 1:25 p.m.)

112

         ACKNOWLEDGMENT OF DEPONENT
     I, COLIN BLOCH, do hereby acknowledge that
I have read and examined the foregoing testimony,
and the same is a true, correct and complete
transcription of the testimony given by me and any
corrections appear on the attached Errata sheet
signed by me.

_____   _____
(DATE)              (SIGNATURE)

```
                                                    113
 1           REPORTER'S CERTIFICATION
 2       I, Micheal A. Johnson, the officer before
 3   whom the foregoing deposition was taken, do hereby
 4   certify that the foregoing transcript is a true
 5   and correct record of the testimony given; that
 6   said testimony was taken by me stenographically
 7   and thereafter reduced to typewriting under my
 8   direction; that reading and signing was requested;
 9   and that I am neither counsel for, related to, nor
10   employed by any of the parties to this case and
11   have no interest, financial or otherwise, in its
12   outcome.
13       IN WITNESS WHEREOF, I have hereunto set my
14   hand this 24th day of June, 2018.
15
16   [signature]
17   _____
18   MICHEAL A. JOHNSON, RDR, CRR
19   NOTARY PUBLIC IN AND FOR
20   THE STATE OF TEXAS
21
22
23
24
25
```