# Exhibit 3

# FILED UNDER SEAL

CHRISTOPHER SABEC - August 7, 2018
Rough Draft

```
 1      Q    So Rightscorp is being remunerated on a
 2  fixed basis for the services it's providing in
 3  conjunction with this lawsuit?
 4           MR. O'BEIRNE:  Objection.  Vague as to
 5  fixed.
 6           And caution you not to reveal privileged
 7  communications.  But the financial arrangement
 8  facts, you can discuss.
 9           THE WITNESS:  Correct.
10  BY MR. BROPHY:
11      Q    I have seen documents that reflect payments
12  made by RIAA to Rightscorp similarly in conjunction
13  with this litigation.  Those payments are paid over
14  time, month to month.
15           Is it your understanding that that's the
16  way in which Rightscorp is being paid by RIAA for
17  the services in this case?
18           MR. O'BEIRNE:  Same cautions, but you can
19  answer.
20           THE WITNESS:  Could you repeat?
21  BY MR. BROPHY:
22      Q    Sure.
23      A    I lost you somehow.
24      Q    Sure.  I have seen what I believe to be --
25  and we can pull them out -- records of payments made
```

CHRISTOPHER SABEC - August 7, 2018
Rough Draft

1   by RIAA to Rightscorp.  Which I understand to be in
2   conjunction with the services provided by Rightscorp
3   in this case.
4           Is it your understanding that Rightscorp is
5   being paid by RIAA monthly or somehow over time for
6   the services it provides in conjunction with this
7   litigation?
8           MR. O'BEIRNE:  Same cautions but you can
9   answer.
10          THE WITNESS:  That's one way, yes.
11  BY MR. BROPHY:
12      Q   What is the other way?
13          MR. O'BEIRNE:  Same cautions.
14          THE WITNESS:  Lump sum.
15  BY MR. BROPHY:
16      Q   Was there some lump sum at the beginning
17  and some payments over time?  Is that the way it's
18  structured?
19          MR. O'BEIRNE:  Same cautions.
20          THE WITNESS:  Two lump sums at the
21  beginning, and then payments over time.
22  BY MR. BROPHY:
23      Q   Do you recall the amounts of those lump
24  sums?
25          MR. O'BEIRNE:  Same cautions, but you can

1113

CHRISTOPHER SABEC - August 7, 2018
Rough Draft

```
 1    answer.
 2               THE WITNESS:  Yes.
 3    BY MR. BROPHY:
 4        Q    What were they?
 5        A    $100,000 on signing, $200,000 a month
 6    later -- I believe a month later.  And then monthly
 7    thereafter.
 8        Q    And how much per month thereafter?
 9        A    I'm not 100 percent sure of the exact
10    amount.  I believe it was $22,222 and change.
11        Q    And is there some total amount that's --
12    that was agreed upon that RIAA would pay Rightscorp
13    over the life of its work on this case?
14        A    Yes.
15        Q    What's that amount?
16        A    400,000 over time.
17        Q    Is that the largest amount that Rightscorp
18    is being paid for any one engagement with -- or in
19    conjunction with a litigation support role?
20        A    Yes.
21        Q    And that's $400,000 regardless of work done
22    or anything like that it's just a fixed $400,000
23    payment?
24        A    Correct.  That's for the data and services
25    provided short of trial work.
```

1114

CHRISTOPHER SABEC - August 7, 2018
Rough Draft

```
 1      Q    And so is Rightscorp also going to be paid
 2   hourly for trial work?
 3      A    Correct.
 4      Q    Are there certain individuals who are
 5   identified as those who will be paid hourly at
 6   trial?
 7      A    Yes.
 8      Q    Who are those people?
 9      A    Myself, Robert Steele, Greg Boswell.
10      Q    What are the what are the hourly rates that
11   each of you are going to charge for your work at
12   trial?
13      A    I believe I am -- around $500 an hour, and
14   Greg and Robert is 350.
15      Q    Is that the standard amount that each of
16   you charges for trial work?
17      A    Yes.
18      Q    Did you charge those rates to BMG in
19   conjunction with the BMG Cox litigation?
20      A    No.
21      Q    Did you charge anything to BMG for your
22   work in that case?
23      A    No.
24      Q    I'd like to switch gears and talk a little
25   bit more about Rightscorp's interactions with ISPs.
```

