**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| UMG RECORDINGS, INC., et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | No.  1:17-cv-00365-LY |
| ) | |
| GRANDE COMMUNICATIONS ) | |
| NETWORKS LLC, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT GRANDE COMMUNICATIONS NETWORKS LLC'S**
**RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION....................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 2

LEGAL BACKGROUND .......................................................................................... 6

I.      SUMMARY JUDGMENT STANDARD ..................................................... 6

II.     RELEVANT DMCA SAFE HARBOR PROVISIONS ................................ 7

ARGUMENT ............................................................................................................. 8

I.      PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT
        ON GRANDE'S SAFE HARBOR DEFENSE ............................................ 8

        A.      Grande adopted and informed subscribers of its policy for
                terminating repeat copyright infringers. ....................................... 9

        B.      The evidence forecloses the conclusion that Grande should
                have terminated any subscribers based on the receipt of
                Rightscorp's notices. ...................................................................... 11

                1.      The evidence shows that Rightscorp is incapable of
                        detecting or notifying ISPs of actual instances of
                        copyright infringement. ...................................................... 11

                2.      Rightscorp's notices are not legitimate evidence of repeat
                        infringement. ....................................................................... 17

        C.      Notwithstanding the flaws in Rightscorp notices, Grande has
                terminated subscribers. ................................................................. 18

CONCLUSION ....................................................................................................... 20

## INTRODUCTION

Plaintiffs' request for partial summary judgment on Grande's safe harbor defense, pursuant to 17 U.S.C. § 512(a), is yet another instance of over-reaching, in an attempt to bolster their facially deficient copyright infringement claims. *See generally* Grande's Mot. for Summ. J. (ECF No. 140).[1]  The crux of the issue before the Court is whether Grande adopted and reasonably implemented a policy for terminating the Internet access of repeat copyright infringers in appropriate circumstances, pursuant to the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512(i).  This presents numerous disputed factual questions that cannot be resolved on summary judgment.

It is undisputed that Grande has terminated subscribers based on allegations of copyright infringement.  Because there can be no real dispute that Grande adopted and informed subscribers of its repeat infringer policy at all relevant times, Plaintiffs' motion therefore turns on the reasonableness with which Grande implemented that policy—*i.e.*, whether it terminated enough subscribers.  The reasonableness of Grande's implementation of its policy is therefore necessarily a factual issue that cannot be resolved on summary judgment.

More importantly, the notices of alleged infringement Grande received—the basis of Plaintiffs' entire case—are fatally flawed and unreliable.  The evidence shows that non-party Rightscorp, Inc., which sent these notices and then later sold its records to Plaintiffs, is incapable of identifying actual instances of copyright infringement, for a host of different reasons.  The evidence also shows that Rightscorp omits crucial information from its notices, such as the specific copyrighted work at issue or the relevant copyright registration number.  As a result, there is at least a genuine issue of material fact as to whether any of these notices provided "appropriate circumstances" for terminating the Internet access of an affected subscriber.

---

[1] Grande's Motion for Summary Judgment is not based on its safe harbor defense, and resolution of the instant motion therefore does not affect Grande's Motion.

In view of the evidence, as discussed in detail below, Plaintiffs' request for summary judgment must be denied.

## **FACTUAL BACKGROUND[2]**

In 2011, Rightscorp, Inc. began sending email notices of alleged copyright infringement to Grande, an Internet service provider ("ISP"), concerning its subscribers' alleged use of the online file-sharing protocol BitTorrent.  To date, Rightscorp has sent over 600,000 of these notices to Grande—peaking at nearly 220,000 notices in 2015 alone.  Notice Count (Ex. 1).

Rightscorp's business model is to use these notices to extract small settlements from the alleged infringers.  Sabec Dep. Tr. 1042:17-1043:23, 1051:4-1052:12 (Ex. 2).  As a result, Rightscorp's notices have always been addressed to Grande's subscribers (identified by IP address), not Grande itself, and direct the subscriber to Rightscorp's website to make a small $20-$30 payment to resolve the claim:

> **NOTE TO ISP: PLEASE FORWARD THE ENTIRE NOTICE***
>
> Re: Unauthorized Use of Exclusively Owned Copyrights
>
> Reference#: JSB7ATF  IP Address: 67.198.13.136
>
> Dear Sir or Madam:
>
>     Your ISP has forwarded you this notice.
>     Your ISP account has been used to download, upload or offer for upload copyrighted content in a manner that infringes on the rights of the copyright owner.
>     Your ISP service could be suspended if this matter is not resolved.
>     You could be liable for substantial civil penalties.
>
> The file Album07 Fair Game.mp3  was infringed upon by a computer at IP Address 67.198.13.136 on 2016-02-26 04:09:39.0 GMT.
>
>     We represent the copyright owner.
>     This notice is an offer of settlement.
>     Go to the Rightscorp web page (rightscorp dot com) and enter this Reference #: JSB7ATF and this IP Address 67.198.13.136 to begin the process to receive a legal release from the copyright owner.

Ex. 4 to Grande's Mot. for Summ. J. at 14 (ECF No. 140-2); Sabec Dep. Tr. 1051:4-1053:15,

---

[2] To the extent the assertions in Plaintiffs' "Statement of Undisputed Material Facts" are disputed and material, those assertions are addressed in this brief.  In the interest of avoiding unnecessary briefing on irrelevant issues, Grande does not attempt to address the numerous immaterial "facts" identified by Plaintiffs or concede that any such assertions are undisputed.

