# EXHIBIT 1

GREGORY H. BOSWELL  \*\*HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY\*\*  8/8/2018

Page 1

```
 1                UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                      AUSTIN DIVISION

 3
     UMG RECORDINGS, INC., et al.,      )
 4                                      )
              Plaintiffs,               )
 5                                      )
           vs.                          ) Case No.
 6                                      ) 1:17-cv-00365-LY
     GRANDE COMMUNICATIONS NETWORKS     )
 7   LLC,                               )
                                        )
 8            Defendant.                )
     _____)
 9

10

11      **HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

12

13        VIDEO DEPOSITION OF GREGORY H. BOSWELL

14      30(b)(6) REPRESENTATIVE FOR RIGHTSCORP, INC.

15                 Santa Monica, California

16

17               Wednesday, August 8, 2018

18

19

20

21

22

23

24

25
```

```
 1    A    Do not know.
 2    Q    Rough ballpark?
 3    A    Do not know.
 4    Q    I'll ask one more.
 5         Within the last few years, or has it been
 6   quite some time?
 7    A    Jeff would have been a few years ago.
 8         Victor -- Vincent.  It's not Victor.
 9    Q    I'm sorry.
10    A    It's Vincent.
11    Q    Thank you.
12    A    Vincent, probably at the end of last year.
13    Q    So in 2012 or 2013, Rightscorp transitioned
14   to using Audible Magic to do its song matching; is
15   that correct?
16    A    Uh-huh.
17    Q    And is Audible Magic a commercial solution?
18    A    Yes.
19    Q    And so does Rightscorp pay money to
20   Audible Magic to perform those services for it?
21    A    Well, we're going to have to say did
22   Audible Magic pay.  Yes.
23    Q    Thank you.  Thank you.
24    A    It did.
25    Q    And would you describe for me how the
```

```
 1    Rightscorp system utilized Audible Magic to do its
 2    file matching, song matching.
 3         A    So, again, we're at that point.  We've got
 4    this blind -- you have got this blind file.  We put
 5    it into the system.  We say, "Tell us what this file
 6    is."
 7              That company's third-party software told us
 8    what the file was and came back with an XML saying
 9    "I think it's this artist and this song."  And
10    that's what we got.
11              So then -- I'll wait.
12         Q    Did it always only return one result or
13    hit?
14         A    No.
15         Q    Sometimes there were more than one?
16         A    Yes.
17         Q    How many were the maximum number that you
18    ever saw?
19         A    Don't know.
20         Q    Can you give me a ballpark?
21         A    Don't know.  I don't remember.
22         Q    More than ten?
23         A    Some of the older songs, maybe.
24         Q    What about newer songs?
25         A    Not as much.
```

1    Q    More than five?

2    A    Yes.  It could have been.

3         But what it would come back with is usually
4    the same song name, maybe alternate spellings or
5    maybe a different performer.

6         The song name never varied much unless
7    there was an alternative spelling or "featuring
8    this" or "featuring that" or something of that
9    nature.

10   **Q    And when you say "different performer," you**
11   **mean perhaps an original artist and then some cover**
12   **of it?**

13   A    Oh, pick a song that everyone's done.  And,
14   you know --

15   Q    "Happy Birthday."

16   A    "Happy Birthday."

17        You know, something that maybe Nirvana's
18   done or ZZ Top has done and then they did with David
19   Bowie or Queen and David Bowie.  Basic.  Same sort
20   of thing.  It's still -- you know, "I've Got to Be
21   Free," but "I've Got to Be Free" with Queen or "I've
22   Got to Be Free" with David Bowie and Queen.

23   **Q    So what would the Rightscorp system do to**
24   **determine which of those hits was the one to use?**

25   A    Well, it would take the closest -- what it

```
 1   would do -- we haven't gotten even to that point
 2   yet.
 3           It would take the one that it thought was
 4   probably the best match and put it in as a name in
 5   that field.
 6           So we have a song name and an artist that
 7   we've identified for this song.  All right?
 8       Q   So it would take what I think you
 9   identified as the blob, the song -- the file that we
10   don't really know what it is --
11       A   Right.
12       Q   -- and the Rightscorp system would then
13   populate that file name with the information it
14   received from Audible Magic?
15       A   Correct.
16       Q   And it picked the one that it thought was
17   the best option?
18       A   Yes.
19       Q   And what criterion did it use to --
20       A   I think --
21           MR. O'BEIRNE:  Hold on.
22   BY MR. BROPHY:
23       Q   What criterion did it use to make that
24   determination?
25           MR. O'BEIRNE:  Objection.  Vague.
```

