IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

UMG RECORDINGS, INC., *et al.*,

    Plaintiffs,

vs.

GRANDE COMMUNICATIONS NETWORKS LLC,

    Defendant.

§
§
§
§
§   Civil Action No. 1:17-cv-00365-LY
§
§
§
§
§
§

**REPLY IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR
SUMMARY JUDGMENT AS TO LIABILITY**

# INTRODUCTION

Grande's reply/opposition to Plaintiffs' opposition/cross-motion for summary judgment does not seriously dispute the evidence showing that, for years, (1) many thousands of Grande's subscribers illegally copied copyrighted sound recordings (including those listed in Exhibit A to the Complaint) ("Plaintiffs' Copyrighted Recordings"); (2) Grande knew that its subscribers were infringing, that its subscribers included thousands of repeat infringers, and specifically that Plaintiffs' Copyrighted Recordings were among the infringed works; yet (3) Grande chose not to terminate even a single repeat infringer's account and continued to provide them with the internet service they used to commit the infringement (earning substantial profits in the process). These facts establish Grande's liability for contributory infringement. Lacking an answer for this overwhelming evidence, Grande resorts to mischaracterizing it, quarreling about its admissibility, and misstating the law under which it is analyzed. None of Grande's makeweight arguments supports its summary judgment motion, or preclude Plaintiffs' entitlement to summary judgment.

# ARGUMENT

## I. PLAINTIFFS HAVE OVERWHELMING EVIDENCE THAT GRANDE SUBSCRIBERS INFRINGED PLAINTIFFS' COPYRIGHTED RECORDINGS, NONE OF WHICH GRANDE REBUTS.

### A. The Rightscorp Notices And Downloads Are Indisputable Evidence Of Direct Infringement.

Plaintiffs have presented substantial and conclusive evidence of direct infringement. The Rightscorp data show that Rightscorp detected (1) hundreds of thousands of instances of Grande's subscribers offering Plaintiffs' Copyrighted Recordings for distribution, and (2) thousands of instances of subscribers actually distributing those works to Rightscorp. Ex. I, Boswell Decl. ¶¶ 6-10, 12; Ex. H, Frederiksen-Cross Report ¶¶ 56-58; Ex. K, Bardwell Report, p. 9.

Grande's attempts to dispute this evidence all fail. First, Grande argues that the Rightscorp notices are insufficient evidence of direct infringement by Grande's subscribers. But Plaintiffs, of

course, are relying not only on the Rightscorp notices to prove direct infringement, but also on the entire infringing audio files that Grande's subscribers shared with Rightscorp. Pls.' Opp./Cross-Mot. at 14-16. Regardless, Grande's attack on the notices ignores well-settled law. Under the Copyright Act, anyone who violates a copyright owner's exclusive right to distribute copies of a copyrighted work is an infringer. 17 U.S.C. §§ 106(3), 501(a). The case law in this Circuit provides that offering to distribute sound recordings through online file-sharing constitutes infringement under Section 106(3):

> Courts have concluded that availing unauthorized copies of sound recordings for download using an online file-sharing system (such as a peer-to-peer network, as is the case here) constitutes an offer to distribute those works, thereby violating a copyright owner's exclusive right to distribution. … Stated differently, making copyrighted works available for download via a peer-to-peer network contemplates "further distribution," and thus constitutes a violation of the copyright owner's exclusive "distribution" right under 17 U.S.C. § 106(3).

*Atl. Recording Corp. v. Anderson*, No. CIV-A-H-06-3578, 2008 WL 2316551, at *7 (S.D. Tex. Mar. 12, 2008) (citing *A&M Records, Inc. v. Napster, Inc.,* 239 F.2d 1004, 1014 (9th Cir. 2001) (explaining that individuals who download unauthorized music files and/or who avail such files for download by others commit copyright infringement)).[1]

Every district court in this circuit to have addressed the question has found that offering to distribute recordings through online file-sharing is actionable. *See Maverick Recording Co. v. Harper*, No. 5:07-cv-026-XR, 2008 WL 11411855, at *3 (W.D. Tex. Sept. 16, 2008) (granting

---

[1] "[T]he Supreme Court has equated the term [distribution] with 'publication' under the Copyright Act." *Anderson*, 2008 WL 2316551, at *7 (citing *Harper & Row Publishers, Inc. v. Nation Enters.,* 477 U.S. 539, 552 (1985)). "'Publication' is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication." 17 U.S.C. § 101. Grande claims that Plaintiffs do not assert violations of Plaintiffs' reproduction rights under section 106(1), but that is not correct: Plaintiffs' suit targets both uploading (reproduction) and downloading (distribution) of copyrighted recordings. Pls.' Opp./Cross-Mot. at 10.

