**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **UMG RECORDINGS, INC., et al.,** | § | |
| | § | |
| **V.** | § | **CAUSE NO. A-17-CA-365-DAE** |
| | § | |
| **GRANDE COMMUNICATIONS** | § | |
| **NETWORKS, LLC, and PATRIOT** | § | |
| **MEDIA CONSULTING, LLC** | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

TO:   THE HONORABLE DAVID EZRA
      SENIOR UNITED STATES DISTRICT JUDGE

Before the Court are UMG Recording, Inc., et al's Motion for Partial Summary Judgment as to Safe Harbor Defense (Dkt. No. 127); the Response (Dkt. No. 143); and the Reply (Dkt. No. 167). The District Court referred the above motion to the undersigned Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. §636(b) and Rule 1(c) of Appendix C of the Local Rules.

**I.  BACKGROUND**

As noted in prior orders, this is a suit seeking to hold an internet service provider liable for copyright infringement allegedly committed by the ISP's customers.   The ISP—Grande Communications—has raised as a defense to the suit one of the "safe harbor" defenses created by the Digital Millennium Copyright Act.  Under the DMCA, a "provider of online services or network access" may not be held monetarily liable for claims arising out of the provider transmitting, routing, or providing connections for material through a system or network controlled or operated by or for it, as long as the provider has:

> adopted and reasonably implemented, and informed subscribers and accountholders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers.

17 U.S.C. §§ 512 (i)(1)(A); (c); (k)(1)(B).  In the present motion, Plaintiffs request that the Court grant summary judgment that Grande is not entitled to the defense as a matter of law.

## II. SUMMARY JUDGMENT STANDARD

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting FED. R. CIV. P. 56(a)). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.' " *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.* (quotation marks omitted); *see also Celotex*, 477 U.S. at 325. "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per

curiam)).  "Once the moving party [meets its initial burden], the nonmoving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Nola Spice*, 783 F.3d at 536.  In deciding a summary-judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008); *see also Nola Spice*, 783 F.3d at 536.

### III. ANALYSIS

Plaintiffs assert that the undisputed facts demonstrate that Grande does not qualify for the DMCA safe harbor, because from October 2010 to June 2017, it did not "reasonably implement" a policy providing for the termination of repeat offenders.  They contend that the policy Grande had was a policy in name only, was never enforced, and for more than six years Grande did not terminate a single subscriber for infringement.  Grande responds by contending there are fact questions precluding summary judgment, regarding both the reasonableness of its policy implementation, and the sufficiency of the infringement notices it received from Rightscorp.

The most recent courts to examine in detail what is needed to establish the DMCA safe harbor defense in a suit against an ISP for contributory copyright infringement were those which have presided over the *BMG v. Cox* litigation in the Fourth Circuit.  *See BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 657 (E.D. Va. 2015), *aff'd in part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018).  The claims in that suit are very similar to those here.  BMG sued Cox Broadcasting, contending that Cox was liable for its subscribers' copyright infringement, as it had received millions of notices of infringement, and had allegedly failed to take appropriate action.  At the trial court level, BMG moved for summary judgment on the safe harbor defense raised by

Cox—the very same defense raised by Grande here. BMG's argument was much like the Plaintiffs' here—though Cox purported to have a policy, it was weakly enforced, and resulted in strikingly few terminations, notwithstanding evidence that Cox did not doubt the validity of the notices of infringement it received. *BMG*, 881 F.3d at 303-305. The trial court agreed with BMG, and granted summary judgment. Cox challenged that ruling on appeal, and raised many of the same arguments Grande has raised here.

The *BMG* court started by stating the basics of what is required to be able to raise a safe harbor defense. It explained that, at a minimum, a "reasonably implemented" policy had to at least be occasionally enforced:

> We are mindful of the need to afford ISPs flexibility in crafting repeat infringer policies, and of the difficulty of determining when it is "appropriate" to terminate a person's access to the Internet. At a minimum, however, an ISP has not "reasonably implemented" a repeat infringer policy if the ISP fails to enforce the terms of its policy in any meaningful fashion. *See In re Aimster Copyright Litig.*, 252 F.Supp.2d 634, 659 (N.D. Ill. 2002), aff'd, 334 F.3d 643 (7th Cir. 2003) ("Adopting a repeat infringer policy and then purposely eviscerating any hope that such a policy could ever be carried out is not an 'implementation' as required by § 512(i).").

