# Exhibit 2

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
 2                    AUSTIN DIVISION

 3
    UMG RECORDINGS, INC., et al.,     )
 4                                    )
            Plaintiffs,               )
 5                                    )
          vs.                         ) Case No.
 6                                    ) 1:17-cv-00365-LY
    GRANDE COMMUNICATIONS NETWORKS    )
 7  LLC,                              )
                                      )
 8          Defendant.               )
    _____ )
 9

10

11      **HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

12

13        VIDEO DEPOSITION OF GREGORY H. BOSWELL

14    30(b)(6) REPRESENTATIVE FOR RIGHTSCORP, INC.

15              Santa Monica, California

16

17            Wednesday, August 8, 2018

18

19

20

21

22

23

24

25
```

```
 1              THE WITNESS:  In 2011, 2012, by that point
 2   in time, all my work for Lockheed Martin or
 3   Northrop Grumman was done in SQL or Java.
 4              The predominant languages I work in are
 5   Java and SQL.  And SQL is the language for
 6   databases.
 7   BY MR. BROPHY:
 8       Q    Are you proficient in other languages like
 9   C, C++, Fortran?
10              MR. O'BEIRNE:  Objection.  Compound.
11   Vague.
12              THE WITNESS:  I have done C, C++, Fortran.
13   I would not -- I would not bill myself out on any of
14   those languages.  It's been a very, very, very long
15   time since I've done them.
16   BY MR. BROPHY:
17       Q    Okay.  So when you were first developing
18   the Rightscorp system, you were writing everything
19   in Java; is that correct?
20       A    That is correct.
21       Q    Okay.  And has that remained true until
22   today?  Is the predominance of the Rightscorp system
23   written in Java?
24       A    It is.
25       Q    When you first began developing the
```

```
 1    software, did you institute any type of change

 2    management system that would allow Rightscorp or

 3    yourself to track the changes in the source code

 4    over time?

 5        A    No.

 6        Q    When I say a "change management system," do

 7    you understand what I mean by that?

 8        A    Please define that.

 9        Q    Sure.

10             A change management system, as I'm

11    describing it, is a system that you can put in place

12    that keeps track of changes in source code over

13    time.

14             So you can -- one example would be a system

15    that allows you to check a file out from an archive,

16    make changes to it, and then check it back in.  And

17    the system would keep track of the changes that were

18    made, who made those changes, and when they were

19    made so that you have a history, a timeline, of how

20    the source code has evolved over time.

21             Are you comfortable with that -- using that

22    definition for a change management system?

23             MR. O'BEIRNE:  Objection.  Vague.  Calls

24    for speculation.

25             You can answer.
```

```
 1              THE WITNESS:  I am comfortable with it.
 2              And, no, we did not.
 3    BY MR. BROPHY:
 4         Q    Have you ever used a change management
 5    system?
 6         A    Yes.
 7         Q    Where did you use that type of system?
 8         A    I used it for Countrywide Home Loans.  We
 9    used it for Northrop Grumman -- or for
10    Lockheed Martin.
11              Where else?
12              I have used it for some of my current
13    customers.
14         Q    When you were working with Northrop Grumman
15    and Lockheed Martin, which change management system
16    did you use, if you recall?
17         A    Don't recall.
18         Q    What about at Countrywide?
19         A    Visual SourceSafe.
20         Q    And which change management system do you
21    use currently in your work?
22         A    Rightscorp has Subversion.
23         Q    I'm sorry.  What's the name of that
24    software?
25         A    Subversion.
```

1          I also work with my clients in whatever

2     systems they want.

3        **Q     So in addition -- if I understand your**

4     **testimony, in addition to your work with Rightscorp,**

5     **you also have other clients, and you use change**

6     **management systems with those clients as well?**

7        A     Correct.

8        **Q     Okay.  What are the names of the systems**

9     **you use with those clients?**

10       A     They were Git-based systems.

11       **Q     Do you know the specific names?**

12       A     I believe GitHub is one of the repositories

13    that my clients use.

14       **Q     Okay.  When did Rightscorp first institute**

15    **or begin using the Subversion change management**

16    **tool?**

17          **MR. O'BEIRNE:  Objection.  Vague.  Scope.**

18          **You may answer.**

19          THE WITNESS:  Roundabout 2016.

20    BY MR. BROPHY:

21       **Q     This is a bit of an aside.**

22          **Do you understand that, in discovery in**

23    **this case, Grande has requested change management**

24    **logs or other information for the Rightscorp**

25    **software?**

1    there's this ingestion where the Rightscorp system

2    is told which copyrighted works it should be

3    monitoring.

4            Do you agree with that?

5            MR. O'BEIRNE:  Objection.  Vague.

6            THE WITNESS:  Are you saying the first step

7    is that it is a suggestion of what it should be

8    monitoring?

9    BY MR. BROPHY:

10   Q    Yeah.  Why don't we do it a different way.

11           In your mind, what is the very first step

12   of the Rightscorp system as of the date that we've

13   identified?

14           MR. O'BEIRNE:  Objection.  Vague as to

15   "step" and "system."

16           THE WITNESS:  Well, you know, in my mind,

17   the very first step would be to have -- inform the

18   Rightscorp system -- and, by the way, this is not

19   necessarily a linear process.  This is systems of

20   systems.

21           But if we're going to take it from you, as

22   a new customer coming into the system, the very

23   first thing we would do is require information about

24   the copyrights you'd like us to monitor.

25   BY MR. BROPHY:

GREGORY H. BOSWELL **HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY** 8/8/2018

Page 101

