# Exhibit 5

```
 1                UNITED STATES DISTRICT COURT
 2                 WESTERN DISTRICT OF TEXAS
 3                      AUSTIN DIVISION
 4   UMG RECORDINGS, INC., et al.,    )
                                      )
 5            Plaintiffs,             )
                                      )
 6       vs.                          )
                                      ) Case No.
 7   GRANDE COMMUNICATIONS NETWORKS   ) 1:17-cv-00365-
     LLC,                             ) LY
 8                                    )
              Defendant.              )
 9   _____)
10
11
12
13      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
14         VIDEO DEPOSITION OF CHRISTOPHER SABEC,
15     30(b)(6) REPRESENTATIVE FOR RIGHTSCORP, INC.
16                 Santa Monica, California
17                 Tuesday, August 7, 2018
18
19
20
21
22   REPORTED BY:
23   JEAN KIM
     CSR NO. 13555, RPR
24
25
```

CHRISTOPHER SABEC HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY  8/7/2018

Page 2

```
 1                UNITED STATES DISTRICT COURT
 2                 WESTERN DISTRICT OF TEXAS
 3                      AUSTIN DIVISION
 4    UMG RECORDINGS, INC., et al.,    )
                                       )
 5            Plaintiffs,              )
                                       )
 6        vs.                          )
                                       ) Case No.
 7    GRANDE COMMUNICATIONS NETWORKS   ) 1:17-cv-00365-
      LLC,                             ) LY
 8                                     )
              Defendant.               )
 9    _____)
10
11       Video Deposition of CHRISTOPHER SABEC, 30(b)(6)
12    REPRESENTATIVE FOR RIGHTSCORP, INC., taken on
13    behalf of the Defendant, at 100 Wilshire Boulevard,
14    Suite 1000, Santa Monica, California, commencing at
15    9:10 a.m., on Tuesday, August 7, 2018, before
16    Jean Kim, CSR No. 13555, RPR, a Certified Shorthand
17    Reporter in and for the County of Los Angeles,
18    State of California.
19
20
21
22
23
24
25
```

```
 1              One:  Is Holly Schilz the person who knows
 2   the most about ISP processes and so forth, the kinds
 3   of things we've been talking about just now?
 4       A    Yes.
 5       Q    Two:  You mentioned the call center and
 6   receiving those calls.  Are those calls recorded?
 7            MR. O'BEIRNE:  Objection.  Form.
 8            THE WITNESS:  No.
 9   BY MR. BROPHY:
10       Q    So Rightscorp does not record phone calls
11   in its call center?
12            MR. O'BEIRNE:  Same.
13            THE WITNESS:  No.
14   BY MR. BROPHY:
15       Q    Has that always been the case?
16       A    At one point, we had the ability to record
17   set up.  There were some abusive situations that
18   were going on, and it was one of the ways to protect
19   the call center.  And they had a button that they
20   could press if they ever felt threatened or
21   uncomfortable, and they were instructed to inform
22   the person they were now recording the call, they
23   are now on a recorded line.
24            I believe at one point that was set up
25   universally, and it was recording -- that all the
```

1  calls got set up that way.  And so, then, we changed
2  that because I don't want to have -- it was never
3  our intention to have recorded calls.  And there
4  was, like, a significant data storage cost on that.
5          And there's been a couple instances where
6  the other side has recorded calls on their own.
7  Like, they've threateningly said, "Oh, we're
8  recording the calls."  So that's basically it.  It
9  was never a policy of the company to record calls.
10     **Q    Is there -- during what time period was the**
11 **company recording at least certain portions of its**
12 **call center activity?**
13     A    Probably when the -- for a short period of
14 time sometime in 2015, maybe.  The summer of 2015 or
15 the summer of 2014.  I could figure out exactly
16 when.  Because it happened to be the summer I spent
17 two months down here with my family.
18          MR. BROPHY:  Why don't we take a break.
19 Thank you for your patience.
20          THE VIDEOGRAPHER:  Going off the record at
21 11:00 a.m.
22          (Recess.)
23          THE VIDEOGRAPHER:  We're back on the record
24 at 11:16.  This is Media Number 3 in the deposition
25 of Chris Sabec.

```
 1    BY MR. BROPHY:
 2         Q    Even though it meets Rightscorp's
 3    definition for a repeat infringer?
 4              MR. O'BEIRNE:  Objection.  Calls for a
 5    legal conclusion.  Speculation.
