UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UMG RECORDINGS, INC., | § | No. 1:17-CV-365-DAE |
| CAPITOL RECORDS, LLC, | § | |
| WARNER BROS. RECORDS, INC., | § | |
| SONY MUSIC ENTERTAINMENT, | § | |
| ARISTA RECORDS, LLC, ARISTA | § | |
| MUSIC, ATLANTIC RECORDING | § | |
| CORPORATION, CAPITOL | § | |
| CHRISTIAN MUSIC GROUP, INC., | § | |
| ELECKTRA ENTERTAINMENT | § | |
| GROUP, INC., FONOVISA, INC., | § | |
| FUELED BY RAMEN, LLC, LAFACE | § | |
| RECORDS, LLC, NONESUCH | § | |
| RECORDS, INC., RHINO | § | |
| ENTERTAINMENT COMPANY, | § | |
| ROADRUNNER RECORDS, INC., | § | |
| ROC-A FELLA RECORDS, LLC, | § | |
| TOOTH & NAIL, LLC, and ZOMBA | § | |
| RECORDING, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| GRANDE COMMUNICATIONS | § | |
| NETWORKS, LLC, | § | |
| | § | |
| Defendant. | § | |

ORDER: (1) ADOPTING REPORT AND RECOMMENDATIONS (DKTS.
## 240, 241); (2) GRANTING PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO GRANDE'S DMCA SAFE HARBOR
DEFENSE (DKT. # 127); (3) GRANTING IN PART AND DENYING IN PART
GRANDE'S MOTION FOR SUMMARY JUDGMENT (DKT. # 140); (4)
DENYING GRANDE'S MOTION FOR SANCTIONS (DKT. # 156); AND (5)
DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AS TO LIABILITY (DKT. # 172).

1

Before the Court are two Report and Recommendations, both filed by Magistrate Judge Andrew W. Austin on December 12, 2018.  (Dkts. ## 240, 241.) Pursuant to Local Rule CV-7(h), the Court finds this matter suitable for disposition without a hearing.  After careful consideration and review, the Court—for the reasons that follow—(1) **ADOPTS** the Report and Recommendations (Dkts. ## 240, 241); (2) **GRANTS** Plaintiffs' Motion for Partial Summary Judgment as to Grande's DMCA safe harbor defense (Dkt. # 127); (3) **GRANTS IN PART AND DENIES IN PART** Grande's Motion for Summary Judgment (Dkt. # 140); (4) **DENIES** Grande's Motion for Sanctions (Dkt. # 156); and **DENIES** Plaintiff's Motion for Summary Judgment as to Liability (Dkt. # 172).

## BACKGROUND

Plaintiffs in this case are record companies that produce commercial sound recordings and distribute them throughout the United States.  (Dkt. # 1 at 2.) Remaining Defendant Grande Communications Networks, LLC ("Grande") is an internet service provider ("ISP"), providing internet access to customers in Texas. (Id.)  Former Defendant Patriot Media Consulting, LLC ("Patriot") provided and continues to provide various management services to Grande.  (Id. at 6.)  Plaintiffs originally filed suit against both Grande and Patriot.  (Id. at 1.)  Plaintiffs asserted that Defendants received over one million notices of direct copyright infringement allegedly committed by Grande's customers.  (Id. at 2, 11–12.)  Plaintiffs allege

that these customers directly infringed on Plaintiffs' copyrights through the use of various of file sharing applications, including BitTorrent.  (Id. at 2, 8–12.) Plaintiffs' complaint asserted claims for secondary copyright infringement under 17 U.S.C. § 101 et seq. against both defendants, alleging Defendants continued to provide infringing customers with internet access after receiving the notices of infringement.  (Id. at 13, 15, 17.)

On April 19, 2017, Defendants filed separate motions to dismiss under Federal Rule of Civil Procedure 12(b)(6).  (Dkts. ## 28, 29.)  On March 26, 2018, the Court adopted a Report and Recommendation from Magistrate Judge Austin recommending Patriot's motion be granted in its entirety and Grande's motion be granted as to Plaintiffs' claims for vicarious secondary infringement.[1]  (Dkts. ## 72 at 21; 77 at 3.)  Patriot was thus dismissed as a defendant from this action.  (See id.)  Therefore, the only remaining claim in this case is for contributory secondary copyright infringement against Grande.

---

[1] There are two recognized types of secondary infringement: contributory and vicarious.  Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005).  Contributory copyright infringement occurs where a defendant "intentionally induc[ed] or encourag[ed] direct infringement."  Id.  Vicarious infringement occurs when a defendant "profits directly from the infringement and has a right and ability to supervise the direct infringer, even if the defendant initially lacks knowledge of the infringement."  Id. at 931 n.9.

3

On April 9, 2018, Grande filed their answer to the complaint.  (Dkt. # 80.)  Among other affirmative defense, Grande pled the safe harbor provision of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512(i).  § 512(i) protects ISPs like Grande from liability for the copyright infringement of their customers if the ISP "has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers[.]"  17 U.S.C. § 512(i)(1)(A).

On August 8, 2018, Plaintiffs filed a motion for summary judgment as to Grande's affirmative defense of the DMCA safe harbor provision.  (Dkt. # 127.)  On December 18, 2018, Judge Austin issued a Report and Recommendation (the "Safe Harbor Report") recommending Plaintiffs' motion be granted as to the safe harbor issue.[2]  (Dkt. # 241.)  On January 23, 2019, Grande filed written objections.  (Dkt. #  251.)  On January 23, 2019, Plaintiffs filed a response to Grande's objections.

---

[2] On September 17, 2018, by order of the Court, the case was referred to Magistrate Judge Austin.  (Dkt. # 183.)  And on October 30, 2018, the case was reassigned to this Court by the Honorable Lee Yeakel.  (Dkt. # 212.)

Additionally, on August 18, 2018, Grande filed a motion for summary judgment as to the issues of liability and damages.  (Dkt. # 140.)  On September 11, 2018, in their response in opposition to Grande's motion for summary judgment, Plaintiffs cross moved for summary judgment as to liability.  (Dkt. # 172.)  On December 18, 2018, Judge Austin issued a Report and Recommendation (the "Liability Report") recommending Grande's motion for summary judgment be granted as to Grande's alleged liability for infringing Plaintiffs' reproduction rights under 17 U.S.C. § 106(1) and public performance rights under 17 U.S.C. § 106(6).  (Dkt. # 240.)  The Liability Report also recommends denying Grande's motion in all other respects and denying Plaintiffs' motion for summary judgment in its entirety.  (Id.)  Both Plaintiffs and Grande filed objections to the Liability Report on January 9, 2019.  (Dkts. ## 250, 252.)  Plaintiffs filed a response to Grande's objections on January 23, 2019.  (Dkt. # 257.)  Grande filed a response to Plaintiffs' objections on the same day.  (Dkt. # 258.)  On January 30, 2019, Plaintiffs filed a reply in support of their objections. (Dkt. # 259.)

The Safe Harbor Report and the Liability Report and the parties' objections thereto are currently before the Court.

<u>LEGAL STANDARD</u>

I.   <u>Review of the Magistrate Judge's Report and Recommendations</u>

Any party who desires to object to a Magistrate Judge's findings and recommendations must serve and file written objections within 14 days after being served with a copy of the findings and recommendation.  Fed. R. Civ. P. 72(b)(2).  The Court conducts a de novo review of any of the Magistrate Judge's conclusions to which a party has specifically objected.  <u>See</u> 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.").  Findings to which no specific objections are made do not require de novo review; instead, the Court need only determine whether the memorandum and recommendation is clearly erroneous or contrary to law.  <u>United States v. Wilson</u>, 864 F.2d 1219, 1221 (5th Cir. 1989).  As the parties have timely filed objections to the Magistrate Judges Report and Recommendations, the Court reviews de novo those portions of the reports to which objections have been raised.

II.   <u>Summary Judgment</u>

Summary judgment is proper if "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>see also</u> <u>Meadaa v. K.A.P. Enters., L.L.C.</u>, 756 F.3d 875, 880 (5th Cir. 2014).  A dispute is genuine only "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the nonmoving party must come forward with specific facts that establish the existence of a genuine issue for trial. Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703, 706 (5th Cir. 2013) (quoting Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 621 (5th Cir. 2000)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

In deciding whether a fact issue has been created, the court must draw all reasonable inferences in favor of the nonmoving party, and it "may not make credibility determinations or weigh the evidence." Tiblier v. Dlabal, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form. See Fed. R. Civ. P. 56(c); Lee v. Offshore Logistical & Transp., LLC, 859 F.3d 353, 355 (5th Cir. 2017). However, "[u]nsubstantiated assertions, improbable inferences, and

unsupported speculation are not sufficient to defeat a motion for summary

judgment." United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012)

(quoting Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003)).

Finally, when, as here, "parties file cross-motions for summary

judgment, [the court] review[s] each party's motion independently, viewing the

evidence and inferences in the light most favorable to the nonmoving party."

