## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| UMG RECORDINGS, INC., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | Civil Action No. 1:17-cv-00365-DAE-AWA |
| | § | |
| GRANDE COMMUNICATIONS | § | |
| NETWORKS LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANT GRANDE COMMUNICATIONS NETWORKS LLC'S MOTIONS *IN LIMINE*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

LEGAL STANDARD ............................................................................................................1

      A.    Admissibility .........................................................................................1

      B.    Timing of Disclosure of Evidence ..................................................2

ARGUMENT..........................................................................................................................2

    1.    Response to MIL 1 (Tracie Parry) (Dkt. 308) ...............................2

    2.    Response to MIL 2 (Expert Testimony of Dr. Terrence McGarty) (Dkt. 309).....................................................................................4

    3.    Response to MIL 3 (Pre-2014 Infringement) (Dkt. 310)............5

    4.    Response to MIL 4 (Audible Magic) (Dkt. 311) .........................7

    5.    Response to MIL 5 (Evidence Concerning AcoustID) (Dkt. 312)...........12

    6.    Response to MIL 6 (*Cox*) (Dkt. 318)........................................14

    7.    Response to MIL 7 (Evidence of Grande's Total Revenues/Profits, and TPG's Acquisition of Grande) (Dkt. 319) ...........................17

    8.    Response to MIL 8 (Rightscorp's Interactions With Other ISPs) (Dkt. 320)......................................................................................20

    9.    Response to MIL 9 (Rightscorp's 2014 Subpoena to Grande) (Dkt. 321).........................................................................................21

    10.    Response to MIL 10 (Frederiksen-Cross Second Rebuttal Report and January 2019 Declaration) (Dkt. 322) ...............................21

    11.    Response to MIL 11 ("Irrelevant" and "Unproven" Infringements) (Dkt. 323)......................................................................................24

    12.    Response to MIL 12 (Termination for Nonpayment) (Dkt. 324).............28

    13.    Response to MIL 13 (DMCA) (Dkt. 325) .................................29

    14.    Response to MIL 14 (Value of Copyrights And Overall Harm Caused By Copyright Infringement) (Dkt. 326).........................36

    15.    Response to MIL 15 (Summary Exhibits and Demonstrative Medleys) (Dkt. 327) ...................................................................38

16.    Response to MIL 16 (2016 Richard Fogle Emails Contemplating
       Grande Deleting Incriminating Emails Post-*Cox* Verdict) (Dkt.
       328)............................................................................................................40

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*BMG Rights Mgmt. L.L.C. v. Cox Commc'ns, Inc.*,
    881 F.3d 293 (4th Cir. 2018) ........................................................................... 19, 35

*Boudreaux v. J.P. Morgan Chase & Co.* ,
    No. CV 07-555, 2008 WL 11354967 (E.D. La. Jan. 11, 2008) ............................. 34

*Brazos River Auth. v. GE Ionics, Inc.*,
    469 F.3d 416 (5th Cir. 2006) .............................................................................. 32

*Capitol Records, Inc. v. MP3tunes, L.L.C.*,
    48 F. Supp. 3d 703 (S.D.N.Y. 2014) .................................................................. 18

*EMI April Music, Inc. v. Jet Rumeurs, Inc.*,
    632 F. Supp. 2d 619 (N.D. Tex. 2008) ............................................................... 17

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
    840 F.3d 69 (2d Cir. 2016) ................................................................................. 18

*Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, L.P.*,
    No. 18-20350 cons w/18-20615, 2020 WL 219008 (5th Cir. Jan. 15, 2020) .................. 17, 38

*Escobedo v. Dynasty Insulation, Inc.*,
    694 F. Supp. 2d 638 (W.D. Tex. 2010) .............................................................. 15

*Farmington Cas. Co. v. 23rd St. Props. Corp.*,
    No. 98 Civ. 3597 (HB)(KNF), 1998 WL 755163 (S.D.N.Y. Oct. 27, 1998) ........................ 34

*Garden City Boxing Club, Inc. v. Johnson*,
    552 F. Supp. 2d 611 (N.D. Tex. 2008) .............................................................. 6, 7

*Great Am. Life Ins. Co. v. Tanner*,
    No. 3:18-CV-23-DMB-JMV, 2019 WL 2745639 (N.D. Miss. July 1, 2019) ........................ 39

*Hovsepian v. State Farm Mut. Auto. Ins. Co.*,
    No. CV 09-08929 MMM (PLAx), 2011 WL 13213900 (C.D. Cal. Jan. 12, 2011) 15-16

*Lovo v. Express Courier Int'l, Inc.*,
    No. 4:16-CV-853, 2018 WL 6573132 (N.D. Tex. Oct. 24, 2018) ......................... 39

*Lowry's Reports, Inc. v. Legg Mason, Inc.*,
    302 F. Supp. 2d 455 (D. Md. 2004) ................................................................... 18

*Malaco Inc. v. Cooper*,
    No. CIV.A. 300CV2648P, 2002 WL 1461927, at *5 (N.D. Tex. July 3, 2002) .................... 16

*Mariscal v. Graco, Inc.*,
    52 F. Supp. 3d 973 (N.D. Cal. 2014) ................................................................. 22

*Mick v. Big Sur Waterbeds, Inc.*,
   No. A-06-CA-115 LY, 2006 WL 8432099 (W.D. Tex. Dec. 18, 2006) ............................... 15

*Mick v. Big Sur Waterbeds, Inc*,
   No. A-06-CA-115-LY, 2007 WL 9701141 (W.D. Tex. Jan. 24, 2007) ................................ 15

*Mitchell v. Univ. of La. Sys.*,
   154 F. Supp. 3d 364 (M.D. La. 2015) .................................................................. 39

*Novick v. Shipcom Wireless, Inc.*,
   946 F.3d 735 (5th Cir. 2020) ............................................................................ 33

*Phx. Entm't Partners, L.L.C. v. Liquid Monkey Lounge, Inc.*,
   No. SA-15-CA-00592-DAE, 2015 WL 12659927 (W.D. Tex. Dec. 17, 2015) ......... 17, 26, 36

*Psihoyos v. John Wiley & Sons, Inc.* ,
   No. 11 Civ. 1416 (JPO), 2012 WL 5506121 (S.D.N.Y. Nov. 7, 2012) ................................ 18

*Richmond v. Madison Mgmt. Grp., Inc.*,
   918 F.2d 438 (4th Cir. 1990) ......................................................................... 32-33

*Rozier v. Ford Motor Co.*,
   573 F.2d 1332 (5th Cir. 1978) ............................................................................ 32

*Sony BMG Music Entm't v. Tenenbaum*,
   660 F.3d 487 (1st Cir. 2011) ............................................................................. 37

*Tex. A&M Research Found. v. Magna Transp., Inc.*,
   338 F.3d 394 (5th Cir. 2003) ................................................................. 3, 4, 5, 6

*Thanongsinh v. Bd. of Educ.*,
   462 F.3d 762 (7th Cir. 2006) ......................................................................... 10-11

*U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*,
   576 F.3d 1040 (9th Cir. 2009) ................................................................... 9, 10, 13

*UMG Recordings, Inc. v. Escape Media Grp., Inc.*,
   No. 11 Civ. 8407 (TPG), 2015 WL 1873098 (S.D.N.Y. Apr. 23, 2015) ............................. 36

*UMG Recordings, Inc. v. MP3.Com, Inc.*,
   No. 00-cv-472 (JSR), 2000 WL 1262568 (S.D.N.Y. Sept. 6, 2000) .................................... 17

*Underwriters at Lloyd's London v. OSCA, Inc.*,
   No. 03-20398, 2006 WL 941794 (5th Cir. Apr. 12, 2006) .................................. 33

*United States v. Bailey*,
   270 F.3d 83 (1st Cir. 2001) ............................................................................... 15

*United States v. Bates*,
   665 F. App'x 810 (11th Cir. 2016) ................................................................. 11, 12

*United States v. Buck*,
　324 F.3d 786 (5th Cir. 2003) ........................................................................ 39, 40

*United States v. Caldwell*,
　586 F.3d 338 (5th Cir. 2009) ........................................................................ 2, 40

*United States v. Ikezi*,
　353 F. App'x 482 (2d Cir. 2009) .................................................................... 10

*United States v. Lizarraga-Tirado*,
　789 F.3d 1107 (9th Cir. 2015) ...................................................................... 10, 13

*United States v. Okoronkwo*,
　46 F.3d 426 (5th Cir. 1995) .......................................................................... 1-2

*United States v. Trumbo*,
　No. 18-CR-20403, 2019 WL 3289848 (E.D. Mich. July 22, 2019) ................ 36

*United States v. Valencia*,
　600 F.3d 389 (5th Cir. 2010) ........................................................................ 8, 9, 11

*Whitney v. Citibank, N.A.*,
　782 F.2d 1106 (2d Cir.1986) ......................................................................... 18

*Wielgus v. Ryobi Techs., Inc.*,
　No. 08 CV 1597, 2012 WL 3005306 (N.D. Ill. July 23, 2012) ...................... 35

*Zomba Enters. v. Panorama Records, Inc.*,
　491 F.3d 574 (6th Cir. 2007) ........................................................................ 19

**Statutes**

17 U.S.C. § 512(i)(1)(A)……………………………………………………………………36

**Rules**

Fed. R. Civ. P. 37 .......................................................................................... 2, 3
Fed. R. Evid. 26 ............................................................................................ 22, 24
Fed. R. Evid. 401 .......................................................................................... 1
Fed. R. Evid. 402 .......................................................................................... 1
Fed. R. Evid. 403 .......................................................................................... 2, 16, 40
Fed. R. Evid. 407 .......................................................................................... *passim*
Fed. R. Evid. 801 .......................................................................................... 16
Fed. R. Evid. 803 .......................................................................................... 13, 16
Fed. R. Evid. 901 .......................................................................................... 8, 9, 11
Fed. R. Evid. 1006 ........................................................................................ 38, 39

**Other Authorities**

Wright & Miller, 31 Federal Practice & Procedure §§ 7114, 8045.......................................... 8, 39

Plaintiffs respectfully submit this omnibus response to Defendant Grande Communications Networks LLC's motions *in limine*.

## INTRODUCTION

Grande's **sixteen** motions *in limine* must be seen for what they are: a brazen attempt to exclude virtually all of the evidence Plaintiffs could seek to introduce in this case, including evidence that this Court has specifically said is highly relevant and admissible.  Grande's motions recognize and are based on one basic truth: that if Plaintiffs are allowed to present the jury with the probative evidence on the key issues in this case, Grande will be held contributorily liable for the massive infringement it enabled on its network.  Thus, Grande is attempting to preclude Plaintiffs from putting on a case—in many cases by asking the Court to reverse or ignore its prior holdings, which are the law of the case and should not be disturbed.[1]  Recognizing that it needed to construct an approach that would disguise the disingenuous nature of its application, Grande has decided to break the motion to preclude Plaintiffs from putting on a case into sixteen pieces. But, as discussed herein, even in its component pieces, Grande's application is manifestly baseless.

