```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
 2                         AUSTIN DIVISION

 3   UMG RECORDINGS, INC., ET AL,    :
     Plaintiffs,                     :
 4                                   : Case Number:
     vs.                             : 1:17-CV-00365-DAE
 5                                   : Austin, Texas
     GRANDE COMMUNICATIONS           :
 6   NETWORKS, LLC, ET AL,           : January 5, 2022
     Defendants.                     :
 7   ********************************************************

 8                  TRANSCRIPT OF PRETRIAL CONFERENCE
                    BEFORE THE HONORABLE DAVID A. EZRA
 9                 SENIOR UNITED STATES DISTRICT JUDGE

10   APPEARANCES:
     FOR THE PLAINTIFFS:
11     Paige Arnette Amstutz, Esquire
       Scott, Douglass & McConnico, LLP
12     303 Colorado Street, Suite 2400
       Austin, Texas  78701
13     (512)495-6300; pamstutz@scottdoug.com

14     Andrew H. Bart, Esquire
       Jacob Tracer, Esquire
15     Jenner & Block, LLP
       1155 Avenue of the Americas
16     New York, NY 10036
       (212)891-1600; abart@jenner.com
17
       Robert B. Gilmore, Esquire
18     Philip J. O'Beirne, Esquire
       Stein Mitchell Cipollone Beato & Missner, LLP
19     1100 Connecticut Avenue, NW, Suite 1100
       Washington, D.C.  20036
20     (202)661-0900; rgilmore@steinmitchell.com

21

22   FOR THE DEFENDANTS:
       J. Stephen Ravel, Esquire
23     Kelly Hart & Hallman, LLP
       303 Colorado Street,  Suite 2000
24     Austin, Texas  78701
       (512)495-6429; steve.ravel@kellyhart.com

25
```

```
1   FOR THE DEFENDANTS:
      Richard L. Brophy, Esquire
2     Zachary C. Howenstine, Esquire
      Margaret R. Szewczyk, Esquire
3     Armstrong Teasdale, LLP
      7700 Forsyth Boulevard, Suite 1800
4     St. Louis, Missouri  63105
      (314)621-5070; rbrophy@armstrongteasdale.com
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20  COURT REPORTER:
    Angela M. Hailey, CSR, CRR, RPR, RMR
21  Official Court Reporter, U.S.D.C.
    262 West Nueva Street
22  San Antonio, Texas  78207
    Phone(210)244-5048
23  angela_hailey@txwd.uscourts.gov

24

    Proceedings reported by stenotype, transcript produced by
25  computer-aided transcription.
```

1    *(Wednesday, January 5, 2022, 9:05 a.m.)*

2                         *   *   *

3             COURT SECURITY OFFICER:  All rise.

4             THE COURT:  All right.  Good morning to all of you and

5    I thank you for making yourselves available this morning.

6             COURTROOM DEPUTY CLERK:  Good morning, Judge.  Court

7    calls AU:17-CV-365, UMG Recordings, Inc., et al versus Grande

8    Communications for a pretrial conference.

9             THE COURT:  Now, what we're going to do is ask for

10   counsel to put themselves on the record and we'll start with

11   the plaintiffs and then any lawyers that are on the call can

12   also identify themselves.

13            MS. AMSTUTZ:  Good morning, Your Honor.  Paige Amstutz

14   with Scott, Douglas & McConnico for the plaintiffs.  With me

15   are Andy Bart from Jenner and Block, Rob Gilmore from Stein

16   Mitchell and our client representative Jared Freedman with the

17   Recording Industry Association of America.

18            THE COURT:  All right.  Good morning.

19            MR. RAVEL:  Good morning, Judge.  I'm Steve Ravel from

20   Kelly Hart, here in Austin for defendant Grande Communications

21   Networks.  With me from Armstrong and Teasdale is Richard

22   Brophy, Zach Howenstine and Maggie Szewczyk.

23            THE COURT:  Very good.  Now, I don't know exactly who

24   we have on the line.

25            COURTROOM DEPUTY CLERK:  Counsel, the mike is unmuted

1    if you'd like to announce yourself online.

2            MR. TRACER:  Sure.  This is Jacob Tracer from Jenner

3    and Block on behalf of plaintiff.

