UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

```
UMG RECORDINGS, INC., ET AL,    :
Plaintiffs,                     :
                                : Case Number:
vs.                             : 1:17-CV-00365-DAE
                                :
GRANDE COMMUNICATIONS          : Austin, Texas
NETWORKS, LLC, ET AL,          : October 11, 2022
Defendants.                     :
*********************************************************
```

TRANSCRIPT OF PRETRIAL CONFERENCE
BEFORE THE HONORABLE DAVID A. EZRA
SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:
FOR THE PLAINTIFFS:

**Andrew H. Bart, Esquire**
**Jacob Tracer, Esquire**
Jenner & Block, LLP
1155 Avenue of the Americas
New York, NY  10036
(212)891-1600; abart@jenner.com

**Robert B. Gilmore, Esquire**
**Philip J. O'Beirne, Esquire**
Stein Mitchell Cipollone Beato & Missner LLP
1100 Connecticut Avenue, NW, Suite 1100
Washington, DC  20036
(202)601-1589; rgilmore@steinmitchell.com

**Paige Arnette Amstutz, Esquire**
Scott, Douglass & McConnico, LLP
303 Colorado Street, Suite 2400
Austin, Texas  78701
(512)495-6300; pamstutz@scottdoug.com

1   FOR THE DEFENDANTS:

2   **Richard L. Brophy, Esquire**
    **Zachary C. Howenstine, Esquire**
3   **Mark A. Thomas, Esquire**
    **Margaret R. Szewczyk, Esquire**
4   Armstrong Teasdale, LLP
    7700 Forsyth Boulevard, Suite 1800
5   St. Louis, Missouri  63105
    (314)621-5070
6   rbrophy@armstrongteasdale.com
    zhowenstine@armstrongteasdale.com
7   mathomas@atllp.com
    mszewczyk@armstrongteasdale.com

8

9

10

11

12

13

14

15

16

17

18

19

20  COURT REPORTER:
    Angela M. Hailey, CSR, CRR, RPR, RMR
21  Official Court Reporter, U.S.D.C.
    262 West Nueva Street
22  San Antonio, Texas  78207
    Phone(210)244-5048
23  angela_hailey@txwd.uscourts.gov

24  Proceedings reported by stenotype, transcript produced by
    computer-aided transcription.

25

 1   *(Tuesday, October 11, 2022, 1:58 p.m.)*

 2                            *   *   *

 3        COURTROOM DEPUTY CLERK:  1:17-CV-365, UMG Recordings,

 4   Inc., et al versus Grande Communications Network, LLC.

 5        THE COURT:  All right.  Good afternoon.  I normally

 6   don't just plant myself on the bench, but I had a sentencing,

 7   and so there was no real reason for me to get off the bench,

 8   turn around, and wait for you and then come back on.

 9        Can we have appearances of counsel.  We'll start with

10   plaintiff.

11        MR. BART:  Thank you, Your Honor.  Andrew Bart and

12   Jacob Tracer from Jenner & Block; Robert Gilmore, Phil

13   O'Beirne, Kevin Attridge from Stein Mitchell, and Paige Amstutz

14   from Scott, Douglas & McConnico.

15        THE COURT:  Okay.

16        MR. BROPHY:  Good afternoon, Your Honor.  Richard

17   Brophy.  Also with me, my colleague Sydney Johnson, Maggie

18   Szewczyk, Jennifer Carpenter, Steve Ravel, Mark Thomas and Zach

19   Howenstine.

20        THE COURT:  You're all from the same firm?

21        MR. BROPHY:  We're all from Armstrong Teasdale with

22   the exception of Mr. Steve Ravel is from the Kelly Hart firm.

23        THE COURT:  Yes, right.  I recognize him, yeah.  I

24   have been sitting here in Austin now for about a decade, so

25   I've gotten to know the bar pretty good, actually.

1           All right.  So I had a dream last night, and that

2    dream was that I would walk in today and counsel would say,

3    Judge, We have really good news for you.  We've settled the

4    case.

5           But unfortunately, my dream didn't come true.  And

6    apparently you have not settled the case.  I know there have

7    been some efforts to try to do that, but sometimes, you know,

8    as my old colleague, Martin Pence, in Hawaii used to say, you

9    just got to try 'em.

10          Now, I had no intentions of having a separate pretrial

11   today because, quite frankly, there aren't a lot of things that

12   need to be resolved other than some things that were brought to

13   my attention by my courtroom deputy, Priscilla, while -- where

14   was I, sitting on the Ninth Circuit when you called me?

15          COURTROOM DEPUTY CLERK:  Yes.

16          THE COURT:  I sit on the Ninth Circuit frequently, so

17   I was sitting by designation in Portland, Oregon, and she

18   called me and said you had a little bit of a dispute going on.

19          So let's resolve the dispute.  I've already ruled on

20   the motions in limine.  I denied the motion for

21   reconsideration.  Those are all done.  All the other pretrial

22   motions that were outstanding have been ruled upon, so we don't

23   have any of that to deal with.  What we do have is whatever it

24   is in terms of hoped-for evidence that you wish to bring to my

25   attention.

1          And so who wants to start?  I don't know who raised

2     this issue.  Was it the plaintiff or the defense?

3          MR. BART:  Which issue, Your Honor?

4          THE COURT:  This has to do, counsel, with the issue of

5     sending computers back to the jury with -- now, I may have

6     misunderstood this, I hope I did -- with a million different

7     files on it.  If anybody has the thought in their head that I

8     am going to send computers back to a jury with a million files

9     on it, let me tell you that is not going to happen today,

10    yesterday, or any day.

11         MR. GILMORE:  Thank you, Your Honor.  Robert Gilmore

12    for the plaintiffs.  That might make this very short.  Just to

13    explain the request, we have in this case, copyright

14    infringement case, the central evidence is two sets of very

15    large data, 1.3 million e-mailed notices that were sent by a

16    company called Rightscorp notifying Grande of infringement by

17    its subscribers.  And then MP3 files, audio files of the songs

18    themselves that Rightscorp downloaded from Grande subscribers.

19    Both of those sets of evidence are massive, so that's the over

20    a million e-mails.

21         THE COURT:  Million that we are talking about, right?

22         MR. GILMORE:  Now, we, plaintiffs have also included

23    on our exhibit list 1006 summary charts that summarize the

24    e-mails and the downloads as well as some other sets of data.

