UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UMG RECORDINGS, INC., ET AL, | : | |
| Plaintiffs, | : | |
| | : | Case Number: |
| vs. | : | 1:17-CV-00365-DAE |
| | : | |
| GRANDE COMMUNICATIONS | : | Austin, Texas |
| NETWORKS, LLC, ET AL, | : | October 12, 2022 |
| Defendants. | : | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE DAVID A. EZRA
SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:
FOR THE PLAINTIFFS:

**Andrew H. Bart, Esquire**
**Jacob Tracer, Esquire**
Jenner & Block, LLP
1155 Avenue of the Americas
New York, NY  10036
(212)891-1600; abart@jenner.com

**Robert B. Gilmore, Esquire**
**Philip J. O'Beirne, Esquire**
Stein Mitchell Cipollone Beato & Missner LLP
1100 Connecticut Avenue, NW, Suite 1100
Washington, DC  20036
(202)601-1589; rgilmore@steinmitchell.com

**Paige Arnette Amstutz, Esquire**
Scott, Douglass & McConnico, LLP
303 Colorado Street, Suite 2400
Austin, Texas  78701
(512)495-6300; pamstutz@scottdoug.com

```
1   FOR THE DEFENDANTS:

2   Richard L. Brophy, Esquire
    Zachary C. Howenstine, Esquire
3   Mark A. Thomas, Esquire
    Margaret R. Szewczyk, Esquire
4   Armstrong Teasdale, LLP
    7700 Forsyth Boulevard, Suite 1800
5   St. Louis, Missouri  63105
    (314)621-5070
6   rbrophy@armstrongteasdale.com
    zhowenstine@armstrongteasdale.com
7   mathomas@atllp.com
    mszewczyk@armstrongteasdale.com

8

9

10

11

12

13

14

15

16

17

18

19

20  COURT REPORTER:
    Angela M. Hailey, CSR, CRR, RPR, RMR
21  Official Court Reporter, U.S.D.C.
    262 West Nueva Street
22  San Antonio, Texas  78207
    Phone(210)244-5048
23  angela_hailey@txwd.uscourts.gov

24  Proceedings reported by stenotype, transcript produced by
    computer-aided transcription.
25
```

# I N D E X

**OPENING STATEMENTS**                              **PAGE**

By Mr. Bart                                    47

By Mr. Brophy                                  77


**WITNESSES:**

**JEFF WALKER**
By Mr. Bart                                    117
By Mr. Howenstine                              163

**WADE LEAK**
By Mr. Bart                                    175
By Mr. Howenstine                              183

**JEREMY LANDIS**
By Mr. Tracer                                  189
By Mr. Howenstine                              213

1    *(Wednesday, October 12, 2022, 8:27 a.m., in open court.)*

2                              *   *   *

3            COURT SECURITY OFFICER:  All rise.

4            COURTROOM DEPUTY CLERK:  1:17-CV-365, UMG Recordings,

5    Incorporated, et. al, versus Grande Communications.

6            THE COURT:  Can we have just appearances of those who

7    are going to be arguing right now.

8            MR. BART:  Thank you, Your Honor.  Andrew Bart from

9    Jenner & Block and Robert Gilmore from Stein Mitchell for the

10   plaintiffs.

11           MR. BROPHY:  Good morning, Your Honor.  Richard Brophy

12   with Armstrong Teasdale on behalf of Grande.

13           THE COURT:  All right.  Okay.  What are the issues?

14   What are your many issues?

15           MR. BART:  There are a number of issues, but the first

16   one that I want to address, if I may, is going back to the

17   second motion for reconsideration that was made yesterday on

18   the DMCA where Your Honor --

19           THE COURT:  Not back to that again.

20           MR. BART:  Well, the only reason I was going back to

21   that again is, as you remember, one of the arguments that I

22   made to you was that they're going to make equitable arguments

23   that require us to introduce the DCMA as a way of responding to

24   those arguments.  And certainly the demonstratives that were

25   produced indicate certain questions like Can Grande investigate

1   or verify Rightscorp's accusations, a series of various

2   Internet sites with Grande just being an intermediary in the

3   middle, did Grande really act like an apprentice with a caption

4   saying Grande did what it could, all of which imply that there

5   was no other alternative available to Grande and that this is

6   all that was available to them.

7          And I think it's really critical for us to be able to

8   advise the jury, particularly since the goal here on the part

9   of the defendant is to basically take everything else out of

10  the case except for Rightscorp and just present facts, to let

11  them know that this pattern of ignoring infringements was done

12  in a structure where they could have gotten the safe harbor and

13  that the safe harbor would have avoided these types of claims.

14         And I said when we were arguing about this yesterday

15  that, in fact, in the motion on the DCMA, they made those

16  equitable arguments.  And in the voir dire selections on

17  Friday, they made those equitable arguments, and there was a

18  representation that there wouldn't be any, but I think that

19  it's still a theme in their overall presentation that we were

20  an innocent bystander, we were in the middle, we did what we

21  could, what do you expect from us.

22         And I don't see how we can be expected to allow that

23  argument to be presented repeatedly to the jury without

24  advising them that there was another way that the ISPs could be

25  a passive intermediary, just pass on the notices, keep tabs on

1    who was infringing repeatedly and terminate people as the law

2    requires.

3          THE COURT:  Well, look, it seems to me that if counsel

4    makes the argument that they were just an intermediary, they

5    had no control over this, this isn't their concern, they did

6    everything they could, I don't know, it's been a very long time

7    since I've tried a lawsuit, but I would think that if I were

8    opposing counsel on these facts -- and I'm not giving you any

9    argument you don't already know about -- I always worry about

10   that with inexperienced lawyers, but you're no inexperienced

11   lawyer.  I would be arguing, wait a minute.  They could have

12   done something about it and, in fact, they did do something

13   about it.

14         MR. BART:  Well, certainly --

15         THE COURT:  And you don't even need to get into, you

16   know -- I mean, from the early 2000s until 2010, they

17   monitored, they stopped, and they -- but then, in 2010, your

18   argument would go on about how they put profit ahead of -- you

19   know...

20         MR. BART:  Absolutely, Your Honor.

21         THE COURT:  And that to me seems like the argument

22   that you would make.  Now, maybe I'm crazy.

23         MR. BART:  No, but there's another piece to this,

24   which is there's a unique little window here because it wasn't

25   just that they had a policy before 2010.  They also had a

1    policy starting in 2017, and they posted it on their website,

2    and it specifically provides, we are obligated under federal

3    law, and it recites the language of the DCMA repeat infringer

4    provision.  They're objecting to that as one of our exhibits

5    here, even though it's their own document, and it's been

6    stipulated to as to authenticity.

7            I think at an absolute minimum I need to be able to

8    point that out and to point out they thought it was okay here,

9    they thought it was okay here, here is that point in the

10   middle.  So even if Your Honor wants --

11           THE COURT:  Where did they post this?

12           MR. BART:  On the website.

13           THE COURT:  They put it on the website?

14           MR. BART:  Yes, they absolutely --

15           THE COURT:  Public website?

16           MR. BART:  Publish website, absolutely.

17           THE COURT:  Okay.  Let me hear from counsel.

18           MR. BROPHY:  Your Honor, I'll try to take those in

19   order.  The slides that my colleague referenced regarding --

20           THE COURT:  Well, let's make sure we're talking about

21   the same thing here because, you know, it can get a little

22   confusing.  Not just for me, but at some point, I'm sure, an

23   Appellate Court is going to be looking at this, and they need

24   to know what you're talking about.  As somebody who sits four

25   times a year on the Ninth Circuit and goes over those records,

 1    I can tell you it's not easy to follow sometimes.

 2              MR. BROPHY:  Understood.

 3              THE COURT:  So what are you talking about now?  Not

 4    just his arguments.  What argument specifically?

 5              MR. BROPHY:  I'd like to address first the suggestion

 6    that we are making equitable arguments to the Court.  We are

 7    not going to do that.  Our arguments are directed at the

 8    knowledge element of this claim.  Because this is a

 9    contributory copyright infringement claim --

10              THE COURT:  Yes.

11              MR. BROPHY:  -- not only do they have to prove the

12    underlying copyright infringement occurred, but they have to

13    prove that we, among other things, knew about it.

14              THE COURT:  Of course.

15              MR. BROPHY:  And when we say things like, we're just

16    an intermediary, it's because we're passing packets back and

17    forth, and we don't know what the packets have in them, and so

18    it directly relates to knowledge.  That's what we're arguing

19    about.  Do I have you with me so far?

20              THE COURT:  Well, you do, but -- well, I'll leave that

21    for the jury.

22              MR. BROPHY:  Just to preview my opening ever so

23    slightly here, there is a distinction between an accusation and

24    knowing something is true.

25              THE COURT:  Sure.

1      MR. BROPHY:  And this case is about accusations we

2  received.  And one of our defenses is that we didn't know

3  whether they were true or not.

4      THE COURT:  Right.

5      MR. BROPHY:  And had no way of determining whether

6  they were true or not, because --

7      THE COURT:  Okay.  To be honest with you, I don't have

8  the same problem that plaintiff's counsel does with your

9  exhibit itself because I think there's a very easy,

10  straightforward way of dealing with it, which I've already

11  outlined, which I think is -- well, maybe I'm giving myself too

12  much credit here, but I think it's pretty effective.

13      MR. BROPHY:  Your Honor, if I may address that also

14  very briefly.  My colleague, Mr. Bart, said -- and I wrote this

15  down exactly as he wrote it*, "They could just terminate people

16  as the law requires*."  The law does not require us to terminate

17  anyone.  The DCMA gives us the option to, but this is exactly

18  the concern that I have about presenting the DCMA in this case

19  is that it confuses the jury in the thinking there's an

20  obligation to terminate when there absolutely is not.

21      THE COURT:  Well, the law may not require you to

22  terminate them, but your failure to terminate them is at your

23  own risk, a risk which your client took, which is why you don't

24  have that defense available to you.

25      MR. BROPHY:  Correct, but 512(L) states expressly that

1  the fact that we chose not to avail ourselves of that

2  affirmative defense or tried and didn't meet the burden, the

3  hurdle, does not mean that the plaintiffs get to use our

4  failure to adhere to it or our failure to meet the hurdle as

5  affirmative evidence to prove their underlying claim, and

6  that's exactly what they're doing.

7           THE COURT:  Well, the fact that you didn't terminate

8  them, however, and you, I think -- and this is pretty clear

9  from our previous rulings, sometimes I say "our" because it was

10  not just me.  There was substantial evidence that your client

11  did know what was going on, and that goes to the willful

12  blindness argument, doesn't it?

13          MR. BROPHY:  If they had evidence that we knew, then

14  that would go to the knowledge.

15          THE COURT:  Well, they have pretty substantial

16  circumstantial evidence that you knew.

17          MR. BROPHY:  Well, that's an argument we're going to

18  take up later, I suppose.  But for the purposes of this

19  discussion --

20          THE COURT:  I mean, I don't know that anybody -- I

21  don't think there's a whistleblower in this trial.  Maybe there

22  is.

23          MR. BROPHY:  And, Your Honor, the issue here -- I'm

24  sorry.  I don't want to waste your time with this, but I think

25  it's important to understand this context.

1          THE COURT:  Counsel, let me tell you something.  Your

2    being here and my being here is not a waste of my time.  All

3    right?

4          MR. BROPHY:  Thank you, Your Honor.  Thank you.

5          THE COURT:  I have an absolute obligation to be here.

6    I have an obligation to listen to you and to make the best

7    rulings I can.  That doesn't mean that you have to agree with

8    my rulings.

9          MR. BROPHY:  I understand.

10         THE COURT:  You know?  The very first day I became a

11   federal judge, an old-timey judge that had been a -- well, I

12   guess by the time he died on the bench almost, he had to be

13   taken off the bench and rushed to the hospital, and he died at

14   96.  So he literally died on the bench -- told me -- and he was

15   an old -- he came from Kansas, his dad was a rancher.  And he

16   said, *"David, something you got to understand about this job.*

17   *Every day half the people that go out of your courtroom are*

18   *going to think you're the front of the horse and the other half*

19   *are going to think you're the rear end."*  Okay?  I've come to

20   understand that, all right?

21         MR. BROPHY:  Yes, Your Honor.  I understand.

22         THE COURT:  And any judge that's running around trying

23   to make everybody happy with their rulings is the worst judge

24   in any case.  There's nothing worse.

25         MR. BROPHY:  Agreed.

1          THE COURT:  So go ahead and make your arguments, I'll

2   rule, and that's the way we're going to go, and then, you know,

3   we got a great Court of Appeals and they'll look at it.  And I

4   got a pretty good record before them, but sometimes I get

5   reversed.

6          MR. BROPHY:  The first thing I'll say is -- just to

7   make it crystal clear what our position is -- we're not

8   objecting to the other side arguing about the fact that we

9   didn't terminate anyone during this time period.  In fact,

10  we're willing to stipulate to that fact.  That's not a dispute.

11          However, there is the fact, the underlying fact, that

12  we didn't terminate anyone, and then there's the gloss of us

13  trying to achieve the safe harbor, or not, or deciding to

14  pursue the safe harbor, or not.  And it's that category of

15  arguments that are the problematic ones --

16          THE COURT:  Well, I don't know that plaintiff's

17  counsel is going to be arguing to the jury that you tried to

18  achieve safe harbor and didn't make it.

19          MR. BROPHY:  Well, they are going to argue that we

20  could have used the safe harbor but chose not to.

21          THE COURT:  Well, there's a difference.  There's a big

22  difference.  And I, personally, at this point have already

23  ruled on that, and I don't think there's a problem with that.

24  And as long as they don't suggest that because -- now, see, the

25  problem with safe harbor is that it doesn't prove liability.  I

 1  mean, you cannot avail your -- I've had a copyright case,

 2  actually.  You can avail -- you not avail yourself of the safe

 3  harbor and still not have infringed.

 4          MR. BROPHY:  Right.

 5          THE COURT:  I mean, you don't have to go into safe

 6  harbor in order to win a copyright case.

 7          MR. BROPHY:  Right.  In fact, the Courts of Appeals

 8  say that phase one is determining whether there's been a

 9  copyright infringement --

10          THE COURT:  That's right.  You have to --

11          MR. BROPHY:  -- and phase two is the DCMA.

12          THE COURT:  That's right.  Exactly.

13          MR. BROPHY:  But we're trying to keep that line

14  crystal clear that --

15          THE COURT:  But I even had a case where one of the

16  parties desperately was trying to get themselves into the safe

17  harbor, and it was a jury question in that case.  And the jury

18  found that they hadn't done it.  They hadn't done enough, but

19  then again they -- but they hadn't violated the copyright,

20  except in one small instance, which didn't make a difference.

21          MR. BROPHY:  Just to make sure the record is clear on

22  our position on this, Your Honor, because there's that two-part

23  process, our position is that the case law is clear that part

24  one is determining whether there has been an infringement of

25  copyright --

1            THE COURT:  Right.

2            MR. BROPHY:  -- and that the DCMA is irrelevant, has

3    no role in that determination whatsoever.  It's only relevant

4    to the second step of determining whether the safe harbor

5    applies.  And so because the safe harbor, by Your Honor's

6    summary judgment order, does not apply in this case, and we're

7    only adjudicating the underlying copyright infringement

8    question, the DCMA safe harbor shouldn't be uttered in this

9    courtroom.  That is our position.  I understand that you have a

10   different perspective.  I just want to make sure the record is

11   clear.

12           THE COURT:  Well, I'm not the only one.

13           Go ahead.

14           MR. BART:  Thank you, Your Honor.  I think we have

15   some clarity here.  I think we are not -- my mention, my

16   proposed mention of the DCMA is going to be, as I said

17   yesterday, within the context of saying, essentially that, that

18   it does not effect the jury's determination of the underlying

19   claim of contributory infringement.  However, we are trying

20   more than just the knowledge issue.  We are trying willful

21   blindness.  We are trying the damages issue.  All of this

22   evidence is coming in together, and this is all relevant.  And

23   the problem right now is, frankly, let's take it a half step

24   back.  Had we not moved for summary judgment on the DCMA, then

25   all of this would come in and Mr. Brophy's argument would be

1    falling on deaf ears.

2         And basically the notion here is, well, you know what,

3    we have a gotcha.  You won, and we are not eligible, and so we

4    have a better position in terms of this trial and excluding

5    evidence than if you hadn't won on summary judgment.  But the

6    bottom line is that all of this, their awareness of this safe

7    harbor -- and there's tons of evidence that they were aware of

8    it and that they were aware of the fact that they weren't

9    terminating, might affect their statuses for safe harbor is

10   relevant to willfulness, is relevant to willful blindness.

11        Mr. Brophy keeps talking about knowledge as if they

12   have a duty to, in fact, investigate.  But what he's really

13   saying is, we don't have to do anything.  Because,

14   theoretically, there's a possibility that there might be an

15   error in some of these statements, we can look the other way

16   and just not pay attention to it at all.

17        That is classic willful blindness, as Your Honor

18   pointed out, particularly for a party that knew its obligations

19   before and knew its obligations after.  I don't know that we

20   need to really go further with it --

21        THE COURT:  Well, I think that it's very important

22   that you stay away from any argument that would suggest to the

23   jury that because they did not avail themselves or were not

24   able to avail themselves of the safe harbor, that that is in

25   some way probative of a copyright infringement --

 1          MR. BART:  Absolutely.  There's no argument.

 2          THE COURT:  -- because not only will you hear from me,

 3  but if there's ultimately an award for your client, the Fifth

 4  Circuit would probably take a very dim view of upholding it.

 5          MR. BART:  I hear you, Your Honor.

 6          So the last point --

 7          THE COURT:  You shoot yourself in the foot even if you

 8  get it past me.

 9          MR. BART:  I think we've all done that from time to

10  time, but the warning is very clear.  And as I said, I have no

11  intention of making that statement.

12          But I do want, in terms of the demonstratives, the

13  ability to point out that in 2017, on their website, they put

14  down their DCMA policy and stated it as their obligation to do

15  these things, because just as you said --

16          THE COURT:  It is probative, not of the DCMA, not of

17  safe harbor, okay?  This is important.  It's not probative of

18  safe harbor, all right?

19          MR. BART:  Right.

20          THE COURT:  What it goes to, however, is willful

21  blindness.

22          MR. BART:  Agreed.

23          THE COURT:  So, yes, you can.

24          MR. BART:  Okay.  Thank you, Your Honor.  That's all

25  that I'm going to address.  Mr. Gilmore will address the other

1    objection.

2             THE COURT:  I thought you were done.  Why was I

3    dreaming?  Go ahead, Mr. Gilmore.

4             MR. GILMORE:  Thank you, Your Honor.  Robert Gilmore

5    for the plaintiffs.  We have objections to one piece of

6    evidence that is replicated in several of defendant's slides.

7    I have a copy of their slides with the pages flagged.  May I

8    approach?

9             And for the record, they are -- counsel, I think we

10   told you last night -- slides 37 and 38 and 40 through 44,

11   although defendant's slides didn't have page numbers on them.

12            All of these slides refer to a document that concerns

13   the technical workings and business dealings of an entirely

14   different online detection company, not Rightscorp, different

15   company called MarkMonitor.  But the infringement evidence

16   that's going to be presented to the jury in this case is about

17   Rightscorp, not some other company, and the issue of whether --

18   how a whole other system works and what its dealings with the

19   RIAA, that was ruled as not relevant and, therefore, not

20   discoverable by a Magistrate Judge Austin in his ruling from

21   several years ago, ECF 191.

22            THE COURT:  They're talking about Rightscorp here.

23   They use the term "Rightscorp."

24            MR. GILMORE:  And I think that is why these slides are

25   all the more problematic, because when you look at the slides,

 1    you think that the document that they're showing is about

 2    Rightscorp, but it's not.  They're talking about technical

 3    specs of some other company that RIAA hired; different

 4    technology for different kinds of services.

 5           And so we think that this is going to confuse the jury

 6    because we're going to be getting to a trial within a trial.

 7           THE COURT:  Let me hear from opposing counsel.  Is

 8    that true, you're using a different company, not Rightscorp,

 9    but calling it Rightscorp?

10           MR. BROPHY:  No, that's not true at all, and not what

11    I intend to do.

12           THE COURT:  Are we in the same courtroom here?  Have

13    you been litigating together for several years?  I mean, how

14    can we have this misunderstanding?

15           MR. BROPHY:  I'm not sure, Your Honor.  I didn't

16    communicate that at any time.  The document that we wish to use

17    is a contract that exists between the RIAA, which is the

18    industry body for the record labels --

19           THE COURT:  That's right.

20           MR. BROPHY:  -- in MarkMonitor, a different company

21    from Rightscorp.

22           THE COURT:  Okay.

23           MR. BROPHY:  However, this contract sets forth the

24    industry standard requirements for collecting and storing

25    evidence before accusing someone of music sharing.

JURY TRIAL PROCEEDINGS                    19

 1          THE COURT:  Wait a minute.  Did Rightscorp execute a
 2  similar agreement?
 3          MR. BROPHY:  Your Honor, Rightscorp never worked with
 4  the record labels.  There is no equivalent agreement for
 5  Rightscorp.  One of our arguments in this case --
 6          THE COURT:  Why is it relevant?
 7          MR. BROPHY:  Because the RIAA is the industry body for
 8  the record labels.
 9          THE COURT:  Okay.
10          MR. BROPHY:  They established a standard for what is
11  required to be collected and stored to prove that an e-mail
12  accusation of infringement of music sharing is legitimate.
13  This document we want to use is the industry standard.  It's
14  the RIAA's own articulation of what is necessary to be
15  collected and saved to legitimize an e-mail accusing someone of
16  music sharing.
17          We want to bring up documented -- not to talk about
18  how MarkMonitor works but, rather, to talk about what the RIAA
19  requires to be detected, collected, and saved before accusing
20  someone of music sharing.
21          The reason this is important is, one of our arguments
22  in this case is that Rightscorp didn't save these things, and
23  therefore, Rightscorp's e-mail accusations are not legitimate.
24  They don't meet the industry standard.
25          THE COURT:  Well, was Rightscorp bound to do that?  In

JURY TRIAL PROCEEDINGS                    20

1    any way?

2           MR. BROPHY:  Rightscorp was never hired by the record

3    labels.

4           THE COURT:  Is this a voluntary type of agreement or

5    is this -- this is certainly not a law.

6           MR. BROPHY:  It's not law, Your Honor, but this is

7    the -- how do I describe this?  Shortly before filing this

8    lawsuit --

9           THE COURT:  Okay.

10          MR. BROPHY:  -- the record labels purchased a bulk set

11   of e-mails from Rightscorp, okay?  The record labels never

12   hired Rightscorp to do work on their behalf, never hired them

13   to do monitor songs or send e-mails.  The record labels bought

14   this data, and they're now trying to pass it off to the jury as

15   legitimate evidence of music sharing.

16          One of our arguments in this case is it is not

17   legitimate evidence of music sharing because even though the

18   record labels want to tell the jury in court that Rightscorp

19   did the right things, we have documents showing the record

20   labels think other things are the right things, not these, and

21   so we're going to argue what Rightscorp did wasn't appropriate

22   to detect music sharing, and they don't have the evidence to

23   prove these songs were shared.

24          THE COURT:  You know, this sounds very much to me like

25   a scenario which I have seen and faced in maritime cases.  As

1    you know, the Coast Guard has a very voluminous series of

2    requirements in order for a passenger ship -- actually any

3    ship -- to sale.

4          Let's talk about passenger vessels for a moment.  And

5    they're very detailed, they're very comprehensive, and they are

6    law, and they are binding.  Okay?  So you violate -- most of

7    these are law, most of these.  You violate them, you're in

8    trouble, big trouble.  But there are also associations that

9    many of these shipping companies belong to that have their own

10   codes of -- I don't want to say conduct, but codes of sailing

11   that describe the various things that should be done in order

12   to safely sail.

13         And, you know, you could -- actually, if you think

14   back for just a little bit to COVID, which we're I guess still

15   in to a degree, with passenger vessels, we had the CDC putting

16   out what were binding regulations, but the passenger vessel

17   association also had their own regulations that those who

18   signed up adhered to, right?

19         Now, if they chose not to adhere to the regulations or

20   the guidelines by their own passenger vessel, that would not be

21   evidence that they have somehow violated safety regulations put

22   out by the CDC, which were in many cases actually less

23   stringent.  For instance, around masking and vax and all of

24   that kind of thing.

25         So it seems to me like what we have here is we have

1  what the law is, the copyright law, and then we have some

2  association, RIAA, which isn't a governmental body, and they

3  put out their own little regulations, their own little set of

4  standards, I guess you might call them.  And how are those

5  standards in any way binding on anyone as a matter of law?

6          MR. BROPHY:  So the copyright law doesn't articulate

7  what evidence needs to be collected and saved before you accuse

8  someone of sharing music.

9          THE COURT:  That's right.

10          MR. BROPHY:  And so we are left -- the jury is going

11  to be deciding whether the evidence that they can present is

12  sufficient, and we get to bring in -- I would like to bring

13  in -- evidence that is directly relevant to that fact.  And

14  from my perspective, what we're talking about here is a Rule

15  401 question.  And I can't fathom a way in which the

16  plaintiff's own position on what is necessary to collect and

17  save to evidence an instance of music sharing is not probative

18  of the issue of whether Rightscorp's process of collecting and

19  saving was sufficient or not.

20          I mean, they're going to tell the jury what Rightscorp

21  did was good enough when their own documents and protocol says

22  something else.  And we should be able to bring that in and say

23  this is a mismatch, and the jury should be able to consider

24  whether the fact that --

25          THE COURT:  At the very least, I am not inclined to

 1   let some agreement between RIAA and some third-party company

 2   that's not involved in this case come into evidence.  It's more

 3   confusing than it is probative.  However, I do not have a

 4   problem if there is an industry-wide accepted standard that

 5   comes directly from the RIAA for which these parties, the

 6   plaintiffs, ascribe to be brought in as some evidence, as long

 7   as it's properly argued.  I mean, you can't argue that they

 8   were bound by it.

 9          MR. BROPHY:  I didn't intend to do that, Your Honor.

10   But to be clear, there is no separate document that promulgates

11   this other than the --

12          THE COURT:  Well, where does it come from?  Did they

13   just work it out on a case-by-case basis?

14          MR. BROPHY:  They --

15          THE COURT:  We'll just grab one contract because it's

16   got some in there?

17          MR. BROPHY:  There is a single set of contracts with

18   this company, MarkMonitor, and the record labels, in

19   conjunction with the RIAA, establish this set of requirements,

20   and those are embodied within the contract.  And every single

21   record label that is --

22          THE COURT:  Well, where did they embody these

23   requirements?  They must be laid out somewhere in the RIAA.

24          MR. BROPHY:  They're in the contracts, Your Honor.

25   That's where they exist.  And to be clear, I don't intend to

1  talk about --

2          THE COURT:  I'm still having a very hard time

3  understanding how this works.

4          MR. BROPHY:  I'll try to frame it a little bit.  The

5  RIAA contracted with a company named MarkMonitor to detect

6  music sharing on the Internet.

7          THE COURT:  Sure.

8          MR. BROPHY:  And in that contract, the RIAA requires

9  that certain evidence be detected and saved as part of the

10  process of establishing an evidence package, as they call it,

11  for purposes of legitimizing accusations of music sharing that

12  they subsequently make.

13          THE COURT:  Now, what evidence do you have that the

14  plaintiffs in this case either, number one, knew about it or

15  were, number two, bound by it?

16          MR. BROPHY:  The record labels rely on the RIAA to

17  engage in copyright infringement enforcement, and the record

18  labels basically give the RIAA that power to do that.  And on

19  top of that, MarkMonitor monitors all of their copyrights, all

20  the record labels' copyrights, pursuant to this requirement

21  that the RIAA promulgated.  So we have the RIAA promulgating a

22  standard that all of these record labels in this lawsuit signed

23  up for when they asked MarkMonitor to do this process for them.

24          So this is the record labels agreeing that this is the

25  process they're going to use and they want to use, and we

1   should be allowed to bring in the fact that Rightscorp doesn't

2   meet that standard.  They're going to try to argue that

3   Rightscorp's accusations are legitimate.  We have the right to

4   undermine that position.  And one of the ways to do that is to

5   say the plaintiffs don't even think this is the right way to do

6   it because they require it to be done a different way.

7         And if I may, Your Honor, this issue came up in the

8   motions in limine, and Your Honor entered an order indicating

9   that *The Court shall allow Grande to point to the industry --*

10  *the standard industry policies on infringement notices.*

11        This is a standard industry policy.

12        THE COURT:  That's what I'm trying to get at, but

13  you're telling me that there is no standard policy, that this

14  is -- because that's just exactly what I asked you.  Where is

15  this standard policy promulgated?  And your only answer to me

16  is, well, it happens to be in this particular contract.

17        MR. BROPHY:  There's only one company that monitors

18  all the music for all the record labels.  The RIAA, the

19  recording industry body, works with one company, and so the

20  contract with that one company is the standard, because every

21  record label uses the RIAA to do its policing, and the RIAA

22  uses MarkMonitor.  So there is a one-to-one correlation between

23  what the RIAA requires and what the record labels believe is

24  appropriate.

25        THE COURT:  Well, look --

1          MR. BROPHY:  May I make two more?  I'm sorry, Your

2    Honor.  This is an important document.  It's a very important

3    issue.  May I make just two more points on that, if you don't

4    mind?

5          THE COURT:  Yes.

6          MR. BROPHY:  Point number one is in addition to just

7    having this document and believing it is highly relevant to

8    this case, our expert relied on this document.  He looked at

9    it.  He agreed that it is an industry standard.  He opined, he

10   offered opinions in his expert report, based on this document.

11   The plaintiffs deposed him.  He opined in that deposition about

12   this document, and they did not move to strike his expert

13   report.  They did not move to Daubert him on this basis.  So we

14   have an expert trying to present opinions that are informed

15   by -- largely by this document, and so to say that it's not

16   relevant and that it's not admissible when our expert relies on

17   it to establish a standard and they didn't even object to it

18   is, in my mind, problematic.

19          The other point I would like to make is it is not the

20   case that Rightscorp is the only noticed company at issue in

21   this litigation.  During this trial, the plaintiffs are going

22   to introduce evidenced related to a wide variety of other

23   notification companies.  The reason for this is simple.  You've

24   heard they want to talk about what we did or didn't do with

25   notices in 2010.  Rightscorp didn't exist in 2010.  That

1    argument that they're going to make is based exclusively on

2    notices sent from other companies.

3            They're also going to want to introduce e-mails into

4    this case where our internal folks react to notices received

5    from other companies.  There are tons of instances in which

6    their expert is going to opine on the entire body of notices

7    that Grande received, not the subset from Rightscorp, but all

8    the notices that we've received from every notification

9    company.  So this notion that we've tied a tidy box around

10   Rightscorp is a fallacy.

11           There are other notices coming into this case, because

12   they're going to introduce them, and so the notion that they

13   get to do that, but then we can't bring in one document that

14   says MarkMonitor -- even though we're not going to use it to

15   talk about what MarkMonitor does, but only to say what the

16   record labels require, frankly, is absurd in my mind.  We have

17   to be able to do that.  Those are my points.

18           MR. GILMORE:  May I be heard?  I'll be brief, Your

19   Honor.

20           THE COURT:  Yes.  The famous last words.

21           MR. GILMORE:  As soon as I said that.  If Grande had a

22   policies document, if Grande had the RIAA issue, here are the

23   standards that any online detection company needs to abide by,

24   that would be the exhibit on the list.  They don't have that

25   because that doesn't exist because that is not what happened.

