```
1                   UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
2                          AUSTIN DIVISION

3   UMG RECORDINGS, INC., ET AL,    :
    Plaintiffs,                     :
4                                   : Case Number:
    vs.                             : 1:17-CV-00365-DAE
5                                   :
    GRANDE COMMUNICATIONS           : Austin, Texas
6   NETWORKS, LLC, ET AL,           : October 18, 2022
    Defendants.                     :
7   ********************************************************

8                TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE DAVID A. EZRA
9                SENIOR UNITED STATES DISTRICT JUDGE

10  APPEARANCES:
    FOR THE PLAINTIFFS:
11
    Andrew H. Bart, Esquire
12  Jacob Tracer, Esquire
    Jenner & Block, LLP
13  1155 Avenue of the Americas
    New York, NY  10036
14  (212)891-1600; abart@jenner.com

15  Robert B. Gilmore, Esquire
    Philip J. O'Beirne, Esquire
16  Stein Mitchell Cipollone Beato & Missner LLP
    1100 Connecticut Avenue, NW, Suite 1100
17  Washington, DC  20036
    (202)601-1589; rgilmore@steinmitchell.com
18
    Paige Arnette Amstutz, Esquire
19  Scott, Douglass & McConnico, LLP
    303 Colorado Street, Suite 2400
20  Austin, Texas  78701
    (512)495-6300; pamstutz@scottdoug.com
21

22

23

24

25
```

```
1    FOR THE DEFENDANTS:

2    Richard L. Brophy, Esquire
     Zachary C. Howenstine, Esquire
3    Mark A. Thomas, Esquire
     Margaret R. Szewczyk, Esquire
4    Armstrong Teasdale, LLP
     7700 Forsyth Boulevard, Suite 1800
5    St. Louis, Missouri  63105
     (314)621-5070
6    rbrophy@armstrongteasdale.com
     zhowenstine@armstrongteasdale.com
7    mathomas@atllp.com
     mszewczyk@armstrongteasdale.com

8

9

10

11

12

13

14

15

16

17

18

19

20   COURT REPORTER:
     Angela M. Hailey, CSR, CRR, RPR, RMR
21   Official Court Reporter, U.S.D.C.
     262 West Nueva Street
22   San Antonio, Texas  78207
     Phone(210)244-5048
23   angela_hailey@txwd.uscourts.gov

24   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
25
```

1                           **I N D E X**

2     **WITNESSES:**                              **PAGE**

3     **BARBARA FREDERIKSEN-CROSS**

4     By Mr. O'Beirne                        603

5     By Mr. Brophy                          665

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1  (October 18, 2022, 9:00 a.m.)

 2                      *   *   *

 3          COURT SECURITY OFFICER:  All rise.

 4          THE COURT:  Please be seated.

 5          COURTROOM DEPUTY CLERK:  Austin, 17-CV-365, UMG

 6  Recordings, et al vs. Grande Communications.

 7          THE COURT:  All right.  Good morning.  I hope you had

 8  a nice weekend.  I guess late yesterday there were a couple of

 9  additional motions in limine filed.  One of them is basically

10  just a rehash of prior argument that had been made with respect

11  to the Cox trial.  I've reviewed it, and I am not changing my

12  mind.  I have given the plaintiffs leeway and the right to

13  address to a witness, and argue, that there was another

14  litigation, the Cox litigation, that the defendants were aware

15  of it and, because they were aware of it, that in your view,

16  the plaintiff's view, creates a -- at least an opportunity to

17  investigate and possibly a red flag that maybe they might need

18  to look at.

19          It's no different than a car manufacturer that has a

20  certain brand of air bag in their car, in all their cars they

21  built in a certain year, or multiple years, and they become

22  aware of a different car manufacturer being sued over those

23  same brand of air bags.  That might be a red flag or a reason

24  for them to investigate.  And if they choose not to investigate

25  or take appropriate steps, then, certainly, you can argue
```

1    willful blindness.

2          Now, if they investigated and they came to a different

3    conclusion, that would be a matter for the jury.  What we will

4    not do -- and I've said this repeatedly, and I won't address it

5    again in this litigation.  I don't want to get another motion

6    in limine on this.  I will not allow the verdict to come in for

7    multiple reasons.  Under 403, it's far more prejudicial than it

8    is probative.  First of all, that's a different trial, some of

9    the same witnesses, many different, I am quite sure.

10         Secondly, that case is not this case.  We even had

11   different lawyers, I believe.  Thirdly, it's been reversed.

12   There's a dispute as to whether it was reversed for reasons

13   that are relevant here, but we don't need to get into that.  I

14   assume -- unless they've settled the case.  Have they settled

15   it?  They did settle it.  So there won't be a retrial.

16         So we don't know what would have happened in a

17   retrial.  Maybe it would have gone the other way, who knows.

18   It just is not appropriate to lay in front of a jury the

19   verdict in a different case, with different parties, with

20   different lawyers, at a different time.  A lot of witnesses may

21   be similar, but others are different.  Circumstances are going

22   to be, at least to some degree, different, and then say to

23   them, you see, this file-sharing software was in this case and

24   they got a giant verdict, and -- ostensibly, for purposes of

25   willful blindness, but in reality, sitting -- you know,

1    providing the jury with an easy way out when they deliberate.

2           You know, another jury found the Internet provider

3    responsible and awarded, you know, these huge damages.  Eh, you

4    know, kind of the same case, easy enough for us to do it.

5           Now, would I like that if I was the plaintiff?  Of

6    course.  Is it appropriate and fair?  No.  For the reasons I

7    have stated before and I restate now.

8           MR. BART:  Your Honor, may I briefly address that?

9           THE COURT:  Yeah.  You're not going to change my mind.

10          MR. BART:  I'm not -- I just want to make the record,

11   frankly.  The issue is not so much your ruling, because Your

12   Honor has been consistent all throughout.  You ruled on our

13   motion in limine on this very subject and held that we were

14   entitled to present the jury with the fact that Rightscorp sent

15   notices to Cox, and that Cox was ultimately found liable for

16   copyright infringement based on those notices.  That is your

17   ruling.

18          On Friday, you also said, *"You can put in who won just*

19   *not the verdict."*  And so what I really want is clarification.

20   And the reason that this is coming up repeatedly is because

21   there's some ambiguity about the application of your principles

22   to the specific evidence in this case.

23          THE COURT:  Well, I am consistent.  I said -- you

24   know, the result that there was a verdict in the case.

25          MR. BART:  Right.

JURY TRIAL PROCEEDINGS                586

1          THE COURT:  And that they were aware of the verdict
2    for purposes of willful blindness.
3          MR. BART:  Exactly.
4          THE COURT:  But I don't want to hear -- I don't know,
5    how many hundreds of millions of dollars was it?
6          MR. BART:  It was 25 million.
7          THE COURT:  That was all?
8          MR. BART:  Yes.
9          THE COURT:  Oh, minuscule.
10         MR. BART:  So the point really is --
11         THE COURT:  By today's standards.
12         MR. BART:  Yes.
13         THE COURT:  No wonder they settled.  Probably
14   25 million in attorneys' fees.  Go ahead.
15         MR. BART:  Could well have been.  The purpose for
16   today and the reason we filed a motion, just to go back and to
17   put this in procedural context --
18         THE COURT:  Okay.
19         MR. BART:  -- the argument on Friday was about whether
20   or not and to what degree the Cox trial decision could be used
21   with Mr. Boswell.  And at Mr. Brophy's request, the discussion
22   was limited to that subject, and the transcript is very, very
23   clear that that's all that was going to be done.
24         However, during the argument, Your Honor made the
25   statements that you've repeated again this morning.  So we

1    wanted to get clarity that that meant that these particular

2    documents, that were contemporaneous documents of Grande's and

3    showed that they were following it and that they reacted to it,

4    and therefore is consistent with Your Honor's ruling --

5            THE COURT:  I've already said that the subject

6    matter -- and I don't have those documents in front of me.  I

7    don't know what they say.  If the documents mention the amount

8    of the verdict, or whatever, that is not coming in.

9            MR. BART:  Well, the problem, then, is we can redact

10   out any reference to that --

11           THE COURT:  Yeah.

12           MR. BART:  But it's put --

13           THE COURT:  Oh, my God.  They got a $25 million

14   verdict.

15           MR. BART:  But we're not interested, to be perfectly

16   clear --

17           THE COURT:  That's not coming in.

18           MR. BART:  -- and we've never argued that point, but

19   what we are arguing is that their contemporaneous behavior is

20   material.  And to take that out of the case is very

21   prejudicial.

22           THE COURT:  I also want to let you know that I have

23   every intention -- and you might want to remind me of this --

24   of giving a limiting instruction to the jury that the fact that

25   there was a verdict in favor of the plaintiff in that case is

1    of no purpose here at all.  It is not an indication of the

2    defendant's liability in this case.  It's only being offered

3    for purpose of the plaintiff's knowledge of that case, period.

4            MR. BART:  Right.  And the defendant's knowledge of

5    that case.

6            THE COURT:  That's what I meant.

7            MR. BART:  Oh, okay.  I'm sorry.

8            THE COURT:  Did I say plaintiff?

9            MR. BART:  I think so, yes.

10           THE COURT:  Oh, well.  See, you've already got me

11   going.  You've accomplished your task.

12           MR. BART:  That was honestly not -- never my goal.

13           THE COURT:  Whatever they're paying you, it's not

14   enough.

15           MR. BART:  You hear that?

16           So we will proceed to introduce that evidence.  We

17   will take out any reference in the doc -- I think there's only

18   one document that mentions a dollar amount, and we will never

19   argue to the jury anything about the result controlling because

20   again, to make it very clear on the record, the only impact,

21   the only relevance, from our perspective, is the

22   contemporaneous impact of the case and the result on the

23   conduct of the parties, plain and simple.

24           THE COURT:  That's it.  And as I said, I will be

25   giving a limiting instruction at the time that that comes in,

1   and we'll see about -- you know, I already have a general

2   instruction, which I'm sure I will give.

3             MR. BART:  I have other comments to other parts of it,

4   but I'm really only concerned about our ability to move forward

5   on that evidence, and we will do so.

6             THE COURT:  I think I've clarified it.

7             MR. BART:  You have.  Thank you.

8             THE COURT:  Yes.

9             MR. HOWENSTINE:  Your Honor, if I could address that

10  briefly.  Zach Howenstine for the defendant.

11            I think there's been a little bit of slippage in what

12  Mr. Bart has been saying.  Previously, when Your Honor

13  addressed this issue, I think everyone had the same

14  understanding, which was that the plaintiffs could introduce

15  the fact of that other litigation and the fact that Grande was

16  aware of that.

17            THE COURT:  Well, I considered -- yeah, this may be,

18  in part, my fault, right?  You know, I like to think I don't

19  make mistakes, but occasionally I do.  And maybe I'm not as

20  clear sometimes as I should be.  I admit that.

21            The fact of the matter is that I always understood

22  when I said the fact of the litigation, okay, the fact of that

23  to include the fact that there was, indeed, a verdict for the

24  plaintiff.  Okay?  That's what I was thinking.  I don't think I

25  was as clear as I should have been, so I can understand the

1    confusion.

2            MR. HOWENSTINE:  And I just wanted to point out, Your

3    Honor --

4            THE COURT:  The point is that it only matters when we

5    talk about whether your client had knowledge that this was --

6    see, the fact that somebody has knowledge of something, which

7    is remote or fanciful or has a high, high likelihood of being

8    something that is unlikely to impact them is significantly

9    different than their knowledge that it is substantive and it

10   does, in fact, have the potential to impact them in a serious

11   way; and therefore, it goes -- you know, this is one of those

12   strange areas of civil law where a criminal concept, which is

13   willful blindness, applies.  And that's what makes it

14   difficult.

15           If we didn't have the concept of willful blindness, if

16   they had to prove actual knowledge beyond -- and willful

17   blindness was not a potential, I would absolutely agree with

18   you, and this would not be in the least bit probative.  It

19   would be much more under 403, much, much more prejudicial than

20   probative.  But because we have willful blindness, they are

21   entitled, in my view, to show that there was a serious concern,

22   not just a fanciful concern.

23           People sue people all the time for nothing.  I mean,

24   you know, you should see some of the cases -- well, you

25   probably do see them.  Well, you might not, because law firms

1    at your level rarely get involved in these kinds of cases, but

2    I'm going to tell you, I get companies sued for unbelievably

3    ridiculous things.

4              MR. HOWENSTINE:  Your Honor --

5              THE COURT:  And I get them sued for serious things

6    too.

7              MR. HOWENSTINE:  -- I'd just like to make two points

8    in response to that.  Number one, if we are going to be talking

9    about the fact of the verdict, that there was a verdict for the

10   plaintiff, then that raises those same concerns about the

11   reversal and the subsequent settlement, so --

12             THE COURT:  Well, it doesn't in the sense that at that

13   point in time, at that point in time, it was a red flag.

14             MR. HOWENSTINE:  Right.  But then we would need to

15   show that subsequent events showed that if we acted, based on

16   that, that we were mistaken to do that, because there was a

17   subsequent reversal and then a settlement.

18             THE COURT:  Well, I don't see --

19             MR. HOWENSTINE:  So we would still have the

20   trial-within-a-trial scenario.  And these are the cases that we

21   cited on pages two to three of our brief.  You know, lots of

22   different Court of Appeals cases finding that that's the real

23   concern when you bring in this evidence about the result in

24   another case, then you inevitably have that

25   trial-within-a-trial.  And that's why we have this principle --

1    and this is from Wright & Miller and some other cases that we

2    cited --

3              THE COURT:  I haven't had a chance to read, you know,

4    pull out those cases myself from this brief.  You know, I just

5    came in and was handed the papers --

6              MR. HOWENSTINE:  Sure.

7              THE COURT:  -- before I walked in.  So I stepped back

8    and quickly read.  Are these the same cases you previously

9    cited?

10             MR. HOWENSTINE:  No.

11             THE COURT:  Well, I haven't had a chance.

12             MR. HOWENSTINE:  These are numerous -- numerous

13   additional cases, Your Honor.

14             THE COURT:  All right.

15             MR. HOWENSTINE:  We have cases from --

16             THE COURT:  But are these willful blindness cases?

17             MR. BART:  No.

18             MR. HOWENSTINE:  Well, these are cases about

19   introducing evidence of prior verdict.  And the principle, Your

20   Honor is that --

21             THE COURT:  Well, I understand that, but that's not

22   what I just asked you.  Are these willful blindness cases?

23             MR. HOWENSTINE:  Those are not, but I'd like to

24   separately address willful blindness.  That's the separate

25   point.  The question about willful blindness is whether we

1  could have learned -- whether we deliberately avoided learning

2  about whether there was a --

3          THE COURT:  The key, the key -- you're right.  Okay?

4  But the key here is the word "deliberate."  Do you understand?

5  "Deliberate" is the key word.

6          MR. HOWENSTINE:  Right.

7          THE COURT:  And that's why I said if something is

8  fanciful, if it's just kind of out there in the ether, because

9  people get sued for all kinds of stuff, and who knows what.

10 And Internet service providers get sued all the time.  I'm sure

11 that record companies get sued all the time, you know?  I mean,

12 it happens.

13         MR. HOWENSTINE:  Yes, Your Honor.

14         THE COURT:  I know that Sony Corporation gets sued all

15 the time.

16         MR. HOWENSTINE:  But the question, then, is whether --

17         THE COURT:  Doesn't mean they're wrong.

18         MR. HOWENSTINE:  The question is whether we could have

19 done something to unblind ourselves and determine whether

20 infringement had occurred and we didn't do that.  But this

21 question about whether we knew about the Cox case doesn't

22 involve any of those questions, because there's no dispute that

23 we knew about the Cox case.  So it's not a question of whether

24 we were blind to anything.  It's whether, according to the

25 plaintiffs, the fact that we knew about the Cox case means that

1    we knew about infringement.  And that's not willful blindness

2    at all, Your Honor.  I think that's the point.

3            So we would ask that Your Honor take a look at our

4    brief, and specifically take a look at the cases that we cited,

5    because we think they're clear that the purpose of verdict in

6    another case -- there are two possibilities.  Number one,

7    either the verdict is -- or the judgment is preclusive on some

8    issue in the case, and then you bring it in, and you preclude a

9    party from re-litigating that.

10           THE COURT:  But you have to have the same -- yeah, the

11   same parties, the same issues.  You're talking about issue

12   preclusion.

13           MR. HOWENSTINE:  Right.  And what the cases say, if

14   the judgment is not preclusive, then it's irrelevant.  And

15   that's the situation we have here.

16           THE COURT:  Yeah, but I will --

17           MR. BART:  Your Honor, may I briefly respond?  Are you

18   finished?

19           THE COURT:  Here we are.  See, we're right back with

20   our tennis ball game.

21           MR. BART:  But the problem, Your Honor, is you asked

22   the right question.  None of those cases deal with willful

23   blindness.  They all deal with an attempt by a party to

24   actually have the prior verdict have an impact on the jury.

25           There's one case that they cited there, one, that

1   dealt with providing the prior case as evidence of context of

2   behavior, and in that case, the evidence was admitted.  And

3   that's one of their cases that they cited.  This is all a red

4   herring.  There is not a single case that's on point with

5   these, because in a willful blindness context, the fact that

6   they were aware of the case and then had contemporaneous

7   behavior, that's what we want to show.

8          They don't really care about re-litigating.  That has

9   nothing to do with it.  The reason they jumped up is because

10  what they really care about is excluding evidence that shows

11  how they reacted to these verdicts, or to this result.  They

12  want to take that out of the case because it hurts them on

13  willful blindness, and that's why this becomes such a big

14  issue.

15         I think Your Honor has been clear all along that the

16  impact of the case and its result on the contemporaneous

17  conduct of the parties --

18         THE COURT:  Well, obviously, I haven't been as clear

19  as I need to be.

20         MR. BART:  Well, but that's why we made the motion,

21  Your Honor, and that's why it's good to have the argument.  But

22  I still don't think that there's any case that's ever been

23  cited to you in which the contemporaneous conduct of a party in

24  responding to a decision or a case has been excluded.

25         What it does is it takes material evidence out of the

1   case.  We're not looking to argue the merits of that case.  It

2   doesn't need to.  And the whole thing about the appeal is

3   completely misleading.  The Fourth Circuit specifically said,

4   *"At trial, BMG offered powerful evidence from which a*

5   *reasonable jury could find that Cox willfully blinded itself to*

6   *specific instances of infringement."*

7              That appeal dealt with a jury instruction and not at

8   all with Rightscorp.  Okay?  It dealt with what the stand- --

9              THE COURT:  Make sure we get that jury instruction

10  right, okay?

11             MR. BART:  Well, I'm sure we'll have discussions on

12  those things as well, but I think --

13             THE COURT:  We don't want to retry this case.

14             MR. BART:  The point of --

15             THE COURT:  Well, somebody might want to retry it.

16             MR. BART:  Yeah.  But I think if material evidence

17  about how they reacted in realtime that affected behavior

18  that's at issue in this case is excluded, then you have the

19  greatest chance of retrial, any possibility.

20             THE COURT:  Okay.

21             MR. HOWENSTINE:  Your Honor, we would just ask --

22             THE COURT:  I told you I will look at your cases.  The

23  problem that you have -- please, be seated, okay, so we don't

24  just keep going on and on and on.

25             The problem we have is that, as I said before, this is

1   one of those strange areas of the law where the concept of

2   willful blindness plays a role -- and there's some other areas

3   where it does as well.  This isn't the only one, but where

4   willful blindness plays such an important role in the context

5   of the case.  And I think that was put in the law because it's

6   so difficult to prove somebody actually knew, you know.  I

7   mean, Congress wanted to level the playing field, so to speak,

8   for plaintiffs.

9          Now, I couldn't agree with you more.  Any mention of

10  the verdict is a mistrial here.  If somebody pops up, some

11  witness pops in front of the jury and says, $25 million,

12  there's no way they can unhear that.  And I would, in all

13  likelihood, declare a mistrial.  So if you are wanting to avoid

14  a mistrial, please be sure that you school your witnesses that

15  they cannot say anything about the amount of the verdict.

16         I believe that with a strong limiting instruction to

17  the jury about what this actually stands for in terms of

18  evidence, that any potential prejudice to your client, above

19  and beyond the fact that anytime evidence is introduced by one

20  party against another, obviously, it isn't evidence that

21  they're thrilled to see or hear.  I mean, lawyers get up all

22  the time in front of me and say -- and this is particularly

23  true in criminal cases.  I'll get, Well, Judge, you know, if

24  you admit that eyewitness testimony, that's going to be highly

25  prejudicial to my client.

1          Well, I understand that, but he saw him rob the bank.

2   He's going to testify.  Obviously, it's going to be prejudicial

3   to your client.  And that's where we are.

4          Now, I will allow defense counsel and plaintiff's

5   counsel, if you wish, to work on that limiting instruction.

6   Okay?  I don't normally do that.  I'm perfectly capable of

7   drafting up my own.  I could give a limiting instruction right

8   now to the jury, you know, after 36 years as -- 35 -- I don't

9   know how many years.  I quit counting.  I can give a limiting

10  instruction to the jury.  Okay?  But if you would like, I will

11  make an exception here.  I will be more than happy to allow you

12  to assist me in coming up with an appropriately strong -- and I

13  want a strong limiting instruction here.  Okay?  I'll let you

14  do that.

15         I don't know that I've ever done that.  I don't think

16  I ever have, but I'll do it here.  Because I do know the

17  importance of it.  I understand where you're coming from.  I

18  was a trial lawyer.  I fully appreciate your concern about it

19  and why you want to try to keep that out, but I also understand

20  that it's critically important in a case like this where there

21  has been a red flag -- and it doesn't really, you know, the

22  amount of the verdict is absolutely anathema to a fair trial,

23  because -- and that's what I was saying when I said -- what I

24  meant when I said earlier this morning that you can't allow

25  that kind of evidence before a jury, and I won't, now or ever.

1    Well, I shouldn't say ever.  Maybe there will be the unique

2    case where it will be important, I don't know, but not in this

3    kind of context.

4            So we'll go with that.  And you know, sometimes I just

5    have to make a call.  The Appellate rules give me some latitude

6    in attempting to control the admission of evidence and the way

7    in which it is admitted.  And, you know, a judge that won't

8    make a ruling and just sits on it forever -- we had a judge one

9    time in Hawaii that used to take a recess when lawyers would

10   make an objection to a witness's testimony.  You know,

11   three-day trial would take three weeks.  It's ridiculous, you

12   know, get your law clerks to research it, every time somebody

13   says, this is hearsay.  You have to make a call or you don't

14   get the trial done.

15           And the only reason I'm addressing this now again is

16   because it was brought to my attention.  I'm perfectly happy to

17   sail on.  I always intended to give a limiting instruction.

18   That's not new.  I don't know whether I mentioned it before,

19   but it was -- to me, it should have been apparent that if

20   you're going to let this kind of testimony in, you have to give

21   a limiting instruction.

22           Now, there's no question that they have the right, in

23   my view, absolutely no question at all, to get in before the

24   jury the fact of the Cox litigation, because it does go,

25   absolutely directly -- like many other things.  It would be no

1    different than some business person coming in to them at some

2    point and saying to them, Hey, you know, you guys have a big

3    problem here.  People are -- and we've got that testimony, too,

4    here, I think, to a degree -- people are using the service, you

5    know, via BitTorrent to infringe copyrights left and right, and

6    you really need to do something about it.

7         Would that come in?  Yes.  Because it would go to

8    willful blindness.  Now, there are many defenses.  Hey, we

9    looked at it, we did not think we had a responsibility because

10   we felt we were doing everything we could do.  But that's why

11   we have a jury trial.

12        So if you don't want to work on a limiting

13   instruction, I'm perfectly happy to do it myself, okay?  But if

14   you want a limiting instruction, get one to me.  All right?

15   And if you can't agree on one, get me various versions.  I will

16   look at it and I will decide for myself what I'm going to give.

17   All right?  End of story.

18        Can we not address this again?  There comes a point

19   where, as I said, I have to make a ruling, and it is then for

20   the jury to decide what to do, and then we have a process

21   called the Court of Appeals.  And if I have made a mistake that

22   affects the fairness and integrity of the proceedings -- and

23   "integrity," we don't mean integrity of somebody else.  We're

24   talking about the fairness of the proceedings -- by admitting

25   evidence that was so taintive that the jury couldn't possibly

1  listen to my limiting instruction and disregard it, and they
2  reverse whatever the verdict might be, I will understand.  I
3  mean, that's the name of the game.
4          As I told you, I sit all the time as an Appellate
5  judge by designation on the Ninth Circuit.  All the time.
6  Three times a year, sometimes four, for two or three days of
7  sitting.  And I've done it for 30 years.  I appreciate that
8  process and I appreciate the Fifth Circuit.  They will look at
9  it.  But at some point you got to take it out of your hands and
10 my hands and give it to them.  That's the name of the game.
11         All right.  Now, as to this other one, I haven't even
12 had a chance to look at that one.  I don't know, this is some
13 person?  I will look at that.
14         MR. HOWENSTINE:  If I might respond to that briefly,
15 Your Honor.  That's not going to affect anything going on
16 today.  We intend to file a response later, but that's probably
17 not going to come up until next week.
18         THE COURT:  Okay.
19         MR. BART:  We have no problem --
20         THE COURT:  Well, I understood that this issue, that
21 Cox was going to come up either today or tomorrow, so I needed
22 to address it this morning.  I was trying to -- if I was going
23 to rush to read this.  And as I told you, I haven't had the
24 chance to look at all the cases.  I will go back and look at
25 the cases.

1          Look, I told you before, in Hawaiian parlance, I am no

2   Opihi.  If I look at the cases and I read them and I agree with

3   the defense that it shouldn't come in at all based on those

4   cases -- I doubt it seriously, but if that were to happen, I

5   will come out and say, you know, I made a mistake, and it

6   shouldn't come in.  But I can't see it, because these cases are

7   not willful blindness cases and that's the killer here.  That's

8   the crux of it.  That's the whole issue here that means

9   anything.

10         Now, I've burned my voice out for the week already.

11  What am I going to do?

12         *(Discussion off the record.)*

13                          *   *   *

14         THE COURT:  Go ahead and bring in the jury.

15         COURT SECURITY OFFICER:  All rise for the jury.

16         *(9:31 a.m., the jury enters the courtroom.)*

17                          *   *   *

18         THE COURT:  Please be seated.  Good morning, ladies

19  and gentlemen.  I hope you had a good weekend and Monday.

20  Sorry we started late, but as is almost always the case where

21  you have a litigation that involves a lot of documents, a lot

22  of witnesses, a lot of issues, I need to address those to the

23  lawyers, so they know how to proceed, so they know how to move

24  forward.  Otherwise, we get a big problem.  We start getting

25  all kinds of sidebars and other issues and arguments.  Better

Barbara Frederiksen-Cross  -  Examination       603

1  to do it before we start, but that doesn't mean we aren't going

2  to have some issues, but at least we got rid of those.

3          Okay.  Counsel.

4          MR. O'BEIRNE:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          MR. O'BEIRNE:  Plaintiffs are prepared to proceed with

7  Ms. Frederiksen-Cross.

8          THE COURT:  Yes, please step forward.  Please be

9  seated, and I just want to remind you that you remain under

10  oath.

11          THE WITNESS:  Yes, sir.

12          THE COURT:  You may proceed, counsel.

13              DIRECT EXAMINATION CONTINUED

14  BY MR. O'BEIRNE:

15  Q.  Good morning, Ms. Frederiksen-Cross.

16  A.  Good morning.

17  Q.  How are you?

18  A.  Good.

19  Q.  On Friday, when we broke from court, we had just finished

20  discussing how the BitTorrent system works.  Do you recall

21  that?

22  A.  Yes.

23  Q.  I'd like to turn your attention now to the Rightscorp

24  system for detecting infringement over BitTorrent.  Do you

25  understand the Rightscorp system?

Barbara Frederiksen-Cross  -  Examination          604

1   A.  Yes, I do.

2   Q.  How did you come to that understanding?

3   A.  Principally through studying the code, the source code of

4   the Rightscorp system.

5   Q.  Did you review any other relevant evidence about how the

6   Rightscorp system functions?

7   A.  Certainly.  I have seen Mr. Boswell's sworn testimony in

8   this matter and also was present in court when he testified.

9   Q.  Can you please provide the jury with an overview of how the

10  Rightscorp system works at each stage?

11  A.  Sure.  Just kind of walking through a couple of phases

12  here.  The beginning of this system is when Rightscorp is hired

13  by a client to monitor their protected works.  And so what they

14  receive is information about the works that they are to

15  protect, and they put that in a database.

16      Then the next step is that they search for torrents whose

17  names indicate that they might contain a protected work, so it

18  might be the name of an album or the name of an artist or the

19  name of a particular song.  They then go out to using just a

20  normal BitTorrent process to download that payload from the

21  BitTorrent network.  And so in the process of that, they go

22  through all the normal steps to get a list of peers and to

23  download the payload of the particular suspect work.  I'm going

24  to call it a suspect work, because it hasn't been verified yet.

25      The next step, then, once they have those files on their

Barbara Frederiksen-Cross  -  Examination          605

1    system, is to submit -- or to verify and identify that the

2    suspect work actually contains, you know, the particular song,

3    the name of the work suggested it has.  So that process

4    involves verifying the music.  In most cases, that's done using

5    a third-party audio identification service.  Early on in the

6    game they used a service called Audible Magic.  Later they used

7    a service called AcoustID.

8        In both cases, those are services that rely on the creation

9    of a digital fingerprint that's based on the characteristics of

10   the music, so this is different than a hash.  It's actually

11   based on the acoustic characteristics of the music.  And that

12   fingerprint is then matched by that service against a database

13   that has reference works.  So that the service has already

14   identified the music.  And they then pass back a response to

15   Rightscorp indicating the identity -- well, whether they were

16   able to match the work and, if so, what it matched to, what the

17   song was.

18       In some cases, they also use a manual verification --

19            MR. BROPHY:  Your Honor, I'm sorry, but this is a

20   monologue, not a direct examination.

21            THE COURT:  Yes, sustained.  You need to ask her

22   questions and kind of keep with that format, if you will.

23            MR. O'BEIRNE:  Understood, Judge.  We're just looking

24   for an overall summary of each step, but we'll take them one

25   step at a time.

Barbara Frederiksen-Cross  -  Examination          606

