```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
 2                         AUSTIN DIVISION

 3   UMG RECORDINGS, INC., ET AL,    :
     Plaintiffs,                     :
 4                                   : Case Number:
     vs.                             : 1:17-CV-00365-DAE
 5                                   :
     GRANDE COMMUNICATIONS           : Austin, Texas
 6   NETWORKS, LLC, ET AL,           : October 19, 2022
     Defendants.                     :
 7   ********************************************************

 8             TRANSCRIPT OF JURY TRIAL PROCEEDINGS
              BEFORE THE HONORABLE DAVID A. EZRA
 9            SENIOR UNITED STATES DISTRICT JUDGE

10   APPEARANCES:
     FOR THE PLAINTIFFS:
11
     Andrew H. Bart, Esquire
12   Jacob Tracer, Esquire
     Jenner & Block, LLP
13   1155 Avenue of the Americas
     New York, NY  10036
14   (212)891-1600; abart@jenner.com

15   Robert B. Gilmore, Esquire
     Philip J. O'Beirne, Esquire
16   Stein Mitchell Cipollone Beato & Missner LLP
     1100 Connecticut Avenue, NW, Suite 1100
17   Washington, DC  20036
     (202)601-1589; rgilmore@steinmitchell.com
18
     Paige Arnette Amstutz, Esquire
19   Scott, Douglass & McConnico, LLP
     303 Colorado Street, Suite 2400
20   Austin, Texas  78701
     (512)495-6300; pamstutz@scottdoug.com
21

22

23

24

25
```

FOR THE DEFENDANTS:

**Richard L. Brophy, Esquire**
**Zachary C. Howenstine, Esquire**
**Mark A. Thomas, Esquire**
**Margaret R. Szewczyk, Esquire**
Armstrong Teasdale, LLP
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri  63105
(314)621-5070
rbrophy@armstrongteasdale.com
zhowenstine@armstrongteasdale.com
mathomas@atllp.com
mszewczyk@armstrongteasdale.com

COURT REPORTER:
Angela M. Hailey, CSR, CRR, RPR, RMR
Official Court Reporter, U.S.D.C.
262 West Nueva Street
San Antonio, Texas  78207
Phone(210)244-5048
angela_hailey@txwd.uscourts.gov

Proceedings reported by stenotype, transcript produced by
computer-aided transcription.

1                        **I N D E X**

2  **WITNESSES:**                              **PAGE**

3  **BARBARA FREDERIKSEN-CROSS**

4  By Mr. Brophy                               777

5  By Mr. O'Beirne                             781

6

7  **COLIN BLOCH**

8  By Ms. Amstutz                              842,869

9  By Mr. Howenstine                           866

10

11  **MATTHEW MURPHY (videotaped deposition)**

12  By Mr. O'Beirne                            893

13

14  **LAMAR HORTON**

15  By Mr. Bart                                912

16  By Mr. Brophy                              974

17

18  **STEPHANIE CHRISTIANSON (videotaped deposition)**

19  By Mr. O'Beirne                            981

20

21

22

23

24

25

```
 1    (October 19, 2022, 9:06 a.m.)
 2                           *   *   *
 3              COURT SECURITY OFFICER:  All rise.
 4              THE COURT:  Please be seated.
 5              COURTROOM DEPUTY CLERK:  Austin 17-CV-365, UMG
 6    Recording, et. al., versus Grande Communications.
 7              THE COURT:  All right.  And the Court would note the
 8    presence of counsel, ladies and gentlemen of the jury.  Good
 9    morning.  Not taking any chances, huh?  Everybody's got a
10    jacket on this morning or a sweater.  Before we moved to the
11    new courthouse in San Antonio, I had jurors coming in with
12    Parkas it was so bad.  Thank God we don't have that problem
13    anymore.
14              All right.  Counsel, you may continue.
15              MR. BROPHY:  Thank you, Your Honor.
16                   CROSS-EXAMINATION (CONTINUED)
17    BY MR. BROPHY:
18    Q.  Ms. Frederiksen, good morning.
19    A.  Good morning.
20              THE COURT:  Of course, I hate to have to do this, but
21    I'm supposed to every time.  You remain under oath.
22              THE WITNESS:  Yes, of course, sir.
23    BY MR. BROPHY:
24    Q.  I only have two quick items for you.  They both relate to
25    the testing that you performed in this case.  I believe
```

1  yesterday you testified that you plugged into the Internet and

2  shared songs and then recorded information about Rightscorp

3  detecting you sharing those songs; is that right?

4  A.  That's correct.

5  Q.  Who identified the songs that you were going to be sharing?

6  A.  Counsel provided me with a short list of torrent IDs that

7  they had gotten permission from their clients for me to be able

8  to share.

9  Q.  So the plaintiffs identified the songs that you shared,

10  right?

11  A.  Yes.  I needed their permission to conduct that test.

12  Q.  The other thing I'm going to put up --

13      MR. BROPHY:  May I turn on the ELMO again?  Would that

14  be all right?

15  BY MR. BROPHY:

16  Q.  I believe yesterday and perhaps even the day before, you

17  testified about a second rebuttal report that you served in

18  this case; do you recall that?

19  A.  Yes.

20  Q.  And that's the rebuttal report in which you discuss, among

21  others things, the testing that you performed of the Rightscorp

22  system; is that right?

23  A.  I think it was in that report.  I know I discussed it in

24  one of my reports.  I don't remember specifically which one.

25      MR. BROPHY:  Your Honor, do I have permission to

Barbara Frederiksen-Cross  -  Examination      779

1   publish that report to the jury?

2          THE COURT:  Yes.

3          MR. BROPHY:  Thank you.

4   BY MR. BROPHY:

5   Q.  This is one of the attachments to that report.  Do you

6   recognize this?

7   A.  Yes, I believe it was Exhibit D to the report.

8   Q.  I believe that's right.  And what is Exhibit D?

9   A.  Again, this is using Wireshark to filter just for

10  BitTorrent protocol traffic from that test.

11  Q.  And this reports, for example, the handshake that occurred

12  between the Rightscorp computer and some other computer on the

13  Internet, right?

14  A.  Actually, it was between my computer and -- this particular

15  one was between my computer and various other computers on the

16  Internet.

17  Q.  And this data here that begins *"extended bit field Len."*

18  Do you see that?

19  A.  Yes.

20  Q.  What is that?

21  A.  That is a communication from another peer on the Internet,

22  76.95.1.53, and so it shows that a bit field is being exchanged

23  followed very quickly by a series of have piece communications.

24  Q.  And that's the information that indicates that a computer

25  has the song in question or pieces of a song; is that right?

Barbara Frederiksen-Cross  -  Examination     780

1   A.  The bit field and the have messages indicate that, yes.

2   Q.  And you attached this to your report to prove that you --

3   that these communications actually happened, right?

4   A.  Well, this was demonstration of a specific aspect of the

5   communication, yes.

6   Q.  And this is not information that Rightscorp saved in any of

7   its databases; is that right?

8   A.  I --

9   Q.  Let me ask that a different way.

10      For all of the instances in which Rightscorp claimed it

11  went out to another computer and made a connection and received

12  bit field data, that's the same kind of bit field data we're

13  seeing here; is that right?

14  A.  Yes, with the exception that this is kind of a condensed

15  version in the actual communication.  You can also interrogate

16  the bit field that's being passed if you inspect the packets.

17  Q.  And you saved that bit field information to present in your

18  report for your test, right?

19  A.  To illustrate the protocol communications, yes.

20  Q.  But Rightscorp doesn't have any of the equivalent bit field

21  information for all the contacts that it had with various

22  computers, right?

23  A.  That is my understanding, that that information -- we

24  discussed that yesterday -- was not retained.

25  Q.  Mr. Boswell has told you it's not retained, but we saw

Barbara Frederiksen-Cross  -  Examination        781

1  source code indicating it is retained, right?

2  A.  Well, we saw source code indicating that it's put in a

3  table until the point where it's evaluated and another -- I

4  don't know that we looked at the cleave function yesterday, but

5  another function then empties that table so that it can be

6  reused on a daily basis.

7  Q.  And before it's emptied, a copy of the bit field data is

8  saved, right?

9  A.  There was a copy saved in a function that's invoked by that

10  function, yes.

11       MR. BROPHY:  Your Honor, I think that's all I have.

12  Thank you very much for your time.

13       THE COURT:  All right.  Redirect?

14       MR. O'BEIRNE:  Yes, Your Honor.  May I have a moment

15  to get situated?

16       THE COURT:  Of course.

17                 REDIRECT EXAMINATION

18  BY MR. O'BEIRNE:

19  Q.  Good morning, Ms. Frederiksen.  How are you?

20  A.  Good morning.  Just doing fine.

21  Q.  Wanted to go over a couple points that Mr. Brophy discussed

22  with you on cross-examination yesterday, not what was just

23  discussed this morning.

24     Do you recall Mr. Brophy showed you a demonstrative of a

25  user with ten possible songs and only had two songs in the

1   payload?  Do you recall that?

2   A.  Yes, I recall that table.

3   Q.  He asked you some questions about -- he showed you

4   testimony from a different earlier trial discussing whether

5   people could reconfigure the software in BitTorrent to ask for

6   specific songs; do you recall that?

7   A.  Generally, yeah.

8   Q.  In 2015, did all BitTorrent software allow users to change

9   the configuration and only ask for individual songs?

10  A.  Based on my review of BitTorrent software back then, the

11  more sophisticated advanced ones did but, generally, it was a

12  mixed bag, and many did not.

13  Q.  So fair to say many BitTorrent users in 2015 wouldn't have

14  had that as an option in their software?

15  A.  That's my understanding, based on the torrent software that

16  I've reviewed.

17  Q.  And even if it were an option, is it the normal way the

18  software is configured when you download it or would you have

19  to do something to change it in 2015?

20        MR. BROPHY:  Objection, Your Honor.  Outside the scope

21  of her expert reports.

22        THE COURT:  I believe it is.  Sustained.  At least at

23  this point.  It may be relevant later, depending upon what goes

24  on later.

25        MR. O'BEIRNE:  Your Honor, she was directed to answer

1    questions on cross-examination about her awareness of this

2    option in the software and her testimony was elicited based on

3    her familiarity and she was shown her testimony about it.

4             THE COURT:  I don't think that was the --

5             MR. BROPHY:  Your Honor, my only question was the same

6    question she answered in another trial, which is whether the

7    software exists to do that or not, not how often it happens or

8    anything like that.

9             THE COURT:  Yeah, I don't think he opened the door.

10   Go on.  Next question.

11   BY MR. O'BEIRNE:

12   Q.  Ms. Frederiksen, based on your familiarity with BitTorrent

13   software, when you download it and install it on your computer,

14   is it normally set to download the entire torrent file?

15   A.  Yes, it is.

16   Q.  All right.

17   A.  Whatever the total payload is.

18   Q.  So the normal function is download the whole torrent?

19   A.  Once you open a torrent file in your client, it begins

20   downloading the entire torrent and so sharing whatever pieces

21   you've downloaded.

22   Q.  That's the next question I wanted to ask you.  You told the

23   jury during your direct testimony about tests you ran where you

24   went out and started downloading a torrent payload, and even as

25   you were downloading pieces, you were already sharing those

Barbara Frederiksen-Cross  -  Examination      784

1   pieces; do you recall that?

2   A.  That is correct.  That was the behavior that I observed.

3   Q.  Was that the normal functioning of BitTorrent in 2014/2015,

4   that even as a user would be downloading parts of a torrent,

5   that it would be sharing those same parts?

6        MR. BROPHY:  Objection, Your Honor.  Outside the scope

7   of her expert reports.

8        THE COURT:  No, I think that's within.  I'll allow the

9   question.

10       THE WITNESS:  Yeah, that's even spelled out in the

11  BitTorrent protocol, that as soon as you begin getting pieces,

12  you also begin sharing them, and you will continue to do so

13  until you either remove that torrent from the client or shut

14  the client down.

15  BY MR. O'BEIRNE:

16  Q.  So the hypothetical Mr. Brophy showed you where Rightscorp

17  did a handshake with someone that only has 20 percent of the

18  bit fields, fair to say that user would likely be downloading

19  the rest while they're sharing that 20 percent?

20  A.  In a normal situation, if they hadn't selected to download

21  just a single file, that would be true.  You know, if a user

22  had gone in and said, I only want track four, then it would be

23  track four that they would be uploading and downloading.

24  Q.  Apart from that user taking that extra step to only select

25  it, would the normal course be to be downloading the whole

 1  torrent and sharing whatever parts they had so far?

 2  A.  That is correct, yes.

 3        MR. O'BEIRNE:  Do the first slide, please.

 4  BY MR. O'BEIRNE:

 5  Q.  So do you recall Mr. Brophy showing you a demonstrative

 6  like this that was meaning to represent, okay, hypothetically,

 7  there's a user, they only have 20 percent of the payload, and

 8  the 20 percent they have are only songs five and eight?  Do you

 9  recall that?

10  A.  Yeah, looks like a variant of that.

11        MR. O'BEIRNE:  Next slide, please.

12  BY MR. O'BEIRNE:

13  Q.  Is this another way to portray a user, a hypothetical user,

14  that only has 20 percent of the payload?

15  A.  Sure.  The pieces are kind of downloaded randomly and so it

16  would be more likely it would be scattered throughout the

17  chart, but this is equally valid.

18  Q.  Now, in this scenario, the user has pieces of every single

19  song in this payload, right?

20  A.  That's correct, yes.

21        MR. O'BEIRNE:  Next slide, please.

22        MR. BROPHY:  Objection, Your Honor.  I'm sorry.  I

23  didn't notice until earlier, but do you mind if I speak with my

24  counsel for a moment?

25        THE COURT:  Of course.

1          *(Discussion off the record.)*

2          MR. BROPHY:  Thank you.

3          MR. O'BEIRNE:  You can put it back.

4     BY MR. O'BEIRNE:

5     Q.  So you anticipated the next slide.  So you were saying more

6     likely, as you're downloading pieces, the first 20 percent is

7     scattered at random among the payload; is that fair?

8     A.  That's more typical, yes.

9     Q.  Is having random pieces of the whole payload because you're

10    downloading it the most likely explanation for a BitTorrent

11    user having 20 percent of a payload during a handshake in 2015?

12    A.  Can you ask that again?

13    Q.  Sure.

14    A.  I'm not sure I followed you.

15    Q.  Rightscorp does a handshake with a hypothetical peer and

16    they're reporting that they only have 20 percent.  Is the most

17    likely explanation, in 2015, because they're downloading the

18    rest?

19    A.  Yeah, typically, if they have any of it, they're in the

20    process of downloading all of it, so if they report 10 percent

21    or 20 percent or whatever, they're in the process of

22    downloading.  And it typically takes a very short period of

23    time to complete that.

24    Q.  So if Rightscorp did a handshake with this peer who's got

25    this 20 percent, would you agree -- and sent a notice, would

Barbara Frederiksen-Cross  -  Examination       787

```
 1   you agree that the notice is detecting this user downloading?
 2            MR. BROPHY:  Objection, Your Honor, leading.
 3            THE COURT:  Sustained.
 4   BY MR. O'BEIRNE:
 5   Q.  If Rightscorp -- I'm asking --
 6            MR. O'BEIRNE:  Trying to set up a hypothetical, Your
 7   Honor.
 8   BY MR. O'BEIRNE:
 9   Q.  If Rightscorp did a handshake with a peer that had these
10   bit fields of the total, has Rightscorp detected this person
11   downloading this payload?
12   A.  Yes.
13   Q.  Or offering to upload it?
14   A.  Typically both would be true at the same time.
15   Q.  So would you agree that a notice sent stating that this
16   BitTorrent user is downloading or offering to upload this
17   torrent file would be accurate?
18   A.  Yes.
19   Q.  Mr. Brophy presented you with a fictional person who only
20   has the two songs out of the ten; do you recall that?
21   A.  I do, yes.
22   Q.  Did he show you any instance of this hypothetical ever
23   happening to an actual Grande customer who received an actual
24   Rightscorp notice?
25   A.  No, he did not.
```

Barbara Frederiksen-Cross  -  Examination      788

1   Q.  And you were present for Mr. Boswell's testimony, right,

2   ma'am?

3   A.  I was, yes.

4   Q.  You recall Mr. Boswell testifying that over the last

5   decade, Rightscorp has sent more than a billion notices?

6   A.  Yes.

7   Q.  Are you aware of anything suggesting that Mr. Brophy's

8   fictional scenario of just the two songs with the modified

9   software ever occurred in an actual Rightscorp notice sent to

10  an actual BitTorrent user?

11          MR. BROPHY:  Objection, Your Honor.  That

12  mischaracterizes the earlier testimony.  "Modified software."

13  It's not modified.

14          THE COURT:  Well, I think there's no appropriate

15  foundation.  I think you need to ask her that question first,

16  and then, depending upon her answer, follow it up.  So I'm

17  going to sustain the objection.

18          MR. O'BEIRNE:  I'll ask a different question, Judge.

19  BY MR. O'BEIRNE:

20  Q.  You're aware that Mr. Boswell testified that Rightscorp

21  sent a billion notices?

22  A.  That's correct, yes.

23  Q.  Have you seen any instance or any evidence that the example

24  Mr. Brophy showed you of just two songs preselected from a

25  payload ever occurred in connection with any actual notice that

1   Rightscorp sent?

2   A.  No, I have not.

3   Q.  Ms. Frederiksen, you were here for Mr. Boswell's testimony.

4   Do you recall him being shown his prior depositions just like

5   Mr. Brophy showed you his prior depositions?

6   A.  Yes.

7   Q.  And do you recall him being asked some questions about

8   testimony he gave that the 10 percent bit field continued into

9   2015?

10  A.  I recall that, yes.

11  Q.  Do you recall that he said he misspoke at that deposition?

12  A.  I do recall that he said that, yes.

13  Q.  And you were also shown some prior testimony of your own

14  from depositions in 2015 and, in fact, for a trial in 2015; do

15  you recall that, ma'am?

16  A.  That is correct, yes.

17  Q.  I just want to make sure the chronology here is clear.  So,

18  Ms. Frederiksen, you've explained to the jury that you reviewed

19  Rightscorp code in connection with a prior case in which BMG

20  was the plaintiff and Cox and another ISP was the defendant; do

21  you recall that?

22  A.  Yes.

23  Q.  You were the expert for plaintiffs in that case; is that

24  right, ma'am?

25  A.  That is correct.

1   Q.  And you reviewed the Rightscorp code in connection with

2   your expert work in that matter, right?

3   A.  That is correct as well.

4   Q.  And again, Rightscorp was not a party in that case; they

5   were providing evidence?

6   A.  That's correct.

7   Q.  And so when you've talked about looking at Rightscorp code

8   from 2013 and 2014 and 2015, that was all in connection with

9   the prior BMG matter?

10  A.  That is correct.

11  Q.  And did you also review code from 2018 provided by

12  Rightscorp in this matter?

13  A.  At a later point in time, obviously, when it was produced,

14  yes.

15  Q.  Sure.  In connection with this case?

16  A.  Yes.

17  Q.  Now, I believe you were explaining to Mr. Brophy yesterday

18  that you saw a change in the Rightscorp code in October 2015

19  that would eliminate the possibility of sending notices based

20  on 10 percent; do you recall that?

21  A.  Well, what specifically it would eliminate whether the

22  10 percent was in place or not in that time period is because

23  the change in 2015 was looking just at the bit field for a

24  particular song, and each song individually.  Then that record

25  would be evaluated on whether or not the peer had at least

1   10 percent of the song.  But my understanding is that by that

2   point in time, the 10 percent had also been discontinued, but

3   whether it was or whether it wasn't, the code would still be

4   looking at the individual song bit fields.  And so a peer would

5   have to be reporting that it had a part of a particular song at

6   least to be able to be notice eligible.

7   Q.  So I want to take those one at a time.  So you mentioned it

8   was your understanding that the 10 percent experiment had been

9   discontinued by late 2015; is that your testimony?

10  A.  That's my understanding.

11  Q.  Based on what Mr. Boswell said?

12  A.  Yes.

13  Q.  Separate from what Mr. Boswell said, your review of the

14  code in 2015, based on that review, you have concluded the

15  10 percent experiment couldn't have operated after that; is

16  that fair?

17  A.  It's not that it couldn't have operated.  It's that it

18  couldn't have had the effect that defendant's counsel has

19  suggested where a notice would be sent erroneously, because at

20  that point in time, each song was being verified to have some

21  portion of the song.

22  Q.  So it couldn't have mattered for the notices?

23  A.  That's what I'm saying, yes.  Thank you.

24  Q.  And is it your understanding that all this code that you

25  reviewed in 2013, '14, '15, '18 has been provided to Grande in

Barbara Frederiksen-Cross  -  Examination      792

1   this case?

2   A.  Yes, sir.

3   Q.  Ms. Frederiksen, you were asked some questions by

4   Mr. Brophy about an exhibit to your initial report in this case

5   and the code description exhibit that was talking about

6   TestJava.5 and how you described in your exhibit; do you recall

7   that?

8   A.  Yes, I do.

9   Q.  And he showed you this Exhibit E to your report; do you

10  recall that?

11  A.  I recall seeing that exhibit, yes.

12  Q.  Is that the final code description that you prepared in

13  this case?

14  A.  If this was to my earlier report, no, it is not.  There was

15  a later version that was filed with my supplemental.

16  Q.  You prepared an updated code description in connection with

17  your rebuttal report; is that correct, ma'am?

18  A.  Right.  That also described the Pocket and Memphis code

19  that was also present in the repository.

20  Q.  And you recall Mr. Brophy's questions to you were that this

21  summary and this initial exhibit didn't describe the Pocket

22  Memphis update to the code; is that fair?

23  A.  That's correct, yes.

24        MR. O'BEIRNE:  Please pull up PX 535.  Could you zoom

25  in on the writing on the top of that.  Thank you.

Barbara Frederiksen-Cross  -  Examination      793

1   BY MR. O'BEIRNE:

2   Q.  Is this your revised Exhibit D, ma'am, from your rebuttal

3   report?

4   A.  Yes.  It's noted here, this is the revised exhibit that

5   includes the description of the Memphis and Pocket code.

6   Q.  And do you recall that it was in 2018 when you provided

7   this rebuttal report?

8   A.  That's correct, yes.

9   Q.  Including to counsel?

10  A.  That's correct.

11  Q.  Did he show you this updated exhibit to your expert

12  opinion?

13  A.  I do not recall that we looked at the revised exhibit

14  yesterday.

15  Q.  I believe you mentioned during your testimony about this

16  code update, this Pocket Memphis change, you mentioned to

17  Mr. Brophy that you didn't believe it was material or

18  effective, the infringement detection in any way; do you recall

19  that?

20  A.  Yes.

21  Q.  Would you please explain to the jury what update that you

22  saw in the 2018 code that you're referring to when you talk

23  about this Memphis Pocket update.

24  A.  Sure.  In the original Infringement Finder, it was

25  basically a single program with its subprograms that contacted

Barbara Frederiksen-Cross  -  Examination      794

1   the tracker, got that peer list, and then went out to contact

2   the peers.  And in the newer Memphis Pocket code, they

3   basically just broke that in half.  I mean, it involved

4   creating a new table to pass between the two, but they broke

5   that in half so that Memphis was the component that would go

6   out and talk to a tracker and get a list of peers that were

7   running right now, and then the Pocket process would receive

8   the peer list from Memphis that had been collected.

9       And that was because as a result of the earlier trial,

10  Rightscorp's IP address that they used to talk to the tracker

11  had been exposed, if you will, during the court hearings, and

12  so they had to use a separate IP -- a new IP address to do the

13  collection, but they were still running their -- the Pocket

14  portion on their same servers, because those IPs hadn't been

15  released.

16  Q.  Fair to say infringers were hiding from -- attempting to

17  hide from Rightscorp on BitTorrent?

18  A.  I think -- yeah, I think that's fair to say.  Their IP

19  address was now on a blacklist for the tracker, and it wouldn't

20  pass that IP out.

21  Q.  So how did this update try to account for that or continue

22  to conduct handshakes?

23  A.  Well, by using a different IP to go out to talk to the

24  tracker, now they could still get the peer list.  It wasn't

25  blacklisted, and then they could hand that off to the portion

Barbara Frederiksen-Cross  -  Examination       795

1  that actually went out and tried to talk to the peers.

2  Q.  Other than separating those two functions into different

3  parts of the code, was there any change into what Infringement

4  Finder was doing?

5  A.  No material change with how it operated.  There were some

6  better error messages returned if it encountered an error, and

7  some of the code was made a little bit more efficient, as one

8  will when one is changing code.  It's, like, oh, I wish I would

9  have done that, but there was no material change in the

10 approach to how peers were contacted or what evidence was

11 collected or how it was put in the system.

12 Q.  Are you only relying on Mr. Boswell to say that or did you

13 actually examine the code to reach that opinion?

14 A.  I actually examined both the code and then the revision

15 history that exists that shows every single change to the code

16 from the point in time the code was entered in the revision

17 control system in 2016.

18 Q.  Does this update to the code that modifies how they would

19 go about infringement detection affected your opinion in the

20 reliability of the Rightscorp system in any way?

21 A.  No.  Again, the system was still going out, talking to

22 peers on the network, using the same kind of protocol that

23 every peer uses.  It was recording the conversations with those

24 peers based on what they self-reported in terms of what they

25 were offering to share.

1    So in my opinion, this change didn't affect the accuracy of

2  the system at all, with the one proviso that I think that once

3  they went to checking for the specific bits of a specific file,

4  which was introduced at the same time, that that probably

5  improved the reliability of the system even further.

6  Q.  Above what you already believed was a reliable system in

7  the first place?

8  A.  Correct.

9       MR. O'BEIRNE:  You can take that down.  Thanks.

10  BY MR. O'BEIRNE:

11  Q.  You heard some -- well, Mr. Brophy asked you some questions

12  about testimony from the BMG versus Cox matter about Rightscorp

13  sending out notices and batches of a hundred thousand in

14  15-minute increments in 2015; do you recall that?

15       MR. BROPHY:  Objection, Your Honor.  That

16  mischaracterizes the questions and testimony.  He's indicating

17  that those were sent out.  That's not accurate.

18       THE COURT:  The objection is sustained.

19  BY MR. O'BEIRNE:

20  Q.  Do you recall the testimony that you gave in response to

21  questions from Mr. Brophy about notifications being processed

22  through Rightscorp's system in batches of a hundred thousand

23  every 15 minutes?

24  A.  I think that was related to the function that was checking

25  the 10 percent bit field rather than what was sending the

Barbara Frederiksen-Cross  -  Examination      797

1   notices, counsel.

2   Q.  Thank you.  So you anticipated my question.

3       So do you have a sense, sitting here, for the volume of

4   notices that were being sent any given day or time in 2015?

5   A.  My understanding is it was millions per day, but not just

6   to Grande, of course, but to many different ISPs.

7   Q.  In your opinion, what does that reflect that they're

8   detecting?

9   A.  A really substantial amount of traffic on BitTorrent where

10  peers are offering to download and upload content from various

11  rights holders that they were hired to protect.

12  Q.  Would you say the handshakes that Rightscorp is engaging in

13  is a majority of the traffic on BitTorrent?

14  A.  Not at all.  Again, the Rightscorp system can only

15  handshake with a peer from the Rightscorp system.  It can't see

16  what's going on in the swarm as a whole or what's going on

17  between other peers in the swarm, so I would characterize it

18  more as the tip of the iceberg.

19  Q.  You were asked some questions on cross-examination by

20  Mr. Brophy about evidence whether downloads obtained from the

21  Samplit system from an individual peer came from any Grande

22  subscriber; do you recall that?

23  A.  Yes, I recall that questioning.

24  Q.  Have you reviewed -- and I think we covered this, but to be

25  clear, have you reviewed the Rightscorp code that goes back and

Barbara Frederiksen-Cross  -  Examination      798

1  does a handshake with a peer by IP address?

2  A.  Yes.

3  Q.  Is it your opinion Rightscorp can reliably do that?

4  A.  Yes, both in the context of the infringement detection and

5  also in the context of the sampling program.  Both of those are

6  relying on shaking hands with a particular peer.

7  Q.  Let's talk about the sample process where they actually get

8  files from the IP address.

9  A.  Okay.

10  Q.  Is it your expert opinion that Rightscorp can reliably

11  complete a handshake with a known IP address and download a

12  file from that IP address -- from a computer using that IP

13  address?

14  A.  They can reliably handshake with the peer -- or open the

15  connection, handshake with a peer, begin requesting pieces, and

16  download pieces.  Now, obviously, if the peer disconnects or if

17  the peer snubs them because they're not providing pieces, that

18  can be interrupted.  But assuming that there's no interruption,

19  then they will download the entire file.

20  Q.  Fair to say that whatever file they got, they got from a

21  computer using that IP address?

22  A.  Yes.

23  Q.  Mr. Brophy asked you some questions about the hard drive

24  provided from the Rightscorp download database containing the

25  downloads that had been introduced in this case; do you recall

Barbara Frederiksen-Cross  -  Examination     799

1   that?

2   A.  I recall that he asked questions about that, yes.

3   Q.  And I believe you gave testimony that you've reviewed the

4   Rightscorp code, and you believe it is capable of doing an

5   export from its database saying, give me all the downloads in

6   the database from a particular ISP; do you recall that?

7   A.  Yes.

8   Q.  Have you reviewed that part of the code?

9   A.  I have.

10  Q.  And do you believe it is accurate and can perform that

11  function?

12  A.  Yes.  I believe that Dr. Cohen, defendant's expert, had

13  also confirmed that it looked consistent with that operation.

14  Q.  And you were here for Mr. Boswell's testimony, as we've

15  clarified, right?

16  A.  That's correct, yes.

17  Q.  Do you recall Mr. Boswell testifying that he not only

18  exported the files onto the drive, but also the information

19  about those files contained in the downloads database?

20  A.  Yes.

21        MR. O'BEIRNE:  Exhibit 40, please.  Zoom in at the

22  top, the TC number in the subject.  Thank you.

23  BY MR. O'BEIRNE:

24  Q.  I think you testified on your direct when Rightscorp gets a

25  download from a peer that already received a notice, does it

Barbara Frederiksen-Cross  -  Examination        800

1    save it in Rightscorp's system with some information that's

2    connected to that notice?

3    A.  Yeah, this TC number, this long TC followed by a string of

4    numbers, that's a unique identifier for a particular

5    infringement detection.  And when they go back to that peer

6    based on this particular detection in order to download a

7    sample, they record this TC number in association with that

8    sample in the data about when that sample happened and the IP

9    they went to and everything.  So it serves as a link between

10   the notice they sent and a subsequent sample if they sampled

11   from that peer.

12   Q.  So if they got the file from one peer through Samplit, its

13   saved with additional information like the TC number and the IP

14   address, etc.?

15   A.  Right.

16   Q.  Mr. Brophy, do you recall, was suggesting that maybe

17   Mr. Boswell gave us a bunch of downloads from the swarm and not

18   downloads from the individual users?  Do you recall that?

19   A.  I remember he suggested that that could be a possibility.

20   Q.  Do you believe that's a possibility, based on the data that

21   you've seen?

