1            UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF TEXAS
2               AUSTIN DIVISION

3  UMG RECORDINGS, INC., ET AL,  :
   Plaintiffs,             :
4                            : Case Number:
   vs.                   : 1:17-CV-00365-DAE
5                            :
   GRANDE COMMUNICATIONS       : Austin, Texas
6  NETWORKS, LLC, ET AL,      : October 20, 2022
   Defendants.             :
7  *********************************************************

8          TRANSCRIPT OF JURY TRIAL PROCEEDINGS
         BEFORE THE HONORABLE DAVID A. EZRA
9          SENIOR UNITED STATES DISTRICT JUDGE

10  APPEARANCES:
   FOR THE PLAINTIFFS:
11

12  **Andrew H. Bart, Esquire**
   **Jacob Tracer, Esquire**
   Jenner & Block, LLP
13  1155 Avenue of the Americas
   New York, NY  10036
14  (212)891-1600; abart@jenner.com

15  **Robert B. Gilmore, Esquire**
   **Philip J. O'Beirne, Esquire**
16  Stein Mitchell Cipollone Beato & Missner LLP
   1100 Connecticut Avenue, NW, Suite 1100
17  Washington, DC  20036
   (202)601-1589; rgilmore@steinmitchell.com
18

19  **Paige Arnette Amstutz, Esquire**
   Scott, Douglass & McConnico, LLP
   303 Colorado Street, Suite 2400
20  Austin, Texas  78701
   (512)495-6300; pamstutz@scottdoug.com
21

22

23

24

25

```
 1   FOR THE DEFENDANTS:

 2   Richard L. Brophy, Esquire
     Zachary C. Howenstine, Esquire
 3   Mark A. Thomas, Esquire
     Margaret R. Szewczyk, Esquire
 4   Armstrong Teasdale, LLP
     7700 Forsyth Boulevard, Suite 1800
 5   St. Louis, Missouri  63105
      (314)621-5070
 6   rbrophy@armstrongteasdale.com
     zhowenstine@armstrongteasdale.com
 7   mathomas@atllp.com
     mszewczyk@armstrongteasdale.com
 8

 9

10

11

12

13

14

15

16

17

18

19

20   COURT REPORTER:
     Angela M. Hailey, CSR, CRR, RPR, RMR
21   Official Court Reporter, U.S.D.C.
     262 West Nueva Street
22   San Antonio, Texas  78207
     Phone(210)244-5048
23   angela_hailey@txwd.uscourts.gov

24   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
25
```

JURY TRIAL PROCEEDINGS                                    996

**I N D E X**

**WITNESSES:**                                    **PAGE**

**STEPHANIE CHRISTIANSON (videotaped deposition)**

By Mr. O'Beirne                      1007, 1021

By Mr. Brophy                              1021


**MATTHEW FLOTT**

By Mr. Bart                                1024

By Mr. Howenstine                          1055


**TRACIE PARRY**

By Mr. Tracer                              1068

By Mr. Brophy                              1074


**WILLIAM LEHR**

By Mr. Gilmore                             1076

```
 1   (Thursday, October 20, 2022, 8:45 a.m.)
 2            THE COURT:  All right.
 3            COURTROOM DEPUTY CLERK:  Austin, 17-CV-365.
 4            THE COURT:  The Court would note the presence of all
 5   counsel -- we don't have the parties here -- all counsel and
 6   the absence of the jury.
 7            All right.  This morning the Court was notified that
 8   counsel wanted to reconsider some rulings that I had already
 9   made.
10            MR. THOMAS:  Good morning, Your Honor.
11            THE COURT:  Good morning.  You have a nice voice.  You
12   should have been a radio announcer.
13            MR. THOMAS:  It seems like I'm off to a decent start,
14   but let's not dally here.  This relates to --
15            COURT REPORTER:  Can you state your name, counsel?
16            MR. THOMAS:  Mark Thomas from Armstrong Teasdale for
17   Grande.  Thank you, ma'am.
18            Your Honor, this relates to Dr. Lehr.  And Your Honor
19   will have seen there is --
20            THE COURT:  I remember Dr. Lehr's -- all that, we had
21   a Daubert motion on Dr. Lehr.  We had motion in limine on
22   Dr. Lehr.
23            MR. THOMAS:  We did.  And one issue that neither of
24   those touched on in the Daubert motion, Your Honor will recall
25   that Judge Austin found traction in the relevance argument
```

 1   relating to Dr. Lehr's opinions about public policy.  He's got

 2   several opinions about the policy behind trademark -- I'm

 3   sorry, behind copyright enforcement and that sort of thing.

 4        And Judge Austin recognized, well, there's a relevance

 5   issue here, directed us to raise it again at trial, so here we

 6   are raising it at trial under 401 and 403 grounds.

 7        In a nutshell the public policy opinions of

 8   Dr. Lehr -- setting aside whether he's qualified to offer

 9   them -- are simply just not relevant and will be hugely

10   prejudicial.  We're not lobbying Congress.  They're deciding

11   damages based on specific infringement.

12        THE COURT:  Right.  Sit down.  Let me hear from the

13   other side.  We're going to get through this quick because I've

14   looked at it already.  I know what the arguments are.

15        MR. GILMORE:  Yes, just very briefly.  Your Honor

16   addressed these arguments, including the public policy --

17        THE COURT:  Well, I did say, you know -- when I looked

18   at the Judge Austin thing, I left it alone, but I did have

19   concern about it and I was trying to -- I mean, I wasn't there

20   for the arguments themselves, so my thought was maybe there was

21   something raised during argument that convinced Judge Austin to

22   kind of let this go for now.

23        MR. GILMORE:  And Dr. Lehr is not going to be sort of

24   opining in a general sense on why we have copyright law.

25   That's not what his opinions are.  His opinions are going to be

1    tying -- explaining what online piracy's impact is on rights

2    holders like plaintiffs and then kind of going from there to

3    applying that to this case.

4              THE COURT:  Well, that's not a public policy argument.

5              MR. GILMORE:  I agree.  I think they're -- Grande is

6    trying to mischaracterize that into public policy.

7              THE COURT:  Yeah, to the extent that he was going to

8    be giving public policy arguments, we're not a political forum.

9    This isn't Congress, thank God.  I'm not interested in public

10   policy arguments here.  But to the extent that he's giving

11   cogent, relevant testimony on the harm suffered by your

12   clients, not the industry in general.  Got it?

13             MR. GILMORE:  We understand.  I mean, I'm not --

14             THE COURT:  I mean, the fact of the matter is that

15   there is so many -- your clients cover such a broad spectrum --

16             MR. GILMORE:  And I --

17             THE COURT:  -- that they basically are the industry in

18   general in some sense.

19             MR. GILMORE:  That was the only thing I was going to

20   say.  It's sort of hard to distinguish the three major record

21   labels from the recording industry.  They are the recording

22   industry.

23             THE COURT:  Well, I know, but it has to be a focused

24   opinion.  It can't be a generalized across --

25   shot-across-the-bow type of an opinion.  Okay?

1          MR. GILMORE:  We understand that.  And we don't think

2     that there's going to be any problem with that.

3          THE COURT:  Okay.

4          MR. GILMORE:  And also just very briefly, I'll also

5     mention that at the time of the prior briefing, I don't think

6     plaintiffs had yet elected statutory damages, so much of the

7     arguments that they were raising were addressed to actual

8     damages.  Now that we've made an election of statutory damages

9     and the clear case law on the various factors that you will be

10    instructing the jury to consider about statutory damages in

11    particular, as the Fifth Circuit said in the Energy

12    Intelligence Group case, various factors, including deterrent,

13    deterrent purpose, and particularly where the infringement is

14    willful, that kind of broad, flexible standard under statutory

15    damages encompasses, we think, all the testimony that Dr. Lehr

16    is going to be giving.

17         THE COURT:  You can rest assured that, you know, I'm

18    no different from any other judge that tries to get it right.

19    I recognize that my responsibility here is to, as they would

20    say in the Bible, cleave as closely as possible to the Fifth

21    Circuit's rulings.  I know, because I have looked at them

22    before this trial, what the Fifth Circuit -- as a general

23    policy of mine, I've always done that.  I go look on my own at

24    what the rulings -- I don't even get my law clerks involved

25    with this -- what the rulings are, particularly the more recent

1   ones, from the Fifth Circuit on these issues.  And to a lesser

2   extent, other circuits.  And so I am familiar with what the law

3   calls for.

4           MR. THOMAS:  Your Honor, I'm not going to, as the

5   Bible would say, stand here and try to kick over the traces on

6   the profit calculation.  However, the report said the public

7   would benefit from Grande addressing copyright infringement.

8           THE COURT:  No, we're not going to have that

9   testimony.

10          MR. THOMAS:  And I think Your Honor articulated about

11  exactly as we would have it and that is only what relates to

12  these plaintiffs in particular, not industry at large.

13          THE COURT:  Well, yes, but we have to remember that

14  when we talk about "these plaintiffs," we are talking to some

15  degree about a large, not all, but a large chunk of America's

16  recording industry here.  So to the extent that it has to kind

17  of drift a little bit that way, it's okay.  But not general

18  public policy arguments or we would all be benefited.  This is

19  why we benefit from copyright protection and so forth.

20          MR. THOMAS:  That latter point is rather precisely

21  what's in the report, just to kind of drive that home.  And as

22  to the former, the industry, whether or not these plaintiffs --

23          THE COURT:  That's a kind of punitive damages

24  argument, really.

25          MR. GILMORE:  May I respond just briefly on that one

1   point?

2           THE COURT:  Yes.

3           MR. GILMORE:  So I think the case law is clear,

4   including the Energy Group Fifth Circuit case, that the

5   deterrence factor includes looking at deterring other entities,

6   so we're not going to have Dr. Lehr say the public at large

7   would benefit from enforcing copyrights.

8           But to the extent that his opinions are probative, I

9   think that that is a valid, relevant consideration to say other

10  entities.  I mean, part of the factor for statutory damages is

11  not just deterring this entity, but others as well.  And so we

12  just want to make sure -- we're not going to say sort of

13  generally the public, but like other ISPs out there.

14          THE COURT:  As long as you focus your questions in a

15  way that goes to this case and not have him start opining about

16  why Congress needed to pass these laws and that stuff.

17          MR. GILMORE:  No intention of doing that here.

18          THE COURT:  All right.  Let's get to the next one.

19          MR. THOMAS:  Thank you, Your Honor.  And as a matter

20  for the record, we do have 401 and 403 objections to all of

21  Dr. Lehr's opinions across the board.

22          THE COURT:  This has been ruled on.  Your objections

23  are preserved.

24          MR. THOMAS:  Thank you, Your Honor.

25          THE COURT:  Anything else?  I thought there was

1  another.

2          MR. THOMAS:  We have an objection to -- a couple of

3  discrete objections to slides and the demonstratives.

4          THE COURT:  See.  I'm not half asleep up here.

5          MR. THOMAS:  Basically what we've got here, Your

6  Honor, is some inflammatory clip art.

7          THE COURT:  Inflammatory clip art?

8          MR. THOMAS:  Inflammatory clip art.

9          THE COURT:  I'm sure it wasn't -- at least it's not as

10  inflammatory as teenage -- we won't -- what teenagers allegedly

11  like.  We're not -- that would be about as inflammatory as it

12  gets.

13          MR. THOMAS:  Well, we can take it out if and when it

14  comes, but that's --

15          THE COURT:  Those objections should be made at and if

16  the time when the evidence is offered.

17          MR. THOMAS:  That's how I've been reading it, so to

18  speak, this morning, Your Honor, so that's what we will do.

19          What we have here is this shady character with the

20  pirate flag in the background supposed to represent Grande and

21  then we've got all these people having a dance party throwing

22  money around.  Those are --

23          THE COURT:  Well, who got creative here?  Nobody is

24  raising their hand.

25          MR. GILMORE:  Collective effort, but I'll take

1    responsibility.

2          THE COURT:  No, we're not doing that.  Maybe in

3    closing, maybe in closing argument you could put that up, but

4    not during the evidentiary phase.  Okay?

5          MR. GILMORE:  The piracy logo is simply -- because

6    it's referring to piracy and --

7          THE COURT:  Well, it's a little over the top.

8          MR. THOMAS:  We don't need any swords in the

9    courtroom, Your Honor, over a copyright case.

10         MR. GILMORE:  I mean, well, it is referring to

11   Grande's incentive to tolerate online piracy.

12         THE COURT:  You don't even give the guy any eyes.  I

13   mean...

14         MR. GILMORE:  I'm sorry?

15         THE COURT:  Why does he mysteriously look a lot like

16   me?  He's wearing a robe.  Are you trying to point at me?

17         MR. GILMORE:  This guy doesn't have a mustache.

18         THE COURT:  Well, you can't tell.

19         MR. GILMORE:  I think from the angle.  We can take the

20   pirate --

21         THE COURT:  That's my wife's dream, by the way, that I

22   shave off my mustache.

23         MR. GILMORE:  We can take the pirate logo off, Your

24   Honor.

25               In terms of the -- but the anonymity, I think, is

1  important and accurate.  I think we've had other -- simply

2  because we don't know who the subscribers are, so I think that

3  is not -- I don't see how that can be objected to.

4          THE COURT:  Take the dollar sign off.  Okay?

5          MR. GILMORE:  We'll take the dollar sign off.

6          THE COURT:  All right.  Green dollar signs.

7          MR. THOMAS:  No swords and no dollar signs?

8          MR. GILMORE:  No swords, no jolly roger in the dollar

9  signs.

10          THE COURT:  Do you think Judge Kimba Wood would allow

11  that in?

12          MR. BART:  No comment.

13          THE COURT:  I don't think so.  She's tougher than me,

14  believe me.

15          MR. BART:  I've been there.

16          MR. THOMAS:  Thank you, Your Honor.

17          THE COURT:  All right.

18          David, bring them in.

19          COURT SECURITY OFFICER:  Yes, sir, they're all here.

20  Please rise for the jury.

21          *(8:56 a.m., the jury enters the courtroom.)*

22                        *   *   *

23          THE COURT:  Good morning, ladies and gentlemen.  Are

24  we ready to go?

25          MR. GILMORE:  Good morning, Your Honor.  Robert

 1   Gilmore for the plaintiffs.  Plaintiffs will resume calling

 2   Grande's corporate representative, Stephanie Christenson, who

 3   Grande had designated, so it will be the remaining of her

 4   deposition testimony.

 5            THE COURT:  We'll go right into it.

 6            MR. GILMORE:  Your Honor, plaintiffs -- should have

 7   mentioned this before.  Plaintiffs wanted to know if Your Honor

 8   would be able to instruct the jury to explain how deposition

 9   testimony that's being played here works.

10            THE COURT:  I think I already did.

11            MR. GILMORE:  Perhaps you did.

12            THE COURT:  Didn't I explain to you?

13            MR. GILMORE:  The one reason is, obviously, it's

14   edited from the original seven-hour deposition.  We just wanted

15   to make sure the jury understood that it was --

16            THE COURT:  Yeah, they do edit, but I think you can

17   tell that, that there's extraneous stuff in there, obviously,

18   but it's just as if they were testifying.  I did explain that

19   to them at some length.

20            MR. GILMORE:  Thank you, Your Honor.

21            THE COURT:  But I'm glad you reminded me because I

22   might have forgotten and it would be a good thing.

