```
 1                    UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF TEXAS
 2                          AUSTIN DIVISION

 3   UMG RECORDINGS, INC., ET AL,    :
     Plaintiffs,                     :
 4                                   : Case Number:
     vs.                             : 1:17-CV-00365-DAE
 5                                   :
     GRANDE COMMUNICATIONS           : Austin, Texas
 6   NETWORKS, LLC, ET AL,           : October 21, 2022
     Defendants.                     :
 7   ********************************************************

 8             TRANSCRIPT OF JURY TRIAL PROCEEDINGS
              BEFORE THE HONORABLE DAVID A. EZRA
 9            SENIOR UNITED STATES DISTRICT JUDGE

10   APPEARANCES:
     FOR THE PLAINTIFFS:
11
     Andrew H. Bart, Esquire
12   Jacob Tracer, Esquire
     Jenner & Block, LLP
13   1155 Avenue of the Americas
     New York, NY  10036
14   (212)891-1600; abart@jenner.com

15   Robert B. Gilmore, Esquire
     Philip J. O'Beirne, Esquire
16   Stein Mitchell Cipollone Beato & Missner LLP
     1100 Connecticut Avenue, NW, Suite 1100
17   Washington, DC  20036
     (202)601-1589; rgilmore@steinmitchell.com
18
     Paige Arnette Amstutz, Esquire
19   Scott, Douglass & McConnico, LLP
     303 Colorado Street, Suite 2400
20   Austin, Texas  78701
     (512)495-6300; pamstutz@scottdoug.com
21

22

23

24

25
```

1    FOR THE DEFENDANTS:

2    **Richard L. Brophy, Esquire**
     **Zachary C. Howenstine, Esquire**
3    **Mark A. Thomas, Esquire**
     **Margaret R. Szewczyk, Esquire**
4    Armstrong Teasdale, LLP
     7700 Forsyth Boulevard, Suite 1800
5    St. Louis, Missouri   63105
     (314)621-5070
6    rbrophy@armstrongteasdale.com
     zhowenstine@armstrongteasdale.com
7    mathomas@atllp.com
     mszewczyk@armstrongteasdale.com

8

9

10

11

12

13

14

15

16

17

18

19

20   COURT REPORTER:
     Angela M. Hailey, CSR, CRR, RPR, RMR
21   Official Court Reporter, U.S.D.C.
     262 West Nueva Street
22   San Antonio, Texas   78207
     Phone(210)244-5048
23   angela_hailey@txwd.uscourts.gov

24   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.

25

**JURY TRIAL PROCEEDINGS**                    1104

1        **I N D E X**

2    **WITNESSES:**                              **PAGE**

3    **WILLIAM LEHR**

4    By Mr. Gilmore                           1109

5    By Mr. Howenstine                        1128

6

7    **RICHARD FOGLE**

8    By Ms. Amstutz                           1162

9    By Mr. Brophy                            1199

10

11   **MATT ROHRE**

12   By Ms. Amstutz                           1208

13

14

15

16

17

18

19

20

21

22

23

24

25

1    *(Friday, October 21, 2022, 8:43 a.m.)*

2                              *  *  *

3         COURT SECURITY OFFICER:  All rise.

4         THE COURT:  Please be seated.  So I wanted to let you

5    know, I don't know whether we had mentioned to you or not that

6    we had a potential issue for next week that was going to

7    disrupt because of some --

8         COURTROOM DEPUTY CLERK:  I already told them.

9         THE COURT:  Okay.  We have moved things around and

10   made some shifts, it's going to mean some extra work later, but

11   it's okay.  So next week we have full days, Tuesday, Wednesday,

12   Thursday and Friday.  So you'll have full days all next week.

13   Now, is there anything we need to cover this morning before we

14   bring the jury in?

15        MR. BROPHY:  Your Honor, just one administrative

16   question, if you don't mind.

17        THE COURT:  Sure.

18        MR. BROPHY:  Mr. Bart and I have been working to try

19   to get the schedule to fit.  We think we have a plan that's

20   going to work, but out of an abundance of caution, is the

21   following Tuesday available or is that like a dead zone?

22        THE COURT:  What's the following --

23        MR. BROPHY:  Whatever that next.

24        COURTROOM DEPUTY CLERK:  November 1st.

25        THE COURT:  I don't know, we'll find out.

 1          MR. BROPHY:  I'm not saying we won't use it.

 2          MR. BART:  But we definitely don't want to.

 3          THE COURT:  This is why we're doing this this morning,

 4  to try to make sure we're all on the same page and you know

 5  what's what.

 6          MR. BART:  And that's why we had the conversations

 7  yesterday.

 8          THE COURT:  Of course.  That's the smart thing to do.

 9  That's right.  Exactly.  And if we have something, maybe I can

10  move it, if we get to the point.

11          COURTROOM DEPUTY CLERK:  We do have something.  You

12  have a sentencing, but it can be moved.

13          *(Discussion off the record.)*

14                          *   *   *

15          THE COURT:  Yes, we'll make that available.  And what

16  do we look like on the 2nd?  I mean the following Wednesday,

17  we've just got sentencings packed up there?

18          *(Discussion off the record.)*

19                          *   *   *

20          MR. BROPHY:  I can't imagine we'll need Thursday.

21          THE COURT:  Famous last --

22          MR. BART:  The Tuesday, Wednesday is a nice cushion

23  for us.  We're still trying very hard to finish next week.

24          THE COURT:  I don't know how it is in St. Louis and

25  New York, but I will tell you getting doctors and dentist

1   appointments, it's like a nightmare, you have to get them,

2   like, way, way in advance.  And if you move it, they'll see you

3   whenever.  She's checking.  Sit down.

4        Okay.  Sentencing dockets I can move.  Like yesterday

5   I couldn't move it because we had lawyers flying in from out of

6   state and they were already basically on their way, so there's

7   no moving it when you have that kind of a situation.  But other

8   than that, we're good.

9        MR. BROPHY:  Thank you very much, Your Honor.

10        MR. BART:  Thank you.

11        THE COURT:  This is priority number one is to get your

12   trial to the jury in a fair way, not just to rush it through,

13   but then again not to go out and lay on the beach.

14        MR. BART:  That hasn't happened.

15        THE COURT:  I don't think so.  We can go off the

16   record.

17        *(Discussion off the record.)*

18                              *   *   *

19        THE COURT:  So we can make room for you in very early

20   November.  The only thing that would come up, but I could

21   always move that, would be if Judge Yeakel or Judge Pitman said

22   they had an emergency criminal trial and had to go.  What I can

23   always do is we can pick the jury, get started and then stop.

24   And we'll toll the Speedy Trial Act and we'll finish up here

25   and I'll go right into that trial.  We can always do that.  If

1  it's a civil case, that's not a problem.

2        COURTROOM DEPUTY CLERK:  You do have Midland.

3  November 9th.

4        THE COURT:  If we're not done by November 9th --

5        MR. BART:  We have bigger problems.

6        THE COURT:  -- we've got real problems.  One of the

7  judges up in Midland is conflicted out of a bunch of criminal

8  cases with a particular lawyer he's close to so he asked me to

9  come up and handle those matters and I've been doing that so

10 I've got some stuff -- is that a trial?

11       COURTROOM DEPUTY CLERK:  Sentencings.

12       THE COURT:  Just sentencings.  So I have to go up

13 there and do that, those have been waiting a long time.

14 Anybody ever been to Midland?  You've been to Midland?

15       MS. AMSTUTZ:  Yes, sir.

16       THE COURT:  What were you doing there?

17       MS. AMSTUTZ:  Only work, I promise.

18       THE COURT:  You know the high school from Friday Night

19 Lights, that's from Midland, that's their claim to fame.  I've

20 got one of my other law clerks, Bailey, is going to be sitting

21 in because the other one has gone to her sister's wedding.

22 This is a University of Virginia, then University of Michigan

23 Law School graduate and she just passed the Bar too.  Can you

24 tell her to come on in?  Can you get the jury?

25       MR. GILMORE:  May Dr. Lehr take the stand?

1          THE COURT:  Yes.

2          COURT SECURITY OFFICER:  All rise for the jury.

3          *(8:53 a.m., the jury enters the courtroom.)*

4                          *  *  *

5          THE COURT:  All right.  Please be seated.  The Court

6    would note the presence of all of the parties, counsel, the

7    witness and the ladies and gentlemen of the jury.  Good

8    morning.

9          Good morning, sir, and I would remind you that you

10   remain under oath.

11         THE WITNESS:  Yes.

12         THE COURT:  All right, counsel, you can continue.

13         MR. GILMORE:  Thank you, Your Honor.  Good morning,

14   Dr. Lehr.  May we publish Dr. Lehr's demonstratives?

15         THE COURT:  Yes.

16                  DIRECT EXAMINATION (CONTINUED)

17   BY MR. GILMORE:

18   Q.  Good morning, Dr. Lehr.  When we left off yesterday, you

19   had explained to the jury that you had conducted a review of

20   literature, academic research and studies on online piracy.

21   Can you summarize for the jury what were your main take-aways

22   from your assessment of those studies, and articles?

23   A.  Sure, I'd be happy to.  I looked at, you know, on the order

24   of 20 to 30 different papers, some of which were survey papers

25   that looked -- sort of asked the same question which was what

1  has the academic literature said about online piracy.  And, you

2  know, the first thing that was clear was the scope of online

3  piracy is enormous, that the volume of files that are

4  transferred illegally using things like BitTorrent far exceeds

5  the number, by in order of magnitude, like, more than ten times

6  the number of legal sales that are out there.

7  Q.  What was the second take-away from your assessment of the

8  research?

9  A.  Yeah, of the surveys and of the data, they were able to

10  determine that the file sharing they saw was almost all, like

11  99 -- one of the papers I think was 99.97 percent the data they

12  looked at was unauthorized file trading.  Although other

13  studies had slightly different numbers, they were all pretty

14  much in that category, almost all the file sharing using things

15  like BitTorrent was illegal file sharing.

16  Q.  And then your third take-away from your assessment of the

17  academic research on online file sharing piracy?

18  A.  And so these different studies also then tried to consider

19  what did this tell you about the possible impact on copyright

20  owners and the overwhelming conclusion was the economic impact

21  on copyright owners is quite large, it's substantial.

22  Q.  Now, Dr. Lehr, were you able to precisely quantify the

23  amount of harm that plaintiffs in this case suffered due to

24  online piracy on Grande's network?

25  A.  No, it's not possible.

1          MR. GILMORE:  Can we look at slide 16?

2    BY MR. GILMORE:

3    Q.  And can you explain for us -- we'll take your highlighting

4    here, three reasons, can you explain, I'll start with the first

5    reason why you concluded that it was impossible to quantify

6    precisely the harm that plaintiffs suffered from piracy on

7    Grande's network?

8    A.  Well, the first problem is you can't assess the scope of

9    the infringement or the number of illegal copies, free copies

10   that are out there competing, which is the starting point you

11   would need to know to figure out what the impact is.  The

12   various economic research papers that I looked at all did

13   various versions of this with, you know, different sorts of

14   samples and such, but those studies and the available

15   information in this case or I think that's available anywhere

16   doesn't allow you to know how many copies are out there.  Once

17   a copy is out there, it can be shared umpteen million times and

18   could be made available ten years ago and still be producing

19   offspring of additional illegal copies.  You just don't know

20   the scope of the infringement.  You don't know what you're

21   competing against.

22   Q.  Thank you.  Can you explain the second reason you concluded

23   that it was impossible to quantify the harm to plaintiffs here?

24   A.  Yeah, the second thing is that while it's obvious to

25   economists that competing against free makes it really hard for

1   legal sales, to figure out the economic harm, you have to know

2   how much legal sales fell and how much the free content

3   displaced legal sales, and you don't know that.  You know, you

4   don't know how much free content is out there, you can't figure

5   out what would have happened to legal sales.

6   Q.  Thank you.  And then can you explain the third point that

7   you're showing us here, impact on plaintiff's pricing from

8   viral peer-to-peer piracy?

9   A.  So in addition to the effect on the sales, the volume of

10  sales and the different distribution channels that the sales

11  take place in and the way the free content depresses that, all

12  those legal sales that do take place are in a world where

13  they're competing against free, so all of those prices are also

14  depressed and you have no good way to estimate what the price

15  effect is in the "but for" world where the piracy didn't take

16  place, which is what you would need to know to figure out what

17  really is the economic impact of the harm.

18  Q.  Now, Dr. Lehr, counsel for Grande in his opening statement

19  suggested that the economic impact of the infringement on

20  Grande's network was simply equal to the cost of monthly

21  subscriptions to Spotify for Grande's infringing subscribers.

22  Do you agree with that concept?

23  A.  No, absolutely not.

24  Q.  And can you explain why you don't agree with that concept?

25          MR. HOWENSTINE:  Objection, Your Honor, outside the

1    scope of the expert's reports.

2           THE COURT:  I believe that's right.  The objection is

3    sustained.

4           MR. GILMORE:  Your Honor, I believe that what counsel

5    is alluding to was an opinion that they may intend to sponsor

6    from their expert, Dr. Kemmerer.  And Dr. Lehr expressly

7    addressed that in his rebuttal report.

8           MR. HOWENSTINE:  Your Honor, Dr. Kemmerer offers that

9    opinion, that will be a question of rebuttal, but that opinion

10   is not in the case.

11          MR. GILMORE:  They introduced it in their opening.  He

12   told them that's what the evidence is going to show, counsel

13   for Grande, I'm allowed to have my witness respond.

14          THE COURT:  I don't remember that.  Did you do that?

15          MR. GILMORE:  The 200,000 Spotify subscriptions.

16          MR. HOWENSTINE:  There was no reference to Grande's

17   expert in opening statement.

18          MR. GILMORE:  I don't think that counsel is going to

19   get up and do that calculation, so if he's going to have it in

20   evidence, which he told the jury he is, it's going to come from

21   his expert.

22          THE COURT:  I'll revise my ruling.  I'll permit the

23   question.

24          MR. GILMORE:  Thank you, Your Honor.

25   BY MR. GILMORE:

1    Q.  Dr. Lehr, can you explain for the jury why as an economist

2    you don't think that kind of concept that you can measure the

3    economic impact simply by monthly subscriptions to Spotify why

4    you don't think that is correct?

5    A.  Well, I just explained that one of the key things is you

6    don't know how many illegal copies are out there.  So Spotify

7    allows an individual user, potentially a family if you have a

8    family subscription of users to listen to the music that

9    Spotify makes available, which is a lot of music.  It's not all

10   the music.  But a free copy, a free digital copy allows you to

11   share that with anybody and use that forever and the people you

12   share it with can then share it forever.  So that's the first

13   thing, you can't know the scope of it.

14       The second is that the Spotify subscription only allows you

15   to do that for as long as the user has a Spotify subscription,

16   so that with the illegal copy, that goes on forever, there's no

17   limit to that.

18       And the third reason is that Spotify itself, which is one

19   of the distribution channels through which the legal sales try

20   to take place and address it, takes place in a world that

21   confronts piracy.  So those prices, whatever the Spotify

22   subscriptions are, those prices are depressed by the presence

23   of illegal file sharing.  Those are just three reasons.

24   There's more, I think.

25   Q.  Thank you, Dr. Lehr.  Now, I want to turn to your next

1    opinion concerning Grande's business and profitability.

2              MR. GILMORE:  Can we look at slide 17?  Thanks.

3    BY MR. GILMORE:

4    Q.  And before we go into the financial figures about Grande,

5    can you describe briefly the nature of Grande's business, as

6    you understand it, based on your experience as an Internet

7    telecommunications industry expert?

8    A.  Well, Grande's a we call Internet service provider, they're

9    the descendant of a legacy cable television company.  To

10   residential customers they typically offer three principal

11   services; cable television services, which is what they

12   originally only did; telephone service now you can get from

13   your cable television provider; and Internet service.  And they

14   do that by using the network that they've built, in Grande's

15   case, in Texas, in parts of Texas where they offer service.

16   Q.  Let's go to slide 18, the next slide.  And I'd like to

17   focus on Grande as an Internet service provider.  Can you

18   summarize for us kind of the key aspects of their Internet

19   business that you think is relevant for your testimony in this

20   case?

21   A.  Sure.  So the high-speed Internet or broadband service that

22   Grande makes available, they're able to do that because they

23   had this cable television network that they've upgraded.  When

24   they sell that, when they go into a community, they build a

25   network, then they get a bunch of subscribers and then try to

1    sell those subscribers as many services as they can.

2        The broadband service that they sell is one of their

3    product lines and that is multiple tiers of service depending

4    on what speed you get at a monthly subscription price.  And if

5    they also sell you, which they hope to do, television service

6    and telephone service as much as they can sell you, that all

7    gets a consolidated bill.  You get a bill from them for that

8    monthly service and you get that bill for as long as you are a

9    customer of Grande.

10   Q.  Can you explain the second point that you're showing us

11   here, the subscribers and their monthly subscription, the

12   length of subscription what's significant about that?

13   A.  What I just explained is how the business works, but how

14   does that translate into revenues and ultimately profits for

15   Grande is they have a network with subscribers on it.  If they

16   just have a network, they just have cost.  If they have a

17   network with subscribers on it, they're paying bills every

18   month, they get the number of subscribers times the dollars

19   that each subscriber is worth per month times the length of

20   that subscription.  That's what the value they get from

21   Grande -- sorry, from being in that business.

22   Q.  And then your third point, can you just briefly summarize

23   how is that significant, these financial figures?

24   A.  So we'll talk in a minute about what the actual numbers

25   were for Grande, but it's clear with this business model that

1   Grande has been quite successful for a long time from 2012 to
2   2017 the data that I have available that was provided by
3   Grande, their total revenues were $1.3 billion in revenue and
4   that the gross margin, the sort of amount of money that flows
5   to their bottom line was $870 million in gross margin and then
6   when you account for their fixed costs, the other costs they
7   have to cover so they're not under water as a company, their
8   operating cash flow was $420 million over that same time
9   period.
10  Q.  Can we go to slide 19?  I'd like to ask you for an
11  explanation of the last point, the financial figures.  So first
12  of all, what have you summarized here, Dr. Lehr, can you
13  explain that for the jury?
14  A.  Sure.  This is an exhibit from the report that I prepared
15  in the context of this case and this is data taken from
16  information that Grande provided as their financial information
17  and it's from 2012 to 2017 and it's the revenue gross margin
18  operating cash flow.  And at the far right, you see the sums
19  and that's the $1.3 billion I told you in total revenue.  But
20  what you see is year by year they were growing and that if you
21  look a little more closely, you'll see that -- well, you can't
22  see it quite on this slide, we'll get to that in a minute, that
23  their gross margin was also improving over this time period.
24  And that was because basically their Internet service growth
25  was especially good and the margins on their Internet service

1   are especially high.

