UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

UMG RECORDINGS, INC., ET AL,      :
Plaintiffs,                       :
                                  : Case Number:
vs.                               : 1:17-CV-00365-DAE
                                  :
GRANDE COMMUNICATIONS             : Austin, Texas
NETWORKS, LLC, ET AL,             : October 25, 2022
Defendants.                       :
*********************************************************

TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE DAVID A. EZRA
SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:
FOR THE PLAINTIFFS:

**Andrew H. Bart, Esquire**
**Jacob Tracer, Esquire**
Jenner & Block, LLP
1155 Avenue of the Americas
New York, NY  10036
(212)891-1600; abart@jenner.com

**Robert B. Gilmore, Esquire**
**Philip J. O'Beirne, Esquire**
Stein Mitchell Cipollone Beato & Missner LLP
1100 Connecticut Avenue, NW, Suite 1100
Washington, DC  20036
(202)601-1589; rgilmore@steinmitchell.com

**Paige Arnette Amstutz, Esquire**
Scott, Douglass & McConnico, LLP
303 Colorado Street, Suite 2400
Austin, Texas  78701
(512)495-6300; pamstutz@scottdoug.com

```
 1   FOR THE DEFENDANTS:

 2   Richard L. Brophy, Esquire
     Zachary C. Howenstine, Esquire
 3   Mark A. Thomas, Esquire
     Margaret R. Szewczyk, Esquire
 4   Armstrong Teasdale, LLP
     7700 Forsyth Boulevard, Suite 1800
 5   St. Louis, Missouri  63105
     (314)621-5070
 6   rbrophy@armstrongteasdale.com
     zhowenstine@armstrongteasdale.com
 7   mathomas@atllp.com
     mszewczyk@armstrongteasdale.com

 8

 9

10

11

12

13

14

15

16

17

18

19

20   COURT REPORTER:
     Angela M. Hailey, CSR, CRR, RPR, RMR
21   Official Court Reporter, U.S.D.C.
     262 West Nueva Street
22   San Antonio, Texas  78207
     Phone(210)244-5048
23   angela_hailey@txwd.uscourts.gov

24   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
25
```

JURY TRIAL PROCEEDINGS                    1229

1                 **I N D E X**

2  **WITNESSES:**                            **PAGE**

3  **MATT ROHRE**

4  By Ms. Amstutz          1256, 1281

5  By Mr. Howenstine         1269

6

7  **DR. ROBERT "ANDY" BARDWELL**

8  By Mr. Gilmore            1284

9  By Mr. Brophy             1297

10

11  **ALASDAIR MCMULLAN**

12  By Mr. Bart             1307, 1366

13  By Mr. Brophy             1350

14

15  **ROBERT EUGENE ROEDER (videotaped deposition)**

16  By Mr. O'Beirne          1369

17

18  **LAMAR HORTON**

19  By Mr. Brophy             1372

20  By Mr. Bart              1408

21

22

23

24

25

JURY TRIAL PROCEEDINGS                    1230

1    *(Tuesday, October 25, 2022, 8:42 a.m.)*

2                              *  *  *

3              COURT SECURITY OFFICER:  All rise.

4              THE COURT:  Good morning, please be seated.

5              COURTROOM DEPUTY CLERK:  Austin, 17-CV-365, UMG

6    Recording, Inc., et al versus Grande Communications Network.

7              THE COURT:  Good morning again.  And the Court would

8    note the presence of counsel as well as the parties'

9    representatives, and -- I think we have the party

10   representatives here, don't we?  And the absence of the jury.

11             Well, you have been back at it again, haven't you?  I

12   mean, somebody filed something at like 3:00 in the morning.

13   Good grief.

14             Okay.  I need to know what the timeline is on this.

15   Now, we've got the first motion in limine and that regards

16   Mr. Shockley's testimony on Grande customer statements.  And he

17   is, as I understand it, an employee?

18             MR. BROPHY:  That's correct, Your Honor, an employee

19   of Grande.

20             THE COURT:  Right.

21             MR. BROPHY:  Works in the Call Center.

22             THE COURT:  Right.  And you want to limit his

23   testimony.

24             MR. TRACER:  That's right, Your Honor.  As we said in

25   our reply brief that we filed yesterday, we think it's contrary

1    to Your Honor's ruling regarding communications that Grande had

2    with non -- with customers about non-Rightscorp notices, and

3    for the other reasons we stated in our brief.

4            MR. BROPHY:  Your Honor, I think -- where to begin

5    with this?  I think there's been a little bit of confusion

6    introduced into this because the statement that I made in

7    opening, I'm not sure --

8            And with all respect to you, I know you're doing a

9    wonderful job.

10           I'm not sure that one sentence was transcribed

11   properly.  I may have misspoken, but my intention was not to

12   say that we will introduce testimony from a particular instance

13   in which Mr. Shockley spoke with someone but, rather,

14   generally, he's going to testify that he speaks with customers

15   and they say they didn't do it.

16           We're not going to introduce anything over and above

17   what he already identified in his 30(b)(6) testimony.  So I

18   think that may resolve the issue.  My understanding is they

19   want to push further and say he can't even say that, but we

20   think it's entirely appropriate for him to come in and talk

21   about what he said in his 30(b)(6) deposition.

22           MR. TRACER:  Your Honor, I don't believe that's

23   correct with regard to what opposing counsel said in his

24   opening statement, but regardless of that --

25           THE COURT:  Obviously, I don't have a transcript of

1   the opening statement before me.

2       MR. TRACER:  But regardless, even the testimony

3   regarding the general conversations he had, we think are

4   untrustworthy because they are based on unidentified customers

5   that there is no way to test the accuracy of that information.

6   And we cited case law in our brief, Your Honor, that such

7   statements are -- you know, when the customer complaints are

8   received and not identified by in terms of who made those

9   statements, so there's no way in discovery to test the

10  customer's recollection of that conversation, that such

11  conversations are hearsay and excluded.

12      THE COURT:  Well -- stay seated.  And you can go and

13  sit down.  Thank you.

14      MR. TRACER:  Oh, thank you, Your Honor.

15      THE COURT:  Thank you.  I didn't mean that in a

16  derogatory way.  I'm happy to have you sit down.

17      MR. TRACER:  Thank you, Your Honor.  I appreciate

18  that.

19      THE COURT:  Believe me, I don't get upset with lawyers

20  often.  In fact, rarely, but when I do, you'll know it.

21      I'm going to deny the motion in limine because I

22  think, given the fact that the plaintiffs have attempted to

23  offer, and have offered successfully, evidence regarding state

24  of mind of the defendants through evidence that they highly,

25  you know, opposed, I will, however, as I did with the other,

1   give a limiting instruction to the jury if it comes in saying

2   that this only goes to the state of mind of the defendants and

3   does not go to the correctness of any statements they may or

4   may not have made regarding Rightscorp or any other company.

5   So I will allow it in.

6        MR. BART:  Your Honor, I'm not going to argue the

7   point.  Just to -- for housekeeping, could we have a standing

8   objection to that testimony so I don't have to get up and

9   object?

10       THE COURT:  Yeah.  No, you've already done that.

11       MR. BART:  Okay.

12       THE COURT:  I think your motion in limine suffices.

13  There was significant -- well, I wouldn't say significant

14  testimony.  There was testimony that came in regarding the

15  willful blindness issue that they tried to keep out, and I said

16  you could get in.  And what did that go to?  That went to their

17  state of mind.  It went to their -- I shouldn't say -- because

18  it's a company, but it went to the state of mind of their

19  officers, people in control of the company.  And this is really

20  kind of the half-flipped coin of that.  This is their

21  opportunity to put in evidence that they did receive stuff,

22  notice or comments from people that said, well, you know, we

23  didn't infringe.

24       Now, you know, as with anything else, I mean, if

25  somebody were to call up a bank robber and said, Did you Rob

1    the bank?  Oh, of course I did.  What are they going to say?  I

2    don't know why I'm hearing from you.  I don't know why the

3    police are at my door.

4            You know, what do you think people are going to say?

5    And that's an argument we can make to the jury, and you will

6    make to the jury, at closing, but they also have the right to

7    make to the jury the argument that, wait a minute, these are

8    customers that contacted us, and we didn't call them, and they

9    said this or that to us.  So in fairness, this testimony is

10   germane to their defense, and so I think it would be clear

11   error for me to not let them get it in, but with the

12   appropriate limiting instruction.  Just like I think it would

13   have been error for me not to let you get the information in

14   that you needed to get in.

15           All right.  Now, you also filed yet another motion in

16   limine.  This was yesterday, I guess, afternoon, and it

17   requests -- are you aware of this one?

18           MR. BART:  I'm completely aware of it.

19           THE COURT:  You looked at me like this guy must have

20   been drinking over the weekend.  And I don't drink, so --

21           MR. BART:  We're making an application to exclude a

22   document that defendant is trying to get in on their case,

23   which is a very inflammatory newspaper article.  Can we put

24   that up?

25           So I don't know if you can see it.  *"Rightscorp's*

1    *Terrifying Extortion Script Is Breathtaking In Its Sleaze*."

2           This sort of harkens back to the articles that we have

3    been required to take out of our evidence.  There is no

4    testimony -- it's clearly hearsay.  It's clearly a statement by

5    a reporter who is not present.  It's not germane to anything.

6    The only thing that happened was a Warner employee sent a copy

7    of that article to himself.  No comment, no nothing, just copy

8    of it to himself.  And the prejudice to us from having this

9    hearsay document read to the jury -- this is a pro-piracy

10   website, and while Your Honor allowed them to get into issues

11   of Rightscorp's business practices in ruling on the motions in

12   limine, you allowed us to re-argue specific points, and that's

13   what we're doing here.

14          We're not saying that they are not allowed to get into

15   the subject of business practices at all, but we're saying when

16   something is this inflammatory and has no credibility

17   whatsoever and there's no -- they never deposed the guy whose

18   e-mail it was and they're just using it as an opportunity to

19   throw this in front of the jury for the truth of what's being

20   asserted here.  And it's enormously prejudicial and it, I

21   think, vastly outweighs any probative value.

22          MR. BROPHY:  Your Honor, to be clear, we don't intend

23   to put this picture up or even this exhibit.  What we intend to

24   do or would like to do is utilize an e-mail that was sent by

25   Mr. Singer, who is the -- at the time was the head of the

1  antipiracy for Warner.  He saw this article.  He extracted text

2  from this article and wrote an e-mail to himself to document

3  and record information about this article.

4         THE COURT:  I don't have that.  What does that e-mail

5  say?

6         MR. BART:  The same thing that's here.  There it is.

7         THE COURT:  Okay.

8         MR. BROPHY:  So we have --

9         THE COURT:  I can't read that.

10         MR. BART:  We have a copy, Your Honor.

11         THE COURT:  I can read it over here.  Just a minute.

12  Oh, he just basically cut-and-pasted.

13         MR. BART:  Yeah, that's it.

14         MR. BROPHY:  So, Your Honor, this is a document,

15  internal e-mail from the head of antipiracy.  I recognize

16  Mr. Bart says this is a pro-piracy website, but the head of

17  antipiracy for Warner thought it was legitimate enough to

18  extract it and document it for himself and save it as a

19  business record within Warner.

20         We're not going to introduce it to prove that the

21  statements are true, but merely to prove that the state of mind

22  of Warner was that they didn't want to work with Rightscorp,

23  which is a key issue in this case, as far as we're concerned.

24         THE COURT:  So where is Howie Singer?

25         MR. BROPHY:  Mr. Singer is the "To" and "From" line in

1    the e-mail, Your Honor.

2              THE COURT:  I know, but where is he?

3              MR. BROPHY:  Well, he's now working for Universal.

4    The plaintiffs could have called him to explain this.  They

5    chose not to.

6              THE COURT:  You could have called him.

7              MR. BART:  Exactly.

8              MR. BROPHY:  Well, we have 30 -- excuse me.  We have

9    30(b)(6) testimony from Warner's 30(b)(6) representative who

10   was presented to talk on their view of Rightscorp, and this is

11   a document that we discussed with that witness.  So we have

12   30(b)(6) testimony on what Warner thinks about Rightscorp, and

13   this is a business record that we deposed that person about

14   related to Rightscorp.

15             THE COURT:  Okay.  Everybody can be seated.  I'm going

16   to grant the motion in limine.  I don't know who *Bonobos* is.  I

17   know what a bonobo is.  That's a breed of monkey.  I have no

18   idea -- this is not *The New York Times*.  If you ask Donald

19   Trump about *The New York Times*, he isn't going to be too happy,

20   but outside of Mr. Trump, I would think that that's slightly a

21   more reliable source than the monkey magazine here.  I don't

22   know -- and I am not trying to criticize it, but a bonobo is a

23   monkey.  It is.  I mean, what do you name your site?  It's

24   crazy.

25             Now, you do say you have -- to the extent that you

 1    have testimony from Mr. Singer that he reviewed an article that

 2    criticized Rightscorp's credibility, that's perfectly

 3    admissible.  I don't have a problem with that testimony.

 4              MR. BROPHY:  Your Honor --

 5              THE COURT:  But I'm not going to put this *"Rightscorp*

 6    *is a notorious publicly traded shakedown outfit that accuses*

 7    *people of online infringement and threatens them with Titanic*

 8    *fines and jail time."*  That's not going before the jury.

 9              MR. BROPHY:  We have 30(b)(6) testimony, not from

10    Howie Singer but from Warner's representative where we talk to

11    that representative about this document.  Are we able to play

12    that deposition testimony?

13              THE COURT:  Well, not if it quotes this.

14              MR. BROPHY:  It doesn't quote what you just mentioned.

15    It requests -- we asked questions about whether Warner was

16    aware of this information.

17              THE COURT:  That's fine.  I would need to see that

18    before we play it before the jury.

19              MR. BART:  Your Honor, just for clarification.  The

20    testimony was that the 30(b)(6) witness had no knowledge of

21    this, so there's nothing that is in -- he can present whatever

22    he wants, and you should look at it.

23              THE COURT:  I am going to look at it.  I will rule on

24    it at the time it's offered.  Okay?  But I'm not going to let

25    this document as it is or even if it was a cut-and-paste before

1  the jury.  It's far more prejudicial than it is probative.  We

2  have no idea whatsoever where this came from, what this

3  person's professional qualifications is, whoever it is that

4  wrote it.  Do we even know who wrote it?

5              MR. BROPHY:  I think -- Your Honor, I understand, and

6  that's why we didn't intend to present the article.  We find it

7  compelling that the head of the antipiracy found it compelling.

8  That's the fact we would like to get into evidence.

9              MR. BART:  The problem is that he didn't find it

10  compelling.  He copied it.  And as you heard --

11             THE COURT:  We don't know whether he found it

12  compelling.

13             MR. BART:  Exactly.

14             THE COURT:  You're simply extrapolating that -- I

15  think you might more correctly say he found it significant

16  enough to copy, but there are many things that are significant

17  that one does not agree with or that one just puts down.  I

18  mean, if somebody wrote an e-mail that criticized one of my --

19  or put an article out that criticized one of my colleagues, and

20  my colleague was on a cruise or on a trip and it was full of

21  inflammatory falsehoods, I might well save that and copy it so

22  that I could show it to them later, not because I thought it

23  was compelling, but the opposite.

24             MR. BROPHY:  I think, Your Honor, the issue in this

25  case is, from our perspective, the plaintiffs shunned

1   Rightscorp until they bought this data and are trying to use it

2   in this litigation, and from our perspective we should be

3   permitted to demonstrate, number one, that Warner did shun

4   Rightscorp and the reasons why they shunned Rightscorp --

5           THE COURT:  I told you that I am more than happy to

6   allow testimony in from the Warner representative or anybody

7   else that you want to call from them that speaks directly to

8   their reviewing an article that was critical -- you can use

9   that term -- of the capabilities and business practices of

10  Rightscorp and that they took that into consideration.  That is

11  perfectly all right, but to -- this thing is just -- we used to

12  call it in my line of legal work, a flamer.  I mean, we don't

13  know who this person is.  We don't know where they got their

14  information.  We don't know what their agenda was.  That's

15  another concern.

16          MR. BROPHY:  I understand, Your Honor.  But our --

17  again, just to make sure the record is clear, our position is

18  we don't need that document in.  We're not asking to put that

19  document --

20          THE COURT:  Well, I know, but the e-mail that you want

21  to put in is a direct copy of that and your reason for doing it

22  is because you believe that Warner found it compelling, but you

23  don't know that.

24          MR. BROPHY:  Well, respectfully, I think that's

25  something the jury should decide.

1          THE COURT:  No, I don't think so.  Not when it's more

2     prejudicial than it is probative, when there's absolutely no

3     evidence whatsoever from which a rational jury could find that

4     they found it compelling, because there's no testimony that

5     they found it compelling.

6          Now, what we might have -- I haven't seen the

7     deposition -- is testimony that they did receive a memorandum

8     of some sort on this.  It wasn't even a third party that sent

9     it to them.  They just -- the guy just kind of copied it

10    himself.  Maybe he found it amusing.

11         MR. BROPHY:  Well, he found it and documented it in

12    the business records of Warner.  That's our position.

13         THE COURT:  There are more people in this world that

14    get into trouble because they forward on e-mails than anything

15    else in the -- I mean, I know federal judges.  I know them, and

16    sadly -- knew of them who forwarded on, you know, racist jokes.

17    Bad, bad, bad, and they were required to step off the bench,

18    and they should have stepped off the bench because those jokes

19    were not --

20         Now, what?  I mean, what does that mean?

21         MR. BART:  Your Honor, can I just say one last thing?

22         THE COURT:  Yes.

23         MR. BART:  I'm concerned that there's going to be -- I

24    know that there will be an attempt to get the text of this

25    article in front of the jury.

 1          THE COURT:  The text of the article is not coming

 2   before the jury.

 3          MR. BART:  Because the deposition questions say, "The

 4   subject of this e-mail is*, "Rightscorp's Terrifying Extortion*

 5   *Script Is Breathtaking In Its Sleaze*."  And going on, "Having

 6   just reviewed this e-mail, is this the first you're learning

 7   about Rightscorp's terrifying extortion script?"

 8          So the testimony itself is an attempt to get the text

 9   of that article in, and the witness said that he hadn't seen it

10   before and knows nothing about it.  So --

11          THE COURT:  I told you that the text of that -- that's

12   why I said I want to see it before it goes before the jury, and

13   we are not allowing the text of this, whatever it is, to get

14   in.

15          You know, I remember so well when I was the director

16   of the Federal Judges Association, we had the director of the

17   FBI.  It was actually somebody I knew very well, a former

18   federal judge who was the director at the time.  And he said,

19   *"You know, you get --"* somebody asked him, *"What do you do with*

20   *all these kind of wild things that come in or these anonymous*

21   *complaints and stuff?"*  And he says, *"You know, 99 percent of*

22   *this is garbage in, garbage out.  Anybody can say anything*

23   *about anyone."*

24          We have no idea what this was all about.  And I doubt

25   seriously that Rightscorp would agree with the contents of this

 1   article.

 2          MR. BROPHY:  Just to make sure you understand this,

 3   Your Honor, the article was referencing Call Center scripts

 4   that were being used by Rightscorp.

 5          THE COURT:  Oh, I'm very familiar with that, but we

 6   don't even know if that's true.

 7          MR. BROPHY:  Well, we have the Call Center scripts,

 8   Your Honor.

 9          THE COURT:  Okay.

10          MR. BROPHY:  And this publication is a 30-year-old,

11   award-winning news agency, so this isn't --

12          THE COURT:  Bonobos?

13          MR. BROPHY:  The company that published this article

14   is a 30-year-old publishing entity.

15          THE COURT:  I don't know about that.

16          MR. BROPHY:  It's award-winning and they were reacting

17   to the Call Center scripts that Rightscorp was using with

18   customers, and that's why the head of the antipiracy documented

19   it because it indicates --

20          THE COURT:  The Call Center scripts -- if you have

21   Call Center scripts that they used and you can document those,

22   those can come in.  That's a whole other story, but not this.

23          MR. BROPHY:  Well, understood, Your Honor.  As far as

24   the deposition testimony is concerned, I'm at a bit of a

25   crossroads, because we have a 30(b)(6) witness who was produced

1    by Warner on the topic of what they know about Rightscorp and

2    we put an e-mail business record in front of that witness and

3    asked them questions about that.  So whether that witness

4    individually knew about it or not, we believe we should be able

5    to play that testimony, because it's Warner's 30(b)(6)

6    representative talking about business records within the

7    company that relate to Rightscorp.

8            THE COURT:  That he knows nothing about.

9            MR. BART:  Exactly.

10           MR. BROPHY:  But he is the 30(b)(6) witness for the

11   company and we should be -- we're allowed to put documents in

12   front of that witness and ask him about it.

13           THE COURT:  Well, I haven't seen the testimony.  I'll

14   look at the -- since your --

15           MR. BROPHY:  It's not the next, it's not the next

16   witness.

17           MR. BART:  Your Honor, you'll look at it, obviously,

18   but the point is there's nothing that the 30(b)(6) witness

19   says.  They want to put it in for the questions that are asked

20   because that way they get in the prejudicial material.  That's

21   why --

22           THE COURT:  Well, you're not going to get this article

23   in, period, because it is way, way more inflammatory than it is

24   probative.

25           MR. BROPHY:  Understood, Your Honor.

1          THE COURT:  It's just one reporter's viewpoint.

2          MR. BROPHY:  And the head of the antipiracy's reaction

3    to it.  The 30(b)(6) testimony was about who that person was,

4    what their role at the company was, what the document is --

5          THE COURT:  You know what you can do?  I'll let you do

6    what Judge "Lock" Waters let me do, retake the person's

7    deposition.  You can send -- where is this person?

8          MR. BROPHY:  The actual person who had the article?

9          THE COURT:  No.  Whoever you deposed.

10         MR. BROPHY:  I'm not sure where they are physically.

11         MR. HOWENSTINE:  New York.

12         THE COURT:  Well, okay.  There's lawyers from their

13   firm in New York.  You can hire counsel in New York, brief

14   them, or you can send one of your team up there.  It's not that

15   far.

16         MR. BROPHY:  We need to do a video deposition, Your

17   Honor.

18         THE COURT:  You can do a video deposition, I don't

19   care, but you can re-ask these questions, but in a different

20   way.

21         MR. BART:  Your Honor, if the witness has no

22   knowledge -- they didn't pursue this, okay?  They went through

23   discovery.  They got this answer.  The answer was, I don't know

24   anything about it.  They didn't make any motions, they didn't

25   do any applications.  They're now asking about it here, which

1   has nothing to do with the truth of the matter.  They want to

2   get the questions in.  They want --

3            THE COURT:  They're not going to get these questions

4   in.  I already told you that, so you don't need to re-argue

5   that to me, because I've already said they're not going to get

6   in this article or any questions about the article other than

7   the fact that they read an article critical of Rightscorp.  And

8   what did they do about it?  They're entitled to ask them that.

9            MR. BART:  But the 30(b)(6) witness had never seen it

10  before.

11           THE COURT:  Well, then what were you asking him about

12  if he had never seen it?

13           MR. BROPHY:  Your Honor, it was Warner's 30(b)(6)

14  witness.  He was apparently not well prepared on the topic, but

15  we put the document in front of him and asked questions about

16  it, which we're entitled to do.

17           MR. BART:  The notion that he wasn't well prepared

18  because he hadn't seen an e-mail that someone sent to himself.

19           THE COURT:  What relevance -- the testimony from

20  somebody -- I mean, sounds to me like speculative testimony.

21  What would you do if you had known about this or seen it

22  before?  I don't know what you would ask him.

23           MR. BROPHY:  We were documenting the fact that the

24  head of antipiracy for Warner was aware of this article and

25  documented it by sending it to himself to save the article, and

1    that fact that the head of antipiracy at Warner knew about this

2    and took steps to record it is a relevant fact for our case.

3              THE COURT:  That's right.  And you are more than

4    entitled to get before the jury the fact that there was a

5    critical article of Rightscorp, number one; that Warner saw the

6    article, he felt the article was significant enough that he

7    copied it, and any other actions that Warner took as a result

8    of it, but the text of the article is incredibly inflammatory.

9    I mean, it is incredibly inflammatory.  And it has got

10   virtually no independent probative value other than what effect

11   it might have had on Warners.  And you have every right to get

12   that into evidence without the inflammatory stuff coming in.

13             MR. BROPHY:  We can dodge the inflammatory language,

14   Your Honor.  Understood.

15             THE COURT:  All right.  Okay.  We'll look at it.  I'll

16   look at it.  Let's not worry about it.  I'll look at it.

17             MR. BROPHY:  Are we deposing this witness?  Are we

18   looking -- because I think --

19             THE COURT:  You can -- I don't care --

20             MR. BART:  Your Honor, this is a tremendous imposition

21   in the middle of trial.  They never attempted to depose the

22   person whose --

23             THE COURT:  I thought so too when I was a trial

24   lawyer.  It's going to happen.

25             MR. BART:  Well, that's fine, but this is not -- this

1   is not the person who even copied the article.  You're just

2   saying to somebody that -- there's no duty of a 30(b)(6)

3   witness to know every e-mail in everybody's files.  They had to

4   have a knowledge of something that was material.  They found

5   out an article, they didn't pursue it.  We're now at trial.  We

6   have to produce somebody on -- you know, who knows what this

7   person's schedule is, just so that they can get into, you know,

8   the "terrifying sleaze."  Your Honor, I think it's a

9   tremendous --

10          THE COURT:  They're not going to get into the

11  "terrifying sleaze."  There's going to be no questions

12  permitted that go into the substance of the article other than

13  the fact that it was an article that was critical of the

14  business practices of Rightscorp, and that's it.

15          MR. BROPHY:  Understood.

16          THE COURT:  Critical of the accuracy -- I think it was

17  the accuracy and the business practices.

18          MR. BROPHY:  And the Call Center --

19          MR. BART:  It had nothing to do with accuracy.  It was

20  about the business practices.

21          THE COURT:  Okay.  Business practices.  So you know,

22  I've granted your motion in limine.  This inflammatory article

23  is not coming in.  Done.

24          However, I will allow them to -- I haven't seen the

25  deposition.  It could be that it could be redacted to a point

 1  where the testimony that is okay can come in.  If not, I will

 2  let you take a limited deposition of this guy or some other

 3  corporate representative and ask them those questions, but it

 4  has to be very tailored.

 5          MR. BROPHY:  I understand, Your Honor.

 6          THE COURT:  This deposition shouldn't take more than

 7  15 minutes.

 8          MR. BROPHY:  That's our understanding, Your Honor.

 9          THE COURT:  It's not a huge imposition, given the

10  scope of this case, the fact that this case has been going on

11  for weeks.  It's just one of those things where I'm trying to

12  be fair to both sides, but being fair doesn't mean allowing in

13  evidence that is just -- and I don't know about the credibility

14  of this publication.  I've never heard of it.  And I'm well

15  read, when it comes to this stuff, and I never heard of them.

16  There's a clothing manufacturer called Bonobos, by the way, and

17  quite successful actually.

18          What is your issue?

19          MR. HOWENSTINE:  Good morning, Your Honor.  We wanted

20  to raise an issue about the jury instructions.  The parties

21  have discussed this -- we've discussed this with each other.

22          THE COURT:  I'm always happy to hear about discussions

23  between the parties on jury instructions.

24          MR. HOWENSTINE:  We are in agreement, and we wanted to

25  get Your Honor's permission to submit some limited briefing

1    about some of the disputed instructions.  We were talking about

2    a total of six pages per side on a few of the disputed

3    instructions.  Number --

4              THE COURT:  How many disputed instructions are there?

5              MR. HOWENSTINE:  I can't cite the total number off the

6    top of my head, but we're talking about approximately four

7    instructions that we would be submitting briefly.

8              THE COURT:  I'm more than happy to have that happen.

9    Yes.  The answer is yes.

10             MR. HOWENSTINE:  Does Your Honor have a timeframe in

11   which you'd like to --

12             THE COURT:  I don't know.  We're getting close, aren't

13   we?

14             MR. BART:  Yes.  This was with, in all candor,

15   defendant's suggestion, and we thought it was a good one.  Our

16   response was that, you know, one of the things we want to try

17   and do is to meet each other halfway and have discussion.  And

18   without getting into detail, that sometimes has been hard.  And

19   in fact, we were accused in papers that were filed at 2:00 last

20   night of unnecessarily filing motions.

21             Just so that Your Honor is clear, the reason that we

22   did this is so that it's teed up and the other side knows what

23   we're saying before we get into court.  We had that problem,

24   you know, when they were objecting to our evidence and had no

25   idea what the objection was until we showed up in court.

1          With regard to the jury instructions, we said, you

2    know what, why don't we exchange these drafts so that we can

3    actually maybe make some progress on them and narrow them.  And

4    we proposed originally that we would exchange drafts on

5    Wednesday night and submit them to you on Thursday.  I

6    understand that that's not acceptable, and they just want to

7    have each side put in their own response.  Frankly, we think

8    that limits the possibility of narrowing some of the issues,

9    but if that's what they insist on doing and Your Honor doesn't

10   have a preference, we'll go with that.  But you know, I

11   think --

12         THE COURT:  Well, my general practice -- and I think I

13   told this to you weeks ago, actually -- was that I wanted a

14   combined set of instructions which contained all the

15   agreed-upon instructions.

16         MR. BART:  Well, you have that, I think.

17         THE COURT:  Yes.  I do.  And then with respect to the

18   instructions that you don't agree upon, I want to have

19   authority submitted in support of your position.  And that's

20   all you're doing.  You're not doing anything different -- this

21   is my normal practice.  It has been for over 35 years.

22         MR. BART:  Okay.  That's all well and good.  I mean,

23   we'll be prepared to get that to you the end of, you know,

24   tomorrow night or --

25         THE COURT:  Tomorrow is fine.

1          MR. BART:  -- tomorrow night or Thursday morning.

2          THE COURT:  Yeah, that's fine.  You can be seated,

3     counsel.

4          MR. HOWENSTINE:  At the risk of trying your patience,

5     Your Honor, we have one more issue.  We have some deposition

6     testimony that the plaintiffs intend to play after the next

7     witness and we have exchanged objections to it, but we haven't

8     been able to resolve those amongst ourselves.  So instead of

9     filing another motion, we were just going to bring it up with

10    Your Honor.  If you'd like to hear it now --

11         THE COURT:  No, I don't want to hear it now, because

12    we've got too many things on the plate.  I will be more than

13    happy to hear it either this afternoon or tomorrow morning, so

14    why don't you be seated.

15         Let me tell you that --

16         MR. GILMORE:  Your Honor, on that issue, though, we

17    were planning on playing these deposition designations right

18    after the first live witness.

19         THE COURT:  No, you're not, not until I get a chance

20    to rule on it.