1115

CHRISTOPHER SABEC - August 7, 2018
Rough Draft

1      Has there ever been an relationship or a
2 contract that exists between RIAA -- excuse me --
3 Rightscorp -- reset.  After lunch.
4      Has ever been a contractual relationship
5 between Rightscorp and any plaintiff in this case?
6    A    No.
7    Q    So is it fair to say for me to say that no
8 plaintiff has approached Rightscorp and asked
9 Rightscorp to monitor any of the copyright
10 properties that it owns?
11   A    Can you rephrase that?
12   Q    Is it fair for me to assume that because
13 there is no contractual relationship between
14 Rightscorp and any plaintiff in this case that no
15 plaintiff has ever asked Rightscorp to send notices
16 on its behalf?
17   A    Correct.
18   Q    I understand that Rightscorp has provided
19 certain data to RIAA in relation to this case; is
20 that correct?
21   A    Correct.
22   Q    That data existed before there was ever in
23 any relationship between RIAA and Rightscorp;
24 correct?
25   A    Correct.

1149

CHRISTOPHER SABEC - August 7, 2018
Rough Draft

 1     Q    And that data was not gathered at RIAA's
 2  request; correct?
 3     A    Correct.
 4     Q    And it was not gathered in the plaintiff in
 5  this case's request; is that correct?
 6     A    Correct.
 7     Q    I'd like to talk about a situation.  Let's
 8  say that Rightscorp is operating and scanning the
 9  Internet for activity that it believes represents an
10  infringement -- it identifies that activity, it
11  sends out a notice to Grande and says hey, send your
12  standard notice, which identifies the IP address of
13  the subscriber, the work that was infringed, so on
14  and so forth.
15          What facilities because Grande have at its
16  disposal according to Rightscorp to verify the
17  accuracy or correctness of that notice?
18          MR. O'BEIRNE:  Objection.  Outside the
19  scope.  Calls for speculation.  Vague.
20          THE WITNESS:  I'm not sure what Grande has
21  internal.
22  BY MR. BROPHY:
23     Q    Are you aware of any way in which Grande
24  can determine whether your notice is correct or not?
25     A    I can't speak for Grande, but I know that

1150

CHRISTOPHER SABEC - August 7, 2018
Rough Draft

1  ISRC numbers on the master side.  Copyright numbers
2  on the copyright side.  Internal numbers for the
3  company, the company might identify it as saying
4  Acme music composition blah, blah, blah, and we can
5  build our database.  So some clients have more data
6  than others.  It just depends.  It really does
7  depend.  Some clients, because they have multiple
8  arms of the company, we might have different data
9  for each arm the way they gave it to us.
10      Q    So a second ago -- thank you for that.
11           A second ago, I asked for what the bare
12  minimum is.  Do you know what the bare minimum
13  information is that Rightscorp requires in order to
14  start monitoring?
15      A    I would say the name of the song and author
16  or rights holder, holder or holders, and name of the
17  song and performer on a master.  That's a smaller
18  set than.
19      Q    My understanding is that many of the
20  copyrights that Rightscorp monitored, especially
21  earlier in time were BMG copyrights.  Is that fair
22  to say?
23           MR. O'BEIRNE:  Objection.  Vague.
24           THE WITNESS:  Early in time, yes, but
25  eventually it expanded.  But they were a big client

1170

CHRISTOPHER SABEC - August 7, 2018
Rough Draft

1  And vague as to time and confusing and calls for
2  speculation.
3           THE WITNESS:  Right.  We always invited
4  people to call the notice invited people to call.
5  So that's -- that was always on the table.
6           You have to ask Greg why it wasn't designed
7  that way.  But -- yeah.
8  BY MR. BROPHY:
9      Q    Was the system designed to cause people to
10 come and pay a single settlement to get their
11 personal information so that Rightscorp could then
12 go back to them and demand more money based on the
13 remaining infringements or alleged infringements for
14 which Rightscorp believed they were liable?
15          MR. O'BEIRNE:  Objection.  Vague.
16 Misstates testimony.  Argumentative.  And outside
17 the scope.
18          THE WITNESS:  No.
19 BY MR. BROPHY:
20     Q    Does Rightscorp have the ability to
21 increase or decrease the number of notices it sends
22 in a given week to a given IP address based on the
23 sharing of a given file?
24          MR. O'BEIRNE:  Objection.  Outside the
25 scope of the topics.  Calls for speculation.