1271:13-1273:20 (acknowledging that Rightscorp has sent notices to other ISPs in a different format, with separate portions directed to the ISP and the subscriber).

Rightscorp has not sent a single notice of alleged infringement to Grande on behalf of any Plaintiff. Rightscorp has never had a contractual relationship with any Plaintiff, and it has never been asked to monitor Grande's network for alleged infringement of any of Plaintiffs' copyrighted works. Sabec Dep. Tr. 1149:4-1150:6 (Ex. 2). All of the notices at issue in this case were sent on behalf of other alleged rights-holders, and there is no evidence in this case that any of these notices were legitimate—*e.g.*, that any of those rights-holders actually owned the asserted copyrights. After non-party BMG Rights Management (US) LLC ("BMG") successfully relied on Rightscorp's notices in litigation against another ISP, Cox Communications, Inc. ("Cox"),[3] Rightscorp agreed to sell its data concerning Grande to the Recording Industry Association of America ("the RIAA"), Plaintiffs' trade association, for $700,000. Sabec Dep. Tr. 1107:8-1114:25, 1305:5-1306:8 (Ex. 2).

Contrary to Plaintiffs' claims, Grande has at all relevant times had policies in place providing for the termination of subscribers who engage in copyright infringement. Since at least 2012, Grande has made its subscribers aware of its Acceptable Use Policy ("AUP"), which provides for the termination of repeat copyright infringers. 2012 Acceptable Use Policy (Ex. 3); 2013 Acceptable Use Policy (Ex. 4); Horton Dep. Tr. 62:12-63:7 (Ex. 5); S. Christianson Dep. Tr. (June 27, 2018) 21:9-20 (Ex. 6). Grande has also had a more specific, customer-facing DMCA policy in place since 2016. DMCA Policy and Procedure (Ex. 7); S. Christianson Dep. Tr. (June 26, 2018) at 36:5-22 (Ex. 6).

Recognizing the threat of litigation from copyright owners, as in BMG's litigation against Cox, it is undisputed that Grande has terminated the accounts of subscribers pursuant to these policies, based on notices of alleged copyright infringement Grande received. Pls.' Mot. at 7 (¶

---

[3] The jury verdict in BMG's favor was subsequently reversed on appeal. *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 310 (4th Cir. 2018).

19) (ECF No. 127).  However, it is also beyond dispute that Rightscorp's notices do not actually provide legitimate grounds for concluding that *any* subscriber is a "repeat infringer" because Rightscorp's entire system is defective and misleading.[4]

On a technical level, Rightscorp is unable to detect any actual unlawful copying or distribution of copyrighted works.  Instead, according to Rightscorp and Plaintiffs' own technical expert, Rightscorp is—at most—only able to detect when a given music file is made available for download through BitTorrent.  Ex. 1 to Grande's Mot. for Summ. J. (Frederiksen-Cross Report at ¶ 46, 70, 79, 97, 119) (ECF No. 141-1); Ex. 2 to Grande's Mot. for Summ. J. (Boswell Dep. Tr. 1261:16-23) (ECF No. 141-2).  As discussed below and in Grande's Motion for Summary Judgment (ECF No. 140 at 6-9), this does not constitute copyright infringement, which requires actual reproduction or distribution of a copyrighted work.  As a result, Rightscorp's notices falsely represent that Rightscorp has identified "infringements" and that such "infringements" occurred at specific dates and times.[5]

In addition to this fatal defect in Rightscorp's system, the volume of Rightscorp's notices, and its identification of so-called "repeat infringers," is unrelated to the amount of any actual infringing activity.  Rightscorp sends one notice to the ISP for each day Rightscorp determines that an allegedly infringing song file is available for download.  Sabec Dep. Tr. 1195:14-20 (Ex. 2).  Rightscorp then deems the relevant IP address to be a "repeat infringer" if Rightscorp's system generates a notice for an individual IP address regarding two song files over three days.

---

[4] While Grande has received notices of alleged infringement from entities other than Rightscorp, there is no record evidence concerning these notices apart from the notices themselves.  For example, there is no evidence as to how these notices were generated (*i.e.*, whether they reflect actual instances of copying or distribution of copyrighted material) or whether they pertain to valid copyrights.  Thus, there is no evidence from which a reasonable juror could conclude that these non-Rightscorp notices are in any way reliable or actionable.  As noted above, there is also no evidence that *any* of the notices Grande received (from Rightscorp or a third party) were sent on behalf of a party that actually owned the asserted copyright.

[5] The identified times are merely the moments when Rightscorp executed its system.  Boswell Dep. Tr. 1339:3-9 (Ex. 9)

Sabec Dep. Tr. 1214:19-1216:3.  Rightscorp has acknowledged that its definition of a "repeat infringer" is nothing more than a "business variable" that can be changed at the whim of Rightscorp or its customers.  Sabec Dep. Tr. 1059:3-9 (Ex. 2) (Q: Is there some process by which Rightscorp identifies who to label as a repeat infringer?  A: <u>It's a business variable</u> that can be – because it's a data – it's a mining of the data, analysis of the data, <u>it can be set any way we choose at a moment or a client chooses</u>.") (emphasis added).