 1            THE WITNESS:  It's never asked of us.
 2     BY MR. BROPHY:
 3         Q    And that -- just to be clear, that material
 4     is part of the SQL Rightscorp database?
 5         A    It is data in the database.
 6         Q    Thank you.
 7              How far back do the records go in the
 8     version of the SQL database that Rightscorp
 9     currently maintains?
10         A    2011, roughly.
11         Q    And did Rightscorp maintain the changes to
12     that database?
13         A    There is no SQL database.  No SQL version
14     system.
15              THE VIDEOGRAPHER:  Off the record at
16     2:37 p.m.
17              (Recess.)
18              THE VIDEOGRAPHER:  We are back on the
19     record at 3:01 p.m.  This is Disc 4 of the
20     deposition of Gregory Boswell.
21     BY MR. BROPHY:
22         Q    Before the break, we were talking about the
23     various ways in which Rightscorp conducts a matching
24     between the files it finds on the Internet and its
25     clients who copyrighted the works.  And you had

```
 1    introduced a company named Audible Magic.
 2            Do you recall that?
 3       A    Yes.
 4       Q    What do you know about how Audible Magic
 5    works?
 6            MR. O'BEIRNE:  Objection.  Outside the
 7    scope.
 8            You can answer to the extent you know.
 9            THE WITNESS:  Audible Magic somehow
10    acquires the information from some source.  I don't
11    know.
12    BY MR. BROPHY:
13       Q    So when Rightscorp would operate its system
14    and rely on Audible Magic to do this matching, is my
15    understanding correct that the actual file that
16    Rightscorp downloaded is then forwarded to
17    Audible Magic for analysis?
18       A    No.
19       Q    Okay.  Can you -- do you have some
20    understanding of how that part of the process works?
21       A    Yes.
22       Q    And what's that understanding?
23       A    Okay.  So, again, backing up to the
24    process.  For the Audible Magic's method is you
25    download the code -- I lost my tongue during the
```

```
 1   break, guys.
 2           Remember, we go download the sample GUID
 3   onto a computer -- sample GUID from the music
 4   database is downloaded onto a Windows box.  There is
 5   a binary from Audible Magic, executable, and the
 6   code would say -- a piece of code would fire off and
 7   say, "Audible Magic, analyze this."
 8           Now, Audible Magic would not -- it would
 9   not be transmitted back to Audible Magic.  It would
10   digest the song -- whatever the file is, digest it
11   with some form of proprietary methodology and return
12   an answer.
13       Q   So your understanding is that the
14   Audible Magic program that resides on Rightscorp's
15   server performs some proprietary analysis and then
16   compares the results of that analysis to a database
17   that it has offsite.  Is that correct?
18       A   To the best of my knowledge, yes.
19       Q   How long does that process take for
20   Audible Magic to perform an analysis on a single
21   song?
22       A   A second or two.
23       Q   You indicated that at some point in time
24   Rightscorp transitioned to using another resource
25   for conducting that matching.
```

```
 1            What is the name of that other source?
 2      A     AcoustID.
 3      Q     And what is AcoustID?
 4      A     It is an open source identification tool
 5  for matching content.
 6      Q     When did Rightscorp first begin using
 7  AcoustID?
 8      A     I think I spoke to that before.  I don't
 9  recall the exact date.
10      Q     Rough.
11      A     We're probably talking 2013 again, 2014.
12      Q     Was there any period of time during which
13  AcoustID and Audible Magic were being used at the
14  same time?
15      A     Yes.
16      Q     What time frame?
17      A     Again, the 2013, 2014 time frame.
18      Q     So after 2014, was Rightscorp exclusively
19  using AcoustID?
20      A     I believe so.  Somewhere after that time
21  frame, yeah.
22      Q     Give me just one moment.  Apologies.
23            Is there any information that was produced
24  by Rightscorp in this case that would allow us to
25  nail down the specific date on which AcoustID began
```

```
 1   being used?
 2       A    At this moment in time, I do not recall the
 3   exact time it was being used.  I may have spoke to
 4   that before.
 5       Q    But is there anything that Rightscorp has
 6   in its possession or has produced in this case that
 7   would allow Grande to make a determination of when
 8   that switch-over occurred?
 9       A    No.
10       Q    Can you tell me how the AcoustID -- pardon
11   me.  Start over.
12            Can you tell me how Rightscorp uses
13   AcoustID to perform song matching?
14       A    In the same way, almost identically, that
15   we used Audible Magic.