summary judgment), *aff'd in part and rev'd in part*, 598 F.3d 193 (5th Cir. 2010);[2] *Atl. Recording Corp.*, 2008 WL 2316551, at *7 (granting summary judgment); *Warner Bros. Records v. Payne*, No. W-06-CA-051, 2006 WL 2844415 (W.D. Tex. July 17, 2006); *Arista Records LLC v. Greubel*, 453 F. Supp. 2d 961, 971 (N.D. Tex. 2006).[3]

In its reply/opposition, Grande cites a single, ten-year-old, out-of-circuit district court decision, *Atlantic Recording Corp. v. Howell*, 554 F. Supp. 2d 976, 986 (D. Ariz. 2008), which held that "[i]f the owner of the shared folder simply provides a member of the public with ***access*** to the work and the ***means*** to make an unauthorized copy, the owner is not liable as a primary infringer of the distribution right, but rather is potentially liable as a secondary infringer of the reproduction right." Def.'s Reply/Opp. at 8.[4] But *Howell* is directly at odds with the Fifth Circuit's decision in *BWP Media USA, Inc. v. T & S Software Assocs., Inc.*, where the court of appeals held that ***direct infringement liability <u>can</u> attach*** where the defendant "provided ***access*** and the ***means*** to transmit the infringing material." 852 F.3d 436, 439 (5th Cir.), *cert. denied*, 138 S. Ct. 236 (2017) (analyzing *American Broadcast. Co., Inc. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014)).[5]

---

[2] Grande points out that the Fifth Circuit in *Maverick* declined to rule on this question, but the Fifth Circuit's decision last year in *BWP* lays to rest any question that providing access and the means for transmission is direct infringement.

[3] In any event, even if the notices' detection of subscribers making songs available through BitTorrent were not direct evidence of infringement, it indisputably is powerful circumstantial evidence of infringement, as the court in *Cox* observed and as Grande fails to rebut. *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 671-72 (E.D. Va. 2015), *aff'd in part, rev'd in part on other grounds,* 881 F.3d 293 (4th Cir. 2018). Furthermore, the evidence shows that Grande never questioned the reliability of the Rightscorp notices, or identified a single inaccurate notice. To the contrary, Grande acted on the Rightscorp notices. Grande forwarded Rightscorp notices to Grande subscribers identified as infringers. Pls.' Opp./Cross-Mot., Stmt. of Undisp. Mat. Fact ¶¶ 12-14. Then, after this lawsuit was filed, Grande terminated a small number of repeat infringers ***for whom it received Rightscorp notices***, *id.* ¶¶ 17-18, because Grande determined the customers were repeat infringers, *id.* ¶¶ 19-20. This conduct evidences Grande's understanding that the Rightscorp notices identified actual infringement by subscribers.

[4] Emphasis added throughout unless otherwise indicated.

[5] Grande recognizes that *BWP* defeats its position, so it resorts to arguing that the BitTorrent protocol, not the subscriber using BitTorrent, is what provides access and the means to transmit

Second, as noted above, Plaintiffs have also produced the complete audio files of the infringed works (in addition to the notices). Even Grande cannot ignore that the files are evidence of infringement. Instead, Grande resorts to trying to poke holes in the evidence's reliability and admissibility. But Grande's arguments are insufficient to rebut Plaintiffs' evidence. Grande first claims that "Plaintiffs failed to produce any evidence in discovery regarding the provenance of these files." Def.'s Reply/Opp. at 10. That is not true, as Rightscorp's Mr. Boswell—who created the Rightscorp technology and has first-hand knowledge of its operation—testified in his declaration that Rightscorp obtained each download from a Grande subscriber between September 25, 2014 and July 31, 2016. Ex. I, Boswell Decl. ¶ 14; *see also id.* ¶ 8.[6]

Grande then insists that the Court should strike Mr. Boswell's declaration because it is not the "best evidence" of the recordings' provenance. Def.'s Reply/Opp. at 13. But Federal Rule of Evidence 1002 only applies to proving the content of a recording, not its origin or location. *See United States v. Smith*, 804 F.3d 724, 730 (5th Cir. 2015) ("It is well-established that Rule 1002 does not apply in situations where the mere existence of an independent factual condition is sought to be proved…."). In any event, the provenance has been provided: the filenames of the recordings correspond to the Grande subscribers from whom they were downloaded, as identified in the Rightscorp notices sent to each such subscriber. Ex. II, Second Declaration of Gregory Boswell

---

the sound recordings. Def.'s Reply/Opp. at 10. This is sheer sophistry. Subscribers install BitTorrent on their computer, allow it to convert their .mp3 audio files into .torrent files, communicate with other BitTorrent users regarding the availability of the infringing recordings, and then distribute the torrent files of the recordings. Ex. H, Frederiksen-Cross Report ¶¶ 30-42. The subscribers themselves are engaging in the direct infringement.