*Id.* at 303 (citation omitted). This reading of the statute is in line with every court that has discussed the issue. *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007) (implementation "requires that a service provider terminate users who are 'repeat infringers,'" and an ISP must "terminate[] users who repeatedly or blatantly infringe copyright"); *Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp.2d 500, 515 (S.D.N.Y. 2013) *aff'd in part, rev'd in part*, 826 F.3d 78 (2d Cir. 2016) (allowing safe harbor because "user accounts violating the Terms of Service were often terminated upon the receipt of the first DMCA takedown notice," and "Vimeo disabled user accounts upon discovery of infringing conduct"); *Capitol Records, LLC v. Vimeo, LLC*, 826 F.3d 78, 83 (2d

Cir. 2016), *cert. denied*, 137 S. Ct. 1374 (2017) (agreeing with trial court that defendant "must have adopted and reasonably implemented a policy that, essentially, bans users who repeatedly infringe copyright"); *Capitol Records, LLC v. Escape Media Grp., Inc.*, 2015 WL 1402049 at *10 (S.D.N.Y. Mar. 25, 2015) ("the relevant question is whether [the ISP] actually terminates the uploading privileges of repeat infringers under appropriate circumstances").

As far as the evidence is concerned, the Fourth Circuit found Cox was not entitled to the safe harbor defense because Cox "made every effort to avoid reasonably implementing [its] policy," and "Cox very clearly determined *not* to terminate subscribers who in fact repeatedly violated the policy." *BMG*, 881 F.3d at 303. In reaching this conclusion, the Fourth Circuit made a thorough analysis of the summary judgment evidence. Notably, though it was still far short of what was required to take advantage of the DMCA safe harbor, Cox actually did more to enforce its termination policy than Grande. The evidence showed that Cox had a "thirteen-strike" approach: its receipt of one DMCA notice resulted in no action, receipt of six more notices resulted in Cox sending a warning email to the customer, receipt of two notices after that led to the customer receiving a screen requiring him to "acknowledge" receipt of warnings before being able to access the internet, receipt of tenth and eleventh notices led to Cox suspending service until the subscriber called a technician, who would reinstate service after a verbal warning, receipt of a twelfth notice required the customer to call yet another technician who, after another verbal warning would reinstate service, and, finally, after a thirteenth notice the subscriber would be "considered" for termination. *Id.* at 299. The evidence reflected that even after all of this, Cox rarely if ever terminated users.

In this case, Grande had nothing even approximating the system Cox used, as for the six years before this lawsuit was filed, it *never* warned a customer they might be terminated, regardless of how many infringement notices Grande received about that customer.   Grande's corporate representative on this very issue admitted it had no policy calling for the termination of infringing subscribers during this time:

Q.   You would agree with me that Grande did not have a policy that provided for the termination of subscribers and account holders who were repeat copyright infringers in 2010, right?

A.   To my knowledge, yes.

Q.   Same answer for 2011?

A.   Yes.

Q.   2012?

A.   Yes.

Q.   2013?

A.   Yes.

Q.   2014?

A.   Yes.

Q.   2015?

A.   Yes.

Q.   And 2016?

A.   Yes.

Dkt. No. 127-21 at 8-9.   Grande's Vice President for Network Engineering and Operations admitted this as well.   He explained that prior to 2010, Grande's practice was to terminate repeat infringers,

and to discuss with them the reasons for the termination when they called about it.  Dkt. No. 127-3 at 13.  As he described it, "we had a policy of turning off all subscribers upon copyright violation notice, requiring the customer to then contact Grande to discuss the issue, understand what happened, inform the customer of why they'd been shut off, and take appropriate action from there." *Id.* at 12.  Then, beginning in October 2010, the practice of terminating customers ceased, Dkt. No. 127-3 at 12-13, and Grande did not terminate a single infringing customer from October 2010 through May 2017, Dkt. No. 127-7 at 6.  This is despite the fact that Grande received "millions" of notices of copyright infringement from 2010 to 2016, it was tracking over 9,000 customers on its DMCA "Excessive Violations Report" by late 2016, and it specifically tracked users by the number of notices Grande received about them. Dkt. Nos. 127-9 at 5; 127-3 at 9.  Grande's corporate representative further admitted that until 2017, it would not terminate a user for infringement "regardless of the source of any notice," "regardless of the content of any notice," and "regardless of the volume of notices . . . for a given customer."  Dkt. No. 127-7 at 6-7.

During the six year period, the only policy that addressed repeat infringement was Grande's general Acceptable Use Policy, which among many other things, stated that repeat copyright infringers could have their service terminated.  Dkt. Nos. 143-3( 2012 Policy, including language that "Grande may terminate the Service provided to any customer or user who is either found to infringe third party copyright or other intellectual property rights, including repeat infringers. . ." ); 143-4 (2013 Policy); 143-5; and 143-8 at 3.  Then, in November 2016, for the first time, Grande posted on its website a specific DMCA policy.  Dkt. 143-8 at 4; Dkt. No. 143-7.  More than six months after posting the DMCA policy, and two months after this case was filed, Grande terminated

its first customer for infringement in nearly seven years.  Through the date of the filing of the instant motion, Grande has terminated a total of 12 users—eleven in 2017, and one in 2018.