```
 1            But, basically, they're for music sampling
 2     and the sampling of -- the legal samples.
 3            So one's music sampling, and one's legal
 4     samples.
 5        Q    This Rightscorp SQL database that we've
 6     been discussing, is that the database that houses
 7     all of the information that Rightscorp takes in from
 8     various subscribers who are allegedly engaging in
 9     infringement?
10        A    Subscribers who are allegedly engaging --
11     that is -- Rightscorp has many tables.  One table is
12     called "infractions," and in that table is the
13     repository of the infringements that were found.
14        Q    And then, if I understand correctly, this
15     other database warehouses music samples and legal
16     samples; is that correct?
17            MR. O'BEIRNE:  Objection.  Vague.  And
18     compound.
19            THE WITNESS:  Yes and yes.
20     BY MR. BROPHY:
21        Q    Can you describe for me what you mean by
22     "music samples."
23        A    Music samples is part of the ingestion
24     process.  And if you'd like to delve into that, this
25     would be a good time.
```

1    operation conversation.

2       A    Where were we?

3       Q    **Well, we were talking through the**

4    **RIAA Loader and the fact that the CVS file is**

5    **polled.**

6       A    Right.

7       Q    **Polled with an O.**

8            **And the individual line items from that**

9    **spreadsheet are loaded into the tracks table within**

10   **the Rightscorp database.**

11      A    Okay.

12      Q    **What happens next?**

13           MR. O'BEIRNE:  Objection.  Vague.

14           THE WITNESS:  So we have a table of tracks

15   that are owned.  We need to now try to find torrents

16   which indicate that they are sharing that pair

17   combination.  Okay?

18           We have another process.  So should I go

19   into that process first?

20   BY MR. BROPHY:

21      Q    **Let's -- what is it named?**

22      A    That process is part of the ingestion

23   process, but it is a separate subsystem of the

24   ingestion process.

25      Q    **Is there a specific program?**

```
 1      A    There are several different programs.
 2      Q    What is the first one we'll be talking
 3   about?
 4      A    We are going to be talking about -- and
 5   we'll talk about it over its life span.  We're just
 6   going to be talking about the acquisition of the
 7   torrent.  All right?
 8      Q    Is there -- is there a .java or a .class --
 9      A    Oh, it's a series of different pieces of
10   code.
11      Q    Okay.
12      A    And they all have lived or died over
13   the years.
14           And do you want to take a break before we
15   go into this?
16      Q    No, no.  It's okay.
17      A    So let me know when you're ready.
18      Q    I'm ready.
19      A    The Torrents are advertised generally on
20   pirate sites.  When you --
21      Q    Can you give me -- I'm sorry.  I didn't
22   mean to interrupt you, but can you give me an
23   example of some pirate sites?
24      A    The current surviving pirate sites are
25   thepiratebay.org.
```

```
 1        Q     Okay.

 2        A     All right?

 3              MR. O'BEIRNE:  So there's not now a pending

 4    question?

 5              I'm happy for the witness to give fulsome

 6    responses, but if we can try to make sure that

 7    there's -- we're pegging questions along the way so

 8    that I can be in a position to object rather than

 9    just say this is one big narrative.  I don't want

10    to --

11              THE WITNESS:  This would be one big

12    narrative.

13              MR. O'BEIRNE:  I don't want to get in the

14    way of your examination, but I don't want to have

15    one big narrative because it doesn't allow me to

16    interpose objections.

17              MR. BROPHY:  Sure.

18              MR. O'BEIRNE:  So to the extent that we can

19    return to the line of questioning.

20              So maybe we can pose a question to him that

21    I can object to, if necessary, or not.

22              MR. BROPHY:  That's more dictated by the

23    witness's answer than my question, but in any event.