 6              THE WITNESS:  Correct.  But if you recall
 7    at the beginning, I said there's two different
 8    definitions here.  Maybe we should have chosen
 9    internally to talk about repeat infringers with a
10    different term.  We could have called them
11    tiddlywinks, you know.  Or we could have had a name
12    for it, but --
13              We use the same term, but it means
14    different things.  There's the legal obligation of a
15    repeat infringer, and then there's just the people
16    that repeatedly infringe.
17              And we're never trying to terminate
18    anybody.  We're only trying to get people to stop
19    infringing and, you know, protect them from the
20    liability that they're incurring by their
21    infringement when we're facing the actual infringer.
22    BY MR. BROPHY:
23         Q    I'd like to understand a little bit better
24    how the dollar amount that was decided upon was
25    decided upon.
```

```
 1              And I'm not talking about the $30.  What
 2    I'm trying to get at is if your call center staff
 3    receive a phone call from someone and they've been
 4    accused of infringing 100 times.  100 times
 5    30 -- times 20 or 30, it's a lot of money.
 6              How much of a discount would you give in
 7    those circumstances?  Would there be a discount?
 8    What are the factors that you consider in
 9    determining that discount, if there was one?
10              I'm asking a lot of questions at once,
11    which is improper.  So I'm going to stop that.
12              Were there specific guidelines that
13    Rightscorp personnel used to determine pricing that
14    would ultimately be paid by someone who called in?
15       A    Right.  There was --
16            MR. O'BEIRNE:  Go ahead.
17            THE WITNESS:  There was an attempt to make
18    it consistent.  Sometimes it was inconsistent
19    because you're dealing with different personalities
20    of people and you couldn't, you know, make them
21    always adhere to it.
22              And I'd say there was two attempts to have
23    consistency.  We had a -- a chart.  I do recall
24    seeing it at one point.  Again, I wasn't really
25    running the call center.
```

 1               So we had a chart at one point that showed
 2     a way to offer discounts.  But I think what ended up
 3     happening to that is we found that some people were
 4     more aggressive in the discount than others.
 5               And I felt it was -- would be -- it was
 6     just bad form for one infringer to call and get
 7     Billy on the phone and have his discount be
 8     X percent and the next infringer call with the same
 9     number of infringements and get Sally on the phone
10     and have a much more egregious -- or a much more
11     forgiving settlement.  I just didn't think that was
12     right.  We needed consistency.
13               And because one of our goals in coming up
14     with this model was that it -- to feel like a bad
15     speeding ticket.  We wanted the worst it ever felt
16     like was a bad speeding ticket.  Not like a DUI
17     speeding ticket but a -- you know, a 25 on the
18     freeway speeding ticket.
19               And I believe we looked it up in California
20     even.  We found that the most expensive speeding
21     ticket you can get that doesn't move into, like, a
22     real infraction, like, a DUI type of thing, was
23     $990.
24               So when we moved to $30 an infringement, we
25     came up with a policy where we would enforce the

```
 1    first 33 infringements and anything over 33 we
 2    wouldn't enforce.  So 990 became the cap.
 3    BY MR. BROPHY:
 4         Q    To stay within that --
 5         A    Correct.
 6         Q    Under $1,000 --
 7         A    Yes.
 8         Q    -- amount.
 9         A    Stay under 1,000, and -- and we gave a
10    little bit of leeway.  We told them if it's, like,
11    the same -- it had to be 33 different copyrights,
12    like, for them to really enforce it.  And they had a
13    little bit of leeway.
14              Sometimes we'd have somebody come and
15    say -- have somebody come and say to me, "It's
16    really" -- "I know it looks like it's 30
17    infringements, but it's really 15," for various
18    reasons because it might have been the same song
19    from a different album.  And we would make a -- just
20    a determination to forgive the doubles.
21         Q    Were there discounts that were given or are
22    given -- let me try that differently.
23              My understanding is that Rightscorp
24    generates notices on a per-song basis; is that
25    correct?
```

```
 1      A     A per-copyright basis.
 2      Q     A per-copyright basis.
 3      A     That we represent.
 4      Q     Okay.  And would Rightscorp treat an
 5   individual differently if -- let's say they're two
 6   individuals who call in.  One of them received 50
 7   notices all for the same work.  One of them received
 8   50 notices all for different works.
 9            Would those two individuals be treated
10   differently when it came time to make a payment to
11   Rightscorp?
12            MR. O'BEIRNE:  Objection.  Vague.  Calls
13   for speculation.  And hypothetical.
14            THE WITNESS:  If they called in and talked
15   to us about it, I think that would be a situation
16   where they would be treated differently.
17   BY MR. BROPHY:
18      Q     Which one would be given more of a discount
19   between those two?
20      A     50 of the same song.  Assuming it was the
21   exact same torrent and they just had it in their
22   share folder and it kept sending it over and over
23   and over and over again, there would be a little bit
24   more education, a little explaining because it was
25   one -- it was one copyright.