Green v. Life Ins. Co. of N. Am., 754 F.3d 324, 329 (5th Cir. 2014) (internal

quotation marks omitted) (quoting Duval v. N. Assur. Co. of Am., 722 F.3d 300,

303 (5th Cir. 2013)).

## DISCUSSION

I.   Report and Recommendation Regarding Plaintiff's Motion for Partial
     Summary Judgment as to Grande's Statutory Safe Harbor Defense

In order to be entitled to the DMCA's safe harbor protections, an ISP

must "adopt[] and reasonably implement[] . . . a policy that provides for the

termination in appropriate circumstances of subscribers and account holders . . .

who are repeat infringers[.]"  17 U.S.C. § 512(i)(1)(A).  The Safe Harbor Report

recommends granting summary judgment to Plaintiffs because:

> [t]he undisputed evidence shows that though Grande may have adopted
> a policy permitting it to terminate a customer's internet access for
> repeat infringement, Grande affirmatively decided in 2010 that it would
> not enforce the policy at all, and that it would not terminate any
> customer's account regardless of how many notices of infringement
> that customer accumulated, regardless of the source of the notices, and
> regardless of the content of a notice.

(Dkt. # 241 at 12.)  Grande objects to this conclusion, asserting that "[t]here are fact issues for trial regarding whether Grande 'reasonably implemented' its repeat infringer termination policies" and "[t]here are triable issues of material fact regarding the existence of 'appropriate circumstances' warranting termination." (Dkt. # 251 at 3, 7.)  Because of Grande's objections, the Court reviews this issue de novo.  28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.").

　　　　　As a party asserting the affirmative defense of the DMCA's safe harbor, Grande "bears the burden of raising entitlement to the safe harbor and of demonstrating that it has . . . taken the steps necessary for eligibility."  Capitol Records, LLC v. Vimeo, LLC, 826 F.3d 78, 94 (2d Cir. 2016); see also Mavrix Photographs, LLC v. Livejournal, Inc., 873 F3d 1045, 1052 (9th Cir. 2017) ("Because the [§ 512(i)] safe harbor is an affirmative defense, [a defendant] must establish 'beyond controversy every essential element,' and failure to do so will render [a defendant] ineligible for the [§ 512(i)] safe harbor's protection.").

　　　　　Grande argues that it has adopted an appropriate policy because since 2012 it has had a public-facing policy providing for the termination of infringing subscribers.  (Dkt. # 251 at 4.)  The evidence in the record indicates the opposite. Although Grande apparently stated publicly that its policy was to terminate

infringing customers, Grande's corporate representative testified that from 2010

through 2016, Grande did not have any specific policies or procedures providing

for how it would actually go about terminating any such infringing customers.

(Dkt. # 127-21, Ex. B at 8–9.)  In internal emails, one Grande employee even

stated that "we have users who are racking up DMCA take down requests and no

process for remedy in place."  (Dkt. # 127-22, Ex. D.)

  Moreover, to be eligible for the DMCA safe harbor, an ISP must

"reasonably implement" a termination policy, not just adopt one.  17 U.S.C. §

512(i)(1)(A).  And "an ISP has not 'reasonably implemented' a repeat infringer

policy if the ISP fails to enforce the terms of its policy in any meaningful fashion."

BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc., 881 F.3d 293, 303 (4th Cir.

2018).  Adopting a repeat infringer termination policy that is not "carried out is not

an 'implementation' as required by § 512(i)."  In re Aimster Copyright Litig., 252

F. Supp. 2d 634, 659 (N.D. Ill. 2002), aff'd, 334 F.3d 643 (7th Cir. 2003).  "[T]he

relevant question is whether [the ISP] actually terminates the uploading privileges

of repeat infringers under appropriate circumstances."  Capitol Records, LLC v.

Escape Media Grp., Inc., No. 12-CV-6646, 2015 WL 1402049, at *12 (S.D.N.Y.

Mar. 25, 2015).

  Prior to 2010, Grande enforced "a policy of turning off all subscribers

upon copyright violation notice, requiring the customer to then contact Grande to

discuss the issue, understand what happened, inform the customer of why they'd been shut off, and take appropriate action from there." (Dkt. # 127-3, Ex. C at 12.) However, beginning in October 2010, Grande's practice of terminating customers ceased (id. at 12–13.), and Grande did not terminate a single infringing customer from October 2010 until May 2017 (Dkt. # 127-7, Ex. G at 6). Yet during that period Grande received over a million copyright infringement notices, it was tracking over 9,000 customers on its DMCA "Excessive Violations Report" by late 2016, and it specifically tracked users by the number of notices it received about them. (Dkts. ## 127-9, Ex. I at 5; 127-3, Ex. C at 9.)

In internal emails, Grande employees recognized that "we have some customers that are up to their 54th notice[,]" yet "there is no 'three strikes' law or anything that we follow like some ISPs." (Dkt. # 127-22, Ex D.) Grande's corporate representative further admitted that until 2017 it would not terminate a user for infringement "regardless of the source of any notice," regardless of the content of any notice," and "regardless of the volume of notices . . . for a given customer." (Dkt. # 127-7, Ex. G at 6–7.) It was not until June 2017, two months after the commencement of this litigation, that Grande terminated any customers, and even then, it only terminated eleven customers in all of 2017. (Dkt. # 127-24, Ex. H at 1–3.)

Such an utter failure to terminate any customers at all over a six-and-a-half-year period despite receiving over a million infringement notices and tracking thousands of customers as repeat infringers demonstrates that Grande "made every effort to avoid reasonably implementing [its] policy" and "very clearly determined *not* to terminate subscribers who in fact repeatedly violated the policy." BMG, 881 F.3d at 303 (emphasis in original). Comparing the facts in this case to the facts in BMG is instructive on this point.

In BMG, the defendant Cox Communications, Inc. ("Cox") actually had formal procedures in place that would lead to a customer's termination. The first copyright notice would result in no action. Id. at 299. The second through seventh copyright notices related to a specific customer would result in Cox sending a warning email to the customer. Id. After the eight and ninth notices, Cox would require the customer to click an acknowledgment on their web browser before being able to access websites. Id. After the tenth and eleventh notices, Cox suspended service, requiring the customer to call a technician, who would reactivate service only after advising the customer of the reason for suspension and advising removal of any infringing content. Id. After the twelfth notice, the account would again be suspended, requiring the customer to contact a specialized technician before service would be reactivated. Id. And finally, after a thirteenth notice, Cox would finally consider termination, though termination was not

12

automatic.  Id.  Because this policy was laxly enforced and often circumvented, the Fourth Circuit affirmed the district court's ruling that Cox failed to qualify for the DCMA safe harbor.  Id. at 303.

Grande argues that BMG is inapposite in this case because in BMG Cox "failed to follow through on its own policy" because Cox internally concluded that a subscriber should be terminated, but then declined to do so to preserve a revenue stream.  (Dkt. # 251 at 6 (quoting BMG, 881 F.3d at 293).)  In this case, in contrast, Grande argues, "there is no evidence that Grande ever internally concluded that a particular subscriber should be terminated pursuant to Grande's public-facing policies, and then nevertheless declined to enforce that policy and terminate the subscriber's account."  (Id. at 7.)

But in BMG, Cox at least had internal procedures that in theory could lead to the termination of a customer, even if they were laxly enforced and often circumvented.  In this case, the evidence is clear that from at least 2011 until 2016 Grande had no internal policy or procedures whatsoever to enforce their forward-facing statement that they would terminate customers for repeat infringements. (Dkt. # 127-21, Ex. B at 8–9.)  Grande admitted that until 2017 it would not terminate a user for infringement "regardless of the source of any notice," regardless of the content of any notice," and "regardless of the volume of notices . . . for a given customer."  (Dkt. # 127-7 at 6–7.)  And in fact Grande did not

13

terminate a single infringing customer from October 2010 until May 2017 (Dkt.

# 127-7 at 6.)  Unlike Cox, Grande did not even have a policy or procedures in the

first place for them to laxly enforce or frequently circumvent.

Grande thus did even less than Cox to "reasonably implement" the

kind of policy required for the protections of DMCA's safe harbor.  If lax

enforcement and frequent circumvention of existent procedures disqualifies a

defendant from the safe harbor's protections, the complete nonexistence of such

procedures surely must do likewise.  Such a complete abdication of their

responsibilities to implement and enforce a policy terminating repeat copyright

infringers requires the Court to conclude that Grande is not entitled, as a matter of

law, to the safe harbor provisions of 17 U.S.C. § 512(i).  See, e.g., Perfect 10, Inc.

v. CCBill LLC, 488 F.3d 1102, 1109 (9th Cir. 2007) (holding that implementation

"requires that a service provider terminate users who are 'repeat infringer,'" and an

ISP must "terminate[] users who repeatedly or blatantly infringe copyright");

Escape Media Grp., Inc., 2015 WL 1402949 at *10 ("[T]he relevant question is

whether the [ISP] actually terminates the uploading privileges of repeat infringers

under appropriate circumstances.")