## LEGAL STANDARD

### A.  Admissibility

Evidence is relevant when "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.  Relevant evidence is generally admissible.  *See* Fed. R. Evid. 402.  Whether to admit or exclude evidence has long been "left to the sound discretion of the trial judge."  *United*

---

[1] Notwithstanding the law of the case, Grande's other pretrial filings have also revealed its intent to re-litigate issues the Court has already decided.  Plaintiffs addressed those filings in their *Motion in Limine* to Preclude Any Evidence or Argument Inconsistent with the Court's Summary Judgment Opinion (Dkt. 316).

*States v. Okoronkwo*, 46 F.3d. 426, 435 (5th Cir. 1995).  While Rule 403 provides that otherwise relevant and admissible evidence can be excluded, the Rule provides for that remedy only where "the probative value of that evidence is ***substantially*** outweighed by the ***unfairly*** prejudicial nature of the evidence." *United States v. Caldwell*, 586 F.3d 338, 342 (5th Cir. 2009) (citing Fed. R. Evid. 403) (emphasis in original).

### B.  Timing of Disclosure of Evidence

"If a party fails to provide information or identify a witness as required by [Federal Rule of Evidence] 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, ***unless the failure was substantially justified or is harmless.***"  Fed. R. Civ. P. 37(c).[2]

### ARGUMENT

### 1.  RESPONSE TO MIL 1 (TRACIE PARRY) (DKT. 308)

Plaintiffs' identification of Tracie Parry as a witness that the Warner Plaintiffs may call at trial was wholly appropriate and timely.  As Plaintiffs specifically advised Grande's counsel,  Parry would testify as to the Warner Plaintiffs' ownership and control of certain of the sound recordings at issue in this litigation.[3]  As an initial matter, Plaintiffs submit that Grande's MIL 1 is moot given that this Court already resolved the issue of ownership of the relevant recordings at summary judgment and ownership is therefore not an appropriate subject at trial.  The support for that position is set forth in Plaintiffs' *Motion in Limine* to Preclude Any Evidence or Argument Inconsistent with the Court's Summary Judgment Opinion (Dkt. 316).  If the Court agrees and grants Plaintiffs' motion, then it is likely that  Parry would not need to testify, and Plaintiffs would

---

[2] Emphasis is added throughout unless otherwise indicated.
[3] Ex. 1, Feb. 4, 2020 Gilmore Email to Howenstine.

not need to introduce ownership evidence, thereby significantly shortening and simplifying the presentation of the case to the jury.

If, however, the Court does require Plaintiffs to put on ownership evidence at trial, Parry should be permitted to testify for two primary reasons. *First*, the original witness identified by Plaintiffs on this subject, Steven Poltorak (who submitted a declaration on the Warner plaintiffs' ownership of sound recordings), is no longer employed by Warner. Plaintiffs intend for Parry to present the testimony on ownership that Poltorak would have presented (and that is reflected in Poltorak's declaration, which Grande has had for over a year). *Second*, Grande didnot depose Poltorak during discovery. Thus, the fact that Parry was not disclosed previously is harmless. *See* Fed. R. Civ. P. 37(c).

In conducting an inquiry into harmlessness under Rule 37(c), courts examine the following factors: "1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Texas A&M Research Found. v. Magna Transp., Inc.,* 338 F.3d 394, 402 (5th Cir. 2003) (affirming district court's allowing late-disclosed witness to testify, when opposing party knew of the substance of the proffered affidavit and was not prejudiced).

Here, all four factors weigh decisively in favor of permitting Parry to testify (again, if and only if the Court concludes that ownership of the copyrighted sound recordings remains an issue for trial). *First*, ownership evidence is important, as ownership is an element for a copyright infringement claim. *Second* and *third*, Grande was clearly not prejudiced in any way and thus does not need a continuance. Grande was provided with a declaration signed by Poltorak in September 2018 that set forth the facts and presented the documents establishing Warner's ownership of the relevant recordings. Notably, Grande never deposed Poltorak. If called, Parry simply would

testify as to the facts and documents set forth in Poltorak's declaration. *See* Dkt. 180 [Poltorak Decl. and Exhibits]. Thus, unlike with most witnesses, Grande knows exactly what Parry would testify to at trial. *Fourth*, Plaintiffs did not disclose Parry previously because they were hopeful that, in light of the Court's prior ruling on the subject, the parties would be able to reach a reasonable agreement to stipulate as to ownership thus obviating the need for any testimony on this subject. In December 2019, counsel reached out to Grande to discuss such a stipulation and followed up with an email on January 9, 2020.[4] Grande did not respond until January 27th, the day before the witness list was due, when it stated without explanation that it would not agree to Plaintiffs' proposed stipulation.

For all of these reasons, the Court should deny Grande's motion and allow Parry to testify as to the Warner Plaintiffs' ownership evidence set forth in Poltorak's declaration.

## 2. RESPONSE TO MIL 2 (EXPERT TESTIMONY OF DR. TERRENCE MCGARTY) (DKT. 309)

Dr. Terrence McGarty draws on his significant background in the ISP industry to analyze and opine on Grande's policies and practices for handling copyright infringement.

Grande claims that McGarty's testimony is irrelevant and should be excluded because the Court has rejected Grande's DMCA safe harbor defense, which Grande claims is the only topic for which McGarty's testimony would be relevant. Mot. at 1. Grande is incorrect. As an initial matter, Grande's argument is based on its patent mischaracterization of Magistrate Judge Austin's ruling as "finding that Dr. McGarty's testimony is moot." *Id.* Magistrate Judge Austin actually held that Grande's *Daubert motion—not McGarty's testimony—*was moot, because Grande's motion was focused on the relevance of his testimony for the DMCA safe harbor, on which the Court granted summary judgment to Plaintiffs. The Court therefore *denied* Grande's motion. Dkt.

---

[4] Ex. 2, Jan. 9, 2020 A. Bart Email to R. Brophy.

280, July 16, 2019 Order at 9 ("Because summary judgment has been entered on this issue, the Court will deny the motion to exclude McGarty as moot.").

As Plaintiffs pointed out in opposing Grande's *Daubert* motion, McGarty's testimony is relevant to central questions in the case: Grande's knowledge of, or willful blindness to, its subscribers' infringement, and the willfulness of Grande's conduct. Applying his experience and knowledge of how ISPs operate to the facts of the case, McGarty will testify that Grande had the technical, financial, and operational ability to process infringement notices, identify infringing subscribers, and take action against them. McGarty will explain that Grande's refusal to terminate repeat infringers for approximately seven years was not caused by a technical or resource limitation or an oversight, but rather was the result of deliberate corporate policy choices. From that conclusion, McGarty can properly testify that Grande made a deliberate decision not to enforce the public-facing acceptable use / DMCA policies that it placed on its website.

Notably, McGarty was permitted to testify in both *Cox* trials on the same subject matter about which he would testify in this case, even though the court in those cases (like this Court) found prior to trial that the ISP failed to qualify for the DMCA safe harbor defense.[5]

### 3. RESPONSE TO MIL 3 (PRE-2014 INFRINGEMENT) (DKT. 310)

Grande seeks to exclude evidence of infringement that occurred prior to April 21, 2014 (three years before the statute of limitations), arguing that the "discovery rule" for calculating the

---

[5] In *BMG v. Cox*, McGarty was qualified as an "expert in the design and implementation of Internet telecommunications networks, including IP data networks in the operations of companies that use such networks." Ex. 3, *BMG v. Cox*, 12/15/2015 (Vol. 9 p.m.) Trial Tr. [Dkt. 750], at 2000:15-2001:4. He testified that Cox was capable of processing Rightscorp infringement notices, and that, contrary to Cox's expert, Cox's "graduated response" system in effect did not process those notices. *Id.* at 2004:9-2004:24. He explained that, based on his review of depositions, interrogatories, documents produced in discovery, and trial testimony, Cox ignored Rightscorp notices and deliberately configured its system to minimize customer terminations. *Id.* at 2001:27-2002:8, 2006:21-2007:22, 2024:21-2025:7. McGarty's opinions were admitted at the *BMG v. Cox* trial. He testified to similar effect in the recent *Sony v. Cox* trial as well.

limitations period should not apply.  Mot. at 2-3.  This motion is nothing more than a repeat of the argument that Grande made on summary judgment that "the discovery rule is not applicable to this case" and thus that "[t]here is no probative value to [pre-April 2014 infringement] evidence."  This Court already squarely rejected those arguments, denying summary judgment and explaining that "Plaintiffs produced evidence that they did not learn of Grande's infringements until January 2016, when Rightscorp approached the RIAA with evidence of Grande's customers' infringements. (Dkt. # 136 at 16.)"  Dkt. 268, S.J. Order at 45.  The Court noted Grande's evidence showing that Rightscorp had attempted to market its services to Plaintiffs and sought meetings with Grande before 2016, but found no evidence that *Plaintiffs* were informed of Grande's infringement during any of those pre-2016 meetings or communications. *Id.*

The Court considered Grande's supposed evidence that portions of this action were untimely, but concluded that such evidence "says nothing about Plaintiffs' knowledge of Grande's policy of refusal to take action in the face of such infringement by its customers, which is central to Plaintiffs' contributory liability theory against Grande." *Id.*  Indeed, for years, Grande posted so-called acceptable use policies on its website that included language that "Grande may terminate the Service provided to any customer or user who is either found to infringe third party copyright or other intellectual property rights, including repeat infringers. . . ." Dkt. No. 143-3 (2012 Policy). These sham outward-facing policies portrayed Grande to the world as a responsible actor when it came to copyright infringement—even though, in reality, Grande was anything but, as its own internal policies allowed its subscribers to engage in unlimited infringement with no repercussions.

There is no sound basis for this Court to reconsider its prior ruling.  Grande's *in limine* motion presents no new or different evidence than what was before the Court when it concluded that a jury trial is necessary to resolve the timeliness defense that Grande raises.  In fact, Grande's own cited authority, *Garden City Boxing Club, Inc. v. Johnson*, 552 F. Supp. 2d 611 (N.D. Tex.

2008), Mot. at 2, refutes its position.  In that case, "the Court conclude[d] that Garden City's claims are not time-barred."  Applying the discovery rule, the Court found that the plaintiff had no actual knowledge of the defendant's infringement. It further found that the plaintiff had acted with reasonable diligence, by sending investigators to commercial establishments to find if they were illegally rebroadcasting the Tyson/Lewis boxing match, although the Court noted the plaintiff could not reasonably be expected to have "enter[ed] every commercial establishment across the United States." *Id.* at 616.  Similarly, Plaintiffs had no actual knowledge of Grande's misconduct before 2016.  And while Plaintiffs employ various measures to monitor and combat online piracy, like the boxing club in *Garden City*, they could not be expected to hire an infringement monitoring company to engage in an ongoing investigation of *every* ISP across the country—particularly where, as here, Grande publicly (but falsely) portrayed itself as a responsible ISP, thus giving Plaintiffs no reason to suspect that it was the haven for infringement it turned out to be.

The evidence of pre-2014 infringement also is relevant to core elements of Plaintiffs' claims, knowledge and willfulness.  As Magistrate Judge Austin explained, "how Grande handled DMCA issues prior to 2013 could be relevant to demonstrating Grande's knowledge of its obligations under the statute, and could be circumstantial evidence that Grande was aware of infringing conduct on its system, and actually had taken action on it before the time frame at issue here." Dkt. 191, Order at 6.  This evidence also was discussed extensively in the Court's summary judgment order as relevant to these same issues.  *See* Dkt. 268, S.J. Order at 10-11 (discussing 2010 change in Grande's policy to stop terminating infringing subscribers).  The Court should once again deny Grande's statute of limitations motion.