4            MR. O'BEIRNE:  Good morning, Your Honor.  Philip

5    O'Beirne from Stein Mitchell, also on behalf of plaintiffs.

6            THE COURT:  Is that it?  Okay.  Now, counsel, I think

7    you know this, but I need to remind you that there's no

8    recording allowed of the proceedings other than the recording

9    taken down by our court reporter.  You understand that?

10           MR. O'BEIRNE:  Yes, Judge.

11           THE COURT:  Thank you.

12           MR. TRACER:  Yes, of course, Your Honor.

13           THE COURT:  All right.  Well, believe it or not, I had

14   a situation when I was presiding over a big case in Chicago

15   where some paralegal was in the room and she was recording the

16   whole thing and the lawyer had to call me and apologize and

17   destroy the recording.  So it's good to make sure that we get

18   that on the record.

19           All right.  So first let me get out of the way the

20   elephant in the room and that's COVID.  I understand and I'm

21   well aware that there are many districts throughout the United

22   States -- I have friends, a lot of friends on the east coast

23   and so forth, I was a member of the Judicial Conference and I

24   was vice president of the Federal Judges Association and so I

25   had made acquaintance with many, many, many judges in

1   Washington and New York and I know that there are districts

2   where they have postponed jury trials.  We were, of course,

3   like every other district, on pause for well over a year

4   actually and that has caused what I like to refer to as a

5   tsunami of lawyers and cases that are backed up -- you were one

6   of them -- waiting for a trial and anxious to get a trial.

7           Now, I spoke this morning with Judge Yeakel.  Now, the

8   Western District of Texas operates a little differently than

9   many districts where I've sat in the past.  I've been sitting

10  here for nine years, so it's like I'm helping out, so it's not

11  like I'm a guy that just flew in for the trial, although I do

12  that all the time, but I spoke with Judge Yeakel this morning.

13  And each division of the Western District of Texas controls its

14  own procedures with respect to courtroom operations and I think

15  the Southern District in Houston does the same thing.  Now,

16  that doesn't mean that they don't get together and make a

17  decision as a district on occasion, they do.  But at this

18  point, the Chief Judge, who is in San Antonio where I am

19  actually based --

20          Although I do almost as much work here because in San

21  Antonio, well, you saw my name outside the courtroom.  Well,

22  you didn't.  If we were in the first floor ceremonial

23  courtroom, you would have seen my name outside the courtroom.

24  I have a chambers and courtroom here.

25          -- has not decided or determined to take the matter to

1    a vote district-wide, so each of the divisions is making their

2    own choice and that's because this is a huge division.  El Paso

3    is 550 miles away in a different time zone.  You have Austin,

4    San Antonio which are pretty close obviously, but then you're

5    talking about Del Rio which is way down, heart of the Mexican

6    border and the situation in these various places is like going

7    from New York City to the far reaches of Connecticut and

8    beyond.  So we can't really look at this as a homogeneous

9    situation.

10           In any event, my discussion with Judge Yeakel this

11   morning is that we are to proceed with jury trial unless I make

12   a decision otherwise.  They are going to be going forward and,

13   in fact, they're picking a jury now for a trial.  So we don't

14   have a situation where, at least as of right now -- this could

15   change in a week, you know, you've all lived this, you know

16   what it's all about.  I'm not telling you anything you don't

17   know.  But as of right now, as I sit here, we are scheduled to

18   begin our trial.

19           Now, I understand and appreciate the fact that you are

20   concerned, as I should say am I, about the potential that we

21   could either have a juror or jurors come down with COVID or you

22   could lose a witness due to COVID and so forth.  Now,

23   unfortunately, the country is being swept like nobody's

24   business with this omicron variant, but fortunately there is a

25   silver lining in every dark cloud.  It doesn't appear to be as

1  bad symptom-wise, at least for those who are vaccinated, as the

2  Delta variant was, which means that if you have witnesses that

3  cannot make it because they've contracted let's say the omicron

4  variant of COVID, we could have their testimony by video.  This

5  is a civil trial, it's not a criminal trial, you don't have the

6  same kind of constitutional confrontation issues that you would

7  have in a criminal case.  And in fact, I think you both have

8  asked that some witnesses be allowed to participate by or give

9  their testimony by video, so apparently you're not opposed to

10  that, at least not unilaterally opposed to it.  Now, if I grant

11  your request, and it's a joint request as I understand it, to

12  postpone the case, here is your problem --

13          You know, counsel, you're such a good-looking guy, I'd

14  like to see you and the problem is that damn arm is right in

15  your face from here.  All right.  I don't know what it is, I

16  like to look somebody in the eye when I'm talking to them.  I

17  don't like to see an ELMO in your face.