25    We are I think fully prepared to put those into evidence.  We

1    are going to use some exemplar e-mails, show one e-mail

2    notification, for example, but in the event that the jury

3    wishes to see the underlying evidence, which we think is

4    admissible, underlying the 1006 charts, we really wanted to

5    raise just sort of mechanically how -- if the jury asks -- we

6    certainly aren't going to ask them, We'd like you to read all

7    these e-mails or listen to every, you know, tens of thousands

8    of audio files.  There's going to be evidence on that in

9    summary charts.

10           We also were hoping that the -- while we understand

11   that defendants aren't admitting --

12           THE COURT:  Did I hear you correctly say that you had

13   a thousand summary charts?

14           MR. GILMORE:  No.  I'm sorry.  Federal Rule of

15   Evidence 1006 on summary exhibits.

16           THE COURT:  Oh, I thought you said you had a thousand

17   summary charts.

18           MR. GILMORE:  No, it's not -- that would be summaries

19   of summaries.  No, I'm sorry.

20           Rule of Evidence 1006, summary exhibits, charts that

21   compile and summarize the data concerning the notification

22   e-mails and the audio files.

23           So on our exhibit list, we have prepared, in exchange

24   with defendant, several of those charts.  We understand that --

25   they have told us that they have objections to those charts as

1    well, as well as to the underlying evidence.  We're prepared to

2    argue both the substance of those --

3              THE COURT:  Well, much of this I've already ruled on

4    in motions in limine in terms of --

5              MR. GILMORE:  We agree.

6              THE COURT:  -- the experts being able to testify about

7    this or that having to do with these copyrighted files, music

8    files.

9              MR. GILMORE:  Yes.

10             THE COURT:  The case has been significantly narrowed,

11   but there are genuine issues of disputed fact that have to be

12   tried which, depending upon how the jury sees it, could make a

13   significant difference in how this case turns out one way or

14   the other.  I am generally amenable to allowing summary charts

15   so long as the individual -- and I'll give opposing counsel an

16   opportunity -- so long as the individual who is testifying to

17   those summary charts is basically just summarizing evidence

18   which is in evidence and not, you know, offering some opinion

19   with respect to that evidence.  Unless they're an expert and

20   they're testifying about expert matters for which they can give

21   an opinion, as long as it doesn't go to the ultimate issue in

22   the case.

23             MR. GILMORE:  And I would say we have both in that we

24   will have a couple fact witnesses who will be testifying just

25   about the contents of the chart and, you know, what the chart

1   is, and then we have experts who also have summary charts who

2   would be expressing opinions based on their analysis of the

3   data that is compiled in the chart.  So we would have both,

4   but...

5        THE COURT:  But it is unlikely -- you know, I think

6   that -- I've presided over, in my 36 years as a federal judge,

7   a lot of complex cases and with tens of thousands of pieces of

8   potential evidence.  And generally speaking, it has been my

9   practice -- and it's been a practice which has been upheld on

10  appeal consistently, not just because I do it, but other judges

11  do the same thing and that is to allow the lawyers to pick a

12  representative sample and testify about that and then have

13  individuals who have actually reviewed the entire body of

14  evidence testify as to their authenticity and to testify that

15  that is, in fact, a representative sample.

16       And the other side has access to these same files, and

17  if they have -- you know, they have the right to cross-examine

18  and bring their own individual in who's looked at those

19  documents and either agree or disagree with it.  But it's

20  unlikely that I'm going to allow the jury to take, you know,

21  thumb drives back there and fool around with the computer.

22  That just generally is not a very productive activity and can

23  lead to some degree of chaos.

24       There are times where during deliberations a jury

25  might want to see this, that, or the other thing.  If it has to

1     do with complicated files or they need to see something, we can

2     do it one of two ways and that is either to bring them back

3     into the courtroom and show it to them in the courtroom, or we

4     can have a tech person -- with no deliberation going on -- just

5     simply show them what it is that they wanted to see and then

6     leave the room.  Either way works, and we can discuss that if

7     and when we come to that, but that's down the line.

8         MR. GILMORE:  That makes perfect sense.  And we

9     certainly didn't intend to foist these and ask the jury, You

10    must look at the entire -- the hard drive.  That's why we have

11    the summary charts.

12        THE COURT:  You know, if we had the old style -- I

13    have to say that, fortunately or unfortunately, this is

14    actually one practice that preceded me.  There's very few

15    practices that have preceded me on the bench, but this one did,

16    where they had the so-called elite juries or specialized

17    juries, and you would only pick people who had college

18    educations or only people who had a Master's degree or

19    something like that and they would be on your jury.  Those were

20    declared unconstitutional and you can't have them, but they did

21    use them for a while.  And that's the kind of group you could

22    probably send a file back and maybe not have as much chaos as

23    you would have otherwise.

24        MR. GILMORE:  Our jurors sounded -- during voir dire,

25    they sounded pretty tech savvy.

1        THE COURT:  Well, that's great.  I'm sure Magistrate

2   Howell did a great job.  The reason I have the Magistrate do it

3   is it gives me the extra day to work, because we're -- I mean,

4   the caseload here is ridiculous.

5        MR. GILMORE:  It's a very busy docket.

6        I think that is all that we needed to be heard on on

7   that issue, and I think that your approach makes perfect sense.

8   Thank you, Your Honor.

9        THE COURT:  All right.  Counsel.

10        MR. BROPHY:  Yes, Your Honor.  I'm not sure I need to

11   comment on that last topic unless you want to hear from me on

12   it.

13        THE COURT:  No, no, no.  Unless you have some

14   strenuous objection.

15        MR. BROPHY:  No.  I think we just need to -- it's

16   dangerous to deal with those summaries en masse.  We have to

17   deal with them as they come up in the case.

18        THE COURT:  Well, I think that's right.  And I think

19   that's what I said.  And many of my rulings -- every lawyer,

20   including me when I was a trial lawyer, wanted to have

21   everything ruled upon ahead of time and have everything put

22   away, but I frequently was disappointed, because it's very

23   difficult sometimes for a judge to make a definitive ruling out

24   of context.  Because sometimes people say things on the stand

25   that surprise the lawyers, surprise the judge, and it provides

1   a basis for certain evidence to either be admitted or not be

2   admitted, and I can't do that in a vacuum and have it make any

3   sense.

4           MR. BROPHY:  Understood.  And I'll admit that I'm

5   guilty of being that attorney that wants to clean everything up

6   before we start the trial.

7           THE COURT:  Well, everybody does.  Believe me, I think

8   we all do.

9           MR. BROPHY:  There is one item, if I may, Your Honor.

10          THE COURT:  Sure.

11          MR. BROPHY:  We have a number of issues that I would

12  love to talk to you about, but if I had to pick one to speak

13  with you about --

14          COURTROOM DEPUTY CLERK:  Judge.

15          (Discussion off the record.)