1           Instead, MarkMonitor made a proposal to the RIAA,

2   different company, said, here is our technology, here are the

3   specifics of how it works.  RIAA decided to hire MarkMonitor

4   and entered into an agreement.  Those two documents, here is

5   how MarkMonitor's technology works, and here is the agreement

6   requiring MarkMonitor to do the things that MarkMonitor's

7   specific technology can do.  Those are the two documents, the

8   only two documents.

9           And now counsel is trying to turn that into a industry

10  standard.  There is no evidence that that is an industry

11  standard, because there are other companies out there like

12  Rightscorp that have been hired by many other companies,

13  content copyright holders, to do the same work.  The reason why

14  the various specs are discussed in these two documents about

15  MarkMonitor is because that's how MarkMonitor does its system.

16          And so now they're going to try and compare two

17  different technologies, one of which there's no evidence.

18  There's not a MarkMonitor witness.  There's not an expert

19  witness who is going to be testifying about MarkMonitor in this

20  case.  And so they want to turn that into an industry standard

21  when that's not what it is.  It's a contract, a statement of

22  work, about a different company, and there's just no evidence

23  that that reflects some kind of industry standard as to how

24  online detection is supposed to happen.

25              And the extent -- I mean, we've heard that's what they

1    want to argue, and I think that is -- it's a 402 and 403

2    problem.  The jury is going to be confused if they hear all of

3    this discussion about a completely other company and they

4    think, oh, well, that's what Rightscorp was supposed to have

5    done, when the discussion is about a different company,

6    different kind of technology, and it's going to engender a

7    trial within the trial.  Oh, no, that's actually not what

8    MarkMonitor does.  Oh, well, Rightscorp could do that.

9         That's what -- we shouldn't be here.  It is true the

10   fact that there are other detection companies and the fact that

11   Grande received notices from many other companies, that's a

12   fact.  Both sides, I'm sure, are going to talk about that.

13   That has nothing to do with delving into the technology of an

14   entirely different company and trying to say that that is an

15   industry standard, which you just heard that is what Grande

16   wants to do.  That's not appropriate.

17        THE COURT:  So, no, absolutely not.  We are -- at some

18   point we have to stop playing tennis here, knocking the ball

19   back and forth.

20        With respect to the defendant's use of this so-called

21   list of requirements, if we might put it that way, I am going

22   to permit the defendant to use that, just like I would permit

23   them to use any other witness that they might be able to

24   produce who would have, in their view, an expert, for instance,

25   what the plaintiffs should have done or why Rightscorp's

 1    processes are ineffective or did not properly do, if you will,

 2    a due diligence on these various acts of infringement.

 3          On the other hand, I will never permit in this trial

 4    any suggestion by the defendant that this is some sort of

 5    standard or industry standard that must be adhered to by the

 6    record companies because the plaintiff has -- other than an

 7    expert who might opine that he thinks that this is an industry

 8    standard, which is a factual matter, which can be addressed by

 9    cross-examination, there will be no discussion by the defendant

10    that this is somehow a binding industry standard that

11    Rightscorp violated and therefore was not diligent in what they

12    were doing in identifying these infringements.

13          Do we understand where we are?  So they can put the

14    document in.  I don't have a problem with that, but it has to

15    be scrubbed to the extent that it's -- there is a suggestion

16    there that somehow this is an industry standard, because it's

17    pretty clear to me that it isn't an industry standard, that it

18    is a -- if I understand correctly -- an agreement reached

19    between the RIAA and its participants and this company, and the

20    company said, this is what we are going to be looking at, this

21    is what should be the appropriate measures and steps that need

22    to be taken.  And the RIAA said, yeah, that's fine.

23          That doesn't make it an industry standard.

24          MR. BROPHY:  Your Honor, may I ask one point of

25    clarification just to make sure -- I do not want to run afoul

1    of your requirements.

2           THE COURT:  I would hope not, because, you know,

3    sometimes you can argue yourself out of a position.

4           MR. BROPHY:  I understand.  And I don't want to do

5    that.  I will absolutely not be saying that this is some kind

6    of binding industry standard.  I would like to be able to

7    say -- we would like to argue that this is an industry

8    standard -- and they can present evidence that it isn't -- but

9    you don't want me to even say it's an industry standard?

10          THE COURT:  No, because it isn't an industry standard.

11   I asked you if you had any documents from the RIAA.  No.  What

12   is this?  Well, this is actually just a one-time contract

13   between the RIAA and this company, and this is what they have

14   agreed to do.  That is not an industry standard.

15          MR. BROPHY:  They have said in the previous Cox trial

16   that it is the gold standard.  Their attorneys stood up in

17   front of the jury and said this is the gold standard.

18          THE COURT:  Okay.  I don't know anything about that.

19   I wasn't at the Cox trial.

20          MR. BROPHY:  I understand.  My point is that from our

21   perspective, we should be permitted to argue that it's the

22   standard, and if they disagree, they can say that it isn't.

23          The concern I heard you articulating was us suggesting

24   it's binding or that by not meeting that standard, Rightscorp

25   was violating some regulation or was -- you know, something

JURY TRIAL PROCEEDINGS                    32

1  like that.  We don't intend to do that at all.  I would like to

2  be able to take the position it's a standard.  Our experts have

3  opined it is a standard, and they haven't sought to exclude

4  that testimony or Daubert it out.

5          THE COURT:  Look, you know, your expert can testify as

6  to their opinion, okay?

7          MR. BROPHY:  Understood.

8          THE COURT:  Their opinion.

9          MR. BROPHY:  Yes.

10          THE COURT:  But they cannot say that this is a binding

11  standard in the industry, because it isn't.

12          MR. BROPHY:  I completely agree, Your Honor.  We

13  weren't intending to do that, and we won't do that.

14          THE COURT:  I mean, it isn't.

15          MR. BROPHY:  Understood.

16          THE COURT:  Any more than the -- I forget what the

17  name of this cruise ship association that all these cruise

18  lines belong to.  They promulgate rules, and if you're part of

19  that cruise line association, like all the major lines are,

20  then you follow them if you feel like they're appropriate.  But

21  if you don't, the Coast Guard isn't going to come and stop you

22  from sailing --

23          MR. BROPHY:  Correct.

24          THE COURT:  -- because you violated the CDC.  And, in

25  fact, some cruise lines, before the association had agreed to

1    it, went ahead and removed the mask mandates and vaccination

2    requirements.  One of them is Viking.  I know that because I'm

3    on a Viking cruise.  Hopefully.

4              MR. BROPHY:  If this trial is over by then, right?

5              THE COURT:  Yeah, that's right.  That's at

6    Christmastime.  We better be done.

7              MR. BROPHY:  Thank you for the clarification.

8              THE COURT:  All right.  So you can -- if you put the

9    right foundation in, you can put it in as evidence.

10             MR. BROPHY:  Thank you, Your Honor.

11             THE COURT:  So I'll consider that an objection, and

12   the objection is partly sustained and partly overruled.

13   Because I'm sustaining it to the extent that they cannot

14   present this as an industry standard.  I'm overruling it to the

15   extent that they should be able to, as part of their defense to

16   the argument that they were willfully blind here, present

17   evidence that the -- evidence that you're showing which alleges

18   that they were willfully blind is not adequate.  Okay?  Does

19   that make any sense at all?

20             MR. GILMORE:  It does.  And we appreciate that ruling.

21   Thank you, Your Honor.

22             MR. BROPHY:  Your Honor, there is one extremely small

23   last item if I may pass some slides to you.  The only question

24   is whether you're going to allow the plaintiffs to instruct the

25   jury on the law during the opening.  I have some slides that

1    indicate that they're going to be identifying elements and

2    burdens of proof.  Does Your Honor want that or not?

3              THE COURT:  No, no.  We can't instruct them on the

4    law.  You can tell them what -- you can tell them what you are

5    attempting to prove.  There's a difference.

6              MR. BART:  Okay.  I hear you.  I mean, the standards

7    are not even in debate.  The jury -- one of them, for example,

8    is the standard on preponderance of the evidence.  They have

9    the same standard as we do, and the jury has already been

10   instructed.  The other is on statutory damages.  They have a

11   jury instruction with a list of --

12             THE COURT:  I don't have your thing in front of me,

13   so -- at this point, I don't want to see it.  Just tell me.

14   Okay?

15             MR. BART:  Okay.  Fair enough.  So --

16             THE COURT:  We'll never get this trial started.

17             MR. BART:  I apologize.  I do feel the need to respond

18   to --

19             THE COURT:  I don't have a problem with you

20   responding.

21             MR. BART:  Okay.  Thank you, Your Honor.  I think that

22   we're not instructing the jury.  We're telling the jury what

23   the issues are and what the standards are going to be from

24   undisputed statements either of the Court or undisputed issues

25   as between us.  So it is completely correct that I can't argue

1    a disputed issue of law to the jury.  I would certainly never

2    try to do that, but if I'm just simply saying as, frankly, I've

3    seen done a million times, this is not a criminal case.  This

4    is a civil case, and so you only need to prove a preponderance

5    of the evidence that --

6              THE COURT:  I don't have a problem with that.

7              MR. BART:  Okay.  And another one is, you know, they

8    are going to be talking about the amount of damages, but we

9    have statutory damages.

10             THE COURT:  You don't have in your opening statement,

11   here are the elements of this claim, do you?

12             MR. BART:  No.  I don't list them one, two, three,

13   four, five.  Actually, let me back up.  I was talking about --

14             THE COURT:  Because that is my province.

15             MR. BART:  Okay.  No.  I understand that.  Okay.

16   Well, I can work around that.  I think that with regard to --

17             THE COURT:  Because we may have some disagreements

18   later about that.  You know, this is one of the reasons why --

19   I mean, I don't think so, but this is one of the reasons why we

20   don't generally like lawyers to instruct the jury on the law in

21   opening statement because something may happen during the trial

22   that removes something or adds something and, you know, if you

23   go from Circuit to Circuit to Circuit, the pattern jury

24   instructions sometimes are quite different depending upon the

25   Circuit's ruling with respect to issues.

1          MR. BART:  Right.  But what I'm instructing -- not

2    instructing.  That's the wrong word.  What I'm talking to the

3    jury about --

4          THE COURT:  A Freudian slip, counsel.

5          MR. BART:  Perhaps.  Please don't hold it against me,

6    but it's out there.

7          THE COURT:  You don't want to be in my job, counsel.

8    You'd be making a lot less money.

9          MR. BART:  I don't want your job.

10         But, you know, I think with regard to the underlying

11   claim here, we need to be able to tell the jury that this is a

12   claim for contributory copyright infringement.

13         THE COURT:  Yes.

14         MR. BART:  That Judge Ezra will instruct you on the

15   law on that subject.

16         THE COURT:  Right.

17         MR. BART:  But that we are going to prove that they

18   had knowledge, that they materially contributed to it, and that

19   there was actual infringement by the underlying user, because

20   that is what our proof is going to show.

21         This also happens to be the standard that was set

22   forth in Your Honor's summary judgment's decision, so I don't

23   think that I'm going on to --

24         THE COURT:  I don't have a problem with any of that.

25         MR. BART:  Okay.  Fair enough.

1          THE COURT:  Unless there is a suggestion that what

2     he's saying is misstating the law.

3          MR. BROPHY:  Your Honor, this is a slide right here.

4     *"Plaintiffs will prove contributory copyright infringement,"*

5     colon, and then a set of three elements, one of which we

6     vehemently oppose.  He's providing instruction to the jury on

7     what the law of contributory infringement is.  And then we're

8     going to see a statutory damages slide with a cherry-picked set

9     of elements to consider for statutory damages.

10         THE COURT:  You may be right, counsel, on all of

11    those, and I may ultimately agree with you, but at this point

12    in time, I'm not in a position -- not having heard any of the

13    evidence, I have a pretty good idea what it's going to be

14    because of all the motions in this case.

15         MR. BART:  Well, exactly.  They're trying another

16    motion for reconsideration on the issue of whether material

17    contributions --

18         THE COURT:  Well, they may win and they may not win.

19    They've won a few and they've lost a few in the last few days.

20         MR. BART:  Understood.  I think we can address the

21    issue.

22         THE COURT:  Please stay away from the elements, all

23    right?

24         MR. BART:  I do need to be able to say, for example --

25    I will say what we intend to prove as opposed to saying these

JURY TRIAL PROCEEDINGS                    38

1   are the elements of the claim.

2           THE COURT:  That's fine.  You can say whatever you

3   want to with respect to what you intend to prove.

4           MR. BART:  Okay.

5           THE COURT:  Just don't list them as elements of the

6   law.

7           MR. BART:  Okay.  That's fine.  But the last one on

8   statutory damages is a tactical move, not a legal disagreement.

9   There's a legal disagreement on the contributory infringement

10  one.

11          THE COURT:  Right.

12          MR. BART:  They believe that material contribution is

13  not sufficient.  They've argued that inducement is required.

14  They're wrong.  You have decided that already, but they want to

15  re-argue it.

16          But on the statutory damages, they recite the same

17  factors that we do.  They simply don't want the jury to know

18  that they're supposed to consider things like deterrence and

19  circumstances of the infringement, which both sides say and

20  recite in our proposed jury instructions are factors.

21          I am not going to -- I will not list them and instruct

22  the jury, but I do want the ability to say to the jury that in

23  determining statutory damages, which Your Honor will instruct

24  them on, there are a series of factors that go into that, and

25  we are going to attempt to prove that, you know, among the

 1  factors will be deterrence and willfulness and things like

 2  that.

 3          Because, otherwise, we're left in a situation where

 4  we're making all of these arguments that are geared towards

 5  those factors, and the jury doesn't understand why that's even

 6  part of the case.  I'm not going to instruct them and give them

 7  a list and say --

 8          THE COURT:  I told you already that you can tell them

 9  what you intend to prove.

10          MR. BART:  Okay.

11          THE COURT:  All right?

12          MR. BART:  All right.  I'll work within that.  Thank

13  you.

14          THE COURT:  That's the name of the game.  I'm going to

15  take just a five-minute recess, give you a chance to use the

16  restroom, and then when we come back, we'll have the jury.  You

17  will see me -- I don't know, have I told you why -- we're not

18  on the record.

19          *(Discussion off the record.)*

20                        *   *   *

21          COURT SECURITY OFFICER:  All rise for the jury.

22          *(Whereupon the jury enters at 9:38 a.m.)*

23                        *   *   *

24          COURT SECURITY OFFICER:  All rise.

25          *(Whereupon the judge enters the courtroom.)*

1          THE COURT:  Please be seated.  All right.  Can you

2    call the case.

3          COURTROOM DEPUTY CLERK:  Austin, 17-CV-365, UMG

4    Recordings, Incorporated, et. al, versus Grande Communications.

5          THE COURT:  All right.  And can counsel make their

6    appearances before the jury, please.

7          MR. BART:  Yes.  Good morning, members of the jury.

8    My name is Andrew Bart from Jenner & Block with my whole trial

9    team on behalf of the plaintiffs.

10          MR. BROPHY:  Good morning, members of the jury.  My

11    name is Richard Brophy.  I'm here on behalf of Grande

12    Communications along with my team, and I would like to point

13    out Mr. Lamar Horton will be our client's representative for

14    the duration of the trial.

15          Thank you, Your Honor.

16          THE COURT:  Thank you.  And good morning, ladies and

17    gentlemen.  You haven't seen me before.  One of our magistrate

18    judges, Judge Howell, was kind enough to participate and do the

19    jury selection so that I could do some additional other work.

20    We're very, very stretched, to say the least, because we don't

21    have enough judges, Article III federal judges, who can do

22    criminal cases.  Magistrate judges cannot do felony cases, and

23    so I have to -- me and my colleagues -- there's only two active

24    judges here in Austin, and so I split my time between Austin

25    and San Antonio.  And I have a chambers and an office in both

1    places.  And so I'm running back and forth all the time.

2              Now, I'm going to be the presiding judge during this

3    trial.  You have already heard that this trial involves music

4    copyrights, and you're going to hear a lot more about that from

5    counsel when they address you.  They will begin this morning by

6    making what we refer to as an opening statement.

7              I believe that the jury has already gotten the

8    preliminary jury instructions.

9              LAW CLERK:  Up to the rule, yeah.

10             THE COURT:  Okay.  So normally I do that, but Judge

11   Howell did it.  So good.  I won't make you do it again.

12             So this is the lawyer's opportunity to tell you what

13   they believe the evidence will show.  At the end of the trial,

14   they have another opportunity to address you directly.  And at

15   that time they will give what we call in the West, argument.

16   What they used to call, at least in the East Coast, summation.

17   And that is their opportunity to tell you what they believe the

18   evidence has shown and to point out items of evidence which

19   they think are particularly important and to try to convince

20   you that their side is the correct side in this legal dispute.

21             Now, it's very important for you to understand that

22   attorneys have an obligation.  And, in fact, they have two

23   significant obligations.  Number one, they are advocates for

24   their respective clients, so they are not here as mediators or

25   someone in the middle, okay?  In fact, if they were acting that

1    way, they would be violating their oath.  They are representing
2    their client, okay?  That is what their job is.

3           They are also officers of the court, just as I am,
4    which means that they have a duty and responsibility to uphold
5    the rules and ethics of the court, and so they have two
6    obligations.

7           My job is to be the trial judge.  And as the trial
8    judge, I take absolutely no position whatsoever on the merits
9    of this case.  And it is incredibly important that you
10   understand that nothing I do or say during this trial should
11   ever be misinterpreted as my views of how you should vote in
12   your jury deliberations or how the outcome of this case should
13   resolve itself.

14          Now, there will be times, as there always is, when I
15   may have what appears to you to be a disagreement with an
16   attorney during the course of this trial.  I will tell you that
17   I was a trial lawyer at one time, and I tried cases in federal
18   court, and I did not always agree with the rulings of the
19   judge.  So it may be that it appears to you that there may be
20   some back and forth between myself and one or more of the
21   attorneys.  That's part of the process, okay?  We all
22   understand that.  And as long as we're respectful to each
23   other, that is the name of the game, so to speak.

24          They have the responsibility to advocate to me their
25   client's view of things, and I may or may not agree with it.

1   That does not under any circumstances mean that I dislike the

2   lawyer, that I have any view of the lawyer's competence.  The

3   lawyers in this case are very competent, I can tell you from

4   their reputations.  And I certainly am not trying to telegraph

5   to you what I think you should do as a jury.

6          Now, from time to time a lawyer may ask for a

7   sidebar -- and Judge Howell may have covered this with you, but

8   it's very important for you to understand that when they do,

9   it's probably because they want to ask a question that they're

10  not sure I'm going to permit.  Or they believe the other side

11  has done that.  And I may or may not grant a request for a

12  sidebar.  Sidebar just means they come over here and talk to me

13  out of your hearing, okay?  That's kind of the sidebar of the

14  bench.  We want to be sure that we get the law right.

15         Now, if it's going to be a long process, I'll probably

16  send you back so you can relax, so you're not just sitting

17  there waiting.  If it's something we can do very quickly, then

18  I'll just leave you there, and we'll go on.  I may deny a

19  request for a sidebar because I think we can take this matter

20  up at a recess, okay?  And so it is not to be thought of by you

21  as any indication of my view of the case or the lawyer or the

22  outcome of the case.  Has nothing to do with it.

23         I have a number of different implements here that I

24  use on the bench.  I'm slowly but surely getting into this.

25  I'm one of the few Reagan appointees, Ronald Reagan appointees

1    still on the bench, so I'm kind of from the old era.  But I

2    have an iPad that connects -- it's a court iPad, and it

3    connects to the court system, and I also have another device

4    here called a reMarkable where I can make notes, and they also

5    get transmitted to my clerks.

6          When you see me on these things, rest assured that I'm

7    not trying to send you a signal that these are important

8    matters and you better pay attention to it.  It may be that

9    I've gotten a communication that one of the lawyers needs to

10   call their office or something of that kind, okay?  Nothing

11   like that.

12         Finally, we recess for lunch between 12 and 1:30.

13   Now, I've had jurors say to me, well, Judge, you know, if we

14   only took an hour, then we'd get through the case faster.

15   Actually, not.  In my 36 years' experience on the bench, we

16   have found that by giving the lawyers the opportunity to have

17   lunch and prepare themselves for the afternoon, we actually do

18   much better than if we rush them through.

19         Also, because of where we happen to be located here,

20   there's only a few places around here to eat, and so it may be

21   that it's going to take you a little time to walk up and get

22   something to eat and come back, unless you bring your lunch

23   with you, which you are certainly entitled to do.  Okay.

24         Now, you're going to see me drinking liquid.  I've

25   already explained this to the lawyers.  Many years ago I had a

1    very small little vocal cord cancer, which was caught very

2    early, and I'm fine.  This was 20 years ago.  But they do a

3    radiation on me, and so if I don't keep my vocal cords somewhat

4    moist, I lose my voice, and that's not a good thing for a trial

5    judge.  Might be good for the lawyers, but it wouldn't be good

6    for me in getting my job done.  Okay?

7              All right.  And finally, I want to remind you that we

8    do trial on Tuesday, Wednesday, Thursday and Friday, okay?  We

9    don't do trial on Monday.  Why is that?  Is that another

10   opportunity for a nice three-day weekend for everybody?  No.

11   The reason is we are so jammed up because of COVID, we couldn't

12   do anything.  We have all these cases and sentencings and all

13   this stuff, that I need time to do that, and the only time I

14   have is Mondays.  But this also gives the lawyers an

15   opportunity to, again, prepare, and it also gives you the

16   opportunity, if you wish to take it -- because you won't be

17   paid for jury service on Monday, because you won't be here --

18   to go back to work if you want to.  You can go to work on

19   Monday and reconnect with your office or reconnect with your

20   work, whether you work from home or you work in an office,

21   you're not entirely out of sync.

22             Now, what I'm doing here in this case is the standard

23   practice here in the Western District of Texas.  Okay?  I'm not

24   doing anything unusual.  Now, there are a few judges, one judge

25   in particular in San Antonio, that makes the jurors come in

1   super early and then finishes at 3:00.  Some of you probably

2   don't live in the downtown Austin area, right?  Some of you

3   live far out, kind of?  I mean, I don't want my jurors getting

4   up at 3:30 in the morning to get here and then you're -- you

5   know, you're half asleep by 2:00 in the afternoon.  It's not a

6   good look.

7          So we're better off starting at 9:00, giving people

8   time to get in.  San Antonio is the same.  We have people from

9   halfway to Laredo that come in, that have to drive in.  Way

10  down in Dilley and, you know, up in the other -- it doesn't

11  work.  So I don't know how he does it, but I'm not doing it.

12         All right.  If that's it, then we're going to start

13  with the opening statements.

14         The jury has been sworn, right?

15         COURTROOM DEPUTY CLERK:  Yes, Judge.

16         THE COURT:  I always ask.

17         I am originally from Hawaii.  I did go to law school

18  in Texas.  I married a woman from Texas 51 years ago, still

19  married.  And I love Texas, but I'm from Hawaii, and I was a

20  federal judge in Hawaii for 25 years before I came here, and

21  I've been here ten years helping out.  One of the judges went

22  through a two-month trial, and then right before jury

23  deliberation they realized they had forgotten to swear the jury

24  in.  Mistrial.  They had to start all over again.  I saw that,

25  I thought, oh, no.  So I always ask.  That's not a good thing.

```
 1              All right.  Counsel, are you ready?

 2              MR. BART:  I am, Your Honor.

 3              THE COURT:  All right.  You might want to reintroduce

 4    yourself after all --

 5              MR. BART:  I will, Your Honor.  Thank you, Your Honor.

 6              And good morning, ladies and gentlemen of the jury.

 7    My name is Andy Bart, and it's my honor to be representing the

 8    major record labels in the United States, Sony Music, Universal

 9    Music, and Warner Music in this very important case for the

10    music industry and the artists that it represents.

11              We appreciate your willingness to serve on this jury

12    and to sacrifice your time to help us reach a just result,

13    which will compensate my clients for the damage that they

14    suffered due to the actions and inactions of the Defendant,

15    Grande Communications.

16              With me on this case are my partner Jake Tracer, three

17    partners from the firm of Stein Mitchell in DC, sitting to my

18    right:  Rob Gilmore, Phil O'Beirne, Kevin Attridge, Paige

19    Amstutz from the Austin firm of Scott Douglass & McConnico.

20    And together we'll be presenting evidence, questioning

21    witnesses, introducing documents, and showing brief video clips

22    of depositions that will constitute our case in chief.

23              Also here on behalf of the plaintiff record groups are

24    Scott Bowman from Universal, David Jacoby from Sony, and Tom

25    Monahan from Warner, as well as Jared Freedman from the
```

1   Recording Industry Association of America, or RIAA, the trade

2   association for the recording industry.

3           As I started to say a moment ago, this case is about

4   the actions and, more importantly, the inactions of the

5   defendant, Grande Communications, in enabling a flood of

6   copyright infringement on its network and then refusing to play

7   a role in stemming that flood.

8           Grande is what's known as an ISP, or Internet service

9   provider.  As the name suggests, an ISP provides customers with

10  high-speed broadband Internet service as well as some other

11  services such as TV and cable service.  You may know them as a

12  cable company, but whatever it's called, it's a very highly

13  profitable business.  And particularly the Internet component

14  of that business.

15          And as you'll hear at trial from their own witnesses,

16  Grande has an amazingly high profit margin on that Internet

17  service of up to 95 percent, a factor that played heavily into

18  many of Grande's worst decisions that resulted in this case.

19          What brings Grande to this court as a defendant is its

20  intentional decision to ignore a massive amount of copyright

21  infringement that it facilitated through this high-speed

22  broadband network; specifically, the illegal copying and

23  distribution of copyrighted song recordings -- sound

24  recordings.  As you'll hear during the trial, Grande recognized

25  the importance of addressing this infringement, and for a

1   period of time had a robust policy to deal with it and to deal

2   with subscribers who committed that infringement.

3           However, in 2009, Grande was bought by an out-of-state

4   private equity firm that installed a different company called

5   Atlantic Broadband, or ABB, to manage the company and to

6   provide management and legal support for Grande.  And in 2010,

7   ABB decided to revoke that policy.  And for the next seven

8   years, the period that's at issue before you today, Grande

9   concededly took no action whatsoever against any subscribers

10  that it knew had committed infringements, and instead continued

11  to provide those subscribers with the very tools they needed to

12  infringe; namely, continued access to Grande's high-speed

13  Internet service.

14          Why would it do that?  Grande says it doesn't know

15  because it was a decision made by ABB.  Whether you believe

16  that testimony or not, one of the most striking things about

17  this trial is that none of the people who made that decision

18  are going to testify here.  But as with many other mysteries,

19  it's always a good idea to follow the money.  And as I told you

20  before, Internet service is an extraordinarily profitable

21  business, and over 90 cents out of every dollar in revenue was

22  pure profit.  So terminating users who were paying their bills

23  cost Grande and their private equity owners money that they

24  would otherwise be collecting.

25          Unsurprisingly, the owners wanted to boost the profits

1   of the company so that they could flip Grande, sell it, and

2   cash out, which they did handsomely in 2016 to the tune of

3   $400 million.  And beside, they thought they would never get

4   caught.

5           But in 2015, in a case that Grande watched carefully,

6   another cable company was held liable for the infringements

7   committed by its users, and Grande knew that the arguments and

8   evidence that were asserted in that case can also be asserted

9   against Grande.  But remarkably, even then it did not address

10  infringement on its network, and it instead continued to

11  provide broadband service to users that it knew were repeat

12  infringers.

13          But after it was sued here in 2017, Grande

14  manufactured a series of excuses and accusations it had never

15  made before, including all of the arguments that you'll hear

16  from them in this case, but those after-the-fact excuses don't

17  change the underlying fact that Grande caused massive damage to

18  the plaintiffs and to the entire music industry and has to be

19  held accountable for that damage.

20          On the other side of the case are the major label

21  groups, Warner, Sony, and Universal, that constitute the bulk

22  of the recording industry in this country.  Most of you

23  probably have a sense of what the recording industry is, but at

24  its core, it's a business that finds, invests, develops,

25  markets talent, artists, in order to create the music that

 1   enriches all of our lives.

 2         And as you'll hear, so much goes into that, making

 3   that happen.  Finding the artists, investing in their careers,

 4   surrounding them with musicians and producers and other

 5   resources to develop their musical vision and providing the

 6   teams of support to promote and market their creations and

 7   paying for all of that.  It also requires a willingness to take

 8   risks.  For the overwhelming majority of the resulting

 9   recordings, as much as the labels believe in them, are not

10   commercially successful, so the success of the profitable

11   releases has to pay for the cost of the entire operation.

12         But the result of all that effort, investment, and

13   risk, is profound, and it's felt far beyond the sale of vinyl

14   records or CDs or subscriptions to streaming services.  It's

15   the foundation for an entire ecosystem, the career of artists

16   and musicians, producers, engineers, managers, road crews,

17   publicists, and all the others whose lives are based on these

18   creations.  And what better place in time to see and appreciate

19   how far-reaching that ecosystem is than to be here now and to

20   be in Austin during Austin City Limits.

21         Everywhere you look you see the power of music.  It

22   connects us, it moves us, it inspires us.  It's one of the

23   great American industries.  In fact, in a way, it is a

24   definition of America, a communal resource based on our

25   diversity in reflecting all the people in this country.  Think

1   about your favorite artists and your favorite songs.  Think

2   about how much they enrich our lives.  In fact, it's almost

3   impossible to imagine life without it.

4         But as you'll hear during this case, this industry

5   that has brought so much pleasure to all of us has been under

6   siege for the last 25 years.  Although people are listening to

7   more music now than in any time in the past, the industry has

8   been at a crossroads where its very survival has been an issue.

9         I'm talking about Internet piracy, a concept that

10  you've probably heard of before.  The crisis began in the late

11  1990s when free, unauthorized copies of virtually every

12  recording flooded the Internet and ultimately destroyed the

13  business model that had sustained the industry for the past 50

14  years and severely damaged all the artists and others who

15  depended on that industry.

16        When unauthorized music files became readily available

17  online, people stopped buying CDs.  Revenues kept going down

18  and down, and there was no clear end in sight.  Indeed, between

19  1999 and 2012, the revenues of the industry dropped in half.

20  Stop and think about that for a minute.  How many industries

21  survive such a disastrous collapse of its business model?  And

22  worse, the widespread availability of pirated music led many

23  people to believe that piracy was a victimless act and that

24  music should be free like air, despite the years of effort,

25  creativity and enormous investment that went into creating this

1   precious resource.

2          The industry tried to fight back.  It tried to educate

3   consumers about the investments it made in finding and

4   developing artists, the damage it was suffering from the

5   massive amount of Internet piracy and how critical it was that

6   artists get paid and that labels had a chance to recoup their

7   investments.  They tried to create new formats for music like

8   selling digital downloads.  And finally, it protected its

9   investments in court and sued the websites that were making the

10  infringing copies available.

11         And after years of effort and millions of expense, the

12  industry was able to shut down most of them, but then piracy

13  just shifted to a different system called peer-to-peer networks

14  where users share the recordings directly with each other

15  rather than downloading them from a central website.  So the

16  industry undertook another round of legal actions, and the

17  companies that ran those networks ultimately -- and you've

18  heard of many of them, Napster, Grokster, LimeWire, were

19  ultimately shut down after more -- millions and millions in

20  costs and years of effort.

21         But you can probably guess what happened next.  Piracy

22  morphed yet one more time into a more sophisticated form of

23  peer-to-peer piracy where there was no central company in the

24  middle.  Now, that might sound strange.  You wonder how that

25  could work, but in fact, it's really a pretty simple operation.

1    People would get software that was freely available on the

2    Internet and then directly copy from each other using a system

3    known as BitTorrent.  And in BitTorrent, there was no company

4    running the system.

5            Further, the users who were engaging in the copying on

6    the system were completely invisible to the outside world.  So

7    piracy flourished and the music industry continued to implode.