```
 1              THE COURT:  Yes, I think that's a good idea.
 2              MR. O'BEIRNE:  Next slide, please.
 3   BY MR. O'BEIRNE:
 4   Q.  You were just discussing, Ms. Frederiksen, the -- obtaining
 5   works from the clients, and then the verification process.  So
 6   using this demonstrative, could you orient the jury to that
 7   process, as you were just describing it, and finish your
 8   description of how that works?
 9   A.  Sure.  On the leftmost side here we have, you know, the
10   clients of Rightscorp providing a list of the works they want
11   protected.  And then Rightscorp searching for the potentially
12   infringing files, downloading those files, as I described.  So
13   they just download them from the swarm, so they're downloading
14   the actual torrent payload, as represented by the torrent.  And
15   then submitting the song or songs that they downloaded from
16   that payload for identification to Audible Magic or AcoustID
17   or, as I mentioned, in some cases they also do manual
18   verification.
19       And then once they have identified a file, they enter it
20   into another table in the database that is for the known
21   identified files.
22   Q.  I believe we've heard some testimony about Audible Magic.
23   I want to ask you some questions about AcoustID.  What is
24   AcoustID?
25   A.  AcoustID is a song identification service.  It's an
```

Barbara Frederiksen-Cross  -  Examination        607

1    open-source song identification.  It's used by products like

2    VLC, the video player, and by MusicBrainz, Picard, the software

3    you can use to identify a song that you hear on the radio or if

4    you have a song in your collection, but it's just labeled as

5    Track One, you can use that to identify what the song is.  And

6    it also gives back some other metadata like the length of the

7    recording and the name of the artist and title, and if it came

8    from an album, the album.

9    Q.  Are you aware from public information any companies or

10   services that use AcoustID?

11          MR. BROPHY:  Objection, Your Honor.  Outside the scope

12   of the expert report.

13          MR. O'BEIRNE:  Your Honor, she discussed AcoustID in

14   her report, and it's publicly available information about

15   services that use it.

16          MR. BROPHY:  Your Honor, she has not identified any of

17   those things in her expert report.

18          THE COURT:  I don't have her expert report.  I don't

19   know.

20          MR. BROPHY:  In fact, I can point it out to --

21          MR. O'BEIRNE:  Your Honor, she discussed her awareness

22   of AcoustID in --

23          THE COURT:  Did she discuss this in her expert report,

24   yes or no?

25          MR. O'BEIRNE:  Yes, the use of AcoustID and her

Barbara Frederiksen-Cross  -  Examination        608

1    understanding of AcoustID, yes.

2            MR. BROPHY:  She did not discuss individual companies

3    that use AcoustID in her report.

4            MR. O'BEIRNE:  Your Honor, they're on notice of her

5    opinions.  These are just additional facts she's aware of that

6    are public and can be Googled about the use of AcoustID for --

7            THE COURT:  Well, the fact that it's public and can be

8    Googled is different.  I mean, anything can be public and

9    Googled.

10           MR. O'BEIRNE:  Fair enough, Your Honor.  She discussed

11   her awareness of AcoustID in --

12           THE COURT:  You can talk to her about her awareness,

13   but not specific instances if it wasn't discussed in her

14   report.

15           MR. O'BEIRNE:  Understood, Your Honor.

16   BY MR. O'BEIRNE:

17   Q.  Ms. Frederiksen, are you aware of AcoustID, generally, as a

18   reliable audio identification service?

19           MR. BROPHY:  Objection, Your Honor.  Outside the scope

20   of the expert report.

21           THE COURT:  Overruled.

22   A.  Yes, I am aware that it is generally regarded as a reliable

23   way to identify music.

24           MR. O'BEIRNE:  Next slide, please.

25   BY MR. O'BEIRNE:

Barbara Frederiksen-Cross  -  Examination        609

1   Q.  What is being portrayed in this slide about the
2   verification process, Ms. Frederiksen?
3   A.  This is a little bit of a drill down on how that
4   verification works.  So the unknown audio song is identified --
5   or is submitted to a piece of software that generates an audio
6   fingerprint.  And that software analyzes the acoustic
7   characteristics of the song and generates actually a series of
8   fingerprints for that particular song.
9        Then those fingerprints are submitted to the AcoustID
10  service where they're matched against a reference database in
11  order to identify the content.  And then the information is
12  passed back about whether there's a match or no match.  And as
13  I mentioned before, also some information about, for instance,
14  the artist and title that was matched.
15  Q.  And you'll see Audible Magic is reflected there.  Without
16  getting into the details of Audible Magic, are you aware at
17  various times Rightscorp did also use Audible Magic?
18  A.  I am aware of that fact, yes.
19  Q.  I'd like to turn to the next step of the process after
20  verification, which is the handshake process that Rightscorp
21  engages in.
22        MR. O'BEIRNE:  Next slide, please.
23  BY MR. O'BEIRNE:
24  Q.  Could you please walk the jury through the process by which
25  Rightscorp engages in handshakes with peers over BitTorrent, to

Barbara Frederiksen-Cross  -  Examination      610

1   detect infringement?
2   A.  Sure.  This is a separate process from the initial
3   identification of music.  We now have a database of identified
4   music and the associated torrents that were found, you know, in
5   relationship to that music.
6       So Rightscorp then uses a system that they call
7   Infringement Finder.  It goes by a couple names, but I'm going
8   to use Infringement Finder, because it's the clearest.  That
9   system behaves as a normal BitTorrent peer except that it
10  collects evidence.  And so what it does initially is, just as
11  BitTorrent would, it reaches out to a tracker and gets a list
12  of the peers that are online that that tracker knows about at
13  this particular moment in time that are participating in a
14  specific torrent payload.
15      So the way that works is it sends a request to the tracker
16  that has the identification of the particular torrent from the
17  .torrent file, and it gets back a list of peers that the
18  tracker knows are using that specific torrent and it reported
19  their activity recently.  The Rightscorp system then takes that
20  list and one by one it goes through it, and it reaches out to
21  the peer and it performs what's called a handshake.
22      And a handshake consists of first establishing a connection
23  with the peer so that they can talk to each other, and then it
24  sends a BitTorrent protocol message that identifies the
25  torrent --

Barbara Frederiksen-Cross  -  Examination        611

1              THE COURT:  Could you stop for a second, and let's let

2       that fire engine get by.  It's very difficult for the reporter.

3              (Pause.)

4       A.  So it asks the tracker for the peers for the torrent, gets

5       the list, and then it goes through the list and for each peer

6       makes a connection and does what's called a BitTorrent protocol

7       handshake.  So that's the Rightscorp system passing to the peer

8       the torrent identity that it's interested in, the peer

9       confirming that it has that torrent and is sending back -- in

10      that exchange, they each send a bit field too that basically

11      says these are the pieces I have, and that way the two peers

12      can decide if they're interested in each other.  And if they

13      are -- so, for instance --

14             MR. BROPHY:  Objection, Your Honor.  This is more of a

15      monologue from the witness.

16             THE COURT:  Yeah, I think you need to really ask her

17      specific questions so we don't get into a narrative.

18             MR. O'BEIRNE:  It wasn't my intention, Judge.  I'll

19      try to ask more targeted questions.

20      BY MR. O'BEIRNE:

21      Q.  Ms. Frederiksen, let's take a step back.  You talked about

22      the handshake from start to finish.  I'd like to ask you a

23      couple more specific questions about it.

24          First of all, you mentioned Infringement Finder being the

25      name of the part of the Rightscorp code that performs this

Barbara Frederiksen-Cross  -  Examination        612

1   function.  Do you recall that?

2   A.  Yes.

3   Q.  Did the organization of the code that does these handshakes

4   or the naming within the Rightscorp code change over time?

5   A.  It did.

6   Q.  Does that affect in any way your assessment of how that

7   code functions?

8   A.  No, because the code functioned essentially the same way,

9   regardless of what the name of the program was.

10  Q.  And so I believe the first step you talked about was

11  obtaining IP address information from the trackers.  Do you

12  recall that?

13  A.  Correct.

14  Q.  Once Rightscorp has that information, what's the initial

15  next step?  What does it do with that tracker information?

16  A.  It is stored in memory, in the program and in later

17  versions of the code they actually passed it as an XML -- I

18  think it's an XML list, but from one component to another.  But

19  it's basically collects that list so that it can then step

20  through the list to contact individual peers.

21  Q.  Did you review the portion of the Rightscorp code that

22  obtains IP addresses from the trackers?

23  A.  I did, yes.

24  Q.  And is it your opinion that the Rightscorp code can

25  accurately and reliably go to the trackers and obtain IP

Barbara Frederiksen-Cross  -  Examination          613

1    address information?

2    A.  Yes.

3    Q.  Then the next step, I believe you described, is taking

4    those IP addresses and reaching out to engage in handshakes

5    with those IP addresses, peers at those IP addresses.  Do you

6    recall that?

7    A.  Correct.

8    Q.  Did you review the part of the code in the Rightscorp

9    system that takes the IP addresses from the tracker and, in

10   turn, attempts to connect with those peers?

11   A.  Yes, I did.

12   Q.  Is it your opinion that that part of the Rightscorp code

13   can accurately relay the IP address information it got from the

14   peers to the part of the system that engages in handshakes?

15   A.  Yes.

16   Q.  And on Friday, I believe you testified that the tracker

17   data was what you described as transitory.  Can you remind the

18   jury what you meant by that?

19   A.  Sure.  It means that the tracker provides a list of those

20   peers that are active right now at this moment in time that

21   have contacted the tracker in their interaction to get a list

22   of peers, so it's basically a single point in time when some

23   group of computers somewhere is participating in the BitTorrent

24   protocol for a particular payload.

25   Q.  In your expert opinion, was it necessary for Rightscorp to

Barbara Frederiksen-Cross  -  Examination      614

1    save that tracker information once it had obtained the IP

2    address information and attempted to contact those peers?

3    A.  I wouldn't see any purpose in that, no.

4    Q.  Why is that?

5    A.  Well, again, it represents just a point in time when it got

6    a list of peers that were active at that moment.  That list

7    changes moment to moment.  New peers come onboard, maybe

8    somebody is done downloading a song, so they shut their

9    BitTorrent client down, so the peers come and go.  And that's

10   the whole purpose of the tracker is just to be able to provide

11   information about who is doing it right now.

12   Q.  Let's now turn to the first part of a handshake where

13   Rightscorp sends a message, the Infringement Finder code sends

14   a message to a peer at an IP address from the tracker.  Are you

15   following me?

16   A.  I think so, yes.

17   Q.  And I believe you just testified that through the

18   BitTorrent protocol, Rightscorp asks the peers if it possesses

19   a hash value of a file it's looking for.  Is that fair?

20   A.  Approximately.  The very first message is the connection,

21   Will you talk to me?  The next message is, Will you talk to me

22   about this particular info hash.  So this particular torrent

23   payload.

24   Q.  Did you examine the part of the Rightscorp code that sends

25   messages to a BitTorrent peer requesting a connection about a

Barbara Frederiksen-Cross  -  Examination      615

1   particular info hash?

2   A.  Yes.

3   Q.  Is it your opinion that the Rightscorp code can accurately

4   and reliably reach out and connect with other peers and discuss

5   info hashes with them?

6   A.  Yes.

7   Q.  I think the next step that you described is receiving

8   messages back from the peer.  What response, if any, during the

9   handshake does the peer give to Rightscorp?

10  A.  It provides a response that includes the info hash, and it

11  includes this bit field we've talked about that is a

12  representation in ones and zeros.  You can kind of think of it

13  a table.  A one means I have this piece.  A zero means I don't

14  have this piece.  And so it's a long string of ones and zeros

15  that represent the pieces that that particular peer is

16  advertising to others that it has available.

17  Q.  What would happen if Rightscorp attempted to handshake with

18  a peer that didn't have the torrent hash of the file Rightscorp

19  was looking for?

20  A.  The peer would close the connection.

21  Q.  And is that an automatic process in the BitTorrent

22  protocol?

23  A.  Yes.

24  Q.  Is the providing bit field information, which pieces the

25  peer actually has, an automatic process in the BitTorrent

Barbara Frederiksen-Cross  -  Examination          616

1    protocol?

2    A.  It is.  There is one alternative where a peer could just

3    reply, I have full file.  That's a newer message that's been

4    added to the protocol, to just shorten the transmission for

5    that data.  So if it has a full file, it can just say, I have

6    the full --

7    Q.  Setting aside the full file, apart from that kind of

8    communication, it would typically be a list of the pieces and

9    which pieces the peer has?

10   A.  That is correct.

11   Q.  I believe you testified on Friday, but just to make clear

12   to the jury.  What process does a BitTorrent user's system go

13   through on its side to confirm it has the piece before it

14   reports to another in a handshake that it has the piece?

15   A.  When a BitTorrent client initially gets a piece, it

16   calculates the SHA-1 hash of that piece and it compares it

17   against the hash for that specific piece that's a part of the

18   torrent file to make sure the piece wasn't corrupted in

19   transmission or wasn't the wrong piece.  So it makes sure it

20   got the piece that it asked for.  It stores that piece, and

21   then it advertises it to other peers.  So at that point it

22   would also send out a message to other peers saying, Hey, I

23   have this piece now too.

24   Q.  Based on your knowledge of BitTorrent, is it fair to say a

25   peer would not report having a piece unless it has confirmed by

Barbara Frederiksen-Cross  -  Examination        617

1    hash value that it does, in fact, have that right piece?

2    A.   In the normal operation of BitTorrent, that's correct,

3    because the whole point of this exchange of information is so

4    that peers know who they can ask for a particular piece.

5    Q.   And again, have you examined the actual part of the

6    Rightscorp code that receives this bit field report from the

7    peer and records it?

8    A.   Yes, I have.

9    Q.   And do you believe you have sufficient information to reach

10   an expert opinion about how that code functions?

11   A.   Yes.

12   Q.   Were you able to verify that the Rightscorp system can

13   accurately record bit field information provided from a peer

14   during a handshake?

15   A.   Yes, I can.

16   Q.   And based on this verification, are you certain that the

17   Rightscorp system can accurately obtain and save bit field

18   information?

19   A.   Just to be clear, the actual ones and zeros are saved on a

20   just transitory -- in a temporary table until they're

21   evaluated.  And then a flag is set in another table that

22   indicates the results of that evaluation.

23   Q.   Thank you for that clarification.

24        Talking first about the initial -- when that bit field

25   information comes over, are you certain that Rightscorp can

Barbara Frederiksen-Cross  -  Examination        618

1    accurately receive and analyze that bit field information?

2    A.  Yes.  At that point it's acting just as any other client

3    would.

4    Q.  And I think you just mentioned this, but after Rightscorp

5    receives the bit field information, what does its system do to

6    analyze that bit field information?

7    A.  It looks at the bit field information, and it determines

8    whether it's all ones, and if it is, it sets a flag that

9    indicates that it has -- that the peer is saying it has the

10   full file.  Otherwise, it sets a different value in that flag

11   that indicates the peer doesn't have the full file, so it's a

12   plus one or a minus one depending on what the peer has

13   indicated it has.

14   Q.  Have you examined the portion of the code in the Rightscorp

15   system that compares the bit fields of known torrent files to

16   the bit field information that Rightscorp received from a peer?

17   A.  Yes.  And just to be clear here, at a point in time, one of

18   the changes in the software was to look just for the bits of a

19   specific file within a payload because, for instance, if the

20   torrent payload had multiple files.  So in the beginning, it

21   always checked to see if the full payload was there.  At a

22   point in time later, in late 2015, it started checking if all

23   of the bits for a particular file were there.

24       I just didn't want to leave any unclearness, because I'm

25   sure we'll talk about that eventually, but to just lay that

Barbara Frederiksen-Cross  -  Examination        619

1   foundation.

2   Q.  Absolutely.  Thank you.

3       Setting aside for the time being whether Rightscorp was

4   comparing -- analyzing whether there was 100 percent of the

5   entire payload or 100 percent of part of the payload, did you

6   review the code that makes that comparison, the peers reporting

7   these bit fields and my system knows what these bit fields are,

8   did you review that portion?

9   A.  Yes, of course.

10  Q.  And did you have enough information to reach an expert

11  opinion as to whether the code can do that reliably and

12  accurately?

13  A.  Yes, and it does.

14  Q.  Thank you.  You anticipated my next question.

15      Now, at this point, has the Infringement Finder system

16  actually downloaded the payload from the other peer?

17  A.  Not from the specific peer it's in communication with.

18  It's just done the handshake at this point.

19  Q.  And does that affect your opinion about the reliability of

20  what Rightscorp is detecting?

21  A.  No, because these peers, in order to be flagged as peers

22  that are participating, they have to be online, they have to

23  have a BitTorrent client open.  They have to have completed the

24  communication handshake indicating that they have that torrent,

25  that they have a specific part of the payload that they're

Barbara Frederiksen-Cross  -  Examination        620

1  offering to share, and then Rightscorp records that

2  interaction.  At that point in time, they record that

3  interaction.

4  Q.  Turning back to the comparison, if Rightscorp's analysis of

5  the bit field shows that the peer is sharing 100 percent of a

6  file that Rightscorp is monitoring for infringement of, what

7  happens next?

8  A.  In the detection process?

9  Q.  Yes.

10  A.  At that point, Rightscorp creates its evidentiary record

11  that's related to that transaction, so it records things like

12  the time that it contacted the peer, the IP address and port of

13  the peer, the particular hash that the two were communicating

14  about, that Rightscorp was communicating with that particular

15  peer about, the information about whether it reported the bit

16  field.  And, again, in the temporary table, it actually has the

17  bit field, but ultimately then it just records whether it was

18  full or not.

19  Q.  Before we go on to talk about the part of the Rightscorp

20  system that sends notices, I'd like to talk to you about the

21  concept of choking and unchoking in the BitTorrent protocol.

22  Are you familiar generally with this concept?

23  A.  Of course.

24  Q.  I'm going to read you a statement, and I'd like to get your

25  opinion on it.  *"The choke data indicates whether the computer*

Barbara Frederiksen-Cross  -  Examination        621

1   *is willing to share the song."*  In your expert opinion, is that
2   an accurate description of BitTorrent?
3   A.  No.  The choke data is more like a traffic control to
4   control congestion in the TCP connection, so it controls --
5   like, say that I am talking to ten peers.  I might be sharing
6   with only -- I might be sending a piece or receiving a piece
7   from four of those, and the rest are in a queue, and then I
8   rotate that queue periodically.
9       And so choke is like a transitory state.  All peers start
10  choked at the beginning of a conversation, and then after I get
11  a message that you're interested, I can unchoke you and send
12  you a piece as soon as I have a free transmission slot to send
13  you a piece.  And so peers will go through choke and unchoke
14  periodically, so it's not an indicator of whether a peer will
15  share, but rather an indicator of if it's your turn to go.  So
16  kind of think of a stoplight.  You know, you come up to the
17  stoplight, other traffic comes up to the stoplight.  Some of
18  you get to go right now, some of you wait, and then it's your
19  turn to go and the other guys wait.
20  Q.  Are you familiar with the name Bram Cohen?
21  A.  Yes.  He's the inventor of BitTorrent.
22  Q.  As part of your expert work in this case, did you review
23  descriptions of how BitTorrent works by Bram Cohen?
24  A.  Yes.  Those are publicly available at BitTorrent.org.
25          MR. O'BEIRNE:  Can you pull up PX 550, please.  Just

Barbara Frederiksen-Cross  -  Examination        622

1   for the witness.

2           THE WITNESS:  And could you make it just a little bit

3   bigger, please, for me?

4           MR. O'BEIRNE:  Zoom in, yes.

5   BY MR. O'BEIRNE:

6   Q.  When you've had a chance, Ms. Frederiksen, do you recognize

7   the document at PX 550?

8   A.  Yes.  This is the BEP-003 document, which is the base

9   BitTorrent protocol specification.

10          MR. O'BEIRNE:  Your Honor, this is a document

11  Ms. Frederiksen relied on in reaching her opinions.  Permission

12  to publish it to the jury?

13          MR. BROPHY:  Your Honor, this is not in evidence.

14  It's not an exhibit, so I object to that.

15          MR. O'BEIRNE:  Experts are allowed to rely on

16  documents that are not in evidence.

17          THE COURT:  The objection is overruled.

18          MR. O'BEIRNE:  Could you please publish.

19  BY MR. O'BEIRNE:

20  Q.  You mentioned Bram Cohen.  Is his name reflected there?

21  A.  Yes.  He's shown as the author of this particular

22  specification document.

23  Q.  Let's turn to page -- it's five of the exhibit, but

24  page four of the document, right there, *Peer Protocol*.  Do you

25  see that, Ms. Frederiksen?

Barbara Frederiksen-Cross  -  Examination        623

1    A.  Yes, I do.

2    Q.  I'd like to direct your attention to the sentence, *"Peer*

3    *connections are symmetrical."*

4        Could you read that to the jury, please?

5    A.  *"Peer connections are symmetrical"* --

6    Q.  Yeah, I'm sorry.  Can read the rest of it?

7    A.  *"Messages sent in both directions look the same and data*

8    *can flow in either direction."*

9    Q.  Is that a description of, generally, the handshake process

10   and the hash information and the other kinds of communications

11   you've been describing?

12   A.  Yeah, this applies generally to the entire communication

13   protocol that peers are sending messages back and forth.

14   Q.  And then could you read the sentence in the next paragraph,

15   the second sentence that starts, *"When a peer finishes"*?

16   A.  *"When a peer finishes downloading a piece and checks that*

17   *the hash matches, it announces that it has that piece to all of*

18   *its peers."*

19   Q.  Is that the process you were describing where before a peer

20   reports that it has a bit field, it checks the hash to make

21   sure it's accurately describing what it has?

22   A.  That's correct, yes.

23   Q.  Let's review further down.

24       Do you recall in this document, ma'am, a description of the

25   choking function and the choking algorithm within BitTorrent?

Barbara Frederiksen-Cross  -  Examination        624

1   A.  Yes, I do.

2   Q.  And do you see there that -- the second sentence in the top

3   paragraph?  Could you read that for the jury, please?

4   A.  *"Choking is a notification that no data will be sent until*

5   *unchoking happens."*

6   Q.  Is that what you were describing before about the idea that

7   it's a traffic light and that choking is a temporary state that

8   precedes unchoking?

9   A.  Yes.  That's described in more detail a little bit further

10  down in the document.

11  Q.  And the last sentence there, *"Connections start out choked*

12  *and not interested."*  Do you see that?

13  A.  That's correct.

14  Q.  Is it fair to say any file that has ever been shared over

15  the BitTorrent protocol, as described here, was shared in a way

16  where the person receiving it was initially choked?

17  A.  Yes.  All peers start out choked.

18  Q.  You can go further down in the document, please.  And the

19  top two sentences there, Ms. Frederiksen, could you read that

20  for the jury?

21  A.  Sure.  *"Choking is done for several reasons.  TCP*

22  *congestion control behaves very poorly when sending over many*

23  *connections at once."*

24  Q.  The next sentence?

25  A.  *"Also choking lets each peer use a tit-for-tatish algorithm*

Barbara Frederiksen-Cross - Examination          625

1   *to ensure that they get a consistent download rate."*

2   Q.  And is this what you were describing about the idea that a

3   peer that is sharing files will be choking and unchoking peers

4   that they're connected to?

5   A.  In part.  Though, the tit-for-tat issue is also -- that's

6   something that's built into the BitTorrent protocol where a

7   peer will prefer to communicate with a peer that is

8   reciprocating its requests.  And so part of the

9   choking/unchoking lets you always see if you've got the best

10  connection to a good partner.  And so periodically it changes.

11  It typically changes about every ten seconds.  And then about

12  every 30 seconds you check to see if somebody new has joined

13  the swarm who maybe doesn't have any pieces so they can't

14  reciprocate, but you can -- it gives them a chance to get their

15  first pieces.

16  Q.  Thank you, Ms. Frederiksen.

17          MR. O'BEIRNE:  We can take that down.

18  BY MR. O'BEIRNE:

19  Q.  Did you run any tests on an active BitTorrent file sharing

20  to review this idea of choking versus unchoking during the file

21  share process?

22  A.  Yes, I have.

23  Q.  Please describe to the jury -- well, did you run -- I'd

24  like to talk to you about the first test, which involved

25  sharing files and monitoring network traffic.  Do you recall

Barbara Frederiksen-Cross  -  Examination        626

1   that test?

2   A.  I do, yes.

3   Q.  Please describe to the jury what you observed in an active

4   test of BitTorrent.

5   A.  I got permission to use some specific torrents to be able

6   to conduct my testing, from the rights holders.  And then I

7   conducted testing in which I joined the -- I downloaded

8   BitTorrent software.  I opened that particular torrent, or a

9   particular torrent.  And what I was doing in the background was

10  monitoring the traffic that was going back and forth between my

11  machine and other machines.  So the first thing I see is I

12  reach out to the tracker and I get the address of some peers,

13  and then I see my software reaching out to various peers doing

14  connections, doing handshakes.  And then saying that I'm

15  interested in something, because I didn't have the file, I just

16  had the torrent, so I'm interested in what you have.  And then

17  the peer unchoking me, and I would request specific pieces, and

18  the peer would respond by sending those pieces.

19      And I was communicating with multiple peers at the same

20  time during this test, so I was receiving pieces of the same

21  payload from different peers until I had the entire payload.

22  As I was receiving those pieces and verifying them, I was also

23  sending the messages out to the peers I was connected to that,

24  oh, I have this piece now.  And other peers were requesting

25  pieces from me, so at the same time I was collecting my

Barbara Frederiksen-Cross  -  Examination          627

1    payload, I was also sharing pieces with other peers.

2    Q.  And during that sharing process, did your system choke and

3    unchoke periodically peers with whom you were sharing?

4    A.  Yes.

5    Q.  And in your experience, is that the normal operation of

6    sharing files over BitTorrent?

7    A.  That is.  Just as described in the protocol, that's part of

8    the normal operation of the system.

9    Q.  So again, does receiving a choke message from a peer

10   indicate that that peer is unwilling to share with you?

11   A.  No.  It just means that it's not my turn to talk to that

12   peer right now.

13   Q.  Let's put aside choking for the time being.  Did you

14   review, in your expert analysis in this case, whether there are

15   settings that a BitTorrent user could implement to tell

16   BitTorrent don't share files with other people?

17   A.  Some BitTorrent clients that I investigated do have that

18   setting.  I'll refer to it as "parasite mode" just because

19   different clients call it different things.  But basically the

20   setting says that I'm only going to ask for pieces, and if

21   somebody asks me for a piece, I'm just not going to give them

22   anything once I've got my initial download.

23   Q.  Did you run any tests to analyze the kind of network

24   traffic and information that occurs when a BitTorrent peer is

25   operating in parasite mode?

Barbara Frederiksen-Cross  -  Examination        628

 1    A.  Yes, I did.

 2    Q.  Please explain to the jury what --

 3            MR. O'BEIRNE:  Actually, could you pull up, but not

 4    show to the jury yet, PX 553.  Zoom in at the top third,

 5    please.

 6    BY MR. O'BEIRNE:

 7    Q.  Ma'am, do you recognize this document?

 8    A.  Yes, I do.  This is one of my testing documents that's been

 9    filtered just for BitTorrent messages, from the general network

10    traffic.

11    Q.  And does this PX 553 document information that you observed

12    during this parasite mode testing?

13    A.  If you could scroll down, we didn't have the very top page

14    of the document.  I think we started on page two, so if I could

15    see how it ends.  Yeah, this is the parasite test.

16    Q.  Thank you.

17            MR. O'BEIRNE:  Your Honor, I offer or request

18    permission to publish PX 553 to the jury as demonstrative of

19    the witness's expert testimony.

20            MR. BROPHY:  No objection.

21            THE COURT:  You may move forward.

22            MR. O'BEIRNE:  Pull it down for a second, Connor,

23    while Ms. Frederiksen describes --

24    BY MR. O'BEIRNE:

25    Q.  Generally speaking, could you explain to the jury the test

Barbara Frederiksen-Cross  -  Examination       629

1  that you set up as to what would occur if a peer were in

2  parasite mode saying, I'm not going to share files that I have?

3  A.  Yeah, basically what I did is I captured the network

4  communication between my machine and other machines that were

5  participating in this BitTorrent protocol.  And then I filtered

6  the communications to get the essential BitTorrent

7  communication commands like the handshake and the have piece

8  and the request for a piece and what the other peers were

9  sending me.

10     So I just filtered it out to have specific communications

11  between my own computer and other computers that I was

12  communicating with using BitTorrent.

13  Q.  And I think you explained the first step was obtaining the

14  file to share, is that accurate?  In your test?

15  A.  I'm not sure what you're asking.  Are you asking about

16  getting the torrent file?

17  Q.  Yes.  Yes.

18  A.  Yeah, I don't think that in this particular diagram I show

19  my communication with the tracker.  So this is from the time I

20  have opened the torrent on my client and began communicating

21  with other peers.

22  Q.  So I'll orient you to the top of the first page of data

23  here in PX 553.  Do you see there's a date and time stamp and a

24  source and info there?

25  A.  Yes, I do.

Barbara Frederiksen-Cross  -  Examination        630

1   Q.  What does this information reflect?

2   A.  Okay.  This was the date and time that this particular test

3   was run.  I've run a few tests over the years.  Source, the

4   computer 192.168.1.101 was the IP address of the computer I was

5   using in the test.  And source and destination basically tell

6   you which way the communication was flowing.  So in the first

7   line, you see that I am the source and I'm reaching out with a

8   handshake to another computer at 85.226.165.91.  And on the

9   next couple lines you see that I'm also reaching out to three

10  other computers at the same time or virtually the same time --

11  it's within the same second -- to make handshakes with those

12  computers as well.

13  Q.  And these handshakes are seeking to obtain the payload of a

14  torrent file you're looking for?

15  A.  Right.  And so then you see on the next line down where

16  there's no highlighting, one of those computers,

17  179.155.155.139 is reciprocating with its handshake back to me,

18  so I've said, Hey, I want this torrent.  And it's coming back

19  with the handshake that would have identified for me, as you

20  see in the next line, the extended bit field information and

21  the list of pieces it has.

22  Q.  And, ma'am, do you see the time stamp there 18:06:17, is

23  that the time that you started this test?

24  A.  Yeah, all of this happens very quickly, these initial

25  handshakes, so it's all in the same second.

Barbara Frederiksen-Cross  -  Examination          631

1   Q.  18:06 is military time for 6:06 p.m.?

2   A.  That's correct.

3          MR. O'BEIRNE:  Could you please scroll to the end of

4   the data on the last page of the document.

5   BY MR. O'BEIRNE:

6   Q.  Ms. Frederiksen, do you see -- this is the last page of the

7   document.  Do you see the time stamp there 18:06 and 59

8   seconds?

9   A.  I see that, yes.

10  Q.  This is less than a minute after the test started?

11  A.  That's correct.

12  Q.  And then you'll note there on the right-hand side, there is

13  a message handshake extended, *"Have all*."  Is that reflecting

14  that your machine now has all the pieces of the payload?

15  A.  No.  That happens to be a message coming into me from

16  201.6.166.3 saying that that particular peer is telling me it

17  has all pieces.

18  Q.  I see.  By this time in the test, had your computer

19  successfully obtained the entire payload you were looking for?

20  A.  Yes.

21  Q.  In less than a minute?

22  A.  Yes.

23  Q.  And then at the bottom, you note after this point, *"No*

24  *further BitTorrent control packets received.  The test*

25  *continued for approximately 14 hours."*

Barbara Frederiksen-Cross  -  Examination        632

1        Can you explain to the jury what you mean by that?

2    A.  Once I had completed -- once my test machine had completed

3    downloading, when set in parasite mode, it no longer

4    communicated with any peers.  So it didn't receive BitTorrent

5    control packets or send control packets after that point in

6    time.  And I left the test running for 14 hours to see if there

7    was any change over time in that communication, you know, if it

8    just was happenstance that I was doing something for a few

9    seconds and didn't communicate or if I just didn't communicate.

10   And in parasite mode, once I have my copy of the song, I'm not

11   handshaking with anybody.

12   Q.  So with the BitTorrent software set not to share in

13   parasite mode, you called it, your machine did no handshakes

14   for 14 hours?

15   A.  That's correct.  And then I terminated the test.

16   Q.  Is it your opinion that a BitTorrent user who possessed the

17   file that Rightscorp was seeking but had their software set not

18   to share pieces would have engaged in a handshake with

19   Rightscorp?

20   A.  No.  Once you're in parasite mode, you're not connecting --

21   you're not accepting new connections or doing new handshakes.

22   Q.  Is it your opinion that a BitTorrent user with its software

23   set not to share would have provided bit field data to

24   Rightscorp during a handshake?

25   A.  Only when it was first collecting the pieces and seeking to

1   download them from another peer, but then once it had the song,

2   again, it stops -- stops communicating for the handshake.

3   Q.  So a peer that already had the full song would not be

4   sending bit field information in parasite mode?

5   A.  That's correct.  And that is based not only just on this

6   test, but on examining the open-source software for various

7   publicly available BitTorrent clients like the uTorrent client

8   and the software that underlies the popular BitTorrent client,

9   as well as Bram Cohen's software.

10        MR. O'BEIRNE:  Thank you, Conner, you can take that

11   down.

12   BY MR. O'BEIRNE:

13   Q.  I'd like to return, Ms. Frederiksen-Cross, to the

14   discussion about parts of the Rightscorp system and moving from

15   retaining information from the handshake to sending a notice.

16   Does that make sense?

17   A.  Yes.

18   Q.  And on slide 14 -- well, what is being portrayed on slide

19   14?

20   A.  Slide 14 shows some of the requirements on the right-hand

21   side.  I'm going to start there.  So initially, the file has

22   been -- a particular torrent payload has been verified as being

23   an infringing file.  The Infringement Finder software has gone

24   out and identified a peer or peers distributing a hundred

25   percent of that file.

Barbara Frederiksen-Cross  -  Examination        634

1      And then there's one other thing we haven't talked about

2   yet, and that's that before a notice can be sent, you need to

3   figure out who to send it to.  And so that's the last line

4   here.  The Rightscorp software goes out and determines what ISP

5   is associated with that particular IP address that it was doing

6   the detection on.  And it does that using the data that I think

7   you've heard discussed before, the ARIN data that identifies

8   what blocks of IP addresses have been assigned to what ISPs.

9      And one thing that's actually not shown on here, but once

10  it identifies the ISP, it also has to pull from its database

11  the e-mail address that you're supposed to use when you send a

12  notice to that ISP.  And then when it has all that data, it's

13  ready to send a notice.

14  Q.  Ms. Frederiksen-Cross, have you examined the actual code in

15  the Rightscorp system that performs the query of the ARIN IP

16  listing to determine which IP address belonged to which ISP?

17  A.  I've examined the code that pulls that information, yes.

18  Q.  Did you have some additional information to reach an expert

19  opinion about how that code functions?

20  A.  Yeah.

21  Q.  And did you verify that the Rightscorp system can

22  accurately query this list of IP addresses and the

23  corresponding ISP and obtain that information?

24  A.  Yeah.  It queries the records that it has for the ISP

25  addresses, so that would be accurate based on the information

Barbara Frederiksen-Cross  -  Examination        635

1    for what IP -- or what ISP had been assigned that IP address.

2    Q.  Based on this verification, are you certain that the

3    Rightscorp system can accurately do this?

4    A.  Yes.

5    Q.  Turning back to slide 14, you see there there's a bullet

6    *"Peer Distributing 100 percent of the file."*  Is that the file

7    that's going to be the subject of the notice?

8    A.  Again, depending on the point in time we're talking about,

9    it was either the 100 percent of the payload or 100 percent of

10   the file that is the subject of the notice.

11   Q.  But a file being the subject of a notice would be part of

12   the payload, right, ma'am?  It would just be a subset of it?

13   A.  Right, correct.  If you had a hundred percent of the

14   payload, of course you have a hundred percent of any file

15   that's in the payload.

16   Q.  Right.  So specific to the notice, it's your understanding

17   the Rightscorp's notices list a file name of what was detected,

18   correct?

19   A.  They list the names associated with the torrent and a file

20   name of an exemplary file from that -- from that payload that

21   would be the file -- one of the files they were protecting.

22   Q.  Right.  And specifically, here -- well, take a step back.

23       There's been some discussion about the matching of the bit

24   field information obtained from the peer with the bit field

25   information in Rightscorp's system and whether Rightscorp

Barbara Frederiksen-Cross  -  Examination          636

1   looked for a hundred percent match of the bit fields it was
2   monitoring.  Do you recall that testimony from Mr. Boswell?
3   A.  Yes.
4   Q.  And there was discussion about a time period where they
5   experimented with sending notices based on 10 percent bit field
6   matching between a known torrent and the bit field records
7   provided by the other peer.  Do you recall that?
8   A.  That's correct, yes.
9   Q.  Before we talk about that 10 percent, I want to talk about
10  the hundred percent matching function.  Rightscorp sending a
11  notice only if 100 percent of the part of the payload that is
12  the file in the notice was detected.  Do you follow me?
13  A.  I think you're saying we're going to talk about the time
14  period before they were testing that 10 percent.
15  Q.  Yes.
16  A.  Yes.
17  Q.  And you've reviewed the code, and the Rightscorp code
18  provides for 100 percent matching between the bit fields that
19  make up the file in the notice and bit fields reported by the
20  peer, is that fair?
21  A.  That's correct.
22  Q.  Was that 100 percent matching code present in Rightscorp's
23  system throughout the entire -- all the versions of code that
24  you've ever reviewed?
25  A.  Yes, it was.

Barbara Frederiksen-Cross  -  Examination      637

1   Q.  So are you confident that at every time period in which

2   there was Rightscorp code that you've had a chance to review,

3   the functionality was there to match 100 percent of the bit

4   fields reported with a file that was going to be in a notice?

5   A.  Yes.

6   Q.  There's been some testimony about experimenting with -- I

7   don't want to use the wrong word -- a patch or some sort of SQL

8   query on top of the code that would change the threshold down

9   to 10 percent.  Do you recall that?

10  A.  Yes.

11  Q.  I want to ask you several questions about that 10 percent

12  portion.  In the event that Rightscorp was sending a notice

13  having detected the user reporting 10 percent of the bit fields

14  of a known torrent, does that in your mind undermine the

15  accuracy of Rightscorp's conclusion that the peer was sharing

16  that torrent?

17  A.  No, because whether they have already achieved a hundred

18  percent of the torrent or whether they are in the process of

19  downloading it, the peer is still got at least a portion of

20  that payload, is offering to share it, and is engaged in

21  copying or distributing that payload, or both.

22  Q.  And is it your understanding that the Rightscorp

23  Infringement Finder system was always recording however much of

24  the bit fields the peer was reporting that the 10 percent only

25  occurred within its notice generation system.  Is that

Barbara Frederiksen-Cross  -  Examination       638

1    accurate?

2    A.  It occurred as a precursor between the data collection and

3    the notice generation.

4    Q.  And I'm going to make sure I'm being clear.  Rightscorp was

5    always collecting 100 percent of whatever bit fields --

6              MR. BROPHY:  Objection, Your Honor, leading.

7              THE COURT:  Sustained.

8    BY MR. O'BEIRNE:

9    Q.  What percentage of the bit fields the peer was reporting

10   did Infringement Finder record to analyze?

11   A.  It recorded all of the bit field it received.

12   Q.  Every time, during the operation of the system?

13   A.  Correct.  So all of the ones and zeros that the peer sent

14   it were put in this temporary table.

15             MR. O'BEIRNE:  Let's go to the next slide, please.

16   BY MR. O'BEIRNE:

17   Q.  Ms. Frederiksen-Cross, you've reviewed the Rightscorp

18   notices in this case, is that fair?

19   A.  I have, yes.

20   Q.  And are you generally familiar with the information

21   contained in the notices that Rightscorp generated?

22   A.  Yes.

23   Q.  What information from the handshake did Rightscorp provide

24   to ISPs in the notice process?

25   A.  Well, based on the handshake with a specific peer, the

1    Rightscorp system has confirmed that a particular IP address

2    with which it was communicating had completed that handshake,

3    and it identifies basically what part of the bit field

4    corresponds to a particular song or work that it represents in

5    the notice.

6        And so if you look down kind of the second blob here, for

7    instance, on the top -- very top line it says, you know, the IP

8    address that it was communicating with.  And then that address

9    a little bit farther down where you see the file Ten Good In

10   Goodbye MP3, was infringed by a computer at the address

11   216.82.220.184.  That's the same IP address it's referencing at

12   the top.  So that is the IP address that this particular notice

13   refers to that reflects that handshake that the Rightscorp

14   system did with that specific peer.

15       And the data about the file represents the specific file

16   that it was seeking when engaging in that handshake.  And so it

17   was represented here in a more human-friendly form based on the

18   information from the torrent about which fields that file

19   corresponded to, so that the user can know what file they're

20   being notified of -- or the end recipient of this notice, I

21   should say, can know what file they're being notified of.

22   Q.  Thank you.

23           MR. O'BEIRNE:  You can take it down.

24   BY MR. O'BEIRNE:

25   Q.  Have you examined the actual code in the Rightscorp system

Barbara Frederiksen-Cross - Examination          640

1  that performs this function of transferring information from

2  the Infringement Finder detection into a notice?

3  A.  Yes.

4  Q.  Did you have sufficient information to reach an expert

5  opinion about how this code functions?

6  A.  Yes.

7  Q.  Were you able to verify that Rightscorp could accurately

8  take information it detected from a peer in a handshake and

9  import it into a notice to be sent to the ISP?

10 A.  Yeah, the information that was confirmed through the

11 handshake with the peer is stored in a table, and then that is

12 just merged kind of like a mail-merge operation into a template

13 for the notice.  So it takes the IP and moves it in, and the

14 song information and the date and time information, and merges

15 it with the general form of the notice to prepare the notice.

16 Q.  In your opinion, do these notices accurately reflect

17 file-sharing activity over BitTorrent detected by Rightscorp?

18 A.  Yes, they reflect the activity of peers who are actively

19 engaged in a particular point in time, as reflected in the

20 notice, in the exchange of either downloading or uploading

21 content with respect to a specific torrent hash that has been

22 verified as containing specific work that Rightscorp has been

23 hired to monitor and send notices for.

24 Q.  Can Rightscorp's system detect when two non-Rightscorp

25 peers are distributing portions of a payload to each other?

Barbara Frederiksen-Cross  -  Examination        641

1   A.  No, the Rightscorp system doesn't infiltrate the peers to

2   see what they're doing amongst themselves.  It captures the

3   communication of the Rightscorp system to a specific peer and

4   the responses that that peer sends back.  But there's no way

5   that it goes into the communication between two other machines.

6   One of the machines has to be the Rightscorp detection peer.

7   Q.  Are you aware of Rightscorp ever claiming it could

8   infiltrate, to use your word, a communication between two peers

9   other than Rightscorp?

10  A.  I am not aware that any such representation has ever been

11  made.

12  Q.  I'd like to turn to Rightscorp's downloading of files, but

13  before we do, I just want to make sure your opinions are clear

14  to the jury.

15      Do you believe that Rightscorp's process of obtaining

16  copyrighted works to look for, verifying them, engaging in

17  handshakes, and then sending notices, is accurate and reliable?

18  A.  I do believe that, yes.

19          MR. O'BEIRNE:  Your Honor, we got started a little

20  late this morning.  Would you like to proceed through our

21  normal --

22          THE COURT:  No.  We can take our recess now, if you're

23  comfortable.  I thought you were planning on going a few

24  minutes longer, but it's okay now.

25          MR. O'BEIRNE:  This is a natural time for a break.

Barbara Frederiksen-Cross  -  Examination          642