22   A.  No, not based on the extraction code that I have seen.  The

23   extraction code that I understand to have been used to prepare

24   that disk was provided for my examination, and it's clearly

25   extracting from the database and the records that are related

1    to the sampling from a particular peer detection, as opposed to
2    the samples that they used to identify songs.
3    Q.  And in the code in the databases you've reviewed, are the
4    files they're getting from the swarm at the beginning given TC
5    numbers or IP addresses?
6              MR. BROPHY:  Objection, Your Honor.  Outside the scope
7    of her expert reports.  Also outside the scope of direct
8    testimony she gave earlier.
9              MR. O'BEIRNE:  Your Honor, it's in the code.  It's
10   either in the code or it's not, and she was asked questions
11   about how he could differentiate --
12             THE COURT:  Objection is overruled.
13   A.  No.  There is a unique identifier assigned when they
14   download something from the swarm, but the TC identifier is
15   unique to a different process, and that's the notice generation
16   and the sample process.  It's just two different complete
17   references for a file.
18             MR. O'BEIRNE:  Let's take a look at Exhibit 5.  Could
19   you zoom in to that top column heading.
20   BY MR. O'BEIRNE:
21   Q.  Ma'am, do you recognize this to be the summary data that
22   Mr. Boswell testified that he exported along with the downloads
23   from the individual users?
24   A.  Would you mind scrolling slowly to the right so I can see
25   the rest of this?

1          THE COURT:  Can you read it off your monitor?

2          THE WITNESS:  I can.  Thank you.

3          THE COURT:  Sometimes it gets cut off because of the

4    size of the monitor.

5          THE WITNESS:  Yeah, this is a really wide spreadsheet.

6    Yes, I recognize that, counsel.

7          MR. O'BEIRNE:  You can zoom out.

8    BY MR. O'BEIRNE:

9    Q.  So do you recall -- do you recognize that as the data about

10   each download from a Grande customer that's in the Rightscorp

11   database?

12   A.  Yes.  It references in the first column the associated

13   infraction ID -- that's the TC number we were talking about --

14   and then the torrent hash, the file name, the date that it was

15   put into the database from the download, etc.

16   Q.  Are you confident that this data came from the downloads

17   database and not the swarm files database?

18   A.  Yes.  Because of the nature of the data that's in here and

19   because I've examined the code for what's in that database

20   that's associated with the downloads to see where these fields

21   came from.

22   Q.  There's one last exhibit.  There's one last exhibit that I

23   want to show you about this topic about the drive, which is

24   Exhibit 4.

25          MR. O'BEIRNE:  Could you pull up Exhibit 4.  Zoom in

1  on the two columns.

2  BY MR. O'BEIRNE:

3  Q.  Do you recognize this, Ms. Frederiksen, as the summary --

4  the file names of each file on the drive of downloads that

5  we've been talking about?

6  A.  Yes.

7  Q.  And to the left there's a Bates number and then to the

8  right you see "file name"?

9  A.  Right.  This is the cross-reference between the production

10  number, the so-called Bates number -- that's just how a

11  particular anything is labeled in this.  And then on the

12  right-hand side is the name of the file as it exists on the

13  disk.  So you see that it has that TC number as the first part

14  of the file name and then the hash and the actual MP3 name at

15  the end, each separated by underscores.

16  Q.  So based on the information you've seen in the Rightscorp

17  system and the databases, can we be confident that these

18  downloaded files came from computers at Grande IP addresses?

19  A.  I believe so, yes.

20  Q.  One last topic I wanted to ask you about, Ms. Frederiksen,

21  and that was the bit field data.  The bit field data that

22  Rightscorp gets from the handshake.  Not talking about the

23  download handshake.  We're talking about the first handshake

24  that leads to a notice.

25  A.  Okay.

Barbara Frederiksen-Cross  -  Examination       804

1  Q.  You follow?

2  A.  So during the Infringement Finder.

3  Q.  Yes, Infringement Finder.

4  A.  I do.

5  Q.  Thank you.  I'll go about this a different way.  When

6  Infringement Finder engages in a handshake with a peer and

7  receives the hash confirmation in the bit fields, you recall

8  you testified about that?

9  A.  Yes.

10 Q.  And Mr. Brophy talked to you at length about the idea that

11 that bit field information is in a table, and it's not

12 permanently saved.  Do you recall that, whether it was stored

13 or permanently stored?

14 A.  Right.

15 Q.  Did you ever claim anywhere in your report or your

16 testimony that that information was permanently stored?

17 A.  Certainly not that I recall.

18 Q.  And I believe you clarified for the jury your view of the

19 temporary storage being what you were mentioning in your

20 report; is that fair?

21 A.  Yeah, when something is put in a table, it's stored.  You

22 may not keep that table forever, but once it's put in a table,

23 it's written out to disk, it's stored in the system.  If you

24 later clear that table, it doesn't erase the fact that it was

25 stored at least until it was subsequently processed.

Barbara Frederiksen-Cross  -  Examination        805

```
 1   Q.  So I'd like to talk about what BitTorrent -- forgive me.  I
 2   don't want to talk about what BitTorrent -- I want to talk
 3   about what Rightscorp does, the system, with the information
 4   while it's in that table.  You follow me?
 5   A.  Yes.
 6   Q.  Okay.  So there's been a handshake.  Rightscorp has gotten
 7   the bit field information from a peer, right?  What does it do
 8   to analyze that bit field information?
 9   A.  When the information is initially put in the torrent
10   infractions table.  That's where the bit field data is put,
11   along with other information about the interaction with the
12   peer.  There's a what we would call a processing flag or a
13   single byte of data that is set to a one if that bit field
14   indicates full file.  So that's the normal operation, the base
15   code.
16        In one of his depositions, Mr. Boswell testified that, oh,
17   we experimented with this 10 percent bit field, so he raised
18   that issue in a deposition.  And I hadn't seen that code yet,
19   so I asked to be provided with the SQL code as well, because he
20   indicated it was SQL code, not a part of the main program.
21        So I was provided with that code.  I analyzed it, and what
22   that code does is it checks to see if the length of the bit
23   field --
24             THE COURT:  I was paying attention to this.  Who --
25   was it a juror that was coughing?
```

Barbara Frederiksen-Cross  -  Examination      806

1            (Court Security Officer coughing.)

2            THE COURT:  All right.  You don't get any water.  If

3     it was a juror, I was going to get you some water, but he can

4     get up and get his own water.

5     BY MR. O'BEIRNE:

6     Q.  Let's take a step back, Ms. Frederiksen.

7            THE COURT:  Go ahead, counsel.  I'm sorry.  I thought

8     we had a juror choking out up here.  I wanted to make sure he

9     or she was all right.

10           MR. O'BEIRNE:  Everybody okay?

11    BY MR. O'BEIRNE:

12    Q.  So setting aside the 10 percent bit field experiment, I

13    want to talk about how -- I want to ask you about how bit field

14    information that is in that table is translated into other data

15    in the system, so --

16    A.  Okay.

17    Q.  -- when it's looking to make a hundred percent match, the

18    Rightscorp system is, what does it do with the information that

19    it learns from the bit field table?

20    A.  The information that's recorded at the time that bit field

21    is received, you know, includes that date, time stamp we've

22    talked about and the IP address and the port address, and all

23    of the rest of that is all recorded in the same table.  So that

24    information ultimately flows into the process that's used to

25    generate the notices.  And so, for instance, that TC ID that

Barbara Frederiksen-Cross  -  Examination        807

 1  was assigned with a particular interaction with a peer gets

 2  propagated into the subject of the notice, and the peer's IP

 3  address gets put into the notice, and date and time gets put in

 4  the notice, because an ISP has to have an IP address and the

 5  date and time to be able to look it up and see who was assigned

 6  that IP address on that particular date and time.  So if

 7  they're going to forward the notice, they know who to forward

 8  it to.

 9  Q.  Is it your opinion that the information in the bit field

10  data is preserved in other records in the system?

11  A.  It is via its preservation in the notice, essentially,

12  through the qualification of a particular observation that's

13  notice worthy and the full files that's put in the database for

14  that that ultimately feeds into the notices.  Then the notices

15  themselves preserve the data and the record that that bit field

16  was found to be sufficient to make a particular observation

17  notice worthy.

18  Q.  And if there's no bit field match, is there any reason to

19  keep the bit field data?

20  A.  No.  I wouldn't see any particular value in doing so.

21  Actually, it's just a waste of storage.

22  Q.  And the process of matching the bit field data with the

23  known torrents in Rightscorp's system, does that happen

24  automatically?

25  A.  It happens programmatically, and it's an automated system

Barbara Frederiksen-Cross  -  Examination        808

1   that is based on the matching of the torrent hash because the

2   torrent hash has been verified in the ingestion step to contain

3   a work that Rightscorp has been hired to protect.  And then

4   subsequently at the detection of a particular peer is based on

5   a handshake for that same torrent.  And so via that info hash

6   is how the matching actually happens.  And then in later parts

7   of the code, it actually even goes a little bit farther and

8   looks at -- for specific songs that are part of that info hash

9   payload; but the handshake is always on the info hash, and

10  that's what ties the identification of a payload as having

11  protected works in it to the identification that happens when

12  the Infringement Finder shakes hands with a peer.

13  Q.  In your opinion, can the Rightscorp code accurately and

14  reliably translate the bit field information it learns into

15  notices?

16  A.  Yes.

17  Q.  And if it has done so and then there's been a notice

18  generated or not, do you see any reason why that bit field data

19  should be retained or would be valuable?

20  A.  I don't really.  Again, you know, I've studied the code to

21  see how the code works and I think that that information is

22  really reflected via the notices that are sent and the record

23  made of sending those notices.  So I don't think that there's

24  any real merit from the standpoint of the functionality of the

25  system in retaining that bit field information specifically.

1              MR. O'BEIRNE:  May I have a moment, Your Honor?

2         *(Pause.)*

3         That's all I have, Judge.

4              MR. BROPHY:  We don't have anything further, Your

5    Honor.

6              THE COURT:  Okay.  You are temporarily excused.

7    What's happening, ladies and gentlemen -- you may step down,

8    ma'am.

9              THE WITNESS:  Thank you.

10             THE COURT:  -- is that there's some additional

11   evidentiary discovery that's going on, and the witness may

12   indeed be called back later.  I'm not sure, but it's a real

13   possibility, for the limited purpose of testifying about that

14   material.  Okay?  So that's why I said she's temporarily

15   excused.  Okay.

16             MR. HOWENSTINE:  Your Honor, you may recall we have an

17   evidentiary issue that affects the next two witnesses, I

18   believe, that we wanted to take up with Your Honor outside the

19   presence of the jury.

20             THE COURT:  Oh, yeah.  That's right.  Okay.  We're

21   going to have to take an early break this morning so that I can

22   deal with that.  So it will be a little while, so if you want

23   to step outside, you have time to do that.

24             COURT SECURITY OFFICER:  Please rise for the jury.

25             *(9:50 a.m., the jury exits the courtroom.)*

1                                *   *   *

2          THE COURT:  You can be seated.  Give me just a moment.

3   I have to look at this.  I want to refresh myself.

4          MR. HOWENSTINE:  Your Honor, it isn't that motion.  It

5   is a series of exhibits that are all related.

6          THE COURT:  It isn't this motion?

7          MR. HOWENSTINE:  No.  It's going to come up with the

8   next witness and also affects some deposition testimony that

9   the plaintiffs intend to play after that witness, so we thought

10  we could take it up at one time, and then that would streamline

11  everything.

12         THE COURT:  Okay.  So this is the first time I'm

13  hearing about this.

14         MR. HOWENSTINE:  Correct, Your Honor.

15         THE COURT:  What's new?  The same famous song, What's

16  New, from the '40s.

17         MR. HOWENSTINE:  This relates primarily to PX 68, and

18  I can provide a full copy of the exhibit, Your Honor.

19         THE COURT:  No, that's all right.  I've got the

20  monitor, so if I'm looking here, I'm not trying to ignore you.

21         MR. HOWENSTINE:  Right.  These are some excerpts that

22  we took out of PX 68 to give Your Honor a sense of what it's

23  about.  This is an e-mail.  It's an e-mail chain about a notice

24  from a company other than Rightscorp in 2014 in which employees

25  at Grande are discussing this non-Rightscorp notice.  It's

1    about a pornographic film, and one of the employees at Grande

2    was asked some questions about it.  He looked into the

3    settlement system of this particular company, which again is

4    not Rightscorp, and offered his opinions about that.

5            And I think Your Honor has been pretty clear that this

6    case is about Rightscorp and about the Rightscorp notices, so

7    there's no need to bring in this extra issue about this other

8    detection system that is not at issue in this case.  You know,

9    if it was commentary about the notice system at Grande

10   generally, that would be one thing, but this was commentary

11   specifically about this company that the employee looked into,

12   which is not relevant to any issue in this case.  It's not

13   relevant to whether there was direct infringement, whether

14   Grande had knowledge of infringement, whether Grande

15   contributed to infringement of plaintiff's copyrights.  This is

16   just completely a sideshow.

17           And then, Your Honor -- so this is Plaintiff's 68.

18   And then for the record, this also impacts PX 140 and PX 334,

19   which are subsequent e-mail chains that discuss this same

20   subject matter as PX 68.  And so by taking this out of the

21   case, this will simplify the testimony of the next witness,

22   Mr. Bloch, as well as the deposition testimony of Mr. Matt

23   Murphy that plaintiffs intend to play after that.

24           MR. GILMORE:  Robert Gilmore for plaintiffs.  Your

25   Honor, I have the designations as well as the exhibits if you'd

1    like to see the full documents.  May I hand them --

2            THE COURT:  I'm not going to take a recess here to

3    take 30 minutes or 40 minutes or an hour to read all this

4    material that's popped on me at the last minute.

5            MR. GILMORE:  Your Honor, these documents are highly

6    relevant for critical issues in the case.  They demonstrate

7    Grande's contemporaneous views on the infringement notices that

8    the company received, regardless of source.  The documents show

9    that, unlike what they're saying here in court, at the time

10   when they received these kinds of notices, from various

11   different companies, that they were not viewed as mere

12   allegations, mere accusations without evidence, but instead

13   they were credited.  They were accepted as infringement and

14   communicated to customers as such.  Their employees expressed

15   the view -- can you actually pull up that slide.  I'm sorry.

16   Can you pull up the slide that we showed?

17           So this highlight right here shows, *"Believe me, they*

18   *know they downloaded the reference content each time."*

19           And so that reflects that Grande understood when this

20   kind of infringement was happening and they were receiving

21   notices from different detection companies, not just

22   Rightscorp, but others as well, they didn't say, Well, our

23   customers don't know what's happening, our customers are

24   denying it.  Instead the people responsible for investigating

25   these kinds of issues said*, "Believe me, they know that they*

1    *downloaded the reference content each time."*

2           In addition, I think you've already heard and I think

3    that their witnesses are going to try and argue, that because

4    the Rightscorp notices have a settlement demand, that that

5    somehow made them illegitimate, and that impacted the company's

6    views on whether to credit Rightscorp and what to consider them

7    with merit or processing them.

8           And here's an example of a discussion of the same kind

9    of settlement demand system and infringement notice where --

10   and there are other documents in the packet that we sent --

11   where the net-net of it is that these kind of systems seem

12   legitimate and that you should probably pay.  In fact, the

13   witness you're going to hear from told his friend, who is head

14   of a business customer of Grande, that you should probably pay

15   this.  And you should also do other things, like investigate to

16   see whether there's a way to stop what you're doing.  Maybe we

17   can try and have our tech people address it so that the

18   infringement that's happening doesn't continue happening.

19          So that's what Grande was saying at the time.  And the

20   same is true of a number of other documents that Your Honor --

21          THE COURT:  You keep saying Grande was saying.  I

22   don't even know who this guy is.  I mean, what's his position?

23          MR. GILMORE:  So Colin Bloch is the next witness

24   you're going to hear from, is the head of IT.  He is actually

25   the person who first started the system, and you're going to

1    hear testimony from him who said he always thought --

2            THE COURT:  He's the head of IT at Grande?

3            MR. GILMORE:  Yes.  He's the one who developed the

4    system originally for processing the abuse notices, and so

5    we're calling him as our next witness.  And this is one of the

6    documents that we're going to go through with him because it

7    reflects and corroborates the testimony he gave as well.

8            Contemporaneously, this is what they thought about

9    these notices, which is very different than what they're trying

10   to tell the jury now at court.

11           MR. HOWENSTINE:  I'm obligated to correct the record a

12   little bit.  Mr. Bloch is not the head of IT.  He developed an

13   automated system for processing notices in the early 2000s.

14   He's never had any responsibility for Grande's copyright

15   system.

16           MR. GILMORE:  Well, you'll hear the testimony.  I just

17   think that's inaccurate.  And he has very probative testimony

18   on that.

19           So these kinds of documents are probative of

20   knowledge, willful blindness, and the willfulness of the

21   company, in that they knew that they were getting these

22   notifications, they were communicating to customers that these

23   kinds of infringement notifications were legitimate.  They were

24   telling customers that the customers should take actions to

25   stop the infringement, and yet they never terminated customers

 1  from between 2010 and 2017.  That's the critical issue in this

 2  case.

 3          THE COURT:  I have a couple of concerns here.  This is

 4  highly inflammatory.  This case is not about whether Grande

 5  allowed people to download pornography.  This is about music

 6  files.  Your clients are music copyright holders, not

 7  pornography producers.  There are those cases out there, but

 8  this isn't one of them, fortunately.

 9          MR. GILMORE:  We don't have to reference the fact that

10  it deals with pornography.

11          THE COURT:  Well, what does it say?  "E-mail, RE:

12  Pornography Notice," and then if you notice --

13          MR. GILMORE:  No, no.  That's their argumentative

14  characterization.

15          THE COURT:  No, but it gives in there what the name of

16  the file is.  I'm not going to read it out.

17          MR. GILMORE:  We're happy to redact that, the

18  identification of the code.  And from our perspective, the fact

19  that they were treating this -- this is the same kind of

20  peer-to-peer sharing of copyrighted content over the Internet.

21  It's not because it's pornography.  It's because it's copyright

22  infringement.  And this is what they thought about copyright

23  infringement notices.

24          And frankly, if they thought this about companies that

25  were sending notices about pornography, I think it's all the

1    more probative when they had -- as to their views of the

2    legitimacy of notices about music and movies that are

3    not inflammatory in this way.

4              THE COURT:  Well, you know, that argument doesn't fly,

5    because it's far more prejudicial than it is probative.  I'm

6    not going to put before the jury on a music copyright case

7    files that they allegedly allowed their customers to download

8    that says, Teenage girls like, blank, blank, blank.  We're not

9    doing that in this case.

10             MR. GILMORE:  I understand, Your Honor.

11             THE COURT:  It just is so prejudicial.  It's far more

12   prejudicial than it is probative, beyond and out.  It paints

13   the defendants as callous, uncaring individuals that would

14   allow pornography involving teenage girls to be distributed

15   without any concern for the public policy involved and that --

16   you know, I don't know whether that's true or it isn't true,

17   but it isn't the case we have in front of us.  And so we're not

18   doing that.  If this was a music file, that would be different.

19             MR. GILMORE:  Your Honor, so non-Rightscorp notices

20   and their treatment of non-Rightscorp notices, regardless of

21   the content, if they address peer-to-peer file sharing by their

22   customers --

23             THE COURT:  Well, the question is --

24             MR. GILMORE:  -- that shows willful blindness as to

25   the treatment --

1            THE COURT:  Well, well, well, I know all about willful

2   blindness, but the question here is were these -- see, I agree

3   with you to the extent that you are entitled to put in front of

4   the jury evidence which is contemporaneous from individuals

5   that have --

6            Counsel, you're kind of hovering there.  Sit down,

7   relax.  I'll give you plenty of opportunity.  You're like a

8   lion in the bush.

9            MR. HOWENSTINE:  I apologize.

10           THE COURT:  And I feel like the gazelle.

11           MR. GILMORE:  We can redact the content.

12           THE COURT:  No, no.  That's not the point I was

13  making.

14           MR. GILMORE:  I'm sorry.

15           THE COURT:  Okay.  Their position is that they didn't

16  give a lot of credibility to Rightscorp for X, Y and Z reason,

17  right?  This is a totally different provider.

18           MR. GILMORE:  They treated all of the -- they didn't

19  credit any of them.  So we're going to show that they didn't

20  single out people, that they viewed all of these notices

21  similarly and that regardless of what they were telling their

22  customers at the time, which is these systems are legitimate.

23  You should probably pay.  This shows copyright infringement.

24  That's the communications in terms of this kind of e-mail, the

25  letters that they sent.  And they didn't say, Well, this

1    company is bad, you can ignore them.  This company is good.

2         That's not what happened, and so that's why it's

3    probative of their knowledge and their willful blindness.

4         THE COURT:  I am inclined to allow the testimony to

5    come in in a limited way.  I don't want to hear testimony from

6    somebody about, You should probably pay.  Because this is his

7    own personal view, his personal opinion.  And we have no

8    evidence that it represents the position of Grande or its

9    corporate officers.

10        MR. GILMORE:  Well -- no, he's the CEO.  The gentleman

11   who ends up telling the customer, he was the former president

12   of Grande, the highest ranking person at the time at the

13   company.  We're playing his depo designations.

14        THE COURT:  You told me the guy putting out this

15   notice was the -- what is he?  Is he CEO?  And he's also head

16   of IT?

17        MR. GILMORE:  Your Honor, if you'll look at the

18   documents --

19        THE COURT:  Jack-of-all-trades?

20        MR. GILMORE:  There are two people involved.  It's a

21   communication that made --

22        THE COURT:  Well, I thought --

23        MR. GILMORE:  -- that was generated by Colin Bloch and

24   sent all the way up to Mr. Murphy, who we're going to play

25   depositions from him.  And he was this president of the

1    company.  And based on the information that he --

2          THE COURT:  What did he say, what did the president

3    allegedly say?

4          MR. GILMORE:  Sure.  It is -- if you look at, I think,

5    Exhibit 334, which is in the packet I sent.

6          THE COURT:  I don't know.  You mean the one you gave

7    me?

8          MR. GILMORE:  Yeah, it's in the packet that I just

9    handed up.  Mr. Murphy is discussing with his friend, who is

10   the head of one of their business customers.  So Mr. Murphy

11   says, *"Okay, here is the skinny on the IT situation.  While we*

12   *haven't seen too many cases that are actually asking for a*

13   *settlement, this doesn't seem too out of the ordinary.  They're*

14   *basically scare tactics to get some payments, but -- you could*

15   *waste time having to fight something.  My advice would be to*

16   *check out what the amount they're looking for and make a*

17   *decision.  It's small, may be worth your time."*

18         THE COURT:  That sounds like -- it sounds like what

19   happens every day in court where parties get sued and the cost

20   to pursue the litigation is 50 times what they could settle

21   for, and they frequently settle in order to avoid -- just a

22   minute.

23         MR. GILMORE:  Of course.

24         THE COURT:  They frequently settle to avoid the cost

25   of litigation as long as they meet certain requirements.  We've

 1    all been involved in that as lawyers.

 2         MR. GILMORE:  That may well be the argument, but he

 3    passes on-- in this document 334 -- he passes on to his

 4    customer, the president of Grande passes on to his customer the

 5    highlighted big block, advising him on things like, *"Better*

 6    *yet, find a more secure source to download copyrighted*

 7    *materials and don't show up on their radar again."*

 8         So this is something where he's not saying, You don't

 9    need to worry about this notice, it's completely fake.  These

10    companies can't detect infringement and we advise our customers

11    to ignore it.

12         It's the opposite.  And now they're trying to say that

13    we had no idea.  We don't know if this is actually happening,

14    and so it was appropriate for us not to act and to let our

15    customers continue to engage in copyright infringement.  It

16    just contradicts directly their litigation issue.

17         We're happy to redact the facts -- the name of the

18    company -- the name of the media, the content.  That's fine.

19    We're not trying to inflame the jury about pornography.  That's

20    not what this case is about.  But when they are talking about

21    their contemporaneous views of copyright infringement and what

22    they're telling their customers about that, it's probative of

23    all the critical issues in this case.

24         MR. HOWENSTINE:  Your Honor, may I be heard briefly?

25         THE COURT:  Of course.

1           MR. HOWENSTINE:  As I was saying initially, Your

2    Honor, this is an e-mail chain specifically about this other

3    monitoring company, Ceg Tek.  Mr. Bloch looked --

4           THE COURT:  Well, it may be, but it's also true that

5    it involves alleged copyright infringement.  It involves

6    apparently a high-ranking officer at Grande.  It is relevant

7    for the issue of knowledge.  That's what it's relevant for.

8           MR. HOWENSTINE:  Your Honor, I would say that the

9    knowledge issue is whether we had knowledge of the

10   infringements at issue in this case based on the Rightscorp

11   detection system, not this system.  And early in the case when

12   it seemed like the plaintiffs were going to try to --

13          THE COURT:  This is really no different than Cox in a

14   sense, although Cox did involve Rightscorp.  In the sense that

15   it goes to whether your client was aware that their service --

16   this involves Grande -- that their service was being used

17   generally by individuals who were, in fact, allegedly violating

18   copyright law.  It doesn't have to necessarily mean that you

19   have to have all of the same parties.

20          Let me give you an example.  It's like a personal

21   injury case where you have, let's say, an entity that has an

22   obligation to protect the safety of its customers and that

23   entity has been made aware that a certain -- let's say they

24   were robbed at one point and some customer was injured, and

25   they were made aware of that.  And then later on they get

1    robbed again and a second customer is injured.  And then later

2    on they get robbed yet a third time, they don't have any

3    security guards, they don't have any cameras, nothing to

4    protect their customers, by a third person.

5         The fact that the other two robberies might have

6    occurred by -- at the behest of totally different individuals

7    doesn't impact the question of whether they were knowledgeable

8    of the fact that they were susceptible to being robbed and they

9    weren't taking any precautions.

10        MR. HOWENSTINE:  Your Honor, two things in response to

11   that.  Number one, this is the specific issue that came up with

12   Cox on appeal that led to the reversal, which was --

13        THE COURT:  Well, the Cox issue had to do with whether

14   the Court gave an appropriate instruction, and the Court gave

15   an inappropriate instruction.

16        MR. HOWENSTINE:  Right.

17        THE COURT:  Instead of instructing on willful

18   blindness, which we've talked about the whole time, and which

19   I'm well aware of is the appropriate instruction, that court

20   instructed on another standard, not willful blindness.  That

21   was what got that case reversed.

22        MR. HOWENSTINE:  Correct.  And the Court also

23   erroneously gave an instruction that allowed the jury to find

24   knowledge based on a general knowledge that some kind of

25   infringement was happening.  And what the Fourth Circuit said

1    was it needed to be focused on the specific instances of

2    infringement at issue in that case.  And this is the opposite

3    of that.  This is taking it far afield from Rightscorp, which

4    is what makes this problematic.  And then the --

5              THE COURT:  No, I agree that they have to be made

6    aware of the specific instances in this case, and there will be

7    an appropriate instruction to that effect.  But when we talk

8    about willful blindness, they have to be willfully blind as to

9    those instances, but if other instances are happening and they

10   ignore them and they're substantially the same, then I think

11   that's relevant.

12             MR. HOWENSTINE:  Well, these are not substantially the

13   same, Your Honor.  This is a different monitoring system.  This

14   is outside the damages period in this case.  And also, early in

15   discovery, when it seemed that the plaintiffs were going to try

16   to bring in evidence about other monitoring companies and other

17   notices, we sought discovery on this, and Judge Austin said,

18   no, that's not relevant, this case is about Rightscorp and

19   Rightscorp notices.  We're not going to allow you to take

20   discovery about what other monitoring companies do.

21             THE COURT:  I might have been aware of that at some

22   point, but I did not recall that.

23             MR. HOWENSTINE:  So this is something that we've never

24   had an opportunity to investigate or respond to and now it's

25   going to be offered as if its evidence that we knew about the

JURY TRIAL PROCEEDINGS                          824

1  infringement of the plaintiff's copyrights when it's a

2  different monitoring system, a different type of content, and

3  it's outside the damages period.

4           MR. GILMORE:  Can I respond to that?

5           MR. BROPHY:  May I make one additional comment,

6  please, just quickly?  We spent the last two or three days

7  talking about the Rightscorp system and how it operates, and

8  the focus of this case is the Rightscorp system and how it

9  operates, among other things.  The knowledge at issue in this

10 case relates to the Rightscorp system and the notices they sent

11 to us.  This is a total red herring.  We weren't allowed to

12 discover how the Ceg Tek system works.  We weren't allowed to

13 take discovery from them in any way, shape or form, because

14 they stopped us from doing it, and now they want to bring in

15 e-mails from that other company that we were prevented from

16 taking discovery of and use it against us, and that's massively

17 prejudicial.

18          MR. GILMORE:  Your Honor, counsel fought tooth and

19 nail, and you allowed him to show a document and to examine

20 Mr. Boswell about another detection company, so for him to get

21 up and say, it's outrageous that we're talking about other

22 detection companies -- and we're not trying to get into the

23 technical details.  That's the trial within the trial.  This is

24 relevant for willful blindness, as Your Honor just observed,

25 because if they are telling their customers that when we're

1    getting these notices, it's infringement.  You should act on

2    it.  And yet they do nothing, and they choose to ignore the

3    Rightscorp notices that they were getting, that shows that they

4    were willfully blind to the knowledge of infringement that

5    Rightscorp was sending them, the specific instances, and we're

6    proving the specific instances of the infringement that we're

7    sawing on through the Rightscorp notices.  But for the willful

8    blindness element, this is directly probative.

9                THE COURT:  I don't think --

10               MR. BART:  May I get equal time?  Just -- I'm sorry.

11   But one extra point --

12               THE COURT:  I feel like I'm a referee in a

13   professional wrestling match, and we've got a tag-team going

14   here.

15               MR. BART:  This is going to be very, very short.  The

16   willful blindness point is separate from specific knowledge.

17   As Mr. Gilmore said, we're proving specific knowledge, and Your

18   Honor will instruct it.  The willful blindness point is they

19   terminated no one.  Okay?  It's not that they didn't terminate

20   Rightscorp -- people who were receiving Rightscorp notices.

21   They didn't terminate this person.  There's going to be ample

22   testimony that from 2010 to 2017 they terminated no one.  So

23   the willful blindness point is company-wide, all notices, it

24   doesn't matter --

25               THE COURT:  I don't think the defendants -- maybe they

1    do, maybe I am missing something, but I don't think the

2    defendants contest that they received notices.  Do you?

3              MR. HOWENSTINE:  No.  And we --

4              MR. BART:  Not, but it's not -- we're not contesting

5    that, but the point is the willful blindness is the contrast

6    between the receipt of notices and the failure to act and to

7    look the other way with regard to all of them, not just the

8    Rightscorp notices, every notice they received for a seven-year

9    period.  And here's an example that it's willful, because they

10   know it, and they're telling their customer --

11             THE COURT:  Well, I don't have a problem with you

12   asking whoever it is that's going to testify on your behalf

13   whether they ever acted on any of the notices which they

14   received, period.  End of story.  But I'm hesitant to allow us

15   to get any -- you know, I really have not had a chance to

16   thoroughly research this or look at it carefully like I like to

17   do because, you know, this is the kind of motion in limine that

18   I would have liked to have seen a month ago, not five minutes

19   ago.  And I am faced with a Hobson's Choice here, because I

20   either rule off the cuff without getting a chance to carefully

21   review the law, or I take a massive break and go -- when we're

22   so desperate to move this case forward.

23             And neither, really, is a particularly delightful

24   choice, as far as I'm concerned.  You know, I'm not afraid to

25   make a ruling from the bench, obviously, as you know.  I've

1    made them all day.  I've made them since we started this trial.

2    I don't take recesses to research issues which I should have

3    some knowledge of, but this is entirely different.  It involves

4    some law that, quite frankly, I haven't had a chance to

5    carefully research.

6         MR. BART:  And in all candor, we haven't even heard

7    this before this morning.  I mean, we have exchanged objections

8    with the other side.  We met and conferred and they were

9    willing to meet and confer on broad categories, but not

10   individual exhibits.  We have tried to present issues when we

11   perceive them coming, as we did this weekend, but we have no

12   choice.  This isn't our application to keep out the evidence,

13   and it's not a motion in limine.