23            MR. GILMORE:  I may have missed it.

24            THE COURT:  Well, you're working back there.

25                            *   *   *

Stephanie Christianson - Videotaped Examination    1007

1          (9:00 a.m., playing videotaped deposition testimony of

2   Stephanie Christianson.)

3   BY MR. O'BEIRNE:

4   Q.   How many alleged infringement notices must be received to

5   trigger a final termination letter under Grande's current

6   procedure, as you understand it, as the corporate witness on

7   this topic?

8   A.   Thirty.

9   Q.   How long has that been Grande's procedure?

10  A.   Approximately two weeks.

11  Q.   Prior to two weeks ago, it was three?

12  A.   No.

13  Q.   What was it prior to two weeks ago?

14  A.   It was 60.

15  Q.   So at some time prior to two weeks ago, Grande had a

16  60-strike policy for users receiving notices of copyright

17  infringement?

18  A.   That is my understanding.

19  Q.   Two weeks ago that was changed to a 30-strike policy?

20  A.   That is my understanding.

21  Q.   Does Grande have a 60-strike policy for paying your cable

22  bill?

23  A.   I don't know what Grande's policy is in terms of payments.

24  Q.   I'm handing you what's previously been marked and admitted

25  as PX 60.   This is a document provided by counsel for Grande to

1    *plaintiffs in this case.  There's no Bates number on it.  It's*

2    *printed out as we received it.  And it for some reason has been*

3    *stapled in the upper right-hand corner, but obviously it flips*

4    *landscape throughout the document.*

5        *I'll represent to you, we received an Excel spreadsheet*

6    *natively that has three tabs at the bottom.  So the first tab*

7    *is this colored table, the second tab starts on the third piece*

8    *of paper.  It says "Sum of count" in the upper left-hand*

9    *corner, then the third tab is a vertical table that has columns*

10   *A, B, C and D.  Do you see that, ma'am?*

11   *A.  Yes.*

12   *Q.  You helped prepare this document, I take it?*

13   *A.  Yes.*

14   *Q.  Without getting into any communications, you provided it to*

15   *counsel and then they gave it to us?*

16   *A.  Yes.*

17   *Q.  So you're very familiar with what's in here?*

18   *A.  Yes.*

19   *Q.  And the entries in red in the first three pages of PX 60*

20   *are the eleven subscribers that Grande terminated for copyright*

21   *infringement up to the point that this was provided to us last*

22   *fall, right?*

23   *A.  That is correct.*

24   *Q.  I'm handing you PX 61.  It's already -- ma'am, if you turn*

25   *to the last page of this document, you'll see that there's a*

1   *Grande Bates number on a slip sheet that says "This document*

2   *was provided in native format upon request."*

3       *Do you see that?*

4   *A.  I do.*

5   *Q.  I'll represent to you in litigation when a document's*

6   *produced natively, there's a placeholder sheet like this and*

7   *then the native is produced, but since you can't Bates stamp an*

8   *Excel sheet, we just attach the accompanied native document so*

9   *that the Bates number is in the record.  Do you see that?*

10  *A.  Sure.*

11  *Q.  Okay.  So PX 61, the first two pages are a printout of the*

12  *Excel that was produced at the Bates number Grande 0000199.*

13  *A.  Yes.*

14  *Q.  So first of all, you would agree with me -- let's look back*

15  *at the -- Exhibit 60, the list of terminated subscribers that*

16  *you generated.  Turn to the second page.  There's a row marked*

17  *11.  There's a name there.  I'll refrain from using the name in*

18  *the record, but there's a customer account number ending 7589.*

19  *Do you see that?*

20  *A.  Yes.*

21  *Q.  And that's a subscriber that was terminated, right?*

22  *A.  Yes.*

23  *Q.  And the first infringement letter received is June 6th,*

24  *2017.  Do you see that?*

25  *A.  To clarify, that's not the first letter that they received.*

1    Q.   How do you know that?

2    A.   This spreadsheet depicts when I manually took it over.

3    They were -- by the time it gets to this spreadsheet, they

4    would have already received multiple notices.

5    Q.   Setting that aside for now, I just want to focus on the row

6    of customer ending 7589 on the second page.  Do you see that?

7    A.   Yes.

8    Q.   So the first entry in the row underneath mail notes is

9    6/6/17 regular infringement letter.  Do you see that?

10   A.   Yes.

11   Q.   But account number 7589 was terminated based on notices

12   that account continued to receive after June 6th, 2017, right?

13   A.   Alleged notifications, but yes.

14   Q.   Okay.  Let's look at PX 61.  PX 61, almost every single

15   account number is our 7589 that we see in the second page of

16   PX 60, right?

17   A.   It is on there quite a bit.

18   Q.   Yeah.  Every single -- well, I shouldn't say that.  Almost

19   every single one of the entries on this document of ticket

20   numbers in the abuse system has Rightscorp as the entity,

21   right?

22   A.   There are others.

23   Q.   You understood my question, which was, almost every single

24   one is Rightscorp, right?

25   A.   Yes.

1  *Q.   Thank you.  So I'll rephrase.*

2  *    152 out of 162 of the notices reflected in this document*

3  *are from Rightscorp, right, ma'am?*

4  *A.   Yes.*

5  *Q.   Would you agree with me that 152 constitutes the vast*

6  *majority of 162?*

7  *A.   It does make up the majority of the lines.*

8  *Q.   Let's look at PX 62, ma'am.  PX 62, if you turn it over, is*

9  *Bates numbered Grande 0000200.  Do you see that?*

10  *A.   Yes.*

11  *Q.   Also within the Bates range 155 to 230 that we looked at on*

12  *page 10 of the interrogatory responses, right?*

13  *A.   Yes.*

14  *Q.   Please look back at PX 60, the terminated subscriber list,*

15  *and you'll see on the first page an account number 6380 --*

16  *ending in 6380.  Do you see that?*

17  *A.   Yes.*

18  *Q.   Please look back at PX 62.  Do you see that same account*

19  *number?*

20  *A.   I do.*

21  *Q.   Representing the entries from line 15 down?*

22  *A.   I do.*

23  *Q.   Every single one of these entries list the entity as*

24  *Rightscorp, right?*

25  *A.   Yes, it does.*

Stephanie Christianson - Videotaped Examination     1012

1  Q.  And the date is June 15th, 2017, right?

2  A.  Yes.

3  Q.  If you go back and look at line nine on PX 60 for account

4  6380, it indicates that Grande sent a regular infringement

5  letter dated June 15, 2017, right, ma'am?

6  A.  It does.

7  Q.  That was one of the bases of termination of this

8  subscriber, correct?

9  A.  I can't say that conclusively.

10  Q.  You made this list, right, ma'am?

11  A.  I made this list, yes.

12  Q.  And on July 21st, 2017, this user got a notice of

13  termination letter based in part on the previous letters that

14  that subscriber had received, right?

15  A.  Yes.

16  Q.  To include a letter sent June 15, 2017 as reflected in the

17  fourth entry down in row nine of PX 60, correct?

18  A.  That is correct.

19  Q.  And looking at PX 62, which is one of the documents Grande

20  pointed us to as representing actions taken against

21  subscribers, it lists from row 15 to row 37 notices Grande

22  received from Rightscorp for this account, right?

23  A.  Yes.

24  Q.  PX 62 does not list any other entity for which Grande

25  received a notice for this account on June 15th, does it?

Stephanie Christianson - Videotaped Examination    1013

1    A.   It does not.

2    Q.   So Grande sent a notice to account ending 6380 on June 15th

3    based on a Rightscorp notice it received, right?

4         (Witness reviews document.)

5    A.   I can't say that conclusively.  I would need more

6    information.

7    Q.   I understand your reluctance to say that that's what

8    happened, but isn't that obvious from these documents?

9    A.   It's not obvious.  There could be additional information.

10   Q.   Grande prepared written discovery responses to us that told

11   me that this document reflects actions taken against this

12   customer who you terminated.  And you're going to say under

13   oath that you didn't take action against this customer based on

14   Rightscorp notices?

15   A.   I can't speak to why this document was included.

16   Q.   Did you have anything to add to that answer, ma'am?  I

17   don't want to interrupt you, but it seemed like you were going

18   to continue testifying.

19   A.   No.

20   Q.   Prior to Grande updating its DMCA policy to expressly

21   request notices be signed with a PGP digital signature, Grande

22   did process all the way through and generate a letter based on

23   Rightscorp notices it received, correct?

24   A.   That is my understanding, yes.

25   Q.   Your understanding as Grande's corporate witness, on the

Stephanie Christianson - Videotaped Examination      1014

1   topic of notices?

2   A.   Yes.

3   Q.   There was a time before Grande requested that notices be

4   digitally signed by PGP where it was sending letters based on

5   Rightscorp notices, right?

6   A.   Yes.

7   Q.   And then your testimony is Grande stopped sending letters

8   based on Rightscorp notices after it updated its DMCA policy to

9   ask senders to digitally sign it with PGP, right?

10  A.   Yes.

11  Q.   And that happened in April 2017, right?

12  A.   Yes.

13  Q.   Sitting here today, can you tell me any difference in the

14  notices from Rightscorp, from before that change and after the

15  change?  Rightscorp was sending the same information in the

16  notices, right?

17  A.   I don't know of any changes.

18  Q.   Let's take a look.  I'm handing you PX 186.  You can see

19  this is an e-mail from DMCA@roundhillmusic.com to

20  legal@grandecom.com, dated August 17, 2015.  Do you see that?

21  A.   Yes.

22  Q.   The subject, "Grande Communications termination request for

23  Round Hill Music."  Do you see that?

24  A.   Yes.

25  Q.   And the e-mail that it's sent to is legal@grandecom.com.

1    *Do you see that?*

2    *A.  Yes.*

3    *Q.  And you would agree with me that was the e-mail address in*

4    *the copyright registration document that we reviewed that*

5    *listed Gina Fuentes as the registered DMCA agent, correct?*

6    *A.  Yes.*

7    *Q.  And then if you look down, the e-mail is -- it is sent via*

8    *U.S. mail to Mr. Murphy at Grande's address and via e-mail to*

9    *Ms. Fuentes.  Do you see that?*

10   *A.  Yes, I do.*

11   *Q.  And the body of the e-mail reads, "As you know from our*

12   *prior notices, Rightscorp has confirmed under penalty of*

13   *perjury that it is authorized to act in matters involving the*

14   *infringement of the musical compositions owned or controlled by*

15   *Round Hill Music."  It goes on, "Rightscorp has further*

16   *notified you that these copyrights are being downloaded,*

17   *uploaded, and/or offered for upload on or through your network*

18   *or system by a subscriber or account holder of your network or*

19   *system."*

20       *Do you see that?*

21   *A.  Yes.*

22   *Q.  The second paragraph starts, "Despite our notices, these*

23   *infringements are continuing and are being committed repeatedly*

24   *by the same subscribers or account holders."*

25       *Do you see that?*

Stephanie Christianson - Videotaped Examination    1016

1   A.   Yes.

2   Q.   "Between 2015, April 19th, and 2015, August 15th, we have

3   sent 918 infringement notices to you."

4        Do you see that?

5   A.   Yes.

6   Q.   Now, if you go down to the last full paragraph, "The

7   problem of the copyright infringement on the Internet and the

8   problem of repeat infringers are very significant."

9        Do you see that?

10  A.   Yes.

11  Q.   "Therefore, aside from providing you notice of the

12  infringements of your subscribers and account holders,

13  Rightscorp has provided you with access to a comprehensive

14  database (i.e., our dashboard) containing the information

15  necessary for you to identify the subscribers or account

16  holders of your network or system who have used your network or

17  system to infringe copyrights owned or controlled by RHM."

18       Do you see that?

19  A.   I do.

20  Q.   It goes on.  "As a reminder, the dashboard may be accessed

21  at--" and it gives a website with a user name and a password.

22  Do you see that, ma'am?

23  A.   I do.

24  Q.   Did Grande ever access the Rightscorp dashboard?

25  A.   No.  This letter is new to me.  I have -- didn't -- I

1   *haven't seen the letter, haven't seen the dashboard.*

2   *Q.  As Grande's corporate representative on topic 32, with all*

3   *the facts available to Grande, are you aware of any evidence*

4   *that any person at Grande ever accessed the Rightscorp*

5   *dashboard at any time?*

6   *A.  I am not.*

7   *Q.  You would agree with me Grande cannot point to a single*

8   *instance in which it concluded that the alleged activity*

9   *reflected in any Rightscorp notice, in fact, did not occur?*

10  *A.  Yes.*

11  *Q.  When Grande processes notices through its abuse system that*

12  *it receives from senders, DMCA notices, Grande is able to*

13  *identify the subscriber associated with the IP address, right?*

14  *A.  Yes.*

15  *Q.  Rightscorp's system is capable of identifying actual*

16  *instances of infringement, right, ma'am?*

17  *So just to be clear, topic 33 is "Grande's understanding of*

18  *Rightscorp's capabilities for identifying instances of*

19  *copyright infringement."*

20  *So I'll ask it again.  Grande is aware that Rightscorp's*

21  *system is capable of identifying actual instances of copyright*

22  *infringement, right, ma'am?*

23  *A.  Grande has no way of knowing that.*

24  *Q.  Grande has no way of knowing whether Rightscorp's system is*

25  *capable of detecting actual infringement?*

1    A.  Grande can only say what is listed in the alleged

2    notifications that they get.

3    Q.  I'm going to show you a portion of this PX 174 where the

4    e-mail letter date is before November 1st, 2016.

5        You testified previously that Grande's DMCA policy and

6    procedure was not implemented 'til November 2016, right, ma'am?

7    The DMCA policy and procedure document that we've looked at was

8    implemented, at the earliest, November 2016?

9    A.  That policy, yes.

10   Q.  Okay.  And you agree with me that this document reflects on

11   each page a list of letters sent to customers based on notices

12   of alleged infringement Grande received, right?

13   A.  Yes.

14   Q.  So this is what Grande produced to us as the record of

15   letters sent to Grande customers based on notices from

16   December 2013 through October 2016.  Do you see that, ma'am?

17   A.  I see the pile.

18   Q.  How many terminations occurred during that period based on

19   these?

20   A.  None.

21   Q.  None.  Zero, right, ma'am?

22   A.  Yes.

23   Q.  Do you have any idea how many letters this represents?

24   A.  Quite a few.

25   Q.  And it starts December 2013.  If we had a stack that also

1    *went as far back as 2011, that stack would be higher than this,*

2    *wouldn't it, ma'am?*

3    *A.   Theoretically, yes.*

4    *Q.   Practically, it wouldn't, right?  If we added more paper to*

5    *this stack, it would be taller, right?*

6    *A.   Yes.*

7    *Q.   But if we added every letter sent by Grande to a customer*

8    *based on a notice of infringement all the way back to 2011, no*

9    *matter how high that stack got, the number of terminated*

10   *customers would still be zero, right?*

11   *A.   That is correct.*

12   *Q.   Grande could have implemented the e-mails and final*

13   *termination letter process that it implemented sometime in 2017*

14   *in previous years, right?*

15   *A.   Hypothetically, yes.*

16   *Q.   Well, not just hypothetically.  The information that Grande*

17   *has in its possession now that it uses to generate these*

18   *e-mails and termination letters, it had that same kind of*

19   *information about notices -- DMCA notices that it received in*

20   *previous years, right?*

21   *A.   The information is the same.*

22   *Q.   So there was no technical barrier that you're aware of*

23   *sitting here that would have prevented Grande from implementing*

24   *this process sooner, is there?*

25   *A.   No.*

1   Q.   You would agree with me, no, there is no such barrier?

2   A.   Yes, I would agree with you.

3   Q.   And up through 2016, how many subscribers of Grande were

4   terminated based on any one of these letters?