2   Q.  And we'll get into that in a little bit more in just a

3   moment.  Before we do, can you explain for the jury the three

4   categories, just briefly explain for the jury what revenue

5   gross margin and operating cash flow mean?

6   A.  Fine.  Revenues is ultimately the total amount of money

7   that flows into Grande's business.  And from that revenue,

8   which is what they get, the number of subscribers times the

9   number that they get per subscriber is what they get each month

10  and then their expectation of what that cash flow is going to

11  look like -- that revenue stream will look like over time gives

12  you a way to value the revenue of the company.

13      The second line down is -- gross margin is just revenue

14  less the variable cost associated with generating those sales.

15  So if the sales were a little higher or lower, their costs

16  would be a little higher or lower.  So the gross margin is you

17  take those costs that would vary with the sales out, so the

18  number of subscribers, whatever.  Their other costs, a lot of

19  costs that a company like Grande incurs associated with having

20  a big network having, you know, offices, things like that,

21  those costs also have to be covered for the company to stay in

22  business and be profitable.  You take those costs out and you

23  end up with operating cost cash flow.  All three of those,

24  revenue, gross margin, operating cash flow are things that

25  economists or financial analysts would look at to sort of get

1   an understanding of the profitability of a company like Grande.

2   Q.  Thank you, Dr. Lehr.  Turn to slide 20 now.

3       I think a moment ago you were explaining how Grande's

4   financial performance in those figures we were looking at

5   changed over time.  Can you walk us through what you're showing

6   in this demonstrative, sir?

7   A.  Yeah, this is just the same information that was on the

8   table before presented in a graph, so it's just another way to

9   see the same information.  And what you see is that the

10  revenues were growing from $192 million in 2012 to $249 million

11  in 2017 and that the operating cash flow, which is probably an

12  easy number to think about the profitability of the business

13  has risen from $53 million to $80 million by 2017.  So this is

14  a very profitable company.  As I said, the overall operating

15  cash flow -- well, the operating cash flow margins for Grande

16  are sort of higher than most other businesses, they're a little

17  higher than --

18              MR. HOWENSTINE:  Objection, Your Honor.  This is

19  outside the scope of the expert's report.

20              THE COURT:  I think this one clearly is.  The

21  objection is sustained.

22              MR. GILMORE:  That's fine.  We'll move on, Your Honor.

23  He does discuss this explicitly his graph --

24              THE COURT:  Move on.

25              MR. GILMORE:  Understood.

1  BY MR. GILMORE:

2  Q.  Dr. Lehr, did you look at as part of your expert work the

3  specific financial figures regarding Grande's Internet service

4  specifically?

5  A.  Yes, to come up with calculations that -- some of the

6  numbers that I present in the report of Grande's economic

7  incentive to come up with quantification of an example of that

8  to tolerate the infringement I needed to look at the specific

9  product line revenue cost data, which Grande provided by

10 service.  So they provided it for the Internet service, for the

11 video service and for the telephone service.  And from that

12 data that Grande says here are the costs that we think are

13 directly attributed to those services, you can see that the

14 margin, for example, for the Internet service is 95 percent.

15 There's also some testimony that was provided that suggests

16 from Grande internally that those numbers were consistent with

17 Grande's sort of own way of thinking about the Internet

18 service.

19 Q.  All right.  Thank you, Dr. Lehr.  I want to now turn to

20 your opinion that Grande had economic incentives to allow

21 infringement on its network.  Have you prepared a slide

22 summarizing the basis of your conclusion?

23 A.  Yes.

24         MR. GILMORE:  Can you pull up slide 21?

25 BY MR. GILMORE:

1  Q.  Can you briefly summarize the first basis for your opinion

2  that Grande had economic incentives to allow infringement on

3  its network?

4  A.  Right.  So I can explain how I come up with these numbers,

5  but basically Grande had an economic incentive worth 49.7 to

6  $78 million to retain known repeat infringing subscribers on

7  its network.

8  Q.  And let's talk about that kind of how you reached that

9  opinion.  First what was the first step in calculating the

10  figures of Grande's economic incentive to retain repeat

11  infringing customers?

12  A.  Well, as I was sort of explaining a little bit earlier, one

13  of the things I needed to do was figure out what is the revenue

14  provided by the different product lines so that I could figure

15  out what is the value of a subscriber to Grande, using the data

16  that was available.  So the first step in doing that is how

17  valuable is it to Grande to have a subscriber.  You come up

18  with that number and then you will have to figure out, okay,

19  what do you multiply it by?  You multiply it by some estimate

20  of what the repeating infringers are.

21          MR. GILMORE:  Can we go to slide 22?

22  BY MR. GILMORE:

23  Q.  So this demonstrative shows two different calculations of

24  subscriber value.  Can you explain for the jury what these two

25  calculations are?

William Lehr - Examination                    1122

1   A.  Yeah, these are the two valuations that I developed using

2   the data available in this case from sort of two standard

3   approaches.  The lifetime average profit value of a subscriber

4   is based on looking at the product line data and building it up

5   from Grande's own data to come up with an estimate of what the

6   value of an average subscriber is, the lifetime value.  So data

7   on the life of a typical subscriber, data on the typical bill

8   of the average subscriber, that data and a discount rate, you

9   know, that's appropriate for the industry, that number gets you

10  a value of subscribers.  So for each subscriber Grande has

11  that's worth using that method, $2,448 per subscriber.

12  Q.  And can you explain your second value, subscriber value

13  calculation, the TPG acquisition value?  What does that

14  reflect?

15  A.  A second approach that's commonly used by economists and

16  financial analysts is to look at data on market transactions of

17  where assets that are similar to the one you're trying to value

18  have occurred.  So in 2017 TPG acquired Grande.  So they

19  actually bought it, paid for it.  That amount of money, when

20  you translate that into a per subscriber value, gives you

21  another way to value them.  That number turns out to be $3,846

22  per subscriber and there's other transactions per variable, but

23  that was the number you get from doing that sort of market

24  based valuation.

25  Q.  Dr. Lehr, do these subscriber value calculations, do they

1  include just Internet service or do they include all the

2  services that a Grande subscriber was paying Grande for?

3  A.  These include all the services because I'm trying to value

4  how valuable is it to Grande to have a subscriber.

5  Q.  And I think that the jury has heard this already from one

6  of the Grande witnesses, but did you see evidence in the record

7  in your work on this case that when Grande would terminate a

8  customer they shut down all the services, not just Internet?

9  A.  Yes, I did.  Let me just clarify one point about what I

10  just said.  When I talk about the average subscriber, the

11  bottom up data in 2,448 is a valuation based on the average

12  revenues from an Internet subscriber which is most of their

13  subscribers, but not completely.  And yes, they didn't -- my

14  understanding of the evidence in this case and what I've seen

15  Grande didn't terminate a single subscriber for copyright

16  infringement, but they did terminate subscribers during that

17  period, for example, for non-payment of bills, that sort of

18  thing.

19  Q.  All right.  Now, so you've shown us your calculations of

20  the value of a Grande subscriber.  What was the next step in

21  your calculation of the 50 to $80 million economic incentive

22  calculation you showed us?

23  A.  Sure.  We had access to what is I think been variously

24  referred to as a letters database, which was a database of the

25  letters that were sent related to infringements on Grande's

1   network to Grande subscribers.  From that, those letters, what

2   they said was they basically -- the data we had said this is

3   the subscriber, this was the letter that got sent on a certain

4   date and these are the works that they infringed.  And from

5   that, you can analyze that and you can calculate how many

6   subscribers infringed three or more times or two or more times.

7   And the numbers I reported were three or more times.

8        MR. GILMORE:  Can we go to the next slide?

9   BY MR. GILMORE:

10  Q.  And does this chart summarize your calculations?

11  A.  Yes.  So the 49.7 million is what you get if you take

12  2,448, the value of a subscriber, times 20,284 subscribers who

13  the letters database indicated received notices of three or

14  more infringements.

15  Q.  And the 78 million-dollar figure, can you explain that

16  calculation for us?

17  A.  Sure.  That's just the same 20,284 infringed subscribers

18  multiplied by the alternative estimate, the $3,846 per

19  subscriber which gets you 78 million.  And so the reason I say

20  there's a range is these are two different methods for us to

21  mean the value and they both give you an idea of Grande's value

22  of having these infringing subscribers on its network and you

23  can see those are big numbers.  So when I say Grande had a

24  significant incentive to tolerate infringing subscribers on its

25  network, this is an example of that incentive and I consider

1    this a lower bound.

2    Q.  And when you say you consider it a lower bound, is that

3    because you here applied a three plus infringement notice

4    threshold for these calculations?

5              MR. HOWENSTINE:  Objection, leading.

6              THE COURT:  Sustained.

7    BY MR. GILMORE:

8    Q.  Can you explain for the jury why you think this is a lower

9    bound estimate?

10   A.  Well, as I explained, no one knows how much infringement

11   really took place, like how many illegal copies were being

12   shared by Grande subscribers or how many other copies got out

13   there.  What we have is we have snapshots that give an

14   indication of that.  And I worked from those snapshots

15   understanding that those estimates don't capture the full scope

16   of that infringing activity.  So that's one example.  There are

17   also problems with the data sets.  For example, the letter

18   databases that we had, if a subscriber received a note that he

19   had infringed more than three in the database I had, you only

20   saw three because that's the way the database looks.  So if

21   they only infringed one, there's a blank and there's empties.

22   If they've infringed more than three, it's three filled in and

23   then you don't know, so I don't know.

24        The second thing is although I know there were notices from

25   Rightscorp that went back to 2011, there were no letters sent

1  until 2016 associated with Grande infringements and I don't

2  believe the database, the letters database only goes back to

3  2013.  So presumably, you know, I have no reason and seeing no

4  evidence that would lead me to believe that there weren't also

5  letters issued in 2011, 2013, even if they didn't involve

6  Rightscorp.

7  Q.  And just so the jury is very clear on the data that you

8  were analyzing to come up with the repeat infringer notices,

9  this is Grande's own data, you were referencing the letters

10 database, right?

11 A.  Yes.

12 Q.  And for the record, that is what's been pre-admitted into

13 evidence as Defense Exhibit 111.  I believe it's the printout

14 of the large stack that we saw with Ms. Christenson in

15 deposition designations.

16     Now, I think you just explained this, but to be clear, the

17 figures here, do these include just notices about Rightscorp or

18 do they include notices from not all subscribers, Rightscorp,

19 but who received notices from Rightscorp and others?

20 A.  No, this is the data of the letters, the infringement

21 letters that Grande had sent out and that includes, you know,

22 infringement of all copyrighted material that took place on the

23 Grande network as reflected in that database which is what I

24 was trying to get an idea of is what is their incentive to

25 tolerate infringement, not what is their incentive to uniquely

1    tolerate infringement of people that, you know, were infringing

2    the plaintiffs in this case works, but were engaging in

3    infringing activity of any kind.

4    Q.  Thank you.  Now, you told us a few minutes ago that you had

5    concluded that there were other incentives Grande had to allow

6    infringement on its network.  Can you explain what that second

7    bucket is.  Go to the next slide please.

8    A.  Yeah, Grande maintained a larger subscriber base --

9    avoiding subscriber churn and, therefore, keeping revenue and

10   saving costs.  And churn is the fact that in any business,

11   customers leave you.  Some businesses they only come to you

12   once and then they leave you immediately, but in a subscription

13   business like the cable television industry or the business

14   that Grande was in, as I explained, the deal is you get

15   customers that can be expensive, but once you have them, you

16   keep them as long as you can, but even if you're serving them

17   real well, you will lose customers over time and that loss over

18   time is a churn rate and data on the churn rate for an

19   individual company will allow you to come up with an estimate

20   of what is the expected life that you're going to have a

21   subscription for.  So you could sort of think about, okay, what

22   is that cash flow?  So it's like thinking of a bond or annuity

23   kind of way of thinking about it.

24   Q.  Why do you think that avoiding subscriber churn by not

25   terminating repeat infringing customers, why is that

1  significant in terms of understanding Grande's economic
2  incentives?
3  A.  Well, first off, if Grande had terminated subscribers for
4  infringement, those subscribers would have been, you know, not
5  subscribers of Grande for the rest of the time they would
6  otherwise have been subscribers of Grande and that would be
7  like basically throwing away money from Grande's perspective.
8  And the customers clearly wanted to do, engage in this
9  activity.  And economists would say there was a lot of it going
10 on, I assume the consumers that are doing this find it
11 valuable.  And, you know, Grande, you know, there was a huge
12 profit incentive for them to tolerate this.  Had they not
13 tolerated this, they would have put some of that extensive, you
14 know, profit benefit, you know, at risk and they had no
15 incentive to do that.
16       MR. GILMORE:  Thank you, Dr. Lehr.  I have no further
17 questions.
18                    CROSS-EXAMINATION
19 BY MR. HOWENSTINE:
20 Q.  Good morning, Dr. Lehr.
21 A.  Good morning.
22 Q.  Now, you used the word "infringement" a lot in your
23 testimony, but I just want to make something clear.  You've
24 testified that you're not offering any opinion about whether
25 anyone committed copyright infringement in this case, correct?

William Lehr - Examination                    1129

1    A.   I'm not offering opinion -- I'm not offering legal opinion

2    about what an infringement is and when I use that term I

3    hopefully didn't confuse anybody.   I was talking about how I

4    used that term in my testimony to estimate things.   And I am

5    not talking about any specific, you know, user having infringed

6    or shared copies.

7    Q.   So you talked a little bit just now about that database of

8    letters that Grande had sent to customers; do you recall that?

9    A.   Yes.

10   Q.   So when you looked at information about the complaints that

11   Grande had received, you assumed that every copyright notice

12   Grande received was 100 percent accurate, right?

13   A.   No.

14   Q.   You didn't make any assumptions about that either way?

15   A.   Certainly didn't assume they were 100 percent accurate.   I

16   know that the letters database, for example, was an accurate

17   reflection of the letters database because part of it was

18   missing.

19   Q.   I'm talking about the copyright complaints that came into

20   Grande, did you assume that those were accurate?

21   A.   No, I didn't make an assumption one way or the other.   I

22   relied on the evidence and used it and explained how I used it,

23   but you know, I saw no evidence that it wasn't accurate.

24   Q.   And you saw no evidence that they were accurate?

25   A.   No, I saw significant evidence that they were.   I read

1  testimony in the case and I found that compelling, but I'm not

2  testifying about the details of that, no.

3  Q.  You're not testifying about whether there was infringement,

4  right?

5  A.  No, I am testifying as an economist, I am testifying that

6  the body of evidence substantially supports the fact that there

7  was massive amount of illegal copy sharing and that that

8  illegal copy sharing was causing economic harm to the

9  plaintiffs.  And the defendant had a very strong economic

10  incentive to tolerate.  That's what I'm testifying to, but I'm

11  not testifying about the specific counts of the infringement or

12  the technical or legal arguments about that.  That's outside of

13  my scope.

14  Q.  Did you assume that Grande has the ability to verify

15  whether a copyright complaint it receives is accurate?

16  A.  I didn't offer an opinion about that.  I don't -- you know,

17  I'm not sure.  I didn't assume that because it wasn't sort of

18  something that I think I needed to say I assume that, what you

19  just said, if I understood your question.

20  Q.  So you assumed Grande was obligated to take all the

21  copyright notices it received at face value, right?

22  A.  No.  Sorry if my earlier answers weren't clear.  No, I

23  didn't make any such assumption.

24  Q.  Okay.  I'd like to talk about your assignment in this case.

25  In your direct testimony, you said it was impossible to

1  quantify the harm that the plaintiffs suffered from the

2  infringement that's actually at issue in this case.  Did I say

3  that correctly?

4  A.  That sounds like something that I might have said in my

5  deposition because I think that that's accurate, specific

6  estimates of the harm suffered by the plaintiffs in this case

7  is not possible.  And I hopefully in my direct testimony

8  explained why, because to do that you would have had to be able

9  to solve the larger problem.  You can't solve the larger

10  problem, so you can't solve the more narrow problem.

11  Q.  But in fact, the plaintiffs didn't ask you to try to

12  determine the harm that they suffered from the infringements at

13  issue in this case, correct?

14  A.  They didn't ask me to specifically -- they asked me to

15  offer opinions as an economist that would, you know, go to the

16  extent to which copyright infringement caused an economic

17  impact on plaintiffs.  And, you know, to me, part of that was

18  can I value that?  And that was part of the question I looked

19  at.  And the answer to that was I can say it's large, but I

20  can't say what it is.  That was the first set of opinions I

21  came to, but that was what I was asked to do.

22  Q.  Dr. Lehr, I just appreciate a yes or no answer to this

23  question so that we're not wasting the jury's time.

24          MR. GILMORE:  Objection, Your Honor.  The witness

25  should be able to answer the question fairly.  I don't think it

1    was outside the scope of the question.

2            MR. HOWENSTINE:  I'll move on.  I'll ask a new

3    question.

4            THE COURT:  Okay.

5    BY MR. HOWENSTINE:

6    Q.  The plaintiffs did not ask you to determine the harm they

7    suffered from the infringement at issue in this case, correct?

8    A.  They did not ask me those specific words, no.

9    Q.  And you have not done that?

10   A.  I haven't done that because it's not possible, as I

11   explained.

12   Q.  I'd like to take a look at some of your slides.

13           MR. HOWENSTINE:  James, could you put up slide eight

14   from his demonstrative?

15   BY MR. HOWENSTINE:

16   Q.  Now, I want to make sure everyone understands what this

17   graph represents.

18       Looking at this graph, this orange band that goes through

19   the middle of it, that represents CD sales, correct?

20   A.  Yes, I believe those are CD sales, it may be CDs and

21   something else.  I forget exactly what the legend was on this,

22   but they're physical sales and I think those are the CD.

23   Q.  So if you look at this graph, if you look at the period,

24   you know, from 2007 and before, you would agree with me that

25   the sale of CDs and other physical products generated most of

1    the record company's revenue, correct?