21         MR. BART:  Your Honor, just so that the record is

22    clear, aside from Ms. Frederiksen-Cross who we're bringing back

23    because of all the issues on Audible Magic that Your Honor has

24    ruled about, we're going to finish the remainder of our case

25    this morning.

1          THE COURT:  Right.  I understand that.

2          MR. BART:  So I guess we can defer that --

3          THE COURT:  We'll have to take some time.

4          MR. BART:  Well, we can defer that piece too since

5    we're not resting at the end of these witnesses.

6          THE COURT:  Well, I have to look at it.  I mean, don't

7    you want me -- I mean, I've got a jury sitting back there

8    waiting.

9          MR. BART:  No, I appreciate that.  I just wanted you

10   to realize that I want to keep the trial moving also.

11         THE COURT:  Well, so do I, but not at the expense of

12   committing error.  I want to have an opportunity to listen to

13   and hear what it is that you're arguing about, but in the

14   meantime, we've got a jury waiting, so we need to move forward

15   at this point.

16         MR. BART:  I think this is a very finite point, but --

17         THE COURT:  It may be, but I still need to rule on it.

18         MR. BART:  Okay.

19         THE COURT:  With some semblance of -- you know, I'm

20   getting these things at 2:00 in the morning or 3:00 in the

21   morning.  I mean, it's a little hard, you know, and I don't

22   require my law clerks -- I'm not like the former Judge

23   Kozinski, who had in the days of fax machines required his law

24   clerks to have fax machines in their bedrooms.  It's true.  He

25   brags about it.  He used to brag about it.  And the lawyers

 1   would fax his law clerks stuff in the middle of the night, and

 2   they were required to get up and work on it and have the memo

 3   to the judge.  No.  I don't do that.

 4           Okay.  Are we ready to move forward maybe?

 5           MS. AMSTUTZ:  Your Honor, plaintiffs are ready to

 6   continue with Matt Rohre.

 7           MR. BROPHY:  And Your Honor, this will take ten

 8   seconds.  JMOL issues.  Do you like those submitted via paper

 9   or do you like actual argument on it?

10           THE COURT:  I'm sorry, you said what issues?

11           MR. BROPHY:  JMOL issues.  How do you like those

12   presented, paper or oral?

13           THE COURT:  Oral.

14           MR. BROPHY:  Thank you.

15           MR. BART:  Your Honor, we're not resting now.

16           THE COURT:  No, you're not.

17           MR. BROPHY:  I understand.  I just wanted to make sure

18   I understood what was expected of us.

19           THE COURT:  Yeah.  It can be done orally.

20           Okay.  As for next week, Monday of course is not a

21   court day because I got court in San Antonio.  Tuesday we'll

22   have a full day if we need it, next week.  Wednesday is a

23   problem.  I've got a -- something I've got to do on Wednesday

24   morning in San Antonio, so I'm going to have to go back to San

25   Antonio on Tuesday after court and then be there on Wednesday

1    morning.  I will be available -- and then I'm going to come

2    right back here, so I'll be available Wednesday afternoon and

3    Thursday, but I wouldn't be available Wednesday morning.

4              MR. BROPHY:  Your Honor, we have taken a careful look

5    at the remainder of our case and I think it's very possible we

6    will be ending on Friday or early on Tuesday, so my hope and

7    expectation -- I'm not sure what your position is on this,

8    Mr. Bart, but my hope and expectation is that we'll be able to

9    fin --

10             THE COURT:  We have this person coming back in the

11   next --

12             MR. BART:  That's one of the pieces -- I mean, I share

13   your goal, which is to finish as quickly as possible.  I mean,

14   I would hope that at worst case we would be able to sum up on

15   Tuesday.

16             MR. BROPHY:  Right.

17             MR. BART:  In which case the jury may be able to be

18   out, you know, while you're in San Antonio, but we'll have to

19   take it -- but, yeah, our goal is the same, to finish up as

20   quickly as we can.

21             THE COURT:  Very good.

22             MR. BROPHY:  Thank you, Your Honor.

23             THE COURT:  Okay.  Thank you.  All right.  Why don't

24   you bring the jury in.

25             COURT SECURITY OFFICER:  Please rise for the jury.

```
 1              (9:19 a.m., the jury enters the courtroom.)

 2                           *   *   *

 3        THE COURT:  Please be seated.  Good morning.  I hope

 4   you had a good weekend.  Good to see you all back.  Thank you

 5   so very much.

 6          We're going to continue on with the plaintiff's case.

 7        MS. AMSTUTZ:  Your Honor, Paige Amstutz for the

 8   plaintiffs, and we call Matt Rohre back to the stand.

 9        THE COURT:  Okay.  Where is Mr. Rohre?

10        MR. BROPHY:  We are getting him, Your Honor.

11                           *   *   *

12        THE COURT:  Okay.  Mr. Rohre, thank you for coming

13   back.  And I would remind you that you remain under oath, sir.

14        THE WITNESS:  Yes, Your Honor.

15        THE COURT:  Thank you.

16                          EXAMINATION

17   BY MS. AMSTUTZ:

18   Q.  Good morning.

19   A.  Good morning.

20   Q.  It's been several days since we've been all together, so

21   very briefly I just want to reorient you and the jury where we

22   were when we left off on Friday.  Okay?

23   A.  Okay.

24   Q.  Towards the end of the day, we went through a series of

25   e-mails between you and Lamar Horton and others at Grande dated
```

1    back February 22nd, 2016; do you recall that?

2    A.  Yes, ma'am, I do.

3    Q.  And the general subject matter of those e-mails, which was

4    Plaintiff's Exhibit 106, were the DMCA notices that Grande was

5    receiving about its customers; do you recall that?

6    A.  Yes, ma'am.

7    Q.  And Plaintiff's Exhibit 106 also included two letters that

8    Grande had ready to send to customers regarding copyright

9    infringement; do you recall that testimony?

10   A.  Yes, ma'am.

11   Q.  And we walked through what is known as the 551 letter that

12   Jimmy Quigley sent to you and Lamar Horton on February 22nd of

13   2016, correct?

14   A.  That's correct.

15   Q.  And that on that same day you sent to the Legal Department;

16   do you recall that?

17   A.  Yes, ma'am.

18   Q.  Now, fast-forwarding to June of 2017, you knew that between

19   June 2017 and October 2017 Grande terminated at least eleven

20   subscribers for copyright infringement, correct?

21   A.  Yes, ma'am, that is correct.

22   Q.  And that was after the plaintiffs filed this lawsuit in

23   April of 2017; isn't that right?

24   A.  I do not remember exactly when the lawsuit was filed, but

25   yes, ma'am, if it was filed in April, then that was after.

1   Q.   Okay.  And do you have any reason to disagree that

2   April 2017 was when the plaintiffs filed this lawsuit?

3   A.   I do not.

4   Q.   And you agree that those eleven terminations from June 2017

5   to October 2017, those were warranted for copyright

6   infringement, correct?

7   A.   They met our policy.

8   Q.   And they were warranted?

9   A.   Yes, ma'am, under our policy, they were warranted.

10  Q.   And those subscribers were terminated under Grande's policy

11  in 2017 as you point out because they were repeat infringers;

12  isn't that correct?

13  A.   Under our policy, they were alleged repeat offenders, yes,

14  ma'am.

15  Q.   They were repeat infringers under your policy in 2017,

16  correct?

17  A.   Under our policy.

18  Q.   Yes?

19  A.   Yes, ma'am.

20  Q.   Okay.  And in 2017, Grande's policy didn't say, we're going

21  to terminate out of an abundance of caution, did it?

22  A.   No, ma'am.

23  Q.   Rather, back in 2017 when Grande terminated customers, it

24  did so for a reason; is that fair?

25  A.   I'm sorry, repeat the question?

1   Q.  Back in 2017 when Grande made the decision to terminate a

2   customer, it was for a reason, right?

3   A.  Yes, ma'am.  It was for the reason that we had received

4   enough notices that they met the threshold in our policy, and

5   our policy was to terminate those subscribers.

6   Q.  And when you say "those subscribers," we're talking about

7   the 11 subscribers in 2017 that Grande kicked off for copyright

8   infringement, correct?

9   A.  That's correct.

10  Q.  And you would agree that those specific 11 subscribers

11  should have been kicked off, correct?

12  A.  Under the terms of our policy, that's correct.

13  Q.  And you agree that, in general, repeat infringers deserve

14  to be kicked off Grande's system, correct?

15  A.  If the allegations are true, absolutely.

16  Q.  That wasn't my question.  In general, beyond the 11 that

17  you actually terminated, you agreed that repeat infringers

18  deserved to be kicked off Grande's system, correct?

19  A.  That meet the threshold of our policy, yes, ma'am.

20  Q.  That's correct?

21  A.  That's correct.

22  Q.  And is it fair to say, Mr. Rohre, that as the general

23  manager of Grande at the time, in 2017, you believed it was the

24  right thing to do, to terminate people from Grande's Internet

25  service that had been notified of copyright infringement,

1  didn't you?

2  A.  It was the right thing to do under our policy, yes, ma'am.

3  Q.  Now, the same mechanism that Grande used to terminate those

4  11 subscribers in 2017, that could have been done based on

5  notices that Grande got back in 2011 or 2012 or really any year

6  leading up to 2017; isn't that right?

7  A.  I believe so, yes, ma'am.

8  Q.  Do you believe so or as the general manager do you know so?

9  A.  I don't believe there was anything that would have

10  precluded us from implementing that policy other than the fact

11  that we had an existing policy in place to inform and educate,

12  and that's what we were doing.

13  Q.  So what you did in 2017, you could have done in 2011,

14  correct?

15  A.  I believe so.

16  Q.  And in 2012, right?

17  A.  Yes, ma'am.

18  Q.  And in every year in between leading up to 2017; is that

19  right?

20  A.  Yes, ma'am, that's correct.

21  Q.  And Grande didn't change its policy in 2017 because of the

22  availability of some new technology to process notices, did it?

23  A.  No, ma'am.  It was still relatively manual at that, but

24  there was no new technology.

25  Q.  Okay.  So the technology that existed in 2017 to process

Matt Rohre - Examination                    1261

```
 1    those notices, it existed before that as well?
 2    A.  It was the same billing system, so, yes, ma'am.
 3    Q.  And the reason why Grande changed its policy and began
 4    terminating customers for copyright infringement in June of
 5    2017 was because of a change in management philosophy, correct?
 6    A.  A change in -- from our Legal Department, and legal and
 7    regulatory sets these policies.
 8    Q.  The reason that they changed the policy, "they" being
 9    Grande, was a change in management philosophy; isn't that
10    right?
11              MR. HOWENSTINE:  Objection.  Asked and answered.
12              THE COURT:  Sustained.
13    BY MS. AMSTUTZ:
14    Q.  Mr. Rohre, do you recall that I gave you a copy of your
15    deposition transcript from 2018?
16    A.  Yes, ma'am.
17    Q.  Do you still see it there in front of you?
18    A.  I do.
19    Q.  I will direct you and the Court to page 149, lines three
20    through eight.
21        Are you there with me, Mr. Rohre?
22    A.  Yes, ma'am.
23              MS. AMSTUTZ:  Directing the Court to page 149, line
24    three.
25              "Question:  So just to be clear, I've asked you why
```

1   *Grande changed the policy.  You didn't change it because the*
2   *availability of some new technological mechanism to process*
3   *these notices?"*
4           *"Answer:  No.  It was a change in management*
5   *philosophy."*
6   BY MS. AMSTUTZ:
7   Q.  But from October of 2010 until June of 2017, Grande didn't
8   terminate a single customer about whom it received an
9   infringement notice, did it?
10  A.  Not that I'm aware of, no, ma'am.
11  Q.  And let's talk about some reasons why Grande did terminate
12  customers in that time period, October 2010 to June 2017.
13  Okay?  Now, is it fair to say that Grande expected its
14  customers to pay its bills?
15  A.  Yes, ma'am, that's fair.
16  Q.  And fair to say that Grande expected its customers to
17  timely pay its bills?
18  A.  Yes, ma'am, that's correct.
19  Q.  And isn't it true, Mr. Rohre, that if a Grande customer did
20  not pay his or her bill, then that person was no longer a
21  profitable customer for Grande.  Fair?
22  A.  Yes, ma'am.
23  Q.  And at the time period that we're talking about now, 2010
24  through 2017, Grande terminated customers who didn't pay,
25  didn't it?

1    A.  Absolutely, yes, ma'am.

2    Q.  And there was a process leading up to termination for

3    non-payment; do you recall that?

4    A.  I do.

5    Q.  Once a customer was 30 days late in paying a bill, Grande's

6    billing system generated a late notice that it sent to the

7    customer; do you recall that?

8    A.  That's correct.

9    Q.  And then if payment was not made by day 60, Grande

10   suspended the customer's service and turned the customer's

11   equipment off, correct?

12   A.  Yes, ma'am.

13   Q.  And then if the customer still didn't pay Grande within,

14   you know, a couple weeks or so, Grande would go out to the

15   physical location of the residence or the building and

16   disconnect the service; isn't that right?

17   A.  Yes, ma'am, that's correct.

18   Q.  And at that point, the customer was terminated for

19   non-payment, right?

20   A.  Yes.

21   Q.  And isn't it true that in that timeframe, October 2010

22   through June 2017, if someone did not pay Grande for its

23   services, Grande eventually terminated those customers

24   100 percent of the time; isn't that right?

25   A.  If we did not receive payment, then, yes, we would

1    terminate them 100 percent of the time.

2    Q.  In fact, from 2011 through 2017 Grande, terminated

3    thousands of customers over those years when they stopped

4    paying their bills; isn't that right?

5    A.  Yes, ma'am, that's correct.

6    Q.  Okay.

7           MS. AMSTUTZ:  Can we pull up Plaintiff's Exhibit 712,

8    which has already been admitted into evidence, so we can

9    publish it to the jury.

10   BY MS. AMSTUTZ:

11   Q.  Can you see that on your screen, Mr. Rohre?

12   A.  Yes, ma'am, I can.

13   Q.  Okay.  Plaintiff's Exhibit 712 appears to be an e-mail from

14   Keith Taub to you, dated August 2nd of 2016; is that correct?

15   A.  That is correct.

16   Q.  And as of August of 2016, Kevin Taub was the vice president

17   of finance for Grande; is that right?

18   A.  Keith Taub, yes, ma'am.

19   Q.  I'm sorry.  Thank you for correcting me.  As of August of

20   2016, Keith Taub was the vice president of finance, right?

21   A.  That's correct.

22   Q.  Now, on August 2nd of that year, 2016, Mr. Taub writes to

23   you and says, *"Here's the churn file."*

24        Do you see that?

25   A.  I do.

Matt Rohre - Examination                    1265

1   Q.  And you're familiar with the term "churn" within Grande,

2   aren't you?

3   A.  Absolutely.

4   Q.  And is it fair to say that "churn" means the loss of a

5   customer?

6   A.  Yes, ma'am, that's correct.

7   Q.  And you're familiar with what's described in this e-mail

8   marked as Plaintiff's Exhibit 712, which is a churn file?

9   A.  Yes, ma'am.

10  Q.  And is it fair to say that a churn file is an analysis or a

11  summary of the reasons why Grande has lost customers?

12  A.  Yes, it's the reason why customers have churned, that's

13  correct, the reason that was applied in the billing system.

14  Q.  Okay.  And there can be various reasons --

15  A.  That's correct.

16  Q.  -- why a customer is lost, right?

17  A.  Yes, ma'am, that is correct.

18  Q.  Okay.  So let's look at the attachment -- well, you see on

19  the cover e-mail there's an attachment described as *"Voluntary*

20  *Churn Details,"* and it looks like it's a spreadsheet, right?

21  A.  Yes, it's a spreadsheet.

22  Q.  Okay.  So let's look at page eight of this 26-page document

23  that's Plaintiff's Exhibit 712.  Okay.  And do you see the

24  section that says, *"Subscriber Churn."*  Do you see that?

25  A.  I do.

1   Q.  And is it fair to say that that's loss of a subscriber?

2   That's what that's intended to indicate, right?

3   A.  Yes, ma'am.

4   Q.  Okay.  And if you scroll down the reason or the -- scroll

5   down the column of Subscriber Churn, you see one of the reasons

6   as non-pay; do you see that?

7   A.  That's correct.

8   Q.  And if you look to the right, the first column says,

9   *"Grande year-to-date 2016,"* correct?

10  A.  Yes, ma'am.

11  Q.  And if you scroll over from non-pay to year-to-date of

12  2016, which would have been August 2nd of 2016, you see that

13  this churn file shows that Grande terminated 6,943 subscribers

14  in that year for non-payment up to August 2nd, right?

15  A.  I'm willing to assume so, because I can't see the entire

16  spreadsheet.  But, yes, ma'am, that -- I just see one small

17  section of it.

18  Q.  Yeah, okay.

19          MS. AMSTUTZ:  If you can please zoom out, Conner, for

20  a second?

21  BY MS. AMSTUTZ:

22  Q.  Do you see there's separate columns for Austin and Corpus

23  Dallas and Odessa?

24  A.  I do.

25  Q.  That first column that we were looking at, that was for

1  Grande as a whole, all of the markets, right?

2  A.  That's correct.

3  Q.  So going back to my question, year-to-date as of August 2nd

4  of 2016, this business record, this churn file, shows that

5  Grande terminated 6,943 subscribers for non-payment, correct?

6  A.  Yes, ma'am, that looks to be correct.

7  Q.  Okay.  And that would be across all three lines:  Internet,

8  cable TV and telephone, right?

9  A.  That's at the subscriber level, so not necessarily at the

10  product level.

11  Q.  So it would encompass all three lines?

12  A.  It could encompass, you know, three services for one

13  customer.

14  Q.  Okay.  So let's go to the next page, page nine of this

15  26-page PDF.  And I'm going to direct you to the section that's

16  entitled "Data RGU Churn"; do you see that?

17  A.  Yes, ma'am.

18  Q.  And based on your experience and knowledge of these churn

19  files, is that data of customers lost that had -- well, data is

20  bad word.  A summary of costumers lost that had Internet or

21  data service?

22  A.  That's correct.  RGU stands for "revenue-generating unit,"

23  so that would -- that's right.

24  Q.  And I believe you testified earlier -- and when I say

25  earlier, I mean last Friday, that sometimes Internet and data

1  were used interchangeably at Grande; is that fair?

2  A.  That's correct.

3  Q.  And so as with the subscriber churn, if we go down the

4  reasons for loss of the customer, we see non-pay again; do you

5  see that?

6  A.  Yes, ma'am.

7  Q.  And then if we go over to Grande year-to-date 2016, it

8  indicates that between January 1st and August 2nd of 2016,

9  Grande terminated 6,427 Internet customers for non-payment; is

10 that right?

11 A.  Yes, ma'am.

12 Q.  And in your experience as the general manager of Grande who

13 reviewed these churn files, would it be reasonable to expect

14 that there were more Internet customers that Grande terminated

15 after August 2nd of 2016 that aren't reflected in that number?

16 A.  Yes, ma'am.

17 Q.  And you're aware that Grande maintained the same type of

18 churn data for years before 2016; for instance, for 2015 and

19 2014, correct?

20 A.  That's correct.

21 Q.  And is it fair to say that while you were the general

22 manager of Grande, it terminated customers for non-payment

23 because Grande didn't allow its customers to use its Internet

24 for free, correct?

25 A.  Yes, ma'am, that's correct.

1  Q.  But from October 2010 to June 2017, Grande continued to

2  accept payment from subscribers about whom it was getting

3  infringement notices, no matter how many notices it received

4  about that customer; isn't that correct?

5  A.  Yes, ma'am.  We accepted payments from all customers.

6  Q.  Including the ones that you were getting multiple copyright

7  infringement notices about, correct?

8  A.  Yes, ma'am.

9         MS. AMSTUTZ:  Your Honor, I have no further questions

10  at this time.  I'll pass the witness.

11         MR. HOWENSTINE:  Just so the Court is clear on this,

12  we intend to do a direct examination of Mr. Rohre now instead

13  of calling him back in our case.

14         THE COURT:  That's fine.

15                     EXAMINATION

16  BY MR. HOWENSTINE:

17  Q.  Good morning, Mr. Rohre.

18  A.  Good morning.

19  Q.  Could you tell the jury, when did you start working at

20  Grande?

21  A.  I started working at Grande in 2002.  I believe it was

22  April of 2002.

23  Q.  What did you do before you joined the company?

24  A.  Before I joined Grande, I worked for a couple years at a

25  company by the name of Marconi, which was an equipment

1   manufacturer.  And prior to that, I worked for a cable company

2   in the North Dallas area.  It was originally Telecable acquired

3   by TCI, then acquired by AT&T Broadband.

4   Q.  I think the court reporter would probably appreciate it if

5   you slowed down just a little bit.

6       When did you first become aware of Grande?

7   A.  Probably around the year 2000 is when I became aware of

8   Grande.

9   Q.  How did that come about?

10  A.  Well, actually, when I had made the decision to leave AT&T

11  Broadband, I actually interviewed for a job at Grande for a

12  plant activation manager, so I believe that was in 2000.  They

13  were making a big splash because they were one of the first

14  companies that was going to sort of go out and overbuild some

15  of the incoming providers, so it was interesting what they were

16  doing.

17  Q.  And how did you come to join the company?

18  A.  I actually did not take that job.  I took a job at Marconi.

19  And while I was at Marconi, I was a sales and systems engineer,

20  and Grande was actually eventually assigned as one of my

21  customers.  So I spent about a year working with Grande as they

22  were turning up the equipment that we had sold them and then

23  they offered me a job in 2002.

24      My youngest daughter -- my oldest daughter now -- she was

25  two years old.  My wife would prefer that I not travel so much

1    anymore, so we took the job.

2    Q.  So was that close in time to when the company first

3    started?

4    A.  It was.  The company was founded in late 1999, the

5    executive team founded it.  And in 2000 they acquired a company

6    by the name of Thrifty Call, which was a wholesale voice

7    provider in San Marcos and that gave them some cash flow, the

8    employee base and, more importantly, the telephone switching

9    network that they would eventually build a company around.

10   Q.  So during this time period when you joined when the company

11   was first starting out, what was the goal?

12   A.  To provide choice to customers.  I mean, previously all

13   these customers were getting services from incumbent cable and

14   telephone customers and the thought was that we could provide

15   the unified service, all three services on one bill.  We were

16   local here in Texas.  The goal was to -- I think the big

17   overarching goal was to build out the entire state.  We haven't

18   made that, but we've certainly made some strides in expanding.

19   Q.  So when you joined the company in these early years, what

20   was the environment at Grande like?

21   A.  Oh, it was a start-up company.  So it was very, very

22   hectic.  It was exciting, but tiring, but it was -- it was a

23   lot of fun.

24   Q.  And what markets did Grande serve in those early years?

25   A.  When I came to work here in 2002, it was just Austin, San

1   Antonio and San Marcos.

2   Q.  And focusing on, let's say, your first ten years at the

3   company, 2002 through 2012, did Grande start serving any new

4   markets over that time?

5   A.  We did.  We had some acquisitions.  In 2002, later in 2002,

6   we acquired a company by the name of Clearsource.  Clearsource

7   served the markets of Midland/Odessa, Waco and Corpus Christi.

8   And then in 2003, we acquired a company by the name of

9   Advantechs, which was actually the telecommunications arm of a

10  power utility co-op in the North Dallas suburbs.  And so we --

11  that's how we got into the Dallas market as well.

12  Q.  Again, focusing on that time period, your first ten years

13  there, were there any ownership changes at Grande?

14  A.  In 2009, there was an ownership change.

15  Q.  And what was the change?

16  A.  A company by the name of ABRY Partners acquired the company

17  from the original private equity investment group.

18  Q.  Did that change things at Grande?

19  A.  Absolutely.  It changed some of our leadership, but it also

20  changed in the fact that there was a big capital infusion that

21  came with that, so we were able to significantly expand our

22  network capacity.  We expanded speeds.  We invested in our data

23  product.  That was when we launched TiVo back when people

24  actually didn't watch all their TV over the Internet, but we

25  launched -- we were the first ones to kind of embrace the

1   over-the-top with TiVo as well as the multi-room DVRs.  And we

2   used a lot of that money, too, to start expanding our footprint

3   in the markets that we served.

4   Q.  Now, with that ownership change, did the culture change

5   within the company?

6   A.  No.  No.  You know, there were definitely some changes in

7   personalities as there would be in any type of scenario like

8   that, but our culture has always been strong here.  The

9   majority of the leadership here locally outside of our C-suite

10  stayed intact.

11  Q.  Now, I'd like to move forward in time a little bit and talk

12  about the time period when you were the GM of the company.

13  What period was that exactly?

14  A.  From, really, kind of on an interim basis in the fourth

15  quarter of 2014 through the first quarter into the middle of

16  the second quarter of 2018.

17  Q.  Did the company continue to grow over that time?

18  A.  We did.  We did.  We continued to expand our footprint.

19  You know, we probably -- actually, we started to accelerate at

20  that time because we built around 12,000 new homes.  We also,

21  in 2015, acquired a company by the name of Centrovision that

22  was in the Temple and surrounding markets.  And that gave us

23  kind of a foothold to start expanding in Temple.  And in 2016,

24  we built about 16,000 homes and then in '17, about 20,000, so

25  we were continuing to ramp that up.

Matt Rohre - Examination                    1274

1  Q.  So if you could tell the jury, as someone who's worked for

2  Grande for 20-plus years, what's it like to work there?

3  A.  It's good.  It's challenging.  Twenty years is a long time.

4  I don't think I would stay here if it hadn't been good.

5  Certainly had its ups and downs, but you know, I've had other

6  opportunities, but none of them that made me want to go

7  anywhere.

8  Q.  How would you describe the culture within the company?

9  A.  It's a family-type culture.  We really have a mission

10  statement.  Take care of our customers, take care of each

11  other, do what we say we're going to do and have fun.  And we

12  really step up, whether it's, you know, people with personal

13  issues or hurricanes or floods, which we certainly have seen

14  over the last several years, we step up and take care of people

15  when they're impacted, and that's rewarding.

16  Q.  So with the acquisitions, expansions, ownership changes,

17  has that changed the culture within the company?

18  A.  No.  Actually, with the latest management change, the -- we

19  actually called it a value system.  They called it a mission

20  statement.  They were almost identical.  It was minor changes.

21  It hasn't really changed, no.

22  Q.  Now, in your time as the GM -- again we're talking about

23  2014 through 20 -- into 2018 -- who were Grande's main

24  competitors in the Internet space?

25  A.  Well, they've all changed names, so let me see if I can go

Matt Rohre - Examination                    1275

1   through all the current.  Our largest competitor in the vast

2   part of Texas was Time Warner, which is now Spectrum.  AT&T was

3   obviously originally a telephone competitor and DSL, but then

4   they had the U-Verse product, which was their fiber overbuild,

5   which made them a lot more competitive on the data side of the

6   business.

7       And so we competed against them.  We competed against

8   CenturyLink, I believe which is now Lumen in several markets,

9   San Marcos, in particular, and some areas in North Dallas.  In

10  West Texas, we competed against Suddenlink which is now Optimum

11  and Cable One, which is now Sparklight.  So pretty much all the

12  big ones that people have heard of, whether they know the new

13  names or not, we've competed against.

14  Q.  Going into those markets against companies like Spectrum,

15  what was Grande's approach?

16  A.  Customer service was our biggest focus.  When we initially

17  started in these markets, obviously we didn't have any brand

18  recognition, it's a lot easier for us -- and I think we could

19  have really good brand recognition in the smaller markets.  The

20  larger markets can still be a challenge because we don't serve

21  the entire footprint of San Antonio or Dallas or Austin, but

22  what we would do is we would go in and we would really focus on

23  our customer service, on our products, keeping the service on,

24  answering the phone and making sure that customers would give

25  us good word-of-mouth referrals.

1  Q.  In your view as someone who has worked for Grande for
2  20-plus years, how is Grande different from its competitors?
3  A.  Well, I think we're small.  You know, even though we've
4  grown over the years, I think we still maintain that small
5  company mentality.  We're nimble.  If we need to change, we
6  will, and we don't take things for granted.
7  Q.  When you were the GM, how did Grande differentiate itself
8  from its competitors in its marketing?
9  A.  It's changed over time, but in 2014, we were the first
10 customer to launch 1-gig service in Austin when Google Fiber
11 said they were coming to town.  That's one I missed earlier,
12 Google Fiber we competed against in Austin.  They actually had
13 made their announcements and they were going through the
14 process of getting their agreements together with the city.  So
15 we had some infrastructure in place where we could change out
16 some electronics and we really wanted to prove to people that
17 we could react to that, and so we were actually the first ones
18 to launch 1-gig.
19     And then over the next couple of years, we upgraded all of
20 our platforms so that we could launch 1-gig service across the
21 entire state.  So we really differentiated ourself on speed and
22 reliability.  And again, I mentioned, you know, from a video
23 perspective, you know, video is not the primary business, as
24 we've established, but we still have 45,000 video customers in
25 this state alone, so it's important to us.

1      And we invested in that product with the TiVo platform, and
2   it was -- we were one of the first in the country to partner
3   with TiVo at the time.  Prior to that, TiVo had been all retail
4   business, where you go to Best Buy and buy that, and that was
5   really a differentiator for us as well on the video side and
6   product side.
7   Q.  Now, when you were GM of the company, did Grande pay
8   attention to customer churn?
9   A.  Absolutely.  We looked at sales.  We looked at churn.  And
10  we looked at net growth.
11  Q.  Was minimizing churn the most important thing when you were
12  the GM?
13  A.  No.  Giving customers a reason not to churn I think is the
14  most important thing, but certainly you're going to look at all
15  the metrics behind that to figure out if you're doing a good
16  job or not.
17  Q.  If you could describe for the jury just a little bit at a
18  high level, what were the things that you did to stay on top of
19  churn and customer retention?
20  A.  Well, we would certainly look at how our non-pay policies
21  worked and how customers were responding to those.  You know,
22  over time, we've sent letters, or we may make some outbound
23  calls in some cases.  We looked, certainly, at loss to
24  competition, and we look at what our competitive -- what the
25  competitors' offers are out in the marketplace to see if we

1    need to be more competitive in certain markets or certain

2    places or certain customer groups.

3        You know, and then the biggest reason customers churn is

4    obviously for move non-serviceables.  Since we're not

5    ubiquitous in most of our markets, if they move, they can't

6    just transfer service because we don't have service available

7    there.  So we would certainly look where people are moving and

8    look where there where opportunities for us to expand our

9    footprint going forward.

10   Q.  Did you receive regular reports on customer churn?

11   A.  I received regular reports every day, every week, on all

12   kinds of things.

13   Q.  Did you sit in in -- did you have meetings regularly about

14   churn issues?