1189


CHRISTOPHER SABEC - August 7, 2018
Rough Draft

```
 1            THE WITNESS:  Right, you're going to have
 2   to rephrase that.  I think I know what you mean.
 3   But I'm not sure.
 4   BY MR. BROPHY:
 5      Q     Sure.
 6            So let's assume a subscriber has a song
 7   sitting on his or her hard drive and bit Torrent
 8   client is running and the bit Torrent is therefore
 9   making that file available.  And Rightscorp detects
10   that throughout -- let's say the file remains in
11   that situation with bit Torrent client running,
12   computer connection to the Internet.  Let's say it
13   stays that way for two weeks.  Somebody turns it on
14   and goes away on vacation.
15            Does Rightscorp have the ability to control
16   how many notices it sends to that subscriber based
17   on the scenario I just described?
18            MR. O'BEIRNE:  Objection.  Calls for
19   hypothetical.  Incomplete hypothetical.  Outside the
20   scope.  Lack of foundation.  Calls for speculation.
21            THE WITNESS:  In the grand scheme --
22            (Telephonic interruption.)
23            THE WITNESS:  In the grand scheme, yes.
24   But not -- on a macro level, yes.  On a micro level.
25   We wouldn't say on that particular IP address, we're
```

CHRISTOPHER SABEC - August 7, 2018
Rough Draft

```
 1   going to send a punch of notices, but it is a
 2   business variable that we can tell our system how
 3   many notices to generate or I wouldn't say how many
 4   notices to generate.  How many infringements to
 5   detect on a particular IP address.
 6   BY MR. BROPHY:
 7       Q    So Rightscorp has the ability to adjust one
 8   of its business variables and either send out a
 9   single notice based on that two weeks of behavior or
10   20 notices based on that two weeks of behavior; is
11   that right?
12            MR. O'BEIRNE:  Objection.  Calls for
13   hypothetical.  I think you introduced different
14   facts than the previous hypothetical.  Outside the
15   scope.  Calls for speculation.
16            THE WITNESS:  In the scenario you just gave
17   me, yes, that's possible.
18   BY MR. BROPHY:
19       Q    And the subscribers's behavior didn't
20   change, but Rightscorp can change the number of
21   notices it sends based on that behavior?
22            MR. O'BEIRNE:  Same objections.
23   BY MR. BROPHY:
24       Q    Is that correct?
25            MR. O'BEIRNE:  And calls for a legal
```

1191

CHRISTOPHER SABEC - August 7, 2018
Rough Draft

 1    conclusion.
 2            THE WITNESS:  The system could, but we
 3    don't.
 4    BY MR. BROPHY:
 5        Q    Rightscorp made a decision as to where to
 6    set that number, but it was within its discretion
 7    where to set it, between one and 20?
 8            MR. O'BEIRNE:  Objection.  Compound and
 9    outside the scope of the topics for this witness.
10    And calls for speculation.
11            THE WITNESS:  Do I still answer if it's
12    outside the scope.
13            MR. O'BEIRNE:  You can answer -- if you
14    know it as your personal capacity.
15            THE WITNESS:  Correct.
16    BY MR. BROPHY:
17        Q    In what circumstance, that hypothetical
18    subscriber would call into Rightscorp and Rightscorp
19    could demand one payment for the one notice it sent
20    for $30 and then the other circumstance that
21    subscriber would call in and Rightscorp would demand
22    $30 for all 20 of the notices.  So $600.  Correct?
23            MR. O'BEIRNE:  Objection.  Compound
24    hypothetical.  Calls for speculation.  Outside the
25    scope.

CHRISTOPHER SABEC - August 7, 2018
Rough Draft

 1          THE WITNESS:  Right.  I wouldn't be able to
 2   speak to the scenario of the paying because you'd
 3   have to see what happens.
 4   BY MR. BROPHY:
 5      Q    Suffice to say in one scenario a subscriber
 6   would be calling in with a single notice that it
 7   needed to resolve, and, in the other notice, they
 8   would be calling in with many more notices that they
 9   need to resolve?
10          MR. O'BEIRNE:  Same objections.
11          THE WITNESS:  Correct.
12   BY MR. BROPHY:
13      Q    How long does Rightscorp keep the personal
14   information of an individual who either called in or
15   connected to the website to pay on a notice?
16          MR. O'BEIRNE:  Objection.  Compound and
17   assumes -- misstates testimony and misstates facts
18   not in the record.
19          THE WITNESS:  I'm not sure.
20   BY MR. BROPHY:
21      Q    Are you aware of them ever deleting any
22   personal information stored for a subscriber who
23   calls in to pay?
24          MR. O'BEIRNE:  Same objections.  Vague.
25   Calls for speculation.