Thus, for example, if a Grande IP address appeared to make two monitored songs available for download for a period of 10 consecutive days, Rightscorp would send <u>20 notices of alleged infringement, *and* deem the relevant subscriber a "repeat infringer," **even though neither song file was actually downloaded from the subscriber *a single time* over that 10-day period**</u>.[6]  The volume of Rightscorp's notices is entirely disconnected from any infringing activity—if Rightscorp ran its system twice as often, that would result in twice as many infringement notices for which it would attempt to collect a settlement, without any related change in the conduct of the subscriber.

Separate and apart from these glaring defects in its system, Rightscorp's notices omit information that is necessary to give Grande notice of alleged copyright infringement. Rightscorp's notices do not identify an allegedly infringed copyrighted work or the relevant copyright registration number.  *See generally* Ex. 4 to Grande's Mot. for Summ. J. (ECF No. 140-2); Sabec Dep. Tr. 1288:7-17.  Incredibly, Rightscorp does not even obtain this information from its customers before engaging in its monitoring and notification activities.  Its customers provide lists of songs to be monitored, and Rightscorp does not do anything to verify whether those songs are the subject of a valid copyright—let alone a copyright owned by its customer.

---

[6] There are a host of other critical defects in Rightscorp's system that make its notices unreliable, including its inability to match song files allegedly made available for download to copyrighted works, its generation of notices in circumstances where the BitTorrent user does not possess any portion of a targeted song file, and numerous flaws in how Rightscorp identifies song files that may correspond to copyrighted works.  *See generally* Cohen Decl. & Report, ¶¶ 53-150 (Ex. 8).

Sabec Dep. Tr.  1168:6-1172:4 (Ex. 2).

Instead of identifying the copyrighted work and/or registration number, Rightscorp's notices only identify the name of the song file that is alleged to be infringing.  *See generally* Ex. 4 to Grande's Mot. for Summ. J. (ECF No. 140-2); Sabec Dep. Tr. 1288:7-17.  Thus, in order to ascertain whether a notice could _potentially_ reflect actual copyright infringement, Grande would need to independently research whether the identified song file is protected by a valid, registered copyright.  And in many instances, this is impossible given the scant information Rightscorp provides.  *See, e.g.*, Ex. 4 to Grande's Mot. for Summ. J. at 8 (Rightscorp notice stating "The file 09 Haze.mp3 was infringed upon by a computer at IP Address . . . ."), 14 ("The file Album07 Fair Game.mp3 was infringed upon by a computer at IP Address . . . .") (ECF No. 140-2).

## LEGAL BACKGROUND

### I.   SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate "if the record, taken as a whole, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Katrinecz v. Motorola Mobility LLC*, No. 1:12-cv-235-LY, 2014 WL 12167631, at *1 (W.D. Tex. Dec. 3, 2014) (citations omitted).  Summary judgment should be denied whenever the nonmoving party identifies "evidence in the record which demonstrates that it can satisfy a 'fair-minded jury' that it is entitled to verdict in its favor."  *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986)).

On summary judgment, the court "consider[s] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in its favor."  *Edwards v. Continental Cas. Co.*, 841 F.3d 360, 363 (5th Cir. 2016).  "Indeed, even if the moving party comes forward with an abundance of evidence supporting its theory of the case, the nonmoving party may nevertheless defeat the motion by countering with evidence of its own, which, if credited by the fact-finder, would entitle the nonmoving party to a verdict in its favor."  *Rally's*, 939 F.3d at

1263. "Or, the nonmoving party can defeat the motion by demonstrating that the evidence tendered by the moving party is itself laced with contradictions of fact." *Id.* at 1263-64. "If the nonmoving party responds satisfactorily, the motion for summary judgment is denied, and the case proceeds to trial." *Id.* at 1263.

## II.    RELEVANT DMCA SAFE HARBOR PROVISIONS

The DMCA, 17 U.S.C. § 512, contains several distinct safe harbor provisions that limit the potential liability of "service providers" against claims of copyright infringement.  The specific safe harbor provision at issue in this case is set out in § 512(a), which pertains to ISPs alleged to be liable "by reason of the provider's transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider." Section 512(a)(1-5) contains five requirements the ISP must satisfy in order to qualify for this safe harbor.  In their motion, Plaintiffs do not dispute that Grande is a "service provider" under § 512(k) or that it satisfies each of the requirements in § 512(a)(1-5).

Instead, Plaintiffs' argument focuses solely on § 512(i), which provides that the safe harbors may only be available if the service provider "has adopted and reasonably implemented, and informs subscribers and account holdings of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers."[7] § 512(i)(1)(A). The statute does not define "repeat infringer" or otherwise impose any specific requirements for such a policy, evidencing Congress's "intent to leave the policy requirements, and the subsequent obligations of the service providers, loosely defined." *Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500, 513 (S.D.N.Y. 2013) (quotations & citation omitted), *vacated*

---

[7] Section 512(i)(1)(B) further requires that the service provider "accommodates and does not interfere with standard technical measures," which are defined in § 512(i)(2) as certain technical measures "used by copyright owners to identify or protect copyrighted works."  Plaintiffs do not dispute that Grande has at all relevant times satisfied this requirement.

*in part on other grounds*, 826 F.3d 78 (2d Cir. 2016).

Section 512 also contains important limits on the scope and effect of the safe harbor provisions.  First, and most significantly here, the applicability of the safe harbors may <u>not</u> be construed to require "a service provider [to] monitor[] its service or affirmatively seek[] facts indicating infringing activity."  § 512(m).  Second, by its terms, § 512 does not impose any affirmative obligations on ISPs or otherwise affect a plaintiff's obligation to prove all elements of a copyright infringement claim in order to establish liability.[8]  § 512(l).