16       Q    Was the same server used to perform the
17   Audible Magic matching also used to perform the
18   AcoustID matching?
19       A    Yes.
20       Q    And was the same source code or program
21   responsible for running that matching?
22       A    No.  Not the same source code.
23       Q    So what's the name of the source code or
24   file responsible for running the AcoustID song
25   matching?
```

```
 1     A     It would be AcoustID, I think.
 2     Q     And when Rightscorp run the -- let me start
 3   over.
 4           Similarly to Audible Magic, did Rightscorp
 5   also have some AcoustID program that ran internally
 6   at Rightscorp?
 7     A     Can you be --
 8           MR. O'BEIRNE:  Objection.  Vague.
 9   BY MR. BROPHY:
10     Q     You described with the Audible Magic that
11   there was a program that resided on Rightscorp's
12   servers that Rightscorp would invoke to conduct this
13   matching.
14           And my question is:  Was there something
15   similar to that with respect to the AcoustID
16   capability?
17     A     Yes.
18           MR. O'BEIRNE:  Oh, I'm sorry.  Objection.
19   Misstates testimony.
20           Go ahead.
21   BY MR. BROPHY:
22     Q     Can you just describe at a very high level
23   how that worked.
24     A     Exactly as AcoustID -- exactly as
25   Audible Magic.  Download a blind sample, tell it to
```

```
 1    process it, sends the data off to the servers.
 2    Servers come back and say, "This is what we think it
 3    is."
 4         Q    And would you get multiple hits from
 5    AcoustID?
 6         A    Yes.
 7         Q    How many?  Or let me --
 8              What was the range?
 9         A    Between --
10              MR. O'BEIRNE:  Objection.  Vague.
11              THE WITNESS:  Between zero and five or six.
12    BY MR. BROPHY:
13         Q    How did Rightscorp go about determining
14    which of the results to go with?
15         A    As with AcoustID, matched what was closest
16    to the file.
17         Q    I'm sorry.  When you say "the file," you
18    mean the alphanumeric name?
19         A    Yes.
20         Q    What type of algorithm did Rightscorp
21    utilize to determine which result was closest to the
22    track information and the track table?
23              MR. O'BEIRNE:  Objection.  Vague and
24    confusing.
25              THE WITNESS:  I think we did a match
```

```
 1   against in an SQL table.
 2   BY MR. BROPHY:
 3       Q    And you say "match against."  Is that a
 4   defined standard --
 5       A    Yes.
 6       Q    -- function within the SQL database
 7   software?
 8       A    Yes.
 9       Q    And I'm sorry.  Once again, that was
10   match --
11       A    Against.
12       Q    Against.
13            And you would pass in to match against both
14   the alphanumeric string returned from AcoustID and
15   the string from the tracks table; is that correct?
16       A    I believe so.
17       Q    And would Rightscorp run that match against
18   for all the results from AcoustID and pick the one
19   that was the highest match?
20            MR. O'BEIRNE:  Objection.  Vague.
21            THE WITNESS:  If there was only one match,
22   which usually there is, we'd only pick the top one,
23   first one.
24   BY MR. BROPHY:
25       Q    If there were four or five, how would that
```

```
 1   work?
 2       A    I would probably pick the first one with
 3   the highest response rate.
 4       Q    And so that match-against function from the
 5   SQL system, would it return some kind of
 6   percentage-based match?
 7       A    No.  Just one for the first one that
 8   returned.
 9       Q    I'm sorry.  When Rightscorp would run the
10   match-against function, would it pass in for a
11   single run of that match against all of the results
12   from AcoustID in addition to the track database
13   names or one at a time?
14            MR. O'BEIRNE:  Objection.  Vague and
15   compound.
16            THE WITNESS:  Now you are so far down in
17   the weeds that I couldn't tell you off my memory.
18   BY MR. BROPHY:
19       Q    Is there information produced in this case
20   from which Grande can understand how that
21   functionality was operating in 2014?
22       A    Should be.
23       Q    And was Rightscorp able to produce in this
24   case the 2014 version of the AcoustID code?
25       A    I believe so.
```

```
 1          Will you agree with me that the AcoustID
 2   system could and did return hits, multiple hits,
 3   where each one was potentially sung by a different
 4   artist?
 5       A    Correct.
 6            MR. O'BEIRNE:  I'm sorry.  Objection.
 7   Form.
 8            THE WITNESS:  Correct.
 9   BY MR. BROPHY:
10       Q    And Rightscorp would -- the Rightscorp
11   system would determine which of those it considered
12   to be the best match; is that correct?
13            MR. O'BEIRNE:  Objection.  Vague.