[6] Grande also claims that the downloads cannot be considered as evidence because Plaintiffs did not file them with the Court. That is incorrect. Plaintiffs introduced a summary exhibit detailing the downloads. Ex. L., Landis Decl. Exhibit 1. That summary exhibit is admissible under Federal Rule of Evidence 1006 ("The contents of voluminous writings, ***recordings***, or photographs which cannot conveniently be examined in court may be presented in the form of a ***chart***, summary, or calculation."). At the Court's request, Plaintiffs will submit a hard drive or disk containing the download files themselves.

4

¶¶ 7-11. Plaintiffs have produced all of the downloads and all of the notices (which collectively are the best evidence), and thus the information "matching" downloaded files to Grande subscribers has been produced in discovery, in the notices and audio files themselves.

Grande next claims that Plaintiffs assert an "entirely new theory of liability" by relying on the Rightscorp download evidence, arguing that the Court should "preclude Plaintiffs from relying on this new theory and related evidence." Def.'s Reply/Opp. at 15-16. This argument is not credible. Grande admits it "was aware of the music files," yet somehow claims that it "was *not* aware of Plaintiffs' intention to rely on these files, let alone as evidence of a new theory of liability, because Plaintiffs never indicated their intention to do so, as demonstrated by their Complaint, their discovery responses, and their expert reports." *Id.* at 15 fn.21 (emphasis in original). There is nothing new about Plaintiffs' evidence or theories; Grande's assertions are demonstrably false:

- Plaintiffs referenced the Rightscorp systems' downloads in their Complaint, *see* Dkt. 1 ¶ 43 ("***Rightscorp's system also has the capability to acquire entire files from the infringing host computers. Using this system,*** Rightscorp has notified ISPs, including Grande, of specific instances of first-time and repeat copyright infringement committed by their account holders and has requested that the ISPs, ***including Grande***, notify their account holders of these infringements.");

- The Court discussed this feature in its ruling on the motions to dismiss, *see* Dkt. 72 at 11 fn.3 ("[T]he Rightscorp system, in addition to identifying files available for download, also 'will sometimes download the whole file to show proof beyond any doubt that the actual entire file is being shared by that person. And we have those for all 1500, as we plead that Exhibit A represents a sample of the copyrighted sound recordings actually downloaded, actually copied, actually distributed.'");

- Plaintiffs produced the Rightscorp downloaded files, and identified them to Grande in writing, *see* Ex. FF, UMG Pls.' Resp. to Grande Interrog. No. 20 and Ex. GG, May 9-10, 2018 Correspondence;

- Grande's own expert described and examined the downloaded files, *see* Expert Report of Jonathan Kemmerer [Dkt. 144-6] ¶ 51 & fn. 61; and

- Plaintiffs' expert, Barbara Frederiksen-Cross, discussed the downloads extensively in her expert report, *see* Ex. H, Frederiksen-Cross Report ¶¶ 46(5), 60-64.

### B. Plaintiffs Have Established That The Files Rightscorp Downloaded Are Identical To Plaintiffs' Copyrighted Recordings.

Grande contends that Plaintiffs have failed to produce evidence that allows for a comparison of the copyrighted works and the allegedly infringing works. Def.'s Reply/Opp. at 2-3. This argument fails on the law and on the facts. The case law upon which Grande relies (such as, for example, *Positive Black Talk Inc.*) involves claims that one artist copied another artist's copyrighted work; the question for the fact-finder in those cases is whether the challenged work is similar enough to the copyrighted work to conclude that the defendant appropriated it. *See, e.g., Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 364 (9th Cir. 2004). In such cases, answering that question often involves side-by-side comparisons of the two works, expert testimony as to the similar features of the songs, and evidence about whether the defendant had access to the plaintiff's work or whether the defendant independently created its work, among other factors. *See id.* at 375-80.

But the instant case is a different kind of copyright case; it is not a "substantial similarity" case. Plaintiffs of course do not contend that Grande or its subscribers "copied" their recordings by appropriating elements of them to create their own similar works. Unlike the aforementioned type of cases, the "copying" in the instant case refers to the creation of identical duplicates of Plaintiffs' Copyrighted Recordings, for which Grande is contributorily liable.