As noted earlier, after it reviewed the evidence of Cox's implementation of its policy, the Fourth Circuit described those facts as demonstrating that Cox "made every effort to avoid reasonably implementing [its] policy," and "very clearly determined *not* to terminate subscribers who in fact repeatedly violated the policy."  *BMG*, 881 F.3d at 303 (emphasis original).  The evidence here is even stronger.  Notwithstanding the terms of the AUP in place until October 2016, the reality was, in *Grande's own words*, it would not terminate a user for infringement "regardless of the source of any notice," "regardless of the content of any notice," and "regardless of the volume of notices . . . for a given customer."  Dkt. No. 127-7 at 6-7.  This amounts to absolutely ***no*** implementation of the policy Grande had allegedly adopted.  And, as in *BMG*, the policy that was *actually* in effect for this time was that Grande was determined *never* to terminate a subscriber, no matter what information Grande received about that customer allegedly infringing a copyright.  It is hard to imagine a case in which it is more clear that the DMCA safe harbor is not available.

Notwithstanding this evidence, in an attempt to avoid summary judgment Grande makes two primary arguments: (1) because it did eventually terminate a handful of customers, there is a fact question regarding the "reasonableness" of the implementation of its policy; and (2) because there are numerous deficiencies in Rightscorp's notices, there is at least a fact question regarding whether those notices evidenced "appropriate circumstances" for the termination of users.  Neither of these arguments has merit.

The fact that Grande finally terminated a few subscribers, all after the Plaintiffs sued it, is plainly not enough evidence to show that Grande had implemented its policy in a consistent or

meaningful way. Cox, for example, had terminated more customers, and had done so before being sued, and that was not enough to create a fact issue for trial. *BMG*, 881 F.3d at 304 ("Before September 2012, Cox was terminating (and reactivating) 15.5 subscribers per month on average; after September 2012, Cox abruptly began terminating less than one subscriber per month on average."). Further, the evidence is that Grande went for more than six years with a de facto policy of never terminating a user no matter how many copyright complaints it received about that user; terminating a dozen users—only after it was sued—is not enough to rehabilitate its complete failure to implement a policy for the prior six years. The fact is, Grande had no policy in effect for the vast majority of the relevant time period, and its last minute conversion is too little too late.

Grande's complaints about the Rightscorp notices also miss the mark, for a host of reasons. First, the very same sort of Rightscorp notices at issue here made up a large portion of the notices that BMG relied on in their suit against Cox. Cox made very similar attacks on those notices, and also argued that the evidence failed to "prove actual knowledge of repeat infringement." *Id.* at 305. As the Fourth Circuit explained, that argument was misplaced, because "Cox bears the burden of proof on the DMCA safe harbor defense; thus, Cox had to point to evidence showing that it reasonably implemented a repeat infringer policy." *Id.* The court found Cox failed to show that it had ever actually followed through and implemented its policy as written, and without such evidence, there was not a triable issue. *Id.* The same is the case here. Grande has pointed to no evidence that it *ever* considered terminating a user during the relevant period, despite the fact that there is ample evidence, including internal emails, indicating that it believed many of its customers were repeat infringers. Without at least some evidence of this sort, it cannot create a fact dispute related to its defense.

Grande also argues that because the Rightscorp notices fail to show actual infringement, there is no evidence there were "appropriate circumstances" that justified terminating any customers.  But this argument ignores the actual facts.  Just as Cox did, Grande has

> failed to provide evidence that a determination of "appropriate circumstances" played any role in its decisions to terminate (or not to terminate).  [Grande] did not, for example, point to any criteria that its employees used to determine whether "appropriate circumstances" for termination existed.  Instead, the evidence shows that [Grande's] decisions not to terminate had nothing to do with "appropriate circumstances". . . .

*BMG*, 881 F.3d at 305.  Grande has admitted that it would not have terminated any subscribers, no matter what the circumstances were, prior to June 2017, as the policy in place from 2010 to mid-2017 was that it would not terminate a user for infringement "regardless of the source of any notice," "regardless of the content of any notice," and "regardless of the volume of notices . . . for a given customer."  Dkt. No. 127-7 at 6-7.  Moreover, the evidence in the record from Grande's own documents reflects the opposite of what it now argues—Grande took the Rightscorp (and other) notices as evidence of infringement.  For example, in one email exchange in April 2013, a senior Grande official asked:  "Question - we have users who are racking up DMCA take down requests and no process or remedy in place.  I don't know if I'm seeing a broken process or compliance with the letter of the law. Do you guys have insight or knowledge on this?"  Dkt. No. 127-22.  In the ensuing conversation, another manager reported back regarding what a Grande affiliate was doing:

> Who is responsible for the DMCA notification process?  Do we call customers?