24        Q     Are there other websites besides Pirate Bay

25    that you're aware of that are commonly used to
```

```
 1    gather .torrent information from?
 2        A    Yeah.  There are several others.
 3        Q    Can you give me some examples?
 4        A    Well, Kickass Torrents used to be around.
 5     I believe it's gone now.
 6        Q    Any others?
 7        A    Huh?
 8        Q    Any others?
 9        A    There's demonoid.ph.  It has come and gone
10    and come again.
11             There's -- it's -- the word is really
12    "elite," but it's 3733L.  And I can't remember if
13    it's .edu or what it is, but it's one of the
14    surviving ones.
15             There's a few others that do not have any
16    real name to them as much as they are just an
17    assembly of letters that the developers have used.
18        Q    Okay.  So you were talking about the
19    ingestion process.
20        A    Right.
21        Q    So what is -- what is next in that process?
22        A    Well, in this aspect of that process, we
23    need to find Torrents.  We need to find Torrents
24    that potentially match our client's base.
25        Q    How does the Rightscorp system accomplish
```

GREGORY H. BOSWELL  **HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**  8/8/2018

Page 172

 1    database onto that computer to do a blind analysis.

 2         **Q    Okay.**

 3         A    So, then, this third-party software will

 4    digest this blind song.  It's blind because it has

 5    no name on it.  Just has the GUID.  And it will

 6    digest it and send this information off to a

 7    third-party system.

 8              This third-party system comes back with

 9    what it thinks it is.

10         **Q    A moment ago you identified two different**

11    **services.  One was AcoustID, and the other one is**

12    **Audible Magic.**

13         A    Correct.

14         **Q    My understanding is that Rightscorp used**

15    **Audible Magic some time ago and then stopped.  Is**

16    **that correct?**

17         A    That's correct.

18         **Q    When did Audible Magic first -- when did**

19    **Rightscorp first use Audible Magic?**

20         A    I don't recall.  It's when we started going

21    to this automatic process.  We're probably looking

22    at 2012, 2013.  In there.

23         **Q    Prior to Rightscorp beginning to use**

24    **Audible Magic, how did it perform a matching between**

25    **a downloaded music file and the copyrighted works**

1    that it was tracking?

2        A    Very painfully.

3            So the music -- prior to this whole

4    process, there was a manual process.  Someone would

5    get on a BitTorrent client and download the song.

6    And this was not me.  This would be the people in

7    charge of copyrights.  And they would listen and

8    compare that song to something that was provided to

9    us.  If that was a human match, then they matched

10   that song to the system.

11       Q    Did the rights holders provide the actual

12   true song to Rightscorp for purposes of that

13   analysis?

14           MR. O'BEIRNE:  Objection.  Vague.

15           THE WITNESS:  Out of my domain.  I was not

16   part of the verification process at that point.

17   BY MR. BROPHY:

18       Q    Who was?

19       A    That would have been -- well, Robert Steele

20   ran the process.  Christopher Sabec would know.

21       Q    In preparing for your testimony today, did

22   you speak with Robert Steele or Chris Sabec to

23   understand this aspect of the operation of the

24   Rightscorp system?

25           MR. O'BEIRNE:  I object -- hold on a

```
 1   second.

 2          I object that this is outside of the scope.

 3   Mr. Sabec was offered on the two specific topics

 4   about which copyrights were chosen and ingested from

 5   clients and entered into the system.  And so it's

 6   outside of the witness's noticed topics.

 7          But you can answer.

 8          THE WITNESS:  I haven't chatted with Robert

 9   or Christopher about this.

10          MR. BROPHY:  So just to be clear, this is

11   absolutely within the set of topics he's been

12   produced for.  This is a step in the Rightscorp

13   system process, and that's what we're discussing

14   today.

15          So we can discuss that afterwards, but

16   we're going to want somebody who's prepared to talk

17   about this.

18          MR. O'BEIRNE:  I disagree.  My objection is

19   on the record.  We can talk about it.

20   BY MR. BROPHY:

21      Q    When Rightscorp switched to -- let me back

22   up and ask a few more questions.

23          Are you aware of any instance in which a

24   client of Rightscorp's provided actual music files

25   to Rightscorp in order to do its file matching?
```

```
 1              MR. O'BEIRNE:  Objection.  Outside the
 2   scope.
 3              THE WITNESS:  That would not have been in
 4   my domain.
 5   BY MR. BROPHY:
 6       Q    Are you aware of an instance in which they
 7   did send those files?
 8              MR. O'BEIRNE:  Same.
 9              THE WITNESS:  Outside of my domain.  It's
10   outside my wheelhouse.
11   BY MR. BROPHY:
12       Q    So does that mean you're not aware of any
13   instance in which they sent a file?
14              MR. O'BEIRNE:  Same.
15              You can answer if you know.
16              THE WITNESS:  I don't know one way or the
17   other.
18   BY MR. BROPHY:
19       Q    Is it fair for me to say that you're not
20   personally aware of any instance?
21       A    I am not personally aware of any instance.
22       Q    Are you aware of other ways in which
23   Rightscorp would perform or could perform the human
24   matching that you described?
25       A    Yes.
```

```
 1      Q     And what's that?

 2      A     Well, they could go to one of the

 3   customer's websites, listen to a trailer.  Watch a

 4   trailer.

 5            They could go to the customer's YouTube

 6   channel and watch a trailer of the song, the music.

 7   There are plenty of -- I'm trying to think.

 8            I believe at one point in time one of the

 9   customers gave us access to their private channels.

10   But I believe that was in the movie industry.

11      Q     You keep saying "trailer."

12      A     Well, I'm sorry.  That's -- because, when I

13   think of YouTube, I think of movies.  I don't think

14   of music.

15      Q     So focusing specifically on the music

16   category for a moment, are there ways you're aware

17   of that Rightscorp could perform this human matching

18   that we've been discussing?

19      A     Yes, there are ways.

20      Q     What are those ways?

21      A     I just stated them.

22      Q     So we've talked about going to YouTube

23   channels to watch trailers or customers' websites to

24   watch trailers --

25      A     Should we change the word to "videos"?
```

1       Q       Okay.  So -- I understand.

2               So you're saying that someone from

3    Rightscorp could go to YouTube and watch a music

4    video for one of the songs?

5       A    If it was on the customer's channel.

6       Q    Is there any way that Rightscorp could

7    verify or determine whether that music video was an

8    accurate example of the copyrighted work that it was

9    asked to monitor?

10      A    Now you're out of my domain.

11      Q    Are you aware of any steps that Rightscorp

12   took to verify that the materials it was reviewing

13   to perform its human matching actually represented

14   the copyrighted work it was asked to monitor?

15              MR. O'BEIRNE:  Objection.  Scope.  And

16   misstates prior testimony.

17              You can answer.

18              THE WITNESS:  I'm lost on that question.

19   Can you re-ask it for me.

20   BY MR. BROPHY:

21      Q    Sure.

22              I'm wondering if you're aware of any way in

23   which Rightscorp attempted to verify that the song

24   it was using to match against this unknown file was

25   actually a song that accurately reproduced the

 1     copyrighted work that Rightscorp was asked to

 2     monitor.

 3              MR. O'BEIRNE:   Same.

 4              THE WITNESS:   Well, the people in charge of

 5     verifying the copyrights -- we'll listen to the

 6     sirens as they go by for a second.

 7              That's the third time today, isn't it?

 8     BY MR. BROPHY:

 9        Q    Go ahead.

10        A    The people in charge of verifying the

11     copyrights would either have figured out or have

12     been told why they can verify that.

13              Again, I'm the software end of it.  I do

14     not do the manual verification of the copyrights.

15        Q    And that would have been "Victor" or Jeff;

16     is that correct?

17        A    "Victor" or Jeff.

18        Q    Did you, in preparation for your deposition

19     today, speak with either of them to understand how

20     this process was performed?

21        A    No.  Because -- I didn't.

22        Q    Do they work at Rightscorp still?

23        A    No, they don't.

24        Q    When did they cease their employment with

25     Rightscorp?

```
 1      A    Do not know.

 2      Q    Rough ballpark?

 3      A    Do not know.

 4      Q    I'll ask one more.

 5           Within the last few years, or has it been

 6   quite some time?

 7      A    Jeff would have been a few years ago.

 8           Victor -- Vincent.  It's not Victor.

 9      Q    I'm sorry.

10      A    It's Vincent.

11      Q    Thank you.

12      A    Vincent, probably at the end of last year.

13      Q    So in 2012 or 2013, Rightscorp transitioned

14   to using Audible Magic to do its song matching; is

15   that correct?

16      A    Uh-huh.

17      Q    And is Audible Magic a commercial solution?

18      A    Yes.

19      Q    And so does Rightscorp pay money to

20   Audible Magic to perform those services for it?

21      A    Well, we're going to have to say did

22   Audible Magic pay.  Yes.

23      Q    Thank you.  Thank you.

24      A    It did.

25      Q    And would you describe for me how the
```

1    torrent copyrights.  It would be -- this table is
2    accessible through a manual process, then.
3    BY MR. BROPHY:
4        **Q    So at this point, the Rightscorp system**
5    **says is there an exact match between the tracks**
6    **table and the result from Audible Magic?**
7        A    Uh-huh.
8        **Q    If the answer is yes, populate the torrents**
9    **copyright table?**
10       A    Right.
11       **Q    What happens if there's not an exact match?**
12       A    Well, then we have a process where the
13   copyright people can intervene.
14            So they have a JSP page they can pull up
15   off the website.  And, say, "I'm curious.  I'm going
16   to do a keyword search for Drake."
17            Type in Drake.  Anything that pops up with
18   the word "Drake" in it will appear on this page.
19   All right?
20       **Q    And I'm sorry.  They've just searched which**
21   **database to get --**
22       A    They have searched this torrent files
23   table.
24            The torrent files table that we are talking
25   about that has the entry, the artist and the song

 1   name and the GUID.  Sample GUID.

 2        They have another tool that they can pop up

 3   and just put in a query, or they can look at the

 4   latest updates.

 5        And oh, my God.  The name has slipped

 6   around, as you said.  They can go over here and play

 7   the song, yeah.  That's the song it is, but the name

 8   is flipped around.

 9        They can go in and say, "Okay.  This is

10   really this song."  Modify the entry.  It's logged

11   that they've modified, that they've manually put it

12   in, and it goes into the torrents copyright.

13        Or, again, the famous one, Kesha with an S

14   instead of a -- or someone put a Z in instead of a

15   dollar sign.  Or one of the four Tupac spellings.

16   **Q    So if I understand you correctly, when**

17   **there is not an exact match between the**

18   **Audible Magic song title and artist and the tracks**

19   **table, that result gets flagged for human review; is**

20   **that correct?**

21   A    It doesn't get flagged as much as it's left

22   for human review.

23        In other words -- I'm sorry.  Go ahead.

24   **Q    Well, does it go into a purgatory where it**

25   **doesn't get processed or watched in any way until a**

```
 1    human intervenes?

 2            MR. O'BEIRNE:  Objection.  Vague as to

 3    "purgatory."

 4            MR. BROPHY:  Isn't that true?

 5            THE WITNESS:  For those who have purgatory,

 6    yes, it goes into purgatory.  It is -- anything that

 7    is not matched is in purgatory.

 8            And there's another aspect of purgatory.

 9            So let's say we have downloaded a song --

10            Well, I'll wait for a question.  I could

11    talk all night long.

12    BY MR. BROPHY:

13      Q    No.  It's fine.  I appreciate that.

14            Go ahead, if you wouldn't mind, explaining

15    what the other aspect is that you were going to

16    describe.

17      A    Well, besides the manual intervention, at

18    some point in the future, we may have downloaded a

19    song that we thought was our customer's but it isn't

20    our customer's right now.  So there it sits.  Right?

21            But later another customer comes along and

22    says, "We own that song."  They give us the tracks,

23    and we push a button that says "rematch."  And it

24    says, "Oh, yeah.  We've already downloaded that

25    song.  Here's a perfect match."  You're out of
```

```
 1   purgatory now.
 2          So when we do a rematch, we rematch against
 3   things that are already there with potential new
 4   tracks that have just come in.
 5      Q    In that instance you just gave me, why is
 6   Rightscorp not committing copyright infringement
 7   when it downloaded that song in the first instance?
 8          MR. O'BEIRNE:  Objection.  Outside the
 9   scope.  Calls for a legal conclusion.
10          THE WITNESS:  Definitely I'm not a lawyer.
11   I can't "ask" to that.
12   BY MR. BROPHY:
13      Q    So we have a copyright personnel who
14   intervenes at Rightscorp, and they would presumably
15   find the match, fix the names or whatever; is that
16   right?
17          MR. O'BEIRNE:  Hold on.
18          Objection.  Misstates testimony.  Vague.
19          THE WITNESS:  There's a copyright person
20   who has the power to necessarily fix any
21   misspellings or take things out of torrent
22   copyrights, if they don't want to take them out of
23   the torrent copyrights page or enter them in, based
24   off of their knowledge of the copyright.
25   BY MR. BROPHY:
```

```
 1      Q    And that includes potentially reviewing the
 2  alphanumeric song title and artist name; is that
 3  correct?
 4          MR. O'BEIRNE:  Objection.  Misstates
 5  testimony.
 6          THE WITNESS:  That is potentially reviewing
 7  the alphanumeric copyright -- yes.
 8  BY MR. BROPHY:
 9      Q    And it's also potentially listening to the
10  downloaded song and comparing it to the song owned
11  by the copyright owner?
12          MR. O'BEIRNE:  Same.  You can answer.
13          THE WITNESS:  Yes.
14  BY MR. BROPHY:
15      Q    Where do they get the song that they
16  compare the downloaded song to to see whether
17  they're a match?
18          MR. O'BEIRNE:  Objection.  Vague.
19          THE WITNESS:  That is up to them.  I
20  believe we've discussed this in the previous manual
21  process.
22  BY MR. BROPHY:
23      Q    So do you have any information sitting here
24  today about where that -- we'll call it truth
25  data -- comes from?
```

GREGORY H. BOSWELL **HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY** 8/8/2018

```
 1              MR. O'BEIRNE:  Object.  Mischaracterizing
 2      the testimony.  And vague.
 3              THE WITNESS:  Outside of my scope.
 4      BY MR. BROPHY:
 5          Q    Did you speak to Vincent or Jeff in
 6      preparation for your deposition today about this
 7      aspect of the Rightscorp system?
 8          A    With regards to where they get their data
 9      from?
10          Q    Yes.
11          A    No.
12          Q    What about with regard to how they
13      performed that matching analysis?
14          A    No.  I have not spoken to them about that
15      today.
16          Q    And you didn't speak with them about it in
17      preparation for today; is that correct?
18          A    In preparation for today, no.
19          Q    So let's move forward with the
20      understanding that at this point all the copyright
21      team has matched as many of the files downloaded
22      with copyrighted works as possible.
23              What happens next in the process?
24              MR. O'BEIRNE:  Object to the
25      characterization.
```

GREGORY H. BOSWELL  **HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**  8/8/2018

Page 197

```
 1              What is the name of that other source?
 2      A    AcoustID.
 3      Q    And what is AcoustID?
 4      A    It is an open source identification tool
 5 for matching content.
 6      Q    When did Rightscorp first begin using
 7 AcoustID?
 8      A    I think I spoke to that before.  I don't
 9 recall the exact date.
10      Q    Rough.
11      A    We're probably talking 2013 again, 2014.
12      Q    Was there any period of time during which
13 AcoustID and Audible Magic were being used at the
14 same time?
15      A    Yes.
16      Q    What time frame?
17      A    Again, the 2013, 2014 time frame.
18      Q    So after 2014, was Rightscorp exclusively
19 using AcoustID?
20      A    I believe so.  Somewhere after that time
21 frame, yeah.
22      Q    Give me just one moment.  Apologies.
23           Is there any information that was produced
24 by Rightscorp in this case that would allow us to
25 nail down the specific date on which AcoustID began
```

1        Q     Which of the files that were produced in

2    the laptop did you personally zip and name?

3        A     The one with the current database.

4    Code 2018.

5        Q     Is that the only one that you personally

6    zipped and named?

7        A     The only one I can guarantee I personally

8    zipped and named.

9        Q     If there are dates on other zipped files --

10              Are you aware that there are dates on other

11   of the zipped files that were produced on the

12   laptop?

13       A     Yes.

14       Q     Do you know where those dates came from?

15       A     If they were produced by me, I did them.

16   But I don't know.

17       Q     Well, I believe you just testified that the

18   2018 file you can say with certainty that date is

19   correct because you zipped that file and you dated

20   it.  Is that correct?

21       A     Correct.

22       Q     Are there other files on the laptop that

23   were produced by Rightscorp that you can say the

24   same thing about?

25       A     With 100 percent certainty?

GREGORY H. BOSWELL **HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY** 8/8/2018

Page 206

```
 1       Q     Yes.

 2       A     No.

 3       Q     If hypothetically there is a 2015 ZIP file,

 4   how do we know that represents 2015 source code?

 5       A     If I didn't do it, don't know.

 6       Q     So I think -- pardon that diversion.  We

 7   had gotten to the point in the process where the

 8   Rightscorp system had performed some kind of

 9   matching, whether using Audible Magic or AcoustID,

10   and we were discussing the match-against function.

11           And I believe your testimony was you don't

12   have specific recall of how that match-against

13   function was actually being operated; is that

14   correct?

15           MR. O'BEIRNE:  Objection.  Mischaracterizes

16   testimony.

17           THE WITNESS:  Not exactly correct.

18   BY MR. BROPHY:

19       Q     Okay.  Would you correct my statement,

20   then.

21           MR. O'BEIRNE:  Objection.  Form.

22           THE WITNESS:  I don't have

23   down-in-the-weeds knowledge at this very moment in

24   time on how that function worked, if it was

25   returning just the first instance of a connection or
```

```
 1      Q     And I'm sorry.  Would you say that last bit
 2  again?  I apologize.  I had a brain moment.  Help me
 3  stay on track.  Give me the last bit of that.
 4      A     It would take the torrent -- again, let's
 5  say it was a Nirvana torrent.
 6           It said that it was a Nirvana torrent and
 7  with a Nirvana name.  And if we had a match for
 8  Nirvana in that song, then it would say, "Okay,
 9  well, it's Nirvana."  And it's Nirvana.  The artist
10  is Nirvana.  And it'd say, "Okay, it says it's
11  Nirvana.  AcoustID says it's Nirvana.  That's
12  Nirvana.  And this is the song name for it."
13      Q     I'm going to jump back for one second.
14           Does Rightscorp save the hit results from
15  either the Audible Magic or AcoustID software?
16           MR. O'BEIRNE:  Objection.  Vague.
17           THE WITNESS:  You mean all the results?
18  BY MR. BROPHY:
19      Q     Yes.
20      A     No.
21      Q     So if there were four results, Rightscorp
22  doesn't save all four of those hits?
23      A     No.
24      Q     Does it save the single hit?
25      A     Yes.
```

```
 1          MR. O'BEIRNE:  Objection.  Vague and
 2   compound.
 3          THE WITNESS:  It provided an executable,
 4   and I believe it provided an example of how to
 5   interact with that in multiple languages.
 6   BY MR. BROPHY:
 7      Q    When Rightscorp uses AcoustID to perform
 8   its matching, does it execute the executable
 9   provided in the development kit?
10          MR. O'BEIRNE:  Objection.  Vague.
11          THE WITNESS:  Yes.
12   BY MR. BROPHY:
13      Q    And in what form did the results of the
14   AcoustID software come?  I'll give you some context
15   for that.
16          Rightscorp runs the AcoustID executable.
17   It passes in these inputs in the form of a file it
18   wants to identify, and then presumably the software
19   spits out a result; right?
20          What form does that result come in?
21      A    I believe it comes in a stream in XML
22   format.
23      Q    So it's some alphanumeric output in XML?
24      A    Yes.
25      Q    Does Rightscorp retain those XML outputs?
```

Page 213

```
 1              MR. O'BEIRNE:  Objection.  Vague.
 2              THE WITNESS:  No.
 3     BY MR. BROPHY:
 4          Q    So if I understand correctly, what
 5     Rightscorp does is it extracts from that XML the
 6     alphanumeric for the song and artist and then loads
 7     that information into its database; is that correct?
 8          A    Yes.
 9          Q    Okay.  So what -- going back to where we
10     were in the process.
11          A    Okay.
12          Q    You had talked about Nirvana and
13     identifying a match with Nirvana.
14          A    Uh-huh.
15          Q    What happens next in the system?
16          A    Now I have to really stop and think again.
17              So we're at the point where the service has
18     identified -- given us a match saying, "Yeah, this
19     is a Nirvana song, and this is what we think it is,
20     and this is what we've got."
21              Goes into our system.  Our system says,
22     "Okay" -- I can't remember the code at this late
23     hour now -- that goes up and says, "I can match that
24     song and that artist to a track that our customer
25     has given us," or we represent.
```

1   information it received from the tracker servers?

2          MR. O'BEIRNE:  Objection.  Vague.

3          THE WITNESS:  Please ask me that question

4   again.

5  BY MR. BROPHY:

6     Q   Sure.  It's okay.

7       This infringement bot would reach out to a

8  tracker and receive via UDP a binary-formatted file

9  which contained information about the various

10  members of the swarm; is that correct?

11     A   Uh-huh.

12     Q   Did Rightscorp retain the UDP binary format

13  of message it received from the tracker server?

14          MR. O'BEIRNE:  Objection.  Vague as to

15  "retain" and as to time.

16          THE WITNESS:  No.

17  BY MR. BROPHY:

18     Q   Did it retain that information in 2014?

19          MR. O'BEIRNE:  Same objections except as to

20  time.

21          THE WITNESS:  I answered that question.

22  BY MR. BROPHY:

23     Q   Well, so your counsel's objecting as to

24  vague as to time.  And so I'm trying to break it

25  into smaller pieces to get a more clear answer.

```
 1      A    I'm sorry.

 2      Q    It's okay.

 3           So in 2014, did Rightscorp retain those

 4   materials?

 5      A    No.

 6           MR. O'BEIRNE:  I'm sorry.  Objection.

 7   Vague as to "retain."

 8   BY MR. BROPHY:

 9      Q    In 2015, did Rightscorp retain those

10   materials?

11           MR. O'BEIRNE:  Same objection.

12           You can answer.

13           THE WITNESS:  That process never retained

14   those materials.

15   BY MR. BROPHY:

16      Q    And that's true from 2014 until today?

17      A    That process no longer runs.

18      Q    And when we say "that process," are we

19   talking about the infringement bot process?

20      A    Correct.

21      Q    When did that process stop running?

22      A    That process stopped running shortly after

23   the Cox case was done.

24      Q    What rough time frame is that?

25      A    When would be, what, early 2015.  Something
```

Page 225

```
 1     A     Pocket makes a connection to a BitTorrent
 2  client and gathers the handshake and brings it back.
 3     Q     From 2015 until today, what process within
 4  the Rightscorp system is responsible for reaching
 5  out to the tracker and identifying the IP addresses
 6  and ports of the members of the swarm?
 7     A     Memphis.
 8     Q     Okay.  So I did them in the wrong order.
 9     A     That's right.
10     Q     So let's talk about Memphis for a moment.
11           Would you explain to me what Memphis does.
12           MR. O'BEIRNE:  Objection.  Vague.
13           THE WITNESS:  Basically, Memphis goes out,
14  gets a list of torrent hashes -- or gets a torrent
15  hash, goes out to the trackers, talks to them, gets
16  the swarm data, and brings them back.
17  BY MR. BROPHY:
18     Q     So Memphis is responsible for reaching out
19  to the tracker servers and retrieving the UDP binary
20  formatted information about the swarm; is that
21  correct?
22           MR. O'BEIRNE:  Objection.  Mischaracterizes
23  testimony.
24           THE WITNESS:  Memphis reaches out, takes
25  the binary information, converts it back to port/IP
```

Page 226

```
 1   pairs, and sends it back to the system.

 2   BY MR. BROPHY:

 3       Q    Okay.  Does Memphis retain the UDP binary

 4   formatted material that it receives from the tracker

 5   website?

 6             MR. O'BEIRNE:  Object.  Vague as to

 7   "retain."

 8             And you can answer.

 9             THE WITNESS:  I'm just waiting for him to

10   be done.

11   BY MR. BROPHY:

12       Q    You can go ahead.

13       A    No, it does not retain -- it does not save

14   any of the binary information.

15       Q    And that's true from when Memphis first

16   became operational in 2015 up until today?

17       A    Correct.

18       Q    So now we move on to Pocket.

19             Am I fair to assume that Pocket takes the

20   work that Memphis did and then reaches out to

21   individual clients using the TCP/IP port number

22   information?

23       A    You are correct.

24       Q    So let's walk through that process in a

25   little bit of detail.
```

1          Does Memphis populate a table with specific

2    IP address and port information?

3          MR. O'BEIRNE:  Objection.  Vague.

4          THE WITNESS:  Memphis populates a table

5    with hash, IP, and port.

6    BY MR. BROPHY:

7      Q    What's the name of that table?

8      A    What is that?  It starts with an A.  If

9    you'd asked me earlier, I'd remember.

10          Well, it's in the report that's given.  So

11   I'd have to remember.  It's "auto populate ID" or

12   something of that nature.

13     Q    And then Pocket reads information from that

14   table?

15     A    Not directly.  Through a -- through a

16   JDBC -- or I'm so sorry.  Getting a little warm, a

17   little tired -- through a JSP page that reads that

18   information.

19     Q    Does Pocket reach out to individual

20   BitTorrent clients using the IP address and port

21   information provided from the JSP page?

22     A    That is correct.

23     Q    When Pocket reaches out, what does it do

24   specifically with respect to that client?

25          MR. O'BEIRNE:  Objection.  Vague.

```
 1           THE WITNESS:  Okay.  So it opens up a
 2  socket, starts the BitTorrent protocol, which I
 3  believe hasn't changed, where you open up the socket
 4  and you send in the torrent hash you're looking for.
 5  And they respond in one of many different ways.
 6  BY MR. BROPHY:
 7     Q    Is one of the responses "I don't have
 8  anything"?
 9     A    Usually that response is they cut
10  everything -- they close the connection.
11     Q    So option A is --
12     A    Close the connection and go away.
13     Q    Client closes connection.  Okay.
14          What is option B?
15     A    Option B is they hold the connection open
16  and send us a bit field.
17     Q    And is that true whether the client is
18  operating traditionally or with a lazy bit field?
19          MR. O'BEIRNE:  Objection.  Vague and
20  confusing.
21          THE WITNESS:  Each client is slightly
22  different.  Some, if you hold a connection open long
23  enough, will eventually populate the full bit field.
24  Some will only give you a partial lazy bit field.
25          And if they're not operating a lazy bit
```