```

 1      Q    Can you give me a sense of the degree of
 2  discount between those two things?
 3      A    Can't.
 4           MR. O'BEIRNE:  Same objections.
 5           THE WITNESS:  Well, on the following
 6  policy -- following that last policy I described,
 7  the first one would probably be given the 990.  And
 8  there might be a discount from there, or they might
 9  put it on a payment plan.
10           But I gave some leeway to the people to
11  listen.  We were compassionate.  We wanted -- you
12  know, if they told us a story of real hardship, we'd
13  try to work with them.  We had payment plans and
14  things like that.
15           But the one that's one, they probably would
16  have gotten a significant discount.
17  BY MR. BROPHY:
18      Q    Just to make sure the record's clear, a
19  moment ago you said the first one would be charged
20  990.  You meant the individual with the 50 separate?
21      A    Correct.  Correct.  That would have been --
22           MR. O'BEIRNE:  Hold on.
23  BY MR. BROPHY:
24      Q    The 50 notices for separate works as
25  opposed to the person who would get a more

```
 1    significant discount, which is the person who
 2    received 50 notices on the same work; is that
 3    correct?
 4            MR. O'BEIRNE:  Objection.  Calls for a
 5    hypothetical.  Vague.  Misstates testimony.
 6            You may answer.
 7            THE WITNESS:  Correct.  If we -- if the
 8    first person that came to us with 50 copyrights
 9    under the reformed policy that we put in place when
10    we went to 30 that was capping everything at 990, we
11    enforce the first 33 copyrights.  We'd charge them
12    for 33 and then forgive the rest.  Because 50 times
13    30 would have been $1,500.  So they would think they
14    had a 50 -- or they would be told that they had
15    $1,500 in liability, but we would settle that for
16    990.
17    BY MR. BROPHY:
18       Q    And what amount would the person who
19    received 50 notices on the same song likely pay?
20            MR. O'BEIRNE:  Objection.  Calls for
21    speculation.  Calls for a hypothetical.  I think
22    outside the scope at this point.
23            But go on.
24            THE WITNESS:  Right.  I'm not sure.  It
25    would be on a case-by-case basis determined by the
```

```
 1    person dealing with them, the call center person.
 2    BY MR. BROPHY:
 3        Q    And do you have any documentation regarding
 4    the discount policies or guidelines for pricing or
 5    anything like that?
 6        A    No.
 7        Q    That's just something that was understood
 8    generally inside the call center?
 9        A    Correct.
10        Q    Is that something that is still applied
11    within the call center, some notion of a kind of
12    general discount policy?
13        A    We don't have a call center right now.
14        Q    Okay.
15        A    So it's all online.
16        Q    I see.
17             When did that call center cease to exist?
18        A    I'd say about a year ago.  I'm not sure the
19    exact date.
20        Q    Is that because there just wasn't enough
21    money in it to keep maintaining that call center?
22        A    That was part of it.  It was the new CEO
23    wanted to move the company to Santa Barbara.  We
24    were in Los Angeles, and that's where the call
25    center was.  So in that process of closing down one
```

```
 1    office space and moving up another, the staff didn't
 2    want to move.  So we just -- yeah.  So we just moved
 3    it online for the short term.
 4         Q    Did call center personnel receive any form
 5    of commission for the settlements that they would
 6    make?
 7         A    I don't believe it was a commission.  It
 8    was more of a bonus.  And that was handled by
 9    Robert.  There was something consistent that they
10    worked out, bonuses with their paychecks.
11         Q    Do you know how much of -- was it a
12    percentage of the amount that was settled, or was it
13    based on some other metric?
14              MR. O'BEIRNE:  Objection.  Outside the
15    scope.  Calls for speculation.
16              THE WITNESS:  I think there was -- there
17    was various variables that were used by the
18    supervisors of the call center staff, Robert,
19    Vincent, and Holly at different times.
20    BY MR. BROPHY:
21         Q    Okay.  If somebody today receives a notice
22    and has a question about that notice, is there a way
23    for them to reach out to Rightscorp to get any
24    answers now that the call center's closed?
25         A    I'm not sure.  They could e-mail and -- and
```

```
 1   it would come in to the technology team.
 2       Q    Who is responsible for responding to those
 3   e-mails?
 4       A    At this point, I'm not sure because I'm not
 5   there anymore.
 6       Q    Is -- even though you're not aware of who
 7   that person is, are you aware that there's an e-mail
 8   inbox that receives those kinds of requests
 9   currently at Rightscorp?
10       A    I know we have an e-mail inbox.
11       Q    And it's the e-mail inbox that's identified
12   to those who have questions about --
13       A    On the notices.
14       Q    You say you're not there anymore.  Can you
15   explain that to me.
16       A    We talked about that.  I'm not at
17   Rightscorp anymore.  I'm a consultant.
18       Q    You're a consultant.  Okay.  And I should
19   have asked about that, and I didn't.
20            What is your role now as a consultant for
21   Rightscorp?
22       A    I guess it's best described as as needed by
23   the CEO.
24       Q    And then obviously you're providing
25   litigation consultation services as well?
```

```
 1      A    All the -- we -- we produced all the
 2   documents that we had.
 3      Q    Does Rightscorp retain written records of
 4   the calls it receives from subscribers?
 5      A    No.
 6      Q    Has it ever retained or recorded written
 7   notes from calls?
 8      A    Yes.
 9           MR. O'BEIRNE:  Objection.  Scope.
10           THE WITNESS:  Yeah.  I believe so.  Yes.
11   BY MR. BROPHY:
12      Q    Does Rightscorp still have those records?
13      A    No.
14      Q    During what time frame did Rightscorp
15   collect those or record those written records?
16           MR. O'BEIRNE:  Objection.  Scope.
17           THE WITNESS:  I'm not sure.
18   BY MR. BROPHY:
19      Q    Can you give me some rough approximation?
20      A    Prior to 2017.
21      Q    Can't be any more specific than that?
22      A    No.
23      Q    Did Rightscorp delete those records?
24      A    No.
25      Q    How is it that it came to be they no longer
```

```
 1    exist?
 2           MR. O'BEIRNE:  Objection.  Mischaracterizes
 3    the testimony as to "no longer exist."
 4           THE WITNESS:  Right.  We didn't delete
 5    them.  They just no longer exist.
 6    BY MR. BROPHY:
 7       Q   How did they disappear?
 8           MR. O'BEIRNE:  Objection.  Mischaracterizes
 9    testimony.
10           THE WITNESS:  They were in Salesforce.
11    BY MR. BROPHY:
12       Q   And explain how that answers that question.
13           Did you stop using Salesforce?
14       A   We stopped paying for the Salesforce
15    access.
16       Q   And when you stopped paying for that
17    access, the data that was in Salesforce was no
18    longer accessible?
19           MR. O'BEIRNE:  Objection.  Calls for
20    speculation.  Foundation.  Outside the scope.
21           THE WITNESS:  Correct.
22    BY MR. BROPHY:
23       Q   Did Rightscorp take any steps to preserve
24    the information that it had recorded in the
25    Salesforce software or service?
```

```
 1              MR. O'BEIRNE:  Same objection.
 2              THE WITNESS:  No.
 3   BY MR. BROPHY:
 4       Q    So if there was an instance of someone
 5   calling in and saying that one of the notices was
 6   flawed or incorrect or false and it was recorded in
 7   Salesforce, that information is no longer available
 8   today?
 9              MR. O'BEIRNE:  Objection.  Mischaracterizes
10   the testimony.  Foundation.  Calls for speculation.
11              THE WITNESS:  I believe so.  Yes.
12   BY MR. BROPHY:
13       Q    How, if at all, did the call center record
14   how it offered settlements to subscribers or the
15   number value of the settlements that it offered to
16   subscribers?
17              MR. O'BEIRNE:  Objection.  Vague and
18   compound.
19              THE WITNESS:  I'm not sure.  In the notes.
20   But it was also the settlement that got paid that we
21   would know the settlement got paid.
22   BY MR. BROPHY:
23       Q    And when you say "in the notes," those are
24   the written notes that no longer exist; is that
25   correct?
```

```
 1          MR. O'BEIRNE:  Objection.  Mischaracterizes
 2   testimony.
 3          THE WITNESS:  Correct.
 4   BY MR. BROPHY:
 5      Q   In your earlier deposition in the Cox case,
 6   you indicated that, from time to time, you would
 7   review what you characterized as a binder of
 8   e-mails.
 9          Do you recall giving that testimony?
10      A   I don't recall giving it, but if I -- if
11   it's on the record, it's on the record.
12      Q   Do you have a binder of e-mails --
13      A   No.
14      Q   -- that you reference?
15      A   No.
16      Q   Do you recall ever having a binder of
17   e-mails that you had referenced?
18      A   I didn't have it.  It was in the office.
19      Q   Do you know if that binder of e-mails still
20   exists?
21      A   No.
22      Q   What did that binder of e-mails relate to?
23          MR. O'BEIRNE:  Objection.  Calls for
24   speculation.  Scope.
25          THE WITNESS:  I'm not sure.  I need to know
```