Grande raises two additional arguments as to why summary judgment

should not be granted on this issue, each relating to alleged infirmities in some of

the infringement notices it received.  Grande argues that because these notices

14

were "incapable of identifying or giving notice of actual copyright infringement, there are questions of fact as to whether it reasonably implemented a termination policy in spite of never terminating any customers from 2010 to 2016." (Dkt. # 251 at 3–7.) Grande also argues, again because of the supposed flaws in these notices, that there are triable questions of fact whether appropriate circumstances existed warranting termination of any customers. (Id. at 7–8.)

However, these arguments are unpersuasive for several reasons. First, BMG also involved the same notices, generated by a company called Rightscorp, that Grande objects to in this case. Cox argued that these notices "do not necessarily *prove* actual knowledge of repeat infringement." 881 F.3d at 304 (emphasis in original). But the Fourth Circuit held that "Cox's decision to categorically disregard all notices from Rightscorp provides further evidence that Cox did not reasonably implement a repeat infringer policy." Id. The Fourth Circuit explained that Cox's argument was misplaced because "Cox bears the burden of proof on the DCMA safe harbor defense; thus, Cox had to point to evidence showing that it reasonably implemented a repeat infringer policy." Id. at 305. Grande is similarly unable to show such reasonable implementation, because the evidence is undisputed that it failed to terminate any customers from 2010 through 2016, despite receiving over a million infringement notices and tracking more than 9,000 customers as repeat infringers. (Dkts. ## 127-9 at 5; 127-3 at 9.)

Second, Grande's argument that the Rightscorp notices failed to demonstrate appropriate circumstances justifying termination is similarly unpersuasive.  This argument was also made by the defendant in BMG.  881 F.3d at 305.  But just as Cox did in BMG, Grande has:

> failed to provide evidence that a determination of "appropriate circumstances" played any role in its decisions to terminate (or not to terminate). [Grande] did not, for example, point to any criteria that its employees used to determine whether "appropriate circumstances" for termination existed. Instead, the evidence shows that [Grande's] decisions not to terminate had nothing to do with "appropriate circumstances" . . . .

Id.  Grande admitted that it had no procedure in place from 2010 through 2016 providing for how it would actually go about terminating infringing customers. (Dkt. # 127-21, Ex. B at 8–9.)  Grande also admitted that until 2017 it would not terminate a user for infringement "regardless of the source of any notice," regardless of the content of any notice," and "regardless of the volume of notices . . . for a given customer."  (Dkt. # 127-7 at 6–7.)  And Grande did not terminate a single infringing customer from October 2010 until May 2017 (Dkt. # 127-7, Ex. G at 6.)  This evidence indisputably shows that Grande's "decisions not to terminate had nothing to do with 'appropriate circumstances' . . . ."  BMG, 881 F.3d at 305.

Third, Grande's own documents in the record reflect, contrary to the arguments it now advances, that it took the Rightscorp and other notice as affirmative evidence of infringement.  In one April 2013 email exchange, a senior

Grande official stated that "we have some customers who are up to their 54th notice . . . [yet] there is no 'three strikes' law or anything that we follow like some ISPs." (Dkt. # 127-22, Ex. D.)  As a result, the same official then asked, in the same email: "Question – we have users who are racking up DMCA take down requests and no process for remedy in place.  I don't know if I'm seeing a broken process or compliance with the letter of the law.  Do you guys have insight or knowledge on this?"  (Id.)  In the ensuing conversation, another Grande manager reported the following:

> Who is responsible for the DCMA notification process? Do we call customers?
>
> Bartlett just answered my email, and, as you said, they contact the customer and let them know they will disconnect them if they continue to receive those notice.
>
> If we do nothing more tha[n] emails (as I think you mentioned) we might lose our safe harbor status.

(Dkt. # 128-28, Ex. M at 2.)  Other internal emails also demonstrate that Grande viewed the notices as evidence that a customer had infringed a copyright.  (See Dkts. ## 127-17, Ex. Q; 127-30, Ex. R; 127-31, Ex. S.)

Finally, Grande's arguments related to the Rightscorp notices ignores the hundreds of thousands, out of roughly 1.2 million notices of infringement Grande received between 2011 and 2016 (Dkt. # 127-7, Ex. G at 10), came from entities other than Rightscorp.  In 2015, for example, out of 365,569 infringement

notices received, 119,247, roughly one third, were received from other sources.
(Dkt. # 172-18, Ex. R at 2.)  Grande has presented no summary judgment evidence
that these other notices are in any way unreliable.

Even if the Court were to accept Grande's arguments related to the
Rightscorp notices, the summary judgment evidence shows that Grande failed to
terminate a single customer despite the receipt of several hundred thousand other
copyright infringement notices.  Therefore, summary judgment in favor of
Plaintiffs' on this issue is still be appropriate because, as the DMCA safe harbor is
an affirmative defense, Grande carries the burden of demonstrating it is entitled to
raising it.  See Capitol Records, LLC v. Vimeo, LLC, 826 F.3d 78, 94 (2d Cir.
2016) (holding that defendant "bears the burden of raising entitlement to the safe
harbor and of demonstrating that it has . . . taken the steps necessary for
eligibility").  Even ignoring the Rightscorp notices, with no evidence undermining
these hundreds of thousands of other notices, Grande has failed to carry this
burden.

For these reasons, the Court **ADOPTS** the Safe Harbor Report.  (Dkt.
# 241.)  Plaintiffs' Motion for Partial Summary Judgment as to the issue of
Grande's entitlement to the affirmative defense of the DMCA safe harbor
provisions, 17 U.S.C. § 512(i), is therefore **GRANTED**.  (Dkt. # 127.)

II.     Report and Recommendation Regarding Parties' Cross Motions for
        Summary Judgment as to Liability

        A.     Grande's Motion for Summary Judgment

               Grande moved for summary judgment as to liability based on six

arguments: (1) Plaintiffs cannot prove direct infringement by Grande's customer of

their distribution, reproduction, and public performance rights as copyright holders

(Dkt. # 140 at 4); (2) Plaintiffs cannot prove contributory liability (id. at 11);

(3) Plaintiffs cannot prove willful copyright infringement (id. at 18); (4) Plaintiffs

cannot prove that the discovery rule expands the statutory damages period (id. at

18); (5) Plaintiffs cannot prove actual damages or Grande's profits from alleged

infringement (id. at 19); and (6) Plaintiffs cannot prove they own many of the

asserted copyrights (id.).  In opposing Grande's motion, Plaintiffs also moved for

summary judgment in their own favor on the issue of liability.  (See Dkt. 172.)

               The Magistrate Judge's Liability Report recommends granting Grande

summary judgment as to whether Grande's customers violated Plaintiffs

reproduction or public performance rights, and thus whether Grande could be held

contributorily liable for such infringement.  (Dkt. # 240 at 4 n.1.)  In all other

respects, the Liability Report recommends denying both parties' motions.  (Id. at

20–21.)  Grande objects on all six issues to the Liability Report's recommendations

denying the motions.  (Dkt. # 252.)   Plaintiffs object to the Liability Report's

19

recommendations denying their cross motion on direct and contributory

infringement.  (Dkt. # 250.)  Plaintiffs also object to the Liability Report's

recommendation to grant Grande summary judgment on their claim for Grande's

contributory liability for violating their reproduction rights.  (Id.)  The Court

therefore reviews these issues de novo.  See 28 U.S.C. § 636(b)(1)(C) ("A judge of

the court shall make a de novo determination of those portions of the report or

specified proposed findings or recommendations to which objection is made.")

The Court will review each of these issues in turn.

1.    <u>Direct Infringement by Grande's Customers</u>

It is axiomatic that there can be no contributory copyright

infringement without there first being direct copyright infringement.  See, e.g.,

A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1013 n.2 (9th Cir. 2001)

("Secondary liability for copyright infringement does not exist in the absence of

direct infringement by a third party.").  Therefore, in order to prevail on their claim

against Grande for contributory infringement, Plaintiffs must prove direct

infringement committed by Grande's customers.

17 U.S.C. § 106 provides certain exclusive rights to the owners of

copyrights.  As issue in this case are: (1) the right "to reproduce the copyrighted

work" under 17 U.S.C. § 106(1); (2) the right to "distribute copies . . . of the

copyrighted work" under 17 U.S.C. § 106(3); and (3) the right to perform . . .

copyright[ed sound recordings] publicly by means of a digital audio transmission" under § 106(6).  (See Dkt. # 1 at 7.)  "Anyone who violates any of the exclusive rights of the copyright owner as provided by section[] 106 . . . is an infringer of the copyright . . . ."  17 U.S.C. § 501(a).

 To establish direct copyright infringement, a plaintiff must show that (1) he owns a valid copyright and (2) the defendant copied constituent elements of the plaintiff's work that are original.  BWP Media USA, Inc. v. T&S Software Assocs., Inc., 852 F.3d 436, 439 (5th Cir. 2017).  To prove the second element, copying, a plaintiff must prove (1) factual copying and (2) substantial similarity.  Baisden v. I'm Ready Prods., Inc., 693 F.3d 491, 499 (5th Cir. 2012).  Factual copying can be proved by either direct or circumstantial evidence.  Armour v. Knowles, 512 F.3d 147, 152 (5th Cir. 2007).  Substantial similarity requires proof that "the copyrighted expressions in the two works are sufficiently alike that the copyright to the original work has been infringed."  Id.

 Grande moved for summary judgment on the issue of direct infringement, arguing that Plaintiffs cannot prove: (1) substantial similarity; (2) that any Grande subscriber violated the reproduction right using Grande's network; (3) that any Grande subscriber violated the distribution right through Grande's network; (4) direct infringement with respect to each asserted copyright;

and (5) that a Grande subscriber violated the public performance right using
Grande's network.  (Dkt. # 140 at 8–14.)

        i.        Public Performance and Reproduction

As a threshold matter, the Liability Report recommends granting
summary judgment to Grande as to direct infringements by their customers of
Plaintiffs' reproduction and public performance rights as set forth in 17 U.S.C.
§ 106(1) and 106(6) because Plaintiffs' failed to respond to Grande's summary
judgment arguments on these issues.  (Dkt. # 240 at 4 n.1.)  No objection was
raised by either party as to the Liability Report's recommendation of granting
summary judgment as to the violation of public performance rights.  Therefore, the
Court reviews this recommendation for clear error.  United States v. Wilson,
864 F.2d 1219, 1221 (5th Cir. 1989).  The Court concludes the Liability Report's
recommendation on this issue is not clearly erroneous.  See ContiCommodity
Servs. Inc., v. Ragan, 63 F.3d 438, 441 (5th Cir. 1995) ("In order to defeat a
properly supported motion for summary judgment, the nonmoving party must
direct the court's attention to admissible evidence in the record which demonstrates
that it can satisfy a 'fair-minded jury' that it is entitled to a verdict in its favor.").

Moreover, "to perform or display a work 'publicly' means . . . to
transmit or otherwise communicate a performance or display of the work to [a
public place] or to the public . . . ."  17 U.S.C. § 101.  Performance through a

22

digital audio transmission only occurs where "there is a playing of the song that is perceived simultaneously with the transmission." United States v. ASCAP, 627 F.3d 64, 74 (2d Cir. 2010). Making a copyrighted work available for downloading, or actual downloading of a copyrighted work, is not itself a performance. See id. There is no evidence in record of any simultaneous perception and transmission of the copyrighted works at issue in this case.

However, Plaintiffs object to the Liability Report's recommendation to grant summary judgment to Grande as to violation of the right of reproduction. Plaintiffs argue that they stated in their combined opposition and cross motion for summary judgment that their claims involve both uploading and downloading of copyrighted music, the latter of which would constitute an infringement of the reproduction right. (Dkt. # 250 at 3.) However, a review of Plaintiffs' argument in which the referenced language is found makes it clear that their argument is directed solely towards Grande's argument related to violations of the right of distribution. (See Dkt. # 172 at 16–23.) The language in the motion Plaintiffs now attempt to rely on is merely their introductory statement of the law and is then followed only by argument related to distribution. Plaintiffs' motion does not reference or respond to Grande's argument related to reproduction.

Further, Plaintiffs' objections fail to respond to the substance of Grande's summary judgment argument. In this context, violation of a copyright

holder's right to reproduction involves downloading copyrighted material.  See, e.g., Maverick Recording Co. v. Harper, 598 F.3d 193, 197 (5th Cir. 2010); Columbia Pictures Indus., Inc. v. Fung, 710 F.3d 1020, 1034 (9th Cir. 2013).  But Plaintiffs' claims are based on notices and evidence that Grande subscribers made copyrighted material available for download by others.  Plaintiffs have not presented any evidence, either on summary judgment or in their objections to the Liability Report, that Grande subscribers downloaded or otherwise acquired the copyrighted materials through Grande's network, as opposed to any other of a number of plausible—including some legal—means.  There is no evidence at all concerning the origin of the songs at issue.  Without evidence of the origin of the infringing music, there is no evidence the music was obtained in violation of Plaintiffs' right of reproduction, and thus no evidence of direct infringement through illegal reproduction.[3]

ii.   Substantial Similarity

Grande argues that proving a copyright infringement claim "requires a side-by-side comparison of the copyrighted work and the allegedly infringing work, so that the factfinder can assess whether they are 'substantially similar.'"

---

[3] Because there is thus also no evidence subscribers obtained the infringing music through Grande's network, there is no evidence sufficient to support contributory liability against Grande on the basis of infringement through reproduction.

(Dkt. # 140 at 8.)  The necessary implication of this argument is that to prove its case Plaintiffs would have to play every song at issue for the jury, alongside the allegedly identical copy or copies found on Grande's customers' computers. Grande relies for this premise on language found in various decisions of the Fifth Circuit.  For instance, in <u>Bridgmon v. Array Systems Corp.</u>, the court stated "the law of this circuit prohibits finding copyright infringement without a side-by-side comparison of the works."  325 F.3d 572, 577 (5th Cir. 2003).  In <u>Creations Unlimited, Inc. v. McCain</u>, the court stated "[t]o determine whether an instance of copying is *legally actionable*, a side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as "substantially similar.'"  112 F.3d 814, 816 (5th Cir. 1997) (emphasis in original).  And in <u>King v. Ames</u>, the court stated "copying is an issue to be determined by comparison of works, not credibility."  179 F.3d 370, 376 (5th Cir. 1999).

   This Court believes Grande reads too much into this language and these decisions.  First, the three cases relied on by Grande are factually distinct from the instant case.  In <u>Bridgmon</u> and <u>King</u>, the only admitted evidence of substantial similarity asserted by the plaintiffs was their own oral testimony of similarity.  See <u>Bridgmon</u>, 325 F.3d at 576; <u>King, on Behalf of Estate of King v. Ames</u>, 1997 WL 327019, at *5–6 (N.D. Tex. June 4, 1997).  This reliance purely

on oral testimony is what <u>King</u> means by "copying is an issue to be determined by comparison of works, not credibility."  179 F.3d at 376.  <u>Bridgmon</u> also expressly quotes this language from <u>King</u> in explaining its conclusion.  325 F.3d at 577.

      <u>Creations Unlimited</u> involved an allegation that the defendant sold t-shirts with images modelled off of a series of black and white drawings that the plaintiff held copyrights in.  112 F.3d at 815.  In that case, the Fifth Circuit upheld a grant of summary judgment in favor of the defendant because a side-by-side comparison revealed the defendant's "tee-shirts differed from [Plaintiff's] line drawings in too many respects for a layman to conclude that the works were substantially similar." <u>Id.</u> at 816.  In this case, the allegation is not that Grande's customers infringed Plaintiffs' copyrights by creating substantially similar, but not identical, derivative works, which might raise a question of substantial similarity about which a side-by-side comparison might be probative.  Instead, Plaintiffs are asserting Grande's customers infringed their copyrights by distributing exact copies of works covered by Plaintiffs' copyrights.

      But perhaps more importantly, these cases do not appear to stand for the proposition that a side-by-side comparison of the original and allegedly infringing works must be made in front of the jury, something that would prove beyond impractical in a case of this sort.  Nothing in these cases state or imply a comparison must be made directly to a jury.  Instead, there simply must be

evidence, beyond mere oral testimony, resulting from such a comparison that would permit a layman to view the two works as substantially similar.  See Bridgmon, 325 F.3d at 577 ("[T]he law of this circuit prohibits finding copyright infringement without a side-by-side comparison of the works."); Creations Unlimited, Inc., 112 F.3d at 816 ("To determine whether an instance of copying is *legally actionable*, a side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as "substantially similar.'")

In this case, Plaintiffs' evidence of substantial similarity comes in the form of "audio fingerprinting" provided by a company called Audible Magic and a similar matching process performed by Rightscorp.  Audible Magic:

> scans the perceptual characteristics of a sound recording. The tool compares the characteristics of the sound recording to the content that has been registered in Audible Magic's database (what Audible Magic calls its "Global Content Registry"). If the tool returns a "match" condition, that indicates that the sound recording contains copyrighted content that has been registered with Audible Magic. When Audible Magic returns a "match" condition, it includes information about the sound recording contained in the file, including the track title and artist name for the sound recording and the copyright owner of the matched content (as contained in its registry).

(Dkt. # 172-12 at 3.)  And Rightscorp's process:

> receives a list of copyright works (including artist and title information) from its customers, obtains .torrent files matching those named works, forensically scrubs these torrent files to confirm a digital match (discarding any file that does not match), manually checks the digital

27

match results, and only then monitors BitTorrent networks for infringement of these files.

(Dkt. # 173-79 at 3.)

The ability of the Audible Magic software in particular to identify and match files to copyrighted content has been widely recognized.  See Capitol Records, LLC v. Escape Media Grp., Inc., No. 12-CV-6646(AJN), 2015 WL 1402049, at *23 (S.D.N.Y. Mar. 25, 2015) (citing cases).  Further, "Audible Magic is a vendor that has been repeatedly used in entertainment copyright cases and thus, its methods are well-known to those within the entertainment industry." UMG Recording, Inc. v. Escape Media Grp., Inc., No. 11 Civ. 8407, 2014 WL 5089743, *17 (S.D.N.Y. Sept. 29, 2014) (citing cases).  "Audible Magic's methods of analysis are not a secret and have been relied upon in various similar copyright litigations."  Id.  In UMG, the court expressly stated that "plaintiffs established that the infringing . . . uploads correspond to plaintiffs' copyrighted works" through a process that "included enlisting Audible Magic to use industry-recognized audio-fingerprinting technology to confirm that copies of certain files uploaded by defendants and their employees corresponded to plaintiffs' copyrighted sound recordings."  Id. at 20.

Grande's argument that the Audible Magic evidence is inadmissible as hearsay is unpersuasive.  Because Mr. Landis's "knowledge and analysis were derived from duties he [has] held at [the RIAA], his opinions [a]re admissible as

28

testimony based upon personal knowledge and experience gained while employed

by [the RIAA]." United States v. Valencia, 600 F.3d 389, 416 (5th Cir. 2010) (lay

witness with personal knowledge of databases was permitted to provide testimony

about analysis using those databases).  Further, the outputs from the Audible Magic

database generated by Mr. Landis are likely admissible against hearsay objections

as records of a regularly conducted business activity under Federal Rule of

Evidence 803(6).  See id.; see also U-Haul Intern., Inc. v. Lumbermens Mut. Cas.

Co., 576 F.3d 1040, 1044–45 (9th Cir. 2009) (holding that a printout from a

computer database was admissible as business records, even where sponsoring

witness had not himself personally input the data into the database, where the

person had knowledge of its content and the databases owners' practices for

compiling the data); Thanongsinh v. Bd. of Educ., 462 F.3d 762, 777 (7th Cir.

2006) (holding that the qualified witness "need only be familiar with the

company's recordkeeping practices").[4]

---

[4] Grande argues that the Rightscorp evidence is precluded by the best evidence rule
because "Rightscorp destroyed all records of its manual verification process,
including any records of the alleged "original" songs that were used for
comparison."  (Dkt. # 247 at 7; see also Dkt. # 252 at 29.)  This argument is best
suited for the trial context.  All that is required at the summary judgment stage is
that evidence be capable of presentation in an admissible form.  See Fed. R. Civ. P.
56(c)(2).  Moreover, even if the "original" evidence has been destroyed by the
proponent, other evidence of content is admissible unless the destruction was the
result of "the proponent acting in bad faith."  Fed. R. Evid. 1004.  First, the alleged
destruction was done by Rightscorp, which is not a party to this action, not the

For these reasons, Plaintiffs' evidence—in particular the Audible Magic evidence—is sufficient to raise a genuine issue of material fact as to substantial similarity.  Summary judgment in favor of Grande on this issue is therefore inappropriate.

Finally, Grande's argument that "Plaintiffs' cannot demonstrate that the [allegedly] disseminated material satisfies the 'substantially similar' requirement" because "BitTorrent operates by breaking a file into small pieces for transmission, and any Internet user who may download an allegedly copyrighted work would only take a small portion of any allegedly infringing work from a particular Grande subscriber" finds no support in the case law.  "It makes no difference from a copyright perspective whether the infringing copy is created in a single wholesale file transfer using a peer-to-peer protocol; or in a swarm of fragmented transfers [using BitTorrent] that are eventually reassembled into the new infringing copy."  Malibu Media, LLC v. Bui, No. 1:13-cv-162, 2014 WL 12469955, at *1 (W.D. Mich. July 21, 2014); see also Fung, 710 F.3d at 1034

_____

Plaintiffs, who are the proponents of the evidence at summary judgment and would be the proponents at trial.  Second, Grande has presented no evidence that Rightscorp destroyed these "originals" at the behest of Plaintiff.  In fact, Grande's own motion for sanctions states that the RIAA, the trade group of Plaintiffs, "requires the BitTorrent monitoring company working on behalf of Plaintiffs to preserve all of this data as part of its copyright infringement evidence package." (Dkt. # 247 at 7.)  Nor did Grande present any evidence or argument that the originals were destroyed in bad faith.  (See id.)

(affirming grant of summary judgment to plaintiff where defendant uploaded material to BitTorrent).  Further, "it is enough if constituent parts of each work are similar; the plaintiff is not required to show the whole of the infringing work is similar to the whole of the copyrighted work."  Busti v. Platinum Studios, Inc., No. A-11-CA-1029-SS, 2013 WL 12121116, at *5 (W.D. Tex. Aug. 30, 2013); see also Mattel, Inc. v. Azrak-Hamway Int'l, Inc., 724 F.2d 357, 360 (2d Cir. 1983) ("[I]t is possible to infringe while copying only a part of a work….").

iii.   Distribution

Grande argues that summary judgment on distribution is proper because a mere offer to share an infringing file is not actual distribution.  Grande relies primarily on Atlantic Recording Corp. v. Howell for the proposition that "[i]f the owner of the shared folder simply provides a member of the public with access to the work and the means to make an unauthorized copy, the owner is not liable as a primary infringer of the distribution right, but rather is potentially liable as a secondary infringer of the reproduction right."  554 F. Supp. 2d 976, 986 (D. Ariz. 2008).

However, to the extent Grande relies on Atlantic Recording for the proposition that contributory infringement of the reproduction right is the only viable theory against a party who makes infringing material available to the public, that reliance is misplaced because Atlantic Recording appears to be contrary to the

great weight of the case law, including decisions of other courts in this district.  In

Warner Bros. Records, Inc. v. Payne, the court held that:

> the Supreme Court has equated the term with "publication," which is
> defined under the Act.   "Publication" includes "[t]he offering to
> distribute copies or phonorecords to a group of persons for purposes of
> further distribution, public performance, or public display."   Listing
> unauthorized copies of sound recordings using an online file-sharing
> system constitutes an offer to distribute those works, thereby violating
> a copyright owner's exclusive right of distribution.

No. W-06-CA-051, 2006 WL 2844415, at *3 (W.D. Tex. July 17, 2006).  Similarly,

in another peer-to-peer copyright infringement case, the court "reject[ed]

Defendant's argument that merely making copyrighted works available to the

public is not enough evidence for summary judgment purposes to establish

infringement."  Maverick Recording Co. v. Harper, No. 5:07-cv-026-XR, 2008

WL 11411855, at *3 (W.D. Tex. Sept. 16, 2008), aff'd in part and rev'd in part, 598

F.3d 193 (5th Cir. 2010) (holding that district court erred by denying plaintiffs'

motion for summary judgment on defendants' "innocent infringer" defense).  Other

district courts in other circuits have reached similar conclusions in analogous

circumstances.  See, e.g., Universal Studios Prod., LLLP v. Bigwood, 441 F. Supp.

2d 185, 190 (D. Me. 2006) ("[B]y using [a peer-to-peer network] to make copies of

the [infringing materials] available to thousands of people over the internet,

Defendant violated Plaintiffs' exclusive right to distribute . . . .");  Motown Record

Co., LP v. DePietro, No. 04-CV-2246, 2007 WL 576284, at *3 (E.D. Pa. Feb. 16,

2007) ("A plaintiff claiming infringement of the exclusive-distribution right can establish infringement by proof of actual distribution or by proof of offers to distribute, that is, proof that the defendant 'made available' the copyrighted work.")

Even the case most directly relied on by Grande, Atlantic Recording, recognized that multiple courts "have held that the terms publication and distribution are synonymous, so where a defendant's act fulfills the definition of 'publication' provided by the statute, it also constitutes a 'distribution' under § 106(3)." 554 F. Supp. 2d at 984 (citing cases).

Other courts have held that "[i]n order to establish 'distribution' of a copyrighted work, a party must show that an unlawful copy was disseminated 'to the public.'" Hotaling v. Church of Jesus Christ of Latter-Day Saints, 118 F.3d 199, 203 (4th Cir.1997); see also National Car Rental System, Inc. v. Computer Assocs. Intern., Inc., 991 F.2d 426, 434 (8th Cir. 1993) ("[I]nfringement of the distribution right requires an actual dissemination of either copies or phonorecords."). But even under such a requirement, "*direct* proof of actual dissemination is not required by the Copyright Act. Plaintiffs are free to employ circumstantial evidence to attempt to prove actual dissemination." Capitol Records, Inc. v. Thomas, 579 F. Supp. 2d 1210, 1225 (D. Minn. 2008) (emphasis in original).

Regardless of whether or not violation of the distribution right requires actual dissemination instead of a mere offer to disseminate, Plaintiffs have come forward with sufficient evidence to survive summary judgment.  Plaintiffs have presented evidence of hundreds of thousands of notices sent to Grande of infringing material being made available by Grande's customers for download and evidence that Rightscorp downloaded over 59,000 full infringing files shared by Grande customers.[5]  (Dkts. ## 173-78, Ex. H at 21; 173-79, Ex. I at 3–4; <u>see also</u> 172 at 13–14 (citing evidence).)

The infringement notices provide evidence of offering to share under a "making available" theory, and constitute circumstantial evidence of dissemination if actual dissemination is required.  Further, the audio files Rightscorp downloaded from Grande subscribers are exactly the type of evidence that courts have used to establish direct infringement under an "actual dissemination" theory.  <u>See, e.g.</u>, <u>BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.</u>, 199 F. Supp. 2d 958, 972, (E.D. Va. 2016), <u>rev'd in part on other grounds by</u> <u>BMG</u>, 881 F.3d 293 (4th Cir. 2018) ("Courts have consistently relied upon evidence of downloads by a plaintiff's investigator to establish both

_____

[5] Grande again reiterates its best evidence rule argument related to Rightscorp song matching and downloading evidence.  (<u>See</u> Dkt. # 252 at 34.)  The Court has already addressed this argument and found it unpersuasive.  <u>See</u> FN 4, <u>supra</u>.

unauthorized copying and distribution of a plaintiff's work.") (citing Arista Records LLC v. Lime Grp. LLC, No. 06-cv-5936, 2011 WL 1641978, at *8 (S.D.N.Y Apr. 29, 2011) (citing cases)); Warner Bros. Records, Inc. v. Walker, 704 F. Supp. 2d 460, 467 (W.D. Pa. 2010) ("it is undisputed that MediaSentry [the copyright holder's investigator] downloaded actual copies of nine of the Copyrighted Recordings from Defendant's computer, establishing unauthorized distribution as to those nine recordings.").

Finally, relying again on Atlantic Recording's premise that making infringing files available only implicates contributory secondary liability against Grande's customers, Grande argues any theory of liability against it invokes tertiary liability, a premise which is not recognized in the law.  (Dkt. # 140 at 12.) However, for the reasons previously stated, the Court concludes a theory of direct liability properly applies to Grande's customers, either through making infringing materials available, or through actual dissemination of infringing materials. Therefore, by providing the services permitting their customers' alleged direct infringement, Grande is potentially liable as a secondary infringer.

      iv.     Evidence of Direct Infringement with Respect to Each Asserted Copyright

Grande argues that Plaintiffs cannot show direct infringement with respect to each asserted copyright.  (Dkt. # 140 at 13.)  However, as previously discussed, the court concludes the Rightcorp notices and analysis and the Audible

Magic analysis constitute sufficient evidence to raise a genuine issue of material fact to survive summary judgment.  The Rightscorp system receives a list of copyrighted works, obtains infringing files allegedly matching those works, forensically scrubs these torrent files to confirm a digital match, discards any non-matching allegedly infringing files, manually checks the match results, and then monitors BitTorrent Networks for infringement of these files.  (Dkts. ## 173-78 at 19–33; 173-79 at 3.)  Further, the Audible Magic digital fingerprinting technology "scans the perceptual characteristics of a sound recording[, . . .] compares the characteristics of the sound recording to the content that has been registered in Audible Magic's database[, and i]f the tool returns a 'match' condition, that indicates that the sound recording contains copyrighted content that has been registered with Audible Magic."  (Dkt. # 172-12, Ex. L at 3.)  Plaintiffs have also provided evidence that they "ran the mp3 audio files RIAA received from Rightscorp through Audible Magic[, and] Audible Magic returned a "match" condition for . . . the works . . . the Plaintiffs are suing over (the "works in suit"), attached as Exhibit A to Plaintiffs' Complaint."  (Id. at 4 (attaching as an exhibit "a chart setting forth each work in suit listed in Exhibit A to the Complaint, along with the corresponding .mp3 audio files that Rightscorp downloaded and the "match" output files from Audible Magic.").)

For these reasons, Grande is entitled to summary judgment as to direct infringement by Grande's customers of Plaintiffs' rights to reproduction and public performance.  But there remain genuine issues of material fact as to direct infringement by Grande's Customers of Plaintiffs' distribution right related to all of the asserted copyrights.  Summary judgment on this issue is therefore inappropriate and denied.

      2.   <u>Contributory Infringement</u>

After the Supreme Court's decision is <u>MGM Studios Inc. v. Grokster, Ltd.</u>, liability for contributory infringement requires "intentionally inducing or encouraging direct infringement."  545 U.S. 913, 930 (2005) (citing <u>Gershwin Pub. Corp. v. Columbia Artists Management, Inc.</u>, 443 F.2d 1159, 1162 (2d Cir. 1971). Grande argues it is entitled to summary judgment on this issue because: (1) there is no evidence it induced the direct infringement committed by its customers; (2) there is no recognized independent contributory liability theory of "material contribution"; (3) that even if there is, there is no evidence Grande's conduct materially contributed to direct infringement; and (4) there is no evidence Grande had actual knowledge of direct infringement by its customers.  (Dkt. # 140 at 11–20.)  However, for the following reasons, the Court disagrees with Grande's arguments.

Within the general rule of contributory liability announced by Grokster, the Supreme Court has identified two categories of contributory liability: "actively encouraging (or inducing) infringement through specific acts . . . or . . . distributing a product distributees use to infringe copyrights, if the product is not capable of 'substantial' or 'commercially significant' noninfringing uses." 545 U.S. at 942 (Ginsberg, J., concurring). It is beyond dispute that the provision of internet services to customers is capable of substantial and commercially significant noninfringing uses. Contributory liability against Grande must therefore be predicated on "actively encouraging (or inducing) infringement through specific acts." Id.

In expositing these principles of contributory liability, the Grokster Court expressly relied on those "doctrines of secondary liability [that] emerged from common law principles and are well established at law." Id. at 930. The black letter expression of such contributory liability in the common law, directly cited by the Grokster Court in regard to this point, is that "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." Gershwin Pub. Corp., 443 F.2d at 1162.

Grande's assertion that a cause of action for "material contribution" to copyright infringement is not recognized in the law is thus misplaced. The

38

Grokster Court was clear that liability for contributory infringement was still to be analyzed by reference to those "rules of fault-based liability derived from the common law." 545 U.S. at 934–35. Grokster's expression that "[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement" should not be taken as writing out of the law liability based on material contribution, but instead stands as a simple restatement of the same principles of liability found in Gershwin and elsewhere. Federal courts are generally in accord on this conclusion that contributory liability for copyright infringment can be premised on material contribution. See, e.g., Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1171 (9th Cir. 2007); Alcatel USA, Inc. v. DGI Techs, Inc., 166 F.3d 772, 790 5th Cir. 1999). Moreover, whether labeled "material contribution" or "inducement" or anything else, Grokster recognized that "where evidence goes beyond a product's characteristics or the knowledge that it may be put to infringing uses, and shows statements or actions directed to promoting infringement," liability is authorized. Grokster, 545 U.S. at 935.

Under this articulation, liability may "be imposed for intentionally encouraging infringement through specific acts." Perfect 10, 508 F.3d at 1170. The specific act in question here is the continued provision of internet services to customers. Thus this is not a case of mere refusal to act. Grande acted

affirmatively by continuing to sell internet services and continuing to provide

internet access to infringing customers.[6]

   However, "mere knowledge of infringing potential or of actual

infringing uses would not be enough here to subject a [product] distributor to

liability.  Nor would ordinary acts incident to product distribution, such as offering

customers technical support or product updates, support liability in themselves."

Grokster, 545 U.S. at 937.  But such "mere knowledge" of "actual infringing uses"

---

[6] In this way, Grande's reliance on Cobbler Nevada LLC v. Gonzales, 801 F.3d
1142 (2018), is misplaced.  Cobbler Nevada involved an individual subscriber who
failed to prevent users of his internet subscription from infringing the plaintiff's
copyright.  Id. at 1146.  Cobbler Nevada focused on the fact that it was an
individual internet subscriber at issue, who paid for internet services to an adult
care home he operated, in contrast to the actual ISP defendant in this case.  Id. at
1145, 1149.  But more importantly, in Cobbler Nevada there were "[n]o allegations
suggest[ing] the [defendant] made any clear expression or affirmative steps to
foster infringement."  Id. at 1148.  Instead, the defendant's "only action was his
failure to secure, police and protect the connection."  Id.  Further, the evidence in
Cobbler Nevada indicated that after the defendant learned of the infringement, he
and his staff attempted to identify the infringer and instructed everyone living in
home to stop infringing.  Id. at 1145 n.1.  But the infringer was never identified.
Id.  Cobbler Nevada, therefore, fits cleanly into the principle announced Grokster
that "mere knowledge . . . of actual infringing uses would not be enough here to
subject a [defendant] to liability."  545 U.S. at 937.  In this case in contrast, the
allegation is that Grande took affirmative steps to foster infringement by
continuing to provide internet service to specific customers about whom it had
actual knowledge of repeated infringement.  This case, therefore, fits more
appropriately into a corollary principle announced in Grokster, that "where
evidence goes beyond . . . the knowledge that [a product or service] may be put to
infringing uses, and shows statements or actions directed to promoting
infringement," liability may attach.  Id.  at 935.

is limited to when the seller only has generalized knowledge that some of its users are engaged in infringement.  See BMG, 881 F.3d at 311.  In contrast, "when a person sells a product that has lawful uses, but with the *knowledge* that the buyer *will in fact* use the product to infringe copyrights . . . the seller intends to cause infringement."  Id. at 307 (emphasis in original).  This conclusion flows from the common law rule that if a person "knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he has in fact desired to produce the result."  Restatement (Second) of Torts § 8A cmt. b (1965); see also Grokster, 545 U.S. at 932 (holding that a person "will be presumed to intend the natural and consequences of his acts").  Finally, it is beyond debate that Grande's continuing provision of internet services to customers who engage in repeated copyright infringement substantially facilitates access to and the distribution of infringing materials.  See, e.g., Perfect 10, 508 F.3d at 1172.

       Distilling these principles into a rule of liability, service providers like Grande "can be held contributorily liable if [they] ha[ve] *actual* knowledge[7] that

---

[7] Willful blindness can also satisfy the requirement of actual knowledge. Global-Tech Appliances, Inc. v. SEB S.A., 563 U.S. 754, 766 (2011) ("[P]ersons who know enough to blind themselves to direct proof of critical facts in effect have actual knowledge of those facts."); see also In re Aimster Copyright Litig., 334 F.3d 643, 650 (7th Cir. 2003) ("Willful blindness is knowledge, in copyright law . . . as it is in the law generally.")

*specific* infringing material is available using its system, and can take simple measures to prevent further damages to copyrighted works, yet continue[] to provide access to infringing works." Id. at 1172 (emphasis in original) (internal citations and quotation marks omitted).

Turning to the summary judgment evidence, it is clear that Grande has at least one simple measure at its disposal—terminating the internet services of repeat infringers—to prevent further damages to copyrighted works. It is also clear that for the period in question, 2011 through 2016, Grande continued to provide access to the infringing works by continuing to provide internet service to such customers. (Dkt. # 127-7, Ex. G at 6.) The question therefore is whether Grande had actual knowledge of specific infringement on the part of specific customers.

The Court concludes that the summary judgment evidence is sufficient to raise a genuine issue of material fact on that question. Between 2011 and 2016, Grande received over a million copyright infringement notices, it was tracking over 9,000 customers on its DMCA "Excessive Violations Report" by late 2016, and it specifically tracked users by the number of notices it received about them. (Dkts. ## 127-9, Ex. I at 5; 127-3, Ex. C at 9.) Further, in internal emails, Grande employees recognized that "we have users who are racking up DMCA take down requests" and that "some customers . . . are up to their 54th notice" (Dkt. # 127-22,

Ex D).  Grande is therefore not entitled to summary judgment on the issue of contributory liability.

### 3.   Willfulness

A showing of willfulness under the Copyright Act tracks the common law construction of the term.  See Graper v. Mid-Continent Cas. Co., 756 F.3d 388, 395 & n. 7 (5th Cir. 2014) (citing Safeco Ins. Co. of America v. Burr, 551 U.S. 47, 58 (2007)).  Willfulness thus requires a showing that Grande knew its conduct constituted contributory copyright infringement or acted with reckless disregard of Plaintiffs' rights as copyright holders.  Id.  There is evidence in the record— previously discussed—that Grande: (1) was aware of subscriber's infringing conduct; (2) decided not to cut of services to any customers, regardless of their conduct; (3) discussed this conscious decision in internal emails; and (4) profited from continuing to provide service to those subscribers.  (See Dkt. # 172 at 33; see also Discussion Section I, supra.)  This evidence is sufficient to raise a genuine issue of material fact that Grande acted knowingly or recklessly, so as to constitute legally willful conduct.  Summary judgment in favor of Grande is therefore not appropriate on this issue.

### 4.   Discovery Rule

Under 17 U.S.C. § 507(b), a three-year statute of limitations applies to claims of copyright infringement.  Plaintiffs in this case seek to extend that

limitations period by invocation of the discovery rule.  (See Dkt. # 172 at 34.)

"The discovery rule tolls the operation of a [statute of limitations] until the point in

time in which the plaintiff learned or by reasonable diligence could have learned

that it had a cause of action."  Edmark Industries SDN. BHD. v. South Asia

International (H.K.) Ltd., 89 F. Supp 2d 840, 842–43 (E.D. Tex. 2000).

   "[T]he discovery rule need not be specifically pleaded in federal

court."  TIG Ins. Co. v. Aon Re, Inc., 521 F.3d 351, 357 (5th Cir. 2008).  Instead,

"[u]nder Rule 8 of the Federal Rules of Civil Procedure, it is enough that the

plaintiff plead sufficient facts to put the defense on notice of the theories on which

the complaint is based."  Id.  In this case, the facts pleaded by Plaintiffs were

sufficient to put Grande on notice.  Among other facts, Plaintiffs pleaded that their

claims were: (1) based on notices Grande received from Rightscorp; (2) Grande

had been informed of more than one million infringements; and (3) Grande ignored

the infringement notices and refused to take action—including termination of

service—against users who repeated infringed Plaintiffs copyrights.  (Dkt. # 1 at

11–13.)

   The summary judgment evidence indicates that Grande received 1.2

million notices of infringement, including from Rightscorp, between 2011 and

2016 (Dkt. # 127-7, Ex. G at 10) and that Grande refused to terminate any

subscribers between October 2010 and May 2017 (Dkt. # 127-7, Ex. G at 6).  Since

44

Grande was aware of when it received such a volume of notices, and over what time period it failed or refused to terminate any subscribers or take any action based on such notices, Plaintiffs' pleading of such facts are sufficient to put Grande on notice that Plaintiffs were asserting claims based on conduct dating back to 2010 and thus that Plaintiffs' might assert that the discovery rule applied.  See TIG Ins. Co., 521 F.3d at 357 ("Under Rule 8 of the Federal Rules of Civil Procedure, it is enough that the plaintiff plead sufficient facts to put the defense on notice of the theories on which the complaint is based.")

Further, Plaintiffs' produced evidence that they did not learn of Grande's infringements until January 2016, when Rightscorp approached the RIAA with evidence of Grande's customers' infringements.  (Dkt. # 136 at 16.)  In response, Grande presented evidence that Rightscorp marketed its services to Plaintiff Sony in 2012 and that Plaintiff UMG had meetings related to Rightscorp in late 2011.  (Dkts. ## 201-5, 201-4.)  However, the witness testimony on this issue is vague and does not indicate conclusively that Plaintiffs' were made aware of infringement on Grande's network through these meetings.  (See id.)  This evidence also says nothing about Plaintiffs' knowledge of Grande's policy of refusal to take action in the face of such infringement by its customers, which is central to Plaintiffs' contributory liability theory against Grande.  The evidence before the Court thus raises a genuine issue of material fact as to when Plaintiffs

became aware, or through reasonable diligence could have become aware, of a cause of action against Grande for contributory liability. Therefore, Grande is not entitled to summary judgment on the issue of the application of the discovery rule.

     5.    <u>Damages</u>

17 U.S.C. § 504 provides in the alternative—as damages for copyright infringement—either the copyright owner's actual damages and disgorgement of profits of the infringer attributable to the infringement, or statutory damages. 17 U.S.C. § 504(a)–(c). A copyright owner is permitted to elect, at any time before final judgment, which of these forms of damages it would prefer to recover. 17 U.S.C. § 504(c)(1). Grande moved for summary judgment as to actual damages and disgorgement. (Dkt. # 140 at 22.) Plaintiffs stated in their response that they do not intend to seek their lost profits as damages, mooting that issue as to Grande's motion. (Dkt. # 172 at 35.)

In order to be entitled to disgorgement of profits under § 504(b), "a copyright holder must show more than an infringer's total gross revenue from *all* of its profit streams." <u>MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc.</u>, 622 F.3d 361, 367 (5th Cir. 2010) (emphasis in original). Instead, the copyright holder must come forward with evidence of revenues "*reasonably related* to the infringement." <u>Id.</u> (emphasis in original).

To prove disgorgement damages, Plaintiffs rely on two expert reports. (See Dkts. ## 173-74, 173-81.)  The Bardwell report applies probability analysis to the infringement data collected by Rightscorp to determine the probability that sequential infringements—including of the copyrights asserted in this case—are attributable to individual Grande subscribers.  (Dkt. # 173-81 at 6.)  The Lehr report estimates Grande's average monthly gross margin per customer, for all services a customer purchases from Grande, which can include voice and television services, in addition to high-speed internet.  (Dkt. # 173-74 at 13–15.)  The Lehr report also estimates the average tenure for a Grande subscriber.  (Id. at 15.)  Taking these two numbers together, and after accounting for net present value, the Lehr report arrives at an estimated lifetime net present value to Grande per subscriber.  (Id. at 16.)  The report also derives an alternative net present value amount per customer based on the price paid by TPG Capital to acquire Grande in 2017, and what it implies about the expected value per customer TPG had formed in paying that price.  (Id.)  The Court concludes this evidence is sufficient to raise a genuine issue of material fact about Grande's revenues reasonably related to infringing customers to defeat summary judgment on this issue.[8]

_____

[8] Grande's objections to the sufficiency of this evidence are not persuasive.  (See Dkt. #  252 at 38.)  "Gross revenue" under 17 U.S.C. § 504(b) "refers only to revenue reasonably related to the infringement."  MGE UPS Sys., Inc., 622 F.3d at 367.  While the calculations in the Lehr report are not limited to the specific

6.    <u>Copyright Ownership</u>

In order to prove copyright infringement, one of the things a plaintiff must prove is ownership of the asserted copyright.  <u>BWP Media USA, Inc.</u>, 852 F.3d at 439.  To establish ownership, a "plaintiff must prove that the material is original, that it can be copyrighted, and that he has complied with statutory formalities."  <u>Lakedreams v. Taylor</u>, 932 F.3d 1103, 1108 (5th Cir. 1991).  The

_____

customers who allegedly infringed the copyrights asserted in this case, requiring such an exacting and specified showing would go far beyond the requirement of merely showing a "reasonable relationship."  The average value Grande receives from any given customer is certainly reasonably related to the value Grande received from a specific infringing customer.  Grande receives more value from some customers and less value from others, and this includes infringing customers.  Without some showing that infringing customers are somehow different or unique in their purchase patterns from noninfringing customers, an average value for all customers is certainly sufficient to reasonably demonstrate the average value received by Grande from infringing customers.  Further, the argument that Dr. Lehr's calculations assume that every customer accused of infringement would have otherwise never become a customer in the first place misstates the question.  Whether they would or would not have become a customer is beside the point.  The fact is that they did become customers, and Grande received revenues from their being and continuing to be customers.  Finally, that the lifetime value includes revenues from unrelated services like phones and cable TV is similarly beside the point.  The fact is that Grande received that revenue from those allegedly infringing customers.  That revenue would therefore be reasonably related to Grande's asserted contributory liability in not terminating the service of such customers.  If Grande had terminated the internet service of those customers, it is reasonable to conclude they would have found a new service provider, for all services purchased from Grande, and Grande would have lost all revenues from such customers, including those not directly derived from the provision of internet services.

requisite statutory formalities are receipt of the application for registration, fee, and deposit by the copyright office.  Id.

Grande argued in its motion for summary judgment that of the 782 unique registered copyrights listed by Plaintiffs as at issue in this case, Plaintiffs' evidence only demonstrated that they are the owners of 421 of the copyrights. (Dkt. # 140 at 23.)  Grande thus argued it was entitled to partial summary judgment as to the remaining 361 unique copyrights at issue.  (Id.)  Plaintiffs responded with declarations from executives employed by each Plaintiff, with voluminous attachments, that they claim proves their ownership of these 361 copyrights.  (See, e.g., Dkts. ## 173-2 to 173-47; 173-48 to 173-73; 180-1 to 180-31.)  Such sworn affidavits—when uncontroverted—are generally sufficient to prove ownership. See, e.g., Sony BMG Music Entertainment v. Cuellar, No. CC-07-58, 2008 WL 11398942, at *1 (S.D. Tex. July 24, 2008) ("[P]laintiffs have provided sworn affidavits from their respective in-house counsels confirming that they are owners or licensees of valid copyrights. Defendant has not provided evidence to contradict plaintiffs' sworn statements, and accordingly the Court finds no issue of fact regarding plaintiffs' ownership of the copyrights.").

Grande did not challenge the validity of this evidence on the merits, but instead requested in a motion for sanctions that it should be excluded as untimely because it was produced after discovery.  (See Dkt. # 156.)  In the

Liability Report, the Magistrate Judge denied Grande's motion for sanctions

pursuant to his authority under 28 U.S.C. § 636(b)(1)(A).  Grande has objected to

this decision of the Magistrate Judge.  (Dkt. # 252 at 38–40.)  The Court reviews

such orders of the Magistrate Judge on non-dispositive pretrial matters for clear

error.  28 U.S.C. § 636(b)(1)(A); see also Fed. R. Civ. P. 72(a).  The clear error

standard precludes modifying or setting aside the Magistrates Judge's order unless

this Court is "left with the definite and firm conviction that a mistake has been

committed."  Jauch v. Nautical Services, Inc., 470 F.3d 207, 213 (5th Cir. 2006)

(quoting Anderson v. City of Bessemer, 470 U.S. 564, 573 (1985).

   Under Federal Rule of Civil Procedure 37(c)(1), failure to timely

disclose evidence allows exclusion of that evidence "unless the failure was

substantially justified or is harmless."  Plaintiffs' presented arguments that these

disclosures were not in fact untimely. (Dkt. # 179 at 6–7.)  But in any event, even if

they were, such untimeliness was harmless because: (1) the evidence is

fundamental to Plaintiffs claim; (2) Grande will suffer no demonstrable prejudice

from permitting it; (3) the trial date in this case has been vacated and a new trial

date has not yet been set; and (4) there is no evidence of willful misconduct or bad

faith.  See Texas A&M Research Found. v. Magna Transp., Inc., 338 F.3d 394, 402

(5th Cir. 2003) ("In evaluating whether a violation of rule 26 is harmless, . . .

[courts are to] look to four factors: (1) the importance of the evidence; (2) the

prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose.") (See also Dkt. # 179 at 7–11.)  Moreover, Rule 37(c) permits—but does not require—exclusion of evidence untimely disclosed.  Fed. R. Civ. P. 37(c) (describing alternative sanctions that can be imposed "[i]n addition to or instead of" exclusion).

For these reasons, the Court is not "left with the definite and firm conviction that a mistake has been committed" by the Magistrate Judge in denying Grande's motion for sanctions.  The order was therefore not clearly erroneous and will not be modified or set aside.

Grande's argument regarding ownership is dependent on the Court striking this supplemental evidence.  (See Dkt. # 252 at 38–40.)  If allowed—as the Court concludes it should be—such evidence is sufficient to prove ownership.  See Sony BMG Music Entertainment, 2008 WL 11398942 at *1.  Therefore, Grande is not entitled to summary judgment on this issue.

Thus, the Court **ADOPTS** the Liability Report with respect to Grande's Motion for Summary Judgment (Dkt. # 140) and Motion for Sanctions (Dkt. # 156).  Grande's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.  It is **GRANTED** as to infringement of the rights of

reproduction and public performance, and **DENIED** in all other respects.  (Dkt. # 140.)  Grande's Motion for Sanctions is **DENIED**.  (Dkt. # 156.)

      B.    <u>Plaintiffs' Motion for Summary Judgment</u>

      Plaintiffs also moved for summary judgment as to liability for contributory infringement on essentially the same evidence discussed in relation to Grande's motion for summary Judgment.  (Dkt. # 172).  The Liability Report recommended denying this motion for the same reasons it recommended Grande's motion be denied on that issue.  Plaintiffs object to this recommendation.  (Dkt. # 250 at 6.)  Because the Court has concluded that genuine issues of material fact exist as to Grande's customers' direct liability, (<u>See</u> Discussion Section II.A, <u>supra</u>) and contributory liability cannot exist in the absence of direct liability, <u>A&M Records, Inc.</u>, 239 F.3d at 1013 n.2, Plaintiffs are not entitled to summary judgment as to Grande's liability for contributory infringement.  Plaintiffs are also not entitled to summary judgment because genuine issues of material fact exist as to Grande's actual knowledge of specific instances of direct infringement committed by specific customers.  (<u>See</u> Discussion Section II.B, <u>supra</u>.)

      Therefore, the Court **ADOPTS** the Liability Report with respect to Plaintiffs' Motion for Summary Judgment.  (Dkt. # 240.)  Plaintiffs' motion is **DENIED**.  (Dkt. # 172.)

<u>CONCLUSION</u>

For the reasons stated, the Court **ADOPTS** the Safe Harbor Report and the Liability Report.  (Dkts. ## 240, 241.)  Plaintiffs' Motion for Partial Summary Judgment as to Grande's DMCA safe harbor defense is **GRANTED**. (Dkt. # 127.)  Grande's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.  (Dkt. # 140.)  It is **GRANTED** as to infringement of the rights of reproduction and public performance and **DENIED** in all other respects.  (<u>Id.</u>)  Grande's Motion for Sanctions is **DENIED**.  (Dkt. # 156.) Plaintiffs' Motion for Summary Judgment as to Liability is **DENIED.**  (Dkt. # 172.)

**IT IS SO ORDERED.**

**DATED**: Austin, Texas, March 15, 2019.

_____

David Alan Ezra
Senior United States Distict Judge