### 4.  RESPONSE TO MIL 4 (AUDIBLE MAGIC) (DKT. 311)

Owners of the most valuable copyrighted works in the world regularly rely on Audible Magic in the ordinary course of business, and Audible Magic evidence is routinely used in court

to confirm the identity of copyrighted works.  Grande argues that the evidence should be excluded, alleging that it is hearsay and cannot be authenticated.  But those arguments are based on mischaracterizations of the law and facts, and completely ignore this Court's summary judgment ruling.  *See* Dkt. 268, S.J. Order at 28-29.

*First*, the foundation for the Audible Magic evidence can be established either through judicial notice or by RIAA employee Jeremy Landis.  Grande claims that "i[t] is only appropriate to authenticate evidence generated by a complicated system through expert testimony."  Mot. at 2 (citing Wright & Miller, 31 Fed. Prac. & Proc. § 7114).  But that assertion is incorrect and rests on a clear mischaracterization of Wright & Miller, which merely states that the "showing often is made with expert testimony."  31 Fed. Prac. & Proc. § 7114.  Grande conveniently fails to note that Wright & Miller goes on to state that "***where the evidence in question is the result of a process or system that is generally known and accepted as accurate***, a court may take judicial notice of the foundational facts required by Rule 901(b)(9)."  *Id.*  That statement aptly describes the situation with Audible Magic.  In its summary judgment opinion, the Court observed that "[t]he ability of the Audible Magic software in particular to identify and match files to copyrighted content has been widely recognized."  Dkt. 268, S.J. Order at 28.  The Court appropriately could and did take judicial notice of Audible Magic's functioning.  That conclusion suffices for its foundation under Rule 901.

But even if authentication by a witness were required, the foundation can be laid by Landis, the RIAA employee whose job responsibilities include regularly accessing and using the Audible Magic database to match illegal online copies to the record industry's copyrighted works.  Landis's "knowledge and analysis were derived from duties he [has] held at [the RIAA], his opinions [a]re admissible as testimony based upon personal knowledge and experience gained while employed by [the RIAA]."  Dkt. 268, S.J. Order at 28 (citing *United States v. Valencia*, 600

F.3d 389, 416 (5th Cir. 2010)).  In an unavailing effort to turn the Court around on that conclusion, Grande presents misleading snippets of testimony from Landis's deposition.  While Landis acknowledged he would not "be the right person to answer th[e] questions" "about the proprietary technology"—unsurprising given that he is not employed by Audible Magic—he gave detailed testimony about how the system functions.  Specifically, elsewhere in his deposition,[6] Landis explained that:

- he has experience programming in computer software languages (Dep. at 100-1);

- he "understand[s] how to utilize the Audible Magic software to get results" and that he "use[s] it quite frequently" (*id.* at 99);

- he understood and used the Audible Magic "software development kit, or "SDK", and gave detailed testimony about his familiarity with and use of the SDK (*id*. at 100, 105-8);

- he can control parameters that the system uses to create its digital fingerprint (*id.* at 105); and

- he has used the system for 12 years, routinely verifies its match results himself by listening to the recordings in question, has never encountered an error by the system, and stated unequivocally that "in 12 years, I have not experienced a false positive" (*id.* at 103-04, 138-140).

And for pages and pages of his deposition (*id.* at 111-14, 117-124),  Landis gave a detailed description of the Audible Magic system's functioning under various scenarios and settings, none of which Grande quoted in its motion.  He thus is fully capable of explaining the Audible Magic "process or system and showing that it produces an accurate result"—laying the foundation for admissibility under Rule of Evidence 901(b)(9).  "It is not necessary that the computer programmer testify in order to authenticate computer-generated records."  *U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1045 (9th Cir. 2009).  *See also Valencia*, 600 F.3d at 416.[7]

---

[6] Ex. 4, J. Landis Dep. Excerpts.

[7] Although Plaintiffs do not believe it is required to lay the foundation for the Audible Magic evidence, Plaintiffs' computer science expert, Barbara Frederiksen-Cross, has knowledge of

All that is necessary is that Landis works with and relies on the program and thus can attest to its functioning and accuracy.  Indeed, Grande's ***own cited authority***, *U.S. v. Lizarraga-Tirado*, makes this clear.  789 F.3d 1107, 1110 (9th Cir. 2015).  Grande disingenuously presents the following quotation from that case: "[W]hen faced with an authentication objection, the proponent of Google-Earth-generated evidence would have to establish Google Earth's reliability or accuracy."  Mot. at 2.  But the ***next sentence*** in *Lizarraga-Tirado* explains that "[t]hat burden could be met, for example, with testimony from a Google Earth programmer ***or a witness who frequently works with and relies on the program.***"  789 F.3d at 1110.  Landis quite clearly fits that description, and thus, under *Lizarraga-Tirado*, he can lay the foundation for the Audible Magic evidence.[8]

Grande also asserts that  Landis "has no personal knowledge regarding the reliability of the system," Mot. at 6, but that claim is demonstrably false.  As noted above,  Landis has used Audible Magic for many years; has listened to recordings at times to confirm its matching is correct; has never found any errors or flaws in the system; and has never received a false positive.[9]

Additionally, Grande insists that Landis needed to have personally verified that the label members of the RIAA properly incorporated their copyrighted recordings into Audible Magic's registry.  Mot. at 5-6.  But that is a manufactured self-serving standard that finds no support in the law.  "It is not necessary for each individual who entered a record … into the database to testify as to the accuracy of each piece of data entered."  *U-Haul Int'l, Inc.*, 576 F.3d at 1044.  Instead, Landis "need only be familiar with the company's recordkeeping practices."  *Thanongsinh,* 462

---

Audible Magic's functioning and can present expert testimony on this subject. *See* Dkt. 322-2, B. Frederiksen-Cross Second Rebuttal Expert Report ¶¶ 91-101.

[8] *See also United States v. Ikezi*, 353 F. App'x 482, 483 (2d Cir. 2009) (surveillance videotaping authenticated, where "[t]he government produced evidence that agents set up the equipment, tested it and verified the nature of the taped meeting with the informant.").

[9] Ex. 4, Landis Dep. at 103-04, 138-140.

F.3d at 777.   Landis knows that the Audible Magic database registry contains the RIAA members' recordings, Dkt. 172-12, Landis Decl. ¶¶ 9-12, even if he did not personally input them himself. That is more than enough of a foundation under Rule 901.   Grande's arguments at most go to the weight of the evidence, not its authenticity; Grande is free to cross  Landis about the extent of his knowledge and work at trial.   But Grande has no basis to demand the exclusion of the evidence from the jury.

*Second*, the Audible Magic evidence is not hearsay.   In fact, when this Court denied Grande's summary judgment motion, it concluded that "***Grande's argument that the Audible Magic evidence is inadmissible as hearsay is unpersuasive***."   The Court explained that "[b]ecause Landis's 'knowledge and analysis were derived from duties he [has] held at [the RIAA], his opinions [a]re admissible as testimony based upon personal knowledge and experience gained while employed by [the RIAA].'  *United States v. Valencia*, 600 F.3d 389, 416 (5th Cir. 2010) (lay witness with personal knowledge of databases was permitted to provide testimony about analysis using those databases)."   Dkt. 268, S.J. Order at 28-29.

There is no basis for allowing Grande a second bite at the apple.   Grande did not seek reconsideration of the Court's ruling, and it should not be allowed to do so through an *in limine* motion nearly a year later.   Moreover, Grande's argument is as baseless as it was the first time. Grande concedes that "machine-generated records do not ordinarily constitute 'statements' for hearsay purposes," but then makes the nonsensical assertion that such records "become subject to the hearsay rule when they are developed with human input."   Mot. at 2.   But there is no such blanket rule as virtually all machine-generated records are developed with human input.  *United States v. Bates*, 665 F. App'x 810 (11th Cir. 2016), relied on by Grande, underscores this point.   In *Bates*, the court of appeals observed that the "human input" at issue in the computer matching evidence consisted of law enforcement "officers' ***opinion*** about whether the files were known

11

child pornography." *Id.* at 815.  It was ***this*** sort of subjective human involvement that, according to *Bates*, rendered the records hearsay and testimonial.  Here, in contrast, no one's subjective "opinion" is being interjected into the Audible Magic process.  To the contrary, the whole point of the Audible Magic digital fingerprinting system is to avoid human subjectivity in comparing recordings to one another.  As Landis explained in his declaration, and would do so again at trial,

> [t]he Audible Magic tool scans the perceptual characteristics of a sound recording. The tool compares the characteristics of the sound recording to the content that has been registered in Audible Magic's database (what Audible Magic calls its "Global Content Registry"). If the tool returns a "match" condition, that indicates that the sound recording contains copyrighted content that has been registered with Audible Magic. When Audible Magic returns a "match" condition, it includes information about the sound recording contained in the file, including the track title and artist name for the sound recording and the copyright owner of the matched content (as contained in its registry).

Dkt. 172-12, Landis Decl. ¶ 8.  The Court, therefore, was right the first time.

*Third*, Grande faces no unfair prejudice from the admission of the Audible Magic evidence. Grande has all of the audio files that Rightscorp downloaded from Grande subscribers that the RIAA matched to Plaintiffs' copyrighted content using Audible Magic.  Grande's witnesses and counsel simply can listen to audio recordings to verify if they are copies of Plaintiffs' works in suit (something that Landis himself said he did for a number of the recordings).  Thus, Grande is not prejudiced because of its claimed lack of knowledge about the proprietary inner workings of the Audible Magic technology.

In short, Grande's evidentiary objections to the Audible Magic evidence—like so many of Grande's evidentiary objections—rest on misstatements of the law and mischaracterizations of the facts.  The Court properly rejected them once and should do so again.

## 5. RESPONSE TO MIL 5 (EVIDENCE CONCERNING ACOUSTID) (DKT. 312)

AcoustID is a digital fingerprinting tool, similar to Audible Magic, for matching online audio files to copyrighted content.  Rightscorp used the AcoustID tool for part of the relevant time

period in this case, matching torrent files being offered for download by Grande users, to copyrighted content. Grande's motion to exclude the AcoustID evidence is largely a cut-and-paste of its Audible Magic motion. Plaintiffs will not repeat all of their same responsive points here. Suffice it to say, the AcoustID evidence can be authenticated and is admissible under Rule 803(6)'s hearsay exception for records of a regularly conducted activity.

"Although it is not necessary that the computer programmer testify in order to authenticate computer-generated records[,]" *U-Haul Int'l, Inc.*, 576 F.3d at 1045, Plaintiff will in fact have a computer programmer, Greg Boswell of Rightscorp, testify about Rightscorp's familiarity with and use of the AcoustID tool. Because Boswell "frequently works with and relies on the program" he is a proper witness to establish the foundation for the AcoustID evidence. *Lizarraga-Tirado*, 789 F.3d at 1110.

Moreover, the AcoustID "outputs" are simply the information reflected in the notices that the Rightscorp system generates. Again, these notices are not inadmissible hearsay, but rather are machine-generated business records admissible under Rule 803(6). Tellingly, Grande does not object to the admission of the Rightscorp notices themselves. Dkt. 305-2, Grande Objs. to Pls' Trial Exhibits, at 1 (no hearsay objections to Plaintiffs' Exhibit 1, the Rightscorp notices).

Finally, Grande's suggestion that AcoustID is a "black box" and that there is no way "to understand how the system works," Mot. at 3, is demonstrably false. As Grande knows, but fails to tell the Court, AcoustID is open source and free. Thus, Grande and its experts have unlimited ability to examine and test how it operates. In fact, when Magistrate Judge Austin recommended rejecting Grande's prior attack on AcoustID, he pointedly explained that "UMG has produced to Grande the audio files Rightscorp downloaded, and thus Grande itself can verify the match through the publicly available AcoustID system. Grande does not deny that it has received this information or that it could use a service to verify the song matches itself." Dkt. 289, Order on Discovery

Mots. at 5.  If Grande wants to analyze the source code, it can download a copy any time it wants by visiting this location on the internet: https://acoustid.org/chromaprint.  If Grande wants the library from which AcoustID identifies matches, it can obtain that information from this location: https://acoustid.org/database.  And if Grande wants to check the accuracy of the AcoustID system, it can use any number of free online applications that use the AcoustID software, five of which are identified on AcoustID's own website: https://acoustid.org/applications.  Grande's Motion is conspicuously silent about whether it used these sources to test and respond to Plaintiffs' evidence, which suggests either that Grande ignored Magistrate Judge's Austin's recommendation or that Grande used those resources and found no misidentifications.  Either way, the aforementioned facts are fatal to Grande's claims.

### 6. RESPONSE TO MIL 6 (*COX*) (DKT. 318)

Grande seeks to exclude "all evidence and argument regarding any findings, judgments, or conclusions from the *Cox* litigations" and asserts—without any basis—that "Plaintiffs will … hope to rely on findings and conclusions of those cases …."  Dkt. 318, Mot. at 1, 2.  To be clear, Plaintiffs do not intend to discuss the findings of fact or conclusions of law in either *Cox* trial, nor do Plaintiffs intend to introduce the verdict form, judgment, evidence, or testimony presented.

Plaintiffs *do* intend to introduce compelling and admissible evidence that includes *references to* the *Cox I* verdict.  Numerous internal Grande emails in late 2015 and 2016 reveal that, in the wake of and with specific reference to the *Cox I* verdict, Grande employees (1) thought that the verdict might cause Grande to revisit its own infringement policies and practices, (2) examined its receipt and handling of Rightscorp notices, and decided to forward such notices to Grande subscribers (until switching course again in 2017), and (3) contemplated that Grande, like

14

Cox, had damning internal emails that could lead to Grande, like Cox, being found liable.[10] Indeed, these documents include the same evidence the Court cited when denying Grande's motion for summary judgment on the question of willfulness.  *See* Dkt. 268, S.J. Order at 43 (citing Dkt. 172, Pls' Opp. and Cross-Mot. for S.J., at 33/38).  Accordingly, the fact of the *Cox I* verdict will be introduced to the jury through these relevant and independently admissible documents.

The emails at issue are non-hearsay because they are not being offered for the truth of the assertions contained therein that a jury found Cox liable for secondary copyright infringement. The emails are instead being offered for the effect the *Cox I* verdict had on the "listener," here Grande employees and personnel, and as evidence of their motive for taking certain actions related to Grande's procedures for document retention and processing infringement notices.  "An out-of-court statement might be offered to show that the declarant had certain information, or entertained a specific belief, or spoke a particular language; or it might be offered to show the effect of the words spoken on the listener (e.g., to supply a motive for the listener's action)."  *United States v. Bailey*, 270 F.3d 83, 87 (1st Cir. 2001).  Out-of-court statements, when only offered for their effect on the listener, are routinely admitted as non-hearsay.  *See, e.g.*, *Escobedo v. Dynasty Insulation, Inc.*, 694 F. Supp. 2d 638, 645 (W.D. Tex. 2010) (holding statements admissible to show notice); *Mick v. Big Sur Waterbeds, Inc.*, No. A-06-CA-115 LY, 2006 WL 8432099, at *7 (W.D. Tex. Dec. 18, 2006) (Austin, M.J.) (holding statements admissible to show discriminatory animus), *report and recommendation adopted sub nom. Mick v. Big Sur Waterbeds, Inc*, No. A-06-CA-115-LY, 2007 WL 9701141 (W.D. Tex. Jan. 24, 2007).  These statements are especially relevant, where, as here, they demonstrate an effect on a defendant's decision making.  *See, e.g.*, *Hovsepian v. State Farm Mut. Auto. Ins. Co.*, No. CV0908929MMMPLAX, 2011 WL 13213900, at *3 n.44 (C.D.

---

[10] *See, e.g.*, Ex. 5, PX 155, 206, 207, 214.

Cal. Jan. 12, 2011) ("[T]he court may consider the statements made by the Hillrose resident not for their truth, but **for their effect on State Farm's decision** as to whether it should indemnify plaintiff.").

The Grande emails described above are admissible for two additional reasons.  *First*, the emails are not hearsay since they are party admissions under Federal Rule of Evidence 801(d)(2)(D).  The emails being offered against Grande are statements made by Grande employees concerning matters within the scope of their employment (Grande's policies), made while the declarants were Grande employees.  *Second*, they are admissible under Federal Rule of Evidence 803(3) as statements of Grande employees' then-existing state of mind because they are evidence of Grande's "intent, plan, motive, [or] design" to comply (or not) with federal copyright law.  The state of mind of Grande's employees is directly at issue in this case, because whether Grande committed *willful* infringement is a question for the jury.  *See Malaco Inc. v. Cooper*, No. CIV.A. 300CV2648P, 2002 WL 1461927, at *5 (N.D. Tex. July 3, 2002) (holding that the "infringer's state of mind in committing the infringement" is relevant to copyright infringement damages).

Once Grande's motion is placed in the appropriate evidentiary context, its objection under Federal Rule of Evidence 403 quickly collapses.  The only evidence Grande's motion would exclude are the emails directly at the heart of this case.  These documents are highly probative of why Grande finally changed its policies to start terminating repeat infringers and the bases for those decisions, including the receipt of notices from Rightscorp.  They are also highly probative of Grande's awareness of its conduct and its potential liability.  While harmful to Grande's case, these emails are not *unfairly* prejudicial—let alone so unfairly prejudicial that they substantially outweigh their considerable probative value.  Indeed, Grande's Motion does not even mention these emails, and instead is misdirected at "findings or judgments" that Plaintiffs are not offering.

7. **RESPONSE TO MIL 7 (EVIDENCE OF GRANDE'S TOTAL REVENUES/PROFITS, AND TPG'S ACQUISITION OF GRANDE) (DKT. 319)**

Grande seeks to exclude evidence of Grande's total revenues and profits, and evidence related to the acquisition of Grande by the private equity firm TPG Capital in 2017, including the valuation of Grande. But that evidence is highly probative for statutory copyright infringement damages as well as the willfulness inquiry.

Grande's argument is inconsistent with well-settled law. In the copyright infringement context, courts have considered the following factors in setting statutory damage awards:

> (1) the expenses saved and the profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the copyright; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant.

*Phoenix Entm't Partners, LLC v. Liquid Monkey Lounge, Inc.*, No. SA-15-CA-00592-DAE, 2015 WL 12659927, at *4 (W.D. Tex. Dec. 17, 2015), *report and recommendation adopted,* No. 5:15-CV-592-DAE, 2016 WL 5957383 (W.D. Tex. Jan. 22, 2016).

"The defendant's size and financial assets are highly relevant to arriving at the appropriate level of statutory damages." *UMG Recordings, Inc. v. MP3.Com, Inc.*, No. 00-cv-472 (JSR), 2000 WL 1262568 at *6 (S.D.N.Y. Sept. 6, 2000). Specifically, Grande's total profits are critical information for the jury to have in assessing two of the factors used to calculate those statutory damages: Grande's profits from infringement, and the deterrent effect on the defendant of the potential damages award.[11]

---

[11] In considering the deterrence factor, it is significant to note that just last month, the Fifth Circuit emphasized that "the modern Copyright Act's statutory damages regime has a significant deterrent and potentially punitive purpose." *Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, L.P.*, -- F.3d --, No. 18-20350, 2020 WL 219008, at *8 (5th Cir. Jan. 15, 2020) (statutory damages are "clearly designed to discourage wrongful conduct and may be imposed to sanction and vindicate the statutory policy against copyright infringement.") (citation and internal

17

"The wealth of the defendant has been widely recognized as relevant to the deterrent effect of a damages award." *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 302 F. Supp. 2d 455, 461 (D. Maryland 2004). *See also Psihoyos v. John Wiley & Sons, Inc.*, No. 11 CIV. 1416 JPO, 2012 WL 5506121, at *4 (S.D.N.Y. Nov. 7, 2012), *aff'd*, 748 F.3d 120 (2d Cir. 2014) ("considering the fact that Defendant is a '$300 million a year division of a $1.7 billion company' (*see* Trial Tr. at 925:7-11), the deterrent effect of a $130,000 damages award hardly seems excessive, and may not even be sufficient to 'hurt the offender's pocketbook enough for [it] to take notice.'") (quoting *SESAC, Inc. v. WPNT, Inc.*, 327 F. Supp. 2d 531, 532 (W.D. Pa. 2003)).[12]

Grande's overall profits and TPG's acquisition of Grande are also critical to understanding Grande's intent and motive in engaging in the wrongful conduct at issue, factors which are highly probative of willful blindness (which relates to liability) and willfulness inquiries (which relates to damages).

Here, the evidence will show that Grande's prior owners, Abry Partners, purchased the company in 2009 with the intent to increase profits and then flip it for a profit. One way it raised profits was by discontinuing its practice of terminating infringing customers in 2010. This new approach enabled Grande to keep receiving revenues from customers who were repeat infringers and was a clear factor that enabled it to sell Grande to TPG for $400 million more than the amount that Abry Partners had paid in 2009. These facts are highly probative of why Grande chose to turn

---

quotations omitted). Thus, statutory damages serve to put "Defendants 'on notice that it costs less to obey the copyright laws than to violate them,' so Defendants will not 'be able to sneer in the face of copyright owners and copyright laws.'" *EMI Apr. Music Inc. v. Jet Rumeurs, Inc.*, 632 F. Supp. 2d 619, 625–26 (N.D. Tex. 2008).

[12] *See also Capitol Records, Inc. v. MP3tunes, LLC*, 48 F. Supp. 3d 703, 732 (S.D.N.Y. 2014), *aff'd in part, rev'd in part and remanded sub nom. EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 840 F.3d 69 (2d Cir. 2016) ("Because punitive damages act as a deterrent, a wealthier defendant may be subject to stiffer penalties") (citing *Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1119 (2d Cir.1986)).

a blind eye to infringement on its network, despite receiving more than 1.35 million notices of infringement. *See BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.,* 881 F.3d 293, 311 (4th Cir. 2018) (finding these sort of facts "powerful evidence from which a reasonable jury could find that Cox willfully blinded itself to specific instances of infringement by its subscribers.").

These facts are also relevant to the question of whether Grande's secondary copyright infringement was willful, which in turn determines whether Grande faces maximum statutory damages of $30,000 per work (ordinary infringement) or of $150,000 per work (willful infringement). *See* 17 U.S.C. § 504(c). "Willfulness thus requires a showing that Grande knew its conduct constituted contributory copyright infringement or acted with reckless disregard of Plaintiffs' rights as copyright holders." Dkt. 268, S.J. Order at 43 (citing *Graper v. Mid-Continent Cas. Co.*, 756 F.3d 388, 395 & n. 7 (5th Cir. 2014) (citing *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 58 (2007)). Section 504 places "no limits [on] what may be considered willful infringement," and courts have interpreted willfulness expansively. *See, e.g., Zomba Enters., Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 584 (6th Cir. 2007).

Grande also contends that the calculation of its value by its own parent company (TPG) should be excluded. Mot. at 3. But this information is plainly relevant. One of Plaintiffs' expert witnesses, Dr. William Lehr, relies on the TPG valuation of Grande in his analysis- specifically relating to his calculation of a Grande subscriber's lifetime value. Grande challenged this analysis on summary judgment, but the Court rejected Grande's argument:

> The report also derives an alternative net present value amount per customer based on the price paid by TPG Capital to acquire Grande in 2017, and what it implies about the expected value per customer TPG had formed in paying that price. [] The Court concludes this evidence is sufficient to raise a genuine issue of material fact about Grande's revenues reasonably related to infringing customers to defeat summary judgment on this issue.

Dkt. 268, S.J. Order at 47 fn.8.  Grande raised the same arguments again in a *Daubert* motion, which the Magistrate Judge also rejected:  "whether Lehr's calculations are inflated is a factual issue, best explored through cross examination.  ***Lehr based his calculation on Grande's own revenue records, <u>as well as records related to the acquisition of Grande in 2017</u>, and upon a reasonable methodology***, all that is required by *Daubert*."  Dkt. 280, Order on *Daubert* Motions, at 10.  Grande's third shot at this argument should fare no better than its first two.

### 8. RESPONSE TO MIL 8 (RIGHTSCORP'S INTERACTIONS WITH OTHER ISPS) (DKT. 320)

Plaintiffs do not intend to introduce evidence of Rightscorp's interactions with other ISPs, with three exceptions.

*First*, Plaintiffs should be able to present evidence as to the narrow fact that Rightscorp detects infringement by subscribers of, and sends notices to, a number of different ISPs, without getting into the details of Rightscorp's interactions with those ISPs.  If Plaintiffs are not permitted to present that fact, the jury may be confused into concluding, wrongly, that Grande alone was singled out by Rightscorp, or that Grande's conduct is singular among ISPs.  There is nothing prejudicial about providing the jury with this context.

*Second*, Plaintiffs should be permitted to present the jury with the fact that Rightscorp sent notices to Cox, and that Cox ultimately was found liable for copyright infringement based on those notices.  Those facts are admissible and highly relevant for explaining Grande's conduct in late 2015 through 2016 following the Cox verdict, in particular Grande's actions and communications reflecting its knowledge of its subscribers' infringement and its own culpability, as explained in Plaintiffs' response to Grande Motion *in Limine* No. 6.

*Third*, in the event that, through evidence or arguments, Grande attempts to present a misleading picture of Rightscorp's business practices concerning, or interactions with, other ISPs,

Rightscorp witnesses should be allowed to rebut such misleading or incomplete evidence or argument by providing truthful testimony concerning those interactions.

9.  **RESPONSE TO MIL 9 (RIGHTSCORP'S 2014 SUBPOENA TO GRANDE) (DKT. 321)**

After considering Grande's motion, Plaintiffs will not seek to introduce Rightscorp's 2014 subpoena to Grande as affirmative evidence.  However, Plaintiffs should be allowed to introduce the subpoena for impeachment purposes if Grande witnesses give misleading or incomplete testimony concerning Rightscorp or its interactions with Grande regarding Grande subscribers' infringement.

10.  **RESPONSE TO MIL 10 (FREDERIKSEN-CROSS SECOND REBUTTAL REPORT AND JANUARY 2019 DECLARATION) (DKT. 322)**

Grande's motion to exclude Barbara Frederiksen-Cross' second rebuttal report that was specifically authorized by the Court and her declaration responding to Grande's denied spoliation motion, is the latest chapter in Grande's desperate effort to keep Frederiksen-Cross's reliable and probative testimony from the jury.  The Court has rejected each of Grande's prior attempts, and should do the same again here.

Grande's motion disregards the Magistrate Judge's order that—as a sanction against Grande—granted Plaintiffs the right to re-depose Grande's expert (Geoff Cohen) and then to have Frederiksen-Cross rebut Cohen's "supplemental testimony."  Dkt. 279, Order on Mots. to Strike, at 11.  That is exactly what Plaintiffs have done. Further, the schedule for that deposition and Frederiksen-Cross's subsequent report were dictated by Grande's delay in making Cohen available for deposition and in producing documents that Cohen used in connection with his report.  Indeed, given Grande's well-documented history of sandbagging Plaintiffs with respect to Cohen's supplemental report—a history that, as explained below, persisted even after the Magistrate Judge's Order—Grande is plainly not an aggrieved party.  The timing of Frederiksen-Cross's

report is entirely of Grande's own making, and a product of the repeated failures of Grande's expert to disclose relevant information as Rule 26 required.  Thus, the timing of  Plaintiffs' disclosure of her report was "substantially justified" and not subject to striking under Rule 37(c). *See Mariscal v. Graco, Inc.*, 52 F. Supp. 3d 973, 988 (N.D. Cal. 2014) (allowing party to supplement its expert's report out of time to account for the opponent's late expert disclosure).

The Magistrate Judge's order allowed some, but not all, of Cohen's supplemental testimony and ordered that Frederiksen-Cross could, at Grande's expense, respond to Cohen's "testimony."  Dkt. 279, Order on Mots. to Strike, at 11-12.  Thereafter, Plaintiffs sought Cohen's deposition, with the intent that Frederiksen-Cross would present her supplemental report after Cohen explained his supplemental report through deposition testimony.   Plaintiffs and Frederiksen-Cross were wholly warranted in taking that approach, because, as explained below, Cohen had withheld supporting analyses that should have been disclosed months earlier, but were only revealed and produced in connection with his deposition.

In response, Grande claimed that Cohen was not available for that deposition until October 10, 2019.  While scrutinizing Cohen's report in preparation for that deposition, Plaintiffs' counsel and Frederiksen-Cross became concerned that Cohen had not disclosed the supporting analyses underlying his opinions in his supplemental report.

Sure enough, when this issue was raised with Grande's counsel on October 4, 2019,[13] they agreed to defer Cohen's deposition as he had "availability in the coming weeks" and promised to "get back to you very shortly regarding your request for additional information."[14]  After further delays, Grande's counsel then admitted during a phone call on November 4, 2019 that Cohen in fact had in his possession such analyses, but had not produced them as Rule 26 requires.

---

[13] Ex. 6, Oct. 4, 2019 O'Beirne Email to Brophy.
[14] Ex. 7, Oct. 7, 2019 Brophy Email to O'Beirne.

Plaintiffs would have been well within their rights at that moment to renew their motion to strike Cohen's supplemental report in its entirety.  However, rather than burdening the Court with further motion practice, Plaintiffs' counsel allowed Cohen's deposition to be rescheduled on the condition that Cohen produce the missing materials in advance and without further delay.  Cohen produced some (but as Plaintiffs later learned, not all) of his supporting analyses for his supplemental report, *more than a month later*, on November 12, 2019.[15]

After Plaintiffs' counsel made several requests to schedule the Cohen deposition, Grande's counsel finally informed Plaintiffs' counsel that Cohen could not be available until January 2020.[16]  Plaintiffs accepted the deposition occurring in January, but again warned Grande that this necessarily would impact the timing of Frederiksen-Cross' supplemental rebuttal report.[17]

Plaintiffs took Cohen's deposition on January 16.  Under questioning from counsel, Cohen admitted that he had still more supporting analyses—concerning his assertions that the Audible Magic matching results are flawed—*which he had not produced to Plaintiffs*:

> Q. And you agree with me part of what you did was run SQL searches that you have in your possession and could have but did not provide as part of your support materials?
>
> A. What I did was perform SQL searches that compared the names of information that you have available in ways that are consistent with analysis that Mr. Landis has already done, *but it is true I did not provide my version of the SQL that did that because it did not occur to me that that was something that you would be unable to do because you have the full evidentiary basis of my opinions in the Landis spreadsheet and the files*.[18]

---

[15] Ex. 8, Nov. 12, 2019 Howenstine Email to Counsel, Subject Line: "UMG v. Grande – Cohen supporting materials" ("Phil/Rob, Below is a download link to additional Cohen materials.").

[16] Ex. 9, Dec. 4, 2019 Brophy Email to O'Beirne.

[17] Ex. 10, Dec. 6, 2019 O'Beirne Email to Brophy.

[18] Ex. 11, Jan. 16, 2020 G. Cohen Dep. at 416.

Unable to substantively address the fact that these materials should have been produced and needed to be produced now, counsel for Grande was left with nothing but the snide response that: "we also didn't provide a dictionary that provides the English language definition of all the words that our expert reads."[19]

Cohen and Grande did not produce these additional supporting analyses until January 24, 2020.[20]  Frederiksen-Cross finalized and served her supplemental report ten days later, on February 3, 2020.

As this chronology underscores, Plaintiffs, not Grande, are the ones who suffered prejudice, all of which were the result of Grande's and Cohen's delays.  It defies reason that **_Grande_** now claims that **_it_** is the prejudiced party.

As for Frederiksen-Cross's January 17, 2019 rebuttal declaration, she submitted it in response to entirely new arguments that Grande raised two weeks before in its January 3, 2019 Motion for Spoliation Sanctions (Dkt. 247).  The declaration explicitly incorporated by reference her two prior expert reports, *see* Decl. ¶ 2., so Grande's claim that it did not comply with Rule 26's disclosure requirements is false.  Moreover, Grande's motion to strike it as untimely is itself untimely, as Grande waited more than a year to file its motion.

**11. RESPONSE TO MIL 11 ("IRRELEVANT" AND "UNPROVEN" INFRINGEMENTS) (DKT. 323)**

Grande offers no valid basis for excluding (1) Rightscorp notices and downloads about content other than the works in suit, (2) Lehr's calculations of profits from overall infringement, and (3) evidence concerning the viral nature of online copyright infringement.

---

[19] *Id.* at 419.
[20] Ex. 12, Jan. 24, 2020 Brophy Email to O'Beirne.

A.      **Rightscorp Notices And Downloads**

Plaintiffs should be permitted to introduce evidence—from Rightscorp and from Grande itself—as to the overall volume of the notices that Rightscorp sent and Grande received, as it is probative of Grande's knowledge of (and/or willful blindness to) infringement on its network.  As Grande is aware, the Grande reports, emails and other documents referring to or reflecting its receipt of Rightscorp notices cannot be parsed out to isolate just the notices concerning the works in suit.  Thus, the practical effect of Grande's motion would be to exclude all of this evidence of Grande's knowledge of infringement—which is likely Grande's intent, but a plainly unfair and unwarranted result.

Furthermore, the overall number of Rightscorp notices and downloads, and even notices and downloads about other content, is probative of the reliability of the Rightscorp technology. For example, if Rightscorp, and another company, independently identify the same Grande subscriber as engaging in online copyright infringement—as is the case—that would be highly relevant to showing that the Rightscorp system works and that Grande's criticisms are makeweight, regardless of whether the specific instances of infringement in question concern Plaintiffs' works in suit or other copyrighted content.

As Grande points out, Plaintiffs' expert Dr. Robert Bardwell analyzed the Rightscorp notices to identify the specific subset related to the works in suit, and will present that calculation to the jury.  Mot. at 2.  Similarly, as discussed above, RIAA witness Jeremy Landis matched a subset of the audio files Rightscorp downloaded from Grande subscribers, to the works in suit, and will testify to that matched figure, not just the overall number of downloads.  *Id.* at 3.  Thus, there is no risk that the jury might be confused into thinking all of the more than 1.35 million notices, or all of the more than 59,000 downloaded files, concern the works in suit.  Tellingly, the Courts

in each of the Cox trials allowed evidence of both the overall number of notices and those related to works in suit and they should be permitted here as well.

**B.     Lehr's Calculations Of Infringement On Grande's Network**

Similarly, Lehr's calculations of overall infringement are relevant to understanding Grande's economic incentives for allowing unlimited infringement on its system, which, in turn, is relevant to the open issue of willfulness and to the calculation of statutory damages.   While Grande argues that if this testimony is admitted, Plaintiffs will be awarded damages "for alleged infringement of other parties' copyrights," it is plainly wrong.   Lehr explains in his report (and will do the same at trial) that he is not sponsoring these overall calculations as actual damages figures.   It should also be noted that Grande has sought to exclude these calculations on two prior occasions, and the Court rejected that attempt each time.   *See* Dkt. 268, S.J. Order at 48 n.8 ("While the calculations in the Lehr report are not limited to the specific customers who allegedly infringed the copyrights asserted in this case, requiring such an exacting and specified showing would go far beyond the requirement of merely showing a 'reasonable relationship.'"); Dkt. 280, Order on *Daubert* Motions, at 10-11 (rejecting criticisms of Lehr because his calculations are based on "Grande's own revenue records" and "upon a reasonable methodology" and observing that the Court already had "expressly rejected these exact arguments.").   Lehr was permitted to offer such calculations in the two *Cox* trials for similar purposes, and should be allowed to do so here as well.

**C.     The Viral Nature Of Online Infringement Using Peer-To-Peer Technologies Like BitTorrent**

Plaintiffs intend to introduce evidence concerning this aspect of online copyright infringement, and for good reason, as it is highly probative to a number of material issues. Explaining that "an infringing file distributed to one person may ultimately be distributed to multiple other people," Mot. at 2, is a key element of the harm caused by this sort of infringement,

26

and the role of ISPs such as Grande in facilitating such infringement.  This evidence is relevant for several of the statutory damages factors, such as "the revenues lost by the plaintiff," "the value of the copyright," and "the deterrent effect on others besides the defendant[.]"  *Phoenix Entm't Partners, LLC*, 2015 WL 12659927, at *4.

Because a single Grande user can spread infringing content through BitTorrent to so many others, Rightscorp and other similar companies necessarily can only detect a fraction of the infringing activity occurring on Grande's (or any other ISPs') network; the full scope of the infringement is undoubtedly far greater in magnitude.  For this reason, it is impossible to quantify the economic harm of these downstream effects with any certainty, as Lehr and others will testify.  But the remedy of statutory damages is provided precisely because copyright infringement damages often are extremely difficult or impossible to quantify.  Grande, on the other hand, will have its damages expert, Jonathan Kemmerer, offer a purported "actual damages" calculation of Plaintiffs' supposed lost profits concerning the works in suit, that erroneously assumes the only infringement is the small sliver that Rightscorp detects.  Plaintiffs' witnesses must be permitted to explain that given the viral nature of BitTorrent infringement, Kemmerer's calculation misleadingly understates the harm to Plaintiffs.

The viral nature of BitTorrent infringement also is important in explaining why Grande properly bears liability for contributing to its subscribers' infringement, and should pay damages for that infringement.  An ISP like Grande could have terminated known infringing subscribers, thereby stopping them from spreading the infringing content through the use of Grande's internet service.  Had Grande done so, that would have been far more effective than pursuing the individual infringers themselves, and would have much more significantly reduced the harm Plaintiffs suffered.  These factors all are relevant for the jury in assessing the propriety of holding Grande liable for contributory infringement and for assessing an appropriate measure of damages.

For all of these reasons, Plaintiffs' evidence concerning the full scope of infringing activity on Grande's network is highly relevant and should be admitted.

### 12. RESPONSE TO MIL 12 (TERMINATION FOR NONPAYMENT) (DKT. 324)

It is understandable that Grande wants to keep from the jury evidence that it terminated customers for non-payment. Such evidence completely eviscerates an argument Grande is likely to make: that because of the importance of internet access, termination of service is a drastic measure that should be used sparingly, if at all. Plaintiffs should be allowed to attack the sincerity of Grande's argument, by presenting the jury with the full picture: that Grande routinely deprives customers of internet service when they don't pay Grande.

Moreover, evidence that Grande terminated customers when **its** property or services were being stolen, but refused to do so when **others'** property was being stolen, is independently admissible as it is highly probative of Grande's willfulness.

Nor is there a genuine concern about confusing the jury. A jury is more than capable of receiving the evidence of Grande's termination for non-payment, and understanding the basic point: Grande terminates accounts when the subscriber no longer benefits its financial interests (non-payment of subscription fees) but does not terminate accounts when doing so benefits its financial interest (continued receipt of subscription fees from repeat infringers). Similar testimony was permitted in the *Cox* trials and should be permitted here as to Grande.

Unable to address these valid bases for the admission of this evidence, Grande makes the self-serving argument that it was able to verify non-payment but could not verify infringement, as the justification for the company's starkly different treatment of these two groups of customers. This argument is not only false but is not a basis for excluding clearly probative information. *First*, and foremost, Grande was under no duty to verify notices of copyright infringement, but it was under a duty to track repeat infringers and to implement a reasonable termination policy. *Second*,

there were certainly actions Grande could have taken if it had actual doubts about the accuracy of Rightscorp's allegations.  Grande could have contacted the individuals who Rightscorp identified, or it could have taken up Rightscorp on its offer to access the Rightscorp dashboard, which provided extensive additional information about the infringement Rightscorp was detecting on Grande's network, or even meet with Rightscorp to discuss its system's operation and the evidence it was collecting.  Grande chose to do none of those things.  Of course, Grande had no doubts about the accuracy of the Rightscorp allegations—those arguments were created for the first time by the legal team after the commencement of this action. The evidence is relevant and should be permitted.

### 13. RESPONSE TO MIL 13 (DMCA) (DKT. 325)

It is hardly surprising that Grande seeks to exclude evidence and argument related to the DMCA safe harbor, including evidence and argument that Grande failed to qualify for the safe harbor, and that Grande terminated a handful of repeat infringers who received Rightscorp notices in 2017, as well as evidence and argument about how Grande responded to infringement notices from parties other than Rightscorp.  That evidence is devastating to Grande's defense.  But the evidence is plainly relevant to the material issues of willful blindness and willfulness that remain to be decided by the jury.

Anticipating that Grande would seek to exclude this evidence, Plaintiffs preemptively filed a motion related to Grande's ineligibility for the DMCA safe harbor.  *See* Dkt. 315, Plaintiffs' Motion *in Limine* to Permit Evidence or Argument Related to Grande's Ineligibility for the DMCA Safe Harbor Defense (Feb. 4, 2020).  That motion, which Plaintiffs incorporate herein by reference, discusses the relevance of these issues.

A.        **Grande's Policies**

In their motion, Plaintiffs explained how Grande's lack of a termination policy supports two independent contentions Plaintiffs will prove to the jury.  *First*, the fact that Grande had a policy not to terminate anyone for copyright infringement *at the same time* that it received over 1.35 million infringement notices is powerful support for Plaintiffs' contention that Grande was willfully blind to the infringements on which Plaintiffs base their claims.  *See* Dkt. 315 at 4-5. Further, the fact that Grande adopted policies that resulted in termination of repeat infringers both before 2011 and after 2016 are further support for Grande's willful blindness, as they show that Grande knew how to institute such policies during the intervening years, but simply chose not to. In addition, the fact that Grande in 2017 terminated a handful of repeat infringers who received Rightscorp notices is relevant to Grande's claim that the Rightscorp notices were unreliable.

*Second*, Grande's change from a compliant policy to a policy not to terminate any user for copyright infringement during the heart of the relevant time period supports Plaintiffs' contention that Grande acted willfully in its contributory infringement, which affects the range of statutory damages to which Plaintiffs are entitled.  *See id.* 5.  The additional facts that Grande had different policies that allowed for the termination of repeat infringers both before and after October 2010 – June 2017 further show Grande's willfulness in instituting a policy of unlimited infringement during the central time period.

Grande's argument that its policies are irrelevant because they show only how Grande responded to "non-Rightscorp" notices is manifestly baseless as it completely ignores that Grande's policies applied to *all* notices it received, no matter the sender.  Dkt. 325 at 3.  Because Grande ignored all notices over the relevant time period, it necessarily ignored Rightscorp notices in particular.  To conceal this obvious flaw in its argument, for the first time, in its papers to this Court, Grande offers to stipulate that it "has never terminated a subscriber account in response to

Rightscorp notices." *Id.*[21]  As a threshold matter, that is not true: Plaintiffs will prove at trial that Grande did exactly that shortly after this lawsuit was filed.  But even if it were true, it does not eliminate the significance of the fact that Grande had a corporate policy not to terminate subscribers in response to notices.  That policy is relevant to Plaintiffs' claims and should be considered by the jury.

Moreover, Grande's decision to terminate accounts for copyright infringement in 2017 after Plaintiffs brought this case is not a "subsequent remedial measure" barred by Rule 407. Grande's argument that its decision to begin a new policy of terminating subscribers for infringement in 2017 is inadmissible under Rule 407 omits essentially all of the relevant facts relating to its policy decision, and ignores well-settled law regarding subsequent remedial measures, both of which clearly establish that this evidence is admissible.

Grande's motion intentionally focuses on the implementation of its so-called "DMCA Policy and Procedure" in early 2017.  However, this focus is misleading as the relevant chronology starts much earlier.  In fact, it was the December 2015 *Cox* verdict that set off alarms inside Grande, because Grande was well-aware of its own exposure for the same liability based on the same evidence.  In 2013, a Grande employee had predicted that its policy of unlimited infringement would cost it the safe harbor.  Grande's immediate reaction to the *Cox* verdict was to examine its own handling of the Rightscorp notices and revisit its previous unlimited infringement policy. This review inexplicably took more than a year, and the infringement at issue in this case continued

---

[21] Throughout its motion, Grande proposes various stipulations which it suggests are offered to, "streamline the issues for trial."  Mot. at 4.  Had Grande wanted to propose factual stipulations to Plaintiffs, it could have done so before the parties' pretrial filings, when the Court requested any such stipulations.  However, at that time, Grande told Plaintiffs that it did not intend to propose *any* stipulations and refused to participate in Plaintiffs' efforts to make trial more efficient by proposing stipulations to undisputed facts.  Grande's offer to stipulate to facts now—in the context of an *in limine* motion designed to prevent the jury from understanding the full scope of Grande's conduct—is plainly disingenuous and is not about streamlining issues for trial.

unabated.  Ultimately, Grande decided in 2017 to terminate a handful of customers hoping retroactively to qualify for the DMCA safe harbor.

Rule 407 provides that:  "When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product or its design or a need for a warning or instruction.  But the court may admit this evidence for another purpose, such as impeachment or--if disputed--proving ownership, control, or the feasibility of precautionary measures."  Fed. R. Evid. 407.  Grande cannot cite a single case applying Rule 407 to these circumstances—a defendant's self-serving, *pro forma* attempt to retroactively qualify for an affirmative defense—because none exists.  In fact, numerous precedents from the Fifth Circuit provide independent bases to reject Grande's Rule 407 motion.

*First*, Grande's new policy and its eventual litigation-focused terminations were the culmination of a yearlong self-assessment based on the *Cox* verdict that shines a crucial light on Grande's mental state and awareness of its own misconduct.  Rule 407 does not exclude bruising internal assessments, as the Fifth Circuit has made clear.  "[Rule 407] only prohibits evidence of subsequent measures, not evidence of a party's analysis of its product."  *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 430 (5th Cir. 2006)(internal citations omitted).  To the extent that the eventual terminations could themselves even be considered a "measure," they fall far short of exclusion under Rule 407 for the reasons discussed below.  Regardless, Grande's candid internal discussions about the *Cox* verdict and Grande's handling of the Rightscorp notices, merely because they related to a potential future policy change, are not subject to Rule 407 as a threshold matter.

*Second*, and relatedly, Grande's 2016-2017 policy review and eventual terminations were not "subsequent" to the infringement of Plaintiffs' works.  The review was concurrent with the infringement, and Grande allowed the infringement of these works to continue throughout 2016

32

and beyond.  The Court denied Grande the safe harbor even under its 2017 policy, and thus infringement that postdates the 2017 terminations remain at issue in this case.  This alone prevents the application of Rule 407, because the "measure" must occur ***after*** the events in question.  *See, e.g., Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1343 (5th Cir. 1978) (holding that a measure that occurred before the relevant injury did not trigger Rule 407); *City of Richmond, Va. v. Madison Mgmt. Grp., Inc.*, 918 F.2d 438, 460 (4th Cir. 1990) ("[T]he remedial measure was, therefore, prior to the event.  Accordingly, we find no violation of Rule 407.").

*Third*, Grande's decision to finally reinstate the possibility of termination was not aimed at preventing the harm of infringement; it was aimed at immunizing Grande from responsibility for that harm.  Once Cox lost the DMCA safe harbor and was found liable for contributory infringement for (among other things) ignoring Rightscorp notices, Grande terminated 12 people over the next year in the misguided hope that such an anemic effort might provide a limitation on Grande's liability.  But whether or not Grande qualifies for the safe harbor has no effect on making the harm of infringement more or less likely, it only makes ***a verdict against Grande*** more or less likely.  Thus, Grande's conduct was not "remedial."  *See, e.g., Novick v. Shipcom Wireless, Inc.*, 946 F.3d 735, 740 (5th Cir. 2020) ("Thus, even assuming Shipcom conducted the audit solely to ensure that its employees were properly classified, the audit, standing alone, did not make the earlier injury or harm less likely to occur.  And, therefore, the audit was not a subsequent remedial measure.").

*Fourth*, and relatedly, Rule 407 is reserved for the public policy protection of voluntarily, socially responsible behavior aimed at improving the safety of others.  Grande knew it was legally obligated to terminate infringers, ignored this obligation for years, waited until it was sued, and then engaged in contrived litigation-driven terminations.  Such self-serving efforts are not excludable under Rule 407, because they are neither voluntary nor altruistic.  *See, e.g.,*

*Underwriters at Lloyd's London v. OSCA, Inc.*, No. 03-20398, 2006 WL 941794, at *6 (5th Cir. Apr. 12, 2006) (holding that Rule 407 did not apply because "the investigation itself was conducted not out of a sense of social responsibility but in order to gain the sales benefits of membership in a trade organization."); *Novick v. Shipcom Wireless, Inc.*, 946 F.3d 735, 740 (5th Cir. 2020) ("Because [Defendant] is legally obligated to take these measures to comply with the FLSA, excluding evidence of Plaintiffs' reclassification to nonexempt status would not further a social policy....").

 *Fifth*, even if Grande's policy change was the type of action that could trigger the threshold exclusion of Rule 407 (and it is not),  "The Fifth Circuit has held that evidence of subsequent remedial measures is admissible as proof of subsidiary issues in the case, such as knowledge of the dangerous condition."  *Boudreaux v. J.P. Morgan Chase & Co.*, No. CV 07-555, 2008 WL 11354967, at *1 (E.D. La. Jan. 11, 2008).  *See also Farmington Cas. Co. v. 23rd St. Properties Corp.*, No. 98 CIV. 3597 HB KNF, 1998 WL 755163, at *1 (S.D.N.Y. Oct. 28, 1998) ("Other exceptions have developed that permit proof at trial of subsequent remedial measures to demonstrate such things as prior notice and knowledge….").

 Grande's immediate reaction to Cox's liability for allowing unlimited infringement is proof of Grande's knowledge of the same conduct occurring on its network.  Rule 407 exists to avoid disincentivizing defendants from making fixes to improve safety.  Fixing your own broken step after someone falls to ensure more people don't fall is a remedial measure.  Hearing that someone was seriously hurt on a neighbor's stairwell and sending an email maintaining "we could be in real trouble because our stairs are really unsafe too" is an admission of knowledge.  The same is true here.  Grande's internal emails reflect (1) actual knowledge that infringement was occurring and (2) awareness that its failure to terminate infringing subscribers failed to meet its legal obligations.  Grande's immediate analysis of its policy after the *Cox* verdict confirms its knowledge and

awareness of guilt.  That the self-serving new policy eventually went into effect does not change the central relevance of this evidence.

*Finally*, subsequent remedial measures are also independently relevant to prove feasibility of conduct relevant to the case.  Grande attempts to sidestep this basis by offering to stipulate that it had the "ability" to terminate subscribers in response to Rightscorp notices.  This slices the question much too thinly.  The feasibility exception to Rule 407 exclusion is not limited to technical feasibility.  "Although the defendants argue that they are not contesting the technological feasibility of the [measure], it is clear they are contesting its economic feasibility.  Accordingly, the issue of feasibility is, in fact, disputed, and Rule 407 does not bar admission…" *Wielgus v. Ryobi Techs., Inc.*, No. 08 CV 1597, 2012 WL 3005306, at *6 (N.D. Ill. July 23, 2012).  Grande is keen to explain to the jury that, as a business matter, it does not snoop on its customers and is reluctant to terminate users based on what it calls unverified allegations.  Yet Grande witnesses admitted that 2017 terminations were because Grande concluded its users did infringe, and (despite Grande's protests otherwise) the documents make clear that Grande relied on Rightscorp notices to decide whom to terminate.  Grande has made the business feasibility of terminations a central issue in this case and Rule 407 allows Plaintiffs to introduce this evidence.

## B.    The DMCA Safe Harbor

Plaintiffs also explained in their motion why the DMCA and the Court's safe harbor ruling are relevant to trial.  *See* Dkt. 315 at 5-7.  As an initial matter, similar evidence was admitted in the first *Cox* trial, where "witnesses and documents often referred to the DMCA and its safe harbor provisions."  *BMG Rights Mgmt. (US) LLC v. Cox Communications, Inc.*, 881 F.3d 293, 313 (4th Cir. 2018).  The same is true here: many of Grande's contemporaneous documents that show Grande was willfully blind and acted willfully refer expressly to the DMCA and its safe harbor.  *See, e.g.*, Dkt. 307, Plaintiffs' Amended Exhibit List (Feb. 4, 2020), Exs. 57-59, 187, 366-67, 575-

76 (all spreadsheets titled, *inter alia*, "DMCA Excessive Violations") & 91 (email from Grande employee worrying that "we might lose our safe harbor status").

And regardless of what the documents reference, the DMCA and the Court's safe harbor ruling are also relevant to rebutting what will undoubtedly be one of Grande's key thematic defenses at trial.  At summary judgment, the *first paragraph* of Grande's motion argued that "[t]his case is an attempt by the U.S. recording industry to make Internet service providers, or ISPs, its de facto copyright enforcement agents" or "copyright police."  Dkt. 129, Grande's Motion for Summary Judgment (Aug. 10, 2018), at 1.  The gaping hole in that argument is that ISPs can avoid any economic liability for copyright infringement by their users if they establish their eligibility for the DMCA safe harbor defense by, among other things, adopting and reasonably implementing a repeat infringer policy that provides for termination in appropriate circumstances.  *See* 17 U.S.C. § 512(i)(1)(A).  Plaintiffs should be able to expose that gaping hole to the jury.[22]

### 14. RESPONSE TO MIL 14 (VALUE OF COPYRIGHTS AND OVERALL HARM CAUSED BY COPYRIGHT INFRINGEMENT) (DKT. 326)

The Court should reject Grande's baseless motion to exclude testimony and argument about the value of copyrights or the overall harm caused by copyright infringement.  Such evidence (of copyrighted musical sound recordings generally, and specifically about the works in suit) is

---

[22] The relevance of the safe harbor to rebutting an argument Grande will make at trial distinguishes this case from the two cases Grande cites for the false proposition that unavailable affirmative defenses are irrelevant at trial.  *See* Dkt. 325 at 3.  In both those cases, the *defendant* sought to invoke an unavailable statutory defense to argue that its conduct should be evaluated in light of that unavailable defense.  *See UMG Recordings, Inc. v. Escape Media Group, Inc.*, No. 11-CV-8407, 2015 WL 1873098, at *7 (S.D.N.Y. Apr. 23, 2015) (precluding defendant from making "mitigation argument" based on DMCA safe harbor defense when all parties agreed defendant did not qualify for it); *United States v. Trumbo*, No. 18-CR-20403, 2019 WL 3289848, at *2 (E.D. Mich. July 22, 2019) (precluding defendant from invoking unavailable affirmative defense because "it may cause the jury to consider a defense that is not raised").  The desire to avoid jury confusion animated both those decisions.  However, unlike the defendants in those cases, Plaintiffs do not seek to invoke the safe harbor to create jury confusion, but rather to *avoid* confusion that would otherwise be created by Grande's reliance on an equitable argument foreclosed by the statute.

one of the express statutory damages factors.  In essence, then, Grande seeks to write one of the factors out of the controlling law of statutory damages.  *See Phoenix Entm't Partners, LLC*, 2015 WL 12659927, at *4 (identifying "value of copyrighted work" as one of statutory damages considerations).  Grande acknowledges that Plaintiffs' company witnesses and experts have testified that piracy, including the peer-to-peer piracy by Grande and its subscribers at issue here, has devastated their businesses, but that quantifying that harm is not possible.  Part of the reason the harm cannot be quantified is that no one knows the scope of infringement—including the scope of infringement by Grande and its subscribers.  In order for the jury to understand why the scope of and harm from infringement cannot be quantified, it must also understand the evolution of the music industry.  In particular, the jury must understand the historic shift from sale of physical media (such as records, tapes and CDs) to online digital distribution, viral music sharing through peer-to-peer networks, and the history that undergirds Plaintiffs' antipiracy efforts that resulted in this lawsuit.

Lehr will further explain, through the lens of academic and economic literature, the unquantifiable nature of the harm of digital piracy.  Indeed, it is precisely because of the difficulty quantifying harm from Grande's infringement that fact and expert testimony on the nature of harm caused by piracy are needed.  The loss of revenue to the industry before and during the years at issue is on point and is as close to quantifying harm as possible.  Lehr and other witnesses were allowed to present this type of testimony in the recent *Cox* trial.  The jury should be allowed to hear this testimony in this case, too.

Lehr does more than just describe the evolution of the industry or opine that infringement is harmful: he explains why economists have concluded that infringement is harmful. A statutory damages analysis permits consideration of all the harms a defendant's infringement causes, not merely those that can be quantified in a traditional actual damages analysis.  *See Sony BMG Music*

*Entm't v. Tenenbaum*, 660 F.3d 487, 502–03 (1st Cir. 2011) (affirming statutory damages award in part based on record evidence of "extensive testimony regarding the loss in value of the copyrights at issue that resulted from [the defendant's] conduct, and the harm of [the defendant's] actions to [the plaintiff] and the recording industry, including reduced income and  profit").  In order to properly award statutory damages, the jury should be aware of the academic consensus that piracy harms rights holders and how that harm affects the marketplace for creative content.

Grande argues that because Plaintiffs did not provide a quantification of the specific value lost or harm caused by the infringement during discovery, they cannot discuss the general concepts of value or harm at trial.  But that was not a discovery failure; it was a function of the extreme difficulty in quantifying the type of harm here, which is precisely the reason for the availability of statutory damages in this sort of copyright case.  As the Fifth Circuit emphasized again just last month, "[t]he availability of statutory damages is not contingent on the demonstration of actual damages." *Energy Intelligence Grp., Inc.*, 2020 WL 219008, at *8 (citing *Tenenbaum*, 660 F.3d at 507).  Grande's motion disregards this bedrock principle for copyright statutory damages.

For these reasons, the Court should deny Grande's motion, and permit Plaintiffs' witnesses to testify (as they were allowed to testify in the recent *Cox* trial) about the value of sound recording copyrights (generally and specifically as to the works in suit), and to the overall harm caused by online peer-to-peer infringement.

## 15. RESPONSE TO MIL 15 (SUMMARY EXHIBITS AND DEMONSTRATIVE MEDLEYS) (DKT. 327)

### A.    Summary Exhibits

Grande's motion to exclude several Federal Rule of Evidence 1006 summary exhibits on Plaintiffs' exhibit list is misplaced and should be denied.  Rule 1006 provides that a party "may use a summary, chart, or calculation to prove the content of voluminous writings ... that cannot be

conveniently examined in court." Fed. R. Evid. 1006.  The Rule requires that the proponent of the summary make the underlying records that are being summarized available for inspection.  *Id.* Here, in preparation for trial, Plaintiffs generated summaries of various sets of data produced in discovery long ago—such as the Rightscorp notices and files downloaded from Grande subscribers—and included those summaries on Plaintiffs' exhibit list.

Grande acknowledges that Rule 1006 "permits the use of summaries to prove the content of voluminous documents in some circumstances," but claims that Plaintiffs are not allowed to use the summaries in question because Plaintiffs supposedly "were obligated to produce them prior to the close of fact discovery" but did not do so.  Mot. at 2.  Grande, however, cites no authority for its argument, and that is for a reason: it has no support in the law.  "Rule 1006 provides that only the underlying documents, not the summaries themselves, must be produced to the opposing party."  31 Fed. Prac. and Proc. § 8045.  Numerous cases thus have held that "***Rule 1006 requires only that the underlying documents upon which a summary is based be produced within a reasonable time and does not require that the summary be produced during discovery.***"  *Lovo v. Express Courier Int'l, Inc.*, No. 4:16-CV-853, 2018 WL 6573132, at *1 (N.D. Tex. Oct. 24, 2018)).  *See also Great Am. Life Ins. Co. v. Tanner*, No. 3:16-CV-70-DMB-JMV, 2019 WL 2745639, at *1 (N.D. Miss. July 1, 2019) (denying motion to exclude on same ground); *Mitchell v. University of La. Sys.*, 154 F. Supp. 3d 364, 380 n.8 (M.D. La. 2015) (same).[23]

### B.  Medleys of Copyrighted Sound Recordings

Grande also objects to Plaintiffs' inclusion of medleys of the copyrighted sound recordings at issue in this case.  As Grande acknowledges, Mot. at 3 n.2, Plaintiffs explained that these medleys of some of the works in suit simply would be offered as demonstratives.  The Fifth Circuit

---

[23] Nor can Grande plausibly claim prejudice, as it has all of the underlying data used to generate these summaries, and in fact could have generated them itself.

has held that demonstratives may be used as a pedagogical aid, to assist the jury in understanding evidence, but not admitted into evidence. *See U.S. v. Buck*, 324 F.3d 786, 790 (5th Cir. 2003). Plaintiffs do not intend to have the medleys admitted into evidence, nor do Plaintiffs intend to argue that the recordings that would be played establish a "match" with files Rightscorp downloaded from Grande subscribers. Instead, the medleys simply will help provide the jury with a demonstration of what record labels do—produce popular and memorable music recordings— while providing a short, lively interlude from what otherwise might be a long, document- and testimony-intensive trial. The medleys are hardly prejudicial, and should be permitted as demonstratives.

### 16. RESPONSE TO MIL 16 (2016 RICHARD FOGLE EMAILS CONTEMPLATING GRANDE DELETING INCRIMINATING EMAILS POST-*COX* VERDICT) (DKT. 328)

Unsurprisingly, Grande asks the Court to exclude two of the most damning internal documents the company produced: emails discussing Grande's document retention policy in light of the first *Cox* verdict and the fact that bad internal emails played a role in Cox losing that case. The first is Richard Fogle's August 23, 2016 email in which he suggests that, since "Cox was nailed on DMCA because they had evidence from subpoenaed corporate email/call recordings" Grande should think about its "email retention policy in more liability terms."[24] The second is another email from Fogle, on September 30, 2016, in which he writes that "[t]he key to Rightscorp winning the judgement [*sic*] is Cox kept email, that was subpoenaed, showing that they told support staff not to kick out DMCA offenders thus placing the safe harbor in jeopardy."[25]

Grande's motion has no merit. Grande misconstrues Plaintiffs' reliance on the two documents it seeks to exclude. Plaintiffs do not intend to assert that Grande embarked on a

---

[24] Ex. 5, PX-206.
[25] *Id.*, PX-207.

wholesale evidence destruction campaign.  Rather, Plaintiffs will argue that Fogle's *contemplating*

the destruction of bad internal emails evidences his awareness of culpability in a stark and powerful

way.  Plaintiffs have the right to present this evidence in order to prove their case, just as the Court

recognized in summary judgment ruling.  It is true that these documents are *prejudicial* to Grande.

But that is the point: "all relevant evidence tends to prejudice the party against whom it is

offered…."  *Caldwell*, 586 F.3d at 342.  Rule 403 instead allows for evidence to be excluded only

where "the probative value of that evidence is ***substantially*** outweighed by the ***unfairly*** prejudicial

nature of the evidence."  *Id.* (emphasis in original).

Grande does not come close to showing how the prejudice it would face from these

documents would be unfair, let alone that any such unfairness "substantially outweighs" their

highly probative nature.  The emails are highly probative of Grande's awareness of its conduct and

potential liability—key evidence in a case where Plaintiffs seek to prove Grande's (1) knowledge

of infringement and (2) willfulness in giving that infringement free reign for the sake of Grande's

profits.  In particular,  Fogle's emails reflect his awareness, and the recipients' awareness, that:

Grande had received many, many notices of infringement from Rightscorp; Grande had emails

showing that its subscribers were engaging in infringement; and Grande had emails discussing that

the company's policies of allowing unlimited infringement exposed it to liability.   Fogle's own

April 2013 email, in which he expressed concern that Grande had customers who were "racking

up" DMCA notices with no process in place to remedy the infringement (Dkt. 172-22), surely was

what  Fogle had in mind when he wrote his 2016 emails.

In its summary judgment opinion, the Court found this key evidence relevant to the

knowledge and willfulness inquiries:

> There is evidence in the record—previously discussed—that Grande: (1) was aware
> of subscriber's infringing conduct; (2) decided not to cut off services to any

41

> customers, regardless of their conduct; (3) discussed this conscious decision in internal emails; and (4) profited from continuing to provide service to those subscribers.  (*See* Dkt. # 172 at 33; *see also* Discussion Section I, *supra*.)  This evidence is sufficient to raise a genuine issue of material fact that Grande acted knowingly or recklessly, so as to constitute legally willful conduct.

Dkt. 268, S.J. Order at 44. Grande offers no good reason for the Court to second-guess its determination that this evidence was relevant and presented an issue for the jury to decide.  The Court should deny Grande's motion.


Dated: February 14, 2020                    Respectfully submitted,


                                            By:_____*/s/ Andrew H. Bart*_____
                                            Andrew H. Bart (admitted *pro hac vice*)
                                            Jacob L. Tracer (admitted *pro hac vice*)
                                            **Jenner & Block**
                                            919 Third Avenue
                                            New York, NY 10022
                                            Telephone: (212) 891-1600
                                            Facsimile: (212) 891-1699
                                            abart@jenner.com
                                            jtracer@jenner.com

                                            Robert B. Gilmore (admitted *pro hac vice*)
                                            Philip J. O'Beirne (admitted *pro hac vice*)
                                            Michael A. Petrino (admitted *pro hac vice*)
                                            Kevin L. Attridge (admitted *pro hac vice*)
                                            **Stein Mitchell Beato & Missner LLP**
                                            901 15th Street, N.W., Suite 700
                                            Washington, DC 20005
                                            Telephone: (202) 737-7777
                                            Facsimile: (202) 296-8312
                                            rgilmore@steinmitchell.com
                                            pobeirne@steinmitchell.com
                                            mpetrino@steinmitchell.com
                                            kattridge@steinmitchell.com

                                            Daniel C. Bitting (State Bar No. 02362480)
                                            Paige A. Amstutz (State Bar No. 00796136)
                                            **Scott Douglass & McConnico LLP**
                                            303 Colorado Street, Suite 2400
                                            Austin, TX 78701
                                            Telephone: (512) 495-6300

Facsimile: (512) 495-6399
dbitting@scottdoug.com
pamstutz@scottdoug.com

***Attorneys for Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on February 14, 2020 all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system pursuant to Local Rule CV-5(b)(1).

*/s/ Daniel C. Bitting*
Daniel C. Bitting