18          We have a problem and that is that we're getting calls

19  constantly from lawyers like yourselves wanting to get to trial

20  and they are, many of them, in situations that are as bad as

21  yours time-wise and some actually even worse.  I told you, I

22  think, or I had relayed to you that I would do everything I

23  could to get you a firm trial date and I kept my promise.  You

24  do have a firm trial date.

25          Now, there was no way I could have known then what we

1  know now, but here is my problem, because of the length of this

2  trial and I know that you have suggested between, I don't know,

3  I think it was like nine days of trial for in one case and then

4  somebody else said 13 or 14 days of trial, I don't know.  Then

5  we've got one party has 155 exhibits, the other party has 780

6  exhibits.  We've got 14 witnesses and there's a possible 16

7  other witnesses from the plaintiff.  And the defendant has

8  three, but may call eleven.  There's going to be some overlap

9  obviously.  But the problem is that because of the nature of

10 this case, this is not the first case like this I have presided

11 over or actually ever been involved in.  I was involved in as a

12 lawyer, many decades ago as that was.  Some of these witnesses

13 can take a long time.  We could get a witness on the stand that

14 could take a day.  So this is not a criminal case where we're

15 talking about somebody getting on the stand and says, yeah, I

16 saw him pass the drugs, you know, and he's on for two hours or

17 an hour and a half.  There may be some witnesses like that, but

18 there's others that are going to be on for a very long time, so

19 I'm looking at this trial taking about three weeks, two to

20 three weeks, unless I really put some time limits on you.  And

21 you don't want me to do that.  I had to try a case where I had

22 a -- more than one case actually, where I had judges say, well,

23 you know, you got eleven hours, divide it up any way you want.

24 And I hated it and I don't do it.  I won't let lawyers fool

25 around and dillydally either and I put a stop to that, but if

1   you're reasonably trying to pursue a point and you're

2   reasonably trying to get your case tried in a way that makes

3   you feel comfortable, I'm not going to bother you.  Under those

4   circumstances, even being diligent -- what am I, 36 years on

5   the bench now?  I'm one of the few Ronald Reagan appointees

6   that's actively on the calendar and I've got a huge calendar.

7   So the point is I can't just swap you in.  You see what I'm

8   saying?  Most of our trials in federal court are a week, so

9   maybe a little less, then we have the deliberation time.

10  Sometimes they're a little longer.  Then we get -- I mean, I

11  did a three and a half month trial, I had a weekend break and

12  then I had another two and a half month trial, so I was in

13  trial basically six months straight, literally.  And that was

14  bad.

15          So what we need to do is be as careful as we can about

16  moving this case.  Now, the very soonest trial date I could

17  give you, and I'm talking about the absolute soonest, and even

18  this is dependent on me being able to get through some other

19  cases as we have planned because, you know, I'm a huge

20  basketball fan and I'm a big Baylor fan on top of it and

21  they're number one right now and it's very aggravating when I

22  go to ESPN and I turn it on and there's University of Texas

23  versus, you know, somebody and it's run over and I can't watch

24  my -- I'm missing the first five minutes of the Baylor game,

25  and sometimes longer.  And that's what I worry about, I worry

1    about us getting a trial that goes long and it runs into this

2    date.  And if it does, I can't just say, well, sorry, sorry

3    jury, go home.

4           So October 11th and that is me pushing it.  If you

5    don't go on October 11th, you're off until 2023.  Now, that

6    means that you've got to think about this very carefully

7    because I know that this case has been around a while, it's not

8    a small case, it's an important case for both sides.  I know

9    the media, not the Austin Statesman, but the media in your area

10   has been very active in following this case, I mean the

11   entertainment media, and so they think it's a big case, I

12   guess.  I think that it's certainly something we're willing to

13   try.  And it is a risk on October 11th.  I have between now and

14   October 11th, I'm set solid.  It's like one pushes the other

15   one and the other one pushes the other one and the other one

16   pushes the other one and by the time you're done, it's like

17   dominoes falling and I don't want you to be the last domino and

18   then get kicked off to 2023, which could happen.

19          So counsel, what are your thoughts?  And I'm talking

20   to the plaintiff first.  I don't know who is talking for

21   plaintiff.

22          MR. BART:  Thank you.  Andrew Bart from Jenner and

23   Block.  First off, thank you for the explanation and the

24   thoughtful consideration of this issue and obviously it's

25   something that we thought about a great deal and didn't just

1    reflexively say we want to push this off.  We very much want to
2    try the case and I think -- I'm sure the defendant does as
3    well.  The biggest problem that we face right now is after all
4    of this break we want the case to be tried in a way where both
5    sides can make their points as convincingly to the jury as
6    possible.  And we already are aware of witnesses who will not
7    come for health reasons or, you know, they're elderly, they
8    have unvaccinated children.  There are a million different
9    reasons right now in addition to just the surge.  And while I
10   share the sentiment and hope that this may be the last surge,
11   that maybe we'll get past this, that really is what's
12   motivating the thought, that we'll get here.  The spike is
13   really just hitting us right now and so we could commit to
14   going forward.  And if the numbers continue the way that they
15   are, not be able to get a jury, get jurors who are sick and
16   that will almost certainly happen if the numbers continue in
17   the way that they are.  So I think that I owe it to the clients
18   to give them an opportunity to present their case in an
19   unbroken way and as effectively to a jury as possible and not
20   bring in witnesses by remote and not get chopped up and not
21   take the risk of having to stop midway because of this surge
22   that is uncertain to us all collectively as anything has been
23   over the last couple of years.  So reluctantly I think we would
24   take the October 11th date, just so that we would have some
25   certainty that we're past this because I think what we're

1    looking at over the next three to four weeks is such a volatile

2    and growing thing.  And I think back on the east coast we're a

3    couple of weeks ahead of everyone else and the infection rates

4    are just staggering.

5            THE COURT:  Oh, yeah.  You're in New York, right?

6            MR. BART:  Yes.

7            THE COURT:  Judge Lamberth and I have been very close

8    friends for 25 years and he's from San Antonio and he comes

9    down here, but you know, he's a U.S. District Judge in D.C. and

10   has been forever, he and I were appointed the same time.  He

11   got out of town in the nick of time.  I said, *Well, you went*

12   *from the frying pan into the fire here.*  And he said, *No, no,*

13   he said, *Believe me, D.C. is worse, much worse than here.*

14           MR. BART:  And my colleagues here are from D.C. and

15   they are experiencing the same thing that we are.  And we're

16   seeing the numbers here follow suit a few weeks behind and I

17   think the likelihood is that it's going to have an impact,

18   whether it causes the complete suspension of cases or just

19   reeks havoc on jury selection being able to maintain a jury for

20   a couple of weeks trial, which is a real concern as well.  So I

21   think there are a lot of reasons and but for this we very much

22   appreciated having the fixed date.  We would take the

23   October 11th date.

24           THE COURT:  Okay.  All right.  And by the way, I only

25   called on counsel -- I want you to know this, because he

1   happened to be sitting right here.  It wasn't because I was

2   calling on a man and not the woman, all right?  I want you to

3   know that.  You're looking at a guy who was nominated to be the

4   woman lawyer of the year.

5          MS. AMSTUTZ:  I appreciate it.

6          THE COURT:  I'm a big supporter of women in the law.

7   Yes, sir?

8          MR. BROPHY:  Good morning, Your Honor.  I share

9   Mr. Bart's thoughts.  We've spoken at length about this with

10  our client and we share their concerns about trying the case

11  and trying it properly.  I don't think either of us is

12  interested in having video-based witnesses or anything like

13  that for a case of this importance.

14         The other point that I would make is I think we can

15  commit to you, at least for Grande I can commit to you that we

16  can try our case in five days.  My understanding is that

17  Mr. Bart feels he can do the same.

18         THE COURT:  You mean get the whole case tried in five

19  days?

20         MR. BROPHY:  No, no, ten days total.

21         THE COURT:  Oh, I see.  I was going to say, what

22  happened?

23         MR. BROPHY:  We've got a lot of stipulations to talk

24  about.

25         THE COURT:  That's right.  Including stipulating as to

1   liability.  Just try it on the damages.

2         MR. BROPHY:  So I think if you're willing to be

3   flexible with us, we very much appreciate that in giving us an

4   ability to move this until we think we can do it properly, we

5   can commit to you to getting the case done in ten days in a way

6   that satisfies our clients, satisfies you.

7         THE COURT:  Okay.  I'm going to grant your motion.

8   Obviously I think -- I understand there would be a lot of

9   federal judges that will say, look, this is your trial date,

10  you're going, but I don't ever like the idea of somebody

11  walking out of my courtroom feeling as though -- now, they may

12  disagree with me.  In fact, half the people that walk out of my

13  courtroom probably always disagree with me, but I want the

14  lawyers to feel as if they have had their day in court, that

15  they've been able to try their case.

16        And I am concerned, I'm not as concerned about the

17  jury because our jury pool is vaccinated, completely

18  vaccinated.  Now, I understand that you can get omicron, but

19  I'm not worried we're going to make somebody deathly ill here,

20  that's the point.  I am worried we would lose them because

21  regardless of whether they're vaccinated or not, they come down

22  with COVID-19, they're off the jury.  So that worries me, but

23  what is my greatest concern here -- because we can socially

24  distance the heck out of them because it's a civil trial and

25  we're going to have eight jurors, it's not a 12-person jury

1    here, so we have plenty of room to socially distance them and

2    we have plenty of room to socially distance them in terms of

3    their deliberations and their contacts together.  So I'm not so

4    worried.  I've had jury trials during COVID before in San

5    Antonio and I think here.  But what I'm worried about is

6    omicron is so bad right now, I mean we're getting a million

7    cases a day, over a million cases a day in the United States.

8    I was watching the news this morning as I was getting ready to

9    come in and they had somebody from the CDC say that many

10   hospitals, particularly hospitals on the east coast where many

11   of our witnesses are coming from have the largest number of

12   people in hospital with COVID than they ever had from the

13   entire pandemic, which surprises me because it's supposed to be

14   milder.  I'm not going to get into that and argue about that.

15   But I'm worried about you not getting your witnesses here.

16   You've got some expert witnesses and your expert witnesses not

17   being able to make it because they're down with COVID and then

18   what do we do?  We've got a jury sitting here and we can't get

19   your expert and we don't know how your expert is going to be.

20   Are they going to be in a situation where they're even going to

21   be able to testify by video?  I mean, if they're in the

22   hospital, obviously not.  So I think the risk of you not

23   getting a thoroughly fair trial is enough.  And that concerns

24   me.

25             I just finished a patent case not long ago, a few

 1    months ago, a pretty big patent case actually in San Antonio.

 2    Believe it or not, it's not just the judge in Waco that tries

 3    patent cases.  I know that's what it seems like, but Judge

 4    Albright isn't the only one that tries patent cases.  I

 5    actually do try patent cases.  My colleagues have a tendency to

 6    give me these complex cases because I have a reputation of

 7    doing these complex cases and they never appeal.  It's a pretty

 8    big verdict, no appeal.  So I think they felt like they got a

 9    fair trial.  They probably weren't happy with the verdict and

10    I'm sure neither side was a hundred percent happy with my

11    rulings, you know, in every instance, but that's not my job.

12    My job is to try to make the right ruling.  You don't want a

13    judge who does this which way is the wind blowing.

14         Now, let me also be candid with you.  I know you have

15    given me your agreement as to how much time you're going to get

16    for this and how much time you're going to get for that.  These

17    are decisions that I make, not the attorneys.  And I may fully

18    agree with you and I may not.  I want to see a little bit more

19    before I make those decisions, so I'm going to defer making any

20    type of commitment on those issues.  Let's see if there's

21    anything else that I can --

22         *(Pause.)*

23         Okay.  We've got a bunch of motions in limine.

24         LAW CLERK:  You ruled on those.

25         THE COURT:  Oh, that's right, I did.  I ruled on all

1   those motions in limine, so those are out of the way.  Do we

2   have anything else that -- how long ago was that that I ruled

3   on those?  A while ago, right?

4           MR. BART:  Year and a half ago.

5           THE COURT:  A year and a half ago?  No wonder I didn't

6   remember.  I have a hard time remembering where I parked my car

7   when I go into the grocery store.

8           Do we have anything else that we should discuss that

9   would be important to talk about now given the fact that we've

10  got the October 11th date?

11          MR. BART:  I don't think so, Your Honor.  There are

12  certainly issues that we need to have resolved before trial.

13  Some of them have just come up within the last week or two as

14  we've been preparing for this conference and we've been working

15  collaboratively with defendant's counsel to try and focus those

16  issues and also to reduce the scope of witnesses and exhibits

17  and I think we will continue to do that.  Mr. Brophy may have a

18  different view on whether there's anything else we should

19  cover.

20          MR. BROPHY:  No, I agree.  I think given the

21  October 11th date, there's time for us to continue to work

22  together which we've been doing quite well to try to narrow

23  those issues for Your Honor.

24          THE COURT:  Thank you.  Thank you very much.  You can

25  be seated.  You know, it may surprise you, but I'm actually

1    looking forward to this trial.  There's nothing better for a

2    trial judge who came from a civil trial background -- I used to

3    represent banks and savings and loans and I was involved deeply

4    in the savings and loan crisis and the -- remember the Keating

5    Five and all that?  Then to have good lawyers from good firms,

6    well prepared to try a case.  I mean that is the best.  I can't

7    tell you how often that doesn't happen.  And I was talking with

8    Judge Pitman, about a month ago we were talking about trials

9    and he says, *Don't you just sometimes want to jump off the*

10   *bench and grab the microphone and say Just ask it this way*.

11   And I said, *Yes, yes!*  But I don't think I'm going to have that

12   problem in this case at all.

13        Okay.  Very good.  Then that's what we'll do.  I want

14   to again caution you that I have given you a trial date, I am

15   not going to call it a firm trial date.  I'm going to call it a

16   set trial date, which means that I don't want you throwing

17   rocks at me if you get a call from my courtroom deputy,

18   Ms. Springs, telling you that your trial has been bumped for

19   three weeks or whatever because Judge Ezra is still in trial in

20   another case.  We're going to have the ESPN problem here.

21        Okay.  I can't think of anything else we need to cover

22   and I just have a tendency to drone on and on, so I don't think

23   you want me to do that.  I do thank you for coming.  I know it

24   was a long flight.  You're probably saying to yourself, *Why did*

25   *I come all this way for him to just tell me he's going to grant*

1   *the motion?*  Well, because I wasn't sure I was going to grant

2   the motion when I walked in the door.  I wanted to hear from

3   you, I wanted to determine for myself how sincere I thought you

4   really were, whether this was just it's more convenient to do

5   it then, you know.  And we have turned down counsel who have

6   asked for COVID extensions when there wasn't the kind of

7   compelling reasons which you have cited here.  You know, you

8   really do have a lot of witnesses who are going to be coming in

9   from out of town and who will probably say I'm not coming in

10  from out of town.  And you know, you have no way to compel them

11  to do that.  This isn't a criminal case, I can't issue a

12  subpoena and compel them.  You know, my old buddy Judge Kelly

13  in New York, I used to have him issue my subpoenas for me.  But

14  I think he's -- didn't he retire?  Yeah.

15          Okay.  That being that, we will issue a civil order

16  today, a bench order continuing your trial, granting the joint

17  motion to continue, resetting the trial for October 11th.  I

18  don't know which courtroom we will be in, but we may well be

19  in --

20          COURTROOM DEPUTY CLERK:  By October I would think

21  you'd be back downstairs.

22          THE COURT:  Maybe not.  We'll see.  We've got to -- we

23  have some shuffling going on here, so we'll find a courtroom.

24  When you come we'll get you to the right spot, all right?  The

25  worst thing you've got to worry about is the judge who can't

1   find his courtroom or her courtroom, not the lawyers.

2          Okay.  Thank you so very much for coming.  It was

3   important that I talk to you, it was important that I listen to

4   you and I wanted you to hear from me personally what the

5   ramifications were and I wanted an answer from you as to

6   whether you wanted to take that risk.  Okay.  And that was

7   important.  I don't like to do that over the telephone.  Okay,

8   thanks very much.  Have a safe trip back.

9          *(9:41 a.m.)*

10                          *   *   *

1                    *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5         I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.  I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  August 15, 2022

12

13   /s/ Angela M. Hailey

14   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
15   262 West Nueva Street
     San Antonio, Texas  78207
16   (210)244-5048

17

18

19

20

21

22

23

24

25