16                          *   *   *

17          THE COURT:  I just came off another matter, so --

18          All right.  Go ahead.

19          MR. BROPHY:  Thank you, Your Honor.  So just very

20  briefly, there's one issue that I would bring to Your Honor's

21  attention, and only because it doesn't relate, in my view, to a

22  single piece of evidence, but rather to thematic issues in

23  trial.  And that relates to the use of the DMCA and safe

24  harbor.  There has been a lot of discussion of that throughout

25  various motions in limine that have been filed, and Your Honor

1    has dealt with us on those things.

2            I, with respect, still think there's an open issue in

3    that regard given how the plaintiffs articulate what they

4    intend to do with it and what you have articulated as your

5    understanding of what the plaintiffs are going to do with it.

6    And so I wanted to raise that issue with you because I have a

7    fear that once this cat is out of the bag in openings, for

8    example, it can't be put back in the bag.  And from our

9    perspective, the law is crystal clear that you can't talk about

10   the DMCA safe harbor in relation to proving the underlying

11   claim, that the case law is crystal clear there is a two-step

12   process.  Step one is decide the underlying claim.  Step two is

13   consider whether the DMCA applies and gives that ISP a pass.

14           THE COURT:  Well, that's correct.

15           MR. BROPHY:  And there have been discussions in the

16   briefing -- and I don't mean to put words in my colleagues'

17   mouths, but there have been discussions of Grande introducing

18   an equitable argument.  It wouldn't be fair to punish Grande

19   for something someone else did, and the notion that the

20   plaintiffs are, therefore, able to talk about the DMCA and the

21   existence of the safe harbor and injecting that into the

22   underlying case for copyright infringement to deal with that

23   issue.  And I want to make sure that we all know whether

24   they're allowed to talk about the DMCA and say there's this

25   safe harbor and Grande didn't meet it or they could have done

1   that and didn't or whether they're not allowed to say those

2   things.  That's the fundamental kind of pit of the issue.

3             THE COURT:  Go ahead.

4             MR. BART:  May I speak from here?

5             THE COURT:  Yeah, I don't care.  As long as you speak

6   up.

7             MR. BART:  I think Your Honor has already addressed

8   the issue of whether we're allowed to address the DMCA.  And

9   we're not going to ever argue that because they didn't have a

10  safe harbor that they, therefore, are guilty of contributory

11  infringement.  There is an interplay between them, as

12  Mr. Brophy just indicated, which is, we could have proven

13  contributory infringement and they would have gotten a pass had

14  they qualified for the safe harbor.  And I think we're

15  absolutely entitled and I think Your Honor has ruled to say

16  they didn't get the safe harbor.

17             We absolutely have to prove that they are guilty of

18  contributory infringement and we're not in any way going to

19  suggest that because they don't have the safe harbor, we win

20  the case.  We have to prove, you know, the underlying

21  infringements.  We have to prove material contribution.  We

22  have to prove their knowledge.  Those are the elements of the

23  contributory infringement, which is what we're trying, but

24  there is an impact here in terms of that argument of fairness,

25  which was presented to the potential jurors during voir dire by

1    defendant's counsel.

2              And the answer to that in terms of fairness is, yes,

3    there was a way that they could have done it, and they didn't.

4    We still have to prove contributory infringement, but that

5    whole notion that they are really interjecting, of fairness,

6    there is a defense to it and they didn't qualify.

7              The main purpose of the DMCA, the main purpose, is

8    because Grande referred to it constantly.  Their own documents,

9    their own witnesses, everything that's going to bear on

10   willfulness and willful blindness during the time period that

11   we're talking about, the fact that they followed the Cox case

12   and talked about it.  This is all part of their behavior and we

13   can't certainly be precluded from talking about their behavior

14   when those factors are at issue.

15             But I can categorically assure Your Honor that we will

16   never at any point in this case argue that because they didn't

17   qualify for the safe harbor, they are liable and we have proven

18   our case.  So I don't think that's an issue.

19             THE COURT:  Yeah, if you did, we'd have a mistrial.

20   There's no question, I think, that one of the big issues here

21   is, you know, from the early 2000s up until around 2010, Grande

22   behaved one way, according to the plaintiff, and then after

23   2010, they behaved a different way, according to the plaintiff.

24   I don't think I'm misstating your position.

25             MR. BART:  No, you're not, Your Honor.

1          THE COURT:  And you have reasons for that and you're

2     entitled to put on those reasons, but you can't use the safe

3     harbor as a, well, you know, we were, you know, somehow

4     justified to do this because of the safe harbor provisions.

5     You can't do that because in this case it's pretty clear, to me

6     at least, I think it was to Judge Austin and Judge Yeakel.  So

7     you've got three federal judges who have looked at it who have

8     said, no.  And I think you understand that.

9          MR. BROPHY:  Absolutely, Your Honor.  I understand

10    that in crystal clear fashion.  I guess what I would say is you

11    just heard Mr. Bart say they're going to use the existence of

12    the DMCA safe harbor to argue that we are willfully blind.

13    That's an element of the core copyright infringement claim.

14          THE COURT:  I don't think that's what he said.

15          MR. BART:  That's not what I said.  What I said was

16    that we're going to use their own evidence of their actions

17    which may, in some of those e-mails and deposition testimony,

18    reference the DMCA to prove their willful blindness.  We are

19    not going to argue that the fact that they didn't qualify for

20    the safe harbor --

21          THE COURT:  You know, this whole case is based on the

22    DMCA.  It's pretty hard not to mention the DMCA.  It's only the

23    safe harbor provision which is where we're in trouble.

24          MR. BROPHY:  If I may, Your Honor.  I disagree with

25    that.  The underlying copyright law is what's at issue here.

1          THE COURT:  Well, of course.  But, I mean, the DMCA is

2   pretty much at issue here too.

3          MR. BROPHY:  I disagree with that.

4          THE COURT:  You don't think so?

5          MR. BROPHY:  I don't think so.  The DMCA only is

6   relevant to this case -- or was relevant -- because of the safe

7   harbor provision it supplies.  And now that that safe harbor

8   has been taken out of play under summary judgment, DMCA is no

9   longer an issue.

10          THE COURT:  That is true in terms of, in terms of

11   where we are with respect to the black letter law.  But my

12   understanding was that you were going to be arguing, or your

13   position was that your clients were acting in good faith

14   attempting to comply with the law.

15          MR. BROPHY:  We do not -- I would be perfectly fine

16   not ever mentioning the DMCA during this entire trial, Your

17   Honor.  And I don't think it's frankly proper to mention the

18   DMCA.

19          THE COURT:  Okay.  Well, I may have had a

20   misunderstanding of what your defense was.

21          MR. BROPHY:  If I may --

22          THE COURT:  That's why we're here.

23          MR. BROPHY:  -- we cited a few cases and if I could

24   just read one sentence from one of them.  This is the Costar

25   case, although there's another Fifth Circuit case.

1          THE COURT:  I've read that case multiple times.

2          MR. BROPHY:  The one sentence is, *"The DMCA is*

3   *irrelevant to determining what constitutes a prime facie case*

4   *of copyright infringement.*"

5          THE COURT:  I couldn't agree more.

6          MR. BROPHY:  So we shouldn't be talking about the

7   DMCA.

8          THE COURT:  I don't think that's what I was talking

9   about, however.  I think you understood what I was saying.

10          MR. BART:  I do understand.  And I think it's pretty

11   clear what is being attempted here, which is the Grande

12   discussion consideration and incriminating information about

13   their awareness that they were or might not be complying is

14   relevant to their willfulness in the award of statutory

15   damages.  They would love to be able to say, you can't think

16   about it at all.  You know, and we'll exclude this evidence.

17   We'll exclude consideration of it.

18          But the fact is we have to prove -- and this is why

19   the quote from Mr. Brophy doesn't work.  We're not using the

20   DMCA to prove our prima facie case.  As I said at the

21   beginning, we have to prove contributory infringement.  That's

22   all that sentence says and there's no debate about that.

23          However, the awareness of the safe harbor, the

24   behavior of the company, the way they acted, all of these are

25   relevant to their willful blindness, the award of statutory

1  damages, a whole series of things that are not relevant to

2  whether they are liable for contributory infringement, but are

3  part of the case when it comes time for assessing a damages

4  award and in looking at the good faith or willfulness of this

5  party.  And I think that it's very important to not allow an

6  out-of-context quotation to be used as a way of erasing

7  relevant and material evidence from the case, and that's really

8  all this application is about.

9      THE COURT:  Here is what I am going to do.  I will

10  take up any objection -- I know where you're coming from.  I

11  understand it.  This is not my first copyright trial that I've

12  ever presided over.  I fully understand what your position is,

13  counsel, and I don't disagree with either of you.  I don't

14  think I was suggesting that your case was based on the DMCA --

15  your defense, rather, was based on the DMCA.  I wasn't saying

16  -- or that he's based his case on copyright law and your

17  defense is based on copyright law.

18      What I was talking about is we have a very interesting

19  concept in -- because you folks, as we used to say, specialize

20  in this area of the law and you know this, I'm sure, better

21  than I do.  This is one of the very few areas of civil law

22  where the issue of willful blindness, which is really a

23  criminal concept, comes into play.  You don't really hear that

24  concept being used often in civil cases, but it is relevant

25  here.  And when we have that juxtaposition of the law with this

 1   kind of -- it's an ethereal concept, really, because you're

 2   getting into somebody's head, you know, and it's difficult even

 3   in a criminal context to deal with.

 4          I think more criminal cases, white-collar criminal

 5   cases, have been troublesome because of the issue of willful

 6   blindness than mostly any other criminal concept.  We're not

 7   talking about a criminal case, obviously, but the concept is

 8   the same.  You know, somebody knew about it, they were making

 9   money off of it and they just chose not to figure it out, in

10   quotes.  They kind of -- their mind went on vacation, as I

11   heard a learned lawyer say once.

12          MR. BROPHY:  May I make just two points, Your Honor,

13   and then I promise to be quiet about this.

14          THE COURT:  Sure.

15          MR. BROPHY:  Number one, I want to make sure Your

16   Honor appreciates my perspective, at least, that willful

17   blindness relates to a belief that there was infringement, a

18   belief relating to the underlying claim for copyright

19   infringement.  Whether or not a party qualifies for the safe

20   harbor doesn't have anything to do with whether that individual

21   has a subjective belief as to the underlying copyright

22   infringement act.  And that's the problem here is we're

23   confusing the affirmative defense with knowledge of the

24   underlying act, and they need to be decoupled.

25          THE COURT:  The affirmative defense, he's not doing

1    any defenses.

2            MR. BROPHY:  I understand, Your Honor.

3            THE COURT:  You're the defendant.

4            MR. BROPHY:  No, my point is this, willful blindness

5    requires them to show that we, among other things, had a

6    subjective belief that there was a high probability of

7    infringement.

8            THE COURT:  Of course.

9            MR. BROPHY:  That doesn't have anything to do with

10   whether or not we know about the DMCA safe harbor or whether we

11   qualify for the affirmative defense.  It only has to do with

12   whether or not we have a subjective belief --

13           THE COURT:  I think what counsel was saying, though,

14   before is that before we even get there, he has to prove

15   infringement.

16           MR. BART:  Right.

17           MR. BROPHY:  Yes, Your Honor.

18           THE COURT:  You don't have to worry about willful

19   blindness if there hasn't been infringement.

20           MR. BROPHY:  And I would say that nothing having to do

21   with the DMCA safe harbor bears on the issue of whether there's

22   underlying infringement.

23           THE COURT:  Okay.  Well, we'll see how -- nobody

24   mention the DMCA before talking to me, okay, in the sense that

25   we're talking about here, all right?

1          MR. BART:  Okay.  Well, we are going to address it in

2     the -- in the opening.

3          THE COURT:  Well, of course.  I'm talking about in the

4     sense we're talking about it here.

5          MR. BART:  Right, understood.

6          THE COURT:  Okay.

7          MR. BROPHY:  Well, I'm still not clear because my

8     understanding is that Mr. Bart just said he's going to mention

9     the DMCA and talk about the fact that we didn't qualify for it

10    in his opening.

11         THE COURT:  No, I don't think he's going to say that,

12    I hope not.

13         MR. BART:  Your Honor, the fact that they didn't

14    qualify is going to be a precluded subject because there is no

15    doubt that they have a series of arguments about how they just

16    provide pipes, how it's unfair to stick this to them because

17    they're just the ISP.  And to say to us we can't give context

18    to the jury about the fact that, yes, in fact, it's eminently

19    fair -- you know, they can't have it both ways.

20          There are two things, there are two separate things

21    here.  There's the evidence that references the DMCA that is

22    their evidence that is relevant and is admissible.  There is

23    also the basic notion that these two principles dovetail.

24    Okay?  There is an interconnection between the two entities,

25    which is, we could prove contributory infringement, and if they

1    qualified for the safe harbor, they walk.  Right?

2              THE COURT:  Right.

3              MR. BART:  So for them to come up and say, ladies and

4    gentlemen of the jury, we are just an Internet service

5    provider, they're just looking to scapegoat us, this is unfair.

6    And where we can't say, well, you know what, they had an

7    opportunity to qualify.  We still have to prove our case.

8    Nothing about this means we don't have to prove material

9    contribution or prove knowledge or the rest, but we do have the

10   right to tell them that there was a way that they could have

11   addressed it and gotten out and didn't.

12             I'm not going to say that that means that they're

13   guilty of willful -- of contributory infringement, but it

14   leaves the door open for them making equitable arguments that

15   we obviously have a response to, but we're helpless to address

16   in the absence of mentioning the DMCA.  And for the jury to

17   need to wait until the end of the case and have you put that

18   into context by hopefully advising them at that point, let's

19   all of this evidence go in without the understanding of the way

20   the law operates as it relates to ISPs.  Because ultimately at

21   the end of the day, the reason why the ISPs are here is because

22   they play a critical role in this.

23             And Congress, in fact, recognized they played a

24   critical role and wanted to give them serious benefits if they

25   cooperated.

1            THE COURT:  Let me tell you what my concern is here

2    and that concern has to do with making sure that we try this

3    case on the facts.

4            I don't want the jury to be left with the opinion that

5    I, Judge Yeakel, Judge Austin, the judges involved in this case

6    over a long period of time, looked at this and found that

7    Grande had acted egregiously and therefore -- and knowingly and

8    willfully, and therefore they were disqualified from the safe

9    harbor provision, because that would be tantamount to a

10   directed verdict.

11           MR. BART:  Okay.  But I'm not suggesting that.

12           THE COURT:  That won't happen.

13           MR. BART:  No, I understand that, but I'm not

14   suggesting that there's a finding of willfulness from the

15   application of the safe harbor.  The safe harbor is you either

16   qualify for it or you don't and it's not bearing on that.  They

17   didn't qualify because they didn't have a repeat infringer

18   policy and they didn't terminate.  Okay?  So it's very easy to

19   tell the jury we have the burden of proving to you that they

20   have -- they're liable for contributory infringement, but at

21   the same time, they had a way out, they didn't.  We still have

22   the burden of proving that, right?  But they can't come up here

23   and say, you know what, it's unfair.  You are sticking us with

24   the liability of the users, and that, you know, to try and

25   basically create a world view that doesn't exist, because just

1    among the lawyers here in the room, we know that when the DMCA

2    was enacted, there was heavy lobbying by both the ISPs and the

3    content community.  And they looked at the balance between the

4    burden is on the ISP and the need to protect the content

5    community.

6           And so they said, okay, ISPs, we'll give you two

7    things.  You won't have to monitor your network and we'll give

8    you a safe harbor.  You just need to cooperate in the process

9    and have a repeat infringer policy.  And basically that was the

10   trade-off here.  We still have to prove contributory

11   infringement, but that was the trade-off.  And for them to be

12   able to come in here and say, we're just the pipes, you're

13   looking to scapegoat us and, even worse, that, you know,

14   they're asking you to snoop on the consumers.

15          There are a lot of arguments that were made to the

16   jury that are just simply responded to by saying, you know

17   what, the equity issues have been -- are not before you.  It's

18   not an issue of is it fair or is it not fair.  The issue is are

19   they materially -- are they guilty of contributory

20   infringement?  And the issues of fairness have been addressed

21   by the law in other ways and they're not eligible for that.  So

22   you just have to look at the law and decide the law, but that

23   is the context in which if we don't address it, we are

24   vulnerable to arguments that are, honestly, disingenuous and

25   are disproven by the way the DMCA came about.

 1            But to be clear, there are two issues here.  The first

 2    one is that the DMCA is relevant to their conduct and the way

 3    they behaved and that is a separate issue just dealing with

 4    their evidence that must come in.

 5            The second issue is the issue of the general context

 6    of the DMCA.  I believe that without that happening, we are

 7    prejudiced in a bad way, but I think that Your Honor can

 8    address that as it comes across.

 9            MR. BROPHY:  Your Honor, if I may, it sounds like we

10    have an opening-the-door problem here, among other things,

11    where I'm not going to argue it's not equitable to punish

12    Grande for this because you should go after the users.  We're

13    going to be arguing the elements of the copyright infringement

14    claim, period.  Period.  If we open the door, perhaps that

15    gives Mr. Bart an opportunity to address that issue, but we're

16    not intending to open that door.

17            THE COURT:  Well -- okay.  I'm going to ask both

18    counsel to be seated.  Thank you for your arguments.  I

19    understand where you're coming from.

20            Counsel for plaintiff is absolutely right that it

21    would be both unfair and inappropriate under the law for me to

22    allow a defendant to get up there and start making all kinds of

23    equitable arguments about unfairness and then leave them

24    vulnerable in their case by not being able to say, well, wait a

25    minute, they had a chance and that chance doesn't apply here in

1   this case.  But he says he's not going to do that.

2          So, you know, generally, when a lawyer makes a

3   statement of fact in front of me and then tries to do something

4   that is contrary, it doesn't go well for them.  I've been

5   around long enough, I've presided in enough cases.  There are

6   lawyers in this room I think that have practiced -- I've been

7   at the bar 50-plus years.  May have a few lawyers around here

8   that are as old as I am, I don't know.  Hopefully, for your

9   sake, no.  I'm 75.

10          MR. BART:  Close, but no cigar.

11          THE COURT:  Close, okay.  And I haven't just sat in

12   the Ninth Circuit.  I've sat in Chicago and many other places.

13   I've had a lot of lawyers in front of me and I've had many of

14   these types of arguments, you know.  I think that a plaintiff

15   in a case like this has got, if they're doing their job, to

16   anticipate what the opponent is going to do, and vice versa,

17   obviously.

18          Now, he said he's not going to make these arguments.

19   Now, I don't think in this case there is a lot of room, quite

20   frankly, for the kind of equitable arguments that you're

21   concerned about.  You know, this isn't fair, the law isn't fair

22   is -- you know what that sounds like to me?  Sounds a lot like

23   jury nullification to me and I don't like jury nullification.

24   Never have.  And so the law isn't fair kind of argument and

25   it's just not right and, yeah, we did this, we did that and we

1    did the other thing.  But, you know, so what?  It isn't right.

2           And let me tell you something.  In a state where --

3    and particularly this area, where people value their personal

4    freedom a lot, that argument could be quite compelling, but it

5    isn't going to be made in this courtroom.  That isn't an

6    appropriate argument here.

7           MR. BART:  But, Your Honor, you're not reversing your

8    decision on the DMCA motion in limine.  We're allowed to

9    introduce the evidence that shows Grande's conduct and

10   references the DMCA and put that --

11          THE COURT:  Whatever -- yes.  I don't have my ruling

12   all in front of me.  I made a lot of rulings.  That was

13   unfortunately a long time ago.  We got caught in COVID.  This

14   is one of our COVID catch cases that should have been tried a

15   long time ago, but we couldn't.  Can you imagine trying this

16   case by video or Zoom?  Oh, no.  No way.  So it just had to

17   wait.  No, I'm not reversing any of my rulings.

18          MR. BART:  Thank you, Your Honor.

19          THE COURT:  Now, that doesn't mean if something comes

20   up during trial, I won't reconsider.  I'm not -- we have a term

21   in Hawaii we call somebody who doesn't use their head and

22   realize that they've made a mistake and make a change an opihi.

23   An opihi is a very small little mollusk that attaches itself

24   generally in the most inhospitable places where waves are

25   crashing against rocks.  And people lose their lives, you know,

 1   going after these opihi prying them off the rock.  Well, an
 2   opihi is a term used for somebody who is faced with obvious
 3   error on their part and stands their ground anyway.  I hope I'm
 4   never that person.
 5            MR. BROPHY:  Your Honor, I'm sorry to be this person,
 6   but your motion in limine -- you granted their motion in limine
 7   allowing them to introduce the notion of the safe harbor ruling
 8   as part of the arguments they present in this case.
 9            THE COURT:  Right.
10            MR. BROPHY:  And so I understand from what we've
11   discussed today that the plaintiffs are not allowed to talk
12   about the DMCA safe harbor unless I open the door.
13            THE COURT:  I didn't say that.
14            MR. BROPHY:  Well, let me maybe -- let me clarify
15   something.
16            THE COURT:  What I said was that I will stand by my
17   ruling.  What I said you can't do is try to make a -- some sort
18   of equitable argument that it doesn't make any difference
19   whether we violated the copyright law, it isn't fair and we did
20   our best.
21            Did our best is okay in the right context, but it's
22   not fair, the law isn't fair, is not okay.
23            MR. BROPHY:  I completely agree with Your Honor 100
24   percent.  The point I want to make is that the plaintiffs filed
25   a motion in limine expressly seeking permission to talk about

1    the DMCA safe harbor.  And this is what the MIL says,

2    *"Plaintiffs intend to rely on the Court's safe harbor ruling*

3    *and the facts supporting it to prove the elements of*

4    *contributory infringement and the appropriate measure of*

5    *damages for that infringement."*

6            They want to use the existence of the DMCA safe harbor

7    to prove contributory infringement, and I am just --

8            THE COURT:  I don't think that's right.

9            MR. BART:  Your Honor, I've already represented to you

10   that we're not going to do that.  This is, as I was going to

11   say at the very beginning of the argument, a motion for

12   reconsideration two years after the fact to be done on an oral

13   basis on the eve of trial.  Your Honor granted our motion in

14   limine, denied theirs, saying we could mention the DMCA safe

15   harbor.  I'm representing to you in --

16           THE COURT:  In the appropriate context.

17           MR. BART:  Yes.  And I'm representing to you in open

18   court that I will never argue that the absence of the safe

19   harbor means that they're liable for contributory infringement,

20   period, end of statement.

21           MR. BROPHY:  The issue isn't that.  The issue is

22   saying the safe harbor exists is the problem.

23           THE COURT:  I've already ruled on that.

24           MR. BROPHY:  Well, I'm --

25           THE COURT:  And I think we had a motion for

 1  reconsideration, and I denied it.

 2          MR. BART:  Yes.

 3          THE COURT:  So we're not going to go back over this,

 4  okay?

 5          MR. BROPHY:  I'm not trying to --

 6          THE COURT:  Stop.

 7          MR. BROPHY:  I understand, Your Honor.  I'm just

 8  trying to get clarification so I understand what the ground

 9  rules are going into tomorrow.

10          THE COURT:  Okay.

11          MR. BROPHY:  And I understood Your Honor to say just a

12  moment ago that if we don't raise the equitable defense, which

13  we agree is totally inappropriate, that they don't get to talk

14  about the DMCA safe harbor and our attempts to comply with it.

15  They can show documents that say we didn't terminate people,

16  they can do all those things, but they can't say there's this

17  DMCA safe harbor, and they could have gone for that, but they

18  didn't.  They shouldn't be allowed to say that.

19          THE COURT:  Go ahead.

20          MR. BART:  The factual record is that they had no --

21  they had a repeat infringer policy.  They removed it.  They

22  talked about removing it and whether or not this would affect

23  their ability to claim the safe harbor.  These are documents

24  that refer to Grande's own behavior made by their own employees

25  that is relevant to the findings of willfulness, willful

 1  blindness, statutory damages.  This is a motion for
 2  reconsideration to take the words "DMCA" out of the case.  You
 3  just heard from him saying we should not be allowed to mention
 4  DMCA.
 5          THE COURT:  All right.  I really have heard enough on
 6  this.  I've already ruled on it.  I've ruled on it in writing.
 7  We're done.  Okay.  We are done.  Now, if he starts to stray
 8  beyond that, you can object.  And if I think that he's --
 9  counsel is attempting to taint the jury by suggesting that your
10  client is liable simply because they didn't obtain relief
11  through the safe harbor provision, that isn't going to fly.  I
12  think counsel understands that.
13          MR. BART:  I do understand that.
14          THE COURT:  He's going to be very careful in the way
15  he argues that.
16          MR. BROPHY:  I still don't understand what purpose
17  there could possibly be for bringing up the safe harbor.
18          THE COURT:  Well, that was your motion to reconsider
19  and I think I've already ruled on that.  Did I rule on that one
20  or was it Judge Yeakel?
21          COURTROOM DEPUTY CLERK:  You did.
22          MR. BART:  You did, Your Honor.
23          THE COURT:  There were so many motions.
24          MR. BROPHY:  Your Honor, you left open the possibility
25  for us to reraise the objection at trial.

1          THE COURT:  Well, that's right.  I didn't yell at you.

2          MR. BROPHY:  I understand.

3          THE COURT:  I gave everybody an opportunity to be

4    heard and I've ruled.

5          MR. BROPHY:  Yes, Your Honor.

6          THE COURT:  Now, there seems to be some dispute

7    somewhere as to how long you expect this trial to go.  I would,

8    quite frankly, like to know because I keep getting asked by the

9    powers that be here in the Austin courthouse how long this

10   trial is going to go, for their purposes.

11         MR. BART:  We had a, I think, productive conversation

12   about that.  I mean obviously it's hard to assess where the

13   other parties.

14         THE COURT:  I mean, I know we've got two weeks at

15   least, it's going to go at least two weeks, maybe a little

16   longer than that, but I don't know how much longer.

17         MR. BART:  You mean ten days.

18         THE COURT:  Ten days.  And as you know, because of the

19   need for me to do things on Mondays, I'm not relaxing, that we

20   will do Tuesday, Wednesday, Thursday and Friday.

21         MR. BART:  Right.

22         MR. BROPHY:  Yes, Your Honor.

23         MR. BART:  And we talked about that and I think we're

24   each going to try and monitor and get it done within that time

25   and we're optimistic that we can.  It's not a certainty, but we

 1  have to see where cross-examination goes and the rest, but I

 2  think we're hopeful that we can do it within those ten days.

 3          THE COURT:  And the judges here have kind of closed

 4  the courthouse to proceedings during the investiture ceremony

 5  for one of the Magistrate judges who even if I wanted to go

 6  forward during that day, I would be tarred and feathered.

 7          MR. BART:  Is that one of the half days in the second

 8  week?

 9          THE COURT:  That's right, exactly.

10          MR. BROPHY:  Your Honor, I think we received a

11  schedule for the days and we're prepared to comply with that

12  schedule.

13          THE COURT:  Are you planning on going back to New York

14  during those?

15          MR. BART:  I'm New York, he's St. Louis.

16          THE COURT:  I like both.

17          MR. BROPHY:  We're here for the long haul, Your Honor.

18          THE COURT:  I have a very dear friend who practiced

19  law for many years and dear friends who are judges in both

20  places.

21          MR. BART:  I wasn't drawing any inference one way or

22  the other.

23          THE COURT:  Judge Walker on the Circuit is a very dear

24  friend of mine.

25          MR. BART:  Our team is here and I'm sure Mr. Brophy's

1   team is here and ready to go.

2            THE COURT:  I've been up in the arch.

3            *(Discussion off the record.)*

4                              *   *   *

5            THE COURT:  All right, counsel, so generally speaking,

6   I allow between, in a case like this, normally 20 minutes to

7   half an hour, but in this case because of the complexity of it,

8   it will be between 45 minutes and an hour for opening

9   statement.

10            MR. BART:  We had agreed to 45.  I expect to be

11   somewhat less than that.

12            THE COURT:  Okay.  Well, then I'm not being --

13            MR. BART:  You're being very generous.

14            MR. BROPHY:  Mine is right around 45 minutes.

15            THE COURT:  I don't know that a lot of people would

16   describe me as generous, but okay.

17            MR. BART:  It's the start of the case.

18            THE COURT:  So between 45 minutes and an hour.  If you

19   get at an hour, she'll let you know, okay.

20            MR. BROPHY:  Great.

21            THE COURT:  As you know, and I know this isn't the

22   practice, I don't know as well as I should probably what the

23   practice is in New York and St. Louis with respect to civil

24   juries, but it has always been my practice to allow all the

25   jurors to deliberate.  I assume we don't have any objection to

1    that.

2              MR. BART:  No.

3              MR. BROPHY:  No, Your Honor.

4              THE COURT:  I know some judges will impanel eight or

5    ten and only let the six go back, but I prefer to let them all

6    go back.  I think it causes them to pay more careful attention

7    if they know that they're going to deliberate versus the

8    thought that maybe they won't, so I can just relax.  So we'll

9    do it that way.

10             Is there anything else that you would like to discuss

11   this afternoon?

12             MR. BART:  I just would like to refresh my

13   recollection on the sequestration issues in terms of witnesses.

14   We have corporate representatives here who are both reps and

15   trial witnesses.  May they sit through the trial?

16             THE COURT:  Generally speaking, a party has the right

17   to be in the courtroom during the trial, and a party means a

18   representative.  However, that doesn't mean everybody from the

19   firm.  I mean, you know, I've had cases where I've had major

20   corporations in here and I wouldn't have the entire General

21   Motors, you know, legal team and their environs in here if they

22   were going to be testifying.  I generally request that you

23   choose a representative.

24             MR. BART:  Okay.

25             THE COURT:  Now, how many do you have that you would

1    like to have?

2          MR. BART:  Because of the length of the trial, each of

3    the labeled plaintiffs has two representatives who may well

4    rotate, just given the length of the time, amount of time.

5          THE COURT:  That's all right.  And I assume you're in

6    the same position.

7          MR. BROPHY:  Your Honor, we only have one individual

8    who is going to be our rep the entire time.

9          THE COURT:  Okay.

10         MR. BROPHY:  The only concern that I might express is

11   if the record label representatives are also witnesses and

12   there are going to be six of them, they could have essentially

13   all of their witnesses --

14         THE COURT:  He said two people.

15         MR. BART:  Two for each --

16         THE COURT:  That's too much.

17         MR. BART:  We have one witness for -- just so that you

18   know, we were planning on having one witness from -- well,

19   okay, we'll pick one representative.  That's probably the

20   better way to do it then.

21         MR. BROPHY:  And I have no objection if they're not

22   witnesses.  My concern is having all the witnesses sitting here

23   the whole trial.

24         If I may, I only have one other administrative item.

25   How does Your Honor wish to resolve evidentiary disputes?

1    Should we e-mail your clerk the evening before and raise it

2    with you in the morning before the jury comes in or what's Your

3    Honor's preference in that regard?

4              THE COURT:  I don't know what you mean by -- are you

5    talking about objections to testimony?

6              MR. BROPHY:  We have an agreement between the parties

7    to share certain information about which witnesses are going up

8    in what order, and probably from that we can anticipate --

9              THE COURT:  Oh, I see, if you have an objection to a

10   particular witness or a broad range of what they're going to

11   testify to?

12             MR. BROPHY:  Or an exhibit that we expect them to

13   address.

14             THE COURT:  I certainly would like to know that the

15   night before, the day before, obviously, the sooner the better.

16             MR. BROPHY:  Understood.

17             THE COURT:  But we did resolve a number of these

18   witnesses in the motions in limine.

19             MR. BROPHY:  Yes, Your Honor, but I am quite confident

20   there will still be some issues to resolve.  We'll do our best

21   to resolve them ourselves, but I just want to understand what

22   the process was so that you didn't call the jury in and then we

23   said, hey, we have some evidentiary issues and then we're

24   wasting their time.

25             THE COURT:  I agree with you, I wouldn't want that

1    either.

2              MR. BROPHY:  We will alert you beforehand.

3              THE COURT:  Thank you.

4              MR. BART:  There's one other administrative thing.  We

5    are calling some Grande witnesses on our case.  And we've

6    spoken about this, so this isn't the first time Mr. Brophy is

7    hearing about this.  Does Your Honor have a preference when we

8    call an adverse witness whether they do their direct of the

9    witness then or reserve it?  We don't care as long as it's not

10   two bites at the apple, so I just want to know if Your Honor

11   has a preference so we can plan for scheduling purposes if

12   we're just going from one --

13             THE COURT:  Let me make sure that I understand what

14   you're -- when you say that they do their direct.  You're not

15   suggesting that you call a witness and then he stands up and

16   starts --

17             MR. BART:  I'm saying I've seen that done and I'm

18   saying --

19             THE COURT:  I saw it done and it was a disaster.  But

20   it wasn't in my court.  I was a lawyer at the time.

21             MR. BART:  But what I'm saying is if Mr. Brophy tells

22   me that he's not going to do his crosses or his directs of

23   those witnesses and will put them up on his case, then I'm fine

24   with that.

25             THE COURT:  Go ahead.

1          MR. BROPHY:  My proposal would be that we do a

2    cross-examination of that witness with respect to the specific

3    issues raised on the direct and then if we had other issues, we

4    would recall that witness in our case.

5          THE COURT:  That's exactly the way we would do it.

6    That's what I generally do.  You can call that witness.  You

7    then have the right to lead the witness if it is, in fact,

8    their witness and we don't need to go through this whole thing.

9    I hate that when you tell the jury, well, this is a hostile

10   witness.  I like that about as much as I do the use of the term

11   "the judge abused their discretion."  And then the Appellate

12   Court goes, but it doesn't really mean that they were bad

13   people.  Judge Sarica used to hate that term too.

14         So he will obviously ask a line of questions and then

15   you will have the opportunity to ask your client or your

16   client's representative or your witness, the witness from your

17   side, what would be otherwise direct questions on that issue

18   and address the issues that he has raised.  You will then

19   reserve the right to recall the witness as you normally would

20   if you so choose to do so on direct and you will have the

21   opportunity to cross on those areas.  I would hope we wouldn't

22   recover the same ground twice.

23         MR. BART:  That was my only concern, Your Honor.  I

24   don't care what the procedure is as long as it's not two bites

25   at the same apple.

```
 1              THE COURT:  No, if it's covered --

 2              MR. BART:  On direct, that's fine.

 3              THE COURT:  Yeah.

 4              MR. BROPHY:  We're not going to rehash anything, Your

 5    Honor.

 6              THE COURT:  It doesn't serve any useful purpose.

 7    Okay.  Still time to settle.

 8              MR. BROPHY:  Three long weeks, Your Honor.

 9              THE COURT:  Believe me, I know.  It's not the worst I

10    had.  I did a three month -- four-month trial, I had a weekend

11    off and then three months, with one weekend off.  And these

12    were pretty high-powered lawyers involved in both of those

13    cases.  So if I survived that, I'll survive this.

14              Okay, folks, thank you very much.  Don't hesitate to

15    bring to my attention anything during the trial -- I mean

16    obviously outside the presence of the jury -- that you think

17    will assist or make things move more quickly or something that

18    you think you would like to see me do that will help you as a

19    group.  Because, you know, you're here, I'm obviously trying to

20    pay attention to the witness and I'm trying to pay attention to

21    you and I don't have -- you know, they say the judge has the

22    broad overview, but you'd be surprised how narrow it is when

23    you're trying to pay very careful attention to what the witness

24    is saying so that I can respond to any objections in a

25    meaningful way.  And there may be something that I do or say
```

1    and I may -- I want to be sure that I'm not unintentionally

2    making a gesture or doing something that you think might be

3    sending a bad signal to the jury.  I don't get accused of that,

4    but it can happen, I've seen it happen.  So let's just -- I'm

5    not thin-skinned, so if something is going on and you'd like to

6    bring it to my attention, feel free to do so.  I would

7    appreciate it, actually doing me a favor.  All right.

8              Oh, yes, there are a number of exhibits to which there

9    are no objections.  Can we pre-admit those so that you don't

10   have to worry about that?

11             MR. BART:  Sure.

12             THE COURT:  Let's go ahead and do that.  And jury

13   instructions.  Now, I follow a practice which we use in the

14   Ninth Circuit and I think it's a good practice actually with

15   respect to jury -- it may seem like a little odd to talk about

16   jury instructions now, but it's funny how fast time flies

17   sometimes.  I require counsel to submit a joint set of jury

18   instructions to which they all agree.  Okay.  I don't care if

19   it's one instruction, dear ladies and gentlemen of the jury,

20   okay.  And then with respect to those instructions that they do

21   not agree, I require you to submit those separately with the

22   appropriate citations as to why you believe I should give it.

23   Okay?  Don't leave this to the very end of the case because it

24   then causes me to have to deal with this in a compressed way

25   and I don't want to do that.  We don't want any errors or

1   mistakes because I didn't have the time to do the research and

2   look into it carefully.  So we get one joint set -- I mean,

3   even complex patent cases that I've presided over, 90 percent

4   of the instructions are agreed to.  The law is the law and

5   everybody knows what the law is.  But there are ways in which

6   people want certain things worded to fit the particulars of the

7   case and there's often disputes about that.  And those are the

8   ones that should be submitted to me separately.  Listen, I've

9   had complex cases where I've had only one or two instructions

10  where they were really in dispute.  I've had others that

11  weren't that complex where it looked like they never even got

12  together, so hopefully this will be the former and not the

13  latter.  Okay.

14        All right.  Thank you very much.  Have a good evening.

15  And you're going to be arguing, making the opening statement.

16        MR. BART:  Yes.

17        MR. BROPHY:  Yes, Your Honor.

18        THE COURT:  All right.  Very good.  Thank you.  We

19  will see you tomorrow morning.

20        COURT SECURITY OFFICER:  All rise.

21        THE COURT:  I permit counsel, if you wish, if you want

22  to have water, water bottle, I don't even have a problem if you

23  have coffee, it's okay with me.  Not the case with some of my

24  colleagues back in San Antonio.  It's okay.  I have had very

25  few mistakes.

1          *(3:00 p.m.)*

2                                      *   *   *

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5        I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.  I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  October 30, 2022

12

13   /s/ Angela M. Hailey

14   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
15   262 West Nueva Street
     San Antonio, Texas  78207
16   (210)244-5048

17

18

19

20

21

22

23

24

25