8    The only hope to address this piracy came from monitoring

9    companies that developed new technologies to infiltrate the

10   illegal component of BitTorrent.  Appearing to act as any other

11   user and identifying the users who were making an unlimited

12   number of unauthorized copies available to the world, these

13   companies made it possible to document specific infringements

14   that were occurring on BitTorrent.

15           But there was still a problem.  The actual infringers,

16   the actual identities of the infringers remained hidden because

17   on BitTorrent, users are only identified by their IP address.

18   And what's an IP address?  Probably most of you know that, but

19   it stands for Internet Protocol address and you will hear that

20   it's an identifying number given to Internet users.

21           Critically, users obtain their IP addresses from their

22   Internet service provider, the company like Grande, that

23   provides Internet service to its users.  And an Internet

24   service provider like Grande is the only party that can match

25   an IP address to the specific subscriber to whom it had

1    assigned that address.  The monitoring companies can't do that

2    matching, the record companies can't do that matching.  In

3    fact, only the ISP providing the Internet service has the

4    records necessary to match the IP addresses to specific

5    subscribers.

6           So when the monitoring companies found and documented

7    infringements on BitTorrent, they notified the only entity that

8    had power to do anything about it, the ISPs.  The monitoring

9    companies sent millions of notices of infringement to ISPs,

10   including Grande, telling them which IP addresses were

11   infringing, which songs they were infringing, and when they

12   were doing it.  Why?  Because as I said before, the ISP is the

13   only party with the ability to find out who those IP addresses

14   belong to.

15          That's simple, indisputable fact explains why we're

16   here and why this case is so important.  Since only the ISPs

17   can connect the infringing IP addresses to the infringing

18   users, they're the only party that can pass on the notices of

19   infringement to the users and take action if the infringement

20   doesn't stop.  And without their participation, there's

21   literally no way to address this rampant infringement.

22          And as I said earlier, for seven years, from 2010 to

23   2017, Grande took no action whatsoever to terminate any

24   subscriber who committed infringements using Grande's broadband

25   service and, instead, continued to provide that service to

1  those users to enable them to continue to infringe.

2         And what was happening in those seven years?  Grande

3  was receiving millions of infringement notices.  Indeed, they

4  received 1.3 million notices just from the monitoring company

5  that documented the infringements at issue here, a company

6  called Rightscorp.  And even though the notices demonstrated

7  thousands and thousands of infringers, some of them who

8  infringed more than hundreds and hundreds of times, Grande did

9  nothing to address this and instead continued to provide them

10  with service.

11         So now Grande has to face a case it could have easily

12  avoided.  A case in which plaintiffs will demonstrate the

13  infringement of over 1400 of their works that occurred only

14  because Grande provided broadband service to its infringers.  A

15  case where Grande received specific notices of the infringement

16  and did nothing, and a case in which Rightscorp not only sent

17  notices documenting the infringement, but also downloaded

18  unauthorized copies, usually multiple copies, of every one of

19  the works in suit from Grande subscribers.

20         And all of those downloads will be presented to you.

21  And these 1400 tracks include recognizable and commercially

22  successful recordings by the top stars in multiple genres from

23  country to rock to pop to rap.

24         Now, your first and foremost task here is determine

25  whether Grande is liable for the infringement committed by its

1   users.  As Judge Ezra will instruct you -- and he will instruct

2   you on the law -- the law has a doctrine called contributory

3   copyright infringement, which is the claim asserted here.

4   You'll hear more about that claim in detail when you get

5   instructions from the court.

6         But what we will prove in this case is that there was

7   direct infringement by Grande's users, and you'll see a

8   mountain of evidence on that point, that Grande provided

9   material contribution to those infringements in this case by

10  providing the very tools and mechanisms necessary for it to

11  happen, and that Grande knew about the infringements through

12  the mountain of notices it received.

13        While it's not relevant to whether Grande has

14  committed contributory infringement or to the plaintiff's

15  burden to prove our case that Grande is liable under this law,

16  the law has gone further and has specifically addressed the

17  issue of whether it's fair to apply this doctrine of

18  contributory infringement to ISPs.

19        A law called the DCMA, or Digital Millennium Copyright

20  Act was enacted more than 25 years ago to balance the needs of

21  content community, the creators of music, books, film and other

22  content, and the responsibility of the ISP communities.  And

23  that balancing resulted in a very good deal for the ISPs in two

24  specific ways.

25        First, it freed them from any obligation to monitor

1    infringement on their networks.  So there's no duty on any ISP

2    to snoop or police on its users.  Second, the ISPs got a safe

3    harbor defense, a get-out-of-jail-free card that protects them

4    from claims of contributory infringement for their users'

5    infringement.  But they get that safe harbor if, and only if,

6    they take a few simple steps, the most important of which, for

7    this case, is that an ISP must set up a reasonable policy for

8    addressing repeat infringement on its network and, when

9    appropriate, must terminate users who repeatedly infringe

10   copyrights.

11          Grande obviously knew and understood this, as they had

12   such a policy up until 2010.  And they did again after 2017.

13   But they didn't in the time period that is before you.  Given

14   that, it's hardly surprising that Grande is not eligible for

15   this safe harbor.  It does not get the get-out-of-jail-free

16   card, because between those seven years, Grande, by its own

17   admission, never implemented a policy for addressing and

18   terminating repeat infringers.  So given all of these

19   undisputed facts, it's eminently fair that Grande be forced to

20   face the music and defend against the claim of contributory

21   copyright infringement.

22          And as I said before, that claim rises or falls

23   depending on whether plaintiffs can prove the standards that

24   you'll hear from Judge Ezra, and the issue of whether Grande

25   qualified for the safe harbor is not a factor in deciding

1    whether plaintiffs have proven their case.

2              However, here there is evidence, and it's clear and

3    powerful.  Grande's users committed over a million detected

4    acts of infringement.  And Grande was specifically put on

5    notice of each of them.  And yet Grande continued to provide

6    each one of them with high-speed broadband Internet service.

7              So let's put this story back into the context of the

8    music industry, for this is a case where you as the jury will

9    have to engage in a little bit of time travel or memory game,

10   because the critical events in this case didn't happen in 2022

11   in Austin during Austin City Limits, it happened between 2010

12   and 2017 when Grande admittedly failed to address infringements

13   on its network.

14             And as I will describe later, the music industry at

15   that time was not the music industry of today.  It was an

16   industry in free-fall, hoping to find some way to stop the

17   hemorrhaging of jobs and money.  And in the midst of this

18   calamity, there was a company, Grande, that had had a robust

19   policy to address piracy on its network, but suddenly removed

20   that policy in order to reap economic benefits at the expense

21   of the music industry.

22             In essence, its owners opened the door to unlimited

23   infringement on its high-speed Internet broadband service

24   because they would get away with it.  And if the recording

25   industry, all the artists and the entire economy based on that

1    industry suffered, well, that wasn't their concern, even if the

2    company was based in the live music capital of the world, a

3    city that is an integral part of that industry.  And the damage

4    caused by that selfish decision is precisely the issue for you

5    in this trial.

6            So what will you hear at this trial?  You will hear

7    testimony from representatives of all three of the label groups

8    and the RIAA about the way the industry operates, its

9    partnership with artists, its investments, its risk taking and

10   accomplishments, how it generates revenue, and how it needs to

11   spend lots of money to generate that revenue, its desperate

12   attempts to recover from the tsunami of piracy that was

13   unleashed in the late 1990s and destroyed the business model of

14   the industry, the damage that piracy caused and the critical

15   role that ISPs play in any attempt to address infringement

16   using BitTorrent.

17           You'll hear testimony from Greg Boswell from

18   Rightscorp, one of the multiple monitoring companies that

19   documented the massive infringements going on in Grande, about

20   how monitoring companies are able to detect infringements, even

21   in the anonymous closed-door world of BitTorrent.  How they

22   pose as regular users of BitTorrent and make agreements with

23   other users called "handshakes" to download illegal copies of

24   copyrighted works.

25           He will explain that Rightscorp is reliable and their

1    notices are reliable, because it's built around the same tool

2    that's used by the BitTorrent system itself to run efficiently

3    and with reliability.  Digital fingerprints called hashes that

4    ensure that the songs and movies that users want are precisely

5    the ones that are copied, because only perfectly identical

6    recordings get the same hash.  Indeed, even microscopic changes

7    to a recording result in a different hash.  Rightscorp used

8    these same hashes to ensure that they were identifying the

9    infringements accurately and provided them.

10            And finally, Mr. Boswell will explain how Rightscorp

11   was able to eliminate all doubt about the accuracy of its work

12   by downloading at least one complete copy, and often many more,

13   from every one of the 1422 works in issue here from Grande's

14   users, and all those downloads will be in evidence in this

15   case.

16            You'll hear testimony from plaintiff's expert, Barbara

17   Frederiksen-Cross, who has over 39 years of experience as a

18   software developer and forensic software analyst, confirming

19   the reliability of the Rightscorp evidence, explaining how hash

20   matching ensures reliability, and attesting to the reliability

21   of the download evidence.

22            Then you will hear testimony from Grande's own

23   employees about how Grande had implemented a robust policy of

24   addressing infringements on its network and how that policy

25   worked.  Specifically, prior to 2010 when Grande received

1   notice that one of its users was engaged in copyright

2   infringement, Grande took appropriate escalating punitive

3   steps.  It sent e-mail and paper notices to its customers, and

4   it suspended the account of users until they called Grande to

5   talk through the issues.  And when appropriate, they terminated

6   users who continued to infringe.

7        You will even see and hear evidence from the Grande

8   employee who set up that system that he thought it worked well

9   and would have opposed any change to it.  However, as I

10  mentioned before, in 2009 Grande was bought by a Boston-based

11  private equity group that installed ABB to manage Grande.  And

12  in 2010, ABB abolished that policy.  And so the company

13  operated without any policy for addressing infringements on its

14  network for seven long years, the seven years before you in

15  this case.

16       Indeed, the only policy that Grande had during these

17  years was not to terminate any user for copyright infringement

18  no matter how many notices of infringement they received about

19  that users, and some subscribers were the subject of a

20  staggering number of notices.

21       This did not go unnoticed at Grande.  Indeed, you'll

22  see an e-mail from a Grande employee questioning whether a

23  system that allows users to accumulate such a large number of

24  infringement notices without any consequences was a broken

25  system, and another e-mail from another Grande employee asking

 1   whether Grande might lose its safe harbor defense under the

 2   DCMA as a result.

 3          And you will also hear how Grande slowly grew to

 4   realize that it had made a huge mistake.  And its actions

 5   during this period are hard to reconcile with the stories they

 6   will tell you at this trial.

 7          First, you will hear about how from 2014 on, Grande

 8   was monitoring a case very similar to this one.  It was filed

 9   by a music publishing company named BMG against an ISP called

10   Cox Communications, how BMG's case, like this case, was based

11   on notices from Rightscorp.  You will hear about how Grande

12   reacted in early 2016 after BMG won that case.

13          And two things stand out powerfully about Grande's

14   response.  The first is that instead of immediately recognizing

15   its error in implementing a proper policy for addressing

16   infringement by its users, Grande simply continued to ignore

17   the infringements on its network despite receiving notices

18   providing details about specific infringements, and continued

19   to provide broadband Internet to every infringer identified in

20   those notices.  Indeed, it didn't even make a cosmetic attempt

21   to address that infringement until after it was sued in this

22   case more than a year later.

23          And the second is that despite the critical role that

24   Rightscorp played in the Cox trial, Grande's conduct

25   immediately after the verdict showed that it had none of the

 1  concerns about reliability of Rightscorp's evidence, that

 2  defendants and their counsel will vehemently present to you

 3  after I'm done.

 4          As you will hear and see, shortly after the Grande

 5  verdict -- after the Cox verdict, excuse me, Grande realized

 6  that due to what it described as a technical glitch, it had

 7  never sent the Rightscorp notices it had received on to the

 8  infringing subscribers.  In response, it quickly devised a

 9  technical fix so that future Rightscorp notices could be

10  forwarded.  But then right there at that moment, Grande's

11  management decided to -- to use their term -- "suspend" fixing

12  the glitch.  So one might think that if Grande had any concerns

13  whatsoever about the reliability of the Rightscorp evidence,

14  the system, that concern would have surfaced then.  But nothing

15  of the kind happened.

16          After a short period, Grande started sending out the

17  Rightscorp notices to its infringing users.  Hardly the conduct

18  of a company that today professes to be so outraged by the

19  alleged unreliability of the Rightscorp system.  But a year

20  later, plaintiffs filed this action, and now the real

21  scrambling began.  Grande realized that it needed to both make

22  some token effort to address infringements by its users and to

23  come up with excuses for why the Rightscorp notices shouldn't

24  be sent.  And so they hired lawyers to come up with those

25  excuses for why it was okay that they did nothing in response

1   to the 1.3 million notices that they received from Rightscorp.

2           Why do I say that?  Because there are a number --

3   numerous fingerprints proving that Grande never doubted the

4   validity of Rightscorp notices until they were sued and had to

5   come up with excuses.

6           First, Grande admitted in this case that they never

7   did any technical evaluation of the Rightscorp system.  Second,

8   they rejected Rightscorp's overture for a meeting to discuss

9   Rightscorp's system and findings.  Third, there are e-mails

10  from Grande's employees showing that they believed that

11  infringement notices reflected actual infringements.  One said,

12  *Believe me, they know they did it*.

13          And fourth, even after the verdict in Cox based on

14  Rightscorp notices, they decided to forward the Rightscorp

15  notices to their subscribers, not alleging any of the alleged

16  infirmities that it now claims.

17          But, nonetheless, after they were sued, Grande

18  responded by terminating a handful of users and fabricated a

19  series of notices about why Rightscorp couldn't be trusted.

20  And you'll hear them all in this case, and they'll all be

21  presented forcefully as if they always represented Grande's

22  position.  But there are two fatal flaws in Grande's

23  narratives.

24          The first is, as a technical matter, they're all

25  frivolous, given the hash-matching and downloads of every work

1   in suit.  The second is that they're clearly all after-the-fact

2   excuses.  Even after the verdict in Cox, no one at Grande

3   raised any doubt about the validity of Rightscorp notices.

4   Grande knew that these reflected actual infringements.  And of

5   course they did.  They knew, as everyone knew, that these users

6   were infringing, and that the only reason that users made

7   libraries of music and film content available on BitTorrent was

8   to enable other users to make unauthorized copies of that

9   content.

10          Indeed, the entire premise of Grande's position in

11  this case that the notices don't reflect actual infringement

12  ignores the obvious and dispositive fact that BitTorrent users

13  who make massive files of music or movies available to the

14  world were constant and viral infringers.  No one doubts that

15  fact.  Yet Grande's entire case is premised on the empty

16  assumption that people who made vast libraries of content

17  available voluntarily on BitTorrent weren't infringing.

18          And after you hear about how the industry operates,

19  the impact of digital piracy on the industry, and the story of

20  how Grande took advantage of digital piracy to make profits at

21  the expense of the industry, the remainder of plaintiff's case

22  will consist of expert testimony providing further context for

23  your deliberations.

24          Specifically, you'll hear from Andy Bardwell, a

25  statistician, who analyzed the notices that Rightscorp sent to

OPENING STATEMENTS                    67

1   Grande, and will describe how many repeat infringers Grande

2   had.  You'll also hear from William Lehr, an economist, who

3   will testify about the harm that plaintiffs suffered and the

4   benefit that Grande received from the infringements; in

5   particular, how the damage is impossible to quantify because

6   BitTorrent infringements are viral, and every copy can be used

7   to create thousands of further infringements so that the

8   specific infringements identified by Rightscorp are only the

9   tip of the iceberg.

10          And you'll hear from Terry McGarty, a former

11  telecommunications industry executive, about how Grande had the

12  technical capabilities to address the infringement notices it

13  received and to comply with its obligations, but it didn't.

14          So what will you hear from Grande in this case?  A

15  series of excuses and finger-pointing in an attempt to deflect

16  attention from their plain and obvious liability.  First and

17  foremost, they blame Rightscorp.  Indeed, when you hear

18  Grande's case, you may well think that Rightscorp is the

19  defendant in this case, but when you hear their excuses, ask

20  yourself whether there's any evidence showing that Grande

21  doubted the accuracy of Rightscorp notices prior to the filing

22  of this suit.

23          Moreover, see if Grande has any response or rebuttal

24  to the hash-matching that provided the forensic security for

25  the Rightscorp system and identified over 1.3 million

1    infringements and downloaded infringing copies of each work

2    just to make sure.  Instead, they will argue that Rightscorp

3    should have kept more data relating to the infringements.  They

4    will try to characterize it as destruction of information,

5    because that sounds so inflammatory, but what they're really

6    saying is that Rightscorp was obligated to incur the

7    significant cost of maintaining data that was redundant and

8    unnecessary, given the hash-matching that underlies BitTorrent

9    and the Rightscorp system.

10         They will also raise a myriad of other technical

11   objections, none of which Grande had ever articulated before it

12   was sued and none of which is any rebuttal to the forensic

13   certainty of hash-matching and the belt-and-suspender support

14   provided by the infringing downloads.  And they'll try to

15   create a smokescreen by complaining about Rightscorp's business

16   practices, specifically the fact that in its notices,

17   Rightscorp offered the infringer the opportunity to settle the

18   claim for a small payment.

19         However, the only relevance of Rightscorp to this case

20   is its notices, not its business practices and, therefore, the

21   only issue you should need to consider is whether those

22   monitoring services are reliable, not whether you personally

23   like the business plan.  Moreover, as you will see, other

24   companies engaged in the same practice and Grande viewed such

25   practices as common in the industry and felt that they didn't

1   affect the reliability of notices.  Rather, they felt that the
2   notices themselves reflected actual infringement.
3          And they may make a series of equitable arguments
4   about how it's unfair to come after them despite their critical
5   role in facilitating the infringements and the refusal to take
6   any measures to mitigate the damage.  They'll say that they
7   couldn't investigate the allegations in the notices.  But ask
8   yourself, who asked them to do so?  Who asked them to be a
9   judge deciding the validity, particularly since they never
10  challenged the validity any time during the seven years that
11  we're talking about?
12         They will ask you, what do we do if we're confronted
13  by an infringement notice and a denial of infringement by the
14  user?  Well, that one is easy.  Ask them to show you the
15  evidence for any users who claim that they were innocent.  It
16  didn't happen.  And this, just like all the other arguments is
17  simply a smokescreen to hide their wrongful inactivity in the
18  face of massive infringement that happened only because they
19  continued to provide broadband service to infringing customers.
20         And as the evidence mounts and the proof of massive
21  infringement becomes overwhelming, some other questions may
22  emerge, such as, why is Grande taking the side of the
23  infringers instead of the artists who created the works that
24  are being stolen?  Who is asking the ISP to monitor its network
25  or snoop on its users?  Who is asking the ISP to vet or test

1  the reliability of the monitoring company?  Certainly, Grande

2  never did so.  And mostly, why is the ISP taking the side of

3  the infringer?

4          Indeed, why is Grande manufacturing a position for the

5  infringer that the infringer never asserted?

6          The only reason that Grande attacks Rightscorp and

7  acts like an avenger for infringers is that it concededly

8  failed to take the simple steps that would have allowed it to

9  avoid suits like this altogether, but it did more than that.

10  It simply turned a blind eye to the massive infringement on its

11  network because it felt that was someone else's problem.

12          But that's the very reason why the doctrine of

13  contributory infringement exists, to impose a duty on those who

14  provide the mechanisms for infringement, and then look the

15  other way when it occurs.

16          Grande blames others as well.  It blames Audible

17  Magic, the industry standard technology that matched the

18  downloads that Rightscorp had obtained from Grande's users to

19  the works in suit.  It blames the record companies for their

20  enforcement strategy.  It even blames its users, but it never

21  looks in the mirror and accepts responsibility for the fact

22  that it knew what its responsibilities were and simply

23  abdicated them.

24          The simple fact is that Grande knew what it was

25  supposed to do, and did it for years, and then abolished the

 1   policy, and allowed infringements to flourish for its own gain.

 2          In fact, in its current policies that it makes

 3   available on the website, Grande expressly announces to

 4   subscribers and to the public that it is -- and these are their

 5   words on their website, *"obligated under federal law to adopt,*

 6   *reasonably implement, and inform Internet subscribers of a*

 7   *policy for the termination in appropriate circumstances of*

 8   *Internet access subscribers who repeatedly violate the*

 9   *copyright laws."*  From the defendant's mouth.  So Grande knew

10   about its obligations both before 2010 and after 2017.  Somehow

11   there was some collective amnesia in the time in between, and

12   that's why we're here right now.

13          And perhaps most cynically, Grande may argue that

14   terminating users is too harsh because of peoples' reliance on

15   the Internet.  In essence, portraying itself as guardians of

16   the weak and helpless.  But if that happens, don't fall for

17   that trap.  Grande has no problem terminating users that don't

18   pay their bills.  You'll see evidence that they did that

19   thousands of times when their own finances were at stake.  It

20   simply doesn't want to lose a single penny to address damage

21   being done to someone else, in this case, the music industry in

22   a city where they operate is a vital part of that industry.

23          Three other quick points before I wrap this up.

24   First, as Judge Ezra will advise you, this is a civil case, and

25   so the plaintiffs merely need to prove their case by a

1    preponderance of the evidence.  You heard that from the

2    Magistrate Judge before you were sworn in as well.

3            So if you've heard in school or TV or on the Internet

4    that this need to prove a case beyond a reasonable doubt, that

5    doesn't apply here.  That only applies in criminal cases.

6            What does a preponderance mean?  Again, Judge Ezra

7    will give you the actual formulation, but it basically just

8    means that we need to prove that our case is more likely than

9    not.  We're confident that you'll have a much deeper level of

10   belief than that, but that's all that's necessary.

11           Second, damages in this case will be calculated under

12   the terms of the copyright act that provides what are known as

13   statutory damages.  The reason for statutory damages is that

14   often in copyright cases, it's impossible to quantify damages

15   precisely.  And so it considers a variety of factors in setting

16   a range for possible damages.  And again, Judge Ezra will

17   recite the list of factors for you.  And I won't address them

18   with you other than to say that in assessing statutory damages,

19   you look at -- and we will contend that you look in this case

20   at the circumstances of the infringement and the fact that

21   we're dealing with the operation of the BitTorrent ecosystem

22   where infringements don't occur without ISPs, where

23   infringements can't be identified without ISPs, where no action

24   can be taken against infringers without ISPs, and where the

25   infringements are inherently viral, and a single infringement

1    can become a separate distribution node and go on to create

2    thousands of additional infringements.

3         And we also will suggest to you that an award is

4    necessary to deter the defendant in this case because of its

5    willful conduct.  And you'll hear more about that during jury

6    instructions in this case as well.  But simply put, it just

7    continued to ignore repeated infringements on its network and,

8    in fact, the time period after it found out about the result in

9    the Cox case is a perfect example of why this particular

10   defendant needs to be deterred from future infringement,

11   because acting on their own, they simply don't care.

12        Third, as I mentioned before, you'll have to engage in

13   some time travel.  The financial situation of the recording

14   industry is stronger today than it was back in 2010 when Grande

15   opened up the flood gates to infringement.  That's a good

16   thing, but it doesn't give Grande a pass for the damage it did

17   during those years.

18        When our story starts back in 2010, the industry was

19   still in economic free-fall.  It was based upon an economic

20   model where people were possessing copies of recordings.  But

21   the availability of MP3 files in the late '90s destroyed that

22   model entirely and income continued to drop year after year

23   after year.  But there was a little ray of hope at this point.

24   New streaming services were just starting to appear, taking

25   advantage of the fact that the public were starting to carry

1  around smart phones, little portable computers in their pockets

2  that enabled them to take music everywhere.  And so now it was

3  possible to contemplate a musical business model based on

4  access to music instead of possession to music, and that was a

5  pivotal change in the music industry.

6          But it's that change, that transformation, struggle to

7  get a foothold for years.  The first early companies failed.

8  And even Spotify, when it opened up in the United States in

9  2011 struggled mightily and hemorrhaged money for the first few

10 years.  In fact, the prevalence of free, unauthorized music led

11 many people to believe that they didn't have to pay for music

12 at all and that all the investment was just an ongoing gift,

13 and frustrated and slowed down the transition to the model

14 where people can now access all the world's music through a

15 subscription.

16         So Spotify tried to address their losses, tried to get

17 a toehold, by operating a free service that was supported by

18 advertising dollars.  And at least in this way the industry was

19 continuing -- or starting to receive some compensation through

20 that advertising money.  And it was hoped that the free tiers

21 -- the free ad-supported tier, would convince many of those

22 users to -- that unlimited access to all the world's music was

23 worth subscribing to.

24         But during the seven years that are at issue in this

25 case, during the seven years when Grande had the collective

1    amnesia of what its obligations were after it repudiated its

2    policy and before it reinstituted it later, that was the time

3    period that it was very uncertain that this strategy would

4    work.

5            As I said before, Spotify was losing tons of money,

6    and Grande was making the job much more difficult by turning a

7    blind eye to the massive piracy on its network.

8            So yes, things did turn around.  Apple Music entered

9    the streaming market in 2015.  Things started to turn around,

10   so that by the time we're sitting here in 2022, the situation

11   is better, but it's still not better on an inflation-adjusted

12   basis than it was in 1999, 23 years ago.

13           But the important point is that during the time that

14   Grande was facilitating infringements, it imposed enormous

15   losses on the industry, losses for which it should have to

16   answer, and for which it has no defense.

17           So after you've seen all the evidence, I think certain

18   facts will be clear.  Grande once had a robust policy to

19   address infringement on its network, but abolished it to make

20   more money.  Multiple monitoring companies found mountains of

21   evidence of infringement on Grande's system, but Grande took no

22   action against a single user ever during that time and never

23   terminated a user for copyright infringement.

24           Rightscorp documented more than 1 million

25   infringements by Grande subscribers and sent more than a

 1   million notices during this period, and Grande didn't even

 2   forward them to the users.  The infringements noticed by

 3   Rightscorp were based on forensically reliable hash-matching

 4   that made error impossible.  Rightscorp backed all this up with

 5   downloads, further proving the infringements at issue.  And

 6   tellingly, Grande never raised a word of protest.  Never said

 7   any of the things that you're about to hear until after it got

 8   sued.  These are all after-the-fact excuses, when they

 9   understood they needed some rationale for ignoring the very

10   evidence that sustained the Cox verdict.

11           And that Grande defense in this case is, in fact,

12   nothing more than fictional narratives created after the fact.

13           Before I close, let me thank you again on behalf of

14   all plaintiffs for your service.  We understand the sacrifice

15   of jury service.  But this is a critical case for the music

16   industry and the artists it represents.  It's a privilege to be

17   here in Austin during Austin City Limits and to see the power

18   of music firsthand and to appreciate what a resource and

19   treasure it is for all of us and how it needs to be protected.

20           We appreciate your attention.  Thank you.

21           THE COURT:  All right.  We'll take about a five-minute

22   recess, let counsel get ready, and let the jury use the

23   restroom if you need to.  And then we'll come back, and it will

24   be counsel's opportunity to make his opening statement.

25           COURT SECURITY OFFICER:  All rise.

1          *(10:40 a.m., jury exits the courtroom.)*

2                              *   *   *

3          *(10:53 a.m.)*

4          COURT SECURITY OFFICER:  All rise.

5          THE COURT:  Please be seated.

6                              *   *   *

7          COURT SECURITY OFFICER:  All rise for the jury.

8          THE COURT:  All right.  Please be seated.

9          All right, ladies and gentlemen.  You're now going to

10   be hearing the opening statement by the counsel for Grande, and

11   he's going to be reintroducing himself.

12          MR. BROPHY:  Thank you, Your Honor.  Good late

13   morning, ladies and gentlemen.  I'm Richard Brophy.  We're

14   going to be proving two things in this case.  Number one, we're

15   going to prove the Rightscorp system is not legitimate and that

16   it sent false accusations of infringement.

17          Number two, we're going to prove Grande has no idea

18   what its customers are doing online, and so therefore, it

19   cannot knowingly facilitate music sharing.  I'm going to talk

20   about both those topics during my opening, but before then, I

21   want to make -- set the stage just a little bit.

22          This case is not about protecting musicians.  You're

23   not going to hear testimony from a single musical recording

24   artist during this entire trial.  This case also is not about

25   music sharing harming the record label's business.  You're

1   going to learn that the record labels will let anyone listen to

2   as much music as they want on Spotify for $9.99 a month.  In

3   fact, you're going to learn that it would cost less than

4   $200,000 to purchase a Spotify account for every single Grande

5   customer accused of sharing music in this case, and that would

6   let them listen to all the music that's going to be in this

7   lawsuit and plus much, much more, and they're going to be able

8   to listen to it continuously, 24 hours a day, seven days a week

9   for years.  Every accused customer for years for less than

10  $200,000.

11          You're going to learn in this case the record labels

12  are going to be asking you for as much as $200 million, one

13  thousand times as much money as it would cost to purchase every

14  single accused customer a Spotify account, a thousand times as

15  much.

16          You're going to learn this lawsuit is nothing more

17  than a money grab.  The record labels are going to come in here

18  and try to romanticize their industry, and they're going to try

19  to tug at your heartstrings by mentioning famous musicians.

20  This case is not about any of that.

21          The entire case that the record labels have here is a

22  lottery ticket that they purchased from the Rightscorp company,

23  and they're here in court hoping it's going to pay out.  We're

24  going to show you that lottery ticket is a loser.  Every single

25  allegation of infringement in this case is based on e-mails

1    sent by Rightscorp.

2         We're going to show you that for a decade or more the

3    record labels have known that Rightscorp is not a legitimate

4    business.  We're going to show you e-mails like this one, and

5    you can hopefully see it on the screen there also, in which

6    individuals from the record labels indicated they weren't going

7    to form a relationship with Rightscorp because they had

8    concerns about their methods, and they were put off by

9    Rightscorp's solicitation tactics.

10         You're also going to learn that the record labels

11   tried to affirmatively stop Rightscorp from doing what they

12   were doing and then wanted to distance themselves from the

13   company so no one thought they were in any way affiliated with

14   Rightscorp or the e-mails that they were sending.

15         As a result of that, you're going to learn the record

16   labels never hired Rightscorp to monitor a single song or to

17   send a single e-mail on their behalf, not one.  Despite all

18   that, you're going to learn that shortly before filing this

19   lawsuit, the record labels bought a bunch of Rightscorp e-mails

20   in bulk.  And they bought those e-mails in bulk for the sole

21   purpose of filing this lawsuit to try to fleece Grande for

22   money.

23         You see, during this trial, the record labels, they're

24   going to hope to trick you into thinking that the Rightscorp

25   accusations are legitimate, even though they've known for years

1   and years that they aren't, which is why they never worked with

2   them in the first place.

3          You're going to learn during this trial that

4   Rightscorp's business is failing.  It was a business model that

5   was built on volume and scare tactics.  Rightscorp's plan was

6   to manufacture as many e-mails as it possibly could and spew

7   them out there, hoping that people would be scared into paying

8   them money.  The more e-mails that Rightscorp sent, the more

9   money it stood to make.  You're going to learn Rightscorp

10  thought it could get away with this because it never expected

11  its e-mail accusations to see the inside of a courtroom.

12         You're going to see documents like this one.  This is

13  going to show you that Rightscorp purposefully designed its

14  business model to avoid having its accusations scrutinized in

15  court.  Rightscorp didn't want anyone peeking behind the

16  curtain.  Rightscorp purposefully asked for small amounts of

17  money, 20 or $30, to resolve the accusations that it sent.  And

18  the reason it asked for those small amounts is because no one

19  is going to file a lawsuit and go into court and dig into

20  Rightscorp's operations over $20 or a hundred dollars or $500.

21         But when Rightscorp's business model failed, they sold

22  their e-mails to the record labels for some quick cash, and now

23  the record labels are here, have filed this lawsuit, to try to

24  make some quick cash of their own.  But as a result,

25  Rightscorp's e-mails are now in court, and we are scrutinizing

OPENING STATEMENTS                    81

1   them and we're going to show you they don't hold any water.

2   We're going to show you during this trial, affirmatively, that

3   whole swaths of Rightscorp's accusations were false.

4          During this trial, Rightscorp is going to claim that

5   it reaches out and connects to computers and downloads

6   evidence.  Rightscorp is going to claim it scrutinizes that

7   evidence to look to see whether individual computers have music

8   and are sharing it.  Rightscorp is going to claim it sent

9   e-mails to Grande only when the evidence indicated that

10  computers were actually sharing music, because Rightscorp

11  wanted Grande to send those e-mails off to Grande subscribers,

12  who would then get scared and send Rightscorp money.

13         But you're going to learn Rightscorp wasn't really

14  inspecting the evidence the way they should have been.  You're

15  going to learn Rightscorp sent e-mail accusations of music

16  sharing even when they knew the individual computer was not

17  willing to share a single piece of music.  And even when they

18  knew the individual computer didn't even have the song in the

19  first place.

20         But even worse, you're going to learn Rightscorp

21  deleted all the evidence.  Every single packet of data that

22  Rightscorp claims it collected from an individual Grande

23  customer's computer is gone.  That is the evidence on which all

24  of Rightscorp's e-mail accusations are based.  But you see, if

25  the evidence doesn't exist, no one can look at the e-mails and

1    determine which ones are true and which ones are false and that

2    means Rightscorp can send as many e-mails as it wants and it

3    can try to collect more money.

4          Because Rightscorp deleted all the evidence, it is

5    impossible to identify each and every e-mail they sent that is

6    false.  But more importantly, it is equally impossible to prove

7    that a single e-mail that Rightscorp sent is true.  And this is

8    a big problem for the record label's case, because their entire

9    case is based on the e-mail accusations that Rightscorp sent.

10   There is not any evidence from a Grande customer to support a

11   single e-mail accusation that Rightscorp sent.

12         What I have on the screen is an e-mail accusation that

13   Rightscorp has sent.  And you can't read the small text, but

14   I've blown up part of it.  You will have the opportunity to

15   look at these documents during your deliberation in detail.

16   And frankly, you'll probably see more detail about some of

17   these throughout the trial.  But I've blown up the part that

18   shows the details of the accusation.

19         During this trial, the record labels will not be able

20   to show you any evidence from a Grande customer's computer

21   proving that the song Angel, by Aerosmith was shared with

22   anybody else.  They're not going to show you packets of

23   information from a Grande customer's computer.  They're not

24   going to show you packets from any other computer using that IP

25   address there, and they're not going to be able to show that

1    that song was shared on the date and time on this e-mail or any

2    other date or any other time.

3            All the record labels have in this case is a stack of

4    e-mails that Rightscorp sent.  And then they're going to trot

5    somebody in from Rightscorp, a guy named Greg Boswell, he's the

6    programmer.  And the record labels are paying him to come here

7    and say, Trust me, we had evidence.  We don't have it anymore,

8    but trust me, we had evidence.

9            Accusations will not be enough to prove the record

10   label's case and they can't show you any actual evidence

11   because it doesn't exist.  Rightscorp either never had it in

12   the first place or they purposefully deleted it.

13           At this trial, the record labels are going to try to

14   convince you that Rightscorp's system is perfect, that it's

15   flawless, that every single e-mail Rightscorp sent proves an

16   individual Grande customer actually shared music.  They don't

17   have any evidence to show that to you, not a single shred from

18   a single Grande customer.  And we're going to show you hundreds

19   and hundreds of instances in which the accusations are

20   affirmatively wrong.

21           But it's important to bear in mind this lawsuit does

22   not accuse a single Grande employee of actually sharing music.

23   The only accusation is that Grande's customers shared music.

24   And so the problems with Rightscorp's system and the false

25   accusations it was sending, they're only half the story.

1           In this case, the record labels will tell you that

2     because Grande received these e-mail accusations, that Grande's

3     employees knew, actually knew, didn't suspect, didn't believe,

4     but actually knew that its customers were sharing music with

5     others.

6           Ladies and gentlemen, that's dead wrong.  We're going

7     to explore throughout this morning, what's left of it, and

8     throughout the trial, that knowing about an accusation is not

9     the same thing as knowing that an accusation is true.  And this

10    leads to the first key question of the day.  I'm going to be

11    posing a couple key questions during my opening.  You're

12    welcome to write these down.  You don't have to.  I think you

13    have notepads, but these questions we think are very important

14    to consider throughout the trial and during your deliberations.

15          And the first question I'm going to ask is:  Can

16    Grande investigate or verify Rightscorp's accusations?  You're

17    going to learn during this trial Grande has no way to

18    investigate the accusations and no way to verify that a single

19    e-mail accusation it received from Rightscorp is true or false.

20          Now, most of you probably already know this, but

21    companies like Grande only connect people to the Internet.

22    Grande is a delivery service and its job is to move packets of

23    information between its customers' computers and other

24    computers that are on the Internet.  To be clear, Grande is not

25    the Internet.  I realize that seems basic, but some people

 1   don't understand that fully, so Grande is just providing a

 2   connection to the Internet.  And Grande's people will testify

 3   under oath at this trial that they do not know and do not track

 4   what their customers are searching for online, what

 5   advertisements they've received from the Internet or what

 6   websites they're visiting.

 7          And the record labels will not be able to show you a

 8   single document indicating that Grande's employees monitor what

 9   their customers do on the Internet.  None of those documents

10   exist.  They're not going to be able to show them to you

11   because Grande doesn't do it.  Grande acts like the Post

12   Office.  The Post Office moves letters back and forth between

13   houses.  It does not open your mail or read it.  Grande moves

14   packets back and forth between computers.  It doesn't open

15   them, and it doesn't read them.

16          During this trial, Grande's employees are going to

17   acknowledge that music sharing happens on the Internet.  We all

18   know it does.  But Grande can't see what its individual

19   customers are doing online.  And for that reason, they don't

20   know whether individual customers are sharing music or not.

21   And that's the fundamental issue you're going to learn about in

22   this case.  Grande doesn't spy on its customers or know what

23   messages its customers are sending to other people and so it

24   cannot know whether an individual accusation against an

25   individual customer is true or false.

1          During this trial, Grande's employees are also going

2     to agree they received a bunch of e-mails from Rightscorp.  But

3     you're going to learn those e-mails don't prove Grande knew

4     individual customers were sharing music, only that they knew

5     someone said they were.  The e-mails are not evidence.  And

6     they're certainly not proof, and there was no way for Grande to

7     validate or investigate them.

8          And bear in mind, you're going to learn all these

9     e-mails came from Rightscorp, who was in the business of

10    manufacturing and sending as many accusations as it possibly

11    could to try to make money.  It's going to be vital throughout

12    this case for you to draw a strong line between knowing about

13    an accusation and knowing that an accusation is true.

14         The record labels are going to try to confuse you on

15    that point.  Please don't let them trick you.  Knowing about an

16    accusation is not the same thing as knowing that it's true.

17         At this moment, each of you knows I'm wearing a tie.

18    You also know you're sitting in a courtroom.  Those aren't

19    accusations, not beliefs.  You know it's true because you're

20    sitting here and you're observing my tie and the courtroom.

21         Well, what if I told you the juror sitting next to you

22    ran a red light this morning?  What if I sent you an e-mail or

23    a hundred e-mails accusing your fellow juror of running a red

24    light?  And what if in those e-mails I put details?  They ran

25    it right at 8th and Congress, and they did it at 8:25 a.m.

 1   That doesn't mean you know they ran the red light.  That means

 2   you know I accused them of running the red light.

 3          But I could also show you pictures of the individual

 4   running the red light in their car at 8:25 a.m.  If I could

 5   prove that the pictures were legitimate and hadn't been

 6   doctored, they would then be the evidence that supports the

 7   accusation that someone ran the red light.

 8          We're going to show you that here Rightscorp sent a

 9   bunch of accusations, a whole bunch, bunches and bunches, but

10   not a single shred of evidence.  We're going to show you during

11   this trial that they didn't send that evidence because they

12   don't have any of that evidence.  None of it exists.

13   Rightscorp's notices are designed to look very official to

14   scare people into paying money.  But these accusations are so

15   disconnected from reality, they can't be used to determine when

16   or even whether any song was ever shared.

17          Got a little red pointer here, this fancy set of

18   numbers and letters at the top.  That did not come from a

19   Grande subscriber.  That was manufactured by Rightscorp.  It

20   was randomly generated by its system.  The same goes for the

21   file name.  That didn't come from a Grande customer either.

22   You're going to learn Rightscorp had that information days,

23   weeks, months or even years before they sent this e-mail.

24          The same goes for the IP address.  That didn't come

25   from a Grande customer either.  In fact, you're going to see

1   Rightscorp's own documents and they're going to indicate that

2   back when this music sharing was taking place, most of it

3   occurred because someone else was connecting to your Internet.

4           So who exactly is accused here?  Is it Grande's

5   customer?  Is it their partner or their children or the

6   neighbor across the street?  How is Grande supposed to know

7   what the accusation is and how is Grande supposed to

8   investigate those accusations to know whether they're true or

9   not?

10          Going back to the e-mail, this date and time here,

11  you're going to learn that's not the date and time a single

12  song was sent.  Rightscorp is going to admit that.  It's the

13  date and time the Rightscorp programmer hit "go" on his

14  program, not when the music song was shared.  These e-mails do

15  not contain any smoking gun, anything equivalent to the picture

16  of the person running the red light that would be evidence to

17  support an accusation.  These e-mails are only accusations.

18  There is no evidence included.

19          You're going to hear testimony from the CEO of

20  Rightscorp during this trial.  And he is going to admit in his

21  testimony he does not know how Grande or anyone else could

22  validate the e-mail accusations his own company sends.

23          I want you to take a moment to let that sink in.  The

24  CEO of Rightscorp will admit he doesn't know of a way for

25  Grande to validate the e-mails that his company sent.

1    Rightscorp's e-mails don't include evidence, and even if they
2    did, Grande would need some way to validate that evidence to
3    verify whether the accusation is true or false.

4          You're going to learn Grande had no way of doing that.
5    And that's because the Internet provides a private
6    communication channel.  And you're going to learn Grande
7    doesn't spy on its customers.  And you're going to learn Grande
8    also isn't the FBI.  Grande's employees are going to testify
9    they can't kick down peoples' doors, take their computers and
10   scan them for illegal activity.

11         By the same token, you're going to learn that Grande
12   doesn't have the power to investigate Rightscorp, to look at
13   its documents or dig into how its system operates.  We're also
14   going to show you that even if Grande could do those things and
15   acts like law enforcement and collect all this evidence, Grande
16   also isn't a court.  It doesn't have the ability to weigh facts
17   and evidence from Rightscorp on the one hand and from the
18   customer on the other to determine who is telling the truth and
19   who isn't.

20         As I'm going to discuss in a little bit here, you're
21   going to learn that whenever Grande received an accusation of
22   music sharing from one of its customers, it would send a paper
23   letter to that customer to let them know about the accusation.

24         And you're going to learn that customers would call in
25   confused by the accusations against them.  You're going to hear

 1   from one of our witnesses who talked to one of those people

 2   directly and he's going to say they swear they did nothing

 3   wrong.  How is Grande supposed to know who is telling the

 4   truth?  Is it Rightscorp with their e-mail accusations?  Is it

 5   the subscriber who calls in swearing they didn't do anything

 6   wrong?

 7           Remember throughout this trial, Grande is in the

 8   business of providing Internet service.  It's not in the

 9   business of collecting evidence or deciding innocence and

10   guilt.  And you're going to learn law enforcement has never

11   been involved in this dispute.  And no court has ever

12   determined that a single Grande customer, for which these

13   notices were sent, was guilty of sharing music.  Think about

14   that.

15           You're going to learn all we have is these e-mail

16   accusations from Rightscorp.  And who the heck is Rightscorp

17   anyway?  They're not working with any law enforcement body.

18   It's a guy in a room named Greg Boswell hitting "go" on a

19   program, sending e-mails, trying to scare people into paying

20   money.

21           During this trial, you're going to learn Grande is

22   just stuck in the middle.  Greg Boswell in his room is making

23   an accusation.  The customer calls Grande and says, I have no

24   idea what this accusation is all about.  And Grande is stuck in

25   the middle with absolutely no way of knowing whether the

1   accusation is true or false.  Knowing about an accusation is

2   not the same thing as knowing that it's true.

3           Now, typically, with this kind of dispute, you would

4   have someone make an accusation, and then they present evidence

5   to support that accusation.  And then the individual accused

6   would have the opportunity to defend themselves, to present

7   evidence of their own, and all of that information would go to

8   the Court.  And the Court would weigh that evidence and

9   determine whether the individual is innocent or guilty.  And if

10  the Court determines that individual is guilty, then the Court

11  decides on the punishment, the Court decides.

12          During the trial, the record labels are going to argue

13  you should just ignore this process.  Let's skip right from the

14  accusation and let's go directly to the punishment.  The record

15  labels will argue Grande should have blindly accepted

16  Rightscorp's e-mail accusations as true, should have assumed

17  every single citizen that they accused of doing something wrong

18  actually did it and that Grande should have automatically

19  punished all those people with permanent Internet disconnection

20  for their entire household.

21          It's easy for the record labels to point fingers and

22  say that Grande should have shut of a bunch of peoples'

23  Internet.  They aren't the ones stuck in the situation of

24  trying to decide who is right and who is wrong, who is telling

25  the truth and who isn't.  They also aren't the ones being

1   targeted by Rightscorp and they aren't the ones who have the

2   threat of losing their Internet connectivity.

3           We're going to show you during this trial the record

4   label's case is an attempt to throw innocent until proven

5   guilty right out the window.  They don't think people should

6   have the benefit of the doubt.  They don't think people should

7   have the opportunity to defends themselves, to face their

8   accusers or to present evidence of their innocence.  And

9   because Grande didn't blindly dole out these punishments, the

10  record labels will argue Grande itself should be punished.

11          Throughout this trial, think about whether the record

12  label's position is rational.

13          Another key question.  Did Grande really act like an

14  accomplice?  In Mr. Bart's opening, you heard some pretty

15  charged allegations against Grande and its people.  Throughout

16  this trial, the record labels are going to argue that we've

17  compromised our values.  And that we knowingly participated in

18  helping people engage in music sharing.  But as the Court will

19  instruct you -- and I think already has -- what we say up here

20  is not evidence.  The actual evidence comes during the trial in

21  the form of documents and testimony from the actual witnesses.

22  And you're going to hear from Grande's witnesses and you're

23  going to understand that the allegations that have been levied

24  against Grande and its people are nothing but hot air.

25          During this trial, you're going to hear from Grande's

1   employees directly, people that worked and lived in this

2   community, like Lamar Horton who is the head of operations.

3   You're going to learn that he and the other folks at Grande are

4   just people trying to make a living, trying to do a job to

5   provide quality service and Internet connection for people here

6   in Texas.

7          Now, during this trial, the record labels are going to

8   show you e-mails between various Grande employees and they're

9   going to try to twist those e-mails into admissions that

10  Grande's people actually knew Rightscorp's accusations were

11  true.  But that will be the record labels grasping at straws.

12  You're going to learn it is literally impossible to know

13  whether Grande's accusations are true.  Literally impossible.

14         Throughout this trial, please listen to Grande's

15  witnesses' testimony, not the arguments by the record labels'

16  attorneys.

17         By the end of this trial, you're going to know

18  Grande's people are not villains or accomplices.  We're going

19  to show you they're just caught in the middle of a dispute

20  between two third parties with no way of knowing whether the

21  accusation is true or false.

22         During this trial, you're also going to learn that for

23  years Grande did what it thought was the right thing to do

24  under the circumstances.  Grande has a team of people whose job

25  it is to process these accusations of infringement that it

1    receives.  They process the e-mails and they also field phone

2    calls from individuals who call in who are accused of sharing

3    music.  You're going to learn Grande isn't ignoring these

4    accusations.  It just doesn't know whether they're true or

5    false.

6           And so when Grande receives an accusation, it sends a

7    paper letter to the individual customer telling them that

8    someone accused them of sharing music.  The letter tried to

9    educate the customer on what the accusation was all about, what

10   steps they could take to try to secure their wireless networks,

11   and how to look for file-sharing software on family computers.

12   These letters provided recommendations for who to contact at

13   Grande for help in investigating the accusations.

14          Now, this is a lengthy letter, and you can't see most

15   of it.  You'll have the opportunity to review it in full, but

16   these letters and the other evidence that you're going to see

17   during this trial will prove Grande's employees were not

18   accomplices.  They were not knowingly or intentionally

19   assisting music sharers.  They were doing the exact opposite.

20   They were trying to help people stop music sharing if it was

21   taking place.

22          During this trial, you're also going to learn that

23   Grande has started terminating customers based on accusations

24   of music sharing from companies other than Rightscorp.  You're

25   going to learn this is not something Grande wants to do.  But

1   you're going to learn Grande is being forced to take those

2   measures, forced to terminate people based on mere accusations,

3   because the record labels are filing lawsuits like this one.

4   And you're going to be in the privileged position of deciding

5   whether termination programs like the one Grande was forced to

6   implement are necessary.

7         Another key question, the big one:  Are Rightscorp's

8   e-mails truthful?  During the period of time that Grande was

9   receiving these accusations, these e-mails from Rightscorp, it

10  didn't have the ability to dig into Rightscorp's system.

11  You're going to learn that during this trial.  But during this

12  lawsuit, Grande's attorneys, me and my colleagues, and our

13  hired experts, we were given access to Rightscorp's secret

14  source code and its internal documents.  We're going to show

15  you some of those materials and they're going to prove Grande

16  was right not to blindly assume that all of Rightscorp's

17  accusations were legitimate.

18        During this trial, we're going to show you that even

19  if Rightscorp's system operated exactly as Rightscorp claims --

20  and I say "claims," because you're going to learn no one

21  actually knows how the Rightscorp system worked.  But if it

22  worked as Rightscorp claims, we're going to show you its

23  accusations were false.  To understand the flaws of the system,

24  you have to learn just a little bit about how the Rightscorp

25  system operates.

1          You're going to learn during this trial that

2    Rightscorp and the record labels will claim Rightscorp reached

3    out to something called a tracker and pulled down a list of

4    computers allegedly engaged in sharing of music.  And

5    Rightscorp and the record labels are going to claim that

6    Rightscorp went through that list one by one connecting to the

7    computers on the Internet to have a conversation with them.

8    Rightscorp is going to claim it did this to determine whether

9    those computers had songs and were sharing them.

10         Now, there's lots of data that goes back and forth

11   during these conversations.  I'm not going to bore you with it

12   all, but there are two pieces of information that I'm going to

13   highlight that you're going learn about during this trial that

14   we think are important.

15         The first piece of information is a bit field.  A bit

16   field is a piece of data that indicates whether a computer on

17   the Internet actually has a song or not.  The bit field

18   indicates whether the computer has the song.  The second piece

19   of data is the choke.  The choke data indicates whether the

20   computer is willing to share the song.  Bit field is whether

21   you have it, choke is whether you'll share it.  And Rightscorp

22   will claim it connects to computers and pulled this evidence

23   down.

24         Rightscorp is going to claim it analyzed that

25   evidence, and only when the evidence indicated someone had the

1   music and was sharing it, they're going to claim they sent an

2   e-mail.  We've got a blowup of that e-mail.  This is a

3   different part of it.  This is the part that highlights the

4   various accusations that were made.  Rightscorp makes three

5   accusations in this e-mail.  We caught you downloading,

6   uploading or offering to upload a song.

7          We're going to talk about each of those.  First with

8   the download.  Maybe all of you know this, but a download is

9   when you have a file somewhere on the Internet and you pluck it

10  through the Internet down to your own computer.  That's a

11  download.  Now, Rightscorp sent e-mails accusing people of

12  downloading songs.  But you're going to learn Rightscorp's

13  people are going to admit during this trial their system can't

14  detect people downloading songs.

15         The CEO of Rightscorp will admit during this trial, we

16  don't monitor for downloads.  Now, he's going to say, We don't

17  choose to monitor for downloads.  But you're going to learn

18  Rightscorp can't detect downloads.  Can't monitor for them.

19  It's impossible.  Rightscorp sends e-mails accusing people of

20  downloading songs.  Their own people are going to admit they

21  can't detect that.

22         What about uploading?  As you probably already know,

23  uploading is the opposite of downloads.  It's where a file goes

24  from your computer somewhere else through the Internet.  That's

25  an upload.  Rightscorp sent e-mails accusing people of

1    uploading songs.  You're going to learn Rightscorp's system

2    can't detect people uploading songs.

3            You're going to hear from Greg Boswell, the programmer

4    for Rightscorp, and he's going to admit Rightscorp doesn't have

5    any information about the sharing of payloads, songs, with

6    other people.  Rightscorp sends out e-mails indicating it

7    caught someone uploading a song.  When you dig into Rightscorp,

8    they don't detect people uploading songs.

9            What about the third one?  The third of the three, an

10   offer for upload.  An offer for upload is like an upload that

11   never happens.  Your computer has the song, you say you're

12   willing to share it, but it doesn't ever go anywhere, no copy

13   is made.  Rightscorp accused people of offering to share songs.

14   We're going to show you Rightscorp accused people of sharing

15   songs even when it was told they weren't willing to share

16   songs.  You see, sometimes the Rightscorp computer would reach

17   out and say, Hey, I want to talk about a song.  And to be cute,

18   we're going to use the song Happy Birthday here.  And the

19   computer says, Okay, what do you want to know?  Rightscorp

20   says, Will you share the song with me?  And the computer says,

21   No.

22           Now, these are computers talking, not humans, so they

23   don't say, Do you have a song, and No.  But instead, that

24   computer is going to send back choke data indicating whether

25   that computer is willing to share the song file or not.

1          Now, what happens in the Rightscorp system when it

2    receives evidence in the form of choke data indicating that

3    that computer isn't willing to share the song?  Rightscorp

4    accuses that person of sharing the song, generates an e-mail

5    and sends it off to Grande.  It just got evidence in the form

6    of choke data indicating that computer isn't willing to share

7    the song and it sent the e-mail anyway.

8          Greg Boswell, programmer for Rightscorp, again, you're

9    going to hear from him and he's going say, Rightscorp ignores

10   the choke data.  Rightscorp doesn't care whether the computer

11   is willing to share the song or not.  It is going to send

12   e-mails, so off they go.  Three accusations in the e-mail.

13         We're going to show you that all three of those are

14   not legitimate.  Those are the only three.

15         Well, we're going to show you that Rightscorp even

16   sent e-mails when it knew the individual didn't even have the

17   song in the first place.  Sometimes the Rightscorp computer

18   would reach out and say, I want to talk about that song Happy

19   Birthday.  And the computer would say, What do you want to

20   know?  Rightscorp would ask, Do you have the song?  The

21   computer says, No, don't got it, can't give it to you.

22         Essentially, what's going on here, once again, because

23   they're not talking English, is the bit field data from that

24   customer computer was sent back to Rightscorp and indicated

25   that computer doesn't have the song.  The bit field said no

1    song here.

2           What does Rightscorp do when it gets that information?

3    Well, it accuses that person of having the song and sharing it.

4    Fires an e-mail right off to Grande.

5           We're going to show you Rightscorp designed its system

6    this way to make more money.  We're going to show you

7    Rightscorp wasn't in the business of accurately detecting and

8    documenting instances of music sharing.  Rightscorp was in the

9    business of sending scam e-mails to make money.

10          You're also going to learn during this trial the

11   record labels knew about it.  You're going to see e-mails like

12   this one where the record labels indicate Rightscorp is milking

13   people for money.  They're going to try to block the activity

14   and distance themselves from Rightscorp because they don't want

15   anything to do with what's going on at Rightscorp.

16          Another key question.  What do the record labels

17   consider to be legitimate evidence of music sharing?  You're

18   going to learn during this trial that for years the record

19   labels have used another company to conduct their detection.

20   To be crystal clear, this case is not about any e-mails sent

21   from that company, not one.  This case is only about e-mails

22   sent from Rightscorp.  But during this litigation, we obtained

23   documents that indicate and reflect what the record labels

24   require their own monitoring company to collect and save to

25   document instances of music sharing before they accuse someone

1    of sharing music.  These contracts will prove to you that the

2    record labels require evidence to be collected and saved, not

3    ignored and not deleted.

4              We're going to show you documents like this one

5    indicating that the record labels require evidence packages.

6    And those evidence packages, you're going to learn, include all

7    the packets of data transmitted back and forth between the

8    monitoring company and the computer in question, including the

9    bit field and choke data that I discussed with you earlier.

10   These evidence packages are the equivalent of the pictures of

11   the person going through the red light.  They're the evidence

12   that supports the accusation in the e-mail.

13             We're going to show you the record labels care so

14   dearly about these evidence packages, the collecting and saving

15   evidence, that they go to the trouble of listing out all the

16   individual evidence they require to be collected and saved to

17   substantiate an accusation of music sharing.  This includes

18   things like a log of all the steps of the investigation, the

19   dates and time stamps; and number four, that all-important bit

20   field that indicates whether the computer even has the song in

21   the first place.

22             But here comes another key question.  Once you learn

23   at this trial what the record labels require as far as evidence

24   to be collected and saved, the next logical question is going

25   to be What evidence can they show you to indicate that

1    Rightscorp's accusations are legitimate?

2            You're going to learn during this trial Rightscorp did

3    the exact opposite of what the record labels require.  They

4    didn't collect and save evidence of music sharing.  You're

5    going to learn they trashed everything, if they ever had it in

6    the first place.

7            Putting back up that list of evidence required by the

8    record labels.  You're going to hear from the lead programmer

9    at Rightscorp and he's going to admit they don't retain a log

10   of all the steps of their investigation with dates and time

11   stamps.  He's going to say -- admit they don't log all the

12   control communications.  He's going to claim he doesn't even

13   know what those are.  You're going to learn those are the

14   packets that go back and forth between the monitoring company

15   and the computer.  They don't keep them.

16           You're going to learn he doesn't keep traceroute data.

17   Traceroute data is what shows all the computers that the

18   packets pass between when they go from one computer to the

19   other on the internet, to prove that the monitoring company

20   actually connected to that computer and talked to it.  They

21   don't have that stuff.

22           Those bit fields.  The programmer is going to claim he

23   collected those bit fields and then he's going to tell you he

24   deleted them.  They don't store it.  He's going to say they

25   don't take screen shots, they don't have any of the other

 1    evidence that the record labels affirmatively require in their

 2    evidence packages.

 3         The record labels are going to tell you during this

 4    trial Rightscorp collected to that tracker and pulled down that

 5    list of computers participating in the network sharing songs.

 6    And they're going to tell you Grande's computers -- Grande's

 7    customers' computers were on that list.  And then they're going

 8    to tell you Rightscorp reached out to all these computers and

 9    had conversations with them to determine whether they had songs

10    and were willing to share them.  That means they exchanged

11    packets and they collected bit field data and choke data.

12         Can they show you any of this evidence at this trial?

13    Absolutely not.  You're not going to see a single list pulled

14    down from a tracker identifying all the computers on a network

15    sharing music.  And you're not going to see any Grande's

16    customers' computers on that list.  Gone.  You're not going to

17    see a single packet of data that passed back and forth between

18    a Grande customer's computer and the Rightscorp system.  Gone.

19    No bit fields indicating that an individual computer had the

20    song in question.  Gone.  The choke flag indicating whether the

21    computer was willing to share the song.  Gone.

22         Throughout this case, you should ask yourselves why

23    did Rightscorp get rid of all this extremely important

24    evidence?  And did they ever even have it in the first place?

25    Without any evidence, there's no way of knowing whether

1  individual Rightscorp accusations are true or false.  The

2  evidence that supports the accusation is gone.

3        The record labels will have the burden of proving that

4  these accusations are true.  It's not going to be our burden to

5  prove they're false.  It's going to be their burden to prove

6  these accusations are true, and they won't be able to do it

7  because they don't have any evidence, because Rightscorp either

8  deleted it or never had it in the first place.

9        We're going to show you that for years, the record

10  labels didn't want anything to do with Rightscorp.  Suddenly,

11  now, when there's money on the line, they're all buddy-buddy

12  with Rightscorp and they want you to think that Rightscorp's

13  system and the accusations that it sent are beyond reproach,

14  that they're faultless, that they're perfect.  The evidence is

15  going to show that isn't the case.  Far from it.

16        Another key question -- and I'm going to change the

17  topic a little bit here -- is the record labels' download story

18  credible?  At this trial, the record labels are going to argue

19  that Rightscorp's accusations are true because Rightscorp went

20  out to Grande customers' computers and plucked songs and

21  downloaded them.  First and foremost, you're going to learn

22  none of that information made it to Grande.  Rightscorp didn't

23  tell Grande it had downloaded any songs and didn't provide

24  evidence of any of those songs.  If Rightscorp didn't send it,

25  Grande can't know about it.

1            But even more importantly, we're going to show you

2    Rightscorp didn't send any of that evidence because it didn't

3    have any of that evidence.

4            You're going to learn during this trial there is not

5    evidence that Rightscorp ever connected to a single Grande

6    customer's computer or downloaded a single song from it.  They

7    don't have a single packet of information to show you to prove

8    that they ever connected to a Grande customer's computer.

9            They're going to claim that Rightscorp had a set of

10   download targets, right, a list of computers that Rightscorp

11   was going to go out to the Internet and try to download songs

12   from.  And they're going to claim they had download

13   communications.  They talked to each of those computers as part

14   of the process of pulling those songs down, and they're going

15   to admit to you that in some instances the download didn't

16   work.  They couldn't get the song in question.

17           Does Rightscorp have any of this evidence?  You're

18   going to learn they don't.  Rightscorp is not going to show you

19   a single list of the computers that they tried to download

20   songs from.  They're not going to show you a single

21   communication with a single Grande Internet customer's computer

22   where they actually downloaded a song, and they're not going to

23   show you -- they're certainly not going to show you instances

24   in which they tried and failed to download the song.  You see,

25   if the evidence doesn't exist, no one can determine how often

1   Rightscorp reached out and accused someone of sharing music,

2   but then when they connected to the computer, they couldn't

3   download the song they accused the person of sharing.  All you

4   will see at this trial is a list of songs, and they're going to

5   cart in the guy from Rightscorp, Greg Boswell, to say, Trust

6   me, I got this stuff from Grande's computers.

7          But there will not be any evidence of that other than

8   his say-so.  No documentation, no computer data.  Just, Trust

9   me, it happened.

10          The download story is also going to be bad for the

11   record labels because Rightscorp doesn't even claim to have

12   downloaded a song from all the customers they accused of

13   sharing music.  You're going to learn that in total Rightscorp

14   accused roughly 9,000 Grande customers of sharing music, but

15   they're only going to even claim they could download a song

16   from 492 of them.  That's their best day, 492.  That leaves

17   roughly 8500 Grande customers accused of music sharing.  And

18   the Rightscorp folks aren't even going to claim they could get

19   a download from them.

20          Now, you're going to hear argument that because they

21   downloaded songs from 492 of them or so, they claim, that means

22   that the 8988 accusations are true.  That's not going to make

23   any sense.  But even if we were to assume for a moment that

24   those downloads did take place, notwithstanding the fact that

25   they're not going to be able to show you any evidence, you're

JURY TRIAL PROCEEDINGS                    107

1  going to learn there are tons of instances in which Rightscorp

2  claims it went out to get the song and got something else.

3         Here is an example of an e-mail Rightscorp sent

4  accusing someone of sharing You Know You're Right by Nirvana.

5  And you heard about hashes earlier during the plaintiff's

6  opening statement and how they're perfect.  Rightscorp

7  downloaded a picture that says Nirvana.  And this didn't happen

8  once or twice or ten times or a hundred times.  It happened

9  1200 times, and those are just the instances that we know

10 about.

11        Put simply, the download story that you hear from the

12 record labels is going to prove even further that Rightscorp's

13 system is fundamentally flawed.  You're going to know that the

14 Rightscorp system is unreliable and that its e-mail accusations

15 are inaccurate.

16        By the end of this trial, you're going to know

17 Rightscorp's system deleted evidence and generated false

18 accusations of music sharing.  You're going to know that

19 because Rightscorp deleted that evidence, the record labels

20 can't prove that Rightscorp's accusations are true.  You're

21 going to know Grande has no way to investigate Rightscorp's

22 accusations or what its subscribers are doing, and you're going

23 to know that Grande did not knowingly or intentionally

24 facilitate music sharing.

25        At the end of this trial, we're going to ask you for a

 1   verdict in favor of Grande Communications.  And I genuinely

 2   thank you for your patience throughout this trial.  Thank you.

 3             THE COURT:  All right.  Thank you very much.  Well,

 4   it's about a quarter to 12, not really enough time for us to

 5   get plaintiff's first witness up here, get them sworn, and get

 6   started.  As soon as we did that, we'd have to recess.  So we

 7   will see you back in the jury lounge at about 1:20 or so.

 8             Please remember not to discuss this matter among

 9   yourselves or among anyone else you come in contact with just

10   as Judge Howell earlier instructed you.  Thank you.  You can be

11   excused.

12             COURT SECURITY OFFICER:  All rise for the jury.

13             *(11:44 a.m., jury exits the courtroom.)*

14                             *   *   *

15             THE COURT:  Okay.  The jury is departed.  Counsel, is

16   there anything else that you would like to address with me?

17             MR. GILMORE:  Yes, Your Honor, one evidentiary issue.

18   Robert Gilmore for the plaintiffs.

19             THE COURT:  Yes.

20             MR. GILMORE:  So, we have three exhibits that are

21   compilations of copyright registration documentation, and we're

22   going to start introducing them I think with the next witness

23   from Sony, Mr. Walker.  And they are part of our evidence to

24   prove the statutory elements for our works in suit to be

25   eligible for statutory damages.  They don't go to ownership,

1    since Your Honor already ruled they're ownership, but they're

2    simply to show the date of registration and publication.

3           And Grande has stipulated to the copyright

4    registration certificates themselves, but the compilations for

5    some works also include printouts from the Government Copyright

6    Office.  And we understand Grande isn't going -- is either

7    objecting or not willing to stipulate to them.  But numerous

8    courts have held that courts can take judicial notice under

9    Rule 201 of a printout from a government office and,

10   particularly, these kinds of printouts from the copyright

11   website that reflect this information that is judiciously

12   noticeable.  I have several case cites, but we think those

13   should be admissible.

14          THE COURT:  All right.  Just a minute.

15          Is there any suggestion that they're not legitimate?

16          MR. HOWENSTINE:  Well, the issue is not one of

17   legitimacy, Your Honor, but just the foundation or relevance of

18   things other than the copyright registration certificates.  We

19   understand they want to introduce these certificates.  That's

20   fine.  We don't have an issue with that.  We don't understand

21   what purpose or relevance or what foundation they could lay to

22   introduce basically searches they ran on the copyright office

23   website.

24          THE COURT:  If they acknowledge that the copyright is

25   valid and you have the copyright, why do you want to put the

1   other material in?

2           MR. GILMORE:  I think that the -- in some instances,

3   the information from the copyright website has the relevant

4   information for date of registration and publication, and I

5   think in some instances --

6           THE COURT:  That isn't in the copyright notice itself?

7           MR. GILMORE:  Well, maybe not the complete information

8   for certain of the copyright registrations.  It's a relatively

9   small number, but the -- I have several case cites that --

10  where courts have held that --

11          THE COURT:  The point is I certainly understand, I can

12  take judicial notice of that.  I don't need a bunch of case

13  cites for that.  The question is whether it's necessary.  I

14  mean, I'm not seeing the need for it, to be honest with you.

15          MR. GILMORE:  Well, the information is not -- it is

16  relevant for the statutory criteria under Section 412 to

17  establish eligibility for the copyright -- sorry -- eligibility

18  for statutory damages, just for the --

19          THE COURT:  They don't -- that's for the copyright,

20  but they don't dispute that you hold the copyright.

21          MR. GILMORE:  It doesn't get to ownership.  It's

22  certain dates, so the eligibility under Section 412 is

23  triggered off of --

24          THE COURT:  Well, if you have and can show that the

25  copyrights themselves don't have the dates that you need and

1   this other material does have the dates that you need, and

2   there's no question about the authenticity of it, then I have

3   no problem with that.  But I'm not going to let it in wholesale

4   just because somebody wants something with an eagle on it.

5              MR. GILMORE:  That's certainly not the reason why.  It

6   is only the specific information that is shown on the Copyright

7   Office website on registration and publication dates that are

8   relevant for the eligibility for 412.

9              Again, I don't think that these are a matter of

10  debate, but we just want to put the evidentiary proof in.  And

11  our witnesses are familiar with this information, they work

12  with this daily as part of their business, so...

13             MR. HOWENSTINE:  Your Honor, this is a copyright

14  infringement case, obviously.  In order for them to sue for

15  infringement, they need a registered copyright.  I believe what

16  Mr. Gilmore is saying is that they do not have all the

17  certificates of registration for their copyrights.

18             THE COURT:  Is that true?

19             MR. GILMORE:  It may be true for -- with respect to

20  certain copyrights, or -- but I think the actual relevance is

21  not as to ownership which, again, has been established, but the

22  specific dates for eligibility for statutory damages, that the

23  dates of registration itself and publication.

24             THE COURT:  You two are talking past each other,

25  unfortunately.  He is saying that you don't have the copyright

```
 1    registration certificate for these, that you want to put in
 2    other material.  And you're saying I don't know what.
 3              MR. GILMORE:  Well --
 4              THE COURT:  Either you do or you don't?
 5              MR. GILMORE:  -- I am saying that either --
 6              THE COURT:  This is a yes, we have it, or no, we don't
 7    have it.
 8              MR. GILMORE:  I believe that maybe for certain number
 9    of works that we don't have the actual copy of the registration
10    certificate itself --
11              THE COURT:  Okay.
12              MR. GILMORE:  -- for purposes of showing the
13    information for 412 analysis.
14              THE COURT:  And then in lieu of that, you want to put
15    in evidence?
16              MR. GILMORE:  That's right, in lieu of the evidence in
17    the certificate itself.
18              THE COURT:  I know that's right.  What is it?
19              MR. GILMORE:  It is a printout from the Copyright
20    Office website that shows the dates that are relevant for
21    statutory damages eligibility.
22              THE COURT:  Does it show that the copyright exists?
23              MR. GILMORE:  Oh, yes.  I'm sorry.  It's a record of
24    the copyright, of the work, the copyright, the registration
25    number.  It has all that information in there.  And relevant
```

1   for the purpose we're introducing it, has the registration

2   dates itself.

3          THE COURT:  All right.  If there's no dispute that it

4   comes from the Copyright Office and there's no dispute that

5   they own the copyright, I do not have an issue with them

6   putting that in.

7          MR. HOWENSTINE:  Your Honor, I would suggest the issue

8   is perhaps not necessarily with putting them in, but with

9   whether that is sufficient or not.

10          THE COURT:  Well, that's an entirely new argument

11   you're making here now.

12          MR. HOWENSTINE:  Right.  If they can lay a foundation

13   for the searches that were done, you know, that's fine.

14   Presumably, we won't object to that.

15          THE COURT:  I'm assuming -- I was assuming that there

16   was no dispute that they owned the copyright, but when you

17   raised the argument, well, is that sufficient, that sounds to

18   me like an attack on the validity of the copyright.

19          MR. HOWENSTINE:  Well, they intend to introduce the

20   registration certificates for a separate purpose, which is to

21   show the publication dates and the registration dates of the

22   copyright.  Because to prove that their works are eligible for

23   statutory damages, they have to prove that those dates line up

24   with the dates of infringement --

25          THE COURT:  Of course.

1          MR. HOWENSTINE:  -- so that's the reason they want to

2    put the registration certificates in.

3          THE COURT:  I'm going to say it again.  If the

4    information comes directly from the Copyright Office of the

5    United States and they can authenticate that they've got that

6    information, then I will take judicial notice of it, unless

7    there is some question as to whether what they've done is

8    legitimate.  And if you don't have that evidence, then your

9    argument doesn't stand.

10          MR. HOWENSTINE:  Yeah.  We are not questioning the

11    searches.  We may dispute the information that is in those

12    documents, and I think we're entitled to do that.

13          THE COURT:  Yes.

14          MR. HOWENSTINE:  But we won't contest those being

15    admitted into evidence, assuming they can lay the proper

16    foundation, as they say they're going to.

17          THE COURT:  Well, all right.  I don't know what we're

18    arguing about.

19          MR. GILMORE:  Then I gather we have no dispute.  That

20    was our intent.

21          THE COURT:  Okay.  Now we're at five to 12.  All

22    right.  Then I'm having a hard time figuring out what that was

23    all about, but anyway.  Maybe I'm missing something here.

24          MR. BART:  Your Honor, if I may, I'm missing something

25    too.  Because basically we all understand that the dates of

 1    publication and registration are relevant to the 412 statutory

 2    analysis.

 3              THE COURT:  Absolutely.

 4              MR. BART:  We have printouts from the Copyright

 5    Office, regular records of the Copyright Office providing that

 6    information.  I don't know what foundation is being referred

 7    to.  They have not articulated any basis for doubting or

 8    challenging that, unless they're saying that we somehow

 9    manipulated -- which I can't imagine they're saying.

10              THE COURT:  That's what I just asked, and he said no.

11              MR. BART:  Okay.  Well, then, shouldn't they just be

12    admitted, period?

13              THE COURT:  I thought so.

14              MR. BART:  Okay.  Thank you.

15              THE COURT:  I think that's what I said.

16              COURTROOM DEPUTY CLERK:  What numbers are they?

17              THE COURT:  Somebody needs to tell my courtroom

18    manager what the numbers are.

19              MR. BART:  Thank you.

20              THE COURT:  Have a good lunch.

21              COURT SECURITY OFFICER:  All rise.

22         *(11:55 a.m., lunch recess.)*

23                              *   *   *

24         *(1:26 p.m.)*

25              COURT SECURITY OFFICER:  All rise for the jury.

1              (Whereupon the jury enters the courtroom.)

2                            *   *   *

3         COURT SECURITY OFFICER:  All rise.

4              (Whereupon the judge enters the courtroom.)

5         THE COURT:  Please be seated.  All right, ladies and

6    gentlemen.  You heard all of the opening statements, and now we

7    will get right into evidence.  Do they have pads?

8         COURTROOM DEPUTY CLERK:  They should, yes.

9         THE COURT:  Do you have pads?  Okay.  You can start

10   taking notes if you wish.  Now, I want to remind you that

11   there's no requirement that you take notes.  You can take notes

12   as much or as little as you'd like.  Just remember, however, if

13   you do take any notes, those notes are not to be shared with

14   anyone, including your fellow jurors and are solely for your

15   use in helping you to recollect the evidence.  Okay?

16        All right.  Counsel.

17        MR. BART:  Thank you, Your Honor.  Plaintiffs call

18   Jeff Walker to the stand.

19        THE COURT:  Okay.  Just as a matter of -- I don't

20   think I mentioned this, counsel.  Generally, on Friday we will

21   try to end right around 3:30, if we can.  Getting out of

22   Manhattan on Friday afternoon is a nightmare.  Getting out of

23   Austin, as my jurors will tell you, on Friday afternoon, is

24   worse.  It's worse.  Believe me.  It's bad, the traffic around

25   here, or at least as bad.

1          MR. BART:  Fair enough.

2          THE COURT:  So they'll never get home if we don't get

3     them out of here.

4          COURTROOM DEPUTY CLERK:  Please remain standing and

5     raise your right hand.

6          You do solemnly swear that the testimony you're about

7     to give in this case now before the Court will be the truth,

8     the whole truth and nothing but the truth, so help you God?

9          THE WITNESS:  I do.

10                         *   *   *

11          (JEFF WALKER, Plaintiff Witness, Sworn.)

12                         *   *   *

13          COURTROOM DEPUTY CLERK:  You can have a seat.

14          THE COURT:  You may proceed at your pleasure, counsel.

15          MR. BART:  Thank you, Your Honor.

16                    DIRECT EXAMINATION

17     BY MR. BART:

18     Q.  Good morning, Mr. Walker.  Can you identify yourself to the

19     jury, please.

20     A.  Hi.  My name is Jeff Walker.

21     Q.  Move the mike in front of you.  Want to try now?

22     A.  Yes.  I'm Jeff Walker.

23     Q.  By whom are you employed?

24     A.  Sony Music Entertainment.

25     Q.  And what is Sony Music Entertainment?

1   A.   Is's a U.S. record company.

2   Q.   And what's your current title there?

3   A.   I'm executive vice president and head of legal affairs for

4   the global digital business.

5   Q.   Okay.  And what does Sony Music Entertainment do?

6   A.   We develop talent and help artists create music that we

7   make available to the world and we market and promote it and

8   distribute it on their behalf.

9   Q.   Is Sony Music Entertainment a plaintiff in this case?

10   A.   Yes, it is.

11   Q.   And is it affiliated with any other plaintiffs in this

12   case?

13   A.   Yes.

14   Q.   And which ones?

15   A.   I believe it's Arista Music, Arista Records, LLC, LaFace

16   Records, LLC, and Samba Recording, LLC.

17   Q.   And what is the relationship between Sony Music

18   Entertainment and those entities?

19   A.   We're technically sister companies.  We all report into

20   Sony Music Group.

21   Q.   And what do those companies do?

22   A.   They primarily -- the four companies I mentioned primarily

23   hold catalog, but we also have label divisions like Arista and

24   Sony Music Entertainment.

25   Q.   But it all operates within the same group?

1   A.  We all operate -- yes, we all operate as one company.

2   Q.  And what is that operating company?

3   A.  Sorry, Sony Music Group.

4   Q.  Did you assist in preparing a demonstrative exhibit that

5   identifies the Sony companies that are plaintiffs in this suit?

6   A.  I did.

7          MR. BART:  Your Honor, permission to show this

8   demonstrative to the jury, please?

9          THE COURT:  You may.

10  BY MR. BART:

11  Q.  And what does this demonstrative show, Mr. Walker?

12  A.  It's showing the logos of the companies that are

13  participating in the lawsuit.

14  Q.  The Sony companies?

15  A.  The Sony companies, I'm sorry.

16  Q.  That's all right.  And would you understand if I refer to

17  them as the Sony plaintiffs?

18  A.  Yes.

19  Q.  Are there other plaintiffs in this case as well?

20  A.  Yes.  Universal Music Group and Warner Music Group.

21  Q.  Is there any descriptive term that is applied to the three

22  of those music groups, Sony, Universal and Warner?

23  A.  Yes.  We're generally known as the major record labels.

24  Q.  Okay.  And why are they called the major record labels?

25  A.  We're the biggest record companies in the world.  We have

1   roughly 80 percent of the U.S. market in terms of the market

2   share.

3   Q.   Okay.  And how do you know that?

4   A.   We get reporting from Nielsen SoundScan.

5   Q.   Do you use SoundScan in your regular business?

6   A.   Yes.

7   Q.   What is the primary product of these record companies?

8   A.   Sound recordings.

9   Q.   And what are sound recordings?

10  A.   Sound recordings, they're music.  They're the finished

11  product that the artist delivers to the record company that's

12  made available commercially through distribution channels.

13  Q.   Let's shift for a minute and talk about your own personal

14  background.  Did you attend college?

15  A.   I did.  I graduated from Dartmouth College in 1984.

16  Q.   And what did you do after college?

17  A.   I went to law school at Harvard and I graduated in 1988.

18  Q.   And after law school?

19  A.   I worked as a corporate associate in a private firm.

20  Q.   For about how long?

21  A.   For about three years.

22  Q.   And what happened next?

23  A.   I took a job --

24  Q.   This is your life.

25  A.   I took a job at Sony Music Entertainment in 1991.

Jeff Walker - Examination                    121

1   Q.   Okay.  And what was that job?

2   A.   Initially, I was counsel in the Law Department.

3   Q.   And what were your responsibilities in the Law Department?

4   A.   I drafted agreements for all the Sony Music divisions.  So

5   the Classical Division, the U.S. record labels, the music

6   publishing company, video, whatever division needed --

7   Q.   What type of contracts were you drafting?

8   A.   Recording agreements, publishing agreements.  That's

9   generally it.

10  Q.   Okay.  And did you move on from the law or Legal Department

11  at some point?

12  A.   Yes.  In 1993, I moved to the Business Affairs Department

13  for the U.S. record labels.

14  Q.   So at that point you were just on the record side?

15  A.   Correct.

16  Q.   And what were your responsibilities when you moved over to

17  Business Affairs?

18  A.   We negotiated the terms of the agreements with the artists

19  and their representatives.

20  Q.   Okay.  Now, earlier when you were talking about your

21  responsibilities in the Law Department, you mentioned music

22  publishing.  Can you tell me what that is?

23  A.   Sure.  So music publishing administers rights in musical

24  compositions, which are the song.

25  Q.   And what do you differentiate the composition from?

1   A.  From the sound recording.  The example I typically give to

2   junior lawyers is that it's Whitney Houston, I Will Always Love

3   You, because most people know it's a seminal song, and they

4   know that Whitney made it famous, but Dolly Parton is the

5   songwriter.  She recorded a country version, which is also

6   great, but Dolly Parton controls the rights in the song, the

7   musical composition, and Whitney Houston's recording is owned

8   by Sony Music.  We're her record company.

9   Q.  So when you're talking about a composition, you're talking

10  music and lyrics, the underlying --

11  A.  Yes.

12  Q.  Are they covered by the same copyright?

13  A.  No.  They're two distinct copyrights under copyright law.

14  Q.  And does the record company typically own the copyright in

15  both of those products, the sound recording and the

16  composition?

17  A.  No.  Typically, recorded music companies own sound

18  recordings and music company -- sorry, music publishing

19  companies administer, or own, musical compositions.

20  Q.  Okay.  Can you give me an example of a music publishing

21  company?

22  A.  Sure.  I mean, Sony Music has a music publishing affiliate,

23  which is Sony Music Publishing.  Each of the major label groups

24  has a publishing affiliate, but there are literally thousands

25  and thousands of publishing companies.  There are lots of

1  artists who write their own material, who have -- who control

2  their publishing, for example.  They're all independent

3  publishers.

4  Q.  Okay.  So what was your next job after you left the Sony

5  recorded music division?  I think that's where we were last.

6  A.  Sure.  So I -- in 1995, I left Sony to go to RCA Records as

7  head of business and legal affairs at RCA.

8  Q.  So I take it that at that point in the mid-nineties RCA was

9  not part of Sony?

10 A.  That's right.  At the time, RCA was owned by BMG Music,

11 which was at the time one of the six major record labels.

12 Q.  So in the mid-nineties, there were six major record labels?

13 A.  Yes.

14 Q.  And there are three now?

15 A.  Right.

16 Q.  What were some of RCA's artists at the time that you were

17 working there?

18 A.  While I was there, we signed Christina Aguilera.  I worked

19 very hard on a deal with the Foo Fighters.  We also worked with

20 lots of artists who had already been signed to the label like

21 Dave Matthews Band, ZZ Top.  And we also worked closely with

22 the catalog team, so Elvis Presley, John Denver, Glen Miller,

23 The State and, you know, the Pointer Sisters.  It's a really

24 varied catalog.

25 Q.  And what were your responsibilities at RCA?

Jeff Walker - Examination                    124

1   A.  I oversaw the Legal Affairs Department, so we were

2   negotiating, hand-drafting the agreements with the artists and

3   other creatives.

4   Q.  Okay.  How long did you stay at RCA?

5   A.  Roughly eight years.

6   Q.  And what did you do next?

7   A.  In about 2002 -- 2003, I left.  There was some tumult, and

8   I left to go into private practice.

9   Q.  When you say "tumult," is that tumult at RCA, tumult in the

10  industry, some other tumult?

11  A.  Meaning I left my job.  We were -- we were basically let

12  go, and I went into private practice and represented artists

13  and songwriters and independent labels.

14  Q.  And how long did you remain in your own practice, your

15  independent practice?

16  A.  A little more than a year.

17  Q.  Until about 2004?

18  A.  Yes.

19  Q.  And what happened then?

20  A.  BMG called and asked if I wanted to come back in another

21  role as head of the business and legal affairs team for North

22  America, the North American Division.

23  Q.  And how long were you in that role?

24  A.  Two months.

25  Q.  Two months?

1    A.   Yes.

2    Q.   What happened then?

3    A.   Two months after I came back to BMG, it was announced that

4    Sony Music Entertainment and BMG Music were going to merge.

5    Q.   And how did that affect you?

6    A.   Well, as the companies consolidated, I was offered a role

7    back on the Sony side as head of business and legal affairs of

8    the Columbia/Epic label group.

9    Q.   And can you tell me a little bit about the Columbia/Epic

10   label group at that point?

11   A.   Sure.   It was the -- it's basically the New York labels of

12   Sony Music Entertainment, so not including Nashville or Miami.

13   Q.   Okay.   And what is Columbia Records?

14   A.   Columbia Records is one of the most iconic record labels

15   ever.   It's also the oldest surviving record company in the

16   world.

17   Q.   When did it start?

18   A.   1889.

19   Q.   And can you give us a short list of their most famous

20   recording artists, Columbia's?

21   A.   Yeah.   I hesitate to say the most famous because there are

22   many, many, but Johnny Cash, Willie Nelson, Miles Davis, Billie

23   Holiday, Janice Joplin.   I'm trying to stick with the classics.

24   Q.   That's fine.   And who are some of the artists who were

25   under contract at Columbia/Epic at the time you were there?

1    A.   Sure.  Well, The Chicks for one.  I understand they're

2    performing here this weekend.  But Adele, Beyonce, Bob Dylan,

3    Bruce Springsteen, Celine Dion, AC/DC.  There's many, many

4    artists.  Lauren Hill.  A lot of artists.

5    Q.   And what were your responsibilities when you were in the

6    business and Legal Affairs Department?

7    A.   It was a similar role.  I was the head of business and

8    legal affairs overseeing the team that drafted and negotiated

9    the agreements with the artists.

10   Q.   So you were negotiating directly with artists and their

11   managers?

12   A.   Yes, yes.  I mean, we engage with artists periodically, but

13   it's primarily through their managers and their lawyers.  And

14   managers can be just as big a personality as the artist.  So

15   Sharon Osborne, for example, is Ozzie Osborne's wife and his

16   manager, and she's a hoot.  And Beyonce, while I was in this

17   role, was managed by her father, Matthew Knowles, who is a

18   fantastic manager.  And I flew to Texas to meet with him and to

19   try to close deals on occasion.

20   Q.   What happened next in your career?

21   A.   So in roughly 2010, I was offered a role as head of

22   business and legal affairs for the digital team at Sony Music

23   Entertainment.

24   Q.   And are you still in that role?

25   A.   I am.

Jeff Walker - Examination                    127

1   Q.  And what's your title in that role?

2   A.  I'm executive vice president and head of the Business and

3   Legal Affairs Department for the global digital business at

4   Sony.

5   Q.  And can you give us a little description of what your

6   responsibilities are in that role?

7   A.  Sure.  So I help develop the digital strategy for the

8   company and manage -- help manage the relationships with our

9   digital partners as well as overseeing the negotiation and the

10  drafting of the agreements with those partners.

11  Q.  Do you have any responsibilities vis-a-vis the content

12  protection team of that company?

13  A.  Yes.  The content protection team at Sony Music reports in

14  to me.

15  Q.  But you don't literally run it, correct?

16  A.  No, no.  I'm involved in setting priorities and strategy.

17  And generally, I look at content protection more from the lens

18  of development and, you know, relationship development with

19  TSPs.

20  Q.  Can you give us a little bit of a description of that last

21  answer.  When you say you look at content protection in terms

22  of business development, what do you mean by that?

23  A.  So there are lots of platforms.  I mean, part of our job

24  is -- in strategy is trying to figure out how we want the music

25  business to evolve, right?  Where the business is going,

1    because in the past the business sort of got away from us.  So

2    we think very, you know, intentionally about companies that we

3    may want to partner with.  And content protection plays a role

4    in that, particularly as it relates to social media platforms

5    where we may have to send take-downs to make sure that our

6    content stays off the platform, that sort of thing.

7    Q.  Well, when you say business development, is that business

8    development as opposed to some other facet of content

9    protection?

10   A.  Well, I'm not involved in the day-to-day details of piracy;

11   for example, antipiracy, and their work on that front.

12   Q.  You're looking for developing potential new digital

13   partners?

14   A.  Yes.

15   Q.  What do you think, from this long career in the music

16   industry, what is most important to you about the music

17   industry in the United States?

18   A.  Well, I mean, the music industry, we're one of the great

19   American businesses.  We -- our output is very culturally

20   significant.  Pop music from America is -- you know, it's known

21   all over the world.  We represent a huge -- more than

22   50 percent of the music that's consumed around the world.  It's

23   a very special industry.

24   Q.  Okay.  And where in this country is the music industry

25   located?

1   A.  Well, I mean, great music comes from everywhere.  We all

2   know that.  And artists come from everywhere.  The business is

3   -- there are hubs around the world -- I'm sorry, around the

4   country.  New York, L.A., and everywhere in between.  If we say

5   Nashville, for example, you'll think country music.  If you

6   think of Detroit, you'll think of Motown, and Seattle is

7   grunge.  New Orleans is jazz and blues, and Austin, you think

8   of live music.

9   Q.  And what are the music industry's connections here?

10  A.  Well, the music industry is very involved in supporting the

11  Austin music scene.  Everyone knows that Austin is the live

12  music capital of the U.S.  So we're definitely embedded in

13  supporting the industry here.

14  Q.  Have you ever released recordings from Austin-based

15  artists?

16  A.  Sure, sure.  Willie Nelson is an Austin artist.  Janice

17  Joplin went to UT Austin and performed here a lot in her early

18  career.  Artists like Stevie Ray Vaughan.  There are lots of

19  Austin-based artists.

20  Q.  And more generally from Texas?

21  A.  Sure.  So I mentioned The Chicks and Beyonce.  They're

22  Texas artists.  Maren Morris, Miranda Lambert, Roy Orbison.

23  There are a lot of Texas-based artists.

24  Q.  Have you had an opportunity to become familiar with Sony

25  sound recordings that are a part of this case?

1    A.  Yes.

2    Q.  Do you know how many of Sony sound recordings are at issue

3    in this case?

4    A.  Yes.  I believe it's 453.

5    Q.  Did you get a chance to look at the list of songs that were

6    involved in this case?

7    A.  I did.

8    Q.  Did you have any particular connection to any of them?

9    A.  I did.  I mean, the list of recordings, I mean, they're

10   really great recordings.  One of the recordings that was on the

11   list is a recording that I recently talked to my daughter

12   about.  She's -- she's been struggling a bit.  She's on her

13   varsity volleyball team, and I've been talking to her about

14   using music as a tool to sort of beat out, when she's beating

15   herself up, when she makes a mistake on the court, like, just

16   use it to, like, push the bad thoughts away.  And the song she

17   chose was Destiny's Child Survivor, which is one of the songs

18   that's on the list.

19   Q.  Did you participate with Sony in creating a medley that

20   gives some examples of the works at issue in this case?

21   A.  Yes, I did.

22        MR. BART:  Your Honor, permission to play a short

23   medley of the Sony works at issue for the jury.

24        *(Music playing.)*

25                              *  *  *

1  BY MR. BART:

2  Q.  Can you tell me, Mr. Walker, why you wanted to play that

3  for the jury?

4  A.  Sure.  I think it's important to understand what art is at

5  issue and how important and special those recordings are.  Each

6  of the artists at issue that we just played has been damaged by

7  the defendant's behavior in this case, and that damage is

8  massive.  It's not small, because of the viral nature of

9  BitTorrent and peer-to-peer and, you know, what's happened in

10 this case.

11 Q.  Now I'd like to shift gears a little bit and ask you some

12 questions about how a record company like Sony operates.  Can

13 you tell me what the core business model is of a record

14 company.

15 A.  Sure.  We identify artists.  We try to support them in

16 creating music.  We sign them, and we market and promote their

17 recordings and distribute them.

18 Q.  How does a record company obtain sound recordings?

19 A.  Generally through working directly with artists who we

20 sign.  On occasion, we may acquire recordings that are already

21 finished.

22 Q.  Like buying a catalog or something?

23 A.  Right.

24 Q.  If a record company does, in fact, work with an artist to

25 create a recording through that general process that you

1  described, can you take us through that?  What's the first step
2  in that process?
3  A.  Well, the first step is identifying the artist, right?
4  It's -- that process is driven by our A&R team who go out and
5  find talent.
6  Q.  When you say A&R, what are you referring to?
7  A.  The A&R stands for artist and repertoire.  That's the
8  department -- they're the creative partners of the artist.
9  Q.  And what is the importance of the A&R Department to a
10  record company?
11  A.  It's vitally important.  Any record company that is going
12  to succeed, it succeeds based on the artist and the music that
13  it creates, so the success is entirely driven by the front end
14  of the process.
15  Q.  And how does the A&R Department discover artists?
16  A.  All sorts of ways.  I mean, these days social media plays a
17  big role.  They look at artist presence on different sites.
18  They also go scouting old-school to just live performances, and
19  they get lots and lots of demo recordings that they listen to,
20  but basically anywhere they can find talent is where they will
21  find the talent.
22  Q.  And does the A&R team sign many of the artists that it
23  scouts?
24  A.  No, no.  I mean, of the -- typically, my observation was
25  that each A&R person would sign maybe one or two artists a

1    year.

2    Q.  And does Sony have an A&R scouting presence here in Austin?

3    A.  Yes.  I mean, we will certainly scout here in Austin.  I

4    mean, when I was at RCA Records, we would sometimes schedule

5    A&R meetings here in town.  And during the day, we would do

6    roster reviews and go through every artist and their progress.

7    And then in the evenings, we would all go to shows, and A&R

8    people would be looking for new talent.

9    Q.  And does A&R stay with the artist or remain involved in the

10   evolution and development of the artist's career after they're

11   signed?

12   A.  Yes, so A&R is the creative partner within the company for

13   the artist, and they will -- they'll work with them

14   indefinitely.  I mean, their role will change as the artist

15   evolves and develops and matures.

16   Q.  Okay.  Is A&R a particularly risky part of the business?

17   Does it involve a lot of uncertainty?

18   A.  Yes.  I mean, it's -- we believe in all the artists we

19   sign.  I mean, they're all extremely talented people, but you

20   know, I don't think any record company has a hit rate that is,

21   you know, probably higher than ten percent.  I mean, it's --

22   and most of the artists we sign don't succeed despite our

23   efforts to, you know, help them cross that line.

24   Q.  Do you as a record company have any expectation or

25   awareness of whether something is going to be a hit before it's

1  released?

2  A.  No.  There is no crystal ball.  And we -- you know, I can't

3  tell you how many artists I've personally gotten attached to

4  who I believed, you know, were so talented -- and they were --

5  and had fantastical albums, and for whatever reason, it just

6  didn't happen.

7  Q.  And does every recording that's released by a record

8  company make a profit?

9  A.  No, no, not by a long shot.  It's -- so the way our model

10  works is essentially that the products that do succeed cover

11  the costs, which are fairly extensive, for all -- for

12  investment in all of the artists.  It's a risky business.

13  Q.  Now, once A&R has identified an artist that it wants to

14  sign, what's the next step in the process?

15  A.  They will secure approval from the label management to sign

16  the act, and then they'll come to the business and legal

17  affairs team to discuss, you know, what a deal might look like

18  and turn it over to us.

19  Q.  To negotiate it?

20  A.  Exactly.

21  Q.  And in the general case -- and, obviously, there are

22  variations, but in the general case, what does the record

23  company get as its basic consideration value that the record

24  company gets out of a recording agreement?

25  A.  So we're looking for the artist to deliver recordings to

1   us.  Typically, in the recording agreement, we will be granted

2   ownership of the copyrights in the recordings, which is the

3   primary transfer of rights in the contract, but that's not

4   always the case.  There are increasingly deals where we secure

5   an exclusive license during a fixed term of rights in the

6   recordings.

7   Q.  And why does the record company want either ownership or

8   exclusive rights as part of its contract with an artist?

9   A.  Well, we don't -- we don't want to be competing with third

10  parties in the market, so we distribute to all channels our

11  full catalog.

12  Q.  And, again, just speaking generally, what does the artist

13  get out of a recording agreement?

14  A.  So, certainly there are payments to the artist in the

15  recording agreement.  There are royalties that the artist will

16  receive in perpetuity, assuming it's a royalty deal.  The

17  artist also gets commitments from the label, whether it's -- I

18  mean, certainly release commitments that will release the

19  recordings, you know, through all the distribution channels.

20      There may also be marketing commitments like, for example,

21  they may want us to commit to a certain number of videos.

22  They -- if it's a band, they may need tour support so that they

23  can be out on the road.  And then they also look for

24  commitments from the label.  I mean, some artists don't want to

25  be associated with certain types of products, for example, and

Jeff Walker - Examination                           136

1    so we'll agree to restrict the way we allow their music to

2    interact in certain contexts.

3    Q.  You were mentioning payments to the artist and you

4    mentioned royalties.  Are there any other types of payments

5    that are made to the artist, maybe not in all contracts, but in

6    some?

7    A.  Well, there are different -- do you mean, like, payment

8    structures?

9    Q.  Either payment structures or payments that are not direct

10   royalty payments.  Are there payments relating to the making of

11   recordings?

12   A.  Oh, yeah, yeah, yeah.  So, I'm sorry, there are advances

13   that are generally paid at the -- when we sign the deal, and

14   every time an artist begins to record or delivers an album,

15   there will be more payments over the course of the deal.  So,

16   yeah, the deals are generally structured based on album, so if

17   they're committing to deliver up to five albums, then for each

18   album, there will be separate payments that the record company

19   is making.

20   Q.  Separate recording advances?

21   A.  Yes.

22   Q.  Yeah, okay.  And when you use the term "royalties," what do

23   you mean by that?

24   A.  Royalties are monies paid to the artist.  Royalties are

25   specifically a percentage.  They're calculated based on the

1    agreement.  And if we go back to 1889, as we just said, you can

2    imagine the number of different royalty structures at play.

3    But it's basically -- and today we try to do a fixed percentage

4    of revenue, and that goes to the artist from all exploitations.

5    Q.  Are there other forms of artist deals beside the ones that

6    you mentioned?

7    A.  Yes.  Depending -- I mean, once an artist has, you know,

8    more stature or it's just a competitive situation, we might do

9    a joint venture, which is sort of a profit-sharing between the

10   artist and the label or we might look at what we call a P&D

11   deal or structure, which is pressing and distribution, where

12   the label takes a fee -- it's a much smaller fee -- off the top

13   for its services and the artist keeps the lion's share of the

14   revenue.

15   Q.  Now, what are the deliverables from an artist under

16   recording a contract?

17   A.  Sound recordings?

18   Q.  Yeah.  And sound recordings in what state?  And I don't

19   mean Texas versus New York.  I mean, in what condition they

20   need to be --

21   A.  Well, yeah.  I mean, so they're completed, mixed and

22   mastered, approved recordings that are -- that they deliver to

23   the record company.

24   Q.  And how are these recordings created?

25   A.  I mean, there are so many variations on that theme.  It

Jeff Walker - Examination                    138

1    depends on the type of artist.  But generally speaking,

2    there will -- if you're recording in a studio, which a lot of

3    artists don't these days, but there will be, you know,

4    potentially instrumentation that's recorded, you know.  And

5    then separately there may be vocals.  There may be background

6    musicians that are recording separately.  There's a lot of ways

7    that it could happen.

8    Q.  And in addition to the artist themselves, what other people

9    are involved or may be involved in the recording process?

10   A.  So, I mean, the A&R rep is generally coordinating, but the

11   A&R person will have introduced the artist to one or more

12   producers that they're working with, so the producers will be

13   working closely with the artist and likely be in the studio.

14   The engineers will be in the studio as well.

15   Q.  And what are the jobs of an engineer?

16   A.  Engineers tend to mix and master the recording.  Mixing is

17   when you EQ, equalize a recording so that the sounds of the

18   instruments and the vocals are appropriately balanced and

19   everything sounds right.

20   Q.  Okay.  And what role does the producer play or what roles

21   can a producer play in the creation of sound recordings?

22   A.  So, yeah, producers play many, many different roles

23   depending on the nature of the artist.  So if an artist is a

24   vocalist, for example, a producer -- you may introduce them to

25   producers who are songwriters, and the vocalist will sing the

1   producer's song, for example.  If the artist is a developing

2   artist who wants to write, but doesn't have a lot of experience

3   or confidence writing, you might pair them with a producer who

4   is really comfortable co-writing with artists.  And, you know,

5   a lot of this is relationship driven, so we would introduce

6   them to a lot of potential producers to see how that gels and

7   connects.

8       And then at the other end of the spectrum, there are

9   producers who, you know, if you're dealing with a

10  self-contained band, for example, that writes all their own

11  material, the producer is really there to just help bring the

12  vision of the band, you know, or the artist, because a

13  singer/songwriter can -- you know, just to bring their vision

14  to life.

15  Q.  Okay.  Can there be more than one producer on a recording?

16  A.  Yes, yes.  And I've certainly seen situations where at the

17  end of the process another producer is brought in to review the

18  entirety of the work, and they give comments to the artist and

19  the other producers on the -- on the album.

20  Q.  I won't make any "too many cooks" comments.

21      Who is responsible for paying all the people that we've

22  been discussing?

23  A.  The record company does.

24  Q.  Do all the songs that the artist records during the

25  recording sessions wind up getting released?

1    A.  No.  Rarely.  Rarely.  Artists tend to record many more

2    recordings than ultimately end up on the album, and I've heard

3    of artists recording over a hundred songs in order to deliver

4    an album of ten to 15 songs, so it's fairly expensive and

5    time-consuming.

6    Q.  And who decides ultimately which of the songs are going to

7    be released?

8    A.  That's -- I mean, it's generally collaborative.  It's the

9    artist with A&R and then the management of the label, but as an

10   artist achieves more and more stature, it becomes more common

11   for the artist to take more creative control and to deliver the

12   finished product to the label.

13   Q.  And what is the general role that the A&R Department plays

14   during this recording process?

15   A.  I mean, I alluded to it a bit, but they are responsible for

16   supporting the artist in whatever way the artist needs to be

17   supported, so it varies depending on the kind of artist and

18   where they are in their career.

19   Q.  Just to sum that up, because you said so much about the A&R

20   Department, what conclusions do you draw about the role of the

21   A&R Department within the company?

22   A.  Well, they play a very important role because they're

23   identifying the talent that we're going to sign.  They're then

24   overseeing the process of recording with the artist so that,

25   you know, the ultimate product that's delivered, particularly

1   for newer artists -- I mean, A&R is taking a lot of

2   responsibility for that.  And our success as a company really

3   depends on how that process evolves and how successful they are

4   in bringing something really creative and wonderful to life.

5   Q.  Is there anything that's created for the sale of physical

6   products other than the completed sound recordings?

7   A.  So for the physical records, you would create artwork, and

8   so for physical, there's vinyl, and there's CDs.  For the

9   vinyl, you would have sleeves and on the disk itself, there

10  would be a label, and that's why we're called "labels,"

11  because, you know, that's where in the old days it said

12  "Columbia" or "RCA" or whatever the label was.  And on the

13  sleeve, you would have a lot of detail, which is similar to

14  what's on the CD, which will have a jewel case and liner notes,

15  which have a lot of detail about the --

16  Q.  And a magnifying glass to be able to see.

17  A.  Yes.

18  Q.  Once the recording and the packaging is created, what's the

19  next step in getting physical product down to the public?

20  A.  So once the recordings are ready and the artwork is ready,

21  when all of the components are ready, the production -- sorry,

22  the physical operations team will ship everything to the

23  manufacturing plant and order, you know, a certain quantity of

24  records to be manufactured.

25  Q.  And so how does the process differ for digital products?

1    A.  For digital we are -- we certainly use the artwork, but

2    there's other materials which we call metadata, which are

3    compiled, and we ship both metadata and the recordings to the

4    digital partners.

5    Q.  So what information is contained within this metadata?

6    A.  It's very similar to what's in the liner notes.  It's the

7    artist, it's the song titles, the songwriters, the genre,

8    there's an ISRC code, which is a unique code that we use in the

9    industry for every recording so that it's easy to track

10   everything associated with that recording.

11   Q.  Is that done for incoming royalty purposes?

12   A.  That's certainly one of the purposes, yes.  It enables

13   whoever the streaming service or iTunes, it allows them to

14   clearly identify all transactions related to our recordings and

15   to report them back to us.

16   Q.  Is there anything in the metadata that includes information

17   about the digital file itself?

18   A.  Well, there's a digital hash, which is like a fingerprint

19   that's also included.

20   Q.  Okay.  And what does the hash value look like?

21   A.  It's like a long string of numbers and letters.

22   Q.  Okay.  Can two different digital files have the same hash

23   value?

24   A.  No.

25   Q.  And what happens if you take a sound recording and make

1  changes to it?  Will it have the same hash value?

2  A.  No, no.  That would change the hash value.

3  Q.  Okay.  Once the product is manufactured, what happens next

4  in the life cycle of a recording?

5  A.  Once the product is -- oh, so once we know -- our Sales

6  Department knows what quantities they're able to sell, they

7  would direct the manufacturing plant, they do what's called

8  packing and shipping, and they would ship it out to the

9  retailers.

10  Q.  Can you give us some examples of some physical retailers

11  that still exist in 2022?

12  A.  Sure.  Walmart, Amazon.  They -- it's digital, but they

13  fulfill physical.

14  Q.  How are digital recordings distributed?

15  A.  You mean how do we distribute it to the digital services?

16  Q.  Yeah.  Are there different -- well, first off, are there

17  different formats of digital distribution?

18  A.  Oh, yeah, yes.  So there's downloads, which most people are

19  familiar with, and then there are streaming services.

20  Q.  When you say downloads, for those who may not be familiar

21  with it, what are you talking about?

22  A.  Well, downloads from, I mean, stores like Apple iTunes or

23  Amazon are -- they're bits which -- you know, they're files

24  which have the entire recording that are transmitted to the

25  user, to their device, and it's a transfer of ownership of that

Jeff Walker - Examination                    144

1   file to the consumer, so downloads are kind of, like, physical

2   in the sense that it's based on the ownership model where the

3   consumer owns the recordings.

4   Q.  Now, you also used the term "digital download."  Is that a

5   different model other than the ownership model?  Not download,

6   I'm sorry, streaming.  I'm a step behind myself.

7   A.  Yes.  I mean, streaming is based on -- generally based on

8   an access model where the consumer -- and most of the streaming

9   services have, you know, a full catalog, you know, of all the

10  recordings that they can license, that they make available to

11  their consumers either on a subscription or ad-supported basis.

12  Q.  Can you give us some examples of some streaming services

13  that Sony has as digital partners?

14  A.  Sure, sure.  Spotify, Apple, Tidal, Pandora.  There are

15  lots of them, Deezer.

16  Q.  How does Sony distribute its music to these streaming

17  platforms?

18  A.  We make our music available to them through a digital feed.

19  The music and the metadata goes through the feed.

20  Q.  Can you tell me something about the feed?  What is it

21  specifically?

22  A.  It's -- I mean, basically, it's the mechanism to transfer

23  the files to the digital services.  It's a very complicated

24  process.  I mean, we have a lot of people who work on the feed

25  and managing the feed and keeping it going.

Jeff Walker - Examination                    145

```
 1   Q.  Is the feed updated on a regular basis?
 2   A.  Yeah, daily.  I mean, we -- every week there are new
 3   releases that go through the feed and if an artist wants to
 4   change a recording, if they don't like a word and want to
 5   change a song, we pull it back from the feed and then reship
 6   the new version.
 7   Q.  How many recordings, roughly, are in Sony's catalog or feed
 8   right now?
 9   A.  We have over a million recordings in our catalog.
10   Q.  How does a record company protect its legal interest of its
11   sound recordings?
12   A.  We rely on U.S. copyright law, which protects sound
13   recordings.
14   Q.  And how exactly does that work?  How do you get that
15   protection?
16   A.  Well, we file registrations with the U.S. Copyright Office.
17   Q.  Okay.  And is that reviewed by the Copyright Office?
18   A.  Yeah.  There are registration forms that we submit.  I'm
19   not totally familiar with the process, but I know we sometimes
20   get comments, and there's back-and-forth.  But generally, they
21   send us the registration forms listing Sony Music as the owner
22   or whoever the owner is.
23   Q.  Are there any other legal issues that have to be addressed
24   before -- or may have to be addressed before products go out
25   the door other than just obtaining a copyright?
```

1    A.  Yeah, so before a record can be released, we have -- we

2    review the records -- the business and legal affairs team

3    generally will review the records to make sure, you know, if

4    there are clearance issues.  There could be side artists, that

5    is a guest artist from another label and we have to clear both

6    the artist and the label.  There could be samples.  Samples are

7    an artist may take pieces of a recording and do what's called

8    an interpolation and then use part of that recording in the new

9    recording.

10   Q.  Part of a prior recording?

11   A.  An existing recording, yes.  And we need to clear and

12   license that.  And we also license mechanical royalties -- I'm

13   sorry.  We get mechanical licenses to use the musical

14   compositions in the sales of downloads and physical.

15   Q.  So let me understand that last piece.  Does a record

16   company have to get permission or a license from the owner of

17   the underlying composition in order to commercially release a

18   sound recording of that composition?

19   A.  Yeah.  That's complicated.  I mean, there's such thing as a

20   compulsory license but, yes, we do secure their permission and

21   we do get a license.

22   Q.  Now, earlier in your testimony you also alluded to

23   marketing.  Can you tell the jury a little bit about how sound

24   recordings are marketed.

25   A.  Sure.  So, I mean, we talked a bit about A&R.  Marketing

Jeff Walker - Examination                    147

1  and promotion is really -- it's sort of the next core

2  competence of a record company.  It's the -- it's part of the

3  real value that we bring to artists.

4  Q.  Okay.  And what -- how exactly does -- or not exactly.  How

5  generally does the marketing process work?

6  A.  Well, so once a recording is finished or close to finished,

7  the A&R team and the marketing team will get together and

8  they'll start to create the outlines of a marketing plan.

9  Q.  Can you tell me some of the components that might go into a

10  marketing plan?

11  A.  Sure.  I mean, a lot of it relates to the marketing of a

12  single and the selection of a single, but there are many

13  divisions within the Marketing Department that support the

14  recording once it's in the market.  So, you know, it's

15  everything from social media marketing, marketing to TikTok and

16  YouTube and Instagram, that kind of stuff.

17      We also have promotions, so people who work the records at

18  radio all over the country.  The press and publicity teams who

19  will try to get press, but they're also trying to get

20  television shows.

21      So to give you an example, so if The Chicks is performing

22  here in Austin now, our promotion team would be trying to

23  arrange to get The Chicks into local radio stations.  Our Press

24  and Publicity Department would be trying to schedule local TV

25  just to get as much exposure and buzz around them while they're

1  in town and to take advantage of that.  Our sales team is

2  another team that they try to get placement, whether it's on

3  playlists on the digital side.  Like, if we have a Travis Scott

4  album, they're going to try to get him on Rap Caviar on Spotify

5  or whatever the appropriate playlist is.  There's so many

6  different departments within marketing and promotion.  That's a

7  big part of a record company's job.

8  Q.  Well, you've been talking about marketing, or at least in

9  part, marketing new releases.  Is there marketing that goes on

10  for previously recorded releases once they're part of your

11  catalog?

12  A.  Absolutely.  I mean, our catalog is extremely valuable, and

13  we always want to try to introduce new fans to music.  An

14  example that's very current is there's a current film out right

15  now, Elvis, by Baz Luhrmann, and Sony was very involved.  We

16  released the soundtrack and provided music, obviously, for the

17  film.  But we tried to build a campaign around the film to make

18  sure Elvis, you know, who hasn't been around in a long time, is

19  exposed to new and young audiences.

20       And that's -- even when I was at RCA back in the '90s, we

21  put out an Elvis One's album, and as part of a campaign, we

22  released a new single, Little Less Conversation, which was a

23  remix of a prior recording.  And, I mean, that's the sort of

24  thing we do to try to reinvigorate the catalog from time to

25  time.

Jeff Walker - Examination                    149

1   Q.  After all of these processes that we've been talking about

2   from A&R to manufacturing and distribution and marketing and

3   all the rest, who pays for all of that?

4   A.  The record company is paying for all of that.

5   Q.  Are there any further parts of the record company that

6   address issues we haven't talked about such as the collection

7   of income and payment of royalties?

8   A.  Yes.  So we certainly have teams who validate the recording

9   that we get from different partners.  It's a little more

10  complicated on the streaming side because, you know, the

11  reporting from the streaming services is very, very complicated

12  and very data voluminous.  I don't know how else to say it.

13  But those teams verify that we're being paid properly, and then

14  we do also hire third-party auditors to audit -- can't talk

15  today -- to audit our streaming partners and iTunes to make

16  sure that we have been properly paid and so that artists are

17  properly paid.

18      And I should note, all our audit recoveries are shared with

19  artists, and it's been Sony's policy for a long time that any

20  revenue that -- like, from an audit -- that isn't directly

21  attributable to something but may be related to a recording, we

22  do share that revenue with artists under their contract, so

23  that includes litigation recoveries.  We have been sharing for

24  years with artists.

25  Q.  Now, you mentioned earlier that you work for the global

1    digital business group.  Can you tell us a little bit about

2    what that business group is.

3    A.  Sure.  It's the team that develops the digital strategy for

4    the company and partners with digital businesses and also

5    negotiates the agreements with those businesses.

6    Q.  And when was that global digital business group created?

7    A.  In 2005.

8    Q.  And why?

9    A.  It was very clear by 2005 that -- you know, we had already

10   had several years of declines by 2005 in CD sales and we knew

11   it wasn't coming back.  That was what had driven a lot of

12   the -- sorry, lost my train of thought.  The declines were

13   driven by the lost CDs, driven by private piracy, and so we

14   knew we had to be more thoughtful about building a business to

15   replace the physical business that we were losing.  And so we,

16   you know, sought about to, you know, focus on all opportunities

17   that might make sense to build a commercial business around

18   music at that time and going forward.

19   Q.  Was streaming part of that process back in 2005?

20   A.  So streaming existed, yes.  The first streaming service

21   that launched, Rhapsody launched in 2001, so it did exist.

22   Q.  And did Rhapsody succeed?

23   A.  No, no, it did not.

24   Q.  Do you know why?

25   A.  I mean, I don't know that anyone can say for sure.  There

Jeff Walker - Examination                    151

1    were certainly technological issues.  You know, there was no

2    high-speed Internet in 2001.  Modem speed was an issue.  And

3    there was -- I mean, frankly, in 2001, consumers were getting

4    content for free.  It was very hard to compete with free, so we

5    don't -- I mean, it's possible that consumers just didn't want

6    to pay at that time.  We don't know.

7    Q.  What was Sony's first digital download partner?

8    A.  It was Apple Music.

9    Q.  And were there -- when was the next point where there was a

10   change in the opportunity to create a new market in streaming?

11   Were there conditions that developed that made that a

12   possibility?

13   A.  Yes, so in 2007, Apple launched the first smartphone, the

14   iPhone, and that was a game changer in a lot of ways in that it

15   introduced portability.  And so starting soon after that, a

16   number of services launched to try to take advantage of the

17   fact that consumers were moving to portable devices.

18   Q.  Okay.  And was there negative results of that as well as

19   positive results?

20   A.  Well, yeah, I mean -- so as with all technological

21   advances, you know, as happened in the early days of

22   peer-to-peer, like, the same things that make the business

23   easier, it also makes piracy easier, so that was true with the

24   iPhone as well.

25   Q.  When did digital piracy first develop?

1    A.  Well, the digital piracy we've been talking about, it

2    really started in the late 1990s.

3    Q.  And what was the cause of that?

4    A.  It was -- well, it started -- I guess the cause was the

5    advent of the MP3 file.

6    Q.  Can you tell us a little bit about what that is.

7    A.  Sure.  MP3 files are compressed files.  They're much

8    smaller, which made it easier to -- and they're exact copies of

9    the recording, so it was much easier to copy and share the MP3

10   files than prior files.

11   Q.  And the fact that it was smaller, how did that impact or

12   create digital piracy?

13   A.  It just made it easier for sharing to go viral,

14   essentially, for -- you know, for -- whether it was

15   peer-to-peer at the time or websites or BitTorrent.

16   Q.  Okay.  And how did piracy during that time, during the late

17   '90s through 2004 or '05, affect the health of your company?

18   A.  Well, I mean, we were losing sales.  Our earnings as a

19   company were going down year, over year, over year.

20   Q.  And what's the impact of that on the operations of the

21   company?

22   A.  It was dramatic.  I mean, it's the reason why Sony and BMG

23   merged.  It's the reason why I lost, you know, my job at RCA.

24   Q.  Was there a perceptible difference in the number of units

25   sold apart from just the existence of piracy?

1   A.  Well, yeah.  I mean -- so what we deemed to be a success at

2   the time, just changed.  So in the mid-1990s there were albums

3   that would sell 10 million CDs just in the U.S., right, and we

4   had a lot of those albums.  But -- and there were -- so every

5   year you would expect to see a certain number of platinum

6   albums, a certain number of double platinum and then a certain

7   number of multi-platinum.  Year over year, you know, during

8   this time period from the late '90s to the mid -- until around

9   2005, 2006, I mean, it was just -- it was free-fall.

10       And so we finally got to the point where the biggest album

11  in a year would be 2 million, and that was the biggest seller

12  in the year.  And so as we are trying to invest in A&R, we

13  weren't able to invest as much, because the return we were

14  getting from the products we were releasing was much, much

15  smaller.  And so we had to sign fewer artists.  We had to make

16  lots of adjustments and -- I mean, frankly, a lot of people

17  lost their jobs, myself included.

18  Q.  Tell me a little bit about that.  How did digital piracy

19  affect you in your career personally?

20  A.  I mean, I've talked about that a bit, but -- so I lost my

21  job at RCA because BMG decided that it needed, for efficiency,

22  to merge several of its labels together.  And Clive Davis was

23  the head of one of the labels and so he became the new head.

24  And my boss, who was the CEO of RCA at the time, lost his job.

25  And all the department heads, we lost our jobs.

1      Then, I mean, obviously, the merger of Sony and BMG was

2  driven by the same issue, the desire to create efficiencies and

3  eliminate people and sort of concentrate the artists under a

4  bigger company.  I'm spacing --

5  Q.  Okay.  Well, you've been doing great, so take a deep

6  breath, and I'll try and place you here.

7      So you've talked about the changes through 2005 or so.  Was

8  there effect of ongoing piracy that caused a further

9  directional change in your career later on in that decade?

10 A.  Oh, yeah.  Okay.  Thank you for reminding me.

11     So by 2010, so I had been at Columbia/Epic label group

12 after the merger for, like, five or six years -- I don't

13 remember -- and they came to me and told me that I was going to

14 have to lay off one of my top lieutenants.  And I had already

15 laid off people, several people in my department over the

16 years.  And they said, alternatively you can also take the job

17 as the head of business affairs for the digital team.

18     And at the time, I had two small kids.  I was trying to,

19 you know, figure out how I could stabilize my career in a

20 business that clearly was not stable at the time.  And it

21 looked like digital was the place to be.  It was the part of

22 the company that was likely to grow.  It was the part of the

23 company where there was energy and excitement, and it -- I

24 mean, don't get me wrong.  I loved working at the label, but it

25 had become a very depressing place to be because every six

1    months we were laying people off, and we were working so hard

2    for diminishing returns.  And so I took the chance and switched

3    to digital.

4    Q.  And was digital involved in trying to find alternative

5    models for monetizing your recordings?

6    A.  Yes, yes.  I mean, a big part of what we were trying to do

7    is to identify services that we might enable to create

8    businesses around music.

9    Q.  Well, at the time that you went over there in 2010, was

10   there still a digital download market?

11   A.  Yes.  I mean, there was -- so this is a bit tough to

12   explain.  The download market was a successful market in the

13   sense that it grew as a business, but at the same time that the

14   download market was growing, physical was declining, right, and

15   every year our topline revenue was going down.  So physical --

16   I'm sorry, so downloads were growing, but not enough to sort of

17   stem the bleeding, if you will.  We continued to decline.

18   Q.  When did streaming -- and you may have answered this

19   already, so forgive me if I'm asking you to repeat yourself,

20   but when did streaming first become a viable way or more viable

21   way to distribute music?

22   A.  Well, so starting with the phone, we certainly believed

23   that it might be the next thing to -- you know, as downloads

24   started to flatten.  But I think it wasn't until 2011 that we

25   really -- there were lots of services before 2011.  So, for

1   example, MOG and Artio, Ecast.  Like, there were a number of

2   streaming services that launched in that time.

3   Q.  Launched in the wake of the release of the smartphone?

4   A.  Yes.  So after 2007, but before Spotify.  And those

5   services, kind of like Rhapsody, I mean, they were really good

6   services, but they didn't take off.  I mean, MOG was ultimately

7   turned into Beatz or Daisy and then it was bought by Apple, so

8   it became part of Apple's infrastructure for their service.

9   Q.  Oh, okay.  So I think you said that Spotify launched around

10  2011, correct?

11  A.  Yes.

12  Q.  At least in the United States.

13  A.  That's right.

14  Q.  Did you have confidence that Spotify or other streaming

15  services at that time were going to turn the industry around?

16  A.  Confident, I wouldn't say I had confidence.  I mean, we

17  hoped that Spotify or any one of these services was going to

18  make a difference or that collectively they might add up to

19  something, but we really didn't know at the time.

20  Q.  What was the basis for the concern that they might not?

21  A.  Well, we were still competing with free, basically.  I

22  mean, if a consumer can get something for free, we didn't know

23  that they were ever going to be willing to pay for a

24  subscription.

25  Q.  Did other streaming services come into the marketplace

Jeff Walker - Examination                    157

1  after -- major streaming services after Spotify?

2  A.  Yes.  I mentioned Apple.  Apple launched, I believe, in

3  2015, so four years after Spotify.

4  Q.  Do you know whether Spotify was making or losing money in

5  those years?

6  A.  Spotify was definitely hemorrhaging money in those years.

7  And, look, Spotify was growing, but piracy served as sort of a

8  drag, if you will, on the growth of Spotify and all the

9  legitimate services because you just didn't have a market that

10 was fully available.

11 Q.  Was that piracy drag present in the development in the

12 streaming marketplace between 2011 and '17?

13 A.  Well, yeah.  I mean, so people weren't consuming music on

14 CDs anymore.  We were trying to launch new models, particularly

15 the access model or streaming and so starting in 2011 when

16 Spotify launched, I mean, you did start to see glimmers of hope

17 that they may grow, but it took time.  It wasn't until 2017

18 that streaming represented half of our revenue.  And again, by

19 then, after all those years of decline, half of our revenue was

20 not a lot.

21 Q.  Are you familiar at all with Grande, the defendant in this

22 case?

23 A.  A bit, yes.

24 Q.  And what do you know about them?

25 A.  I know that they're an ISP.

Jeff Walker - Examination                        158

1   Q.  Okay.  And do you have any awareness of what role an ISP
2   plays in stopping copyright piracy online?
3   A.  Well, I think they play a critical role because the nature
4   of the piracy is that we don't have visibility into what's
5   going on on the platforms.  It's basically anonymous and
6   invisible to us, so without the help of a monitoring company,
7   there's no way for us to police what's going on on a platform.
8       And so the ISP is the only party who can connect the IP
9   address, which is the one bit of information that the
10  monitoring company gets along with the hash -- you know, the
11  ISP is the only one who can basically communicate with the user
12  and determine who the user is based on the IP address.  So
13  without them, we're just blind.
14  Q.  Did you learn anything during the course of bringing this
15  lawsuit about how Grande treated infringers and infringement
16  notices during this time period?
17  A.  I learned that they didn't terminate any infringers at all,
18  that they didn't have a policy.  Yeah, this isn't a case where
19  they made a reasonable judgment that certain users didn't hit a
20  threshold.  There was no threshold.  They didn't terminate
21  anyone.
22  Q.  And do you think that had an affect on Sony's revenues?
23          MR. HOWENSTINE:  Objection, Your Honor.  The witness
24  has no personal knowledge.
25          THE COURT:  Sustained.

1    BY MR. BART:

2    Q.  Mr. Walker, have you personally listened to any of the

3    audio files that have been downloaded from Grande subscribers

4    during this case?

5    A.  Yes.  I was given a random selection of 50 files that I

6    listened to.

7    Q.  And did you, in fact, listen to them?

8    A.  I did.

9    Q.  And did you draw any conclusions from listening to them?

10            MR. HOWENSTINE:  Objection, Your Honor.  Foundation.

11            THE COURT:  I don't know what he's going to ask, so I

12   don't know whether -- he needs foundation.

13            What are you going to, in fact, be asking?

14            MR. BART:  I'm asking whether he recognized them as

15   Sony's recordings.

16            THE COURT:  The objection is overruled.

17   A.  Yeah, I listened to the recordings.  I listened to them on

18   Spotify as well and I compared the time stamps of the

19   recordings to confirm that they were the same.

20   Q.  Can you tell me why Sony chose to participate in this

21   lawsuit?

22   A.  We believe that music is very, very valuable.  We invest in

23   artists.  We want to support them in building their art, but

24   it's expensive, it's time-consuming.  What Grande did was to

25   totally disregard the value of music.  They also disregarded

 1  the law.  We think the infringements in this case are massive.
 2  Given the viral nature of BitTorrent and peer-to-peer, we just
 3  can't even say how big it is.  So it's really important that we
 4  signal to other ISPs and generally that, like, you know, we
 5  don't want you to follow Grande's lead.
 6          MR. BART:  I have no further questions.  I pass the
 7  witness.
 8          THE COURT:  All right.  We'll take an afternoon recess
 9  now, then we'll come back, give you an opportunity to use the
10  restroom, and we'll do the cross-examination.
11          COURT SECURITY OFFICER:  All rise for the jury.
12          *(2:42 p.m.)*
13                          *   *   *
14          *(2:56 p.m.)*
15          COURT SECURITY OFFICER:  All rise.
16          THE COURT:  Please be seated.  The Court would note
17  the presence of counsel, the absence of the jury.
18          I don't know why, there may be a method to this, but
19  the witness testified to something that -- this is how you know
20  I'm paying attention up here.  The witness testified that the
21  defendant broke the law.  Did you hear that?
22          MR. HOWENSTINE:  Yes, Your Honor.
23          THE COURT:  There was no objection made.  I understand
24  the witness -- that's his personal feeling, his opinion, but
25  that's the province of the jury as to whether your client broke

1     the law.  That's why we're here.  So there was no objection

2     made.  Did you want to let that slide?

3          MR. HOWENSTINE:  Well, as we saw it, the cat was out

4     of the bag, Your Honor.  He offered it --

5          THE COURT:  Well, the cat may be out of the bag, but

6     there's something called an instruction to the jury that they

7     must disregard that statement.

8          MR. HOWENSTINE:  We would ask that Your Honor give

9     that instruction when the jury returns.

10         THE COURT:  All right.

11         MR. BROPHY:  Your Honor, one other item -- and I

12    apologize.  I polled my folks.  I don't think this happened,

13    but I'm not sure the jury has been instructed that when we see

14    them in the halls, we're going to ignore --

15         THE COURT:  I thought judge --

16         COURT REPORTER:  He did address that.

17         THE COURT:  I would certainly do that myself.  I'll do

18    it again.

19         MR. BROPHY:  I'm just very mindful of it.

20         THE COURT:  Oh, I know.  I know.

21         MR. BROPHY:  Thank you.

22         THE COURT:  No, it's particularly -- we are

23    particularly careful about it in Hawaii because in Hawaii when

24    you see somebody that you know or even know very casually, it

25    is considered the worst not to acknowledge them or say hello to

 1    them.  It's the opposite in New York.  When you see somebody,

 2    you run to the other side of the street.

 3         MR. BART:  I'm getting tarred constantly.

 4         THE COURT:  I remember the days when I represented

 5    JCPenney -- off the record.

 6         *(Discussion off the record.)*

 7         THE COURT:  Let's bring the jury back in.

 8                              *  *  *

 9         *(2:59 p.m.)*

10         COURT SECURITY OFFICER:  All rise for the jury.

11         THE COURT:  All right.  Please be seated.

12         Ladies and gentlemen, at the end of the witness's

13    testimony he was asked a question relative to some of the

14    reasons why Sony had joined in the lawsuit, the reasons why

15    they were participating, and they were concerned about the

16    activities of -- what the witness perceived to be the

17    defendant's activities, and he made a statement, which was his

18    opinion, that the defendants had broken the law.

19         Now, I understand that he was just making a statement

20    predicated on his personal opinion, but you have to understand

21    and disregard that statement entirely, because that is your job

22    here is to make a determination after you hear all of the

23    evidence.  And I'm not criticizing the witness, it's a human

24    reaction sometimes.  But your job here is to determine whether

25    copyright law has been violated in the ways in which I will

Jeff Walker - Examination                    163

1  instruct you, and that is not the province of a witness.  That

2  is your job.

3         It's not even my province, even I don't make that

4  decision.  That's your job.  You take the law I give you and

5  then you will apply it to the facts as you find them and reach

6  that decision, okay?

7         All right.  Okay.  No criticism of anybody, just the

8  way it is.  All right.  You may cross-examine.

9         MR. HOWENSTINE:  Thank you, Your Honor.

10                      CROSS-EXAMINATION

11 BY MR. HOWENSTINE:

12 Q.  Good afternoon, Mr. Walker.

13 A.  Hello.

14 Q.  Now, you're a lawyer, correct?

15 A.  Yes.

16 Q.  And you and your legal team, you oversee all of Sony's

17 antipiracy efforts, is that correct?

18 A.  The head of antipiracy reports to me.  He oversees

19 antipiracy.

20 Q.  And that's Dong Jang, correct?

21 A.  Yes.

22 Q.  Now, you understand this is a case about copyright

23 infringement allegedly detected by a company called Rightscorp,

24 correct?

25 A.  Yes.

Jeff Walker - Examination                    164

1  Q.  You understand that Rightscorp sent e-mails to Grande
2  accusing Grande subscribers of copyright infringement?
3  A.  I'm not aware of that.  I'm aware that they prepared
4  notices that they gave to Grande.  I don't know the details.
5  Q.  And those were notices that were sent by e-mail to Grande,
6  right?  That's your understanding?
7  A.  I don't know how they delivered.
8  Q.  You don't know that Grande got any notice of copyright
9  infringement?
10 A.  No, I know that Grande got notice.  I don't know how they
11 got notices.
12 Q.  I understand.  But you understand that Rightscorp has
13 accused certain of Grande subscribers of committing copyright
14 infringement, correct?
15 A.  Yes.
16 Q.  And you believe that Grande should have terminated the
17 Internet access of those subscribers who Rightscorp had
18 accused, right?
19 A.  No, I believe they were supposed to implement a reasonable
20 repeat infringer policy and determine when it was appropriate
21 to terminate users.
22 Q.  And in some circumstances, to terminate them, correct?
23 A.  Correct.
24 Q.  But only if those accusations were true, right?
25 A.  If the accusations were true?

1   Q.  Yeah, only if Rightscorp's accusations were true, correct?

2   A.  I guess.

3   Q.  I mean, are you telling the jury that Grande should have

4   terminated people if Rightscorp's accusations were false?

5   A.  I'm just not following.  Yeah, if the notices accurately

6   reflected the facts and the users had, in fact, infringed,

7   then, yes, Grande should have terminated users who they deemed

8   to be repeat infringers.

9   Q.  How could Grande determine if Rightscorp's accusations were

10  true or not?

11  A.  I don't know what ISPs preserve, but I imagine they could

12  check the hash themselves -- I don't know, honestly.

13  Q.  So you don't know?

14  A.  No.

15  Q.  Now, you did refer to the term "hash" when you were

16  testifying earlier.

17  A.  Uh-huh.

18  Q.  You talked about a hash as being associated with a digital

19  file somehow, is that right?

20  A.  Yeah.

21  Q.  You were not talking about hashes as they are used in the

22  BitTorrent system, correct?

23  A.  I'm using the -- so in fingerprinting, like on social media

24  platforms a hash is typically identified with a sound file and

25  they have a unique hash.

Jeff Walker - Examination                         166

1   Q.  So you're not talking about hashes that are used in the

2   BitTorrent protocol, correct?

3   A.  I don't -- I don't know.

4   Q.  You don't know anything about BitTorrent?

5   A.  I mean, I know generally what BitTorrent is.

6   Q.  You're not an expert on --

7   A.  I'm not -- I'm not a technology expert, no.  I'm a lawyer.

8   Q.  Now, I believe you testified that there are 453 Sony

9   recordings -- Sony songs, let's say, that are at issue in this

10  lawsuit, is that right?

11  A.  That's right.

12  Q.  And Sony maintains records of all of the original sound

13  recordings that it owns, correct?

14  A.  Yes.

15  Q.  Those are called the masters?

16  A.  Yes.

17  Q.  So Sony keeps the masters, and then it provides a copy of

18  the masters to the Copyright Office when it registers a

19  copyright, right?

20  A.  It keep -- yeah.  It provides a copy of the recording.

21  Q.  So, likewise, Sony could have provided copies of all those

22  original masters so the jury could listen to them, correct?

23      I'm not trying to be tricky.  I think it's a simple

24  question.

25          MR. BART:  Objection, Your Honor.

1   A.  We can provide copies of the recordings for the jury to
2   listen to if that's helpful, yes.
3   Q.  So they could do something similar to what you testified
4   about when you said you had listened to some songs allegedly
5   downloaded by Rightscorp, and you compared them to songs owned
6   by Sony, you said, right?
7   A.  Yeah.  I listened to the same songs on Spotify as the files
8   that were provided to me, that's right.
9   Q.  So if the jury had copies of the original songs, they could
10  do the same thing that you did, right?
11  A.  You mean the same exercise, just comparing side-by-side the
12  two recordings?  Yeah.
13  Q.  So, like you said, there are 453 songs in suit.  Do you
14  know how -- roughly how many Sony artists that equates to?
15  A.  Oh, gosh.  There were definitely duplicates in what I
16  listened to, but I don't -- I don't know.
17  Q.  Over a hundred, fair to say?
18  A.  Yeah, yeah.
19  Q.  And I believe that you suggested that Sony's artists have
20  been harmed by copyright infringement on Grande's network.
21  That's your opinion?
22  A.  Certainly.
23  Q.  Which Sony artist did you ask to come testify about that in
24  this case?
25          MR. BART:  Objection, Your Honor.

```
 1            MR. HOWENSTINE:  I would respond to the objection if I
 2   knew what it was.
 3            MR. BART:  Well, I'm not supposed to give speaking
 4   objections.
 5            THE COURT:  No, but you can tell me why you're
 6   objecting.
 7            MR. BART:  Because this witness does not make a
 8   decision as to who is coming as a witness.  He's saying you
 9   could have called an artist and asked them to come.  It's not
10   the role of this witness.
11            THE COURT:  I'm going to sustain the objection for
12   that reason, but you can ask that question in a different way.
13   BY MR. HOWENSTINE:
14   Q.  Which Sony artist did you speak to about being harmed by
15   copyright infringement on Grande's network?
16   A.  I haven't spoken to any Sony artists about the case.
17   Q.  So you testified -- I believe you said -- you were talking
18   about the difficulty of policing infringement, I think, and you
19   said, "We require the help of a monitoring company to see
20   what's happening on the different platforms."  Do you recall
21   that?
22   A.  Yes.
23   Q.  And when you required that help, Sony has never hired
24   Rightscorp, correct?
25   A.  I don't know that we've ever -- I don't know whether we
```

1   have ever hired Rightscorp.

2   Q.  I'm sorry.  You are responsible for Sony's antipiracy group

3   and you don't know if you've ever hired Rightscorp?

4   A.  The antipiracy team hires many, many, many vendors.  And

5   no, I don't know if at any point in time they've hired

6   Rightscorp.

7   Q.  You didn't speak to anyone within the company about that

8   before you came and testified today?

9   A.  No.  I mean, unfortunately, Dong Jang, who's the head of

10  antipiracy, is on paternity leave, so I wasn't able to talk to

11  him.

12  Q.  I believe you sit on the board of the RIAA, is that right?

13  A.  No.

14  Q.  Are you a member of the board of RIAA?

15  A.  No.

16  Q.  Do you have any role with RIAA?

17  A.  I mean, Sony Music certainly participates in the RIAA.

18  It's our trade association.

19  Q.  But you personally?

20  A.  No.  I'm on the board of Sound Exchange.

21  Q.  Well, you said that Sony is a member of RIAA --

22  A.  Yes.

23  Q.  -- correct?  So to allow Sony and the other labels to bring

24  this case, RIAA bought e-mails from Rightscorp, correct?

25  A.  I'm aware that there was an arrangement between the RIAA

Jeff Walker - Examination                    170

1    and Rightscorp to secure the materials, yes.

2    Q.  And RIAA also bought music files that Rightscorp claims to

3    have downloaded from Grande's Internet users.  Do you

4    understand that?

5    A.  Yes.

6    Q.  Do you know how much RIAA is paying Rightscorp for its

7    witnesses to testify at trial?

8              MR. BART:  Objection, Your Honor.

9              THE COURT:  Well, he's entitled to ask if there are

10   paid witnesses.

11             MR. BART:  Yes, but he can ask the witnesses who are

12   being paid instead of asking this person -- this witness.

13             THE COURT:  I think you missed the foundation question

14   as to whether he has that knowledge.

15   BY MR. HOWENSTINE:

16   Q.  Do you know whether RIAA is paying Rightscorp's witnesses

17   to come and testify at this trial?

18   A.  I don't.

19             MR. HOWENSTINE:  I'd like to show the witness

20   preadmitted DX 66, Defendant's Exhibit 66.  This has already

21   been admitted without objection.

22             THE COURT:  Can we dim the lights a little bit so the

23   jury gets a better -- it's a little bright.

24             MR. HOWENSTINE:  If we could zoom in on the title in

25   the top four paragraphs.

1          THE COURT:  That's right.  You have individual

2    monitors, don't you?  Forgive the old-school guy, okay?  I'm

3    from the days when we used to pass the paper around.

4    BY MR. HOWENSTINE:

5    Q.  This is a document titled "Litigation Support and

6    Consulting Agreement," correct?

7    A.  Yes.

8    Q.  Have you seen this document before?

9    A.  No.

10   Q.  If you look at the top paragraph, it says*, "This litigation*

11   *support and consulting agreement is made this 19th Day of*

12   *October 2016 by and between Recording Industry Association of*

13   *America and Rightscorp."*  See that?

14   A.  Yes.

15   Q.  Now, so this is the agreement between RIAA and Rightscorp.

16   You would agree with me?

17          MR. BART:  Objection, Your Honor.  This witness has

18   never seen this document before.

19          THE COURT:  Sustained.

20   BY MR. HOWENSTINE:

21   Q.  I'd like you to, if you could, move to schedule B, the last

22   page.  If you could zoom in on the information there at the

23   top.

24       So this document indicates that Mr. Boswell is being paid

25   $350 an hour, correct?

1          MR. BART:  Objection.  Same objection.  This witness

2    has never seen the document.

3          THE COURT:  You need to ask him more foundation before

4    you start to probe him on the document, counsel.

5    BY MR. HOWENSTINE:

6    Q.  What do you know about the relationship between RIAA and

7    Rightscorp?

8    A.  I know that Rightscorp provided information to the RIAA.  I

9    don't know what the terms are related to that transfer.  I know

10   that the RIAA and their experts evaluated separately the

11   technology.  That's really the extent of what I know about

12   Rightscorp.

13   Q.  Has Sony independently evaluated Rightscorp's technology?

14   A.  I don't know.  I don't know.

15   Q.  We talked about the fact that -- well, I had asked you

16   about whether Sony has ever hired Rightscorp.  Do you know if

17   RIAA has ever hired Rightscorp, apart from this agreement?

18   A.  I don't know.

19   Q.  You don't know if RIAA has ever hired Rightscorp to send

20   copyright infringement complaints to ISPs, for example?

21   A.  I don't know.

22   Q.  You also testified about different mechanisms by which Sony

23   sells its music or offers its music for sale.  You talked about

24   digital downloads was one of those?

25   A.  Sure.

1    Q.  Certainly, Sony maintains records of digital downloads on a

2    per-song basis, right?

3    A.  Yes.

4    Q.  So if you wanted to show for the jury, for example, how

5    much a given song is worth, you could show it information about

6    how many times it was sold in digital download form, correct?

7              MR. BART:  Objection, Your Honor.  Use of the term

8    "worth."  It has nothing to do with that.

9              THE COURT:  Sustained.

10   BY MR. HOWENSTINE:

11   Q.  If you wanted to show to the jury how many times a song had

12   been sold over a digital download platform, you could provide

13   that information, correct?

14   A.  We would have that reporting.

15   Q.  And, likewise, you could show the jury how many times a

16   given song had been streamed on a streaming service, correct?

17   A.  Yes.

18   Q.  But you're not able to testify about any of that

19   information today on a per-song basis, correct?

20   A.  No.  I mean, that's correct.

21   Q.  As the person responsible for antipiracy efforts at Sony,

22   is it your view that Grande should spy on what its customers

23   are doing online?

24             MR. BART:  Objection, Your Honor.  He's already said

25   he is not the head of antipiracy twice.

1          THE COURT:  Sustained.

2    BY MR. HOWENSTINE:

3    Q.  Is it your view that Grande should spy on what its

4    customers are doing online?

5    A.  No.  I think the suggestion is that Grande has to respond

6    to notices and share those notices with its users and have a

7    repeat infringement policy that's reasonably implemented to

8    terminate repeat infringers.

9    Q.  So in your view, Grande is obligated to take all the

10   notices that it receives at face value, is that correct?

11   A.  I mean, I guess so, yes.

12          MR. HOWENSTINE:  I have no further questions.

13          THE COURT:  All right.  Any redirect?

14          MR. BART:  No, Your Honor.

15          THE COURT:  Okay, sir, you can step down.  Thank you.

16          THE WITNESS:  Thank you.

17          MR. BART:  Thank you, Your Honor.  Plaintiffs are

18   calling Wade Leak as their next witness.

19          *(3:18 p.m.)*

20          COURTROOM DEPUTY CLERK:  Please remain standing and

21   raise your right hand.

22          You do solemnly swear the testimony you're about to

23   give in this case now before the Court will be the truth, the

24   whole truth and nothing but the truth, so help you God?

25          THE WITNESS:  I do.

```
 1                        *   *   *
 2            (WADE LEAK, Plaintiff Witness, Sworn.)
 3                        *   *   *
 4         COURTROOM DEPUTY CLERK:  You can have a seat.
 5                      DIRECT EXAMINATION
 6   BY MR. BART:
 7   Q.  Good morning.  Can you introduce yourself to the jury,
 8   please.
 9   A.  Sure.  My name is Wade Leak.
10   Q.  By whom are you employed, Mr. Leak?
11   A.  What's that?
12   Q.  By whom are you employed?
13   A.  Sony Music Entertainment.
14   Q.  And how long have you worked for Sony Music Entertainment?
15   A.  Going on 24 years.
16   Q.  And what's your current title?
17   A.  I'm the executive vice president, deputy general counsel,
18   and chief compliance ethics and privacy officer.
19   Q.  You have to take a deep breath.
20   A.  It's a lot, yes.
21   Q.  Is Sony Music Entertainment a plaintiff in this case?
22   A.  Yes.
23   Q.  What are the primary assets of Sony Music Entertainment?
24   A.  Our sound recordings.
25   Q.  And what does Sony do to protect them?
```

1   A.   We get copyright protection of those sound recordings.

2   Q.   And what is a copyright?

3   A.   A copyright is like an exclusive legal right that gives you

4   certain protections for a book, a film, sound recording.

5   Q.   Okay.  And how are copyrights protected?

6   A.   Primarily through federal law.  The U.S. Constitution makes

7   a reference to copyright, and over time, since the beginning of

8   our country, Congress has enacted different laws to protect

9   copyright.

10  Q.  And what does owning a copyright enable the copyright owner

11  to do?

12          MR. HOWENSTINE:  Objection, Your Honor.  He's asking

13  the witness to testify on the law.

14          THE COURT:  Sustained.

15  BY MR. BART:

16  Q.   Is there a difference between owning -- okay.

17      As deputy counsel of Sony Music, what rights can Sony

18  exercise -- what rights do you allow Sony to exercise in a work

19  once it has a copyright?

20  A.   Once we have the copyright, we have the right to the -- the

21  exclusive right to reproduce the work.

22          MR. HOWENSTINE:  Objection, Your Honor.  He's going on

23  to testify about the law.

24          THE COURT:  No, I don't think so.  He's just giving

25  his own personal view.

1   A.  We have the --

2         THE COURT:  I mean, I think the jury is entitled to

3   understand the basis of his understanding so they can evaluate

4   his testimony.  I think the jury understands that I will

5   instruct them on the law of copyright.

6   BY MR. BART:

7   Q.  You can continue your answer.

8   A.  -- the exclusive right to reproduce the copyrighted work,

9   to distribute the copyrighted work, to publicly perform the

10  copyrighted work, and to make what's known as a derivative work

11  or a work based on that copyrighted work.

12  Q.  Is there a difference between owning a copyright and owning

13  a copy of a work?

14  A.  Of course.

15  Q.  And what's that?

16  A.  If you own the copy of a work, you only have the right to

17  enjoy that copy.  Potentially maybe resell that copy, but not

18  to do all the other things I mentioned.  You don't have the

19  right to reproduce, distribute, etc.

20  Q.  Okay.  Have the laws -- are copyright laws important to

21  Sony Music?

22  A.  Absolutely.

23  Q.  And why?

24  A.  Because it's the copyright -- it's the protection of our

25  copyrights that our entire business is based upon.  We make

Wade Leak – Examination                178

1    artistic works with our artists, and the only way we can
2    realize the benefit of those works is through exercising those
3    exclusive copyright rights.
4    Q.  Do your responsibilities at Sony Music Entertainment
5    include knowing or investigating what sound recordings the Sony
6    companies own or control?
7    A.  Yes.
8    Q.  How many of those sound recordings are at issue in this
9    lawsuit?
10   A.  There are 453 Sony Music copyrights at issue in this case.
11   Q.  Are you familiar with those recordings?
12   A.  Yes, generally familiar.
13   Q.  How?
14   A.  Many of them I'm familiar with them because I know the work
15   behind Sony Music with the artist creating the work.  And many
16   I know just because I'm a fan of the music.
17   Q.  Are you personally familiar with how the Sony plaintiffs
18   came to own or control these sound recordings?
19   A.  Yes.  In the course of this case, I helped prepare and
20   signed a sworn statement that presented the basis for all of
21   our ownership and/or exclusive control of the copyrights at
22   issue in this case.
23   Q.  Did Sony plaintiffs or their predecessors apply for
24   copyright registration certificates from the Copyright Office
25   for all 453 of these works?

```
1    A.  Yes.
2    Q.  Do you know whether they were compiled and produced in this
3    case?
4    A.  Yes, we did -- my understanding is we got all that
5    information together and produced it in this case.
6    Q.  Okay.
7            MR. BART:  Your Honor, this has already been marked, I
8    think this morning, as Plaintiff's Exhibit 22.
9    BY MR. BART:
10   Q.  Can you describe them for the jury?
11   A.  Do I move this?  Can I move this?  No.  Sorry.  I don't
12   know what I'm supposed to do.
13   Q.  Just generally --
14   A.  My understanding is this is the copyright certificates for
15   the works at issue in this case, the Sony Music works at issue
16   in this case.
17   Q.  Now I'd like to show you Plaintiff's Exhibit 21.  Have you
18   seen this document before?
19   A.  Yes.
20   Q.  Can you tell me what it is?
21   A.  That's a list of the Sony musical tracks at issue in this
22   case with certain registration information about the
23   copyrights.
24   Q.  Okay.  And --
25           MR. HOWENSTINE:  Excuse me.  Has this document been
```

 1   admitted into evidence?

 2         MR. BART:  I'm getting there.  I'm laying a

 3   foundation.

 4         MR. HOWENSTINE:  It's already been published to the

 5   jury?

 6         THE COURT:  Yeah, we really shouldn't publish it until

 7   it's been received.

 8         MR. BART:  I'm sorry.  I didn't intend to say publish.

 9   I wanted to show him Exhibit 21.  And maybe I misspoke.

10         THE COURT:  It's all right.  I don't think -- it was

11   so small, I don't think anybody could read it anyway.  I

12   couldn't.

13         MR. BART:  Okay.  May I proceed?

14         THE COURT:  Yes.

15         COURTROOM DEPUTY CLERK:  Judge.

16         (Discussion held off the record.)

17         THE COURT:  Just let her know what you want to do.

18         MR. BART:  Okay.

19         COURTROOM DEPUTY CLERK:  You can put it on the screen,

20   but only the witness is going to see it, if that's what your

21   intention is.

22         MR. BART:  Right now, because I'm going to move for

23   it --

24         COURTROOM DEPUTY CLERK:  Right.

25         MR. BART:  -- so I didn't understand the procedure.

1          THE COURT:  That's all right.  It's a good time.

2   We're early in the trial.  We've got a long way to go.

3          MR. BART:  Yep, absolutely.

4          THE COURT:  So now is the time to get this squared

5   away.

6          MR. BART:  Okay.

7   BY MR. BART:

8   Q.  Can you tell me what this document is, Mr. Leak?

9   A.  Can you make it a little bigger on my screen or not?  Okay.

10  Yes.  This is a list of the plaintiffs, Sony plaintiffs' works

11  in suit.  It has the plaintiff, the artist, the track title,

12  the registration information.  That's what this is.

13  Q.  And do you know what materials were used as the basis for

14  compiling this chart?

15  A.  Our own information and then information from the Copyright

16  Offices's website.

17         MR. BART:  I'm going to move to admit this as a

18  summary exhibit under Rule 1006.

19         MR. HOWENSTINE:  Objection.  Foundation.

20         THE COURT:  Did he produce the document?

21         MR. BART:  We produced the document on behalf of Sony.

22         THE COURT:  No, no, no, I understand, but who put the

23  document together?

24         MR. BART:  My law firm put this document together, but

25  it's using just the materials that he identified, which are

 1   already part of the record.

 2          THE COURT:  Are these materials already in evidence?

 3          MR. BART:  Yes.

 4          THE COURT:  They're already in evidence, then it's

 5   okay.

 6          MR. BART:  Okay.  Thank you, Your Honor.

 7   BY MR. BART:

 8   Q.  I'd like to move on to something else, Mr. Leak.  Can the

 9   public obtain copies or access to each of the Sony recordings

10   at issue in this case separately without having to purchase or

11   stream an entire album?

12   A.  Yes, to my knowledge.

13   Q.  Okay.  And how can they do that?

14   A.  The tracks are available on streaming services like Apple

15   Music, Spotify, and they also can be available on YouTube, many

16   of them.

17   Q.  Did Sony make each of these recordings available to the

18   public on an individual basis between 2011 and 2017?

19          MR. HOWENSTINE:  Objection.  Lack of personal

20   knowledge.

21          THE COURT:  Overruled.

22   A.  Yes.

23   Q.  Were there any --

24   A.  Except three.  The three that were not available

25   individually are a live recording by Adele of Someone Like Me,

1    a live recording of a Stevie Ray Vaughan track, Crossfire, and

2    a track called Diamonds and Gold by Kid, Inc.

3              MR. BART:  I have no further questions, Your Honor.

4              THE COURT:  All right.  Cross-examination.

5              THE WITNESS:  Can I get some water?

6              THE COURT:  Sure, of course.

7              THE WITNESS:  Thank you.

8                        CROSS-EXAMINATION

9    BY MR. HOWENSTINE:

10   Q.  I'm sorry, you caught me a little offguard, I didn't think

11   you were going to be so quick.

12       Sorry about that.  Mr. Leak, how are you this afternoon?

13   A.  I'm fine.

14   Q.  Now, you don't know anything about how Rightscorp's system

15   works, correct?

16   A.  I don't have personal knowledge of how Rightscorp system

17   works.

18   Q.  You've never examined Rightscorp's software system,

19   correct?

20   A.  No.

21   Q.  Dong Jang is the head of antipiracy at Sony, correct?

22             MR. BART:  Your Honor, if this is an extended

23   dissertation to Rightscorp, it is beyond the scope of the

24   direct and I object.

25             THE COURT:  You want to re-ask your question.

```
 1              MR. HOWENSTINE:  I'll move on, Your Honor.
 2   BY MR. HOWENSTINE:
 3   Q.  So I believe you testified there are 453 Sony sound
 4   recordings, songs at issue in this case, correct?
 5   A.  Yes.
 6   Q.  If you could put up PX 21 again please?
 7   A.  I'll definitely need it bigger on my screen.  Depending on
 8   the questions.  Thank you.
 9   Q.  So let's pick one.  Let's go to page eleven of this
10   document.  If you could just blow up like the bottom third of
11   this page, the bottom third.
12      Okay.  Let's pick a track at random.  So we have Chop Me Up
13   by Justin Timberlake there.  Do you see that?
14   A.  I see that.
15   Q.  Now, let's focus on the period of 2014 to 2017.  You can't
16   tell the jury anything about how much money Sony earned from
17   people buying that song on iTunes, correct?
18              MR. BART:  Objection, Your Honor.  I'll give you my
19   reason if you want to.
20              THE COURT:  Yeah.
21              MR. BART:  Because this is ultimately a discovery
22   issue and there have been discovery rulings and motions with
23   regard to the obligations to produce this type of information
24   and it's being produced in front of the jury as if there is
25   secreting --
```

```
1            THE COURT:  The objection is sustained.
2            MR. HOWENSTINE:  Your Honor, might I request a
3    sidebar?
4            THE COURT:  No, you can do it after.
5    BY MR. HOWENSTINE:
6    Q.  So Mr. Leak, your testimony today is limited to just the
7    fact that Sony obtained copyright registrations for the songs
8    at issue in this case, correct?
9    A.  My testimony is what it was.  I don't know if I should
10   characterize it.
11           MR. HOWENSTINE:  I don't have any further questions.
12           THE COURT:  Do you want to pursue that what you wanted
13   to talk to me at sidebar?  I can have him available tomorrow if
14   I change my mind.
15           MR. HOWENSTINE:  If we could talk about it right now,
16   I think it will be brief.
17           THE COURT:  No.  We need to move on.  Do you have
18   anything else?
19           MR. BART:  No, I don't.  I think the witness is going
20   to leave in the morning, though, if that's possible.
21           THE WITNESS:  It's my birthday.  That's true.
22           THE COURT:  An often used excuse.
23           MR. BART:  Do you have proof on you?
24           THE WITNESS:  I do, I have my driver's license.
25           THE COURT:  All right, let's do a sidebar.
```

Wade Leak – Examination                    186

```
 1                          *   *   *
 2          (Sidebar.)
 3          MR. HOWENSTINE:  Your Honor, I'm not trying to suggest
 4   that they had some obligation to come forward with information
 5   about digital download sales or anything like that, but one of
 6   the factors for statutory damages is the value of the copyright
 7   and I'm just trying to establish that there's no evidence in
 8   the record from which the jury can determine the value of the
 9   copyright, that's it.
10          MR. BART:  Your Honor, the record will be what the
11   record will be and there will not be that type of evidence.
12   You can make that argument all you want, the witness --
13          THE COURT:  He can ask the witness whether he has any
14   empirical value of the copyrights, Sony copyrights that are at
15   issue.  You can ask him that question.
16          MR. BART:  I'm not -- that wasn't the question,
17   though, but I agree with you.
18          THE COURT:  That's the question you can ask, not the
19   other question.
20          MR. BART:  Right, because revenues and values are
21   different things anyway, but the value if you want to ask.
22          THE COURT:  You can ask the question.
23          (Sidebar concluded.)
24                          *   *   *
25   BY MR. HOWENSTINE:
```

1   Q.  So Mr. Leak, very briefly, we were looking at that PX 21

2   that listed all the Sony songs that are at issue in this

3   lawsuit.  Do you recall that?

4   A.  Yes.

5   Q.  You do not have any information about the empirical value

6   of any of those songs, correct?

7   A.  Are you asking about my view of the value of those songs

8   is?

9   Q.  I'm asking whether you can provide a specific value for any

10  of those songs.

11  A.  I guess the best way to answer that is our catalog is very

12  important to us, all of our tracks have value, the value can be

13  different depending on the time frame you're looking at, but we

14  view them all as valuable.

15  Q.  And I'm talking about the specific songs at issue in this

16  lawsuit.  And I'm just asking whether you have any information

17  about the empirical value of those particular songs?

18          THE COURT:  I think you mean monetary value, is that

19  what you're asking him, monetary value?

20          MR. HOWENSTINE:  Yes, yes.

21          THE COURT:  Okay.

22  A.  The only way I can answer that is what I said, we view all

23  of our tracks as valuable.  How much revenue they might

24  generate in a particular time depends on lots of different

25  things, but we view them as -- all of them as valuable and the

1  core of our business, which is what I testified about.

2  Q.  And you do not have any information today about how much

3  revenue any of those songs generated, correct?

4  A.  I don't have any specific testimony about specific revenue,

5  no.

6          MR. HOWENSTINE:  That's all I have, Your Honor.

7          THE COURT:  Anything else?

8          MR. BART:  No, Your Honor.

9          THE WITNESS:  Thank you, Your Honor.

10          THE COURT:  I'll let you get home.

11          THE WITNESS:  Thank you very much.

12          MR. TRACER:  Plaintiffs call Jeremy Landis.

13          THE COURT:  Come forward, sir, and come right around

14  here.  And please remain standing and raise your right hand.

15          COURTROOM DEPUTY CLERK:  You do solemnly swear the

16  testimony you're about to give in this case now before the

17  Court will be the truth, the whole truth and nothing but the

18  truth, so help you God?

19          THE WITNESS:  I do.

20                    *   *   *

21      (JEREMY LANDIS, Plaintiff Witness, Sworn.)

22                    *   *   *

23          COURTROOM DEPUTY CLERK:  Have a seat.

24                    DIRECT EXAMINATION

25  BY MR. TRACER:

1    Q.   Good afternoon.   Could you please state your name for the

2    jury.

3    A.   My name is Jeremy Landis.

4    Q.   By whom are you employed, Mr. Landis?

5    A.   The Recording Industry Association of America.

6    Q.   Does the Recording Industry Association of America have an

7    acronym that it goes by?

8    A.   It does, RIAA.

9    Q.   How long have you worked at the RIAA?

10   A.   A little over 17 years.

11   Q.   So that's since about 2004, my math is a little rusty?

12   A.   That's right.

13   Q.   What's your current title?

14   A.   I'm senior vice president of technology.

15   Q.   Speaking at a high level, what is the RIAA?

16   A.   It's a not-for-profit trade organization that represents

17   recording labels and the recording industry.

18   Q.   Who are the members of the RIAA?

19   A.   Large recording companies, as well as hundreds of smaller

20   companies.

21   Q.   And do they include the plaintiffs in this case?

22   A.   They do.

23   Q.   Could you list just a few of the things that the RIAA does

24   as a trade association?

25   A.   Sure.   Antipiracy, legal work, advocacy, market research,

1   golden platinum program.

2   Q.   What's the golden platinum program?

3   A.   It's a program where we present gold and platinum records

4   to artists that have commercially successful recordings.

5   Q.   What are some of your job responsibilities at the RIAA?

6   A.   I oversee many initiatives in the Content Protection

7   Department.  I oversee a team of five members and we create

8   automated systems for detecting infringement over the Internet

9   as well as maintaining databases of infringement data.

10  Q.   Okay.  I'd like to talk a little about your background.

11  What was your first job title at the RIAA?

12  A.   My first title was analyst.

13  Q.   And what department was that in?

14  A.   It would have been at the time antipiracy.

15  Q.   What was the Antipiracy Department?

16  A.   Department that whose mission was to address theft of

17  content online.

18  Q.   Does that department still exist?

19  A.   It does, but it has a different name now which is Content

20  Protection.

21  Q.   About how many people are employed in the now Content

22  Protection Department?

23  A.   Seventeen to 20.

24  Q.   And how long did you have the job of an analyst in the

25  Antipiracy Department under its former name?

1    A.   I think around until 2006.

2    Q.   And what are some of the other roles you've had at the RIAA

3    since then?

4    A.   I was the university program coordinator, director of

5    online projects, director of information technology and data

6    management, vice president of the technology and now senior

7    vice president of technology.

8    Q.   Can you tell us what some kinds of the antipiracy work the

9    RIAA does are?

10   A.   I can.  We create programs to educate users about the

11   effects of piracy, we investigate websites that engage in

12   infringement and in some cases we file lawsuits on behalf of

13   our members.

14   Q.   Are there any other kinds of legal action that the RIAA

15   takes other than lawsuits?

16   A.   There are.  We send letters to site operators where we find

17   infringement letting them know that there's infringement on

18   their sites and asking them to remove it.  We do file lawsuits

19   on behalf of our members and we, in some extreme cases, provide

20   evidence to the Department of Justice.

21   Q.   I think you said you send out notice letters.  About how

22   many notice letters does the RIAA send in a year?

23   A.   Thousands.  Many of the notices contain multiple

24   infringements, so we would send notices on millions of

25   infringements during the course of a year.

1    Q.  And why does the RIAA do that?

2    A.  It's our mission to address piracy wherever we find it.

3    Our members, they rely on being able to monetize their

4    copyrights and so they can invest in new artists and new music.

5    Q.  What are the main types of piracy that the RIAA

6    investigates?

7    A.  It's changed over the years.  Initially there were sites

8    that hosted files that allowed users to download, then the

9    early 2000s online networks came around that allowed users to

10   share files directly with each other.  Later there were digital

11   storage sites that we commonly refer to as "lockers" and they

12   would allow users to upload a lot of content and in many cases

13   share that content with other users.  Most recently we have

14   stream ripping which takes files from sites like YouTube and

15   makes them shareable.

16   Q.  You mentioned online networks in your answer just now.  Do

17   those networks have a name that they go by?

18   A.  Yes, peer-to-peer or P2P.

19   Q.  And what is a P2P network?

20   A.  Generally it's an online network of users that allow users

21   to log in -- sorry, not log in, to engage with other users,

22   find files, and download those files directly without the

23   assistance of a third party.

24   Q.  And have those networks changed at all over time?

25   A.  They have, yes.

Jeremy Landis - Examination                    193

1   Q.  How?

2   A.  There were originally what we refer to as centralized

3   peer-to-peer sharing services like Napster and LimeWire and

4   Grokster.  There were companies that distributed the software

5   and they had a centralized organization.  Then there was

6   BitTorrent, which was decentralized, it was a piece of software

7   that allowed users to share files.

8   Q.  How do these types of networks work?

9   A.  Generally speaking, they allow users to see what other --

10  what other users are sharing on a network and to directly

11  download those files.

12  Q.  Does the RIAA employ people in the Content Protection

13  Department today who work on piracy issues related to P2P

14  networks?

15  A.  Yes, they do.

16  Q.  So you've talked a little bit about how P2P networks have

17  changed over time.  Is there anything else in your view that

18  distinguishes BitTorrent from the other P2P networks that

19  you've identified?

20  A.  There is the decentralized nature of BitTorrent allows

21  users to share multiple pieces of the same file simultaneously

22  which means that a single user can download multiple pieces of

23  the same file at the same time making download speeds faster.

24  Q.  Do BitTorrent users know who they're downloading files

25  from?

1    A.   No.

2    Q.   Does the RIAA monitor BitTorrent?

3    A.   We do with the help of a vendor, yes.

4    Q.   What do those vendors do?

5    A.   Those vendors act as BitTorrent clients and they log the IP

6    addresses of users sharing files.

7    Q.   What's an IP address?

8    A.   It is a set of numbers assigned to a computer on the

9    Internet, it's a digital address as the name would suggest.

10   Q.   Is it possible to identify a specific person on BitTorrent

11   based only on that person's IP address?

12   A.   No, it's not.

13   Q.   Can anybody do that?

14   A.   An Internet service provider could.

15   Q.   What do you mean by Internet service provider?

16   A.   The company that provides Internet access to a user.

17   Q.   Can you give me an example of one?

18   A.   Grande, the defendant in this case.

19   Q.   So without the cooperation of an Internet service provider,

20   does the RIAA have any means to connect identified

21   infringements to specific users?

22   A.   No, we do not.

23   Q.   Are the vendors you mentioned able to take any direct

24   actions against users as a result of finding that those users

25   are making files available to download on BitTorrent?

Jeremy Landis - Examination                    195

1    A.  No, they're not.

2    Q.  So what do the monitoring companies do when they identify

3    infringing activity on BitTorrent?

4    A.  They log the IP addresses of the user sharing files and

5    they report that information to Internet service providers.

6    Q.  And what happens after they report the information to the

7    Internet service providers?

8    A.  It's up to the ISP what action to take.

9    Q.  Does the RIAA ever acquire any copies of digital audio

10   files that have been downloaded from the suspected infringing

11   websites?

12   A.  We do, yes.

13   Q.  How do they come to possess those files?

14   A.  Sometimes we're provided those files by the vendors.

15   Q.  And is the same true for peer-to-peer networks?

16   A.  That's correct, yes.

17   Q.  And does the RIAA ever try to verify that audio files that

18   it comes to possess are actually copies of copyrighted sound

19   recordings?

20   A.  We do, yes, it's a big part of what we do.

21   Q.  How do you do that?

22   A.  Sometimes we do that just by listening to the files, other

23   times we use software that electronically analyzes the file and

24   compares it to a database of known recordings.

25   Q.  Can you give me an example of one of those pieces of

1    software you just described?

2    A.   Yes, Audible Magic.

3    Q.   What is Audible Magic?

4    A.   Audible Magic is a proprietary software that analyzes audio

5    files and compares those files to a database of known

6    recordings.

7    Q.   Is Audible Magic well known in the music industry?

8    A.   It is, I'd say it's the industry standard.

9    Q.   Have you ever used Audible Magic as part of your job duties

10   for the RIAA?

11   A.   I have, yes.

12   Q.   When was the first time you used it?

13   A.   I would say 2006.

14   Q.   And how frequently have you used it since then?

15   A.   Literally millions of times.

16   Q.   And how often do you use it?

17   A.   I would say almost on a daily basis.

18   Q.   Can you give me an example you can think of when you've

19   used Audible Magic?

20   A.   Yes, there were a few years ago a prevalence of the locker

21   sites that I mentioned, we would download files from the locker

22   sites that we believed to be engaged in infringing activity and

23   we would run those files through Audible Magic to determine if

24   they were from company recordings.

25   Q.   Can you tell us just examples of some of those locker sites

1   you just mentioned?

2   A.   Sure.  Mega Upload, Foreshared, Share Beast.

3   Q.   And has the RIAA ever taken legal action in reliance on

4   Audible Magic evidence?

5   A.   Yes, we have.

6   Q.   What kind of legal action?

7            MR. HOWENSTINE:   Objection, Your Honor, relevance.

8            THE COURT:   Sustained.

9   BY MR. TRACER:

10  Q.   Has the RIAA ever relied on Audible Magic evidence to

11  respond to copyright infringement online?

12           MR. HOWENSTINE:   Objection.   Same objection, Your

13  Honor.

14           THE COURT:   Now, that's a slightly different question.

15  I'm going to allow it.

16  A.   Yes, we have.

17  Q.   What has the RIAA done?

18  A.   In example of Share Beast was a online locker service, we

19  download files from the Share Beast service and we used Audible

20  Magic evidence to eventually alert the Department of Justice to

21  activity on the Share Beast service.

22  Q.   And what was the result of that sharing information with

23  the government?

24           MR. HOWENSTINE:   Objection, relevance again, Your

25  Honor, talking about other litigations.

```
 1              THE COURT:  Sustained.
 2   BY MR. TRACER:
 3   Q.  Are you aware of any times the government has ever taken
 4   any legal action based on Audible Magic evidence?
 5              MR. HOWENSTINE:  Same objection.
 6              MR. TRACER:  Your Honor, this goes to reliability of
 7   Audible Magic technology.
 8              THE COURT:  The objection is overruled.
 9   BY MR. TRACER:
10   Q.  Are you aware of any times when the government has taken
11   any legal action based on Audible Magic evidence that the RIAA
12   has shared with it?
13              MR. HOWENSTINE:  Objection, live personal knowledge,
14   asking about what the government did.
15              MR. TRACER:  Based on the evidence that the RIAA
16   provided to it.
17              THE COURT:  Well, you need a little more foundation
18   than that.
19              MR. TRACER:  Okay.
20   BY MR. TRACER:
21   Q.  Are you aware of any public lawsuits that the federal
22   government has brought based on Audible Magic evidence that the
23   RIAA has provided to it?
24              MR. HOWENSTINE:  Same objection, Your Honor.
25              THE COURT:  Overruled.
```

1  A.  I am, yes.

2  Q.  And what actions are you aware of?

3  A.  In the case of Share Beast specifically, we provided

4  evidence to the Department of Justice.  Department of Justice

5  decided to take action and the operator of Share Beast was

6  sentenced.

7  Q.  Can you give me any recent examples of civil lawsuits that

8  the RIAA has pursued based on evidence from Audible Magic?

9  A.  I can, yes.

10        MR. HOWENSTINE:  Objection, again Your Honor,

11  relevance.

12        MR. TRACER:  Again it goes to Audible Magic's

13  reliability.

14        THE COURT:  You're right on the outer fringes of this

15  because he doesn't have a lot of personal knowledge about this.

16  He's just reflecting what he knows was transferred, so he

17  doesn't know precisely.

18        MR. TRACER:  He's aware of information -- he's aware

19  of what the RIAA has done as an employee of the RIAA.

20        THE COURT:  He can testify to that.

21        MR. TRACER:  I believe that was my question.

22        THE COURT:  I thought you were asking him about

23  something different.

24        MR. TRACER:  My question was if there are any -- I'll

25  ask a new question and we'll go from there.

Jeremy Landis - Examination                    200

```
 1           THE COURT:  All right.
 2   BY MR. TRACER:
 3   Q.  Can you give me any recent examples of civil lawsuits that
 4   the RIAA pursued based on evidence it obtained from Audible
 5   Magic?
 6           MR. HOWENSTINE:  Same objection, Your Honor, talking
 7   about other lawsuits.
 8           THE COURT:  Yeah, I want to stay away from other
 9   lawsuits.  We have enough to deal with here.
10           MR. TRACER:  Okay, I'll move on, Your Honor.
11   BY MR. TRACER:
12   Q.  Why does the RIAA have a need to use a tool like Audible
13   Magic?
14   A.  In many cases there's a vast amount of infringement, this
15   is an electronic tool that helps us save time when identifying
16   recordings.
17   Q.  How does it help you save time?
18   A.  It's a piece of proprietary software that analyzes the
19   files and matches them to known recordings, it means that we
20   don't have to listen to every file.
21   Q.  And how do you use Audible Magic?
22   A.  We write some simple code that inputs the files into
23   Audible Magic and records the returns.
24   Q.  And in your experience using Audible Magic as part of your
25   employment with the RIAA, have you found its results to be
```

1    reliable?

2    A.   A hundred percent reliable, yes.

3    Q.   Have you ever seen any evidence that it made a mistake in

4    matching one sound recording to another?

5    A.   No, I have not.

6    Q.   Do you know anything about how the Audible Magic software

7    works on a technical level as opposed to get results from it?

8    A.   I do not, it's proprietary software.

9    Q.   Has that ever stopped you from using Audible Magic?

10   A.   No, it has not.

11   Q.   Are you familiar with the company called Rightscorp?

12   A.   I am, yes.

13   Q.   What is your understanding of what Rightscorp does?

14   A.   They are a vendor that monitors P2P networks.

15   Q.   Does Rightscorp also download audio files on BitTorrent?

16   A.   They do.

17   Q.   Did there ever come a time when you came to be in

18   possession of material that Rightscorp downloaded from

19   BitTorrent users?

20   A.   Yes.

21   Q.   When was that?

22   A.   Around October of 2016.

23   Q.   And what happened then?

24   A.   I was provided a hard drive of files by my direct

25   supervisor at the time, Mark McDevitt.

1   Q.   What did you do with that hard drive of files?

2   A.   I took those files and input them into Audible Magic.

3   Q.   At that time, did you know where the audio files came from?

4   A.   At that time, no, I did not.

5   Q.   But sitting here today, do you have an understanding of

6   where they came from?

7   A.   I do, yes.

8   Q.   And where is that?

9   A.   They were files that were downloaded by Rightscorp --

10        MR. HOWENSTINE:   Objection, lack of personal

11   knowledge, Your Honor.

12        THE COURT:   Sustained.

13   BY MR. TRACER:

14   Q.   Are you familiar with the concept of metadata associated

15   with audio files?

16   A.   I am, yes.

17   Q.   And what's your understanding of that concept?

18   A.   It's factual data in addition to the audio recording that

19   displays information such as the name of an artist, the name of

20   title, potentially the releasing year of recording.

21   Q.   What is your understanding of what metadata is typically

22   associated with audio music files?

23   A.   That would be the name of the artist, the title of the

24   recording, sometimes the year of the release.

25   Q.   Did the audio files on the hard drive that you received

1    have any metadata associated with them?

2    A.  They did, yes.

3    Q.  How many files were on that hard drive?

4           MR. HOWENSTINE:  Objection, foundation, Your Honor.

5           MR. TRACER:  Your Honor, he testified that he came to

6    be in possession of the hard drive.

7           THE COURT:  The objection is overruled.

8    BY MR. TRACER:

9    Q.  How many files were on that hard drive?

10   A.  Around 60,000.

11   Q.  And did you run all of those files through the Audible

12   Magic program?

13   A.  Yes, I did.

14   Q.  What were the results?

15   A.  There were around 40,000 files that had a match to a

16   recording in the Audible Magic database.

17   Q.  When you say a match, what does that mean?

18          MR. HOWENSTINE:  Objection, foundation.  He's talking

19   about the outputs of software when the inputs are not in

20   evidence.

21          MR. TRACER:  Your Honor, he's talking about his use of

22   a software program that he uses as part of his job

23   responsibilities.

24          THE COURT:  Objection is overruled.

25   A.  Sorry.  Can you repeat the question?

1    Q.   Yeah.   When you said that Audible Magic returned a match,

2    what does that mean?

3    A.   It means that for 40,000 files they found a match to a

4    reference file in their database.

5    Q.   Are plaintiffs in this case alleging copyright infringement

6    based on any of the files where Audible Magic did not find a

7    match?

8    A.   No, they are not.

9    Q.   How did you receive the results from the Audible Magic

10   software?

11   A.   The Audible Magic software outputs a file.   So for every

12   match that we did, a file is output with the results.

13   Q.   And did you receive an output file for each of the

14   downloads on the hard drive?

15   A.   We did, yes.

16   Q.   So I would like to show the witness but not the jury

17   Plaintiff's Exhibit 44, which has not yet been admitted into

18   evidence.

19       Mr. Landis, do you recognize this document?

20   A.   I do, yes.

21   Q.   What is it?

22   A.   It is an example output file from the Audible Magic

23   software.

24   Q.   Is this example output file one of the examples from the

25   hard drive we've been discussing?

1  A.  It is, yes.

2  Q.  Does the RIAA keep this document in its regular course of

3  business?

4  A.  Yes, we do.

5          MR. TRACER:  I move to admit this exhibit into

6  evidence.

7          MR. HOWENSTINE:  No objection.

8          THE COURT:  It will be received.

9          MR. TRACER:  Can we please publish this to the jury?

10  Thank you.

11  BY MR. TRACER:

12  Q.  So is this output file a representative sample of all the

13  output files from Audible Magic that you received on the hard

14  drive?

15          MR. HOWENSTINE:  Objection, foundation.

16          THE COURT:  You're going to need more foundation, the

17  objection is sustained.

18  BY MR. TRACER:

19  Q.  So Mr. Landis, I believe you previously testified that you

20  received an output file for every match that Audible Magic

21  found in its analysis.  Do you recall that testimony?

22  A.  I do, yes.

23  Q.  And this document is one of the output files that you

24  received; is that right?

25  A.  That's correct.

1    Q.  Okay.  Can you walk us through what you look for when you

2    receive an output file like this from Audible Magic?

3    A.  I can, yes.  Can you please scroll up to the top?  Thank

4    you.

5         I would look for the number here, the 2000, that would

6    indicate that Audible Magic successfully received and processed

7    the file.  I look for the ID server date that says when the

8    file was processed.  I would look for the ID status.  In this

9    case, it's 2006 which indicates that Audible Magic found a

10   match.  And cases where Audible Magic doesn't find a match,

11   that would be 2005.  I also look for the title information.  In

12   this case, Just The Way You Are, and the performer information

13   here listed as Bruno Mars.  Additionally, I would look at the

14   match offset.  Here the number is seven which indicates in the

15   Audible Magic lookup seven seconds of the file were skipped and

16   then I look at the match duration which indicates a match

17   length of 20 seconds.

18   Q.  Were you personally involved in collecting all of the

19   Audible Magic output files that you received onto a hard drive?

20   A.  I was, yes.

21        MR. TRACER:  Your Honor, I'd like to seek admission of

22   Plaintiff's Exhibit 13 which is a thumb drive that contains all

23   of these files.  This goes to some of the large voluminous data

24   issues we were discussing earlier.

25        MR. HOWENSTINE:  We object, Your Honor.  Plaintiff's

1   Exhibit 13 is a collection of 40,000 individual files and I

2   believe they're suggesting that these are the outputs of the

3   Audible Magic software, but they haven't laid any foundation

4   under Rule 9019 that the software is reliable.  They haven't

5   laid the foundation of what files Mr. Landis allegedly put into

6   the Audible Magic software to get these outputs.  And they

7   haven't laid any foundation of what the database was that

8   Audible Magic had that it compared those files to.

9           MR. TRACER:  Your Honor, Mr. Landis has already

10  testified that how he obtained the Audible Magic output files

11  from the hard drive he received and he's testified that he

12  maintains -- that RIAA maintains those files in its regular

13  course of business and he was involved in collecting them for

14  this case.

15          THE COURT:  It will be received.

16          MR. TRACER:  Thank you, Your Honor.  I'd now like to

17  show Mr. Landis, but not the jury, Plaintiff's Exhibit 14.

18  BY MR. TRACER:

19  Q.  Do you recognize this document, Mr. Landis?

20  A.  I do, yes.

21  Q.  What is it?

22  A.  It is a summary of the output files of the Audible Magic

23  results.

24  Q.  Did you assist in preparing this document?

25  A.  I did, yes.

1   Q.  And did the RIAA maintain this document in the regular

2   course of its business?

3   A.  Yes, it did.

4           MR. TRACER:  I move to admit Plaintiff's Exhibit 14.

5           MR. HOWENSTINE:  Your Honor, I don't believe there's

6   foundation for where the file name information in this document

7   comes from.

8           THE COURT:  I have to agree, the objection is

9   sustained.

10  BY MR. TRACER:

11  Q.  Mr. Landis, do you know where the file name information in

12  this document came from?

13  A.  Yes, I believe they were the names of the files on the hard

14  drive I received.

15          MR. TRACER:  I move again to admit Plaintiff's Exhibit

16  14.

17          THE COURT:  It will be received.

18  BY MR. TRACER:

19  Q.  Now, Mr. Landis, when we were looking just a few moments

20  ago at the example Audible Magic output file Plaintiff's

21  Exhibit 44, can you identify in this spreadsheet where the

22  information related to that specific output file is located?

23  A.  I believe the row is 631.

24          MR. TRACER:  Can we focus in on that row please?

25  BY MR. TRACER:

1   Q.  Can you tell us what you see in this row?

2   A.  I can see the name of the Audible Magic output file which

3   is based on the name of the file on the hard drive for Just The

4   Way You Are.

5   Q.  Are you familiar with list of sound recordings the

6   plaintiffs allege were infringed in this case?

7   A.  Generally, yes.

8   Q.  How many recordings are there?

9   A.  I believe 1400, around there.

10  Q.  And did you receive an Audible Magic output file match for

11  each of those recordings in the files that you obtained from

12  the hard drive?

13  A.  I'm sorry.  Please repeat the question.

14  Q.  Sure.  Did you receive an Audible Magic matching output

15  file for each of the sound recordings when you ran them -- when

16  you ran the files from the hard drive through Audible Magic?

17  A.  For the 1400?

18  Q.  Yes.

19  A.  Yes, I did.

20  Q.  And how do you know that?

21  A.  The results are indicated here on the spreadsheet.

22  Q.  Did you ever conduct an analysis of the plaintiff's works

23  in suit and compare those to the Audible Magic output files you

24  received?

25  A.  I did, yes.

1   Q.  What were the results of that analysis?

2   A.  They matched.

3   Q.  I would now like to show Mr. Landis, but not the jury,

4   Plaintiff's Exhibit 15.  Do you recognize this document?

5   A.  I do, yes.

6   Q.  What is it?

7   A.  It is a summary of the works in suit, along with the

8   copyright registration numbers and a count of the number of

9   files on the hard drive that correlate to these recordings.

10  Q.  Did you participate in the creation of this document?

11  A.  I did, yes.

12      MR. TRACER:  I move to admit Plaintiff's Exhibit 15

13  into evidence?

14      MR. HOWENSTINE:  No objection, Your Honor.

15      THE COURT:  It will be received.

16      MR. TRACER:  I'd like to publish this to the jury.

17  BY MR. TRACER:

18  Q.  Now that the jury can see it, can you just explain again to

19  the jury what this chart shows?

20  A.  Yes, it indicates the works in suit of the recordings at

21  issue in this case.  The artist name, the track title, the

22  copyright registration number, and the number of copies of that

23  recording found on the hard drive.

24  Q.  So we've been talking about the Bruno Mars recording Just

25  The Way You Are, is that recording on this list?

1  A.  I believe it is, yes.

2  Q.  Turn to page nine of the list.  So what is the count for

3  that recording?

4  A.  Forty-three.

5  Q.  What does that mean?

6  A.  That indicates that there were 43 copies of this recording

7  on the hard drive.

8  Q.  Now, for the recordings on this list, did you ever compare

9  the data from the Audible Magic output files to the metadata

10  associated with the files themselves?

11  A.  I did, yes.

12  Q.  And what did you find?

13  A.  I found that they matched.

14  Q.  What does that mean?

15  A.  That means that the artist and title indicated by the

16  Audible Magic software matched the metadata from the Rightscorp

17  hard drive.

18       MR. TRACER:  I'd now like to show Mr. Landis, but not

19  the jury, Plaintiff's Exhibit 16.

20  BY MR. TRACER:

21  Q.  Do you recognize this document?

22  A.  I do, yes.

23  Q.  What is it?

24  A.  It is a summary of the metadata and the Audible Magic data.

25  Q.  And did you help in preparing this document yourself?

1  A.  I did, yes.

2          MR. TRACER:  I move to admit Plaintiff's Exhibit 16

3  into evidence.

4          MR. HOWENSTINE:  Objection, Your Honor.  This document

5  contains information from sources other than Mr. Landis, for

6  example, the IP address column ostensibly comes from

7  Rightscorp.  The file name column --

8          THE COURT:  The objection is sustained.  I was

9  concerned about this one.

10 BY MR. TRACER:

11 Q.  Mr. Landis, do you know in total how many matching copies

12 of the works in suit were reflected in the Audible Magic output

13 files?

14 A.  I believe it was around 19,000.

15 Q.  Did you ever do anything to confirm the accuracy of the

16 Audible Magic output files?

17 A.  I did at the time.  I listened to a small subset of the

18 files.

19 Q.  Did you find any errors when you did that work?

20 A.  I did not.

21 Q.  And since then have you personally listened to any

22 additional audio files from the hard drive?

23 A.  I have.  In preparation for this testimony, I listened to

24 about 25 recordings.

25 Q.  What was your reaction to listening to them?

1   A.  I found that they matched.

2          MR. HOWENSTINE:  Objection to foundation.

3          THE COURT:  Sustained.

4   BY MR. TRACER:

5   Q.  Did you do anything to confirm that they matched?

6   A.  I did.  I listened to the files myself and I also compared

7   them against the recording on Spotify.

8   Q.  Are you aware of any examples of Audible Magic saying that

9   a match exists when it doesn't, in other words, a false

10  positive?

11  A.  No, I'm not.

12         MR. TRACER:  No further questions.

13         THE COURT:  Okay.

14                      CROSS-EXAMINATION

15  BY MR. HOWENSTINE:

16  Q.  So Mr. Landis, you have been involved in discussions within

17  RIAA about the appropriate ways to go about detecting online

18  file sharing, correct?

19  A.  I'm not sure I understand what you mean by appropriate

20  ways.

21  Q.  Well, I'm talking about methodologically sound ways of

22  determining whether an infringement occurred?

23  A.  In general, yes.

24  Q.  And you believe that accurately identifying the IP

25  addresses at issue as the source of the suspected infringement

1   is an important component of that, correct?

2   A.  It is, yes.

3   Q.  And you don't have any information about how Rightscorp

4   identifies suspected IP addresses, correct?

5   A.  I don't, no.

6   Q.  You also believe that it's important that infringement

7   notices sent by RIAA need to accurately identify infringement,

8   true?

9   A.  Accurately identify the infringement by -- sorry, I'm not

10  quite sure the implication there.

11  Q.  I was asking you whether you believe that infringement

12  notices sent by RIAA or on behalf of RIAA need to accurately

13  identify infringement, you agree with that?

14  A.  Yes, I do.

15  Q.  And you personally have not analyzed whether the Rightscorp

16  system can accurately identify infringement, correct?

17  A.  I have not.

18  Q.  The information in a notice to an ISP needs to be accurate

19  too, right?

20  A.  I would agree, yes.

21  Q.  And you haven't analyzed whether the information in

22  Rightscorp's notices to Grande is accurate either, correct?

23  A.  I have not.

24  Q.  You also believe that you need to be confident that the

25  allegedly infringing content identified in a notice is the

1    content that the RIAA believed it to be, right?

2    A.   Yes, yes, I do.

3    Q.   Now, you testified about a collection of roughly 60,000 MP3

4    files that you received on a hard drive, right?

5    A.   60,000 files, yes.

6    Q.   You don't know anything about the origin of those files,

7    correct?

8    A.   I don't.

9    Q.   Now, you testified that you got approximately 40,000 match

10   conditions for member company sound recordings; is that right?

11   A.   I believe I testified 40,000 matches to a recording in the

12   Audible Magic database.

13   Q.   So roughly 18,000 of the 60,000 files couldn't be matched

14   to anything in Audible Magic's database, correct?

15   A.   The files where there were no match, yes, that's correct.

16   Q.   And when you say you got 40,000 matches, that just means

17   it's a song that was in Audible Magic's database, correct?

18   A.   That's correct.

19   Q.   Doesn't mean it was a song at issue in this lawsuit?

20   A.   That's correct.

21   Q.   Doesn't mean it's even a song owned by one of the

22   plaintiffs?

23   A.   That's correct.

24   Q.   Now, I believe you also testified earlier that RIAA sends

25   notices on millions of infringements a year, correct?

1   A.  I did, yes.

2   Q.  You use a vendor for that, correct?

3   A.  For some of them, yes.

4   Q.  You use a vendor for the notices you send to ISPs, correct?

5   A.  That's correct.

6   Q.  Millions of notices?

7   A.  As I sit here, I'm not sure of the numbers to ISPs, but we

8   use a vendor for the notices we send to ISPs.

9   Q.  And zero of those notices were sent by Rightscorp, correct?

10  A.  To the best of my knowledge, yes.

11          MR. HOWENSTINE:  I have no further questions for the

12  witness.

13          THE COURT:  Anything else, sir?

14          MR. TRACER:  Nothing further, Your Honor.

15          THE COURT:  All right, sir, you can step down.  Thank

16  you.

17          THE WITNESS:  Thank you.

18          THE COURT:  Well, it's a little late in the afternoon

19  for us to be starting another witness, I think.  So ladies and

20  gentlemen, I thank you for your careful attention today and we

21  will be resuming tomorrow morning at 9:00, which means we'd

22  like to have you in the jury room no later than -- when

23  Priscilla?

24          COURTROOM DEPUTY CLERK:  8:15, 8:30.

25          THE COURT:  8:30.  Thank you.  That's so we can make

1    sure we have everybody.

2              COURT SECURITY OFFICER:  All rise for the jury.

3              *(4:16 p.m.)*

4              THE COURT:  You can be seated.  Is there anything else

5    counsel would like to take up before we recess this afternoon?

6              MR. BROPHY:  I don't believe so, Your Honor.

7              MR. BART:  No.

8              THE COURT:  Who are your witnesses for tomorrow so

9    that we know?

10             MR. BART:  Greg Boswell and Barbara Frederiksen-Cross.

11             THE COURT:  Got that?

12             MR. BROPHY:  Yes, Your Honor.

13             MR. BART:  We had already notified them.

14             MR. BROPHY:  We have exchanged information.

15             THE COURT:  And you know what I forgot to do?  Because

16   nobody reminded me, was to tell the jury --

17             MR. BROPHY:  Sorry, I didn't know when the opportunity

18   would present itself.

19             THE COURT:  Oh, well.  What can you say?  I'll tell

20   them tomorrow, I promise I will.  Thank you.  Have a good

21   evening.

22             *(4:18 p.m.)*

23                           *   *   *

24

25

1                        *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5         I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.  I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  November 3, 2022

12

13   /s/ Angela M. Hailey

14   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
15   262 West Nueva Street
     San Antonio, Texas  78207
16   (210)244-5048

17

18

19

20

21

22

23

24

25