```
 1              THE COURT:  Let's take our break.
 2              COURT SECURITY OFFICER:  All rise for the jury.
 3              (10:28 a.m., the jury exits the courtroom.)
 4                              *   *   *
 5              (10:47 a.m.)
 6              COURT SECURITY OFFICER:  All rise for the jury.
 7                              *   *   *
 8              COURT SECURITY OFFICER:  All rise.
 9              THE COURT:  Please be seated.  All right.  The Court
10    would note the presence of all counsel as well as the ladies
11    and gentlemen of the jury.
12              All right, counsel.
13              MR. O'BEIRNE:  Thank you, Your Honor.
14              Could you put up slide ten, please.
15    BY MR. O'BEIRNE:
16    Q.  Ms. Frederiksen-Cross, before we took the break, we were
17    talking about the notification system.  I'd like to turn your
18    attention to the part of the Rightscorp system that obtains
19    downloads from peers and BitTorrent.  Are you familiar with
20    this process?
21    A.  Yes.  I assume you're talking about the portion that now
22    obtains the download from a single peer as opposed to the peers
23    in the swarm?
24    Q.  Yes, thank you.  Please describe the process by which
25    Rightscorp -- at least the initial part of the process -- by
```

1   which Rightscorp determines which peers to contact and reach

2   out to in order to obtain a file from a single peer.

3   A.  Okay.  In this process, which is different than the

4   download process I talked about before, the Rightscorp system

5   goes to get an IP address that has previously been the subject

6   of a notice.  So it goes back to that notification table and

7   chooses an IP address there and then it performs the BitTorrent

8   handshake with that specific peer and attempts to download the

9   entire work from that specific peer.

10            MR. O'BEIRNE:  Slide 16.

11   BY MR. O'BEIRNE:

12   Q.  Let's talk about the process, step by step, during which

13   Rightscorp handshakes with a peer that has already received a

14   notice.  What's the first step of the process once Rightscorp

15   has contacted that same peer again?

16   A.  As before, it establishes a connection with the peer and

17   then does a BitTorrent handshake to begin the initiation or to

18   begin -- to initiate the communication about a particular

19   torrent that was the -- torrent that was the subject of the

20   notice.

21   Q.  Is this the same kind of handshake it engaged with this

22   peer in which it engaged with the peer in order to generate the

23   notice?

24   A.  Yes, it's the normal BitTorrent protocol handshake.

25   Q.  And what happens as the first part of this handshake, after

Barbara Frederiksen-Cross  -  Examination        644

1    the connection is opened?

2    A.  Well, again, as a part of that handshake, the peers send

3    back and forth the torrent payload that they're talking about

4    and the bit field.  And so they're confirming that they're both

5    talking about the same payload and then they're exchanging that

6    bit field information.

7    Q.  And the slide says the first step there is that the Grande

8    user confirms the hash value of the torrent file.  Is that the

9    same step, the same hash confirmation step that occurred in the

10   initial handshake?

11   A.  Yes.  It's basically sending back the information that,

12   yes, I have this torrent payload and here is the pieces I have.

13   So it is confirming via the torrent info hash that they're

14   talking about the same thing.  And that's the confirmation at

15   the hash that I'm referring to here.

16   Q.  Confirming that they're talking about the same hash that

17   was the subject of the notice?

18   A.  Correct.

19   Q.  After the BitTorrent peer that Rightscorp is communicating

20   with has confirmed that it's still sharing the hash that was

21   the subject of the notice, then what's the next step?

22   A.  The next step would be the Rightscorp sending -- the system

23   sending an interested message and the peer unchoking it and

24   then the Rightscorp system requesting or beginning to request

25   pieces of that payload and the peer providing those pieces.

Barbara Frederiksen-Cross  -  Examination        645

1   And as it gets the pieces, of course, Rightscorp verifies them

2   and saves them, to collect all the pieces of the particular

3   song.

4   Q.  What does Samplit 2 do with files that it is able to

5   download from a peer in this second handshake?

6   A.  Whatever is downloaded from the peer is stored in a

7   database table and then a companion record records information

8   about when that sample was put in the table and the associated

9   torrent and the rest of the information.  So we get the file

10  downloaded, and we get the information about the particular

11  transaction that resulted in downloading that file from that

12  specific peer; so the torrent hash, the date and time, you

13  know, the other information.

14  Q.  Does it obtain -- I think you just testified to this, but

15  did it obtain just the part of the payload, or information

16  about the peer that was sharing the payload?

17  A.  Well, it records both the material that it downloaded and

18  the information about the transaction that resulted in that

19  particular download, so the hash, you know, who it was talking

20  to, when it was talking to them; the information that provides

21  an evidentiary record of that download.

22  Q.  And that information about the peer and the hash and the

23  time, is that saved alongside or connected in some way to the

24  file in the Rightscorp system in its database?

25  A.  Yes.  They're connected through a unique identifier that

Barbara Frederiksen-Cross  -  Examination        646

1   ties the two together.

2   Q.  Might there be reasons why -- first of all, are you aware

3   of the name Samplit in connection with this process?

4   A.  Yes.

5   Q.  Samplit 2, specifically, within the Rightscorp code?

6   A.  Yes.

7   Q.  We've been referring to the Samplit part of the system as

8   the one that goes and tries to get downloads; is that fair?

9   A.  Yes.

10  Q.  Okay.  So are there reasons why Samplit 2, having gotten an

11  IP address from Rightscorp's database of somebody that received

12  a notice might be unable to engage in a connection with that

13  peer?

14  A.  Sure.  If the peer is not online, you can't get the initial

15  connection or if it's not running BitTorrent, there's nothing

16  to respond to the BitTorrent handshake.  So in some instances,

17  you won't be able to complete a connection or the handshake.

18  Q.  If Samplit 2 got an IP address from Rightscorp's notice

19  database and attempted to handshake with that peer and that

20  peer is not online, can there be a handshake?

21  A.  No.  If the peer is not online, there can't be a handshake.

22  Q.  Do you view that as somehow a problem or a flaw in the

23  Samplit system, that it can't handshake with peers that aren't

24  online?

25  A.  No, that's just the way the Internet works.

Barbara Frederiksen-Cross  -  Examination        647

1    Q.  And if Samplit attempts to handshake with a peer at that IP

2    address who is online but not running BitTorrent at that

3    moment, can there be a handshake?

4    A.  No.

5    Q.  Would you view it as some -- as a flaw or in some way

6    undermining Samplit 2's ability to accurately obtain evidence

7    that it can't handshake with computers that aren't running

8    BitTorrent?

9    A.  No.  That's just the way it works.

10   Q.  You testified that Samplit is attempting to get all of the

11   payload that makes up the file that was in the notice, is that

12   accurate?

13   A.  Correct.

14   Q.  Are there reasons why Samplit, having engaged in a

15   handshake and started to get pieces of the file, it may not be

16   able to get the full file?

17   A.  Sure.

18   Q.  Please explain those to the jury.

19   A.  Once the handshake is established, the system is behaving

20   like a normal -- semi-normal BitTorrent client, except that

21   it's requesting pieces from a single peer.  If that peer goes

22   offline, if the guy closes the torrent file, if he closes his

23   BitTorrent or if he just gets too impatient and decides to talk

24   to somebody else, you know, he can break the connection.  And

25   that's part of the tit-for-tat algorithm, actually, that if

Barbara Frederiksen-Cross  -  Examination       648

1   you're not responding, you eventually get shut down by the

2   other guy.  So there's a lot of reasons that that could happen,

3   and it's not remarkable.  I mean, one would expect that.

4   Q.  So for example, if Samplit 2 is engaged in a handshake and

5   obtaining pieces from a peer who loses their Internet

6   connection, can they continue to get more pieces after that

7   peer is no longer online?

8   A.  No.  The peer is not there to give them pieces.

9   Q.  Does that impact, in your opinion, the accuracy or the

10  reliability of what Samplit 2 is doing in trying to download

11  this file?

12  A.  No.

13  Q.  Same thing if the peer shuts down BitTorrent.  If Samplit 2

14  is in the middle of a handshake getting pieces from a peer and

15  that peer turns off BitTorrent, can they continue -- can

16  Samplit 2 continue getting more pieces?

17  A.  No.  BitTorrent has to be running with that hash available

18  to it or, you know, open on the computers that it's sending the

19  pieces for the pieces to be sent.

20  Q.  And if the peer on the other side of a handshake with

21  Samplit 2 turns off BitTorrent, does that in your opinion

22  affect the accuracy or reliability of the information that

23  Samplit 2 got up to that moment?

24  A.  No.

25  Q.  Ms. Frederiksen-Cross, have you examined the actual code in

Barbara Frederiksen-Cross  -  Examination        649

1    the Rightscorp system that performs this function of Samplit 2

2    going to the database, getting an IP address of a peer that got

3    a notice before, and reaching out to go handshake with that

4    peer?

5    A.  Yes, I have.

6    Q.  And do you have enough information to reach an expert

7    opinion as to whether that code operates accurately and

8    reliably?

9    A.  Yes, I have.

10   Q.  And what is that opinion?

11   A.  My opinion is that process is accurate and reliable as far

12   as it can be, given that if the peer goes offline, then the

13   peer is gone.

14   Q.  Turning to the next part, where Samplit 2 engages in a

15   handshake and confirms the hash information being provided by

16   the other peer.  Have you looked at that part of the code?

17   A.  Yes.

18   Q.  And have you verified how that part of the code works?

19   A.  Yes, again, the two have to be talking about the same hash

20   or they won't be talking at all, because the recipient peer who

21   receives the request, if they don't have that hash open, they

22   don't accept the request.

23   Q.  Are you certain, as an expert, that the Rightscorp code can

24   accurately and reliably engage in handshakes and transmit and

25   receive that hash value information?

Barbara Frederiksen-Cross  -  Examination          650

1   A.  Yes.  So long as the other computer also has the same info
2   hash open for the same torrent file.
3   Q.  And during the handshake, after the hash has been
4   confirmed -- I think you explained to the jury -- Samplit 2
5   then asks, can you give me these certain bit fields, these
6   certain pieces of the file.  That's how Samplit communicates
7   with the other peer, correct?
8   A.  Yeah, it requests the pieces by the piece index, so it's
9   not the bit field, per se, but the index associated with a
10  particular -- give me piece seven, give me piece eight, give me
11  piece nine.
12  Q.  Have you reviewed the part of the code that requests those
13  pieces and obtains them back, if possible, from the peer?
14  A.  Yes.
15  Q.  And do you have an opinion as to whether that part of the
16  Rightscorp code operates reliably and accurately?
17  A.  Yes.
18  Q.  What's your opinion?
19  A.  Based on my review of the code, it is reliable and
20  accurate, and it actually behaves very much as any BitTorrent
21  client would, getting the piece, verifying it, and then saving
22  it.
23  Q.  There's been some testimony in this case about instances
24  where Samplit downloads different bit fields of the torrent
25  than are the bit fields that were the subject of the file in

Barbara Frederiksen-Cross  -  Examination          651

1   the notice.  Do you under -- are you familiar with that

2   possibility?

3   A.  Yes.

4   Q.  Could you please explain to the jury how that might happen?

5   A.  In instances where there's more than one file in a payload,

6   the Rightscorp system goes out to the peer, and it asks for a

7   particular set of pieces that constitute a particular file.  It

8   downloads those pieces, but then once it has the information

9   downloaded, it -- or attempts to download based on the -- it

10  checks the file name that the peer is reporting against the

11  file name it believes the file to be.  And if there's not an

12  exact match -- an example might be Beyonce's Greatest Hit, you

13  know, with the diacritical accent on Beyonce or without, those

14  are not going to be a match.

15      So if the match of the file name is not the same as what

16  they have stored in their database, as a way of confirming that

17  they have communicated with this client, they then download the

18  first file from the payload, so that could be a different song,

19  it could be AlgoMart, it could be the discography of what's on

20  this payload.

21  Q.  I'd like to take that explanation and talk about the

22  different parts of it.  So first of all, you talked about the

23  name matching to determine which bit fields Samplit 2 is

24  looking for.  Do you recall that?

25  A.  Yes.

Barbara Frederiksen-Cross  -  Examination          652

1   Q.  That name matching is happening on the Rightscorp side of
2   the handshake within its own system.
3           MR. BROPHY:  Objection, Your Honor, leading.
4           MR. O'BEIRNE:  Just trying to clarify the testimony,
5   Your Honor.  I don't believe it's disputed.  But withdrawn.
6   BY MR. O'BEIRNE:
7   Q.  What is Rightscorp comparing the name in the notice to in
8   order to determine which bit fields to look for?
9   A.  Rightscorp initially takes the song that it's looking for,
10  identifies which specific pieces in the payload correspond to
11  that song, but then it also checks the name to confirm that the
12  name that it is stored in its database in association with a
13  particular file matches the name that's being returned.
14  Q.  It's fair to say -- using the BitTorrent protocol, can
15  Rightscorp communicate with another peer using names or is it
16  only bit fields?
17  A.  Just bit fields.
18  Q.  So at the time that Rightscorp's Samplit 2 system engages
19  in a handshake, is it asking the peer for bit fields or for a
20  name?
21  A.  When it engages in the handshake, it's initially asking for
22  the info hash.  That's the beginning of the communication.
23  Q.  Sure.
24  A.  And then it requests specific pieces that correspond to
25  some particular song in that payload.

Barbara Frederiksen-Cross  -  Examination        653

1   Q.  Regardless, whether it gets the specific bit fields that
2   match the name of the song in the notice, based on your review
3   of Samplit 2, any time it's downloading from the peer is it
4   downloading part of the payload of the torrent file that's been
5   hash matched?
6   A.  Yes, it is.
7   Q.  Do you have an opinion as to what extent the downloads
8   obtained by Rightscorp verify or support the information that
9   Infringement Finder has obtained?
10  A.  Yes, I do.
11  Q.  What's that opinion?
12  A.  By going back to peers that it has previously contacted and
13  for which it has previously sent a notice and then attempting
14  to download that payload, it is verifying that the peer, at
15  this later point in time, is still online, has still got the
16  BitTorrent client open, has still got that particular payload
17  or that torrent file associated with that payload open in its
18  client software at the same time, and that it is making pieces
19  of that payload available.
20  Q.  Even if Rightscorp never downloaded, never returned to a
21  peer and engaged in a download, do you still believe that the
22  notice information of Infringement Finder is accurate and
23  reliable?
24  A.  Yes, I do.  May I add something here?
25          THE COURT:  No, ma'am.  You have to wait for a

Barbara Frederiksen-Cross   -   Examination          654

1   question.

2          THE WITNESS:  Okay.

3   BY MR. O'BEIRNE:

4   Q.  Are there other reasons why you believe the notices --

5   well, for what reason would you tell the jury that the notices

6   are valid even if there's never a download?

7   A.  The notices are created through the interactions with a

8   BitTorrent peer using the BitTorrent protocol as it's designed

9   to be used.  The file verification that happens during the

10  notice process is based on the info hash and what the peer

11  reports.  This separate process of downloading a piece of a

12  file or a whole file is a separate process, it's unrelated to

13  the notice generation.  And so I believe that the notice

14  generation process itself is accurate because of my

15  understanding of the BitTorrent client and my study of the

16  software.

17     This secondary download is a further confirmation that the

18  system is collecting real information and it works.  But I just

19  wanted to clarify that the second download from a single peer

20  is actually a separate process that comes -- potentially after

21  the notice has even been sent even.  It's usually closer

22  aligned in time, but not part of the notice generation process.

23  Q.  Ms. Frederiksen-Cross, I'd now like to ask you about the

24  Rightscorp dashboard.

25          MR. O'BEIRNE:  You can take that down, Conner.

Barbara Frederiksen-Cross  -  Examination        655

1    BY MR. O'BEIRNE:

2    Q.  Are you familiar with the dashboard that Rightscorp created

3    and provided to ISPs?

4    A.  Yes, I am.

5    Q.  Please explain to the jury.  What did you review about the

6    Rightscorp dashboard?

7    A.  With respect to the dashboard, I saw demonstrations of its

8    operation and I also had available the source code of the

9    dashboard.  And I was even given an opportunity via Webex to

10   interact with the dashboard.  And this was specifically the

11   dashboard in this case that was provided for Grande.

12   Q.  When you reviewed the Grande-specific dashboard, what

13   information was Rightscorp populating there that Grande could

14   have reviewed?

15   A.  There's a lot of different information there.  There's

16   information on repeat infringers, that is to say IP addresses

17   that have been detected multiple times across time.  And so for

18   those -- for that part of the dashboard, it would show a list

19   of IP addresses and how many times they had been detected and

20   over what periods of time.  So the first time detected, last

21   time detected.  And then using the dashboard, you can drill

22   down on specific IPs from that list and, you know, see

23   information about when they were sent notices, and by clicking

24   on that, actually even pull up notices.

25       You also have the ability to look more generally at a

Barbara Frederiksen-Cross  -  Examination        656

1  particular timeframe and see, you know, for today, what notices
2  were sent.  And again, click on those individual notices.  If a
3  sample had been taken from a specific IP address, you can
4  actually go all the way by clicking through the dashboard and
5  get down to a point where you -- there's a button that's "Play
6  It," and you can actually play that sample that was selected
7  from the -- from a particular peer.
8      So it will indicate whether or not that peer's payload has
9  been downloaded via this second Samplit process, and if it has,
10  it will give you the option to try to play what's there.
11  Q.  To be clear, would it give you the option to play the known
12  torrent that Rightscorp had obtained, that had hash-matched, as
13  opposed to the actual download that was obtained from the peer?
14  A.  I believe that is correct, yes, that it is the copy of the
15  song that was verified and stored in association with that
16  hash.
17  Q.  And hash-matched in the notice?
18  A.  Correct.
19  Q.  And also if there were a download, in the download?
20  A.  Right.
21  Q.  Ms. Frederiksen-Cross, you've talked about some tests that
22  you performed using BitTorrent yourself apart from the
23  Rightscorp system.  Did you also run any live testing of the
24  Rightscorp system itself?
25  A.  Yes, I did.

Barbara Frederiksen-Cross  -  Examination       657

1   Q.  I'd like to turn your attention to the testing that you

2   ran -- what was your aim in running testing directed at the

3   Rightscorp system?

4   A.  I wanted to see whether using BitTorrent from my own -- or

5   one of my own computers, if my activity would be detected, and

6   if it was detected, would a notice be prepared.  And so the

7   focus of this test was to actually run BitTorrent on a computer

8   under my control, just a normal BitTorrent client that I

9   downloaded from the Internet and a torrent I had permission to

10  run this test on, and run it and then see what happened.  And

11  so --

12  Q.  Before we get into the steps in the test, did you reach a

13  conclusion -- did Rightscorp accurately detect copying of these

14  works that you downloaded over BitTorrent in this test?

15  A.  Not every one, but I did get detected by Rightscorp, and I

16  had the opportunity to inspect their records related to that

17  detection, including the notice.

18  Q.  Let's turn to the details of the test.  First of all, when

19  did you perform this test or tests?

20  A.  I do not recall the specific date.  I think it's recorded

21  in my report, but I don't recall specifically.

22  Q.  Do you recall having done a test in 2015 and then also

23  2018?

24  A.  I did tests in both of those timeframes, yes.

25  Q.  Did you use the same approach each time?

Barbara Frederiksen-Cross  -  Examination        658

1   A.  Yes.

2   Q.  What did you use in your system to document data collected

3   during these tests?

4   A.  I used capture of the network activity that was -- that it

5   was being conducted during my download of a file, and then my

6   own notes about when I had started the test and which specific

7   songs I was using during the tests, so in combination with the

8   torrent file that I was using, the notes I was taking, and the

9   actual network traffic that I captured.

10  Q.  We have a demonstrative that's up on the screen.  I'd like

11  to walk you through the stages of your test.

12      What was the first step of your test?

13  A.  Actually, the first step was to download and install the

14  BitTorrent client, uTorrent.

15  Q.  Okay.  And after that?

16  A.  Then to download a -- the torrent file that I had been

17  given permission to use.  So I think I got it off of Pirates

18  Bay, if I remember correctly, but Googled it at the torrent

19  file and download it from a torrent site.  And then I turned on

20  Dumpcap and Wireshark to monitor the network traffic and to

21  filter the network traffic.  And then I opened --

22  Q.  Sorry.  To the extent that it's relevant, what are

23  Wireshark and Dumpcap, briefly for the jury?

24  A.  One is a capture program that captures network activity,

25  and the other allows me to filter that network activity.  So,

Barbara Frederiksen-Cross  -  Examination       659

1  for instance, there are built-in filters for Wireshark that
2  allow me to filter specifically for BitTorrent protocol
3  communications, and that way I don't get the noise as it's
4  talking to my router and things.
5  Q.  Once you had the network monitoring software working, what
6  was the next step of the test?
7  A.  To actually then open the torrent file I had downloaded in
8  my BitTorrent client so that I could begin the activity
9  associated with the BitTorrent protocol in downloading a file.
10 Q.  Were your computers on Grande's network during this test?
11 A.  No.  I'm based out of Portland, Oregon, so I was on a
12 different ISP there.
13 Q.  So is what's being represented in this demonstrative your
14 test machine offering to distribute and, in fact, distributing
15 torrent files and payloads over the Internet -- excuse me, not
16 torrent files -- payloads over BitTorrent?
17 A.  Yeah.  First what had to happen is I had to download them,
18 but as I downloaded pieces, my machine was also distributing
19 them to other peers, just as one would expect in the normal
20 BitTorrent operation, so I was receiving pieces and sending
21 pieces.
22 Q.  After you -- about how long was your computer running as
23 you conducted this test?
24 A.  There were various tests.  Typically, it took between
25 20-something seconds and 35 or 40 seconds to download the song

1  completely, but as we mentioned earlier, for the parasite test,

2  I left it on for much longer.  But typically, I left it on for

3  a few minutes if I was just doing the download test.

4  Q.  Just to return quickly to the ISP you were using, does the

5  fact that you were on a different ISP, in your opinion, in any

6  way affect the outcome or the reliability of what you observed

7  in this test?

8  A.  No.  I mean, what I was observing was just the normal

9  BitTorrent traffic that goes on between my computer and the

10  world at large.  And in the course of that, I also caught the

11  communication in one of my tests from Rightscorp where I

12  happened to be a peer that it sampled.

13  Q.  So you just mentioned that next step.  So after you monitor

14  network traffic, what was the next step in order to assess

15  whether Rightscorp had detected what your computer was doing?

16  A.  The next step was to obtain from counsel the list of IP

17  addresses that Rightscorp was using for its detection software

18  that day so that I could filter my network traffic to see if I

19  had received any communication from the Rightscorp system.  And

20  because of that, I was able to verify that, yes, one of their

21  computers had hit me during this download/upload operation and,

22  therefore, they would have had a record about my behavior.

23  Q.  After confirming that there was an IP address that you

24  believed would have represented a handshake with Rightscorp,

25  what was the next information you obtained from Rightscorp?

Barbara Frederiksen-Cross  -  Examination       661

1   A.   Then I asked Rightscorp to send me the extract of the

2   record that it had created based on that interaction and also

3   the notice that it had generated based on that reaction, so

4   both what they had stored in their database about me, you know,

5   the date and time and the IP address I was using and also the

6   notice that was prepared.

7   Q.   So that Rightscorp could get any records about your

8   computer, did you provide them your IP address?

9   A.   Yeah, I had to do that so that they could look that up.

10  Q.   Did you tell Rightscorp which torrent files you claim you

11  were sharing or any other payload information?

12  A.   I think the only thing I gave them was my IP address and

13  the particular date.  I said, you know, if you've got anything

14  for this IP address on this date.

15  Q.   So you didn't share the hash or the payload or any other

16  BitTorrent information, just the IP address and the date?

17  A.   That's correct.

18  Q.   What did Rightscorp provide to you from their records about

19  your testing IP address and the date of your test?

20  A.   They were able to provide back to me the record that they

21  had captured in their databases recording that activity, you

22  know, my IP and this hash on this date, time.  Their date times

23  are in universal time code, UTC, so I had to translate that to

24  Pacific Time to be able to match them up with my records of

25  when I was active and with my PCAPS.

Barbara Frederiksen-Cross  -  Examination        662

1  Q.  Did you compare the information in the notice records

2  generated by Rightscorp's Infringement Finder with your network

3  traffic about what your computer was doing?

4  A.  Yes.

5  Q.  What did that comparison reveal?

6  A.  It showed that they had accurately captured the torrent

7  hash that I was using and they had actually -- or accurately

8  captured the date and time and the IP address and the port that

9  I was using during that communication.

10  Q.  And to be clear, when you were using BitTorrent during that

11  test, did every single peer that initially connected to you

12  start out choked?

13  A.  Yeah.

14  Q.  And during the course of the test, did your machine

15  periodically choke and unchoke in the process of sharing files?

16  A.  That's correct.  And I also started out chocked.  I mean,

17  everybody starts out choked and then you send interested

18  messages and get unchoked and later get choked again.  It's

19  just part of the normal protocol.

20  Q.  And while the Rightscorp system was engaged in a handshake

21  with your testing computer for this hash, was your computer

22  also sharing that same -- the payload of that hash with other

23  peers in BitTorrent?

24  A.  As soon as I got pieces and verified them, I was sending

25  out my have messages and other peers were contacting me and

Barbara Frederiksen-Cross  -  Examination        663

1    downloading those pieces from me.

2    Q.  Did you have an opportunity to review and confirm the

3    accuracy of the infringement record generated by Rightscorp in

4    connection with your testing?

5    A.  Yes, I did.

6    Q.  Is it your opinion that the information provided to you by

7    Rightscorp in connection with this test verifies the accuracy

8    and reliability of the Rightscorp Infringement Finder system?

9    A.  It provides further verification of that, that it works to

10   me, yes.

11   Q.  I believe you mentioned at the beginning of the discussion

12   of testing, to the jury, Rightscorp only detected some of the

13   sharing your computer was engaged in; is that fair?

14   A.  Yeah, they weren't constantly monitoring me or anything.

15   It's just like any other peer.  They would have to get my

16   address from a tracker, reach out to me, and then if they

17   caught me in the act, so to speak, then they created a record.

18   Q.  Fair to say your computer was sharing a lot more than the

19   sharing that was recorded in this Rightscorp test?

20   A.  Yeah, because -- like, it didn't capture what I was sending

21   to other peers outside the Rightscorp peer.  It could only have

22   that little keyhole window of what I was doing when it

23   contacted me with respect to Rightscorp's computer, but it --

24   it doesn't see what I'm doing with other peers.

25   Q.  What was your conclusion, if any, about the reliability of

Barbara Frederiksen-Cross  -  Examination          664

1   the Rightscorp system based on this testing in 2015 and 2018?

2   A.  Again, it further confirmed my opinion that it can

3   accurately detect activity and that it can create an accurate

4   record of that activity that records the date and the IP

5   address and the payload that's being exchanged.

6   Q.  Ms. Frederiksen-Cross, in your expert opinion, does the

7   Rightscorp system function as Mr. Boswell explained it to the

8   jury?

9   A.  Yeah.

10  Q.  Does the Rightscorp system, in your expert opinion,

11  accurately detect copying of known files over BitTorrent?

12  A.  It accurately detects both the upload and the participation

13  of a peer who may also be downloading.

14  Q.  And offers to upload as well?

15  A.  Yes.

16  Q.  In your opinion, does the Rightscorp system accurately

17  record BitTorrent file sharing information and send it to ISPs

18  in a reliable fashion?

19  A.  Yes, it does.

20          MR. O'BEIRNE:  Pass the witness, Judge.

21          MR. BROPHY:  I need just a moment to get set up.  If

22  you don't mind.

23          THE WITNESS:  Perfectly okay.

24          (11:25 a.m.)

25                  CROSS-EXAMINATION

Barbara Frederiksen-Cross  -  Examination        665

1   BY MR. BROPHY

2   Q.  I'd like to start out by asking how you'd like to be

3   addressed.  In deposition, we've spoken as -- I treated you as

4   Ms. Frederiksen-Cross.  I've heard Ms. Frederiksen today.

5   Which would you prefer?

6   A.  No strong preference either way, whichever is more

7   convenient to you, counsel.

8   Q.  Okay.  I'll use Ms. Frederiksen just to keep the number of

9   words to a minimum, if that's okay?

10  A.  You got it.

11  Q.  I think we've heard a number of times both today and last

12  week that your opinion is that the Rightscorp system is

13  accurate and reliable; is that right?

14  A.  That is correct, sir.

15  Q.  And that is your opinion?

16  A.  Yes.

17  Q.  And that's your opinion, top to bottom, every aspect of the

18  Rightscorp system; is that correct?

19  A.  I can think of no exceptions as I sit here.

20  Q.  Would you agree with me that your opinion is only as good

21  as the information that you rely on?

22  A.  I think that's a fair statement.

23  Q.  I'd like to start by talking about what the Rightscorp

24  system is.  I'm going to say something, and if you disagree

25  with it, please correct me as you need to, but my understanding

Barbara Frederiksen-Cross  -  Examination        666

1   of the Rightscorp system is that it's actually a collection of
2   functions that are manually executed by an operator.  Is that
3   fair to say?
4   A.  I wouldn't characterize it entirely that way.  I would say
5   that some functions are manually initiated by an operator.  You
6   start a program.  And others, once the program is running,
7   various components of it operate automatically as the program
8   moves through the sequence of its operations.
9   Q.  So to put it another way, an operator maybe pushes the
10  first domino and then these other dominoes fall; is that fair
11  to say?
12  A.  I guess you could think of it that way, yeah.
13  Q.  As a simple example?
14  A.  Yes.
15  Q.  But the operator can push multiple initial dominoes to have
16  multiple rows of dominoes fall; is that fair to say?
17  A.  I don't think the Rightscorp system uses dominoes, so I
18  think it would be helpful if we got more specific about what
19  actions you're talking about the operator doing versus the
20  software doing.
21  Q.  Sure.  Would you agree with me that there are multiple ways
22  to begin execution of the Rightscorp software?  Multiple Go
23  buttons you can hit, in other words?
24  A.  Well, for instance, I guess there's a Go button for the
25  verification of the songs or a Go button for detection of

Barbara Frederiksen-Cross  -  Examination        667

1    infringement or a Go button for sampling.  So in that sense,

2    there are multiple Go buttons for different aspects of the

3    system.

4    Q.  And I believe one of those three you identified was a Go

5    button for detection; is that right?

6    A.  For the -- what we've been calling the infringement

7    detection, yes.

8    Q.  The infringement detection.  Would you agree with me there

9    are multiple Go buttons even within that single infringement

10   detection system?

11   A.  It depends at what point in time you're talking about.  In

12   the early days, everything was run from one script that would

13   start the various processes that we've talked about for

14   infringement, the reaching out to the tracker and getting a

15   list of peers and doing the peers.

16       At a later point in time, the function of talking to the

17   tracker and going out to collect the evidence was separated.

18   So in that later point, I think must be what you're referring

19   to, where there's a Go button for talking to the tracker and a

20   Go button for doing the actual investigation.

21   Q.  Later in time, do you agree with me there were multiple Go

22   buttons you could push to kick off those items as well?

23   A.  I'm not sure what you're referring to counsel.  If you

24   could give me an example, I could give you my opinion on it.

25            MR. BROPHY:  Sure.  Your Honor, may I approach?

1            THE COURT:  Of course.

2    BY MR. BROPHY:

3    Q.  Ms. Frederiksen, I've handed you a document.  Do you recall

4    serving an opening expert report in this case?

5    A.  Yes, sir, I do.

6    Q.  And do you recall attaching certain source code and

7    comments to that report?

8    A.  I recall attaching this exhibit, which describes the

9    specific operation -- or some of the specific operations of the

10   system as they related to verification of songs and

11   infringement and the dashboard.  As I sit here, I don't recall

12   if I actually attached the source code.  I think I referred to

13   the source code as it had been produced to the parties.

14   Q.  Is it fair for me to say that this document you have in

15   front of you is a correlation of certain processes within the

16   Rightscorp system and your description of what they do?

17   A.  That is an accurate description, yes.

18   Q.  I'd like to turn your attention to page 22 of this

19   document.  And before we get into the details, would you agree

20   with me that this document is separated into two large

21   categories:  One for the source code as it was operated in

22   2015, and another for the source code as it was operated in

23   2018?  For the ease of your reference, I think you'll find the

24   2018 references begin on page 20?

25   A.  Yes.  I see that to be true.

Barbara Frederiksen-Cross  -  Examination        669

1    Q.  That's your understanding of this document, that it was

2    broken into those two major categories?

3    A.  Yes.  And then within each of those categories, the pieces

4    of verification and dashboard and so on.

5    Q.  I'd like to direct your attention to page 22 of this

6    document, please, which is part of your discussion of the 2018

7    version of the code.  Do you see that?

8    A.  I see that page 22 is in that section, yes.

9    Q.  And at the very bottom of page 22, on the left side,

10   there's a column, and within that column there's an indication

11   *"Searching for infringers*."  Do you see that?

12   A.  Yes.

13   Q.  What did you intend that *"Searching for infringers"* to

14   refer to?

15   A.  This is referring to one of the processes that was present

16   in the code related to the attempt to detect BitTorrent peers

17   that were participating in the BitTorrent network for a

18   particular torrent file.

19        MR. O'BEIRNE:  Your Honor, if I may, there's another

20   additional exhibit of this same kind attached to

21   Ms. Frederiksen's rebuttal report.  For completeness' sake, I

22   would request -- and to the extent that her opinions are based

23   on both, I'd like her to be presented with both exhibits rather

24   than a portion of the information underlying her opinions.

25        MR. BROPHY:  Your Honor, my questions relate to this

1    document and this document alone.

2            THE COURT:  You can address it on redirect.

3            MR. BROPHY:  And I guess, is it possible to use this

4    ELMO or is that -- is that a hill that we don't want to climb?

5            THE COURT:  No.

6            MR. BROPHY:  Is that okay?

7            THE COURT:  Sure, that's why it's there.

8            MR. BROPHY:  Your Honor, may I have permission to

9    publish this to the jury as it were?

10           THE COURT:  Is that in evidence?

11           MR. BROPHY:  It's not in evidence, Your Honor.

12           THE COURT:  What is it?

13           MR. BROPHY:  This is an attachment to her expert

14   report that we've been discussing.

15           THE COURT:  I would assume you don't have an

16   objection.

17           MR. O'BEIRNE:  Your Honor, if we're going to talk

18   about portions of it, I think we should introduce the whole

19   exhibit.

20           THE COURT:  Well, we're not going to show -- he's

21   asking questions about a portion of it.  You can ask questions

22   about other portions of it.  I don't want him to be reading the

23   whole thing.

24           MR. O'BEIRNE:  Not that he would have to read it,

25   Judge, just the whole thing would be in evidence for the

 1    witness to testify about.

 2            THE COURT:  I don't think we need to put expert

 3    reports in evidence.

 4            MR. BROPHY:  I have no intention of doing that, Your

 5    Honor.  I just want the jury to be able to follow along as we

 6    look at this document that she created.

 7            THE COURT:  You can do that.

 8            MR. BROPHY:  Thank you, Your Honor.

 9    BY MR. BROPHY:

10    Q.  Ms. Frederiksen-Cross -- Ms. Frederiksen, at the bottom of

11    the page, do you see where it says *"Searching for infringers"*

12    there?

13    A.  I see that, yes.

14    Q.  And that's what you just mentioned, this is an indication

15    of the -- part of the Rightscorp process that searches for

16    alleged infringements; is that right?

17    A.  This was a part of the code that was a part of both the

18    2015 and the 2018 code, yes.

19    Q.  And in this document, which you attached to your opening

20    report, you indicate on the right side *"Deamon.java starts with

21    the Test5 server."*  Do you see that?

22    A.  I see that, yes.

23    Q.  Was that correct?

24    A.  That was what was present in the code, yes, that the

25    Deamon.java started the Test5 process.

Barbara Frederiksen-Cross   -   Examination        672

1   Q.  And upon looking at the code, it was your understanding
2   that that Test5.java was what was running as part of the
3   Rightscorp system; is that right?
4   A.  That it could be run as part of the Rightscorp system, yes.
5   Q.  And when you issued your first expert report in this case,
6   your opinion was Test5.java was running as part of the
7   Rightscorp system, correct?
8   A.  It was my opinion that Test5.java was a part of the system
9   that could be used for the detection of the infringing peers or
10  the peers participating in the BitTorrent network, yes.
11  Q.  And not just could be used, but was being used, correct?
12  A.  I think at the time I issued my original report, that was
13  correct.
14  Q.  And below where you indicate Deamon.java starts the Test5
15  server, it says, *"Test5.java function main at line 111 builds a*
16  *request to invoke torrent request .jsp."*  Do you see that?
17  A.  Yes.
18  Q.  So it was your opinion at the time that the Test5.java
19  program was performing that functionality; is that correct?
20  A.  Certainly the code could perform that functionality.  And
21  at that point in time, it was my understanding that it still
22  was, because that was the portion that had been used earlier in
23  time as well.
24  Q.  If we go to the next page, this is -- and I'm not going to
25  go through all of them, but you can see there are various

Barbara Frederiksen-Cross - Examination      673

1  instances in which you identified Test5.java as performing

2  functions as a part of this infringement detection; is that

3  correct?

4  A.  Correct.

5  Q.  And that's because at the time, you believed Test5.java was

6  being run as a part of the Rightscorp system in 2018, correct?

7  A.  That it was still being run, yes.

8  Q.  That was correct.  Is that right?

9  A.  Subsequent to issuing this report, Mr. Boswell testified

10  that he had split this function into two different components,

11  Memphis and Pocket, and that now the system was running Memphis

12  and Pocket, so they were also present in this same code.

13  Q.  So we had two functions named Memphis and Pocket; is that

14  right?

15  A.  That's correct.  Memphis contacts the tracker, Pocket goes

16  out to do detection.

17  Q.  We also had Test5.java, correct?  We had both Memphis and

18  Pocket and Test5.java, right?

19  A.  That is correct.

20  Q.  And you didn't know which one was running in 2018; is that

21  right?

22  A.  My initial understanding was that Test5.java was still

23  running.  Later I found, from Mr. Boswell's testimony, that he

24  had changed that and broken it in half into the Memphis and

25  Pocket parts and that they were what was, in fact, running in

Barbara Frederiksen-Cross  -  Examination        674

1    2018.

2    Q.  And the only way you could determine which code was running

3    and which wasn't was by reading Mr. Boswell's testimony; is

4    that right?

5    A.  That's correct.  I wasn't provided the cron tables that

6    would have scheduled any operation.

7    Q.  Have you reviewed those cron tables during your engagement

8    in this case?

9    A.  I do not believe the cron tables were produced as a part of

10   this case.

11   Q.  Do you even know if the cron tables exist?

12   A.  I don't for certain in this case.  They would typically

13   exist in this kind of a scenario, but I don't for certain that

14   they have.

15   Q.  And as a result, for purposes of this case, the only way we

16   know which of these programs was running Test5.java were

17   Memphis and Pocket is by relying on Mr. Boswell's memory; is

18   that correct?

19   A.  To the best of my knowledge, that is accurate, yes.

20   Q.  And your original understanding that Test5.java was the

21   program that was running, that was based on Mr. Boswell's

22   testimony too, wasn't it?

23   A.  I think, based on a conversation with Mr. Boswell, that

24   nothing had changed in the system, but I don't believe it was

25   sworn testimony.  It was a much more casual conversation at the

Barbara Frederiksen-Cross  -  Examination         675

1   outset of this litigation.

2   Q.  So if I understand you correctly, you spoke with

3   Mr. Boswell, he told you nothing has changed in the system and,

4   therefore, you issued an opinion indicating that Test5.java was

5   running; is that right?

6   A.  That's not exactly correct.  He had said there had been no

7   major changes in the code and I mistakenly took that to mean

8   that none of the names had changed.  In fact, there are no

9   major changes in the code, but the names of certain

10  components -- he had broken Test5 into two pieces and renamed

11  the two components.

12  Q.  We'll get to whether there are major changes or not later,

13  but for purposes of this discussion right now, you heard

14  something from Mr. Boswell and concluded that Test5.java ran,

15  and then you heard something else from Mr. Boswell and

16  concluded Memphis and Pocket ran; is that right?

17  A.  Yes.  He corrected my understanding of which the current

18  programs were at that point in time.  And I addressed that in

19  my supplemental report then to correct that understanding and

20  to map out the Memphis and Pocket code as well.

21  Q.  And I think we've touched on this already with respect to

22  the crons, but you're not aware of any records Mr. Boswell or

23  anyone else at Rightscorp keeps that reflect how the Rightscorp

24  system is operated at any given time; isn't that right?

25  A.  That's not specifically true, counsel.  They use -- they've

Barbara Frederiksen-Cross  -  Examination          676

1   used a source code revision control system since 2016.  And I

2   had at various times produced to me in 2013 or early 2014 the

3   then current version of the code, and also in 2015 the then

4   current version of the code, and again in 2018 the then current

5   version of the code.  So for specific periods of time, I know.

6   And then from the use of the revision control system from 2016

7   forward, it's very clear what was in existence at those times.

8   Q.  Ms. Frederiksen-Cross, do you recall being deposed on

9   October 18, 2018, in this matter?

10  A.  I don't recall the specific date, but I was deposed a

11  couple times.

12  Q.  You recalled spending a day with me in Washington, D.C., in

13  2018 roughly?

14  A.  A charming day, sir, yes.

15  Q.  Charming day.  I hope so.

16       MR. BROPHY:  May I approach again, Your Honor?

17       THE COURT:  You may.

18       MR. BROPHY:  I'd like to direct the Court's attention

19  to the October 18, 2018 deposition of Ms. Frederiksen-Cross,

20  specifically lines 80 -- page 80, lines 3 through 11.

21  BY MR. BROPHY:

22  Q.  Ms. Frederiksen, on that day I asked the question, *"Have*

23  *you seen any records of Mr. Boswell or anyone else at*

24  *Rightscorp documenting how the Rightscorp system has operated*

25  *over time?"*

Barbara Frederiksen-Cross  -  Examination        677

1    And you answered, *"He sometimes puts comments in the*
2    *headers of his programs about when he makes modifications or*
3    *when he creates programs, but beyond that, I have not seen --*
4    *if you're asking if there's a formal record, I am not aware of*
5    *any.  I am not saying they don't exist.  I am just saying I am*
6    *not aware of any."*
7    Do you see that?
8    A.  Yes, I do.
9    Q.  Would you agree with me that Rightscorp and Mr. Boswell do
10   not retain records of how the Rightscorp system operates on any
11   given day?
12   A.  With respect to how it is operating on a specific day, that
13   may be correct, but I think you are asking a slightly different
14   question before about what's in their code, if I was
15   understanding your question correctly.
16   Q.  Is it fair for me to say that you need to speak to
17   Mr. Boswell to understand how the Rightscorp system is
18   operating?
19   A.  I think that is fair, as he's chief technology officer of
20   the corporation, that was in his wheelhouse.
21   Q.  Well, it may be in his wheelhouse, but without talking to
22   him, we don't know how the Rightscorp system is operating;
23   isn't that right?
24   A.  Well, we know how its source code operates and how that
25   source code performs its detection activities.  There was not a

Barbara Frederiksen-Cross  -  Examination        678

1   substantive change in how that operated over time in any of the

2   versions of the code from the 2013, 2014, 2015, 2018.  So from

3   the standpoint of how it works, you would know that.

4        If you're saying which particular component he was running

5   at any point in time, that's correct, you would need to ask

6   Mr. Boswell.

7            MR. BROPHY:  I'd like to direct the Court's attention

8   to page 79 of the same deposition, lines five through eight.

9   Just let me know when you're there.

10   BY MR. BROPHY:

11   Q.  In 2018, I asked you the question, *"So you need to speak to*

12   *Mr. Boswell to understand how the Rightscorp system was*

13   *operating, correct?"*

14        And your answer was, *"That is my understanding now, yes."*

15   Do you see that?

16   A.  Yes.

17   Q.  So we have to talk to Mr. Boswell to understand how the

18   Rightscorp system is operating; isn't that right?

19   A.  How it's operating, yes.

20   Q.  We also don't know -- I think we've established already,

21   but we don't know which functions are operating within the

22   Rightscorp system unless we talk to Mr. Boswell, correct?

23   A.  We know how the code is operating, because we can see that

24   from the source code.  Which specific -- whether he was using

25   Pocket, Memphis or Test5.java, that we would need input on, at

Barbara Frederiksen-Cross  -  Examination       679

1   least as far as the records that have been produced to me.

2   Q.  And I want to be really clear about this.  We're talking

3   about the fact that we can't know how the Rightscorp system

4   operated unless we talk to a human, is that right?  You have to

5   talk to a human?

6   A.  That, I would dispute, because I think the way the system

7   operates is revealed in the code.  What specific steps the

8   system does to detect or to verify are revealed in the code.

9   You might not know which of two programs was running at a

10  specific time, but they operate with respect to their -- the

11  methodology they use to collect information in the same way.

12          MR. BROPHY:  I'd like to direct the Court's attention

13  to page 66, lines 3 through 16.

14  BY MR. BROPHY:

15  Q.  I asked the question, *"So if I understand your testimony,*

16  *in order to understand how the Rightscorp system is working at*

17  *some given time, we have to speak to Mr. Boswell; is that*

18  *correct?"*

19      And you answer, *"There may be others you could speak to."*

20  And then I ask, *"But some human needs to be interviewed."*

21      And your answer is, *"In this specific instance, I have not*

22  *seen other formal records, contemporaneous records, that would*

23  *say on this day we switched to this process, on this day we did*

24  *this.  Sometimes you get those in production, but in this case*

25  *I've not seen anything.  It's my understanding they weren't*

Barbara Frederiksen-Cross  -  Examination        680

1   *that formal in their recordkeeping because Mr. Boswell was*

2   *basically the sole programmer."*

3       Do you see that?

4   A.  Yes.

5   Q.  So we have to talk to a human to understand how the

6   Rightscorp system is operating on any given day; is that

7   correct?

8   A.  With respect to which specific component was being run that

9   way, yes, but with respect to what it was doing in its

10  interactions with peers, that was the distinction I was making.

11  Q.  Just to clarify, the question that I asked is*, "In order to*

12  *understand how the Rightscorp system is working at some given*

13  *time."*  I didn't qualify it based on what functions were

14  running.  I said, *"in order to know how the Rightscorp system*

15  *is working, we have to speak to Mr. Boswell."*

16      And you said, *"We have to talk to some human,"* right?

17  A.  With respect to which components were running and how they

18  were configured, yes.

19  Q.  How the Rightscorp system is running, right?

20          MR. O'BEIRNE:  Objection, Your Honor.  Misstates the

21  testimony she just gave.  Asked and answered now.

22          MR. BROPHY:  I'll move on, Your Honor.

23  BY MR. BROPHY:

24  Q.  Given what we've just discussed, it's your opinion that the

25  Rightscorp system is accurate and reliable; is that right?

Barbara Frederiksen-Cross  -  Examination        681

1  A.  Yes, based on my review of the code and my understanding of

2  the BitTorrent protocol, the actions performed for the

3  Rightscorp code, whether you're running Pocket, Memphis, or

4  Test5.java, are accurate and reliable with respect to the

5  detection of activity on the BitTorrent peer-to-peer network.

6  Q.  And your testimony is that there is no difference between

7  Test5.java and the new Memphis and Pocket functionality, is

8  that your testimony?

9  A.  I didn't say that.  There would necessarily be some

10  differences when you break a component into two components,

11  obviously the data needs to be passed.  You know, it may have

12  been passed in memory before, and now it's passed through a

13  table, but the modularization of programs doesn't change their

14  core functionality with respect to how they operate.

15      Now, there was one change that was introduced in 2015 with

16  Pocket and Memphis where the code now goes after the -- only

17  the specific pieces of a particular song when it's evaluating

18  if the payload, if the peer is offering the entire payload as

19  opposed to going after all of the -- you know, getting the bit

20  field for the entire torrent file.  So that was a distinction

21  that was made there that I think is a refinement to the

22  program.

23  Q.  And that refinement, as you describe it, is a refinement

24  that we only know whether it runs or not based on the testimony

25  of Mr. Boswell, correct?

Barbara Frederiksen-Cross  -  Examination          682

1   A.  Not quite sure I'm interpreting your question properly.

2   Are you saying we only know if Pocket Memphis runs based on

3   Mr. Boswell's testimony?

4   Q.  That's my question.

5   A.  Both bodies of code were present in the code, so it would

6   require someone from Rightscorp to say which was currently

7   being used.

8   Q.  So that refinement, as you've described it regarding the

9   focus on either 100 percent of the payload or 100 percent of an

10  individual file within that payload, which version of the

11  system was running, we only know because of Mr. Boswell's

12  testimony; is that right?

13  A.  I believe that to be true, at least based on the records

14  that have been provided to me.  Even though there may be other

15  records in the case I haven't seen, because I've been focused

16  on the technical part of the case.  But unless that were true,

17  then we would have to rely on Mr. Boswell.

18  Q.  So you've been focusing on the technical side of the case,

19  but as a result of that, you've been necessarily relying on

20  Mr. Boswell's testimony regarding the functionality of the

21  software; is that right?

22  A.  The functionality of the software I have determined based

23  on reading the source code of the software.  When a particular

24  piece of that software was brought into use, that I have relied

25  on Mr. Boswell for.

1          MR. BROPHY:  Your Honor, I'm about to move into a

2     different topic.  Now is a good time for lunch.

3          THE COURT:  Yes, this is a good time for lunch.  Okay.

4     Lunch recess.  Thank you very much.

5          COURT SECURITY OFFICER:  All rise for the jury.

6          *(11:52 a.m., the jury exits the courtroom.)*

7                              *  *  *

8          *(1:33 p.m.)*

9          COURT SECURITY OFFICER:  All rise.

10          THE COURT:  Please be seated.  All right.  Is there

11     anything before we bring the jury in?

12          MR. BROPHY:  Not for our side, Your Honor.

13          THE COURT:  Okay.

14          MR. GILMORE:  Two things, Your Honor.  Robert Gilmore

15     for the plaintiffs.

16          THE COURT:  I know who you are.

17          MR. GILMORE:  Just for the record.  We, as an update

18     on the Audible Magic materials that Ms. Frederiksen has

19     considered, we are ready to transmit those.  We've already sent

20     some of them, but the source code materials, we are ready to

21     send those to the other side, and we've told them we're ready.

22     We're just waiting for them to send us the list of the names of

23     the people who will be looking at it, per the stipulation that

24     we reached with them over the weekend.

25          THE COURT:  Okay.

1          MR. GILMORE:  So wanted to update on that.  And then

2    we have upcoming some depo designations to which Grande has

3    objected and some related exhibits as well that it was my

4    understanding -- I think this is what counsel indicated -- that

5    we thought it made sense to resolve that before we bring the

6    jury in since that would be a witness, and then the

7    designations would be right after Ms. Frederiksen.

8          THE COURT:  Okay.

9          MR. HOWENSTINE:  Your Honor, to clarify that, there's

10   essentially one evidentiary issue that affects the testimony of

11   the next witness and the subsequent deposition testimony that

12   they intend to play.  I guess from our perspective we figured

13   we would take that up after Ms. Frederiksen --

14         THE COURT:  Yeah, let's -- we've got enough -- we have

15   too many things, too many irons in the fire.  Let's not get one

16   mixed up with the other.  So let's wait until this witness

17   finishes.  And then when she's done, we can talk about all

18   the -- we'll take a break after she leaves the stand, if she

19   ever leaves the stand.  We'll take this up.

20         MR. GILMORE:  That makes sense.

21         THE COURT:  Maybe we'll do it in the lobby of my

22   hotel.  All right.

23         COURT SECURITY OFFICER:  Please rise for the jury.

24         (1:36 p.m., the jury enters the courtroom.)

25                         *   *   *

1          THE COURT:  Okay.  Thank you.  Please be seated.

2    Okay.  Let's continue on.

3          MR. BROPHY:  Thank you, Your Honor.

4    BY MR. BROPHY:

5    Q.  Ms. Frederiksen, before the break, we were talking about

6    the operation of the Rightscorp system.  Do you recall that?

7    A.  Yes, I do, sir.

8    Q.  And I believe I started out the afternoon with this notion

9    of pushing dominoes down and watching them fall, right?  Do you

10   remember that?

11   A.  Uh-huh.

12   Q.  And we had discussed these two different programs,

13   Test5.java and the Pocket Memphis programs.  Do you recall

14   that?

15   A.  Yes, I do.

16   Q.  And I believe your testimony was that those are two

17   different sets of functions that could run depending upon how

18   Mr. Boswell hit Go on the program.  Do you agree with that?

19   A.  They both appeared to be complete and functional systems in

20   the 2018 code, yes.

21   Q.  And I believe you testified that they were what you

22   characterized as some refinements that were implemented in the

23   Pocket and Memphis source code that weren't in the Test5.java.

24   Do you recall?

25   A.  I don't remember if I said refinements or reformatting, but

Barbara Frederiksen-Cross  -  Examination        686

1   they were carved up into multiple pieces.

2   Q.  There's some different functionality between the Pocket and

3   Memphis on the one hand and Test5.java on the other; is that

4   right?

5   A.  With respect to the testing of the bit fields, yes,

6   specifically.

7   Q.  So to carry on with my silly domino analogy, would you

8   agree with me that in a simplistic way, Mr. Boswell is sitting

9   at his computer, and he has the ability to push down one or the

10  other set of dominoes.  If he pushes the first domino on this

11  side, it's going to start a cascade that runs the Test5.java

12  and other functions, and if he pushes down this domino over

13  here, it's going to knock down the Pocket in Memphis and other

14  functions down a different pathway; is that right?

15  A.  It would execute different sets of code depending on what

16  set of code he started, yes.

17  Q.  And you agree with me there could be logs that keep track

18  of which dominoes are pushed down and which ones fall in what

19  order; is that right?

20  A.  Hypothetically, there could be logs.  I'm not aware of

21  whether or not there are any.  I have seen none produced.

22  Q.  Thank you.  I'd like to switch gears now and talk about

23  what I'll call the "ingestion" process.  Does that phrase have

24  a meaning to you?

25  A.  As I use it, it's the process whereby Rightscorp obtains

Barbara Frederiksen-Cross  -  Examination        687

1   the initial copies of files from the Internet and then verifies

2   those files.  So I assume that that's the way you're using it

3   as well.

4   Q.  Yes, ma'am.  And just to make sure the jury is clear on

5   this, I'm talking about a situation not where we're downloading

6   a song from an individual computer, but rather, when Rightscorp

7   first finds a file that it thinks is infringing on the

8   Internet, it goes out to the swarm and pulls down bits and

9   pieces of that song from everywhere; is that right?

10  A.  That's correct.  We're on the same page with the

11  terminology.

12  Q.  Great.  And after that file is pulled down from the swarm,

13  Rightscorp has to check whether the file it got is a copy of

14  some copyrighted work; is that right?

15  A.  Well, they have to check if it's a file they've been

16  protected to hire, and so...

17  Q.  Hired to protect?

18  A.  Yes.

19  Q.  Yes, ma'am.

20  A.  Thank you.

21  Q.  Great.  And I believe earlier you testified there are a

22  number of different ways in which the Rightscorp system can

23  perform that check of the song they downloaded from the swarm

24  against some copyrighted work.  Do you recall that testimony?

25  A.  Yes.

Barbara Frederiksen-Cross  -  Examination      688

1   Q.  One of the ways is by running something called Audible

2   Magic software; is that right?

3   A.  That's in the code, yes.

4   Q.  Another one is AcoustID; is that right?

5   A.  That's also an automated process in the code, yes.

6   Q.  Will you agree with me that there are also instances in

7   which Rightscorp has done what they call a manual verification

8   process?

9   A.  That is my understanding.

10  Q.  What is your understanding of that manual verification

11  process, please?

12  A.  That a human being would take the downloaded song and play

13  it and listen to a copy of the song and be able to understand

14  if it was the same song or not.  So actually it was done

15  through a human listening to the song.

16  Q.  So is it your testimony to the jury today that the manual

17  verification process that Rightscorp operated was accurate and

18  reliable?

19  A.  I would find no reason for it not to be, but because that

20  was a manual process, it was not something that I directly

21  analyzed computer data for, but I've seen no evidence of any

22  inaccuracy.

23  Q.  Is it your understanding that Rightscorp would perform this

24  manual verification process by reaching out to, for example,

25  YouTube and listening to a song on YouTube?

Barbara Frederiksen-Cross  -  Examination        689

1   A.  My understanding is that they would look on YouTube for the

2   official version of the song and listen to the song that they

3   were trying to identify.  So, yes, I think that YouTube was

4   involved in at least some cases.

5   Q.  When you said that they would go out and listen to the

6   official version, what do you mean by that?

7   A.  That was the information that was provided to me.  I'm

8   aware of work that I have done for YouTube that often companies

9   will provide either full songs or partial songs as sort of a

10  teaser for an album that aren't officially released by the

11  music companies.  And so that was my understanding of what he

12  was talking about.

13  Q.  You don't have any records of which songs Rightscorp

14  reached out and listened to; is that right?

15  A.  I do not believe I have seen a specific indicator for which

16  songs were verified manually.  And I also understand that they

17  sometime did this as a quality control, even after they had

18  received identification, to just check the identification.

19  Q.  Right.  And I want to focus specifically not on those

20  validations, but rather, the manual process where there's no

21  Audible Magic or AcoustID.  It's just a human listening to a

22  song saying, yes, this is a copy.  Is that fair?

23  A.  Sure.

24  Q.  Okay.  So just to make sure your testimony is clear, you

25  weren't provided with a list of the links to all the songs that

1    Rightscorp went out and listened to on YouTube to do

2    verifications; is that right?

3    A.  Not exactly sure what you're asking for.  You're asking did

4    I have, like, the URLs of the songs they listened to on

5    YouTube?

6    Q.  Right.  So let's say that there's a song that Rightscorp

7    downloads from the swarm, a new song, they don't know what it

8    is or maybe they suspect what it is and they have to do this

9    manual verification process.  And so they're going to go to

10   YouTube and listen to what they think is potentially a copy of

11   the song.  Are you with me so far?

12   A.  Got you so far.

13   Q.  You don't know what song they listened to for any

14   particular song that was later ingested into Rightscorp system;

15   is that right?

16   A.  My recollection is that on one or two occasions via Webex,

17   I saw demonstration of the manual process, but I didn't receive

18   any comprehensive list of what songs that they listened to, if

19   that -- I think that's the thrust of your question.

20   Q.  That is the thrust of my point.  And I guess to put it a

21   different way, if I were to hand you a notice for a particular

22   song and represent to you that that song was ingested using the

23   manual process, you couldn't tell me what YouTube song the

24   Rightscorp person listened to to determine whether it was a

25   copy; is that right?

Barbara Frederiksen-Cross  -  Examination          691

1   A.  That is correct, with just the proviso that once they

2   started using Audible Magic and AcoustID in the 2013/2014

3   timeframe, it's my understanding that everything went through

4   those verifications, but then they sometimes did QA spot

5   checks, but for an earlier song.  I wouldn't be able to tell

6   you what link they listened to.

7   Q.  And again, I'm just focusing on those manual verifications.

8   So my understanding of your testimony is that for the manual

9   verifications, you can't identify for me what YouTube song was

10  listened to to validate any particular song that Rightscorp

11  ingested; is that correct?

12  A.  As best I recall, I did not receive any materials that

13  would allow me to make that assessment for the manual

14  verifications.

15  Q.  And again, just to make sure we're all on the same page,

16  you haven't seen any logs either that reflect which links on

17  YouTube Rightscorp used to validate certain songs that it

18  downloaded; is that right?

19  A.  That's correct, yes.  I haven't seen anything that would

20  tie those two together.

21  Q.  I believe you mentioned that you received a demonstration

22  of how that manual verification process was performed; is that

23  right?

24  A.  Yeah, I think that was in the context of the earlier case.

25  I mean, that was something that had already happened before.

Barbara Frederiksen-Cross  -  Examination          692

1    Q.  Do you recall who gave you that demonstration?

2    A.  I don't recall specifically.  It's likely it was

3    Mr. Boswell, but I do not recall specifically.

4    Q.  Do you still have that deposition transcript in front of

5    you?

6    A.  Yes.

7    Q.  Do you recall giving testimony in this case about who gave

8    you that demonstration?

9    A.  I don't.

10   Q.  I direct your attention to page 188 of your deposition

11   transcript, lines 8 through 17.

12   A.  Sorry.  You said 8 through 17?

13   Q.  Yes.  Page 188, lines 8 through 17.  Do you see that?

14   A.  I do, yes.

15   Q.  Feel free to review that.  Does that help you recall who

16   gave you the demonstration?

17   A.  Yes.  Back in 2018, it was a little closer in time, and I

18   did recall that it was Mr. Boswell who did --

19   Q.  So Mr. Boswell is the one who gave you that demonstration,

20   right?

21   A.  Yes.

22   Q.  Just want to make sure the record is clear.

23   A.  Sorry.  I didn't speak loud enough.  Yes.

24   Q.  Did you review Mr. Boswell's depositions in this case

25   before rendering your opinions?

Barbara Frederiksen-Cross  -  Examination          693

1  A.  I believe that I have seen all of them.

2  Q.  Are you aware that he is not the person who performed the

3  manual verification process within Rightscorp?

4  A.  My understanding is that they had a dedicated team of one

5  or more persons who routinely did that back when that was the

6  practice.

7  Q.  Are you aware that Mr. Boswell identified individuals who

8  were responsible for doing that manual verification process?

9  A.  I don't recall as I sit here if he did or did not.

10 Q.  If I were to give you the names Jeff or Victor, do those

11 names ring a bell, by any chance?

12 A.  Afraid not.

13 Q.  Okay.  Needless to say, you didn't reach out to any other

14 individuals at Rightscorp to learn how that manual verification

15 process was actually being performed; is that right?

16 A.  No, I didn't talk to the people who routinely did the

17 manual process.

18 Q.  So the only person you talked to was Mr. Boswell; is that

19 right?

20 A.  Mr. Boswell and to a lesser extent, Mr. Steele, but not

21 about this topic.

22 Q.  So with respect to this topic, and how manual verifications

23 were performed, you exclusively talked to Mr. Boswell from

24 Rightscorp; is that right?

25 A.  I believe that to be correct, counsel.

Barbara Frederiksen-Cross  -  Examination          694

1   Q.  Just to sum that up, you haven't seen any logs of which
2   files were used to do the validation; is that right?
3   A.  To the best of my belief as I sit here, that is correct.
4   Q.  And therefore, you can't testify about which songs were
5   used to do individual validations of songs that Rightscorp
6   downloaded; is that correct?
7   A.  From the manual verifications; that is correct.
8   Q.  And you never reached out to the individuals who actually
9   performed that validation testing to make sure that they were
10  doing it the way Mr. Boswell indicated; is that right?
11  A.  Mr. Boswell presented all of the demonstrations that I saw.
12  Q.  And nevertheless, it's your opinion that the manual
13  verification that Rightscorp was performing was accurate and
14  reliable; is that right?
15  A.  As I said before, counsel, it's my opinion that I've seen
16  no evidence that would suggest otherwise.
17  Q.  You've seen no evidence at all other than Mr. Boswell's
18  demonstration, right?
19  A.  With respect to something that was identified manually,
20  that is correct.
21  Q.  I'd like to switch gears and talk a little bit about
22  downloaded songs.  I believe you gave testimony with
23  Mr. O'Beirne that related to a hard drive that was provided to
24  you that contained songs allegedly downloaded from Grande
25  customers.  Do you recall that?

Barbara Frederiksen-Cross - Examination        695

1   A.  It contained files downloaded from Grande customers, so

2   they were both songs and then things like cover art and

3   discographies as well.

4   Q.  Is it your opinion that those songs were downloaded from

5   Grande customers?  Are you here testifying to that today?

6   A.  I believe that's to be addressed by another witness.  What

7   I can say about the disk is that the format of the disk was

8   such that songs were placed in directories according to the IP

9   address that they were downloaded from, which is consistent

10  with what I understand to have been the requirement or

11  specification for those songs.  And as best I recall, they were

12  downloaded over a couple-month period, I want to say, based on

13  the dates or they were copied over a couple-month period to

14  that particular disk.

15  Q.  So I guess my question is, are you here today to -- let me

16  ask that a little bit of a different way.

17      Is it your intention to offer opinion testimony in this

18  case that those songs and files on that hard drive actually

19  came from Grande customer computers?

20  A.  It is my understanding that they do.  And based on all of

21  the evidence I have reviewed, I saw nothing to contradict that,

22  but I didn't see that disk created.  And so, you know, what I

23  have been told about the creation of that disk and everything

24  about the formatting of that disk and the arrangement of the

25  data on that disk is consistent with what I have been told, but

 1    I didn't actually see its creation, if that clarifies anything

 2    for you.

 3    Q.  You said that based on all the evidence you've seen, you

 4    believe those songs came from Grande's customers; is that

 5    right?

 6    A.  I believe that to be true, based on the sworn testimony I

 7    have reviewed, the declarations I have reviewed of various

 8    witnesses, and the fact that I found nothing inconsistent with

 9    that in my review of the disk.

10    Q.  Isn't it true that the only evidence you have of where

11    those songs and files came from is Mr. Boswell's testimony?

12    A.  That and the fact that those songs are organized and

13    arranged into specific folders, as was required for that

14    specific task that identified the IP addresses.  And that the

15    IP addresses were consistent with Grande IP addresses.

16            MR. BROPHY:  I'd like to direct the Court's attention

17    to page 142 of your deposition, lines 15 through page 143, line

18    17.

19            THE WITNESS:  I'm sorry.  Could you give me the lines

20    again, counsel?

21    BY MR. BROPHY:

22    Q.  Yes, ma'am.  It's page 142, line 15 through 143, line 17.

23    A.  Thank you.  Okay.

24    Q.  I'm waiting for my colleague to finish reading the passage.

25            In that deposition I asked you, *"Do you know who downloaded*

Barbara Frederiksen-Cross  -  Examination        697

1    *those files?"*

2        And your answer was, *"The Rightscorp software downloaded*

3    *those files."*

4        I then asked you, *"How do you know that?"*

5        And you answered, *"That's a really good question.  I know*

6    *that based on the representations of how these files were*

7    *produced and where they were produced from in the context of*

8    *the litigation."*

9        And I asked, *"I'm sorry.  Who made those representations to*

10   *you?"*

11       And you answered, *"That information was provided, I*

12   *believe, by Mr. Boswell, in terms of, you know, which databases*

13   *he went to to collect them."*

14       And then I asked, *"So it's your testimony that Mr. Boswell*

15   *told you he extracted these files from some part of the*

16   *Rightscorp database?"*

17       And you answered, *"The copies, the part of the database*

18   *that retains the evidentiary copies, as opposed to the music*

19   *sample copies, yes."*

20           MR. O'BEIRNE:  Objection, Your Honor.  This is

21   improper impeachment.  This is not inconsistent with the

22   testimony that she just gave.

23           MR. BROPHY:  Your Honor, this testimony is that she

24   only had information from Mr. Boswell, and she's testified --

25           THE COURT:  The objection is overruled.  The jury can

Barbara Frederiksen-Cross  -  Examination      698

1  parse that out.

2  BY MR. BROPHY:

3  Q.  So continuing, I asked, *"So it's your testimony that*

4  *Mr. Boswell told you he extracted these files from some part of*

5  *the Rightscorp database?"*

6     Your answer was, *"The copies, the part of the database that*

7  *retains the evidentiary copies, as opposed to the music sample*

8  *copies, yes."*

9     And then I asked, *"When did he have that conversation with*

10 *you?"*

11    And you indicated, *"It was a phone conversation.  I don't*

12 *recall.  It would have been once we received the media when I*

13 *asked counsel if they could set up a call to say 'What is this*

14 *stuff?  Where did it come from?' Because when I initially*

15 *received it, I knew there were some samples.  I could see that,*

16 *but I didn't know what their providence was."*

17    Do you see that?

18 A.  Yes.

19 Q.  So you got a list of song files, a hard drive of song

20 files; is that right?

21 A.  I got a hard drive that contained the song files -- well,

22 all of the files that had been downloaded from Grande

23 customers.

24 Q.  And you did not know what the providence of those files

25 was, right?  Meaning you don't know where they came from; is

Barbara Frederiksen-Cross  -  Examination        699

1    that right?

2    A.  When I got the hard drive, there wasn't a cover letter

3    other than to identify a Bates number that we were to use to

4    refer to it as, so I wanted to know what these materials were

5    so I would know what analysis I might perform with them.

6    Q.  And you got your exclusive answer from Mr. Boswell, right?

7    A.  Through counsel on that call, yes.

8    Q.  Well, you indicate here that it was Mr. Boswell.  He told

9    you on a phone call, right?

10   A.  Right.  Counsel set up the call, and I said, "*What is this*

11   *stuff?  Where did it come from*?"  And he explained that it was

12   from the music samples.  Remember, before we talked about when

13   they download samples they also record information.  And in

14   this case, it was the samples that came from single peers on

15   the Grande network as opposed to the other music that's used

16   for the ingestion verification.

17   Q.  So in your answers that I just read, you've mentioned that

18   they were extracted from some part of a Rightscorp database.

19   Do you recall that?

20   A.  Yes.

21   Q.  And you specifically said it came from the evidentiary

22   copies as opposed to the music sample copies.  Do you remember

23   that?

24   A.  Right.  The distinction I was making there is the music

25   samples being the ones that were used when they identify and

Barbara Frederiksen-Cross  -  Examination        700

1   ingest an unknown work versus the evidentiary copies being the

2   ones that are retrieved from single peers.

3   Q.  So in other words, Rightscorp has at least one copy of the

4   song that went out and got from the swarm.  Let's use

5   Aerosmith's *Angel* as an example.  So Rightscorp goes out to the

6   swarm and gets a copy of Aerosmith's *Angel* and downloads it to

7   a hard drive, right?  That's early step in the process,

8   correct?

9   A.  Right.  And then submits it for AcoustID verification.

10  Q.  Or manual verification, right?

11  A.  Or Audible Magic.  It verifies the copy.

12  Q.  And separately and apart from that, after Rightscorp claims

13  it detects an instance of music sharing, sometimes Samplit 2

14  goes out and tries to pull that song, that same song down from

15  an individual customer; is that right?

16  A.  Right.  All of the pieces of the song from one customer.

17  Q.  So now we've got two copies of the same song.  We've got

18  one copy from the swarm and allegedly we have another copy from

19  an individual customer; is that right?

20  A.  Correct.

21  Q.  And your comment here in this answer I read is that

22  Mr. Boswell told you the songs came from the evidentiary

23  records, not from the music samples that Rightscorp has, right?

24  A.  Correct.

25  Q.  And that's important, because if Mr. Boswell had pulled

Barbara Frederiksen-Cross  -  Examination        701

1    them from the music samples, those aren't songs that came from
2    Grande customers.  They're just songs Rightscorp pulled from
3    the Internet at large, right?
4    A.   Yeah, they're entire torrent payloads that were pulled from
5    the Internet at large prior to being verified.
6    Q.   And not from Grande's individual customers, right?
7    A.   Correct.  Or presumably correct.
8    Q.   Well, always correct, right?  Because it gets it from the
9    swarm, not from an individual customer?
10   A.   Hypothetically, it could come from an individual customer,
11   but it's unlikely that in that process that would happen.
12   Q.   Very, very unlikely.  Would you agree with me?
13   A.   Depends on the song and how many people are trading it, but
14   probably unlikely at least.
15   Q.   And you mentioned that there are these different databases
16   within Rightscorp's system that house the songs that were
17   pulled from the swarm and also separately the songs that were
18   plucked from individual customers' computers, right?  Those are
19   two different databases?
20   A.   Correct.
21   Q.   And Mr. Boswell represented to you that he pulled from the
22   evidentiary database and not from the sample database, right?
23   A.   That's correct, yes.
24   Q.   And you could have looked at the databases to verify that
25   that was true, right?

Barbara Frederiksen-Cross  -  Examination        702

1   A.  I'm trying to recall which specific information came -- was

2   provided to me from each database.  But, yes, the database

3   records would have indicated the date that those were, for

4   instance, first put into the database.  In the case of the

5   downloaded samples that were from the peers at large or from

6   the samples that were collected from a single peer, there would

7   similarly be a record that indicated the peer and the date/time

8   that that download occurred.

9   Q.  So you could have gone out and looked at that data to

10  verify where the songs came from, right?

11  A.  Had I had access to that data and some way of querying it,

12  yes.

13  Q.  But you did not do that, did you?

14  A.  I do not recall that we did that.

15  Q.  So the only basis for your testimony that these songs and

16  files on this hard drive came from the evidentiary database is

17  Mr. Boswell's say-so; isn't that right?

18  A.  Mr. Boswell's say-so, but I would also observe that because

19  the disks sometimes contained fragmentary files or other

20  inclusions like the album art and things associated with the

21  attempted download, everything that I saw on that disk was

22  consistent with his testimony about how that disk was created

23  and what it contained.

24  Q.  So if I understand you correctly, because the hard drive

25  contained some incomplete files, that indicates it came from

Barbara Frederiksen-Cross  -  Examination      703

1    the evidentiary database; is that right?

2    A.  That would be consistent with his testimony about the

3    collection of those files and the issues that we've already

4    discussed, that sometimes in downloading from a single peer,

5    you won't get the complete file, whereas downloading from the

6    swarm as a whole, you generally will.

7    Q.  But that's not true with respect to the complete files,

8    right?  We have no idea where those came from, whether it's the

9    sample's hard drive database or the evidentiary database other

10   than Mr. Boswell's say-so; isn't that right?

11   A.  I'm thinking about that.  As I sit here, I know that there

12   are records in the database and that some of the code that I

13   saw in the Rightscorp sql.txt file, I believe it was, was

14   consistent with a process that would extract from the music

15   samples database and, you know, put things on a hard drive or

16   external drive in the folder structure that I observed.  So the

17   code that I saw was also consistent with what I saw there.

18   Q.  You did not review the database to verify where those songs

19   came from; is that correct?

20   A.  I do not recall having direct access to that database.

21   Q.  Do you recall not doing it or do you simply not remember

22   whether you did it or not?

23   A.  As I sit here, I do not recall that I had access to that

24   database directly, and I do not recall specifically going out

25   there to verify that each and every file on that hard drive was

 1   represented in that database.
 2           MR. BROPHY:  I'm going to direct the Court's attention
 3   to page 143 of your deposition, line 22 through 144, line 3.
 4           THE WITNESS:  I'm sorry, 143 starting which line?
 5   BY MR. BROPHY:
 6   Q.  143, line 22, through 144, line 3.  Do you see that?
 7   A.  Yes, I see that.
 8   Q.  I asked the question, *"Did you specifically review the*
 9   *Rightscorp database and where those files reside within the*
10   *database?"*
11       And your answer was, *"In other words, did I go out for each*
12   *file and check that it was really in the database?"*
13       I asked, *"Right."*
14       And you said, *"I did not do that, no."*
15       Do you see that?
16   A.  Yes.
17   Q.  Do you agree with me you did not check the database to know
18   where those song files came from?
19   A.  As I said, counsel, as I sit here today, I don't recall
20   doing that.  And this was much closer in time and I said I
21   didn't do it.  So I think that's consistent.
22   Q.  While we're on the topic of downloads, you'll agree with me
23   that Rightscorp doesn't keep track of instances in which it
24   tries to go out and pluck songs from an individual computer and
25   failed to do so; is that right?

Barbara Frederiksen-Cross  -  Examination        705

1    A.  That is my understanding.

2    Q.  Your understanding is they do not keep records of those

3    failed attempts, correct?

4    A.  That's correct.

5    Q.  Okay.  Let's switch gears.  I'm going to talk about bit

6    field data for a little bit.

7        Your testimony has been that Rightscorp collects bit field

8    data from individual computers when it goes out and determines

9    whether they're sharing music; is that right?

10   A.  When it does that handshake, yes.

11   Q.  So just to make sure we're oriented in the process,

12   Rightscorp has already downloaded a song from the swarm, it's

13   done whatever verification it's going to do to conclude that

14   it's a copy, including potentially that manual verification

15   process, and then it goes out and tries to find that same song

16   on computers, right?

17   A.  Well, specifically, it goes out to the tracker, gets a list

18   of peers that are at that moment participating in that

19   particular payload, and then it reaches out to each peer to do

20   that handshake that I spoke of.

21   Q.  So it goes through that list of computers and contacts each

22   of them, tries to handshake, and tries to obtain bit field data

23   from each of those computers; is that right?

24   A.  That's correct, yes.

25   Q.  And the purpose of reaching out and trying to get that bit

Barbara Frederiksen-Cross  -  Examination          706

1   field data is to determine whether that computer has the songs
2   in question, right?
3   A.  Whether that computer is online and currently active and
4   reporting that it has those songs and is willing to share them,
5   yes.
6   Q.  And the bit field data indicates -- how do I put this?  I
7   think you've already testified to this and you probably did a
8   good job of explaining it.  But a bit field indicates which
9   chunks of an overall payload exist on a particular computer; is
10  that right?
11  A.  It indicates which chunks the peer is self-reporting that
12  it has and that it is willing to share at that particular
13  moment in time.  As I mentioned, over time that bit field will
14  change and so a peer sends "have" messages when it gets a new
15  piece, but at the specific point in time of that conversation,
16  it's the pieces the peer is reporting that it has and can
17  share.
18  Q.  Great.  Thank you.  And it is your position in this case
19  that Rightscorp reached out to Grande customer computers and
20  obtained the bit field data from them, is that correct?
21  A.  That is what the evidence shows and that is how the
22  software operates, yes.
23           MR. BROPHY:  Your Honor, may I approach?
24           THE COURT:  Sure.
25           MR. BROPHY:  More paper.

Barbara Frederiksen-Cross  -  Examination        707

```
1            THE WITNESS:  Thank you, counsel.
2  BY MR. BROPHY:
3  Q.  Ms. Frederiksen, do you recall serving an expert report in
4  this case on July 27, 2018?
5  A.  Yes, I believe this was my opening expert report.
6  Q.  Your opening expert report.  Is that the document you have
7  in front of you?
8  A.  Yes, it is.
9  Q.  And just to make sure the jury understands, the purpose of
10 this expert report was to articulate your opinions about, among
11 other things, how the Rightscorp system works; is that correct?
12 A.  That is correct.  That is one of the things that's covered
13 in the report.
14            MR. BROPHY:  Your Honor, may I have permission to
15 publish a copy of this report to the jury?
16            THE COURT:  Yes.
17 BY MR. BROPHY:
18 Q.  Ms. Frederiksen, I'd like to direct your attention to
19 paragraph 57 of your report, which is on page 23.  Please let
20 me know when you're there.
21 A.  I'm there.
22 Q.  Okay.  In that paragraph of your report you state -- and
23 actually, I'm going to skip up one line to the last sentence of
24 the preceding paragraph.  And you say, *"After Infringement*
25 *Finder receives the bit field, it creates an evidentiary*
```

1   *infringement record."*  Do you see that?

2   A.  I do.

3   Q.  Then you go on in paragraph 57 to say, *"The infringement*

4   *record includes information such as the torrent hash, the*

5   *tracker ID, the IP address and port the peer was using, the*

6   *date and time the peer offered the work,"* and then you say, *"A*

7   *copy of the bit field values that show which portions of the*

8   *file the peer was offering."*

9       Do you see that?

10  A.  Yes.

11  Q.  You go on.  And in the last sentence says, *"This record is*

12  *stored in Rightscorp's torrent infractions table."*

13      Do you see that?

14  A.  I see that, yes.

15  Q.  In your opening report, you state that, *"The bit field*

16  *values that show which portions of the file the peer was*

17  *offering are stored in Rightscorp's database."*  Right?

18  A.  Yes.

19  Q.  And --

20  A.  In a temporary table, just to be clear, so it's not

21  confusing to the jury.  But, yes, they are initially stored.

22  Q.  Where does it say in this expert report that that's a

23  temporary table?

24  A.  I would have to read down and see if I say what happens to

25  that table.

Barbara Frederiksen-Cross  -  Examination      709

1   Q.  Please take a moment to review it.

2   A.  Okay.

3       *(Pause.)*

4       I see that in the part where I'm discussing the notice

5   generation, I refer to the other table that's derived from this

6   one, but I don't see where I say specifically what happens to

7   that bit field data.

8   Q.  So you don't have anywhere in this report where you

9   indicate that the bit field data is deleted; is that correct?

10  A.  Not unless it's in the exhibit where I described the code.

11  Q.  I want to make sure we're clear about this.  You have your

12  entire report in front of you.  Is there anywhere in there

13  where it says that the bit field values in that torrent

14  infractions table are deleted?

15       MR. O'BEIRNE:  Your Honor, I'm sorry.  I would object

16  at this point as misleading.  As counsel knows, Ms. Frederiksen

17  also has a rebuttal report and a supplemental report.

18       MR. BROPHY:  Your Honor, I'm getting there.

19       MR. O'BEIRNE:  But the reports are not the summary of

20  her full opinions that she's prepared to express, as Your Honor

21  knows.  The sequencing report is not --

22       THE COURT:  I think the jury is well aware that --

23  because we've discussed it here in open court in front of the

24  jury and other questions have been asked, that she does have a

25  rebuttal report and a supplemental report.  So you'll be able

Barbara Frederiksen-Cross  -  Examination       710

1   to get into those on redirect.  The objection is overruled.

2   BY MR. BROPHY:

3   Q.  There is nowhere in this report where you say the bit field

4   values are deleted; is that correct?

5   A.  I haven't read the entire report as I sit here on the

6   stand, but I have looked in the two parts where I would expect

7   to have mentioned that, if I covered it in this report, and I

8   do not see it in these few sections.

9   Q.  So the only language that you can find in your report

10  indicates the record is stored, right?

11  A.  Yeah.  Give me a moment just to review the code

12  descriptions to see if I cover it in that exhibit, if you

13  would, because that goes into a little bit more detail.

14      (Pause.)

15      No, I don't see here that I specifically say what happens

16  to that bit field --

17  Q.  Okay.  So --

18  A.  -- in this report.

19  Q.  Thank you.  So report number one, the only information you

20  provide is that the bit field data is stored in these torrent

21  infraction tables; is that right?

22  A.  Correct.

23  Q.  Now, do you recall that I deposed you after you issued this

24  report.  We discussed that lovely time we spent together?

25  A.  Yes.  We had.  You deposed me a couple times, so at least

1   one of them was after this report.

2   Q.  So I deposed you two times.  I'm referring to the time you

3   were deposed in October 2018.

4   A.  The first time.

5   Q.  The first time, yes, ma'am.  Do you recall giving

6   testimony -- let me ask this a different way.

7       Did you testify that the Rightscorp system stores bit field

8   data during that deposition?

9   A.  That was four, five years ago.  I recall that we discussed

10  it.  I don't recall specifically the exact questions I was

11  asked or answers I gave.

12  Q.  Let me do this a different way.  Does Rightscorp's system

13  store bit field data -- I'm sorry.  I don't mean to interrupt.

14  I just want to make sure the question is clear.

15      Does Rightscorp's system store bit field data as it's

16  received from the Grande customer's computer?

17  A.  It stores the bit field data -- it receives the bit field

18  data as ones and zeros.  It translates that into a condensed

19  format called hexadecimal, which just allows you to use shorter

20  space to represent those values.  That is stored in a temporary

21  table until it's processed to identify whether the peer was

22  reporting that it had the full bit field.  And then a flag is

23  set in yet another table that feeds down the e-mail process

24  later.  That temporary table where the bit field is stored is

25  not retained permanently in the system, so the data is

Barbara Frederiksen-Cross  -  Examination        712

1   collected, it's manipulated, checked, but ultimately that table
2   is cleared out periodically.
3   Q.  So my question was, does the Rightscorp system actually
4   store the bit field data?  Sounds like your answer is no; is
5   that right?
6   A.  Well, I guess I'm being careful to answer "stored," because
7   it stores it for a short period of time, but it does not store
8   it forever.
9   Q.  Let's say we wanted to know whether the Rightscorp system
10  had bit field data for a notice sent in 2018.  Would it have
11  that data?
12  A.  Only via the interrogation of the full field -- the full --
13  full load flag.  You would not be able to go back and look at
14  the original bit field data that was reported, in all
15  likelihood, unless there was a backup or something.
16  Q.  So your testimony is all we have is a flag that either says
17  one or zero, right?  We don't have the bit field that shows how
18  much of the payload was actually on that individual computer,
19  right?
20  A.  Except for very recent detections, I would believe that to
21  be true, yes.
22  Q.  So my hypothetical is back in 2018.  So your testimony is
23  that a notice from 2018, we can't go back and look at that
24  data; is that right?
25  A.  As far as I am aware, that is correct, yes.

Barbara Frederiksen-Cross  -  Examination     713

1   Q.  What about 2016, same answer?

2   A.  Yes.

3   Q.  2014, same answer?

4   A.  Yes.

5   Q.  2012, same answer?

6   A.  As far as I am aware, that is correct.

7           MR. BROPHY:  I'd like to direct the Court's attention

8   to page 207 of your deposition, lines 24 through 208, line 17.

9   BY MR. BROPHY:

10  Q.  So that's 207, line 24 to 208, line 17.

11  Please let me know when you're there.

12  A.  I'm there.

13          MR. BROPHY:  Counsel, you there?

14  BY MR. BROPHY:

15  Q.  I asked the question, *"Do you know if Rightscorp records*

16  *the bit field information transmitted from a subscriber when it*

17  *performs that handshake?"*

18      And you answered, *"Some of the records I have seen from*

19  *their database contain bit field information, but I'm trying to*

20  *think if I have ever seen any that recorded partial bit fields*

21  *or it was only the full ones that get recorded.  I think if the*

22  *client comes back and says it only has a partial handshake, it*

23  *only has a partial bit field in the current code, I think it*

24  *just moves on to another client.  I don't think it makes a*

25  *record of that partial handshake."*

Barbara Frederiksen-Cross   -   Examination        714

1        And then you say, *"In the older code, there was a process*
2   *where it would return the bit field and record that bit field,*
3   *even where it wasn't full.  I want to double-check the code, I*
4   *think in the current code, it only records those clients that*
5   *come back and say I've got it all."*
6        Do you see that?
7   A.   Yes.
8   Q.   So in 2018, you testified that in the older code, there was
9   a process where it would return the bit field and record that
10  bit field even when it wasn't full.  Do you see that?
11  A.   Yes.
12  Q.   Is that correct?
13  A.   I believe it to be, yes, based on my recollection of the
14  code.
15  Q.   So your understanding is that the Rightscorp system does
16  record bit field data?
17  A.   Well, again, without dragging you through too much of a
18  database tutorial here, databases are comprised of -- can be
19  comprised of multiple tables.  At the time the detection
20  occurs, there is an insert into the torrent infractions table
21  that includes the bit map data.  At a later point in time, as
22  that table is being processed in preparation for notices,
23  certain information is extracted out of that table once the
24  eligibility or some of the eligibility for notices is
25  determined and populated in another table that subsequently

Barbara Frederiksen-Cross - Examination     715

1    used to make notices.

2        So that later table, which at some point feeds into the

3    table that's done the original observation of the peer, gets

4    marked, for instance, with whether a notice has been sent.  And

5    so the ultimate record table does not retain the bit field, but

6    during the processing of the program, information is placed in

7    a table that's processed in subsequent passes until it gets to

8    the point where it says, okay, this guy's got the full payload.

9    Yes, we'll put him in this table.  And otherwise, he doesn't go

10   in the table that's for notices.  Does that make sense at all?

11   Q.  Not -- frankly, no, but I think I'll just try to clarify

12   this here.  You served an expert report that says, this record

13   is stored in a table on Rightscorp system, right?

14   A.  Yes.

15   Q.  It's in the expert report.  And then in your deposition you

16   stated, *In the older code, there was a process where it would*

17   *return the bit field and record that bit field even when it*

18   *wasn't full."*  Right?

19   A.  That is my recollection is that it stores the entire bit

20   field.  I stand by that testimony.

21   Q.  Even if it's not full?

22   A.  That is my recollection as I sit here, and it's what I

23   testified to four years ago, so I'm -- I would double-check in

24   the code, but that is my recollection that once that handshake

25   occurs and the bit field is obtained, the hash amount that

Barbara Frederiksen-Cross  -  Examination        716

1    contains the bit field is stored in that infractions database.

2    Q.  So then we can go back to 2014 and pull the bit fields for

3    a particular notice.  Is that what you're saying?

4    A.  No.  I'm saying -- I'm not saying that that table is

5    retained forever.  I'm saying that in the processing of the

6    code, when the initial detection is made, the bit field is

7    collected and stored.  And until that bit field has

8    subsequently been acted upon and that table flushed out, it's

9    in that table.

10   Q.  How long is it in that table for?

11   A.  I do not recall how long they retained that table.  I don't

12   have specific knowledge of that.  It's retained -- it's

13   retained until it's processed by the next step in the process,

14   but I don't recall if it's flushed immediately or if it's

15   flushed on some periodic basis.  There is a piece of SQL code

16   that goes through and cleans that table out.  But I don't, as I

17   sit here, recall whether that's run with each pass of the

18   notice generation or if it's run on some other schedule.

19   Q.  So your testimony is that when you use the word "stored" or

20   "recorded," that means it's not saved, is that your testimony?

21   A.  No.  My testimony is that it's stored until it is

22   subsequently -- until that table is subsequently purged when

23   it's no longer needed for the processing.  So I am not saying

24   it is stored forever or saved forever or kept forever.  What I

25   am saying is that a record is made in a database table until

Barbara Frederiksen-Cross  -  Examination          717

1   such time as that database table has been processed by another

2   step in the process, and then that database table is

3   periodically cleaned out.  And I don't think that it's

4   instantaneous.  I think that it's over a period of days -- day

5   or days.

6   Q.  Do you recall -- let me back up.

7       Have you seen bit fields actually collected from Grande

8   customer computers within the Rightscorp database?

9   A.  My recollection is in that earlier case that we have

10  mentioned, that at one point in time --

11  Q.  Sorry.  Just to make sure it's clear, I don't mean to

12  interrupt you, but I don't want to talk about the earlier case.

13      I'm talking about this case and the Grande customers and

14  whether you have seen bit fields collected from Grande

15  customers that were stored in the Rightscorp database?

16  A.  I don't recall specifically as I sit here.  I know that in

17  the earlier case I did an inspection of the live database on a

18  Webex session and saw some of that data, just to see what it

19  was stored as.  I do not recall whether I did that in this

20  case, so as I sit here, I can't say that I recall that I have.

21  Q.  Okay.  So if I were to ask you, yes or no, have you seen

22  bit field data actually collected from a Grande customer, what

23  would your answer be?

24  A.  My answer would be that my recollection on that is unclear

25  as I sit here today and that I don't have a clear recollection

Barbara Frederiksen-Cross  -  Examination        718

1   of having seen such.

2   Q.  Let me direct you, then, to page 210 of your deposition

3   from October of 2018, line 24 on 210 to line 14 on 211.  Please

4   take a look at that and let me know if that refreshes your

5   recollection.

6   A.  Okay.

7   Q.  Do you recall now giving testimony that you did see bit

8   fields from Grande's customers in the Rightscorp database?

9   A.  What I say is, I think in reviewing the database, it's

10  likely I would have seen that specific database that's

11  populated from infractions, certainly with respect to older

12  records.  And that I would want to double-check that in the

13  newer ones to see if they're also producing that.

14  Q.  So certainly with respect to the older records you had seen

15  Grande customer bit field data, right?

16  A.  Yeah, that suggesting to me that I did see that Webex, that

17  we repeated that Webex exercise in this case.

18  Q.  So the Rightscorp system does record bit field data, right?

19  A.  Again, it's recorded in the table until such time as it's

20  subsequently processed and then that table is flushed out

21  periodically, as new records come in, table fills up, the table

22  is flushed out and new records start populating it.

23  Q.  Where did you say that in this answer we're looking at

24  here?

25  A.  I don't say that in this specific answer.  You didn't ask a

Barbara Frederiksen-Cross  -  Examination       719

1   question about it.

2   Q.  So here you say you saw the data, right?

3   A.  I say it's likely that I saw it, yes.

4   Q.  And previously the answer we looked at on page 208, you

5   say, it records the bit field, right?

6   A.  It does record the bit field.  I told you in the code.

7   Q.  But where in this answer on page 208 do you say that the

8   bit field is deleted?

9       *(Pause.)*

10  A.  I don't think you asked me what happens to the bit field,

11  counsel.  I don't see that following question here.  I think

12  you were just asking me had I ever seen it, and I said, yeah, I

13  believe that I had.

14  Q.  Your testimony -- I asked, *"Do you know if Rightscorp*

15  *records the bit field information*?"  And you said, *"It records*

16  *the bit field information."*  Right?

17  A.  It does.  It records the bit field information in a

18  temporary table until such time as that table is processed and

19  then subsequently clears that table out after it's gotten the

20  information it needs from the table.

21  Q.  You didn't say that second part, right?  You just said it

22  was recorded, in this deposition, right?

23  A.  To me, that's recorded, counsel.  I'm sorry.  I live in a

24  very precise world of computer code.  And if something is

25  stored in a database, it's recorded.  If that database is later

Barbara Frederiksen-Cross  -  Examination      720

1   cleared out, then it's cleared out.  But it's recorded at the

2   time that it's collected until the next step of the analysis

3   process happens.

4   Q.  So your testimony, then, is that the bit field data is

5   saved momentarily, 15 minutes or whatever that time period is,

6   but ultimately it's trashed, is that right?

7           MR. O'BEIRNE:  Objection, Your Honor.  Misstates the

8   testimony.

9           THE COURT:  Yes.  Restate your objection.

10          MR. O'BEIRNE:  Your Honor, misstates the testimony as

11  to length of time and the terms --

12          MR. BROPHY:  I'll rephrase my question, Your Honor.

13          THE COURT:  Yes.

14  BY MR. BROPHY:

15  Q.  Your testimony is that Rightscorp saves the bit field data

16  for a very small period of time and then throws it in the

17  garbage; is that right?

18          MR. O'BEIRNE:  Same objection as to "throws in the

19  garbage," Judge.

20          THE COURT:  Well, overruled.

21  A.  My testimony is that the data is recorded.  It is retained

22  in the table until such time as it's processed.  Processing

23  data from the infringement detection table in order to prepare

24  a notice can happen up to days after the time that notice is

25  sent, and so it would be retained until it is processed and

Barbara Frederiksen-Cross  -  Examination       721

1    until such time as that table is flushed.

2        And I've already told you I don't know the specific

3    frequency that that table was refreshed, so your

4    characterization that this happens in moments or hours, I would

5    disagree with, but I cannot provide you a date certain that

6    something would be gone 30 days later or three days later or --

7    but I know that those notices can be sent -- there's testing in

8    the code to see if that notice was within a certain window of

9    time of freshness, if you will, and I know that the data is

10   there up until the point in time that the process right ahead

11   of that processes the data from the torrent infractions table

12   to create the secondary and tertiary tables that are used to

13   actually feed the notice generation process.

14   BY MR. BROPHY:

15   Q.  Would you agree with me that you have not looked in the

16   Rightscorp database yourself to determine whether the bit field

17   data persists there or not?

18   A.  I would agree with you that I haven't performed any

19   extensive analysis on that particular table to be able to see

20   how far back the bit field data persists.  I have seen code in

21   the production that is the code that refreshes that table.

22       So with the understanding that that code is run

23   periodically, it would be my understanding that that bit field

24   data doesn't persist clear back into the beginning of

25   Rightscorp's notice generation history.

Barbara Frederiksen-Cross  -  Examination          722

1    Q.  You have not independently searched the Rightscorp system

2    for any trace of bit field information to determine whether it

3    exists or not; is that correct?

4    A.  I have not been asked to perform such a search of

5    Rightscorp's system and I have not independently gained access

6    to their system and run searches against their database.  I've

7    seen demonstrations of the database and what was in it, but I

8    have not performed a real analysis in real time against those

9    databases.

10   Q.  Who told you that the bit field data is gone?

11   A.  Well, first of all, the code told me it's gone because I

12   see the programs that are used to refresh that table or to --

13   it's called "dropping" the table, and then a table is recreated

14   as a fresh and empty table.  I believe that -- my understanding

15   that that happens on a periodic basis as the table fills up was

16   gained from Mr. Boswell's deposition testimony, if I recall

17   correctly.

18   Q.  So if I understand your testimony correctly, you have not

19   investigated the database yourself and you're relying on

20   Mr. Boswell's say-so that those bit field materials are no

21   longer in existence; is that right?

22   A.  Mr. Boswell's say-so and my understanding of the source

23   code that I have reviewed in the context of this litigation.

24   Q.  I think you referenced a moment ago some source code that

25   drops the torrent infractions table; is that right?

Barbara Frederiksen-Cross  -  Examination        723

1    A.   That's correct.

2    Q.   And your position is that that source code deletes the bit

3    field data; is that right?

4    A.   Well, when a table is dropped, all of the data that is

5    contained within the table is effectively gone at that point in

6    time and it's a normal step when you refresh a new table that

7    you drop the old table and then you do what's called a "create"

8    to create the new table, and that creates a new empty instance

9    of that table.

10   Q.   Is the name of the file that drops the torrent infraction

11   table a file named Rightscorp_torrentinfractions.sql?

12   A.   It may be.  I don't have a specific memory of the name of

13   the table.  I could locate it very quickly searching the code

14   for drop and the table name, but as I sit here, I don't recall

15   the specific name of the function.  I mean, I know I've seen it

16   and I've seen the code, but I don't recall what it was called.

17   Q.   Do you recall us discussing this in your second deposition?

18   A.   No, but I'm sure you'll refresh my memory.

19   Q.   I'll do my best.

20        MR. BROPHY:  May I approach again, Your Honor?

21        THE COURT:  Yes.

22        MR. BROPHY:  Thank you, sir.

23        THE WITNESS:  Thank you, counsel.

24   BY MR. BROPHY:

25   Q.   Okay.  I'd like to -- let's back up a little bit.  So what

```
 1   I've handed you is a transcript of a deposition dated
 2   December 15, 2021.  Do you recall giving deposition testimony
 3   at that time period?
 4   A.  You have handed me copy of my October 18, 2018 deposition,
 5   counsel.  That's the same one we were looking at a moment ago.
 6   Q.  My paper shuffling has failed me here.  Give me one moment,
 7   please.
 8            MR. BROPHY:  Your Honor, now would be a good time to
 9   take our afternoon break and I can get my act together.
10            THE COURT:  Okay.  Well, I wasn't planning on taking
11   it quite yet, but, okay, I want to let you get your act
12   together.
13            MR. BROPHY:  Thank you, Your Honor.  I appreciate it.
14            COURT SECURITY OFFICER:  All rise for the jury.
15            (2:38 p.m., the jury exits the courtroom.)
16                           *   *   *
17            (3:07 p.m.)
18            COURT SECURITY OFFICER:  Please rise for the jury.
19                           *   *   *
20            COURT SECURITY OFFICER:  All rise.
21            THE COURT:  Please be seated.
22            Before we get started, counsel, have any of you had
23   difficulty with the attorney WiFi?  Had any problems?  Any of
24   you?  Yes.  Well, join the club.  I don't know what they did
25   with the attorney WiFi here, but I couldn't get the attorney
```

Barbara Frederiksen-Cross  -  Examination          725

1   WiFi.  And I needed to communicate back and forth.  I ended up

2   having to reset my iPad's WiFi in order to get it to work at

3   all in there.  And I just wondered.  We're going to contact IT

4   and see what's going on, because that's crazy.  I don't know if

5   any of you use the WiFi in the courthouse during the lunch

6   breaks or anything to check your e-mail.  Have you had trouble

7   with it?  You did.  Something is going on here.  I don't know

8   what it is.  It's very strange.

9        The Court would note the presence of the ladies and

10  gentlemen of the jury as well as counsel and the parties.

11        Let's move forward.

12        MR. BROPHY:  Thank you, Your Honor, and I appreciate

13  the accommodation earlier.

14  BY MR. BROPHY:

15  Q.  Ms. Frederiksen, I have now handed you what is the correct

16  transcript of a deposition that you gave in December.  Do you

17  recall giving a second deposition, December 15, 2021?

18  A.  I remember it was around the end of the year, so yeah.

19  Q.  It was cold.  I believe before we left off, we were talking

20  about the fact that you had identified some function within the

21  Rightscorp system that you perceived did this -- I believe you

22  said the drop?

23  A.  Drop and recreate the table, yes.

24  Q.  Drop the table.  I direct your attention -- and just to

25  reorient you, I was asking whether you knew the name of the SQL

1  file that housed that function and I believe your testimony was

2  you didn't remember.  Is that --

3  A.  Yeah.  I didn't remember as I sit here.

4  Q.  I'd like to direct your attention, then, to your

5  December 15, 2021 deposition on page 200, lines three through

6  nine, if you would, please.  And please let me know if that

7  refreshes your recollection as to the name of the dot-SQL file?

8  A.  Yes, during the deposition you allowed me to search for

9  the -- search the code for the file, and I found it, and I have

10  it here.

11  Q.  And the name of that file is Rightscorp_routines.sql; is

12  that correct?

13  A.  It's actually -- I mention here

14  Rightscorp_torrentinfractions.sql and Rightscorp_routines.sql.

15  Q.  So it's in both of those?

16  A.  The file that drops and redefines the table is

17  Rightscorp_torrentinfractions.sql, and that's all one word,

18  lower case.

19  Q.  Okay.  Thank you.  And do you happen to recall the name of

20  the function within that file that performs the quote/unquote

21  drop, as you say?

22  A.  My recollection is we sought it out in the deposition, but

23  I don't recall it as we sit here.

24  Q.  If I could direct your attention to page 201 of that same

25  deposition, line five.  Please let me know if that refreshes

Barbara Frederiksen-Cross  -  Examination          727

1   your recollection.

2   A.  Let's see, this is a comment about invoking a scheduled

3   function that invokes Rightscorp_TorrentCleave, where

4   TorrentCleave is a one word, with a capital T and C.

5   Q.  And to your memory, is that the name of the function that

6   performs the drop that you've identified?

7   A.  My recollection is that the drop is actually in this parent

8   function, but the TorrentCleave does some splitting of the

9   table, but I would want to look at the code to refresh my

10  recollection on that.

11  Q.  Would you agree with me that whatever function is that you

12  identified that dropped the table, when you looked at it more

13  carefully, you determined that function actually backs up the

14  bit field data rather than deleting it?

15  A.  No, that's not my recollection at all, counsel.  My

16  recollection is that during my deposition we discussed two

17  discrete functions.  One of which is the drop and recreate the

18  table, which effectively clears the table, but that that same

19  routine included this invocation of the TorrentCleave routine

20  which did a backup.

21      So you can kind of think of it from top to bottom, if you

22  went out and looked at everything that was being done, that

23  there was a splitting of the table with some date associated to

24  a temporary -- to a different table that had the date affixed

25  to it.  And then subsequent to that, the original table was

Barbara Frederiksen-Cross  -  Examination        728

1    dropped and recreated.

2        So the table we've been talking about, the torrent

3    infractions table, that was dropped and recreated, just

4    scrubbed clean, but there was some action before that that we

5    discussed in my depo that I think was related to the cleave

6    function you're talking about, where there was some form of

7    backup done.  And my recollection is that it appended, like,

8    the date.  And as I sit here, I don't recall if it was the date

9    of the action or the date for a specific range of data it was

10   cleaving out, but that could easily be determined from the

11   code.

12   Q.  Thank you for that.  I'd like to break that down a little

13   bit, because that was complex.  Just to orient us, we have an

14   expert report in which you've stated that the record, including

15   the bit field data, is stored in Rightscorp's torrent

16   infractions tables; is that right?

17   A.  Correct.

18   Q.  And during your second deposition, you identified some code

19   that you believed deleted that torrent infraction table; is

20   that right?

21   A.  That's correct, yes.

22   Q.  And through the process of that deposition, you came to

23   understand that before that table is dropped, the table is

24   backed up, a copy of it is made; is that right?

25   A.  We discussed during the deposition that that cleave

Barbara Frederiksen-Cross  -  Examination        729

1   function creates a copy with a different name.  It's a

2   different copy.  But, yes, a copy is made of torrent

3   infractions before the table is deleted.

4   Q.  So if I can -- if I understand this correctly, what you're

5   saying is there is a torrent infractions table that has bit

6   field data in it and the Rightscorp system makes a copy of it

7   and puts a date along with the file name, so January 15, 2022,

8   torrent infractions.  And then it deletes and blanks out the

9   original torrent infraction table; is that right?

10  A.  As best I recall that code, that's correct, yes.

11  Q.  And based on your understanding of how that code operates,

12  every day, there's a new torrent infraction created.  It's

13  populated with bit field data, then the Rightscorp system makes

14  a copy of it -- there's another one -- and deletes the

15  original, but now we have two copies for the two days, and it

16  would continue to do that every day, making a new copy, a new

17  backup of that torrent infractions table; is that right?

18  A.  With the proviso that I don't recall that we ever made a

19  determination of those cleaved tables, if they were a temporary

20  copy, just until some point in processing or if they were

21  retained permanently.

22  Q.  And that's really what I'm getting at, is you haven't seen

23  whether those things are retained permanently or not directly,

24  have you?

25  A.  I have no direct knowledge of that, sir.

Barbara Frederiksen-Cross - Examination          730

1   Q.  So all you know is that Mr. Boswell says that data doesn't
2   exist; is that right?
3   A.  I know that Mr. Boswell says he searched for bit field data
4   and was unable to locate any.  I don't know if anyone else was
5   involved in that search.
6   Q.  But Mr. Boswell told you that bit field data doesn't exist;
7   is that right?
8   A.  I think he told counsel, and I asked counsel about it, and
9   counsel said that's what he said.  But I think that he may have
10  written a declaration about that as well, as best I recall.
11  But he stated that in a declaration.
12  Q.  So one way or another, you were relying on Mr. Boswell's
13  representation that that bit field data no longer exists; is
14  that right?
15  A.  I was relying on the representation of the producing party
16  that the data doesn't exist, that's correct.
17  Q.  And the code that we've seen makes a copy of it, right?
18  A.  That is correct.  In the code there is a copy operation
19  with a date stamp appended to the file name that's being
20  created and it gets renamed to a temporary table, then copied
21  out, and some other things happen, as best I recall.
22  Q.  So we have Mr. Boswell saying the bit field data doesn't
23  exist and we have source code indicating that it makes a daily
24  backup.  Is that fair to say?
25  A.  I wouldn't characterize it that way specifically, just

Barbara Frederiksen-Cross  -  Examination          731

1  because I don't have knowledge of the intent or purpose of that

2  cleave operation, if that is a short-term backup or a daily

3  backup that's intended for longer retention or, you know,

4  exactly what happens to that downstream.  I know that when we

5  were searching for that code during my deposition, you know, I

6  went back and reviewed what we had seen when I was searching

7  that in the deposition.  I don't recall that we ever got the

8  ultimate answer of why it was being created, how long it was

9  being retained, or how it was destroyed.

10 Q.  So we have Mr. Boswell saying there is no bit field data,

11 and the source code that you've seen indicates it makes a daily

12 back up, right?

13         MR. O'BEIRNE:  Objection, Your Honor, asked and

14 answered.

15         MR. BROPHY:  Your Honor, I'm getting a very long

16 answer.  I'm trying to discretize the issue a bit.

17         THE COURT:  The objection is overruled.

18         THE WITNESS:  Just to be clear, what we see is a job

19 that at least in 2016 was scheduled to run on a daily basis to

20 clear this table out.  A part of its operation created a

21 backup.  To me, a daily backup is typically a backup that's

22 kept until some point, like a weekly backup or a monthly backup

23 when it's rolled up.  I mean, that's my storage administration

24 background.

25         So with the proviso that it appears that this job runs

Barbara Frederiksen-Cross  -  Examination        732

1   daily and that as a part of its operation it keeps a backup, I
2   agree with you.  Beyond that, I do not know anything about the
3   intended purpose of that backup or what happens to it later.
4   BY MR. BROPHY:
5   Q.  If the bit field data existed on Rightscorp's database, we
6   can go back and look at notices from 2015 and determine whether
7   the computers accused of sharing music actually have the song
8   files based on the bit field data, right?
9   A.  We would be able to determine what that peer had recorded
10  with respect to its bit field, if the bit field data was still
11  in existence, yes.
12  Q.  So if we had the backups, we could check to see if the
13  notices are accurate or not, fair to say?
14  A.  That's a reasonable premise, I think.  If they existed and
15  if they have the data that -- I mean, if nothing had changed,
16  then yes.
17  Q.  And Mr. Boswell says they don't exist, those backups,
18  right?
19  A.  That is my understanding that Rightscorp has represented
20  that that data no longer exists and Mr. Boswell has said that,
21  and perhaps others for all I know.
22  Q.  And you haven't pointed to any code that identifies -- let
23  me say that differently.
24      You have not pointed to any code in your expert reports
25  that permanently deletes that bit field data; isn't that right?

1    A.  I believe that to be true.

2    Q.  We're going to switch gears.  I want to talk about payloads

3    and bit fields.  What I'd like to do is start out with a couple

4    simple questions, soft balls, hopefully.

5        I think earlier today we talked about a payload.  Do you

6    remember that?

7    A.  Yes.

8    Q.  Would you mind articulating for the jury again your view of

9    what a payload is, please?

10   A.  A payload would be a file or a set of files that is

11   represented by a particular dot-torrent file such that peers

12   that wanted that file or files could use the dot-torrent file

13   to locate other peers that had the same.  So it could be a

14   single file.  It could be an album.  It could be a collection

15   of albums, but it's a file or files that are grouped together

16   and described by a single dot-torrent file.

17   Q.  Thank you.

18       MR. BROPHY:  Your Honor, with your permission, I'd

19   like to publish a demonstrative to the jury.  I'm happy to show

20   it to counsel.

21       MR. O'BEIRNE:  I haven't seen it, Judge.

22       THE COURT:  You haven't seen it?  You have to show

23   him.  What is it?

24       MR. O'BEIRNE:  I see it.

25       MR. BROPHY:  May I proceed, Your Honor?

Barbara Frederiksen-Cross  -  Examination        734

1              THE COURT:  You may.

2    BY MR. BROPHY:

3    Q.  Okay.  So Ms. Frederiksen, what I'd like to do is assume

4    for a moment that we have a payload with ten songs in it.  Do

5    you understand what I mean by that?

6    A.  Sure.

7    Q.  So we've got a single payload, and it's got songs one

8    through ten, just like shown on the screen.  Do you see that?

9    A.  Yes.

10   Q.  Let's see.  Do you understand that BitTorrent software will

11   allow you to pick which files from a payload you want to

12   download?

13   A.  Some of the more sophisticated clients that are running

14   today would allow you to do that.  That has not always been the

15   case, but over time, especially as payloads included multiple

16   movies and you might want to do previews and things, some of

17   the more sophisticated clients certainly can allow you to do

18   that.

19   Q.  Would you agree with me that at least as far back as 2015,

20   there were BitTorrent solutions that would allow you to do

21   that?

22   A.  I don't remember specifically when that technology was

23   introduced, counsel, so I would want to do some research before

24   I agreed or disagreed with you.

25   Q.  Before we go there, I should have asked something else.  I

Barbara Frederiksen-Cross  -  Examination        735

1  believe you referenced uTorrent earlier in your testimony.  Do

2  you recall that?

3  A.  Yes.

4  Q.  And that's a software that you've used yourself; is that

5  correct?

6  A.  I have used uTorrent, yes, in my testing.

7  Q.  And you used it for the testing in this case; is that

8  right?

9  A.  My recollection is that that was the client I used in

10  testing for this case.

11  Q.  Do you understand that uTorrent allows you to do this

12  selective file -- selective downloading of files from payload?

13  A.  I know that the current version that's available for

14  download in 2022 allows you to do that.  Again, I don't recall

15  specifically when that capability was added.

16  Q.  Do you recall giving testimony at a trial in a prior case

17  involving Rightscorp, December 3rd of 2015?

18  A.  I recall that I gave testimony in that case, but if you're

19  asking me do I remember exactly what testimony I gave, some of

20  it I will, some of it, I won't.

21  Q.  I'll give you a cheat sheet in just a moment.

22          MR. BROPHY:  May I approach, Your Honor?

23          THE COURT:  Yes.

24          THE WITNESS:  Thank you, counsel.

25  BY MR. BROPHY:

Barbara Frederiksen-Cross  -  Examination        736

1   Q.  So I believe my question was -- I'll just rephrase it since
2   I won't ever get it right if I try to say it again.
3       Will you agree with me that in 2015 there were BitTorrent
4   software clients that would allow you to selectively pluck
5   files out of a payload and download them?
6   A.  Again, as I stated, counsel, I do not remember specifically
7   when that feature was added.  I know it's been around for at
8   least a couple years, but I just don't recall as I sit here
9   when it was added.  I would want to check that from the
10  repositories of the source code for the clients or if there's
11  something you can show me that would help me recall whether I
12  knew that in 2015.
13  Q.  Yes, ma'am.  So I handed you a copy of a deposition
14  transcript.  I believe you've already testified you recall
15  giving -- pardon me, a trial transcript.  I believe you recall
16  testifying roughly in this timeframe, in 2015; is that right?
17  A.  Yeah, in the BMG/Cox matter, yes.
18  Q.  I direct your attention to page 437 of that trial
19  transcript beginning on line 15 and extending through the top
20  of the next page.  Would you mind, please, reviewing that and
21  let me know if it refreshes your recollection?
22      (Pause.)
23  A.  Okay.
24  Q.  Does that refresh your memory as to whether BitTorrent
25  clients existed in 2015 that allows you to selectively download

Barbara Frederiksen-Cross  -  Examination       737

1  files from a payload?

2  A.  Yes, during our discussion in 2015, I observed that some of

3  the more sophisticated BitTorrent clients did provide that

4  capability, so that does refresh my recollection that it must

5  have existed, at least that early.  And I also observed that

6  some of them don't.

7  Q.  Right.  So going back at least seven years, there were

8  BitTorrent solutions that allowed a user to selectively

9  download files from a payload, correct?

10 A.  A specific file from a payload or a set of files from a

11 payload, yes.

12 Q.  Thank you.  So looking at our demonstrative up here, it's

13 possible for a user to decide to just grab those two song files

14 that have moved over underneath that computer, songs five and

15 eight; is that right?

16 A.  Okay.

17 Q.  Do you agree with that?

18 A.  Again, depending on which client you were using, but if the

19 user knew how and the client was capable, then they could do

20 so.

21 Q.  So it's possible for the user to say, I want to download

22 just songs five and eight, and I'm going to pull those to my

23 computer, and I don't want any of the others, right?

24 A.  Correct.

25 Q.  In that instance, the user's computer would only have those

Barbara Frederiksen-Cross  -  Examination        738

1   two songs from the payload, right?  The rest would be empty?

2   A.  If their client was functioning properly, that would be my

3   presumption, yes.

4   Q.  You were in the courtroom during Mr. Boswell's testimony

5   last week; is that correct?

6   A.  I believe I was here for all of it, yeah.

7   Q.  And do you recall Mr. Boswell testifying about something

8   called a 10 percent bit field rule?

9   A.  Yes.

10  Q.  What's your understanding of the 10 percent bit field rule?

11  A.  That the 10 percent bit field rule was a change that was

12  made to the data rather than the software, if you will, during

13  a period of time when BitTorrent peers were underreporting in

14  the handshake how many pieces they actually had in order to try

15  to evade detection by antipiracy.  So maybe they had the whole

16  thing, but they would report 80 or 90 percent.  And then they

17  would send a flurry of half pieces, so that peers that were

18  communicating with them actually knew they had everything, but

19  they didn't know it from the bit field.

20      And the 10 percent change that we're talking about is

21  Rightscorp went through and checked the bit field data that it

22  had not yet disposed of from the torrent infraction tables we

23  were talking about.  And if the total length of the bit field

24  was greater than 30, then it would apply a change that would

25  say, if you have at least 10 percent of the bit field, I'll

Barbara Frederiksen-Cross  -  Examination        739

1    change that flag that I mentioned was used in the downstream

2    processing for notice generation, that I would flip it to the

3    value that would cause a notice to be generated.

4    Q.  So if I understand your testimony correctly, the 10 percent

5    bit field rule caused the Rightscorp system to look at a bit

6    field and as long as 10 percent of the payload existed on that

7    computer, it would consider the computer as having all the

8    payload, right?

9    A.  With respect to eligibility for notice and with the proviso

10   I think there was a second check that made sure that the bit

11   field was some minimum length.  I believe that was 30, so if

12   it's at least 30 long and you've got 10 percent, then you're

13   notice-eligible for that payload.

14   Q.  Then you're in business.  Okay.  So let's assume for a

15   moment that all these songs are roughly the same size and based

16   on that math, we have two songs out of a ten-song payload,

17   meaning we've got 20 percent of the bit fields full; would you

18   agree with that?

19   A.  I'm with you so far.

20   Q.  So under the Rightscorp 10 percent bit field rule, it's

21   going to consider that computer as having the entire payload,

22   isn't it?

23   A.  It would consider that computer to be eligible for that

24   payload for a notice.

25   Q.  And so it's going to generate notices for those songs,

Barbara Frederiksen-Cross  -  Examination        740

1   isn't it?

2   A.  Assuming that they were songs that were being protected,

3   yes.

4   Q.  And I should have said that.  I'm assuming every single one

5   of these songs is a song that Rightscorp monitors for.  So

6   assuming that, Rightscorp is going to generate e-mails for

7   those two songs, isn't it?

8   A.  During that -- yes, during that time period.

9   Q.  And it's also going to generate e-mails for all the other

10  songs that aren't in the payload, isn't it?

11  A.  During -- assuming that all were protected songs, during

12  the 10 percent bit field timeframe, it would generate --

13  potentially generate notices for those other songs.

14      Now, from the 2015 time period on where it switched to

15  checking for actual only the bit fields of a specific protected

16  work, then it would not have generated for any of those others.

17  Q.  We're going to get to that.

18  A.  Yeah.  Let's just be clear on the time period so we don't

19  leave a confusing record.

20  Q.  So your testimony is that even though that computer only

21  has two songs, Rightscorp is going to send out ten notices,

22  isn't it, under the 10 percent bit field rule?

23  A.  I would want to investigate and confirm that, but my

24  assumption as I sit here is that that is a possible

25  hypothetical.

1  Q.  So the computer doesn't have song one, and Rightscorp is

2  sending a notice anyway, isn't it?

3  A.  Again, as I sit here, that would be my speculation that

4  that would be the likely behavior, but I would want to confirm

5  and see if there was anything that checked or balanced that in

6  the code.

7  Q.  Well, that's what the 10 percent bit field did to the

8  program, right?  It went through and found instances where only

9  10 percent of the bit field was full, and here we have 20, and

10  then it would just change everything to full, right?  That's

11  what it did?

12  A.  The full files was at the total payload level, so it would

13  essentially check the box that this payload is eligible for a

14  notice.  And in the hypothetical you present here, as I said, I

15  think that that might be correct, but before I affirmed that it

16  was correct, I would want to just double-check it in case there

17  was any check and balance in the code for that.

18      I don't recall any as I sit here, but I wouldn't want to

19  make a definitive opinion based on a hypothetical that I'm

20  saying I think I agree with you, but I would want to check the

21  code before I said that's what's happening.

22  Q.  So sitting here today, though, with all the information

23  you've reviewed, your understanding is that Rightscorp would

24  send out all ten of those letters; isn't that right?

25  A.  As I sit here today in this specific set of instances, I

Barbara Frederiksen-Cross  -  Examination        742

1  think that it's at least possible that that could happen.

2  Q.  And the way -- I want to focus on the way the bit field

3  10 percent rule worked is, it would go out, and it would look

4  at the bit field data and -- I'm going to say that a little

5  differently.

6      Will you agree with me that under the 10 percent bit field

7  rule, there were two sweeps done through the bit field data by

8  the system.  Do you understand what I mean by that?

9  A.  No.

10 Q.  Let me describe the two sweeps and see if you agree with

11 me.  Sweep one, Rightscorp goes out, gets the bit field data,

12 pulls it in and it looks at it and it looks to see if the

13 complete payload is there, whether the bit field data coming

14 from the computer reports that the full payload is there; is

15 that right?

16 A.  That's correct, generally, yes.

17 Q.  And if we have this situation where there are only two

18 songs out of ten, the system is going to recognize that and put

19 that full file flag in the database at a zero, right?

20 A.  That's correct.  The default value for the full file flag

21 is zero until it's verified that all the bits are there.

22 Q.  So because the system detected less than a full bit field,

23 it leaves a zero in the database for the full file flag, right?

24 A.  Correct.

25 Q.  And that's because it's indicating the bit field isn't

Barbara Frederiksen-Cross  -  Examination       743

1    full, right?  If it detected a full bit field, then that value

2    would be a one, right?

3    A.  Correct so far.

4    Q.  Then there's a second sweep where the 10 percent bit field

5    rule comes in and it takes a second look at that bit field, and

6    if it looks a bit field like this, where it's got 20 percent,

7    it changes that full file flag to a one, right?

8    A.  Again, with -- I think with the proviso that I believe

9    there's a certain length check for the number of flags in the

10   bit field so that shorter bit fields didn't get flipped.  Like,

11   if it was a single song, and then I don't think that it flipped

12   it.  It was for longer bit fields.

13   Q.  How many bit fields would there be in a ten-song payload?

14   A.  Entirely depends on the size of the pieces, because that's

15   something that the person who creates the torrent determines.

16   Q.  Let's assume for a moment that this is a ten-song album

17   that someone has that's a CD quality.  It's not compressed at

18   all, so it's large audio files.  Would it have more than those

19   30 blocks typically?

20   A.  I believe so.  Assuming that -- again, that the individual

21   piece size at the time the copy was created had not been set to

22   a high value.  And that's something that the person who creates

23   the torrent decides.  And typically they decide, you know, the

24   larger the payload, the larger the size is basically.

25   Q.  So that second sweep that happens, it goes in, looks again,

Barbara Frederiksen-Cross  -  Examination          744

1   realizes that there's 20 percent in the payload and just
2   switches that full file to one, right?  That's how that second
3   sweep works?
4   A.  Yeah, looks at the length of the number of bits, how many
5   bits make up the payload, and then does the math and says, if
6   it's more than 10 percent, it sets that switch.
7   Q.  Now, if we had the actual bit field data that was gathered
8   from the customer, we could go back and look at that bit field
9   data and look at the full file flags and see how many of the
10  notices were sent as a result of the 10 percent bit field rule,
11  right?
12  A.  Yes.  You could interrogate that.  You could also determine
13  how many of those notices had at least a piece of the file or
14  had the full file.  You would be able to tell where in the bit
15  field that data was.
16  Q.  So that bit field data that's acquired from the computer,
17  that's like the secret decoder ring for this, right?  It's the
18  truth data that we can use to determine how much of the actual
19  payload that computer had, right?
20  A.  It would tell you which specific pieces of the payload it
21  had.  Not how much, per se, but which specific pieces.
22  Q.  And we could back out from that how many notices Rightscorp
23  sent based on the 10 percent bit field rule if we had that bit
24  field data, right?
25  A.  Yeah.  I think by taking the count for some interval of

Barbara Frederiksen-Cross  -  Examination      745

1   time and saying this many of them were full file and this many

2   of them were less than full file, you could derive that number.

3   Q.  Well, for any individual notice we could pull the bit field

4   data and look at it and then see whether it was full or not.

5   And if it was full, then we'd know the notice was sent without

6   the 10 percent bit field.  And if it wasn't full, we'd know

7   that was a notice that went out because this flag was flipped

8   from zero to one, right?

9   A.  I think we're saying the same thing essentially.

10  Q.  Okay.  But we don't have the bit field data, right, because

11  Rightscorp deleted it?

12  A.  I do not know the specific circumstance under which we do

13  not have the bit field.  I know that their representation is

14  that they were unable to locate the bit field data.  Whether

15  they deleted it, whether it was not retained in the normal

16  course of business beyond one day or three days or five days, I

17  don't know what their business rule for that was.  And I see no

18  record that would allow me to make that determination, but my

19  understanding is it's gone today, where we sit today.

20  Q.  All we know is Mr. Boswell says it's gone, and the code

21  says it makes a backup, right?

22  A.  Again, the code says it makes a backup and I do not recall

23  ever having done any extensive analysis of the code that was

24  provided to me to know whether or what happens to that backup.

25  It's certainly something one could search for to see if the

Barbara Frederiksen-Cross  -  Examination        746

1  code subsequently, you know, in another program does something

2  with that data, but I do not recall -- as I sit here, recall

3  ever making such a search.

4  Q.  So if we go back to this demonstrative for a moment, that

5  slot, right here, for song number one, Rightscorp is going to

6  send a notice, but this computer doesn't have song number one,

7  right, in this hypothetical?

8  A.  They're going to send a notice that it doesn't have it?

9  Q.  No, that it does.  So let me say that differently.

10 Rightscorp is going to send a notice indicating that this

11 computer is sharing this song, but this computer doesn't even

12 have that song; isn't that right?

13 A.  I believe that as a hypothetical that is possible, at least

14 as I sit here without performing additional review to see if

15 there are any other checks and balances.

16 Q.  That would be a false accusation of music sharing, wouldn't

17 it be?

18 A.  For that one notice, but not for the notices five and eight

19 that you indicate that the computer did have.

20 Q.  So let's talk about another hypothetical.  When the

21 plaintiffs in this case don't own the copyrights for songs five

22 and eight, under that hypothetical, all the notices the

23 plaintiffs would be relying on in this case would be false?

24         MR. O'BEIRNE:  Objection, Your Honor.  Calls for legal

25 conclusion.

```
 1              THE COURT:  Doesn't call for a legal conclusion.
 2     She's testifying based on her opinion, so the objection is
 3     overruled.
 4              THE WITNESS:  I'm sorry.  Could you ask your question
 5     again?
 6     BY MR. BROPHY:
 7     Q.  Yes.  If the plaintiffs don't own the copyrights for songs
 8     five and eight, but they do for all the rest, just
 9     hypothetically, every single one of those notices would be
10     false, right?
11     A.  Under the hypothetical where a user of the BitTorrent
12     client had for some reason selected to download only a specific
13     song from the payload, under that specific, narrow
14     hypothetical, and where the songs they chose to download were
15     sufficient to meet the 10 percent threshold and they owned no
16     other songs in the payload, in that specific, narrow
17     hypothetical, it would appear that those notices, if they were
18     sent, would be inaccurate.  That is, again, assuming that they
19     were sent.
20     Q.  Do you have an understanding of how many entries in the
21     database Rightscorp's 10 percent bit field threshold would
22     process at a given time?
23     A.  As I sit here, I do not recall a specific number.  I would
24     want to look at that code.
25     Q.  I'd like to direct your attention to your December 2015
```

Barbara Frederiksen-Cross  -  Examination        748

1   trial testimony, specifically page 425, lines 10 through 19.
2   If you wouldn't mind, please, reviewing that and let me know if
3   that refreshes your memory on this item.
4        (Pause.)
5   A.  Okay.
6   Q.  Does this information help you remember how many entries in
7   the Rightscorp database the 10 percent bit field function would
8   process at a time?
9   A.  Assuming that this transcript is actually correct, and I
10  have no reason to believe that it's not, but again, I would
11  want to check the code before I pounded my fist on the table,
12  it would run 100,000 records at a time.
13  Q.  100,000 records at a time.  And how often would it run
14  that?
15  A.  The data that we were looking at when this testimony was
16  given indicated that it was being run approximately every 15
17  minutes.
18  Q.  So every 15 minutes it would process 100,000 entries from
19  the Rightscorp database; is that right?
20  A.  Yeah, I don't recall the specific document we were looking
21  at when this was discussed in my testimony, but what it says
22  here, what I am reciting as I look at whatever this is, is that
23  they were running 100,000 records every 15 minutes in order to
24  spread the processing out so that it didn't crash the system by
25  trying to absorb all resources running against everything at

Barbara Frederiksen-Cross  -  Examination        749

1    once.

2    Q.  So if they let the 10 percent bit field rule run at full

3    tilt, it would eat up all the memory of the computer and crash

4    the system; is that right?

5    A.  My understanding -- again, this is -- I'm not looking at

6    the actual document, but what I was saying about the document

7    during my testimony is that they were running it on that

8    15-minute interval to essentially throttle its behavior so that

9    it didn't overrun the system.

10   Q.  And they were limiting it to 100,000 entries every 15

11   minutes, right?

12   A.  That's what it indicates here.  Again, I don't remember the

13   specific document we were looking at, but that's the testimony

14   I was giving in that trial, and I'm sure I was looking at

15   something when I was giving it.

16   Q.  I believe you testified earlier that you have reviewed

17   Mr. Boswell's testimony in this case in preparing your

18   opinions; is that correct?

19   A.  Yes.  Not recently, but when I prepared my reports

20   initially, that's correct.

21   Q.  Do you recall how many notices on a percentage basis

22   Mr. Boswell testified the 10 percent bit field affected?

23   A.  I don't recall specifically his testimony on that in terms

24   of percentages.

25            MR. BROPHY:  May I approach, Your Honor?

Barbara Frederiksen-Cross  -  Examination        750

```
 1              THE COURT:  Yes.
 2              THE WITNESS:  This is the 2018 testimony he gave?
 3              MR. BROPHY:  Yes, ma'am.
 4              THE WITNESS:  Just want to make sure I had the right
 5    one.
 6              MR. O'BEIRNE:  Your Honor, just to be clear, the
 7    witness is now being asked about Mr. Boswell's deposition
 8    testimony, not his trial testimony that's actually before the
 9    jury.  I don't know if this is impeachment or how she's being
10    confronted with his deposition testimony as opposed to his
11    day-and-a-half trial testimony.
12              MR. BROPHY:  Your Honor, she's testified that she
13    relied on Mr. Boswell's testimony in rendering her opinions in
14    this case, and I'm refreshing her memory on what she reviewed
15    so she can fully articulate the opinions that she has in this
16    case.
17              THE COURT:  Well, is that trial testimony or
18    deposition?
19              MR. BROPHY:  This is deposition testimony, Your Honor.
20              THE COURT:  Well, I think you said trial, but fine.
21              MR. BROPHY:  I apologize for that miscommunication.
22    BY MR. BROPHY:
23    Q.  Ms. Frederiksen, I'd like to direct your attention to page
24    258 of Mr. Boswell's August 8, 2018 deposition.  If you
25    wouldn't mind, please, reviewing lines 8 through 21, and let me
```

1  know if that refreshes your memory about what Mr. Boswell said

2  regarding the percentage of notices impacted by the 10 percent

3  bit field rule.

4      (Pause.)

5  A.  Sorry, you said eight through what?

6  Q.  Page 258, lines 8 through 21.

7  A.  Okay.  Thank you.

8      (Pause.)

9      Okay.

10  Q.  Having reviewed that, do you recall Mr. Boswell's testimony

11  regarding what percentage are affected?

12  A.  Yes.  I think when you asked him for a ballpark, he said

13  maybe 10 percent.

14  Q.  10 percent.  So if we do the math, we've got a hundred

15  thousand records processed every 15 minutes.  10 percent of

16  those means the bit field 10 percent rule is impacting 10,000

17  notifications every 15 minutes; is that right?

18  A.  Systemwide, I think your math is correct there, yes.  And

19  that's assuming some even distribution or some -- 10 percent of

20  the -- let me back up.

21      I think your general principle that some percent are being

22  affected is correct, but I don't think you can say that it's

23  10 percent of the total records, because in these timeframes,

24  the -- as far as bit field was still comparatively new and so

25  many of the records in the database would still be full file or

Barbara Frederiksen-Cross  -  Examination          752

1    accurately reported.  So with respect to, you know, what day --

2    the number that are affected, you would have to look at the

3    total number of detections that -- you would want to look at

4    how the overall effect on the database was to really understand

5    what that -- you're running against 10,000, but what was the

6    actual effect of that?  How many were already full and how many

7    were flipped, I guess is what I'm trying to get at.

8    Q.  I could not agree with you more.  That's my next topic.  Do

9    you remember issuing an expert report in this case on

10   February 3rd, 2020?

11   A.  About that timeframe, yes.  Are we done with this

12   deposition?

13   Q.  Pardon me?

14   A.  Are we done with Boswell's deposition?

15   Q.  Yes, ma'am.  Please feel free to stow that.  I know it's a

16   big one.

17   A.  Running out of lap here.

18        MR. BROPHY:  Your Honor, may I approach once more?

19   Thank you.

20        THE WITNESS:  Thank you.

21   BY MR. BROPHY:

22   Q.  Okay, I'd like to direct your attention to page ten of your

23   expert report.

24        MR. BROPHY:  And Your Honor, may I publish this to the

25   jury?

Barbara Frederiksen-Cross  -  Examination        753

1              THE COURT:  Yes.

2              MR. BROPHY:  Thank you.  Pardon my scribbles.

3    BY MR. BROPHY:

4    Q.  You state in your expert report that --

5    A.  Which paragraph is this excerpt on the screen from?  I

6    can't see the paragraph number.

7    Q.  Yes, ma'am, it's paragraph number 43 on the bottom of page

8    ten.

9    A.  Thank you, sir.

10   Q.  And you state there that*, "The 10 percent bit field rule*

11   *was in place and active for one or two weeks around November of*

12   *2014."*  Do you see that?

13   A.  That's my understanding based on Mr. Boswell's testimony,

14   yes.

15   Q.  Mr. Boswell's testimony in this case, right?

16   A.  That's correct, yes.

17   Q.  So in this case, Mr. Boswell testified that that 10 percent

18   bit field rule was only in place for two weeks in 2014,

19   November, right?

20   A.  That's my understanding, that for this case he testified

21   that this 10 percent change was an experiment they were doing

22   starting in late November 2014 and running sometime into

23   December of 2014, as best he could recall.

24   Q.  And you go on to say, *"After this experimental period, the*

25   *requirement for the peer to be offering 100 percent of the file*

Barbara Frederiksen-Cross  -  Examination          754

1   *was put back in place."*

2       Do you see that?

3   A.  Yes, I do.

4   Q.  So your statement in this expert report, based on

5   Mr. Boswell's testimony in this case, is that this 10 percent

6   bit field rule was only in place for two weeks in November of

7   2014, and right after that, we went right back to a hundred

8   percent bit field, right?

9   A.  That was my understanding based on the available

10  information, yes.

11  Q.  Ms. Frederiksen, do you recall giving an expert report in a

12  prior case involving Rightscorp in August 31st -- excuse me,

13  sorry.  Pardon me.  One moment.

14      MR. O'BEIRNE:  Your Honor, expert report from the

15  prior case seems to be different than testimony and opening the

16  door to introducing her opinions from the prior case and other

17  details about her analysis in the prior case.

18      MR. BROPHY:  Your Honor, I'm impeaching her with a

19  prior written statement.

20      THE COURT:  Overruled.

21      MR. BROPHY:  Trying to keep track of too many papers.

22  I apologize.

23  BY MR. BROPHY:

24  Q.  Do you recall issuing an expert report on July 24th of 2015

25  in a prior case?

Barbara Frederiksen-Cross  -  Examination          755

1   A.  Possibly.  Would you mind telling me what case it was?

2          MR. BROPHY:  May I approach, Your Honor?

3          THE COURT:  Yes.

4          MR. BROPHY:  Thank you.

5          THE WITNESS:  Thank you.

6          A reply report, yes, okay, because I was trying to fit

7   something in that timeframe, and I'm going --

8   BY MR. BROPHY:

9   Q.  So you do remember issuing a reply report in a prior case

10  involving Rightscorp in --

11  A.  July 24, 2015 --

12  Q.  -- July, 2015?

13  A.  Correct.

14         MR. BROPHY:  Your Honor, may I also publish this to

15  the jury, please?

16         THE COURT:  Yes.

17  BY MR. BROPHY:

18  Q.  I'm going to put both of these on the screen.  In the

19  earlier case, you issued an expert report indicating that the

20  100 percent bit field was only in use before December 2014 and

21  that the Rightscorp system now uses a 10 percent bit field.  Do

22  you see that?

23  A.  That the code had the 10 percent bit field modification

24  still present in the code, yes, because that was a -- like an

25  add-on program and I couldn't tell necessarily when it had been

Barbara Frederiksen-Cross  -  Examination        756

1   used.  I had to rely on the testimony of Mr. Boswell for when

2   that was in use.  So it was still in the code -- or it was

3   present in the code in the 2015 production I had received.

4   Q.  So in this case, your expert report states that the bit

5   field 10 percent rule was only in effect for two weeks in

6   November 2014, right?

7   A.  That's my understanding of when they were actually running

8   that code that flipped the bit field, based on Mr. Boswell's

9   testimony, yes.

10  Q.  And in July of 2015, you issued a report indicating that

11  the 10 percent bit field was actually in place from

12  December 2014 until the date of your expert report, right?

13  A.  Would you mind scooting the page slightly so I can see just

14  what's above that, so I can have this in context?  No, in --

15  the one that's on the top, if you could scoot that down

16  slightly?

17      (Pause.)

18      I see that -- I am noting there that that is still present

19  in the code, yes.

20  Q.  Well, your expert report is indicating that the 10 percent

21  bit field is in operation from December 2014 until at least the

22  date of your expert report in July of 2015, right?

23  A.  Well, what I'm noticing -- noting there -- remember that

24  that code that flips the 10 percent bit field is code that is

25  not a part of Test5.java, but is rather a SQL procedure that is

1    run separately.  That SQL procedure was still in place in the

2    code that I received in the 2015 production.  So I had no

3    alternative, not having had the benefit of Mr. Boswell's

4    testimony about the specific timeframe it was used at that

5    point, to observe that it was still in the code at that point

6    in time.

7    Q.  Isn't it true that in the earlier case, Mr. Boswell told

8    you that the bit field 10 percent rule was in place from 2015

9    forward, but in this case he told you the 10 percent bit field

10   rule was only in place for two weeks in November of 2014?

11   A.  Mr. Boswell -- as best I recall, Mr. Boswell had always

12   said it was only in place for very few weeks.  I think

13   Mr. Steele, who was a -- not directly involved in the code, but

14   was also a Rightscorp employee, had suggested he thought it

15   might have been in place for a longer period of time.  I don't

16   recall Mr. Boswell ever saying that it was in place for a much

17   longer period of time than a few weeks.  I think he was fuzzy

18   about exactly when it ended.  It was pretty clear that it went

19   in December 2014, and he said, sometime in the first half of

20   December is what I recall him saying, as I sit here.

21             MR. BROPHY:  May I approach, Your Honor?

22             THE COURT:  Yes.

23             THE WITNESS:  Thank you.

24   BY MR. BROPHY:

25   Q.  Ms. Frederiksen, do you recall reviewing Mr. Boswell's

Barbara Frederiksen-Cross  -  Examination        758

1  deposition testimony in preparing your opinions for that

2  earlier case?

3  A.  I'm sure I did, yes.  I don't recall specifically the act

4  of doing so or the details, but I'm sure I would have.

5  Q.  I've handed you a Friday, July 3rd, 2015 deposition

6  transcript from Mr. Boswell's corporate deposition in that

7  case.  And I'd like to direct your attention to page 170 of

8  that deposition, specifically line -- page 170, line 21,

9  through 171, line 3.

10  A.  I'm sorry.  You said page 170?

11  Q.  Yes, ma'am, page 170, line 21.

12      (Pause.)

13  A.  Okay, I see this.

14  Q.  Does reviewing this transcript refresh your memory about

15  what Mr. Boswell said about the operation of the 10 percent bit

16  field rule in 2014 and 2015?

17  A.  As he first says, that it uses the entire bit field, and

18  then he says -- the question is, *"Does it apply that 10 percent*

19  *threshold to specific parts of the bit field to look for values*

20  *in a specific part or does it look for particular values across*

21  *the entire bit field?"*  And he says that *"Since 2015, it only*

22  *looks at 10 percent across the board."*

23  Q.  So he doesn't say two weeks in November of 2014.  He says

24  since 2015, it's in effect; isn't that right?

25  A.  That's what he appears to be saying here.

Barbara Frederiksen-Cross  -  Examination        759

1   Q.  And he gave this testimony in July 2015; isn't that right?

2   A.  The date on the testimony is in July of 2015, yes,

3   July 3rd, 2015.

4   Q.  So the deposition testimony you reviewed in the earlier

5   case, Mr. Boswell testified this was in effect for seven months

6   at least; isn't that right?

7   A.  That would be approximately right, yes.

8   Q.  That's a lot different than two weeks in November 2014,

9   isn't it?

10  A.  It is a different time period.  It was also a different

11  case and I don't see anything here that elaborates on whether

12  that was being applied differently based on the ISP involved

13  or -- I mean, I would have to refresh my recollection of his

14  testimony.  It was seven years ago, but I see here that he is

15  saying that.  I just don't recall the specific context in which

16  he gave that testimony.

17  Q.  Do you recall issuing a declaration in this case?  This

18  case, January 17th, 2019?

19  A.  I recall issuing a declaration in this case.  I don't

20  recall the specific date.  I think there was only one, though.

21         MR. BROPHY:  May I approach, Your Honor?

22         THE COURT:  Yes.

23  BY MR. BROPHY:

24  Q.  In January of 2019, in this case, you issued a declaration

25  indicating that *the 10 percent bit field rule was in place from*

Barbara Frederiksen-Cross  -  Examination        760

1   *December 2014 until September 1 of 2015,* didn't you?

2   A.  Are you referring to paragraph ten here?

3   Q.  Yes, ma'am.

4   A.  Yes, I see that.

5   Q.  So in this case, you issued a sworn declaration that the

6   bit field was in -- the 10 percent bit field was in play from

7   December 2014 until at least September 1st of 2015; isn't that

8   right?

9   A.  That was based, I believe, on Mr. Steele's testimony about

10  it, yes.

11  Q.  And then in this case, Mr. Boswell gave this new testimony,

12  about two weeks in November 2014; isn't that right?

13  A.  I don't have them arranged in the chronological order he

14  gave them, but I see that that is what he said here that I

15  quoted in my report.

16          MR. BROPHY:  Your Honor, may I publish the declaration

17  that Ms. Frederiksen issued in January 2019 to the jury?

18          THE COURT:  Yes.

19          MR. BROPHY:  Too many pages and not enough ELMO.

20  BY MR. BROPHY:

21  Q.  So this is the statement you made in January of 2019 in

22  this case, that, *"In December 2014, the system was also changed*

23  *to increase the sensitivity of the infringement detection*

24  *because some peers were attempting to evade detection by*

25  *reporting partial bit field.  It's my understanding that this*

1   *chain was reversed on September 1st, 2015.*"

2       Do you see that?

3   A.  I see that.

4   Q.  How many months is that?

5   A.  Nine or ten, depending on when in December it was

6   implemented.

7   Q.  So in this case, you issued a declaration indicating the

8   bit field 10 percent rule was in place for nine or ten months,

9   right?

10  A.  I see that.

11  Q.  And in an earlier case, you issued an expert report

12  indicating that the 10 percent bit field was in place from

13  December 2014 until at least the issuance of that report, which

14  was months and months later, right?

15  A.  July of 2015, I believe was the date of that report, yes.

16  Q.  And suddenly in this case, magically the bit field

17  10 percent rule has shrunk, and it's only active for two weeks

18  in November 2014, right?

19          MR. O'BEIRNE:  Your Honor, objection to "magically."

20          THE COURT:  Yes.  Over editorializing, counsel.

21          MR. BROPHY:  Apologies, Your Honor.

22  A.  I had gone back and reviewed the deposition transcripts,

23  and the one I found that I cited at the bottom of that page is

24  Mr. Boswell's transcript Volume 1 from this case.  And so I was

25  reviewing the transcript specifically to identify the time

Barbara Frederiksen-Cross  -  Examination        762

1   period.  And I believed at the time I wrote this that to be his

2   most recent and, therefore, likely he had done additional

3   research to try to confirm those dates.

4       But the dates -- I agree with you that there is an

5   inconsistency in these dates.  I don't dispute that at all.  I

6   really don't, counsel.

7       Could you remind me the date of the report that we're

8   looking at on the main page here, page 10 of 40?

9   BY MR. BROPHY:

10  Q.  The date of this report that you issued in this case is

11  February 3rd, 2020.

12  A.  Okay.  So that is the most recent report.  And the date of

13  Mr. Boswell's transcript, if you have that date?  I'm sure it's

14  probably on my lap here somewhere, but I'm not sure which one

15  it is.

16  Q.  August of 2018.

17  A.  The date that I cite in this report or was that one of his

18  more recent depositions?

19  Q.  This right here, this Boswell depo Volume 1, page 262?

20  A.  Yeah, I can't see it on my screen, but you can see it on

21  yours.

22  Q.  That was in 2018.

23  A.  That was the 2018 one.  Okay, thank you.

24  Q.  So we looked at Mr. Boswell's testimony from 2015, which

25  you reviewed, right?

Barbara Frederiksen-Cross  -  Examination       763

1   A.  Correct.

2   Q.  And in 2015, he testified that the 10 percent bit field

3   rule was in effect since 2015, right?

4   A.  I think it was since 2014, but he testified that it was in

5   effect in 2015, if I'm not mistaken of that testimony.

6   Q.  Well, he gave testimony July 3rd, 2015 indicating that the

7   10 percent bit field rule had been in effect since 2015, right?

8   A.  Okay.  Since the beginning of the year, so seven months.

9   Q.  Seven months.

10  A.  Six and a half months at that time.

11  Q.  In this case, he changed his testimony and said it was only

12  active for two weeks in November 2014, right?

13  A.  I observed that here, yes.

14  Q.  And you changed your opinion based solely on his changed

15  testimony, right?

16  A.  I was using his testimony as a guideline for when that had

17  been in place, that's correct.

18  Q.  Why would his testimony in 2018, so far removed from the

19  dates in question, in your view be more accurate than the

20  testimony he gave closer in time to the actions that he had

21  taken?

22  A.  I don't have an answer for that, counsel.  When I was

23  preparing this report, I went back and reviewed the deposition

24  transcripts that I still had in my possession at that point in

25  time, and this was the one where I found the dates he recited,

1    and so I cited in my report.  Why there would be discontinuity

2    in his testimony, I do not know.

3    Q.  Pardon me while I do a little bit of housekeeping.

4        By changing his testimony to decrease the amount of time to

5    two weeks in November of 2014, that would minimize the impact

6    of the 10 percent rule, right?

7    A.  In what respect?  Are you just saying that it would mean

8    that it was in effect for a shorter period of time?

9    Q.  Instead of the earlier testimony when it was in effect for

10   months and months, he's now changed his testimony that the

11   10 percent bit field was only in place for two weeks, right?

12   A.  Yes.

13   Q.  And as a result of that, he has minimized the number of

14   notices potentially impacted by that 10 percent bit field rule,

15   right?

16   A.  Or at least the duration of time that that rule was in

17   effect, yes.

18   Q.  And we talked earlier about the fact that this process goes

19   through a hundred thousand entries every 15 minutes, right?

20   A.  In the entire Rightscorp database table, yeah.

21   Q.  Yes.  And so, obviously, if you have that running for

22   months and months, it's going to impact far more notices than

23   two weeks, right?

24   A.  I think that's a safe assumption, yes.

25   Q.  And so Mr. Boswell was motivated to limit that time, to

Barbara Frederiksen-Cross  -  Examination        765

1   modify his testimony to limit the amount of impact that those

2   10 percent bit field rules had on the notices Rightscorp sent,

3   right?

4            MR. O'BEIRNE:  Objection, Your Honor.

5            THE COURT:  Yes.  You're calling for her to speculate

6   on what motivates Mr. Boswell.

7   BY MR. BROPHY:

8   Q.  Now, I believe at the beginning of my cross-examination of

9   you, we talked about those dominoes falling and Memphis and

10  Pocket versus Test5.java.  Do you remember that?

11  A.  Yes, I do.

12  Q.  And your testimony was that, based on Mr. Boswell's

13  testimony, you understood that as of October 2015, Rightscorp

14  was now using the Memphis and Pocket functions and not the

15  Test5.java functions, right?

16  A.  My recollection is that's when he testified they made the

17  switch was in that timeframe.

18  Q.  And I believe that you testified to a refinement under

19  which Memphis and Pocket no longer looked at the entire bit

20  field of the payload, but instead focused on the bit field for

21  individual files within a payload; is that right?

22  A.  Correct.

23  Q.  But we're relying exclusively on Mr. Boswell's testimony

24  about when that switch took place, right?

25  A.  By that I believe I'm asking, we're relying on his

1   testimony for when he started using that code; is that correct?

2   Q.  That's correct, ma'am.

3   A.  Yes, I think that would be true.

4   Q.  And this is the same person who changed their testimony in

5   this case, right?

6   A.  That it would appear that Mr. Boswell -- reviewing the

7   excerpts that we've reviewed out of the proper context, I'm

8   assuming that your representation that these were kind of

9   in-isolation statements or your implied representation is

10  correct.  I haven't had a chance to verify that.  But it is the

11  same Mr. Boswell that we are talking about, that there's only

12  one of them, as far as I know.

13  Q.  Now, that 10 percent bit field rule, that was a SQL query

14  that was run on the Rightscorp database; isn't that right?

15  A.  Yes, that's what I meant by the fact that it was outside

16  the code proper.  The code functions as the code functions, and

17  then this SQL query ran against the torrent infractions table

18  to flip the full file field as a separate thing from the large

19  body of the code.

20  Q.  The truth of the matter is we can't know when that

21  10 percent bit field function stopped running; isn't that

22  right?

23  A.  My recollection is that in the program or in the procedure

24  that fires that off, that fires that function off, there was a

25  date.  And as I sit here, I don't recall if it was the date

1    that it started or the date that it ended.  We know that at

2    some point in time the name of that function was changed such

3    that even if that other script was running, the function could

4    not execute, because it was still looking for the old name.  So

5    I remember that there was a date in association with something

6    related to this file.

7        As I sit here, I don't remember the specifics of whether

8    that was an ending date because it was in the function that

9    invoked it or if it was a starting date with respect to the

10   function of when it began being used, but there were some

11   comments in the code that delineated some date information.

12   Q.  I'd like to direct the Court's attention to your

13   December 15, 2021 deposition, page 241, line 21 through 242,

14   line 11.  241, 21, through 242, line 11.

15   A.  Hold on just a second.  Let me catch up to you if I could.

16   Sorry again, the page?

17   Q.  241, line 21, through 242, line 11.

18       I asked the question, *"That SQL query could have been*

19   *running after October 21st, 2015, right?"*

20       And you answer, *"Yeah, I would be speculating, counsel.  I*

21   *don't know.  Let me see if I can determine when they turned it*

22   *off.  I'm not seeing anything here at the moment, counsel, that*

23   *I can identify that tells me specifically when it was turned on*

24   *or when it was turned off.  I'm not saying there isn't*

25   *something in here that would tell me that, but I don't see*

1  *anything as I sit here that tells me that dispositively.*"

2      Do you see that?

3  A.  Let me just look back to see what I was commenting on when

4  I made that observation, if you don't mind.

5      *(Pause.)*

6  Q.  Ms. Frederiksen-Cross, we can't know when that 10 percent

7  bit field stopped; isn't that right?

8  A.  With respect to the issue -- the hypothetical we discussed

9  before where we were talking about a payload that could

10  potentially have selective songs, a peer could download only

11  selective songs, the operation of the code was changed in

12  October 2015 to look only at specific songs.  So in a worst

13  case, the point in time where the 10 percent bit field could be

14  at effect would be from when it was put in place in late

15  November, December of 2014 until that change in October '15

16  where it would no longer matter, because each individual song

17  was being identified by its bit field.

18      But up until that time, I think, given the contradictions

19  in the testimony and the fact that there is no clear record,

20  there may be a time period there of as much as from late 2014

21  to that code change in October 2015 when we would not know if

22  it ran.  After that, if it ran, it wouldn't matter, because

23  each bit field was individually being identified or each set of

24  bit fields was being individually identified in the

25  notification.  So it wouldn't matter with respect to the

Barbara Frederiksen-Cross - Examination       769

1    accuracy.

2    Q.  You've already testified we were relying on Mr. Boswell to

3    know that October 2015 switch-over date, right?

4    A.  I think there were some comments in some of the code

5    related to that date as well.  And we know that when they

6    started using the revision control system in early 2016, that

7    that code was checked in whole and intact and into that

8    revision control when they first started using it.

9    Q.  When I asked you this question in December of 2021, your

10   answer was, *"There is nothing that tells you dispositively*

11   *whether the 10 percent bit field was ever turned off."*  Right?

12   A.  I don't think that there is any dispositive evidentiary

13   record.  The point I'm making is that the period in which it

14   would affect or potentially affect the accuracy of a notice,

15   under the hypothetical you were giving, is bounded to that time

16   period before the system began checking individual files within

17   a payload as opposed to the payload as a whole.

18   Q.  And we're relying on Mr. Boswell to know when that

19   changeover happened; isn't that right?

20   A.  No.  We can tell when that changeover happened, at the

21   latest, from the time that code was entered into the revision

22   control system.

23   Q.  So sitting here today, we have no idea how many e-mails are

24   impacted by this 10 percent bit field process; isn't that

25   right?

Barbara Frederiksen-Cross  -  Examination       770

1  A.  I do not have a specific count as I sit here today.

2  Q.  What we do know is that that process was going through a

3  hundred thousand entries in Rightscorp database every 15

4  minutes and potentially sending out more notices, right?

5  A.  Well, the process itself didn't send notices, but it would

6  potentially be marking peers that had 10 percent of the payload

7  as notice-eligible for a particular detection.

8  Q.  It was going in and manipulating the data in the database

9  to change zeros to ones, right?

10      MR. O'BEIRNE:  Objection as to "manipulating the

11  database."

12  BY MR. BROPHY:

13  Q.  It was going in and changing zeros to ones in the database,

14  wasn't it?

15  A.  A zero to a one, per record.  That multi -- we're not

16  talking about the bit field here, but it was flipping that flag

17  that -- I think it was called full load or full file that was

18  used in the processing to determine whether a particular

19  detection was notice-eligible, along with some other criteria.

20  Q.  And every single flag it flipped was an e-mail that the

21  Rightstcorp system otherwise wasn't going to send, right?

22  A.  That is not necessarily true.  And the reason it is not

23  necessarily true is that there were some bounds and limits for

24  some ISPs on how many notices could or would be sent for a

25  particular ISP over a particular time period.  So it is true

Barbara Frederiksen-Cross  -  Examination        771

1    that it was marking as eligible records, but that doesn't

2    necessarily translate to an e-mail being sent for each of those

3    records, if that makes sense.

4              MR. BROPHY:  Your Honor, I have a little bit more

5    questioning.  I know we're late in the day.

6              THE COURT:  I presume you're going to have redirect,

7    am I right?

8              MR. O'BEIRNE:  Yes, Your Honor.

9              THE COURT:  All right.  Then there's no sense in

10   trying to push this.  So you're going to have to come back

11   tomorrow.

12             THE WITNESS:  Okay.

13             THE COURT:  All right.  Ladies and gentlemen, thank

14   you very much.  Tomorrow is just a regular day, right,

15   Priscilla?

16             COURTROOM DEPUTY CLERK:  Yes, Judge.

17             THE COURT:  Okay.  We've got a regular day tomorrow.

18   Thursday is another story, but tomorrow is a regular day.

19             COURT SECURITY OFFICER:  Please rise for the jury.

20             *(4:35 p.m., the jury exits the courtroom.)*

21             THE COURT:  Please be seated.  We're moving kind of

22   slow here, to say the least.  I didn't anticipate this witness

23   to go all day today.  And we kind of need to speed it up a bit.

24   I mean, I'm not the former Judge Sparks who, you know, said,

25   You each have 48 hours, good luck, to put your case on.

Barbara Frederiksen-Cross  -  Examination        772

 1              You can step down, ma'am.

 2              But we need to speed it up, because I think we are --

 3    both sides have been replowing some ground here and I think we

 4    don't have -- given the length of this trial and the complexity

 5    of it, that has a tendency to confuse a jury more than it does

 6    help.  So I'm not addressing this to any particular lawyer or

 7    side.  I think this is kind of universal here, so we need to

 8    kind of move a little bit quicker.  Kind of get to the crux of

 9    it a little bit faster.  Otherwise, we're going to be here for

10    another month, and that's not going to happen.

11              So.  All right?  Anything else before we break?

12              MR. BROPHY:  No, Your Honor.

13              MR. O'BEIRNE:  No, Your Honor.

14              THE COURT:  Okay.  Thank you very much.  Have a good

15    evening.

16              COURT SECURITY OFFICER:  All rise.

17              *(4:36 p.m.)*

18                              *   *   *

19

20

21

22

23

24

25

1                          *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5         I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.   I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:   November 6, 2022

12

13   /s/ Angela M. Hailey

14   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
15   262 West Nueva Street
     San Antonio, Texas   78207
16   (210)244-5048

17

18

19

20

21

22

23

24

25