14        THE COURT:  All right.  My view is this -- and I have

15   to take the chance because I have no other choice.  I am going

16   to permit the plaintiff to query their witness on the issue of

17   whether they received copyright infringement notices, from what

18   period of time they received them, and what kind of copyright

19   infringement notices they received, and did they ever act on

20   them, but I am not going to allow the plaintiff to get into the

21   specifics of any particular copyright infringement notice that

22   doesn't involve Rightscorp, because that is a bridge too far,

23   as far as I am concerned, given my knowledge of where we are.

24        Now, this is not, in my view, prejudicial to the

25   plaintiff.  What you want to show and what you will be able to

 1  put before the jury I'm allowing you the opportunity to extract

 2  the testimony regarding the Cox case, to a point, over the

 3  objection of the defendants, because that does involve

 4  Rightscorp, and it does go directly to the issue of their

 5  willful blindness, if any.

 6          But this involving a totally different company, we

 7  don't know how they operate.  Maybe this guy does.  I don't

 8  know.  But the crux of what you want to get in front of the

 9  jury is that they received numbers of notices over whatever

10  relevant period of time they were, and that allegedly they did

11  nothing about it.  And if he can testify to that, he testifies

12  to it.

13          What you then want to do is you want to go, well, and

14  here's an example.  But the problem is that the example doesn't

15  involve the company which is in hot contest in this case.  What

16  the jury has to figure out here, one of the critical points --

17  and it's the crux of the defense -- is that the defendants

18  didn't believe Rightscorp's notices were valid, that they had

19  any merit.  Am I wrong?

20          MR. BROPHY:  Your Honor, our position is the

21  Rightscorp system doesn't work.

22          THE COURT:  Okay.  That's to say you're saying the

23  same thing as I just said.  Wait, wait, wait.  I know what

24  you're going to say.

25          MR. BART:  You don't, but --

1            THE COURT:  Sorry.  Okay.  I don't.  I probably don't.

2    I have to concede that.  I am certainly not a seer, that's for

3    sure.  Boy, do I wish I was.  I'd never get reversed, even

4    though I have a low reversal rate, I do get banged once in a

5    while.

6            MR. BART:  Your Honor, just briefly.  The problem is

7    that this is a motion in limine by ambush, and we haven't had a

8    chance to brief it.  And I think Your Honor, with all due

9    respect, is doing what you have to do to make a judgment, but I

10   think, with all due respect, it's wrong, because what's

11   happening here is that the willful blindness -- everything that

12   counsel has said about Rightscorp, we will demonstrate today

13   was never said by anybody at Rightscorp at any time before this

14   case was filed, okay -- by Grande.  So everything now is an

15   after-the-fact excuse.  We're going to show --

16           THE COURT:  Well, they said they -- and I haven't had

17   a chance to go back and look at the file, but they said that

18   they attempted to get discovery on this very provider, and they

19   were precluded from doing so.

20           MR. GILMORE:  Well, no, Your Honor, that's not --

21           MR. BART:  Let's put the discovery to the side for

22   just one moment --

23           THE COURT:  How am I supposed -- now, I want to ask

24   you a question here.  How am I supposed to -- when I get

25   lawyers that I think are highly ethical and good lawyers on

1    both sides whom I have -- I've learned over this last week and

2    a half to have a great deal of respect for, tell me two

3    opposite things?  What am I supposed to do?

4                MR. BART:  Well, I think that in this --

5                THE COURT:  Call retired Judge Austin?

6                MR. BART:  What we're trying to do here is to show

7    that during a time, that they terminated nobody.  No person

8    accused of copyright infringement was terminated.  That's

9    conceded fact, Your Honor.  I think Mr. Brophy at one point

10   said they were willing to stipulate to that fact, so we have a

11   period where there was nothing -- nobody was being terminated

12   for any reason for copyright infringement.

13               THE COURT:  I don't know that the jury has heard that

14   as evidence, but they will.

15               MR. BART:  They will, they will and they will today.

16   Okay?  And they will also hear that they didn't investigate

17   Rightscorp --

18               THE COURT:  I'm not going to change my ruling.

19               MR. BART:  Okay.

20               THE COURT:  But let's let your examination go forward,

21   all right?  And you ask the questions you think are appropriate

22   that get to -- without getting into teenagers do whatever.  I

23   mean, this smells like child pornography to me.

24               MR. BART:  Well, frankly -- yeah, but that's why this

25   was a motion in limine by ambush, because we walk in here, we

1    think we're arguing about another monitoring system.  There's

2    an exhibit put on the board which has been carefully thought

3    out about how it's going to be presented to have the most

4    impact on you, Your Honor, and it did have that impact.  We

5    would never have had an objection, and we don't have an

6    objection, to redacting out that information.  As Mr. Gilmore

7    said, that's not what this is about.

8          What this is about is showing that Grande, at the

9    highest level, understood that these were, in fact, all valid

10   notices across the board and not terminating anybody.

11         THE COURT:  No, no, no.  I don't think that's what --

12   quite frankly, the suggestion in what was read from that notice

13   doesn't amount to -- as far as I am concerned just listening to

14   it, I'm not the jury, okay?

15         MR. BART:  Right.

16         THE COURT:  But it didn't say these are valid notices.

17   Basically, what he said was, you know, this is such a small

18   amount of money, you know.  I don't know what's happening here,

19   but let's go ahead.  I would advise you to go ahead and pay it,

20   because it's not worth fighting, basically.

21         MR. BART:  The problem is that it's -- and this is

22   unfair, Your Honor, I apologize.  But it's more than just the

23   communication from the president to his customer.  It's the

24   communication from -- internally at Grande that led to that

25   communication to -- and it's all part of the same exhibit.

1    It's that yellow block out there, which says what Grande --

2            THE COURT:  You need to read it again.

3            MR. GILMORE:  *"They know they downloaded the reference*

4    *content each time and find a more secure source to download*

5    *copyright materials."*

6            THE COURT:  Can I read it, please?

7            *(Pause.)*

8            See, I don't know -- is Colin Bloch, the fellow that's

9    going to testify?

10           MR. BART:  Yes.

11           THE COURT:  Yeah, I don't know the context of this,

12   that's the problem.  Obviously, something went before it and

13   something happened afterward.

14           MR. HOWENSTINE:  Essentially the notice comes in, the

15   customer asks about it, someone decides to ask Colin, just

16   because he's a guy who knows about stuff.  He does some

17   Googling.  He looks into this company Ceg Tek, that sent the

18   notice, which is why he has the link in this e-mail, and he

19   fires off his opinion.  It's one isolated conversation about a

20   company other than Rightscorp -- again, this is outside the

21   damages period -- based on some Googling that Colin Bloch did.

22   This doesn't have any bearing on the Rightscorp system.  This

23   doesn't have any bearing on whether we had knowledge of the

24   infringements at issue in this case.  Frankly, it doesn't have

25   any bearing on anything.

1           And Your Honor, I think every time the plaintiffs want

2     to get into evidence that is not relevant, they bring up the

3     concept of willful blindness.  But here willful blindness is

4     about willful blindness to the instances of infringement at

5     issue in this case.  So again, this has nothing to do with

6     that.  This has to do with Ceg Tek and whether there was this

7     notice about the sharing of a pornographic film.  It has

8     nothing to do with any of the issues in this case.

9           MR. GILMORE:  May I respond to that last point, Your

10    Honor?

11          THE COURT:  I'm sure you will.  Go ahead.

12          MR. GILMORE:  If a company treats all of the notice

13    it's getting regardless of sender, the same, that they

14    willfully blind themselves through their practices, through

15    their inaction, all the while knowing that, in fact, what is

16    happening, that is reflected in these notices, is actually

17    happening, and they have contemporaneous statements to that

18    effect, that's probative of willful blindness.  It doesn't

19    matter that a specific e-mail is talking about one company or

20    another.  When the practice, which is what the evidence is

21    going to show, regardless of source, they got all these notices

22    in, millions of notices from lots of different companies, and

23    they never terminated any customer about it.  That's the

24    willful blindness evidence that we're going to -- that this is

25    probative of.  It doesn't matter that this specific instance

1    isn't referring to Rightscorp.

2          THE COURT:  I told you that you are entitled to

3    examine the witness about whatever general practices they had

4    at Grande with respect to their treatment of copyright

5    infringement notices sent to them.  I told you you could do

6    that, okay.  And it seems to me if you do that, you can ask

7    them, and you will, you know, whether they received these

8    notices on a regular basis, how many they received, to their

9    knowledge, and whether they ever did anything about any of

10   them.

11         MR. GILMORE:  Their witnesses have said -- and I think

12   you heard this from counsel.

13         THE COURT:  Their?  Whose witnesses?

14         MR. GILMORE:  Grande's witness.

15         THE COURT:  This is your witness, but he worked for

16   Grande, so whose witness is he?

17         MR. GILMORE:  It's a Grande employee.  We're calling

18   him adversely in our case-in-chief.

19         THE COURT:  All right.  He's still there?

20         MR. GILMORE:  He's still there, current employee.

21         THE COURT:  All right.

22         MR. GILMORE:  Has been there for many, many years, so

23   he's not friendly to our side.  He's a hostile witness.

24         We're going to elicit testimony, because we've taken

25   his deposition, I've taken the deposition of many Grande

1   witnesses, where they've said these are alleged notifications,

2   alleged instances.  We don't know.  We don't have any basis to

3   think that they're true or not.  We're stuck in the middle.

4   That was what counsel had said.

5           THE COURT:  Just a minute.  Were they, when they were

6   testifying, talking about all the notices or just the notices

7   generated by Rightscorp?

8           MR. GILMORE:  Both.  They didn't -- we asked questions

9   about both.  Notices in general.  When you get copyright

10  infringement, they will always try and say that it's -- no,

11  it's just allegations.

12          And so we should be entitled to show while they're

13  saying that now, at the time when they got copyright notices,

14  they weren't simply saying they're allegations.  They were

15  saying the customers know they downloaded the referenced

16  content, that the customers should find a secure way to --

17          THE COURT:  I don't know, but it seems to me like this

18  fellow is talking about Rightscorp -- I mean, this other

19  company and not yours.  You know what we're going to have to do

20  here?  I am going to have to take his testimony outside the

21  presence of the jury on this issue.  I have no idea what he's

22  thinking or what he's talking about.  I don't know any other

23  way.  Because maybe he's talking generally here when he says

24  "these companies," in which case, I will allow it.  If he's

25  talking about this particular company, it's irrelevant.

1            MR. HOWENSTINE:  Your Honor, based on the context of

2    the e-mail, this e-mail makes very clear that he's just talking

3    about Ceg Tek.

4            THE COURT:  Well, it doesn't make it -- if it made it

5    that clear, I wouldn't have an issue.

6            MR. BROPHY:  Your Honor, to try to avoid this issue, I

7    think it's worth pointing out, the e-mail says that the

8    customer knows.  The issue in this case is whether we know.

9    And they're trying to use this document to prove that we knew,

10   but that's not even remotely what is said here.

11           What is said here is the person knows, if they pay.

12   That's not us knowing.  And they're trying to do a switch where

13   suddenly this e-mail means we knew.  But that's not even what

14   the e-mail says.  And so I don't think it's necessary for us to

15   go through the trouble of having his testimony outside the jury

16   when the document doesn't say anything about our knowledge of

17   whether these things are true or not.  The statement is the

18   people who get the notice know.  And that's obvious.  If they

19   get the notice and they're the one that actually did it and

20   they pay, they know they did it.  The issue in this case is

21   whether a separate company, Grande, knew and its employees

22   knew.  This e-mail doesn't bear on that issue one iota.

23           MR. GILMORE:  It originates from a notice identifying

24   that this happened, so Grande knows because they get the notice

25   in the first place.  And what does their customer say -- I

 1   mean, what does the employee say, Mr. Bloch?  He doesn't say

 2   this doesn't happen, that this is unsubstantiated.  He says the

 3   employee -- the customer knows that they downloaded, and now

 4   Grande knows.  He's not saying that the notice is bogus, that

 5   it doesn't reflect what's actually happening.

 6            THE COURT:  See, what we have is we have two people,

 7   two lawyers here, each telling me what the person who wrote the

 8   e-mail meant.  And you have diametrically opposed views of it.

 9   Isn't the witness themselves the correct person to tell me

10   that?  It would seem?  I mean, I don't know why I'm getting so

11   much pushback here.

12            MR. GILMORE:  So we have Murphy, Mr. Murphy, by depo

13   designations and then we have Mr. Bloch live.  We're calling

14   him live.

15            THE COURT:  You're calling him live, aren't you?

16            MR. GILMORE:  We are calling Mr. Bloch live.

17            THE COURT:  Well, this is Mr. Bloch.

18            MR. GILMORE:  This e-mail is about Mr. Bloch.

19            THE COURT:  Right.

20            MR. GILMORE:  But it's also Mr. Murphy, who is the

21   president, he's not coming live.  So we're playing him by depo

22   designations.

23            THE COURT:  Well, maybe or maybe not.

24            MR. BART:  The reason that he mentioned that is that

25   it might be easier for you to look at the Murphy designation

1  and see if that gives you any additional context as opposed to

2  taking testimony, which I don't think either side wants,

3  outside the presence of the jury.  I'm not suggesting that as a

4  final answer, but if you feel you need context, I think it's

5  simpler to look at that designated deposition testimony than to

6  actually swear in the witness and take testimony --

7         THE COURT:  Well, on the one hand, obviously, I don't

8  want to bring before the jury a witness's statement about a

9  system that is not at issue in this case, and then have the

10 jury left with the impression that that testimony has to do

11 with the system that is at issue in this case.

12        MR. GILMORE:  That would be made clear.  We're

13 obviously going to make clear with Mr. Bloch that this specific

14 document isn't talking about Rightscorp.  We're not trying to

15 do that.

16        THE COURT:  Yeah, but the issue is confusion of the

17 jury.  That's the issue.  It's confusion of the jury.  That's

18 the issue.  On the other hand, I don't want to prevent the

19 plaintiff from putting in appropriate evidence of knowledge, so

20 as I said, I am -- I'm trying to find a way around this to do

21 the right thing.

22        MR. GILMORE:  We have the depo designations for

23 Mr. Murphy printed out.  That's in the packet I gave you.

24        THE COURT:  How long do you think it's going to take

25 me to get through all of that and then do legal research and

 1   then come back and make a ruling?  Should I recess the trial

 2   for the rest of the day?

 3          MR. GILMORE:  I don't think either side wants that.

 4          THE COURT:  Well, you know, when you pop this stuff on

 5   me at the last minute, what am I supposed to do?

 6          MR. GILMORE:  They should have filled an MIL on this,

 7   Your Honor.  These are exhibits from testimony from depos from

 8   years ago.

 9          THE COURT:  Well, they claim that you fought them

10   tooth and nail to keep them from researching or taking

11   discovery on these very issues.

12          MR. GILMORE:  Not at all.  I'm not sure what counsel

13   was referring to.  Ceg Tek, they didn't ever try and subpoena

14   Ceg Tek or take depositions or subpoenas of Ceg Tek.  I think

15   the company they're talking about is MarkMonitor, and that's

16   the document that doesn't have to do with Rightscorp that Your

17   Honor allowed them to show and cross-examine our witness with,

18   about a whole different company, the very details about that

19   technology.

20          This is -- we're not getting into the details about

21   some other company.  We're simply saying when you got these

22   kinds of notices from these companies, what did you think?

23   What were you doing?  What were you telling your customers?

24          THE COURT:  Seems to me like you simply ask them those

25   questions.  You don't need these documents.

1          MR. GILMORE:  Well, but if he denies or says something
2   that's inconsistent with these documents --
3          THE COURT:  Well, maybe you can impeach him at that
4   point.  I don't know.  That's what I was going to say, and that
5   is my ruling.  All right?
6          MR. HOWENSTINE:  Thank you, Your Honor.
7          MR. GILMORE:  Understood, Your Honor.
8          MR. BROPHY:  Thank you, Your Honor.
9          THE COURT:  I mean, I've got to make a ruling.  That's
10  it.  I feel like I've got Judge Pence hitting me in the back of
11  the head saying, *Make a ruling, damn it.*  You don't know who
12  Judge Pence is, but that's okay.  He was my mentor, 50 years on
13  the federal bench, and he gave me two matters of sage advice.
14  One of them was, when you get into a difficult situation in a
15  trial, you have to sometimes fish or cut bait.  You got to make
16  a decision, the best decision you can make under the
17  circumstances and hope that you're right, given your background
18  and your knowledge and your understanding.
19          And the second one was always use the bathroom before
20  you go on the bench.  And I think he was right on both.
21          MR. GILMORE:  Your Honor, my colleague, Ms. Amstutz,
22  is going to be conducting the adverse direct examination.  May
23  we have ten minutes so she can adjust her -- prepare for her
24  examination to adjust for Your Honor's ruling?
25          THE COURT:  Yes.

```
 1          MR. GILMORE:  Thank you.
 2          THE COURT:  So he's the next witness, Mr. Bloch?
 3          MR. GILMORE:  Yes.
 4          THE COURT:  So don't put that darn thing up there.
 5   Just ask him the questions and we'll see where we go.  All
 6   right?  We'll see how he testifies.  And then I will hear a
 7   motion or request out of the presence of the jury as to whether
 8   you are entitled to get into this information on impeachment.
 9   Okay?
10          MR. GILMORE:  Understood.
11          COURT SECURITY OFFICER:  All rise.
12          (10:40 a.m.)
13                          *   *   *
14          (10:58 a.m.)
15          COURT SECURITY OFFICER:  All rise.
16          (The jury enters the courtroom.)
17                          *   *   *
18          THE COURT:  Okay.  The Court would note the presence
19   of the ladies and gentlemen of the jury.  Let's just say we had
20   a spirited discussion and we have resolved it.
21          So counsel, would you like to call your next witness.
22          MS. AMSTUTZ:  Yes, Your Honor.  Paige Amstutz, with
23   Scott Douglass & McConnico here in Austin, Texas, and we call
24   Colin Bloch.
25          THE COURT:  And you represent?
```

JURY TRIAL PROCEEDINGS                    842

```
 1              MS. AMSTUTZ:  The plaintiffs.
 2              THE COURT:  Just so the jury knows who the players are
 3    here.
 4              Mr. Bloch, would you come forward, please.  Just go
 5    over here and remain standing, if you will, and raise your
 6    right hand.
 7              THE WITNESS:  Yes, sir.
 8              COURTROOM DEPUTY CLERK:  You do solemnly swear that
 9    the testimony you're about to give in this case now before the
10    Court will be the truth, the whole truth and nothing but the
11    truth, so help you God?
12              THE WITNESS:  Yes, I do.
13                             *   *   *
14              (COLIN BLOCH, Witness, Sworn.)
15                             *   *   *
16              COURTROOM DEPUTY CLERK:  Have a seat.
17              THE COURT:  You may proceed, counsel.
18              MS. AMSTUTZ:  Thank you, Your Honor.
19                             EXAMINATION
20    BY MS. AMSTUTZ:
21    Q.  Good morning, Mr. Bloch.
22    A.  Hello.
23    Q.  Can you please introduce yourself to the judge and the
24    jury?
25    A.  My name is Colin Bloch, and --
```

1   Q.  Mr. Bloch, you began working at Grande Communications --

2              THE COURT:  Just a second, counsel.

3              Mr. Bloch, can you -- because your last name can be

4   spelled many different ways, can you spell it for the court

5   reporter.

6              THE WITNESS:  Absolutely.  B-L-O-C-H, as in hotel.

7              THE COURT:  Thank you.

8   BY MS. AMSTUTZ:

9   Q.  Mr. Bloch, you began working at Grande Communications in

10  September of 2000; is that correct?

11  A.  Yes.

12  Q.  And around 2003, you took the position of manager of

13  Internet systems for the company; is that right?

14  A.  That was pretty close to that time, yes.

15  Q.  And you had that position for at least 15 years, through

16  2018; is that fair?

17  A.  Yes.

18  Q.  And in that position as manager of Internet systems, your

19  responsibilities included managing the systems that provide the

20  experience for Grande's retail Internet, telephone, and cable

21  TV customers; is that a fair summary?

22  A.  Yes.

23  Q.  And going back to when you joined Grande in September of

24  2000, Grande already had in place a process to address any kind

25  of illicit activity on Grande's network; isn't that correct?

Colin Bloch - Examination                     844

```
 1    A.  The very first part of that, can you give me that again?

 2    Q.  Sure.  I'm just trying to set the timeframe.

 3    A.  Yeah, that's why I wanted to hear the date again.

 4    Q.  Sure.  When you joined in September of 2000, Grande already

 5    had a process in place to deal with, generally, illicit

 6    activity on Grande's network; isn't that right?

 7    A.  No.

 8    Q.  That's incorrect?

 9    A.  They did not yet, no.

10    Q.  Okay.  Mr. Bloch, do you recall giving a deposition in this

11    case?

12    A.  I do, yes.

13    Q.  And it was in June of 2018?

14    A.  Yes.

15    Q.  And it was here in Austin, I believe, in my offices at

16    Scott Douglass & McConnico; do you recall that?

17    A.  Yes.

18    Q.  And you were under oath?

19    A.  Yes.

20    Q.  To testify truthfully at that deposition?

21    A.  Yes.

22    Q.  And there was a court reporter there taking down your

23    questions and answers; do you recall that?

24    A.  Yes, I do.

25         MS. AMSTUTZ:  Your Honor, may I approach?
```

1          THE COURT:  You may.

2          Can you speak more -- pull the mike a little bit

3  closer and speak a little bit --

4          THE WITNESS:  Sure.

5          THE COURT:  That's good.

6          THE WITNESS:  Does that sound all right?

7          THE COURT:  Yes.  I have to remember that myself at

8  times.

9          MS. AMSTUTZ:  And Your Honor, let the record reflect

10  that I've handed a copy of Mr. Bloch's June 20th, 2018

11  deposition transcript to opposing counsel and the witness.

12  Would Your Honor like a copy?

13          THE COURT:  What is it that you've got there?

14          MS. AMSTUTZ:  His deposition transcript.

15          THE COURT:  Yes, if you have one.  Okay.  Thank you.

16          MS. AMSTUTZ:  And Your Honor, one last question.

17  Permission to -- when I discuss the deposition testimony with

18  Mr. Bloch, do we have permission to publish the written

19  transcript excerpt so the jury can follow along to assist them

20  while I'm putting that evidence into the record?

21          THE COURT:  Well, it depends.  Are you planning on

22  getting into the materials we discussed over the --

23          MS. AMSTUTZ:  No, Your Honor.  It would just be

24  literally the transcript excerpts as we're reading them into

25  the record for impeachment purposes, but only as

1   demonstratives.

2          MR. HOWENSTINE:  If it has been determined to be

3   proper impeachment, we wouldn't necessarily have an objection,

4   but that hasn't been determined yet.

5          THE COURT:  Yeah, I think that's where we are.  That's

6   the rule anyway.

7          MR. HOWENSTINE:  Sorry.  Do you have a page and line?

8          MS. AMSTUTZ:  Yes.  38, two through seven.

9   BY MS. AMSTUTZ:

10  Q.  So page 38, Mr. Bloch, starting on line two.

11  A.  Okay.

12          MR. HOWENSTINE:  Objection, Your Honor.  Nothing in

13  this is inconsistent with anything Mr. Bloch said.

14          THE COURT:  You can't impeach him yet.

15          MS. AMSTUTZ:  Let me ask a couple of follow-up

16  questions.

17  BY MS. AMSTUTZ:

18  Q.  Mr. Bloch, you're familiar with the process at Grande

19  called the abuse process; is that right?

20  A.  I am.

21  Q.  And you've used that term yourself to describe that

22  process, right?

23  A.  I did.

24  Q.  And that's a process within Grande to deal with illicit

25  activity within Grande's network, correct?

Colin Bloch – Examination                      847

1   A.   It is.

2   Q.   And you were responsible for the abuse process for at least

3   a couple of years; is that fair?

4   A.   Yes.   I was responsible for the technical aspect of taking

5   the complaints in and then filing them in some manner that

6   other people could handle them, yes.

7   Q.   And you were responsible for the technical aspects of the

8   abuse process for at least a couple of years, correct?

9   A.   That is correct, yeah.

10  Q.   And that would have been relatively early on in your career

11  at Grande, in the early to mid-2000s?

12  A.   Yes.

13  Q.   And at some point that abuse process came to include

14  copyright infringement; isn't that correct?

15  A.   It did.

16  Q.   And including copyright infringement in the abuse process

17  also happened relatively early in your career, in the early to

18  mid-2000s, correct?

19  A.   Probably the mid-2000s, yeah.

20  Q.   And Grande became aware of that activity when it began

21  receiving notices from third-party companies telling Grande

22  that its subscribers were engaged in copyright infringement,

23  true?

24  A.   Yes.

25  Q.   And around that same time that Grande began receiving these

Colin Bloch - Examination                    848

1   notices, they also -- they, being Grande, also noted

2   fluctuations in bandwidth usage; do you recall that?

3   A.   I do recall that.

4   Q.   And when I say fluctuations in bandwidth usage, I mean

5   increased usage, right?

6   A.   Right.   That is what I said, yeah.

7   Q.   Okay.   Not decreased usage, correct?

8   A.   No.

9   Q.   That is correct?

10  A.   Yes, that is correct.

11  Q.   And you concluded that the increased usage of the bandwidth

12  and the notices of infringement were potentially related to one

13  another, correct?

14  A.   Potentially, yes.

15          MR. HOWENSTINE:  Objection.  Foundation.

16          THE COURT:  Overruled.

17  BY MS. AMSTUTZ:

18  Q.   Your answer was, potentially, correct?

19  A.   Potentially, yes.

20  Q.   So in other words, when you saw a significant uptick in the

21  bandwidth, you knew that that would be consistent with

22  uploading or downloading content; is that fair?

23  A.   Yes, that's fair.

24  Q.   And you insisted, insisted on developing technical

25  solutions to deal with those notices about Grande subscribers,

Colin Bloch - Examination                    849

1   correct?

2   A.   Yeah.  Well, all abuse complaints of any kind.

3   Q.   And abuse -- all complaints of abuse of any kind included

4   complaints of copyright infringement, correct?

5   A.   Yes.  That was definitely a part of it as well.

6   Q.   And you didn't ask, you didn't request, you didn't suggest.

7   You insisted on developing technical solutions to deal with

8   those notices, right?

9   A.   Yes.

10  Q.   And that's because you believed that having Grande

11  subscribers engage in copyright infringement was disparaging to

12  Grande's reputation, right?

13  A.   If we could -- if we knew that that was happening or we

14  could prove it, yes, that would be disparaging.  And yes.

15  Q.   Is your answer yes?

16  A.   Yes.

17  Q.   And you believed that Grande subscribers engaging in

18  copyright infringement was a drain on Grande's technical

19  resources; isn't that correct?

20  A.   We thought that it potentially could be.  We did not know

21  that.

22  Q.   Potentially?

23  A.   Yes.

24  Q.   That's your testimony?

25  A.   Yes.

1  Q.  Mr. Bloch, if you'll go to the deposition transcript in

2  front of you, I'm at page 40, lines 6 through 11.

3          MR. HOWENSTINE:  Objection.  Improper impeachment.

4  There's nothing inconsistent with what the witness has said.

5          MS. AMSTUTZ:  It is inconsistent.  I asked him the

6  exact question, and he gave a different answer.

7          THE COURT:  The objection is overruled.  I'm not

8  saying that it's inconsistent.  That will be for the jury to

9  decide, but I think it's close enough, so the jury has the

10  right to hear it.

11  BY MS. AMSTUTZ:

12  Q.  I will direct the Court's attention to page 40 of the

13  deposition transcript, line six.

14      *"Question:  Tell me why you insisted on it.*

15      *"Answer:  Well, that kind of activity was a drain on our*

16  *technical resources and it was also disparaging to our*

17  *reputation."*

18      You didn't testify that it was potentially back in 2018,

19  right?

20  A.  I did not say that at that time, no.  I imagine I was

21  equally nervous then, as I am now, but I think that's a

22  semantic difference.

23          MS. AMSTUTZ:  Your Honor, motion to strike everything

24  after*, I did not testify to that then.*

25          THE COURT:  Sustained.  The jury will disregard.

 1  BY MS. AMSTUTZ:
 2  Q.  And would you agree, Mr. Bloch, that you insisted on that
 3  because, frankly, it was important, right?
 4  A.  It was important, yes.
 5  Q.  And as a result, you and others at Grande began developing
 6  a process for processing these notices you were receiving,
 7  right?
 8  A.  Yes, we did.
 9  Q.  And was that around 2005; is that a fair timeframe,
10  mid-2000s?
11  A.  I'd say that's pretty close.
12  Q.  And as part of that process, you wrote a program to extract
13  certain information from the notices that Grande was receiving;
14  do you recall that?
15  A.  I do, yes.
16  Q.  And from those notices, based on the program that you
17  developed, Grande was able to extract the IP address of the
18  Grande subscriber who was the subject of that notice; is that
19  right?
20  A.  No.  The notices contained the IP address already, and they
21  were supplied to us in the notifications.  I guess maybe we're
22  saying the same thing, but the program would simply take those
23  fields out and insert them into a database.
24  Q.  Right.  I think we are saying the same thing --
25  A.  Okay.

Colin Bloch - Examination                    852

1   Q.  -- because these notices, you'll recall, had an XML
2   attachment, right?
3   A.  Yes.
4   Q.  And they had standardized fields, correct?
5   A.  They did.
6   Q.  And one of those fields was IP address, correct?
7   A.  Right.
8   Q.  And this program that you developed, it could extract the
9   IP address of the Grande subscriber who was the subject of that
10  notice, right?
11  A.  Yes.
12  Q.  And this program that you developed could also extract from
13  the notice the time and the date; is that right?
14  A.  Yes.
15  Q.  And this program that you developed could also extract the
16  name of the infringing content, correct?
17  A.  It was -- there was usually a file name included, yes.
18  Q.  And your program that you developed could take that out of
19  a notice, right?
20  A.  Right.
21  Q.  And once Grande was able to extract the IP address and the
22  time and the date and the name of the infringing content,
23  that's about all it needed to process the notice and forward it
24  to a subscriber; isn't that correct?
25  A.  That's correct, yes.

Colin Bloch - Examination                853

1   Q.  And except in a very, very tiny amount of cases, Grande was

2   able to match up its subscriber to that notice using that

3   process; is that correct?

4   A.  Yeah.  There was a small number of cases where we could not

5   identify a customer.

6   Q.  A minuscule number of cases?

7   A.  A minuscule amount of cases in -- from the subset of the

8   notifications that were legitimate, because we did get

9   illegitimate notifications as well.

10  Q.  Well, that's not my question.  My question is, except in a

11  minuscule number of cases, you were able to match up the name

12  of the subscriber with the notice based on the information

13  extracted from the program you developed, correct?

14  A.  Yes, that is correct.  Again, with the caveat that it be a

15  legitimate notification.

16  Q.  But your program that you developed didn't determine

17  whether it was legitimate notification or not, did it?

18  A.  Well, we can't know.  We have no way of knowing whether

19  it's legitimate and we're taking these submissions from the

20  Internet from people claiming things, and we have to take them

21  at face value and try to do what we can with them, you know.

22  Q.  Well, taking it at face value, if you're able to extract

23  the IP address, the time and date and the name of infringing

24  content, that was enough for Grande to match it up to a

25  subscriber almost every time, correct?

1   A.  We could say -- we could match it up to a subscriber, but

2   we had no way of knowing that what was in that document was

3   truly being accessed by that subscriber.

4           MS. AMSTUTZ:  Motion to strike everything past *"we

5   could match it up with the subscriber."*

6           THE COURT:  Sustained.  You're going to have to just

7   answer the direct question, if you would, please.

8           THE WITNESS:  I'm sorry.  Okay.

9   BY MS. AMSTUTZ:

10  Q.  And Grande did, indeed, forward some of the notices it

11  received from these third-party companies on to its subscribers

12  based on the process and the program that you developed,

13  correct?

14  A.  That was my understanding.  I don't know what happened

15  after that.  That wasn't my job.

16  Q.  Well, in the early 2000s, you were aware that Grande was

17  forwarding some of the notices to its subscribers based on the

18  process that you developed.  You knew that?

19  A.  I knew that -- sorry, let me phrase this carefully.  That

20  was definitely how I designed the system, so that the notices

21  would be forwarded on.  Let's just say I don't know when and

22  what years we did and how -- you know, since I was not in the

23  enforcement department.  I'm a system administrator.

24  Q.  And my question is a little bit more general.  In the early

25  to mid-2000s, that's when you testified you worked on this

Colin Bloch - Examination                    855

```
 1  process, right?
 2  A.   Uh-huh.
 3  Q.   Is that a yes?
 4  A.   Yes.  I'm sorry.
 5  Q.   You were aware that, based on the program that you
 6  developed, that some, maybe not all, but some of those notices
 7  were being forwarded on to subscribers, correct?
 8  A.   Yes.
 9  Q.   And when Grande actually processed and forwarded notices to
10  its customers, that meant that Grande approved that third-party
11  company beforehand; isn't that right?
12  A.   Yes.
13  Q.   And in the early 2000s when you were involved in that
14  process, Grande's abuse process was also specifically designed
15  to apply punitive measures to subscribers based on these
16  notices, correct?
17  A.   No.
18  Q.   No.  That's your testimony?
19  A.   The process was --
20  Q.   Is your testimony "No"?
21  A.   May I explain?
22           THE COURT:  If she asks the next question or your
23  counsel will have an opportunity --
24           THE WITNESS:  Okay.  Then, no.
25           THE COURT:  -- to ask you anything that needs to be
```

1  explained.

2  BY MS. AMSTUTZ:

3  Q.  Well, let's talk about the various steps that Grande went

4  through under this abuse process back when you were involved in

5  it back in the early to mid-2000s, okay?

6  A.  Uh-huh.

7  Q.  Is that a yes?

8  A.  Yes.

9  Q.  And at that time when Grande received a notice from a

10 third-party detection company, the process generated an e-mail

11 to the customer, right?

12 A.  The process opened a ticket in a database.  It did not

13 automatically generate an e-mail to a customer.

14 Q.  So the first ticket was -- I mean, the first step was to

15 open a ticket in the database.  That's your testimony?

16 A.  Yes.

17 Q.  And then was an e-mail generated to the customer?

18 A.  That was out of my realm at that time, so I do not know,

19 but if you're telling me they were, they were.

20 Q.  Well, let's go to your deposition testimony at line --

21 sorry, page 28, starting on line 18 through line 25.

22        MS. AMSTUTZ:  Okay.  I'll point or direct the Court to

23 line 18, on page 28 of this deposition.

24 BY MS. AMSTUTZ:

25 Q.  *"Question:  Now --"*

1          MR. HOWENSTINE:  I'm sorry.  Lines -- what are the

2    full lines?

3          MS. AMSTUTZ:  I'm sorry.  Page 28, lines 18 through

4    25.

5          MR. HOWENSTINE:  That's not the full answer.

6    BY MS. AMSTUTZ:

7    Q.  Let me ask it this way.  At that time when Grande received

8    a notice from a third-party detection company, the process was

9    first an e-mail is generated to the customer; second, at some

10   point, a paper copy started going to the physical address of

11   the subscriber; and third, subsequent infringements led to

12   account termination; is that correct?

13   A.  Yes.

14   Q.  And you, Mr. Bloch, advocated for a policy to apply

15   punitive measures to anybody who did any kind of infringement

16   on the Grande network; isn't that correct?

17   A.  It is what I stated, although it was poorly worded.  I

18   advocated for a process to do this.  Again, I'm not on the

19   enforcement side of the house, but I definitely needed a

20   process that could make it possible for other people to go

21   ahead and, yes, apply punitive measures.

22   Q.  Okay.  This is really a yes-or-no question.  Did you

23   advocate for a policy to apply punitive measures to anybody who

24   did any kind of infringement on Grande's network?

25          MR. HOWENSTINE:  Objection.  Asked and answered.

Colin Bloch - Examination                858

1            MS. AMSTUTZ:  Your Honor, I don't believe it was.
2            THE COURT:  The objection is overruled.
3  A.  Yes.
4  Q.  And that's because you thought that after receiving
5  multiple notices, Grande should terminate customers, correct?
6  A.  Yes.
7  Q.  And if Grande had decided that it no longer was going to
8  take any punitive measures for subscribers that were using the
9  service to infringe, that's something that you would disagree
10  with, correct?
11  A.  I would disagree with it, yes.
12  Q.  And isn't it true that no one informed you at any point in
13  time before this lawsuit was filed that Grande had decided to
14  no longer terminate customers, no matter how many notices they
15  had received; isn't that true?
16  A.  That's true.
17  Q.  And do you now know that that decision was made around 2009
18  or 2010?
19            MR. HOWENSTINE:  Objection.  Foundation.
20            THE WITNESS:  I did not know that.
21            THE COURT:  Then I don't think we need to worry about
22  the objection.
23  BY MS. AMSTUTZ:
24  Q.  Well, let me ask this.  In 2009, you were still the manager
25  of Internet systems, correct?

1   A.   Yes.

2   Q.   And you developed the process that had been working in the

3   early 2000s, right?

4   A.   That is correct.

5   Q.   But you had no input into any change of policy in 2009 or

6   2010; isn't that correct?

7   A.   Correct.

8   Q.   You weren't even kept in the loop, right?

9   A.   No, no, I wasn't -- that's not part of my job, no.

10  Q.   You weren't kept in the loop; is that correct?

11  A.   That is correct.

12  Q.   In fact, it sounds like you were affirmatively kept out of

13  the loop; is that fair?

14  A.   No.

15  Q.   No?

16  A.   No.

17  Q.   You didn't know anything about it, though, did you?

18  A.   No.  But it's a -- you know, it's a big company.

19  Q.   I want to take you to 2014, okay.  At times, your

20  colleagues at Grande would direct questions to you about these

21  notices that were being received from third parties; do you

22  recall that?

23  A.   Yes.

24  Q.   And do you recall back in 2014 the president of the company

25  was Matt Murphy; do you remember that?

Colin Bloch - Examination                    860

1   A.  Yes.

2   Q.  Did you know Mr. Murphy?

3   A.  A little, yes.

4   Q.  Back in 2014, were you familiar with a Grande employee

5   named Robert Creel?

6   A.  Yes.

7   Q.  What was Mr. Creel's position?

8   A.  I believe he was a manager over a call center.

9   Q.  And back in 2014, were you familiar with another Grande

10  colleague named Lamar Horton?

11  A.  Yes.

12  Q.  And what was Mr. Horton's position back then?

13  A.  I believe director of network operations.

14  Q.  And Mr. Horton is in the courtroom with us today?

15  A.  He is.

16  Q.  And back in 2014, I believe you just testified that at

17  times your colleagues would bring questions to you about these

18  notices that Grande was receiving.  Did I hear that correctly?

19  A.  Yes.

20  Q.  And at times those questions came from Mr. Murphy, the

21  president of the company; do you recall that?

22  A.  Yes.

23  Q.  And at times those questions came from Mr. Creel in the

24  call center; do you recall that?

25  A.  Yes.

1   Q.  And back in 2014, do you ever recall in response to

2   questions from Mr. Murphy or Mr. Creel telling them that,

3   *"Believe me, they know they downloaded the referenced content*

4   *each time"?*

5   A.  I do remember that.

6   Q.  And you recall making that statement, and the "me" in that

7   was Colin Bloch, correct?

8   A.  Yeah, what I was describing was --

9          MS. AMSTUTZ:  Your Honor, everything after, *"Yeah,"*

10  please strike.

11         THE COURT:  You will have -- your attorney will have

12  plenty of opportunity.  I know it's very difficult not to go on

13  and explain what you're saying, but the way we do it here is

14  that it's questions and answers.

15         THE WITNESS:  All right.

16         THE COURT:  So let her ask the question.  You just

17  answer that question.  Your lawyer is taking good notes.  He

18  will get up and give you plenty of opportunity to explain any

19  answer that you feel you need to explain.  Okay?

20         THE WITNESS:  All right.

21  BY MS. AMSTUTZ:

22  Q.  So in 2014, in response to questions from Mr. Murphy or

23  from Mr. Creel, you recall telling them that you knew -- or I'm

24  sorry, that the Grande subscribers knew they had downloaded the

25  referenced content each time in response to questions about

1    these notices, correct?

2    A.  Yes.

3    Q.  And sometimes these notices that Grande received included

4    offers to resolve the claim of infringement for a settlement

5    payment; do you recall that?

6    A.  Yes.

7    Q.  And do you recall back in 2014 getting questions from

8    either Mr. Murphy or Mr. Creel about whether you thought those

9    settlement payment systems were valid or legit?

10   A.  Yes.

11   Q.  And do you recall in response to those questions back in

12   2014 telling them that the settlement system is legit in the

13   sense that people can, indeed, respond and pay up?

14   A.  I do remember that.

15   Q.  Do you recall that?

16   A.  Yes.

17   Q.  Now, having been at Grande for now over 22 years -- you're

18   still there, right?

19   A.  Yes.

20   Q.  -- you know that Grande does not allow its customers to

21   steal Grande property, correct?

22   A.  Yes.

23   Q.  And when I -- if I use the phrase "intellectual property,"

24   do you know what I'm talking about?

25   A.  I do.

Colin Bloch - Examination                    863

```
 1    Q.  I'm talking about a business's confidential proprietary
 2    information?
 3    A.  Yes.
 4    Q.  And you know that Grande has its own intellectual property,
 5    correct?
 6              MR. HOWENSTINE:  Objection.  Relevance.
 7              MS. AMSTUTZ:  Your Honor, this goes to Grande's
 8    knowledge about intellectual property rights and protecting
 9    those rights.
10              THE COURT:  You can ask him about intellectual
11    property rights, yes.  The objection is overruled to that
12    extent.
13    BY MS. AMSTUTZ:
14    Q.  So you know that Grande has its own intellectual property,
15    correct?
16    A.  Yes.
17    Q.  And that kind of intellectual property is important to
18    Grande, right?
19    A.  Yes.
20    Q.  And Grande spent time and money to develop its intellectual
21    property, didn't it?
22              MR. HOWENSTINE:  Objection.  Relevance, foundation.
23              MS. AMSTUTZ:  Your Honor, it goes to willfulness.  And
24    even better, I only have, like, three questions left.
25              THE COURT:  Willfulness.  And you only have three
```

1   questions left.

2          MR. HOWENSTINE:  Your Honor, I don't think "I only

3   have three questions left" is a valid reason for an

4   objectionable question.

5          MS. AMSTUTZ:  Your Honor, it goes to knowledge of

6   intellectual property rights --

7          THE COURT:  You can ask him those questions, but don't

8   stray away from that.

9   BY MS. AMSTUTZ:

10  Q.  Grande doesn't allow its employees or customers to steal

11  its intellectual property, correct?

12  A.  No.

13  Q.  That's correct?

14  A.  Yes, that's correct, yes.

15  Q.  Going back to the time period that we just discussed, in

16  2014, when you were responding to questions from the president

17  of the company about notices -- are you with me time-wise?

18  A.  Yes.

19  Q.  At that point in time in 2014, you still thought that after

20  receiving multiple notices, Grande should terminate customers,

21  didn't you?

22  A.  Yes.

23  Q.  And you thought that in 2018, when you gave your deposition

24  testimony in this case, correct?

25  A.  Yes.

1   Q.  And Mr. Bloch, isn't it true that as you sit here today in

2   October of 2022, you still believe that after receiving

3   multiple notices, Grande should terminate customers; isn't that

4   right?

5   A.  I've softened on it a little bit, but yes.

6   Q.  Have you softened on it because you're now sitting in a

7   courtroom in front of a judge and a jury and a copyright

8   infringement case?

9   A.  No.  I softened on it because COVID changed the necessity

10  of the Internet in a fundamental way and -- sorry.  Am I

11  allowed to explain?

12          THE COURT:  I think she asked you why.  So, yes, you

13  can explain.  Go ahead with your answer.

14          MS. AMSTUTZ:  I'm not sure I asked --

15          THE COURT:  I thought you did.

16          MS. AMSTUTZ:  I'm not sure I asked why he softened,

17  but let me ask another question.

18  BY MS. AMSTUTZ:

19  Q.  As of 2018, you were very clear that you thought that if

20  Grande's customers received multiple notices, they should be

21  terminated, correct?

22  A.  Yes.

23          MS. AMSTUTZ:  Your Honor, I will pass the witness.  I

24  have no further questions at this time.

25          THE COURT:  Okay.

```
 1              MR. HOWENSTINE:  Mr. Bloch, just a couple things, and
 2    you will be done.
 3              THE WITNESS:  Great.
 4                              EXAMINATION
 5    BY MR. HOWENSTINE:
 6    Q.  First thing, you were asked a few questions about the
 7    termination of subscribers in the early 2000s; do you recall
 8    that?
 9    A.  Yes.
10    Q.  Now, when -- at that time, if you know, were those
11    terminations of subscribers permanent or temporary?
12    A.  I don't -- I don't know whether they were permanent or
13    temporary.
14    Q.  Do you know anything about what happened when Grande would
15    turn off a customer's Internet service at that point in time?
16    A.  I believe the customer would call in.
17    Q.  And what would happen next?
18    A.  They would make a case for their innocence and -- look, I
19    wasn't part of this process, but that's --
20              MS. AMSTUTZ:  Objection.  Lacks personal knowledge and
21    foundation, Your Honor.
22              MR. HOWENSTINE:  He's explaining what he knows, Your
23    Honor.
24              MS. AMSTUTZ:  I think --
25              THE COURT:  I don't want him guessing.  If he doesn't
```

1   know, he can testify only as to what he personally knows.

2   BY MR. HOWENSTINE:

3   Q.  Mr. Bloch, do you know if Grande was permanently

4   terminating subscribers in the early 2000s?

5   A.  I do not know.

6   Q.  You were also asked some questions about an exchange you

7   had with Mr. Murphy at Grande; do you recall that?

8   A.  The exchange was actually between me and Mr. Creel.

9   Q.  And Mr. Murphy was part of the discussion separately?

10  A.  He initiated the conversation with Mr. Creel.

11  Q.  And I believe Ms. Amstutz asked you a question about your

12  comment that when people receive a notice -- it was your

13  opinion -- *"Believe me, they know they downloaded the reference*

14  *content"*; do you recall that?

15  A.  I recall that, yes.

16  Q.  And you wanted to explain what you meant by that.  Please

17  explain what you meant by that.

18  A.  I did.  It was in reference to a link that was provided in

19  the e-mail that gave somebody the opportunity to pay a

20  settlement fee for alleged content that they had downloaded.

21  And I said if somebody paid in that circumstance, then there

22  was very likely that they knew that they did it or they just

23  got scared.

24  Q.  And was this a single discussion that you were a part of or

25  was this something that happened multiple times?

1  A.  Oh, this was just a single discussion, if I recall.

2  Q.  Have you ever been responsible at Grande for deciding how

3  Grande would respond to copyright infringement complaints?

4  A.  No.

5  Q.  Have you ever been responsible for determining what

6  Grande's policy would be as to how it would respond to

7  copyright infringement complaints?

8  A.  No.

9  Q.  Have you ever even been involved in any of that

10  decision-making?

11  A.  No.

12  Q.  You were also asked some questions about observed

13  fluctuations in bandwidth in the early 2000s; do you recall

14  that?

15  A.  I do.

16  Q.  Would a fluctuation in someone's use of bandwidth allow

17  Grande to determine whether or not they were actually using

18  BitTorrent?

19  A.  No.

20  Q.  Now, you're familiar with, in general, the notion of Grande

21  receiving copyright infringement complaints, correct?

22  A.  Yes.

23  Q.  To your knowledge, is there any way for Grande to know if

24  those complaints are true?

25  A.  No.

 1           MR. HOWENSTINE:  I have no further questions.

 2           THE COURT:  Any redirect?

 3           MS. AMSTUTZ:  Yes, Your Honor.  Paige Amstutz for the

 4    plaintiffs.  I'm going to make the request to show the document

 5    that we discussed to the witness, but not publish it to the

 6    jury, for impeachment purposes.

 7           THE COURT:  Okay.  You can show it to him.

 8           MS. AMSTUTZ:  Your Honor, may I approach?

 9           THE COURT:  Yes.

10           THE WITNESS:  Thank you.

11           MS. AMSTUTZ:  Counsel, I'm referring to Plaintiff's

12    Exhibit 68.

13                            EXAMINATION

14    BY MS. AMSTUTZ:

15    Q.  Mr. Bloch, I've handed you a copy of Plaintiff's Exhibit 68

16    which is not yet in evidence.  However, I want to direct you to

17    the e-mail exchange between you and Robert Creel at the bottom

18    of page one, dated March 29th of 2014.  Do you see that e-mail?

19    A.  Yes, I do.

20    Q.  And it's dated 1:03 p.m. on that date?

21    A.  Yes.

22    Q.  I'm sorry.  I misspoke.  The e-mail from you to Mr. Creel

23    is dated 12:57 p.m. on March 29th of 2014, correct?

24    A.  Yes.

25           MR. HOWENSTINE:  Your Honor, this isn't impeachment.

1  This is asking about a document that's not in evidence.

2           THE COURT:  Well, I don't know what it is because she

3  hasn't asked the question yet.

4           MR. HOWENSTINE:  Well, she's asking him about details

5  of the document, Your Honor.

6           THE COURT:  Well, just a date and time.  There's no

7  substance yet on any question.

8           MS. AMSTUTZ:  Well -- and, your Honor, when I get to

9  the substance, it's going to show that what he said in 2014 to

10  Mr. Creel and Mr. Murphy is materially different from what he

11  testified just now.

12          THE COURT:  Okay.  Well, we'll see.  So why don't you

13  ask him the question.

14  BY MS. AMSTUTZ:

15  Q.  On March 29th of 2014, you wrote to Mr. Creel, *"The*

16  *settlement system is legit in the sense that people can,*

17  *indeed, respond and pay up."*

18      Did I read that correctly?

19  A.  You did.

20  Q.  It doesn't say -- and you go on to say, *"and believe me,*

21  *they know they downloaded the referenced content each time,"*

22  correct?

23          THE COURT:  He already testified to that.

24          MR. HOWENSTINE:  Asked and answered.  This was already

25  addressed.

1          MS. AMSTUTZ:  Your Honor, just let me ask one more
2    question.
3    BY MS. AMSTUTZ:
4    Q.  What the e-mail does not say is that, *Believe me, they*
5    *downloaded the referenced content each time they pay.*  It
6    doesn't say that, does it?
7    A.  The word "pay up" precedes that, if you read that sentence.
8    Q.  Well, you're saying it's legit because they can respond and
9    pay, but when you said*, "Believe me, they downloaded the*
10   *referenced content each time,"* you did not say, when they pay,
11   or because they paid, correct?
12   A.  This is your interpretation of my words, and I'm telling
13   you that what I said earlier, I meant exactly that.  If a
14   customer paid, then most likely they knew they downloaded the
15   content.
16   Q.  But that's not what you put in your e-mail, isn't it?
17          THE COURT:  Now you're arguing with him, counsel.
18          MS. AMSTUTZ:  Well, I'm --
19          THE COURT:  No, you've already stated that.  You've
20   already asked him that question.  Move on.
21   BY MS. AMSTUTZ:
22   Q.  As the manager of Internet systems, you thought it was
23   important to provide thorough and complete answers to questions
24   posed by Mr. Creel, or the president of the company, correct?
25   A.  Sure, yes.

1          MS. AMSTUTZ:  I have nothing further at this point,

2    Your Honor.

3          THE COURT:  Okay.

4          MR. HOWENSTINE:  Nothing further, Your Honor.

5          THE COURT:  Okay, sir, you can step down.  Thank you

6    very much.

7          THE WITNESS:  Thank you.

8          THE COURT:  Next witness.  At least we'll get him

9    sworn in, if nothing else.

10         MR. GILMORE:  Your Honor, in light of the discussion

11   we had with Your Honor, the next witness that we intended to

12   present was Mr. Murphy by deposition designations.  Those -- we

13   need to edit those designations, the video clips, so we would

14   propose that we break early and come back early for a lunch

15   break so we have time.  Then when we come back a little early

16   from lunch, we'll play those edited designations to fit with

17   Your Honor's ruling.

18         THE COURT:  All right.  That's a good idea.  So we

19   will come back at 1:15, okay?

20         COURT SECURITY OFFICER:  All rise for the jury.

21         *(11:39 a.m., the jury exits the courtroom.)*

22                        *   *   *

23         THE COURT:  Apparently there were some redactions made

24   on a couple of exhibits, and they needed to be substituted for

25   the exhibits, and there's no objection to any of that, so I'm

```
 1   going to go ahead; is that right?
 2           MR. HOWENSTINE:  There's no objection in the sense
 3   that they're not yet in evidence anyway, so this is just an
 4   administerial exercise.
 5           THE COURT:  That's right.
 6           COURTROOM DEPUTY CLERK:  They're not in evidence. I
 7   just can't switch them until you --
 8           THE COURT:  She can't switch them out until I make the
 9   ruling to switch them out, so I just want to make sure there's
10   no objection to switching them out.
11           MR. HOWENSTINE:  Correct.
12           COURTROOM DEPUTY CLERK:  Thank you.
13           THE COURT:  All right.
14                           *   *   *
15       (1:20 p.m.)
16           COURT SECURITY OFFICER:  All rise.
17           THE COURT:  Be seated.  Okay.  The Court notes the
18   presence of -- we're missing somebody.
19           MR. BART:  We just switched seats.
20           THE COURT:  Okay, I understand that we have something
21   to discuss.  First of all, there's deposition testimony for --
22   where are these witnesses?  Why aren't they here live?
23           MR. HOWENSTINE:  The point I've chose to -- I've chose
24   to call them by video testimony.
25           THE COURT:  Was there some reason?
```

1          MR. BART:  It's very discrete testimony.  It's 15, 20

2     minutes, and it's -- they've already given their answer, and

3     there's really very little reason.  If they wanted to call them

4     on cross, they could do that.

5          MR. GILMORE:  Some of the testimony is also 30(b)(6)

6     testimony that we have under Rule 30(b)(6).

7          THE COURT:  Well, usually we prefer to have witnesses

8     live.  We don't just, you know, say, well, let's just present

9     the witness by video.  There has to be a reason for it.

10          MR. GILMORE:  And I think that, Your Honor, our

11     understanding was the treatment of 30(b)(6) testimony is

12     different.  We actually did have a discussion about one of the

13     witnesses, Stephanie Christianson, and we've been trying -- we

14     had been trying to pin down whether the defendants --

15     defendants had said she would need to testify this week.  They

16     had asked if they were going to call her, whether she could

17     come live.  And we said if they do commit -- if they commit to

18     calling her, then she could testify this week, that's fine.  In

19     that case, we may not have been playing her depo designation.

20     I think it turns out --

21          THE COURT:  We don't have a lot left of this week, in

22     quotes, because we really only have one -- we're really talking

23     about one day, even though we have two days, because we have

24     the morning, and then we have the morning.

25          MR. HOWENSTINE:  So this should be brief, Your Honor.

 1   The first issue affects the deposition testimony they intend to

 2   play next of Matt Murphy.

 3            THE COURT:  Okay.

 4            MR. HOWENSTINE:  If I may approach?

 5            THE COURT:  Sure.

 6            MR. HOWENSTINE:  This is PX 334.  We understood this

 7   to be resolved by Your Honor's prior ruling.  This is an e-mail

 8   exchange where Mr. Bloch's e-mail that they discussed with

 9   Mr. Bloch is pasted into this exchange, and then it's an e-mail

10   with Matt Murphy about what Mr. Bloch said.

11            Mr. Bloch has already testified about that.  Your

12   Honor has ruled that this subject matter, these documents, are

13   not, in and of themselves, admissible.  They evidently don't

14   intend to show the actual document, but they want to play

15   questioning of Mr. Murphy about the document, but he's not

16   being impeached, which was the reason for which Your Honor said

17   the document could be used.  So this seems out of bounds for

18   the reasons Your Honor has identified.

19            And Mr. Bloch has already testified about what he said

20   in that e-mail.  He's the one who said it.  And having --

21   introducing testimony from Mr. Murphy about what he thought

22   Mr. Bloch was saying doesn't seem to serve any purpose in this

23   case and is irrelevant to any of the issues to be decided.

24            MR. GILMORE:  And Your Honor, may I approach with the

25   actual deposition testimony that we -- it's just a one page, so

1  if Your Honor wants to see it.  It goes over to the very top of
2  the next page.
3          THE COURT:  One thing I like about this e-mail, it
4  starts out with a familiar feeling, *"Wow, what a pain in the*
5  *ass."*  There we go.  There it is.
6          MR. GILMORE:  Perhaps a feeling many of us can
7  empathize with at this point.
8          THE COURT:  Here it is right here in writing.
9          MR. GILMORE:  So we're not looking to introduce into
10 evidence that exhibit, but the questioning is about the reasons
11 why Mr. Murphy, not Mr. Bloch -- so the testimony there is not
12 about Mr. Bloch's underlying e-mail as much as it is what
13 Mr. Murphy communicated to his friend, the customer.
14         And so we're not going to publish the document.  It's
15 not going to say anything about the company or the pornography
16 or anything like that.  That testimony is simply about,
17 contemporaneously, what the president of the company was and
18 was not telling a customer who had been accused of their
19 business, you know, having copyright infringement.
20         THE COURT:  Who is questioning?  I can't tell here.
21         MR. GILMORE:  I think that's Mr. O'Beirne, my
22 colleague.
23         THE COURT:  Okay.  Doesn't say here, you know, and I'm
24 not a mind reader.
25         MR. GILMORE:  I think -- we're going to have video.  I

1    think you'll recognize the voice.

2          THE COURT:  I am not looking at the video.  It just

3    says --

4          MR. GILMORE:  We're happy to introduce when we play --

5          THE COURT:  -- question.

6          MR. GILMORE:  Understood.

7          THE COURT:  Can I read it?

8          MR. GILMORE:  Please.

9          (Pause.)

10          THE COURT:  Well, he said he had no idea -- in the

11    final analyses, he says he had no knowledge of whether it was

12    accurate or not.  But this had to do with the other system, not

13    this system.  Right?

14          MR. GILMORE:  To be sure, that's true.

15          THE COURT:  Well, I think I already ruled.  So the

16    answer is no.

17          MR. HOWENSTINE:  Thank you, Your Honor.  We just have

18    one other issue that --

19          THE COURT:  Because he's talking about something else,

20    and I don't know that it's that helpful to your client anyway.

21    In the end he says, I don't know if it's accurate or it isn't

22    accurate.  So I don't know how that could possibly help your

23    client.

24          MR. HOWENSTINE:  The other issue concerns deposition

25    testimony of Stephanie Christenson that the plaintiffs intend

1    to play.  Your Honor has --

2              THE COURT:  All right.  Who is Stephanie Christenson?

3              MR. HOWENSTINE:  She -- starting in 2017 -- 2016ish

4    managed the DMCA program at Grande.  And Your Honor has ruled

5    that the plaintiffs may bring up the topic of the DMCA.

6              THE COURT:  Yes.

7              MR. HOWENSTINE:  But Your Honor hasn't ruled on the

8    specific issue of whether plaintiffs may introduce evidence of

9    Grande's termination program after this lawsuit was filed in

10   which Grande started terminating people.  And we object to that

11   as irrelevant, beyond the relevant time period in this case and

12   also under 17 U.S.C. 512(L), which provides that a service

13   provider's failure to qualify for the safe harbor can't be held

14   against it, can't be used against it in defending against one

15   of these copyright cases.

16             So, Your Honor, we believe this evidence is

17   irrelevant.  We've offered to stipulate that we didn't

18   terminate anyone during this relevant time period of 2011 to

19   2017, but introducing evidence of what Grande did later is just

20   going to confuse the issues, isn't necessary to deciding

21   anything and is just going to be prejudicial to Grande.

22             THE COURT:  Well, I think I already said that the only

23   period of time that I was going to permit evidence to come in

24   was the period of time that's covered by this lawsuit.  Any

25   number of things could have happened later or decades before.

```
 1   I mean, I don't know how long Grande has been in existence.
 2   So...
 3           MR. BART:  Your Honor, may I get more clarification,
 4   please?
 5           THE COURT:  Sure.
 6           MR. BART:  May I have the podium, please?  Because we
 7   continue to get objections --
 8           THE COURT:  I love your clarifications.
 9           MR. BART:  It is a clarification, because I am not
10   sure how far they're going with this 512(L) argument.  Okay?
11   The next live witness is Lamar Horton and we are going to ask
12   him, as Your Honor's summary judgment decision anticipates,
13   about their failure to terminate anybody during the relevant
14   period at issue.
15           THE COURT:  During the relevant period is fair game.
16           MR. BART:  Okay.  So I just want to make sure that
17   when I start asking those questions, there's not going to be an
18   objection --
19           THE COURT:  Well, there may be an objection.
20           MR. BART:  No, no.  That's going to lead to a sidebar.
21   They're free to make whatever objections they want.
22           THE COURT:  They don't agree with my summary judgment
23   order, I'm sure in many respects.
24           MR. BART:  Yes.  Well, in terms of the Stephanie
25   Christenson statement, there's a lot of that testimony that is
```

1   also within the time period of this case and I think that's,

2   frankly, what I understood the primary purpose of it was.  Do

3   you want to address the subsequent period?

4          MR. GILMORE:  So we need to prove material

5   contribution.

6          THE COURT:  Yes, you do.

7          MR. GILMORE:  And they want to stipulate that they

8   could, but they're going -- terminate people, which no one is

9   disputing, but they want to argue that they shouldn't have to.

10  And so we need to be able to introduce evidence that, in fact,

11  after the lawsuit was filed, they did terminate a handful of

12  people, and we have multiple witnesses who said they terminated

13  those handful of people based on not allegations that are

14  unfounded, but because they were actual repeat infringers.  We

15  have evidence testimony including -- that you're going to hear,

16  you know, in the next day plus, from both live and deposition

17  witnesses.

18          In addition, I think you heard Mr. Brophy say, they

19  never terminated people based on Rightscorp notices.  And they

20  try and say that very carefully, because they know full well

21  that the handful of people that they terminated after our

22  lawsuit, those people received Rightscorp notices.  In fact,

23  the overwhelming majority of notices that those people received

24  came from Rightscorp.  And so we need to be able to show that

25  their activity in terminating -- even though it was a handful

1    of people, that terminating some people shows -- undermines

2    their current position that Rightscorp was garbage, undermines

3    their position that they shouldn't have to.

4            And, frankly, I think you also heard in opening

5    Mr. Brophy said that the plaintiffs forced them to terminate,

6    which is completely made up and their --

7            THE COURT:  Wait a minute.  The key here is I think

8    you have to prove intent, don't you?

9            MR. GILMORE:  I don't think that we have to prove

10   intent for copyright infringement.  For willfulness, we

11   certainly do.  I mean, it's obviously relevant --

12           THE COURT:  That's what I am saying.

13           MR. GILMORE:  It's relevant for willfulness, yes.

14           THE COURT:  Well, that's what willfulness is.

15           MR. GILMORE:  Yeah, exactly.  I just want to make

16   clear.  I mean, that's for heightened statutory damages.

17   Obviously, intent is an element for -- knowledge is, but that's

18   different from intent.  You don't have to prove intent --

19           THE COURT:  I understand.  I was talking about

20   willfulness.

21           MR. GILMORE:  Understood.

22           THE COURT:  But that's an element here.

23           MR. GILMORE:  Absolutely.

24           THE COURT:  The one thing that I'm concerned about is

25   that there is no dispute that during the relevant time period

```
 1    they could have terminated individuals, had they chosen to do
 2    so.  They don't dispute that.  If they had come out and said,
 3    We can't terminate -- we couldn't have terminated people, we
 4    would have gotten sued left and right if we terminated people,
 5    we couldn't terminate people, and then they started terminating
 6    people, I think under those circumstances your argument would
 7    have greater weight.  But they have haven't taken that
 8    position, at least not yet, and I don't know that that's one of
 9    their defenses.  He's shaking his head no.  He's not going to
10    come back and say, well, we couldn't terminate anybody.
11           So during the relevant time period -- if during the
12    relevant time period they have terminated some people and then
13    we're making this argument that they, you know, couldn't
14    terminate people, or even if they, during the relevant time
15    period, had terminated people and were making the argument, as
16    you've suggested, I think that would be much better, a much
17    better foundation for the evidence that you're trying to
18    introduce.  But after the time period that is covered by this
19    lawsuit, whatever they did, I'm having a very hard time finding
20    why it's more probative than it is prejudicial and what the
21    relevance is, more importantly, because whatever they're doing,
22    they're doing later.  It's not covered by the time period here.
23           MR. GILMORE:  Well, first of all, I think that
24    there's -- Grande has tried to limit the time period in a way
25    that we completely disagree with and is inconsistent with Your
```

 1   Honor's summary judgment rulings.  They want to argue that the

 2   time period ends on April 2017 when we filed the lawsuit, but

 3   there's no basis for that.

 4          We continued -- Rightscorp continued sending notices.

 5   There's an enormous amount of notices that were sent detecting

 6   infringement that go well into 2018, and so --

 7          THE COURT:  Are you trying to recover damages for

 8   2018?

 9          MR. GILMORE:  We're not seeking actual damages, but

10   we're seeking statutory damages and so --

11          THE COURT:  For 2018?

12          MR. GILMORE:  For 2017 and 2018, as well as any time

13   periods permitted from before the lawsuit.

14          THE COURT:  I did not understand that.  This is news

15   to me.

16          MR. BROPHY:  Your Honor, if I may remind you, when I

17   was cross-examining Mr. Boswell, I was instructed to limit,

18   based on their objections, the questions that I had about the

19   operations, the Rightscorp operations, in this later 2018/2019

20   time period.

21          THE COURT:  That's right.  And they --

22          MR. BROPHY:  Because it wasn't at issue in this case.

23          THE COURT:  -- and you objected, because it was

24   outside the scope of the case.

25          MR. GILMORE:  No.  I'm not sure what --

1           THE COURT:  I think that's right.

2           MR. GILMORE:  Certainly, 2017.  There's been plenty of

3    testimony and evidence developed in this case about what they

4    were and were not doing in 2017.

5           Mr. Brophy stood up in opening and said -- told the

6    jury, *We were forced to terminate people after this lawsuit by*

7    *plaintiffs.*  Well, that is just not true.  The evidence -- we

8    will show the evidence that is not what happened, and we need

9    to be able to put that evidence in.  They're saying that it's

10   not appropriate, that we never thought that these notices are

11   legitimate, when, in fact, after this lawsuit, just two months

12   after this lawsuit, they terminated people who received many,

13   many Rightscorp notices.

14          We've got to put that evidence in to show that the

15   position they're taking now at trial that Rightscorp is bogus,

16   that it was completely appropriate for them to not act on

17   Rightscorp is belied by what they did just two months after we

18   filed this lawsuit.  It also shows willfulness, because the

19   fact that they're trying to -- they may try to assert the DMCA

20   safe harbor.  The failure to qualify for that, that's not why

21   we're introducing this.  So they're trying to set up this red

22   herring that we're trying to re-litigate the DMCA safe harbor.

23   That's not what we're talking about.

24          THE COURT:  Well, I'm still having a very difficult

25   time understanding why this is relevant, because they have

1   admitted that they could have, at any time during this period,

2   terminated people.  So the fact that they chose to terminate

3   them later doesn't, to me, seem to be particularly relevant

4   when somebody stands up and says, we could have terminated them

5   at any time.

6           MR. GILMORE:  Of course, we're not disputing --

7           THE COURT:  Wait, wait, wait.

8           MR. HOWENSTINE:  Your Honor.

9           THE COURT:  Wait, no, no.  We have a court reporter

10  here.  She can only take down one person at a time.  Okay?  So

11  when you start talking over here and he's talking there and I'm

12  trying to -- you know, what is she doing?  She's going crazy.

13  She's going to blow up her head.  We'll lose our court

14  reporter.  We're going to give her high blood pressure.

15          MR. GILMORE:  In June 2017, two months after we filed

16  the lawsuit, they terminated eleven customers.

17          THE COURT:  Okay.

18          MR. GILMORE:  All of those customers they had gotten

19  Rightscorp notices for.  Now they're here saying Rightscorp is

20  bogus, that it was completely appropriate for us not to act on

21  Rightscorp notices, whereas in 2017, in just two months after

22  we filed this lawsuit, they terminated people for whom they had

23  gotten dozens and dozens of Rightscorp notices.  That's perhaps

24  the most relevant evidence in this case that their current

25  litigation stance is --

1          THE COURT:  Well, I don't know.  If it's outside the

2     scope of this case, it isn't relevant.  If it is, maybe it is

3     relevant.  I'm hearing for the first time that you're seeking

4     damages for something happening in 2017 and 2018 after you

5     filed your lawsuit.

6          MR. GILMORE:  The defendant is the one who has tried

7     to impose a ruling on the relevant time period, and I think

8     they're trying to leverage somehow the --

9          THE COURT:  Generally speaking, generally speaking, in

10    federal court, when you file a lawsuit and your lawsuit will

11    cover the period of time prior to when you filed your lawsuit.

12         MR. GILMORE:  We explicitly pleaded that the activity

13    was ongoing, and it was.  And so, in fact, we sought

14    prospective injunctive relief.  We're not seeking that in

15    court, but when we pleaded this case we absolutely did.  And

16    they tried to argue that they should at least get the DMCA safe

17    harbor for the timeframe in which there were notices.  And both

18    Magistrate Judge Austin and Your Honor rejected that as too

19    little, too late.  Not, oh, yes, you do get the safe harbor.

20    Not, it doesn't matter, you don't need the safe harbor, because

21    2017 and forward is irrelevant for the case.  The fact of their

22    terminations was in the center of your and Magistrate Judge

23    Austin's rulings on the DMCA safe harbor.

24         After they lost, now they're trying to jiu-jitsu that

25    loss and say, actually, that's a win for us, that means we get

1    to unilaterally impose a cut-off on the time period that's

2    relevant for plaintiff's case.  That doesn't make any sense.

3    It's not what we pleaded and we don't see how it possibly can

4    be that their loss on an affirmative defense actually, in fact,

5    limits our case.

6            MR. HOWENSTINE:  Your Honor, if I could respond to

7    this briefly?

8            THE COURT:  Just a minute, counsel.

9            *(Pause.)*

10           Yes, go ahead.

11           MR. HOWENSTINE:  When Grande started terminating

12   subscribers after this lawsuit was filed, it was doing that in

13   order to qualify for the safe harbor, and what 512(L) says,

14   very clearly, *"The failure of a service provider's conduct to*

15   *qualify for limitation of liability under this section shall*

16   *not bear adversely upon the consideration of the defense by the*

17   *service provider, that the service provider's conduct is not*

18   *infringing under this title or any other defense."*

19           So in essence, the failure of Grande to qualify for

20   the safe harbor can't be held against us.

21           THE COURT:  Well --

22           MR. HOWENSTINE:  Either the safe harbor protects us,

23   or it's not germane.  And this lawsuit is about the period

24   beforehand when we were not terminating people.  When we chose

25   to rely -- attempt to rely on the safe harbor is a later issue.

```
 1   It's not relevant to this case.  It's a subsequent remedial
 2   measure to deal with the issue that was raised.  And, you know,
 3   again, Your Honor, we think it's very clearly prohibited by
 4   512(L).
 5           MR. BART:  May I respond?
 6           THE COURT:  Yes.
 7           MR. BART:  512(L) does not act as a bar against the
 8   admissibility of otherwise admissible evidence.
 9           THE COURT:  Excuse me, counsel.  I've got cedar
10   allergies, and it is cedar season.
11           MR. BART:  My apologies.
12           THE COURT:  I'm telling you if you parked your car
13   outside like I did, counsel, you would know.  I had to run it
14   through the car wash twice to get the cedar off my car.  It's
15   awful.
16           Go ahead.
17           MR. BART:  512(L) does not act as a bar against
18   otherwise admissible evidence.  Okay?  You can't use it to
19   prove liability.  What they're trying to do here is to say that
20   evidence -- and, frankly -- I'm waiting for you.
21           THE COURT:  If I hold my hand --
22           MR. BART:  Okay.  We'll work with hand signals.
23           If we, I think, can limit this.  We're not looking to
24   go into 2018, 2019, anything like that.  We are looking to
25   complete a series of events that took place after -- really
```

1  after Cox, but after they started a new policy in the beginning
2  of 2017, which is within the period here where they implemented
3  a new policy and didn't terminate anybody.  And then the filing
4  of the lawsuit and the decision to bring this is all relevant
5  to their willfulness, to their willful blindness, in the period
6  itself.  So I don't think they get an opportunity to blot out
7  that evidence --

8       THE COURT:  Well, okay, I understand your argument.
9  You can be seated.

10      MR. BART:  Okay.  Thank you.

11      THE COURT:  My review -- very quickly.  My law clerk
12 gave me the -- refreshed my recollection on what Judge Austin
13 took into consideration, and he took into consideration up to
14 the period -- through the period of 2019.

15      MR. BART:  Twenty --

16      THE COURT:  2019, in making some of his rulings.  And
17 while the defense says that -- and defense is absolutely
18 correct.  I mean, there isn't going to be any mention in this
19 lawsuit here about the use of these to attempt to qualify,
20 which they failed to do for the safe harbor.  That may be some
21 internalized -- I mean, if they want to put evidence on of
22 that, that's fine.  That's their -- as we say in Hawaii, that's
23 their kuleana.  Kuleana is a piece of property that belongs to
24 somebody.  We use that term to mean that's their business.

25      However, I do think, in hindsight, in thinking about

1  it, that a limited amount of that evidence is relevant to the

2  issue of whether they ever came -- and they have every right to

3  attack that -- came to the conclusion that, for whatever

4  reason, they could rely upon the Rightscorp designation of this

5  as an infringement.  They have every right to say, look, you

6  know, we still today don't believe Rightscorp is worth a darn.

7  But at that point, after the lawsuit was filed, we just didn't

8  want to take any chances.

9          That's a perfectly reasonable explanation.  Doesn't

10  admit liability.  They've already admitted they could have, so

11  the objection is overruled.

12          MR. BART:  Thank you, Your Honor.

13          THE COURT:  But it's noted on the record.  If I last

14  up here.  At least -- listen, it's not as bad as a situation I

15  heard of the other day of some judge up in -- I think it was

16  Wisconsin, federal judge in Wisconsin was in the middle of a

17  major trial, came down with COVID.  He had to declare a

18  mistrial, and everything before it went down the tubes.

19          MR. BART:  We'll go out and sweep off your car.

20          THE COURT:  Yeah.  In San Antonio, they refer to it

21  as -- doctors refer to it as cedar fever.  It's not a pleasant

22  thing.

23          *(Discussion off the record.)*

24                          *  *  *

25          THE COURT:  Okay.  How are we going to do this, by the

1    way?

2            MR. GILMORE:  So we're going to start with the Murphy

3    designations.

4            THE COURT:  It's a video deposition?

5            MR. GILMORE:  It's a video deposition, yes.

6            THE COURT:  All right.  So we don't have to have

7    somebody sitting up here doing that business.

8            MR. GILMORE:  Oh, no, just the video.  And then we'll

9    be calling our next witness, who is Grande's client rep, Lamar

10   Horton.  We'll be calling him adversely.  And then after that,

11   the other designations from Stephanie Christenson.

12           THE COURT:  Okay.  Let's bring the jury in.

13           COURT SECURITY OFFICER:  All rise for the jury.

14           *(1:51 p.m., the jury enters the courtroom.)*

15                        *  *  *

16           THE COURT:  Good afternoon.  We had some legal issues

17   that I needed to resolve with the lawyers again, which is not

18   atypical, but we got it done.  So we're going to save some

19   time.

20           Okay.  The next witness, I believe, ladies and

21   gentlemen, is going to be by what we refer to as video

22   deposition.  That means that the witness could not be here, and

23   they were sworn in, they testified on video before a notary

24   public court reporter.  The questions were asked just as if the

25   witness was on the stand.  The witness answered the questions

1    under oath, so you will see both -- well, you see the witness

2    answer the questions.  But questions from both sides.  Okay?

3    Just as if they were sitting here.  And you can look at it on

4    your monitors.

5              All right.  You want to go forward.  You want to

6    introduce who the witness is?

7              MR. GILMORE:  I will.  Thank you, Your Honor.

8    Plaintiffs now call by video deposition former Grande president

9    Matt Murphy.  And, Your Honor, I think all the questioning in

10    this clip is from my colleague, Mr. O'Beirne, from the

11    plaintiffs.

12             THE COURT:  Okay.

13             MR. HOWENSTINE:  Just so the record is clear on that,

14    he was a former Grande employee at the time of the deposition.

15             THE COURT:  Is he back there now?

16             MR. HOWENSTINE:  No.

17             MR. GILMORE:  I think that's what I said.

18             THE COURT:  He said he was a former employee.

19             MR. HOWENSTINE:  Your Honor, I just want to make clear

20    that he was also a former employee when he gave the deposition.

21             THE COURT:  Oh, I see.  I see what you're saying, that

22    he wasn't an active employee at the time, and now he's a former

23    employee.  Okay.  He was a former employee at the time.  Okay,

24    that's fine.  Thank you.  I understand.

25             Okay.  Let's go forward.

```
1                          *   *   *
2              (Videotaped testimony playing, 1:54 p.m.)
3    BY MR. O'BEIRNE:
4    Q.  Great.  Please state your full name for the record.
5    A.  Matthew Morris Murphy.
6    Q.  And you have been living in Austin --
7                          *   *   *
8              THE COURT:  Stop for one second.
9              Ladies and gentlemen, the reason I'm not looking there
10   is that my law clerk has it on her monitor right here, and the
11   easier thing for me to do is to look here so I'm not craning my
12   neck over here.  Okay.  Go forward.
13             (Video resumed.)
14   Q.  -- for how long?
15   A.  Nine years.
16   Q.  So since you came to work at Grande?
17   A.  Correct.
18   Q.  And when was that?
19   A.  September of 2009.
20   Q.  And where were you before that?
21   A.  Boston, Massachusetts.
22   Q.  What were you doing in Boston?
23   A.  I was running -- or part of a management team of a company
24   called Atlantic Broadband, cable company similar to Grande.
25   Q.  And how long were you with Atlantic Broadband?
```

1   A.   Seven years.

2   Q.   What was the time period that you were at ABB?

3   A.   You know, it was actually a little less.  It was 2000 -- we

4   started the company in 2004, and then I moved down to Austin to

5   work with Grande in 2009.  So five years.

6   Q.   I'll start again.  At the time you came down to Grande in

7   2009, Atlantic Broadband was providing management services to

8   Grande?

9   A.   That's right.

10  Q.   All right.  When did Atlantic Broadband start providing

11  management services to Grande?

12  A.   Start?

13  Q.   Yes.

14  A.   When we bought -- when we bought the company in 2009.

15  Q.   So ABB bought the company?

16  A.   No.  Our investors that owned both Grande and Atlantic

17  Broadband bought the company in 2009.

18  Q.   Got it.  When you said "we," I was just trying to clarify.

19  So that's ABRY Partners?

20  A.   Yes.

21  Q.   So you worked for ABB starting in 2004?

22  A.   Yes.

23  Q.   And they were owned at that time by ABRY Partners?

24  A.   And other investors.

25  Q.   And other investors.  And in 2009, ABRY Partners purchased

Matthew Murphy - Videotaped Examination          895

 1   *Grande?*
 2   *A.   Correct.*
 3   *Q.   And as part of the plan to manage the business after they*
 4   *purchased it, they sent you down to be the CEO?*
 5   *A.   Correct.*
 6   *Q.   What was the purchase price?*
 7   *A.   Roughly 250 million.*
 8   *Q.   And about how many users did they have at that time?*
 9   *Sorry, how many Grande subscribers were in the business when it*
10   *was purchased?*
11   *A.   Roughly a hundred thousand-ish, I believe.*
12   *Q.   So you were the president of Grande from September 2009*
13   *until September 2014?*
14   *A.   Correct.*
15   *Q.   Your role was the same the whole time?*
16   *A.   Correct.*
17   *Q.   And you were the most senior person at Grande?*
18   *A.   At Grande.*
19   *Q.   You were the most senior person who was only a Grande*
20   *employee?*
21   *A.   Correct.*
22   *Q.   And ultimately, did you have authority over the operations*
23   *at Grande?*
24   *A.   Not unilaterally.*
25   *Q.   You're aware that TPG purchased Grande in 2017?*

Matthew Murphy - Videotaped Examination          896

1    A.   I am.

2    Q.   What was the sales price; do you recall?

3    A.   I believe somewhere around 650 million.

4    Q.   Did you have any interest in Grande at that time?

5    A.   I did.

6    Q.   And so how did that work?  Did you receive compensation as

7    part of that sale?

8    A.   I did.

9    Q.   How much?

10   A.   I'd rather not say.

11   Q.   That can remain confidential in the case.  It's not --

12   A.   Okay.  Because all -- I have no problem telling you, but

13   none of this stuff is public.

14   Q.   Understood.

15   A.   Okay.  So I made roughly $3 million.

16   Q.   What was the nature of your compensation while you were at

17   Grande?  Was there an equity component to it or was it straight

18   salary compensation?

19   A.   No, it was -- that was the origin of my ownership.  So I

20   got stock as the president, and then I also had regular income

21   and annual targeted bonus.

22   Q.   What went into determining what your bonus would be?

23   A.   We had a company-wide bonus plan that everyone up and down

24   the organization was a part of, and it was roughly 50 percent

25   based on company goals being hit, and 50 percent on your

Matthew Murphy - Videotaped Examination          897

1   *individual performance.*

2   *Q.   And what were the company goals that were being measured?*

3   *A.   There were a lot of different metrics, but most of the*

4   *goals were really focused on financial goals.*

5   *Q.   So revenue?*

6   *A.   Revenue, EBITDA, generally.*

7   *Q.   I take it you thought it was a reasonable price that TPG*

8   *paid?*

9   *A.   I did.*

10  *Q.   And the price they paid, obviously, was a lot more than*

11  *ABRY had paid to acquire Grande?*

12  *A.   Correct.*

13  *Q.   And that higher price that TPG paid was due, certainly in*

14  *part, to your team's success in growing Grande's business?*

15  *A.   I would like to think so.*

16  *Q.   There was a time while you were the president of Grande*

17  *that Patriot began to manage Grande instead of Atlantic*

18  *Broadband, right?*

19  *A.   Right.*

20  *Q.   Can you please explain how that happened?*

21  *A.   So Atlantic Broadband was sold in 2012.  So the services*

22  *that we, at Grande, were receiving from Atlantic needed to be*

23  *replaced.  Patriot Media was running other assets for ABRY, and*

24  *we thought it was an efficient way to replace the Atlantic*

25  *Broadband services once we could no longer use them.*

1  Q.  What was the profit margin on Internet services when you

2  were the president of Grande?

3  A.  On a gross profit basis?

4  Q.  Yes.

5  A.  Probably 85 percent-ish.  Depended on the level of service.

6  Q.  It's common in the industry, right?

7  A.  Yeah.

8  Q.  We mentioned "churn" before.  You would agree churn refers

9  to the rate at which subscribers leave a company?

10  A.  That's right.

11  Q.  Sure.  You would agree, that because most of the costs of

12  providing high-speed Internet services are fixed, or sunk, the

13  incremental profit margin associated with each new subscriber

14  is typically high?

15  A.  That's a generalization.  They're not all fixed charges.

16  Q.  I didn't say all.  You don't agree with the statement that

17  because most of the costs of providing high-speed Internet

18  services are fixed, the incremental profit margin associated

19  with a new subscriber is typically high?  Generally?

20  A.  Generally, sure.

21  Q.  And it's fair to say, when you were president of Grande,

22  the longer that Grande could retain a high-margin subscriber

23  who purchased high-speed Internet or bundled services, the more

24  profitable those subscribers were for Grande?

25  A.  Yes.  Well, they don't become more profitable.  They just

1    *are with you longer.*

2    *Q.   Sure.  But to the extent that whatever costs of*

3    *establishing the network, if they're fixed, the longer you keep*

4    *the customer, the more percentage of the costs associated with*

5    *that customer are profit?*

6    *A.   It's beneficial.*

7    *Q.   Right.  When you, as part of the ABB team, purchased*

8    *Grande, one of your expectations was that under better*

9    *management Grande could reduce its churn?*

10   *A.   Yes.*

11   *Q.   And grow its customer base?*

12   *A.   Yes.*

13   *Q.   And those obviously are two different things, right?*

14   *A.   Yes.*

15   *Q.   Reducing churn means keeping the people you have?*

16   *A.   Correct.*

17   *Q.   And expanding means getting new people?*

18   *A.   Correct.*

19   *Q.   And those were both important priorities?*

20   *A.   They were.*

21   *Q.   Because the more customers the business keeps, the more*

22   *profitable it is?*

23   *A.   We actually had a different view, that we were focused on*

24   *operations and profitability, and a lot of companies in the*

25   *space had always been focused on subscriber metrics, which*

1    *didn't equal profitability.  So we focused more on operations*

2    *and the financial aspect.*

3    *Q.  You were interested in getting high value, low churn*

4    *subscribers?*

5    *A.  Correct.*

6    *Q.  In fact, improving churn levels was central to turning*

7    *around Grande's financial performance after you came on board?*

8    *A.  It was a -- it was an important component.*

9    *Q.  Would you agree with the following statement:  Improving*

10   *churn levels was central to turning around Grande's financial*

11   *performance after you became the president?*

12   *A.  Central?*

13   *Q.  Yes.  So I'll offer you a statement.  You tell me if you*

14   *agree or disagree or whatever.  So do you agree with the*

15   *following statement --*

16   *A.  I don't know what your definition of "central" is.  There*

17   *were a lot of very important things that went into turning*

18   *around Grande, and improving churn was one of them.*

19   *Q.  Sure.  So my question is this, do you agree with the*

20   *following statement:  Improving churn levels was a central --*

21   *strike that.*

22   *     Improving churn levels -- one more time.  And that is*

23   *because broadband is more profitable from a margin standpoint*

24   *than video, right?*

25   *A.  No, I don't think it's -- I don't think it's profitability.*

1    *It's attractive product set.*

2    *Q.  So what did you mean by "broadband is our biggest driver of*

3    *growth"?*

4    *A.  We focused on a broadband service that the market wanted.*

5    *Q.  You understood that your customers were interested in*

6    *Grande in large part because of high-speed broadband Internet?*

7    *You would agree that after ABRY's acquiring Grande, which*

8    *brought you in as the president, a key priority was minimizing*

9    *churn?*

10   *A.  Correct.*

11   *Q.  Minimizing the customers you lose --*

12   *A.  Yes.*

13   *Q.  -- through cancellation or terminations?*

14   *A.  Yes.*

15   *Q.  And when you were the president of Grande, it was not your*

16   *practice to allow individuals to steal Grande's services*

17   *without paying for it?*

18   *A.  That is correct.*

19   *Q.  When you were the president of Grande, you would agree that*

20   *during that period, if there was a person that was stealing*

21   *services from Grande, that would be wrongful conduct on that*

22   *person's part?*

23   *A.  If we found someone stealing our company's services, we*

24   *would not allow that to continue.*

25   *Q.  Sure.  I'm asking you your opinion, your lay opinion as to*

1    *that question.*

2        *Do you agree with me, that if a company was helping*

3    *residents in Texas who lived in Grande's service area steal*

4    *Grande's services, it would be wrong for that company to do*

5    *that?*

6    *A.  I'd need more specifics.*

7    *Q.  Can you please provide me an example in which you would*

8    *think it would be fine for a company to help Texas residents*

9    *steal Grande's Internet services?*

10   *A.  I don't -- I don't know of a case.*

11   *Q.  Okay.  Mr. Murphy, PX 233 is an e-mail chain from*

12   *October 2011.  Do you see that, sir?*

13   *A.  I do.*

14   *Q.  And the original e-mail is an e-mail sent by Pete O'Connell*

15   *from a Disney/ESPN e-mail address to you and Ed Halloran,*

16   *October 28, 2011.  Do you see that?*

17   *A.  I do.*

18   *Q.  Subject is, "UT v. Kansas Piracy Protection," right?*

19   *A.  Yes.*

20   *Q.  So PX 233, Mr. O'Connell from ESPN reaches out to you*

21   *regarding the Longhorn Network?*

22   *A.  Yes.*

23   *Q.  And what he's sharing with you is an e-mail from Longhorn*

24   *Network folks about the upcoming Kansas versus UT game.  Do you*

25   *see that?*

1    A.  I do.

2    Q.  And the e-mail he sends you explains, "In preparation for

3    the Kansas versus Texas game, we are taking proactive steps to

4    eliminate pirated streams."  Do you see that?

5    A.  I do.

6    Q.  Well, in your e-mail to Mr. O'Connell, you say, "Pete,

7    thanks.  I've been chatting with Dave Brown directly about

8    this.  We have proactively called about half a dozen places and

9    are cracking down on it."

10   A.  We were doing this on our behalf.  This was a Grande

11   service.

12   Q.  What was a Grande service?

13   A.  Longhorn Network.

14   Q.  Right.  But you paid Longhorn Network and licensed their

15   content to sell to your customers?

16   A.  And we were the only carrier of it.

17   Q.  Sure.  I guess my question is, Longhorn Network had an

18   interest in not having its stream pirated because it was

19   selling it to you, right?

20   A.  Yes.

21   Q.  And you had an interest in not having the Longhorn Network

22   stream pirated because you were selling it to your customers?

23   A.  Correct.

24   Q.  And what Mr. O'Connell is saying is that on their end,

25   they're taking proactive steps to eliminate pirated streams.

1    *Do you see that?*

2    *A.   I do.*

3    *Q.   You were indicating, you, yourselves at Grande, were also*

4    *proactively reaching out to crack down on pirated streams?*

5    *A.   We physically sent people to locations in Austin.*

6    *Q.   Describe that for me, please.*

7    *A.   We were the only carrier of this network.  Sports bars*

8    *needed to subscribe to our service to be able to get the game.*

9    *It was the only place you could watch it.  And so if we found*

10   *bars that were showing the game but weren't our customers, then*

11   *they were obviously stealing it.*

12   *Q.   And that was wrong for them to be doing?*

13   *A.   Commercially, I wanted -- I was being damaged because we*

14   *paid Longhorn Network.*

15   *Q.   You wanted to eliminate people stealing what you had paid*

16   *for?*

17   *A.   Correct.*

18   *Q.   How would you go about stopping the bars from doing that?*

19   *A.   We sent Grande employees to those locations to talk to the*

20   *bar owners.*

21   *Q.   And tell them turn off the stream?*

22   *A.   Correct.*

23   *Q.   How would you tell whether they were lawfully having the*

24   *stream or not?*

25   *A.   Because we have a billing system that tells us who our*

1  *customers are.*

2  *Q.  So when your people would go to the bar and say, We're from*

3  *Grande, you're not in our billing system, you need to turn this*

4  *off, that's what would occur?*

5  *A.  We would send people to go tell them to stop showing the*

6  *game.*

7  *Q.  Sure.  Sorry.  I fumbled that.  So Grande would send its*

8  *employees to bars that Grande believed were showing the game*

9  *but were not customers to tell these bars, we're from Grande.*

10 *You're not a customer.  Turn off the stream?*

11 *A.  Correct.*

12 *Q.  And you understood that the bar owners were reasonably*

13 *relying on Grande's representation that Grande knows whether or*

14 *not they are a customer?*

15 *A.  They certainly knew whether or not they were a customer.*

16 *Q.  Sure.  But maybe they were confused, right?*

17 *A.  I doubt it.*

18 *Q.  Okay.  Were the techs going out with billing records to*

19 *show you're not a customer?*

20 *A.  I don't know.*

21 *Q.  How did you understand your Grande employees when they were*

22 *doing this were demonstrating to the satisfaction of the bars*

23 *that they needed to turn it off?*

24 *A.  I don't recall we needed to prove it.*

25 *Q.  You expected them to trust what you were saying about*

Matthew Murphy - Videotaped Examination          906

1   *whether they were paying for it or not and turn it off?*

2   *A.  We and other parties would know if they were customers or*

3   *not.*

4   *Q.  Sure.  But you just said, "I don't recall we needed to*

5   *prove it."*

6       *By that, you mean you sent people from Grande and told*

7   *these people, You need to turn this off, you're not paying for*

8   *it?*

9   *A.  We did.*

10  *Q.  And you expected them to follow that?*

11  *A.  We were telling them that they were in violation.*

12  *Q.  Right.  And what you were telling them to do was turn it*

13  *off, based on what you were telling them?*

14  *A.  Correct.*

15  *Q.  And you expected them to do that?*

16  *A.  We were hoping them to.  Many did not.*

17  *Q.  The right thing to do if a bar was not paying for this*

18  *service and a Grande person came and said, You're not paying*

19  *for this, you need to turn it off, the right thing would have*

20  *been to turn it off?*

21  *A.  I think a commercial arrangement, if they were not paying*

22  *for our services, it was right for us to say to turn it off.*

23  *Q.  What PX 233 reflects is somebody with an ownership interest*

24  *in the stream of Longhorn Network, here being ESPN, reaching*

25  *out to Grande about protecting that interest, right?*

Matthew Murphy - Videotaped Examination          907

1    A.   Yes.

2    Q.   And Grande cooperated with them, in part, because Grande

3    also had an interest in the Longhorn Network?

4    A.   Yes.

5    Q.   And protecting that stream, right?

6    A.   Yes.

7    Q.   So I'm talking about something different.  I'll hand you

8    PX 103.  This is Grande's acceptable use policy.

9        Sir, that number -- it doesn't have a Bates number, but

10   it's how it was given to us by Grande as Grande's acceptable

11   use policy.  And the effective date in the upper right-hand

12   corner, as you can see, is October 2013.

13   A.   I see that.

14   Q.   I'll represent to you multiple witnesses from Grande have

15   confirmed that this was the policy that was on Grande's website

16   and was in effect in 2013.  Do you have any basis to dispute

17   that this is the Grande Internet Acceptable Use Policy

18   effective October 2013?

19   A.   I don't.

20   Q.   Okay.  Now, when you were the president of Grande, you knew

21   that there was an acceptable use policy governing your

22   customers' use of the Internet services, right?

23   A.   Yes.

24   Q.   And when you were the president of Grande, you knew that

25   one of the prohibitions in the acceptable use policy was that

1  *users were prohibited from engaging in copyright infringement,*
2  *right?*
3  A.   *No, I did not know that.*
4  Q.   *Sir, you were the president of the company for five years?*
5  A.   *That's correct.*
6  Q.   *And in your five years as president of the company, you had*
7  *no knowledge of Grande's policies regarding copyright*
8  *infringement over its network?*
9  A.   *That's what we have attorneys for.*
10 Q.   *Well, you have marketing people to do marketing, right,*
11 *sir?*
12 A.   *Correct.*
13 Q.   *But you had awareness, generally, of what the Marketing*
14 *Department was doing, right?*
15 A.   *Correct.*
16 Q.   *You have billing people to do billing, right?*
17 A.   *Correct.*
18 Q.   *And you have a general knowledge and understanding of what*
19 *the billing people are doing, right?*
20 A.   *Not very detailed.*
21 Q.   *Do you recall a time in 2014 where you reached out to*
22 *members of your team regarding a notice of copyright*
23 *infringement that one of your customers had received regarding*
24 *alleged copyright infringement on that customer's service?*
25 A.   *Yes.*

1    Q.  You reached out to your team so that they could explain to

2    you information about this copyright infringement notice and

3    what it meant, right?

4    A.  I reached out to my team because I had a customer who had a

5    concern.

6    Q.  And you wanted to get an accurate understanding of the

7    facts the customer was presenting to you so that you could

8    respond to the customer's concern?

9    A.  I wanted to give the customer advice on what they should

10   do.

11   Q.  And you wanted to base that advice on the best information

12   available to you and your team?

13   A.  I asked my subject matter experts in the company to focus

14   on it.

15   Q.  Right.  The reason you asked your subject matter experts in

16   the company to focus on it is because you wanted to rely on

17   what they told you to give the customer advice on what the

18   customer should do?

19   A.  Yes.

20   Q.  If Grande's customers were stealing plaintiff's music while

21   you were the president of Grande, and Grande knew about it,

22   Grande should have done something to stop it.  Would you agree

23   with that, sir?

24   A.  I don't know.

25   Q.  If there were Grande customers using Grande's Internet

1    *services to steal plaintiff's copyrighted sound recordings and*

2    *Grande had received knowledge of that, Grande should have*

3    *terminated those users who were stealing plaintiff's works*

4    *while you were president of the company, right?*

5    *A.  I don't know.*

6    *Q.  Is it your testimony sitting here today that when you were*

7    *president of the company, you thought it would be permissible*

8    *for Grande's customers to steal plaintiff's copyrighted sound*

9    *recordings with Grande's knowledge and for Grande to do nothing*

10   *about it?*

11   *A.  I don't know.*

12   *Q.  You think that might be acceptable when you were the*

13   *president of the company, for Grande's customers to, with*

14   *Grande's knowledge, be stealing plaintiffs copyrighted sound*

15   *recordings and for Grande to do nothing in its power to*

16   *intervene?*

17   *A.  I don't know.*

18   *Q.  When you were the president of the company -- we've*

19   *discussed, for example, the Longhorn Network topic.  But Grande*

20   *took reasonable measures to protect its investment in its*

21   *property while you were the president of the company, right?*

22   *A.  We did.*

23   *Q.  And you would agree that it's equally reasonable for*

24   *plaintiffs to take measures to protect their investment in*

25   *their property?*

1    A.  I don't know.

2    Q.  Were you part of any policy decision regarding Grande's

3    termination or lack of termination of subscribers for copyright

4    infringement?

5    A.  I don't believe so.

6    Q.  What was your understanding during your time as president

7    of what would happen to a user if that user was engaged in

8    copyright infringement that was shown to Grande to be

9    occurring?

10   A.  I don't know.

11   Q.  You didn't have any awareness as to whether users were

12   allowed to infringe in an unlimited fashion before anything

13   happened?

14   A.  No.

15   Q.  If a copyright holder or somebody acting on the copyright

16   holder's behalf demonstrated to Grande that a user had engaged

17   in repeated copyright infringement while you were president,

18   should Grande have kicked that user off the service?

19   A.  I don't know.

20       (Videotaped testimony stopped at 2:17 p.m.)

21                      *   *   *

22       MR. GILMORE:  For the record, the designations

23   referred to Plaintiff's Exhibit 103, which has already been

24   admitted.  We also move into evidence Plaintiff's Exhibit 233,

25   the Longhorn Network e-mail.

1          THE COURT:  It will be received.

2          MR. BART:  Thank you, Your Honor.  Plaintiffs call

3    Lamar Horton as their next witness.

4          COURTROOM DEPUTY CLERK:  Please raise your right hand.

5    You do solemnly swear that the testimony you're about to give

6    in this case now before the Court will be the truth, the whole

7    truth and nothing but the truth, so help you God?

8          THE WITNESS:  I do.

9                              *   *   *

10             (LAMAR HORTON, Witness, Sworn.)

11                             *   *   *

12         COURTROOM DEPUTY CLERK:  You can have a seat.

13                          EXAMINATION

14   BY MR. BART:

15   Q.  Good afternoon.

16   A.  Good afternoon.

17   Q.  Can you state your full name for the record?

18   A.  Lamar Horton.

19   Q.  And you work at Grande Communications, correct?

20   A.  I do.

21   Q.  And, in fact, you've been sitting in the courtroom as

22   Grande Communications' representative throughout the whole

23   trial, correct?

24   A.  I have.

25   Q.  And so you've had the pleasure of listening to every bit of

1    testimony that all the rest of us have heard, correct?

2    A.   I have.

3    Q.   You've worked at Grande since 2003; isn't that correct?

4    A.   That is correct.

5    Q.   And your current title is vice president of network

6    engineering and operations?

7    A.   Yes.

8    Q.   And you've had that title for 13 years, since 2009 or so?

9    A.   Yes.

10   Q.   And you're also Grande's point of contact for copyright

11   holders to provide notices of infringement, correct?

12   A.   Yes, since 2017, I believe.

13   Q.   And that role is known as being Grande's DMCA agent; isn't

14   that correct?

15   A.   That is correct.

16   Q.   Okay.  And you understand that the DMCA is a reference to

17   the Digital Millennium Copyright Act?

18   A.   Yes.

19   Q.   And in that role, you are aware that the DMCA provides ISPs

20   with a safe harbor from claims of secondary copyright

21   infringement?

22   A.   I'm not an attorney, so I don't know that I know the

23   details of that.

24   Q.   But you are the DMCA agent, correct?

25   A.   That is correct.

Lamar Horton - Examination                    914

1   Q.  And despite that fact, you don't know whether the DMCA
2   provides the defense that I just mentioned?
3   A.  I don't believe there's a requirement for me to know that,
4   so no.
5   Q.  I'm not asking you whether it's a requirement.  I am
6   actually asking whether you know it or don't know it?
7   A.  No.
8   Q.  And I guess consistent with that answer, you didn't receive
9   any training in connection with being made Grande's DMCA agent;
10  isn't that correct?
11  A.  That is correct.
12  Q.  And you don't attend any periodic internal meetings at
13  Grande to discuss your role as DMCA agent, do you?
14  A.  No, not to discuss my role.
15  Q.  And you don't review any individual copyright notices
16  received by Grande in your role as DMCA agent?
17  A.  I would answer that, that I have reviewed individual
18  notices, but not on a regular basis.
19  Q.  Reviewing them is not a regular part of your role as DMCA
20  agent, is it?
21  A.  Not a day-to-day role, no.
22  Q.  Did you review specific notices relevant to this case?
23  A.  I believe you guys have provided examples to them in my
24  testimony.  So, yes, I have.
25  Q.  Now, since the early 2000s -- and maybe you heard Mr. Bloch

 1  addressing this this morning -- Grande has had what it calls an

 2  abuse process or abuse system, correct?

 3  A.  Yes.

 4  Q.  And that system was built to take in and track reports of

 5  illicit activity allegedly coming from a Grande IP address,

 6  correct?

 7  A.  Yes.

 8  Q.  And in the 2000s, the system came to include copyright

 9  infringement that was occurring on Grande's network, correct?

10  A.  That is correct.

11  Q.  That decision to include copyright infringement on the

12  abuse system was based on Grande receiving notices of copyright

13  infringement, correct?

14  A.  Yeah.  To explain a little further, the system existed --

15  Q.  I'm -- you've answered my question.  I'm happy to let your

16  counsel let you expound on that.  All I simply wanted to know

17  is what the basis of it was, and you've answered my question.

18        MR. BROPHY:  Your Honor, I feel like it's appropriate

19  to let the witness fully answer the question.  He was in the

20  middle of the answer, and he was cut off.

21        MR. BART:  I asked the question --

22        THE COURT:  No, I think he answered the question.

23  You'll be able to examine him.

24  BY MR. BART:

25  Q.  So Mr. Horton, in response, Grande developed a process to

1   address the notices that it was receiving, correct?

2   A.  Can you restate that, please?

3   Q.  Yes.  Just before, I asked you whether the decision to

4   include copyright infringement that was occurring on the Grande

5   network as part of the abuse system was based on Grande

6   receiving notices of copyright infringement, and you said yes.

7       So I'm asking you in response to that, it's correct, is it

8   not, that Grande developed a process to address those notices

9   as it was receiving them, correct?

10  A.  Yes.

11  Q.  Thank you.  And generally, generally speaking, at that

12  time, Grande's policy was to suspend immediately the service of

13  a subscriber for whom the company received a notice, correct?

14  A.  To answer that question, I want to clarify the terminology

15  here.  Throughout my deposition, the word "suspend" --

16  Q.  I didn't use the word "knowledge."

17  A.  Sir, I'll need to -- in order to answer the question, I'll

18  need to define it.

19  Q.  You need to define a word that's not in my question?

20  A.  No, the word "suspend."  There's a lot of confusion about

21  the terminology.  And in order to answer that, I want to either

22  answer it specifically what I mean as "suspend" or have you

23  define it, either way.

24  Q.  Okay.  You can't answer the question whether there was a

25  policy to suspend as you understand the term "suspend" without

1   defining that term?

2   A.  That is correct, not without explanation of defining the

3   term.

4   Q.  Okay.

5         MR. BART:  Can I have the deposition?  Can we

6   circulate them, please.

7         MR. O'BEIRNE:  May I approach, Your Honor?

8         THE COURT:  Yes.

9         MR. O'BEIRNE:  Would you like a copy, Judge?

10        THE COURT:  Not at this point.

11        MR. BART:  We're going to be looking at the

12  September 24th, 2019 deposition at page 26, lines 14 to 23.

13  Let me just make sure that that's right.

14  BY MR. BART:

15  Q.  Mr. Horton, do you have the transcript in front of you?

16  A.  I believe you said page 26.  What lines?

17  Q.  Lines 14 to 23.

18  A.  Yes.

19  Q.  And at that time, Mr. Gilmore, my colleague, asked you the

20  following question:

21     *"Question:  Grande's policy for addressing infringement*

22  *notices was -- from mid-2000s until October 2010 was to suspend*

23  *immediately the service of a subscriber for whom the company*

24  *received an infringement notice, correct?"*

25     *"Answer:  Generally speaking, that is correct.  To clarify*

1   *exactly what circumstances a subscriber was temporarily*

2   *suspended, I don't have that information -- I don't have*

3   *information to clarify that, but that was action that we took*

4   *for alleged copyright notifications."*

5        Do you see that testimony?

6   A.   I do.

7   Q.   Was that accurate testimony?

8   A.   Yes.  And the point I was trying to make was temporarily

9   suspended versus --

10  Q.   Mr. Horton, please just answer my questions.

11  A.   That is correct.

12  Q.   In other words, Grande was disconnecting all offenders, not

13  just repeat infringer -- or offenders; isn't that correct?

14  A.   Grande was temporarily suspending based on infringement

15  notices; that is correct.

16  Q.   Is my statement to you, *"Grande was disconnecting all*

17  *offenders, not just repeat offenders,"* an accurate statement or

18  not?  Without further explanation, is that statement an

19  accurate statement or not?

20  A.   Not permanently.  I don't know how to answer it any other

21  way.

22  Q.   Mr. Horton, do you recall giving a deposition, several

23  depositions in this case, correct?

24  A.   Three very long ones.

25  Q.   Right.  And you've reviewed every one of them in

1   preparation for this testimony, haven't you?

2   A.   To the best of my ability.

3   Q.   I'm sure you have.  And in that reading and study and

4   preparation, do you recognize the words in my question as being

5   the words that you used in answering the question that, Grande

6   was disconnecting all offenders and not just repeat offenders?

7   A.   I'm sure you're going to show it to me.  I think the words

8   were used in a lot of different ways, so --

9   Q.   I'm asking whether you personally used it that way?

10  A.   I do not recall.

11  Q.   Let's see if we can refresh your recollection.  On

12  February 21st, 2018, on page 148, line 10 to 17.  This one is

13  by --

14  A.   148.

15  Q.   Giving equal time to Mr. O'Beirne.  These were his

16  questions.  Do you have the reference?

17  A.   I'm sorry.  148, 10 through 17?

18  Q.   Yup.

19       *"Question:  So you think it's fair to say"* --

20            MR. BROPHY:  Objection, Your Honor.  He's not

21  impeaching the witness.  He's refreshing his recollection.  The

22  witness gets to review the testimony and see whether he's

23  refreshed or not.

24            THE COURT:  Give him an opportunity.

25            MR. BART:  Certainly.

```
 1              (Pause.)
 2              THE WITNESS:  Okay.
 3    BY MR. BART:
 4    Q.  Does that refresh your recollection that the wording, "We
 5    were disconnecting all offenders, not just repeat offenders,"
 6    were words that you used in answering the question that was
 7    posed to you at that deposition?
 8    A.  I'm sorry.  I want to make sure I'm reading the correct
 9    one.  February 21st, 2018?
10    Q.  Yup.
11    A.  Page 148?
12    Q.  Yup.
13    A.  Ten through 17?
14    Q.  Yup.  And, in particular, lines 15 to 17.
15    A.  Yes, I used the word "disconnecting."
16    Q.  You used the words "disconnecting all offenders, not just
17    repeat offenders," correct?
18    A.  That is what I said.
19    Q.  Okay.  The subscriber whose service was suspended would
20    then have to call Grande about the suspended service; isn't
21    that correct?
22    A.  That is correct.
23    Q.  Okay.  And Grande would then inform the subscriber that had
24    Grande received a notice of alleged copyright infringement from
25    the subscriber's IP address, correct?
```

1    A.   That is my understanding.

2    Q.   And Grande would take appropriate action from there, isn't

3    that correct?

4    A.   Can you be more specific about "appropriate action"?

5    Q.   Whatever Grande deemed at that point to be appropriate

6    action, Grande would take action depending upon what the

7    subscriber told it and what it thought was the appropriate

8    statement -- position to take from there.

9    A.   That is correct.

10   Q.   And under that policy, Grande, in fact, terminated

11   subscribers for copyright infringement; isn't that correct?

12   A.   When you say "terminate," do you mean permanently terminate

13   their account?

14   Q.   That's what I mean.

15   A.   We did not.

16   Q.   Okay.  Let's take a look at page -- the same transcript

17   from February 21st, 2018, page 142, line 20, to 143, line 9.

18   A.   142 line --

19   Q.   Twenty.

20   A.   Okay.

21   Q.   And the question reads:  *"So Grande did terminate*

22   *subscribers for copyright infringement prior to 2011?"*

23       *"Answer:  Yes.  And it's hard for me to describe exactly*

24   *that process because that was a long time ago, and I was not*

25   *involved in it directly at the time."*

1      *"Question:  I understand, but you are generally aware as to*

2      *whether the practice of terminating subscribers was ongoing or*

3      *not?"*

4      *"Answer:  I am generally aware that we were shutting down*

5      *subscribers based on copyright violations, yes."*

6      Do you see that testimony?

7   A.  I do.

8   Q.  And that was accurate testimony?

9   A.  Yes.  And the confusion remains about permanent --

10  Q.  There's no need for you to say anything further,

11  Mr. Horton.

12      Now, in 2009, a private equity firm, as Mr. Murphy was just

13  testifying, called ABRY Partners bought Grande; isn't that

14  correct?

15  A.  That is correct.

16  Q.  And ABRY had worked with another cable company called

17  Atlantic Broadband, known as ABB; isn't that correct?

18  A.  Yes.

19  Q.  And ABRY bought ABB in to manage Grande, didn't they?

20  A.  That's correct.

21  Q.  And ABB took over managerial responsibilities from Grande

22  in late 2009; isn't that correct?

23  A.  Yes.

24  Q.  And that included the provision of legal services, a Legal

25  Department, for Grande also, correct?

Lamar Horton - Examination                    923

1    A.  Yes, that is my understanding.

2    Q.  In other words, Grande didn't have its own Legal

3    Department.  After the ABB management team came in, they used

4    the ABB Legal Department, correct?

5    A.  That is my understanding.

6    Q.  And there was a period of time when ABB was performing

7    management services for Grande in which Grande continued to

8    suspend all subscribers for whom Grande received a notice of

9    copyright infringement; isn't that correct?

10   A.  That is correct.

11   Q.  But ABB implemented a change in that policy, correct?

12   A.  Yes.

13   Q.  And that policy change happened about October of 2010;

14   isn't that correct?

15   A.  I believe that is correct.

16   Q.  And after the policy change in October 2010, Grande no

17   longer suspended or terminated customers for copyright

18   infringement; isn't that correct?

19   A.  I'm still struggling with the words of "suspend" and

20   "terminate."

21   Q.  Well, maybe you'll get more comfort if you want to look at

22   how you answered the same question during your deposition.

23   Would that help?

24   A.  Sure.

25   Q.  So let's look at the September 24th transcript again.  And

1    we'll look at pages 31, lines 23, to 32, line 2.  Tell me when

2    you're there, Mr. Horton.

3    A.  Can you repeat the line?

4    Q.  Line 23 to line 2 of the next page.

5    A.  Okay.

6    Q.  You were asked the question:  *"After the policy change that*

7    *occurred around October '20, Grande no longer terminated or*

8    *suspended customers for copyright infringement, at least not*

9    *until some time in 2017, right?"*

10        *"Answer:  That is correct."*

11        That is accurate testimony, is it not, Mr. Horton?

12   A.  Yes, that is.

13   Q.  So Grande did not terminate any subscribers for copyright

14   infringement in 2011; isn't that correct?

15   A.  That is correct.

16   Q.  And it didn't do it in 2012 either, did it?

17   A.  That is correct.

18   Q.  Or in 2013?

19   A.  That is correct.

20   Q.  Or in 2014?

21   A.  Correct.

22   Q.  Or in 2015?

23   A.  That is correct.

24   Q.  Or in 2016?

25   A.  Correct.

Lamar Horton - Examination                  925

1    Q.  And under the new policy, Grande could have received a

2    thousand notices about a customer, and it would not have

3    terminated that customer for copyright infringement; isn't that

4    correct?

5    A.  That is correct.

6    Q.  Now, it's true, is it not, that this change in policy, to

7    never terminate or suspend subscribers for copyright

8    infringement, did not occur because Grande had any facts

9    suggesting that its subscribers, in fact, were not engaging in

10   copyright infringement?

11   A.  Can you repeat that, please?

12   Q.  Yes.  You can't point to any facts indicating that Grande

13   determined its subscribers, in fact, were not engaging in

14   copyright infringement and that's why you changed your policy?

15   A.  We did not have any facts either way, so...

16   Q.  So the answer to my question is, yes, you didn't have facts

17   that showed that they were not engaging in copyright

18   infringement, correct?

19   A.  To the best of my knowledge, that is correct.

20   Q.  Now, generally speaking, Grande was receiving the same sort

21   of notices of copyright infringement in 2011 as it did in 2009,

22   correct, as a general matter?

23   A.  Generally speaking, that's correct.

24   Q.  So if Grande received a copyright infringement notice in

25   2009, Grande would have suspended the subscriber under its

1    prior policy, correct?

2    A.   Temporarily suspended, that's correct.

3    Q.   Actually, immediately suspended, correct?

4    A.   Immediately, temporarily suspended, that is correct.

5    Q.   And if Grande had received the identical notice from the

6    same company two years later, Grande would not have taken that

7    action, correct?

8    A.  Not in our communication with the customer, that is

9    correct.

10   Q.  Not at all.  Forget communication with the customer.  It's

11   not like you suspended their service and didn't tell them about

12   it, is it?

13   A.  No, we suspended temporarily service to have the customer

14   call us, so we'd changed our policy on how we communicate with

15   the customer, to be specific.

16   Q.  You did not in any way interrupt the service of the

17   customer; isn't that a fact?

18   A.  After 2010?

19   Q.  Yes.

20   A.  That is correct.

21   Q.  Now, you were here in court an hour ago -- well, maybe it

22   only feels like an hour ago, maybe it was 25 minutes ago --

23   when Matt Murphy testified by video that when the new

24   management team came in, in late 2009, one of their primary

25   goals was to reduce churn, to reduce the number of customers

1    that left Grande, correct?

2    A.  Yes.

3    Q.  Okay.  And customer churn includes when Grande terminates

4    their service, correct?

5    A.  If Grande permanently terminates an account --

6    Q.  Please answer my question.

7    A.  I can't answer that question without quantifying what that

8    word means.

9          MR. BROPHY:  Your Honor, I'm sorry, but counsel's just

10   interrupting the witness when he's trying to give answers.

11         MR. BART:  I have a right in cross to ask for an

12   answer to my question.  And for him to be as prepared as he is

13   and try to reframe his question, that's improper.

14         THE COURT:  Basically, he needs -- the witness needs

15   to answer the question that's asked.  However, if the answer is

16   responsive, he's entitled to give the full answer.  The problem

17   is that some have been and some haven't been, so --

18         MR. BART:  Okay.  Well, let me move on, and -- let me

19   just move on.

20   BY MR. BART:

21   Q.  It's a fact, is it not, that one way to reduce churn is to

22   not terminate -- and I'll even say permanently terminate, so we

23   don't even get into this semantic issue -- a customer for

24   copyright infringement; isn't that correct?

25   A.  Yes, that's correct.

Lamar Horton - Examination                    928

1    Q.  Okay.  And under Grande's new policy, Grande continued to

2    collect fees from subscribers who were the subject of multiple

3    infringement notices unless they were terminated for some other

4    reason; isn't that correct?

5    A.  The policy did not change our termination --

6    Q.  Can you answer my question?

7    A.  I'm trying to.

8    Q.  The question is very simple.  Did Grande continue to

9    receive fees from subscribers who were the subject of multiple

10   infringement notices unless they were terminated for some other

11   reason?

12   A.  That is correct.

13   Q.  Thank you.  Isn't it a fact that between 2011 and 2017,

14   Grande received about 1 million notices of copyright

15   infringement?

16   A.  I believe we discussed that at my deposition.  And, yes, I

17   believe that was correct.

18   Q.  Okay.  And you were shown in your deposition a document

19   that was prepared for the litigation by Grande, which was

20   generated by the abuse system, and showed the number of notices

21   that you had received, correct?

22   A.  Yes, notices.

23   Q.  That's all.  There's nothing controversial about this.

24          MR. BART:  Can we show the witness, but not the jury,

25   Plaintiff's Exhibit 346?

1   BY MR. BART:

2   Q.  Do you have that in front of you, Mr. Horton?

3   A.  I do.

4   Q.  And this is the document that we were just talking about,

5   correct?

6   A.  I believe that's correct.

7   Q.  Okay.  And you testified that the information in this

8   document was generated by querying Grande's abuse system,

9   correct?

10  A.  Yes, I believe that's correct.

11       MR. BART:  Your Honor, I move to admit this as a party

12  admission.

13       MR. BROPHY:  Your Honor, I don't think there's been

14  foundation laid for the creation of this document.

15       MR. BART:  Your Honor, it was a document produced for

16  the litigation by Grande bearing Grande --

17       THE COURT:  It will be received.

18       MR. BART:  Thank you.  May I publish it to the jury,

19  please?

20       THE COURT:  Yes.

21  BY MR. BART:

22  Q.  Mr. Horton, now that the jury can see it, let's discuss it

23  briefly.  It's a chart entitled *"DMCA Notices Received By Year*

24  *from 2010 to 2018."*  Isn't that correct?

25  A.  Yes.

1    Q.  And it shows how many notices Grande's abuse system

2    reported it received and processed from Rightscorp from any

3    source for each year and from 2010 to 2018; isn't that correct?

4    A.  That appears correct.

5    Q.  And you would agree this information is accurate, correct?

6    A.  To the best of my knowledge, yes.

7    Q.  Okay.  Now -- and you can take that down.

8         Now, after Grande changed its policy in October of 2010,

9    Grande adopted an automated system for sending a letter or

10   e-mail to customers for whom Grande received an infringement

11   notice about that person, correct?

12   A.  Yes.  When we received the allegation notice, we sent a

13   letter starting at that date, yes.

14   Q.  How about when you received an infringement notice about

15   that person?

16   A.  Yes.

17   Q.  Thank you.  The letter would then ingest the data contained

18   in the notice and parse it into a letter, correct?

19   A.  Yes, that is correct.

20   Q.  The system would get the subscriber's IP address, correct?

21   A.  The IP address would be in the notice, so we would collect

22   that, yes.

23   Q.  Right.  And the date and time of the use of the IP address

24   cited in the notice?

25   A.  Correct.

1   Q.  And the name of the content that was identified in the

2   notice?

3   A.  I believe the file name, yes.

4   Q.  And generally speaking, Grande's systems had the

5   information required to match up the IP address and time stamp

6   to who the subscriber was, correct?

7   A.  Generally speaking, that is correct.

8   Q.  And when Grande began to receive notices from a new entity,

9   it did research to try and confirm that it was a valid entity

10  sending the notices; isn't that correct?

11  A.  Valid in terms of we can determine who they are and who

12  they're sending from, as a source on the Internet.

13  Q.  There would be research done to validate that it's a valid

14  entity sending these notices, correct?

15  A.  A valid entity sending, that is correct.

16  Q.  And if Grande's records show notices from a company going

17  to Grande and then Grande processing and forwarding those

18  notices to customers, that means Grande had qualified that

19  company as a valid entity; isn't that correct?

20  A.  As a valid sending entity, correct.

21  Q.  Now, during the time period when Grande no longer suspended

22  or terminated customers for copyright infringement, it became

23  aware of a litigation against another ISP, Cox Communications,

24  based on notices from Rightscorp, correct?

25  A.  Yes.  I believe we had some awareness of that.

1   Q.  And you personally were aware in November of 2014 that a

2   music company called BMG had sued Cox for copyright

3   infringement, correct?

4   A.  I was.

5   Q.  And you discussed it with another employee, at least one,

6   named Robbie Creel, correct?

7   A.  Yes, I believe we shared articles about it.

8   Q.  Okay.  And the two of you discussed the fact that if the

9   suit was successful, it would cause some changes to your

10  industry; do you remember that?

11  A.  If I recall, I believe Robbie said that.

12  Q.  Okay.  You were also aware that that lawsuit was based on

13  Rightscorp notices, weren't you?

14  A.  I believe that was the context of the article, yes.

15  Q.  And at that time, Grande and you knew that you were also

16  receiving infringement notices from Rightscorp, correct?

17  A.  I was aware of Rightscorp sending notices to us, yes.

18  Q.  But after learning of the lawsuit that BMG filed against

19  Cox, Grande did not do any research into the Rightscorp system,

20  did it?

21  A.  Not to my knowledge.

22  Q.  And then in December of 2015, a jury ruled in favor of BMG

23  in its case against Cox, correct?

24  A.  I believe those dates are accurate, yes.

25  Q.  And Mr. Creel e-mailed you about that verdict, didn't he?

1   A.  Yes.

2   Q.  Okay.

3           MR. BART:  I'd like to show the witness but not the

4   jury Plaintiff's Exhibit 166.

5   BY MR. BART:

6   Q.  It's an e-mail from Mr. Creel to you and another Grande

7   employee named Dawn Blydenburgh.

8       You've seen this e-mail before, have you not, Mr. Horton?

9   A.  Yes.

10  Q.  And you recognize it as an e-mail that Mr. Creel sent to

11  you and Ms. Blydenburgh on December 18, 2015?

12  A.  Yes.

13          MR. BART:  I move to admit this as a party admission,

14  Your Honor.

15          THE COURT:  It will be received.

16          MR. BROPHY:  Your Honor, just subject to our earlier

17  objections, please.

18  BY MR. BART:

19  Q.  The subject line of this e-mail is *"DMCA Judgment,"* isn't

20  that correct?

21  A.  That's what it says.

22  Q.  And again, DMCA is the Digital Millennium Copyright Act;

23  isn't that correct?

24  A.  Yes.

25          COURTROOM DEPUTY CLERK:  Does he want it up to the

1  jury?

2          MR. BART:  Oh, okay.  Thank you.  Can we please

3  publish this to the jury.

4  BY MR. BART:

5  Q.  And in response to that, Mr. Creel wrote, *"We may need to*

6  *revisit this process at some point regarding copyright*

7  *infringement,"* correct?

8  A.  That's what it says.

9  Q.  And you understood that the reason Mr. Creel suggested that

10  Grande might need to revisit its process was because of

11  Grande's own potential exposure to a similar claim; isn't that

12  correct?

13  A.  I can't say I know what Robbie meant by that e-mail, no.

14  Q.  What was your understanding of why he said that when you

15  received this e-mail?  Wasn't it because you thought that he

16  was suggesting that Grande might be subject to the same sort of

17  claim?

18  A.  I couldn't say what he was saying.

19  Q.  I'm asking you what your understanding -- you were the

20  reader -- one of the two readers of this e-mail, correct?

21  A.  Yes.

22  Q.  And you knew at the time that you were receiving Rightscorp

23  notices, correct?

24  A.  That is correct.

25  Q.  And you knew that this case was decided on the basis of

1   Rightscorp notices; isn't that correct?

2   A.  I wouldn't say we fully understood what it meant, but

3   Rightscorp was involved, that is correct.

4   Q.  And when Mr. Creel said to you that this might cause you to

5   revisit your policies regarding this, you didn't understand

6   that as being a reference to the fact that you might -- you,

7   meaning Grande -- might be subject to a similar claim?

8   A.  Not necessarily.

9   Q.  Okay.  Now, two months later, in February of 2016, you and

10  others at Grande had more communications about Rightscorp and

11  the impact of the Cox decision on Grande; isn't that correct?

12  A.  I believe that's correct.

13  Q.  Specifically, your boss Matt --

14      Matt Rohre, he is your boss, correct?

15  A.  Was, at the time.

16  Q.  Was.  Fair enough.  -- asked you for your take on a letter

17  that Rightscorp had sent a year earlier asking for a meeting to

18  discuss Rightscorp's methodology and notices; isn't that

19  correct?

20  A.  I do remember there was an e-mail about that, yes.

21          MR. BART:  And let's show the witness, but not the

22  jury, Plaintiff's Exhibit 108.

23  BY MR. BART:

24  Q.  Do you recognize this e-mail, Mr. Horton?

25  A.  This was to Matt from Deborah Rankin, so this one is not my

1   e-mail.

2   Q.  Okay.  But you do recall that Mr. Rohre forwarded on to you

3   a copy of the letter that Rightscorp had addressed to Grande

4   and asked for your take on it; is that correct?

5   A.  I do remember an e-mail referring to it.  I can't remember

6   when that was exactly.

7   Q.  Okay.  But you're familiar with the basic topic that

8   Mr. Rohre asked you about a letter that had been received by

9   him from Rightscorp asking for a meeting to discuss the

10  Rightscorp system with Grande, correct?

11  A.  Yes.

12  Q.  And but to your knowledge, Grande did not meet with

13  Rightscorp in 2015; isn't that correct?

14  A.  Not to my knowledge.

15  Q.  And Grande has never met with Rightscorp since that time;

16  isn't that correct?

17  A.  Not to my knowledge.

18  Q.  And so let's look instead at Exhibit 52, which has already

19  been admitted into evidence, so we can just put that up.

20      You see that, Mr. Horton?

21  A.  I do.

22  Q.  Okay.  And that's the letter we've just been referring to,

23  correct?

24  A.  It appears to be, yes.

25  Q.  And this letter is addressed to Grande's CEO, correct,

1    Mr. Holanda?

2    A.   Yes.

3    Q.   And to Mr. Murphy, who is Grande -- or at least was

4    Grande's chief technology officer?

5    A.   Yes.

6    Q.   And to its general counsel, correct?

7    A.   That is correct.

8    Q.   And the general counsel is Mr. Kramp?

9    A.   Correct.

10   Q.   And he's still Grande's general counsel, isn't he?

11   A.   He is.

12   Q.   And he's been sitting here in the courthouse with us as

13   well all through the trial, hasn't he?

14   A.   He has.

15   Q.   Can you show the jury who he is?

16   A.   Sitting in the back in the audience.

17   Q.   Now, Grande's -- as far as you know, Grande's legal team

18   handled the receipt of this initial letter in 2015, correct?

19   A.   I can only assume so, I don't know.

20   Q.   Didn't you testify in your deposition that the legal team

21   handled the letter?

22   A.   That is my recollection.

23   Q.   Fair enough.  And so then there came a point at which

24   Mr. Rohre forwarded this e-mail to you and asked you for your

25   take; do you recall that?

1    A.   I do.

2    Q.   And your response to his question was to send him a link to

3    point out the article that talked about the result in the BMG

4    versus Cox case; isn't that correct?

5    A.   Hard to remember the details, but I believe that's correct.

6    Q.   Okay.  And the link that you sent him in response to his

7    question about, what is your take about the Rightscorp letter,

8    was to let him know, this is my take, that Cox lost the

9    decision and we need to think about that in respond -- in

10   addressing Rightscorp; is that correct?

11   A.   I wouldn't characterize it that way, no.  It was more

12   that's my boss, so I'm trying to educate him more about

13   anything pertaining to Rightscorp in the news at the time.

14   Q.   Right.  And what was there about Rightscorp in the news was

15   a headline saying that Rightscorp -- I think inaccurately in

16   the headline -- prevailed in that lawsuit because Rightscorp

17   wasn't a party, but isn't that correct?

18   A.   Is what correct?

19   Q.   The statement that you were educating him, as you said,

20   about the fact that here is a news article, at the very time

21   you were asking me about this Rightscorp meeting, saying that

22   Rightscorp prevails in the case against Cox?

23   A.   Just sharing information, yes.

24   Q.   Yes, and educating him about what you knew, correct?

25   A.   About what the Internet knew, correct.

```
 1   Q.  Okay.  Fair enough.
 2           MR. BART:  Let's show Plaintiff's Exhibit 216 to -- is
 3   this in evidence?  Let's just show it to the witness and to the
 4   judge.  Maybe this puts all the pieces together.
 5   BY MR. BART:
 6   Q.  Do you have that in front of you, Mr. Horton?
 7   A.  I have a black screen.
 8   Q.  Okay.  It's all good.
 9       (Pause.)
10       Do you have that in front of you, Mr. Horton?
11   A.  I do.
12   Q.  This is an e-mail thread that includes an exchange between
13   you and Matt Rohre on February 18, 2016, correct?
14   A.  That is correct.
15   Q.  And you remember this exchange, do you not?
16   A.  Is this the one we were just discussing?
17   Q.  Yes.  It is.
18   A.  Yes.
19           MR. BART:  Your Honor, I move to admit Plaintiff's 216
20   as a party admission.
21           MR. BROPHY:  Subject to our earlier objection.
22           THE COURT:  It will be received.
23   BY MR. BART:
24   Q.  Now, you'll see in this -- can we publish it for the jury,
25   please.
```

Lamar Horton - Examination                    940

1        Now, as we were describing generally before, in this

2    document, Mr. Rohre forwards you an e-mail attaching the 2015

3    Rightscorp letter, correct?

4    A.  Yes, I believe that's correct.

5    Q.  And then asks you, what is your take on this, correct?

6    A.  Yes.

7    Q.  And then in the next e-mail dated -- timed 2:00 on the same

8    day, your response was to paste into your e-mail some text

9    referring to the ruling in the Cox case, correct?

10   A.  Yes.  I believe the text was a copy-and-paste from the

11   article title and then the link to the Internet article.

12   Q.  Okay.  Now, you sent that e-mail to Mr. Rohre at 3:10 p.m.

13   on February 18, 2016, correct?

14   A.  Yes.

15   Q.  And about three minutes later, you sent an e-mail asking

16   how many notices Grande had received from Rightscorp and other

17   entities, isn't that correct?

18   A.  You'd have to refresh my memory.

19   Q.  Happy to do that.

20   A.  I'm sure you are.

21   Q.  We work so well as a team, Mr. Horton.

22        MR. BART:  Let's show the witness, but not the jury,

23   Plaintiff's Exhibit 80.

24   BY MR. BART:

25   Q.  Do you see this?

1   A.   I do.

2   Q.   I can't tell whether there's a blank screen here or whether

3   the document is up, so I just wanted some confirmation before

4   moving forward.

5        Now, this is an e-mail you sent to Sam Merritt and to Colin

6   Bloch a few minutes after your exchange with Mr. Rohre,

7   correct?

8   A.   Yes, that is correct.

9   Q.   And what you're asking is, how many notices we received

10  from these types of entities over a given month, quarter, and

11  year, correct?

12  A.   Yes, that is correct.

13  Q.   And the subject line of this is, *"Rightscorp – DMCA,"*

14  correct?

15  A.   Yes.

16  Q.   And at this time I think it's been established, but just to

17  refresh everyone's recollection, Grande was managed by a

18  company called Patriot Media; isn't that correct?

19  A.   That is correct.

20  Q.   Okay.  And the reason that you sent your inquiry to Sam

21  Merritt and Colin Bloch that we just looked at, is that you

22  were asked by Patriot to let them know how many notices Grande

23  had received from Rightscorp, correct?

24  A.   Specifically for this e-mail?  I don't recall.

25  Q.   So let's take a look, see if we can refresh your

1   recollection, to your deposition on the February 21st, 2018

2   deposition at page 243, line 23, to 244, line 1.  Just bear

3   with me for a second too.

4           MR. BART:  Your Honor, a bird just whispered into my

5   ear that PX 80 that we had just been talking with the witness

6   about has not yet been admitted as evidence, so I will

7   belatedly move its admission as party admission.

8           MR. BROPHY:  Subject to our earlier objection.

9           THE COURT:  It will be received.  And this is probably

10  a good time for our afternoon recess.

11          MR. BART:  Thank you, Your Honor.

12          THE COURT:  I need to talk to counsel about something

13  anyway.

14          MR. BART:  Okay.

15          THE COURT:  Okay.

16          COURT SECURITY OFFICER:  All rise for the jury.

17          *(2:59 p.m., the jury exits the courtroom.)*

18                          *   *   *

19          THE COURT:  You can step down, sir.  The jury is

20  departed.

21          This is the time -- well, I was going to wait until

22  after the witness finished direct and cross, but this would be

23  the appropriate time to give a cautionary instruction to the

24  jury regarding any testimony they've heard about a verdict

25  against Cox, which is what we're talking about here, so I had

1   asked counsel if they wanted to submit something to me or they

2   just wanted to leave it to me.  I haven't seen anything.

3           MR. BART:  We haven't either, Your Honor.

4           MR. BROPHY:  Your Honor, we will leave that to your

5   discretion with one comment.

6           THE COURT:  Okay.

7           MR. BROPHY:  We think it's important the jury

8   understands that verdict was overturned so they're not left

9   with the belief that that verdict is sticking until today.  And

10  I guess just to complete that thought, the other question in my

11  mind is whether we are permitted to elicit from our witnesses

12  information about that fact that it was reversed, if it's

13  something that they knew.

14          MR. BART:  Your Honor, the reason that we were limited

15  the way that we were is to not re-litigate this, but to just

16  talk about the impact of the decision on the company, on

17  Grande, at that time, as reflected through their

18  communications.  To the extent that they want to point out

19  affirmatively that was case was reversed, then I would, of

20  course, want an instruction that the Fourth Circuit expressly

21  validated the Rightscorp evidence, and the reversal wasn't on

22  that ground.

23          And frankly, I think both of those things are

24  improper.  I think Your Honor made the right decision in

25  limiting the use of this to its effect on the conduct of the

Lamar Horton - Examination                 944

1    parties.  And to the extent that we go beyond that and start

2    explaining, not simply that that verdict should not be

3    considered evidence against Grande here, which you're going to

4    do, and we're fine with, but to affirmatively say, and that

5    verdict was reversed, now you're getting into the merits of

6    that case.  And we would want that to be accurately reflected,

7    that if you're going to talk about the appeal, you have to talk

8    about it completely.  And that's going to bring us into a lot

9    more involvement in the merits of the case.

10            THE COURT:  Well, I'm --

11            MR. BART:  So I would oppose that injection.  And if

12   it does happen, we would want to have something in there that

13   indicates that it was based on a jury instruction and the Court

14   expressly found that BMG had presented significant credible

15   evidence of direct infringement.

16            As I said, I'm not asking for that in the first

17   instance, but if we're going to get into reversals, then I want

18   it to be accurate.

19            MR. BROPHY:  Two things, Your Honor.  One, the

20   plaintiff decided to throw the skunk into the jury box and now

21   they want just their side of it to be presented.  You can't

22   show half the picture to the jury, and what's going to be left,

23   if we just say, you know, don't let this verdict affect your

24   decision in this case.  They see this verdict, and that verdict

25   is going to guide their decision-making full stop.

1        So the only way to counter that inevitability is to

2   explain that that decision was overturned and the case resolved

3   itself without final verdict in the case.  That's the best way

4   to get back to neutral, because where we are right now, it's

5   not surprising the plaintiffs don't want us to talk about it

6   anymore, because there's this stinky skunk in the jury box.

7        MR. BART:  Your Honor, it's not that I don't want to

8   talk about it anymore.  I'm saying that if we talk about it,

9   more particularly to add the language that counsel wants

10  included.  That's not an accurate statement.  He wants them to

11  believe by adding that language that it was reversed in some

12  way that impacted Rightscorp, which is not the case.  We didn't

13  get to put in the $25 million verdict -- not that we asked to.

14  Yes, that was reversed, but the finding of the reliability of

15  the Rightscorp evidence was not.

16       And it would be an improper and erroneous instruction

17  to tell the jury that it was reversed and leave it to them to

18  think that somehow that reversal cast doubt on the validity of

19  the Rightscorp evidence.

20       So I think -- I refer to my prior position.  I think

21  Your Honor accurately and properly resolved this, that it's

22  relevant to the conduct of the parties, and that it can be

23  cured with a limiting instruction saying nothing about this

24  should be evidence in terms of our requirement of proving

25  material contribution and contributory infringement.

1          MR. BROPHY:  Your Honor, our position is leaving this

2     as it stands, the way that my colleague suggests, is going to

3     fundamentally and unquestionably affect the jury's ability to

4     look at this case objectively.  They are learning about a

5     verdict in another case based on Rightscorp, and it is going to

6     compromise their decision-making.  There's no way that's not

7     going to happen.

8          MR. BART:  We've already addressed that subject.  We

9     addressed that subject, because you can't exclude that evidence

10    when your own clients are talking about it in real time and

11    it's guiding their decisions.  You can't sanitize the record

12    because of that when your own clients injected Cox into this.

13    If they never referenced this, if they didn't act based on it,

14    then, no, we wouldn't be able to reference it.  But they

15    mentioned it.  They brought it up, and we have a right to bring

16    it to the attention of the jury.  But for you to say it was

17    reversed in a misleading description of what happened on the

18    appeal, gives inaccurate information.  So either we give

19    complete information, which I think is unnecessary, or we leave

20    it the way that the Court left it yesterday.

21         MR. BROPHY:  The Fourth Circuit reversed its decision

22    based in part on the knowledge standard, and the Rightscorp

23    evidence went directly to that knowledge standard, and the

24    Court reversed because the Rightscorp evidence hadn't been

25    proven to meet that threshold.

1          MR. BART:  That's just so completely wrong, I can't

2     believe you say that with a straight face.

3          THE COURT:  All right.  I actually looked at the case,

4     so I know what the case says.  I don't need to be schooled on

5     the case.  Please sit down.  I'm writing something down here.

6          *(Pause.)*

7          All right.  I would propose something along these

8     lines and this is something I just came up with just now.

9          *Ladies and gentlemen of the jury, you have heard*

10    *evidence that in another case, in another court, with different*

11    *parties, a verdict in a copyright litigation was reached*

12    *against a different Internet provider.  This evidence may be*

13    *considered by you only for the purpose of evaluating the state*

14    *of mind of Grande executives at that time and nothing else.  It*

15    *is not to be considered by you as evidence that because a*

16    *different Internet provider was found liable, that Grande is*

17    *liable in this case.  Again, the other case involved different*

18    *parties and different lawyers.  Further, the case went up on*

19    *appeal, and thus, the final result of that case is not before*

20    *you, nor relevant.*

21          I don't have to tell them how the appeal was decided

22    one way or the other.  I'm just going to say "went up on

23    appeal."  As far as they know, it's still on appeal.  Doesn't

24    matter.  I'm trying to be Solomon here.  Nobody likes half a

25    baby.

1              Waiting for a clarification request.  Counsel is

2    mulling his options here.  I better get off the bench before

3    it's too late.  Yes.

4              MR. BROPHY:  May I make one request, Your Honor?

5              THE COURT:  Yes.

6              MR. BROPHY:  Without waiving our objection to a

7    request for a clarification that was reversed, I think you

8    mentioned that there were different parties and different

9    lawyers.

10             THE COURT:  Right.

11             MR. BROPHY:  We'd also ask that you clarify there were

12   different facts and different evidence as well.

13             THE COURT:  There wasn't entirely different facts.

14             MR. BROPHY:  Well, there are, Your Honor.  For

15   example, I spent a lot of time with Ms. Frederiksen talking

16   about that 10 percent bit field rule.  That effect on the

17   notices is only relevant to this case and was not relevant to

18   the previous case.  The period --

19             THE COURT:  Well, then, I'd have to get into the fact

20   that -- I would have to say something to the effect -- and

21   there was -- and while Rightscorp was involved in the other

22   case, there was other evidence in the case that was different.

23             MR. BROPHY:  There was just different evidence, yes,

24   Your Honor.

25             THE COURT:  Well, I would have to put Rightscorp in

1   there, because that's the way it is.  Okay, so I'm going to

2   hand this to you.  I hope you can read it.  My law clerks can

3   barely read my writing.  She might be able to help you.

4           MR. BROPHY:  I'm sure mine is worse, Your Honor.

5           THE COURT:  See if you can redo this.  I'll give you a

6   few minutes, and then we'll talk about it, okay, before the

7   jury comes back.

8           MR. BROPHY:  Your Honor, one other point if I may.

9   We'd like to request a final instruction on this as well when

10  the time comes.

11          THE COURT:  Yeah, no, no, that's fine.  I was

12  intending to give a final instruction.

13          MR. BROPHY:  Thank you.  I would also -- in the

14  interest of making sure I'm clear on things.  There's a

15  question about whether we get to elicit information about the

16  differences between that case and this case.

17          THE COURT:  No.

18          MR. BROPHY:  Understood.

19          THE COURT:  If I put in there that while Rightscorp

20  was involved in that litigation -- and it has to go in there in

21  a way, because that's the whole purpose of the -- you know...

22          MR. BROPHY:  Right.

23          THE COURT:  There was other evidence that was

24  dissimilar, so that's why I'm giving this to you.  You can work

25  out that language.  I'm going to give something along these

```
 1   lines.

 2           MR. BROPHY:  Thank you, Your Honor.

 3           THE COURT:  Okay.

 4           MR. BART:  We will look at it.  Thank you.

 5           THE COURT:  All right.

 6           COURT SECURITY OFFICER:  All rise.

 7           (3:14 p.m.)

 8                            *   *   *

 9           (3:32 p.m.)

10           COURT SECURITY OFFICER:  All rise.

11           THE COURT:  Please be seated.  I'm not going to give

12   this instruction now anyway.  We're not done with the witness.

13   So any additions?

14           MR. BROPHY:  Your Honor, we have a draft proposal, but

15   I don't think my colleagues have had an opportunity to fully

16   prepare theirs.  So we propose, if it's okay with you, to wait

17   until the afternoon break -- or, I guess we are in the

18   afternoon break.

19           THE COURT:  We can wait until tomorrow morning before

20   we start.  I don't think we're going to be done with this

21   witness, are we?

22           MR. BART:  It will be close.  I mean, it depends.  If

23   they have no questioning, we might finish the witness.  If they

24   have questioning, we won't finish the witness.

25           THE COURT:  Well, in any event, this is the last
```

 1   witness for the day, no question.

 2           MR. BART:  Yes.

 3           THE COURT:  So we can do it first thing tomorrow

 4   morning.

 5           MR. BROPHY:  It would be my preference to read the

 6   instruction very shortly after the witness gets down so this

 7   doesn't percolate in the jury's mind about an instruction from

 8   Your Honor.  I realize I'm being difficult, but...

 9           MR. BART:  I think we're fine with it tomorrow

10   morning, but, you know, we -- and this is not finger-pointing,

11   because it's a difficult process to do on the run.  We just got

12   it a minute or two ago, and I need a little more time to look

13   at it.

14           THE COURT:  Well, we probably won't be done with this

15   witness anyway.

16           MR. BART:  Okay.

17           MR. BROPHY:  Your Honor, may we hand up our proposal

18   just so you have it?

19           THE COURT:  Sure.  Of course.

20           MR. BART:  Again, this isn't a criticism.  We

21   literally got it two minutes before.  The Internet was slow,

22   just turning it over to --

23           THE COURT:  I appreciate that.

24           COURT SECURITY OFFICER:  Please stand for the jury.

25           *(3:33 p.m., the jury enters the courtroom.)*

```
 1                          *   *   *
 2            THE COURT:  Go ahead, counsel.
 3            MR. BART:  Thank you, Your Honor.
 4   BY MR. BART:
 5   Q.  Hello again, Mr. Horton.  How are you?
 6   A.  Good.
 7   Q.  Before we broke, we moved Plaintiff's Exhibit 80 into
 8   evidence, and I neglected to publish it, so I'd like to publish
 9   it to the jury so the jury can look at it.
10       And we looked at this exhibit right before the break,
11   Mr. Horton.  Do you recall that?
12   A.  Yes.
13   Q.  And this was an e-mail from you to Sam Merritt and Colin
14   Bloch relating to Rightscorp DMCA as the subject and saying,
15   "Who can tell me how many notices we receive from these types
16   of entities over a given month/quarter/year?"
17       And right before that, I asked you whether the reason that
18   you had sent your inquiry to them was that you had been asked
19   by Patriot to let them know how many notices Grande had
20   received from Rightscorp.  Do you recall that question?
21   A.  I do.
22   Q.  And do you recall that that was the reason?
23   A.  Yes.
24   Q.  Now, you personally were not clear on the process for
25   determining how many notices Grande received over a given
```

1  period, correct, personally?

2  A.  Personally for how to quantify that, yes.

3  Q.  All right.  But you came to learn that there was a process

4  by which someone could run a search and come up with that

5  information, correct?

6  A.  Yes, they were able to search and provide that information.

7  Q.  And in response to your request, a Grande employee named

8  Lars Christenson sent you account of all the infringement

9  notices sent to Grande at either of two e-mail addresses; isn't

10  that correct?

11  A.  That is correct.

12       MR. BART:  Now, I'd like to show the witness, but not

13  the jury, Plaintiff's Exhibit 81.  It's a continuation of the

14  e-mail thread that we just saw.

15       And, Your Honor, I move to admit this as a party

16  admission.

17       MR. BROPHY:  Your Honor, subject to our earlier

18  objections.

19       THE COURT:  It will be received.

20       MR. BART:  And let's show this to the jury, please.

21  BY MR. BART:

22  Q.  Now, this thread begins with the e-mail we just looked at

23  and continues, right?

24       And because your question asks the number of notices Grande

25  received from these type of entities, Mr. Christianson

1  confirmed that the data he pulled was not just for Rightscorp,

2  correct?

3  A.  Yes.

4  Q.  And so Grande received, according to this, 94,919 notices

5  in 2013, correct?

6  A.  Yes.

7  Q.  And 236,090 in 2014, correct?

8  A.  That is correct.

9  Q.  And 365,569 in 2015, correct?

10 A.  Yes.

11 Q.  And you responded to Mr. Christianson, *"Wow,"* right?

12 A.  I did.

13 Q.  And that was because this was a large volume of notices,

14 correct?

15 A.  Large volume of notices and changing year over year.

16 Q.  Okay.  And then you asked what the count was for just

17 Rightscorp notices, correct?

18 A.  I did.

19 Q.  And then later that day, Mr. Christianson also gave you a

20 count just for Rightscorp notices, correct?

21 A.  I believe that is correct.

22 Q.  Okay.

23        MR. BART:  Let's take a look at Plaintiff's Exhibit --

24 show the witness and not the jury, Plaintiff's Exhibit 82.

25 BY MR. BART:

1   Q.  This is another e-mail Mr. Christianson sent to you on
2   February 18, 2016.  Do you recognize this, Mr. Horton?
3   A.  Yes.
4   Q.  Okay.  And this is the data that you had just asked for
5   relating to Rightscorp, correct?
6   A.  Yes, I believe that is correct.
7            MR. BART:  I move to admit Plaintiff's 82 as a party
8   admission, Your Honor.
9            MR. BROPHY:  Just subject to our earlier objection,
10  Your Honor.
11           THE COURT:  It will be received.
12           MR. BART:  I'd like to publish it for the jury as
13  well, please.
14  BY MR. BART:
15  Q.  This tally went through from 2011 to February 18, 2016,
16  correct?
17  A.  Yes.
18  Q.  And this is the information that Patriot had asked you to
19  provide to them, correct?
20  A.  I can't see the full e-mail, but I believe that's correct.
21  Q.  And then you then sent this on to Mr. Rohre, correct?
22  A.  I believe so.
23           MR. BART:  Let's take a look -- let's have the witness
24  but not the jury look at Plaintiff's Exhibit 84.
25  BY MR. BART:

1   Q.  And is this the transmittal e-mail we were just talking

2   about, Mr. Horton?

3   A.  Yes.

4           MR. BART:  I move to admit this as a party admission,

5   Your Honor.

6           MR. BROPHY:  Subject to the same objections, please.

7           THE COURT:  It will be received.

8           MR. BART:  Okay.  Let's show Plaintiff's Exhibit 84 to

9   the jury.

10  BY MR. BART:

11  Q.  And the subject line is *"Rightscorp,"* correct?

12  A.  Yes.

13  Q.  And we can look at the list below, and it gives you the

14  numbers of notices received just from Rightscorp for each year

15  from 2011 through 2016, correct?

16  A.  That is correct.

17  Q.  You also attached a spreadsheet showing the Grande account

18  numbers that correspond to the Rightscorp notices and then the

19  tally of the number of notices received by each account in

20  2015, correct?

21  A.  Based on the query that was provided, yes, that is correct.

22  Q.  And I believe that the --

23          MR. BROPHY:  And also for point of clarification, I

24  apologize, is this already in evidence?

25          MR. BART:  Yes.

```
 1              MR. BROPHY:  Thank you.

 2              MR. BART:  It's page two of the exhibit I just moved

 3     in.

 4     BY MR. BART:

 5     Q.  So the top row of this page -- it may be a little hard to

 6     see -- shows that one Grande account was the subject of nearly

 7     14,000 Rightscorp notices in 2015, correct?

 8     A.  That's what the report says, yes.

 9     Q.  Grande did not terminate that account in 2015, did it?

10     A.  We did not.

11     Q.  Okay.  The document shows that there are more than 40

12     Grande accounts that were the subject of over a thousand

13     Rightscorp notices; isn't that correct?

14     A.  I can't see it that way, but -- without counting them

15     individually, I don't know if I can validate that.

16     Q.  Somewhere in the rough ballpark, and your counsel can

17     correct me on redirect -- on cross, if I'm misstating it, but

18     I'm saying more than 40 accounts had over a thousand notices.

19     Grande didn't terminate any of them either, did they?

20     A.  No.

21     Q.  In fact, Grande didn't terminate the account of any user on

22     this spreadsheet in 2015 for infringing copyrights, correct?

23     A.  That is correct.

24     Q.  Now, at this time in February of 2016, Grande was not even

25     sending Rightscorp notices to Grande subscribers, correct?
```

1  A.  In 2016?

2  Q.  February.  At the time we're looking at all of these

3  e-mails that we're talking about, this whole line of

4  questioning is relating to this exchange of information in

5  early -- among all of you in early 2016, in February.

6  A.  Yes.

7  Q.  Didn't you learn during that -- pretty much at the same

8  time, that there had been a glitch in the Grande system that

9  caused an issue in parsing the data that was needed to send

10  letters, and that Grande notices had not been sent to

11  customers?

12  A.  I recall an e-mail around that time about a glitch, yes.

13        MR. BART:  Let's show the witness but not the jury

14  Plaintiff's Exhibit 181.

15  BY MR. BART:

16  Q.  So this is an e-mail exchange between yourself, Lars

17  Christenson and Jimmy Quigley, correct, relating to the glitch?

18  A.  Yes.

19        MR. BART:  I move to admit this as a party admission,

20  Your Honor.

21        MR. BROPHY:  Subject to the same objections, please.

22        THE COURT:  Okay.  It will be received.

23        MR. BART:  Now, let's show Plaintiff's Exhibit 181 to

24  the jury.

25  BY MR. BART:

1   Q.  And the subject line is, *"Digital Rightscorp Fixed,"*

2   correct?

3   A.  Yes.

4   Q.  And that's a reference to Rightscorp, correct?

5   A.  I believe that's correct.

6   Q.  And in the bottommost e-mail, Mr. Christianson wrote that

7   he fixed the glitch, correct?

8   A.  Yes.

9   Q.  And your response was to ask Mr. Christianson if he could

10  tell when the issue started, correct?

11  A.  Yeah, when it changed or when it started, yes.

12  Q.  And Mr. Christianson responded to you that until he

13  implemented the fix, he couldn't find any record of it working,

14  correct?

15  A.  Yes.

16  Q.  And he also wrote that this flaw may have been present when

17  the system was built, correct?

18  A.  He does say that, yes.

19  Q.  And sitting here today, you don't have any personal

20  knowledge that Grande forwarded any Rightscorp notices to its

21  subscribers before that date, correct, before the date of this

22  e-mail?

23  A.  Without seeing additional details in the system, I couldn't

24  answer that.

25  Q.  Okay.  Now, you sent your e-mail asking Mr. Christianson

1    about when the issue started, at 3:04 in the afternoon,

2    correct?

3    A.  Yes.

4    Q.  Now, less than an hour after that, you ask Mr. Christianson

5    to advise you what the simplest way would be for Grande to

6    suppress restarting Rightscorp; isn't that correct?

7    A.  I believe that's correct.

8         MR. BART:  Let's show the witness, but not the jury,

9    Plaintiff's Exhibit 184.

10   BY MR. BART:

11   Q.  This is another e-mail exchange between you and

12   Mr. Christianson on February 22, 2016.  Do you have that in

13   front of you, Mr. Horton?

14   A.  I do.

15   Q.  Okay.  And this is, in fact, the e-mail that I just

16   referred to asking Mr. Christianson what's the simplest way to

17   suppress restarting Rightscorp, correct?

18   A.  That is correct.

19        MR. BART:  Your Honor, I'd move to admit Plaintiff's

20   184 as a party admission.

21        MR. BROPHY:  Subject to the same objections.

22        THE COURT:  Yes.  You don't have to keep saying that,

23   counsel.  I think it's pretty clear.

24        MR. BROPHY:  Trying to get my exercise.

25        MR. BART:  I'm in a rhythm, and that's part of the

Lamar Horton - Examination                    961

1    rhythm.  I don't know.
2            THE COURT:  I can be like that judge in Cincinnati --
3    I can't remember his name.  He doesn't wear a robe.  He wears a
4    suit.  And he stands up and he wanders back and forth.  It's
5    the most distracting thing in the world.
6            MR. BART:  Let's publish this for the jury if we
7    haven't already.
8    BY MR. BART:
9    Q.  And what you say to Mr. Christianson and Mr. Quigley is,
10   *"What's the simplest way to suppress restarting Rightscorp*
11   *until we have discussed further,"* correct?
12   A.  That is correct.
13   Q.  And the reason you made that request is because you
14   discussed the subject, or wanted to discuss the subject, with
15   Grande's Legal Department, correct?
16   A.  That is correct.
17   Q.  And Mr. Christianson responded to you that he could,
18   quote/unquote, comment out that code, correct?
19   A.  Yes.
20   Q.  And what that meant by "comment out that code" was that the
21   glitch would remain fixed, but Grande would suppress processing
22   Rightscorp notices, correct?
23   A.  Generally speaking, that's correct.
24   Q.  And you told Mr. Christianson to do that, correct?
25   A.  Yes.

1   Q.   And Mr. Christianson confirmed that he had done that,

2   correct?

3   A.   Yes, he did.

4   Q.   Now, a few weeks after that, in March, Grande decided to

5   forward Rightscorp notices to its customers, correct?

6   A.   I don't recall the exact date.

7   Q.   So let's take a look at your -- do you recall that it was

8   shortly after this exchange that Grande decided that it would,

9   in fact, start forwarding the Rightscorp notices to its

10  customers?

11  A.   Yes.

12  Q.   Okay.  But you're just not clear as to a specific date, but

13  it was relatively shortly in time following this, correct?

14  A.   Yes, that is my recollection.

15  Q.   You saved me from pulling out that big binder of

16  depositions.

17  A.   You're welcome.

18  Q.   Now, I'd like to skip ahead a few months now.  In August of

19  2016, another private equity company called TPG announced that

20  it was buying Grande from ABRY Partners, correct?

21  A.   I don't recall the exact date, but, yes, that is generally

22  correct.

23  Q.   And that sale closed in February of 2017, correct?

24  A.   I believe that is correct.

25  Q.   And that same month, Grande implemented a new policy called

1    its DMCA Policy and Procedure, correct?

2    A.   I was thinking that was January -- but I may be mistaken --

3    of 2017.

4    Q.   Do you want me to pull out the binder, Mr. Horton?

5    A.   Maybe so.  You probably should, just to make sure.

6    Q.   I need the break, so it's all good.  Take a look at the

7    February 21st, 2018 transcript at page 56, line one through

8    line six.  Tell me when you have that in front of you.

9    A.   Page 56, what line?

10   Q.   From the top, line one to six.

11       *"Question:  And I'm just asking you, do you agree that the*

12   *statement here on page 16 of Plaintiff's Exhibit 54 that Grande*

13   *implemented the policy set forth in the document entitled DMCA*

14   *Policy and Procedure February 9th, 2017?"*

15       *"Answer:  Yes, I'd say that's a fair statement."*

16       Is that accurate testimony, Mr. Horton?

17   A.   Yes.

18   Q.   And that policy is still current, isn't it?

19   A.   To the best of my knowledge, yes.

20   Q.   So let's take a look at Plaintiff's Exhibit 53, which has

21   already been admitted into evidence.  This is a copy of that

22   policy, correct?

23   A.   Yes, it appears to be.

24   Q.   It is?

25   A.   Yes, I believe so.

1    Q.   Okay.  And you were listed as Grande's designated agent on

2    the first page of this policy, correct?

3    A.   Yes.

4            MR. BART:  Now, if we could take a look at the first

5    paragraph of this policy, blow that up so people can see it.

6    BY MR. BART:

7    Q.   It says towards the bottom of the paragraph that, *"Grande*

8    *Communications Networks, LLC will terminate the subscription of*

9    *repeat copyright infringers.  Grande Communications Networks,*

10   *LLC's copyright compliance policies do not affect any other*

11   *rights Grande may have under law or contract."*

12       Do you see that language?

13   A.   I do.

14   Q.   And if we turn to the fifth page of this policy, in the FAQ

15   section, the sixth question is, *"What is Grande Communication*

16   *Networks LLC's role in this process?"*

17       If we can blow this up.

18       It says, *"Grande Communications Networks, LLC is obligated*

19   *under federal law to adopt, reasonably implement, and inform*

20   *Internet access subscribers of a policy that provides for the*

21   *termination in appropriate circumstances of Internet access*

22   *subscribers who repeatedly violate the copyright laws."*

23       Do you see that language?

24   A.   Yes.

25   Q.   Okay.  And that policy uses this obligated language again

1  on the next page in response to question 12, correct?

2      Let's take a look at question 12.  It answered in response

3  to the question, *Will my Internet access be discontinued,*

4  Grande provides the same language or the same statement I just

5  read; isn't that correct?

6  A.  I couldn't be sure word for word, but it looks similar.

7  Q.  Okay.  And it goes on to say that, *"If Grande continues to*

8  *receive notices from copyright owners indicating that a*

9  *particular subscriber is using their Internet account to commit*

10 *copyright infringement, Grande will take action."*

11     Do you see that?

12 A.  I do.

13 Q.  And then it says that Grande has, quote, *"procedures in*

14 *place to track the copyright infringement notices it receives."*

15     Do you see that?

16 A.  Yes.

17 Q.  It does not say that subscribers who allegedly violate

18 copyright laws, does it, Mr. Horton?

19 A.  This does not.

20 Q.  Okay.  But you agree that Grande did not have such a policy

21 between October '10 and at least February 2017 when this policy

22 was enacted, correct?

23 A.  A policy?

24 Q.  The one that we're looking at now.  From October of 2010

25 until this policy was enacted, Grande did not have a policy

Lamar Horton - Examination                    966

1  that would terminate subscribers who repeatedly violate

2  copyright laws; isn't that correct?

3  A.  Are you asking if we had a documented policy?

4  Q.  No, no.  Whether you had implemented a policy to do that.

5  A.  I can't comment on whether there was a policy.  I'm not

6  sure what you're asking.

7  Q.  When I say "implemented," did you ever terminate a

8  subscriber for copyright infringement during that time period?

9  A.  We did not.

10  Q.  Okay.  Now, Grande also didn't terminate any subscribers

11  for copyright infringement in February 2017 when this policy

12  was implemented, did it?

13  A.  Specifically in that month?

14  Q.  Yes.

15  A.  No, I do not think so.

16  Q.  Or in March of 2017 either, correct?

17  A.  I do not recall when we first terminated.

18  Q.  Okay.  So you can't -- you don't know sitting here today

19  whether Grande terminated anyone in March or April or even May

20  of 2017, do you?

21  A.  I just don't recall the dates.

22  Q.  But Grande did start generating reports containing

23  information about customers that Grande determined had received

24  what it considered an excessive amount of copyright

25  infringement notices; isn't that correct?

1  A.  Reports from the system to try to determine termination

2  criteria.

3  Q.  Yes.

4  A.  Yes.

5  Q.  And it did so in spreadsheets that were called DMCA

6  Excessive Violation Reports, correct?

7  A.  I don't recall the names of the spreadsheets.

8  Q.  Okay.  Well, then, let's take a look at one.

9        MR. BART:  Can we show the witness but not the jury

10  Plaintiff's Exhibit 57.

11  BY MR. BART:

12  Q.  Do you have that in front of you, Mr. Horton?

13  A.  I do.

14  Q.  Okay.  This is a DMCA Excessive Violations Report executed

15  on April 13, 2017, is it not?

16  A.  That is the title of the spreadsheet.

17  Q.  And you've seen this document before, haven't you?

18  A.  I believe so.

19  Q.  And it was produced by Grande in this litigation?

20  A.  Yes.

21        MR. BART:  I move to admit Plaintiff's Exhibit 57 as a

22  party admission.

23        THE COURT:  It will be received over objection.  Is

24  that good enough?

25        MR. BROPHY:  Yes, Your Honor.

1              MR. BART:  Let's show Plaintiff's Exhibit 57 to the

2    jury.

3    BY MR. BART:

4    Q.  Mr. Horton, as we were just discussing, this is a DMCA

5    Excessive Violations Report executed on April 13, 2017.  Right?

6    A.  That is correct.

7    Q.  And to be clear, the title of the report, DMCA Excessive

8    Violations, that's a title that Grande came up with on its own;

9    isn't that correct?

10   A.  That is a title that an individual called this report or

11   this spreadsheet, that is correct.

12   Q.  That Grande, as a company, placed on this report, correct?

13   A.  That is correct.

14   Q.  Okay.  The data in this report was generated by Grande's

15   information systems, correct?

16   A.  Yes.

17   Q.  And it reflects customers that Grande had determined had

18   committed an excessive number of copyright violations, correct?

19   A.  This would represent a count from the system of received

20   notifications of copyright infringement.

21   Q.  That Grande deemed violations, correct?  There's no

22   language in here qualifying it as accusations without evidence,

23   is there, Mr. Horton?

24   A.  These are based on raw receipts of the e-mail notifications

25   from copyright providers.

1  Q.  Right, which Grande is describing in its own discretion as

2  violations, correct?

3  A.  That is the name of the report, but this does not mean that

4  they were vetted or --

5  Q.  Vetted by counsel?

6  A.  Vetted by anybody other than raw reports of received

7  notices.

8  Q.  Okay.  Now, this particular report covers the time period

9  from January 1st, 2017 to January 31st, 2017, correct?

10  A.  It appears so, yes.

11  Q.  And there are 5337 entries on this report, correct?

12  A.  I don't see the whole report, but if that's the last row,

13  then that would be accurate.

14  Q.  Hopefully, we can get you that last number highlighted

15  there on the screen.  Do you see that, Mr. Horton?

16  A.  I do.

17  Q.  Okay.  You have no reason to doubt the accuracy of that

18  number, do you?

19  A.  In this report?

20  Q.  Yes.

21  A.  No.

22          MR. BART:  Now, I'd like to show the witness, but not

23  the jury, Plaintiff's Exhibit 58.  It's another DMCA Excessive

24  Violations Report executed on April 13, 2017.

25  BY MR. BART:

1   Q.  And that, in fact, is the same date as the first one that

2   we saw, correct?

3   A.  That is correct.

4   Q.  And you've seen this document before also, haven't you?

5   A.  I believe in my depositions, yes, we reviewed this.

6   Q.  And it was also produced by Grande in this litigation,

7   correct?

8   A.  That is correct.

9           MR. BART:  Your Honor, I move to admit Plaintiff's

10  Exhibit 58 as a party admission.

11          MR. BROPHY:  Same.

12          THE COURT:  The objection is noted.  It will be

13  received.

14  BY MR. BART:

15  Q.  This one covers the period from October 1st, 2016 through

16  December 31, 2016; isn't that correct?

17  A.  That is correct.

18  Q.  And it shows that Grande was tracking 9014 customers for

19  that time period; isn't that correct?

20  A.  Without seeing the whole spreadsheet, it's hard for me to

21  answer that.

22  Q.  Hopefully, we can give you a little assistance here as we

23  did.

24          MR. BART:  Your Honor, can we publish this for the

25  jury, please?

```
 1            THE COURT:  Yes.
 2   BY MR. BART:
 3   Q.  Now, I'll ask the question where you have a chance to
 4   actually answer those.  It shows that Grande was tracking 9014
 5   customers from that time period, correct?
 6   A.  If that's the last cell in the spreadsheet, then that would
 7   be correct.
 8   Q.  Okay.
 9            MR. BART:  And just for good measure, let's show the
10   witness, but not the jury, Plaintiff's Exhibit 59.
11   BY MR. BART:
12   Q.  This is a third DMCA Excessive Violations Report, also
13   executed on April 13, 2017, correct?
14   A.  Yes.
15   Q.  And you've seen this document before at your deposition as
16   well, have you not?
17   A.  I believe so, yes.
18   Q.  And this was also produced by Grande in this litigation,
19   was it not?
20   A.  Yes.
21            MR. BART:  Your Honor, I move to admit Plaintiff's
22   Exhibit 59 as a party admission.
23            THE COURT:  It will be received over objection.
24            MR. BART:  Thank you.  Can we show this to the jury,
25   please?
```

```
 1              THE COURT:  Yes.
 2    BY MR. BART:
 3    Q.  Now, in fact, are you aware that Grande resumed terminating
 4    subscribers for copyright infringement in June of 2017?
 5    A.  I don't recall the exact date, but it was definitely in
 6    2017.
 7    Q.  And it did so because, as it says in its DMCA policy, it
 8    was obligated to terminate repeat infringers; isn't that
 9    correct?
10    A.  That is what our policy said.
11    Q.  And Grande had the same technical ability to terminate
12    repeat infringers for every year between 2011 and 2016 as it
13    did in 2017, didn't it?
14    A.  Technically --
15    Q.  Yes.
16    A.  -- that is correct.
17    Q.  Okay.  It just had a different policy, correct?
18    A.  Yes.
19    Q.  Now, you're not aware of any communication that Grande had
20    with Rightscorp before this lawsuit was filed to discuss the
21    Rightscorp system, correct?
22    A.  Not that I'm aware of.
23    Q.  And before the lawsuit was filed, Grande didn't engage in
24    any effort to investigate the capabilities of the Rightscorp
25    system; isn't that correct?
```

```
 1   A.  No, we did not.

 2   Q.  And even after learning of the decision in the BMG/Cox

 3   case, Grande didn't do any research into the Rightscorp system

 4   at that time; isn't that correct?

 5   A.  To my knowledge, we didn't have an ability to do that, so

 6   no.

 7   Q.  So before this lawsuit was filed, Grande had no awareness

 8   of any factual basis that the Rightscorp system wasn't

 9   accurate; isn't that correct?

10   A.  We had no knowledge of that.

11   Q.  And before this lawsuit was filed, Grande had no awareness

12   of any facts to support an assertion that Rightscorp's system

13   was incapable of detecting copyright infringement; isn't that

14   correct?

15   A.  We had no knowledge on any of the systems sending us

16   notifications, including Rightscorp.

17   Q.  So Grande developed all the arguments about Rightscorp's

18   system that we've heard in this trial so far after it got sued;

19   isn't that correct?

20   A.  I don't know that I can correlate those two things together

21   for you.

22   Q.  I think the rest of us can.

23           MR. BART:  Thank you, Your Honor.  I pass the witness.

24           THE COURT:  Okay.

25                       EXAMINATION
```

1    BY MR. BROPHY:

2    Q.  Mr. Horton, hello.

3    A.  Hello.

4         MR. BROPHY:  If we could please put up Plaintiff's 58

5    again.  Maybe it's Defendant's 58, the screens we just saw with

6    the excessive violations on it.

7         Would you mind blowing up that bottom with the

8    excessive violations, please?

9    BY MR. BROPHY:

10   Q.  Mr. Horton, do you know whether this document was created

11   before or after this lawsuit was filed?

12   A.  I do not.

13   Q.  Do you see the date on there?

14   A.  April 13, 2017.

15   Q.  Do you know whether that was before or after this lawsuit

16   was filed?

17   A.  That would be after.

18   Q.  Why was Grande creating these materials?

19   A.  We were trying to analyze the data to figure out how to

20   come up with a more robust policy to figure out how to count

21   subscribers and look at notifications received.

22   Q.  Have you ever heard something called the DMCA safe harbor?

23   A.  Yes.

24   Q.  Was this material generated as part of a process to comply

25   with that DMCA safe harbor?

Lamar Horton - Examination                 975

```
 1   A.  Yes.  We were trying to figure out how to fairly look at
 2   the system and come up with a way of creating a way to do
 3   terminations that made sense from a policy perspective.
 4   Q.  Under that DMCA safe harbor?
 5   A.  Yes.
 6           MR. BROPHY:  No further questions, Your Honor.  Thank
 7   you.
 8           MR. BART:  I have nothing further, Your Honor.
 9           THE COURT:  All right, sir.  You can step down.
10           Okay, well, have you had a chance to look at this?
11           MR. GILMORE:  Your Honor, we have deposition
12   designations that I think we would be able to fit in in about
13   around 30 minutes, if we wanted to do that now or if you wanted
14   to break and deal with that --
15           THE COURT:  Deal with this.
16           MR. GILMORE:  Okay.  We still wanted to review the
17   proposal from --
18           THE COURT:  It's not that long.  Take a minute and
19   review it.
20           MR. GILMORE:  Okay.
21           MR. BART:  Do you want my responses in open court,
22   Your Honor?
23           THE COURT:  No.  We'll take them at sidebar.
24           MR. BART:  I'm prepared to talk to you at sidebar
25   about it.
```

1          THE COURT:  All right.  Excuse us, ladies and

2    gentlemen.

3                           *   *   *

4          *(4:06 p.m., sidebar discussion.)* ^

5          MR. BART:  Thank you, Your Honor.  With regard to your

6    proposed instruction, the only thing that I would say is

7    that --

8          THE COURT:  How about theirs?  They basically copied

9    mine and then --

10         MR. BART:  They added a sentence -- they changed.

11   They added a sentence, *"Although the other case involved*

12   *Rightscorp, it involved different parties, different lawyers,*

13   *different facts, different evidence, and different instructions*

14   *on the law."*

15         The rest of it is mostly the same, as I understand.

16         MR. BROPHY:  That's correct, yes.

17         MR. BART:  So the only thing that I would say on the

18   rest of this, is that the Grande executives are employees.

19   We're not limiting -- I don't want there to be an argument that

20   people who were on the e-mail were not executives and therefore

21   their state of mind wasn't part of this, but I have no other

22   comments on the language that you have.

23         With regard to the sentence that Mr. Brophy is

24   suggesting, the only problem that I have is once you start

25   saying "different evidence," I think you have to say

1   "additional evidence."  I think I'm fine with pretty much --

2   and I don't know that we know what the instructions on the law

3   are going to be here.  I assume we're not going to have the

4   instruction that was reversed.

5           THE COURT:  We're not giving that instruction.  I

6   wouldn't have anyway.

7           MR. BART:  Of course not.

8           THE COURT:  I was talking about -- I don't know why

9   the judge -- he was a good Judge -- just missed it.  I've

10  missed things before.

11          MR. BART:  Well, so I guess I'm okay with it if we say

12  "additional evidence," because different suggests that there's

13  no overlap, and there is overlap, so the rest of it, different

14  parties --

15          THE COURT:  To be honest with you --

16          MR. BART:  We can leave that whole sentence out.

17          THE COURT:  No, we shouldn't leave the whole sentence

18  out.

19          MR. BART:  Well, it wasn't on your draft at all.

20          THE COURT:  Well, it was.

21          MR. BART:  It actually wasn't.

22          MR. BROPHY:  The sentiment was.

23          THE COURT:  The sentiment was?

24          MR. BART:  It just doesn't say it there.

25          THE COURT:  You're having a very deleterious effect --

 1          Okay.  I'm going to go ahead and give it.

 2          MR. BROPHY:  Thank you, Your Honor.

 3          MR. BART:  Will you add the employees?

 4          THE COURT:  I've got it.

 5          MR. BART:  Thank you.

 6          *(4:08 p.m., sidebar discussion concluded.)*

 7                         *   *   *

 8          THE COURT:  All right.  Now, ladies and gentlemen, I'm

 9   going to give you what we call a limiting instruction, and it's

10   important that you understand and follow this instruction.

11          Now, you have heard evidence in another -- evidence

12   that in another case, in another court, with different parties,

13   there was a verdict reached in a copyright litigation against a

14   different Internet provider.  This evidence may be considered

15   by you only for the purpose of evaluating the state of mind of

16   Grande executives and employees at the time and nothing else.

17          It is not to be considered by you as evidence because

18   a different Internet service provider was found liable that

19   Grande in this case is liable.  Although the other case

20   involved Rightscorp, it involved different parties, different

21   lawyers, different facts, additional evidence and different

22   instructions on the law.  In other words, it was a totally

23   different case with the exception of the involvement of

24   Rightscorp.  Further, this case went up on appeal and the final

25   result of that case is not before you and is not relevant.

1    Okay?

2            All right.  Now, let's go on to -- move on.  You

3    wanted to do a few things you thought you could do quickly?

4            MR. GILMORE:  Yes.  Plaintiffs would like to call

5    Stephanie Christenson, a witness that Grande designated as a

6    corporate spokesperson by videotape deposition.

7            MR. HOWENSTINE:  Your Honor, we have objections to

8    PX 169 and PX 186 that come up in that deposition testimony.

9            THE COURT:  I see no -- okay.  I'm sorry.  You have to

10   remember something.  The lawyers have been working on this case

11   for years.  I haven't.

12           MR. HOWENSTINE:  Your Honor, I was just going --

13           THE COURT:  PX what?

14           MR. HOWENSTINE:  I was just going to ask that those

15   exhibits not be published to the jury until after the

16   deposition testimony is played and then Your Honor can consider

17   our objections to those exhibits.

18           THE COURT:  I don't know how that works.  I mean, is

19   it discussed in the deposition?

20           MR. GILMORE:  It is.

21           THE COURT:  It's a videotaped deposition?

22           MR. GILMORE:  It's a videotaped deposition.

23           THE COURT:  And it's put up somewhere?

24           MR. GILMORE:  Well, we have the option of not putting

25   the document up on the screen and just hearing the testimony

1  about the document.  It sounded like that's what counsel was

2  suggesting.

3          THE COURT:  It does.  Is that what you're suggesting?

4          MR. HOWENSTINE:  Yes.

5          THE COURT:  Okay.  Let's do that.  And then I'll -- we

6  can discuss either later this afternoon after the jury has gone

7  home to their life or tomorrow morning before they come in.

8          MR. GILMORE:  What were the two that we're not going

9  to -- just so that our --

10          MR. HOWENSTINE:  PX 169 and PX 186.

11          MR. GILMORE:  We'll show the other documents, but not

12  that one.

13          THE COURT:  Okay.  And then I have to talk to you

14  again and remind you a little bit about the schedule and reason

15  so that you understand what's going on.  I'll do that before we

16  leave today.

17          MR. HOWENSTINE:  Just so the record is clear, Your

18  Honor, the other exhibits that come up in this deposition

19  testimony, we understand that Your Honor has already overruled

20  our objections to those exhibits in some of your earlier

21  rulings --

22          THE COURT:  Well, my ruling -- well, I haven't ruled

23  yet.  You make it sound like I ruled against you through the

24  entire trial.  I haven't.  You've won some very significant

25  rulings in this trial.

1          Are you having trouble?  There we go.

2                    *   *   *

3          *(Playing videotaped deposition of Stephanie*

4  *Christenson.)*

5  *BY MR. O'BEIRNE:*

6  *Q.  What is your current position with Grande?*

7  *A.  I am a technical project manager.*

8  *Q.  How long have you been a technical project manager?*

9  *A.  Approximately two and a half years.*

10  *Q.  How many customers has Grande terminated for copyright*

11  *infringement since 2011?*

12  *A.  There are 12 customers total that have been terminated*

13  *based on alleged notices of infringement.*

14  *Q.  Grande terminated no users for copyright infringement or*

15  *alleged copyright infringement in 2016, correct?*

16  *A.  That would be correct.*

17  *Q.  Grande terminated no users for copyright infringement or*

18  *alleged copyright infringement in 2015, correct?*

19  *A.  That would be correct.*

20  *Q.  Grande terminated no users for copyright infringement or*

21  *alleged copyright infringement in 2014, correct?*

22  *A.  Yes.*

23  *Q.  Grande terminated no users for copyright infringement or*

24  *alleged copyright infringement in 2013, correct?*

25  *A.  Correct.*

Stephanie Christianson - Videotaped Examination    982

1   Q.  Grande made a decision not to terminate any users for

2   copyright infringement or alleged copyright infringement

3   regardless of how many notices Grande received for any given

4   user sometime in 2010, correct?

5   A.  Yes.

6   Q.  Grande did not have a policy that provided for the

7   termination of subscribers and account holders who were repeat

8   infringers until at the earliest the DMCA policy and procedure

9   published in 2016, correct?

10  A.  Yes.

11  Q.  The 12 subscribers that Grande has terminated for copyright

12  infringement were all terminated after June 2017, correct?

13  A.  Yes.

14  Q.  The 12 subscribers that Grande has terminated for copyright

15  infringement were all terminated after June 2017, correct?

16  A.  Yes.

17  Q.  So it's fair to say that Grande did not terminate any

18  subscribers for copyright infringement or alleged copyright

19  infringement between at least October 2010 and May 2017,

20  correct?

21  A.  Correct.

22  Q.  That was based on a decision made by Grande in 2010, right?

23  A.  Yes.

24  Q.  From October 2010 to May 2017, Grande was not terminating

25  any users for copyright infringement or alleged copyright

1  *infringement, regardless of the source of any notice of alleged*

2  *copyright infringement that it received, right?*

3  *A.  Correct.*

4  *Q.  And from 2010 through May 2017, Grande was not terminating*

5  *any users for copyright infringement or alleged copyright*

6  *infringement, regardless of the content of any notice of*

7  *alleged copyright infringement that it received, right?*

8  *A.  Correct.*

9  *Q.  And from 2010 through May 2017, Grande was not terminating*

10 *any users for copyright infringement or alleged copyright*

11 *infringement, regardless of the volume of notices regarding*

12 *copyright infringement that it received for a given customer?*

13 *A.  Correct.*

14 *Q.  So I'm asking, did Grande terminate the 12 infringers it's*

15 *terminated since May 2017 under its DMCA policy and procedure?*

16 *A.  Yes.*

17 *Q.  And Grande did so because it determined the circumstances*

18 *were appropriate to terminate them as repeat copyright*

19 *infringers under its DMCA policy and procedure?*

20 *A.  Yes.*

21 *Q.  Well, you understand that's what this case is about, is*

22 *that users of Grande's services, plaintiffs allege, infringed*

23 *plaintiffs' works over BitTorrent, right?*

24 *A.  Yes.*

25 *Q.  Okay.  And how many notices of alleged infringement did*

1   *Grande receive between 2011 and 2016?*

2   *A.   Notices of alleged infringement is about 1.2 million.*

3   *Q.   And you understand that those notices largely deal with*

4   *peer-to-peer file-sharing infringement?*

5   *A.   Allegedly, yes.*

6   *Q.   Sitting here today, what evidence do you have, as Grande's*

7   *representative, that any particular one of those notices*

8   *contained a description of alleged infringement that was*

9   *inaccurate?*

10  *A.   I can only report that we've received the notices.*

11  *Q.   Sitting here today, can you tell me any time that Grande*

12  *determined, using any means at its disposal, that a notice*

13  *describing an event alleged to be copyright infringement did*

14  *not occur as described in the notice?*

15  *A.   Not that I could speak to.  I don't know that.*

16  *Q.   I'm handing you what's previously been marked as PX 169, a*

17  *document produced by Grande in this case with a Bates number*

18  *ending 474.  Do you see that, ma'am?*

19  *A.   I do.*

20  *Q.   This is an e-mail chain from March 2016, right?*

21  *A.   Yes.*

22  *Q.   At the bottom of the e-mail, there's -- strike that.*

23      *The bottom of the first page of PX 169 has an e-mail from*

24  *davidpattee@grifols.com to Paul Morgan and Chris Doyle at*

25  *Mygrande.com.  Do you see that?*

1   *A.   Yes.*

2   *Q.   He's forwarding an e-mail that's titled "Notice of Claimed*

3   *Infringement Case ID 413176005."*

4       *Do you see that?*

5   *A.   I do.*

6   *Q.   And he says, "Paul and Chris, can you clarify the abuse*

7   *e-mail below that we received from Grande."*

8       *Do you see that?*

9   *A.   Yes.*

10  *Q.   And this is being sent by an enterprise customer, right,*

11  *because they would have received an e-mail as opposed to a*

12  *written letter as of March 22nd, 2016?*

13  *A.   Yes.*

14  *Q.   Mr. Morgan forwards the e-mail at the bottom of the first*

15  *page of PX 169 to @osc and Robert Creel asking, "All, Was an*

16  *abuse ticket created for girfols or biomet?  See below e-mail*

17  *chain.  Is this legit, or what is it about?"*

18      *Do you see that?*

19  *A.   I do.*

20  *Q.   He then says, "Their IT guy e-mailed me this today asking*

21  *what is going on."*

22      *Do you see that?*

23  *A.   Yes.*

24  *Q.   William Rannefeld responds to Mr. Morgan's e-mail at 2:23*

25  *p.m. on March 22nd, 2016.  Do you see that?*

1    A.   I do.

2    Q.   He says, "Paul, this is an e-mail generated from our abuse

3    system."

4         Do you see that?

5    A.   Yes.

6    Q.   He says, "I pulled up the actual abuse ticket, and it is

7    also random numbers and letters."

8         Do you see that?

9    A.   Yes.

10   Q.   He says, "I can tell you that they got an abuse ticket for

11   downloading and sharing The Godfather Part 2."

12        Do you see that?

13   A.   Yes.

14   Q.   And he's getting that information from the abuse system

15   because it records what media the notice claims was infringed,

16   right?

17   A.   Yes.

18   Q.   He does not say they were alleged to have downloaded or

19   shared the Godfather Part 2, does he?

20   A.   No, he does not.

21   Q.   He goes on to say, "They need to find out who on their

22   network has downloaded the video and is sharing it and remove

23   it."

24        Do you see that?

25   A.   I do.

1  Q.  Grande has, since 2011, terminated a total of 12 customers

2  for copyright infringement, right?

3  A.  Alleged copyright infringement.

4  Q.  Each of those 12 were terminated based on notices received

5  by Grande, right?

6  A.  Yes.

7  Q.  The notices served as the basis for termination, right?

8  A.  Yes.

9  Q.  It's not that the 12 people came in apropos of nothing and

10  confessed to copyright infringement and then Grande terminated

11  them.  That's not what happened, right?

12  A.  Correct.

13  Q.  A third-party sent a notice to Grande's abuse system, and

14  based on notices received from the abuse system, Grande

15  terminated these customers?

16  A.  Yes.

17  Q.  I'm handing you -- actually, you may have it in front of

18  you, PX 53.  You do, I think, the DMCA policy and procedure.

19  Can you find that, ma'am?  You looked at it earlier.  Do you

20  see that?

21  A.  Yes.

22  Q.  Do you see in the first paragraph of this document it

23  states, about halfway down starting on the far right, "Grande

24  Communications Networks LLC will terminate the subscriptions of

25  repeat copyright infringers."

Stephanie Christianson – Videotaped Examination    988

1      *Do you see that?*

2   A.   *I do.*

3   Q.   *Grande terminated those 12 people because they determined*

4   *them to be repeat copyright infringers, right?*

5   A.   *Because we received multiple copies of the notification of*

6   *alleged infringement.*

7   Q.   *You would agree with me that Grande terminated those 12*

8   *customers because Grande determined that those 12 customers*

9   *were repeat copyright infringers?*

10  A.   *Grande terminated the subscribers because we received*

11  *repeated notices of allegation of infringement for their acts.*

12  Q.   *Does the policy say, We will terminate you even if you're*

13  *not a repeat infringer, if we receive allegations that you*

14  *infringed?  Does it say that?*

15      *(Pause.)*

16  A.   *No.*

17  Q.   *It doesn't say that, does it?*

18  A.   *No.*

19  Q.   *Prior to Grande updating its DMCA policy to expressly*

20  *request notices be signed with a PGP digital signature, Grande*

21  *did process all the way through and generate a letter based on*

22  *Rightscorp notices it received, correct?*

23  A.   *That is my understanding, yes.*

24  Q.   *Your understanding as Grande's corporate witness on the*

25  *topic of notices?*

1   A.   Yes.

2   Q.   There was a time before Grande requested that notices be

3   digitally signed by PGP where it was sending letters based on

4   Rightscorp notices, right?

5   A.   Yes.

6   Q.   And then your testimony is Grande stopped sending letters

7   based on Rightscorp notices after it updated its DMCA policy to

8   ask senders to digitally sign it with PGP, right?

9   A.   Yes.

10  Q.   And that happened in April 2017, right?

11  A.   Yes.

12  Q.   Sitting here today, can you tell me any difference in the

13  notices from Rightscorp from before that change and after the

14  change?  Rightscorp was sending the same information in the

15  notices, right?

16  A.   I don't know of any changes.

17  Q.   Let's take a look.  I'm handing you PX 186.  You can see

18  this is an e-mail from DMCA@roundhillmusic.com to

19  legal@grandecom.com, dated August 17, 2015.  Do you see that?

20  A.   Yes.

21  Q.   The subject, "Grande Communications Termination Request for

22  Round Hill Music."

23       Do you see that?

24          MR. GILMORE:  Sorry, Your Honor, little technical

25  glitch.

1          THE COURT:  We don't want to start all over again,

2     please.  Should we just finish this up tomorrow?

3          MR. GILMORE:  I think we should finish up tomorrow.

4     We'll strain this out and play the rest tomorrow.

5          THE COURT:  Okay.  It's time to close for the day

6     anyway.

7          All right.  Now, ladies and gentlemen, tomorrow and

8     Friday we have four shortened days for two different reasons,

9     none of which I have any control over.  Tomorrow we are only

10    going to have court in the morning, and that is because I have

11    the afternoon reserved for an emergency preliminary injunction

12    hearing in a big case involving the State of Texas, so I have

13    to hear that.  I have to hear it right away.  Involves water,

14    water district and the utility commission and so I have no

15    choice.  I've got to hear that.

16         And on Friday we have the -- in the afternoon there is

17    the investiture of Judge Howell.  He is the Magistrate Judge

18    who selected the jury, so you have seen Judge Howell before.  I

19    actually wanted to continue on with the trial, but I was told

20    that in no uncertain terms that there will be no court in the

21    afternoon and my presence at the investiture is required.  So

22    we all have bosses, right?  So I have to be there and I will be

23    there, but that's the way it is.

24         So we will have court tomorrow morning, we will have

25    court Friday morning, and then we will not have court again

 1   until our usual time, which is Tuesday morning.  Okay?  All

 2   right.  Thank you very much.  Have a good afternoon.

 3                COURT SECURITY OFFICER:  Please rise for the jury.

 4                *(4:31 p.m., the jury exits the courtroom.)*

 5                            *   *   *

 6                THE COURT:  You can be seated.  Just as an aside, my

 7   law clerk on her own initiative -- and that's good, that's why

 8   she passed the Texas Bar -- pulled out and did a little bit of

 9   research on Rule 407.  And this goes to that question of

10   whether it would be appropriate to get into whether the users

11   were terminated post case.  And you can't use subsequent

12   remedial measures -- of course we all know this -- negligence,

13   culpable conduct, defective product or design, need for warning

14   or instruction, you know, the old slip-and-fall case where they

15   fixed the walk before.  You can't put that in.  We all learned

16   that in law school.

17                But you can, it says, *"Likely admissible for the*

18   *purpose of showing..."*

19                *"... but the Court may admit this evidence for another*

20   *purpose, such as impeachment or if disputed, ownership, control*

21   *or the feasibility of precautionary measures,"* which goes to

22   state of mind.

23                So I think we're good on that one.  Unless the Appeals

24   Court says otherwise.

25                Okay.  Have a good evening.  We'll see you tomorrow.

JURY TRIAL PROCEEDINGS                              992

1          COURT SECURITY OFFICER:  All rise.

2      *(4:32 p.m.)*

3      THE COURT:  You can be excused, please.

1                         *   *   *   *   *

2  UNITED STATES DISTRICT COURT

3  WESTERN DISTRICT OF TEXAS

4

5       I certify that the foregoing is a correct transcript from

6  the record of proceedings in the above-entitled matter.  I

7  further certify that the transcript fees and format comply with

8  those prescribed by the Court and the Judicial Conference of

9  the United States.

10

11  Date signed:  November 14, 2022

12

13  /s/ Angela M. Hailey

14  Angela M. Hailey, CSR, CRR, RPR, RMR
    Official Court Reporter
15  262 West Nueva Street
    San Antonio, Texas  78207
16  (210)244-5048

17

18

19

20

21

22

23

24

25