5   A.   Zero.

6   Q.   How many notices did Grande receive of alleged copyright

7   infringement from the years 2012 to 2017?

8   A.   1.2 million.

9   Q.   So I'll just repeat it, ma'am.  The only basis that Grande

10  has ever claimed as justifying not processing a notice it

11  received from Rightscorp is because a Rightscorp notice didn't

12  include a PGP key after that was a requirement in the DMCA

13  policy, correct?

14  A.   Yes.

15  Q.   So you would agree with me that prior to the PGP

16  requirement that Grande put in its policy, Grande was willing

17  to, and did, process notices it received from Rightscorp?

18  A.   Yes.

19  Q.   And it considered Rightscorp a known entity from which it

20  received notices?  Ma'am?

21  A.   Yes.

22  Q.   I think we've covered this clearly, but just to make sure

23  we have a clean record.  You would agree with me that Grande

24  did not have a policy that provided for the termination of

25  subscribers and account holders who were repeat copyright

Stephanie Christianson - Videotaped Examination    1021

1   *infringers in 2010, right?*

2   *A.   To my knowledge, yes.*

3   *Q.   Same answer for 2011?*

4   *A.   Yes.*

5   *Q.   2012?*

6   *A.   Yes.*

7   *Q.   2013?*

8   *A.   Yes.*

9   *Q.   2014?*

10   *A.   Yes.*

11   *Q.   2015?*

12   *A.   Yes.*

13   *Q.   And 2016?*

14   *A.   Yes.*

15   BY MR. BROPHY:

16   *Q.   Ms. Christenson, are you aware of instances in which Grande*

17   *has received fake or spoofed notices from a copyright*

18   *notification entity?*

19   *A.   Yes.*

20   BY MR. O'BEIRNE:

21   *Q.   Sitting here today, you cannot point to an instance in*

22   *which Grande believes it received a notice purporting to be*

23   *from Rightscorp that Grande believes was a spoofed notice?*

24   *A.   I don't know of any, no.*

25   *Q.   Did Grande ever at any time decline to process a Rightscorp*

1   *notice because Grande reached the conclusion that it thought*

2   *the Rightscorp notice had been spoofed?*

3   *A.   Not to my knowledge.*

4       *(9:29 a.m., videotaped deposition testimony stopped.)*

5                           *   *   *

6           MR. GILMORE:  And Your Honor, based on the deposition

7   testimony, plaintiffs move into evidence Plaintiff's Exhibit

8   169 as a party admission; Plaintiff's Exhibit 186, which is

9   actually part of what has already been received as Plaintiff's

10  Exhibit 11; Plaintiff's Exhibit 174, which has been

11  pre-admitted, the same document at Defense Exhibit 111.  And

12  then we move Plaintiff's Exhibit 60, Plaintiff's Exhibit 61,

13  and Plaintiff Exhibit 62 as party admissions of Grande.

14          Then I also note for the record that the deposition

15  testimony referenced Plaintiff's Exhibit 53, which is already

16  admitted.

17          THE COURT:  Yeah.  We're not putting the deposition

18  itself in evidence.

19          MR. GILMORE:  No, no.  These are all exhibits that

20  were discussed.

21          MR. HOWENSTINE:  Your Honor, Grande objects to PX 186.

22  That was a letter ostensibly sent to Grande.  But the witness

23  disclaimed any knowledge of the letter.  It was a document

24  produced by Rightscorp.  There is no foundation that Grande

25  ever received it.

1          MR. GILMORE:  Your Honor, it is a repeat notification

2    letter.  It is one of the set of such business records from

3    Rightscorp that were received into evidence as part of

4    Plaintiff's Exhibit 11.

5          THE COURT:  Is it already in evidence?

6          MR. GILMORE:  It was a standalone example of all the

7    documents --

8          THE COURT:  That is not an answer to my question.  Is

9    it already in evidence?

10          MR. GILMORE:  It is.  It is in evidence as part of

11    Exhibit 11.

12          THE COURT:  It's already in evidence.  They'll be

13    received.

14          MR. GILMORE:  Thank you, Your Honor.

15          MR. BART:  Thank you, Your Honor.  Plaintiff's call

16    Matthew Flott.

17          (Pause.)

18          My apologies.  He'll be here in a minute.

19          THE COURT:  Where is he?

20          MR. BART:  He was out in the hall.  I had to send

21    someone to get him.  He's in the courthouse.

22          THE COURT:  In the courthouse?

23          MR. BART:  Yes, absolutely, through security and

24    everything.

25          THE COURT:  Right up here, sir, and if you'll remain

1    standing.  If you come around and raise your right hand, she

2    will swear you in.

3            COURTROOM DEPUTY CLERK:  You do solemnly swear that

4    the testimony you're about to give in this case now before the

5    Court will be the truth, the whole truth and nothing but the

6    truth, so help you God?

7            THE WITNESS:  I do.

8            COURTROOM DEPUTY CLERK:  You can have a seat.

9                            *   *   *

10           *(MATTHEW FLOTT, Plaintiff Witness, Sworn.)*

11                           *   *   *

12                    DIRECT EXAMINATION

13   BY MR. BART:

14   Q.  Good morning, Mr. Flott.  How are you?

15   A.  I'm good.

16   Q.  Good.  Would you please introduce yourself to the jury?

17   A.  Sure.  I'm Matthew James Flott.

18   Q.  And where do you work, Mr. Flott?

19   A.  I work for Warner Music Group.

20   Q.  And what is Warner Music Group?

21   A.  Warner Music is a collection of companies that operate in

22   the music business.

23   Q.  Are these companies all affiliated with each other at the

24   corporate level?

25   A.  They are.

1   Q.   Okay.  And what does the Warner Music Group do?

2   A.   It operates two -- primarily two segments, one being the

3   recorded music segment that finds, develops, and works with

4   artists to produce music and to monetize it.  The second

5   division is a Music Publishing Division.  They work with

6   writers to monetize their works as well.

7   Q.   And when you say "writers," writers of what?

8   A.   Of the music itself, the lyrics.

9   Q.   The musical compositions?

10  A.   Yes.

11  Q.   What's your current title?

12  A.   I'm the executive vice president and chief financial

13  officer for the recording music segment.

14  Q.   Is Warner considered one of the major record companies in

15  the United States?

16  A.   It is, with Universal Music Group and Sony Music

17  Entertainment.

18  Q.   How does the Recorded Music Division operate?

19  A.   It operates as a collection of affiliates around the world

20  that collectively consolidate into the Recorded Music Division.

21  Q.   And does it do so through record labels?

22  A.   It does.

23  Q.   Can you give us some examples of those labels?

24  A.   Sure.  Warner was founded on three primary labels, one

25  being Atlantic Records, the second at the time was Warner

1    Brothers Records.  Now it's known as Warner Records.  And the

2    third was Elektra Records.  There are also a number of other

3    labels like Rhino, Roadrunner, Fueled By Ramen, but those are

4    just a couple of examples of some of the hundreds of labels

5    that we operate around the world.

6    Q.  Okay.  Are any of the plaintiffs in this case affiliated

7    with Warner Music Group?

8    A.  They are.

9    Q.  Can you tell me which ones?

10   A.  I may not get them all, but I'll try and remember them.

11   They're Atlantic --

12   Q.  Did you prepare a demonstrative exhibit that was related to

13   these companies?

14   A.  Yes.

15         MR. BART:  Your Honor, permission to show this

16   demonstrative to the witness and the jury?

17         THE COURT:  Yes.

18   BY MR. BART:

19   Q.  Mr. Flott, what does this demonstrative show?

20   A.  It's the logos of our -- of the Warner Music Group as well

21   as the labels that are in the case.

22   Q.  Okay.  Is it fair -- would you understand it if I refer to

23   these companies collectively as The Warner Plaintiffs?

24   A.  Yes.

25   Q.  Let's take a couple minutes and talk about your personal

```
 1   background.  What's your educational background, Mr. Flott?
 2   A.  I have a Bachelor of science degree in accounting from
 3   Saint Francis University and a CPA.
 4   Q.  You're a licensed CPA?
 5   A.  Yes.
 6   Q.  How long have you worked in the music industry?
 7   A.  Little more than 30 years.
 8   Q.  And how long have you worked at Warner Music Group?
 9   A.  Just short of 20 years over two different stints.  I first
10   joined in 1983 and worked until 1986, and then I came back to
11   the company in 2006 until present.
12   Q.  Okay.  And what role did you take at Warner when you came
13   back in 2006?
14   A.  I was the chief financial officer for the Independent Label
15   Group, which was a collection of owned and distributed labels
16   for Warner.
17   Q.  Okay.  And what did you do after that?
18   A.  In 2008, I moved to be the CFO for Warner music --
19        (Interruption.)
20            THE COURT:  Wow.  What was that?
21            MR. BART:  That was not part of our presentation, Your
22   Honor.
23            THE COURT:  Okay.
24            MR. BART:  We may have some percussion later, but that
25   wasn't part of it.
```

1  BY MR. BART:
2  Q.  I think you were talking about 2008 with being the CFO of
3  distribution.
4  A.  At Warner Group, distribution, yes.
5  Q.  What subsequent titles have you held?
6  A.  In 2011, I was -- became the CFO for international recorded
7  music.  In 2013, I became the CFO for recorded music.  In 2016,
8  I became the CFO for global financial analysis and operations,
9  and in 2017, I am in my current position as the executive vice
10  president and chief financial officer for the recorded music
11  segment.
12  Q.  And what are your job responsibilities in your current
13  role?
14  A.  Primarily my responsibilities encapsulate delivering the
15  financial performance of the Recorded Music Division.  That
16  includes budgeting, it includes reporting on our actual
17  results, it includes forecasting our forward results.  It also
18  includes our cash -- our cash management, our cash flows, and
19  our reporting into our artists and partners.  And I also
20  oversee our sync license, our global sync licensing business
21  and our global supply chain operations.
22  Q.  You just mentioned something, sync licensing business.
23  That may be a term the jury is not familiar with.  Can you
24  explain what that term means?
25  A.  Sure.  Our music companies will come to us in either for

Matthew Flott - Examination                    1029

1   films, commercials, video games, any number of different

2   instances where they want to use our music in any of those, any

3   of those options to -- and we will license them the music to be

4   able to use.

5   Q.  So it's licensing recordings in timed relation to some

6   video image?

7   A.  Yes.

8   Q.  In addition to the work that you just described to the

9   jury, do you have any responsibility in terms of reporting the

10  financial performance and the reasons for that to management?

11  A.  I do.  On a monthly basis, I will take our actual results,

12  compare that to both our forecast budget and prior years, and I

13  will provide that explanation into not only our recorded music

14  senior leadership, but also the Warner Music leadership and the

15  board of directors.

16  Q.  And in addition to providing the raw data, you provide your

17  opinions and analysis of why those numbers are what they are,

18  correct?

19  A.  Yes.  Part of the interpretation is to go through and

20  understand what's driving the changes in our results, so that's

21  part of the interpretation.

22  Q.  And that's your personal responsibility, correct?

23  A.  Yes.

24  Q.  Okay.  Have you had an opportunity to become familiar with

25  Warner sound recordings that are part of this case?

1    A.   Yes.

2    Q.   And do you know how many recordings are at issue?

3    A.   189.

4    Q.   Did Warner participate in preparing a medley of some of

5    these recordings for the jury to illustrate the works at issue?

6    A.   Yes.

7             MR. BART:  Your Honor, permission to play a short

8    medley of the Warner works for the jury?

9             MR. HOWENSTINE:  No objection.

10            THE COURT:  You may do so.

11            *(Music playing.)*

12   BY MR. BART:

13   Q.   Mr. Flott, why did you want the jury to hear that medley?

14   A.   You know, I think probably like anyone else, you know,

15   music touches people in a different way and, you know, many of

16   those songs are, you know, some of our most iconic songs that

17   just touch everyone in a different way.

18   Q.   How, for an example, do they touch you?

19            MR. HOWENSTINE:  Objection.  Relevance.

20            THE COURT:  Sustained.

21   BY MR. BART:

22   Q.   How would you describe the importance of the sound

23   recordings to Warner Music?

24   A.   I mean, they are some of, you know, our most iconic and

25   some of our most valuable assets.

Matthew Flott - Examination                   1031

1   Q.  And why do you say that these are among the Warner
2   plaintiff's most valuable assets?
3   A.  I mean, as a record company, our assets and the predominant
4   value of our assets come from the musical compositions -- I
5   mean, the sound recordings that we work with our partners to
6   develop and to monetize.
7   Q.  Okay.  I want to talk for a few minutes about record
8   company revenues, which you report to the board and to the
9   company.  How did Warner plaintiffs come to own and control
10  sound recordings?
11  A.  I mean, our -- one of our fundamental functions is to find
12  and develop new artists and to work with them to record music,
13  to bring their passion to the marketplace.  And part of our
14  contractual relationship is to acquire those assets and to work
15  with them to develop them.
16  Q.  And how do the Warner plaintiffs make money with those
17  assets?
18  A.  We will go through and either sell them in multiple forms,
19  whether that's physical records, a vinyl or a CD.  We will
20  license them to streaming platforms right now like Spotify and
21  Apple Music.  They are downloads to iTunes.  And there's a
22  variety of other ways.  We talked about synchronization.  We
23  also will go through and license that music for public
24  performance, so if you're in a bar or a venue where music is
25  playing, we will monetize there as well.

```
 1        But we're -- you know, we want to make music available to a
 2   consumer in whatever manner they want to consume it.
 3   Q.  And how much of the Warner plaintiffs' revenue comes from
 4   distributing sound recordings to the public?
 5   A.  A large majority of our revenue is coming from selling
 6   sound recordings.
 7   Q.  Let's talk a few minutes about costs.  What are the major
 8   categories of costs that a record company has?
 9   A.  Well, first and foremost, it's our talent costs, so as I
10   said, one of our fundamentals is to find and develop artists
11   that are talent costs.  And that talent cost will include
12   advances to artists, it will include the royalties to those
13   artists.  It will include recording sessions and, you know,
14   that is kind of one category of cost.
15        We also have cost to --
16   Q.  Let's take them one at a time.
17   A.  Okay, sorry.
18   Q.  What's Warner Music Group's general approach to paying its
19   artists?
20   A.  It's fundamental.  It's part of the trust we build with our
21   artists that they know that we're going to monetize their
22   artist -- I mean monetize their music, and at the same time,
23   make sure that they get paid based on our contractual
24   relationship of how they're going to be paid.
25   Q.  Does that include net proceeds of recoveries in litigations
```

1    like this?

2    A.  It does.

3    Q.  You mentioned advances before.  In most cases, do artists

4    have to pay back advances if their recordings fail to generate

5    sufficient income to recoup the advances?

6    A.  No, they don't.  Part of the risk that we take, you can

7    look at it or treat it like research and development cost.

8    They're the investments we'll make, and one of those

9    investments is trying to select and work with artists.  Some of

10   them do very well.  Some of them do okay.  Some of them don't

11   perform but, you know, that's part of our job is to go through

12   and to try and find the ones that will work and help them, you

13   know, be the stars that you heard on that -- on that reel.

14   Q.  Okay.  I think you mentioned, before I stopped you a moment

15   ago, recording costs.  Can you tell the jury a little bit about

16   what type of costs those include?

17   A.  Sure.  That will include studio time.  That will include

18   the producers they may be working with.  That would include the

19   session, the session musicians that they're working with.  So

20   it will include anything that goes into the recording process.

21   It could include whether or not they sample another artist's

22   record.  That will need to be licensed so that we can make sure

23   that we have -- we've properly licensed that music into a

24   composition.

25       But it really -- the producers, the recording engineers,

1  the session musicians, the studio space itself, all of those

2  are encapsulated within recording costs.

3  Q.  And that's all paid by the record company?

4  A.  That's correct.

5  Q.  Once the record is actually made, does the company incur

6  costs in promoting and marketing the recordings?

7  A.  It does.

8  Q.  Tell us a little bit about that.

9  A.  Sure.  So first and foremost, we want to record the music.

10 Then we want to be able to get it out to fans to be able to

11 experience it, explore it.  To, you know, enjoy it.  So we have

12 costs that we will incur during a recording process to start to

13 build awareness of the artist and the music that they're

14 bringing forward.

15     We will also incur costs leading up to the release of

16 either a single or an album, and then we will incur costs

17 during that process while the record is released, and the

18 artist may be touring in support of that record, wherever they

19 happen to be.

20 Q.  Okay.  And are marketing costs always tied to the release

21 of specific recordings?

22 A.  It's yes and no.  But for the most part, in the evolution

23 in today's marketplace, you know, it needs to be in an almost

24 always-on basis, whether it's through an artists's socials,

25 whether it's through just the record developing.  The

Matthew Flott - Examination                1035

1    marketplace has evolved to where it's a constant flow of

2    product.  And just the number of products that are out there,

3    we need to be able to make sure that we can put the right

4    attention on to the artist releases that we have, so it is tied

5    to a plan, but at the end of the day, that plan just evolves on

6    a constant basis.

7    Q.  So that, you know, even after the initial marketing plan

8    for the release of a record is completed and you're through

9    that cycle, there's still marketing involved relating to those

10   recordings?

11   A.  Yes.

12   Q.  And how much does Warner Music Group invest in its

13   promotion and marketing efforts?

14   A.  It's a significant percentage of our revenue.

15   Q.  And how much of that happens before there's actually

16   product out in the marketplace to generate revenue to recoup

17   those costs?

18   A.  It can be a material part of it, when you look at what gets

19   developed to build the awareness.

20   Q.  In addition to the recording costs and the marketing costs,

21   are there costs associated with the overall running of the

22   Recorded Music Division that are part of operations, and can

23   you tell us some of that?

24   A.  Yes.  We also have what would be considered overhead or

25   general administrative costs.  So those are the costs of our

1  people.  Those are the costs of our facilities.  Those are the

2  costs of our systems to collect and account to our artists.

3  There are other costs associated with, you know, travel for

4  anyone within the company who is supporting the artist or

5  supporting the business.

6      So anything that really would encompass, you know, general

7  administrative from personnel to systems to facilities to

8  travel, all of that.

9  Q.  To legal and copyright as well?

10 A.  That's correct.

11 Q.  And royalty collection and payment?

12 A.  That's correct.  It's part of the systems that I'm

13 referring to.

14 Q.  Right.  And would Warner be able to pay these costs if it

15 wasn't able to get revenue from the distribution of its sound

16 recordings?

17 A.  No.  We would have to -- you know, like any business, we

18 have to rationalize our costs with the revenues that we're able

19 to collect.

20 Q.  And that's where your business comes in often.  You

21 personally, right, Mr. Flott?

22 A.  That's correct.

23 Q.  In light of everything that you've told us about Warner's

24 revenues and costs, can you tell us a little bit about how

25 Warner, through you and your department, measure the overall

1    performance of its business?

2    A.  Well, I mean, we really look at it from a portfolio

3    approach.

4    Q.  And when you say portfolio, what do you mean by that?

5    A.  Well, we have operations globally, and we have labels that

6    are global as well, so when I look -- when you think about a

7    portfolio, we're trying to manage all of those different

8    companies to a collective result so that, you know, we can

9    determine where we may want to invest more, invest less,

10   rationalize our costs if we aren't getting, you know, a proper

11   return.  But in that portfolio, trying to manage to an overall

12   result, knowing that, you know, we have to take risks, and we

13   have to rationalize what makes the most sense for not only us,

14   but our partners.

15   Q.  And in looking at the portfolio, are you looking at not

16   just the companies that are within the overall Warner Music

17   Group structure, but label operations and how individual labels

18   are operating?

19   A.  That's correct.

20   Q.  In the regular course of Warner's business, does it ever

21   try to determine the value of sound recording copyrights on an

22   individualized basis?

23   A.  No.

24   Q.  Why not?

25   A.  Our -- when we look at value, the value is in the

1    collective, collective of all of our -- all of our assets.  And
2    value is also something that is not a static -- it's not a
3    static view.  There are different events that can happen in the
4    marketplace that can change what that is.  But ultimately to
5    us, the value is in the collective and our -- what we do is to
6    acquire, you know, assets and look at them collectively
7    together.
8    Q.  So the calculation of individual or purported individual
9    values, would not, in your opinion, further any business or
10   financial goals of the company?
11   A.  I mean, we -- that's just not the way we look at it.
12   Q.  Okay.  So let's talk a little bit more from a company and
13   industry basis.  Based on your position and your experience and
14   your reporting, what was the trend in record industry revenue
15   for the period from 1997 to 2012?
16         MR. HOWENSTINE:  Objection.  Relevance.
17         MR. BART:  Your Honor, I can address this.  I think
18   that it is right in his wheelhouse what he reports on.  We've
19   gone through his experience --
20         THE COURT:  Objection is overruled.
21   A.  The revenues from 1997 to 2012 halved over that period of
22   time.
23   Q.  They declined to half of what they were in '97?
24   A.  Yes.
25   Q.  And what were the consequences in that decline in revenue

1   on Warner Music Group?

2   A.   It required us to go through and to rationalize our --

3   almost everything within our business to align it with the

4   revenues that were able to collect.

5   Q.   How did it affect artist payments?

6   A.   It reduced artist payments.  If revenues are going to be in

7   half, artists are going to be impacted by that.

8   Q.   How did it affect company-wide staffing and services?

9   A.   We had to look at our overall infrastructure, so we had to

10  look at the number of labels that we had and whether we could

11  continue to operate all of them.  And in some cases, we had to

12  merge labels together or to shut them down altogether.

13  Q.   Can you give us an example of one of those instances?

14  A.   Sure.  At the beginning, I referenced Elektra Records, one

15  of the three kind of starting companies for Warner.  And in

16  2004, as those revenues declined, we had to make the decision

17  to merge the Elektra label into our Atlantic label to save

18  cost.

19  Q.   Did the decline in revenue have an effect on the overall

20  amount of music that Warner plaintiffs were able to release?

21  A.   Yes.  Since we were not -- if you look at it kind of two

22  ways.  One, we weren't investing as much, so we had to look at

23  our roster of artists and we had to determine how many artists

24  we could actually have.  So in some cases, we had to decide not

25  to go forward with artists.

1      In other cases, we had to go through and cut down our

2   investment in new artists.  So as a by-product, we put out less

3   music because we had to be more selective with the funds that

4   we had available to make those investments.

5           MR. BART:  Now, I'd like to show the witness, but not

6   the jury, Plaintiff's 350, please.

7   BY MR. BART:

8   Q.  Have you seen this document before, Mr. Flott?

9   A.  I have.

10  Q.  And at a high level, what is it?

11  A.  It is a schedule that's produced -- or it's a schedule

12  that's produced by the RIAA for U.S. recorded music revenues

13  from 1996 through 2014 by format.

14  Q.  Okay.  And that's done on an annual basis, correct?

15  A.  That's correct.

16  Q.  Okay.  What is the RIAA?

17  A.  The RIAA is the Recording Industry Association of America.

18  It's the trade association that represents the recorded -- the

19  music business in the United States.

20  Q.  Okay.  Is Warner Music Group a member of the RIAA?

21  A.  We are.

22  Q.  And what does that mean?

23  A.  We help fund the overall operations of the RIAA with the

24  other majors and the other members of the -- the members of the

25  RIAA.

1   Q.  So the operations of the RIAA are paid for by Warner and

2   other members of the recorded music industry?

3   A.  Yes.  We pay for it based on our relative market shares

4   within the U.S.

5   Q.  Okay.  So Warner Music Group's contribution is a

6   significant one?

7   A.  It is.

8   Q.  Is it fair to call the RIAA an agent of its members?

9   A.  It is.

10  Q.  And what functions does the RIAA perform for its members?

11  A.  One of them is the schedule here, they collect data from

12  all of the majors that we provide to them.  They do research

13  and analysis on topics that are relevant to the business and

14  the companies themselves.  They help in legislation so we can

15  protect copyrights or intellectual properties.  Those are, you

16  know, some examples of what they do.  It's not all-inclusive,

17  but the agenda constantly is evolving, so it's -- we're looking

18  at various and different topics that they'll help us with.

19  Q.  And I think you were alluding to this before, but what data

20  does the RIAA receive from what sources?

21  A.  So in the case of revenue data, each of the partner

22  companies will supply and submit their data in that the RIAA

23  will aggregate as that agent and they will then compile that

24  information relative to publish and for all of us collectively

25  to be able to review and discuss.

1  Q.  Do you have any personal experience working with the RIAA

2  as part of your job duties at Warner?

3  A.  I do.

4  Q.  Can you describe that for the jury?

5  A.  Sure.  RIAA meets with us on a regular basis, whether -- it

6  can be more frequently than quarterly, but at a minimum,

7  quarterly, where we will review the most recent not only

8  revenue data, but also any of the topics that the member

9  companies have brought forward.  I've participated in these

10  meetings for most of the last ten to 15 years.

11  Q.  Okay.  These are quarterly meetings?

12  A.  Yes.

13  Q.  And they're going over with you the data and analysis

14  they've received both with regard to the industry as a whole

15  and with regard to Warner specifically, correct?

16  A.  That's correct.

17  Q.  And is Warner revenue data included and reflected within

18  the data that's in Plaintiff's Exhibit 350?

19  A.  It is.  It's part of what's in here.  It's not just ours.

20  Q.  Do you consider the data in Plaintiff's Exhibit 350 to be

21  reliable?

22  A.  Yes.

23  Q.  And do you rely on that data in the regular performance of

24  your job duties?

25  A.  I do.

Matthew Flott - Examination                    1043

1   Q.  And in what way?

2   A.  One of my responsibilities is to evaluate how we as a

3   company are performing, not only against the market, but also

4   our competition.  So knowing and seeing the trends of everyone

5   aggregated together and looking at how we're performing, it

6   will either influence how we go through and make decisions to

7   either make changes or to invest potentially more heavily in a

8   particular area because of how we're performing.

9       If we're not performing in that same direction, it will

10  influence how we make decisions so that we can align ourselves

11  to at a minimum where the market is or beyond it.

12  Q.  Does it also play a role, this exhibit and exhibits like

13  it -- or charts like it, in your explaining results and reasons

14  to the Board of Directors and to senior management?

15  A.  Yes.  Part of the fundamental commentary that I put

16  together will not only be against our own results, but also

17  against the results of the market itself, a particular segment

18  and our competition.

19  Q.  And making this chart and charts like this are part of the

20  regular practice of the RIAA; isn't that correct?

21  A.  That's correct.  It's available on their website.

22        MR. BART:  Your Honor, I move to admit Plaintiff's

23  Exhibit 350.

24        MR. HOWENSTINE:  Objection.  Relevance, Your Honor.

25  This isn't specific to any of the plaintiffs in this case, and

1   it also specifically cuts off the relevant time period in this

2   case.

3          MR. BART:  It includes the relevant time period in

4   this case.  It provides context and it is relevant to as the

5   witness has said --

6          THE COURT:  The objection is overruled.  It will be

7   received.

8          MR. BART:  Thank you, Your Honor.  Can we publish the

9   chart to the jury, please?

10  BY MR. BART:

11  Q.  Now that the jury can see this exhibit, can you describe

12  what it shows?

13  A.  Sure.  It is -- starting from the left side, it would be

14  the annual revenue -- let me put my glasses on.  Annual revenue

15  for 1996 through 2014.  The color shading that's on here

16  determines the format of music that's being sold.  And I think

17  that this is -- and this is just the U.S. recorded music

18  business and it's prepared by the RIAA.

19  Q.  And what is the total revenue in 2000?

20  A.  In 2000, that revenue looks like it's slightly above

21  $20 billion.

22  Q.  Okay.  And what about in 2014?

23  A.  2014, I believe it is right around $7 billion.

24  Q.  There are different colors on this chart.  Can you explain

25  to the jury what those colors represent?

Matthew Flott - Examination                    1045

1   A.   Sure.   There are the different formats of music that -- or

2   different formats of revenue.   Starting with the left side, the

3   predominant color is orange, which is the compact disc.   As it

4   moves to the right, you'll see the purple color.   That will be

5   when the iTunes store came on primarily and the download market

6   started to be created, whether that's, you know, the different

7   formats that are there, downloads for albums, singles, videos,

8   or even ring-back and ring tones.

9       And then the green colors, which are starting to show up in

10  2005, but really starting to show up in 2010 are the

11  subscription, which is the Spotify in this particular case is

12  the predominant partner there.

13  Q.   The streaming?

14  A.   That's correct.

15  Q.   And if you move the chart -- based on your knowledge, not

16  based on what's on this chart -- further to the right, what

17  happens in terms of the relative proportions of the different

18  colors?

19          MR. HOWENSTINE:   Objection.   Foundation.

20  BY MR. BART:

21  Q.   Do you have personal knowledge of what happened with

22  industry revenues after this chart?

23  A.   Yes.

24  Q.   Can you tell us?

25  A.   The green bars continue to expand and in 2016 became the

1    dominant revenue of the industry.  The purple continued to

2    shrink, the downloads, and compact discs have continued to come

3    down, but vinyl records have actually gotten bigger as well.

4    Q.  Okay.  Are you familiar with the term called "music

5    consumption"?

6    A.  Yes.

7    Q.  And what does that term mean?

8    A.  It generally referred to what a consumer would commit, in

9    terms of hours, to listening to music.

10   Q.  Okay.  And in your day-to-day work and through your

11   participation -- well, let me back up for a minute.

12       Is music consumption a topic that is discussed internally

13   at Warner on a regular basis by you and management?

14   A.  It is.

15   Q.  Is it a subject that is discussed in your quarterly

16   meetings with the RIAA?

17   A.  At different points in time, yes.

18   Q.  And does the RIAA, as with revenue, do analysis that it

19   provides to its members relating to music consumption?

20   A.  They do.

21   Q.  And based on all of that, are you familiar with the volume

22   of music consumption over the same timeframe that we were just

23   looking at in this chart?

24   A.  Yes.

25   Q.  And what is your understanding on the volume of music

1  consumption during that period?

2          MR. HOWENSTINE:  Objection.  Relevance.

3          MR. BART:  It's the same --

4          THE COURT:  No, this one is sustained.

5          MR. BART:  But, Your Honor, the comparison between

6  revenue and consumption and the reasons for that are relevant

7  to this case.

8          THE COURT:  Yeah, but you're talking about the entire

9  record industry.

10          MR. BART:  Well, I can -- well --

11  BY MR. BART:

12  Q.  The consumption that we're talking about, Mr. Flott, is

13  that relating to the recorded music industry?

14  A.  Yes.

15  Q.  And the same way that the revenues on this chart are

16  reflected are relating to the recording music industry,

17  correct?

18  A.  Yes.

19          MR. BART:  Your Honor, I think that I'm entitled to

20  ask that question.

21          MR. HOWENSTINE:  Same objection, Your Honor.

22          THE COURT:  I'm going to change my ruling.  I'm going

23  to allow it.

24          MR. BART:  Thank you, Your Honor.

25          THE COURT:  After that clarification.

1           MR. BART:  Thank you, and I should have done that

2    first.

3    BY MR. BART:

4    Q.  And what is your understanding of the volume of music

5    consumption and how it's changed from 2000 to 2014?

6    A.  Consumers have continued to commit more time to listen to

7    music from 1997 through 2014.

8    Q.  Okay.  Now, I forgot to mention before.  In addition to the

9    RIAA, is there a similar trade association that Warner and the

10   other major record labels belong to for international

11   exploitation of their works?

12   A.  Yes.  It's called the IFPI.

13   Q.  And what does that stand for, do you know?

14   A.  It's the International Federation of Phonographic

15   Institute.

16   Q.  I think it's --

17   A.  Industry.  I'm sorry.

18   Q.  Yeah, it's easier for me, I have the cheat sheet.  So is

19   that, in essence, the international equivalent to the RIAA?

20   A.  It is.

21   Q.  Does it do similar research and analytics to what we've

22   just been describing coming from the RIAA?

23           MR. HOWENSTINE:  Objection.  Relevance.  Now we're

24   talking about international statistics.

25           MR. BART:  I'm giving foundation for his opinions.

```
 1    I'm not going to be asking about anything that happens
 2    internationally.
 3              THE COURT:  All right.  Go ahead.
 4    A.   Yes.
 5    Q.   And are the conclusions and the analysis that you have been
 6    giving for the RIAA, which is all that we're interested in
 7    this case, consistent with the same analytics and data that's
 8    coming to you from the rest of the world?
 9              MR. HOWENSTINE:  Same objection, Your Honor.
10              MR. BART:  I think it's just support and foundation
11    for his opinions.
12              THE COURT:  The objection is overruled.
13              THE WITNESS:  Yes.
14    BY MR. BART:
15    Q.   Now, so how does the trend in music consumption compare to
16    the trend in recorded music revenues over that same time
17    period?
18    A.   The trend in consumption has gone up over that period of
19    time while at the same time the trend in revenues have gone in
20    the opposite direction.
21    Q.   Based on your experience, your 30 years' experience in the
22    music industry, is that a normal correlation, that consumption
23    would go up and revenues would go down?
24              MR. HOWENSTINE:  Objection.  Calls for expert
25    testimony.  Now the witness is giving opinions.
```

 1          MR. BART:  He is entitled to give a lay opinion on a

 2   subject of critical importance to the industry that he's

 3   involved in.

 4          THE COURT:  The objection is overruled, but don't get

 5   too far with this.  Don't go too far with it.

 6          MR. BART:  Well, you'll tell me if I go too far, Your

 7   Honor.

 8          THE COURT:  I'm sure I will.  That's my job.

 9          MR. BART:  It is.

10   A.  Yes.  I mean, normally you would expect as consumption is

11   increasing, your revenues would increase in a similar or

12   correlatory effect.  In this case, they went in the opposite

13   direction.

14   Q.  Okay.  And in your conversations and discussions both

15   within Warner and with the RIAA, have there been any attempts

16   to analyze why revenues would be going down while consumption

17   is going up?

18   A.  Yes.

19   Q.  And do you have an opinion or -- do you have an opinion on

20   what the reason for that is?

21          MR. HOWENSTINE:  Same objections, Your Honor.

22          THE COURT:  Overruled.

23          THE WITNESS:  Yes, it's piracy.

24   BY MR. BART:

25   Q.  And can you tell me what piracy, or more specific -- any

Matthew Flott - Examination                    1051

1    particular type of piracy?

2    A.  Peer-to-peer, but piracy takes many forms.  But

3    peer-to-peer at this point was the most impactful.

4    Peer-to-peer piracy is an individual taking a sound recording,

5    putting it up on a network -- and it would be an unauthorized

6    copy because it's not part of what they're allowed to do -- and

7    then individuals going through and taking those copies, which

8    are unauthorized, so effectively stealing that music and not

9    having to pay for it.

10   Q.  Has this been a major topic of conversation both within

11   Warner and within the RIAA and recorded music industry over the

12   last 20 years?

13   A.  I mean, piracy has always been an element, but this digital

14   piracy, which really is completely different to anything we had

15   seen before, you know, has been and continues to be a focal

16   point for us as well as the industry.

17   Q.  Okay.  And in addition to the data that -- never mind.  We

18   won't do that.

19       Now, let's go back and look at Plaintiff's 350 again for a

20   moment.  And as we were talking about, Mr. Flott, the chart

21   gives you changes in formats and the popularity of different

22   formats at different times, correct?

23   A.  That's correct.

24   Q.  And you were talking before about how there were changes in

25   terms of physical products and downloads and streaming

Matthew Flott - Examination                    1052

1    services, and I want to focus in more specifically on the

2    streaming service concept.

3        Is there something significantly different about the

4    business model of streaming compared to other formats in terms

5    of the recorded music business?

6    A.   Yes.

7    Q.   Can you explain that to the jury?

8    A.   If you look at the kind of orange/purple, you know, all

9    but, really, the green bars on this chart, they would be called

10   what we would refer to as a "possessory method," so it's

11   something that you physically or you own.  Where in a streaming

12   model, it is about access.  So you either pay a fee or you join

13   a service, and it allows you access to whatever music you want

14   to consume versus the possessory where it's a physical CD or

15   it's a download of a single or an album or it's a vinyl record.

16       So the difference is you would own or possess it versus

17   just having access to whatever you wanted and it being

18   unlimited in terms of how you wanted to consume it.

19   Q.   Okay.  So prior to -- if you look at the chart -- prior to,

20   let's say, 2010 or 2011, the recorded music industry was almost

21   exclusively based on a possessory model, business model,

22   correct?

23   A.   That's correct.

24   Q.   And that possessory model and the revenues from it were

25   continuously declining from 1997 forward, correct?

Matthew Flott - Examination                    1053

1    A.   That's correct.

2    Q.   And so in order to effectuate any change, you had to

3    actually change the business model of the industry?

4    A.   Yes.

5    Q.   So when did you, in your response, in your role of

6    watching, monitoring, reporting to management, first start

7    noticing any traction in this new access model?

8    A.   I mean, the biggest change for us was the entry of Spotify

9    into the marketplace.  And in 2011, I believe it was -- could

10   have been 2010 -- they were already up and running outside the

11   U.S.  But in the U.S., it was in that timeframe.

12        There were other --

13   Q.   So during that timeframe -- let's talk for a minute from

14   2011 until the end of this chart -- the revenues from that

15   sector were still very small, were they not?

16   A.   Yes.

17   Q.   Did you and the financial management at Warner have

18   confidence during those years that streaming would become an

19   accepted model of business the way that it has become in

20   subsequent years?

21   A.   There was absolutely the hope, but we did not know simply

22   because of the fact that the piracy and its impact on consumers

23   wanting to actually adopt an access model versus possessory

24   model, you know, really was the challenge simply because people

25   were stealing music and getting it for free versus having to

1   pay for it.

2   Q.  So when Spotify first started coming in, were you aware

3   from your interactions in the recording -- and you actually

4   dealt with them as well, correct?

5   A.  That's correct.

6   Q.  Were they a profitable business in their first few years?

7   A.  They were not for many years.

8   Q.  And so it was a hope, but not far from a certainty, that it

9   would be successful or help you in the long run, correct?

10          MR. HOWENSTINE:  Objection.  Relevance.

11          MR. BART:  It's the same topic I've just been asking

12   him for the last --

13          THE COURT:  Overruled.

14   A.  Yes.

15   Q.  Okay.  And in your -- well, you've already said it.

16      Has Warner Music Group ever tried to calculate the specific

17   level of economic harm it experienced with regard to any of its

18   sound recordings as a result of peer-to-peer piracy?

19   A.  No.

20   Q.  And why not?

21   A.  The challenge, frankly, is you don't know what it actually

22   is.  You know, as I said before, someone puts a piece of music

23   up for others to take.  It's not that initial act of someone

24   putting it up.  It is then it cascades.  And think of a pebble

25   going into a pond and seeing the ripples.  One person puts it

1   up, they tell all of their friends, those friends tell their

2   friends, it just keeps going.  So knowing, you know, how or

3   where it -- how big it can be, where it goes, when it stops, is

4   something that, you know, we've never been able to accomplish.

5   Q.  Is there a term that's applied to that sort of infringement

6   that goes -- that increases potentially geometrically like

7   that?

8   A.  I mean, it's just exponential.

9   Q.  Viral?

10  A.  Yeah, but, you know, I think if you kind of look at it,

11  it's -- you know, think of like a virus, so it's the virility

12  of, you know, a piece of product going up and then it just

13  going wherever it wants to go.

14  Q.  And when users share songs on peer-to-peer networks, how do

15  record companies get paid?

16  A.  We don't get paid.

17          MR. BART:  I pass the witness, Your Honor.

18                  CROSS-EXAMINATION

19  BY MR. HOWENSTINE:

20  Q.  Good morning, Mr. Flott.  Nice to see you again.

21  A.  You as well.

22  Q.  Now, you've talked this morning about the harm the music

23  industry has suffered because of piracy, right?

24  A.  Yes.

25  Q.  And you're here today because you believe Grande should

1    have terminated accused infringers on its network?

2            MR. BART:  Objection.  Beyond the scope of direct.  He

3    didn't address Grande at all.

4            MR. HOWENSTINE:  I'm asking him about a core

5    allegation in this case that he's here to support.

6            MR. BART:  You said he's here because you believe that

7    Grande X, and there was no testimony about Grande's behavior,

8    and he's not here to comment on Grande.

9            THE COURT:  The objection is sustained.

10           MR. HOWENSTINE:  Let me ask that a different way.

11   BY MR. HOWENSTINE:

12   Q.  Do you believe that accused copyright infringers should

13   be -- should have their Internet service disconnected?

14           MR. BART:  Same objection, Your Honor.  He's here to

15   talk about the record industry and the effect, not what ISPs

16   should do.

17           THE COURT:  The objection is sustained.

18   BY MR. HOWENSTINE:

19   Q.  Do you understand that this case is about copyright

20   infringement allegedly detected by a company called Rightscorp?

21   Are you aware of that?

22   A.  Yes.

23   Q.  Now, Warner never hired Rightscorp to send copyright

24   complaints on its behalf, correct?

25           MR. BART:  Objection, Your Honor.  Same objection.

```
 1              THE COURT:  No.  I think this one is okay.  The
 2   objection is overruled.
 3              You can answer the question.
 4              THE WITNESS:  Can you repeat the question, sir?
 5   BY MR. HOWENSTINE:
 6   Q.  Warner never hired Rightscorp to send copyright complaints
 7   on its behalf, correct?
 8   A.  Not that I'm aware of.
 9   Q.  Are you familiar with the agreement between Rightscorp and
10   RIAA related to this case?
11   A.  No.
12   Q.  So you're here to testify for Warner, but you don't know
13   the terms under which RIAA bought evidence from Rightscorp?
14   A.  I don't participate in RIAA hiring -- hiring people that
15   they choose to use.
16   Q.  So you don't know anything about it?
17   A.  No.
18   Q.  You don't know anything about any payments that are being
19   made to Rightscorp for its witnesses to testify in this case?
20   A.  No.
21              MR. HOWENSTINE:  Could you put up PX 23, please.
22   BY MR. HOWENSTINE:
23   Q.  Now, this is, I'll represent to you, a list of the Warner
24   songs that are at issue in this lawsuit.  Are you familiar with
25   this?
```

Matthew Flott - Examination                    1058

```
 1   A.  It's not big enough for me to see.  I don't know whether I
 2   can --
 3          MR. HOWENSTINE:  I'm sorry.  Could you zoom in on
 4   maybe like the top third?
 5          COURTROOM DEPUTY CLERK:  This is not in evidence.
 6          THE COURT:  It's not in evidence.  Wait.  It's not in
 7   evidence.
 8          MR. HOWENSTINE:  Okay.  Well, we'll not publish it to
 9   the jury.  I'll just show it to the witness.  I apologize.
10   BY MR. HOWENSTINE:
11   Q.  Do these appear to be songs that Warner owns?
12   A.  Yes.
13   Q.  And Warner maintains the original sound recordings?  Those
14   are the masters for all of the songs that it owns, correct?
15   A.  I don't know specifically, but I'm presuming whoever put
16   this together, that's correct.
17   Q.  Yeah, and I'm asking as a general matter, Warner maintains
18   the masters for all the songs it owns, correct?
19          MR. BART:  Objection, Your Honor.  Ambiguous.  The
20   term "master" is not -- it's an ambiguous term.  I want to make
21   sure the witness understands.
22          THE COURT:  Why don't you get him to clarify.
23   BY MR. HOWENSTINE:
24   Q.  Do you know what I mean when I say "masters"?
25   A.  I believe it's a sound recording.
```

1   Q.  So does Warner own the masters for songs that it owns?

2   A.  I believe so.

3   Q.  So it's fair to say that Warner could have provided a copy

4   of the master recording for each of the songs at issue in this

5   case to show exactly what its songs are, correct?

6           MR. BART:  Objection.  Hypothetical, and beyond the

7   scope of direct.

8           THE COURT:  Sustained.

9   BY MR. HOWENSTINE:

10  Q.  You didn't do anything to gather any masters for purposes

11  of identifying the songs at issue in this lawsuit, correct?

12  A.  No.

13  Q.  Now, you talked a little bit in your direct testimony about

14  how Warner pays artists; do you recall that?

15  A.  Yes.

16  Q.  And I believe you discussed the fact that Warner pays

17  advances to artists on royalties; is that right?

18  A.  Well, advances and royalties.

19  Q.  But first an advance on future royalties, correct?

20  A.  It can be, yes.

21  Q.  And in that situation, after the advance is paid, an artist

22  doesn't collect any royalties until Warner recoups its costs on

23  a work, correct?

24  A.  It depends on the specific contract.

25  Q.  But under certain contracts, that's the case, correct?

1   A.   That is correct.

2   Q.   And that would include recouping all recording costs,

3   right?

4   A.   Again, the contract will dictate what is recoupable or not.

5   Q.   And in some circumstances, Warner doesn't pay out any

6   royalties after the advance until Warner also recoups all its

7   marketing costs, right?

8   A.   That's not correct.

9   Q.   Under no circumstances?

10  A.   Again, it would dictate -- it would be -- it would depend

11  on the specific legal agreement, but in all marketing costs in

12  most recording agreements, that's -- they're not all recovered.

13  Q.   But some of them are?

14  A.   Some of them, based on the contract.

15  Q.   You testified a little bit about Warner selling songs

16  through digital download platforms; do you recall that?

17  A.   Yes.

18  Q.   So like the iTunes music store, for example?

19  A.   That's correct.

20  Q.   As of 2018, Warner typically received 70 percent of the

21  retail price of a download through the iTunes store; is that

22  correct?

23  A.   That's generally correct, yes.

24  Q.   So if it was a 99-cent download, Warner's cut was about 70

25  cents, correct?

1    A.  That's correct.

2    Q.  And the same was true for the Amazon and Google platforms

3    as well, right?

4    A.  It will generally be in that same area, but there could be

5    slight differences depending on the contracts.

6    Q.  Now, Warner keeps historical information about digital

7    download sales of the songs it owns, correct?

8    A.  That's correct.

9    Q.  So you could pull information about how many times a

10   particular song was downloaded in a particular year, right?

11   A.  That's correct.

12   Q.  And you also -- Warner also keeps records of the number of

13   times a song was streamed on a particular streaming service,

14   correct?

15   A.  If it's reported to us, yes.

16   Q.  And you could pull that data if you wanted to, right?

17   A.  Again, it would depend on what the request is.  But, yes,

18   we could pull that data.

19   Q.  And you have not gathered any of this information for

20   purposes of this case, correct?

21          MR. BART:  Objection, Your Honor.  Lack of personal

22   knowledge and beyond the scope.

23          MR. HOWENSTINE:  I asked him if he had personal

24   knowledge, Your Honor.

25          THE COURT:  I think he did ask him that, so that's the

 1    first question.  Then you can go on to the second part of your

 2    question.

 3              THE WITNESS:  Can you repeat the question?

 4    BY MR. HOWENSTINE:

 5    Q.  Well, my question was, did you gather any of this

 6    information about streaming counts and digital download counts

 7    of the songs at issue in this case?

 8    A.  I did not.

 9    Q.  And that's individually or collectively, correct?

10    A.  I did not.

11    Q.  Now, you said in your direct testimony that Warner couldn't

12    quantify any harm that it suffered from infringement of its

13    sound recordings, correct?

14              MR. BART:  Objection.  Mischaracterizes the testimony.

15    The word "harm" was never used in the testimony at all.

16              THE COURT:  Well, he's asking him, so the objection is

17    overruled.

18              THE WITNESS:  Will you repeat it again?

19    BY MR. HOWENSTINE:

20    Q.  You said in your direct testimony that Warner couldn't

21    quantify any harm suffered from copyright infringement; is that

22    correct?

23    A.  I said we didn't.

24    Q.  Well, I believe you said you couldn't.  Do you disagree

25    with that?

Matthew Flott - Examination                    1063

1    A.  No, I don't -- I don't -- in piracy, no, we can't quantify.

2    Q.  But the fact is Warner has not attempted to quantify any

3    harm that it suffered as a result of the alleged infringement

4    of the songs at issue in this lawsuit, correct?

5    A.  No.

6    Q.  No, it's not correct?  Or do you agree with me?

7            THE COURT:  No, he said no -- I think his answer was,

8    no, I didn't -- no, we didn't.  Am I correct, sir?

9            THE WITNESS:  That's correct.

10           MR. HOWENSTINE:  Let me just ask it again, so we have

11   a clear record.

12           THE COURT:  You don't need to ask it again.  He said

13   no.

14           MR. HOWENSTINE:  Okay.

15   BY MR. HOWENSTINE:

16   Q.  And Warner has not attempted to assess the effect of any

17   alleged file sharing on the value of the copyrighted songs at

18   issue in this lawsuit, correct?

19   A.  No.

20   Q.  Yes, you have not?  Have you attempted it?

21   A.  I have not.

22   Q.  So you testified a little bit about sort of general trends

23   in revenue in the recorded music industry as a whole; do you

24   recall that?

25   A.  Yes.

Matthew Flott - Examination                1064

1   Q.  Over the period of 2014 to 2018, Warner Music Group's

2   annual revenues in the U.S. increased each year, correct?

3   A.  That's correct.

4   Q.  And these numbers are in the billions of dollars, correct?

5   A.  In the --

6        MR. BART:  Objection.  Are you talking about the total

7   revenues or the gross?

8        MR. HOWENSTINE:  I asked the witness the question --

9        MR. BART:  It's an ambiguous question.  I object.

10       THE COURT:  The objection is sustained.  I didn't

11  understand either.

12  BY MR. HOWENSTINE:

13  Q.  Over the period of 2014 to 2018, Warner Music Group's

14  annual revenues in the U.S. increased each year, correct?

15  A.  I believe so, yes.

16  Q.  And that number, the annual revenues in each year, was in

17  the billions of dollars, correct?

18  A.  I don't believe so in the U.S.

19  Q.  Well, I asked overall for Warner Music Group.

20  A.  I thought you asked --

21       MR. BART:  Objection.

22       THE COURT:  If you're asking about international, it's

23  irrelevant.

24       MR. HOWENSTINE:  Well, he testified about -- I'll move

25  on.

 1           THE COURT:  No, he didn't.  Remember, you objected.

 2   BY MR. HOWENSTINE:

 3   Q.  Warner Music Group is just one of the three label groups at

 4   issue in this lawsuit, correct?

 5   A.  Yes.

 6   Q.  And over this period of 2014 to 2018, Warner's annual

 7   profits increased in each of those years too, correct?

 8   A.  I guess my question would be in the U.S., globally?  I'm

 9   just trying to connect to your previous question.

10   Q.  Do you recall giving a deposition in this case?

11   A.  I do.

12   Q.  Would it maybe refresh your recollection if I showed you

13   the transcript of your deposition?

14   A.  Sure.

15   Q.  Do you recall you were deposed on December 6, 2018?

16   A.  Yes.

17           MR. HOWENSTINE:  May I approach, Your Honor?

18           THE COURT:  Yes.

19   BY MR. HOWENSTINE:

20   Q.  If you could turn to page 80 of that deposition.

21           MR. BART:  Page what?

22           MR. HOWENSTINE:  Page 80.

23           MR. BART:  Thank you.

24   BY MR. HOWENSTINE:

25   Q.  The bottom of page 80 to the top of page 81 to see if that

1  refreshes your recollection.

2  A.  Yes.  I believe I asked whether you were referring to the

3  U.S., and you responded "Yes."

4  Q.  And you responded "Yes," correct?

5  A.  And then I responded "Yes."  So I was trying to understand

6  whether you -- you referred to Warner versus just Warner in the

7  U.S., so that's all I was trying to clarify.

8  Q.  And the answer that you ultimately gave about whether

9  Warner's annual profits increased in each of those years was

10 "Yes," correct?

11 A.  Yes.

12       MR. HOWENSTINE:  Thank you.  I have no further

13 questions, Your Honor.

14       MR. BART:  I have nothing further, Your Honor.

15       THE COURT:  You can step down, sir.

16       THE WITNESS:  Thank you.

17       THE COURT:  This is a good time for our morning

18 recess.  We'll keep it shorter this morning since we're going

19 to have to end at 12:00.

20       COURT SECURITY OFFICER:  All rise for the jury.

21       *(10:38 a.m., the jury exits the courtroom.)*

22       THE COURT:  Please be excused.

23                         *   *   *

24       COURT SECURITY OFFICER:  Please rise for the jury.

25       *(11:01 a.m., the jury enters the courtroom.)*

```
 1              COURT SECURITY OFFICER:  Please be seated.
 2                              *   *   *
 3              COURT SECURITY OFFICER:  All rise.
 4         (11:07 a.m.)
 5              THE COURT:  Please be seated.  Are you ready with the
 6    next witness?
 7              MR. TRACER:  Plaintiffs call Tracie Parry.
 8              THE COURT:  While she's moving up there, I wanted to
 9    reassure you if they haven't told you that we had made
10    arrangements to ensure that you are going to get your full
11    compensation for today and tomorrow because, you know, you had
12    to step out of your life and it's hard to get back into it.  So
13    even though you won't be here, you will be compensated for the
14    full day.
15              COURTROOM DEPUTY CLERK:  Judge, and they get their
16    raise on Tuesday.
17              THE COURT:  Oh, yeah.  And did you know you get a
18    raise on Tuesday, in long trials.
19              COURTROOM DEPUTY CLERK:  Anything more than ten days.
20    I think it increased by $10.
21              THE COURT:  It increases like by ten bucks a day, but
22    anything over ten days.  Now, do you think they give me a
23    raise?  No.  Absolutely not.
24              You have to raise your right hand.
25              COURTROOM DEPUTY CLERK:  You do solemnly swear that
```

1    the testimony you're about to give in this case now before the

2    Court will be the truth, the whole truth and nothing but the

3    truth, so help you God?

4              THE WITNESS:  Yes.

5              THE COURT:  And you are?

6              THE WITNESS:  Tracie Parry.

7                        *   *   *

8         *(TRACIE PARRY, Plaintiff Witness, Sworn.)*

9                        *   *   *

10                   DIRECT EXAMINATION

11   BY MR. TRACER:

12   Q.  Good morning, Ms. Parry.

13             THE COURT:  I assume you spell your last name

14   P-E-R-R-Y?

15             THE WITNESS:  P-A-R-R-Y.

16             THE COURT:  See, now, there you go.  That's why I

17   should be asking.  P-A-R-R-Y.

18   BY MR. TRACER:

19   Q.  And Ms. Parry, would you like to spell your first name for

20   the court reporter as well?

21   A.  T-R-A-C-I-E.

22             THE COURT:  Well, there's another one.  You may

23   proceed, counsel.

24   BY MR. TRACER:

25   Q.  Ms. Parry, can you introduce yourself to the jury?

1    A.  Hi.  I'm Tracie Parry.

2    Q.  By whom are you employed, Ms. Parry?

3    A.  Rhino Entertainment Company.

4    Q.  What is your current title there?

5    A.  I'm senior vice president, head of the business and legal

6    affairs for our global catalog.

7    Q.  Is Rhino Entertainment Company a plaintiff in this lawsuit?

8    A.  It is.

9    Q.  And is Rhino Entertainment Company affiliated with Warner

10   Music Group Corporation?

11   A.  It is.

12   Q.  How so?

13   A.  It's a subsidiary of Warner Music Group Corporation.

14   Q.  What does Rhino Entertainment Company do?

15   A.  It's a catalog music label.

16   Q.  And what is that?

17   A.  That is a label within the Warner Music Group family that

18   sells, distributes, licenses existing sound recordings, so

19   those are -- we're looking to the legacy recordings from the

20   Warner archives and figuring out new ways to commercially

21   distribute them.

22   Q.  Can you give us an example of how you do that?

23   A.  A good example would be Madonna.  30 years ago this week

24   her Erotica album came out and so to commemorate that, we're

25   doing a picture disc of the title track.

1   Q.  What's a picture disc?

2   A.  That's a record, a vinyl record, that has a picture

3   actually embodied in the vinyl itself.

4   Q.  Who are some of the artists whose music Rhino has reissued

5   over the years?

6   A.  The Doors, the Eagles, Aretha Franklin, Led Zeppelin,

7   Stevie Nicks, Fleetwood Mac, to name a few.

8   Q.  It's a long list, I assume?

9   A.  It is.

10  Q.  How long have you had your current job at Rhino?

11  A.  Actually only two and a half months.

12  Q.  What was your prior job before that?

13  A.  Before that I was senior vice president and head of U.S.

14  legal shared services for Warner Music Group.

15  Q.  How long did you work at Warner Music Group before moving

16  to Rhino?

17  A.  That was eight years.

18  Q.  Did your responsibilities at Warner Music Group include

19  knowing or investigating what sound recordings the Warner

20  companies own or control?

21  A.  Yes.

22  Q.  And are you familiar with the Warner recordings at issue in

23  this lawsuit?

24  A.  I am.

25  Q.  How many of those recordings are there?

Tracie Parry - Examination                    1071

1   A.   189.

2   Q.   And are you familiar with the recordings themselves?

3   A.   Yeah.

4   Q.   How so?

5   A.   Generally, some of them just as being a fan of music, and

6   some of them just being part of the music industry.

7   Q.   Are you familiar with how the Warner plaintiffs came to own

8   or control those 189 recordings?

9   A.   Yes.

10  Q.   How did you become familiar with that information?

11  A.   Before the trial, I reviewed a sworn declaration and some

12  supporting documentation along with that.

13  Q.   Did the Warner plaintiffs or their predecessors-in-interest

14  apply for copyright registration certificates from the

15  Copyright Office for all 189 recordings?

16  A.   Yes.  And I understand those were submitted here for this

17  case.

18  Q.   Yes.

19          MR. TRACER:  So at this point, I'd like to publish for

20  the witness and the jury PX 24, which has already been admitted

21  into evidence.

22  BY MR. TRACER:

23  Q.   This is a large document, Ms. Parry, but have you seen

24  these -- generally seen these documents before?

25  A.   Yes.

1    Q.   Can you describe them for the jury?

2    A.   These are copyright -- this is a copyright registration

3    certificate.  And generally the documents are these

4    certificates along with some printouts of registration

5    information from the U.S. Copyright Office site.

6    Q.   What do those Copyright Office printouts show?

7    A.   They generally show information about the sound recording

8    registrations.

9         MR. TRACER:  Now I'd like to show the witness, but not

10   the jury, PX 23.

11   BY MR. TRACER:

12   Q.   Have you seen this document before, Ms. Parry?

13   A.   Yes.

14   Q.   What is it?

15   A.   It's a chart that shows all of the Warner plaintiffs' works

16   along with a summary of some information like registration

17   numbers.

18   Q.   And where does the information in this chart come from?

19   A.   It comes from the last exhibit, from the copyright

20   registration certificates and the printouts and the information

21   from the Copyright Office site.

22        MR. TRACER:  Your Honor, I move to admit PX 23 as

23   evidence as a summary exhibit.

24        MR. BROPHY:  Your Honor, subject to the same

25   objections we lodged with respect to PX 21.

1            THE COURT:  It will be received.

2            MR. TRACER:  Can we now publish PX 23 to the jury?

3            THE COURT:  Yes.

4            MR. TRACER:  Oh, it has.  Okay.

5            THE COURT:  I think it was.

6            MR. TRACER:  I was standing here looking at the

7    witness and not the screen, so --

8            THE COURT:  All right.

9            MR. TRACER:  If it was earlier, then I missed it.

10   BY MR. TRACER:

11   Q.  Well, now that it's in front of the jury, Ms. Parry, can

12   you just summarize again the information that's in PX 23?

13   A.  Yes.  These are the Warner plaintiffs' works that are at

14   issue in the case and along -- a summary of some information

15   like titles, registration numbers.

16   Q.  I'm going to shift to a different topic now.  Ms. Parry, in

17   the course of preparing to testify today, did you participate

18   in a review of these works at issue to determine whether Warner

19   makes each recording separately available to the public?

20   A.  Yes.

21   Q.  And what were the results of that review?

22   A.  All of the tracks except for one are currently available

23   individually to the public, and that was a recording from

24   the -- one of the Twilight sound tracks, Eclipse.

25   Q.  And was the same true during the years 2011 to 2017?

1   A.  They were all available individually during that time

2   period.

3   Q.  How does Warner make these recordings available to the

4   public on an individual basis?

5   A.  You can stream these on major streaming platforms like

6   Spotify, Amazon, Apple Music, some YouTube.

7   Q.  Have you personally listened to any of the downloaded audio

8   files that have already been admitted into evidence in this

9   case?

10  A.  Yes.

11  Q.  How many files did you listen to?

12  A.  I listened to a random sampling of 50.

13  Q.  And why did you do that?

14  A.  To -- I did that to compare them to the officially -- the

15  publicly available Warner versions to make sure that they're

16  the same.

17  Q.  And what was the result of that comparison?

18  A.  I was able to confirm that they are, indeed, the same.

19          MR. TRACER:  I pass the witness, Your Honor.

20                    CROSS-EXAMINATION

21  BY MR. BROPHY:

22  Q.  Ms. Parry, good morning.

23  A.  Good morning.

24  Q.  How are you?

25  A.  Good.

Tracie Parry – Examination                    1075

1   Q.  Just a couple quick questions.  Number one, do know what a

2   master recording is?

3   A.  Yes.

4   Q.  What's your understanding of what that is?

5   A.  I presume you're talking about a sound recording?

6   Q.  Okay.  Were you involved in any effort to collect and

7   produce the masters for the sound recordings that are at issue

8   in this case?

9          MR. TRACER:  Objection, Your Honor.  Goes beyond the

10  scope of her direct evidence.

11         THE COURT:  Sustained.

12  BY MR. BROPHY:

13  Q.  You mentioned you listened to some files and compared them

14  to the songs that were allegedly downloaded in this case.  Do

15  you recall that testimony?

16  A.  Yes.

17  Q.  You only did that for 50 songs; is that right?

18  A.  That's correct.

19  Q.  Do you recall which 50 songs?

20  A.  Off the top of my head, not all 50, but there was some

21  Depeche Mode tracks, Wiz Khalifa, Bruno Mars.

22  Q.  You haven't prepared any summary chart or anything that

23  identifies those; is that correct?

24  A.  No.

25  Q.  And you didn't do that comparison with respect to the total

1   189 songs that Warner is asserting in this case; is that right?

2   A.   Correct.

3            MR. BROPHY:  Nothing further, Your Honor.  Thank you.

4            MR. TRACER:  Nothing further, Your Honor.

5            THE COURT:  All right.  You may step down.

6            THE WITNESS:  Thank you.

7            MR. GILMORE:  Your Honor, plaintiffs now call

8   Dr. William Lehr.

9            COURTROOM DEPUTY CLERK:  Raise your right hand.  You

10  do solemnly swear that the testimony you're about to give in

11  this case now before the Court will be the truth, the whole

12  truth and nothing but the truth, so help you God?

13           THE WITNESS:  I do.

14           COURTROOM DEPUTY CLERK:  Have a seat.

15                          *   *   *

16           (WILLIAM LEHR, Plaintiff Witness, Sworn.)

17                          *   *   *

18                      DIRECT EXAMINATION

19  BY MR. GILMORE:

20  Q.   Good morning, Dr. Lehr.  Could you please introduce

21  yourself to the jury?

22  A.   Good morning.  My name is William Herndon Lehr.

23  Q.   What is your occupation, Dr. Lehr?

24  A.   I am an economist that specializes in the

25  telecommunications and Internet industry.

1          THE COURT:  Doctor, can you move a little bit closer

2    to the -- move your chair up.

3          THE WITNESS:  Is that better?

4          THE COURT:  That's good.  We've been having that

5    problem all morning.  It's not you.

6    BY MR. GILMORE:

7    Q.  Dr. Lehr, could you briefly describe for the jury,

8    generally, what do you do as a telecommunications and Internet

9    industry economist?

10   A.  I'm involved in multi-disciplinary research that looks at

11   the technical business economics and public policy issues that

12   are of concern to the operation of the Internet and the

13   Internet ecosystem, which includes, for example, the evolution

14   of broadband networks and all the services, including things

15   like streaming media that are provided over that and other

16   digital services provided over the Internet.

17   Q.  Have you prepared some slides to help explain your

18   testimony to the jury today?

19   A.  I have.

20         MR. GILMORE:  Permission to publish, Your Honor?

21         THE COURT:  Absolutely.

22         MR. GILMORE:  Can we go to slide two?

23   BY MR. GILMORE:

24   Q.  And Dr. Lehr, could you give the jury an overview of what

25   you're prepared to address in your testimony?

William Lehr - Examination                    1078

1   A.  Certainly.  There's several issues that I'll be addressing,

2   and what's on the slide here is the first of those.  I was

3   asked whether it was possible, can I offer opinions that would

4   be of use to the jury in this matter, so whether plaintiff

5   record companies suffer economic harm as a result of online

6   infringement of music and whether that harm can be measured so

7   that you could come up with, you know, an assessment, an

8   economic value assessment of that harm.

9   Q.  What was the second issue that you're going to be

10  addressing?

11  A.  The second issue was to, you know, look at Grande's

12  business economics and, you know, understand how they compare

13  with other companies that are similar that I, you know, spent

14  time in my research to understand how profitable a company

15  Grande is and, you know, how that fits within the larger

16  questions of online piracy and the issues in this case.

17  Q.  And the third issue, what was that issue that you are

18  addressing?

19  A.  The third issue was to, you know, consider what the

20  presence of infringing subscribers, how that fits within

21  Grande's business model and, you know, how it impacts their

22  profitability, what their incentives were to address

23  infringement by subscribers on their network.

24  Q.  Thank you, Dr. Lehr.  Now, before we talk about those

25  opinions, I'd like for you to discuss your background a little

1    bit.
2            MR. GILMORE:  Conner, can you publish Plaintiff's
3    Exhibit -- I'm sorry.  Could you show the witness, but not the
4    jury, Plaintiff's Exhibit 554.
5    BY MR. GILMORE:
6    Q.  And Dr. Lehr, do you recognize this document?
7    A.  Yes, I do.
8    Q.  And what is Plaintiff's Exhibit 554?
9    A.  This is my CV, curriculum vitae, resume.  It's a
10   description of what my professional and education experience
11   and publication background is.
12   Q.  Does this accurately -- this document accurately summarize
13   your educational and professional history and background?
14   A.  Yes, it does.
15           MR. GILMORE:  Your Honor, plaintiffs move to admit
16   into evidence Plaintiff's Exhibit 554.
17           MR. HOWENSTINE:  No objection.
18           THE COURT:  Be received.
19   BY MR. GILMORE:
20   Q.  Have you prepared a slide that summarizes your CV for the
21   jury?
22   A.  Yes, I have.
23   Q.  So first of all, how many years have you been a
24   telecommunications and Internet industry economist, Dr. Lehr?
25   A.  I've been engaged in research and work associated with this

William Lehr - Examination                    1080

1  industry for over 25 years.

2  Q.  Where are you currently employed?

3  A.  I currently have a research appointment in the Computer

4  Science and Artificial Intelligence Lab at the Massachusetts

5  Institute of Technology, or MIT.

6          MR. GILMORE:  Sorry.  It appears -- could we publish

7  the slides again?

8  BY MR. GILMORE:

9  Q.  Sorry.  You were telling us that you're currently at MIT?

10 A.  Yes, indeed.  I have an appointment at MIT, and I also

11 engage in providing consulting services to public and private

12 sector clients in the U.S. and abroad.

13 Q.  What's your educational background, Dr. Lehr?

14 A.  I have a Ph.D. in economics from Stanford University that I

15 received in 1992.  I also have an MBA with a concentration in

16 finance from the Wharton School at the University of

17 Pennsylvania, and then I also have a Master's degree and an

18 undergraduate degree in engineering from the University of

19 Pennsylvania and an undergraduate degree in history from the

20 University of Pennsylvania.

21 Q.  A lot of degrees.  What year did you -- I think you said

22 '92 was when you earned your Ph.D.?

23 A.  Yes.

24 Q.  Now, you said earlier that you're a research scientist at

25 MIT.  Can you briefly describe for the jury what's the focus of

William Lehr - Examination                    1081

1   your research there?

2   A.  Well, the research I'm engaged in at MIT is as part of a

3   multi-disciplinary group that includes engineers, computer

4   scientists, network engineers, and an economist, myself, and we

5   look at a range of issues that, you know, are at the nexus of

6   those considerations.  You know, focused on -- of concern to

7   the operation of the Internet.

8       And so my personal focus has been on the Internet and

9   telecommunications industry, how those have evolved over time,

10  with a special focus on the evolution of broadband services.

11  And, you know, as I think anybody that's been alive for the

12  last 20 years understands, the Internet has sort of emerged as

13  a principal platform for all of our digital activities, and

14  certainly the principal platform, increasingly, for the

15  distribution and access involved of digital media services, the

16  entertainment services, copyright works that are at issue in

17  this matter.

18  Q.  Dr. Lehr, have you published any papers or academic

19  articles?

20  A.  Yeah.  I publish regularly, and I think my CV lists well

21  over a hundred.  And those are in a variety of different

22  peer-reviewed publications across multiple disciplines.

23  Q.  Generally speaking, are your publications in the areas of

24  your research that you just described for us?

25  A.  Yes.  You know, on communications, telecommunications,

William Lehr - Examination                    1082

1  economics.  I publish a lot in things like journals associated
2  with the engineering community related on these sort of
3  multi-disciplinary issues.
4  Q.  And have you taught courses at MIT or elsewhere at other
5  universities?
6  A.  Yeah.  I've taught a course over the course of my career on
7  a number of different issues at MIT, at Columbia University,
8  Cambridge University in England and a number of other places on
9  things like telecommunications, economics, competitive
10 strategy.  You know, basic economics, things like that.
11 Q.  Now, shifting gears a little bit.  Before this trial, have
12 you ever testified as an expert witness before?
13 A.  Yes.
14 Q.  About how many times?
15 A.  Over 30 times in a variety of different matters.
16 Q.  And were any of those prior expert testimony engagements,
17 were any of those related or similar to the work you've done in
18 this case and the opinions you're offering here?
19 A.  I've provided testimony in two other cases that are quite
20 similar in a lot of the sort of context to the issues that are
21 being considered in this case.
22 Q.  Now, roughly, what percentage of your professional time is
23 devoted to working as an expert witness or consultant in
24 comparison to your academic research and teaching?
25 A.  Well, it varies year to year, but I would say, you know, my

William Lehr - Examination                    1083

1    time is probably something like 70 percent on my various

2    research activities associated with my appointment at MIT, and

3    the other 30 percent of my time is on the various consulting

4    things that I do.  And a portion of that is -- I'd say probably

5    half of that maybe is the stuff -- providing testimony in

6    various contexts like this, litigation or between regulatory

7    proceedings, those sorts of things.

8    Q.  And about how many hours -- I'm sorry.  Were you paid for

9    your work in this case?

10   A.  Yes.

11   Q.  And about how many hours did you work on this case?

12   A.  Prior to, you know, getting ready for trial, about 200

13   hours.

14   Q.  Does your compensation for your work in this case depend in

15   any way upon you reaching any particular outcome or offering a

16   particular opinion?

17   A.  No.  I'm asked, you know, can I offer opinions, and I come

18   to the opinions I come to.  And, you know, my bills are the

19   time it takes me to do that, but there's no difference in my

20   compensation with regard to the outcome of the proceedings.

21   Q.  And I think you told us before, but do you believe that

22   you've reached conclusions, based on your expertise and your

23   analysis of the information in the record, that would aid the

24   jury in considering the issues in this case?

25   A.  I believe I have.

1          MR. GILMORE:  Your Honor, plaintiffs offer Dr. Lehr as

2    an expert in the field of Internet industry and

3    telecommunications industry economics.

4          MR. HOWENSTINE:  Subject to our earlier objections,

5    Your Honor.

6          THE COURT:  Be received.

7          MR. GILMORE:  Can we go to the next slide please.

8    BY MR. GILMORE:

9    Q.  Now, Dr. Lehr, I'd like for you to walk us through a

10   summary of the opinions that you intend to offer today.  Can

11   you first explain briefly for the jury your first conclusion?

12   A.  Yeah, the best way to understand my opinions is they're

13   organized into two high opinions, each of which has several

14   subparts.

15       So first question was, as an economist, is it -- you know,

16   can I -- I was asked can I evaluate the economic impact of

17   infringement on rights holders.  And, you know, that question

18   really is a question of does online piracy cause significant

19   harm to copyright holders, including the plaintiffs in this

20   case.  And, you know, the answer to that is, you know,

21   overwhelmingly yes.  That's hardly surprising, as I'll explain

22   further.  And although there's lots of evidence that that harm

23   is quite large from lots of studies that have done -- basically

24   everybody that's sort of, you know, the economists that have

25   looked at this from all different ways, it's not possible to

1  come up with an estimate of what the economic impact of online

2  piracy is, quantified precisely in a context of this case.  And

3  we'll talk more about why precisely that's the case.

4  Q.  Thank you, Dr. Lehr.

5      Can we go to the next slide, and can you briefly summarize

6  your second conclusions that you intend to testify about today?

7  A.  Yeah, so Grande is an Internet service provider, cable

8  television company that is quite profitable.  It's in a

9  profitable industry and it's a profitable company in that

10 industry with revenues and profits that have steadily increased

11 over the timeframe involved in this case.

12 Q.  Can you talk about the next component of your opinion?

13 A.  Sure.  That a number of -- you know, subscribers on

14 Grande's network were infringing, and all of Grande's

15 subscribers, including their infringing subscribers,

16 contributed significantly to Grande's profitability.

17      MR. HOWENSTINE:  Objection, Your Honor.  The witness

18 is testifying as to infringement.

19      THE COURT:  Sustained.

20      THE WITNESS:  Sorry.

21      THE COURT:  Sustained.

22 BY MR. GILMORE:

23 Q.  And to be clear, Dr. Lehr, you're not offering legal

24 opinions as to what an infringement -- whether a certain act is

25 or is not an infringement; is that correct?

William Lehr - Examination                1086

1  A.  No.  I'm offering -- I'm not testifying here about the

2  technical metrics of how much infringement took place in this

3  case.  There are other experts that have sort of looked at that

4  data in detail, nor about the legal interpretation of when is

5  something illegal, illegal behavior.

6      There's evidence about the extent to which copies were

7  shared illegally, and the notices were sent that I will talk

8  about later.  But what I did with that analysis -- and that's

9  what I mean by subscribers.  And that those subscribers, the

10 value of those subscribers that were identified, they

11 contributed significantly to Grande's profitability.

12 Q.  And so is it fair to say in your testimony today when you

13 use the term "infringement," are you referring to the instances

14 of online file sharing that are the subject of notices that

15 Grande received?

16 A.  Yes, yes, I am.  I mean -- and how that is generally used,

17 for example, in the literature.  Casually people call it

18 digital piracy, because it's piracy theft digitally and the way

19 we talk about in this context of this case is using these

20 peer-to-peer file-sharing programs.

21 Q.  Thank you, Dr. Lehr.  And can you just briefly tell us

22 about the third component of your conclusion here?

23 A.  Yes, so the third thing is that, you know, I'll explain

24 that, you know, Grande, because they were getting a lot of

25 profits from the subscribers that infringed or were sharing

1  files illegally on their network, Grande had a very strong

2  economic incentive to tolerate that infringement in order to

3  retain those subscribers and capture the revenue associated

4  with the services that those subscribers, a lot of them on the

5  Grande network, a lot of these subscribers were contributing to

6  Grande's bottom line.

7  Q.  Thank you, Dr. Lehr.  Now, before we get into the details

8  of these opinions that you've summarized for us, I'd like to

9  talk a little bit about, can you summarize the materials that

10 you've reviewed and you're relying on for your opinions today?

11 A.  Well, generally -- I mean, I've got a bunch of years of

12 experience in this industry, but specifically in the context of

13 the opinions that I'm offering here, I was looking at, for

14 example, financial data from Grande.  Grande is not a publicly

15 traded company, so to know precisely what their revenues are

16 and various costs are associated with product lines, that data

17 was provided directly by Grande.  It's Grande's internal

18 financial documents.

19     Second, there were a number of other cases' documents in

20 this case, some depositions, some e-mails, other testimony.

21 Also, there were internal Grande data and documents that

22 supplement the interpretation and the understanding of the

23 other financial stuff.

24 Q.  Did you look at some academic -- you have listed here

25 academic papers.  Did you look at those materials for your

William Lehr - Examination                    1088

1    opinions today?

2    A.  Yes.  I also looked at sort of, you know, what do people

3    like me that are asked a question like this as an academic

4    economist, as research folks, investment people, all of that

5    sort of literature that sort of looked at this question to

6    understand this.  And that, you know, I document those sources

7    too.  Those are also a large part of what I was using to

8    supplement my opinions.

9    Q.  Thank you, Dr. Lehr.  Now, I'd like to move on and ask you

10   about your first expert opinion that online file-sharing,

11   online infringement, as you've described it, causes significant

12   harm to copyright holders, including plaintiffs.  Can you first

13   provide us with an overview of the basic economic theory that

14   underlies your opinion.

15   A.  Sure.  Copyright law exists.  Those rights exist in society

16   so that people that invest in creating content or intellectual

17   property --

18         MR. HOWENSTINE:  Objection, Your Honor.  You've ruled

19   that the witness isn't allowed to testify about the purpose of

20   the copyright law.

21         THE COURT:  Sustained.

22         THE WITNESS:  Sorry.

23         MR. GILMORE:  Let me ask a different question.

24   BY MR. GILMORE:

25   Q.  So as an economist, you've studied the impact of piracy on

1    copyright holders from an economic perspective; is that fair?

2    A.  Yes.

3    Q.  And let's go to slide seven.  Does this sort of summarize,

4    as an economist, the basis for your opinion that piracy harms

5    copyright holders such as plaintiffs?

6    A.  Yes.

7    Q.  So can you first tell us about the first point that we see

8    here, that it displaces sales and reduces pricing.  Can you

9    explain that for us?

10   A.  Well, the effect of the piracy is that there's lots of free

11   content out there, so there's unlimited sea of content that's

12   out there.  And so you're talking about a business, the record

13   company, that's trying to commercial its rights, so it's trying

14   to sell records, which cost money.  It's trying to license

15   stuff to streaming services, which costs money.  It's trying to

16   sell digital downloads, which costs money, and a whole bunch of

17   other things.  We heard about that.  I mean, every one --

18   Q.  You were here when Mr. Flott was testifying about that?

19   A.  Yes, exactly.  I mean, he sort of described it and talked

20   about all the different ways they do it, and that's a summary

21   chart.  It's even much more complicated than he explained, you

22   know, in the short time that he explained it, but basically

23   competing against free is really hard, and it affects the whole

24   business.  And if there's a lot of free stuff out there, an

25   unlimited sea of free stuff, then you won't be able to sell as

William Lehr - Examination                    1090

1   much.  So it displaces the commercial sales.

2       So in a world where piracy happens, an economist would look

3   at this, say, okay, because of piracy, you sell less.  That's

4   pretty clear.  But how much less?  But the evidence is you sell

5   a lot less.

6   Q.  And in addition to fewer sales, you note that it also

7   reduces pricing.  Can you briefly explain why that's so?

8   A.  Yeah.  When you think about, like, selling or some simple

9   product, you say how many do I sell and at what price do I sell

10  them?  And you sell less because people who would have consumed

11  copies that you were commercially making available at a

12  positive price, are getting it for free.  And the prices of

13  even the legal sales you make are depressed, because they have

14  to compete.  So, you know, the streaming services can't charge

15  as much when they're trying to attract consumers that have the

16  option of getting the stuff for free.

17  Q.  Now, can you briefly explain the second way that you have

18  concluded piracy harms copyright holders, that it interferes

19  with new models of legitimate business?

20  A.  Yeah.  During the time of relevance in this case, like 2011

21  to 2017, that was a period in the industry where major change

22  was happening, in part because of the, you know, huge expansion

23  of access and use of broadband services of all kinds and

24  devices.  I mean, like the iPhone was introduced in 2007,

25  smartphone and all that stuff.  And so streaming was beginning

1    to emerge, was launched.  Spotify was launched in 2011 in the
2    U.S., as I think Mr. Flott mentioned.  And then it began to
3    grow over time.  The incentives of all the parties in that to
4    invest in those products and things was reduced because they
5    were competing against free.
6    Q.  And I think that you started to explain the third point of
7    how it deters incentives to invest.
8    A.  Well, Mr. Flott in his earlier testimony was just talking
9    about how, you know, Warner Records fits within a larger
10   ecosystem.  So a lot of artists are funded by that.  And any
11   artist, if they start in their garage, must think at some point
12   they need to get paid for their work.  So the investment, the
13   investment in creating those opportunities and building that
14   whole value chain, if you're going to be able to compete
15   against free, is depressed.  So that hurts everybody up and
16   down the whole value chain.  It hurts the whole sector.  And
17   that's a conclusion that, you know, it was clear in the
18   literature and is documented in government reports and things
19   like that.
20   Q.  Can we -- just very briefly, the last point here, forces
21   copyright holders to incur substantial enforcement costs.  Can
22   you just briefly explain that for the jury?
23   A.  Yeah.  I mean, the record industry --
24           MR. HOWENSTINE:  Objection, your Honor.  This is more
25   of a public policy that Your Honor said they were not allowed

1   to do.

2          MR. GILMORE:  This is talking about plaintiffs' costs

3   that they've incurred to enforce and protect their intellectual

4   property.

5          THE COURT:  Stay close to that, okay?  Overruled.

6          THE WITNESS:  To understand the effect, I mean if

7   you --

8          THE COURT:  There's no question pending.  He has to

9   re-ask the question.

10          MR. GILMORE:  Sure.

11   BY MR. GILMORE:

12   Q.  Well, can you explain -- so first of all, as a result of

13   online piracy --

14   A.  Right.

15   Q.  -- competing against free, as you've described, have

16   copyright holders such as plaintiffs, do they have to incur

17   costs to enforce their copyrights, to protect their copyrights?

18   A.  The rights holders incur direct costs.  They have to hire

19   people -- they do hire people -- to basically monitor this.

20   They have to, you know, pay.  They have to make sure this

21   happens.  They have to go engage in enforcement, the industry

22   does.  These are all direct costs associated with this, so it's

23   an economic effect of living in a world where there's piracy.

24   Costs are higher and revenues are lower.

25   Q.  Thank you, Dr. Lehr.

1          MR. GILMORE:  Can we go to slide eight, please.

2    BY MR. GILMORE:

3    Q.  And I think we saw a similar chart, although this

4    information here actually carries through into 2017, when this

5    lawsuit was filed.  And I think that the points were perhaps

6    made with Mr. Flott.

7          But briefly, first of all, can you orient us, what was

8    happening in sort of the late 1990s when we see sort of the

9    revenues in the industry at the highest here in terms of online

10   piracy in the Internet?

11   A.  Well, this chart is similar data.  It's slightly different,

12   because the earlier chart was adjusted for inflation in 2018

13   dollars, so this is 2017 dollars.  And data like this is

14   available, you know, for different industry groups, but the

15   RIAA, for example, has been publishing versions of this chart

16   for a long time.  This is the kind of stuff people look at.

17         But basically what you're seeing here is you're seeing high

18   numbers, you know.  Looks like a peak in 1999, then falling

19   substantially to, you know, what looks like the minimum in

20   2014, and then beginning to recover.  Maybe it's 2015.

21   Beginning to recover.  And you're also seeing a change in the

22   colors, and so what does that correspond to?

23         Well, you know, broadband really takes off in America

24   beginning in about 2000, you know, the first full broadband

25   services were mid-'90s, and, you know, so as you begin that

1    sort of merge to digital stuff, piracy with which broadband --
2    because a digital copy of a file is a perfect copy, really easy
3    to copy and share.  Whereas, if you have a copy of a physical
4    record, it is possible to make fake copies of those, but that's
5    just harder and doesn't happen quite as much.  But the piracy,
6    when you have broadband out there in the world, the ability to
7    share these and sort of virally when they're out there, just
8    say, basically, the number of free copies out there just
9    completely explodes, really takes off.
10       You see then, you know, when the market demand begins to
11   change, people have more, you know, more devices, you know,
12   more connectivity, broadbands were letting them in like 2005,
13   you begin to see a lot of digital downloads.  People are
14   downloading music from legal file stores onto their computers
15   and having that music.
16       And then the beginning --
17            MR. HOWENSTINE:  Objection, Your Honor.
18            THE COURT:  Sustained.  It's kind of a narrative
19   answer here.
20            THE WITNESS:  I'm sorry.
21            MR. GILMORE:  That's fine.  I'll ask another question
22   here.
23   BY MR. GILMORE:
24   Q.  In generally speaking, so the kind of -- is it fair to say
25   that the decline in the industry revenue that we see here, is

1    that consistent with the growth in online piracy over the same

2    timeframe based on your research and expertise?

3    A.  Absolutely.  And it can't be -- not all of this can be

4    explained.  You can't say all of this is due to piracy, but

5    everybody that's looked at this thinks, you know, most of it

6    is, and the -- you know, it's not because people are listening

7    to less music.  That would be an obvious answer.  Like, oh,

8    nobody is buying, you know, wooden wheels anymore because

9    nobody uses wooden wheels anymore.  No, everybody is listening

10   to music.  There's just not -- there's a lot of free stuff

11   they're competing against.

12   Q.  Thank you, Dr. Lehr.  Now, I want to ask you --

13        MR. GILMORE:  Could we publish -- I'm sorry, not

14   publish, but show the witness Plaintiff's Exhibit 617.

15   BY MR. GILMORE:

16   Q.  And are you familiar with this document, the Department of

17   Commerce Internet Policy Task Force Report from 2013?

18   A.  Yes.  It's one of the documents I cite in my report and I

19   looked at.

20   Q.  And is it a document that you've relied on in preparing

21   your testimony and reaching your opinions in this case?

22   A.  Yes.

23   Q.  Is this type of document one that you and others in your

24   industry rely on in assessing the economic circumstances

25   regarding online piracy and its impact in the digital economy?

 1  A.  Yes.

 2         MR. GILMORE:  Plaintiffs would move into evidence

 3  Plaintiff's Exhibit 617 as a market studies document under

 4  803.17.

 5         MR. HOWENSTINE:  Objection.  Relevance, foundation,

 6  hearsay.  The witness didn't prepare this document.

 7         MR. GILMORE:  We don't need -- well, it's one that he

 8  testified that he is familiar with and has relied on and others

 9  rely on.

10         THE COURT:  He can testify about it, but it's not

11  going to come in evidence unless there's some other individual

12  that's going to do it.

13         MR. GILMORE:  Understood, Your Honor.  We don't need

14  to move it into evidence as long as the witness is allowed to

15  testify about it and its impact on his opinions.

16         THE COURT:  Yes, he can testify.

17         MR. GILMORE:  All right.  Certainly.

18  BY MR. GILMORE:

19  Q.  Could we look at slide ten.

20      And Dr. Lehr, what's the key takeaway for purposes of your

21  opinions from this Commerce Department Internet Policy Task

22  Force Report?

23  A.  Well, I think that I've highlighted this quote from the

24  report, but, you know, the report concludes that, *"Despite the*

25  *increasing number of legitimate online services* --" the growth

1  of things like Spotify and such *"-- such services continue to*
2  *be hobbled by unfair competition from unlicensed ones.*"
3  Meaning the competition with free.
4       And this is the report that the government went and was
5  trying to make sense of -- you know, it was one of the kinds of
6  reports that was produced by the government that it was looking
7  at what was going on with the evolution of digital economy.
8  This was published in July 2013.
9       The Department of Commerce is, you know, the executive
10  agency within the executive office that does this sort -- looks
11  at these kinds of things to inform the executive and the
12  government about what's going on in the economy.
13  Q.  And in your professional opinion, does the Commerce
14  Department report and its takeaway, is that consistent with
15  your opinions regarding the impact of online piracy and how
16  it's interfered with new models of legitimate business
17  development by plaintiffs' recording companies?
18  A.  Yes, it's consistent with my opinion, and it's
19  representative -- I mean, it's very typical of the kinds of
20  documents I considered when earlier I said I looked at what do
21  other economists and research analysts and folks that have
22  looked at this problem, what do they have to say.  This is the
23  kind of stuff you find.  This is very consistent and supports
24  my opinion.
25  Q.  Now, in your work on this case -- I think you just

William Lehr - Examination                    1098

1   mentioned research and publications -- did you review academic
2   literature and studies and articles as part of your work for
3   the case here?
4   A.  Yes.  I considered between, like -- and I directly looked
5   at it and cite I think between 20 and 30 different research
6   things like this in my reports and forming -- as basis for my
7   opinion.
8   Q.  And can you just briefly summarize for us the kind of
9   research, academic research articles and studies that you have
10  analyzed for purposes of your opinions?
11  A.  Well, I looked at sort of, you know, a lot of different
12  stuff that was listed at a high level, but some of the stuff I
13  was specifically focused on was the empirical literature on,
14  you know, people trying to figure out what the size of this
15  problem is.  So trying to figure out the size of how much
16  digital sharing of illegal file sharing is going on of
17  copyrighted material, and then what are the economic impacts of
18  that on behavior and pricing.  And that's done in a number of
19  different ways.  People do statistical studies.  When
20  economists do statistics, they call it econometrics.  Also this
21  was based things like surveys and other different
22  methodologies.
23  Q.  And did you observe a consensus or general agreement in the
24  literature on the impact of online piracy for rights holders
25  such as plaintiffs?

William Lehr - Examination                    1099

1    A.  Yes.  I think that, you know, it's fair to say that when

2    you look across almost all of that literature, I think you find

3    a broad consensus, a very significant consensus opinion, that

4    piracy causes significant adverse economic impact for rights

5    holders.

6    Q.  And based on your experience and your own analysis of

7    information in this case and elsewhere, do you agree with the

8    academic consensus that online piracy causes significant harm

9    to the rights holders such as plaintiffs?

10   A.  Yes.  I think overwhelmingly, the evidence shows that, and

11   you know, it's sort of not surprising.  Right?  You think

12   convenience should be -- couldn't be good for your business.

13   Well, when people look at that and really try to nail it down,

14   they find, no, it's not good for your business, it is bad.

15   Q.  All right.  I'd like to just look briefly at a few of the

16   academic papers that you've relied on for your work in this

17   case.

18          MR. GILMORE:  Can you pull up just for Dr. Lehr,

19   Plaintiff's Exhibit 601?

20          THE COURT:  You've only got five minutes before we

21   have to break, counsel.

22          MR. GILMORE:  Actually, before we get into this

23   document, it may be a good time to break, then, Your Honor,

24   rather than walk through some of these materials.

25          THE COURT:  That's what I was concerned about.  Get

1    halfway through the document, then we have to break.

2             MR. GILMORE:  Thank you, Your Honor.

3             THE COURT:  All right.  Okay.  Thank you all very

4    much.

5             Doctor, I'm going to have to see you tomorrow.

6    Tomorrow morning, 9:00.

7             THE WITNESS:  I understand.

8             THE COURT:  Okay.  Thank you very much.  We'll stand

9    in recess.  You can be excused, ladies and gentlemen.  Have a

10   good afternoon.

11            COURT SECURITY OFFICER:  All rise for the jurors.

12            *(11:53 a.m., the jury exits the courtroom.)*

13                           *   *   *

14            THE COURT:  Have a good afternoon.  We'll see you

15   tomorrow morning.

16                           *   *   *

17

18

19

20

21

22

23

24

25

1                    *   *   *   *   *

2   UNITED STATES DISTRICT COURT

3   WESTERN DISTRICT OF TEXAS

4

5       I certify that the foregoing is a correct transcript from

6   the record of proceedings in the above-entitled matter.  I

7   further certify that the transcript fees and format comply with

8   those prescribed by the Court and the Judicial Conference of

9   the United States.

10

11  Date signed:  November 15, 2022

12

13  /s/ Angela M. Hailey

14  Angela M. Hailey, CSR, CRR, RPR, RMR
    Official Court Reporter
15  262 West Nueva Street
    San Antonio, Texas  78207
16  (210)244-5048

17

18

19

20

21

22

23

24

25