2    A.   Yes.

3    Q.   Now, looking at this graph, the purplish band, the

4    purple-ish/pinkish band, that's download sales, correct?

5    Different forms of digital downloads?

6    A.   I believe that's right, yes, as I recall from the legend.

7    Q.   And then the greenish band that appears toward the end and

8    then grows that's revenues from streaming services, correct?

9    A.   Yeah, paid and advertising support.  And I'm not sure

10   why -- I forget the details of why it's multiple shades of

11   green.

12   Q.   So if you look, then, at this graph as a whole, the decline

13   in revenues shown here is almost entirely attributable to a

14   decline in CD sales, correct?

15   A.   No, I think that's the wrong way to look at it.  The

16   decline in the graph is a decline in revenues.  This is a

17   company that's always sold -- these are companies that have

18   sold in multiple ways and what you see is that their ability to

19   sell, even though the volume was going up substantially, their

20   revenues were falling substantially.  And while they recovered

21   somewhat, they are still well below what they were earlier.

22   Q.   So if you look specifically at 1999 in this graph, that's

23   where the CD sales peak, right?

24   A.   Right.  It's right on the edge of when the Internet took

25   off and free digital copies became something that just

1    exploded, yes, it was around then.

2    Q.  And then if you look at 2014 to 2017, the time period at

3    issue in this case, the revenues from CD sales are

4    comparatively pretty small, right?

5    A.  That's right because when you can get free copies and CDs

6    typically cost more, you know, the compelling attraction to

7    having them and also people were shifting to different sorts of

8    devices, they weren't buying physical CDs.  Now, for example,

9    surprisingly for the industry, people are buying LPs.  I don't

10   understand personally because vinyl doesn't sound as good, but

11   whatever.

12   Q.  So when you look -- let's look at 2014 to 2017

13   specifically.  So during this time period, streaming and

14   digital downloads displaced CD sales as the main revenue

15   generator for the plaintiffs, correct?

16   A.  Yes, I think that was testimony that the gentleman from

17   Warner records gave the other day.

18   Q.  Now, you would agree that over the timeframe covered by

19   this chart, a CD typically retailed for ten to $15, right?

20   A.  You know, I think that number sounds reasonable.  I don't

21   know, there's an estimate.  I could look it up.

22   Q.  Now, when services like iTunes started selling digital

23   downloads, they typically charged around a dollar, $1.29 a

24   song, right?

25            MR. GILMORE:  Objection, outside the scope.

1          THE COURT:  The objection is overruled.

2   A.  I think those kind of numbers sound reasonable, but that's

3   like a little bit like apples and oranges.  I mean, the company

4   sells its media in as many possible ways as it can and as many

5   ways as it can.  So when you go in a restaurant, you get a la

6   cart, you get a menu, you get discounts, you buy it in the

7   future, they're franchised and all that sort of stuff.  So

8   yeah, I think those numbers are approximately right, but I

9   don't remember specifically.

10  Q.  Dr. Lehr, as a self-professed expert on the economics of

11  the music industry, you would agree with me that a digital

12  download --

13          THE COURT:  Counsel, I don't think we need to

14  editorialize.  The jury will strike the "self-professed expert"

15  part of it.

16          THE WITNESS:  I kind of liked it.

17          THE COURT:  All right.

18  BY MR. HOWENSTINE:

19  Q.  Dr. Lehr, you would agree with me that over this timeframe

20  when digital downloads -- digital downloads were available from

21  iTunes, they typically cost a dollar to a $1.29, right?

22          MR. GILMORE:  Objection.

23  A.  The reason I'm pausing is because any time someone grabs an

24  average, what is the distribution of that, how did it change

25  over time under different rights.  I think numbers like that

1    I've seen I believe are consistent with what I saw in the

2    testimony and I probably cite in my report, so that number

3    doesn't surprise me.  I think it's reasonable as an average.

4    Q.  So when services like the iTunes store came in existence,

5    instead of buying an entire album, consumers could get

6    individual songs, right?

7    A.  They could do both.

8    Q.  And a person who bought a digital download could listen to

9    the song on their personal devices and burn it onto a CD,

10   right?

11   A.  Yes, so long as that burned CD was just for their own

12   personal use.

13   Q.  Dr. Lehr, do you think it's --

14   A.  Sorry.  When I say that, that's my understanding of the

15   law.  I'm not offering an opinion as a legal scholar about what

16   the actual rights are if you download a file.  I know it's

17   complicated and whatever, but at any rate, as a practical

18   matter, someone could do that, yes.

19   Q.  Dr. Lehr, do you think it's possible that consumers on the

20   whole might prefer buying only the song they want for one

21   dollar to buying a whole CD for $15?

22        MR. GILMORE:  Objection.  This is outside the scope of

23   his direct.

24        THE COURT:  No, I don't think it is.

25   A.  This is a proposition that you sit there and say, Do people

1  prefer free to paying money for something?  Economists don't

2  have much problem saying, Almost always if it's the same good,

3  free is way better.

4      Now, some people do like to buy music a la cart and buy

5  individual songs, some people prefer streaming, some people put

6  it on random and a bunch of people buy albums.  So in general,

7  if the person says, I only want one song in an album, and the

8  album costs $15 and the single song costs 1.99, an economist

9  would say, The consumer in that situation making that decision

10  would generally prefer the 1.99.  But depending on what the

11  consumer's expectations were, if it thought that later it might

12  like other songs or whatever, I don't know.  Some people buy

13  the whole album because they like the artist.

14  Q.  So going back to this graph, the green band here is

15  streaming, right?

16  A.  Yes, the -- yes, the multiple colors of green, yes.

17  Q.  So focusing again on 2014 to 2017, streaming services like

18  Spotify and Apple Music typically charged around $10 a month,

19  right?

20  A.  Yeah, I believe that's right.  And as I explained, those

21  prices are in a world where there's rampant piracy going on,

22  but yes.

23  Q.  And a streaming subscription allows a person to listen to

24  as much music as they want on the service, so long as they have

25  the subscription, right?

1   A.  Well, as much music as the service offers, and different

2   services offer different libraries.  And you have to have

3   typically a broadband connection or you have to have -- you

4   know, for the services to allow you to download for offline

5   listening, you have to have done that and have a device that

6   has enough memory on it.  So it's not the same obviously as

7   having a stolen copy that you can listen to anywhere if you

8   have a device to want to listen to it.  The streaming doesn't

9   impose constraints on your ability to use it while you have the

10  subscription.

11  Q.  Dr. Lehr, do you think it's possible that consumers on the

12  whole might prefer being able to stream all the music they want

13  for $10 versus paying 10 to $15 for a CD?

14  A.  Well --

15      MR. GILMORE:  Objection, relevance.  This is kind of

16  going far afield of anything he testified about, not sure where

17  we're going.

18      MR. HOWENSTINE:  Your Honor, this goes directly to his

19  opinions about the impact of piracy.

20      THE COURT:  Well, if somebody is buying a CD or paying

21  for a streaming service, they're not pirating, so I'm going to

22  sustain the objection.

23  BY MR. HOWENSTINE:

24  Q.  Focusing on this time period of 2014 to 2017, when most

25  label revenue is coming from streaming or downloads, do you

1   think it's possible that consumers are now getting a better

2   product at a fairer price?

3          MR. GILMORE:  Same objection.  This is the same line

4   of questioning, Your Honor.  If he wants to talk about piracy,

5   ask the witness questions about piracy.

6          MR. HOWENSTINE:  Your Honor, the witness has directly

7   testified that he thinks this decline in revenues is

8   attributable to piracy.  I'm exploring with the witness many

9   other potential factors that may have caused that decline in

10  revenues.

11         THE COURT:  I'm going to overrule the objection.  As

12  long as we don't go down a rabbit hole here.

13         MR. HOWENSTINE:  I'll re-ask the question.

14  BY MR. HOWENSTINE:

15  Q.  Again focusing on this period of 2014 to 2017 when most

16  label revenue was coming from streaming or downloads, is it

17  possible that consumers are now getting a better product at a

18  fairer price?

19  A.  First of all, I'm certainly not opining about what the

20  price of music ought to be.  Ultimately that's a question about

21  how much should artists get paid.  I know in the current

22  streaming world, the artist community is feeling like, for

23  example, they make very little money out of that and that's one

24  of the reasons in the business they talk about performance

25  being so important for artists.  And they're down in the food

1    chain below -- not down the food chain, they're part of the

2    value chain that rights holders in this company put the money

3    into the system.

4        I think that CDs they're different products and people

5    consume them for different reason and they're different

6    streaming resolutions and things like that.  There's still a

7    bunch of CDs being sold and people still buy them and collect

8    them.  What I said earlier was I'm surprised that LPs are being

9    bought because I actually think the sound quality of those is

10   worse than CDs, but audio files disagree and those things --

11   and we heard earlier testimony about special releases, special

12   Madonna album that's coming out with a picture from, you

13   know -- Madonna is not one of the people I particularly like

14   listening to, but so there's lots of products and this business

15   has always been complicated.  As the Internet has moved

16   forward --

17           MR. HOWENSTINE:  Your Honor, I move to strike this

18   answer as nonresponsive.

19           THE COURT:  Part of his answer was responsive, but

20   then he kind of went on.  So I'm going to strike that portion

21   which was nonresponsive.

22           MR. HOWENSTINE:  I'll move on.

23   BY MR. HOWENSTINE:

24   Q.  Dr. Lehr, in your work on this case, you did not consider

25   whether artists really need labels any more since they can

1    distribute their music directly over the Internet, right?

2             MR. GILMORE:  Objection, both argumentative and

3    outside the scope.

4             THE COURT:  Sustained.

5    BY MR. HOWENSTINE:

6    Q.  Now, Dr. Lehr, you testified yesterday that the plaintiffs

7    invest money in the creation of sound recordings.  You referred

8    to Mr. Flott's testimony on that subject, I believe?

9    A.  Yes.

10   Q.  So in your terms, those are the plaintiff's assets, those

11   sound recordings, right?

12   A.  Well, I believe -- I'm not sure exactly as I sit here right

13   now what the accounting thing would be, but I would generally

14   consider their interest in the copyrights assets.

15   Q.  You have not analyzed the amount that any of the plaintiffs

16   invested in the creation of any of the assets at issue in this

17   case, correct?

18   A.  Not specifically, but I think there was some information

19   discussion to that in some of the documents and things I've

20   reviewed.

21   Q.  Well, whether you reviewed it or not, this isn't something

22   you've analyzed, correct?

23   A.  Well, everything I considered in the case is part of the

24   analysis I did, but for example, in the testimony provided

25   earlier, there was no reference to any of those numbers in

1  that.

2  Q.  And you haven't offered any opinions that are based on

3  those numbers, right?

4  A.  Well, indirectly I sort of said I think I have.  My

5  opinions depend on the full body of the things I considered in

6  this case, but I'm not offering an opinion that specifically

7  is, you know, that they had an interest in this particular song

8  or, you know, what a financial statement might have said about

9  that or whatever, no.

10 Q.  Now, you would agree that each of the plaintiffs has made

11 the decision to make their catalogs available on streaming

12 platforms, correct?

13 A.  I believe that's true, yes.

14 Q.  That's Spotify, Apple Music, Pandora, right?

15 A.  I believe that's true, but I certainly don't know the

16 terms, precise terms which those arrangements are, and those

17 change over time.  Like, for example, the different streaming

18 services compete very heavily against each other, so there's

19 all kinds of things going on there.

20 Q.  And you're here to testify as an expert on the economics of

21 the music industry, correct?

22       MR. GILMORE:  Objection, that is not what we tendered

23 Dr. Lehr regarding.

24       THE COURT:  Rephrase your question, counsel.  The

25 objection is sustained.

1        MR. HOWENSTINE:  Could you pull up slide two please?

2   BY MR. HOWENSTINE:

3   Q.  So one of the focuses of your research is the rise of

4   Internet as the principle platform for distributing media of

5   all types and especially entertainment, correct?

6   A.  Yes.

7   Q.  Fair to say that you believe that you have a deep level of

8   familiarity with research on how the music industry has evolved

9   from an economic perspective?

10       MR. GILMORE:  I object.  Outside the scope of his

11   direct testimony.

12       THE COURT:  I don't think so.  I think it's in the

13   outer limits, but it's within the envelope.

14   A.  I think to do the things I do, I need to understand, you

15   know, a lot about things that are closely related to it that

16   aren't necessarily the focus.  And I think that anybody that,

17   you know, has done detailed study in any area realizes that

18   there are degrees of expertise and I know more certainly about

19   the music industry than someone who hasn't looked at this at

20   all and more than most economists that haven't focused on the

21   kinds of things I focus on, but there's a lot I don't know and

22   there's a lot of people that I think, you know, whose work I

23   would look at, for example, about specific questions.  So when

24   you ask me about that in a general sense, yeah, I think I have

25   a lot of expertise about the music industry, but you know, I

1  sort of have to hear what the specific question is, and go,

2  well, not necessarily about that.

3  Q.  You believe that the research shows that digital models

4  like streaming may lead to increased incidence of file-sharing

5  piracy, correct?

6  A.  There are some empirical research that shows that those

7  parties that engage in illegal file sharing also tend to use

8  streaming services and I think that's not surprising.  People

9  that are sort of like digital natives tend to do everything and

10 so, you know -- but that evidence, that's some of the evidence,

11 that's some of the evidence that I've seen.

12 Q.  In your report you relied on an article titled *Music*

13 *Streaming Increases the Likelihood of Piracy by About 11*

14 *Percent.*  Do you recall that?

15 A.  That sounds familiar.  I don't remember -- if you give me

16 an exact paper, I could probably remember better, but that

17 sounds reasonable.  I think that's probably the research that I

18 was referring to.

19         MR. HOWENSTINE:  May I approach, Your Honor?

20         THE COURT:  Of course.

21 BY MR. HOWENSTINE:

22 Q.  Perhaps you could refresh your recollection if you look at

23 page eight, footnote 23.

24 A.  You said page 23?

25 Q.  Page eight.

1       MR. GILMORE:  I will object.  It's outside the scope

2  of the direct testimony.

3       THE COURT:  No, I think that's -- you're making

4  essentially the same objection you made the last time and I

5  already overruled that objection.  I think he's entitled to go

6  along this line to a degree, okay.  If he gets too far, then.

7       You can continue.

8  BY MR. HOWENSTINE:

9  Q.  So there in that piece of your report I referenced, you

10  cited an article titled *Music Streaming Increases The*

11  *Likelihood of Piracy By About 11 Percent.*  Correct?

12  A.  Yes, I see this, this is in paragraph 24 and it cites to a

13  paper called *Borha and Derringer*.  And actually -- this wasn't

14  the paper I was thinking about, but it certainly is one of the

15  papers that that's what it concludes.  It was a while since I

16  read that paper.  I don't remember what else, but I think that

17  was one of the salient points of that paper.

18  Q.  Now, I'd like to switch gears a little bit and talk about

19  some of your calculations in this case.  You would agree that

20  your opinions are only as good as the material you relied on,

21  right?

22  A.  Yes, and that if -- I think that if you don't have a basis

23  for your opinion and your basis you have is just completely --

24  then your opinion is garbage in/garbage out, but I try to be

25  very careful about using a broad base of evidence and I saw no

1   evidence that would lead me to question my opinions.

2   Q.  You are aware that this case is about file sharing

3   allegedly detected by a company called Rightscorp?

4   A.  I understand that the principal source of evidence is

5   evidence related to data that Rightscorp did, but the case is

6   about illegal copying by Grande subscribers.

7   Q.  You understand that Rightscorp sent e-mails to Grande about

8   alleged sharing of the songs that are at issue in this lawsuit,

9   correct?

10  A.  Now, as I'm sitting here right now, I'm not sure if the

11  letters database were sent as e-mails.

12  Q.  You don't remember?

13  A.  As I sit here right now, I don't recall.  It's been -- but

14  that sounds reasonable.

15  Q.  If it would refresh your recollection, I'd refer you to

16  page -- paragraph eleven of the report that you have in front

17  of you.

18  A.  Yeah, so what it says here is it's my understanding

19  Rightscorp provided Grande with notices related to more than

20  one million.  I think it was something like 1.35 million or

21  something like that notices in this case and that that

22  corresponded to something like 300,000 notices related to works

23  in this case, something like those are the kind of numbers that

24  were, you know, discussed in the various testimony and attested

25  to by the various experts in the case.

William Lehr - Examination                    1147

1   Q.  You did not look at any of those notices in reaching your

2   opinions in this case, correct?

3   A.  No, I think I did.  I looked at the underlying data, but

4   I'm not offering opinion about it, just to make sure I

5   understood what the kind of data was.  The data that I worked

6   with is this letters database that was, as I understand,

7   already admitted in this case.

8   Q.  Right.  You relied on the letters database and not on any

9   notices sent to Grande by Rightscorp, correct?

10  A.  There aren't -- I don't use any of those specific notices,

11  but I did look at them, I did, you know, see what that kind of

12  data looked like.

13  Q.  Well, you would have looked at them, but they weren't

14  provided to you, right?

15  A.  Well, not the specific notices.  As I sit here right now,

16  they weren't -- that isn't how I came up with estimates.  I

17  came up from the letters database, it's my general familiarity

18  with what Rightscorp's notices are.  I'm not offering testimony

19  about the validity of specific notices or how many there were.

20  That's technical testimony that's outside the scope of my

21  testimony.

22  Q.  So to be clear, you didn't review or consider the actual

23  Rightscorp e-mails in reaching your opinions in this case,

24  correct?

25          MR. GILMORE:  Asked and answered, Your Honor.  He's

1   answered this question like --

2          THE COURT:  I believe he has.  The objection is

3   sustained.

4          MR. BART:  Your Honor, may I be excused for two

5   minutes?  You can continue.

6          THE COURT:  Of course.  You don't need to ask.

7   BY MR. HOWENSTINE:

8   Q.  So instead of considering the Rightscorp e-mails, what you

9   looked at instead was a report of the letters that you

10  understand Grande sent to its customers, correct?

11  A.  It's -- I considered all the evidence I looked at in the

12  case and I cited the various reports.  And as I sit here right

13  now, I don't remember if it was on those, but the calculations

14  I talked about earlier, that was based on this letters database

15  that was my understanding was provided by Grande as

16  representative of the letters that they had sent to subscribers

17  based on that had received notices of infringement telling

18  those subscribers what those notices were.

19  Q.  And this included letters about notices concerning all

20  different kinds of media, right?

21  A.  Yes, I think that was asked in my direct testimony and

22  that's what I said, yes.

23  Q.  Included films?

24  A.  Yes, because basically people that steal music and get away

25  with that, that's easy, they're also going to be inclined to

1    want to steal films.  And also, as we heard earlier, a lot of
2    the rights in the movies also are related to the rights in the
3    music too, but yeah, I was interested in the full extent of
4    infringement on Grande's network.
5    Q.  So you didn't look at how many of those letters concerned
6    any of the songs that are actually at issue in this case,
7    right?
8    A.  I might have seen testimony about it, but not specifically.
9    It wouldn't have been appropriate for me to do that.  And also
10   as I said earlier, the amount of Rightscorp's stuff in that
11   database was limited because of problems with, you know, the
12   letters weren't sent, you know, until 2016.
13   Q.  I'm just trying to get a clear answer to this question.
14   You didn't look at how many of the letters that Grande sent
15   concerned songs that are potentially at issue in this lawsuit,
16   correct?
17   A.  Not for the purpose of doing my calculation, but you could
18   -- like, I glanced, there's one of the songs, I recognized
19   that, but I didn't try to analyze it, no.
20   Q.  So you looked at that report and you concluded that there
21   were roughly 20,000 accounts that you believe received at least
22   three copyright complaints over this time period, correct?
23   A.  Three or more, yes.
24   Q.  And in your analysis, that's a quote/unquote repeat
25   infringer, correct?

William Lehr – Examination                1150

1   A.  Well, I mean, you know, I think you could define that in

2   multiple ways, obviously, you know, the simplest way is if you

3   have two or more infringers and my table also shows that, but

4   you know, just to be more conservative, you know, three or more

5   is a reasonable definition.  To do something more than that

6   would have been tough with the database because of the way the

7   letters reported, as I explained.

8   Q.  Plaintiffs supplied that three or more number to you,

9   correct?

10  A.  No.  They didn't supply it to me.  They, you know, in

11  discussions with me in terms of thinking about how best to

12  present it, I think the idea was, you know, be conservative,

13  but I think that this is the most conservative number for which

14  I have a reliable ability to estimate it.

15  Q.  You do not have any opinion about whether or when Grande

16  should have terminated any particular subscriber, correct?

17  A.  I'm not offering opinion about when they should have

18  terminated any particular subscriber.

19  Q.  Or any subscribers generally?

20  A.  No, no, I'm not saying that they should have terminated any

21  particular number or any particular subscribers.

22  Q.  You're not qualified to give an opinion on that, correct?

23  A.  I'm an economist and, I mean, if I could have advised them

24  on strategy maybe if they asked me, but for the purpose of this

25  course, certainly not.

William Lehr - Examination                    1151

1  Q.  Now, I believe you said you've studied the evolution of the

2  music industry over the past 20 years, correct?

3  A.  Yes.

4  Q.  It's the focus of your research?

5  A.  The focus of my research I said was on the Internet and the

6  evolution of different services that use it, which is a lot

7  broader than just the music industry, but the music industry is

8  certainly one of the businesses that has, you know, been

9  transformed by and makes use of our transforming digital

10 economy.

11 Q.  I think that was wrapped up in your answer right there, but

12 you've studied the specific platforms the plaintiffs have used

13 to distribute their music over the Internet, correct?

14 A.  I've looked at a number of those over time, but not, you

15 know, comprehensively, you know, for every possible -- there's

16 different streaming platforms are different and they're

17 different in the different markets they're in.  Even someone

18 like Spotify, as was talked about earlier, they were originally

19 launched in Europe, when they came to the U.S. they were

20 originally launched as an advertising supporting service and

21 then went to a premium service and then a lot of competition in

22 the industry.

23 Q.  And you're familiar with iTunes store, correct, as a place

24 where plaintiffs sell their music?

25 A.  That's one, there's other places where people sell their

William Lehr - Examination                    1152

1   music, but yes.

2   Q.  So you must be familiar with digital rights management

3   technology that's used to protect digital music files, correct?

4          MR. GILMORE:  Objection.  Outside the scope of the

5   direct.  He's not here to offer opinions about copyright

6   protections.  In fact, I think Your Honor said he couldn't on

7   direct.

8          THE COURT:  That's correct.  The objection is

9   sustained.

10          MR. HOWENSTINE:  Your Honor, I'm asking the witness

11   about --

12          THE COURT:  It's sustained.

13          MR. HOWENSTINE:  If you could put up slide 23 again

14   please, James?

15   BY MR. HOWENSTINE:

16   Q.  I'd like to talk real briefly about these subscriber value

17   calculations.  You came up with this calculation that assumes a

18   value of roughly $3,800 for a subscriber based on the TPG

19   acquisition price; do you recall that?

20   A.  Yes.

21   Q.  And I believe you explained that you divided that purchase

22   price by the number of subscribers you believe Grande had at

23   the time, correct, to get at that value?

24   A.  Yes.

25   Q.  Now, you understand that TPG acquired Grande and all of its

William Lehr - Examination                    1153

1   assets at that time, right?

2   A.  Yes, that's the reason why that's the right number to use.

3   Q.  But you didn't attempt to value any of the assets that TPG

4   acquired in that transaction other than subscribers, correct?

5   A.  Well, I was looking for a total value of subscriber and

6   basically the reason someone buys a company like that is for

7   the ongoing cash flows that the company is going to promise to

8   deliver.  Those net sort of cash flows and that a way to think

9   about that and a way that investors and people that look at

10  this look at it is they basically do it this way.  They say

11  take the value of the transaction, divide it by the number of

12  subscribers, come up with a per subscriber value.

13      There are other transactions you might look at that would

14  be different and you would do a different calculation, but

15  because TPG acquired all of Grande, essentially, that's a

16  reasonable way to do it.

17  Q.  So you didn't attempt to value the customer hardware that

18  Grande owns, modems, routers, set top boxes, anything like

19  that?

20  A.  No, because without the subscribers, that's just iron.

21  Q.  You would also agree that without that hardware, there's no

22  way to deliver product to subscribers, right?

23  A.  As explained in the economics, they need the network to

24  have subscribers, but then the business going forward is

25  retaining those subscribers, keeping that subscriber base is

1  how the business works, so they go together.  The value of the

2  business is the network with the subscribers.  No one would buy

3  the network if it was never going to have subscribers.

4  Q.  You didn't attempt to value any of the physical assets that

5  TPG acquired in that transaction, correct?

6          MR. GILMORE:  Objection, asked and answered.

7          THE COURT:  I believe it was, sustained.

8  BY MR. HOWENSTINE:

9  Q.  Now, Dr. Lehr, you've had access to all of the evidence in

10  this case, correct?

11  A.  Yes.  I believe I had access to it, everything I needed I

12  got.

13  Q.  And you haven't seen a single piece of evidence in this

14  case that anyone at Grande or at Grande's management companies

15  ever considered the value of repeat infringers in deciding how

16  Grande should respond to copyright infringement complaints,

17  correct?

18  A.  I'm not even sure I really follow that question.  I think

19  the answer has to be no, because I saw a lot of evidence about

20  how they thought about their subscribers and thinking about

21  their subscribers they think about what products they want to

22  offer their subscribers.  And the services they offered to

23  their subscribers was here is a broadband service that allows

24  you to do whatever you want and it's high speed and it works

25  really well.  And one of the things that allowed you to do, and

1    their subscribers, a lot of them were doing, was engaging in

2    illegal file sharing.

3    Q.  Dr. Lehr, I'm asking a different question.  The question

4    I'm asking is whether you've seen any evidence that anyone at

5    Grande considered the value of alleged infringers in deciding

6    how Grande should respond to copyright infringement complaints,

7    have you seen any of that evidence?

8    A.  I'm not really sure how to answer your question except to

9    say that if there existed such a memo, for example -- or a memo

10   that said, We have to get rid of infringing subscribers, I

11   don't recall as I sit here ever having seen any memo like that,

12   but I do believe that the evidence I did see as an economist to

13   reach the opinions I reached relates to that.  And I think -- I

14   assume Grande management is reasonably smart, but I'm not --

15   I'm not here testifying about that.  I'm just saying, like,

16   what does the economics and the context of the situation tell

17   you, but I don't recall as I sit here now that they were

18   specifically evaluating infringing subscribers and saying these

19   are really valuable for us, I don't recall anything like that.

20   Q.  I'd like to take a look at this calculation that's up on

21   the screen right now or this set of calculations.

22        These calculations are completely unrelated to the

23   plaintiff's claims in this case, correct?

24        MR. GILMORE:  Objection, argumentative and lacking

25   foundation.

 1          MR. HOWENSTINE:  Your Honor, if the witness disagrees,

 2   he can disagree with me.

 3          THE COURT:  Overruled.  That's a tough one.

 4   A.  I guess -- I'm not sure how to answer.  No, as I'm sitting

 5   here today, so I can't see how the answer could possibly be

 6   yes.

 7   Q.  Let's just say that only one of these plaintiffs had filed

 8   suit against Grande for infringement of just one of their

 9   songs.  Are you with me so far?

10   A.  Okay.  That's a hypothetical, yes.

11   Q.  So we have Sony Music Entertainment is the only plaintiff

12   and they're suing Grande for infringement of Jump Around by

13   House Of Pain.  Are you with me?  One song.

14   A.  I don't actually know that song, but okay.

15   Q.  But you're with me on the hypothetical, correct?

16   A.  Yes.

17   Q.  These numbers would all be the same, right?

18   A.  No.

19   Q.  Well, let's look at them one by one.

20   A.  If I could explain why no or we can look at them one by

21   one, sure.

22   Q.  This number 20,284, in this hypothetical that I've offered

23   you, Grande still would have sent the same number of letters,

24   you would have looked at the same letters database, correct?

25   A.  Sorry, I was -- you were talking about a different set of

William Lehr - Examination                    1157

1    facts and I really don't know how different that would be, but

2    like, I've never seen or heard about a case where someone

3    would -- or in this context, would have sued like this.  You're

4    basically saying they would have come here -- just to

5    understand the hypothetical, they would have come here and

6    would have said, We are only alleging one work of art, and they

7    would have hired me to attest to the incentive to tolerate

8    infringement on their network and the incentive of extent of

9    piracy and the ability to estimate the economic harm associated

10   with that.  I think my fundamental opinions would have been the

11   same, in that hypothetical case, as much as I understand it,

12   but such a case would have a lot of other facts, you know.  I

13   mean, I don't know that I would have presented this exhibit,

14   for example, in that case, I don't know.  That's one work?

15   Q.  But if there were one work at issue, all these numbers

16   would be the same, right?

17   A.  Not necessarily, because I would have written a different

18   report, it would have been a completely different case.

19   Q.  Right, it would have seemed unreasonable to throw out

20   numbers like 50 million and 80 million if there were only one

21   song at issue, right?

22   A.  No, it could have actually been even more because if

23   someone thought it made sense to sue on one song, I would

24   assume that they had a really, really good reason to believe

25   that they had really, really been economically harmed by that

1  particularly outcome.  And in that weird hypothetical, there

2  are lots of things that could happen there.  It's a different

3  statement of facts, but the number could be very large, I don't

4  know.

5  Q.  You're not saying these numbers are plaintiff's damages,

6  right?

7              MR. GILMORE:  Objection, calls for a legal conclusion.

8              MR. HOWENSTINE:  He's an economist, Your Honor.  He's

9  testifying about damages issues.  I'm asking him if this is a

10 damages calculation.

11             MR. GILMORE:  Your Honor, plaintiffs have elected

12 statutory damages, it's a legal question --

13             THE COURT:  The objection is sustained.

14 BY MR. HOWENSTINE:

15 Q.  You are not relying on any evidence or analysis in this

16 case to suggest that there's more copyright infringement on

17 Grande's network than on the network of any other ISP, correct?

18 A.  I'm not offering that opinion, no.

19 Q.  You said that Grande had, in your view, based on your

20 review of the materials, approximately $1.3 billion in revenues

21 over the period of 2012 to 2017, correct?

22 A.  Yes.

23 Q.  How much were the plaintiffs' revenues collectively over

24 that period?

25             MR. GILMORE:  Objection, irrelevant and outside the

1   scope of his direct.

2         MR. HOWENSTINE:  It goes directly to his opinions,

3   Your Honor.  He's testifying about the profitability of

4   Grande's business to suggest that those revenues are

5   astronomical.  They have to be understood in relation to other

6   information as well.

7         THE COURT:  The objection is overruled.

8   A.  As I sit here now, I don't know specifically what those

9   numbers are.  I would be very surprised if they weren't larger

10  because the sum total of the plaintiffs represent most of the

11  global industry and recorded music, which is a big industry

12  globally.  And Grande is a company just in Texas.  And,

13  frankly, you know, if you're big, you know, maybe you got --

14  the economic harm, as an economist, like I say, just on that,

15  you could have been harmed a lot, you know, because there's a

16  lot to harm, but and of course the illegal copies and files

17  that go out and they go beyond Grande's network, so they impact

18  what happens globally, so but it's not -- I don't know how much

19  that was, so I can't estimate that economic -- the extent of

20  that economic harm.

21  Q.  You didn't review the plaintiffs' SEC filings, correct?

22  A.  I think I looked -- I certainly looked at some of those

23  over time.  For the context of this case, I may have looked at

24  some of those, but they weren't really relevant to the opinions

25  I'm offering.

1  Q.  They're not listed in the materials you considered in your

2  reports, correct?

3  A.  I think that's probably -- I'd have to look, but I could

4  look and, you know, then I didn't cite them, that's for sure if

5  they're not listed.

6  Q.  So you haven't seen the factors other than piracy that are

7  identified in those filings as reasons for their decline in

8  revenues?

9        MR. GILMORE:  Objection, lack of foundation.

10        MR. HOWENSTINE:  Your Honor, the witness is either

11  aware of this or not.  I'm asking him if he's aware.

12        MR. GILMORE:  He's suggesting there's a list of

13  factors and documents that are not before us.  It's a lack of

14  foundation question.

15        THE COURT:  You need to lay more foundation than just

16  asking him that question.  I will allow the question if you lay

17  the proper foundation.

18        MR. HOWENSTINE:  I think we can just stick with the

19  previous point.

20  BY MR. HOWENSTINE:

21  Q.  You didn't review any of those SEC filings, correct?

22  A.  Not in detail for the purposes of the opinions, you know,

23  that I'm offering here.

24        MR. HOWENSTINE:  I have no further questions, Your

25  Honor.

```
 1          THE COURT:  Redirect?
 2          MR. GILMORE:  No further questions for Dr. Lehr.
 3   Thank you, Dr. Lehr.
 4          THE COURT:  Okay.  You can step down, sir.  And you
 5   can be excused.  He's not going to be recalled, right?
 6          MR. GILMORE:  Unlikely.
 7          THE COURT:  Well, it's your witness.
 8          MR. GILMORE:  No.
 9          THE COURT:  So we can excuse him, let him go back to
10   wherever he lives.
11          MR. GILMORE:  Thank you, Your Honor.
12          THE WITNESS:  The weather is pretty nice here.
13          MR. GILMORE:  He's in Boston.
14          THE COURT:  You might want to stay here a while.  All
15   right, sir -- ma'am.  Counsel.
16          MS. AMSTUTZ:  Good morning, Your Honor.  Paige Amstutz
17   with Scott Douglas McConnico.  The plaintiffs call Richard
18   Fogle as our next witness.
19          MR. BROPHY:  We'll have to go fetch him, Your Honor.
20   Be right back.
21          THE COURT:  Raise your right hand, sir.
22          COURTROOM DEPUTY CLERK:  You do solemnly swear that
23   the testimony you're about to give in this case now before the
24   Court will be the truth, the whole truth and nothing but the
25   truth, so help you God?
```

```
 1              THE WITNESS:  Yes, ma'am, I do.
 2              COURTROOM DEPUTY CLERK:  You can have a seat.
 3                          *   *   *
 4              (RICHARD FOGLE, Witness, Sworn.)
 5                          *   *   *
 6                          EXAMINATION
 7  BY MS. AMSTUTZ:
 8  Q.  Good morning.
 9  A.  Good morning.
10  Q.  Mr. Fogle, please introduce yourself to the judge and the
11  jury?
12  A.  My name is Richard Fogle.  I'm an IT director at Astound,
13  or Grande at the time.
14  Q.  And you joined Grande Communications in 2006; is that
15  correct?
16  A.  About, don't quite remember the month at this point.
17  Q.  Not the month, but the year, 2006?
18  A.  Sure, yes.
19  Q.  And around 2012, you became Grande's director of
20  information systems.  Was that your formal title?
21  A.  Yes, ma'am.
22  Q.  And you had that role through at least 2018; is that
23  correct?
24  A.  Yes, ma'am.
25  Q.  And in your role as director of information systems, you
```

1    were familiar with Grande's abuse system, right?

2    A.   Yes, ma'am.

3    Q.   And as director of information systems, you shared

4    responsibility for that abuse system with Colin Bloch and Lamar

5    Horton; is that right?

6    A.   That's correct.

7    Q.   And during that time period as director of information

8    systems, were you equal to or superior in rank at Grande to

9    Mr. Bloch and Mr. Horton?

10   A.   I was director, Mr. Horton was the vice president and Colin

11   Bloch was the manager, so I guess I was between, right there in

12   the middle.

13   Q.   Okay.  Now, around 2012, you were asked to help Grande's

14   Call Center build an application to track data about the DMCA

15   notices that Grande was receiving about its subscribers; do you

16   recall that?

17   A.   Yes, ma'am.

18   Q.   And so around that time, 2012, you started doing some

19   research or discovery into what that process was at a very high

20   level; is that fair?

21   A.   Yes, yes.

22   Q.   And that research included reviewing Grande's website that

23   existed at the time, right?

24   A.   Yes.

25   Q.   And on the website, you read a rather high level blurb

Richard Fogle - Examination                    1164

1    about the Digital Millennium Copyright Act, or the DMCA; is

2    that correct?

3    A.  Yes, ma'am.

4    Q.  You then followed that trail from the website to Grande's

5    abuse system, didn't you?

6    A.  Eventually, ma'am, yes.

7    Q.  And after you looked at the information on the website, you

8    also engaged other Grande employees to get a better

9    understanding about the abuse system, didn't you?

10   A.  Sure did.

11   Q.  And one of those employees that you engaged was Roberto

12   Chang.  Did I say that correctly?

13   A.  Yes, you did.

14   Q.  And at the time, Mr. Chang was in charge of Grande's

15   website, right?

16   A.  Yes, ma'am.

17   Q.  And you recall asking Mr. Chang if your understanding of

18   some of the things that you saw on the abuse system was

19   correct.  Do you remember that?

20   A.  I don't quite recall.

21   Q.  Do you recall giving a deposition in this case?

22   A.  Yes, ma'am, I do.

23   Q.  And I believe it was on June 28 of 2018.  Does that sound

24   right?

25   A.  I thought it was December for some reason, 2018.

1   Q.   Okay.   Regardless of the date, do you recall that you were

2   under oath at that deposition?

3   A.   I sure was.

4   Q.   And you were asked questions by one of the plaintiff's

5   lawyers?

6   A.   Yes, I did.

7   Q.   And there was a court reporter there taking down all of the

8   questions and all of your answers; you remember that?

9   A.   Yes, ma'am.

10          MS. AMSTUTZ:  May I approach, Your Honor?

11          THE COURT:  You may.

12          MS. AMSTUTZ:  Let the record reflect that I have

13   provided a copy of Mr. Fogle's deposition transcript to both

14   the witness and opposing counsel.

15          THE WITNESS:  Thank you.

16   BY MS. AMSTUTZ:

17   Q.   Mr. Fogle, I am going to direct you to page 30, line 15

18   through 20 and I want you to read that to yourself and let me

19   know when you're done.

20   A.   You said 15 through 20, ma'am?

21   Q.   Yes, on page 30.

22       (Pause.)

23   A.   Okay.  It's been read.

24   Q.   Are you done?

25   A.   Yes, ma'am.

1  Q.  So after reading that portion of your deposition

2  transcript, do you remember that you asked Mr. Chang if your

3  understanding of some of the things that you saw in the abuse

4  system were correct?

5  A.  Yes, ma'am, that's what I said.

6  Q.  And in particular, you asked Mr. Chang if your

7  understanding was correct that the abuse system showed that

8  Grande received multiple requests or allegations against a

9  single user or IP address.  Do you remember that?

10  A.  Mr. Chang was over the website, he did not have much to do

11  with the abuse system.  My questions to him would have been

12  more about content and copyrighting.

13  Q.  Okay.  And my question is very specific about whether you

14  recall one particular topic that you asked him, okay.

15  A.  Okay.

16  Q.  So we're not looking at the transcript right now.  We may.

17  But my question is in particular do you recall asking Mr. Chang

18  if your understanding was correct that the abuse system showed

19  that Grande received multiple requests or allegations within a

20  single user or IP address?

21  A.  I don't recall asking him that.  He might have been cc'd on

22  the e-mail.  I don't recall asking him that, I don't think he'd

23  know.

24  Q.  I'm going to direct you to page 30, which you may still be

25  on of your deposition transcript, starting at line 21 through

1   page 31, at line nine.

2       *(Pause.)*

3   A.   Okay.

4   Q.   Does that refresh your recollection about the question you

5   asked Mr. Chang?

6   A.   Yes, ma'am, it does.

7   Q.   Okay.  So after reading your deposition testimony, you

8   recall that you asked Mr. Chang if your understanding was

9   correct that the abuse system showed that Grande received

10  multiple requests or allegations against a single user IP

11  address; is that correct?

12  A.   That looks like that's correct, yes, ma'am.

13  Q.   And you learned that that was, in fact, normal at Grande

14  for a single IP address to be the subject of more than one

15  complaint, didn't you?

16  A.   I believe at the time Roberto had limited knowledge and

17  that took me to Robert Creel in my discovery, but I did say

18  that, yes.

19  Q.   Okay.  So we're going to get to Mr. Creel.

20  A.   Understood.

21  Q.   But you learned from your conversations with Mr. Chang that

22  it was, in fact, normal at Grande for a single IP user to be

23  the subject of more than one complaint; isn't that correct?

24  A.   In essence, from what he knew that's what he conveyed.

25  Q.   And you learned that that was normal, right?

1    A.  I learned that it was something that -- he didn't say

2    normal or abnormal, he just kind of stated that that happens.

3    Q.  I didn't ask what Mr. Chang said.  What you took away from

4    that conversation was that it was normal at Grande for a single

5    IP user to have multiple complaints?

6              MR. BROPHY:  Your Honor, asked and answered.

7              MS. AMSTUTZ:  He hasn't answered it, Your Honor.

8              THE COURT:  Yeah, well, he kind of answered it.  You

9    can ask it again, but the last time.

10   BY MS. AMSTUTZ:

11   Q.  You learned that that fact was normal at Grande, correct?

12   A.  I learned that it happened and not that it was normal,

13   ma'am.

14   Q.  I'm going to direct you back to that same deposition

15   testimony, starting at page 30, line 21, going through page 31,

16   line nine.  Are you with me, Mr. Fogle?

17   A.  I sure am.

18   Q.  Okay.  The question -- I direct the Court to that passage.

19   The question was, What was your understanding --

20             MR. BROPHY:  Sorry, Your Honor.  I have to object.

21   This is not a proper impeachment testimony.

22             MS. AMSTUTZ:  I'm sorry, I directed him to the wrong

23   passage.

24   BY MS. AMSTUTZ:

25   Q.  Please go to page 30, lines 10 through 13.

1   A.   I'm there.

2   Q.   *"Question:  So a single IP address being the subject of*

3   *more than one --"*

4             MR. BROPHY:  Objection.  Which page are we on?

5             MS. AMSTUTZ:  Page 30, lines 10 through 13.

6   A.   Sorry, I was on the wrong page.

7   Q.   Sorry.  Is that the wrong one?  Sorry, page 31.  That was

8   my mistake.

9             MR. BROPHY:  Which line?

10             MS. AMSTUTZ:  Ten through 13.

11             MR. BROPHY:  Thank you.

12   A.   Okay.

13   Q.   Okay.  Are you with me?

14   A.   Yes, ma'am.

15   Q.   So question to you, Mr. Fogle, was: *"So a single IP address*

16   *being the subject of more than one complaint?"*  Your answer,

17   *"In essence, I did not know that at the time, I did find out*

18   *afterwards that it was normal."*

19   A.   Yes, ma'am.

20   Q.   Is that your testimony?

21   A.   Yes, ma'am.  If I could add to that a little bit of context

22   here.

23   Q.   No.  Was that your testimony?

24   A.   Yes, ma'am.

25   Q.   Okay.  Now, your work on this project continued into 2013.

1    Do you recall that?

2    A.  Yes, ma'am.

3    Q.  And you learned that Grande's abuse system was handling an

4    incoming deluge of e-mail notifications of copyright

5    infringement by its subscribers, right?

6    A.  Yes, ma'am.

7    Q.  And you learned that there were no limits, no limits on the

8    number of notices that Grande could receive about a particular

9    customer; isn't that correct?

10   A.  There were no limits in the software, that's correct.

11   Q.  Well, there were no limits at all, software, number; is

12   that correct?

13   A.  In the software, yes, that's where my focus is, a team of

14   developers that work in automation.

15   Q.  Let's look at an e-mail that you sent about this.

16           MS. AMSTUTZ:  Can we pull up Plaintiff's Exhibit 90

17   and display it to the witness but not the jury.

18   BY MS. AMSTUTZ:

19   Q.  Okay.  Mr. Fogle, do you see that Plaintiff's Exhibit 90 is

20   an e-mail from you to Roberto Chang and Robert Creel with

21   copies to Lars Christenson and Jimmy Quigley.  Do you see that?

22   A.  Yes, ma'am, I do.

23   Q.  And those were all Grande employees at the time, right?

24   A.  Yes.

25   Q.  And the subject of this e-mail is DMCA notices, right?

1  A.  Yes.

2  Q.  And it's dated April 11, 2013?

3  A.  That's the date, yes.

4  Q.  And Roberto Chang was in charge of the website, I think you

5  testified to that already?

6  A.  Uh-huh.

7  Q.  Is that a yes?

8  A.  Yes, ma'am.

9  Q.  And Robert Creel was in charge of the Call Center?

10  A.  Yes.

11  Q.  And what was Lars Christenson's position?

12  A.  Lars Christenson was a direct report of mine, developer,

13  who was loaned to the Internet systems team to work on the

14  DMCA/abuse app.

15  Q.  And what was Jimmy Quigley's position?

16  A.  Jimmy Quigley was a billing specialist.

17       MS. AMSTUTZ:  Your Honor, I move to admit Plaintiff's

18  Exhibit 90 as a party admission.

19       MR. BROPHY:  Your Honor, subject to our earlier

20  objections please.

21       MS. AMSTUTZ:  If we could publish Plaintiff's Exhibit

22  90 to the jury.

23  BY MS. AMSTUTZ:

24  Q.  Okay.  Looking at the first sentence of your e-mail,

25  Mr. Fogle, you state to Roberto and Robbie, *"We currently send*

1   *out DMCA notifications through mail for what we take in with*

2   *our abuse system."*

3        Was that true?

4   A.  That's what I discovered at the time, yes, ma'am.

5   Q.  Okay.  And you go on to say, *"However, there are no limits*

6   *here, we have customers that are up to their 54th notice."*

7        Did I read that correctly?

8   A.  You sure did.

9   Q.  And Mr. Fogle, you found that out that some of Grande's

10  customers were up to their 54th notice by looking at an

11  internal Grande web page and seeing that the same IP address or

12  customer record was listed multiple times, didn't you?

13  A.  Database, mostly.

14  Q.  Is that a yes?

15  A.  Yes.

16  Q.  And you learned that in 2013, Grande was not terminating

17  any customers based on those multiple complaints, correct?

18  A.  I do not know what Grande was terminating or not

19  terminating in 2013.

20  Q.  But you were aware at that time that other Internet service

21  providers, or ISPs, did have policies for terminating repeat

22  infringers?

23        MR. BROPHY:  Objection, calls for speculation, lack of

24  foundation.

25        MS. AMSTUTZ:  I'm asking whether he knew or not.

Richard Fogle - Examination                   1173

1          THE COURT:  She can lead.  The objection is overruled.

2   A.  Yes, ma'am, through Google sleuthing, mostly.

3   Q.  And even going back to Plaintiff's Exhibit 90, you wrote to

4   Mr. Chang and Mr. Creel, *"Understand that the DMCA law requires*

5   *us to expeditiously notify customers and we can't have*

6   *knowledge of the content being shared, but there is no three*

7   *strikes law or anything that we follow like some ISPs."*

8       Did I read your words correctly?

9   A.  You sure did.

10  Q.  And you learned that these other Internet service providers

11  had these sorts of policies from an article that you read about

12  the DMCA, right?

13  A.  Absolutely, yes, ma'am.

14  Q.  But Grande didn't have anything like that, did it?

15  A.  Not that I could find at the time, I was in the early

16  stages of discovery.

17  Q.  And instead you thought what Grande did have were users who

18  were racking up DMCA take-down requests and there was no

19  process for remedy in place; isn't that correct?

20  A.  I had some concerns, yes, ma'am, I didn't know the remedy

21  portion of it and that's why I was engaging Robbie Creel.

22  Q.  But you thought there were users who were racking up those

23  DMCA take-down requests and no way to remedy it at Grande,

24  right?

25  A.  Initially, yes, I had some concerns.

1  Q.  And you told that to your colleagues back in April of 2013,

2  didn't you?

3  A.  Sure did.

4  Q.  And you were concerned in April of 2013 that there was a

5  broken process in place at Grande, right?

6  A.  Well, I was stating that I wasn't sure what I was seeing,

7  but that was a concern, yes, we need to be in compliance.

8  Q.  Well, with regard to compliance, you were also concerned

9  that Grande was not in compliance with the law; isn't that

10  correct?

11  A.  Well, I was concerned that I didn't know what I was seeing.

12  Q.  Were you or were you not in April 2013 concerned that

13  Grande was not in compliance with the law?

14  A.  Well, at the time, I was concerned, I did have some

15  concerns about compliance, yes.

16  Q.  And these phrases "racking up," "broken process," and

17  "compliance with the law," those were your words back in April

18  of 2013, right?

19  A.  Yes, software requirements.

20          MS. AMSTUTZ:  Your Honor, move to strike everything

21  after "Yes."

22          THE COURT:  Yes, that's sustained.  You will

23  disregard.

24  BY MS. AMSTUTZ:

25  Q.  And you recall that in response to this e-mail that we've

1   been looking at, Plaintiff's Exhibit 90, you learned that at

2   one point prior to April of 2013, Grande was disconnecting

3   subscribers based on infringement notices, right?

4   A.  I do not know what Grande was doing specifically in 2013,

5   just high level.

6   Q.  Okay.  Well, let's look at another e-mail that you wrote

7   about that.

8   A.  Sure.

9   Q.  Or that you received about that.

10        MS. AMSTUTZ:  Can we pull up Plaintiff's Exhibit 91

11   and show it to the witness, but not the jury?

12   BY MS. AMSTUTZ:

13   Q.  Turning to the second page of Plaintiff's Exhibit 91 at the

14   bottom, do you see your original e-mail dated April 11, 2013

15   that we just looked at in Plaintiff's Exhibit 90?

16   A.  Yes, ma'am.

17   Q.  And then you see in the middle of page two a response from

18   Mr. Creel?

19   A.  Yes, ma'am.

20   Q.  And another response from Roberto Chang?

21   A.  Yes, ma'am.

22   Q.  And then turning to the first page of Plaintiff's Exhibit

23   91, there are additional e-mails among the three of you, right?

24   A.  Yes, ma'am.

25        MS. AMSTUTZ:  Your Honor, move to admit Plaintiff's

1   Exhibit 91 as a party admission.

2                MR. BROPHY:  Same objection.

3                THE COURT:  It will be received.

4                MS. AMSTUTZ:  Please publish it to the jury.

5   BY MS. AMSTUTZ:

6   Q.  Turning to page two of Plaintiff's Exhibit 91, as you just

7   confirmed, at the very bottom is that original e-mail that you

8   sent on April 11, 2013, correct?

9   A.  Yes.

10  Q.  And then in response, just above that, Mr. Creel states,

11  *"At one point we were disconnecting customer after X amounts,*

12  *but it was very manual, inefficient and varied."*  Right?

13  A.  That's what it says, ma'am, yes.

14  Q.  So you did learn about this same time that at one point

15  prior to April of 2013, Grande actually was terminating

16  customers based on these notices, correct?

17  A.  I don't know, I'm not Robbie.  I don't know what he meant

18  by that specifically.  We're talking about software

19  requirements for the app he wants to build.  I don't know the

20  details of that, ma'am.

21  Q.  That wasn't my question.  Robbie told you, on April 11th of

22  2013, that Grande previously did terminate subscribers from

23  those infringement notices, didn't he?

24  A.  He did.

25  Q.  And you didn't think Robbie was lying to you, did you?

1   A.  I would have no reason to think Robbie was lying to me, no,

2   ma'am.

3   Q.  And to that, Mr. Chang then responded or told y'all that he

4   had asked Legal if we need to do more and if they -- and he

5   references ABB -- had a policy in place.  Do you see that?

6   A.  I sure do.

7   Q.  And you knew that ABB was another Internet service provider

8   that was managing Grande at the time, right?

9   A.  Yes, ma'am.

10  Q.  And Mr. Chang then let all of y'all know that depending on

11  the answer from Legal, Grande was going to need to establish a

12  policy, publish that policy and enforce that policy, right?

13  A.  That's what he says, ma'am, yes.

14  Q.  And you didn't think Mr. Chang was lying to you either, did

15  you?

16  A.  No, I do not.

17  Q.  Going to the first page of Plaintiff's Exhibit 91,

18  Mr. Chang then sent another e-mail in this same string also on

19  April 11th of 2013, directly to you that *If Grande did nothing*

20  *more than send e-mails to its customers about DMCA notices,*

21  *then Grande might lose its safe harbor status.*"  Do you see

22  that?

23  A.  I sure do.

24  Q.  And you understood that safe harbor status was a reference

25  to the DMCA, right?

 1    A.  Yes, ma'am.

 2    Q.  And that it was a defense for ISPs under the DMCA?

 3          MR. BROPHY:  Objection, Your Honor, calls for a legal

 4    conclusion.

 5          MS. AMSTUTZ:  Your Honor, it goes to what he knew

 6    about the safe harbor, which he admitted he was familiar with

 7    it.

 8          THE COURT:  I think you need to rephrase your question

 9    because you are calling for him to make legal conclusion.  I

10    understand where you're going, I know where you're going,

11    you're entitled to do that, but you need to rephrase it.

12          MS. AMSTUTZ:  Okay.

13    BY MS. AMSTUTZ:

14    Q.  You understood back on April 11 of 2013, the importance of

15    safe harbor status under the DMCA, correct?

16    A.  At a very high level, yes, ma'am.

17    Q.  And you agreed with Mr. Chang's assessment at that time

18    that Grande would lose its safe harbor status if it didn't do

19    anything more than just send notices to customers, right?

20    A.  I understood what Roberto told me that his legal advice

21    was.

22    Q.  And you agreed with it?

23    A.  I took it as a requirement, yes, ma'am.

24    Q.  Well, that's a little bit different answer.  You agreed

25    with his assessment that if Grande did not do anything more

Richard Fogle - Examination                    1179

1    than send notices to its customers, it might lose its safe

2    harbor status; you agreed with that?

3    A.  Can I have some context to this, ma'am?

4    Q.  Either you did or you didn't.

5    A.  Yes, I agreed.

6    Q.  And after these e-mails that we've seen in Plaintiff's

7    Exhibit 90 and Plaintiff's Exhibit 91, you didn't learn

8    anything afterwards that gave you any comfort that Grande was

9    complying with the law, did you?

10   A.  Eventually my discovery ended and the project ended, so I

11   didn't complete my discovery, but I had some concerns, yes.

12   Q.  And my question is slightly different.

13   A.  Okay.

14   Q.  After April 11 of 2013, you did not learn anything that

15   gave you comfort that Grande was complying with the law, did

16   you?

17   A.  No.

18   Q.  Instead after raising concerns about whether Grande's

19   system was broken and whether it was complying with the law,

20   you were taken off that project, weren't you?

21   A.  Yes, ma'am.

22   Q.  Now, you've been -- or you were with Grande for more than

23   15 years, right?

24   A.  Yes, ma'am.

25   Q.  And you're aware that over the years Grande has had various

1   policies in place; is that fair?

2   A.  Yes, that's fair.

3   Q.  And one policy at Grande that's been pretty consistent is a

4   document retention policy; are you aware of that?

5   A.  I am aware of the document retention policy, yes.

6   Q.  And you would agree that part of Grande's document

7   retention policy is that the destruction of documents should

8   stop at the first notification of a lawsuit, you agree with

9   that, right?

10  A.  Yes, I do.

11  Q.  And that the destruction of documents should also stop in

12  anticipation of a lawsuit, right?

13  A.  No, I do not know that, ma'am.

14  Q.  Okay.  Do you know that under Grande's document retention

15  policy that the destruction of documents should stop at any

16  indication of impropriety?  Do you know that?

17  A.  I did not know that, ma'am.

18  Q.  Okay.  I'm going to direct you to your deposition testimony

19  starting at page 174, line 18 and going to page 175, line

20  eight.

21  A.  What line on 174, ma'am?

22  Q.  Line 18.

23     (Pause.)

24  A.  To what line, ma'am?

25  Q.  I'm sorry, line 15.  So 174, line 18 to 175, line 15.

1    A.   Thank you.

2         *(Pause.)*

3         Yes, ma'am, I do recall.

4    Q.   So I'll direct the Court's attention to the question.

5         *"Sir, we've been reviewing Grande's document retention*

6    *policy from before the merger; do you remember that?"*

7         *"Answer:  Yes."*

8         *"Question:  Would you look with me on page six?"*

9         *"Answer:  Yes."*

10        *"Question:  What the policy directs.  We've seen this, but*

11   *I just want to return and ask you some questions about it.  It*

12   *states, quote, document destruction should be ceased at the*

13   *first notification of a lawsuit, closed quote."*

14        *Your answer: "Yes."*

15        *"Question:  Quote, anticipation of suit, closed quote.*

16   *Right?"*

17        *Your answer:  "Yes."*

18        *"Question:  You would agree with me, then, I take it, that*

19   *if a Grande employee --" I'm sorry.*

20        *"Question:  Quote, or any indication of impropriety, closed*

21   *quote."*

22        *"Answer:  Yes."*

23        And the whole time that you worked at Grande, you were

24   required to comply with Grande's document retention policy,

25   correct?

1   A.  Yes, ma'am.

2   Q.  And that policy applied to all Grande employees, didn't it?

3   A.  It did.

4   Q.  And you would agree with me that if a Grande employee

5   knowingly destroyed documents after the anticipation of a

6   lawsuit, that would be a violation of Grande's record retention

7   policy?

8   A.  I would agree, yes, ma'am.

9   Q.  Or in anticipation of a lawsuit, right?

10  A.  We call it legal hold, so if someone comes over to us, if I

11  could explain some context, we call it legal hold.

12  Q.  Just answer my question.  I'm substituting words in my

13  former question.  You would agree with me that if an employee

14  knowingly destroyed documents after anticipation of a lawsuit,

15  that would be a violation of the record retention policy?

16  A.  Yes.

17  Q.  Or any indication of impropriety, correct?

18  A.  Yes.

19  Q.  And if the Grande employee did that, that would just be

20  wrong, correct?

21  A.  That would be in violation of our policies and wrong.

22  Q.  Okay.  Mr. Fogle, I'm going to jump ahead and talk about

23  what was going on in 2016, okay?

24  A.  Sure.

25  Q.  In 2016 you learned about a lawsuit for copyright

1    infringement against another Internet service provider called
2    Cox, right?
3    A.  Yes, I did.
4           MS. AMSTUTZ:  Can we pull up for the witness, but not
5    the jury, Plaintiff's Exhibit 206.
6    BY MS. AMSTUTZ:
7    Q.  Can you see that, Mr. Fogle?
8    A.  Sure can.
9    Q.  And Exhibit 206 is an e-mail that you wrote to your
10   colleague, William Davis; is that right?
11          MR. BROPHY:  Your Honor, I'm sorry to interrupt, but
12   may we have a sidebar for a moment please?
13          THE COURT:  Well, we're going to take a recess now
14   anyway, so let's just take our morning recess.  You may be
15   excused, ladies and gentlemen.
16          COURT SECURITY OFFICER:  All rise for the jury.
17          *(10:43 a.m., the jury exits the courtroom.)*
18                         *   *   *
19          THE COURT:  Please be seated.  He can step outside.
20          THE WITNESS:  Okay.
21          MS. AMSTUTZ:  Your Honor, may I provide you with a
22   copy of the exhibit that he's going to be --
23          THE COURT:  Sure.  Yes, ma'am.  What is that you're
24   attempting to ask him about?
25          MS. AMSTUTZ:  This is an e-mail from Mr. Fogle, the

1   witness, to a colleague at RCN which was a sister company owned

2   by the same parent company.  They shared management services,

3   they shared a Legal Department in 2016 regarding the DMCA.  And

4   we're going to offer this and ask Mr. Fogle some questions

5   about it.  It is not hearsay, it's a party admission.  In the

6   alternative, it's a business record.  I'm just foreshadowing

7   his objections.

8           THE COURT:  It's his e-mail, right?

9           MS. AMSTUTZ:  It's his e-mail to a colleague at a

10  sister company about the DMCA, it's relevant and not hearsay.

11          THE COURT:  Go ahead, sir.

12          MR. BROPHY:  Your Honor, our concern is that we're

13  again delving into the Cox litigation.  We understand from your

14  earlier ruling that --

15          THE COURT:  I've already made a ruling on this, but I

16  do think this again requires me to remind the jury that the

17  outcome of the Cox litigation has essentially nothing to do

18  with this other than for a state of mind purpose.  That's it.

19          MR. BROPHY:  May I make one point please, Your Honor?

20          THE COURT:  Sure.

21          MR. BROPHY:  The concern that I have is the connective

22  tissue that's going to be created here.  We have -- they're

23  going to introduce this document and talk about them being

24  nailed for e-mails and try to tie that back to the e-mails that

25  the jury has seen in this case.  There is a particularly

1   inflammatory e-mail in the Cox case that I'm not going to

2   repeat the language of in the courtroom, but some of the --

3   this e-mail and one that I anticipate coming up next both

4   relate to that inflammatory e-mail and Mr. Fogle's belief that

5   that e-mail was essentially what got Cox in trouble.  And

6   during deposition and I suspect we're going to see it again

7   during trial, there are going to be parallels drawn or attempt

8   to be drawn.

9           THE COURT:  When you say inflammatory, who is the

10  inflammatory e-mail?  Between two Cox people?

11          MR. BROPHY:  Yes, Your Honor.

12          THE COURT:  It's not coming in in this case.

13          MS. AMSTUTZ:  And we're not trying to.  We're not

14  trying to do that.

15          THE COURT:  I wouldn't allow that, that ain't coming

16  in here.

17          MR. BROPHY:  I just -- my position on this just to

18  preserve the record is I understand Your Honor's ruling to be

19  that they get to bring in the result in Cox to address their

20  state of mind, but now they want to talk about why the result

21  occurred in Cox.  We're not just talking about the existence of

22  it, but why.

23          *"I was thinking that Cox was nailed on DMCA because*

24  *they had evidence from subpoenaed corporate e-mail."*

25          THE COURT:  *"This is making me think on Grande's*

1  *e-mail retention policy in more liability terms."*

2          MR. BROPHY:  There is an entire side narrative here

3  about the allegation that Mr. Fogle either deleted himself or

4  instructed other people to delete e-mails.  We've already

5  started down this path by talking about the document retention

6  policy.  So they're going to use the e-mails that Mr. Fogle

7  identified earlier relating to the concerns he had about the

8  DMCA safe harbor to suggest that that was an impropriety and

9  then suggest that he had an obligation to retain records and

10  then suggest that he deleted records and suggest that that all

11  ties together to the Cox litigation.  That's what's --

12          MS. AMSTUTZ:  Your Honor.

13          THE COURT:  I don't think that's where they're going.

14  But if that's where they're going, they're not going there.

15          MR. BROPHY:  That's where they went in the

16  depositions, Your Honor, directly.

17          THE COURT:  Those were discovery depositions.

18          MS. AMSTUTZ:  Your Honor, this is yet another motion

19  for reconsideration of your ruling that we can use the Cox

20  verdict to show the effect of the state of mind on Grande

21  afterwards and any change in conduct that that verdict may have

22  had.  It goes to knowledge, it goes to willfulness, that's

23  where we're using it for.  We're not going to quote any

24  evidence from the Cox case.  It's just what was the impact of

25  that on Grande employees and what did they do in the wake of

1    it.  That's it.

2         MR. BROPHY:  They already have the evidence of the Cox

3    decision.  There's e-mails of our employees reacting to that

4    Cox decision.  Why do we need to keep beating it to death with

5    documents like this that are highly prejudicial to my client?

6         MS. AMSTUTZ:  Your Honor, why can't we make our record

7    about what actually happened in the wake of the Cox decision,

8    at Grande?  We're not bringing up the same documents with every

9    witness.

10         THE COURT:  There is a point where this evidence

11   becomes more prejudicial than it is probative.  I don't think

12   this e-mail is there yet, but we're getting close.  I only

13   allowed the Cox litigation result to come in and actually not

14   even the result, I didn't allow the dollar amount to come in,

15   just that there was -- did the dollar amount come in?

16         MR. BART:  No.

17         THE COURT:  I refused to allow that to come in.  Only

18   for the purpose of their state of mind because we do have this

19   kind of unusual liability potential on willful blindness plus

20   you do have a burden of proving that they knew what they were

21   doing.

22         MS. AMSTUTZ:  Exactly.

23         THE COURT:  So that's fine.  And I have allowed that

24   to a degree with a very strong curative instruction that

25   counsel participated in.  I will allow this, but I don't want

 1  us to keep going down this road because at some point we are

 2  getting to where I think it is more prejudicial than it is

 3  probative because the jury has already heard that, I don't want

 4  the jury to be left with the impression that the Cox litigation

 5  was just the stalking horse for this one.  Here we are, same

 6  result is just fine.  And that is not the way we try these

 7  cases.  Each one is tried on their own merits.

 8           MR. BART:  Your Honor, I think you'll hear as we go

 9  down the road that there won't be references to Cox, only to

10  Grande's own behavior.

11           THE COURT:  This one certainly refers to Cox.

12           MR. BART:  Well, it does and it's the lead into

13  Grande's behavior and that's why.

14           THE COURT:  That's fine.  I said I would allow it.

15  I'm going to overrule the objection.  I think counsel was

16  anticipating that you were going to get into this highly

17  whatever it is.  I haven't seen it, this highly inflammatory

18  e-mail that's between two Cox employees and you're not going to

19  do that.

20           MR. BART:  Absolutely not.

21           MS. AMSTUTZ:  I've never even seen that e-mail.

22           THE COURT:  You haven't seen it?  Well, neither have

23  I.

24           MR. BART:  I've seen it, but we're not going there.

25           THE COURT:  I'd like to see it.  I want to satisfy my

1   prurient interest, as Justice Brennan once said.

2          MR. BROPHY:  Your Honor, it may be helpful to avoid

3   another disruption during the direct examination to talk about

4   Exhibit 207, which is the next one in the series.

5          THE COURT:  What is 207?

6          MR. BROPHY:  I'm not sure.  I don't know if you plan

7   on using that, but we have a similar objection to this as well,

8   Your Honor.

9          THE COURT:  All right.  Let's see it.

10         MS. AMSTUTZ:  And Your Honor --

11         THE COURT:  This has got a whole bunch of links.

12         MS. AMSTUTZ:  Your Honor, just to be clear, there is a

13  link that references the 25 million verdict.  That has been

14  redacted in the copy that is now in JERS.

15         THE COURT:  They're not going to be able to search

16  down these links.  I'm not giving them a computer to go search

17  these links.

18         MS. AMSTUTZ:  No, I'm not going to ask them to do that

19  or ask anybody to do that, but I just want to let you know that

20  that has been redacted.

21         THE COURT:  Let me read the e-mail.  I've never seen

22  this one before.

23         (Pause.)

24         Here we go with Cox again.  You redact out the Cox

25  part of it.  No more Cox.  This is all stuff Cox did and -- no.

1   This is far more prejudicial than it is probative.  The last

2   sentence, the last sentence is okay.  Redact out that, *"The key*

3   *to Rightscorp winning in the judgment is Cox e-mail."*  No,

4   that's the inflammatory e-mail which we're not going to

5   introduce in this case.

6           MS. AMSTUTZ:  No, just kept e-mails in general, Your

7   Honor, we're not talking about one particular e-mail.

8           THE COURT:  That's not what it says.  It says, *"The*

9   *key to Rightscorp winning the judgment is Cox kept e-mail that*

10  *was subpoenaed."*  And obviously what he's showing is, what he's

11  referring to is this flaming e-mail, whatever it is.

12          MS. AMSTUTZ:  No, it's not.  He's referring to the

13  fact that they kept e-mail that was subpoenaed showing that

14  they told people to destroy documents.  That's not the

15  inflammatory e-mail that Mr. Brophy is referring to, I assure

16  you.

17          MR. BROPHY:  Your Honor, that is not true.  This

18  reference is to the e-mail that told support staff at Cox not

19  to kick out DMCA offenders, thus placing the safe harbor in

20  jeopardy.  That is the inflammatory e-mail and we're talking

21  about Cox again.

22          THE COURT:  Okay.  As I told you before, sometimes I

23  have to fish or cut bait, right, as my former partner Peter

24  Wheelon used to say.  He's a pretty smart guy, became general

25  counsel of a big bank.  This sentence is out.

1          MS. AMSTUTZ:  Your Honor, my colleagues can correct me

2    if I'm wrong, but I think this will be the last reference to

3    Cox with any of these witnesses.

4          THE COURT:  No, no.  The sentence is out.  I have just

5    ruled.  Now, I have been told I am one of the most patient

6    judges in the federal judiciary, but I may just lose my

7    patience here.  I've ruled, okay.  When you rule, you rule.

8          MS. AMSTUTZ:  Is the remainder of PX 207 --

9          THE COURT:  Yes, I'm going to sustain the objection as

10   to the Cox sentence.  The remainder of the e-mail is okay.  I'm

11   going to overrule the objection as to the remainder.  And it

12   seems to me, I mean, there is some damaging material here.  He

13   goes on, he says, *"We were just lax in enforcing it."*  That

14   seems to me like it's pretty damaging.

15         MR. BART:  It's removed the reason here, that

16   basically what they're talking about is that Cox didn't enforce

17   their e-mail retention policy, they were subpoenaed for all of

18   the documents and there was evidence of their bad faith in that

19   case.  It's not a reference to any specific e-mail.  And read

20   in context, I think it's very clear.  And that's why the last

21   paragraph refers to document retention policies.  We're not

22   talking about specific e-mails.  They're saying in Cox they

23   allowed, they kept all of their e-mails, they were all

24   subpoenaed and that was powerful evidence.  We need to look at

25   that here and as Mr. Fogle said --

1        THE COURT:  You have other evidence in that does

2    essentially the same thing and I think we're getting to the

3    point where there's too much Cox litigation here.  This is

4    referring to things that Cox did or didn't do, you already have

5    it in in other ways.  I've already ruled.

6        MR. BART:  I understand, Your Honor.

7        THE COURT:  I'm not going to change my ruling.  I'm

8    not a hard head, but I think I'm right and if I think I'm

9    right, then I will stick with it, I will not be talked out of

10    it.  I've been talked out of things.

11        You know, I am going to write a letter to the

12    partnership at Jenner & Block and tell them from now on you

13    need to be referred to as The Great Clarifier.  You have been

14    very successful with me.

15        MR. BART:  You want me to say that flattery will get

16    me to shut up and sit down.  Who am I to argue with that?  I

17    respect your ruling obviously, Your Honor, I do disagree.

18        THE COURT:  Of course you do, that's fine.  When I was

19    a trial lawyer, I didn't agree with every ruling.  There are

20    many rulings I didn't agree with, with some very fine judges

21    and that's the name of the game.

22        MR. BART:  Understood.  It's not the first one.  I do

23    think in context --

24        THE COURT:  You've been more successful than not, so

25    that's why I'm giving you your new title.

1          MR. BROPHY:  Your Honor, at the risk of wrestling that

2    title away from him, I'm going to ask for one point of

3    clarification, if I may.

4          THE COURT:  Here we go.

5          MR. BROPHY:  The links refer to the Cox case, the

6    links refer to Cox losing its DMCA safe harbor.

7          THE COURT:  I don't care what the links do.  The links

8    aren't going anywhere.

9          MR. BROPHY:  The links have text within them, if you

10   can read.

11         THE COURT:  I think we probably ought to take the

12   links out.  That's more confusing than anything.  Redact the

13   links.

14         MS. AMSTUTZ:  The reason this is relevant is because

15   this particular employee that was being directed to delete

16   e-mails was thinking it was just about the retention policy.

17         THE COURT:  Here is what is going to happen, the jury

18   is going to get this and then when they go to deliberate

19   they're going to say, *Well, we want to look at these links.*

20   No.  We're not looking at the links.

21         MR. BART:  Actually, Your Honor, the middle paragraph

22   is far more important to us than the links are.

23         THE COURT:  So take out the links, take out that one

24   paragraph that I've said to take out and the rest of it you can

25   query them about.  That is a fair result here.  You have the

 1   same information in which I have allowed over objection.  I

 2   mean, they've been standing up all day yesterday and half the

 3   day today -- half the day of half the day -- and objecting to

 4   the things that I've allowed in with respect to this topic.  So

 5   you're doing much better on this than you're not, okay, but

 6   there comes a point where that's why 403 is there.  That's what

 7   the trial judge's job is, is to say at some point we're

 8   overdoing it.  We're starting to try a different lawsuit.  I

 9   know what your purported purpose is and I agree with it, you

10   have every right to do that, but their concern is that what the

11   jury is going to do is suddenly start to see the Cox litigation

12   as having some serious impact on this litigation, which it does

13   not have any impact on this litigation other than for the

14   important role that it plays -- and I think you have every

15   right to get into it -- on their knowledge of what was going on

16   in the industry in which they operated and they weren't just

17   off somewhere and they had no idea and they didn't know what to

18   do.  Okay?

19          MS. AMSTUTZ:  Understood.  Thank you, Judge.

20          THE COURT:  Thank you.  Let's take a short recess, you

21   can use the restroom.

22          *(11:01 a.m.)*

23                          *   *   *

24          *(11:18 a.m.)*

25          COURT SECURITY OFFICER:  All rise.

```
1            THE COURT:  Please be seated.  You can bring in the
2   jury.
3            COURT SECURITY OFFICER:  All rise for the jury.
4                          *   *   *
5            THE COURT:  Please be seated.  All right, counsel, you
6   can continue.
7            MS. AMSTUTZ:  Thank you, Your Honor.
8   BY MS. AMSTUTZ:
9   Q.  Mr. Fogle, when we took a break, we had fast-forwarded to
10  2016; do you recall that?
11  A.  I believe so, ma'am.
12  Q.  And I was showing to you, but not the jury, Plaintiff's
13  Exhibit 206.  Can we pull that back up for Mr. Fogle?
14  A.  Thank you.
15  Q.  And just to get us back on track, Plaintiff's Exhibit 206
16  is an e-mail from you to William Davis, correct?
17  A.  That's correct.
18  Q.  And Mr. Davis was a colleague of yours at Grande's sister
19  company RCN, right?
20  A.  Yes, ma'am.
21  Q.  And the subject of the e-mail was DMCA, correct?
22  A.  That's correct.
23  Q.  Dated August 23rd of 2016?
24  A.  Correct.
25            MS. AMSTUTZ:  I move to admit Plaintiff's Exhibit 206
```

1   as a party admission.

2          THE COURT:  It will be received.

3          MS. AMSTUTZ:  If we could publish it to the jury

4   please?

5          THE COURT:  Yes.

6   BY MS. AMSTUTZ:

7   Q.  So on August 23rd of 2016, you wrote to Mr. Davis and you

8   say, *"I was thinking that Cox was nailed on DMCA."*

9       Is that correct?

10  A.  That's what I wrote, ma'am, yes.

11  Q.  And just to be clear, you were referring to the BMG versus

12  Cox lawsuit, correct?

13  A.  I'm not sure how many lawsuits Cox or BMG was involved in,

14  ma'am.

15  Q.  Okay.  You just referred to it as the Cox lawsuit?

16  A.  Yes, ma'am.

17  Q.  And when you said that Cox was nailed on DMCA, you were --

18  you meant that Cox lost that lawsuit; is that right?

19  A.  I believe so, ma'am, yes.

20  Q.  And going back to the e-mail Plaintiff's Exhibit 206, after

21  stating that you add, *"Because they had evidence from

22  subpoenaed corporate e-mail/call recordings."*

23      Did I read that correctly?

24  A.  You sure did.

25  Q.  And isn't it true, Mr. Fogle, that you go on to tell

Richard Fogle - Examination                1197

1    Mr. Davis that it made you think about Grande's e-mail

2    retention policy in more liability terms, isn't that what you

3    say in your e-mail?

4    A.  Well, there's some context around that, ma'am, if I could

5    expand on that.

6    Q.  No, you can do that with your counsel when they get up here

7    to ask you questions.  But my question is, in this e-mail

8    that's been admitted as Plaintiff's Exhibit 206, you go on to

9    explain to Mr. Davis that that fact made you think about

10   Grande's e-mail retention policy in more liability terms; isn't

11   that right?

12   A.  That's what I wrote, ma'am.

13   Q.  And that's what you believed, right?

14   A.  Yes.

15   Q.  And the liability terms that you were thinking of were in

16   terms of Grande's legal liabilities, correct?

17   A.  I don't recall -- yes, I would have to say yes.

18   Q.  And isn't it true that after you sent this e-mail to

19   Mr. Davis on August 23rd of 2016, you began contacting certain

20   Grande employees about cleaning up their e-mail boxes; is that

21   right?

22   A.  Yes, ma'am.

23   Q.  And one of those employees was Paul Morgan; is that right?

24   A.  That's correct, ma'am.

25   Q.  And Mr. Morgan was a sales representative for enterprise

Richard Fogle - Examination                    1198

1  customers.  And just to remind the jury, and you can confirm,
2  those are the larger business customers of Grande, right?
3  A.  I know that he was in sales, ma'am, but yes, enterprise is
4  larger business customers, some networks.
5  Q.  You also know that Mr. Morgan was known as someone who
6  refused to delete any e-mails or clean up his e-mail in box; is
7  that right?
8  A.  Yes, ma'am.
9  Q.  And in September of 2016, you followed up with Mr. Morgan
10 because he wasn't deleting his e-mails, right?
11 A.  He was not complying with our retention policy, correct.
12 Q.  And he wasn't deleting his e-mails, right?
13 A.  Correct.
14 Q.  And when you followed up with him in September of 2016, you
15 sent him some information about the Cox case as why you were
16 contacting him about deleting his e-mails; is that fair?
17 A.  I believe so, yes, ma'am.
18 Q.  And you knew that Grande had e-mails -- and at that time in
19 September of 2016, you knew that Grande had e-mails like the
20 one you wrote in Plaintiff's Exhibit 90 saying that you have
21 customers racking up DMCA notices and no process to remedy it,
22 right?
23 A.  I'm sorry, ma'am, are you asking if I knew there were other
24 e-mails with that phrase in it?  I'm trying to understand your
25 question.

1  Q.  No, you knew there were e-mails within Grande like the one

2  that you wrote in PX 90 saying that customers are racking up

3  DMCA notices and no process to remedy it, right?

4            MR. BROPHY:  Objection.  Foundation.

5            THE COURT:  Overruled.

6  A.  No, ma'am, I don't have access to look at other people's

7  e-mail.

8  Q.  That wasn't my question.  You knew there was at least one

9  e-mail at Grande admitting that customers were racking up DMCA

10  notices and no process to remedy it because you wrote it,

11  right?

12  A.  That would be a yes, yes, ma'am.

13            MS. AMSTUTZ:  I have no further questions, Your Honor.

14  I pass the witness.

15            THE COURT:  Okay.  Counsel.

16                      EXAMINATION

17  BY MR. BROPHY:

18  Q.  Mr. Fogle, hello.

19  A.  Good morning, sir.

20  Q.  Just a little bit here.  What were your responsibilities at

21  Grande in the 2015 to 2016 time period?

22  A.  2015, 2016 time period I was -- we did a rework and I

23  inherited the mail systems and the portion of IT that's closer

24  to the users, like the tech support that we see in TV shows.

25  Q.  Not sure I watch too many TV shows about tech support, but

1  okay.

2     When you say you overtook the mail servers, what do you

3  mean by those were your responsibilities?

4  A.  My responsibilities was enforcing policy, managing

5  employees and provide direction and budgeting.

6  Q.  What kinds of policies were you in charge of enforcing with

7  respect to the e-mail servers?

8  A.  Retention.

9  Q.  What does that mean for the jury's understanding?

10  A.  Well, everyone can't keep everything forever.  Eventually

11  your storage runs out and the same thing in a corporation, so

12  anything over a certain amount of time, we need to let it go so

13  we can keep our systems running efficiently.

14  Q.  Was it ever your job to develop Grande's policies for

15  handling accusations of music sharing at Grande?

16  A.  No, sir.

17  Q.  Are you a lawyer?

18  A.  I am not, sir.

19  Q.  Lucky you.  Do you know anything about the copyright law?

20  A.  I do not.

21  Q.  I'd like to put up Exhibit 207 please, Plaintiff's 207.

22       MS. AMSTUTZ:  207?

23       MR. BROPHY:  Sorry, excuse me, 206, 206.  Thank you.

24  BY MR. BROPHY:

25  Q.  Who is Mr. Davis?

Richard Fogle - Examination                    1201

1   A.  Mr. Davis is currently my boss, but at the time of this

2   e-mail, he was my counterpart at RCN, the sister company.

3   Q.  Then why were you sending this e-mail to Mr. Davis?

4   A.  Because I had a call with him earlier on that I was having

5   challenges with having our users comply with the seven-year

6   law.  I can't just write an e-mail and everyone does what I

7   say, so in corporate life it doesn't work that way, so I was

8   soliciting Mr. Davis's advice on how to handle that.

9   Q.  During the direct examination by my colleague, there was

10  reference to the second sentence in this e-mail, *"This is*

11  *making me think on Grande's e-mail retention..."*

12      You wanted to clarify your position on that.  Would you

13  mind sharing your thoughts on that?

14  A.  The reason why we had that is if I go out to a group of

15  people and I say *I need you to change the way you're working,*

16  it's me personally saying that.  How do we -- or I could point

17  to a policy and not everyone's favorite thing, not everyone

18  reads them.  What are some other business drivers that are not

19  me personally that I could use to help convince someone to fall

20  in line with the policy?

21  Q.  And do you recall what the e-mail retention policy was,

22  roughly speaking, at Grande during this time period?

23  A.  That would be seven years.

24  Q.  So seven years back in time?

25  A.  Yes, sir.

Richard Fogle - Examination                    1202

1    Q.  If you would enforce the policy the day you sent this

2    e-mail, August 23rd, 2016, can you do the math, how far back

3    would you keep e-mails?

4    A.  About 2009.

5    Q.   2009?

6    A.  Yes, sir.

7    Q.  Did Grande end up enforcing its seven-year e-mail policy?

8    A.  Eventually, yes, sir.

9    Q.  When did it first put that enforcement into effect?

10   A.  We had to buy a new e-mail archiver which stands outside of

11   the mail system and intercepts everything outside of the

12   user's -- when you go into Outlook and you delete e-mails, we

13   still have it because we intercepted on the transport.  That

14   device was failing because of lack of storage because we

15   weren't enforcing our policies at the time.  So we got another

16   machine and a bigger one and then we migrated from the old to

17   the new and did the truncation of e-mail or we enforced the

18   seven years, I believe late November to early December 2017.

19   Q.  And how long back as a result of that did Grande keep its

20   e-mails?

21   A.  I believe 2010, sir.

22   Q.  2010?

23   A.  2009/2010 timeframe.

24   Q.  So we go from November or December of 2017 back seven

25   years, right?

1    A.   Uh-huh.

2             MS. AMSTUTZ:  Objection, leading.

3             MR. BROPHY:  I think he already answered the question.

4             THE COURT:  Yeah.

5    BY MR. BROPHY:

6    Q.   In your role at the company, did you have the ability to

7    see other people's e-mail?

8    A.   I did not.

9    Q.   In 2015?

10   A.   I did not at all.

11   Q.   In 2016?

12   A.   No, sir.

13   Q.   Ever?

14   A.   No, sir.

15   Q.   Have you ever had the ability to selectively delete other

16   employees' e-mails?

17   A.   No, sir.

18   Q.   Let's put up Exhibit 90 please.  Let's blow up the top for

19   Mr. Fogle.  This is an e-mail you sent, right?

20   A.   Yes, sir.

21   Q.   You didn't delete this e-mail, did you?

22            MS. AMSTUTZ:  Objection, leading.

23            MR. BROPHY:  I'll change the question.

24   BY MR. BROPHY:

25   Q.   Did you delete this e-mail?

Richard Fogle - Examination                    1204

1    A.   I did not.

2    Q.   Do you wish you would have deleted this e-mail?

3    A.   No.  Kind of thinking about it, I would have violated my

4    policies.

5    Q.   Let's go to 91 please and blow up the top.

6         This is your e-mail, right?

7    A.   Yes, sir.

8    Q.   Did you delete this e-mail?

9    A.   I did not.

10   Q.   Let's go to 206.  Blow up the top.

11        This is your e-mail, right?

12   A.   Yes, sir.

13   Q.   Did you delete this e-mail?

14   A.   I did not.

15   Q.   Have you deleted any of your e-mails relating to music

16   sharing or DMCA or Cox lawsuit at any time?

17   A.   No, sir.

18   Q.   During your testimony, there was some questions asked about

19   a project that you were put on in I think it was 2015 or maybe

20   2013, I don't remember, to take a look at Grande's policies for

21   processing e-mails accusing people of music sharing.  Do you

22   recall that?

23   A.   I believe so, yes.

24   Q.   What year was that in?

25   A.   I thought it was 2012, 2013.

1    Q.  You mentioned that you were pulled off that project.  Do
2    you recall that?
3    A.  Yes, sir.
4    Q.  What happened to that project?
5    A.  They -- when I say "they", the project team decided to go
6    with what Atlantic broadband had to try to consolidate the
7    process and use CSG.
8    Q.  What is CSG?
9    A.  CSG is a billing system.
10   Q.  So to make sure the jury understands, would you explain how
11   that worked, why your project was canceled and CSG was brought
12   in?
13   A.  I guess it was go with what you know or what your sister
14   company is doing, try to be more efficient and save on cost.
15   And my group was also responsible for rolling out new products
16   and hoping our company would be more competitive.  So it was a
17   dual role, so they pulled me off and go back to my full plate.
18   Q.  Were you taken off the project or was the project
19   outsourced?
20   A.  It was outsourced.
21   Q.  So it wasn't just you taken off the project, was everyone
22   else taken off the project?
23   A.  Except for the people who had to help the outsourcer, but
24   pretty much.
25   Q.  I want to step back.  Do you, Mr. Fogle, want peer-to-peer

 1  file sharing on Grande's network?

 2  A.  Sorry, repeat the question, sir.

 3  Q.  Do you want peer-to-peer file sharing on Grande's network?

 4          MS. AMSTUTZ:  Objection, beyond the scope.

 5          MR. BROPHY:  Your Honor, they asked questions about

 6  him deleting e-mails.

 7          MS. AMSTUTZ:  We never asked any questions about peer

 8  to peer.

 9          MR. BROPHY:  That's what the whole case is about, Your

10  Honor.

11          THE COURT:  The objection is overruled.

12  BY MR. BROPHY:

13  Q.  Do you want peer-to-peer file sharing on Grande's network?

14  A.  I guess it would be easier if we didn't have it, but it's

15  just a protocol, so I would say yes.

16  Q.  Do you want illegal music sharing on Grande's network?

17  A.  We absolutely do not.

18  Q.  Did you ever encourage anyone else to share music files

19  illegally on Grande's network?

20  A.  No, sir.

21  Q.  Did you ever intend to facilitate music sharing on Grande's

22  network?

23  A.  No, sir.

24  Q.  Did you ever have any way to investigate allegations of

25  music sharing on Grande's network?

```
 1   A.   No, sir.
 2            MR. BROPHY:  That's all I have, Your Honor.  Thank
 3   you.
 4            THE COURT:  Anything else?
 5            MS. AMSTUTZ:  No, Your Honor.  No further questions.
 6            THE COURT:  Do we have time to squeeze in some
 7   testimony?  What do you think?
 8            MS. AMSTUTZ:  Your Honor, we could probably get
 9   through most of my direct, some of my direct.  I'm not sure we
10   could get completely through with the witness entirely.
11            THE COURT:  The question is do you want to do that?
12   You're going to be breaking for --
13            MS. AMSTUTZ:  Sure.
14            THE COURT:  Okay.  Call the witness.
15            MS. AMSTUTZ:  Plaintiffs call Matt Rohre, R-O-H-R-E.
16   May I have a minute, Your Honor?
17            THE COURT:  Of course, no problem.  No problem.
18            COURTROOM DEPUTY CLERK:  Please raise your right hand.
19   You do solemnly swear that the testimony you're about to give
20   in this case now before the Court will be the truth, the whole
21   truth and nothing but the truth, so help you God?
22            THE WITNESS:  I do.
23                           *   *   *
24                   (MATT ROHRE, Witness, Sworn.)
25                           *   *   *
```

1          COURTROOM DEPUTY CLERK:  You can have a seat, sir.

2                           EXAMINATION

3    BY MS. AMSTUTZ:

4    Q.   Good morning.

5    A.   Good morning.

6    Q.   Can you please introduce -- well, let me ask, what's your

7    name?

8    A.   My name is Matt Rohre.

9    Q.   Can you spell your last name for the record?

10   A.   R-O-H-R-E.

11   Q.   And Mr. Rohre, you've been with Grande since 2002, correct?

12   A.   Yes, ma'am, that's correct.

13   Q.   And when you first joined Grande, your title was director

14   of field operations for its Austin and San Marcos markets,

15   right?

16   A.   Yes, ma'am.

17   Q.   And then you moved into management around October of 2004?

18   A.   Yes, ma'am, that's correct.

19   Q.   And then is it fair to say you moved up the ranks through

20   management working in various positions within the company?

21   A.   Yes, ma'am.

22   Q.   And then in 2015 you were promoted to senior vice president

23   and general manager of Grande, right?

24   A.   Yes, ma'am, that is correct.

25   Q.   And in that role you oversaw all of the Texas markets;

1    isn't that correct?

2    A.  Yes, that is correct.

3    Q.  And in fact, as senior vice president of operations and

4    general manager, you were the highest ranking executive at

5    Grande in the State of Texas?

6    A.  Yes, ma'am, that is correct.

7    Q.  In May of 2018, isn't it true that you left your position

8    as the highest ranking executive at Grande in Texas; is that

9    right?

10   A.  Yes, ma'am, that is correct.

11   Q.  And you became senior vice president of operations for

12   another ISP called Wave Broadband, is that right?

13   A.  I actually was working for our corporate office and

14   transitioning that market.  That was a merger that we did.  We

15   subsequently hired senior vice presidents and general managers

16   and that's what I do now is manage our mergers and

17   acquisitions.

18   Q.  Okay, but as of May of 2018, you were no longer with Grande

19   Communications, right?

20   A.  That's correct.  I was commuting to Seattle every single

21   week.

22   Q.  So Mr. Rohre, unless I specify otherwise, my questions are

23   going to be confined to the time period up until May of 2018

24   when you were actually with Grande Communications.  Do you

25   understand that?

1    A.  Yes, ma'am, I do.

2           THE COURT:  I'm a little confused.  Let's make sure

3    that the jury isn't.  You're with Wave Communications now?

4           THE WITNESS:  No, sir, I'm with Astound Broadband

5    which is a parent company of Grande Communications, one of our

6    brands.  Grande is one of the brands.

7           THE COURT:  So you never really left the Grande

8    family.  Is that correct?

9           THE WITNESS:  That's correct.  I haven't changed

10   companies.  It's all the same company.

11          THE COURT:  Okay.  That's what I wanted to make clear.

12          MS. AMSTUTZ:  Thank you for clarifying, Judge.

13   BY MS. AMSTUTZ:

14   Q.  At that time in May of 2018, Grande's customers included

15   residential customers, small business customers and enterprise

16   customers, which are the larger business customers; is that a

17   fair summary?

18   A.  Yes, ma'am, that's a fair summary.

19   Q.  And back in 2018, the business customers, so I'm talking

20   about both the small businesses and the enterprise businesses,

21   those comprised less than 10 percent of Grande's total

22   customers; is that correct?

23   A.  Yes, ma'am, that would be correct.

24   Q.  And so that would mean the remaining roughly 90 percent of

25   Grande's customers in 2018 were residential, correct?

Matt Rohre - Examination                    1211

```
1    A.  That's correct.

2    Q.  And as far as services offered to all of its customers,

3    Grande offered three different services, Internet, cable TV and

4    telephone; is that right?

5    A.  Yes, ma'am.

6    Q.  And offering faster Internet was one of the ways that

7    Grande attempted to differentiate itself from its competitors;

8    is that fair?

9    A.  Yes, ma'am, absolutely.

10   Q.  And in fact, fast Internet was a unique selling point for

11   Grande as to why it had a better product than other Internet

12   service providers, correct?

13   A.  Certainly up until 2016/17, yes, ma'am, certainly it was.

14   Q.  And but even as of 2018, Grande offered one gig Internet

15   services across all of its footprints in its markets, right?

16   A.  Yes, ma'am, that's correct.

17   Q.  And at least as of 2018, that was pretty much as fast as

18   the majority of the Internet service providers in the entire

19   country could offer, right?

20   A.  Yes, ma'am, it was.

21   Q.  And Grande allowed customers to subscribe to Internet

22   service without having to subscribe to cable TV or telephone,

23   right?

24   A.  Yes, ma'am, that is correct.

25   Q.  And there were customers at Grande who only purchased
```

1    Internet services, correct?

2    A.  Yes, ma'am.

3    Q.  And customers who subscribe to only one service from Grande

4    were called single play or a la cart customers; is that right?

5    A.  That's right, if they only bought one service, we would

6    call them single play or a la cart.

7    Q.  And of the three services that Grande offered, most of the

8    al a cart customers subscribed only to Internet service,

9    correct.

10   A.  That's changed over time, but over this time period we're

11   talking about, it was certainly increasing, so yes, I would say

12   most of our single play customers were Internet customers.

13   Q.  Okay.  And you anticipated my next question.  I was going

14   to ask you if that was true, that most of your a la cart

15   customers were Internet customers when up until that May 2018

16   time period that we're kind of cabined in?

17   A.  They were steadily increasing, that number of a la cart

18   Internet customers was increasing over that period of time.

19   Q.  Let me drill down on that a little bit.  Going back to

20   2012, roughly 30 to 35 percent of Grande's new customers were a

21   la cart Internet customers, correct?

22   A.  That sounds like a good estimate.

23   Q.  But between 2012 and 2018, that number increased, didn't

24   it?

25   A.  Yes, ma'am, it did.

1    Q.  In other words, between 2012 and 2018 a larger percentage
2    of Grande's new customers were a la cart Internet subscribers,
3    right?
4    A.  Yeah, they followed industry trends, absolutely that was
5    the case.
6    Q.  So by early 2018, 45 percent to 60 percent of Grande's new
7    customers were a la cart Internet customers?
8    A.  I think that is a good estimate.
9    Q.  And you agree with it?
10   A.  Yes.
11   Q.  Okay.  And of the three services offered by Grande,
12   Internet was the most profitable during your tenure there?
13   A.  Internet has the highest margin contribution.
14   Q.  Which makes it the most profitable?
15   A.  Not necessarily in absolute terms of dollars, it may not be
16   the most profitable, but certainly it has the highest margin
17   percentage of any of our --
18   Q.  Mr. Rohre, do you recall giving a deposition in this case?
19   A.  I do.
20   Q.  In 2018?
21   A.  I do.
22   Q.  And one of the plaintiffs' lawyers asked you questions
23   during that deposition?
24   A.  Yes, ma'am.
25   Q.  And you were under oath?

1   A.  Uh-huh.

2   Q.  Yes?

3   A.  Yes.

4   Q.  And there was a court reporter taking down all the

5   questions and all of your answers.  Do you remember that?

6   A.  That's correct.

7            MS. AMSTUTZ:  May I approach, Your Honor?

8            THE COURT:  Yes.

9            MS. AMSTUTZ:  Let the record reflect I have provided a

10  copy of Mr. Rohre's deposition transcript to both the witness

11  and opposing counsel.

12  BY MS. AMSTUTZ:

13  Q.  Mr. Rohre, I would direct you to page 52, lines 13 through

14  17.

15  A.  That's correct.

16  Q.  And *"Question:  What are your three services that you*

17  *offer?"*

18      *"Answer:  Internet, cable TV and telephone."*

19      *"Question:  Internet, cable?  What's your most profitable*

20  *between those three?"*

21      *"Answer:  Internet."*

22      Is it true at Grande that Internet is sometimes also

23  referred to as data?

24  A.  Yes, ma'am, that is true.

25  Q.  And in fact, as of 2014, Grande's gross profit margin on

Matt Rohre - Examination                    1215

1  Internet services or data was about 96 percent; is that

2  correct?

3  A.   That sounds right, yes, ma'am.

4  Q.   And from 2015 to 2017, that gross margin for Internet

5  services or data remained around 96 percent to 97 percent; is

6  that right?

7  A.   Yes, ma'am, that sounds correct.

8  Q.   So for every $100 that Grande received on Internet service,

9  it kept 96 or 97 of those dollars, right?

10 A.   That was the margin contribution.

11 Q.   The gross profit margin?

12 A.   I would -- profit would have to remove the expenses to get

13 to a net profit number, but that is correct, that is the gross

14 margin number.

15 Q.   So it's fair to say that Internet service was a very good

16 business line for Grande, right?

17 A.   Yes, ma'am, absolutely.

18 Q.   And it would have never been a good thing for the financial

19 health of Grande's business to lose those high profitable

20 customers and data, right?

21 A.   It wouldn't be good for us to lose any customers.

22 Q.   But particularly the ones that are most profitable; is that

23 fair?

24 A.   Yes, that's fair.

25 Q.   Okay.  Let's switch gears for a moment.  You're familiar

Matt Rohre - Examination                        1216

1    with a company known as Rightscorp?

2    A.  I am.

3    Q.  And you recall that in 2015, Rightscorp sent a letter to

4    Grande requesting an in-person meeting to discuss infringements

5    on Grande's network; do you recall that?

6    A.  I saw that letter in my deposition, but I don't -- I don't

7    know that I saw that letter until long after it was actually

8    sent to the company because it was not sent directly to me.

9    Q.  Okay.  Let's pull up for the witness, but not the jury,

10   Plaintiff's Exhibit 108.  Can you see that, Mr. Rohre?

11   A.  Yes, ma'am.

12   Q.  Do you see that this is an e-mail from Deborah Rankin, to

13   you?

14   A.  Yes, ma'am.

15   Q.  It's dated February 18, 2016?

16   A.  Uh-huh.

17   Q.  Is that a yes?

18   A.  Yes.  I'm sorry.

19   Q.  That's okay.  At the time, Ms. Rankin was in the Legal

20   Department at one of Grande's sister companies, RCN; is that

21   right?

22   A.  That's correct.

23   Q.  And in this e-mail, she attaches a letter that she

24   describes as Rightscorp/customers network infringement letter;

25   is that correct?

 1    A.   Yes.

 2    Q.   And Ms. Rankin, we already went over the date --

 3              MS. AMSTUTZ:  Your Honor, move to admit Plaintiff's

 4    Exhibit 108 as a party admission?

 5              MR. HOWENSTINE:  No objection, Your Honor.

 6              THE COURT:  Be received.

 7              MS. AMSTUTZ:  May we publish to the jury?

 8              THE COURT:  Yes.

 9    BY MS. AMSTUTZ:

10    Q.   The jury is now able to see Plaintiff's Exhibit 108,

11    Mr. Rohre.  And in the first sentence, Ms. Rankin says to you,

12    *"Hi Matt, Could you kindly give me a call upon receipt of the*

13    *attached."*

14         Did I read that correctly?

15    A.   Yes, ma'am, you did.

16    Q.   And we went over this when I was asking the initial

17    questions, but in the attachment at the top of the e-mail, she

18    describes it as Rightscorp customers network infringement

19    letter 1.29.2015 as a PDF.  Do you see that?

20    A.   My screen actually changed, but I believe that was correct.

21    Q.   Let's go back to the cover e-mail, if we can.  Do you see

22    how the attachment is described?

23    A.   Yes, ma'am, I do, that's correct.

24    Q.   And now if we can turn to the actual attachment, you see

25    the first page of the letter on Rightscorp letterhead?

1    A.   I do.

2    Q.   And it's dated January 29, 2015, correct?

3    A.   That's correct.

4    Q.   And the subject of this January 29, 2015 letter is, quote,

5    *Request for in-person meeting to discuss infringements on your*

6    *network.*  Is that right?

7    A.   That is correct.

8    Q.   And if we can go back to Ms. Rankin's cover e-mail to you

9    on February 18th of 2016, she goes on to say, *"Jeff would like*

10   *to schedule a time in which to speak with you one day next*

11   *week."*  Did I read that correctly?

12   A.   Yes, ma'am.

13   Q.   And you understood that she was referring to Grande's

14   general counsel, Jeff Kramp, right?

15   A.   Yes, ma'am, that's correct.

16   Q.   And that he was expressly requesting a time to talk to you

17   about this letter from Rightscorp that was sent to Grande more

18   than a year later, right?

19   A.   Yes, ma'am.

20   Q.   To your knowledge, Grande never reached out to Rightscorp

21   to discuss infringement on the network, did it?

22   A.   No, ma'am, not to my knowledge.

23   Q.   And that was true after Rightscorp sent the letter in 2015,

24   correct?

25   A.   I didn't see the letter until 2016, so I have no knowledge

1    of anyone reaching out to speak to Rightscorp concerning that.

2    Q.  Ever?

3    A.  No, ma'am.

4    Q.  Is that correct?

5    A.  Yes, ma'am, that's correct, I have no knowledge of us

6    reaching out.

7    Q.  But Grande could have reached out to Rightscorp in an

8    effort to get additional information; isn't that right?

9    A.  I don't know that we would have been able to gain anything

10   from the additional information.  We're not experts in any of

11   this stuff.

12   Q.  And Mr. Rohre, my question is a little different.  Grande

13   could have reached out to Rightscorp to get additional

14   information, correct?

15   A.  Yes, we could have.

16   Q.  Right around the same time that Grande's general counsel is

17   requesting a meeting with you to discuss Rightscorp, do you

18   recall a string of internal e-mails about the Rightscorp

19   notices?

20   A.  Yes, ma'am, I do.

21            MR. HOWENSTINE:  Objection, foundation.

22            MS. AMSTUTZ:  Let's pull up Plaintiff's Exhibit 106

23   and show it to the witness, but not the jury.

24   BY MS. AMSTUTZ:

25   Q.  Do you see that, Mr. Rohre?

1  A.  Yes, ma'am.

2  Q.  And do you see that this is a series of e-mails between

3  you, Lamar Horton, Jimmy Quigley, James Jordan and Deborah

4  Rankin?

5  A.  Yes, ma'am.

6  Q.  And all of the folks on the e-mail were affiliated with

7  Grande or Ms. Rankin was affiliated with Grande's sister

8  company at the time, correct?

9  A.  Yes, ma'am.

10       MS. AMSTUTZ:  And Your Honor, I move to admit

11  Plaintiff's Exhibit 106 as a party admission.

12       MR. HOWENSTINE:  Subject to our earlier objections,

13  Your Honor.

14       THE COURT:  It will be received.

15       MS. AMSTUTZ:  Can we publish to the jury?  Thank you.

16  BY MS. AMSTUTZ:

17  Q.  Starting at the bottom of the first page of Plaintiff's

18  Exhibit 106, do you see there's an e-mail from Lamar Horton to

19  you at 11:58 a.m. on February 22nd, 2016?  Do you see that?

20  A.  Yes, ma'am, I do.

21  Q.  And the subject is *Rightscorp*, right?

22  A.  Can we go back up to the top of the e-mail please?

23  Q.  You know how these e-mails start, they start from the

24  bottom and go up, so I'm starting at the bottom.

25  A.  I just wanted to verify the subject line.

1   Q.  You agree it's Rightscorp?

2          MR. BROPHY:  Objection, Your Honor, the witness is

3   asking to see the documents.

4          THE COURT:  The objection is sustained.

5   BY MS. AMSTUTZ:

6   Q.  So this e-mail string, let's wrap it up, starts with an

7   e-mail from Lamar Horton to you on February 22nd, 2016 with the

8   subject *Rightscorp*?

9   A.  Yes, ma'am.

10  Q.  Okay.  And if we turn to page two of Plaintiff's Exhibit

11  106, which is the actual e-mail that was sent from Mr. Horton

12  to you, Mr. Horton is advising you about the number of DMCA

13  infringement notices received from Rightscorp by year from 2011

14  to 2016; is that right?

15  A.  Yes, ma'am, that's correct.

16  Q.  Okay.  And then going back to the first page of Plaintiff's

17  Exhibit 106, do you see that about 15 minutes later Mr. Horton

18  responds to his own e-mail and he gives you the total number of

19  DMCA abuse notices by year from all sources from 2013 to 2015,

20  correct?

21  A.  Yes, ma'am, that is correct.

22  Q.  And then on that same day, Jimmy Quigley -- and you know

23  that he was director of IT operations/billing?

24  A.  Yes, ma'am, that's what Jimmy does.

25  Q.  He attached, quote, *The two letters that we have ready to*

1    *send to customers.*

2        Did I read that correctly?

3    A.  Yes, ma'am.

4    Q.  And then he informs the group that *"We send out the 551*

5    *letter."*  Do you see that?

6    A.  I do.

7    Q.  And then that very same day, February 22nd, 2016, you

8    forwarded the information that Mr. Horton sent to you which was

9    the total numbers of infringement notices from Rightscorp and

10   from all sources along with those two letters that Mr. Quigley

11   provided, correct?

12   A.  Yes, ma'am, that's correct.

13   Q.  And Ms. Rankin was in the Legal Department, right?

14   A.  She was.

15   Q.  And in your e-mail to Ms. Rankin, you see there's two

16   attachments, right?

17   A.  It says, Below there's notifications and attached are the

18   letters.

19   Q.  I wasn't clear.

20   A.  In the attachment line, yes, ma'am, I see that absolutely.

21   Q.  And the second attachment is described as

22   *"20160222_DMCA_letter_551.docx."*

23       Did I read that correctly?

24   A.  Yes, ma'am.

25   Q.  Would you agree with me that that's the 551 letter that was

1    attached?

2    A.   The first one was the 550 and the second one was the 551.

3    Q.   Okay.  So turning to those, the second of those two letters

4    that Mr. Quigley provided and that you forwarded on to

5    Ms. Rankin, which is the 551 letter, let's turn to the first

6    page of that which is Grande 1438547.

7         Okay.  So you should have on your screen the 551 letter.

8    Do you see that?

9    A.   Yes, ma'am, I do.

10   Q.   Okay.  And you understood this to be a template letter that

11   Grande sent to its customers when they were the subject of a

12   copyright infringement notice, right?

13   A.   That's correct.

14   Q.   And it says that it's addressed to Jonathan Customer, but

15   you understood that the real Grande subscriber's name would be

16   put into the letter, right?

17   A.   That's correct.

18   Q.   And this letter states right out of the gate, *"Grande*

19   *Communications was informed --"*

20        And then insert whatever the marketing promo copyright

21   owner.

22        *"-- that a computer connected to Grande Communications*

23   *high-speed Internet service was identified in the unauthorized*

24   *download or distribution of copyrighted material listed below."*

25        Did I read that correctly?

Matt Rohre - Examination                        1224

1    A.  Yes, ma'am.

2    Q.  Now, Mr. Rohre, this template letter, the very one that

3    Mr. Quigley says Grande sends to its customers, it doesn't say

4    We have received an unsubstantiated rumor, but we don't know if

5    it's true or not, does it?

6    A.  No, ma'am, it does not.

7    Q.  And it doesn't say that We received an accusation of

8    infringement without evidence, right?

9    A.  It does not.

10   Q.  Going back to the 551 letter, it goes on to say, *"Our*

11   *records indicate this infraction originated from a computer at*

12   *your location where Grande Communications provides Internet*

13   *service."*

14       Did I read that correctly?

15   A.  You did.

16   Q.  And it says "infraction", right?

17   A.  Yes, ma'am.

18   Q.  It does not say alleged infraction, does it?

19   A.  It does not.

20       MS. AMSTUTZ:  Your Honor, I'm moving on to the next

21   topic, it's 11:58.  Would you like for me to continue going?

22       THE COURT:  No, let's take the break now.  You can

23   step down, sir.  Do you live in the Austin area?

24       THE WITNESS:  I actually live in Waco.

25       THE COURT:  That's not too far, you can drive.

 1              THE WITNESS:  Hundred miles or so.

 2              THE COURT:  I want to thank you, ladies and gentlemen,

 3      for your attentiveness this morning.  You can do whatever you'd

 4      like this afternoon.  As I told you, you're going to get paid

 5      for the full day and then we will see you on Tuesday morning,

 6      as usual.  We will have Tuesday, Wednesday, Thursday and Friday

 7      as full days and there will be no interruptions.  Trying to get

 8      through this, I've moved stuff so we can do as much as we can

 9      here, okay, as quickly as we can.  Thank you very much.  Have a

10      nice weekend.  Remember, not Monday, Tuesday.

11              COURT SECURITY OFFICER:  All rise for the jury.

12              *(12:00 p.m., the jury exits the courtroom.)*

13                              *  *  *

14              THE COURT:  You all can be seated.  Anything we need

15      to go over before we break?

16              MR. BART:  Not from plaintiffs.

17              THE COURT:  If you need anything, my courtroom

18      manager, you know her --

19              MR. BART:  We know the process.

20              THE COURT:  You know the contact information.  So have

21      a nice weekend.

22              MR. BART:  Thank you.

23              THE COURT:  We'll see you on Tuesday.

24              *(12:00 p.m.)*

25

JURY TRIAL PROCEEDINGS                    1226

1                        *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5        I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.  I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  November 16, 2022

12

13   /s/ Angela M. Hailey

14   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
15   262 West Nueva Street
     San Antonio, Texas  78207
16   (210)244-5048

17

18

19

20

21

22

23

24

25