15   A.  Certainly it would come up at our staff meetings.  Our

16   marketing folks are always very focused on looking at churn and

17   making sure that we were doing our best to minimize that.

18   Q.  In all those conversations and reports about customer

19   churn, did the topic of copyright infringement complaints ever

20   come up in connection with churn or customer retention?

21   A.  No, sir, it did not.

22   Q.  To be clear, did you ever consider Grande's policy on

23   copyright complaints as a way to keep or attract customers?

24   A.  I did not.

25   Q.  From 2011 through 2016, if you could describe for the jury

1   a little bit, what did Grande do when it received a copyright

2   infringement complaint about a subscriber?

3   A.  When we would receive complaints, we would send the

4   customer a letter that would be generated by our billing

5   vendor.  That would detail what -- if they had received

6   multiple ones in one day, then they would be on one letter.  If

7   they didn't receive any, then obviously, there wouldn't be a

8   letter.  If they received one, then they would get a letter.

9        That letter had information on what the allegations were

10  and a phone number to call.  And then we would try to educate

11  that customer, you know, if they're an unauthorized user or,

12  you know, an unsecured wireless network, certainly early on

13  when wireless was newer, people didn't really understand the

14  dangers around that.  You know, our policy was really just

15  about informing customers and educating customers and giving

16  them an opportunity to investigate that for themselves.

17  Q.  Has Grande, to your knowledge, ever attempted to monitor

18  what specific customers are doing online?

19  A.  No, we don't.  We respect peoples' privacy.  We don't have

20  the ability or the desire.

21  Q.  Now, in the beginning part of your testimony, you were

22  asked some questions about Grande's termination of customers

23  for non-payment; do you recall that?

24  A.  Yes, sir, I do.

25  Q.  In your view, is it fair to compare termination for

1    non-payment to termination for alleged copyright violations?

2    A.  No, I don't think it is.  Because we are 100 percent sure

3    that we have not received payment from a customer.  They know

4    they haven't paid us.  And they've been given an opportunity to

5    pay us and we terminate them.  When it comes to the notices, we

6    have no way to know if they're a hundred percent accurate and

7    true or not.  So, no, I don't think that's right.

8    Q.  When you were the GM of Grande, did you want peer-to-peer

9    file sharing on the company's network?

10   A.  I did not.

11   Q.  Did you ever encourage anyone to share music files -- I'm

12   sorry.  Let me say that again.

13       Did you ever encourage anyone to share music files?

14   A.  Absolutely not.

15   Q.  Are you aware of anyone else within the company doing that?

16           MS. AMSTUTZ:  Objection.  Hearsay.

17           THE COURT:  No, he's just asking him whether he was

18   aware.  He didn't ask for any statements, so the objection is

19   overruled.

20   BY MR. HOWENSTINE:

21   Q.  You can answer the question.

22   A.  I'm sorry.  Can you ask it again?  I thought I already

23   answered it.

24   Q.  Are you aware of anyone else doing that within the company?

25   A.  No, sir, I'm not.

1  Q.  Did you ever intend to facilitate music sharing on Grande's

2  network?

3  A.  Absolutely not.

4  Q.  Did you have any way to learn about specific instances of

5  peer-to-peer file sharing on Grande's network?

6  A.  I'm not the expert on that, but not to my knowledge, no.

7          MR. HOWENSTINE:  No further questions for the witness.

8          THE COURT:  Okay.  Cross.

9                        EXAMINATION

10  BY MS. AMSTUTZ:

11  Q.  Okay.  Mr. Rohre, just a couple follow-up questions.

12  You're familiar with a company called Rightscorp?

13  A.  I am.

14  Q.  And you testified earlier that between 2011 and 2016 when

15  Grande received infringement notices, it sent a letter to the

16  customer?

17  A.  That's correct.

18  Q.  But Grande didn't do that for Rightscorp notices, did it?

19  A.  Between 2011 and 2016?

20  Q.  Yes.

21  A.  As far as I know, Grande sent letters from Rightscorp.  I

22  do know that it's my understanding that there was a period of

23  time where the originating e-mail address from Rightscorp

24  changed, and there may have been a period of time where those

25  letters weren't sent, but beyond that, I believe they were

1   sent.

2   Q.  Okay.  You believe or you know?

3   A.  I believe.

4   Q.  And you testified earlier that there was a process for

5   terminating customers for non-payment; do you recall that?

6   A.  That's correct.

7   Q.  Where you would -- you would send a letter, right?

8   A.  That's correct.

9   Q.  And then 30 days later, still no payment, you push pause on

10  their service, right?

11  A.  It's at about day 45, yes.

12  Q.  And sometimes that would start a conversation between

13  Grande and the customer, like, Why did you turn off my

14  Internet?  Right?

15  A.  That's correct.

16  Q.  And then they still didn't pay, but then, you know, two

17  weeks or so you terminated them and cut off their service,

18  right?

19  A.  Yes, ma'am.

20          MR. HOWENSTINE:  Objection.  Foundation.

21          MS. AMSTUTZ:  Your Honor, he's already testified to

22  all of this previously.  I'm just laying the groundwork for my

23  next question.

24          THE COURT:  The objection is overruled.

25  BY MS. AMSTUTZ:

Matt Rohre - Examination                     1283

1  Q.  And there was nothing preventing Grande from having that

2  same process of a letter, pushing pause, starting a

3  conversation, and terminating for copyright infringement

4  notices, was there?

5  A.  Certainly the letter asked customers to call us so that we

6  could explain what was going on, but at that time, the policy

7  was not to suspend those customers, no.

8  Q.  But there was nothing preventing Grande from having that

9  policy, right?

10  A.  No.

11  Q.  Is that correct?

12  A.  That's correct.

13        MS. AMSTUTZ:  Nothing further, Your Honor.

14        MR. HOWENSTINE:  Nothing further, Your Honor.

15        THE COURT:  Okay.  You can step down, sir.  Thank you.

16        THE WITNESS:  Thank you, Your Honor.

17        THE COURT:  Okay.

18        MR. GILMORE:  Your Honor, plaintiffs now call Dr. Andy

19  Bardwell to the stand.  I think we have to go get Mr. Bardwell.

20  Give us a moment.

21        THE COURT:  All right.

22        What happened to him?

23        MR. GILMORE:  I thought he was outside.  Sorry, Your

24  Honor.  My colleague is going to bring him.

25        THE COURT:  All right.  Is this the Robert Bardwell?

1          MR. GILMORE:  It is.  He goes by Andy.  Dr. Robert

2    Bardwell.  Can't understand why he doesn't go by Robert.  It's

3    a great name.

4          THE COURT:  It's okay.

5          COURTROOM DEPUTY CLERK:  Please raise your right hand.

6          You do solemnly swear that the testimony you're about

7    to give in this case now before the Court will be the truth,

8    the whole truth and nothing but the truth, so help you God?

9          THE WITNESS:  I do.

10                            *   *   *

11          *(DR. ROBERT BARDWELL, Plaintiff Witness, Sworn.)*

12                            *   *   *

13          COURTROOM DEPUTY CLERK:  You can have a seat.

14                      DIRECT EXAMINATION

15    BY MR. GILMORE:

16    Q.  Good morning, Dr. Bardwell.

17    A.  Good morning.

18    Q.  Could you please introduce yourself to the jury?

19    A.  Yes.  I'm Dr. Robert Bardwell.

20    Q.  And as we were discussing just a moment before, you

21    actually go by Andy, right?

22    A.  That's my middle name, yes.

23    Q.  Dr. Bardwell, can you tell the jury, what were you asked to

24    do in this case?

25    A.  I was asked to analyze Rightscorp infringements that had

Dr. Robert "Andy" Bardwell - Examination          1285

1    been sent to Grande on -- that are associated with songs that
2    are asserted in this case.
3    Q.  Have you prepared some slides to help explain your
4    testimony for the jury?
5    A.  I have.
6    Q.  Can we look at the first slide, please?
7        Let's first start by going through your education and
8    professional background.  First of all, can you summarize for
9    the jury your education, sir?
10   A.  I have a Ph.D. in mathematical statistics from the
11   University of Colorado at Boulder.
12   Q.  And then can you briefly summarize for the jury your
13   professional background?
14   A.  Yes.  I have two companies.  One is a consulting company,
15   and the other is a software company.  The --
16   Q.  Can you tell us first about -- just a little bit about the
17   software company?
18   A.  Yes.  The software company is called OptiMiser.  I started
19   that about 12 years ago, and starting about ten years ago we
20   developed -- completed development of software that analyzes
21   energy use in buildings with an aim to reduce energy use
22   generally, and that software has been marketed nationally for
23   about ten years.
24   Q.  Thank you.  Can you tell us a little bit about your
25   consulting company, Dr. Bardwell?

1    A.   Yes.   I actually started consulting with my dad who was

2    also a mathematician, much more than 25 years ago, but I got --

3    after I got my Ph.D., I started a consulting company, and I've

4    offered consulting to government entities, non-profits and

5    corporations and been qualified as a statistical expert in a

6    number of cases across the country.

7    Q.   Thanks, Dr. Bardwell.

8         MR. GILMORE:   Can we go to the next slide, please?

9    BY MR. GILMORE:

10   Q.   Can you briefly, without going in too much detail, but if

11   you could briefly describe -- I know there's a lot to talk

12   about, but just briefly describe a few of your past consulting

13   matters that you think are relevant for the kind of work that

14   you've done here in this case.

15        How about the first one that you're showing here, work for

16   the CDC?

17   A.   Yeah.   I'm sure we've all become much more familiar with

18   the CDC in the last few years, but I was the lead statistician

19   working with the CDC to resolve questions about statistical

20   estimates from a very large national survey to determine levels

21   of violence against women, and that -- the results of that

22   study was presented to Congress.

23   Q.   And how about the second matter where you worked on

24   developing analysis in a high-profile murder case?

25   A.   Yeah.   So the Boulder Police Department contracted with me

Dr. Robert "Andy" Bardwell - Examination          1287

1    to develop a probability model in a very high-profile murder

2    case that -- and the idea was to be able to identify shotgun

3    pellets in -- at the murder scene and on the suspect's -- in

4    that suspect's hunting vest, and this little graph shows that

5    the mixture of different alloys in the shotgun pellets were

6    very similar to the pellets that were found in the hunting vest

7    and at the murder scene.

8    Q.   And the last one you have on this slide, computing casino

9    payoff probabilities.  Just briefly describe that.

10   A.   Some of us will be happy to know that you have to a

11   certified probability analysis for every casino game before it

12   can be marketed, and I was called in to develop one for a game

13   that was so complex that it had stumped one of the leading

14   experts in that field.  And I had to develop a computer program

15   that actually developed the probability model, which is fun for

16   me.

17   Q.   Can we go to the next slide?  And then just very briefly

18   tell us about the last two matters that you think are relevant

19   for the kind of work that you did here.

20   A.   So for the Federal Election Commission, in 2006 I developed

21   a software that they still use across the country.  All the

22   auditors in the field have our software on their laptops, and

23   in DC, they use the same software to design and draw samples of

24   all contributions for federal elections to identify fraud.

25   Q.   And then the very briefly, the last matter for the Interior

1    Department?

2    A.   So the Interior Department has an agency called Minerals

3    Management Service, and they're responsible for collecting

4    royalties on all the gas, mineral and oil leases, federal gas,

5    mineral and oil leases.  And I developed a statistical software

6    that was used to identify what level of compliance with those

7    royalty payments they were able to achieve, and the results of

8    that were presented to Congress for over a decade.

9    Q.   Dr. Bardwell, why did you think it was important to share

10   with the jury some of your past experience you thought was

11   relevant for the work you've done here?

12   A.   I think it's kind of entertaining, but they all have to

13   deal with developing software and analyzing large data sets,

14   which is essentially what I did here.

15   Q.   Thank you, Dr. Bardwell.  Have you worked as an expert --

16   testified as an expert in any other cases that are similar to

17   this one?

18   A.   Yes.  In a case, BMG and Round Hill v. Cox, I performed a

19   very similar analysis.

20   Q.   Did that case and your analysis also involve infringement

21   notices from Rightscorp?

22   A.   It did.

23        MR. GILMORE:  Can we pull up, just for the witness

24   first, Plaintiff's Exhibit 458?

25   BY MR. GILMORE:

Dr. Robert "Andy" Bardwell - Examination          1289

1    Q.  And do you recognize this as a copy of your CV summarizing

2    your background and experience?

3    A.  I do.

4          MR. GILMORE:  We'd move Plaintiff's Exhibit 458 into

5    evidence.

6          MR. BROPHY:  No objection, Your Honor.

7          THE COURT:  It will be received.

8    BY MR. GILMORE:

9    Q.  Now, Dr. Bardwell, were you compensated for your work on

10   this case?

11   A.  Yes.

12   Q.  And what is your hourly rate?

13   A.  500 an hour for research and consulting, and 750 for

14   testimony.

15   Q.  Now, can you tell us, approximately how many hours have you

16   spent in developing your analysis for this case and preparing

17   to testify today?

18   A.  Approximately 750 hours prior to preparation for trial and

19   about a hundred hours in preparation for trial.

20   Q.  And in your work on this case, were you assisted by

21   statisticians and mathematicians who were part of your

22   consulting firm?

23   A.  Yes.

24   Q.  Did your compensation depend on you reaching any particular

25   conclusion?

Dr. Robert "Andy" Bardwell - Examination     1290

1   A.  No.

2   Q.  And does your compensation in any way depend on the outcome

3   of this case?

4   A.  No.

5           MR. GILMORE:  Your Honor, plaintiffs tender

6   Dr. Bardwell as an expert in statistical analysis.

7           MR. BROPHY:  No objection, Your Honor.

8           THE COURT:  Be received.

9   BY MR. GILMORE:

10  Q.  All right.  Dr. Bardwell, can you tell the jury, what were

11  you asked to do in this case?

12  A.  I was asked to review approximately 1.3 million notices

13  that Rightscorp had sent to Grande involving the offer of

14  Grande subscribers offering copyrighted works to be shared and

15  to determine how many of those involved works asserted in this

16  case.

17  Q.  And can you summarize the conclusion, your opinion that

18  you're offering based on that analysis?

19  A.  Yes.  Of those 1.3 million infringement notices, 317,570 --

20  527 were associated with songs asserted in this case.

21  Q.  Thank you, Dr. Bardwell.  Can you explain for the jury how

22  you went about performing the analysis in this case?

23  A.  Yes.  I analyzed the Rightscorp notices, and I compared the

24  track title and the artist in those notices with the track

25  title and artist of songs asserted in this case and identified

1   all the notices that were associated with asserted songs.

2   Q.  Was the first step of your analysis, did plaintiffs give

3   you a list of their copyrighted recordings that they were

4   asserting had been infringed that they were suing on in this

5   case?

6   A.  That's correct.

7   Q.  And then once you received that list of the copyrighted

8   recordings that plaintiffs are suing on in this case, can you

9   explain how you went about analyzing the notices to see which

10  of those were associated with the songs that plaintiffs are

11  suing on?

12  A.  Yes.  As I said, I created a table of all the track titles

13  of the asserted works and the artist names, and I compared

14  those to the title and the artist name on the Rightscorp

15  notices.  And to do that I developed a computer program,

16  because the way that the subscriber sharing the songs, the way

17  they're titled, is somewhat variable, so I had to write a

18  computer program to effectively match those notices to the

19  asserted works.

20          MR. GILMORE:  Now, can we show just to Dr. Bardwell

21  Plaintiff's Exhibit 459.

22  BY MR. GILMORE:

23  Q.  Do you recognize this document?

24  A.  I do.

25  Q.  Can you identify what Plaintiff's Exhibit 459 is,

1    Dr. Bardwell?

2    A.   This is RAB-1.

3    Q.   And what is RAB-1?

4    A.   It's the -- this is the result of a summary of my analysis,

5    so it lists each of the asserted works and the number of

6    infringement notices and other information about the matching

7    that I did.

8    Q.   Does this chart that we're looking at accurately summarize

9    the information from the list of copyrighted works and from the

10   Rightscorp notices sent to Grande that you compiled and

11   analyzed as part of your work in this case?

12   A.   Yes.  It's a complete summary.

13   Q.   Now, Dr. Bardwell, over the course of your work on this

14   case, have you updated your analysis at times?

15   A.   Yes.

16   Q.   How many times have you updated your analysis?

17   A.   Twice.

18   Q.   Can you explain for the jury the first time you updated

19   your analysis?

20   A.   The first time the plaintiffs reduced the number of

21   asserted songs, so I had to remove those from the table of

22   asserted songs and the titles and artists I was identifying and

23   rerun my analysis.

24   Q.   And then let me ask you about the second time you updated

25   your analysis.  In preparing for your testimony, did you

1    identify certain of plaintiff's asserted songs that were not

2    appearing in your summary chart?

3    A.  Yes.

4    Q.  How many?

5    A.  There were 13 that didn't appear and one that was needed to

6    be added.

7    Q.  And after you identified those asserted recordings that

8    weren't appearing in your summary chart, did you review

9    Rightscorp notices to confirm that there were notices

10   associated with those recordings?

11   A.  Yes.

12   Q.  And did you update your chart so that it included those

13   recordings?

14   A.  I did.

15   Q.  The Plaintiff's Exhibit 459 that you have on your screen

16   there, does that reflect the two updates to your analysis that

17   you just described for us?

18   A.  It does.

19        MR. GILMORE:  Plaintiffs move into evidence

20   Plaintiff's Exhibit 459 as a Federal Rule of Evidence 1006

21   summary exhibit.

22        MR. BROPHY:  No objection, Your Honor.

23        THE COURT:  It will be received.

24   BY MR. GILMORE:

25   Q.  Now, Dr. Bardwell, have you prepared a slide -- so

Dr. Robert "Andy" Bardwell - Examination          1294

1    Plaintiff's Exhibit 459 is kind of a big document, right?

2    A.   It is.

3    Q.   Have you prepared a slide that excerpts some rows so you

4    can sort of explain what's in your summary analysis for the

5    jury?

6    A.   I have.

7             MR. GILMORE:   Can we go to the next slide, please?

8    That's it.

9    BY MR. GILMORE:

10   Q.   All right.   Now Dr. Bardwell, can you walk us through this

11   chart, and first can you explain the information that's in the

12   first four columns?

13   A.   Yes, so the first four columns are all information that

14   comes from the list of asserted songs.   So the first one is the

15   copyright registration number for the recording.   All of these

16   are -- there are six recordings by Bruno Mars.   The artist is

17   listed in that second column.   The third column lists the title

18   of the recording, and then the fourth column lists the owner of

19   the copyright.

20   Q.   Now, let's talk about the next columns in your summary

21   analysis, which is Plaintiff's Exhibit 459.

22        First of all, can you tell us, what is the *Infractions*

23   column there?

24   A.   Right.   So the remaining five columns all come from the

25   infringement notices.   All that data comes from the

1  infringement notices.  So the first one, the number of

2  infractions is the number of notices where that recording was

3  offered for sharing.

4  Q.  And we're looking at the first row, Bruno Mars *Just The Way*

5  *You Are.*  Does the result of your analysis show that there were

6  1,538 Rightscorp notices of infringements sent to Grande for

7  that song?

8  A.  That's correct.

9  Q.  All right.  Can you tell us what the next column, *IP*, what

10  does that indicate?

11  A.  So in those notices, 1,538 notices, there were 301 separate

12  IP addresses offering to share that song, so that column IP is

13  for each one of these is the number of different IP addresses

14  sharing the song.

15  Q.  Now, the next two columns, *Begin Date* and *End Date*, can you

16  explain what's the information that you're summarizing for us

17  in those columns?

18  A.  So these columns give us -- tell us the period over which

19  this recording was offered for sharing, and the first -- it was

20  first offered, Bruno Mars *Just The Way You Are,* on May 16,

21  2012, at 2:20, and last offer was February 25th, 2018, 5

22  minutes past midnight.

23  Q.  Thank you, Dr. Bardwell.  So according to this information

24  in your chart for this song, the Bruno Mars *Just The Way You*

25  *Are* song, the last infringement shown in the Rightscorp notices

Dr. Robert "Andy" Bardwell - Examination          1296

1  was in 2018?

2  A.  That's correct.

3  Q.  And so that's after plaintiffs had filed their lawsuit in

4  April 2017?

5  A.  Yes, quite a few years after.

6  Q.  And did you find that happening with a number of songs as

7  part of your analysis, that there were infringements that

8  occurred even -- that Rightscorp was sending notices about

9  infringements to Grande even after plaintiffs had filed this

10  lawsuit?

11  A.  Yes.  That was true for many of the asserted works.

12  Q.  Thank you.  And now can you explain the last column, the

13  *Files* column.  What does that indicate to you?

14  A.  Yeah, so the -- in the infringement notices, each notice

15  has a file name that's associated with a specific file that was

16  offered.  And for this first work, 68 different files were

17  identified in the infringement notice.

18  Q.  Thank you, Dr. Bardwell.

19         MR. GILMORE:  Can we turn to the next slide, please?

20  BY MR. GILMORE:

21  Q.  Dr. Bardwell, based on your analysis, how many total

22  Rightscorp infringement notices of copyrighted works that

23  plaintiffs are suing on in this case did you find?

24  A.  I found 317,527 that were associated with works in this

25  case.

Dr. Robert "Andy" Bardwell - Examination          1297

1  Q.  Earlier in this case, Grande's expert, Dr. Kemmerer, did he

2  indicate that he had identified virtually the same number of

3  Rightscorp notices associated with the works in suit?

4  A.  Yes.  I think he said it was within a single digits or

5  maybe ten, something like that, yes, of the number that I

6  found.

7  Q.  Dr. Bardwell, did you identify Rightscorp infringement

8  notices sent to Grande for each of the copyrighted recordings

9  that plaintiffs are suing on in this case?

10  A.  Yes.

11  Q.  And for each of those copyrighted recordings, did you

12  identify at least one Rightscorp notice sent to Grande that was

13  dated within three years of when plaintiffs filed this suit; in

14  other words, from April 21st, 2014 onward?

15  A.  Yes.

16      MR. GILMORE:  No further questions.

17      MR. BROPHY:  Your Honor, would you like to take our

18  break, or should I move forward?

19      THE COURT:  Why don't we move forward.  We'll take a

20  break right after you're finished.

21      MR. BROPHY:  Your Honor, may I approach the witness?

22      THE COURT:  You may.

23                  CROSS-EXAMINATION

24  BY MR. BROPHY:

25  Q.  Dr. Bardwell, good morning.

Dr. Robert "Andy" Bardwell - Examination          1298

1   A.  Good morning.

2   Q.  How are you?

3   A.  Good.

4   Q.  Good.  Just a few questions here.  What I've handed you is

5   a copy of an expert report that you authored on July 13, 2018;

6   do you see that?

7   A.  I do.

8   Q.  And this report is a collection of all the opinions that

9   you've developed and the factual underpinnings for those

10  opinions; is that right?

11  A.  That's correct.

12  Q.  Are all the opinions that are expressed in this report

13  accurate, as far as you're aware?

14  A.  I guess I modify the last answer.  I also submitted a reply

15  report.  So could you ask your question again?

16  Q.  Sure.  As of the date of the report that you issued in July

17  of 2018, do you believe the information within that report is

18  correct and accurate?

19  A.  Yes, except for the updates that we've already discussed.

20  Q.  And those updates are the result of you receiving either

21  additional information or reacting to expert reports submitted

22  by Grande in this case; is that right?

23  A.  Correct.

24  Q.  I don't think these are trick questions.  Just wanted to

25  get that out there.

1      Okay.  I'm going to direct your attention --

2           MR. BROPHY:  And Your Honor, may I publish this expert

3  report to the jury?  I'm not moving it into evidence.  Just so

4  they can follow along.

5           THE COURT:  I don't think they have an objection.

6  It's his expert report.

7           MR. GILMORE:  That's right.

8           THE COURT:  The answer is yes.

9           MR. GILMORE:  I may have objections to some questions

10  about it.

11           THE COURT:  Well, that's fine.

12  BY MR. BROPHY:

13  Q.  There is a section at the beginning of your report that

14  states *"Summary of Finding"*; do you see that?

15  A.  I do.

16  Q.  And what was your intention for providing that section

17  within your report?

18  A.  Make the report easier to read.  You know, it's like an

19  executive summary.

20  Q.  And if I can move over to the next page, I believe there's

21  a bullet-pointed list of some of the high-level conclusions

22  that you've arrived at as a result of your analysis; is that

23  right?

24  A.  That is correct.

25  Q.  So for example, at the top you indicate that there are

Dr. Robert "Andy" Bardwell - Examination          1300

1   10,284 verified accounts; do you see that?

2   A.  I do.

3   Q.  Would you mind describing for the jury what that means, a

4   verified account?

5          MR. GILMORE:  I object, Your Honor.  This is his

6   expert report, but it's outside the scope of the testimony that

7   he presented.  Obviously, all experts have lots of expert

8   reports with lots of things on them.  That's not what's

9   relevant in terms of the testimony that the expert is actually

10  giving at trial.

11         MR. BROPHY:  Your Honor, he's done statistical

12  analysis.

13         THE COURT:  The objection is overruled.

14         MR. BROPHY:  Thank you, Your Honor.

15  BY MR. BROPHY:

16  Q.  With you mind describing what a verified account is,

17  please?

18  A.  Yes.  I wouldn't mind.  So -- in fact, I'd love to.  The

19  bulk of my report, which was not what I just presented.  I just

20  presented the counting of infringements in the Rightscorp

21  notices, but the bulk of my report was about constructing a

22  probability model that could demonstrate that many of those

23  infringements were instances of the same subscriber offering to

24  share music over and over again, so repeat infringement.  And I

25  did that by basically creating a way of establishing something

1  like a fingerprint for a subscriber, so I could identify in the

2  infringement data repeat infringers.

3  Q.  And if we look down this list, based on that analysis,

4  you've determined that the mean number of days that someone on

5  Grande's network received notices was 46 days; is that right?

6  A.  That's correct.  I guess I didn't really -- just for the

7  jury's -- to be fair to the jury, so a verified account would

8  be using that fingerprinting.  It would be an account of repeat

9  infringement that is verified with at least a confidence of

10  95 percent probability.

11     Yes.  The mean number of days between the first and last

12  infringement for verified accounts was 46 days.

13  Q.  I believe you also testified that you issued a reply report

14  in this case; is that right?

15  A.  That's correct.

16  Q.  And the date of that report was August 17, 2018; do you

17  recall that?

18  A.  I do.

19  Q.  Do you recall in that report citing to another of

20  plaintiff's experts, Mr. Lehr?

21  A.  I do.

22  Q.  And you reviewed Mr. Lehr's expert report as part of the

23  materials that you based your opinions on in this case; is that

24  right?

25  A.  I believe only in my reply report, because I was responding

1   to some claims that my report differed from Dr. Lehr's.

2   Q.   You reviewed the opinions expressed in Dr. Lehr's report;

3   is that right?

4   A.   I did.

5   Q.   Did you understand Dr. Lehr as concluding that internal

6   Grande indicates the average tenure for a Grande residential

7   customer is 38 months, or 3.2 years?

8          MR. GILMORE:   Objection.   Now he's asking about

9   another expert -- one of our experts who's already testified.

10         MR. BROPHY:   Your Honor, this is material --

11         THE COURT:   The objection is overruled.

12         THE WITNESS:   I don't recall that detail.

13         MR. BROPHY:   May I approach, Your Honor?

14         THE COURT:   Yes.

15         MR. BROPHY:   And Your Honor, may I publish that

16  portion of Dr. Lehr's report that I'm going to refer to?

17         THE COURT:   Yes.

18  BY MR. BROPHY:

19  Q.   Dr. Bardwell, if you wouldn't mind turning to page 12 of

20  the report from Mr. Lehr that I've handed to you.   Sorry, I

21  should say Dr. Lehr.   Pardon me.

22      Do you agree with me that in Dr. Lehr's report, he

23  concludes that internal Grande data indicates the average

24  tenure for a Grande residential subscriber as of 2016 is 38

25  months, or 3.2 years?

Dr. Robert "Andy" Bardwell - Examination        1303

1    A.  I see that.

2    Q.  You're a math guy, right?

3    A.  Okay.

4    Q.  Would you agree?

5    A.  Yes.

6    Q.  I think anyone who gets excited about doing math problems.

7    I'm a math guy too.

8    A.  I confess.

9    Q.  There you go.

10        So if we do a little math here, 3.2 years, that's 1,168

11   days.  Do you have any reason to disagree with my math on that?

12   A.  No.

13   Q.  And 46 days divided by that number of days is 4 percent; do

14   you agree with that math?

15   A.  It sounds approximately right.

16   Q.  So the result of your analysis is that for the average

17   Grande subscriber, they only receive notices of infringement

18   4 percent of the time that they're a Grande customer; is that

19   right?

20            MR. GILMORE:  Objection.  Lack of foundation.

21            THE WITNESS:  That's not correct.

22            THE COURT:  Yeah, I'm going to overrule the objection,

23   but he denied it anyway.

24   BY MR. BROPHY:

25   Q.  Well, you've concluded that the average subscriber receives

Dr. Robert "Andy" Bardwell - Examination          1304

1   notices for 46 days, right, on Grande's network?

2   A.   No, that's not correct.

3   Q.   The mean number of days between the first infringement and

4   the last infringement for verified accounts is 46 days; do you

5   see that?

6   A.   I do.

7   Q.   Do you still agree with that statement?

8   A.   I do.

9   Q.   So the average infringing customer, so you say, on Grande's

10  network, spends 46 days infringing, right?

11  A.   That's not a correct statement of that.  That's not what

12  that statement implies.

13  Q.   Let me understand what that statement means then.

14  A.   So the pattern of infringements that -- infringement

15  notices, that allow me to identify that they are from the same

16  subscriber with high confidence, in part is the result of the

17  pattern of those infringement notices.

18       So subscribers don't share music all the time.  They share

19  music in clusters.  They share music, then they take a break.

20  They share again.  So a verified account is a group of

21  infringement notices that I can identify as with high

22  probability of coming from the same subscriber.  So that's what

23  I call a verified account.

24       Then they may have a gap, and there may be a series of

25  other infringements that I can verify as an account.  I can't

Dr. Robert "Andy" Bardwell - Examination          1305

1   verify that these are from the same subscriber as these, but --
2   so that we're only looking at a group of adjacent
3   infringements.
4   Q.  You haven't expressed any opinions in your report about
5   linking between different clusters, right?
6          MR. GILMORE:  Objection.  Vague.
7          THE COURT:  Sustained.
8   BY MR. BROPHY:
9   Q.  You've just articulated for me an explanation of what a
10  verified account is.  Have you expressed any opinions in your
11  reports about verified account occurring here being linked or
12  not to a verified account that existed some other point in
13  time?
14  A.  I don't know if there's any opinions in my report, but the
15  data does link some of those, because they may be on the same
16  IP address.
17  Q.  Well, but you didn't do that analysis, right?
18  A.  I did not.
19  Q.  One other thing I want to clarify here is you don't have
20  any opinions that you're expressing in this case about the
21  veracity of Rightscorp's accusations or the legitimacy of its
22  system; is that right?
23  A.  My testimony is constrained to the -- what I testified
24  already about counting notices associated with songs asserted
25  in this case.

1  Q.  So you haven't done any analysis of Rightscorp's system,

2  correct -- let me clarify that.

3     You haven't done any analysis of Rightscorp's system to

4  know how it works, right?

5  A.  Very limited.

6  Q.  And you're not here opining that the Rightscorp system is

7  reliable or accurate, correct?

8  A.  That's correct.

9          MR. BROPHY:  That's all I have.  Thank you, Your

10  Honor.

11          THE COURT:  Anything else?

12          MR. GILMORE:  No further questions for Dr. Bardwell.

13          THE COURT:  I didn't think this would take very long.

14  All right, ladies and gentlemen, morning recess.

15          COURT SECURITY OFFICER:  Please rise for the jury.

16          *(10:34 a.m., the jury exits the courtroom.)*

17                       *   *   *

18          COURT SECURITY OFFICER:  All rise for the jury.

19          *(10:58 a.m., the jury enters the courtroom.)*

20                       *   *   *

21          COURT SECURITY OFFICER:  All rise.

22          THE COURT:  Please be seated.  The Court would note

23  the presence of all counsel, as well as the ladies and

24  gentlemen of the jury.  Yes, sir.

25          MR. BART:  Thank you, Your Honor.  Plaintiffs call

```
 1   Alasdair McMullan to the stand.
 2           COURTROOM DEPUTY CLERK:  Please raise your right hand.
 3           You do solemnly swear that the testimony you're about
 4   to give in this case now before the Court will be the truth,
 5   the whole truth and nothing but the truth, so help you God?
 6           THE WITNESS:  I do.
 7                          *   *   *
 8           (ALASDAIR MCMULLAN, Plaintiff Witness, Sworn.)
 9                          *   *   *
10           COURTROOM DEPUTY CLERK:  You can have a seat.
11                        DIRECT EXAMINATION
12   BY MR. BART:
13   Q.  Good morning.  Can you introduce yourself to the jury?
14   A.  My name is Alasdair McMullan.
15   Q.  And by whom are you employed, Mr. McMullan?
16   A.  I'm employed by UMG Recordings, Inc.
17   Q.  And what is UMG Recordings, Inc.?
18   A.  It's a U.S. record company.
19   Q.  And what is your position there?
20   A.  I'm executive vice president of legal and business affairs
21   and head of litigation.
22   Q.  And is UMG Recordings a plaintiff in this case?
23   A.  It is.
24   Q.  And is UMG Recordings, Inc. affiliated with any other
25   plaintiffs in this case?
```

1  A.  It is.  It's affiliated with Capital Records LLC,

2  Tooth & Nail, Roc-A-Fella, Capitol Christian Music Group and

3  Fonovisa.

4  Q.  Are all of those entities you just named still active

5  business entities today?

6  A.  No.  Roc-A-Fella Records assigned all of its assets to UMG

7  Recordings, Inc.  And Tooth & Nail and Capitol Christian Music

8  Group merged and are now Capitol CMG.

9  Q.  Okay.  Do all of these plaintiffs that we've just been

10 discussing operate along with UMG Recordings, Inc., under a

11 common trade name?

12 A.  They do.  Universal Music Group, or UMG.

13 Q.  Broadly speaking, what is Universal Music Group?

14 A.  It's a worldwide music business with record labels, music

15 publishing companies, merchandising companies.  It's a

16 full-service music company.

17 Q.  Did you assist in the preparation of the demonstrative that

18 helps show the jury the companies that you were just

19 discussing?

20 A.  I did.

21 Q.  Okay.

22      MR. BART:  Your Honor, permission to show this

23 demonstrative to the jury.

24      THE COURT:  You may.

25 BY MR. BART:

1   Q.   Mr. McMullan, what does this demonstrative show?

2   A.   These are the Universal plaintiffs' logos.

3   Q.   And you'll understand it if I refer to all of these

4   companies collectively as "the Universal plaintiffs", right?

5   A.   Yes.

6   Q.   How do these various companies operate?

7   A.   They operate through quite a number of divisions, other

8   record labels, including Interscope, Republic, Capitol, Motown,

9   Blue Note.  There are many.

10  Q.   Without getting into a ton of detail, because we've heard

11  from other witnesses, can you tell us briefly what these

12  companies do?

13  A.   They find musical talent, record their performances and

14  market and distribute their performances to consumers.

15  Q.   Okay.  How long have you worked for a company that is now

16  part of Universal Music Group?

17  A.   Since December 1995.

18  Q.   Okay.  And why did you get into the music industry?

19  A.   It sounds cliche, but I came from a very musical household,

20  and I studied piano growing up.  I had been in rock bands,

21  symphonic bands, marching bands.  Music has always been my

22  passion, so it was sort of natural that this was the industry I

23  wanted to work in as an attorney.

24  Q.   Other than working at Universal, have you had other

25  positions within the music industry?

1   A.  When I came out of law school, I worked for a couple of law

2   firms that worked in the music industry both on the artist side

3   and on the company side.

4   Q.  Okay.  And what did you do after that?

5   A.  Then I joined EMI, which was at the time another of the

6   large music businesses.

7   Q.  So back in the '90s when you joined it, EMI was one of the

8   majors?

9   A.  It was.

10  Q.  And when did you join Universal?

11  A.  When did I join Universal?  I guess I joined Universal in

12  2012 when it was a -- when EMI was acquired by Universal.

13  Q.  Do your responsibilities at Universal include knowing what

14  sound recording the Universal companies own and control?

15  A.  Yes, they do.

16  Q.  And how many of those sound recordings are at issue in this

17  case?

18  A.  780.

19  Q.  780?

20  A.  780.

21  Q.  Okay.  Are you familiar with those recordings?

22  A.  I am.  I'm generally familiar with them.  Some I'm very

23  specifically familiar with, because I'm a fan, but I work at

24  the company that markets them.

25  Q.  Okay.  And are you personally familiar with how the

1  Universal plaintiffs came to own or control those 780

2  recordings?

3  A.  I am.  And I put in a sworn declaration to that effect

4  earlier in this case.

5  Q.  Okay.  Did the Universal plaintiffs or their

6  predecessors-in-interest apply for copyright registration

7  certificates from the Copyright Office for all 780 of those

8  works?

9  A.  They did.

10  Q.  I'd like to publish for you and the jury Plaintiff's

11  Exhibit 20, which has already been admitted into evidence.

12      Have you seen these documents before?

13  A.  Yeah.  I don't know if there's a way to scroll through

14  them, but my understanding is this is a compilation of the

15  copyright certificates.

16  Q.  Right.  All we're putting in front of you right now is just

17  the first page of a very long document addressing all 780

18  works.

19  A.  Correct.

20  Q.  Okay.  Can you describe what these works -- what these

21  documents consist of?

22  A.  These are the registration certificates or in some cases

23  printouts from the copyright office database relating to the

24  registrations for the 780 works.

25  Q.  Okay.  Do you have personal familiarity with how these

1  documents are obtained and maintained at Universal?

2  A.  I do.

3  Q.  I'd like to show you, but not the jury, Plaintiff's Exhibit

4  19.  Have you seen this document before?

5  A.  I have.

6  Q.  And what is it?

7  A.  This is a list of the works at issue with some information

8  about the copyright registrations.

9  Q.  Is it a summary of the information contained in Plaintiff's

10  Exhibit 20?

11  A.  It's a full summary of the prior exhibit we looked at.

12  Q.  Okay.  And where does the information in this document come

13  from?

14  A.  Comes from the face of the certificates or from the

15  Copyright Office database.

16       MR. BART:  All right.  Your Honor, I'd like to move

17  Plaintiff's Exhibit 19 as a summary exhibit under Rule 1006.

18       MR. BROPHY:  We object to there being no foundation

19  for this document.  Witness didn't create it.

20       MR. BART:  Your Honor, this has been created as a

21  summary from the documents that are here.  All three labels

22  have put in summary exhibits, most without objection.

23       THE COURT:  Objection is overruled.

24       MR. BART:  I'd like to publish Plaintiff's Exhibit 19

25  for the jury.

1  BY MR. BART:

2  Q.  Mr. McMullan, now that the jury has seen this, can you

3  briefly summarize again what this contains?

4  A.  This is a summary of information from the registration

5  certificates that chose the relevant Universal plaintiff, the

6  artist that recorded the track, the name of the track, the

7  registration number, and some other information that date of

8  publication and date of registration.

9  Q.  Do the Universal plaintiffs make each of these works in

10  suit available individually to the public?

11  A.  Yes.

12  Q.  How?

13  A.  They're available through download services.  They're

14  available through streaming services like Spotify.

15  Q.  Okay.  Has that always been true?

16  A.  Well, the business has changed over time where now all of

17  our music is available individually.  There was a time where

18  some music wasn't available as individual.

19  Q.  Did UMG make each of these recordings available to the

20  public on an individual basis between 2011 and 2017?

21  A.  I think all of them but one, which hadn't been released

22  digitally.  I think that was Richard Marx *You Never Take Me*

23  *Dancing*, but all the others were released digitally

24  individually during that period.

25  Q.  We've been talking about the ownership of these recordings,

Alasdair McMullan - Examination                1314

1    but I'd like to shift gears to the music itself.

2        Who are some of Universal's artists who appear on the

3    recordings that are at issue in this case?

4    A.   There was a pretty wide variety across the list that you

5    just saw.  There was Ariana Grande, Katy Perry, Mariah Carey,

6    Janet Jackson, Keith Urban, Nora Jones, Nirvana.  There's a

7    pretty wide gamut of bucket of music.

8    Q.   Are you familiar with these artists' recordings?

9    A.   I am familiar with them, yes.

10   Q.   And are these recordings valuable to the Universal

11   plaintiffs?

12   A.   They're our sole assets.  What we do is create recordings

13   and market the recordings, and this is -- and monetize the

14   recordings, because that is our business.  They are incredibly

15   valuable to the business.

16   Q.   Did the Universal plaintiffs prepare a medley of some of

17   these recordings for the purpose of demonstrating to the jury

18   the scope of music involved in this litigation?

19   A.   We did.

20       MR. BART:  Your Honor, permission to play a short

21   medley of Universal works for the jury.

22       MR. BROPHY:  No objection.

23       THE COURT:  Okay.

24       *(Music playing.)*

25                              *  *  *

Alasdair McMullan – Examination                    1315

1    BY MR. BART:

2    Q.  Mr. McMullan, all of those songs we heard are works in suit

3    in this case, correct?

4    A.  Correct.

5    Q.  Okay.  And why do you want to play that medley for the

6    jury?

7    A.  Other than just to give a break to them having to listen to

8    lawyers for days.

9    Q.  Well, that may be the best answer.  Why don't we just stick

10   with that.

11       To finish up the musical section of your testimony,

12   Mr. McMullan, you're aware that in this case Rightscorp

13   downloaded copies of works from Grande's customers, correct?

14   A.  I am aware of that, yes.

15   Q.  Sorry?

16   A.  Yes, I am aware of that.

17   Q.  And have you personally listened to any of the audio files

18   that Rightscorp downloaded from Grande's subscribers to confirm

19   that they are, in fact, UMG Recordings?

20   A.  I did, even though they were all matched by an Audible

21   Magic matching process, I listened to 50 of them just to

22   confirm for myself.

23   Q.  Okay.  And what was your reaction after listening to them?

24   A.  They were, in fact, copies of our sound recordings.

25   Q.  Okay.  And did you do anything further to check to make

1   sure they were copies of your recordings?

2   A.  Although I was familiar with a number of them, I also

3   compared them to our official releases access through Spotify.

4   Spotify has a feed from our supply chain of our recordings and

5   I compared them.  So I listened to every one of them twice.

6   Q.  So to be clear, when someone listens to a Universal song on

7   Spotify, how does Spotify get that authorized recording?

8   A.  We provide them a digital feed through our supply chain.

9   Q.  Okay.  Do you recall any of the recordings you listened to?

10  A.  Yeah, I listened to Nora Jones track *Painter's Song* from

11  her first album; Ben Harper track *With My Own Two Hands* and

12  Elvis Costello and Burt Bacharach track, *God Give Me Strength*

13  and Amy Winehouse, *Know You Now*.

14          MR. BART:  Conner, can you pull up RCD 01358996, which

15  has been admitted into evidence as part of Plaintiff's Exhibit

16  Five which is the hard drive containing the downloaded files

17  Rightscorp obtained from Grande subscribers, and please play a

18  bit of that file.

19          *(Music playing.)*

20                          *  *  *

21  BY MR. BART:

22  Q.  What is that recording?

23  A.  That's *With My Own Two Hands* by Ben Harper.

24  Q.  Is that a recording owned by UMG?

25  A.  It is and it's a phenomenal recording, very

```
 1   underappreciated album.
 2          THE COURT:  Did you say underappreciated?  I'm sure a
 3   lot of artists think that.  A lot of judges think that too.
 4          MR. BART:  Now, Conner, can you pull up RCD 01357432,
 5   which is also a part of Plaintiff's Exhibit Five and play us a
 6   bit of it.
 7          (Music playing.)
 8                              *   *   *
 9   BY MR. BART:
10   Q.  Pretty recognizable voice.  Can you identify that
11   recording?
12   A.  That's Nora Jones Painter Song.
13   Q.  Is that a recording owned by UMG?
14   A.  It is.
15          MR. BART:  Conner, pull up RCD 01359353, which is also
16   part of Plaintiff's Five.
17          (Music playing.)
18                              *   *   *
19   BY MR. BART:
20   Q.  Can you identify -- can you name that tune?
21   A.  It's another very identifiable voice, it's Amy Winehouse
22   Know You Now, which is a Universal recording.
23          MR. BART:  And finally, Conner, can you pull up RCD
24   01409082.  I apologize for the long intro on this one.
25          (Music playing.)
```

Alasdair McMullan - Examination                1318

1    A.  If I were a DJ, I could speak over this.

2        (Music playing.)

3    Q.  Okay.  Mr. McMullan, can you identify that song?

4    A.  That's *God Give Me Strength* by Elvis Costello and Burt

5    Bacharach.

6    Q.  Is that a recording owned by UMG?

7    A.  It is.

8    Q.  Unfortunately, that's the end of the fun part of our

9    testimony.  Let's move on to some more meaty subjects.

10       In your position and over the course of your career, do you

11   deal with piracy issues?

12   A.  Unfortunately, yes, I do.

13   Q.  And has that been a central part of your responsibilities

14   both at EMI and at Universal?

15   A.  Yes, it has.

16   Q.  From the time you started in the music business?

17   A.  From the time I started in the music business.

18   Q.  Can you basically describe what piracy is?

19   A.  Piracy is essentially the theft of our content, the

20   unauthorized exploitation, distribution, copying of our

21   recordings.

22   Q.  And how long has piracy of sound recordings existed?

23   A.  Probably since the beginning of sound recordings.

24   Q.  Did there come a time when digital piracy in particular

25   became a significant issue for the music industry?

Alasdair McMullan - Examination          1319

1   A.  In the late 1990s digital piracy became the most

2   significant issue for the music industry.

3   Q.  That was after you started at EMI?

4   A.  It was.

5   Q.  So you followed the entire history of this, correct?

6   A.  Yeah, I was there when it first broke across my desk, in my

7   door, on my phone, on my computer, and I have been at a music

8   company through now, through here, where we are today.

9   Q.  What happened in the 1990s that was sort of this

10  breakthrough -- maybe that's the wrong term -- in terms of

11  digital piracy?

12  A.  It was the development of a file format for music, the MP3

13  file that was easily copyable and --

14  Q.  What's unique about the MP3 file?

15  A.  It was easily transmittable through the Internet, it was --

16  it contained all the information necessary to hear the music,

17  but in a lot smaller space than the digital files that were

18  encoded on CDs.

19  Q.  Did the compression affect the sound quality of the

20  recording?

21  A.  It affected it --

22       MR. BROPHY:  Objection, Your Honor, calls for expert

23  testimony.  He's talking about compression, algorithms and

24  music quality.

25       MR. BART:  I'm not talking about algorithms.  That's

 1   your testimony.  This is just a general introduction to the
 2   file so that the jury can understand.
 3           THE COURT:  As long as you don't start asking him
 4   about the --
 5           MR. BART:  The details, of course not.
 6           THE COURT:  Okay.
 7   A.  I took the question as if an -- did an MP3 file sound
 8   appreciably worse than the music files that were, let's say, on
 9   CDs.  And it certainly didn't sound appreciably worse to the
10   extent that anybody -- well, that the market wasn't flooded
11   with MP3 files and people listening to them, it satisfied their
12   need for the music.
13   Q.  And what impact did the introduction of this file format
14   have on piracy?
15   A.  On piracy, it exploded the pirate market, which in turn
16   decimated the legitimate recorded music market.
17   Q.  It decimated what?  I didn't hear.
18   A.  The legitimate recorded music market.
19   Q.  And how did you learn about this?
20   A.  I was working as a lawyer responsible for, among other
21   things, piracy and the pirating of our work, so I learned about
22   it immediately when stories started to break and it was
23   demonstrated to me what was happening.  It was obvious to
24   anybody working in the music industry what was happening.
25   Q.  And were you also involved in discussions at EMI and your

1   trade association, the RIAA, about piracy and the impact of
2   piracy?
3   A.  Yeah, it became the main topic of conversation certainly
4   with our trade association which did a lot of work, a lot of
5   research, a lot of data trying to figure out what was
6   happening, where, how and the extent of the damage.
7   Q.  Okay.  I'd like to publish for you and the jury Plaintiff's
8   Exhibit 350, which has already been admitted into evidence.
9   This is a chart prepared by the RIAA that there's been
10  testimony about before showing total U.S. revenues for recorded
11  music by year from 1996 to 2014.
12      Mr. McMullan, have you seen charts like this before?
13  A.  I have.
14  Q.  And are you familiar with the color coding on the chart?
15  A.  I am.
16  Q.  Okay.  And can you briefly describe how the revenues from
17  CD sales is represented on this chart and what happened to them
18  over this period?
19  A.  Yeah, CD sales on the chart are represented by the orange
20  color.  And you can see from the late 1990s when sort of
21  digital piracy broke onto the market continuing on through this
22  period, just a precipitous decline in CD revenues.
23  Q.  And how has that affected the market for CDs over this
24  period?
25  A.  Well, over the period it was substantially eroded.  The

1    market for CDs today is incredibly minimal, but over this time
2    you can see just massive decline in a format that was extremely
3    popular, that everyone had a CD player in their house, in their
4    car and yet the business was essentially wiped out, I mean
5    effectively.
6    Q.   In this case, Grande has suggested that the collapse in CD
7    sales from the late '90s until the late 2010s was simply due to
8    changes in consumer preferences for getting individual songs
9    instead of albums.  How do you react to that argument?
10   A.   I think that's just wrong.  I think everybody at the time
11   in the business understood what had happened was our music was
12   flooding on the market, illegally, for free.  Anybody could
13   obtain our music, illegally, for free.  We were denied the
14   opportunity to look at is there a way to shift formats and do
15   it in an intelligent business way where we could protect
16   revenues.  We'll never know.  I think the technology eventually
17   was going to get us to the place we are now, but we were denied
18   the opportunity to do that in an intelligent way that protected
19   the economics of the business and gave consumers what they want
20   because the market was flooded with free music and we had to
21   compete with free while we developed this market.
22   Q.   And we can put Plaintiff's 350 away now.  Mr. McMullan, are
23   you familiar with a type of digital piracy known as
24   peer-to-peer networks or P2P?
25   A.   I am.

Alasdair McMullan - Examination                1323

1   Q.   What is a peer-to-peer network?

2   A.   It's a computer network where users that are logging on to

3   it can pass files from one to the other.   If I'm on a

4   peer-to-peer network, I can receive files that are on the

5   computer, music files that are on the computer of another party

6   connected to the peer-to-peer network.

7   Q.   Can you give me some examples of peer-to-peer networks that

8   were used for music piracy over the years?

9   A.   Napster, Grokster, Kaza, LimeWire.

10   Q.   How did the record companies respond to the impact of these

11   peer-to-peer networks?

12   A.   I think we had to do a number of things.   We tried to

13   educate consumers that using these peer-to-peer networks was

14   wrong and illegal and that they should pay for music.   We took

15   legal action directly against the peer-to-peer networks.   And

16   again, we tried to start developing a legitimate digital music

17   business on the Internet which was incredibly difficult, again,

18   in the face of these networks that were offering the same exact

19   content that we were offering, but they were not charging for

20   it.

21   Q.   So let's break that down and talk about each of the

22   different components you just mentioned as your reactions to

23   the presence of piracy, peer-to-peer piracy in particular, and

24   start with the idea of educating consumers that they shouldn't

25   use P2P networks.   Why did you want to do that?

Alasdair McMullan - Examination                1324

1    A.  The music was flooding the market and was available

2    everywhere and we wanted folks to know that taking that music

3    and then continuing to distribute that music to others, because

4    that's how peer-to-peer systems work, was wrong.  So we had

5    public service announcements, we had artists do sort of

6    educational videos, we had some programs on college campuses

7    and some colleges cooperated with us on that.  We had programs

8    at grammar schools and high schools.  We tried to get the word

9    out everywhere we could that this is not activity that you

10   should engage in.

11   Q.  And what was the message you were trying to get across?

12   A.  Music has value, when you -- that music piracy is not a

13   victimless crime, that when you take it you are hurting a whole

14   ecosystem of artists, songwriters, people that work in record

15   companies, people that work in retail music stores.  We tried

16   to just get the message out that music has value and should be

17   paid for.

18   Q.  So let's turn now to the legal campaign that you engaged in

19   against peer-to-peer networks.  Why did you want to sue them?

20   A.  Well, they were profiting off of and distributing our music

21   to millions of people for free and facilitating this so called

22   file sharing, so we wanted to sue them to stop them.

23   Q.  And what was your legal theory in initiating lawsuits

24   against the peer-to-peer networks?

25   A.  That they were facilitating the users' direct infringement

Alasdair McMullan - Examination                    1325

```
 1    of our content.
 2    Q.   Is there a name for such claims?
 3    A.   Secondary copyright infringement.
 4    Q.   What systems did you sue?
 5    A.   We sued Napster, Grokster and Kaza, LimeWire, probably
 6    others too at the time.
 7    Q.   What happened in those cases?
 8    A.   We eventually won all of them.  Grokster went all the way
 9    to the Supreme Court where we won nine/nothing.
10    Q.   Does that happen --
11              MR. BROPHY:  Objection, Your Honor, relevance.
12              THE COURT:  It is.  I'm going to sustain the objection
13    and the answer will be stricken.
14    BY MR. BART:
15    Q.   Were those cases effective in stopping piracy on
16    peer-to-peer networks?
17    A.   They were of limited effectiveness because peer-to-peer
18    piracy went through another evolution.
19    Q.   And what was that evolution?
20    A.   These prior services were somewhat centralized, there was a
21    central company that was operating the network.  There then
22    came decentralized networks where there was no centralized
23    company, it was just users to users with software on their
24    computer essentially uploading files to millions of people and
25    downloading files from millions of people.
```

Alasdair McMullan - Examination                1326

1    Q.  Can you give me an example of decentralized networks?

2    A.  BitTorrent, the first was Newtella, but BitTorrent was

3    probably the most popular.

4    Q.  And just generally, because we've had some testimony about

5    this, how does that system work?

6    A.  My understanding is --

7          MR. BROPHY:  Objection, Your Honor, calls for expert

8    testimony.  He's testifying about the operation of BitTorrent

9    protocols and networks.

10          THE COURT:  Sustained.

11          MR. BART:  Your Honor -- I'll do it differently.

12   BY MR. BART:

13   Q.  Mr. McMullan, how does a user get started on BitTorrent?

14   A.  They download a what I think is called a client, it's a

15   piece of software.

16   Q.  Okay.  And what does that client allow you to do?

17   A.  It allows you to connect with everybody else that has

18   downloaded it and is logged on to it at the same time.

19   Q.  How is that different from something like Napster?

20   A.  Well, again Napster had a centralized business.  There is

21   no business here.  I think BitTorrent is also different in that

22   it allows you to take pieces of files from many, many users and

23   they get reassembled into the music -- the listenable music

24   file, so it's faster.

25   Q.  Okay.  When you said that before that there's no BitTorrent

```
 1   to sue, is it at least possible to monitor BitTorrent to
 2   determine when copies of specific files are being shared?
 3              MR. BROPHY:  Objection, Your Honor, calls for expert
 4   testimony, monitoring BitTorrent networks.
 5              MR. BART:  All of these objections are assuming that
 6   he's getting into technical details.  We're talking about --
 7              THE COURT:  You asked him is it possible to monitor
 8   BitTorrent.
 9              MR. BART:  Yes.
10              THE COURT:  Isn't that calling for expert testimony?
11              MR. BART:  No, it's not.  There are monitoring
12   companies out there that he interacts with every day that are
13   involved in this case.
14              THE COURT:  If you're talking about the process, is
15   somebody monitoring, fine.  If you're asking him is it possible
16   to monitor from a technical standpoint, that isn't fine.
17              MR. BART:  I completely agree.  So let me rephrase.
18   BY MR. BART:
19   Q.  Are you aware of companies that are engaged in the process
20   of monitoring piracy on BitTorrent?
21   A.  I am.
22   Q.  What do these companies do?
23   A.  My understanding is the companies essentially log on to
24   BitTorrent and are able to connect with other users on
25   BitTorrent, obtain files and then they -- they'll send a notice
```

1    to related to the infringement to the Internet service provider

2    for the user.

3    Q.  And why, from your perspective as a legal representative of

4    the record companies, why is that not sufficient to allow the

5    content owners from effectively monitoring infringements on

6    BitTorrent?

7    A.  Because what they can't see is who is doing the piracy.

8    BitTorrent is anonymous.  All they can see is -- they can get

9    the file, they know when they've taken it, they know what it

10   is, they can have the hash of the file so it's identified, but

11   they can't know the user.  Only -- they only know an IP

12   address.

13   Q.  And what is an IP address?

14   A.  Essentially the Internet address of your device on the

15   Internet, it's a series of numbers.

16   Q.  Can you as a record company match IP addresses to specific

17   Internet users?

18   A.  No, we can't -- we can't do that.

19   Q.  To your knowledge, from interacting with monitoring

20   companies, do monitoring companies have the capability of

21   matching IP addresses to specific Internet users?

22   A.  They can't do that either.

23   Q.  Can anyone match IP addresses to the specific Internet

24   users?

25   A.  Yeah, the Internet service providers who essentially assign

1    the IP addresses to their customers can know who has that IP

2    address.

3    Q.  Can you give me an example of an ISP?

4    A.  Grande.

5    Q.  And in your experience -- has UMG ever hired a monitoring

6    company?

7    A.  We have.

8    Q.  And what monitoring company did UMG hire?

9    A.  We've hired a company called MarkMonitor, it's now called

10   OpSec.

11           MR. BROPHY:  Objection, Your Honor.  My understanding

12   is that MarkMonitor is not at issue in this case.

13           THE COURT:  That's okay.  The objection is overruled.

14           MR. BART:  Thank you, Your Honor.

15           THE COURT:  Just that question.  Don't get into what

16   MarkMonitor was doing.

17   BY MR. BART:

18   Q.  My next question is, Did UMG consider anyone else other

19   than MarkMonitor?

20           There's no objection.

21   A.  Yes, we considered Rightscorp.

22   Q.  Who is Rightscorp?

23   A.  Rightscorp is the monitoring company that discovered the

24   infringements in this case.

25   Q.  Did UMG conclude that MarkMonitor had more reliable

1   monitoring technology than Rightscorp?

2   A.  Not at all.

3   Q.  When you hired a monitoring company to send infringement

4   notices on your behalf, did you ever demand that the ISPs at

5   issue take any specific action in response to the notices?

6   A.  No.  We expected the ISPs to be responsible when they

7   received notices, but in terms of a specific action, the ISPs

8   know their business, their customers, their situation and we

9   expected the actions they take would be the responsible actions

10  that they would choose to take.

11  Q.  Did you ever demand that an ISP spy on their customers?

12  A.  I'm not sure what that means, but no.

13  Q.  Monitor their customer's usage?

14  A.  No.

15  Q.  Did you ever demand that an ISP act as an intermediary or

16  judge if a customer contends that the notice is inaccurate?

17  A.  What we expected as --

18          THE COURT:  That's a yes or no.

19          THE WITNESS:  No.

20  BY MR. BART:

21  Q.  Have you ever demanded that ISPs take action on notices

22  that are directly challenged by a user?

23  A.  No.

24  Q.  What do you expect an ISP to do in response to a notice?

25  A.  We expect an ISP to act responsibly when they're told that

Alasdair McMullan – Examination                    1331

1  there's infringement on their system.  And when they're told

2  over a million times that there's repeated infringement on

3  their system, we would expect an ISP to do something to curtail

4  that.  And as part of that, we would expect that if they have

5  recidivist infringers that are continuing and continuing to

6  infringe, that they will take action to suspend or terminate

7  those users.

8  Q.  Why do you expect them to act?

9  A.  Well, the ISPs negotiated and lobbied for a safe harbor

10  protection in the law.

11       MR. BROPHY:  Objection, Your Honor.  This is calling

12  for legal testimony.

13       THE COURT:  Sustained.

14  BY MR. BART:

15  Q.  Well, putting aside the law for a moment, just from a

16  business perspective and moral perspective, as a record company

17  executive, Mr. McMullan, why do you expect the ISPs to act in

18  response to the notices?

19  A.  It's the right thing to do, but it's also -- if my company

20  gets one notice of infringement, I put somebody on dealing with

21  it.  If I get ten, I put my whole department on it.  If I got a

22  million, I'd divert --

23       MR. BROPHY:  Objection, Your Honor, calls for

24  speculation.

25       THE COURT:  He's telling you what he would do.

Alasdair McMullan - Examination                1332

1    Overruled.

2    A.  I'd divert the resources of the company, if I could, to

3    deal with that sort of issue, it's just the right thing to do.

4    If you're getting notices that your system is being used to

5    violate another company's rights, another whole industry's

6    rights, it's just the right thing to do to do that.  One, to

7    avoid liability for your own company, but two, because that's

8    what allows for a legitimate ecosystem for music.  I mean,

9    Grande is an Internet service provider, the legitimate music

10   sales that we make digitally, and that's the bulk of our

11   business now, goes through Internet service providers like

12   Grande to provide the connectivity, but we also think they

13   should take action when they are told that the --

14        THE COURT:  This answer is really a narrative.  And it

15   goes beyond the scope of your question.

16   BY MR. BART:

17   Q.  Why is it important for you as a record company to have the

18   ISPs act as responsible partners in your attempts to stop

19   piracy?

20   A.  They're the only ones that know their customers and who's

21   doing the piracy and they're providing the means.

22   Q.  Okay.  Are you aware of the basis for the claim that

23   plaintiffs are bringing against Grande?

24   A.  Yes.

25   Q.  And what is that?

1    A.  My understanding is that Rightscorp discovered significant

2    infringement on by the Grande users, Grande was noticed of that

3    infringement, but did nothing in response to it to curtail it.

4    Q.  Do you have a general understanding, not technical, but a

5    general understanding as a record company executive of how

6    Rightscorp detected infringement on BitTorrent?

7    A.  They logged on as a BitTorrent user and obtained music

8    files from Grande users and they were able to identify the IP

9    addresses as IP addresses of Grande users.

10   Q.  Did you hire Rightscorp to detect infringement and send

11   notices?

12   A.  No.

13   Q.  So how did it come about that Rightscorp was the monitoring

14   company for the evidence in this case?

15   A.  Rightscorp was sending notices for a music publisher called

16   BMG.  And those notices necessarily also covered recordings of

17   the music publisher's compositions.

18   Q.  Because on BitTorrent you're obtaining sound recordings,

19   correct?

20   A.  BitTorrent is music files are being shared and those are

21   sound recordings.

22   Q.  So let's just talk for a quick second about the difference

23   between sound recordings and music compositions or publishing.

24   Can you tell us what a publishing right is?

25   A.  The copyright in a musical composition covers the notes and

1    the lyrics, it's what the song writer has written.

2    Q.   Okay.  Can you give me an example of difference between a

3    sound recording and a composition?

4    A.   So every sound recording records a musical -- every musical

5    sound recording records a musical composition, so -- I was

6    trying to think of a local example.  So Townes Van Zandt wrote

7    Poncho and Lefty in 1971.  He was the song writer, but in the

8    early '80s, Willie Nelson and Merle Haggard recorded that song.

9    So there's a copyright in the song, but there's a copyright in

10   the recording of that song.

11   Q.   Can a publishing copyright and sound recording copyright be

12   owned by different entities?

13   A.   They can be and usually are.

14   Q.   Why is that important when it comes to the notices that

15   Rightscorp sent in this case?

16   A.   Rightscorp was sending notices on BMG's compositions, those

17   compositions were covering sound recordings that we owned, but

18   there also may have been sound recordings that other companies

19   own that aren't at issue here.

20   Q.   And how does the fact that Rightscorp was monitoring

21   composition copyrights affect the results of its monitoring

22   project for purposes of this case?

23   A.   Well, so they were identifying compositions, but they had

24   the hash for sound recordings and we needed to look at which

25   sound recordings we owned out of the overall collection of

1   Rightscorp evidence of composition infringements.

2   Q.  Can you give me an example of how Rightscorp might send a

3   notice based on a composition when you didn't own the sound

4   recording?

5   A.  My understanding is there's been some talk about a karaoke

6   version of the Steven Tyler, Desmond Child song *Angel* which was

7   recorded also by Aerosmith, but my understanding is the notice

8   was sent on a karaoke instrumental version.

9   Q.  So how did you handle that?

10  A.  We didn't sue on it because we don't own it.

11  Q.  Does that show that the Rightscorp system is unreliable?

12  A.  No --

13          MR. BROPHY:  Objection, Your Honor, calls for expert

14  testimony, asking for reliability of Rightscorp.

15          THE COURT:  Sustained.

16  BY MR. BART:

17  Q.  Does the fact that Rightscorp identified a karaoke version

18  of the song indicate that it had identified an incorrect work

19  in doing its work for BMG?

20  A.  No, it was correct for BMG, and as to us, it wasn't our

21  work, so we didn't sue on it.

22  Q.  When did you first learn about what Rightscorp found?

23  A.  We knew that Rightscorp was sending notices for some time,

24  then there was another litigation where Rightscorp notices were

25  at issue, it was a BMG litigation where BMG had a successful

Alasdair McMullan – Examination                    1336

```
 1   result and so --
 2          MR. BROPHY:  Objection, Your Honor, mischaracterizes
 3   the lawsuit, "successful result."
 4          THE COURT:  Sustained.
 5   BY MR. BART:
 6   Q.  Do you know who won the decision in the trial court?
 7   A.  BMG.
 8          MR. BROPHY:  Same objection, Your Honor.
 9          THE COURT:  Sustained.
10          MR. BART:  We've already established this, Your Honor,
11   this is backtracking from what we're already allowed to say.
12          THE COURT:  I understand.  What is the relevance to
13   his testimony?
14          MR. BART:  The relevance is why he's using Rightscorp
15   information, it's his state of mind and the conduct and
16   business decisions made by the record labels.  It's an issue
17   that's been put into play by Grande throughout this case that
18   they didn't hire them, that they had no basis, they didn't
19   respect them and the answer to that is this answer.
20          THE COURT:  You know, I've told the jury time and time
21   again in this case that the outcome of the other litigation has
22   no bearing on this case other than for state of mind.
23          MR. BART:  Right.
24          THE COURT:  With that understanding, I'll let you ask
25   him the question.
```

1    BY MR. BART:

2    Q.  How did the trial court result in that case -- and we don't

3    have to talk about what it was -- affect your decision in terms

4    of going forward with this evidence?

5    A.  Well, we understood that BMG had been sending notices, that

6    the notices were the basis of that case and so we looked at,

7    through our trade association, looked at could we see that

8    evidence.  Our trade association obtained notices and

9    information from Rightscorp that had been sent on behalf of BMG

10   and others and discovered the evidence that's at issue in this

11   case.

12   Q.  Had you been looking for evidence against Grande

13   specifically?

14   A.  No.  We were surprised to find that Grande had received

15   1.3 million notices and done nothing with them.

16   Q.  Now, in his opening, Grande's counsel said that this case

17   is a lottery ticket and that you bought Rightscorp's data to

18   fleece Grande and to make some quick cash.  Is that a fair or

19   accurate statement?

20   A.  It's neither fair nor accurate.  We're not looking to

21   fleece anyone.  We're looking to be compensated for severe

22   damage to our business that's occasioned by Grande's

23   facilitation of this peer-to-peer piracy.  This isn't quick

24   cash by any means.  We're spending incredible amount of money

25   to do this and it's been going on for five years.

Alasdair McMullan - Examination                    1338

1  Q.  Are you familiar with the relevant time period of this

2  case?

3  A.  I believe it's 2011 to 2017.

4  Q.  Okay.  Did you learn anything during the course of the

5  prosecution of this case about how Grande responded to

6  infringement notices during that time period?

7  A.  My understanding is they had no policy to deal with --

8         MR. BROPHY:  Objection, Your Honor, calls for

9  speculation.  He's testifying about Grande's internal policies.

10         MR. BART:  It's not speculation, it's testimony that's

11 been given in this case.

12         THE COURT:  Well, he can testify as to his

13 understanding, his understanding.  Doesn't mean it's a fact.

14         MR. BART:  Absolutely.

15 BY MR. BART:

16 Q.  Can you tell me your understanding of Grande's policies

17 during this time?

18 A.  My understanding is they did virtually nothing with the

19 notices they received and that they didn't take any action to

20 suspend or terminate users that were repeatedly infringing our

21 content.

22 Q.  What was the financial state of the music industry at the

23 time that Grande was not taking action?

24         MR. BROPHY:  Objection, Your Honor, that question --

25         THE COURT:  That objection is clearly sustained.

1    BY MR. BART:

2    Q.  What was the state of the music industry at the time that

3    you were just testifying about?

4    A.  I could speak from my -- we were in a state of free-fall.

5    At that point, I'm not even sure that Spotify streaming service

6    had launched in the U.S.  I can just speak from my personal

7    experience, 2011 was a very hard year.  Our company, EMI, one

8    of the largest record companies at the time, home of the

9    Beetles, the Rolling Stones, the company that the -- the

10   company that owned it couldn't service its debt because the

11   revenues were not there, went into essentially equivalent of

12   pre pack administration.  We ended up being owned by Citibank

13   because they effectively foreclosed on the loans to the

14   company.

15   Q.  At that time, in the same time period, did you on behalf of

16   your record company want to make sure that ISPs had meaningful

17   policies to terminate subscribers who infringed copyrights?

18   A.  We did, it was an important initiative to make sure that

19   was happening.

20   Q.  Why?

21   A.  Because BitTorrent file-sharing and the availability of

22   free music to millions of people was draining our revenues,

23   impeding our ability to develop a legitimate music market.

24   Q.  Were you able to get some ISPs to work collaboratively with

25   you?

```
 1   A.  We did --
 2           MR. BROPHY:  Objection, Your Honor, relevance in this
 3   case.  Talking now about what other ISPs are doing.
 4           MR. BART:  In contrast to what's happening in this
 5   case.
 6           MR. BROPHY:  No facts about what's happening.
 7           THE COURT:  The objection is sustained.
 8   BY MR. BART:
 9   Q.  Why did Universal decide to bring this lawsuit?
10   A.  Peer-to-peer piracy through BitTorrent is a serious problem
11   for us.  We needed to -- we need to send the message that
12   companies in this space need to do something at least when they
13   are notified of the massive theft of our content through their
14   systems.  It's important to protect the business, to protect
15   creativity, to protect the revenues that pay artists and
16   songwriters and people that work at record companies like me.
17   Q.  Also in the opening Grande said, quote, *You're going to be*
18   *in the privileged position of deciding whether termination*
19   *programs like the one Grande was forced to implement are*
20   *necessary.*
21       What's your reaction to that statement?
22   A.  It's sort of asking is it necessary to do the right thing.
23           MR. BROPHY:  Objection, Your Honor.
24           MR. BART:  You don't like the answer?  That's your
25   objection?
```

1              MR. BROPHY:  He's going to be testifying about things

2    that are contrary to the law.

3              MR. BART:  He's not talking about the law at all and

4    you're the one who's talking about the law and trying to avoid

5    it.

6              THE COURT:  All right, counsel, counsel.  Let's --

7              MR. BART:  I just want him to react to a statement

8    that was made to the jury.

9              THE COURT:  We'll take this up outside the presence of

10   the jury.  Lunchtime.  Have a nice lunch.  We'll see you back

11   after lunch.

12             COURT SECURITY OFFICER:  All rise for the jury.

13             *(11:54 a.m., the jury exits the courtroom.)*

14                              *   *   *

15             THE COURT:  You can step down, sir.  If I ever wish

16   for good lawyers again, slap me in the head, will you please?

17   All right.  Repeat your question.

18             MR. BART:  My question was a quote from the opening

19   statement and asking him what his reaction was to the

20   statement.  The statement was, *"You're going to be in the*

21   *privileged position of deciding whether termination programs*

22   *like the one Grande was forced to implement are necessary."*

23             And part of the reason -- and I'm actually glad that

24   we're stopping to ask this, this is going to be my last

25   question, because it ties into what we're going to do on

1   Grande's part of the case and an objection that I was going to

2   make to some demonstratives that they are going to offer.  So

3   just give me two seconds to try and put this together.

4          What is at issue here in this case are the elements of

5   contributory infringement.  I think we agree on that.  They are

6   the underlying infringement by the user, knowledge of willful

7   blindness, material contribution.

8          THE COURT:  That's the lawsuit.

9          MR. BART:  That is the lawsuit.  However, that

10  statement in the opening was basically, well, even if that's

11  true, you're going to be in a position to see whether it's

12  necessary.

13         And I anticipate that a lot of Grande's testimony is

14  going to be fairness in public policy arguments about why they

15  shouldn't have to or they're not supposed to or they're in the

16  wrong position or whatever it is.  And part of the reason, just

17  to be completely up front and transparent with Your Honor, why

18  I've been so focused on the DMCA in this case is because that's

19  the answer to that.  That if you're going to allow public

20  policy arguments that we're just the pipes, one of the

21  demonstratives that you're going to see from their first

22  witness is basically trying to just demonstrate that they're

23  just a passive participant in this process.  That's exactly the

24  argument that the ISPs made when they were negotiating DMCA.

25         THE COURT:  You got the bulk of your DMCA --

1              MR. BART:  I appreciate that.  And all I'm saying is

2       that if they're allowed, though, to get beyond the elements of

3       material -- of contributory infringement and argue policy

4       arguments about why it's unfair, then that is asking the jury

5       to make a decision based on something other than the elements

6       of contributory infringement and I think that's prejudicial to

7       my client.

8              THE COURT:  No one is going to engage, whether it's

9       the plaintiff or the defendant, in this case in making

10      arguments to the jury that amount to jury nullification.

11             MR. BART:  And that's what I'm concerned about,

12      absolutely.

13             THE COURT:  We're only going to have arguments that

14      relate to the facts of this case and the law.

15             MR. BART:  If that is the case and Your Honor sticks

16      to it, which I'm sure you will --

17             THE COURT:  I don't know that I've ever been a

18      proponent of jury nullification.

19             MR. BART:  I wouldn't think that would be a

20      controversial point for you, but assuming that that is the

21      case, then I'll withdraw the final question and we can start

22      with cross after lunch.

23             THE COURT:  I don't think they're going make a jury

24      nullification argument.

25             MR. BART:  Not overtly.  I'm sure they won't.  He's

1    way too good a lawyer to do that, but I think it will come in

2    through implicit arguments about the fairness and their role

3    and who they are and they don't know and a lot of things that

4    are not related to the elements of contributory --

5              THE COURT:  He has the right to make an argument "they

6    did not know".

7              MR. BART:  Yes, absolutely.

8              THE COURT:  Whether the jury buys that or not, I don't

9    know.

10             MR. BART:  And if it's limited to knowledge, then no

11   argument from me.

12             THE COURT:  Let me let him speak for himself.

13             MR. BART:  Of course.

14             MR. BROPHY:  Your Honor, I think we started this

15   discussion before opening statements, there's no intention on

16   our part to talk about fairness or to argue public policy to

17   the jury.  We are arguing the elements of this case.  And we

18   are going to argue, among other things, it's no surprise, we

19   don't know what's going on with our customers and their

20   computers.  The concern that I have and the reason I objected

21   to Mr. Bart's last question is there is this commingling

22   occurring between the DMCA safe harbor and the underlying claim

23   for copyright infringement.  And those two things are separate.

24   And what I'm hearing is that if we don't terminate, we are,

25   therefore, liable.  And that is not the law.  And I want to

Alasdair McMullan - Examination                    1345

```
 1   make sure that there is a very wide chasm between the DMCA safe
 2   harbor on the one side --
 3           THE COURT:  Well, if you don't terminate people who
 4   you know are violating the law, then that is the law.
 5           MR. BROPHY:  That presupposes --
 6           THE COURT:  Assuming that no safe harbor applies, and
 7   it doesn't apply in this case.
 8           MR. BROPHY:  So we can either not know --
 9           THE COURT:  Right.
10           MR. BROPHY:  -- or the jury can decide that we didn't
11   materially contribute.  Either one of those things would be a
12   defense to the underlying claim and has nothing to do with the
13   safe harbor.  That's all we're going to argue.
14           THE COURT:  All right.  Very good.
15           MR. BART:  There are responses to those, but they'll
16   come up when we're talking jury instructions and everybody
17   wants to get to lunch.
18           THE COURT:  I don't want to throw a -- as I had a law
19   professor once say, don't throw a broken feather pillow into
20   the courtroom.  But the underlying here is that Texas is a
21   state in which privacy is highly valued and that's kind of an
22   underlying -- somebody already testified about we don't want to
23   invade our customer's privacy.  We heard that.
24           MR. BART:  And that's why I had this witness say they
25   never asked them to do that.
```

1           THE COURT:  That's kind of a stalking horse in the

2   corner.

3           MR. BART:  There are many stalking horses which is why

4   we have so many conversations like this.

5           THE COURT:  All right.  Have a nice lunch.

6           COURT SECURITY OFFICER:  All rise.

7           *(12:00 p.m.)*

8                               *   *   *

9           *(1:33 p.m.)*

10          COURT SECURITY OFFICER:  All rise.

11          THE COURT:  Please be seated.  All right.  I guess we

12  have a couple more objections, right?  Are these best dealt

13  with now or later?

14          MR. HOWENSTINE:  Whatever Your Honor would prefer.

15  We're happy to talk about them now.

16          THE COURT:  I haven't had the chance to really look at

17  them carefully.  This is a -- the one I have here is to William

18  Davis from Rob Rodor*(ph)*, I don't know if I'm pronouncing that

19  right.

20          MR. HOWENSTINE:  Yes, Mr. Raider*(ph)* --

21          THE COURT:  Oh, it's Mr. Raider*(ph)*.

22          MR. HOWENSTINE:  Mr. Roeder was a 30(b)(6)

23  representative of Patriot media, which is the management

24  company of Grande.  He's not a Grande employee.  And the e-mail

25  that Your Honor is looking at, that's an e-mail between

```
 1   Mr. Roeder and an employee of RCN, a different ISP that Patriot
 2   also manages about their DMCA policy.
 3              THE COURT:  About whose DMCA policy?
 4              MR. HOWENSTINE:  RCN's, not Grande's.
 5              THE COURT:  Let me read it.
 6              (Pause.)
 7              This is two and the same, right?
 8              MR. HOWENSTINE:  Yes.
 9              THE COURT:  Okay.  Who is objecting to what?
10              MR. HOWENSTINE:  We, Grande, are objecting to this on
11   grounds that it has nothing to do with Grande, it's about a
12   different ISP, RCN.  And in general, the entirety of
13   Mr. Roeder's depo testimony that the plaintiffs intend to play
14   concerns Patriot's knowledge that Grande was receiving
15   copyright notices, but Patriot is not a party, Patriot was
16   dismissed from this case.  What Patriot knew about those
17   notices is not relevant to anything.  Grande is here, there's
18   been extensive evidence about what Grande knew and didn't know
19   and what they received.  And introducing Patriot and what
20   Patriot knew about it is just going to be confusing.  It's not
21   probative of anything in the case.
22              MR. O'BEIRNE:  Good afternoon, Your Honor.
23              THE COURT:  Good afternoon.
24              MR. O'BEIRNE:  Phil O'Beirne on behalf of plaintiffs.
25   Your Honor, this evidence is plainly admissible under the
```

 1    reiteration of Your Honor's ruling that you articulated this

 2    morning about Grande's state of mind.  The distance they're

 3    attempting to create between plaintiff or between Patriot and

 4    Grande just doesn't exist.  Grande's CEO is a Patriot executive

 5    as well.  Grande's CFO is a Patriot executive as well.  They

 6    have a Patriot executive on their witness list to come in and

 7    talk about Grande.

 8                If you could put up the demonstrative, please, Conner.

 9                So we submitted a 30(b)(6) to Patriot, including about

10    Patriot's knowledge as the management company that manages

11    Grande during the relevant time period about the use of

12    Internet service to infringe.  We have this e-mail in which

13    Mr. Roeder characterizes the notices that Grande receives as

14    notices of illegal downloads.  And I asked him under oath as

15    Patriot's representative, *When Grande was sending notices to*

16    *customers in 2006, it was alerting customers that there had*

17    *been an illegal download, right?*  And he said, *I would expect*

18    *that to be the case, yes.*

19                He also reiterated that *Patriot understood in 2016*

20    *that the notices that Grande was receiving from third parties*

21    *were notice of illegal downloads by Grande customers.*  And his

22    answer was *Yes.*

23                So -- and he has, if you'll look at the second slide,

24    Your Honor, first of all, he has Grande in his e-mail

25    signature, he's the chief development officer for Patriot, but

1     he has a responsibility to Grande.

2              THE COURT:  I've already ruled on a similar one.  This

3     is admissible.

4              MR. O'BEIRNE:  Thank you, Your Honor.

5              THE COURT:  So the objection is overruled.  Now,

6     what's this next one?  The deposition?

7              MR. O'BEIRNE:  We have short deposition clips about

8     that e-mail and his testimony.

9              THE COURT:  This is just the same thing.

10             MR. HOWENSTINE:  Our objection was more generally to

11    his testimony as relating to Patriot and not Grande.  If Your

12    Honor is overruling that objection, that would stay for the

13    rest of the testimony.

14             THE COURT:  I think there's been a clear showing that

15    Patriot and Grande are intertwined here.  Now, they are

16    different legal entities, that's for sure, and that's why

17    Patriot was dismissed as a defendant.  But that does not mean

18    that things that are going on at Patriot don't have an

19    implication for Grande and Grande for Patriot.  So, okay.

20    Let's move forward.  Are you ready with the next witness?

21             COURTROOM DEPUTY CLERK:  It's the same witness.

22             THE COURT:  Oh, that's right.  We were in the middle

23    of a question and we had an objection and I had to rule on it.

24             MR. BROPHY:  Your Honor, just to avoid concerns later,

25    my understanding is that plaintiffs have objections to some of

Alasdair McMullan - Examination                1350

1    the depo testimony we're going to play this afternoon from

2    Mr. Dong Jang; is that correct?

3              THE COURT:  We'll deal with that later.

4              MR. BROPHY:  Okay.  I just want to make sure you're

5    aware, Your Honor.

6              COURT SECURITY OFFICER:  Please rise for the jury.

7              *(1:39 p.m., the jury enters the courtroom.)*

8              THE COURT:  You can proceed.

9                          CROSS-EXAMINATION

10   BY MR. BROPHY:

11   Q.   Mr. McMullan, good afternoon.

12   A.   Hi.

13   Q.   It's the record label's position in this case that music

14   should be more expensive, right?

15   A.   No.

16   Q.   Well, we've heard testimony in this case that music sharing

17   is driving down record label profits, right?

18   A.   Yes.

19   Q.   And you've testified to that, right?

20   A.   Music -- illegal music sharing impacted our revenues.

21   Q.   And we've also heard testimony that because of that illegal

22   music sharing, the record labels have been forced to depress

23   the prices of their products, right?

24   A.   Because we had to compete with free product, we had to

25   price accordingly with our competition, our illegal

1  competition.

2  Q.  So the record label's position is that music should be more

3  expensive, right?

4  A.  No.

5  Q.  Well, your testimony is that music prices have been

6  depressed because of music sharing and the logical extension of

7  that is if there wasn't music sharing, you would be charging

8  more money, right?

9          MR. BART:  Objection, argumentative.  That's not even

10  a question.

11          THE COURT:  Yes, that's true.

12  BY MR. BROPHY:

13  Q.  So it is not your position that the record labels have

14  suffered financial harm as a result of music sharing?

15  A.  It's absolutely our position that we suffered financial

16  harm because of music sharing.

17  Q.  And the extra music -- pardon me -- the extra money that

18  the record labels would earn if there weren't music sharing,

19  that would go, for the most part, into the record label's

20  pockets, right?

21  A.  It would support the entire ecosystem of the music business

22  including publishers, retailers.

23  Q.  The largest percentage of that money would go into the

24  record label's pockets, right?

25  A.  I think it would first go into -- it would first go to the

1   record companies because we're the ones that are distributing

2   the product.  In this day and age, it would first go to the

3   services that are directly in the relationship with the

4   consumer, then they remunerate us and we remunerate our

5   artists, songwriters, etc.

6   Q.  And we've seen this graph, you testified to this graph in

7   your direct testimony; do you recall that?

8   A.  I do.

9   Q.  The record labels filed this lawsuit because the record

10  labels are making less money than they used to, right?

11  A.  The record labels filed this lawsuit because Grande was

12  facilitating the illegal distribution of our music by its

13  customers and profiting from it.

14  Q.  And the record labels are filing this lawsuit and pursuing

15  it because that graph went down, right?

16  A.  We sustained very heavy losses due to piracy.

17  Q.  And you've testified that music sharing is what led to that

18  negative trend in the record label's business, right?

19  A.  I said the illegal distribution of music through services

20  like Napster, Grokster, LimeWire, BitTorrent.

21  Q.  And just to be clear, this case isn't about any of those

22  things you just mentioned except for BitTorrent, right?

23  A.  We've already had our cases against those other entities.

24  Q.  There's no accusation in this case about Napster or any of

25  those other entities you mentioned except BitTorrent, right?

Alasdair McMullan - Examination                    1353

1   A.   This case is about BitTorrent file sharing through Grande

2   system.

3   Q.   And I believe that your testimony was that due to this

4   music sharing, the record label's business has been in a

5   free-fall.  Was that the right word you used earlier?

6   A.   I did use that word earlier.

7   Q.   And you pointed to those orange CD sales as the evidence of

8   that free-fall, right?

9   A.   That is the decline in the CD market over that period, yes.

10  Q.   And that's the part that went way down, right, we can see

11  it on the chart right there?

12  A.   Revenues entirely went way down and CDs were a large part

13  of that for that period of time.

14  Q.   Now, before CDs, there were cassette tapes.  Do you

15  remember those?

16  A.   I do remember those.

17  Q.   Did music sharing lead to the downfall of cassette tapes?

18  A.   No.

19  Q.   Technology improved and nobody wanted cassette tapes

20  anymore, right?

21  A.   I don't know that nobody wanted them, but most people felt

22  that CDs were a better format than cassettes.

23  Q.   Would you buy cassettes today?

24  A.   I don't use a cassette player today, so no, I wouldn't.

25  Q.   Because technology improved, right, nobody uses cassettes

1   anymore?

2   A.   You could record on cassettes, so there were reasons to

3   have cassettes, but as a music product, it's no longer a format

4   that's used heavily in this country certainly.

5   Q.   And before cassettes, there were 8-tracks.  Do you remember

6   those?

7   A.   I remember that they existed.  I was never an 8-track user.

8   Q.   You never had the 8-track you push into your stereo in your

9   car?

10  A.   I did not.

11  Q.   Did music sharing lead to the downfall of the 8-track

12  format?

13  A.   No.

14  Q.   No.  Technology moved forward and nobody wanted 8-tracks

15  anymore, right?

16  A.   The difference here is --

17  Q.   Please answer my question.  Nobody wanted 8-tracks anymore

18  because technology improved, right?

19  A.   I'm sure there's somebody that wanted 8-tracks, but nobody

20  I know did.

21  Q.   And the reason that that orange graph has gone way down is

22  because technology improved and nobody wants CDs anymore,

23  right?

24  A.   That is not correct.  Technology improved, but the reason

25  the CD market collapsed is because free music was dumped on the

1  Internet.  Would people have gravitated to simply music on the

2  Internet without it being free?  We were denied the opportunity

3  to discover that.  In every one of those format shifts you're

4  talking about, the record industry planned and worked.  I

5  remember as a kid being the shift from vinyl to CDs, but we

6  didn't have the opportunity to make that shift and choose that

7  for ourselves as a business because somebody decided to

8  distribute all of our product in a different format without our

9  permission to millions of people through a viral distribution

10  system.

11  Q.  So it's your position that -- let me ask this a different

12  way.  Let's say you go out for a jog tomorrow, do you want to

13  be jogging with a Sony Walkman CD player strapped to your hip,

14  is that convenient?

15  A.  I don't jog.  Sony Walkman CD player?  I had one.  I don't

16  have one now.

17  Q.  Nobody wants to be running around with a CD strapped to

18  their waist, right?

19  A.  That's true, probably.

20  Q.  Because technology improved and CDs are outdated, right?

21  A.  Technology improved and most of the market in the U.S. is

22  not CDs anymore.

23  Q.  And now people can buy one song digitally instead of an

24  entire album on CD, right?

25  A.  That's true.

Alasdair McMullan - Examination                1356

1   Q.  And you can stream music directly to your phone if you want

2   to, right?

3   A.  You can do that.

4   Q.  And the fall in CD sales, those big orange lines we see up

5   there, that's because technology moved forward, not because of

6   music sharing; isn't that right?

7   A.  No, that's not right.

8          MR. BROPHY:  May I approach, Your Honor?

9          THE COURT:  Of course.

10  BY MR. BROPHY:

11  Q.  Mr. McMullan, do you recall giving a deposition

12  November 30, 2018 in this case?

13  A.  Yes.  I don't recall the date, but I recall giving a

14  deposition.

15  Q.  You remember we sat in a room together and talked?

16  A.  Yes.

17  Q.  I'd like to direct the Court's attention to page 233, line

18  13 through 234, line nine.  I asked this question, and I'll

19  admit it's a lengthy one.  When I was younger --

20         MR. BART:  Can you bear with me for one second please?

21         *(Pause.)*

22         Go ahead.

23  BY MR. BART:

24  Q.  *"When I was younger, the way that we purchased music was by*

25  *going into a store and buying a CD.  I'm not quite the record*

1    *age, but I'm the CD age."*  And then I went on.   *"My*
2    *understanding is that at some point there was a shift from*
3    *going into a store and buying a CD to going to iTunes and*
4    *downloading a song; is that fair to say?"*  And you said, *"Well,*
5    *I think there was a -- once the iTunes store launched and*
6    *downloads were available, as popularity of downloads increased,*
7    *the popularity of purchasing CDs decreased."*
8          Do you see that?
9    A.   I do.
10   Q.   So when music became available electronically and when
11   people could download songs on iTunes, nobody wants a CD
12   anymore, right?  That's what you testified to?
13   A.   Right, but music became available digitally illegally
14   before it became available legally.  We were denied the
15   opportunity to make it available legally as a planned business.
16   Q.   So what really is going on here is that the record label's
17   business suffered because they didn't keep up with the times;
18   isn't that right?
19   A.   No.
20   Q.   Technology evolved, the record labels were caught
21   flatfooted and the record labels are no longer relevant; isn't
22   that right?
23   A.   I disagree with all of that.
24   Q.   Well, artists can record and publish their own music now,
25   right?

1        MR. BART:  Objection, Your Honor.  This has nothing to

2   do with his testimony.  He's arguing about the irrelevance of

3   record companies in a way that is argumentative without

4   foundation and just objection.

5        MR. BROPHY:  Your Honor, they have pointed to this

6   graph and said that it's because of music sharing online and

7   I'm pointing out the fact that it's because of things other

8   than music sharing.

9        THE COURT:  Well, that's for the jury to decide.  You

10  can continue, but not very much further.  I think you've

11  covered the area.

12       MR. BROPHY:  Thank you, Your Honor, I'll just have one

13  or two more questions.

14  BY MR. BROPHY:

15  Q.  Artists can record and publish their own music now; is that

16  right?

17  A.  Artists can record and get distribution in many, many

18  different ways.

19  Q.  Right here on this phone, I can record and publish my own

20  music, can't I?

21  A.  I suppose.

22  Q.  That didn't used to be the case; isn't that right?

23  A.  You couldn't record music on your phone, no, that used to

24  not be the case.

25  Q.  Artists don't need you anymore?

1   A.   That's just not true.  I think you can look at what

2   happened on Friday with Taylor Swift's current release and how

3   it was set up and how successful it's been.  You know, if a

4   most successful artist like that feels that a record company

5   provides value and distribution and marketing, I don't see how

6   you could say we're not relevant.  Some artists don't need to

7   be signed to a record label, some artists aren't signed to a

8   record label, many are.  We provide a huge arrange of choices

9   for what an artist's relationship with us could be.  They could

10  have their own label and we distribute it, they could just ask

11  for marketing services, some are signed to traditional labels.

12  There's all different ways that we do it.

13  Q.   Earlier in your testimony, in your direct, you said ISPs

14  should do the right thing.  Do you remember that?

15  A.   Yeah.

16  Q.   And in your view, doing the right thing is Grande pulling

17  the plug on its customers when it receives notices from

18  Rightscorp, right?

19  A.   I think doing the right thing would be having a policy to

20  do something with the notices, try to mitigate the

21  infringements.  And if they are unable to do it with a

22  particular subscriber that is continuing to infringe and

23  they're continuing to get notice from, probably having to

24  suspend that subscriber.

25  Q.   Well, you said suspend, but the record label's position in

1  this case is that Grande should permanently terminate its

2  customers' Internet service; isn't that right?

3  A.  Suspend or terminate if somebody is continuing to violate

4  the law and you're on notice of it, I don't think that's

5  unreasonable, no.

6  Q.  So it is not the record label's position that Grande should

7  be terminating permanently customers when it receives

8  Rightscorp notices?

9  A.  I think they should be terminating the accounts of

10 customers that are receiving multiple notices and aren't

11 stopping.  But since Grande didn't do anything with the

12 notices, it's kind of a weird question.

13 Q.  If someone calls into Grande and claims they didn't share

14 the music they were accused of sharing, should Grande still

15 terminate their Internet service?

16 A.  I think if somebody did that, Grande should have a policy

17 that deals with that and look into it, especially if it's

18 somebody that's getting repeat notices on their account.

19 Q.  How is Grande supposed to look into it?

20 A.  Well, they could put the customer in contact with the

21 monitoring company, put the customer in contact with the

22 copyright holder that hired the monitoring company to send the

23 notice.  They could -- if they had a reasonable policy to do

24 anything, they could account for the fact that maybe somebody

25 will object to the notice.

1    Q.  Is it your understanding that Grande has control over its
2    customers and can force them to do things?
3    A.  No.
4    Q.  Can Grande force its customers to testify under oath about
5    what they did or didn't do?
6    A.  I'm not sure I understand the question.
7    Q.  Grande doesn't have court power to force someone to testify
8    under oath, right?
9    A.  No one is asking them to do that.
10   Q.  But Grande doesn't have that power, right?  Yes or no?
11   A.  I suppose if Grande sued its customer, it could force them
12   to testify under oath, but I don't understand the question.
13   Q.  Can Grande, to your knowledge, kick down its subscriber's
14   doors, take their computers and scan them to see if they have
15   music on them?
16   A.  I don't think so.
17   Q.  I don't think so either.  Can Grande remote into their hard
18   drives and scan them to see what their computers have on them?
19   A.  I don't think they can, should or that's anything at issue
20   in the case.
21   Q.  Can Grande kick down Rightscorp's doors and say Tell us how
22   your system works?
23   A.  No, but Rightscorp's offers to the ISPs to talk about how
24   their system works and try to work out something reasonable
25   with processing notices and all that.  My understanding is

1    Grande didn't take them up on that offer.

2    Q.  Do you understand that Rightscorp has put protections in

3    place to prevent any Grande customer from looking at its source

4    code or databases or documents?

5              MR. BART:  Objection.  This is a technical question

6    that he objected to.

7              THE COURT:  You can ask him whether he knows.  He

8    either knows or he doesn't know.  He's not asking him how it

9    works.

10   A.  Can I hear the question again?

11   BY MR. BROPHY:

12   Q.  Do you know that Rightscorp has put protections in place

13   that stop any Grande employee from accessing any Rightscorp

14   source code, any Rightscorp documents or anything else about

15   how the Rightscorp system works?

16   A.  I don't know anything about that.

17   Q.  Do you think it's doing the right thing for a private

18   company like Grande to punish individual citizens by

19   terminating their Internet service without giving those

20   citizens a chance to defend themselves?

21   A.  I think the citizens -- the citizens, would have a chance

22   to defend themselves if Grande had passed the notices on to

23   them and if they had gotten and if they had gotten objections

24   and talked about it, but I don't think that's where we are

25   here.

1   Q.  Do you see any subscribers in this courtroom?

2   A.  I have no idea who is a subscriber to Grande.

3   Q.  And the record labels never filed suit against any of

4   Grande's subscribers to offer them the chance to come into

5   court and defend themselves, right?

6   A.  We didn't file suit for this period against Grande

7   subscribers.

8   Q.  Your testimony is that Universal music has filed lawsuits

9   against Grande subscribers for the infringements at issue in

10  this case?

11  A.  No, I just said the opposite.

12          MR. BART:  He said the opposite.

13  BY MR. BROPHY:

14  Q.  They haven't filed lawsuits, right?

15  A.  No.  Only Grande knows who their subscribers are.

16  Q.  Is it doing the right thing, in your view, for a private

17  company like Grande to punish individual citizens by

18  terminating their Internet service based on nothing more than

19  an accusation received over the Internet, is that doing the

20  right thing?

21  A.  I think it is the right thing for Grande to have a

22  reasonable policy to deal with notices of infringement it

23  receives from copyright holders and as part of that policy if

24  they -- if the users continue to infringe and Grande continues

25  to get notices, then I think it's very reasonable for them to

1  terminate those subscribers.  Just like the DMCA has a

2  requirement to get a safe harbor for repeat infringer policy.

3  The law literally talks about a repeat infringer policy.  So to

4  say that a repeat infringer policy that includes termination is

5  unreasonable would say the law itself is unreasonable.

6  Q.  Is it doing the right thing for a private company like

7  Grande to punish individual citizens by terminating their

8  Internet permanently when Grande has no way of knowing whether

9  the accusations are true or false, is that doing the right

10  thing?

11  A.  I take issue with the idea that a company like Grande

12  getting 1.3 million notices can say there's not a problem on my

13  system.  I take an issue with that.  Because this is not about

14  one notice here, one notice there, did they do or didn't they.

15  When you have that many, you just have to use some common sense

16  that there's a real problem here.

17  Q.  You don't know how -- anything about how the Rightscorp

18  system works, do you?

19  A.  I testified to the extent I understand what Rightscorp does

20  until the point where I was told not to testify about what

21  Rightscorp does.

22  Q.  You don't know technologically speaking how Rightscorp

23  system works; isn't that right?

24  A.  I am not a technological person.

25  Q.  You're sitting here saying that Grande should terminate

1    people based on Rightscorp notices, but you don't even know how

2    Rightscorp system works?

3    A.  I understand what Rightscorp does.  They log onto the

4    system -- I know in this case they collected downloads of our

5    tracks.

6    Q.  But you don't know how they did that, do you?

7    A.  By connecting to the system --

8    Q.  Sir, do you know how they did that?

9           THE COURT:  Counsel, he was answering your question

10   and you're interrupting.

11   A.  By connecting to the system as a user and downloading from

12   other BitTorrent users that were subscribers to Grande.  Beyond

13   that, I am not a technological person.  I understand there's

14   been plenty of technological testimony in this case.

15   BY MR. BROPHY:

16   Q.  I'd like to direct the Court's attention to your deposition

17   testimony, page 143, line six through eight.  I asked the

18   question, *So do you have any understanding of how the*

19   *Rightscorp system works?"* And your answer, *"Technologically*

20   *not really, no."*

21          MR. BART:  Objection, this is not inconsistent with

22   his testimony at all.

23          THE COURT:  He just testified to that.

24   BY MR. BROPHY:

25   Q.  You don't know how the Rightscorp system works, right?

```
 1          MR. BART:  Asked and answered.
 2   A.  Beyond what I've said, no.
 3          MR. BROPHY:  I don't think I have anything more.
 4   Thank you, Your Honor.
 5          THE COURT:  Okay.  Anything else?
 6          MR. BART:  Just a few.
 7                    REDIRECT EXAMINATION
 8   BY MR. BART:
 9   Q.  Mr. McMullan, when did the piracy on the Internet begin
10   that you were talking about in your direct, the MP3 piracy?
11   A.  MP3 piracy started in the late '90s.
12   Q.  When was the music industry able to respond to that by
13   trying to make downloads available through the iTunes store?
14   A.  The mid 2000s sounds about right to me.
15   Q.  And in that period between the end of the 1990s and the
16   time that you were able to respond and put in a download
17   process, how were people getting -- what was the only means by
18   which people were getting downloads of individual songs?
19   A.  Through illegal services.
20   Q.  And when you were talking before about being deprived of
21   the opportunity to develop your own market, how does that
22   relate to these -- this timeline that we've just been talking
23   about?
24   A.  Well, during the timeframe before there was a launch of a
25   legitimate service that had any traction, because there were a
```

Alasdair McMullan - Examination                 1367

1    number of services that launched and entirely failed because

2    they were competing with free, the CD market was being eroded

3    and it hampered our ability to make deals with companies to

4    provide legitimate music because we knew they had to compete

5    with free.  And it's very hard to launch a business, a new

6    business when someone else is giving away exactly what you are

7    going to try to be selling.

8    Q.  And over the long haul, while it still exists in the

9    marketplace, were digital downloads ever an answer to free

10   material on the Internet?

11   A.  No, I don't think digital downloads -- and you can see just

12   the trajectory of the market -- were not the answer to the

13   piracy question or the availability of music through the

14   Internet.

15   Q.  And your ultimate view on the impact of piracy, how does

16   that relate to the ability of any property owner to control the

17   development and use of its own property?

18   A.  Well, again, this music is copyrighted music and which we

19   have an exclusive right to determine how to distribute it and

20   bring it to consumers.  We would like our music to be

21   everywhere ubiquitous accessed in any way that consumers like.

22   What we don't want is for consumers to be able to do that

23   without us, paying no money and depriving us of our ability to

24   exist.

25   Q.  Now, at the end of your cross-examination, you were

1  presented with a bunch of pretty strong questions about people

2  kicking down doors and, you know, taking very aggressive acts

3  towards users and asking you whether that was appropriate.

4      Have you ever once or has anyone at Universal, to your

5  knowledge, ever demanded that a ISP take some action to spy on

6  its customers?

7  A.  No.

8  Q.  Monitor its customers?

9  A.  No.  In fact, the law doesn't require them to monitor.

10 Q.  But conversely, if a company gets a million -- 1.3 million

11 notices alleging infringement, never investigates, refuses to

12 meet with the company that sends them and instead just looks

13 the other way and comes into court and says We were unable to

14 do anything, are they doing the right thing?

15 A.  They are not doing the right thing and that's why we're

16 here.

17         MR. BART:  I have no further questions.

18         THE COURT:  Anything else, sir?

19         MR. BROPHY:  No, thank you, Your Honor.

20         THE COURT:  Okay.  You can step down.

21         *(2:04 p.m.)*

22         MR. GILMORE:  Your Honor, plaintiffs now call by video

23 tape deposition designation executive vice president and chief

24 development officer for Grande, an employee of Patriot, which

25 is Grande's management company, Robert Roeder.

1          THE COURT:  Okay.  Turn the lights down just a little

2    bit.

3          MR. GILMORE:  Your Honor, we also offer Plaintiff's

4    262 which I think Your Honor indicated would be admitted.

5          THE COURT:  It will be received, over objection.

6          *(Videotaped deposition playing.)*

7                            *EXAMINATION*

8    *BY MR. O'BEIRNE:*

9    *Q.   Would you please state your full name and your home*

10   *address?*

11   *A.   Robert Eugene Roeder.*

12   *Q.   Please state your current position?*

13   *A.   Executive vice president, chief development officer for*

14   *Patriot Media.*

15   *Q.   You also are an officer in Grande, correct?*

16   *A.   No.*

17   *Q.   You're not an officer in Grande?*

18   *A.   No, I don't believe so.*

19   *Q.   Okay.  It's my understanding --*

20   *A.   Officer of Patriot Media.*

21   *Q.   You're an officer of Patriot Media.  So are you the chief*

22   *development officer at Grande?*

23   *A.   No.*

24   *Q.   Your e-mail signature has Grande Communications in it?*

25   *A.   That is correct.*

1    Q.   Why is that if you're not an officer of Grande?

2    A.   Because the management company -- Patriot Media is the

3    management company.

4    Q.   You understand that you are here to provide corporate

5    testimony as a corporate representative speaking on behalf of

6    Patriot?

7    A.   Correct.

8    Q.   When Grande was sending notices to customers in 2016, it

9    was alerting the customers that there had been an illegal

10   download, right?

11   A.   I would expect that to be the case, yes.

12   Q.   Patriot understood in 2016 that the notices that Grande was

13   receiving from third parties were notice of illegal downloads

14   by Grande customers?

15   A.   Yes.

16   Q.   And same for 2015, Patriot understood in 2015 that the

17   notices that Grande was receiving were notice of illegal

18   downloads by Grande customers?

19   A.   Yes.

20   Q.   Same for 2013, from the time that Patriot took over?

21   A.   Yes.

22   Q.   PX 262 is a document produced by Patriot in this case at

23   Bates number 00177841.  Do you see that, sir?

24   A.   Yes, sir.

25   Q.   And this is an e-mail chain between you and Chris Fenger

1   *and Bill Davis from August 2016, right?*

2   *A.   Between me and Bill Davis, correct.*

3   *Q.   So the first e-mail is an e-mail from you to Chris Fenger?*

4   *A.   That's correct.*

5   *Q.   And then you forwarded it to Bill?*

6   *A.   That's correct.*

7   *Q.   So looking at your e-mail, you sent an e-mail to Chris*

8   *Fenger August 16, 2016, subject, "Today's DMCA Call." Do you*

9   *see that?*

10  *A.   Correct.*

11  *Q.   And you go on to say, "We obviously don't enjoy notifying*

12  *customers of illegal downloads." And then the rest is*

13  *redacted. Do you see that?*

14  *A.   Yes.*

15  *Q.   And as we've already discussed, it was Patriot's*

16  *understanding in 2016 that the notices it were receiving were*

17  *notice of illegal downloads by the customers?*

18  *A.   Yes.*

19  *Q.   And you go on to say, "Somehow Grande has been performing*

20  *these notifications with minimal to no impact." Do you see*

21  *that?*

22  *A.   In reference to phone calls coming in, correct.*

23  *Q.   What do you mean?*

24  *A.   They were able to -- all of the agents at Grande had the*

25  *capability of describing or explaining to a customer the reason*

1  *for the notification that was received.  RCN's only had a small*
2  *group of people who had that capability.*
3  *Q.  Oh, I see.  What you're saying is Grande's Call Center*
4  *people were able to describe to the customer what was the*
5  *illegal download?*
6  *A.  They were able to describe why a notification may have, but*
7  *not the specifics of anything.*
8         *(Videotaped deposition stopped.)*
9                    *  *  *
10         MR. BART:  Your Honor, as we've discussed, we still
11  have testimony coming up from Ms. Frederiksen, so we will pass
12  the baton over to the defendants pending our completion of our
13  direct case.
14         THE COURT:  Thank you very much.
15         MR. BROPHY:  Thank you, Your Honor.  Grande would like
16  to call Mr. Lamar Horton to the stand.
17         THE COURT:  All right.  You remain under oath, sir.
18         *(2:10 p.m.)*
19                    DIRECT EXAMINATION
20  BY MR. BROPHY:
21  Q.  Good afternoon.
22  A.  Good afternoon.
23  Q.  Would you mind reintroducing yourself to the jury please?
24  A.  My name is Lamar Horton.
25  Q.  And Mr. Horton, remind the jury where you work?

1   A.   Grande Communications.

2   Q.   And how long have you worked for Grande Communications?

3   A.   I have been with Grande for 19 years since 2003.

4   Q.   Would you mind describing for the jury what education you

5   received before beginning at Grande?

6   A.   Sure.  I have a Bachelor of science in electrical

7   engineering through DeVry University.

8   Q.   In addition to that formal education, do you have any

9   certifications that you hold?

10  A.   Yes, a Cisco CCNA, which is a Cisco Certified Network

11  Associate.

12  Q.   What position did you take on with Grande when you started

13  in 2003?

14  A.   I actually started as a contractor and I was brought on to

15  help the network engineering team who was struggling with some

16  of the rapid growth they were having in the early days, sort of

17  make some decisions on scaling and architecting their network.

18  Q.   Would you mind describing for the jury what your day-to-day

19  work was during that period?

20  A.   A lot of it was reviewing capacity reports, trying to make

21  plans for how that capacity was going to grow so that we could

22  invest our infrastructure into areas of the network that

23  required it to satisfy the Internet products that we were

24  delivering to our customers.

25  Q.   How long did you have that role of a contractor at Grande?

Lamar Horton – Examination                    1374

1   A.  For about five months.

2   Q.  What did you do next?

3   A.  I was brought on full-time as the manager of IP

4   engineering.

5   Q.  And what were your responsibilities as a manager of IP

6   engineering at Grande?

7   A.  Essentially the team that I was working with as a

8   contractor, I was brought in to actually oversee and manage

9   that group.  So the responsibilities became mine to manage the

10  day-to-day operations of that team and the network.

11  Q.  What kind of work did you perform in that role at Grande?

12  A.  Similar in terms of the focus of the team was maintaining

13  the network day to day for customer operations as well as

14  looking forward to grow it in terms of capacity and

15  reliability, things of that nature.

16  Q.  How long were you manager of IP engineering at Grande?

17  A.  For about two years until 2005.

18  Q.  Okay.  And what role did you take on in 2005?

19  A.  I was promoted to director of IP engineering.

20  Q.  And did that involve more responsibilities for you?

21  A.  Yes.  So there was from other teams that were also part of

22  managing our data network infrastructure that were also brought

23  under my management as well and that included things like DNS

24  servers, e-mail servers, cable modem provisioning systems and

25  some of the teams that would do the actual analysis of our

1  capacity needs and trending things like that.

2  Q.  You described DNS.  Would you mind just describing for the

3  jury at a high level what that is?

4  A.  Sure.  DNS is kind of required in an ISP environment and

5  essentially a domain name service is what DNS stands for is

6  used to translate when a customer types in, say, Google.com, it

7  translates that to an IP address which then allows the Internet

8  to know how to deliver that to the final destination.

9  Q.  And how long were you a director of IP engineering at

10  Grande?

11  A.  About four years until 2009.

12  Q.  And what position did you take on in 2009?

13  A.  I was promoted to vice president of network engineering and

14  operations.

15  Q.  Is that your current role at Grande?

16  A.  Yes.

17  Q.  Talk a little bit about what your responsibilities are in

18  that role?

19  A.  So essentially instead of just having the purview of the

20  data and HSD Internet products we provided, I also took on the

21  responsibilities of our phone network and telephone products as

22  well as our cable TV and video services as well as some of the

23  engineering and operations of the actual physical network that

24  we have, our fiber network, things like that.

25  Q.  How many people do you manage, roughly?

1   A.   Roughly, about 50.

2   Q.   What are your day-to-day responsibilities as the vice

3   president of network engineering operations?

4   A.   So essentially my number one focus is keeping our network

5   running and operating to provide a quality product to our

6   customer that's reliable and planning the capacity means that

7   we need to continue to deliver that as we grow and as our

8   customer base grows.

9   Q.   What is the biggest challenge that you face in that role at

10  Grande?

11  A.   I would say on a day-to-day basis we are always looking at

12  the capacity in our network that is an ever-changing thing that

13  we have to monitor and keep an eye on and make plans to

14  accommodate.  Because it takes time to deploy new equipment or

15  new products, things of that nature, to continue scaling where

16  we need to provide the bandwidth to provide a quality customer

17  experience.

18  Q.   I believe you testified already that one of your

19  responsibilities in this role is to make sure customers receive

20  Internet service; is that right?

21  A.   Yes, from a network perspective, yes.

22  Q.   Are you also responsible for providing security for

23  Grande's network?

24  A.   Yes.

25  Q.   What kind of security risks or threats does Grande's

1  network deal with?

2  A.  Well, since our network is part of the Internet, it's

3  reachable by the global Internet, so the big devices that we

4  have in the core of our network are routers, servers, things

5  like that.  People are always trying to gain access or hack

6  into those devices, which is common to a lot of ISPs.  Another

7  big thing that we have to defend are what we call DDOS attacks.

8  Q.  What are those?

9  A.  A DDOS attack is known as a distributed denial of service

10  attack and again very common on the Internet.  ISPs have to try

11  to detect those things and mitigate them so that we don't

12  experience service degradations to our entire customer base.

13  And in today's world, a common example that we use is in the

14  gaming world if somebody gets upset with another gamer and they

15  can identify their IP address, they can go online and there's

16  ways to orchestrate a denial of a service attack to send a lot

17  of traffic to that one IP address with the intention of

18  knocking that person offline.

19      Unfortunately, in doing that, they may impact our own

20  network and knock off many, many other users in that area,

21  which would cause a degraded service.  So those are the things

22  that we have to look for and try to mitigate.

23  Q.  I'd like to switch gears a little bit and talk about at a

24  high level how Grande supplies Internet to its customers.

25      It's my understanding you have a demonstrative that you'd

 1  like to use to walk through this process; is that right?

 2  A.  Yes.

 3       MR. BROPHY:  Your Honor, do I have permission to

 4  publish that demonstrative?

 5       THE COURT:  Yes.

 6  BY MR. BROPHY:

 7  Q.  Okay.  Let's start by talking about what's in a Grande

 8  customer's home.  Does Grande install any hardware within a

 9  customer's home?

10  A.  Yes, we typically use cable modems for most of our Internet

11  service and we typically install a cable modem inside the

12  customer's home.

13  Q.  Is there any other hardware that Grande installs typically

14  inside a home?

15  A.  Typically a customer will provide their own wireless

16  router.  If they don't, we can provide one as well.

17  Q.  Would you describe for the jury what a wireless router

18  does, at a high level?

19  A.  Sure, without being too technical, essentially the wireless

20  router in a customer's home is what allows the customer to

21  connect multiple devices inside the house so they can

22  communicate with each other.

23  Q.  Can you give the jury some examples of the types of devices

24  that would connect to that wireless router?

25  A.  Sure.  Smart phones, printer, Amazon Alexa, smart bulbs,

1   laptop, tablet, things of that nature.

2   Q.  You also mentioned that Grande installs a cable modem.

3   What's a cable modem?

4   A.  So the cable modem is essentially what allows Grande to

5   connect the wireless router to the Internet.  We're kind of the

6   conduit to the Internet.  The other thing that the cable modem

7   plugs into is traditionally you've probably seen the black

8   cable coming out of the wall, the coax cable, that's what

9   Grande brings into the house to plug into the cable modem to

10  provide the connection to the Internet.

11  Q.  The big mystery, where does that black cable go?

12  A.  I spent a lot of time talking about that.  So every house

13  that we service or every apartment that we service, business,

14  etc., has this black coax cable coming into it to deliver the

15  service.  The cable modem is what that plugs into.  If you

16  imagine leaving your house or your apartment, everybody has a

17  cable leaving their physical location, those cables are brought

18  back together and essentially if you think about a neighborhood

19  and multiple neighborhoods, all those cables are essentially

20  coming back to what we call a head end facility.

21  Q.  And without getting too into the weeds, is there a specific

22  device at that head end facility that all those cables plug

23  into?

24  A.  Yes, for cable modem service specifically we call it a CMTS

25  and that stands for cable modem termination system.  It's

Lamar Horton - Examination                    1380

1   essentially a very large box that can take the signals of many,

2   many thousands of cable modems and plug those into that box and

3   provide the connectivity between the head end and the customer

4   house or the customer apartment location.

5   Q.  So now we've gotten the head end.  What is the head end

6   connected to?

7   A.  So the head end would connect to what we call the core of

8   our data network.  So this is a very large, very high-speed,

9   very expensive platforms that are used to connect all these

10  signals and get them to and from the Internet.

11  Q.  Is that the main network identified on your demonstrative?

12  A.  That is correct, the main network.

13  Q.  What does the main network connect to?

14  A.  The main network, after the head end connects to the main

15  network, the main network is essentially the gateway to the

16  Internet at large.  This is how you get to Google or YouTube or

17  other Internet application servers.

18  Q.  So let's assume for a moment that one of Grande's customers

19  sits down at a desk at their house, saddle up to their computer

20  and type in a web address, www.google.com and hit Go, would you

21  mind describing how the message is passed from that computer up

22  to the Internet and back?

23  A.  Sure.  So the customer types Go on Google.com, for

24  instance.  The computer recognizes it needs to send that to an

25  IP address that's on the Internet.  So the first place it sends

1    that packet or that set of packets is to the wireless router in

2    the home.  It then goes from the wireless router to the cable

3    modem and then the cable modem to the head end and these are

4    all packets of -- with IPs tied to them for us to deliver for

5    Grande to know how to deliver that and we send it up to the

6    main network, out to the Internet, a connection is made to the

7    Google servers or whatever that is and then the return traffic

8    comes back in exactly the opposite way to the wireless router

9    and then back to the computer.

10   Q.  This may be ground we've plowed too much already, but would

11   you mind just describing what an IP address is?

12   A.  Sure.  So an IP address on the Internet is similar to

13   having a mailing address at a house.  It's how the Internet

14   knows how to communicate to you when you request information.

15   Q.  How many IP addresses does Grande assign to an individual

16   subscriber household?

17   A.  Typically one.

18   Q.  Does Grande know how many different people are connected to

19   the wireless router at a customer's home?

20   A.  No.

21   Q.  Does Grande know how many different people are using the IP

22   address assigned to a subscriber's home?

23   A.  No, we have no way to know that.

24   Q.  As the vice president of network engineering and

25   operations, do you have an understanding of how the wireless

Lamar Horton - Examination                    1382

1    routers that Grande deploys to its customers operate?

2    A.  Yes, absolutely.  That's an important part of delivering

3    our Internet service to our customers and connecting it back to

4    our network.

5    Q.  Is part of your job dealing with security risks associated

6    with those wireless routers?

7    A.  Yes, that is one of the many security risks.

8    Q.  Have you ever instructed Grande employees on how to deal

9    with security issues pertaining to wireless routers?

10   A.  Yes.

11   Q.  And how do those concerns come to your attention?

12   A.  You know, in the ISP industry, one of the common things

13   customers will call us to get help with is slow Internet

14   experience.  One of those reasons can be somebody using the

15   WiFi that the customer doesn't recognize, as an example.  So

16   through the troubleshooting process of working with the

17   customer to identify what's happening, in many cases the

18   customer will identify that they don't recognize some of the

19   devices on the WiFi.

20   Q.  Are you aware of ways -- well, let me back up.

21       What do you instruct Grande personnel to do to solve those

22   problems?

23   A.  Typically as a matter of procedure, we would have the

24   customer change their WiFi password would be a good step, maybe

25   reset the device to knock everything off of it so that whatever

1   was connected is no longer connected.

2   Q.   Are you aware of ways in which someone can hack into a

3   Grande wireless router?

4   A.   Yes.

5   Q.   And how would someone do that?

6   A.   There are software applications that anybody can download

7   off the Internet that allow you to essentially -- they refer to

8   it as, like, brute force attack a wireless device to try

9   different passwords to see if it can make a connection into the

10  WiFi network.

11  Q.   Are there instances in which that is more prevalent than

12  others, certain types of subscribers or certain installations?

13  A.   I would say that happens more commonly in apartment complex

14  type situations because you have so many wireless routers that

15  are so close to each other, as opposed to maybe some other

16  environments where only a few people could physically connect

17  to that device.

18  Q.   In your experience with the wireless devices that Grande

19  deploys, do they provide any indication or alert that someone

20  outside the household has connected to them?

21  A.   No.

22  Q.   Is it possible someone in this courtroom has a wireless

23  router at home that someone is connected to illegally?

24  A.   That's absolutely possible.

25  Q.   I want to shift gears and talk about how much information

Lamar Horton - Examination                    1384

1   passes through Grande's network.  In your role as vice

2   president of network operations and engineering, do you have an

3   awareness of the average volume of data that passes through

4   Grande's network in a day?

5   A.  Yes, that's a big part of my job.

6   Q.  Roughly speaking, how much information does Grande process

7   in a day?

8   A.  At any given moment on the network, we're passing on

9   average about 400 gigabits per second.  That's at any moment in

10  time.

11  Q.  Can you convert that into a daily total of how much

12  information is being processed?

13  A.  Yeah, that equates to about four and a half petabytes of

14  data in a given day.

15  Q.  What is -- how much data is four and a half petabytes?

16  A.  It's very technical.  That's about 4 million gigabytes.

17  Q.  Do you have a way to put that into a context that the jury

18  might understand?

19  A.  Yeah, one of the examples we use to try to connect it to a

20  physical thing would be if you took the average book and

21  equated it to bytes, you could have a book shelf that could go

22  around the earth twice to accommodate that much data to

23  represent 4.5 petabytes of data, and that's in a given day.

24  Q.  So every single day there's enough information going

25  through Grande's network to have a bookshelf wrap around the

1    earth twice?

2    A.   Yes, every day.

3    Q.   Does Grande save all of that data that passes through its

4    network every day?

5    A.   Oh, absolutely not.

6    Q.   Would it be possible for Grande to save all that data?

7    A.   No.

8    Q.   Are there -- would you mind describing for the jury the

9    reasons why it would be impossible?

10   A.   Sure.  The first hurdle, I guess, would be the amount of

11   horsepower it would take to even process that much data because

12   this data is moving across our network.  We kind of refer to

13   that as it's like transient packets that are just flowing

14   through the network.  We're not storing that or pulling it into

15   a system to keep it anywhere, it's just passing through the

16   network.  So that the horsepower it would take to capture all

17   that traffic and then the amount of storage it would take to

18   actually put it somewhere and keep it would just be enormous.

19   Q.   How long does the typical piece of data passing through

20   Grande's network exist on Grande's network?

21   A.   Milliseconds, which is thousandths of a second.  It's in

22   packet form, so it's just flowing through the routers that are

23   just deciding how to get it to and from the Internet.

24   Q.   What kind of challenges does Grande face in moving that

25   much data around every day?

Lamar Horton - Examination                    1386

1    A.  Running an ISP is a challenge.  We experience issues on a

2    daily basis pertaining to running the network and providing

3    services to customers.  Some of the big things that we deal

4    with on a regular basis are things like fiber cuts or network

5    cuts, could be somebody's widening a road in the City of Austin

6    and they cut one of our fiber lines and that takes down

7    multiple neighborhoods or parts of our head end infrastructure.

8        We have power outages just like everybody else and

9    sometimes backup power doesn't always work or doesn't last long

10   enough to get through a power outage like the winter storms we

11   had a few years ago, because we run big, large platforms in our

12   network sometimes hardware fails, software fails, things go

13   wrong that are unexpected.

14   Q.  Is it your job to deal with all those issues?

15   A.  Absolutely, on daily basis.

16   Q.  What does Grande do to address those challenges?

17   A.  We have monitoring systems in place to help us know when

18   these things happen so we can respond to them as quickly as

19   possible as opposed to waiting for customers to call and

20   complain about loss of service.  We try to design our network

21   to the best of our capabilities where if something fails in

22   certain areas, we can reroute traffic a different direction or

23   through a different set of devices or fail over to another head

24   end, things of that nature.

25   Q.  You mentioned that you manage a team of around 50 people,

1    is that right?

2    A.   That's correct.

3    Q.   How much of that team's time and energy is devoted to the

4    issues that you've just described?

5    A.   Probably almost all of it.

6    Q.   Does Grande look at all of that data passing through its

7    network to see what its customers are doing online?

8    A.   Absolutely not.

9    Q.   What information does Grande have about its customers use

10   of the Internet?

11   A.   The only thing we really have is we look at it in terms of

12   usage or capacity, how much usage is coming out of a

13   neighborhood or a cable modem platform so that we can kind of

14   monitor and manage our -- the capacity on our network.

15   Q.   Talk a little bit more about why you have that information

16   and what you do with it please?

17   A.   Sure.  So we're always studying our network to try to

18   understand where the growth is, where we need to start thinking

19   about investing new equipment or new circuits or new things to

20   ensure we're addressing the anticipated growth in that part of

21   the network.

22   Q.   If Grande wanted to, could it look up what an individual

23   customer was doing online at any given moment?

24   A.   No.

25   Q.   Are there technologies in place that prevent Grande from

Lamar Horton – Examination                           1388

1    knowing what its customers are doing online?

2    A.   There is.

3    Q.   And what are those technologies?

4    A.   The most predominant one would be encryption.

5    Q.   What is encryption?

6    A.   Encryption is essentially a customer on your computer, you

7    want to connect to something on the Internet, encryption is a

8    way for the customer and whoever they're communicating to on

9    the Internet to secure or scramble their traffic in a way that

10   only the sender and receiver can decode that information.

11   Q.   As the vice president of network engineering and

12   operations, do you have occasion to review and understand the

13   kinds of data that passes through Grande's network?

14   A.   I do.

15   Q.   Is one of the kinds of data that passes through your

16   network encrypted data?

17   A.   Absolutely.

18   Q.   Help the jury understand what it is about encrypted data

19   that causes Grande to not be able to read it?

20   A.   Because it's encrypted, essentially the sender and receiver

21   are the ones that negotiated that encryption and so even if we

22   could look at that traffic reasonably, we'd have no way to put

23   it back together or reassemble it to understand what it is.

24   It's just ones and zeros passing through our network with a

25   source and destination IP address.

Lamar Horton - Examination                    1389

1   Q.  Can you provide the jury of an example of encrypted data

2   that would be passed through Grande's network?

3   A.  Sure.  And I think we have a slide.

4          MR. BROPHY:  Would you mind going to the next slide

5   please, James?

6   A.  This is a common example that we use when talking about

7   this kind of thing.  So this slide sort of represents a

8   customer connecting to their bank online.  And if you could

9   zoom in to the URL bar there at the top where it says

10  www.BankofAmerica.

11     You can see the "S" there at the end of the https, if you

12  could point to that.  The "S" indicates that this is a secure

13  or encrypted communication as the customer is on this web page

14  using this interaction or this service.

15  Q.  So Grande has no way to read that traffic?

16  A.  That's correct because it would be encrypted.

17  Q.  Does Grande know its customers' banking passwords?

18  A.  Absolutely not.

19  Q.  Does Grande know its customers' bank account balances?

20  A.  No, absolutely not.

21  Q.  Why is that true even though the packets are being sent to

22  Grande and going through Grande's network?

23  A.  Because essentially because they're encrypted, we are just

24  passing those packets through our network.  And again, this

25  goes beyond just Grande, these packets are traversing the

1   Internet at large, so if there's other ISPs between the

2   customer and Bank of America, they also can't look at these

3   packets and unencrypt them.

4   Q.  What about search engines like Google, can Grande read that

5   information?

6   A.  We cannot.  I think I have a slide on this one as well.

7   You can zoom in on the URL bar on that one as well.

8       I get a lot of questions from a lot of different people in

9   the industry and things about search engines and how is that

10  different or how does that work, but you can see just going to

11  Google you're also connecting, whether you know it or not is

12  https -- and again the "S" means secure.  Most credible

13  websites today are secured.  So this is something that is very

14  common.  And essentially what that means is when the customer

15  is logging in to, in this case, Google, and typing search terms

16  or whatever they're doing for the Google website, all of that

17  information is encrypted between the customer and, in this

18  case, Google, so we can't see that.

19  Q.  So if the traffic with Google is encrypted, why is it then

20  when I type in a search for tennis shoes, I get advertisements

21  for tennis shoes for like two weeks afterwards?

22  A.  So Google is in the business of providing ads based on

23  customers' search terms and whatever other ways Google can find

24  interest of the customer, but in that example, if you search

25  for tennis shoes, that search term was encrypted in that

1  communication between the customer and Google and then Google

2  has software systems that think you may be interested in tennis

3  shoes and they have business models of placing ads to you about

4  tennis shoes.

5  Q.  Can Grande see the search terms that its customers put in

6  that Google search bar?

7  A.  Absolutely not.

8  Q.  Can Grande see what advertisements its customers are

9  receiving?

10 A.  No, we cannot.

11 Q.  In your role as vice president of network engineering and

12 operations, have you had occasion to operate BitTorrent

13 clients?

14 A.  Yes.

15 Q.  Under what circumstances do you use BitTorrent at work?

16 A.  We actually use it for downloading Linux distributions.

17 Linux is a operating system that is used to run server

18 applications, things like that.  So if we need to download a

19 Linux distribution or Linux update, we'll use a BitTorrent

20 client to do that.

21 Q.  Is that the way the company that you work with offers those

22 distributions is through BitTorrent?

23 A.  Absolutely.

24 Q.  Is that a legal use of BitTorrent?

25 A.  Yes.

1   Q.  What BitTorrent clients have you personally used?

2   A.  I've used U-torrent, Q-torrent, that's with a Q.  One

3   called Views.  There's one actually just called BitTorrent.

4   Off the top of my head, that's all I can think of.

5   Q.  Are you familiar with the operation of those BitTorrent

6   clients?

7   A.  I am.

8   Q.  Do those BitTorrent clients encrypt the data that they

9   send?

10  A.  Yes, encryption can be enabled in those clients.

11  Q.  Can Grande read the encrypted BitTorrent traffic to know

12  what files are being transferred through BitTorrent?

13  A.  No, because it's encrypted, we can't see that.

14          MR. BART:  Your Honor, I think we're on the edge of

15  expert testimony here about the BitTorrent system .

16          THE COURT:  We're getting there.

17          MR. BROPHY:  We are getting there, Your Honor, I'm

18  moving on.

19          THE COURT:  Okay.

20  BY MR. BROPHY:

21  Q.  And to clarify, setting aside whether it's encrypted or

22  not, does Grande even have any of the data to read it?

23  A.  We do not.

24  Q.  Are there other reasons besides encryption for why Grande

25  can't see what its customers do online?

Lamar Horton - Examination                    1393

1    A.  Yeah, I would go back to the shear amount of horsepower it

2    would take to try to capture that data much less analyze it if

3    we could.

4    Q.  Why does the volume of data make it impossible for Grande

5    to read what its customers are doing or sending?

6    A.  If you consider how much traffic is passing through the

7    network, and in the case of we talked about the head end and

8    the CMTS that's aggregating all the cable modem traffic, you're

9    talking about multiple Zip codes worth of customers, that may

10   be a third of the city that we're serving, something like that.

11   So that's tens of thousands of potential cable modems that are

12   being passed through this DOCIS platform.  And in order to look

13   at any of that traffic, we have to try to look at all of that

14   traffic.  So you're talking about hundreds of gigabits of data

15   coming through in real-time that we just don't have the

16   horsepower or systems to even begin to try to capture that

17   data.

18   Q.  I want to be really clear about this next question.  Does

19   Grande unpack and read any of the data that it sends back and

20   forth on behalf of its Grande customers?

21   A.  Absolutely not.

22   Q.  Does Grande know what files its customers send and receive

23   on the Internet?

24   A.  No, we do not.

25   Q.  Does Grande collect and sell any data about what its

1  customers do on the Internet to third parties?

2  A.  No, we do not.

3  Q.  Does Grande know what percentage of the traffic on its

4  network is encrypted?

5  A.  We do not.

6  Q.  Does Grande know what percentage of the traffic on its

7  network is BitTorrent traffic?

8  A.  No.

9  Q.  Does Grande have any way of learning those things?

10  A.  Not that I'm aware of.

11  Q.  Does Grande have the ability to remotely access its

12  customers' computers?

13  A.  No.

14  Q.  If Grande customers had song files sitting on their

15  computers at home, is there any way for Grande to peak in and

16  see those files?

17  A.  No, we have nothing like that.

18  Q.  Does Grande have some magic switch it can flip to see what

19  its customers' screens look like on their computers or phones?

20  A.  Absolutely not.

21  Q.  Do you know whether individual Rightscorp's accusations are

22  true or false?

23  A.  We have no way to know that.

24  Q.  You were here when Mr. Boswell testified a week or two ago;

25  is that right?

Lamar Horton – Examination                    1395

1    A.   I was.

2    Q.   Do you remember Mr. Boswell testifying that Grande could

3    investigate Rightscorp's e-mail accusations?

4    A.   I do.

5    Q.   Does Grande have the ability to investigate Rightscorp's

6    e-mail accusations?

7    A.   We do not.

8    Q.   Mr. Boswell testified that Grande could just, quote, read

9    the logs; do you remember that?

10   A.   I do remember him saying that.

11   Q.   Does Grande have logs it could reference to verify

12   Rightscorp's accusations?

13   A.   We do not.

14   Q.   What kind of logs does Grande keep?

15   A.   So in a network, essentially you're talking about giant

16   platforms that are passing this traffic back and forth to and

17   from the Internet and the type of logs that a platform like

18   that keeps are typically what we call like environmental or

19   system type logs, so it tells you how long the system has been

20   up and running, when did it reboot last, what's the temperature

21   of the line cards, what are the CPU utilizations, things of

22   that nature, nothing to do with the traffic passing through it.

23   Q.   Does Grande have any logs that relate to what files

24   customers are transmitting over the Internet?

25   A.   Absolutely not.

1  Q.  Does Grande have any logs about what websites Grande's
2  customers are visiting?
3  A.  We do not.
4  Q.  Does Grande have any logs of any kind that relate in any
5  way to what Grande's customers are doing on the Internet?
6  A.  We do not.
7  Q.  Mr. Boswell also testified, You can just look at the
8  Internet traffic coming in for a customer to see if they're
9  sharing music; do you remember that?
10  A.  I do.
11  Q.  I believe Mr. Boswell mentioned something called Wireshark.
12  Do you remember that term being used?
13  A.  Yes, I do.
14  Q.  Do you know what Wireshark is?
15  A.  Yes.
16  Q.  What is Wireshark?
17  A.  Wireshark is a software application that can be downloaded
18  from the Internet and it can be used to analyze traffic that's
19  been captured on a network.
20  Q.  Throughout your time at Grande, do you have experience
21  using Wireshark?
22  A.  I do.
23  Q.  Does Wireshark allow Grande to view encrypted traffic?
24  A.  It does not.
25  Q.  Can Grande use a tool like Wireshark to inspect a

1  customer's unencrypted Internet traffic to see if they're

2  sharing music?

3  A.  We cannot.

4  Q.  Why not?

5  A.  This goes back to the amount of the volume of data we would

6  have to capture is already the first problem and even if we

7  could capture it, you've got to pare all that down to something

8  that's something like a software like Wireshark could actually

9  handle or process to be able to even begin to look at the

10 traffic.

11 Q.  If I understand what you're saying, there's a limit to how

12 much a computer can accept at one time; is that right?

13 A.  Yes, in terms of the raw traffic in the network.

14 Q.  Can Grande just look at data for a single individual

15 customer to see whether they are sharing music?

16 A.  No, we have no capability to do that.

17 Q.  And why is that?

18 A.  Because again at the head end level where the CMTS type

19 device sits, you've got tens of thousands of users on that

20 platform all generating traffic at the same time, the amount of

21 traffic that would have to be captured at that point is tens to

22 hundreds of gigabits per second.

23 Q.  Is there a special standard that those CMTS boxes and cable

24 modems communicate over?

25 A.  CMTSs use a protocol standard called DOCIS.

1    Q.  What's DOCIS?

2    A.  It's a mouthful, data over cable information systems, I

3    believe.  And that is a specification that was written back in

4    the -- I believe the mid to late '90s that allowed the

5    traditional cable industry before there was high-speed Internet

6    to start putting data connections across a cable TV

7    infrastructure, so DOCIS is the protocol that allows a cable

8    modem to communicate to the CMTS device at the head end.

9    Q.  Is DOCIS and that standard the reason why you can't just

10   pluck traffic from a single customer and look at it?

11   A.  Essentially that's the fundamental issue because DOCIS is

12   built on what's called a shared medium.  So we talked about all

13   the black wires coming out of the house and back to the head

14   end.  All those cables come back and it's a shared network

15   infrastructure, so all that traffic is coming into the CMTS as

16   kind of a shared aggregate of DOCIS traffic.  And so to be able

17   to try to capture that traffic, it's kind of all or nothing

18   thing at that CMTS level.

19   Q.  So how many individual subscriber's traffic would Grande

20   need to capture to look at just the traffic of one of them?

21   A.  At least tens of thousands and that's cable modems.

22   Q.  Now, there's been a lot of testimony in this case about the

23   number of notices that Rightscorp had sent Grande.  You've been

24   present in the courtroom for that testimony, right?

25   A.  Yes.

1    Q.  To be able to monitor IP addresses that relate to those

2    notices, how much of the traffic on Grande's network would

3    Grande have to capture and save?

4    A.  You know, based on the amount of notices and the fact that

5    an IP address in that notice could be anywhere in our network,

6    essentially would have to capture everything in order to be

7    able to look at anything.

8    Q.  And can Grande do that?

9    A.  We cannot.

10   Q.  I'd like to switch gears and talk a little bit about how

11   Grande interacts with law enforcement.

12       In your role as vice president of network engineering and

13   operations, are you responsible for overseeing Grande's

14   response to subpoenas that it receives?

15   A.  Yes, I am.

16   Q.  Does Grande receive subpoenas?

17   A.  We do.

18   Q.  Does Grande keep records of those subpoenas?

19   A.  Yes, we do.

20   Q.  And how does Grande keep those records?

21   A.  Any subpoena we receive we keep a copy of that and then we

22   also statistically count those in spreadsheets so that we know

23   how many of those were received in a given month and who they

24   were sent by.

25   Q.  Have you reviewed all those records?

1   A.  I have.

2   Q.  Does Grande receive subpoenas from the Drug Enforcement

3   Agency, or DEA?

4   A.  We do.

5   Q.  Does Grande receive subpoenas from Department of Homeland

6   Security?

7   A.  We do.

8   Q.  Does Grande receive subpoenas from the Federal Bureau of

9   Investigation, or FBI?

10  A.  Yes.

11  Q.  Does Grande receive subpoenas from local police?

12  A.  Absolutely, yes.

13  Q.  What kinds of issues do these subpoenas relate to?

14  A.  It's scary stuff because a lot of it can be related to

15  crimes, homicides, bomb threats, school shootings, suicides.

16  Sometimes it's civil, it can be about divorces, it can be about

17  anything that's sort of court ordered that results in a

18  subpoena.

19  Q.  Does Grande receive subpoenas for child exploitation?

20  A.  Yes.

21  Q.  Does Grande receive subpoenas that relate to murders or

22  attempted murders?

23  A.  Yes.

24  Q.  Does Grande receive subpoenas that relate to terrorism?

25  A.  Yes.

1  Q.  Has Grande ever received a court order to shut off Internet

2  to any of the customers targeted by those types of subpoenas?

3  A.  We have not.

4  Q.  Have any of the government agencies that issued those

5  subpoenas asked Grande to shut off Internet service to any of

6  its customers ever?

7          MR. BART:  Objection, relevance, Your Honor.

8          MR. BROPHY:  Your Honor, this goes directly to the

9  appropriateness of terminating customers.

10          MR. BART:  No, it actually doesn't.  This is a 403

11  violation, the highest order.

12          THE COURT:  The objection is sustained.

13  BY MR. BROPHY:

14  Q.  To your knowledge, has Grande ever received a subpoena from

15  any plaintiff named in this case seeking the identity of a

16  Grande customer?

17  A.  No.

18  Q.  To your knowledge, has Grande ever received a court order

19  to shut off any customer's Internet for music sharing or

20  anything else?

21  A.  No.

22  Q.  If Grande received a properly issued subpoena from one of

23  the record labels in this case, would Grande provide the

24  identity of that customer to the record label?

25          MR. BART:  Objection, Your Honor.

1            THE COURT:  That is overruled.

2    BY MR. BROPHY:

3    Q.  I'll ask it again.  If Grande received a properly issued

4    subpoena from one of the record labels in this case, would

5    Grande provide the identity of that customer to the record

6    label?

7    A.  Yes, just like every other subpoena.

8    Q.  Okay.  I want to talk a little bit about the program Grande

9    instituted to terminate subscribers later in time.  When did

10   Grande start terminating customers based on copyright

11   accusations?

12   A.  In 2017.

13   Q.  Do you personally agree with Grande's termination program?

14   A.  I do not.  I feel like it puts us in the middle of

15   accusations and trying to figure out what the right thing to do

16   is for our customers.

17   Q.  Does Grande have any way to investigate the way that

18   Rightscorp system works?

19   A.  We do not.

20   Q.  Does Grande have any way to investigate whether its

21   customers are actually sharing music online?

22   A.  We do not.

23   Q.  When Grande put its termination program in place, did it

24   place any heightened requirements on the e-mail accusations it

25   receives?

1   A.   We did.

2   Q.   And what heightened requirements did Grande put in place?

3   A.   We required the notices being sent to us to be PGP signed.

4   Q.   What does that mean, PGP signed?

5   A.   PGP stands for Pretty Good Privacy, and that's an Internet

6   standard around e-mails, sending and receiving e-mails that

7   allows the sender and receiver to essentially encrypt the

8   e-mails and confirm receipt that way.

9   Q.   Why did Grande require PGP signature for the e-mail

10  accusations it receives?

11  A.   Well, since we had a kind of a heightened policy now that

12  included, you know, firmer termination, we felt like it was

13  very important to have PGP signed e-mails coming from the

14  senders of those alleged copyright violations.

15  Q.   Why is it necessary to require PGP signatures from your

16  perspective?

17  A.   It validates that the e-mail is encrypted based on the key

18  that was provided between the sender and the receiver.

19  Q.   Are you aware of instances in which an ISP has received

20  fake notices of music sharing?

21  A.   Yes.

22  Q.   And can you give an example of that to the jury?

23  A.   There was one around a company called IP Echelon where fake

24  notices were sent and processed.

25        MR. BART:  Objection.  This is completely without

1   foundation.

2          THE COURT:  Sustained.

3   BY MR. BROPHY:

4   Q.  How did Grande communicate the requirement for PGP

5   signatures?

6   A.  Via our published policy on our website.

7          MR. BROPHY:  Would you mind, James, pulling up

8   Plaintiff's Exhibit 53?  And would you go to the second page

9   please of this document and blow up the bottom half beginning

10  with where it says, "Notification requirement."

11         Actually before we do that, let's just go back to the

12  first page.  Sorry, James.

13  BY MR. BROPHY:

14  Q.  Mr. Horton, is this a copy of Grande's DMCA policy?

15  A.  Yes, it appears so.

16         MR. BROPHY:  James, now let's go back to that blown up

17  portion, if you don't mind.

18  BY MR. BROPHY:

19  Q.  What is this part of the policy that's shown on the screen

20  here?

21  A.  Essentially we're stating that PGP is required for digital

22  signature of the notices being e-mailed to us and then we

23  provide our side of the public PGP key.

24  Q.  And what is that block of seemingly random characters and

25  numbers at the bottom?

Lamar Horton - Examination                                    1405

1    A.  That is our side of the public key which is part of the

2    trusted provided information between the two parties for doing

3    the encryption for PGP.

4    Q.  Have you reviewed e-mail accusations that Grande's received

5    from various monitoring companies?

6    A.  I have.

7    Q.  Do all the companies that send those e-mails comply with

8    this PGP signature requirement?

9    A.  All but two.

10   Q.  Which don't comply?

11   A.  Rightscorp and PGP -- sorry, P2P.

12   Q.  What does Grande do with e-mail notifications it receives

13   when they aren't PGP signed?

14   A.  We still receive the e-mail and we still bring it into our

15   abuse or DMCA system.  We log that as a matter of record, but

16   we don't continue it on into our termination or notification

17   process to our customer.

18   Q.  And why don't you use those notices as part of the

19   termination protocol?

20   A.  Essentially because they're not compliant with our

21   requirement of sending these to us via the PGP requirement.

22   Q.  And what is the risk present or inherent in notices that

23   are sent without being PGP signed?

24   A.  According to our policy that's a requirement so that we at

25   least know who is sending it to us.  And without that, it opens

1    the door for fake e-mails or spam or spoofing-type scenarios.

2    Q.  We've heard testimony from plaintiff's experts in this case

3    suggesting Grande wants illegal file sharing on its network.

4    Does Grande want infringement on its network?

5             MR. BART:  Objection.  That completely

6    mischaracterizes the testimony.  There's been no testimony to

7    that effect at all.

8             MR. BROPHY:  Your Honor, they have testified that we

9    invited infringers on our network.

10            MR. BART:  That is not true at all.  That is just a

11   complete fabrication --

12            MR. BROPHY:  You had an expert up here identifying

13   millions of dollars that allegedly Grande was motivated to

14   invite infringers as a result of.

15            MR. BART:  There is no testimony about --

16            THE COURT:  I'm going to leave it entirely up to the

17   jury to decide whose testimony was what.

18            MR. BART:  Your Honor, this entire examination has

19   been throwing up strawmen based upon accusations that are not

20   part of the case.

21            MR. BROPHY:  This is Mr. Bart parading in front of the

22   jury right now.

23            MR. BART:  That's been your entire examination.

24            MR. BROPHY:  I'll move on and ask a different

25   question, Your Honor.

1    BY MR. BROPHY:

2    Q.  Mr. Horton, do you want infringement on Grande's network?

3    A.  We do not.

4    Q.  Did you ever encourage anyone to share music files on

5    Grande's network?

6    A.  No.

7    Q.  Did you ever intend to facilitate music sharing on Grande's

8    network?

9    A.  No.

10   Q.  Do you have any way to investigate allegations of

11   peer-to-peer music sharing occurring on Grande's network?

12   A.  We do not.

13          MR. BROPHY:  I don't have anything further, Your

14   Honor.  Thank you.

15          MR. BART:  Your Honor, could we take our break before

16   I do my cross?

17          THE COURT:  Yes, we can.  We'll take a normal

18   afternoon recess at this time.

19          COURT SECURITY OFFICER:  Please rise for the jury.

20          *(2:55 p.m., the jury exits the courtroom.)*

21                          *   *   *

22          *(3:15 p.m.)*

23          COURT SECURITY OFFICER:  All rise.

24          THE COURT:  Please be seated.

25          COURT SECURITY OFFICER:  Please rise for the jury.

1          (3:18 p.m.)

2          THE COURT:  Please be seated.  Good afternoon, ladies

3     and gentlemen.  All right.  Are you ready to proceed?

4          MR. BART:  I am.

5          THE COURT:  You may, sir.

6                          CROSS-EXAMINATION

7     BY MR. BART:

8     Q.  Good afternoon, Mr. Horton.

9     A.  Good afternoon.

10    Q.  Isn't it a fact that none of the plaintiffs ever asked

11    Grande to investigate the accuracy of any Rightscorp notice?

12    A.  I'm not aware of being asked that, no.

13    Q.  And none of the plaintiffs ever asked Grande to determine

14    the validity of the assertions in any Rightscorp notice; isn't

15    that correct?

16    A.  No, I've never been requested that.

17    Q.  And none of the plaintiffs have ever asked Grande to weigh

18    any evidence for or against any infringement that's been

19    identified in a notice; isn't that correct?

20    A.  No.

21    Q.  And none of the plaintiffs ever demanded that you terminate

22    any specific user service; isn't that correct?

23    A.  I'm not aware of a --

24    Q.  And the plaintiffs never told you -- no one from the

25    plaintiffs ever told you what your repeat infringer policy

Lamar Horton - Examination                    1409

1    should be; isn't that correct?

2    A.  That is correct.

3    Q.  And so none of the questions that your counsel asked about

4    monitoring, intercepting information, reviewing customers'

5    activities were based on any demands from any of the

6    plaintiffs; isn't that correct?

7    A.  Not from the demands of the plaintiffs, no.

8    Q.  Now, you testified before about how Grande can't determine

9    what -- who is using a particular subscriber's Internet

10   service, correct?

11   A.  I believe so.

12   Q.  But Grande holds its subscribers fully responsible for

13   ensuring that their accounts are not used to conduct infringing

14   activity; isn't that correct?

15   A.  I believe that's in our AUP.

16   Q.  It's also in your DMCA policy, isn't it?

17   A.  I don't recall specifically.

18   Q.  Well, then let's take a look at Plaintiff's Exhibit 53.

19   And let's go to question six on page five, and the last

20   sentence of that paragraph.

21       *"At all times it is the subscriber's responsibility to*

22   *ensure that their account is not being used to conduct*

23   *infringing activity."*

24       Correct?

25   A.  Yes, I believe this is from our 2017 policy, correct.

1  Q.  That's right.  And "the subscriber" is in italics to

2  emphasize that point, correct?

3  A.  Yes.

4  Q.  Let's talk briefly about PGP, Pretty Good Privacy, I think,

5  isn't that correct?

6  A.  That's correct.

7  Q.  That was something that you added when you adopted the 2017

8  policy, the February 2017 policy, correct?

9  A.  That is correct.

10 Q.  Prior to that time, there was no PGP requirement, correct?

11 A.  No, I think I explained that.

12 Q.  Okay.  And prior to implementing that from roughly March of

13 2016 until the implementation of that policy, you were, in

14 fact, forwarding Rightscorp notices on to your customers; isn't

15 that a fact?

16 A.  To the best of my knowledge, that's correct.

17 Q.  And isn't it a fact, Mr. Horton, that Grande can't point to

18 a single instance in which Grande received a notice claiming to

19 be from Rightscorp that wasn't from Rightscorp?

20 A.  I'm not aware of any.

21 Q.  Now, you're also not aware of any communications that

22 Grande had with Rightscorp before the lawsuit was filed to

23 discuss their system; isn't that correct?

24 A.  I'm not aware, no.

25 Q.  And before the lawsuit was filed, Grande didn't engage in

1   any effort to investigate the capabilities of that system, of

2   the Rightscorp system, correct?

3   A.  I believe I testified we didn't have the ability to do

4   that.

5   Q.  But my question was that you made no effort to do so,

6   correct?

7   A.  We did not.

8   Q.  Okay.  And indeed before this lawsuit was filed, Grande had

9   no awareness of any facts to support an assertion that the

10  Rightscorp system was incapable of detecting copyright

11  infringement or had made any errors, correct?

12  A.  That was a long question.  Would you mind repeating that?

13  Q.  Sure.  It's actually a compound question, so I'll break it

14  up.  Before the lawsuit was filed, Grande had no awareness of

15  any facts to support an assertion that Rightscorp's system was

16  incapable of detecting copyright infringement; isn't that

17  correct?

18  A.  I'm not aware of any facts either way.

19  Q.  Before the lawsuit was filed, Grande had no awareness of

20  any facts that would support an assertion that any single

21  notice from Rightscorp was erroneous in any way; isn't that

22  correct?

23  A.  No, I'm not aware of any.

24  Q.  Now, you'll agree when you received a notice of

25  infringement, the monitoring company was sending you notice of

1  what it contended was a specific infringement, correct?

2  A.  Hard to say what we interpreted that notice to be other

3  than we received a notice.

4  Q.  And in that notice, the monitoring company was telling you

5  here is a specific infringement, here is the IP address,

6  correct?

7          MR. BROPHY:  Objection, Your Honor, calls for

8  speculation.

9          THE COURT:  I believe it does.  The objection is

10 sustained.

11 BY MR. BART:

12 Q.  Have you ever reviewed a notice of infringement?

13 A.  I have seen them, yes.

14 Q.  Okay.  Did you ever see them before you started preparing

15 for this case?

16 A.  Yes.

17 Q.  And you know that the purpose of a notice of infringement

18 is to send to the ISP a claim or an allegation of copyright

19 infringement, correct?

20         MR. BROPHY:  Objection, Your Honor, calls for

21 speculation as to the purpose of it.

22         THE COURT:  Well, he should know.

23 BY MR. BART:

24 Q.  When you received -- you said that you reviewed notices of

25 infringement, correct?

1    A.   Yes.

2    Q.   And you read those notices, correct?

3    A.   I have read some, yes.

4    Q.   Did you ever read any notices that came from Rightscorp?

5    A.   I believe I have.

6    Q.   Okay.  And in those notices, wasn't Rightscorp specifically

7    stating that a particular IP address had been found to be

8    engaging in copyright infringement?

9    A.   I believe that's what the notice says, correct.

10   Q.   But you claim that Grande made the decision that such

11   notices were mere allegations, correct?

12   A.   Those notices are indeed allegations.

13   Q.   Okay.  And when you say they are indeed allegations, Grande

14   decided to treat them as allegations as opposed to treating

15   them as facts that they were going to act upon, correct?

16   A.   Because Grande had no true knowledge --

17   Q.   Can you answer that yes or no?

18   A.   I can't.  I'm trying to answer your question.

19   Q.   Okay.  Let me try it a different way.  When you received

20   notices from Rightscorp, Grande took the position that those --

21   and is taking the position in this courtroom that those were

22   mere allegations, correct?

23   A.   That would apply to all notices, not just Rightscorp.

24   Q.   Okay.  Fine.  And you'll agree that there's not a single

25   piece of paper from Grande that was generated prior to the

1   filing of this lawsuit that contends that any notices were mere

2   allegations; isn't that correct?

3          MR. BROPHY:  Objection, Your Honor, calls for

4   speculation.

5          MR. BART:  It's asking for his knowledge.

6          THE COURT:  Overruled.

7   A.  To the best of my knowledge, they were all treated as

8   allegations equally.

9   Q.  Are you aware of any communication from Grande to anyone,

10  saying that the information in a notice of infringement was a

11  mere allegation before this lawsuit?

12  A.  Well, you'd have to go back to way back when we first

13  developed the system to even talk about the origins of this

14  system to answer that question.  So sitting here today, can I

15  point one to you?  No.

16  Q.  Okay.  Well, let's go back to the basic point about your

17  treating them as allegations and take a look at the 551 letter

18  that we've been talking about for the last few days, and that's

19  Plaintiff's Exhibit 106, and page three in particular.

20      And you were in the courtroom when Mr. Rohre testified

21  about this document, weren't you?

22  A.  Yes.  Which letter is this?

23  Q.  I think he described it as the 551 letter.  And let's look

24  at page three.  Page five.  And it says on the top that Grande

25  was informed that a computer connected to Grande's

1  communications high speed Internet service was identified in

2  the unauthorized download or distribution of copyrighted

3  material listed below.  Isn't that correct?

4  A.  Yes, that's what it says.

5  Q.  And it also goes on to say that our records indicate this

6  infraction originated from a computer at your location.

7      Do you see that language?

8  A.  I do.

9  Q.  There is no statement that it's an alleged infraction, is

10  there?  It says infraction?

11  A.  It does.

12  Q.  And Grande's claim that the notices are allegations as

13  opposed to evidence of infringement is also inconsistent with

14  its 2017 policy; isn't that correct?

15  A.  I would not characterize it that way.

16  Q.  Okay.  Then let's take a look at Plaintiff's Exhibit 53,

17  and page five of that document.

18      And when you were testifying here last week you agreed, did

19  you not, that this policy says that *Grande is obligated under*

20  *federal law to adopt and implement a policy that terminates*

21  *repeat infringing subscribers in appropriate circumstances.*"

22  Do you see that?

23  A.  I do.

24  Q.  And Grande has, in fact, terminated repeat infringers

25  pursuant to this policy, hasn't it?

1  A.  We have.

2  Q.  And that is based upon notices of infringement received

3  from monitoring companies; isn't that correct?

4  A.  That is correct.

5  Q.  Okay.  And you admit, do you not, that between 2010 and

6  2017, Grande never took any action in response to a notice

7  other than forwarding it to a user; isn't that correct?

8  A.  We did forward notices to users, that is correct.

9  Q.  And you continued to provide Internet service to those

10  users no matter how many notices they received; isn't that

11  correct?

12  A.  That is correct.

13  Q.  Even if they received thousands of notices; isn't that

14  correct?

15  A.  That is correct.

16  Q.  And you had no facts that you could point to today to

17  suggest that any of those notices were inaccurate, do you?

18  A.  I can't tell you if they were accurate or inaccurate, that

19  is correct.

20  Q.  So if a jury finds that the infringement reflected in a

21  notice actually occurred, then you were, Grande was providing

22  Internet service to users that were, in fact, guilty of

23  infringement, that you had notice of; isn't that correct?

24  A.  I'm sorry.  Can you restate that?

25  Q.  Sure.  If the jury finds that the infringements that are

1  reflected in the notice actually occurred were actually

2  infringements, then isn't it a logical conclusion from that

3  that Grande was continuing to provide Internet service to users

4  who were guilty of infringement where you had notice; isn't

5  that correct?

6          MR. BROPHY:  Objection, Your Honor, calls for a legal

7  conclusion regarding notice.

8          THE COURT:  Sustained.

9  BY MR. BART:

10 Q.  About which you received a copyright notice.  I'll say it

11 again.  So if a jury finds that the infringement reflected in a

12 notice of infringement actually occurred, then you, Grande,

13 were providing Internet service to users who were, in fact,

14 guilty of infringement of which you had received copyright

15 notices; isn't that correct?

16 A.  Under what timeframe?  I would need to --

17 Q.  2010 to 2017.

18 A.  This policy we're reading is from 2017.

19 Q.  This question doesn't deal with the policy.

20 A.  You've got me confused here.

21 Q.  Let me back up and maybe we can make sure that we're in the

22 same place.  About three questions ago I asked you to admit

23 that between 2010 and 2017 you never took any action in

24 response to a notice other than forwarding it to a user.  Do

25 you remember that question?

1    A.   That is correct.

2    Q.   Okay.  And right after that, and you continued to provide

3    Internet service to users no matter how many notices they

4    received, even thousands, again in that same period.  Do you

5    remember that question?

6    A.   Yes.

7    Q.   Okay.  And after that I said, And you had no facts to

8    suggest that any of the notices were inaccurate.  And you

9    answered -- again during that time period, and you answered

10   that question.  Okay?

11   A.   Uh-huh.

12   Q.   So we're in that time period, 2010 to 2017.  So if this

13   jury finds that infringements reflected in a notice actually

14   occurred, then Grande was continuing to provide Internet

15   service to users who were, in fact, guilty of infringement of

16   which you had received copyright notices; isn't that correct,

17   during that time period?

18   A.   I suppose that's correct.

19   Q.   Okay.  And taking that risk was Grande's choice, wasn't it?

20   That was their decision to have that policy at that time?

21   A.   That was our policy at the time.

22   Q.   We went over this last time.  There was no technical reason

23   that your policy from 2017 couldn't have been implemented

24   earlier; isn't that correct?

25   A.   There was no technical reason, no.

1  Q.  And so you could have taken the same action you took after

2  2017 against repeat infringers but chose to do nothing other

3  than forward notices during that 2010 to 2017 period; isn't

4  that correct?

5  A.  That is correct.

6  Q.  Even when there were thousands of notices, correct?

7  A.  That is correct.

8  Q.  Okay.  And isn't it obvious that the reason for doing that

9  was so that Grande would be able to keep the income from repeat

10  infringers and that that was more important than addressing the

11  violations of another company's intellectual property?

12  A.  That is not obvious, no.

13          MR. BART:  I have no further questions.

14          MR. BROPHY:  Nothing further, Your Honor.

15          THE COURT:  Okay.  You can step down, sir.

16          Now where are we?

17          MR. BROPHY:  Your Honor, I think there are some items

18  to address regarding some deposition testimony.

19          THE COURT:  Oh, that has to be done now.  Well, I'm

20  just going to send the jury home for the day.  I think it's

21  going to take a while for us to get this through.

22          MR. BROPHY:  I think we're ahead of schedule, Your

23  Honor, so I don't think that's a problem.

24          THE COURT:  All right.  Ladies and gentlemen, you're

25  done for the day.  We'll see you tomorrow morning at the usual

 1   time and place.

 2              COURT SECURITY OFFICER:  Please rise for the jury.

 3              *(3:35 p.m., the jury exits the courtroom.)*

 4                              *   *   *

 5              THE COURT:  Please be seated.  Okay.  There's a whole

 6   bunch of designations here.  I'm not sure exactly what is being

 7   objected to.

 8              MR. GILMORE:  Your Honor, I can address them.  So

 9   first you should have two designations, one for Dong Jang and

10   one for John Glass.

11              THE COURT:  Right.

12              MR. GILMORE:  So let's start with Dong Jang, if that's

13   all right.  He's a -- individual fact witness, so he was not a

14   30(b)(6) corporate representative, he was an employee of Sony.

15              THE COURT:  Okay.

16              MR. GILMORE:  And we have in the transcript on the --

17              THE COURT:  So this is an employee of your client.

18              MR. GILMORE:  This is an employee of my client.

19              THE COURT:  All right.

20              MR. GILMORE:  So the objections that we'd like to

21   address, Your Honor, which we think want to focus Your Honor on

22   begin on page four of eleven.

23              THE COURT:  Okay.

24              MR. GILMORE:  And the objection is the testimony --

25              THE COURT:  Where are we?  Four of eleven is an entire

1    page.

2           MR. GILMORE:  It is, and you'll see the number that's

3    6103 to 6119.

4           THE COURT:  That's good that you told me.  6103 to

5    6119.  All right.

6           MR. GILMORE:  And it's concerning a newspaper article.

7    There's -- the underlying document is hearsay.  We don't think

8    that the testimony about the article or the article itself

9    should be admitted.  I gave you Defendant's Exhibit 45.  At the

10   very least, the exhibit itself shouldn't be admitted although

11   you can read the testimony yourself, Your Honor.

12          THE COURT:  I'm reading it.  I'm trying to.

13          MR. GILMORE:  Sorry.

14          *(Pause.)*

15          THE COURT:  Okay.  So what is so objectionable about

16   this?

17          MR. GILMORE:  The exhibit itself is hearsay, Your

18   Honor, we object to it as hearsay.

19          THE COURT:  But you don't object to the testimony.

20          MR. GILMORE:  Well, to the extent that it's -- we're

21   not objecting to the testimony, just the underlying document we

22   don't think should come in.  Particularly because the

23   underlying document references one of these links to the

24   articles, I think Your Honor is saying you don't want these

25   links to these articles coming into evidence.

1          THE COURT:  Well, it's not the links to the articles

2   that are bad, you can print the link out if it's an appropriate

3   exhibit.  I mean that's not the problem.  I said I wasn't going

4   to send back to the jury a computer with a million links.

5          MR. GILMORE:  Of course, we're not suggesting that

6   either.  The link to the article has a title that we think --

7   *"Meet Rightscorp the Internet's New For-profit Copyright Cop"*

8   which is hearsay and we don't think that it's relevant or

9   appropriate.

10          *(Pause.)*

11          THE COURT:  It's just forwarding on something to

12   somebody.  I presume -- well, okay, let me hear from the other

13   side.

14          MR. HOWENSTINE:  So this is the deposition of Dong

15   Jang.  Dong Jang is the head of antipiracy at Sony and this

16   e-mail exchange is an exchange between him and another Sony

17   employee about Rightscorp and about this article about

18   Rightscorp.  We don't care about the link, per se, we can

19   redact out the link, that's fine.  What we're using this for is

20   to show his awareness of Rightscorp in connection with Sony's

21   repeated decision not to hire Rightscorp.  These are party

22   opponent statements, they're admissions, this is a business

23   record.

24          THE COURT:  You're not trying to put the document

25   itself in?

1          MR. HOWENSTINE:  No, the actual article is not part of

2     the exhibit, we're not offering that.

3          THE COURT:  So the objection is overruled.  The

4     objection is overruled.

5          MR. GILMORE:  That's fine and --

6          THE COURT:  He's not going to put the article in,

7     there's not going to be any link, he's going to redact out the

8     link.

9          MR. GILMORE:  That's all we care about, Your Honor.

10    That's fine.  Now, the issue really with the rest of the

11    testimony, though, of Mr. Jang who again is an individual

12    employee, not a 30(b)(6), is that he's asked a series of

13    questions --

14         THE COURT:  He's not just an individual employee, he's

15    the guy that's -- according to the defendant, counsel, he's the

16    guy that's in charge of antipiracy, so it seems like it's a

17    fairly critical job when this whole case is about piracy.

18         MR. GILMORE:  To be sure, I'm not trying to minimize

19    his role or knowledge.

20         THE COURT:  Don't minimize it, the guy may never sleep

21    again.

22         MR. GILMORE:  It's very important, Your Honor, our

23    company takes -- our client takes it very seriously.  The

24    reason why I was pointing out that it was not a 30(b)(6)

25    witness, but an individual witness, is that the rest of the

1    testimony up until the last portion, which I will address

2    separately, are him being asked about a series of e-mails where

3    other people say things and he is being asked what they mean.

4    And he repeatedly, Mr. Jang repeatedly says, *"I don't know.  I*

5    *can't say for sure.  I'd be guessing.  It would be*

6    *speculation."*

7              THE COURT:  Any testimony that's been elicited that

8    asks a witness to try to interpolate or speculate on the

9    meaning of someone else's e-mails is obviously not admissible.

10   We wouldn't admit it here, I won't admit it here.

11             MR. GILMORE:  And so that -- I think that takes --

12   that would address all of the designations until the page nine,

13   Your Honor.  And here, there is a series of questions about

14   whether Sony and other record companies have --

15             THE COURT:  Just a minute.  Let me get there.

16             MR. GILMORE:  Sure, of course.

17             *(Pause.)*

18             THE COURT:  All right.

19             MR. GILMORE:  And here there's a series of questions

20   about whether Sony and other record companies have tried to

21   encrypt or put what's called digital rights management

22   technology on some of their legal products.  And we think that

23   that is an irrelevant side show.

24             The only potential argument on relevance existed

25   before we elected statutory damages.  We understand the

 1   defendant wants to argue some sort of failure to mitigate harm,

 2   but that is only relevant if we are seeking actual damages

 3   since we're electing statutory damages and the law is clear you

 4   don't need to prove harm and so the law is also clear that

 5   failure to mitigate is irrelevant when you're seeking statutory

 6   damages, so we think that the remaining testimony that's been

 7   designated on page nine through the end all applies to

 8   inadmissible material.

 9          MR. HOWENSTINE:  Your Honor, as to that first part,

10   the e-mail exchange, that's DX 46, does Your Honor have a copy

11   of that in front of you?  Was that provided with the materials?

12   May I approach?

13          So this is an e-mail exchange that Mr. Jang himself

14   was a part of with other Sony employees in which they are

15   talking about Rightscorp.  And the subject matter of their

16   discussion is they're talking about wanting to make sure that

17   consumers don't think they're affiliated with Rightscorp and

18   they want to prevent that from happening.  That goes directly

19   to the issues in this case.

20          The plaintiffs are trotting up Rightscorp as the great

21   detection company, when in fact, the head of antipiracy at Sony

22   was on these e-mails with other Sony employees talking about

23   how they wanted to distance themselves from Rightscorp.  The

24   only objection to this, as we understand it, is hearsay and a

25   relevance objection.  There's no issue of foundation here

1   because the witness himself received the e-mail and he was

2   asked questions about it.  So as we see it, the statements

3   within this e-mail are admissions of a party opponent, they're

4   not hearsay.  The piece citing the Rightscorp article at the

5   bottom of this chain is not offered for the truth of the matter

6   asserted, it's offered to show what Sony's reaction was.

7           THE COURT:  I was talking about testimony where the --

8   what's his name Dong?

9           MR. HOWENSTINE:  Dong Jang.

10          THE COURT:  Dong Jang, was opining on other people's

11  e-mails.

12          MR. HOWENSTINE:  Well, in certain instances he's asked

13  if he understood what somebody was referring to.  Sometimes he

14  says no, sometimes he says yes, he acknowledges it was a

15  discussion about Rightscorp.  He acknowledges that the subject

16  matter of the conversation was to make sure that consumers

17  didn't think that Sony was affiliated with Rightscorp.  And

18  again, Your Honor, that goes right to the heart of the case.

19          MR. GILMORE:  May I respond?  May I respond on that

20  specific point?

21          THE COURT:  Yes.

22          MR. GILMORE:  So the issue is that Dong Jang doesn't

23  say anything in this e-mail, that the speakers are other people

24  that are not here and were not deposed.  And so his testimony

25  is *"I don't know what they meant, you would have to ask that*

1    *person.  I can't say specifically, I'd be speculating."*  It's

2    all through the testimony that they've designated.  He

3    disclaims knowing what they meant and why they said whatever it

4    is that they said.

5              The other issue with the document itself --

6              THE COURT:  Why didn't you depose Mark Peeb *(ph)* or

7    whatever his name is.

8              MR. HOWENSTINE:  My recollection is that the other two

9    people on the e-mail chain were no longer with the company.

10             MR. BART:  That's not true.

11             THE COURT:  Even if they weren't, so what?

12             MR. HOWENSTINE:  Mr. Jang is the head of antipiracy.

13             THE COURT:  He might be, but he's not the head of this

14   e-mail.

15             MR. HOWENSTINE:  Well, because he was on the e-mail,

16   Your Honor, he can authenticate the document and he did.  He

17   acknowledged that it was an e-mail that he received.

18             THE COURT:  Yes, he's a recipient of the e-mail.  To

19   that extent, it might be a business record.

20             MR. HOWENSTINE:  Exactly, Your Honor, and whether or

21   not he knew what these people were saying doesn't go to the

22   admissibility of the document.

23             THE COURT:  Well, I'm not going to let this article

24   in.

25             MR. HOWENSTINE:  That's fine.  We can redact out the

1   bottom article.  What we're offering it for is for the internal

2   discussion at Sony.

3           THE COURT:  *"You could be liable for 150,000 in*

4   *penalties, settle instead for $20 per song"*?

5           MR. HOWENSTINE:  What we're offering it for is for the

6   discussion of Rightscorp, not for the underlying article that

7   was forwarded and that is not hearsay.  Again these are all

8   party opponent statements.  These are all statements of Sony

9   employees.

10          THE COURT:  I misunderstood what was -- see, these

11  things are popped on me and I've got to -- this is very

12  different than when I sit by designation as an appellate judge

13  and I can look at this stuff over a period of time.  You're

14  sitting up here on the bench and you have to make these

15  decisions or else you never get through the case.

16          MR. HOWENSTINE:  Understood, Your Honor.

17          THE COURT:  Says, *"Hey, Dong, have you heard of these*

18  *guys?"*

19          It's a business record.  It's okay.  I'll let it.

20          MR. GILMORE:  Your Honor, we would simply ask -- we

21  understand your ruling on the exhibit, but since the testimony

22  is all about calling for speculation, he doesn't know what

23  these people meant when he said these things.

24          THE COURT:  Any speculative testimony should be

25  stricken.  Because I would have -- if they were calling for

1    speculation and there was an appropriate objection, I would

2    have sustained the objection.

3            MR. HOWENSTINE:  Your Honor, we can work together on

4    determining what testimony should come in.  From our

5    perspective, the important point is that the document comes in.

6            THE COURT:  The document is going to come in as a

7    business record.

8            MR. HOWENSTINE:  The last point, the last issue --

9            THE COURT:  But not that article.

10           MR. HOWENSTINE:  Right.

11           THE COURT:  That's pure hearsay.  150,000 for 20.

12   What a deal.  And I'll take you to the Bodega for a sandwich

13   and a little rice pudding.  Go ahead, sir.

14           MR. HOWENSTINE:  So the last piece of this and I would

15   disagree with counsel's suggestions about the damages issues in

16   this case.  This is a statutory damages case, there are a lot

17   of factors that can be considered in assessing statutory

18   damages.

19           THE COURT:  I didn't agree with him or disagree with

20   him, I'm just sitting here.

21           MR. HOWENSTINE:  No, I'm sorry, I said I disagreed

22   with him.  And what this goes to is to the cause of any harm

23   the plaintiffs have suffered.  What this passage relates to --

24           THE COURT:  What passage?

25           MR. HOWENSTINE:  It's the final passage in the

1  deposition transcript, Your Honor.  204/20 through 205/23.

2          THE COURT:  I'm a pretty quick study, but not that

3  quick.  Where is the passage?

4          MR. HOWENSTINE:  Essentially it's from the bottom of

5  page nine of eleven through the end.

6          THE COURT:  Let me read it please.

7          MR. HOWENSTINE:  Okay.

8          (Pause.)

9          THE COURT:  Oh, this is the encrypted downloads.  I

10  think that they gave -- I know the music industry -- well,

11  maybe if they haven't given up, they have pretty much stepped

12  away from the encryption because it was causing problems in the

13  playback of stuff.  Plus you can go on the Internet, in a case

14  like this, you can go on the Internet and pick up a program for

15  free that will absolutely completely demolish their encryption,

16  and you can then record the music or record the movie.  It's a

17  program you can buy.  Well, I think you can buy it at one

18  point.  I think it's all over the Internet now.  We had some

19  testimony about that in a case once.  So this really wouldn't

20  do them any good.

21          MR. HOWENSTINE:  Well, the point here, Your Honor, is

22  that there was a period of time in which the plaintiffs --

23          THE COURT:  Well, might have done them some good at a

24  period in time.  I think when piracy was first -- maybe very

25  unsophisticated people might not have been able to get around

 1   it.

 2           MR. HOWENSTINE:  The point, Your Honor, is there was a

 3   period of time in which the plaintiffs used this DRM to protect

 4   digital downloads to keep people from sharing them.  And then

 5   prior to the time period at issue in this case, the plaintiffs

 6   stopped doing that.  So that is relevant to statutory damages

 7   issues, the cause of any harm that the plaintiffs have

 8   suffered.

 9           MR. GILMORE:  May I be heard on that?

10           THE COURT:  No, not yet.

11       (Pause.)

12       I was right.  It says, *"Well, if you're referring to

13   the traditional DRM ... moved back away from that in 2010."*

14   Because it wasn't working.

15           MR. HOWENSTINE:  Your Honor, I would say that if the

16   plaintiffs wanted to make those sorts of arguments, that they

17   stopped using it because it wasn't working, because there were

18   workarounds, they would be free to do that and the jury would

19   decide what weight to give to this evidence.

20           THE COURT:  Now, for what purpose do you wish to

21   introduce this?

22           MR. HOWENSTINE:  As relevant to statutory damages,

23   Your Honor.

24           THE COURT:  How could it be relevant to statutory

25   damages?

1           MR. HOWENSTINE:  Well, I believe --

2           THE COURT:  Let me ask you this question.  Maybe I'm

3   missing something here.  But let's assume for a minute that

4   somebody has a valid copyright on a movie.  It's no different

5   between a movie and music.  Somebody has a valid copyright on a

6   movie and for whatever reason the movie company is sold to a

7   third party.  And the third party, for whatever reason, is very

8   lackadaisical, maybe he's a head hunter, one of these guys

9   coming in, he wants to kind of, you know, resell the thing, you

10  know, for a lot more money, so he's kind of letting it slide a

11  little bit and then he's going to beef it up a little bit,

12  they're not doing anything.  Right?  And during that period of

13  time, there's a lot of copyright infringement.  Well, they do

14  sell it.  They sell it to number four.  And number four comes

15  back, he's got the copyright on all this.  Right?  And number

16  four says, You've been stealing our content for a long period

17  of time and we want damages.

18          Do you have a statutory damages defense on the basis

19  that they didn't effectively chase after people?  I mean, if

20  you violate the law, you violate the law.  You're not entitled

21  to have as a defense that you had a copyright, but you

22  didn't -- I don't think there's laches on a copyright.

23          MR. HOWENSTINE:  You're right, Your Honor.  If

24  infringement is proven and statutory damages are elected,

25  you're entitled to them, but it's within a range and the case

 1    law is clear that juries and courts are entitled to consider a

 2    wide array of different factors in deciding where in that

 3    range.

 4            THE COURT:  What factors?  I'm trying to pin you down

 5    here as to what factor it is that you are saying this goes to.

 6            MR. HOWENSTINE:  First of all, it goes to the

 7    plaintiff's -- the extent of the plaintiff's actual damages and

 8    there's also a Fifth Circuit case, which my counsel just

 9    helpfully handed to me, holding that mitigation of damages --

10            THE COURT:  The Chemerinsky of our lawsuit here.

11    Chemerinsky and I are very good friends and, I'm telling you,

12    it's scary to talk to the man, he pulls out cases left and

13    right.

14            MR. HOWENSTINE:  Mitigation of damages may be

15    considered as a factor in setting statutory damages within that

16    range.

17            MR. GILMORE:  Your Honor --

18            THE COURT:  I'm not seeing here any evidence that they

19    slept on their rights, but that will be for the jury.  I don't

20    think this is as damaging as you seem to think it is.

21            MR. GILMORE:  Your Honor, two points.  First of all,

22    in Contrella(ph), the Supreme Court rejected the idea that sort

23    of these equitable defenses apply.  And you mentioned laches,

24    so that does not apply to copyright infringement.  Copyright

25    holders are free to make legitimate business decisions about

1    the degree and extent to which they protect or seek to enforce

2    their copyrights.  And the Supreme Court said that that's

3    appropriate and it's not the Court's job to sort of put their

4    thumb on the scale, or a jury's job.

5          Second, on the failure to mitigate harm, counsel

6    admitted, we all know that the issues that they're talking

7    about occurred before the issues in this case.  The relevant

8    timeframe is the infringements that occurred from 2011 to 2017.

9    So even if failure to mitigate harm is conceivably relevant,

10   which we don't think it is, but that happens after you have

11   been harmed.  The conduct, the measures the DRM measures or

12   reducing those measures occurred before any of the

13   infringements in this case happened.  So it couldn't even be

14   failure to mitigate harm, even if that is a relevant factor

15   under any part of this case.

16         THE COURT:  Yeah, I was concerned about the timeframe.

17   It seems like this is outside the realm of --

18         MR. HOWENSTINE:  To that, Your Honor, I would just say

19   that what this passage is about is not strictly about what they

20   did in 2010, but the fact that they were still not using DRM

21   when they were selling music in the damages period during this

22   case.  So if you bought a song from the iTunes store in 2014,

23   2015, 2016, there would be no DRM.  And that's what this

24   passage illustrates.

25         MR. GILMORE:  That's still talking about something

1    coming before the infringement and before the harm.  Duty to

2    mitigate harm is I have been harmed by an act of infringement

3    or a wrongful act and I'm trying to lessen the harm that I

4    suffered from that.  Some prospective, maybe you could have

5    done something different so that the harm didn't occur in the

6    first place, that's not failure to mitigate harm, that's -- for

7    copyright it's just utterly irrelevant.

8              THE COURT:  I think their argument -- I'm not agreeing

9    with it, but I think -- or disagree with it, but their argument

10   is that the knowledge transcends the date.  That's what their

11   argument is, I think.

12             MR. BROPHY:  That's correct.

13             MR. BART:  Your Honor, the notion that DRM on iTunes

14   downloads is going to prevent piracy on BitTorrent is

15   mind-boggling.  I mean, iTunes was driven out of business, in

16   essence, by piracy and they're saying, But if you made it even

17   more restrictive so people even had less access --

18             THE COURT:  Don't they still have iTunes?

19             MR. BART:  They have iTunes, it's this much in the

20   market, Your Honor, because it's all streaming and BitTorrent,

21   right.  And so the notion that DRM on downloads would somehow

22   have mitigated piracy on BitTorrent, saying it's a bridge too

23   far is underestimating and it's just completely unconnected.

24             MR. HOWENSTINE:  That sounded like a closing argument

25   based on --

1          THE COURT:  Well, it's a pretty good closing argument.

2          MR. BART:  Thank you.

3          MR. HOWENSTINE:  A closing argument based on evidence

4     that is not in this case.

5          THE COURT:  Your co-counsel made a pretty good closing

6     argument earlier today too, by the way.

7          MR. HOWENSTINE:  We just think that it's clearly

8     relevant to statutory damages.  The jury can decide what weight

9     to give it.

10         THE COURT:  I'm going to give pretty specific

11    instructions to the jury about what they can consider and what

12    they can't consider.  I am going to allow the evidence in.  I

13    think it's appropriate.  I know you disagree with me.  That's

14    okay.  I live with that every day of my life.

15         MR. GILMORE:  It's your job to do calls.  We do

16    object.

17         THE COURT:  Of course you object.

18         (Discussion off the record.)

19         But if you think that an additional instruction needs

20    to be given relative to this, I'll consider it.

21         MR. GILMORE:  Thank you.

22         THE COURT:  All right.  What else?  In addition to

23    Mr. Dong, we've got somebody else, right?  Mr. Jang.

24         MR. GILMORE:  Dong Jang.  The second person is John

25    Glass.  We had argument about this before and I think, Your

 1   Honor, we just really want to focus on this --

 2         THE COURT:  Is this a rehash, a motion for

 3   reconsideration?

 4         MR. GILMORE:  Well, no.  Your Honor ruled that the

 5   Rightscorp's terrifying extortion script, ridiculous document,

 6   that's not going to be admitted.

 7         THE COURT:  Right.

 8         MR. GILMORE:  The designations --

 9         THE COURT:  I didn't say it was ridiculous, you may be

10   right, I don't know.

11         MR. GILMORE:  We certainly think it's ridiculous, but

12   the phrasing is certainly inflammatory.

13         THE COURT:  I said it was highly inflammatory and it

14   most certainly was.

15         MR. GILMORE:  Yes.  So our issue is that the current

16   designations from page seven to eight of the designations at

17   the end contain the discussion of that document.  And all it is

18   is counsel reading the document in.

19         MR. HOWENSTINE:  We understood this had been resolved.

20         MR. BART:  We covered this already.

21         MR. GILMORE:  Maybe I misunderstood.

22         THE COURT:  Don't talk yourself out of something.  You

23   better consult with The Great Clarifier.

24         MR. GILMORE:  I've been clarified.

25         *(Discussion off the record.)*

1                              *   *   *

2          THE COURT:  All right.  So we've resolved those.  So

3     tomorrow we will have the depositions, correct?

4          MR. BROPHY:  Correct, Your Honor.

5          THE COURT:  And then?

6          MR. BROPHY:  We'll be calling our chief financial

7     officer and an expert, John Kemmerer, on damages.

8          THE COURT:  So we'll run past tomorrow with that, I'm

9     sure.

10         MR. BROPHY:  I'm not sure, Your Honor.  We're going to

11    look at timing again this evening.

12         THE COURT:  As I said, I haven't pushed you.  I've

13    been getting some interesting comments from my colleagues as to

14    why I'm not pushing this case forward.  How come I'm letting

15    the lawyers run all over me.  Letting the case drawing on.  I

16    said, Look, I'm not letting the lawyers run all over me, I

17    don't think they would agree with that.  What I am doing,

18    however, is letting them try their case.  That, you have a

19    right to do.

20         MR. BROPHY:  We appreciate that.

21         MR. GILMORE:  Appreciate that.

22         THE COURT:  I think you have an absolute right to do

23    that.

24         MR. BROPHY:  I do think we're on schedule, Your Honor,

25    maybe a little bit ahead of schedule, so things are looking

1    good.

2            THE COURT:  I thought so too, I think we're doing

3    fine.  And when did I say you could get that stuff to me?  On

4    Thursday, right?

5            MR. BART:  Yes.

6            THE COURT:  Have a good evening.

7            COURT SECURITY OFFICER:  All rise.

8            *(4:05 p.m.)*

9                            *   *   *

1               *   *   *   *   *

2   UNITED STATES DISTRICT COURT

3   WESTERN DISTRICT OF TEXAS

4

5        I certify that the foregoing is a correct transcript from

6   the record of proceedings in the above-entitled matter.   I

7   further certify that the transcript fees and format comply with

8   those prescribed by the Court and the Judicial Conference of

9   the United States.

10

11   Date signed:   November 19, 2022

12

13   /s/ Angela M. Hailey

14   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
15   262 West Nueva Street
     San Antonio, Texas   78207
16   (210)244-5048

17

18

19

20

21

22

23

24

25