CHRISTOPHER SABEC - August 7, 2018
Rough Draft

1          And no ISP has ever challenged that
2     information.  From the inception of the company to
3     today, we've never heard once from an ISP that we
4     were wrong in a notice that we sent.  And I don't
5     believe we ever were wrong.
6     BY MR. BROPHY:
7          Q    Does Rightscorp know the actual register
8     number of the copyrights that it is asserting on
9     behalf of its clients?
10              MR. O'BEIRNE:  Objection.  Vague.
11              THE WITNESS:  If it's provided to us by the
12     copyright owner.
13     BY MR. BROPHY:
14          Q    Does that Rightscorp pass that register
15     number to that the ISP?
16              MR. O'BEIRNE:  Same objection.
17              THE WITNESS:  No.
18     BY MR. BROPHY:
19          Q    Why not?
20              MR. O'BEIRNE:  Same.
21              THE WITNESS:  There's no requirement on
22     what our notice needs to say.
23     BY MR. BROPHY:
24          Q    Does Rightscorp have the exact name of the
25     artist and song title as that work is registered

CHRISTOPHER SABEC - August 7, 2018
Rough Draft

```
 1   with the copyright office?
 2            MR. O'BEIRNE:  Objection.  Vague and
 3   outside the scope.  Lack of foundation.
 4            THE WITNESS:  It would just depend on the
 5   copyright that we're monitoring.
 6   BY MR. BROPHY:
 7       Q    Does Rightscorp have that information for
 8   any of the copyright that it monitors?
 9            MR. O'BEIRNE:  Same objection.  Vague.
10   Outside the scope.  Calls for speculation.
11            THE WITNESS:  I'm not sure.
12   BY MR. BROPHY:
13       Q    So you don't know whether Rightscorp has
14   the actual name of the song or artist for the
15   copyright that it's enforcing on behalf of its
16   clients?
17            MR. O'BEIRNE:  Objection.  Mischaracterizes
18   testimony.
19            THE WITNESS:  We have 3 million copyrights
20   that we represent and I haven't verified all of
21   them.
22   BY MR. BROPHY:
23       Q    Is it your understanding that Rightscorp
24   has accurate song and artist information on at least
25   some of the copyright that it monitors for its
```

CHRISTOPHER SABEC - August 7, 2018
Rough Draft

```
 1            MR. O'BEIRNE:  Same objections.
 2            (Exhibit 12 was marked for identification
 3       by the certified shorthand reporter.)
 4   BY MR. BROPHY:
 5       Q    I'll hand you what's been marked as
 6   Exhibit 12.  This is a document bearing Bates number
 7   RIAA 49813 entitled Rightscorp October 2016 through
 8   March 2018.  Do you see that?
 9       A    Yes.
10       Q    And have you seen this document before?
11       A    No.
12       Q    Do you know what this information relates
13   to?
14            MR. O'BEIRNE:  Objection.  Scope.
15   Foundation.
16            THE WITNESS:  It looks like it's out of our
17   bank statement maybe.
18   BY MR. BROPHY:
19       Q    Are these payments made by RIAA to
20   Rightscorp?
21            MR. O'BEIRNE:  Objection.  Foundation.
22            THE WITNESS:  Yeah.  They look -- that's
23   what it looks like.
24   BY MR. BROPHY:
25       Q    And it totals just shy of $700,000; is that
```

CHRISTOPHER SABEC - August 7, 2018
Rough Draft

```
 1   correct?
 2        A    Yes.
 3        Q    And that's the money that Rightscorp has
 4   been paid to participate in this litigation; is that
 5   correct?
 6             MR. O'BEIRNE:  Objection.  Vague.
 7   Mischaracterizes testimony.
 8             THE WITNESS:  Yes.
 9             What time is it?
10             MR. BROPHY:  It's a quarter until.  Going
11   fast.  I'm sorry.
12             (Exhibit 13 was marked for identification
13             by the certified shorthand reporter.)
14   BY MR. BROPHY:
15        Q    So Mr. Sabec, I'm going to hand you what's
16   been marked as Exhibit 13.  We'll gets you the
17   Bates number in just one moment.
18             MR. BROPHY:  This document has Bates number
19   Rightscorp 000054 -- excuse me -- 5242.  Once again,
20   00005242.
21        Q    Have you seen this document before?
22             MR. O'BEIRNE:  Can I just note before he
23   answers the question.  I just note for the record,
24   this is 13 right?
25             MR. BROPHY:  Correct.
```

1306