## **ARGUMENT**

## I.  **PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON GRANDE'S SAFE HARBOR DEFENSE**

Plaintiffs seek summary judgment on Grande's DMCA safe harbor defense on grounds that Grande is not eligible for safe harbor protection due to its failure to adopt and reasonably implement, and inform subscribers of, a policy that provides for the termination in appropriate circumstances of repeat infringers.  *See generally* Pls' Mot. (ECF No. 127); *see also* 17 U.S.C. § 512(i)(1)(A).  However, a myriad of evidence shows that Grande does meet, and during all relevant times has met, the requirements for protection under the relevant DMCA safe harbor.  In particular, the extensive evidence of critical flaws in Rightscorp's detection and notice system precludes any determination that Grande should have terminated the Internet access of any subscriber based on Rightscorp's notices of alleged copyright infringement.  At a bare minimum, the evidence gives rise to a genuine issue of material fact and therefore precludes summary judgment in favor of Plaintiffs.

---

[8] Thus, the statute expressly precludes the argument—made repeatedly by Plaintiffs in this case—that the failure to qualify for safe harbor protection is tantamount to liability for copyright infringement.

A.      **Grande adopted and informed subscribers of its policy for terminating repeat copyright infringers.**

In their motion, Plaintiffs argue that Grande did not have a DMCA termination policy from October 2010 through October 2016.  *See* Pls' Mot. at 1, 16, 17 (ECF No. 127).  However, the evidence shows that Grande has had a policy for terminating repeat infringers pursuant to the DMCA ("DMCA policy") since at least 2012—that is, during the entire relevant time period.[9]  Accordingly, there is <u>at least</u> a genuine issue of material fact regarding Grande's adoption and publication of a policy for terminating repeat infringers.

In applying § 512(i), courts have recognized "the threshold requirement of the adoption of a repeat infringer policy should not be an overly burdensome one to meet."  *Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500, 513 (S.D.N.Y. 2013) (citations omitted), *vacated in part on other grounds*, 826 F.3d 78 (2d Cir. 2016).  It is sufficient that an ISP takes "a clear position that those who choose to violate another's copyright would not be permitted to avail themselves of the service [the ISP] provides."  *Id.*

From at least 2012 until the present, Grande has taken a clear position that subscribers who violate copyright laws, including repeat infringers, may be terminated from Grande's service.  Grande's 2012 Acceptable Use Policy states: "Grande may terminate the Service provided to any customer or user who is either found to infringe third party copyright or other intellectual property rights, including repeat infringers . . . ."  2012 Grande Acceptable Use

---

[9] Only the 3-year period preceding the filing of Plaintiffs' Complaint—*i.e.*, the period commencing on April 21, 2014—is relevant in this case.  *See* 17 U.S.C. § 507(b).  Although Plaintiffs have suggested in other contexts that they should be allowed to rely on the discovery rule to expand the relevant time period, Plaintiffs did not come forward with any evidence that would support application of the discovery rule to their request for summary judgment.  *See, e.g.*, *Garden City Boxing Club, Inc. v. Johnson*, 552 F. Supp. 2d 611, 616 (N.D. Tex. 2008) ("The burden is on the plaintiff to come forward and demonstrate that the discovery rule should toll the limitations period.").  Moreover, Plaintiffs did not even *plead* any facts relevant to their discovery rule argument.  *See TIG Ins. Co. v. Aon Re, Inc.*, 521 F.3d 351, 357 (5th Cir. 2008) (a plaintiff must "plead sufficient facts to put the defense on notice" of its discovery rule theory).  *See also* Grande's Resp. to Plfs. Mot. to Compel at 305 (ECF No. 119).

Policy at 4 (Ex. 3). Grande's current Acceptable Use Policy, which has been publicly accessible and in force since 2013, reflects the same policy. Current Grande Acceptable Use Policy at 4 (Ex. 4); *see also* Horton Dep. Tr. 62:12-63:7 (Ex. 5); S. Christianson Dep. Tr. 21:9-20 (Ex. 6)

Additionally, since 2016, Grande has posted a specific, customer-facing DMCA policy to its website. This policy is consistent with the 2012 and 2013 Acceptable Use Policies, but provides more detail on the notification process and includes a FAQ section for common questions, among other things. *See* DMCA Policy and Procedure (Ex. 7). The evidence shows that this policy has been in place since 2016. *See* S. Christianson Dep. Tr. 36:5-22 (Ex. 6).

Since 2012, Grande has also gone above and beyond the requirements of the § 512(a) safe harbor by identifying a designated DMCA agent for purposes of receiving notices of alleged infringement. *See* 2012 Acceptable Use Policy at 4-5 (Ex. 3); 2013 Acceptable Use Policy at 4 (Ex. 4); DMCA Policy and Procedure at 1 (Ex. 7). The § 512(c) safe harbor—which is not at issue in this case—requires such a designated agent, but the § 512(a) safe harbor does not. *Compare* § 512(a) *with* § 512(c)(2).

These policies are directly in line with the § 512(i) policies found to satisfy the "adoption" requirement in other cases. *See, e.g.*, *Capitol Records*, 972 F.Supp.2d at 513 (policy that provided contact information for its DMCA agent, required users to agree not to infringe others' copyrights, and notified users that their accounts may be terminated for violations of the Terms of Service); *Obodai v. Demand Media, Inc.*, No. 1:11-cv-2503, 2012 WL 2189740, at *4 (S.D.N.Y. June 13, 2012) (Terms and Conditions provided contact information for a DMCA designated agent and provided that the defendant could terminate customers for repeat infringement); *Perfect 10, Inc. v. CCBill, LLC*, 340 F. Supp. 2d 1077, 1088-89 (C.D. Cal. 2004) (policy stating a user's access may be terminated for copyright infringement).

In light of the foregoing, the record evidence establishes that Grande did in fact adopt and inform subscribers of a policy for terminating repeat infringers pursuant to the DMCA during the entire relevant time period. At a bare minimum, the evidence cited above gives rise to a genuine issue of material fact and therefore precludes summary judgment.

**B.      The evidence forecloses the conclusion that Grande should have terminated any subscribers based on the receipt of Rightscorp's notices.**

Plaintiffs' request for summary judgment is premised on the notion that Grande did not reasonably implement its repeat infringer policy because it did not terminate the accounts of enough subscribers upon receiving Rightscorp's notices of alleged infringement.[10]  *See, e.g.,* Pls' Mot. at 2, 13 (ECF No. 127).  This argument is refuted by the evidence, which shows that (1) Rightscorp is incapable of identifying or giving notice of actual copyright infringement; and  (2) Rightscorp's notices omit information that would be necessary to give Grande actionable notice of copyright infringement.  Thus, there is at least a genuine issue of material fact as to whether Rightscorp's notices could ever present "appropriate circumstances" for termination and/or whether Grande "reasonably implemented" its repeat infringer policy.  *See* 17 U.S.C. § 512(i)(1)(A).

It is impossible to separate the availability of the § 512(a) safe harbor from the disputed factual issues concerning the legitimacy of Rightscorp's "system" for detecting and notifying ISPs of alleged copyright infringement.  It is also undisputed that Grande <u>has</u> terminated the accounts of certain affected subscribers, notwithstanding the defects in Rightscorp's system.  Summary judgment is therefore improper because the evidence Plaintiffs rely on is "laced with contradictions of fact."  *Rally's*, 939 F.3d at 1264.

1.      <u>The evidence shows that Rightscorp is incapable of detecting or notifying ISPs of actual instances of copyright infringement</u>.

Plaintiffs' entire case rests on the notices of alleged copyright infringement Rightscorp

---

[10] As noted *supra*, Grande's alleged failure to terminate subscribers based on the receipt of allegations from parties other than Rightscorp cannot provide a basis for summary judgment. Plaintiffs have come forward with no evidence that any of those notices reflect actionable evidence of copyright infringement.  Moreover, all of Rightscorp's notices to Grande were sent on behalf of third parties—*i.e.*, not Plaintiffs—and there is no evidence in the record that any of those third parties actually owned a valid, registered copyright pertaining to the songs for which notices were sent.

sent to Grande.  Rightscorp's notices are not legitimate and do not evidence copyright infringement by Grande subscribers—let alone repeat infringement.  *See* Pls' Mot. at 15 (ECF No. 127).  Indeed, the evidence shows that Rightscorp's notices are not only unreliable; they are flat-out untruthful.  As such, the reasonableness of Grande's implementation of its repeat infringer policy, in terms of the regularity with which it has terminated the accounts to alleged repeat infringers based on Rightscorp's allegations, is a genuine issue of material fact that cannot be resolved on summary judgment.

### i.  *Rightscorp cannot detect copyright infringement*

Plaintiffs seek to prove direct copyright infringement by simply pointing to the hundreds of thousands of notices Rightscorp has sent to Grande.  Thus, throughout this case, Plaintiffs have repeatedly suggested that Rightscorp's system is capable of detecting actual infringement. In fact, the evidence shows that Rightscorp's system is only capable of detecting when a file may have been made <u>accessible</u> through BitTorrent—the system cannot detect when, or even more importantly whether, an infringing music file has ever actually been copied or distributed.  *See* Ex. 1 to Grande Mot. for Summ. J. (Frederiksen-Cross Report) at ¶¶ 46, 70, 79, 97, 119 (ECF No. 141-1); Cohen Decl. & Report, ¶¶ 16, 25, 88 (Ex. 8).

Thus, even if Rightscorp's notices otherwise contained sufficient information to give notice of infringement (as discussed below, they do not), they cannot provide any basis for terminating a subscriber because they do not reflect actual copyright infringement.  Direct copyright infringement requires actual reproduction or distribution of a copyrighted work— merely making copyrighted material available is not enough.[11]  *See, e.g.*, *Atl. Recording Corp. v.*

---

[11] At best, Rightscorp notices may indicate that certain Grande subscribers possessed copyrighted works; however, obviously those files could have been obtained through any number of means, including completely legitimate ones like iTunes Music, Google Play Music, or Amazon Music.  Even if the songs were originally obtained illegally, the Rightscorp system cannot detect whether that illegal conduct took place <u>through Grande's network</u>.  Cohen Decl. & Report, ¶¶ 113 (Ex. 8).

*Howell*, 554 F. Supp. 2d 976, 981 (D. Ariz. 2008) ("The general rule, supported by the great weight of authority, is that 'infringement of the distribution right requires an actual dissemination of either copies or phonorecords.'") (collecting cases) (quoting *Nat'l Car Rental Sys. v. Computer Assocs. Int'l, Inc.*, 991 F.2d 426, 434 (8th Cir. 1993) (alterations omitted)); *see also* Grande's Mot. for Summ. J. at 6-9 (collecting cases) (ECF No. 140).

Thus, because Rightscorp cannot identify actual reproduction or distribution, Rightscorp's representations in its notices that it has identified "infringement"—made under penalty of perjury—are <u>false</u>.  Rightscorp's notices are also an unreliable source of information regarding the copyrighted work asserted or Rightscorp's ability to enforce that work.  In fact, the evidence shows that Rightscorp has attempted to enforce copyrights—and possibly collected monetary settlements for alleged infringement—without authority from the copyright holder. *See* Boswell Dep. Tr. at 1350:5-1352:17 (Ex. 9).

Rightscorp's system contains a number of other critical flaws that render it incapable of reliably detecting copyright infringement—even <u>attempted</u> infringement.  *See Howell*, 554 F. Supp. 2d at 984 (recognizing that "there is no basis for attempt liability [in the Copyright Act]"). Rightscorp does not attempt to download any portion of an allegedly infringing file before sending a notice of copyright infringement.  Cohen Decl. & Report, ¶¶ 142-143 (Ex. 8). Rightscorp also does not obtain true copies of copyrighted songs to compare against allegedly infringing copies, registration information for the copyrighted songs, or documentation showing that its customer actually owns the copyright.  Instead, Rightscorp looks for "infringements" based on nothing more than song titles and artist names provided by third parties.  *See* Frederiksen-Cross Report, ¶¶ 46-47 (ECF No. 141-1); *see also* Ex. 3 to Grande's Mot. for Summ. J., ECF No. 141-3 (Sabec Dep. Tr.) at 1170:10-18; 1288:24-1289:21 (ECF No. 141-3). This half-baked process results in mistakes, mismatches, and as noted, even the generation of notices for songs that Rightscorp does not have the authority to monitor.  *See* Cohen Decl. & Report, ¶¶ 25, 73, 83, 84, 88, 89, 104, 106, 108-111, 115-117, 119, 121 (Ex. 8); *see also* Boswell Dep. Tr. at 1350:5-1352:17 (Ex. 9).

13

There is more.  Rightscorp relies on third-party websites to compare allegedly infringing song files to copyrighted works, and the evidence shows that flaws in the methodologies used by these websites results in false positives.  Cohen Decl. & Report, ¶¶ 122-130 (Ex. 8).  Based on how Rightscorp's system identifies *.torrent files associated with infringing works, it may also send a notice of infringement regarding a particular song even when the BitTorrent user does not possess any portion of that song—for instance, where a BitTorrent user possesses only one song from an album, Rightscorp's system may generate a notice for a different song from that album.  Cohen Decl. & Report, ¶¶ 117, 119 (Ex. 8).  Rightscorp's system may also generate notices in circumstances where the user only possesses, and is therefore only able to distribute, a small portion of a song file.  Cohen Decl. & Report, ¶¶ 116, 117, 119 (Ex. 8).  Grande's technical expert has provided a detailed analysis of these flaws, which are simply too numerous to fully and accurately discuss in the instant briefing.  *See generally* Cohen Decl. & Report (Ex. 8).

For these reasons, the district court's summary judgment ruling on the safe harbor issue in BMG's litigation against Cox is plainly distinguishable.  *See BMG Rights Mgmt. (US) LLC. v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634 (E.D. Va. 2015), aff'd in part, rev'd in part, 881 F.3d 293 (4th Cir. 2018).  There, the court assumed the validity of Rightscorp's notices and did not address the technical issues plaguing them, or whether Rightscorp's contain sufficient information to give rise to cause for termination (discussed below).  *Id.* at 639-640.  *Cox* does not purport to address the issue before the Court:  whether Rightscorp's notices are sufficiently reliable and detailed to constitute "appropriate circumstances" for terminating any affected subscriber.[12]  *See id.*

In sum, one cannot determine that Grande failed to implement a policy for terminating repeat infringers "in appropriate circumstances" without considering the evidence of the actual circumstances.  That evidence includes the extensive and irrefutable evidence that Rightscorp's

---

[12] Moreover, there was evidence in *Cox* that specific customers had admitted their infringing activities directly to Cox employees.  *Id.* at 662.  No such evidence exists in this case.

system is simply incapable of reliably identifying and giving notice of actual copyright infringement.  In view of this evidence, Plaintiffs' motion must be denied.

> ii. *Rightscorp notices do not provide "appropriate circumstances" for termination because they omit key information.*

In addition to the flaws in Rightscorp's system that render its notices unreliable, Rightscorp's notices do not contain sufficient information to put Grande on notice of actual infringement.  In other words, even if the information contained in Rightscorp notices was accurate, there is not <u>enough</u> information to give Grande notice of copyright infringement.  In fact, on their face, Rightscorp's notices require Grande to conduct a further investigation, which it has no obligation to do under the express terms of the DMCA.

To give Grande cause to terminate a subscriber—*i.e.*, to constitute "appropriate circumstances" for termination—Grande would need information demonstrating infringement.  Yet not a single Rightscorp notice identifies (1) the allegedly infringed copyrighted work or (2) the nature of the infringement (let alone the time/date on which such infringement allegedly occurred).  *See supra* Factual Background.  These are the minimum requirements for a viable claim of copyright infringement.  *See, e.g.*, *BWP Media USA, Inc. v. T & S Software Assocs., Inc.*, 852 F.3d 436, 439 (5th Cir. 2017).

The DMCA expressly provides that the safe harbors <u>cannot be construed</u> to require "a service provider [to] monitor[] its service or affirmatively seek[] facts indicating infringing activity."  17 U.S.C. § 512(m).  As noted, however, Rightscorp's notices do not identify a copyrighted work or a relevant copyright registration number—only the file name of the allegedly infringing copy.  Thus, in order to ascertain whether a notice could *potentially* reflect actual copyright infringement, Grande would need to independently research whether the identified song file is protected by a valid, registered copyright.  Even this would be impossible where the file name in the notice is lacking critical information, such as the artist's name.  *See, e.g.*, Ex. 4 to Grande's Mot. for Summ. J. at 8 (Rightscorp notice stating "The file 09 Haze.mp3

was infringed upon by a computer at IP Address . . . ."), 14 ("The file Album07 Fair Game.mp3 was infringed upon by a computer at IP Address . . . .") (ECF No. 140-2).

Rightscorp also does not provide evidence of duplication or transmission of the subject song in a notice—that is, the activity constituting the actual infringement. Rightscorp's notices simply use a catch-all phrase to encompass every possible form of infringement. This even includes offers to distribute copyrighted works, which as discussed above do not even constitute infringement. *See generally* Ex. 4 to Grande Mot. for Summ. J. ("Your ISP account has been used to download, upload or offer for upload copyrighted content in a manner that infringes on the rights of the copyright owner") (ECF No. 140-2).

Whether or not these allegations are true is anyone's guess, because Rightscorp is incapable of detecting unauthorized copying or distribution. And as discussed, Grande's entitlement to the safe harbor cannot be conditioned on requiring Grande to conduct a further investigation—which would necessarily include determining at least (1) whether a song is actually copyrighted, (2) whether the song is owned by the sender of the notice, (3) whether the song actually exists on its subscriber's computer, and (4) whether the song was actually duplicated using Grande's network. *See* 17 U.S.C. § 517(m). Rightscorp's corporate designee has admitted that there is no way for ISP to verify the accuracy of Rightscorp's allegations. *See* Boswell Dep. Tr. at 1332:16-21 (Ex. 9). Plaintiffs also acknowledge that Rightscorp's notices do in fact call for further investigation. Pls.' Mot. at 16 ("Grande admits that it never felt the need to investigate a single Rightscorp notices . . . .").

Rightscorp also does not digitally sign its infringement notices with PGP ("Pretty Good Privacy") encryption—verifying the identity of the sender—even though Grande's 2016 DMCA policy expressly includes this requirement. DMCA Policy and Procedure (Ex. 7); Boswell Dep. Tr. 1313:4-7 (Ex. 9). Every other entity that sends infringement notices to Grande does so. This addresses a real problem, because at least one other ISP has been "spoofed" by fake notices of infringement intended to elicit fraudulent settlements from subscribers. *See* Email re: IP Echelon Notices (Ex. 11).

16

Finally, it is misleading for Plaintiffs to claim that there is no evidence that Grande believed Rightscorp's notices were inaccurate or unreliable.  Plaintiffs are not privy to any of Grande's privileged communications or attorney work product concerning this issue.  In any event, the argument is a red herring—the question is whether Rightscorp's notices presented "appropriate circumstances" for termination, not whether Grande subjectively believed they did. Moreover, Plaintiffs provide no support for the notion that Rightscorp's allegations of infringement are entitled to a presumption of validity or that those allegations somehow trump Grande's subscribers' legitimate due process rights.

In sum, Rightscorp notices do not provide Grande with sufficient information to give Grande cause to deem any subscriber a "repeat infringer" and terminate their account.  The factfinder must be permitted to consider these deficiencies and determine, based on the evidence, whether the § 512(a) safe harbor actually requires Grande to terminate the Internet access of subscribers based merely on Rightscorp's conclusory, bare-bones allegations, generated by an unreliable system for monitoring BitTorrent activity.

2. <u>Rightscorp's notices are not legitimate evidence of repeat infringement</u>.

Plaintiffs rely on Rightscorp's notices as not just proof of infringement, but proof of "repeat infringement."  *See generally* Pls' Mot. (ECF No. 127).  As explained above, the evidence demonstrates that Rightscorp's notices do not reliably identify any instance of actual infringement.  For the same reasons, Rightscorp cannot reliably identify repeat infringement. Multiple unreliable allegations of infringement only add up to repeated unreliable allegations of infringement—nothing more.

Furthermore, Rightscorp has admitted that its definition of "repeat infringer" is arbitrary and can be changed at the whim of Rightscorp or its customers.  Sabec Dep. Tr. 1059:3-9 (Q: Is there some process by which Rightscorp identifies who to label as a repeat infringer?  A: It's a business variable that can be – because it's a data – it's a mining of the data, analysis of the data, it can be set any way we choose at a moment or a client chooses."), 1063:3-23 (Ex. 2).

As detailed above in Section II, the volume of Rightscorp's notices is also purely a function of its arbitrary decision regarding how often it chooses to run its system.  Sabec Dep. Tr. 1195:14-20 (Ex. 2).  If Rightscorp ran its system twice as often, that could result in twice as many infringement notices, without any change in the number of instances of actual copyright infringement.  Conversely, if Rightscorp ran its system half as often, that could result in half as many infringement notices, as well as some corresponding reduction in the number of identified "repeat infringers."

In short, there is plainly <u>at least</u> a genuine issue of material fact as to whether Rightscorp has ever reliably identified a repeat copyright infringer on Grande's network, especially in a manner that would not necessitate further investigation by Grande.  As a result, there is likewise a genuine issue of material fact as to whether Grande reasonably implemented its § 512(i) policy for terminating repeat infringers "in appropriate circumstances."  Grande therefore respectfully submits that Plaintiffs' request for summary judgment must be denied.

### C.      Notwithstanding the flaws in Rightscorp notices, Grande has terminated subscribers.

Plaintiffs argue that Grande failed to enforce its Acceptable Use Policy "in any fashion whatsoever" from 2010 through 2016.  *See* Pls' Mot. at 14 (ECF No. 127).  This assertion is demonstrably false.  Notwithstanding the flaws in Rightscorp's notices, Grande has acted on notices of alleged infringement and even terminated certain customers.  This evidence further gives rise to a genuine issue of material fact as to whether Grande reasonably implemented its § 512(i) repeat infringer policy over the relevant time period.

The incredible volume of notices of alleged infringement places Grande, like other ISPs, in an impossible situation: either terminate subscribers based on dubious, unverifiable allegations of infringement, or face potential litigation from rights-holders.  It is undisputed that Grande has no ability to verify Rightscorp's allegations (Boswell Dep. Tr. at 1332:16-21 (Ex. 9)), even if had the resources to investigate upwards of hundreds of thousands of such allegations per year.

Nevertheless, given the threat of litigation, as in BMG's litigation against Cox and this

very case, it is undisputed that Grande has terminated the accounts of certain subscribers pursuant to its policies, based on notices of alleged copyright infringement Grande received.[13] Pls' Mot. at 7 (¶ 19).  This necessarily required Grande to give more credit to the notices than is deserved.  Although Grande has terminated the Internet accounts of twelve subscribers, Grande is still left in a position of not knowing whether any of the underlying allegations leading up to termination were true.  Now that Rightscorp has produced evidence of how its "system" operates, it is indisputable that Rightscorp's allegations are not remotely credible.

Thus, setting aside the inappropriateness of terminating any subscriber based on Rightscorp's allegations, if it is Plaintiffs' position that actual termination is a prerequisite for safe harbor protection, then by Plaintiffs' own account, Grande's entitlement to the safe harbor at least presents a genuine issue of material fact.  *See, e.g.*, Pls' Mot. at 1.  To the extent Plaintiffs contend that termination of twelve subscribers does not constitute "reasonable implementation" of a repeat infringer policy, that presents an issue for the factfinder to decide.[14]  Plaintiffs offer no authority to the contrary.

Furthermore, the evidence also shows that Grande has informed its subscribers of infringement allegations pursuant to its Acceptable Use Policy for many years—a fact of which Plaintiffs are well aware.  Grande has produced hundreds of thousands of pages of data illustrating its efforts to inform its customers of these allegations.  Grande employees have also testified to these efforts.  *See, e.g.*, S. Christianson Dep. Tr. 21:9-20 (Ex. 6); Horton Dep. Tr. 61:2-63:13 (Ex. 5).  Plaintiffs themselves acknowledge out that "Grande sent more than 200,000

---

[13] Plaintiffs incorrectly assert that Grande "decided" not to process Rightscorp's notices for a period of time.  Pls' Mot. at 5 (¶ 10).  In fact, this resulted from a software processing error, not any deliberate decision.  L. Christianson Dep. Tr. at 123:15-127:4; 128:22-131:6 (Ex. 12).

[14] Plaintiffs misleadingly assert that Grande tracks subscribers for whom it receives multiple notices of alleged infringement in an "Excessive Violations" report.  Pls' Mot. at 7 (¶ 21).  The cited evidence only refers to a specific window of time spanning parts of 2016 and 2017 during which Grande was tracking the volume of notices it received as part of an effort to assess and restructure its termination policies.  *See* Ex. C to Pls' Mot. at 81-88.  In any event, this issue is immaterial to the safe harbor.

letters to its customers regarding the alleged copyright infringement reflected in these [DMCA] notices." Pls' Mot. at 5. Moreover, Grande's damages expert has determined that Grande expends roughly $250,000 per year on the salaries of individuals tasked with dealing with DMCA issues. Kemmerer Decl. & Report, ¶ 62 (Ex. 10). These efforts go above and beyond what the § 512(a) safe harbor requires.

In view of the evidence, the Court should deny Plaintiffs' request for summary judgment and allow the factfinder to determine whether and to what extent Grande is entitled to the protection of the § 512(a) safe harbor.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Partial Summary Judgment.

Dated: August 22, 2018.

By: /s/ Richard L. Brophy
Richard L. Brophy
Zachary C. Howenstine
Margaret R. Szewczyk
Armstrong Teasdale LLP
7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
Telephone: 314.621.5070
Fax: 314.621.5065
rbrophy@armstrongteasdale.com
zhowenstine@armstrongteasdale.com
mszewczyk@armstrongteasdale.com

Attorneys for Defendant GRANDE
COMMUNICATIONS NETWORKS LLC

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on August 22, 2018, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system pursuant to Local Rule CV-5(b)(1).

/s/ Richard L. Brophy
Richard L. Brophy