14            THE WITNESS:  Which would be the best match
15   to the torrent file.
16   BY MR. BROPHY:
17       Q    And then what would the Rightscorp system
18   do next?
19       A    For example, if it was a Nirvana torrent
20   and it was Nirvana songs and we matched and it came
21   back with a hit for a Nirvana song, we would put
22   that name and song -- that Nirvana group artist and
23   that song into the tracks -- the track files field
24   that correlated to that torrent hash, that song
25   entry, and that binary key.
```

```
 1   has no bit field.  This process compares it, says,
 2   "Eh.  Nothing is generated."
 3           69 -- 169 -- 192.168.2.1 comes through, and
 4   it has a full -- bit full payload for that torrent
 5   hash.  And it goes through and compares and
 6   populates.
 7           10.0.0.1 comes through, and it's got these
 8   ten here, these seven here, these four here.  It
 9   compares.  Where it gets a match, it populates;
10   where it doesn't get a match, it doesn't.
11      Q    In that last example when you say "it gets
12   a match," is it matching the portions of the bit
13   field reported by the BitTorrent client as being
14   available with the portions of the bit field that
15   relate to songs that Rightscorp is attempting to
16   find?
17      A    Yes.
18      Q    And that exercise that you just described
19   results in detections; is that correct?
20      A    Correct.
21      Q    And those detections are saved where?
22      A    They are saved originally in the expanded
23   TI file.  Then they are moved to temporary holding.
24      Q    Do they go anywhere after that?
25      A    Yes, they do.
```

```
 1   file name and not mention the rest of it?
 2       A    All right.  I'm a bit confused about your
 3   question.
 4       Q    Sure.
 5            So I asked you what the name of the song
 6   is, the song name associated with the --
 7       A    Right.  My --
 8       Q    Let me just finish.
 9            -- the song name associated with the
10   copyright that's at issue in this notice.
11       A    "Planetary (GO!) Vazquez-Gorman Remix."
12       Q    Okay.  And if you look at the first page of
13   Exhibit 5, there's a file name there.
14            Why did you focus on the "Planetary (GO!)
15   Vazquez-Gorman Remix" section and ignore the
16   remainder?
17       A    So remember when we were talking about the
18   identification tools?  This is how it was
19   identified, as "Planetary (GO!) Vazquez-Gorman
20   Remix."
21            The file name is "demo2012.01.16 - The Kids
22   From Yesterday06, Planetary (GO!)."  Boom.
23       Q    If an ISP wanted to, how would it go about
24   determining whether this is a legitimate notice
25   relating to an instance of actual infringement?
```

```
 1              MR. O'BEIRNE:  Hold on.
 2              Objection.  Vague.
 3              THE WITNESS:  How would they decide to do
 4    that?  If an ISP wanted to contact us and work with
 5    us and get some deeper information, I'm sure it can
 6    be done.
 7    BY MR. BROPHY:
 8        Q    How?
 9        A    By contacting us and saying "can you
10    provide some information."  But then now I'm passing
11    my scope of business.  I'm technical.
12        Q    So are you aware of any way other than
13    approaching Rightscorp that an ISP could verify the
14    accuracy of the infringement notice identified as
15    Exhibit 5?
16              MR. O'BEIRNE:  Objection.  Scope.
17              THE WITNESS:  Right now?  No.
18    BY MR. BROPHY:
19        Q    How would an ISP go about identifying the
20    registration number for the copyright that is
21    alleged to have been infringed by Exhibit 5?
22              MR. O'BEIRNE:  Objection.  Outside the
23    scope.
24              THE WITNESS:  Definitely outside my scope.
25    BY MR. BROPHY:
```

```
 1       Q    Are you aware of any way?
 2            MR. O'BEIRNE:  Same objection.
 3            THE WITNESS:  Outside my scope.
 4   BY MR. BROPHY:
 5       Q    Is that a "no"?
 6            MR. O'BEIRNE:  Same objection.
 7            THE WITNESS:  I'm not a legal DMCA lawyer.
 8            I'm not a copyrights lawyer.
 9   BY MR. BROPHY:
10       Q    So I'm just asking if you have any personal
11   knowledge of a way an ISP could identify the
12   specific copyright or registration associated with
13   this notice of infringement.
14            MR. O'BEIRNE:  Objection.  Outside the
15   scope.
16            THE WITNESS:  Well, do I have any personal
17   knowledge that hasn't been tried or ever used or
18   even thought of?  No, I have never tried to
19   personally do it myself.  So I don't have any
20   personal knowledge.
21   BY MR. BROPHY:
22       Q    I have maybe just two more quick lines of
23   questioning, and then I'll be wrapping up.
24       A    All right.
25            MR. O'BEIRNE:  I think we're under on time,
```