Rather than ask the fact-finder to listen to all 1,583 of Plaintiffs' original works and all 1,583 works downloaded from Grande's subscribers, to assess whether Grande's subscribers in fact made copies of Plaintiffs' works, Plaintiffs did in this case what they routinely do in cases involving massive online copyright infringement: they used Audible Magic to perform an automated comparison verifying that the audio files are copies of the works in suit.

Audible Magic's database contains Plaintiffs' "original" Copyrighted Recordings, among many others: "'Audible Magic's Music Database is one of the most complete content identification registries in the world, containing recognition signatures for tens of millions of titles that are continually submitted by music studios and content owners world-wide.'" *Capitol Records, LLC v. Escape Media Grp., Inc.*, No. 12-CV-6646 AJN, 2015 WL 1402049, at *23 (S.D.N.Y. Mar. 25, 2015). Audible Magic compares original copyrighted works to whatever works are entered into its system: it "scans the perceptual characteristics of a sound recording" and "compares the characteristics of the sound recording to the content that has been registered in Audible Magic's database (what Audible Magic calls its 'Global Content Registry')" to determine if the "sound recording contains copyrighted content that has been registered with Audible Magic." Ex. L, Landis Decl. ¶ 8. In this case, Plaintiffs used this process to compare Plaintiffs' original copyrighted sound recordings (which are registered in Audible Magic's database) with the audio files that Grande's subscribers unlawfully distributed, and Audible Magic determined that 19,305 of those files were copies of Plaintiffs' sound recordings. *Id.* ¶¶ 10-12. Plaintiffs produced the data outputs reflecting this comparison. *Id.* ¶ 12.[7] Thus, Grande has the evidence it needs to assess whether the illegally shared recordings are in fact copies of Plaintiffs' original works.

Plaintiffs' use of Audible Magic to confirm that the audio files in question correspond to the works in suit is a well-established practice in large-scale copyright infringement cases such as this one. *See Escape Media Grp., Inc.*, 2015 WL 1402049, at *23 (collecting cases); *see also UMG Recording, Inc. v. Escape Media Grp., Inc.*, No. 11 Civ. 8407(TPG), 2014 WL 5089743, at *20

---

[7] Grande's assertion that Plaintiffs did not identify this information in discovery is false. Plaintiffs produced Audible Magic files and identified them in writing. Ex. GG, May 9-10, 2018 Correspondence. And confirming that Grande understood the relevance of this information, Grande actually served a document subpoena on Audible Magic on May 4, 2018, *see* Ex. JJ, May 4, 2018 Rule 45 Subpoena to Audible Magic, and subpoenaed RIAA for related documents and testimony as well, *see* Ex. KK, Apr. 6, 2018 Rule 45 Subpoena to RIAA.

(S.D.N.Y. Sept. 29, 2014) (accepting as proof of infringement the use of Audible Magic's "industry recognized audio-fingerprinting technology to confirm that copies of certain files uploaded by defendants and their employees corresponded to plaintiffs' copyrighted sound recordings."); *id.* at \*17 (noting that "Audible Magic is a vendor that has been repeatedly used in entertainment copyright cases and thus, its methods are well known to those within the entertainment industry.").[8] Thus, unlike in *King v. Ames*, 79 F.3d 370, 376 (5th Cir. 1999), on which Grande relies, where the plaintiff submitted no evidence that the infringing content matched the copyrighted content, Plaintiffs have produced extensive evidence of the identity of copied files to the original recordings, through a technically sound method multiple courts have approved.[9]

Grande claims that the results of the Audible Magic analysis somehow impeach the Rightscorp system. Def.'s Reply/Opp. at 5 & fn.6. That assertion is wrong. There is no legitimate dispute that Rightscorp obtained these full copies from Grande subscribers based on Rightscorp's system's assessment that they matched copyrighted works. Ex. I, Boswell Decl. ¶¶ 8, 13-14; Ex.

---

[8] *See also Arista Records LLC v. Lime Wire LLC,* 06 Civ. 05936(KMW), 2010 WL 10031251, at \*6 (S.D.N.Y. Aug. 9, 2010) (defining "Fingerprinting Technology," which is "available from commercial vendors such as Audible Magic," as "the most effective available means of content-recognition filtering based on recognizing the unique content of an underlying audio-visual work and detecting and preventing copying of that content"); *Arista Records LLC v. Myxer Inc.,* 08 Civ 03935(GAF)(JCX), 2011 WL 11660773, at \*5 (C.D. Cal. Apr. 1, 2011) ("By running a sound file through Audible Magic's Copysense software ..., Myxer can obtain high-level descriptive information, 'metadata,' about the particular sound recording. This information includes whether the sound recording is owned by a particular record company") (internal citations omitted); *Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.,* 518 F.Supp.2d 1197, 1205–06 (C.D. Cal. 2007) ("... Audible Magic has a database of approximately 6 million acoustical fingerprints of musical sound recordings.... Companies such as Audible Magic claim to have a database of file hashes that are known to contain copyrighted content.").

[9] Grande mischaracterizes the district court's decision in *UMG Recordings, Inc. v. Veoh Networks Inc.* There, the court was not addressing the admissibility and reliability of Audible Magic in the context of litigation, but rather an ISP's ability to analyze and rely on its operation in the ordinary course of business, where it lacked the mechanisms of discovery to evaluate Audible Magic's system. 665 F. Supp. 2d 1099, 1117-18 (C.D. Cal. 2009). In any event, *Veoh* is an outlier and should not be credited against the many other, better-reasoned and more recent cases endorsing Audible Magic.

H, Frederiksen-Cross Report ¶¶ 46, 60-62. The RIAA has confirmed, using Audible Magic, that 19,305 of the 59,000 audio files Rightscorp downloaded and identified as Plaintiffs' Copyrighted Recordings are exactly what Rightscorp identified them as: the works in suit. Ex. L, Landis Decl. ¶¶ 12-13 & Exhibit 1. The other files that Rightscorp downloaded are simply files of other recordings that Plaintiffs are not suing on (for example, works Plaintiffs do not own, or pre-1972 works for which there is no federal claim).

The testimony and documents concerning the RIAA's use of the Audible Magic tool are competent and admissible evidence. Mr. Landis personally used the tool to evaluate the downloaded files Rightscorp obtained from Grande subscribers and to verify that those files are copies of Plaintiffs' recordings, something he does routinely as part of his job responsibilities. *See generally id*. Because Mr. Landis's "knowledge and analysis were derived from duties he [has] held at [the RIAA], his opinions [a]re admissible as testimony based upon personal knowledge and experience gained while employed by [the RIAA]." *United States v. Valencia*, 600 F.3d 389, 416 (5th Cir. 2010) (lay witness with personal knowledge of databases was permitted to provide testimony about analyses using those databases).

Mr. Landis's declaration further confirms that the outputs from the Audible Magic database that he generated are admissible as records of regularly conducted activity. *See* Fed. R. Evid. 803(6); *see also Valencia*, 600 F.3d at 416; *U-Haul Intern., Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1044-45 (9th Cir. 2009) (printouts from computer database were admissible as business records, even where sponsoring witness had not himself personally input the data into the database, where the person had knowledge of its content and the database owners' practices for compiling the data); *Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 777 (7th Cir. 2006) (holding that the qualified witness "need only be familiar with the company's recordkeeping practices"); *Weinstein's Federal Evidence* § 803.08[4] (same).

Finally, Plaintiffs are not required to introduce into evidence the entire Audible Magic database. The summaries of that database's outputs attached to Mr. Landis' declaration are proper evidence under Federal Rule of Evidence 1006. *Valencia*, 600 F.3d at 417 (holding that "the databases [did not need to] be admitted into evidence before [the witness] could summarize their contents, as this would contravene the plain language and purposes of Rule 1006").[10]

## II. GRANDE KNOWINGLY FACILITATED ITS SUBSCRIBERS' DIRECT INFRINGEMENT, AND THUS IS LIABLE FOR CONTRIBUTORY INFRINGEMENT.

Grande fails to rebut that it (1) knew its subscribers were infringing Plaintiffs' Copyrighted Recordings, and (2) affirmatively continued to provide known infringers with the internet service that was indispensable for their infringement. Grande therefore is liable for secondary copyright infringement under well-settled law; none of Grande's contrary arguments has any merit.

### A. Grande Does Not Rebut The Record Evidence That It Had Knowledge Of Its Users' Infringement.

Whether analyzed as actual knowledge/willful blindness, or as constructive knowledge,[11] Grande leaves unrebutted the extensive evidence establishing this element of liability:

- Grande received more than 1.35 million Rightscorp notices detailing demonstrable infringement by its subscribers, including 344,450 notices relating to Plaintiffs' Copyrighted Recordings, SUMF ¶¶ 3-6;

- Grande received tens of thousands of notices from other companies as well, *id* ¶ 11;

- Grande's internal documents—like an email observing that customers were "racking up notices"—correspondence with subscribers, and "Excessive Violations" reports all demonstrate the company's awareness of subscribers' infringement, *id.* ¶¶ 9-12;

- Grande personnel have acknowledged that the company learned of infringement through notices from Rightscorp (and other similar companies), *id.* ¶ 9; and

---

[10] The Audible Magic and AcoustID databases are publicly accessible, as reflected by the fact that one of Grande's experts purported to access the AcoustID database and used it to verify a recording he had purchased from iTunes.

[11] As explained in their Opposition and Cross-Motion, Plaintiffs respectfully submit that either actual knowledge (including willful blindness), or constructive knowledge, satisfies the knowledge element. Pls.' Opp./Cross-Mot. at 18-23 (citing cases).

- As discussed above (*see supra* fn. 3), Grande never identified a single inaccurate Rightscorp notice, and in fact acted on the notices, before and after this lawsuit.

This detailed notice of specific infringing material being shared on its system indisputably establishes Grande's knowledge. *Cox Commc'ns, Inc.*, 149 F. Supp. 3d at 671-72 ("***Despite Cox's arguments to the contrary, DMCA-compliant notices are evidence of knowledge.***"); *see also Napster, Inc.*, 239 F.3d at 1020 fn.5 (affirming district court's determination of actual knowledge based on notices Napster received from the RIAA alerting Napster to numerous copyrighted works available for download over Napster's system).

Because it has no answer to this evidence, Grande reprises its failed legal arguments. Grande repeats its claim that because the Rightscorp notices only identify subscribers offering to distribute songs for download, they do not notify Grande of actual infringement. Def.'s Reply/Opp. at 19. But offering to distribute recordings through an online file-sharing system is infringement, *see supra*, and the notices provided knowledge to Grande, just as the same type of Rightscorp notices provided knowledge of subscribers' infringement to Cox. In any event, Grande's argument ignores the audio files that Grande subscribers distributed to Rightscorp. These downloaded files evidence the infringing activity reflected in the notices. Ex. I, Boswell Decl. ¶ 8 ("Rightscorp's system also returns to users and obtains full copies of files for which Rightscorp has previously generated a notice to the user's ISP."); Ex. H, Frederiksen-Cross Report ¶¶ 60-64; Ex. II, 2d Boswell Decl. ¶¶ 4, 6-11. Thus, contrary to Grande's claim that the downloaded files "do not bear in any way on the issue of knowledge[,]" Def.'s Reply/Opp. at 20 fn.24, the downloads show Rightscorp notified Grande of specific instances of infringement.

Grande then mischaracterizes the Fourth Circuit's decision in *Cox,* claiming that "*Cox* was reversed by the appellate court on this specific issue" of whether "Rightscorp's notices could confer knowledge of infringement." Def.'s Reply/Opp. at 20. That is simply untrue. The Fourth

Circuit reversed because it concluded the jury charge erroneously permitted the jury to find infringement based on constructive knowledge, instead of actual knowledge or willful blindness. *Cox Commc'ns, Inc.*, 881 F.3d at 311-12. But the Fourth Circuit held that Rightscorp's notices constituted "powerful evidence" of specific instances of infringement: "BMG offered powerful evidence from which a reasonable jury could find that Cox willfully blinded itself ***to specific instances of infringement by its subscribers, such as evidence that Cox prevented itself from receiving any of the more than one million notices Rightscorp sent on BMG's behalf.***" *Id*.

Grande next argues that Plaintiffs supposedly are "using Grande's efforts to comply with the [DMCA] safe harbor as a basis for establishing the underlying liability for secondary infringement." Def.'s Reply/Opp. at 22 (citing 17 U.S.C. § 512(l)). Not so. Plaintiffs simply contend that "DMCA-compliant notices"—the Rightscorp notices—"are evidence of knowledge" as *Cox* found them to be, 149 F. Supp. 3d at 671-72, and that Grande's acting upon those notices in the pre-October 2010 and post-June 2017 time frames demonstrates that Grande knew the notices reflected infringement.[12]

In sum, the evidence is undisputed that Grande received the Rightscorp notices, understood that they represented specific instances of infringement by Grande subscribers of identified sound recordings (including Plaintiffs' Copyrighted Recordings), discussed the fact of this infringement in internal emails, kept track of the infringing customers on "Excessive Violations" reports, yet never did anything to investigate, let alone halt, the infringing conduct, but instead continued to provide the offenders with the very service they needed and used to infringe. That constitutes knowledge sufficient for contributory liability under any standard.

---

[12] Grande suggests that this presents ISPs with "perverse incentives" to "resist[] implementation of a safe harbor policy[.]" Def.'s Reply/Opp. at 22. But the opposite is true: if ISPs act on notices by terminating repeat infringers, they may satisfy the DMCA safe harbor and thus avoid liability.

**B. Grande's Rehash Of Its *Grokster* Argument Is Unavailing.**

Grande fares no better in trying to resuscitate its argument that *Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.,* 545 U.S. 913 (2005) shields it from liability. As Plaintiffs explained in their opposition/cross-motion, *Grokster* did not rewrite secondary infringement law, and numerous courts have reaffirmed that defendants engaging in conduct like Grande's are liable for contributory infringement. Pls.' Opp./Cross-Mot. at 24-26. Plaintiffs will not belabor these points.

Grande begins its latest *Grokster* argument by asserting that "there is no evidence of affirmative, purposeful conduct by Grande in furtherance of any purported infringement. Rather, Plaintiffs' claims are based exclusively on Grande's alleged *failure to act*—to stop alleged infringement from taking place." Def.'s Reply/Opp. at 16; *see also id.* at 17. That confuses the issues. Grande's failure to stop infringement (by terminating repeat infringing customers) is the reason it cannot qualify for the DMCA safe harbor. The basis for Grande's contributory liability, however, is that it provides internet service to specific subscribers it knows are using the service to infringe, thereby facilitating their infringement. That is certainly "purposeful, affirmative conduct by Grande." *Id.*; *see also Grokster*, 545 U.S. at 930.

Grande then argues that "Plaintiffs cannot prove contributory infringement … because Grande's Internet service is plainly capable of substantial noninfringing uses." Def.'s Reply/Opp. at 18. Cox advanced the same claim, but the Fourth Circuit held that "***this argument is meritless***" and observed that "providing a product with 'substantial non-infringing uses' *can* constitute a material contribution to copyright infringement[,]" 881 F.3d at 305-06 (second emphasis in original). The Fourth Circuit cited *Perfect 10, Inc. v. Amazon.com, Inc.*, where the Ninth Circuit held that "Google's image search engine 'substantially assists websites to distribute their infringing copies' of copyrighted images, and thus constitutes a material contribution, even though 'Google's assistance is available to all websites, not just infringing ones.'" 508 F.3d 1146, 1171 fn.11 (9th

13

Cir. 2007). *Cox* and *Amazon.com* both concluded that a defendant can be liable for contributory infringement, even in cases of products capable of substantial noninfringing uses, because a "company that knows that its action … is substantially certain to result in infringement" can be presumed to have acted purposefully. *Cox Commc'ns, Inc.*, 881 F.3d at 308.

Trying to avoid these authorities, Grande points to the Ninth Circuit's decision in *Cobbler Nevada, LLC v. Gonzales*, 901 F.3d 1142 (9th Cir. 2018), claiming that it somehow "repudiated" *Cox* and *Amazon.com*. Def.'s Reply/Opp. at 18 fn.23. But *Cobbler Nevada* does nothing of the sort. It actually cites *Amazon.com* approvingly as articulating the standards for contributory infringement. 901 F.3d at 1147-48 (citing *Amazon.com*, 508 F.3d at 1170). Significantly, *Cobbler Nevada* did not concern whether an ISP could be held liable for contributory infringement. Rather, the defendant was an individual who owned an adult day care home, and whose liability was "premised on a bare allegation that [he] failed to police his internet service." The Ninth Circuit recognized that the defendant's "position—a subscriber to internet service—does not fit cleanly within our typical contributory liability framework, which often involves consumer-facing internet platforms." *Id.* at 1148. The court concluded that the law did not "create[] an affirmative duty for ***private internet subscribers*** to actively monitor their internet service for infringement" because "[i]mposing such a duty would put at risk any purchaser of internet service who shares access with a family member or roommate, or who is not technologically savvy enough to secure the connection to block access by a frugal neighbor." *Id.* at 1149.

The holding in *Cobbler Nevada* has no bearing on whether Grande can be held liable for contributory infringement. This case is not about whether a private internet subscriber, who is "not technologically savvy enough" to block his family and neighbors' use of his service, has a duty to monitor their use. This case is about whether a sophisticated internet service provider, which knows that specific subscribers are engaging in massive amounts of illegal file-sharing, and

14

which has the means to block that infringement, can be held liable for contributory infringement. The law clearly states that the answer is yes, and Grande cannot point to any case with similar facts in which a court applied *Grokster* to hold otherwise.

### III. GRANDE FAILS TO DISPUTE PLAINTIFFS' OWNERSHIP OF THE COPYRIGHTED RECORDINGS.

Plaintiffs have submitted declarations and documents that establish their ownership and control of the Copyrighted Recordings. Def.'s Reply/Opp. at 25. Grande disputes none of it. Instead, Grande insists that the Court should disregard the documents Plaintiffs produced that are the target of Grande's motion to exclude. *Id.* For the reasons set forth in Plaintiffs' opposition to that motion [Dkt. 179], there is no good basis to exclude that evidence.[13] The Court should grant Plaintiffs summary judgment that they own/control the Copyrighted Recordings.

### IV. GRANDE FAILS TO REBUT THAT THERE ARE TRIABLE ISSUES ON GRANDE'S WILLFULNESS, THE DISCOVERY RULE, AND PLAINTIFFS' DAMAGES.

First, Plaintiffs' opposition/cross-motion cites significant evidence of Grande's willfulness. Pls.' Opp./Cross-Mot. at 26-27. Grande disputes the weight of the willfulness evidence, but that is a question for the jury. Section 504 places "no limits [on] what may be considered willful infringement," and courts have interpreted willfulness expansively. *See, e.g., Zomba Enters., Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 584 (6th Cir. 2007). The jury in *Cox*, presented with similar facts (e.g., receipt of huge numbers of Rightscorp notices, inculpating internal emails, and huge profits from repeat infringers), found the ISP's conduct to be willful. 199 F. Supp. 3d 958, 981 (E.D. Va. 2016).

---

[13] Plaintiffs dispute Grande's claim that when Grande moved for summary judgment (which it did early), there was no evidence in the record as to Plaintiffs' ownership of 361 works. Def.'s Reply/Opp. at 25. As Plaintiffs explain in their Opposition, the evidence Grande challenges only applies to around 160 of the 1,583 Copyrighted Recordings (for which Plaintiffs previously had produced some evidence, and then supplemented with additional documents), far fewer than the number of works Grande claimed were lacking ownership evidence.

15

Second, Plaintiffs' brief cites sufficient evidence and legal authorities to send their discovery rule question to the jury, precluding summary judgment. Pls.' Opp./Cross-Mot. at 28.

Third, Plaintiffs submitted ample evidence for a jury to award actual damages in the form of Grande's profits from its repeat infringing customers. "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504. Plaintiffs did more than that, actually calculating Grande's profits, rather than just revenues, from repeat infringing customers. And Grande is wrong that those profits are not "reasonably related" to the infringement. Def.'s Reply/Opp. at 24. Grande insists that the test is whether "absent the alleged infringement, the subscriber would never have become a Grande subscriber in the first place." *Id*. But Grande cites no authority for such an exacting standard. A plaintiff need only "demonstrate[e] *some* causal link between the infringement and the particular profit stream." *Bonner v. Dawson*, 404 F.3d 290, 294 (4th Cir. 2005). Grande charged known repeat infringing customers for the means to engage in their infringing conduct. That suffices for the jury to consider Plaintiffs' actual damages evidence.

## CONCLUSION

For the foregoing reasons, as well as those set forth in Plaintiffs' opposition/cross-motion, Plaintiffs respectfully request that the Court (1) deny Grande's motion in its entirety, and (2) grant summary judgment to Plaintiffs on Grande's liability for contributory infringement.

Dated: October 15, 2018          Respectfully submitted,

    By: */s/ Robert B. Gilmore*
Pat A. Cipollone, P.C. (admitted *pro hac vice*)
Jonathan E. Missner (admitted *pro hac vice*)
Robert B. Gilmore (admitted *pro hac vice*)
Philip J. O'Beirne (admitted *pro hac vice*)
Michael A. Petrino (admitted *pro hac vice*)

16

**Stein Mitchell Cipollone Beato & Missner LLP**
901 15th Street, N.W., Suite 700
Washington, DC 20005
Telephone: (202) 737-7777
Facsimile: (202) 296-8312
pcipollone@steinmitchell.com
jmissner@steinmitchell.com
rgilmore@steinmitchell.com
pobeirne@steinmitchell.com
mpetrino@steinmitchell.com

Daniel C. Bitting (State Bar No. 02362480)
Paige A. Amstutz (State Bar No. 00796136)
**Scott Douglass & McConnico LLP**
303 Colorado Street, Suite 2400
Austin, TX 78701
Telephone: (512) 495-6300
Facsimile: (512) 495-6399
dbitting@scottdoug.com
pamstutz@scottdoug.com

*Attorneys for Plaintiffs*

17

## **CERTIFICATE OF SERVICE**

      The undersigned certifies that on October 15, 2018 all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system pursuant to Local Rule CV-5(b)(1).

                                          */s/ Daniel C. Bitting*
                                          Daniel C. Bitting