> Bartlett just answered my email, and, as you said, they contact the customer and let them know they will disconnect them if they continue to receive those notices.

> If we do nothing more tha[n] emails (as I think you mentioned) we might lose our safe harbor status.

Dkt. No. 127-28.  When Grande customers (or IT specialists of customers) contacted Grande management employees about copyright infringement notices Grande had forwarded to them, the internal exchanges among Grande employees also make it plain that Grande viewed the notices as evidence that the customer had infringed on a copyright.  *See* Dkt. Nos. 127-17; 127-30; 127-31. The criticism of the Rightscorp system and the notices it generated was never made until Grande was sued, and its lawyers raised these issues.  What the lawyers thought of the notices in 2017 is irrelevant to the question of what Grande thought of them between 2010 and 2017.  It is Grande's employees' knowledge that matters, and the evidence is undisputed that those employees believed the notices reflected that many of Grande's customers were repeatedly infringing on copyrights.[1]

Yet another failure with Grande's argument about the Rightscorp notices is that it does not address the several hundred thousand copyright infringement notices it received from companies other than Rightscorp.  The undisputed evidence is that many of the roughly 1.2 million notices of infringement Grande received between 2011 and 2016 (Dkt. No. 127-7 at 10) came from entities other than Rightscorp.  Thus, for example, in 2015 alone, Grande received 365,569 infringement

---

[1]Grande's argument about the Rightscorp notices is, in practical effect, very much like an argument Cox raised in the *BMG* case.  Cox contended that "repeat infringer" as used in the statute meant an *adjudicated* repeat infringer, not just one who had been accused of repeat infringement, and Cox only needed to terminate the internet access of *adjudicated* repeat infringers to be eligible to raise the DMCA safe harbor defense.  *Id.* at 301.  The Fourth Circuit rejected this argument, based on an analysis of the Copyright Act and existing case law, noting that Cox had not cited "a single case adopting its contrary view that only adjudicated infringers can be 'repeat infringers' for purposes of the DMCA." *BMG*, 881 F.3d at 302-303.  Grande's argument that its failure to take action in response to Rightscorp notices does not disqualify it from raising the safe harbor defense, because the Rightscorp system is "incapable of identifying . . . *actual* copyright infringement," Dkt. No. 143 at 13, is very close to the argument rejected in *BMG*.  Though Grande never explains what it means by "actual" infringement, it would seem that, practically speaking, it is what Cox called "adjudicated" infringement.

11

notices; 246,322 were from Rightscorp, and 119,247 were from other sources. Dkt. No. 172-18 at 2. Grande has presented no summary judgment evidence undermining the reliability of any of these other notices. Thus, even if the Court were to accept Grande's argument that the Rightscorp notices did not create "appropriate circumstances" for termination, summary judgment would still be appropriate, as the undisputed evidence shows that Grande failed to terminate a single customer as a result of its receipt of the several hundred thousand other copyright infringement notices it received. As noted earlier, the DMCA safe harbor is an affirmative defense, and the burden is on Grande to demonstrate it has met the threshold needed to raise the defense. Without *any* evidence undermining the hundreds of thousands non-Rightscorp notices Grande received from 2010 to 2017, Grande has not carried that burden.

In summary, Grande cannot meet the threshold test required by the DMCA to gain the benefit of the safe harbor. The undisputed evidence shows that though Grande may have adopted a policy permitting it to terminate a customer's internet access for repeat infringement, Grande affirmatively decided in 2010 that it would not enforce the policy at all, and that it would not terminate any customer's account regardless of how many notices of infringement that customer accumulated, regardless of the source of the notices, and regardless of the content of a notice. Consistent with this, Grande did not terminate a single repeat infringer from October 2010 to June 2017. A "reasonably implemented" termination policy requires that the policy be enforced, and not just adopted. Because the evidence is undisputed that Grande never enforced its policy during the relevant time period, it is precluded from raising the DMCA safe harbor defense in this case.

## IV. RECOMMENDATION

For the reasons set forth herein, the undersigned **RECOMMENDS** that the district judge **GRANT** UMG Recording, Inc., et al's Motion for Partial Summary Judgment as to Grande Communication Networks LLC's DMCA Safe Harbor Defense (Dkt. No. 127).

## V.  WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections.  *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(c); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED this 18th of December, 2018.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE