```
 1                 UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION

 3   UMG RECORDINGS, INC., ET AL,    :
     Plaintiffs,                     :
 4                                   : Case Number:
     vs.                             : 1:17-CV-00365-DAE
 5                                   :
     GRANDE COMMUNICATIONS           : Austin, Texas
 6   NETWORKS, LLC, ET AL,           : October 26, 2022
     Defendants.                     :
 7   ********************************************************

 8               TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE DAVID A. EZRA
 9               SENIOR UNITED STATES DISTRICT JUDGE

10   APPEARANCES:
     FOR THE PLAINTIFFS:
11
     Andrew H. Bart, Esquire
12   Jacob Tracer, Esquire
     Jenner & Block, LLP
13   1155 Avenue of the Americas
     New York, NY  10036
14   (212)891-1600; abart@jenner.com

15   Robert B. Gilmore, Esquire
     Philip J. O'Beirne, Esquire
16   Stein Mitchell Cipollone Beato & Missner LLP
     1100 Connecticut Avenue, NW, Suite 1100
17   Washington, DC  20036
     (202)601-1589; rgilmore@steinmitchell.com
18
     Paige Arnette Amstutz, Esquire
19   Scott, Douglass & McConnico, LLP
     303 Colorado Street, Suite 2400
20   Austin, Texas  78701
     (512)495-6300; pamstutz@scottdoug.com
21

22

23

24

25
```

```
 1   FOR THE DEFENDANTS:

 2   Richard L. Brophy, Esquire
     Zachary C. Howenstine, Esquire
 3   Mark A. Thomas, Esquire
     Margaret R. Szewczyk, Esquire
 4   Armstrong Teasdale, LLP
     7700 Forsyth Boulevard, Suite 1800
 5   St. Louis, Missouri  63105
      (314)621-5070
 6   rbrophy@armstrongteasdale.com
     zhowenstine@armstrongteasdale.com
 7   mathomas@atllp.com
     mszewczyk@armstrongteasdale.com

 8

 9

10

11

12

13

14

15

16

17

18

19

20   COURT REPORTER:
     Angela M. Hailey, CSR, CRR, RPR, RMR
21   Official Court Reporter, U.S.D.C.
     262 West Nueva Street
22   San Antonio, Texas  78207
     Phone(210)244-5048
23   angela_hailey@txwd.uscourts.gov

24   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
25
```

1          **I N D E X**

2   **WITNESSES:**                                    **PAGE**

3   **JOHN FEEHAN**

4   By Mr. Howenstine                              1454

5   By Mr. O'Beirne              1469, 1576, 1594

6

7   **DONG LI JANG(videotaped deposition)**

8   By Mr. Howenstine                              1504

9

10  **JOHN KEMMERER**

11  By Mr. Howenstine                    1513, 1572

12  By Mr. Gilmore                       1535, 1574

13

14  **JEFF SHOCKLEY**

15  By Mr. Thomas                        1597, 1627

16  By Mr. Tracer                        1619, 1630

17

18

19

20

21

22

23

24

25

JURY TRIAL PROCEEDINGS                    1444

```
1   (Wednesday, October 26, 2022.)
2                        *  *  *
3          COURT SECURITY OFFICER:  All rise.
4          THE COURT:  Please be seated.  Sorry, I was a little
5   delayed this morning.  Got a call from Chief Judge.
6          Okay.  I had understood -- I was told this as I was
7   driving in this morning, that there was some continuing dispute
8   over the transcripts, but now I'm told that that's not the
9   case.  Is it or -- boy, you jumped up like two
10  jack-in-the-boxes.
11         MR. GILMORE:  So the ones that were discussed
12  yesterday, Dong Jang and John Glass, I think we worked through
13  everything with the other side, and I think that's resolved.
14  There's some additional depo designations which I think we
15  probably can address later maybe over the lunch break, but the
16  first ones --
17         THE COURT:  I know you're not going to address them
18  with me over the lunch break, because --
19         MR. GILMORE:  Well, we're just going to try to work it
20  out with the other side first.
21         THE COURT:  You're going to address it among
22  yourselves.
23         MR. BROPHY:  Your Honor, may I address one other quick
24  item?
25         THE COURT:  Yes.
```

 1          MR. BROPHY:  And I'll invite Mr. Bart to join me in
 2   this conversation.
 3          MR. BART:  We actually have a video demonstration
 4   behind our presentation to you.
 5          MR. BROPHY:  We've been talking about the remainder of
 6   the schedule and --
 7          THE COURT:  Waiting for the great compromiser here,
 8   great electrifier and elucidator to step in.  Listen, he didn't
 9   make partner in his firm at such a young age for nothing.
10          MR. BROPHY:  The way the rest of the schedule is
11   playing out, we're going to have, obviously, testimony today.
12          THE COURT:  Sure.
13          MR. BROPHY:  Tomorrow we're bringing in -- you may
14   recall, Ms. Frederiksen is coming back.
15          THE COURT:  Yes, of course.
16          MR. BROPHY:  And we're also calling our expert, and
17   there's some additional depo designations we'll play.  And then
18   we will be done with our case.  And what we had discussed was
19   the prospect of rather than calling the jury on Friday, having
20   a workday to address the jury instruction conference and make
21   our JMOL arguments, and then for our sakes, we would have the
22   weekend to prepare our closing arguments, which we would
23   present on Tuesday morning.  We were curious to get your
24   thoughts on that.
25          MR. BART:  Obviously, that puts some burden on you in

1    the sense that we're giving you the -- some of the briefing on

2    the disputed jury issues on Thursday, but I was thinking -- and

3    we had talked about this -- that if we set a working session on

4    Friday afternoon, there aren't that many issues to really

5    address; that we can get through the charge, get through the

6    JMOLs.  We'll have the benefit of Your Honor's instruction on

7    what the law is going to be in shaping our summations.

8            THE COURT:  I hate that old business.  You know, when

9    I first started to try cases, the standard practice -- and may

10   have been different even because you came a few years after I

11   did, but it may have been different for you.  It certainly was

12   different for you.  Judges always instructed the jury after

13   closing argument.

14           MR. BART:  Scary.

15           THE COURT:  And they refused to make a budge on that.

16   And the problem was, of course, lawyers, in their closing

17   arguments, are not permitted to instruct the jury, so you're

18   doing this thing where you're divining, you know, I believe the

19   judge may, I think the judge may --

20           MR. BROPHY:  Sounds miserable.

21           THE COURT:  Maybe the judge may.  Oh, no.  Honest to

22   God.

23           MR. BART:  No, I've been there.  It's --

24           THE COURT:  Listen, I tried a huge case.  I ended

25   up -- I mean, it was just unbelievable because the jury

1  instructions were like this, and we were -- it was a nightmare.

2  We just couldn't get the judge to change his mind.  So, no,

3  from my very first day as a judge, even before I think a lot of

4  other people changed, I always give jury instructions before

5  closing argument, and I don't care if you put them up on the

6  wall.  It's all right with me.

7          MR. BROPHY:  Great.  The one other item in that regard

8  is Mr. Bart mentioned the possibility of a rebuttal case.

9          MR. BART:  We're just reserving that right.  I mean

10 that's -- we don't have --

11         THE COURT:  I understand.

12         MR. BART:  That's all.

13         THE COURT:  That was going to be my next question, was

14 there going to be a rebuttal case, but you don't know yet.

15         MR. BART:  If it is, it would be short.

16         MR. BROPHY:  Your Honor, the one maybe point of

17 clarification on that is --

18         THE COURT:  So I told you that next week -- of course,

19 we don't have Monday.  I've got a full calendar in San Antonio

20 on Monday.  Tuesday we have all day.  Wednesday we only have

21 the afternoon.

22         MR. BART:  But if Your Honor is amenable to the

23 schedule --

24         THE COURT:  Thursday and Friday, then, we would have

25 the whole day.

1          MR. BART:  Right, but we would be summing up to the

2    jury on Tuesday morning, and they would have the case at that

3    point.

4          THE COURT:  I would hope.  In my dreams.

5          MR. BART:  Well, frankly, ours too.

6          THE COURT:  Your family is not going to know who you

7    are.  God only knows what's going on at your law firms.

8          MR. BROPHY:  Your Honor, the only point of

9    clarification I'd ask is I'd love to understand your ground

10   rules for what the rebuttal case looks like.

11         THE COURT:  Sure.

12         MR. BROPHY:  My understanding is if we remain within

13   the confines of what our folks have said in their expert

14   reports --

15         THE COURT:  Right.

16         MR. BROPHY:  -- that there's no possibility of a

17   rebuttal case because we haven't introduced anything new or

18   unexpected.

19         THE COURT:  No, it has to be -- a rebuttal case -- I'm

20   not telling you fellows anything new here, for heaven sakes.

21   You're as experienced as I am.  The fact of the matter is a

22   rebuttal case is to rebut things that come up during the

23   defendant's case which have not been addressed previously or

24   could not have been addressed previously, and that's it.  It's

25   not a chance to put on a second case.

1          MR. BART:  Well, and we have no intention of doing

2    that, obviously.

3          MR. BROPHY:  And I didn't intend to -- I've had judges

4    have a different impression or take on it than you have, Your

5    Honor, so I just want to make sure and understand.

6          THE COURT:  Really?

7          MR. BROPHY:  Yes.

8          THE COURT:  Well, I don't know where they come from,

9    not coming from the Fifth Circuit or the Ninth Circuit.

10          MR. BROPHY:  No, this is very helpful.  Thank you.

11          MR. BART:  So one clarification from my perspective.

12          THE COURT:  Sure.

13          MR. BART:  I have refrained from standing up and

14    objecting on the Rightscorp business practice's questions.  We

15    made an MIL and you ruled against us.

16          THE COURT:  You have your -- listen, I think in this

17    case, about 85 percent of the evidence that comes in is ripe

18    for appeal.  People put down these blanket appeals, you know,

19    blanket objections, and you know...

20          MR. BART:  We just want to make sure that the record

21    is preserved.  Thank you.

22          THE COURT:  The record is preserved.  I have no

23    delusions about where this case is going after I'm done with

24    it.

25          MR. BART:  Just that you'll be free from it.

1          THE COURT:  I hope.  If it comes back again, we may be

2    visiting another ten weeks.  God forbid.

3          MR. BROPHY:  Thank you, Your Honor.

4          MR. GILMORE:  Your Honor, one last thing.  So

5    defendant's expert, John Kemmerer, is going to testify today.

6    We had filed a Daubert motion that had been granted in part,

7    and certain of his opinions are excluded.  I have a handout

8    that just has the list of the items as well as the excerpted

9    parts from his report.  We fully expect they'll comply, but

10   just in case, we thought it would be helpful that you had it in

11   case something comes up.

12         THE COURT:  A prophylactic procedure going on here.

13         MR. GILMORE:  Just trying to be efficient.  Don't

14   anticipate there will be a problem, but you never know.

15         THE COURT:  Heaven forbid the old man might forget

16   something.

17         All right.  What can we say?  Are we ready to go now,

18   finally?

19         MR. O'BEIRNE:  Yes, Your Honor.

20         MR. THOMAS:  Yes, Your Honor.

21         COURT SECURITY OFFICER:  Please rise for the jury.

22         *(9:13 a.m., the jury enters the courtroom.)*

23                            *   *   *

24         THE COURT:  All right.  Please be seated.

25         Okay, ladies and gentlemen, good morning.  Let me give

1   you a little head's up on where we are since I try to be as

2   transparent in that regard as I possibly can be.  We will have

3   trial, of course, all day today and tomorrow all day -- right?

4   Yes, all day tomorrow.  Then Friday, I'm going to give you a

5   bye day.  Okay?  And the reason for that is -- again, I'm going

6   to be transparent with you, because I think you deserve it.  I

7   have always been that way with my juries.

8              There are a number of legal issues that the lawyers

9   and I need to resolve.  Some of them pertain to the legal jury

10  instructions, which I will be giving you.  Others pertain to

11  motions that have to be made by the various lawyers in order to

12  preserve their record.  These all take time.  They take quite a

13  bit of time sometimes.  And to be honest with you also, the

14  lawyers need time -- and this has not been a short trial.  For

15  heaven sakes, you know that better than anybody.  Right?  They

16  need time to go back to the very beginning, look at the

17  testimony, see where the testimony has gone, favorable and

18  unfavorable to their sides, and they need to craft -- we call

19  it here in the West a closing argument.  In the East Coast they

20  refer to it as a summation.  And I'll explain more about that

21  to you, but they need time to do that as well.

22             So the problem is I could have you come in here on

23  Friday, and it might be that we could get to something late,

24  late Friday afternoon, but oh, wow, I mean, to have you sitting

25  there, all day long?  I mean, it's a nice new courthouse, but

1    gee whiz.  I think there are a lot of places you would better

2    be.  So on Friday, you are not going to come in.  You are also

3    not going to come in on Monday.  So you will have Friday,

4    Saturday, Sunday and Monday that you won't be here.

5           Both Friday, just like Monday, you are perfectly

6    entitled to go back to work if you work outside of your home.

7    I made a mistake one time of not saying "outside of your home,"

8    and I think I offended somebody.  But believe me, I know that

9    women who are stay-at-home moms or just stay at home and do

10   other things, they work their -- well, I won't say.  I can say

11   it in Hawaiian language.  They work their okole off.  Okay?  So

12   I have great admiration for that.

13          But for those of you who actually work outside the

14   home or those of you who work at home, you know, remotely, go

15   back to work if you want to, okay, because the Court won't be

16   paying you for that day anyway, so you might as well work if

17   you can work and you can go back to work.  And that's true for

18   Friday and it's true for Monday.  Okay?

19          So now you know where we are.  We're here today and

20   tomorrow, and then -- what is today?  Wednesday?  Thursday -- I

21   lose track.  I'm living in a hotel.  Give me a break.  And it

22   isn't a luxury hotel either, believe me.  Today and tomorrow --

23   only the lawyers are going to be in a luxury hotel.

24          MR. BART:  Hardly.

25          THE COURT:  I stayed in much nicer hotels as a lawyer

 1   than I do as a judge.

 2          In any event, okay, everybody got it?  Okay, thanks.

 3   Thank you very much.  I just wanted to give you a head's up so

 4   in case you need to make calls sometime and tell your -- you

 5   know, the people you work with, hey, I'll be back or I'll be

 6   online or whatever, your family, what's going on.  You need to

 7   make those plans.  So I'm not one of the guys that leaves it to

 8   the last minute and says, Oh, by the way -- on Thursday

 9   afternoon -- you don't have to come in tomorrow.

10          You know, that's not right.  As my youngest

11   granddaughter would say, she'd say, "Papa, that's not right."

12          All right.  Are we ready to go?

13          MR. HOWENSTINE:  Yes, Your Honor.

14          THE COURT:  Okay.

15          MR. HOWENSTINE:  Grande calls John Feehan.

16          COURTROOM DEPUTY CLERK:  Please remain standing.

17   Raise your right hand.  You do solemnly swear that the

18   testimony you're about to give in this case now before the

19   Court will be the truth, the whole truth and nothing but the

20   truth, so help you God?

21          THE WITNESS:  I do.

22                          *   *   *

23          (JOHN FEEHAN, Defense Witness, Sworn.)

24                          *   *   *

25          COURTROOM DEPUTY CLERK:  You can have a seat.

DIRECT EXAMINATION

BY MR. HOWENSTINE:

1   Q.   Good morning.

2   A.   Good morning.

3   Q.   Please introduce yourself to the jury.

4   A.   Good morning.  My name is John Feehan.

5   Q.   Mr. Feehan, do you currently have a management role with
    Grande Communications?

6   A.   I do.  I'm the chief financial officer.

7   Q.   Now, do you also have a title with Patriot Media
    Consulting?

8   A.   Yes.  I'm an employee of Patriot Media, and I am the chief
    financial officer of Patriot Media.

9   Q.   At a high level, if you could explain for the jury, what's
    the relationship between Patriot and Grande?

10  A.   So Patriot Media is a standalone company that was engaged
    by the owners of Grande to run the day-to-day operations of the
    business as the executive management team.

11  Q.   Now, why does Patriot exist as a separate company instead
    of just being part of Grande?

12  A.   So Patriot, we have a broad depth of knowledge in the cable
    and ISP industry, and as part of that we run various ISPs and
    cable companies at different times.  So in order to be able to
    do that and manage multiple companies at different times, we
    stay as a standalone entity.  If I were the employee of Grande,

1    I wouldn't be able to then turn around and run another company,

2    if that's what our owners -- if that's what the owners of that

3    company wanted us to do, so that's why we stay as a separate

4    entity.

5    Q.  Now, in a moment I'm going to ask you to explain a little

6    bit about what you do as Grande CFO, but before we get to that,

7    I'd like to talk about your background.  Could you tell the

8    jury about your educational background?

9    A.  Sure.  I graduated college in 1986 -- I'm dating myself --

10   1986 from Saint Joseph's University in Philadelphia with a

11   double major in accounting and management information systems.

12   And I'm also a certified public accountant in the State of

13   Pennsylvania.

14   Q.  Please tell the jury a little bit about your career before

15   you joined Patriot and Grande.

16   A.  So after college, I started working in public accounting

17   with the public accounting firm Pricewaterhouse.  I spent

18   roughly five years there doing audits and advisory work.  Since

19   leaving Pricewaterhouse, I spent my time at various

20   corporations, both large and small companies, both public and

21   private companies, in the finance accounting and operations

22   field.

23      In this industry, I started in the kind of

24   telecommunications industry back in 2001 where I was the chief

25   financial officer of Virgin Mobile.  About eight years we sold

1    Virgin Mobile to Sprint, and I stayed with Sprint Corporation

2    for about a year, and then I decided it was time to find my

3    next opportunity, and I left Sprint and became the chief

4    financial officer at Patriot Media.

5    Q.  When did you become CFO of Grande?

6    A.  May of 2013.

7    Q.  Before we delve into your job, I want to make clear that

8    going forward, we're going to be talking about a specific

9    timeframe, 2014 to 2018.  Unless I say otherwise, you can

10   assume I'm talking about that time period.  Are you with me?

11   A.  I am with you.

12   Q.  So as Grande CFO, what are your day-to-day

13   responsibilities?

14   A.  So I oversee a number of different operations.  Obviously,

15   the accounting team, the finance team, which includes financial

16   planning and analysis projections, credit and collections,

17   financial reporting.  Also I have responsibility for the

18   treasury function, risk management function, insurance --

19   managing insurance and risk management in that area, and also

20   taxes, credit and collections, and that's about it.  Oh, and

21   merger and acquisition activity.  I oversee that activity for

22   the company as well.

23   Q.  In your role overseeing Grande's finances, is customer

24   churn something that you look at?

25   A.  It's part of the picture.  More importantly, we look at net

John Feehan - Examination                    1457

1    customer additions and what we're adding in terms of net
2    customer additions to the company.
3    Q.  If you could explain for the jury just a little bit more
4    what do you mean by net customer additions?
5    A.  So net customer additions are really made up of two parts:
6    Obviously, the new customers you're bringing in, and then
7    customers that are already existing customers.  And if they
8    leave, that's referred to as churn.  So if I bring in ten new
9    customers and two customers churn, I have eight new customers
10   for that day.  So that's what I refer to as net customer
11   additions.
12   Q.  As Grande CFO, are you part of regular discussions or
13   meetings regarding Grande's budget for the year?
14   A.  Yes.  My team oversees the budget process for the year
15   which we begin typically in September, late September, early
16   October of the year, and go through the month of October and
17   the month of November preparing the full detailed budget for
18   the next fiscal year, which begins in January.  And we present
19   that to the Board in a Board meeting in December.
20   Q.  Are customer churn and customer retention topics in those
21   budget meetings?
22   A.  They are.  As part of our forecasting and budgeting for net
23   customer additions, both gross customer additions and churn are
24   topics that we discuss during the budget.
25   Q.  Does customer churn also come up in impromptu meetings

1   within the company?

2   A.  It does.  On a monthly basis, we review our financial

3   results with the executive team.  As part of that, we look at

4   the customer metrics as well, so how many net customer

5   additions we brought on.  And then as we re-forecast throughout

6   the year what our current trend is, we would talk about our net

7   customer additions, what the trends and churn may be, what the

8   trends in customer acquisition may be.  And if there's any

9   impromptu meetings that came up because we want to talk about

10  whether net customer additions are going well or falling

11  behind, we can talk about it at that time as well.

12  Q.  What about in Board meetings?  Does the topic of customer

13  churn retention also come up in Board meetings?

14  A.  It comes up in that every -- we have four Board meetings a

15  year every quarter.  Every quarter I'm responsible for

16  presenting to the Board the financial results, as well as the

17  customer metrics of the company, so as part of that, I review

18  net customer additions and the pieces of net customer additions

19  for the Board, and if they have any questions, I'm there to

20  answer them.

21  Q.  Mr. Feehan, are you aware, at least at a high level, that

22  this case concerns how Grande has responded to copyright

23  infringement complaints about its subscribers?

24  A.  Yes.

25  Q.  Now, in all your time as CFO of Grande, have you ever

1    considered customer churn in connection with whether Grande
2    should terminate the Internet service of households accused of
3    copyright infringement?
4    A.  No.  That has never come up.
5    Q.  Have you ever heard anyone suggest that Grande should not
6    terminate a customer accused of copyright infringement in order
7    to reduce customer churn?
8    A.  No, never.
9    Q.  To your knowledge, as Grande's CFO since 2013, have
10   Grande's decisions about how to respond to copyright
11   infringement complaints ever been influenced by considerations
12   related to customer churn?
13   A.  No, never.
14   Q.  Now, I'd like to switch gears a little bit.  The jury has
15   heard testimony about the alleged lifetime value of the average
16   Grande subscriber.  As Grande CFO, when you look at the value
17   of the company, do you just look at the value of the customer
18   base?
19   A.  No, not just the customer base.  The value of the company
20   is also predicated on the biggest part of the company, which is
21   the network that delivers the products and services to the
22   customer.  And that network costs a lot of money to build and
23   to maintain, so that is a valuable part of the company and is
24   what provides the services and the Internet service and cable
25   services and telephone services that our customers enjoy.

John Feehan – Examination                    1460

1    Q.  As the CFO, do you look at lifetime subscriber value in

2    evaluating the company's financial performance?

3    A.  No, not really.  We focus on, as I've talked about, the net

4    customer additions and then the customers we're acquiring as

5    well as our overall customer base and if they're happy and

6    satisfied with our services.

7    Q.  In this case, the jury has heard testimony that Grande has

8    a 95 percent gross profit margin.  We'll get to that very soon,

9    but first I want to set the stage with a little terminology.

10   Is there a particular set of accounting principles that Grande

11   uses in its financial accounting?

12   A.  Yes, we use GAAP, which is -- stands for generally accepted

13   accounting principles.

14   Q.  From your perspective as Grande CFO, could you explain to

15   the jury at a high level what the purpose of GAAP accounting

16   is?

17   A.  So GAAP is to set a standard for all companies to record

18   their financial transactions so that when you look at

19   comparability and reliability of financial information that is

20   provided, you don't have companies that are doing wild things

21   that are out of the norm for recording revenue or expenses, so

22   it's a way for end users of financial investments, financial

23   information, people who are investing, to have confidence that

24   the financial information is provided on a standard, reliable

25   basis so that you can compare results across companies if

1   that's what you choose to do.

2   Q.  Is "gross margin" a GAAP accounting term that you use at

3   Grande?

4   A.  Yes, gross profit is, yes.

5   Q.  As I mentioned, the jury has heard testimony that Grande

6   has a 95 percent margin on Internet service.  Does this mean

7   that 95 cents of every dollar Grande makes on Internet service

8   is pure profit?

9   A.  No, that is not accurate.  The way I would describe that,

10  we have annual and semi-annual meetings with our employees.

11  And when I discuss the financial results with our employees,

12  they sometime ask about, you know, how our financials come

13  together.  So I use an analogy with them where I liken it to

14  your home budget.

15      So the way I look at gross profit or gross margin is,

16  that's analogous to your net paycheck.  You have a gross

17  salary, and that -- from that gross salary taxes are deducted,

18  benefit costs are deducted, things are deducted that are

19  directly related to that salary, and you have a net paycheck.

20  So that's our gross margin, which is our revenue, less direct

21  expenses related to that revenue, gets to gross margin.

22      After that, if we go back to the home analogy, after you

23  get your net paycheck, you have to pay for your food and your

24  clothes and your utilities and your gas and your -- you know,

25  anything that -- your insurance, other things that you have to

John Feehan - Examination                    1462

 1   do, day care, anything you may have that you have to run your
 2   monthly household.
 3        Well, that's what we do.  After our gross profit, we have
 4   to pay all our employees.  We have to pay all our benefit costs
 5   for our employees, our sales and marketing costs, our rent, our
 6   taxes -- property and sales taxes.  We have to pay for our
 7   utilities, to fill up our trucks with gas, sales and marketing
 8   costs, all the things that we have to do to both -- in our
 9   customer care costs, all the things we have to do to maintain
10   our customer base, to service customers, to keep our employees
11   paid.  All of those things have to be paid out of that.
12        Once you then reach that, then at the end, if you --
13             MR. O'BEIRNE:  Objection, Your Honor.  We're getting
14   into a narrative.
15             THE COURT:  Sustained.
16   BY MR. HOWENSTINE:
17   Q.  So are there any other categories of expenses that you
18   would take out after you look at that gross margin?
19   A.  Yes.  So if you own a home, you have -- everybody realize
20   at the end, you've got to pay your mortgage.  Got to pay that
21   mortgage interest.  As a company, we have debt.  We have to pay
22   our interest and service our debt just like our employees have
23   to pay their mortgage costs.
24        And then, finally, whatever is left over, if you're -- you
25   may decide, I've got enough money to go buy a car, or I want to

1   invest in building a patio on the house.  What we do with all

2   that money is we invest it back into the network.  We build a

3   new plant.  We improve the quality of the plant that we are

4   providing the services to our customers.  We increase their

5   speeds by adding more network equipment into the network.

6   Q.  So if it's not gross margin, what is the ultimate measure

7   of Grande's profitability?

8   A.  That would be net income.

9   Q.  As you used the term, as Grande's CFO, what is "net

10  income"?

11  A.  So net income, if you start at the gross profit, which has

12  been discussed, you deduct all of those expenses, what we call

13  selling, general, and administrative expenses.  After that, you

14  then deduct all your interest costs that you've paid.  And then

15  for all of the capital you've invested in the plant, there is a

16  what's called depreciation and amortization.  So all of that --

17  you get a depreciation expense that reduces all of that income,

18  and then any taxes you have to pay related to your company, and

19  then that would be either a net income or a net loss when

20  you're all said and done.

21  Q.  So in the years we have been discussing, 2014 to 2018, did

22  Grande have net income?

23  A.  Basically, no.

24  Q.  Why not?

25  A.  Because after all of those investments -- we invest all of

1    the money that we make back into the company, whether it be

2    through paying all of our expenses, paying our employees,

3    paying for all of those things, as well as then investing

4    capital expenditures back into the company, into the network,

5    to provide our customer service with tools to service our

6    customers, and all of those types of expenditures when we're

7    all said and done.

8    Q.  Now, is there a company philosophy concerning reinvestment

9    in the company?

10   A.  Yes.  Our philosophy is that any money we have left over

11   after paying our expenses and paying all of our taxes and our

12   employees is that we invest that back into the company.

13   Q.  Now, do you consider that to be part of Grande's brand?

14   A.  We do.  Grande is -- we're a challenger brand.  I mean,

15   everybody has heard of the larger cable companies, AT&T,

16   Comcast, so we are a challenger brand that we come in and

17   provide opportunity for customers who don't otherwise have

18   opportunities except for those large brands.  In order to do

19   that, we have to invest money -- we have to do things better.

20   Large cable companies are notorious for terrible customer

21   service.  We take a different approach.

22          MR. O'BEIRNE:  Objection, Your Honor.  Foundation and

23   relevance.

24          THE COURT:  Sustained.

25          MR. HOWENSTINE:  I'll ask a new question.

1    BY MR. HOWENSTINE:

2    Q.  So you mentioned some of the other companies that Grande

3    competes against.  Has Grande been successful in competing

4    against those companies?

5    A.  Yes.

6    Q.  Are there any particular successes at Grande that stand out

7    to you?

8    A.  Yeah.  One example would be when all of the ISPs were

9    talking about launching 1-gig service and taking all their

10   customers to 1 gig.  Here in Austin, we know that AT&T made a

11   big press release and Charter made a big press release about

12   getting 1 gig.  We didn't make a press release, but the first

13   company to launch 1 gig in Austin to its customers was Grande,

14   because we had invested the money into the network to be able

15   to do that.

16   Q.  So you mentioned these investments that Grande has made in

17   its company.  So over this period of 2014 to 2018, just at a

18   high level, could you explain for the jury just a little bit

19   about the different categories of investments the company has

20   made?

21   A.  Sure.  There are five basic categories.  The first one is

22   land and buildings and improvements, any real estate we have

23   that we want to improve.

24       The second is what we call edge out or new home

25   construction.  So we are constantly providing and building new

1   network to communities that otherwise don't have our services,

2   to give them an opportunity to have our services where they may

3   have no other option except in one other company.

4       The third category would be what we call CPE, which is

5   customer premise equipment.  You'd liken it to the router in

6   your home or the modem in your home or the cable boxes in your

7   home.  That's what we call CPE.  So we invest capital in that.

8       The fourth category is our network and head end, and our

9   network infrastructure.  So basically providing capital into

10  the network to be able to provide the speeds, the reliability

11  and the service for your Internet, your phone, and your TV,

12  watching pleasure.

13      And then the fifth one would be what we call support.

14  That's maintaining our trucks, our vehicles, any software we

15  use to run the company, any capital labor that we use of our

16  employees who end up being capitalized.  But all of those

17  miscellaneous things that end up being assets of the company.

18  Q.  Now, over this period -- again, talking about 2014 to 2018,

19  were there any specific projects that represented a substantial

20  portion of Grande's investment?

21  A.  Yeah.  There were two main categories of projects.  The

22  first one was -- I mentioned a little bit earlier about

23  launching 1-gig speeds.  So we call that DOCSIS 3.1, which is a

24  new technology, and all of the cable companies and ISP

25  providers are trying to get to 1-gig speed.  So we invested

1   about -- cumulatively, about 14 to $15 million over a number of

2   years in that timeframe to be able to launch 1-gig speeds to

3   our customers.

4       The second largest category was -- I talked about edging

5   out and providing new communities with our service and building

6   new plant.  And over that five-year period, we spent between 80

7   and $90 million to provide new -- to edge out that network to

8   new communities, new homes, new businesses, to be able to

9   provide them with the ability to get our service.

10  Q.  Does Grande have a mission statement?

11  A.  It does.

12  Q.  What is it?

13  A.  It's very simple, four tenets of our mission statement.

14  Number one is take care of the customer; number two is take

15  care of each other; number three is do what you say you're

16  going to do; and number four is have fun while you're doing it.

17  Q.  How does that mission statement align with Grande's company

18  philosophy regarding reinvestment in the company?

19  A.  Well, that's the -- the most important part is, number one,

20  taking care of our customer.  In order for our customers to be

21  satisfied, we have to have -- one, we have to have excellent

22  customer service, so we provide and invest a lot in our

23  customer service and the tools to be able to service our

24  customers and provide them with top-notch customer service.

25      And two, we have to have a network that provides top

1    speeds.  Not only provides top speeds, but top speeds when you

2    want them 24 hours a day, not only at certain times throughout

3    the day.  We want to make sure that they are reliable.  And

4    when problems do occur, our customer service there is to take

5    care of you and make sure that you understand exactly what's

6    happening and why your service may be down and when it will be

7    fixed, but that takes money, and that's what we need to do.

8    Q.  Mr. Feehan, do you believe that as a company Grande is

9    different from other cable TV and Internet providers?

10   A.  Yes, we are.  Because we're a challenger brand, we -- as I

11   said, cable companies are notorious for terrible customer

12   service --

13          MR. O'BEIRNE:  Objection, Your Honor.  Relevance,

14   foundation.

15          MR. HOWENSTINE:  He's talking about the background of

16   the company, Your Honor.

17          THE COURT:  The objection is overruled.

18   A.  We want to be different.  We try to be different.  Because

19   we're a challenger brand, we want to change the idea of

20   customer service and make sure we are providing good customer

21   service, so we focus on that.  And we also want to be the

22   leader in technology, so when we say we're giving to you -- if

23   you sign up for our gig service, that you're getting a gig

24   speed all the time when you're using it, not only at parts of

25   the time, which I know my company -- that's how I get it, only

1    part of the time.  We want to be different, and that's what we

2    need to do to be able to compete against the larger companies.

3              MR. HOWENSTINE:  I have no further questions.

4              MR. O'BEIRNE:  Your Honor, Philip O'Beirne for the

5    plaintiffs.

6              THE COURT:  Yes.  O'Beirne.

7                          CROSS-EXAMINATION

8    BY MR. O'BEIRNE:

9    Q.  Good morning, Mr. Feehan.  How are you?

10   A.  Good morning.

11   Q.  We met once before at your deposition in New Jersey; do you

12   recall?

13   A.  We did, I remember.

14   Q.  I'd like to ask you some questions about your role and how

15   Patriot performs its services for Grande.  You testified on

16   direct you're the CFO of Grande, right?

17   A.  That is correct.

18   Q.  You're also the CFO of Astound Broadband, right, sir?

19   A.  That is correct.

20   Q.  The jury heard in opening that Grande is part of Astound

21   Broadband.  That's fair, right?

22   A.  That is fair.

23   Q.  And you're also the CFO of Patriot Media Consulting?

24   A.  Correct.

25   Q.  Astound Broadband is the sixth largest telecommunications

 1   provider in the United States, right, sir?

 2              MR. HOWENSTINE:  Objection, Your Honor.  I just want

 3   to make sure we're not going outside the relevant time period

 4   at issue in this case.  Astound only came into existence more

 5   recently.

 6              THE COURT:  I'm going to sustain that objection, stay

 7   within the relevant time period.

 8              MR. O'BEIRNE:  Your Honor, it goes to deterrence as a

 9   factor and statutory damages, the size of an award to deter

10   this ISP and others.

11              MR. HOWENSTINE:  Your Honor, the way we have been

12   approaching this case is confined to this period, you know,

13   2018 and before.  Now the plaintiffs are talking about bringing

14   in an entirely different timeframe.

15              MR. O'BEIRNE:  It's not different for the purposes of

16   damages, Your Honor.  Statutory damages have different factors

17   than liability, and we just heard a lot about being a

18   challenger brand.  They're the sixth largest ISP in the United

19   States.

20              MR. HOWENSTINE:  But we're talking about Grande.  He's

21   talking about a different ISP in a different period of time.

22              THE COURT:  What does that have -- what's the

23   relevance of a different ISP?

24              MR. O'BEIRNE:  They're not a different ISP, Your

25   Honor.  It's what this ISP has become, and it goes to the

1   factor of deterrence and statutory damages.  The size of an

2   award necessary to deter this ISP and others is perfectly

3   admissible.  It's not about liability during the time period.

4            MR. HOWENSTINE:  Your Honor, can we have a sidebar on

5   this, please?

6            THE COURT:  We won't have a sidebar, but I'll have the

7   jury excused briefly.

8            COURT SECURITY OFFICER:  All rise for the jury.

9            *(9:43 a.m., the jury exits the courtroom.)*

10                           *  *  *

11           THE COURT:  You can be seated.  Go ahead.

12           MR. HOWENSTINE:  The issue, Your Honor, is this case

13   has been about this period of 2014 to 2018.  Even now, Grande

14   remains a separate legal entity.  It is a fact that within the

15   past year or so, Grande and other ISPs have begun operating

16   under one single trade name, and it seems that what the

17   plaintiffs want to do now is to treat all of those different

18   entities, which remain separate legal entities, as one company,

19   to suggest there is some mammoth company for purposes of

20   statutory damages.  But that's not the time period that we've

21   been talking about in this case.  This is a case only against

22   Grande, which is and has been a separate legal entity.  And

23   again, we're limited to that time period of 2014 to 2018.

24   Bringing in things that happened in 2020 and 2021 would

25   drastically alter the scope of this case and is not relevant to

John Feehan - Examination                1472

1    the actual claims at issue.

2         MR. O'BEIRNE:  Your Honor, first of all, I don't

3    believe that's an accurate factual description of what's

4    happened.  Grande -- and this witness has testified -- was

5    combined with another ISP, and they're operating together as

6    one company.  They were just acquired as one company.

7         But setting that aside, we're not talking about the

8    liability time period.  We are talking about permissible facts

9    for the jury to consider in determining the size of an award

10   sufficient to deter this ISP and others for this conduct today.

11   Deterrence is prospective.

12        Your Honor, we expect to hear testimony from their

13   damages expert that a very small award would be sufficient to

14   deter Grande and others, and we should be entitled to introduce

15   information about the relative size of this ISP now and what

16   size of an award the jury could consider as effective to deter

17   future conduct from this ISP and other ISPs.  And we just heard

18   a lot of challenger testimony --

19        THE COURT:  Do you have any law on this?

20        MR. O'BEIRNE:  Your Honor, I don't have it present

21   now.

22        THE COURT:  Well, I know you don't.  Do you have any

23   law on it that you can give me?  Do you have any cases where

24   this has been allowed?  Because, generally speaking, we don't

25   go outside the scope.  I mean, what happens if you have a

1   situation where you have a small, little ISP and all the damage

2   that allegedly occurred was with that small, little ISP during

3   the relevant time period, and then they're swallowed up by -- I

4   don't know, what is it, General Electric that owns CBS?  What

5   do you do?  Do you bring in all General Electric's revenues?  I

6   mean, really.  I mean, this gets ridiculous.

7               MR. O'BEIRNE:  That's not this case, Judge.

8               THE COURT:  Well, I know it's not this case, but in a

9   way it is, because Grande is a different company today than it

10  was during the relevant time period.

11              MR. O'BEIRNE:  I would say it goes to two other

12  points.

13              THE COURT:  I would like to see some law supporting

14  your position.

15              MR. O'BEIRNE:  Understood, Judge.  The law we would

16  point to when we looked at the case is that deterrence

17  sufficient -- an award sufficient to deter this ISP and others

18  is proper consideration for the jury.

19              But setting that aside, we've also heard testimony

20  about the corporate philosophy of reinvesting the massive

21  profits that they made.  That directly led to an increase in

22  value of Grande through multiple transactions that have

23  occurred, so they also made it relevant based on their own

24  presentation of their effort to cast -- the company is not

25  making as much money.

1            THE COURT:  Here is what we're going to do.  I will be

2    the first to acknowledge that I do not know the answer off the

3    top of my head.  Okay?  If I don't know something, I'm going to

4    tell you.  And this is not a decision -- because it's not a

5    small decision that I want to make off the cuff after we've

6    gone through weeks of trial.

7            So what I would like to see is, is continue with this

8    witness.  Let's skip this for the time being.  Okay?  And in

9    the meantime, I know you're here and you're doing this, but

10   you've got lots of very qualified lawyers there who have access

11   to Lexis and Westlaw -- and that's true on this side.  Get them

12   to start researching this issue so that I can have some cases

13   to look at over the lunch hour.  All right?  Because -- and I

14   need to look at it myself.  I don't want to make some sort of

15   off-the-cuff decision.

16           You know, trial judges have to rule, and I have

17   probably several hundred times in this case on objections and

18   so forth in real time.  Because in most cases, I've experienced

19   enough to understand what is or should be, in my view, the

20   appropriate ruling.  I'm not a judge who takes recesses to go

21   and research every objection that's made.  But on the other

22   hand, where I come up against something that is in a unique

23   area of the law -- and I've had other copyright cases,

24   obviously, but I've never had one where anybody ever argued to

25   me that they should be bringing before the Court factors

1    relating to damages for a period of time up to the present, and

2    that's what you really want to do here.

3           And before I allow that, I want to see some authority

4    that supports it.  Now, if we can't find any authority on point

5    that supports it, I'm just going to have to make a call, but I

6    would -- and then it's going to be up to the Appellate Court to

7    either agree or disagree.  But I would certainly prefer if I

8    had some authority.  My law clerk is going to be -- if she

9    isn't already -- starting to look, and I can't start to look

10   because I've got to pay attention to what's going on here, but

11   I want to hear from counsel.  I want to get some cases so I can

12   look at them and see, and then I'll make a call.  Okay?

13          MR. HOWENSTINE:  Yes.  If I could make one more point,

14   Your Honor.  In addition to the timeframe issue, the fact is

15   this is a lawsuit only against Grande Communications, which is

16   and always has been a separate legal entity.  And what the

17   plaintiffs are talking about is bringing in evidence of

18   revenues of other entities other than Grande.  They did not sue

19   those companies.  Those companies are not defendants in this

20   case.  So what counsel is suggesting is bringing in that

21   evidence about other companies to add to the value, to add to

22   the revenues, to boost up this notion --

23          THE COURT:  Well, I would suggest you find me some

24   cases on that.  All right?

25          MR. HOWENSTINE:  Sure.

```
 1            THE COURT:  So let's -- because there are plenty of
 2    other cases where we have subsidiaries being sued and people
 3    are trying to bring in the parent company's revenues in order
 4    to -- because, really, that's what we're talking about.  I
 5    think Grande still is an independent company, is it not?
 6            MR. HOWENSTINE:  To be clear, we're not talking --
 7    we're not talking about parent companies either.  We're talking
 8    about other companies that are commonly owned.
 9            THE COURT:  Well, I understand that.  So you've got
10    your charge here.  All right?  I mean, you don't want me to
11    just flick off an answer and let's go forward.  Hopefully, he's
12    right.  Well, he's got 50 percent chance.  That's not good.  I
13    need to have some research.  That's why we have appellate
14    arguments.  You know, people have to submit briefs to the
15    appellate judges.  And the appellate judges have, generally, a
16    good period of time to look at those arguments and research the
17    law to come up with the best answer.
18            And I don't have that luxury here, but I'm going to
19    take a little bit of a page out of the appellate book and give
20    myself a little bit of time here, just a little bit, to try to
21    get it right.  Okay?
22            MR. O'BEIRNE:  Understood, Judge.
23            THE COURT:  Okay.  So we have other questions we can
24    ask this gentleman?
25            MR. O'BEIRNE:  I do.
```

1          MR. BROPHY:  Your Honor, if I may?  The jury has now

2    heard that Grande is the sixth largest ISP in the United

3    States, which is incorrect.  I'm concerned about that tainting

4    the jury and wondering if Your Honor might consider giving an

5    instruction to ignore that question -- somewhat correct the

6    record --

7          THE COURT:  Let's wait until we get --

8          MR. BART:  Yeah, and we didn't -- and he didn't say

9    that Grande is the sixth.  He said Astound is the sixth, and

10   that's clear on the record, but I think Your Honor is right,

11   that we should wait until --

12         THE COURT:  Yeah, let's wait.  Keep that in mind.

13   Make a note to yourself.

14         MR. BROPHY:  Will do.

15         THE COURT:  And if I rule in your client's favor on

16   this, then I will most certainly give an instruction to

17   disregard that testimony.  If I don't, it doesn't make any

18   difference.

19         MR. BROPHY:  Understood.

20         THE COURT:  So let's put him back on the stand.

21                           *  *  *

22         COURT SECURITY OFFICER:  Please rise for the jury.

23         *(9:54 a.m., the jury enters the courtroom.)*

24                           *  *  *

25         THE COURT:  All right.  Please be seated.  Ladies and

1    gentlemen, the legal issue that I needed to resolve turned out

2    to be a little bit more complex than something I can do right

3    off the bat.  So counsel is going to jump to a different area

4    so we don't keep you waiting.  This has to be covered anyway.

5    And then we're going to take this up again while you're either

6    at lunch or at some other point, but not while you're sitting

7    here waiting to come back in.

8              So you can proceed, counsel.

9              MR. O'BEIRNE:  Thank you, Your Honor.

10   BY MR. O'BEIRNE:

11   Q.  Mr. Feehan, you testified that Patriot took over management

12   of Grande 2013; do you recall that, sir?

13   A.  Yes.

14   Q.  And at that time, ABRY Partners owned Grande, right?

15   A.  Correct.

16   Q.  And 2017 ABRY Partners sold Grande to TPG, right, sir?

17   A.  That is correct.

18   Q.  Texas Pacific Group, the private equity firm?

19   A.  That is correct.

20   Q.  And ABRY is a private equity firm?

21   A.  That is correct.

22   Q.  I'd like to show you information contained in Grande

23   documents that we've put here into a chart over time.

24        Do you see represented there, sir, Grande's revenue, gross

25   margin and operating cash flow from 2012 through 2017?

John Feehan - Examination                          1479

1   A.   I do.

2   Q.   And I'll represent to you that's pulled from P&L Excel

3   spreadsheets that Grande produced to us in this case.  And just

4   to orient the jury to the time period, you mentioned it was in

5   2013 that Patriot took over, right?

6   A.   Correct, May of 2013.

7   Q.   So from 2013, you were the CFO of Grande and continued in

8   that position until today?

9   A.   Correct.

10  Q.   So you're familiar with the revenue margin and operating

11  cash flow numbers for Grande from 2013 and forward?

12  A.   Yes.

13  Q.   And these appear to be correct, right, sir?

14  A.   These appear to be accurate.

15  Q.   And so we've totaled on the right side the total revenue

16  that Grande made from 2012 through 2017 as $1.33 billion,

17  right, sir?

18  A.   Correct.

19  Q.   The gross margin on that, as in less direct costs, is

20  $867 million, right?

21  A.   Correct.

22  Q.   And then the operating cash flow, which is another term for

23  profit, is $418 million, right?

24  A.   $418 million.  That is the number.  I'm not sure I would

25  consider that profit.

1   Q.  Well, you testified on direct you're saying that because

2   you reinvested that back into the company, right?

3   A.  Correct, but that's not our net income number either.

4   Q.  Okay.  But that is your operating cash flow --

5   A.  Yes.

6   Q.  -- for that time period?

7   A.  Yes.

8   Q.  And if we took this chart back to 2010 and added in a

9   couple years, Grande would be north of $1.6 billion, right?

10          MR. HOWENSTINE:  Objection.  Foundation.

11          MR. O'BEIRNE:  He's the CFO of the company when they

12   took over in 2013, Judge, he knows or he doesn't.

13          THE COURT:  Overruled.

14          THE WITNESS:  I don't know if that's -- I'm not

15   familiar with the 2011 and 2010 numbers, so I don't know if

16   that would be an accurate statement or not.

17   BY MR. O'BEIRNE:

18   Q.  As the CFO of Grande, at Patriot, who took an ownership

19   interest in Grande in 2013, you can't tell the jury whether

20   Grande's revenue was close to $192 million the year before,

21   2012?

22   A.  I assume it was, but I -- it was something less than that

23   or greater than that.  I don't know.  I have not looked at it

24   in years.

25   Q.  Fair to say that if the revenue in 2011 and 2010 was more

1   than $150 million, then the total would go up past 1.6 billion?

2   A.  I would think that is accurate, but I don't know for sure.

3   Q.  And when you joined Patriot in 2011, it was managing two

4   ISPs -- you joined Patriot in 2011, right, sir?

5   A.  Correct.

6   Q.  When you joined Patriot in 2011, it was managing two ISPs.

7   Grande was not one of them?

8   A.  That is correct.

9   Q.  And Patriot, I think we've established, took over May of

10  2013, right?

11  A.  Yes.

12  Q.  And Patriot was hired by the private equity owners of

13  Grande to manage the day-to-day operations?

14  A.  Yes.

15  Q.  Now, you talked about Grande's corporate philosophy of

16  reinvesting money left over at the end of the year into the

17  business rather than distributing it on direct.  You recall

18  that, correct?

19  A.  I do.

20  Q.  But ABRY is a private equity firm, right?  The reason they

21  bought Grande is to increase the value of the company so that

22  they could sell it, right?

23  A.  Every company wants to increase the value of their company

24  and be an -- and improve the profitability of their company,

25  yes.

1  Q.  Sure, but Grande could have taken distributions of that

2  leftover money at the end of every year, but the private equity

3  owners decided to reinvest it because they were going to sell

4  the company for a lot more money in a few years, right?

5          MR. HOWENSTINE:  Objection.  Calls for speculation.

6          MR. O'BEIRNE:  Your Honor, he's the CFO of the

7  company, and he manages it.

8          MR. HOWENSTINE:  He's asking about what another

9  company thought.

10          THE COURT:  The objection is sustained.

11  BY MR. O'BEIRNE:

12  Q.  Were you yourself also an owner in equity -- an owner of

13  equity in Grande starting in 2013?

14  A.  Not starting in 2013.

15  Q.  When did you obtain equity in Grande?

16  A.  I believe it was '14.

17  Q.  Okay.  And you worked closely with ABRY Partners, the

18  private equity owners of Grande in providing those management

19  services, right?

20  A.  Yes.

21  Q.  Very closely?

22  A.  Yes.  I'm not sure the difference between "closely" and

23  "very closely," but yes.

24  Q.  Well, I'm trying to react to the objection that you don't

25  know what ABRY was trying to do with the company.  You

John Feehan - Examination                    1483

1    understand that ABRY Partners, the private equity firm, was
2    intending to sell Grande within several years of their
3    acquisition, right?
4    A.   The private equity model is that eventually the private
5    equity partners will sell the company.
6    Q.   Right.  And reinvesting money in the company means the sale
7    price goes up, and they make more money at the end, right?
8    A.   That's not necessarily true, just from reinvesting the
9    money.
10   Q.   ABRY reinvested money in Grande and sold the company for
11   $400 million more than they paid for it, right, sir?
12   A.   I believe that number is roughly accurate.
13   Q.   I want to focus on how Patriot is compensated for its
14   management of Grande.  You just mentioned in 2014 you yourself
15   took an ownership interest in Grande; is that right, sir?
16         MR. HOWENSTINE:  Objection.  Beyond the scope of
17   direct, and irrelevant.
18         MR. O'BEIRNE:  It's relevant to Patriot's interest in
19   Grande, his personal interest in the case, and the underlying
20   facts.
21         THE COURT:  I think you need to re-ask your question
22   in a different way.  I'm going to sustain the objection, but I
23   understand what you're trying to get at, but the way you've
24   asked the question is too broad.
25         MR. O'BEIRNE:  Understood.  Your Honor --excuse me.

1   BY MR. O'BEIRNE:

2   Q.   Mr. Feehan, when ABRY hired Patriot to manage Grande,

3   there's a management contract, right?

4   A.   Yes.

5   Q.   And Patriot gets paid whatever expenses it incurs to manage

6   Grande under that contract, right?

7   A.   That is correct.

8   Q.   But the real value for Patriot, specifically the Patriot

9   executives, is in the equity you obtained in Grande, right?

10  A.   I don't know how to define value.  We get paid a salary,

11  which is valuable, and then we do get equity in the company.

12  That could be worth nothing or it could be worth something in

13  the end.

14  Q.   Right.  And so you yourself personally, and the Patriot

15  executives, were motivated to increase the value of Grande

16  because you would stand to profit if it was sold?

17  A.   We're motivated to build a good company and to provide good

18  customer service and provide value to our customers and build a

19  good company.

20  Q.   Sir, for you, for Patriot, the value is ultimately the

21  equity that you have in Grande, right?

22  A.   My salary, plus equity.

23  Q.   The value is ultimately in the equity, right?

24  A.   Equity has value, yes.

25  Q.   Did you make more money when your equity interest was

John Feehan - Examination                    1485

1    cashed out when Grande was sold or in your salary?

2    A.  In a year or over a period of time?  I don't know how to

3    answer that question.

4          MR. O'BEIRNE:  May I approach, Your Honor?

5          THE COURT:  Yes.

6    BY MR. O'BEIRNE:

7    Q.  Mr. Feehan, I just handed you a copy of your deposition in

8    this case.

9    A.  Okay.

10   Q.  You recall being deposed, right, sir?

11   A.  I do.

12   Q.  You understand you were under oath, and you were answering

13   questions truthfully that day?

14   A.  Yes.

15   Q.  Please turn to page 120 of your deposition.

16   A.  Okay.

17   Q.  Starting line 14; do you see that, sir?

18   A.  Yes.

19         MR. HOWENSTINE:  I'll object to this as improper

20   impeachment, because he doesn't say anything different in his

21   deposition than what he just testified to.

22         THE COURT:  We're not going to put before the jury his

23   testimony in a deposition that is consistent with questions you

24   can ask him and he can answer here.  That's not proper

25   impeachment.

1          MR. O'BEIRNE:  Your Honor, I think it is inconsistent.

2   I'd like to confront him with the testimony and explore the

3   inconsistency.

4          THE COURT:  You can go forward as long as it's

5   inconsistent, in your view.

6   BY MR. O'BEIRNE:

7   Q.  I asked you, *"So for Patriot, the value is the equity?"*

8       And your answer was:  *"For Patriot, for us, the value is*

9   *ultimately beyond the normal salary, the equity."*

10  A.  Correct, which is what I just said.  Salary plus equity.

11  Q.  Well, if you look above that, your answer on -- starting

12  number seven was, *"We don't make any money on our management*

13  *fee.  Our management fee covers costs.  That's it.  We don't*

14  *mark up our management fee.  We don't make a profit on our*

15  *management fee.  Patriot has zero profit?"*

16  A.  But you asked about the equity -- the Patriot members.

17  Patriot itself doesn't make money, but Patriot pays my salary,

18  so my value comes from both salary and equity.

19  Q.  The way you and the other Patriot executives profit from

20  your investment in Grande is to increase the value of the

21  company, right, sir?

22  A.  We value from -- we get equity, and if that equity is

23  valuable at the end because the company has increased in value,

24  yes, we profit from that.

25  Q.  When Grande was sold to TPG in 2017, you received a

John Feehan – Examination                    1487

1   distribution for the equity that you had in Grande, right, sir?

2   A.   I did.

3   Q.   How much was that?

4   A.   I don't know the exact amount that I received just for

5   Grande.

6   Q.   More than a million dollars?

7   A.   For Grande, I believe it was.

8   Q.   More than 2 million?

9   A.   A little bit, yes.

10  Q.   More than 3 million?

11  A.   I don't think so.

12  Q.   So based on the increase of value in Grande from 2013 when

13  ABRY bought it to 2017 when they sold it, your equity alone

14  increased more than $2 million?

15  A.   I believe that number is roughly accurate.

16  Q.   You would agree with me as the CFO of Grande, that it's

17  your obligation to protect Grande's financial interest?

18  A.   Yes.

19  Q.   It's your obligation to protect Grande's property?

20  A.   Yes.

21  Q.   And specifically, it's your obligation to protect Grande's

22  intellectual property?

23  A.   Yes.

24  Q.   And Grande takes that obligation to protect its own

25  intellectual property seriously?

John Feehan - Examination                    1488

1    A.   Yes.

2    Q.   You testified on direct about different gross margins on

3    product lines, and specifically Internet being above

4    90 percent; do you recall that?

5    A.   Just in what he asked me?

6    Q.   Yes.

7    A.   I didn't specifically talk about any product line.

8    Q.   Well, let's talk about some product lines and the relative

9    profitability.

10   A.   Okay.

11   Q.   So the highest margin profit -- or excuse me, the highest

12   margin product line that Grande offers is Internet, right?

13   A.   Which margin?

14   Q.   The gross margin on the units itself.

15   A.   The highest percentage is -- from a percentage basis, is

16   high-speed data, yes, data.

17   Q.   And the gross margin on high-speed data to Grande, removing

18   the direct costs of what it cost you to provide that data, is

19   95 percent, right?

20   A.   That's not the only cost to provide that data, but from the

21   accounting perspective and GAAP perspective, the way it is

22   accounted for, that margin is roughly 95 percent.

23   Q.   So the gross margin on your Internet service is 95 percent,

24   right?

25   A.   Correct.

John Feehan - Examination                    1489

1    Q.  And the gross margin on phone service is between 60 to

2    80 percent?

3    A.  Yeah.  It goes up and down, but that's roughly correct.

4    Q.  The gross margin on cable, meaning cable TV and video, is

5    40 percent?

6    A.  That's roughly right.

7    Q.  And falling?

8    A.  Yeah, it's going down a little bit, that is correct.

9    Q.  It's fair to say, sir, Grande makes its money on Internet,

10   right?

11   A.  Grande makes some of its money on Internet.

12   Q.  Well, I want to offer you a statement and see whether you

13   agree.  It's a fair statement, Grande makes its money on

14   Internet?

15           MR. HOWENSTINE:  Objection.  Asked and answered.

16           MR. O'BEIRNE:  Just trying to confirm his answer

17   before we go to the deposition, Judge.

18           THE COURT:  The objection is overruled.

19   BY MR. O'BEIRNE:

20   Q.  Grande makes its money on the Internet, right, sir?

21   A.  Grande makes money on the Internet, yes.

22   Q.  Please turn to page 74 of your deposition, sir.  Starting

23   line 23, page 74, going to line 2 of 75; do you see that?

24   A.  Sorry, page 74?

25   Q.  Seventy-four, line 23 at the bottom.

1   A.   Okay.

2   Q.   I asked you:   *"What I'm asking you is, isn't it really true*

3   *that now Grande makes its money in Internet?"*

4        And your answer was:   *"I'd say that's a fair statement."*

5   A.   Right.   Grande makes money on Internet.

6   Q.   No.   But mostly Internet, right?   Internet is driving

7   Grande's profits, right?

8   A.   Internet drives Grande's profits, yes.   We make money on

9   Internet.

10  Q.   More than 98 percent of your customers have Internet

11  service, right?

12  A.   That's roughly 96 to 98 percent, roughly in that range.

13  Q.   Please pull up PX 248.   Mr. Feehan, this is a

14  Grande retention training.

15            MR. HOWENSTINE:   Is this document in evidence?

16            MR. O'BEIRNE:   Not yet.

17            MR. HOWENSTINE:   Are you showing it to the jury?

18            MR. O'BEIRNE:   I'm sorry.   I meant just for the

19  witness.

20  BY MR. O'BEIRNE:

21  Q.   Mr. Feehan, I'm showing you PX 248.   This is a Grande

22  retention training PowerPoint presentation produced to us in

23  discovery.   Do you recognize this?

24  A.   I recognize it only from when they did the deposition.   I

25  have never seen this before then.

1  Q.  We looked at it at your deposition?

2  A.  Yes, we did.

3  Q.  And you testified about your familiarity with Grande's

4  retention aims and its company policies in connection with

5  retention?

6  A.  Correct.

7  Q.  And, in fact, you testified that your understanding is that

8  the statements in this PowerPoint presentation were consistent

9  with your understanding as Grande's CFO, right?

10  A.  I think I said that.  But I don't -- I don't remember -- I

11  haven't looked at this document since then.  That was five

12  years ago.

13        MR. O'BEIRNE:  Your Honor, we offer PX 248 as a party

14  admission.

15        MR. HOWENSTINE:  The witness just testified that he

16  wasn't familiar with the document.

17        MR. O'BEIRNE:  Your Honor, he testified at his

18  deposition that he understood and agreed with the statements in

19  here.

20        THE COURT:  Objection is overruled.

21  BY MR. O'BEIRNE:

22  Q.  You testified on direct about Grande's efforts to get new

23  customers, examine customer churn, and determine how many net

24  customers you're getting, right, sir?

25  A.  I did.

John Feehan - Examination                    1492

1    Q.  And Grande's customer service employees are trained in how

2    to speak to customers to try to maximize sales and minimize

3    churn, right?

4    A.  That's a fair statement.

5    Q.  It's a core business goal of Grande to retain revenue

6    through minimizing churn?

7    A.  A core business goal is to gain the most amount of net

8    customers we can.

9    Q.  Which includes getting new ones and not losing the ones you

10   have?

11   A.  Correct.

12   Q.  Let's look at page three of this document.

13          MR. O'BEIRNE:  Permission to publish PX 248 to the

14   jury?

15          THE COURT:  Granted.

16          MR. O'BEIRNE:  Thank you, Your Honor.

17   BY MR. O'BEIRNE:

18   Q.  So page three of this PowerPoint presentation describes the

19   objectives of the training, including the second bullet,

20   *"Understanding the importance and impact of monthly recurring*

21   *charges."*  Do you see that?

22   A.  I do.

23   Q.  That's the cost for service or equipment that you bill to

24   the customer on a monthly basis, right?

25   A.  That is correct.

John Feehan - Examination                          1493

1  Q.  And the next bullet is to *"understand the Grande retention*
2  *strategy."*  Do you see that?
3  A.  I do.
4  Q.  Let's look at the next slide.  These are questions for the
5  customer service reps to understand, *"What Is MRC?"*  Do you see
6  that?
7  A.  I do.
8  Q.  And then the next question, *"How do I impact MRC?"*  Do you
9  see that, sir?
10  A.  I do.
11  Q.  And the answer is -- well, before there's an answer,
12  there's a statement*: "We don't want to give services away for*
13  *free or with deep discounts.  This devalues our great service*
14  *offerings."*  Do you see that?
15  A.  I do.
16  Q.  You agree with that, right, sir?
17  A.  Yes.
18  Q.  Grande is not in the business of giving away your services
19  for free, is it, sir?
20  A.  We are not.
21  Q.  You'd go out of business real quick if you did that, right?
22  A.  We would.
23  Q.  Could Grande survive a revenue drop of more than 50 percent
24  if your costs stayed the same?
25  A.  If the costs stayed the same?

John Feehan - Examination                    1494

1   Q.  Yes.

2   A.  No.  I don't believe so.  I'd have to do the math, but I

3   don't believe so.

4   Q.  It wouldn't require a lot of math, though.  If your

5   revenues go down by 50 percent and your costs stayed the same,

6   you'd be in real trouble?

7   A.  With those -- yes.  Roughly, yes.

8   Q.  Let's go back to the slide.  You agree with me Grande

9   shouldn't have to give away your services for free, right?

10  A.  Yes.

11  Q.  You shouldn't have to devalue your great service offerings,

12  right?

13  A.  Correct.

14  Q.  Should Sony Music have to give away its services for free?

15         MR. HOWENSTINE:  Objection.  Calls for speculation.

16  Asking about what Sony thinks.

17         MR. O'BEIRNE:  No.  I'm asking him what he thinks

18  about whether the plaintiffs should have to give away their

19  services for free, which Grande doesn't want to do.

20         THE COURT:  What he thinks as an individual and not in

21  his corporate capacity?

22         MR. O'BEIRNE:  As the CFO of Grande --

23         THE COURT:  You're asking him what Grande thinks,

24  basically, aren't you?

25         MR. O'BEIRNE:  Yes.

John Feehan - Examination                    1495

```
 1              THE COURT:  The objection is sustained.

 2              MR. O'BEIRNE:  Can I ask him personally?

 3              THE COURT:  You can ask him personally.  I don't know

 4    what value it has.

 5    BY MR. O'BEIRNE:

 6    Q.  Does Grande think -- as a defendant in this case, does

 7    Grande think -- strike that.

 8        We've heard a lot of arguments and statements from counsel

 9    about Grande's position as to the state of the music companies.

10    I'm asking you as Grande's CFO, does Grande believe that Sony,

11    Warner and Universal should have to give away their services

12    for free?

13              MR. HOWENSTINE:  Same objection, Your Honor.

14              MR. O'BEIRNE:  It goes to the themes of Grande in this

15    case, Your Honor, statements from other witnesses and their

16    counsel.

17              THE COURT:  All right.  I'll allow the question.

18    BY MR. O'BEIRNE:

19    Q.  Should plaintiffs have to give away their services for

20    free?

21    A.  No.

22    Q.  Should plaintiffs have to devalue their great service

23    offerings?

24              MR. HOWENSTINE:  Objection.  Foundation.

25              MR. O'BEIRNE:  It's the same question, Your Honor,
```

1    just different language on his slide.

2            THE COURT:  Overruled.

3    BY MR. O'BEIRNE:

4    Q.  Should plaintiffs have to devalue their great service

5    offerings?

6    A.  No.

7            MR. O'BEIRNE:  Let's look at page ten of the

8    presentation, please, Conner.

9    BY MR. O'BEIRNE:

10   Q.  You see the slide, sir?  It says *"Margins and what they*

11   *mean to Grande."*  Do you see that?

12   A.  Yes.

13   Q.  And the slide states:  *"Let's do some info on the*

14   *following."*

15       It appears this is to the people drafting it.  *"Very little*

16   *money in video.  We make our money in Internet and phone."*

17       Do you see that?

18   A.  I do see that.

19   Q.  That's what we were talking about before, right?  Grande

20   makes its money in Internet.  Right?

21   A.  Yes.

22   Q.  And then the last bullet, *"Illustration of margin with*

23   *explanation so that they can understand what's really important*

24   *to Grande."*  Do you see that?

25   A.  I do see that.

1    Q.   That's on the margins slide, is what's really important to

2    Grande, right?

3    A.   I'm sorry.  Can you repeat that question?

4    Q.   Sure.  The margins slide is described as what's really

5    important to Grande, right?

6    A.   Sorry.  I don't understand the margins slide.

7    Q.   There's a scale at the bottom, *"Cost and Profit,"* and

8    that's what --

9    A.   Oh, I'm sorry.  I see what you're saying.

10   Q.   That's what's really important to Grande, right?

11   A.   Yes, we want to make money.

12        MR. O'BEIRNE:  You can take it down.

13   BY MR. O'BEIRNE:

14   Q.   When TPG purchased Grande from ABRY, Grande provided churn

15   data to TPG as part of their valuation process, right?

16   A.   Yes, I believe that's accurate.

17   Q.   You testified on direct you weren't privy to any

18   discussions about terminating customers for copyright

19   infringement as a factor in churn, right?

20   A.   Yes.

21   Q.   You weren't terminating any customers for copyright

22   infringement since 2013 when you took over, right?

23   A.   I don't know if we were or not.  I wasn't aware of whether

24   we were or not.

25   Q.   And you were not privy to any decision in 2010 by the prior

1    management company, ABB, to cease suspending or terminating

2    customers, were you?

3    A.  I was not privy to that.

4    Q.  You were asked some questions about lifetime subscriber

5    value.  You're not here to present a different calculation of

6    lifetime subscriber value than the plaintiff's experts have

7    provided, are you?

8    A.  I don't know what the plaintiff's experts provided, but I

9    don't use lifetime value calculation into -- in my way of

10   managing the business.

11        MR. O'BEIRNE:  Can you go back to the 2012-2017

12   demonstrative.

13   BY MR. O'BEIRNE:

14   Q.  I think we covered this, sir, but just to be clear, all of

15   the investments that you talked about that Grande engaged in,

16   the five categories of things you spend money on, all of that

17   increased the value of the company, and that investment was

18   realized in the sale in 2017, right?

19   A.  I believe those investments did increase the value of the

20   company, yes.

21   Q.  And that increase in value was realized by ABRY Partners

22   when they sold Grande to TPG, right?

23   A.  Yes.

24   Q.  And realized by you personally based on your distribution

25   from that sale?

1    A.  Yes.

2    Q.  And Mr. Kramp, who's been here?

3    A.  Yes.

4    Q.  And Mr. Holanda, the CEO?

5            MR. HOWENSTINE:  Objection, Your Honor.  Relevance.

6            MR. O'BEIRNE:  Specific personal financial interest of

7    the Patriot executives running the company at the time.

8            THE COURT:  The objection is overruled.

9    BY MR. O'BEIRNE:

10   Q.  Mr. Holanda, the CEO of Patriot and Grande had equity as

11   well, right?

12   A.  Yes.

13   Q.  Mr. Roeder -- we saw him on deposition -- he had equity?

14   A.  Yes.

15   Q.  And you all made money from that equity when TPG bought

16   Grande in 2017, right?

17   A.  Yes.

18   Q.  You talked about the corporate value statement of Grande,

19   those bullet points, right?  *"Do what we say we're going to do,*

20   *have fun doing it, take care of customers,"* right?

21   A.  Yes.

22   Q.  If you knew that thousands of users were stealing

23   copyrighted content and you kept giving them the means to do it

24   for years, would that be living up to Grande's values?

25   A.  I'm sorry.  Repeat that?

John Feehan - Examination                    1500

1   Q.  If your company knew that your users were stealing

2   copyrighted content and you kept giving them Internet service

3   to do it for years, would that be consistent with Grande's

4   values?

5   A.  No, I don't believe so.

6   Q.  Was having a corporate policy of never terminating any

7   customer for infringement, no matter how much evidence from

8   whatever source, for however long, for years, was that

9   consistent with Grande's values?

10          MR. HOWENSTINE:  Objection.  Foundation, calls for

11  speculation.  The witness has already testified that he doesn't

12  know anything about that.

13          MR. O'BEIRNE:  I'm not sure he did, Judge.

14          THE COURT:  I think he did.  The objection is

15  sustained.

16  BY MR. O'BEIRNE:

17  Q.  Were you aware of any possibility that a customer could be

18  terminated for copyright infringement from 2011 to 2017?

19  A.  I was not aware of any of the churn policies related to

20  that, to that -- what you just described.

21  Q.  Grande doesn't let people steal its valuable property

22  without consequences, does it, sir?

23  A.  If we understand somebody is stealing from us, we try to

24  shut the product down.

25  Q.  Someone splicing into their neighbor's cable and taking

John Feehan - Examination                    1501

1   your valuable cable services, you'd try to stop that?

2   A.  Yes.

3   Q.  And it would be wrong for another company to help people

4   steal Grande's products and services, right?

5   A.  If they were knowingly helping.

6   Q.  If they were knowingly helping, Grande would expect that

7   company to stop, right?

8   A.  Yes.

9   Q.  And you would take action to ensure that those wrongful --

10  that wrongful conduct stopped, right?

11  A.  We would.

12  Q.  You mentioned your corporate values.  There's another one

13  on your website.  The first value being honesty and integrity.

14  *"We work with integrity every day.  It's about always doing the*

15  *right thing every time."* Are those Grande's values, sir?

16  A.  Yes.

17          MR. O'BEIRNE:  Pending questions on the additional

18  topic, Your Honor, that we're going to discuss separately, I

19  have no further questions for the witness at this time.

20          MR. HOWENSTINE:  Nothing further, Your Honor.

21          THE COURT:  Okay, you can step down, sir.

22          THE WITNESS:  Thank you, sir.

23          THE COURT:  Okay.  It's time for our morning recess.

24          COURT SECURITY OFFICER:  All rise for the jury.

25          *(10:27 a.m., the jury exits the courtroom.)*

```
 1            THE COURT:  Okay.  Let's do a little research and see
 2    where we are.
 3                              *   *   *
 4            (11:00 a.m.)
 5            COURT SECURITY OFFICER:  All rise.
 6            THE COURT:  Please be seated.  Well, while we were on
 7    our break, Alison did pull some cases up.  She found -- I think
 8    she found six cases.  They all deal with the time period that
 9    was in issue in the litigation, but none of them that she's
10    been able to find so far are cases where that was an issue.  It
11    was just understood that was the period.  So, I mean,
12    hopefully, maybe you can find some, either side.
13            MR. O'BEIRNE:  We're seeing some cases, Your Honor, we
14    think would go the other way, but pull them and we'll be
15    prepared after lunch --
16            THE COURT:  Well, I didn't say these went the other
17    way.  I just said that the cases that she has found thus far
18    are cases where it was just presumed that the time period at
19    issue was the time period that was covered by the allegations.
20            Now, in none of those cases was there a dispute, so
21    far that she's been able to find, was there a dispute over what
22    the correct time period was for calculation of statutory
23    damages.  So that's the case we're looking for.
24            MR. HOWENSTINE:  Yes, Your Honor.  I would just note
25    also, you know, our view of this is that is one issue.  And the
```

 1    other issue is bringing in revenues and profits of different

 2    entities, because we're talking about Grande.

 3            THE COURT:  Both of you should be researching that as

 4    well.

 5            MR. O'BEIRNE:  Understood, Judge.

 6            THE COURT:  Alison is looking at that also, but we'll

 7    move on, and then we'll bring him back.

 8            All right.  So who will be the next witness?

 9            MR. HOWENSTINE:  Your Honor, next we intend to play

10    about 15 minutes of deposition video.

11            THE COURT:  Okay.  Let's bring in the jury and do

12    that.

13            MR. HOWENSTINE:  And what I might do before the jury

14    comes in is just yesterday Your Honor entertained objections to

15    DX 46, which was the Dong Jang e-mail.  The parties have agreed

16    on redactions.

17            THE COURT:  Okay.

18            MR. HOWENSTINE:  So we're going to formally move to

19    admit that into evidence.  I think there's no objection?

20            MR. GILMORE:  That's correct.

21            THE COURT:  All right.  It will be received.  Good.

22                          *   *   *

23            COURT SECURITY OFFICER:  Please rise for the jury.

24            *(11:04 a.m., the jury enters the courtroom.)*

25                          *   *   *

1           THE COURT:  Please be seated.  We haven't yet resolved

2    this legal issue with respect to the last witness, so the last

3    witness is chilling while we go on with the next witness, which

4    is going to be by videotape deposition.  Okay?

5           Can you knock the lights down a little bit, Priscilla?

6           MR. HOWENSTINE:  Grande calls Dong Jang by video

7    deposition.  Mr. Jang is a Sony employee, and he was deposed on

8    August 30, 2018, in New York, New York.

9           THE COURT:  And he is a current Sony employee; is that

10   right?

11          MR. HOWENSTINE:  That's correct.

12                              *   *   *

13          *(Videotaped deposition playing.)*

14                          EXAMINATION

15   *BY MR. HOWENSTINE.*

16   *A.  My name is Dong Li Jang.*

17   *Q.  When did you join Sony?*

18   *A.  I joined Sony I believe July of 2006.*

19   *Q.  And what was your first position with Sony?*

20   *A.  It was analyst, and I believe the department at the time*

21   *was called New Technology.*

22   *Q.  And if you could just sort of walk me through in*

23   *chronological order the different positions you've held within*

24   *Sony.*

25   *A.  Yes.  I was analyst at new technology.  Then it was*

1    *manager, and I believe the department changed to business*

2    *operations and new technology.  And then the next position I*

3    *held was associate director of antipiracy.  And then from*

4    *there, I was a director of antipiracy, and then after that it's*

5    *the current position I hold, vice president of content*

6    *protection.*

7    *Q.  Do you have an understanding of whether the RIAA sends*

8    *notices of alleged copyright infringement to ISPs concerning*

9    *BitTorrent used by ISP subscribers?*

10   *A.  They have in the past through the Hubcap effort.*

11   *Q.  And what is Hubcap?*

12   *A.  I think it was the term that refers to the process of*

13   *detecting infringing works across P2P networks and BitTorrent*

14   *and then sending notices of infringement to the relevant ISPs*

15   *so that they can forward on that information to the end user.*

16   *Q.  So those notices were sent to ISPs directly by the RIAA?*

17   *A.  I believe they used a third-party vendor by the name of*

18   *Detectnet.*

19   *Q.  Detectnet also known as MarkMonitor?*

20   *A.  I believe so.*

21   *Q.  Do you have an understanding of how Detectnet or*

22   *MarkMonitor's software for detecting alleged infringement over*

23   *BitTorrent functions?*

24   *A.  I haven't reviewed their technology firsthand, so I can't*

25   *speak to their process.*

1    Q.   That's all handled by the RIAA?

2    A.   I'm not involved in that process, so you would have to ask

3    the RIAA.

4    Q.   When did you first become aware of Rightscorp?

5    A.   I vaguely recall a meeting with Rightscorp several years

6    back.  I want to say 2012.  I'm not certain on which year it

7    was, but it was so long ago that I -- it's a vague

8    recollection.

9    Q.   How did that meeting come about?

10   A.   I don't know the specifics in terms of how that company was

11   referred to us.

12   Q.   But you participated in the meeting?

13   A.   Again, you know, it's a vague recollection.  I believe it

14   was a meeting.  It may have been, you know, a call, but I think

15   it was a meeting.  I can't say for certain, it was so long ago.

16   Q.   Was this part of Rightscorp pitching its services to Sony?

17   A.   Correct.

18   Q.   This Exhibit 3, this is an e-mail from you to Marques

19   Johnson, dated September 2, 2014, correct?

20   A.   Correct.

21   Q.   Who is Marques Johnson?

22   A.   Marques Johnson is a former employee.  He was an attorney

23   in our Business and Legal Affairs Department.

24   Q.   And in Mr. Johnson's original e-mail to you, he's asking

25   you whether you're aware of an Ars Technica article about

1    *Rightscorp, correct?*

2    *A.  I believe so, correct.*

3    *Q.  And then in your response you tell him, "No, I'm not aware*

4    *of the article, but the company approached us a few times over*

5    *the last five years."*

6    *Do you recall approximately how many times Rightscorp has*

7    *approached Sony?*

8    *A.  I don't recall.*

9    *Q.  But multiple times?*

10   *A.  Based on this e-mail, it would suggest that it was more*

11   *than one time.*

12   *Q.  But Sony has never taken Rightscorp up on any of its offers*

13   *to send notices on its behalf, correct?*

14   *A.  We haven't -- Sony hasn't retained Rightscorp services*

15   *directly to send notices.*

16   *Q.  And since this time in September 2014, Sony has continued*

17   *not to engage Rightscorp to send notices on its behalf,*

18   *correct?*

19   *A.  To date, we have not hired Rightscorp to send notices on*

20   *our behalf.*

21   *Q.  This Exhibit 4 is an e-mail chain produced in this case*

22   *with beginning Bates number SME_00003177.  Mr. Jang, I'll give*

23   *you a minute to look it over, and then I'll ask you a few*

24   *questions about it.*

25   *A.  Okay.*

1    *Q.  So this Exhibit 4 is an e-mail chain between yourself,*

2    *James Finley, and Mark Piibe, correct?*

3    *A.   Yes.*

4    *Q.  Do you recall this e-mail exchange?*

5    *A.   It doesn't come to top of mind, but I mean, maybe vaguely.*

6    *Q.  So in Mr. Finley's original e-mail, at the bottom of this*

7    *chain, he's asking you about Rightscorp.  He says, "A bit*

8    *old-school way of thinking about it, but with the MP3 market*

9    *declining, maybe an opportunity."*

10       *What did you understand Mr. Finley to mean by "an*

11   *old-school way of thinking about it"?*

12   *A.  You know, I can't say for certain.  You would have to ask*

13   *James, but if I had to guess based off of this e-mail, I think*

14   *he was thinking about the service proposition in the context of*

15   *our prior strategies relating to P2P and BitTorrent in that,*

16   *you know, this was a period where the industry had moved away*

17   *from sending notices through the Hubcap effort.*

18   *Q.  I would like to go back to Exhibit 4, which should be in*

19   *that stack in front of you.*

20   *A.   Okay.*

21   *Q.  If you recall, this was the e-mail exchange between you,*

22   *Mark Piibe and James Finley?*

23   *A.   Correct.*

24   *Q.  In Mr. Finley's original June 10, 2014 e-mail, he starts by*

25   *saying, "Hey Dong, have you heard of these guys?"*

1      He's talking about Rightscorp, right?

2   A.  I believe so.

3   Q.  That's the context of this discussion; it's about

4   Rightscorp, right?

5   A.  Correct.

6   Q.  And Mark Piibe responds saying, "Not sure this is something

7   we want to be a part of."

8      And there he's talking about Rightscorp's sending of

9   notices to ISPs?

10  A.  I think he's just referring to the service as it's

11  described in the Ars Technica article.

12  Q.  What is your understanding of what Mark was alluding to?

13  A.  Again, based on this e-mail, it appears that he's referring

14  to the service as it's described in the article.

15  Q.  Rightscorp service?

16  A.  Correct.

17  Q.  And Mr. Finley goes on to say, "To the average user, it

18  looks like us."

19     What is your understanding of what Mr. Finley is saying

20  there?

21  A.  Yeah, I think the concern here is that in the event that

22  Rightscorp sends notices to end users, from a user perspective,

23  they don't know the difference between the rights holders, BMG,

24  or Sony.  As far as they can tell, they might be thinking it's

25  coming from Sony Music, because it relates to our sound

1    *recording when, in fact, this was a publisher issue.*

2    *Q.   Did you have any subsequent conversations with Mr. Piibe*

3    *about how to prevent consumers from thinking that Rightscorp*

4    *notices were coming from Sony?*

5    *A.   I don't recall.  I may have.  This is going back to 2014.*

6    *I don't --*

7    *Q.   You don't recall one way or the other?*

8    *A.   Yeah, I don't recall one way or the other.*

9    *Q.   But since this, Sony has never authorized Rightscorp to*

10   *send notices to ISPs on its behalf, correct?*

11   *A.   I'm not aware of Sony hiring Rightscorp directly to send*

12   *notices on its behalf.*

13   *Q.   I'm just attempting to understand if there's testing that*

14   *happens of a vendor system, what guidelines or rules are used*

15   *to determine whether the vendor passes or fails the test?*

16   *A.   So that touches on what I mentioned before.  In the case of*

17   *a trial, we'll have the vendor go out and detect infringing*

18   *uses of SME content across the web.  You know, it varies by the*

19   *provider.  And then they service us the results.  We don't have*

20   *them take action on those results because it's for the purpose*

21   *of trial.  We want to evaluate that they're detecting -- we*

22   *want to make sure they're detecting the content correctly*

23   *before effectuating takedowns.  And through that process, we*

24   *trial them out and we assess whether or not there's false*

25   *positives in that process.*

1  *Q.  And how do you assess whether there are false positives?*

2  *A.  We review the results.*

3  *Q.  So you do that manually within your group going back to*

4  *confirm that the notices are accurate?*

5  *A.  In the context of the trial, we will go and review the*

6  *results to confirm that the information and the system is*

7  *working properly, the detections are accurate.*

8  *Q.  Over the last five years, has Sony taken steps to encrypt*

9  *music that's sold by third parties as digital downloads to*

10  *prevent piracy?*

11  *A.  The last five years?  Encrypted digital downloads?  It*

12  *depends on the scenario.  So in terms of offline downloads,*

13  *yes.*

14  *Q.  What do you mean by "offline downloads"?*

15  *A.  If the service offering offers cash downloads, offline*

16  *downloads.  For example, in the context of subscription*

17  *service, they would encrypt, you know -- typically encrypt the*

18  *content so people can't just rip it off their device.*

19  *Q.  And could you be more specific about what that scenario is,*

20  *what some examples are of that scenario?*

21  *A.  You sign up for a streaming service.  You sign up for a*

22  *premium membership.  Part of that gives you offline playback.*

23  *To support that functionality, they have to make available the*

24  *download onto the device.  From our -- from Rightscorp*

25  *perspective obviously, it's in our interest to ensure that*

1   *those downloads are secure and they can't be taken off the*

2   *device or shared with other people, so we ask for contractual*

3   *commitments to have them encrypt that content.*

4   *Q.   What about digital downloads through iTunes?*

5   *A.   Well, if you're referring to the traditional DRM, the*

6   *industry moved away from that, I think, back in 2010 time*

7   *period, thereabouts.*

8   *Q.   So since that time, there haven't been any measures in*

9   *place that prevent music downloaded through iTunes from being*

10  *distributed to other people?*

11  *A.   I'm sorry.  Can you repeat that?  I don't think I agree*

12  *with that statement.*

13  *Q.   Well, you referred to DRM, which I believe you stated went*

14  *away in approximately 2010.  Since that time, have there been*

15  *any other encryption measures in place for digital downloads*

16  *through iTunes?*

17  *A.   In the case of permanent downloads?*

18  *Q.   Correct.*

19  *A.   Permanent downloads, once you purchase it and it hits your*

20  *device, there is no DRM applied to those.*

21  *Q.   And apart from DRM, no other encryption measures?*

22  *A.   With respect to permanent downloads on the Apple app store?*

23  *Q.   Correct.*

24  *A.   There is no encryption applied to the permanent downloads.*

25  *Q.   And the same is true of digital downloads through the*

Dong Li Jang - Examination                    1513

1    *Amazon -- through Amazon Music?*

2    *A.  Permanent downloads downloaded through Amazon Music,*

3    *there's no encryption.*

4    *Q.  And the same is true of permanent digital downloads through*

5    *Google Music, correct?*

6    *A.  Correct.*

7         *(11:19 a.m., videotaped deposition ended.)*

8                        *   *   *

9         THE COURT:  Okay.

10        MR. HOWENSTINE:  Grande calls its next witness, John

11   Kemmerer.

12        COURTROOM DEPUTY CLERK:  Please raise your right hand.

13   You do solemnly swear that the testimony you're about to give

14   in this case now before the Court will be the truth, the whole

15   truth and nothing but the truth, so help you God?

16        THE WITNESS:  I do.

17                        *   *   *

18        *(JOHN KEMMERER, Defense Witness, Sworn.)*

19                        *   *   *

20        COURTROOM DEPUTY CLERK:  Have a seat.

21                     DIRECT EXAMINATION

22   BY MR. HOWENSTINE:

23   Q.  Good morning, Mr. Kemmerer.

24   A.  Good morning.

25   Q.  Would you please introduce yourself to the jury?

1    A.  Hi, my name is John Kemmerer.

2    Q.  What's your job?

3    A.  I'm the president of a company called Applied Economics

4    Consulting Group.  It's located here in Austin.

5    Q.  Could you briefly describe for the jury what you do for

6    Applied Economics Consulting Group?

7    A.  In addition to being president and managing the firm, I

8    provide consulting services to our clients involving financial

9    economic accounting matters, both within a litigation context

10   like this and sometimes non-litigation related.

11   Q.  Now, to orient ourselves here, have you prepared some

12   slides today to help guide the jury through your testimony?

13   A.  Yes.  And to help orient me.

14   Q.  At a high level, please tell the jury about the first

15   subject you'll be testifying about today.

16   A.  So the first thing that I expect to do is to provide my

17   comments and insights about Dr. Lehr's opinions regarding

18   Grande's economic incentives.

19   Q.  And what is the second subject you will be testifying about

20   today?

21   A.  I have done various analyses regarding the economic impact,

22   financial impact, of the plaintiff's claims, and I expect to

23   talk about that as well.

24   Q.  Before we get into your opinions, I'd like to talk a little

25   bit about your background.  Do you have a slide summarizing

1  your qualifications and credentials?

2  A.  Yes.

3  Q.  So please tell the jury just a little bit about your

4  educational background and your other qualifications.

5  A.  Sure.  So I have a degree in accounting that I got in 1982

6  from the University of Texas at Austin.  Two years after that,

7  I became licensed as a CPA by the State of Texas.  The two-year

8  delay is because there's a experience requirement.

9      For about the past 25 years, I've been involved with patent

10  licensing, intellectual property licensing as a valuation and

11  royalty lost profits expert.  I'm a member of the Licensing

12  Executives Society, which is an international group of folks

13  that are involved in the intellectual property licensing

14  industry.  They're a company.  People in that LES, there are

15  attorneys, there are professionals like myself.

16      I'm an associate member of the intellectual -- American

17  Intellectual Property Law Association.  I'm a member of the

18  AICPA, which is the American Institute of Certified Public

19  Accountants.  I'm also a member of the Texas State Society of

20  Public Accountants.  And then I guess finally here about ten

21  years ago, the AICPA implemented a accreditation in financial

22  forensics.  At that point -- it's to encourage knowledge and

23  good practice, best practices in the area of financial

24  forensics, including litigation-related work.  And I was one of

25  the first people in the country to receive that, because --

John Kemmerer – Examination                    1516

1    based on my experience and expertise in this area at the time.

2    Q.  Do you have experience evaluating damages in intellectual

3    property lawsuits?

4    A.  Yes, I do.  I've been engaged hundreds of times in the last

5    25 years by clients both on a consulting, or non-litigation

6    basis, and a litigation basis, to work on intellectual property

7    matters.  And these include things like patent infringement,

8    the copyright infringement that's the subject of this case,

9    trade secrets, trade dress; all kinds of intellectual property

10   rights, issues.

11        And embedded within there, I've a great deal of experience

12   in the industries that are relevant here.  I have a lot of work

13   that I've done for companies involved in streaming space.  I

14   have worked for clients who are Internet service providers,

15   among the large Internet service providers.  I've worked for

16   cable television systems in one form or another for virtually

17   all of my career.

18   Q.  In the last ten years, approximately how many times have

19   you testified at trial?

20   A.  Live at trial, probably about 15 times.

21   Q.  And if you know, how many of those cases concerned

22   intellectual property issues?

23   A.  I believe about half of them.

24   Q.  Do you have experience testifying about statutory damages

25   in copyright cases?

1    A.   Yes.

2    Q.   The damages analysis you have performed in this case, is it

3    comparable to the types of damages analyses you have performed

4    in other cases?

5    A.   Sure.  I think, as we'll get into it, most of the analyses

6    that I've performed have to do with either lost profits of the

7    plaintiff or unjust enrichment of the defendant, and those are

8    very common types of topics and analyses throughout all these

9    hundreds of issues that I've been involved with.

10   Q.   Turning to this case specifically, are you being

11   compensated for your work?

12   A.   I am.

13   Q.   Are you being paid an hourly rate for your work?

14   A.   Yes.

15   Q.   Does your compensation depend in any way on the results in

16   this case?

17   A.   It does not.  I have actually a retention agreement with my

18   client that so states.

19   Q.   Do you believe that you have reached conclusions based on

20   your review of the evidence and your qualifications and

21   expertise that will help the jury consider the damages issues

22   in this case if it needs to?

23   A.   I do.

24        MR. HOWENSTINE:  Your Honor, I move to admit

25   Mr. Kemmerer as an expert in the field of economic damages.

John Kemmerer - Examination                    1518

1          MR. GILMORE:  We don't object to this.

2          THE COURT:  So received.

3  BY MR. HOWENSTINE:

4  Q.  Now, before I ask you about your opinions in this case, I'd

5  like to make clear what you're not giving opinions about.

6      Mr. Kemmerer, are you testifying today about whether anyone

7  committed copyright infringement?

8  A.  No, I'm not.  I'm not here to talk about liability.  I

9  assume that everything -- for purposes of my analysis and most

10 damages analysis, I've assumed everything that the plaintiffs

11 allege is true.  In fact, you know, I'm required to do that by

12 the AICPA practice guides in this area.

13 Q.  In your work as an expert, do you ever offer opinions about

14 liability?

15 A.  Almost never.  I have been involved in a couple cases

16 having to do with federal income taxation, which is another

17 area in which I practice in my career, and I have had some

18 liability testimony there.  But as regards damages, no.  I

19 always -- and all damages analysts assume liability.

20 Q.  Now, you understand that the labels are seeking statutory

21 damages in this case for the alleged infringement of a number

22 of different songs?

23 A.  Yes, I've been told that.

24 Q.  Are you offering opinions about whether those songs are

25 separate works for purposes of awarding statutory damages?

1   A.  No, I'm not.  I'm just referring to the things we talk

2   about as songs.  I don't mean to infer any kind of legal

3   meaning to that.

4   Q.  Now, I'd like to talk about your first opinion regarding

5   the testimony of Dr. Lehr.  Have you had the opportunity to

6   review Dr. Lehr's expert reports and trial testimony?

7   A.  I have.

8   Q.  In your opinion, based on your expertise and review of the

9   record, is Dr. Lehr's testimony helpful to evaluating the

10  economic harm allegedly suffered by the labels?

11  A.  No, it's not at all.

12  Q.  Why not?

13  A.  Because Dr. Lehr's opinions are not related to the actual

14  claims, the specific claims made by the parties in this case,

15  or made by the plaintiffs in this case.

16  Q.  Dr. Lehr testified that the labels' damages from the

17  alleged infringement at issue are impossible to quantify.  What

18  is your response to that?

19  A.  I disagree.

20  Q.  Why?

21  A.  Because in the course of my work on this case, I have found

22  information that is relevant and reliable and speaks to the

23  economic -- the financial issues that are directly related to

24  the actual claims made by the plaintiffs.

25  Q.  What is your response, Mr. Kemmerer, to the notion that

```
 1   harm from music sharing can't be quantified because it's viral?
 2   A.  Well, my first response is, I don't think that's a claim
 3   made by the plaintiffs in this case.  It's not the subject of
 4   the litigation.  And my second comment would be --
 5          MR. GILMORE:  I'm going to object to that as calling
 6   for legal conclusion.
 7          THE COURT:  Sustained.
 8   BY MR. HOWENSTINE:
 9   Q.  Let me ask a different question.  Leaving aside what the
10   plaintiff's actual claim is, in your opinion, as an expert on
11   economic damages, is it appropriate to consider alleged
12   downstream acts of music sharing in evaluating the labels'
13   damages?
14          MR. GILMORE:  Same objection.  This is calling for
15   legal testimony.
16          MR. HOWENSTINE:  Your Honor, I'm just asking him for
17   his opinion as an expert, whether that is something that is
18   appropriate to consider when evaluating lost profits and lost
19   revenues.
20          MR. GILMORE:  It's calling for --
21          THE COURT:  In the legal context, in this lawsuit?
22          MR. HOWENSTINE:  No, in terms of what information --
23          THE COURT:  As an accounting matter?
24          MR. HOWENSTINE:  Correct, Your Honor.
25          THE COURT:  All right.  He can testify as an
```

1  accounting matter, but not in the legal.

2  A.  So as a CPA, no, that's not -- I'm sorry.  Will you ask the

3  question again?  I lost it in all of the back and forth.  I'm

4  sorry.

5  BY MR. HOWENSTINE:

6  Q.  As a CPA, when you're evaluating alleged lost revenues of

7  the plaintiffs, do you think it's appropriate to consider

8  alleged downstream acts of music sharing by people other than

9  Grande subscribers in evaluating the labels' damages?

10  A.  I don't.

11  Q.  In your opinion, is there evidence that Dr. Lehr could have

12  considered, but did not, to attempt to quantify any alleged

13  harm to the labels?

14  A.  Yes, absolutely there is.

15  Q.  Did you prepare a slide on this topic?

16  A.  I did.

17  Q.  So please explain to the jury, with reference to this

18  slide, what you believe Dr. Lehr failed to consider.

19  A.  So I believe that Dr. Lehr failed to consider the

20  Rightscorp notices that are present as information available to

21  be reviewed.  And the second thing is there, to my knowledge,

22  was no production from the plaintiffs of the labels'

23  activities.  Their per-download and per-stream revenues and

24  profits for the specific songs at issue in this case.  Another

25  thing that I would have expected to see and review are the

1   actual sales data, the volumes of sales or downloads of the
2   songs at issue in the case.
3       And then I didn't see anywhere where Dr. Lehr took into
4   account in his opinions the costs that Grande incurred in
5   providing the Internet service that supposedly enabled the
6   songs to be shared.
7   Q.  Now, if you had sales information for the specific songs at
8   issue in this lawsuit, would that have led to a different type
9   of analysis in this case?
10  A.  I don't know that it would have led to a different type of
11  analysis.  I would have -- as we'll see, I've looked, tried to
12  determine on an individual basis what the plaintiffs would have
13  received.  But the analysis would have been informed by real
14  data, actual data, the amount that each song was actually sold
15  for, specifically.  Maybe different amounts of song -- prices
16  for different songs.  There almost certainly were different
17  sales volumes of different songs, and those would have allowed
18  for, I guess I'd say, a more robust analysis.  So not
19  different.  Probably would have done everything I already did
20  to check reasonableness, but it would have been more specific
21  and more robust directly related to the plaintiff's claims.
22  Q.  In your experience, in light of the information you
23  identified that Dr. Lehr did not consider, do you believe it is
24  possible to quantify the harm the labels have suffered, you
25  know, assuming their allegations have merit?

1    A.  Of course I do, yes.

2    Q.  Dr. Lehr, you may recall, also offered opinions about the

3    lifetime subscriber value of a Grande subscriber.  Do you

4    recall that?

5    A.  Yes, I do recall that.

6    Q.  Did Dr. Lehr offer more than one opinion about the

7    subscriber value?

8    A.  Yes.  He had a lifetime subscriber value that he built

9    based on Grande's financial information, and then he calculated

10   another value based on this acquisition that we've been talking

11   about, the acquisition price for the whole company divided by

12   the number of subscribers.  So those two metrics.

13   Q.  So let's start with the first one.  The next slide depicts

14   Dr. Lehr's opinion.  Please explain to the jury what this

15   shows.

16   A.  So this is just showing that Dr. Lehr's opinion is -- and

17   calculation based on the Grande financial information, is that

18   the lifetime subscriber value to Grande for each subscriber is

19   $2,448 per subscriber.  And then this 100 percent attributable

20   to P2P, peer-to-peer usage, is just sort of reminding us that

21   this includes revenues from television, from telephone as well

22   as high-speed Internet, and it's 100 percent of those average

23   revenue per-user amounts.  He included everything.

24   Q.  Now, in offering your opinions and developing your opinions

25   in this case, did you consider a concept called

1    "apportionment"?

2    A.   Yes, I did.

3    Q.   Could you explain to the jury what apportionment is?

4    A.   So for a damages analyst or an accountant doing this kind

5    of work, apportionment is a necessary step.  It means --

6    apportionment means you're supposed -- I'm supposed to limit my

7    consideration to the sales and the profits that are related to

8    the claims, not everything, but the things that are related to

9    the claims made by a plaintiff in a case.

10   Q.   Now, consistent with this concept of apportionment, in your

11   opinion, did Dr. Lehr demonstrate that infringement on Grande's

12   network causes Grande to earn more money?

13   A.   I did not see any evidence of that in Dr. Lehr's report.

14   Q.   Are you aware of any evidence that any subscribers came to

15   or remained with Grande because of the ability to share music

16   files with BitTorrent?

17         MR. GILMORE:  Objection.  Relevance.  There's no

18   relevance to the claim in this case.  That's for a different

19   kind of claim that we're not bringing, Your Honor.

20         MR. HOWENSTINE:  Your Honor, that directly relates to

21   the plaintiff's lost revenues and what caused those lost

22   revenues.

23         THE COURT:  Objection is overruled.

24         MR. HOWENSTINE:  I'll re-ask the question.

25   BY MR. HOWENSTINE:

John Kemmerer - Examination                    1525

1  Q.  Are you aware of any evidence that any subscribers came to

2  or remained with Grande because of the ability to share music

3  files with BitTorrent?

4  A.  I haven't seen any evidence promoted or cited to in

5  Dr. Lehr's reports, nor have I seen any evidence in the course

6  of my work on this case.

7  Q.  And I believe you've also testified about how the

8  subscriber value included revenues from things other than

9  Internet service, correct?

10  A.  I did.  And I believe, from reading the trial transcript,

11  that Dr. Lehr confirmed that.

12  Q.  Do you think that it was appropriate for Dr. Lehr to

13  include those in his calculation?

14  A.  No, I don't, because we're talking about peer-to-peer

15  sharing accomplished through the Internet portion of Grande's

16  services.  So I don't think it's appropriate to include cable

17  television and telephone.

18  Q.  Applying these principles of apportionment that you've

19  discussed, have you evaluated the lifetime value of a Grande

20  subscriber that is attributable to the alleged infringement at

21  issue in this case?

22  A.  Yes, I have.

23  Q.  Did you prepare a slide on that topic?

24  A.  Yes, I did.

25  Q.  So please explain to the jury how you arrived at this

1    apportioned lifetime subscriber value of $54.17.

2    A.  Yes.  So I started with the average revenue per user for

3    high-speed Internet only, so not -- remember, there was a chart

4    a little while ago that showed, you know, TV, phone, Internet.

5    I only included the Internet.  That was my starting point was

6    the average revenue for Internet users.

7        I took the gross margin from that to account for the direct

8    expenses.  I -- well, let me back up.  To the revenues, I

9    applied a 5 percent apportionment factor.

10   Q.  Just to orient you, how did you come up with that 5 percent

11   apportionment factor?

12   A.  So I did some research on my own to see if there was

13   anything I could find or that could inform me about to what

14   extent use of the Internet is related to peer-to-peer usage.

15   And I found a number of sources which together kind of

16   indicated to me that about 5 percent of Internet use is

17   attributable to peer-to-peer applications.

18       So I included 5 percent of the Internet revenues, deducted

19   the gross margin percentage, and then also deducted the

20   5 percent of the subscriber acquisition costs.  Grande and all

21   ISPs, service providers, incur funds:  Advertising, promotional

22   offers, that kind of thing, generally, to acquire a subscriber.

23   And so I also deducted that cost.  And then -- so with those

24   adjustments, I come out to a lifetime subscriber value, kind of

25   trying to just contrast to what Dr. Lehr did, of $54.17 per

1   subscriber.

2   Q.  And I just want to be clear on what the 5 percent

3   represents.  So by using a 5 percent apportionment factor, you

4   are relying on information that -- you know, in the

5   neighborhood of 95 percent of Internet usage is activity other

6   than peer-to-peer file sharing; is that fair?

7   A.  Yes, that's fair.  That's right.  Things are, you know,

8   Netflix viewing is one of the, you know, hugest uses of

9   bandwidth on the Internet.

10  Q.  Now, you recall that Dr. Lehr used his lifetime subscriber

11  value to offer opinions about Grande's economic incentive to

12  permit infringement.  If you substitute your apportioned

13  lifetime subscriber value, what does that number look like?

14  A.  So if I accept Dr. Lehr's count of subscribers, which was

15  about 20,000 shown on the slide here, and multiply it by the

16  properly apportioned lifetime subscriber value, I get an amount

17  of $1.1 million.

18  Q.  Now, this calculation does use Dr. Lehr's identification of

19  approximately 20,000 subscribers who received three or more

20  copyright complaints, according to Dr. Lehr.  How does that

21  number compare to what Dr. Bardwell and Rightscorp have said?

22  A.  It's a great deal larger than what Dr. Bardwell and

23  Rightscorp have said.

24  Q.  How so?

25  A.  Well, here the first red bullet point shows that

1    Dr. Bardwell has indicated that there were 5,361 accounts with

2    multiple Rightscorp notices, about songs in this lawsuit.  If I

3    apply the lifetime subscriber -- the properly apportioned

4    lifetime subscriber value, $54, you get a total loss to the

5    plaintiffs of about $290,000.

6        Rightscorp indicated to Grande that they were tracking 3316

7    subscribers who repeatedly, illegally distributing our clients'

8    copyrights.  So, okay, I'll accept that number.  If I do that

9    and apply the properly apportioned lifetime subscriber value, I

10   get a loss of about $180,000.

11   Q.  Now, I'd like to turn to Dr. Lehr's alternative subscriber

12   value calculation.  The one that was based on the amount TPG

13   paid to acquire Grande in 2017; do you recall that?

14   A.  I do.

15   Q.  Do you have a slide on that as well?

16   A.  Yes.

17   Q.  Now, considering the available evidence in this case, what

18   is your opinion about this approach?

19   A.  Well, I think this is not relevant.  There is much better

20   data, much better, more directly relevant information than

21   doing long division based on an acquisition price.

22   Q.  In your opinion, as an expert on economic damages, was this

23   a reliable way to determine the value of individual Grande

24   subscribers?

25   A.  No, it's not.  The acquisition price of a company has many

1    economic considerations and it's not just focused on subscriber

2    value, so this doesn't provide any information that's relevant

3    to the damages issues in this case, in my opinion.

4    Q.   Ultimately, in your view, are Dr. Lehr's opinions helpful

5    in evaluating the amount of any harm the labels have suffered

6    from the alleged copyright infringement at issue in this case?

7    A.   No, not at all.  They're just completely not attached to

8    the complaints, the things that the plaintiffs, you know,

9    allege were done, songs that were allegedly improperly copied.

10   Q.   Are Dr. Lehr's opinions helpful in evaluating whether or to

11   what extent Grande has profited from any alleged infringement

12   on its network?

13   A.   No.  As I mentioned earlier, I didn't see any evidence that

14   that particular direct question was addressed by Dr. Lehr.

15   Q.   Now, I'd like to move away from Dr. Lehr and talk about the

16   work that you did to evaluate the labels' alleged damages.

17        We all understand that Judge Ezra will instruct the jury on

18   the law concerning statutory damages.  With that understanding,

19   did you prepare a slide identifying some of the factors that

20   you considered?

21   A.   Yes, I did.

22   Q.   Let's go to the first factor.  Well, first, could you give

23   the jury an overview of what those three factors are?

24   A.   Sure.  These are three factors that are things that kind of

25   are within my expertise as an accountant and as a damages

1   expert.

2       One is information about the labels' lost revenues from the

3   particular alleged infringement of specific songs.  Second has

4   to do with Grande's revenues or profits from the alleged

5   infringement.  And then the third thing is just some

6   information about Grande relative to the industry as a whole

7   for consideration.

8   Q.  Now, let's go to the first factor, the labels' alleged lost

9   revenues.  Did you evaluate the e-mails Rightscorp sent to

10  Grande as one way to measure any alleged harm to the labels?

11  A.  I did.  That was something that I looked at.  That was

12  something that in the plaintiff's complaint was attached as an

13  exhibit.  There were 1,350,000 of these, and I looked at those.

14  And I, again, accepted them for purposes of my analysis.

15  Q.  Did you prepare a slide that summarizes what work you did

16  with those e-mails?

17  A.  Correct, I did.

18  Q.  Now, please explain to the jury what this first row

19  represents.

20  A.  Sure.  And by "first row," I think we're referring to the

21  blue shaded row.

22  Q.  Right.  Where it says *Rightscorp Notices (All)*"?

23  A.  Right.  So one way I looked at lost revenues related to the

24  specific claims of the plaintiffs is that I said, okay, all

25  1,350,000 Rightscorp notices represent an improper copying of

1  these songs.

2      I know from the testimony -- well, the testimony in this

3  case, testimony from representatives of the labels, that the

4  labels get 90 cents per digital download.  So, like, if you buy

5  a song on iTunes for $1.29, they get 90 cents.  So I multiply

6  the million-350 by 90 cents and get about $1.2 million of lost

7  revenue related to these 1,350,000 instances.

8  Q.  So to be clear, is this calculation limited to the songs

9  that are actually at issue in this case?

10 A.  It's not.  As it's indicated, this is all.  These

11 Rightscorp notices include songs that aren't in this case.

12 These Rightscorp notices, the 1,350,000 notices, include

13 activities as far back as 2011, so kind of out of the time

14 period that I understand to be relevant here.

15 Q.  So is it fair to say, then, in this analysis, you treated

16 every notice as a lost download?

17 A.  That's right.

18 Q.  How did you treat instances where there were multiple

19 notices about the same song associated with a single IP

20 address?

21 A.  In this row, I just counted them all.

22 Q.  So in that situation, they would all be lost downloads?

23 A.  Correct.

24 Q.  Now, is this calculation limited to the time period at

25 issue in this lawsuit?

1  A.  No.  As I mentioned, there's some as far back as 2011.

2  Q.  In your opinion, as an expert on economic damages, does

3  this calculation likely overstate or understate the labels'

4  lost revenues?

5  A.  I think it clearly overstates.  It's conservative.  It

6  includes things that I think it probably shouldn't.

7  Q.  Now, let's look at the bottom row.  The row that begins:

8  *"Rightscorp notices (Songs in suit)."*  Could you explain to the

9  jury what that means?

10  A.  Sure.  Dr. Bardwell opined, based on his work, that there

11  were 344,450 of these million-350 notices that related to the

12  songs in suit.  So I did the same math for those, taking

13  Dr. Bardwell's number, 344,000 at 90 cents per download is

14  $311,000.

15  Q.  Do you understand that Dr. Bardwell has updated his count

16  of e-mails that relate to the songs at issue in this case?

17  A.  I do understand that, yes.

18  Q.  Have you considered that for the purposes of this

19  calculation?

20  A.  Sure.  Well, he's actually lowered this number, but I

21  didn't update my work.  I just left it at 344,000 based on his

22  initial opinions, and this is the result.  So if had I updated

23  it, the $311,000 would be less.

24  Q.  So in the second calculation, as with the first, did you

25  treat instances -- how did you treat instances where there were

1    multiple notices about the same song associated with one IP

2    address?

3    A.   I just counted every one that Dr. Bardwell included.

4    Q.   In your opinion, are the figures in this slide a reasonable

5    and appropriate way to measure any harm resulting from the

6    alleged infringement at issue in this case?

7    A.   Absolutely.  I mean, I'm starting out with what it is the

8    plaintiffs have alleged and asserted was taken, you know,

9    without compensation.  And I've applied to that those volumes,

10   the amount of compensation for a download, based on the

11   plaintiff's testimony.  I think it's very informative and

12   reliable, and relevant.

13   Q.   Mr. Kemmerer, did you also evaluate the alleged harms to

14   the labels by looking at lost revenues from a streaming

15   perspective?

16   A.   Yes, I did.

17   Q.   Did you prepare a slide on that as well?

18   A.   I did.  So I figured everybody's talked about downloads and

19   streaming probably already.  One way I could get a song is to

20   download it and buy it.  Another way is that I could stream it

21   through, you know, Spotify or some other kind of service.  And

22   so this is looking at the latter, the streaming, the revenues

23   that may have been denied the plaintiffs had these been

24   streamed rather than downloaded.

25   Q.   So let's take it row by row, starting at the top.  There's

1    a number of approximately 46,000.  What does that represent?

2    A.   It represents my -- another analysis that I did of the

3    Rightscorp notices where I went through and did some filtering

4    for the number -- to try to get the number of instances of

5    songs that are claimed as infringed or stolen in this case and

6    unique IP addresses.

7         So to try to avoid the overcounting that we talked about in

8    the other -- in the previous slide.  So I'm looking for the

9    numbers of times that a unique IP address downloaded a song in

10   the case, and I came up with 46,000.

11   Q.   The next row, *"streams per month,"* if you could explain to

12   the jury what those numbers are.

13   A.   Sure.  The next thing I would want to know in trying to

14   figure out, well, what money did the plaintiffs not get is,

15   well, how many times were these streamed?  So in the first

16   column, there's a number 1.066.  That's a statistic that

17   Spotify puts out saying that of the top 100 songs at a given

18   point in time, that they're streamed by a single user on

19   average 1.066 times a month.  I added the other -- the second

20   and third or the third and fourth columns of five times a month

21   and 20 times a month just to kind of show, well, what would the

22   numbers look like if it was a whole lot more, if somebody, you

23   know, streamed a song that they liked and actually then

24   listened to it five times or listened to it 20 times, just to

25   provide some context.

1  Q.  So then the third row, this *"total streams per month*," is

2  that the product of multiplying the top number by the second

3  number?

4  A.  Yes, that's correct.

5  Q.  And where did you get this information about the rate per

6  stream?

7  A.  This also came from testimony from the plaintiff's

8  representatives, so they said they get six one-thousandths of a

9  cent per stream.  That's what I've used.

10 Q.  And then finally, at the bottom, you referred to the

11 four-year revenue that would result from these different

12 calculations.  Are you saying that four years is necessarily

13 the time period that's at issue in this case?

14 A.  No.  As I understand it, and as I've heard even this

15 morning, there's like confusion about what that exactly might

16 be, but if this were to go on in each one of these instances

17 for four years, you know, the plaintiffs would have not been

18 paid something ranging from $14,000 to $268,000 over a

19 four-year period.  Again, just to give some context.

20 Q.  So in your opinion, do the calculations in this slide

21 reasonably and appropriately measure the harm allegedly

22 suffered by the labels from a streaming perspective?

23 A.  Yes, I do.

24 Q.  Okay.  I'd like to switch gears a little bit and talk about

25 whether Grande profited from any alleged infringement.  Is

1    there evidence in this case that allows you to analyze that

2    issue?

3    A.  Yes.

4    Q.  Did you prepare a slide on this as well?

5    A.  Yes.

6    Q.  Please explain to the jury what things you looked at in

7    considering whether Grande profited.

8    A.  So these are kind of questions or topic areas that I kind

9    of thought about in the course of my work.  You know, number

10   one, was the ability to sign up for a Grande account and steal

11   music, you know, a draw for subscribers?  Is that a -- you

12   know, is that a thing?  And I didn't find any evidence that

13   that was the case or didn't ever see any evidence that that was

14   the case.

15       Secondly, you know, okay, well, is maybe another reason

16   Grande wants these subscribers that allegedly infringed

17   copyrights because they make more money?  And I didn't find any

18   evidence of that.  I mean, I asked that question of Grande

19   folks that I talked to, and they told me no.  Just with my

20   familiarity with the industry, you know, I may pay X for

21   Internet service.  The person next to me may be paying X for

22   the same Internet service.  And, you know, maybe I'm doing this

23   improper copying, but -- and the other person isn't, but Grande

24   gets the same amount of money from me and the other subscriber,

25   so there's not really evidence that these subscribers who are

1  allegedly copying provide Grande any more revenues.

2  Q.  Did you also consider Grande's costs from processing

3  copyright complaints?

4  A.  Yes, of course.  We talked about, you know, at certain

5  points in time Grande even had dedicated employees that were

6  involved with processing copyright complaints -- notices,

7  rather.

8  Q.  And what about Grande's costs for providing Internet

9  infrastructure?

10 A.  Yeah.  This would -- this goes to profits from the

11 standpoint of, well, did they save, you know, money?  Did they

12 have less costs?  Well, it's to the contrary.  If there's all

13 this traffic in proper peer-to-peer networking, it would

14 require -- again, I'm told by talking to Mr. Horton,

15 Mr. Jongeneel(ph), it would require Grande to have additional

16 capacity.  And their discussions to me are confirmed by

17 correspondence that Rightscorp sent, which I think is on a next

18 slide.  That indicates --

19 Q.  Let me ask you a question.

20 A.  Okay.

21 Q.  Has Rightscorp said anything about the costs Grande incurs

22 in connection with peer-to-peer usage on its network?

23 A.  Yes.

24 Q.  What has Rightscorp said?

25 A.  Rightscorp says -- and this is an excerpt from a letter

1  sent from Rightscorp to Grande.  *"It is costing Grande*
2  *Communications a lot of capital expenditure to service all of*
3  *the infringement occurring on your network."*  And skip down, it
4  says, *"that is hundreds of thousands of dollars that could be*
5  *saved in capital expenditure."*
6       So it's not a trivial amount.  It's, you know, in the --
7  again, in the area of the numbers that I've been talking about
8  already this morning.
9            MR. HOWENSTINE:  Your Honor, this is a natural
10 stopping point.
11           THE COURT:  All right.  Okay, ladies and gentlemen,
12 time for lunch.  Enjoy your lunch.  We'll see you back here at
13 the usual time.
14           COURT SECURITY OFFICER:  Please rise for the jury.
15           *(12:01 p.m., the jury exits the courtroom.)*
16                          *   *   *
17           THE COURT:  Counsel, do you need to chat with me about
18 anything?
19           MR. HOWENSTINE:  I don't believe so.
20           THE COURT:  Okay.  Very good.  Have a good lunch.
21           *(Lunch recess from 12:01 p.m. to 1:39 p.m.)*
22                          *   *   *
23           COURT SECURITY OFFICER:  All rise.
24           THE COURT:  Please be seated.  Okay.  The Court would
25 note the presence of counsel as well as the party

1   representatives and the absence of the ladies and gentlemen of

2   the jury.

3           Okay.  There's two issues before the Court on our most

4   recent of many late motions.  The question is, Can the

5   plaintiff elicit testimony about Grande's wealth and size,

6   Grande itself, after the infringing period?  The Court is going

7   to say yes.

8           Sit down.  No more argument.  I've heard argument on

9   this before I got the papers.

10          The second question is, Can the plaintiff introduce

11  evidence of their parent company and the size of the parent

12  company and so forth?  The answer is no.  There are multiple

13  factors that go into the award of damages, five of them, as a

14  matter of fact.  Only one would support looking at that.  There

15  isn't -- none of the cases cited, by the way, are directly on

16  point.  But looking at sister companies and other companies

17  that were not sued -- they could have been sued.  They weren't

18  sued, but not part of this case.

19          So you can get into Grande itself, the sued entity.

20  You can get up to the present.  You cannot go into their parent

21  companies or corporations or affiliated companies.  It's a

22  never-ending slide.  I mean, how far away do you go?  I mean,

23  you could have affiliated companies.  You could have companies

24  that have business relationships.  Do they count too?  No.

25          So that's the ruling.  Let's get to the next witness.

1    That's the ruling.

2             MR. BROPHY:  Understood entirely, Your Honor.  You

3    asked me to remind you about a potential instruction related to

4    the jury hearing that Grande is the sixth largest --

5             MR. BART:  That's not what it said.  It said that

6    Astound was the sixth largest.

7             THE COURT:  I don't think it was Grande.

8             MR. BROPHY:  The insinuation was that the company that

9    is now sitting before this court is the sixth largest ISP in

10   the United States.

11            MR. BART:  That's not what the testimony is.  He's now

12   trying to characterize it.  I think it's completely appropriate

13   what they've heard.  You're keeping out all of the other

14   evidence.  They are, in fact, part of this company, and this

15   company is the sixth largest.

16            THE COURT:  I'm not keeping out all the evidence.  You

17   can get up to the present day.

18            MR. BART:  Yeah, no, I appreciate that, but I think

19   that on this record, the record should be left alone and that

20   there's too much of a negative inference with taking that out.

21   I think that there is absolutely permissible legal authority

22   for us mentioning where they are and who -- you know, what the

23   status of Astound is as the sixth largest, but we did not make

24   any statements about Grande being the sixth largest.  And I

25   think it's appropriate for that statement to remain in the

 1   record, as opposed to you instructing them to disregard it.

 2              THE COURT:  I think this can be taken care of in

 3   closing argument.

 4              MR. BROPHY:  Fair enough, Your Honor.

 5              THE COURT:  Okay?

 6              MR. BROPHY:  Judge, can I just --

 7              THE COURT:  My recollection was that it was Astound

 8   and not Grande.

 9              MR. BROPHY:  That's mine as well, Your Honor.  I

10   just -- I wanted to raise the issue because -- and it wasn't

11   anything the witness said, it was the questioning, but --

12              THE COURT:  Well, it's certainly something that you

13   can address during closing argument.

14              MR. BROPHY:  Yes, Your Honor.  Thank you.

15              THE COURT:  Okay.  So let's move forward.

16              MR. HOWENSTINE:  As we understand it, that means that

17   the witness, Mr. Feehan, is done.

18              THE COURT:  I don't know if he's done or not.

19              MR. O'BEIRNE:  No, Your Honor.  May I question him

20   about Grande's revenues up through the present?  We've

21   received --

22              THE COURT:  You can do that.  He has the right to do

23   that, up through the present.

24              MR. O'BEIRNE:  Can we proceed with the current

25   witness, Your Honor, and then we can either recall Mr. Feehan

1   or not?

2          THE COURT:  Yes, that's fine.

3          MR. HOWENSTINE:  We just need the jury.

4          THE COURT:  Yes.  We need him first.

5          *(Witness, Mr. Kemmerer, retakes the stand.)*

6                          *   *   *

7          COURT SECURITY OFFICER:  Please rise for the jury.

8          *(1:43 p.m., the jury enters the courtroom.)*

9          THE COURT:  Please be seated.

10  BY MR. HOWENSTINE:

11  Q.  Welcome back, Mr. Kemmerer.  Before we move on, I want to

12  go back and clarify something that was in your testimony

13  earlier.  You recall when we were talking about these

14  calculations of lost revenues from streaming?  In looking at

15  this row that describes the rate per stream, I think you may

16  have misspoken.  You described that as six-thousandths of a

17  cent.  Did you just misspeak when you said that?

18  A.  Well, it's .006, so I think that's six -- that

19  one-thousandth of a cent.

20  Q.  Six thousandths of a dollar?

21  A.  Of a dollar.  I'm sorry, yes, thanks.

22  Q.  Okay.  Just wanted to make sure the record was clear on

23  that.

24  A.  Thank you.

25  Q.  Going forward, now, you understand it will be up to the

John Kemmerer - Examination                    1543

1   jury to evaluate the effect of any statutory damages award, if

2   necessary.  I am not going to ask you to comment on that.  But

3   just to aid the jury's consideration of that issue, did you

4   identify Grande's market share during the time period at issue?

5   A.  Yes, I did.

6   Q.  And what was it?

7   A.  It was .15 percent, less than one percent --

8   Q.  Okay.

9   A.  -- of the total market for subscribers in the United

10  States.

11  Q.  Now, I'd like you to assume for a moment that each song at

12  issue in this case is a separate work for which the labels may

13  receive an award of statutory damages.  As an expert on

14  economic damages, do you have an opinion on the appropriate

15  amount of statutory damages the jury should award per work?

16          MR. GILMORE:  Objection.  It's a legal issue.

17          THE COURT:  Yes, sustained.

18          MR. HOWENSTINE:  Your Honor, I would just say that

19  they moved to exclude this opinion, and that motion was denied.

20          THE COURT:  Not that opinion.

21          MR. GILMORE:  Not -- this opinion asks -- usurps the

22  role of the jury.  That's for the jury to decide, not for the

23  expert to opine on specific statutory --

24          THE COURT:  I've ruled.  Let's move on.

25          MR. HOWENSTINE:  Just a moment.  I need to skip

1    through a slide, and I want to make sure we don't show one

2    unnecessarily.

3           THE COURT:  All right.

4    BY MR. HOWENSTINE:

5    Q.  So Mr. Kemmerer, to conclude, I'd like to sum up some of

6    the different data points that you looked at to guide the

7    jury's consideration of what an appropriate statutory damages

8    award should be.  Did you prepare a slide on that?

9    A.  Yes, I did.

10   Q.  Do you see it in front of you?

11   A.  Yes.  It's the slide that's on the screen right now.

12   Q.  So if you could wrap that up and lay out for the jury what

13   these data points are and how they relate to the amount of harm

14   the labels may have suffered in this case.

15   A.  Sure.  I often describe this as, you know, looking at

16   different ways and all roads kind of lead to a similar place.

17   And I found that in my analysis.

18       The first bullet point has to do with the lost revenues

19   from downloads, assuming that 1,350,000 or all the Rightscorp

20   notices constituted a song that wasn't paid for, and using

21   Mr. Bardwell's -- or Dr. Bardwell's $344,000 number, so that's

22   the first one is lost download.

23       Then I looked at lost streaming revenues, the second bullet

24   point, and applied the streaming rate per song -- excuse me,

25   the numbers of songs, various numbers of streams, a range of

1   streams, and get somewhere between 15 to $270,000.

2       I looked at -- or I accepted Dr. Lehr's 20,000 subscribers

3   and applied to that the properly apportioned $54 lifetime

4   subscriber value and reached an amount of $1.1 million.  And

5   then, finally, looked at the -- excuse me, the I guess repeat

6   infringers.  As identified by Dr. Bardwell, it's 4000-some, and

7   by Rightscorp, 3,300, I think, and applied, again, that

8   properly apportioned lifetime value to those to get a range of

9   180,000 to $290,000.

10      So looking at the specific works copied by -- allegedly

11  copied by -- or not works, songs, copied by unique infringers,

12  there's kind of a range here of between, you know -- well, the

13  amounts that are shown on the screen.

14          MR. HOWENSTINE:  Thank you, Mr. Kemmerer.  I have no

15  further questions.

16                      CROSS-EXAMINATION

17  BY MR. GILMORE:

18  Q.  Good afternoon, Mr. Kemmerer.  My name is Robert Gilmore.

19  I represent the plaintiffs.  You and I met several years ago at

20  your deposition, right?

21  A.  I read my transcript, and I recognize the name, but I

22  just -- many things have transpired since then.

23  Q.  It's been a few years, hasn't it?

24  A.  Yes, it has.

25  Q.  Mr. Kemmerer, somewhere between 75 and 90 percent of the

1   work that your firm does is people paying for you and your

2   colleagues to testify in lawsuits, right?

3   A.  That sounds fair.

4   Q.  And when you and I last spoke, I think you confirmed that

5   your firm made between ten and $15 million for litigation work

6   in 2018, right?

7   A.  I remember that.

8   Q.  Now, this case involves the music industry.  You've never

9   done any professional work for the music industry, right?

10  A.  Not that I can recall.

11  Q.  You haven't done any research about the music industry

12  prior to your work on this case, right?

13  A.  Not that I can recall.

14  Q.  You haven't published any scholarly articles about the

15  economics of the music industry, have you?

16  A.  I have not.

17  Q.  And you haven't published any scholarly articles about the

18  economics of the Internet, right?

19  A.  No, I haven't.

20  Q.  You don't hold yourself out to be a trained economist, do

21  you?

22  A.  No.  I'm an accountant.

23  Q.  And you don't have a Ph.D. in economics or in anything

24  else, right?

25  A.  No.

1    Q.  Or a Master's degree?

2    A.  No.  My qualifications were what we talked about earlier.

3    Q.  Now, let's talk about your relevant litigation experience.

4    This case involves copyright infringement claims, right?

5    A.  Yes, it does.

6    Q.  And when you and I last spoke in 2018, at the point in time

7    that you had done all your work in this case, you had never

8    testified at trial in a copyright infringement case.  That was

9    true, right?

10   A.  That was true.

11   Q.  Now, the focus of this case is about online copyright

12   infringement of music sound recordings, right?

13   A.  I agree.

14   Q.  You have not worked on a case before this one that involved

15   online infringement of music, right?

16   A.  No.

17   Q.  In fact, before this one, you've never worked on a case

18   that involved any kind of copyrights for music, either sound

19   recordings or compositions, right?

20   A.  That's correct.

21   Q.  Now, let's talk about online peer-to-peer file sharing a

22   little bit more broadly.  Before this case, you had never

23   worked on a case where that was a focus of the dispute, right?

24   A.  That's correct.

25   Q.  And specifically with respect to the file-sharing program

1   BitTorrent, before this case, you had never worked on a case

2   where BitTorrent was a focus, right?

3   A.  That's correct.

4   Q.  As part of your work on this case, you didn't analyze

5   academic research regarding online copyright infringement, did

6   you?

7   A.  Would you please ask that again?

8   Q.  Yes.  You didn't analyze academic research regarding online

9   copyright infringement as part of your work on this case, did

10  you?

11  A.  I don't believe so.  Didn't see that as necessary, so I

12  didn't do that.

13  Q.  Well, you said that you didn't see it as -- that it was

14  necessary, but you know Dr. Lehr, whose report you were

15  responding to, he did do that research on online copyright

16  infringement, right?

17  A.  He cited many, many, many papers, yes.

18  Q.  Yeah.  You didn't review any of those many, many, many

19  papers that Dr. Lehr summarized and gave some testimony about

20  to the jury.  You haven't looked at any of those, right?

21  A.  I don't think that's correct.  That's not correct.

22  Q.  Well, you're not in a position to dispute Dr. Lehr's

23  assessment of the scholarly research that he reviewed and

24  provided his assessment of for this jury, are you?

25  A.  No, I disagree.  I think I am.  I don't think that -- well,

John Kemmerer - Examination                    1549

1   that's the end of the answer to your question.

2   Q.  Yeah.

3          MR. GILMORE:  May I approach?

4          THE COURT:  You may.

5   BY MR. GILMORE:

6   Q.  I've handed the witness a transcript of his deposition.  As

7   we mentioned at the beginning, I took your deposition back in

8   2019, right, sir?

9   A.  Correct, February 20th, 2019.

10  Q.  And can you turn -- at that deposition, you were under oath

11  just like you are here, right?

12  A.  Yes.

13  Q.  Can you turn to page 85 of your deposition, sir, lines two

14  through five?

15  A.  Correct.  I mean I see that, yes.

16  Q.  *"Question:  So you're not in a position to dispute*

17  *Dr. Lehr's assessment of the scholarly research that he cited*

18  *in his initial report?"*

19      *"Answer:  It's not something I've done, no."*

20      Did I read your testimony correctly?

21  A.  You did.

22  Q.  Now, for example, Dr. Lehr testified during this trial that

23  there's an overwhelming consensus among economists that there's

24  a very significant adverse impact on the sales and business of

25  copyright holders due to online piracy.  And you don't have any

1   basis to dispute that testimony, do you, sir?

2   A.  What I have testified is that I think that that's

3   irrelevant to the specific damages issues in this case.

4   Q.  Well, whether or not you think it's irrelevant, that wasn't

5   my question.  My question was simply, you're not here saying

6   that Dr. Lehr was wrong when he summarized and assessed for the

7   jury the consensus in academic research that online piracy

8   causes a significant economic harm to copyright holders.

9   You're not -- you don't have any basis to dispute that, do you,

10  sir?

11  A.  Not to dispute that statement, no; the relevance of it,

12  yes.

13  Q.  Now, you reviewed the notices that Rightscorp sent to

14  Grande as part of your work in this case, right?

15  A.  I did.

16  Q.  And you also -- you saw that the Rightscorp notices were

17  identified with an alphanumeric sequence identifier called the

18  infraction GUID, G-U-I-D; do you recall that?

19  A.  No, not really.

20  Q.  Well, if you want to refresh -- perhaps this will refresh

21  your memory.  Can you take a look at page 108 of your

22  deposition, starting at the very bottom, line 25, and going

23  over to the top at page 109.

24  A.  I'm there.

25  Q.  Just read that to yourself and see if that refreshes your

 1  memory.

 2       *(Pause.)*

 3  A.  Okay.  I've read it.

 4  Q.  And does that refresh your memory that you and your team

 5  saw that the Rightscorp notices were identified with the

 6  alphanumeric sequence, the infraction GUID?

 7  A.  Yes.

 8  Q.  Now, you also received and reviewed a hard drive that

 9  contains around 59,000 audio files that you understood

10  Rightscorp had downloaded from Grande subscribers, right?  You

11  received that hard drive?

12  A.  Yes.

13  Q.  And you and your team found that the audio files Rightscorp

14  downloaded from Grande's subscribers had the same alphanumeric

15  identifiers in their file names that you were seeing in the

16  notices; do you remember that?

17          MR. HOWENSTINE:  Objection.  Relevance, beyond the

18  scope.  This witness hasn't even testified about any audio

19  files.

20          THE COURT:  The objection is sustained.

21          MR. GILMORE:  Your Honor, yesterday the witness --

22          THE COURT:  The objection is sustained, sir.

23  BY MR. GILMORE:

24  Q.  Well, let me ask this question.  You were looking at

25  notices and audio files as part of your effort to identify

 1   notices that were associated with the works in suit that went

 2   into some of the analysis we saw earlier, right?

 3            MR. HOWENSTINE:  Same objection, Your Honor.

 4            THE WITNESS:  I don't think so.

 5            THE COURT:  I don't think so.  The objection is

 6   overruled.

 7   BY MR. GILMORE:

 8   Q.  Well, isn't it true that you determined that the audio

 9   files fell within the date range of September 22nd, 2014 to

10   February 28th, 2017 within the relevant time period in this

11   case?

12            MR. HOWENSTINE:  Same objection, Your Honor.  The

13   witness hasn't offered any opinions about any audio files.

14            MR. GILMORE:  Your Honor --

15            MR. HOWENSTINE:  It's beyond the scope of direct.

16            MR. GILMORE:  Your Honor, they got into it with

17   Dr. Bardwell yesterday, opinions that he had not testified

18   about in his direct that were in his report, and this is

19   material that was in Mr. Kemmerer's report.

20            THE COURT:  Objection is overruled.

21   BY MR. GILMORE:

22   Q.  Isn't it true that you and your team, after looking at the

23   download files on that hard drive, the files that Rightscorp

24   had downloaded from Grande subscribers, determined that all the

25   audio files fell within the date range of September 22nd, 2014

John Kemmerer - Examination                    1553

1  to February 28, 2017; do you remember that?

2  A.  I don't remember that.

3  Q.  Could you look at page 113 of your deposition, sir, to see

4  if that refreshes your memory?

5      *(Pause.)*

6  A.  Okay.  I see those dates, and I see my answer confirming

7  that, yes.

8  Q.  And so looking at your testimony refreshes your memory that

9  you and your team had analyzed the Rightscorp -- the hard drive

10  from Rightscorp of the audio files that they had downloaded

11  from Grande subscribers, and all of them fell within that date

12  range, right?

13  A.  That's what my testimony was.

14  Q.  All right.  Now, let me ask you about the lost profits

15  opinions that you testified about on direct.  And you did two

16  types of lost profit calculations, right, sir?

17  A.  Yes.

18  Q.  The first one was based on downloads?

19  A.  Correct.

20  Q.  And the second one was based on streams, right?

21  A.  That's correct.

22  Q.  Now, when someone buys a single download from iTunes, that

23  doesn't give that person the license, as part of what they're

24  buying, to make unlimited copies of the song and give those

25  copies to everyone?

1        MR. HOWENSTINE:  Objection.  Calls for a legal

2   conclusion.

3        MR. GILMORE:  It's not a legal -- I'm just asking

4   about the nature of the transaction.

5   BY MR. GILMORE:

6   Q.  When you're downloading something from iTunes, which is

7   something that you testified about, that doesn't give that

8   person the license to -- as part of buying that download, to

9   make copies, unlimited copies and share it with everyone, does

10  it?

11        MR. HOWENSTINE:  He's asking the witness about the

12  legal terms of an iTunes --

13        THE COURT:  The objection is sustained.  He's not an

14  expert in that.  He's an accountant.

15        MR. GILMORE:  I'm asking him about the economics of --

16        THE COURT:  That's not what your question was.

17        MR. GILMORE:  Sure.

18  BY MR. GILMORE:

19  Q.  From an economic perspective, when someone downloads a song

20  from iTunes, they're not buying the right to make unlimited

21  copies and distribute those to everyone in the world, are they?

22        MR. HOWENSTINE:  Same objection, Your Honor.  Just

23  added "from an economic perspective" to the beginning of the

24  question.

25        THE COURT:  Well --

1              MR. GILMORE:  This is about the economic value of the

2     downloads and how he --

3              THE COURT:  The objection is overruled.  It makes a

4     difference.

5              THE WITNESS:  Would you repeat the second question

6     again, please?

7     BY MR. GILMORE:

8     Q.  From an economic perspective, when someone downloads a song

9     from iTunes, they're not buying the license or an ability to

10    make unlimited copies and share those copies with the entire

11    world.  It's not what your -- part of what you're buying as a

12    right for that download, right?

13    A.  That's my lay understanding, and that is the premise on

14    which I prepared my calculations.  I was not positing that

15    there was a right to turn around and do something else with it.

16    Q.  Now, similarly, same question when it comes to streams.

17    From an economic perspective, when someone streams a song on

18    Spotify, they're not getting a license to make a copy of that

19    stream and give copies of that stream to everyone in the world,

20    right?

21             MR. HOWENSTINE:  Same objection, Your Honor.  He's

22    again asking what sort of license rights they get.

23    BY MR. GILMORE:

24    Q.  From an economic perspective, in terms of what you're

25    buying, the value of what you're buying when you get a stream.

1  That's my question.

2  A.  It's the same answer we got to with the downloads.  It's my

3  understanding that -- it is not my understanding that one could

4  stream a song and then capture it somehow and give it away to

5  other people.  And that was not the premise of my calculations

6  either.

7  Q.  That is what happens with sharing files through BitTorrent,

8  right?  Distributing unlimited copies with the entire world.

9  A.  In concept -- well, no, I disagree with that.  I totally

10  disagree with that.

11  Q.  Now, speaking of Spotify, in his opening statement, counsel

12  for Grande told the jury, *"You're going to learn that it would*

13  *cost less than 200,000 to purchase a Spotify account for every*

14  *single Grande customer accused of sharing music in this case."*

15      Now, originally, you prepared that sort of calculation in

16  this case, right?

17          MR. HOWENSTINE:  Objection.  Beyond the scope of

18  direct.

19          MR. GILMORE:  Your Honor, this is something that was

20  raised on opening by counsel for Grande and was in his report,

21  Mr. Kemmerer's report.

22          MR. HOWENSTINE:  But he hasn't testified to it, and

23  there was nothing in opening connecting that to Mr. Kemmerer.

24          MR. GILMORE:  Well, that was my next question.

25  BY MR. GILMORE:

1    Q.  You prepared that sort of calculation in this case, didn't

2    you, Dr. Kemmerer -- Mr. Kemmerer?

3              MR. HOWENSTINE:  There's a pending objection.

4              THE COURT:  All right.  Well, he skipped the question,

5    so the pending objection is moot.  I think.

6              Why don't you ask him the question again.

7              MR. GILMORE:  I'll ask the question again.

8    BY MR. GILMORE:

9    Q.  We heard from counsel for Grande in his opening *"You're*

10   *going to learn that it costs less than 200,000 to purchase a*

11   *Spotify account for every single Grande customer accused of*

12   *sharing music in this case."*

13       You, Mr. Kemmerer, originally, in this case, you prepared

14   that sort of calculation, right?

15             MR. HOWENSTINE:  Same objection, Your Honor.  It's

16   beyond the scope of direct.  He hasn't offered any opinion

17   about that.

18             MR. GILMORE:  It is in his report, and it's something

19   that counsel cited in his opening.

20             MR. HOWENSTINE:  I don't believe there was any

21   reliance on Mr. Kemmerer in opening.

22             MR. GILMORE:  He didn't cite his experts by name, but

23   the calculation is something that Mr. Kemmerer came up with.

24             THE COURT:  Well, technically, I mean --

25             MR. GILMORE:  Could I ask the witness to confirm, yes

John Kemmerer - Examination                    1558

1    or no, earlier in this case did he perform a calculation of

2    that nature:  How much it would cost to purchase a Spotify

3    account for every single Grande customer accused of sharing

4    music in this case?

5            (Pause.)

6            THE COURT:  I'm waiting for the answer.

7            THE WITNESS:  Oh, I'm sorry.  I thought he asked you,

8    Your Honor.  Can I ask --

9            MR. HOWENSTINE:  I misunderstood.  I thought my

10   objection was still pending.  We have the same objection that

11   it's beyond the scope of direct.

12           THE COURT:  Okay.  Overruled.

13           THE WITNESS:  I don't know that I can answer that.  I

14   don't know what counsel was referring to in his opening.  I did

15   in my initial report prepare a calculation about the cost of

16   providing Spotify memberships.  But as you well know, at my

17   deposition, it was found out that I had made a mistake.  And I

18   acknowledged that at my deposition, and we moved right on.

19   BY MR. GILMORE:

20   Q.  And the number that you had calculated was less than

21   200,000.  And at our deposition, I showed you that there had

22   been a math error and that number was way too low, right?

23   A.  I don't remember the details of it, but I remember the

24   instance.  And I remember -- yeah, I mean, I want the numbers

25   to be right, so if there was a mistake, I agreed to it.  I

1    don't know if there's any connection whatsoever between what

2    might have been said at any -- by counsel at any point.

3    Q.  You weren't here at opening.  But Mr. Brophy and

4    Mr. Howenstine were at your deposition, right?

5    A.  One moment.

6    Q.  It's on page six of your transcript, if you'd like to see.

7    A.  Yes, they were.

8    Q.  All right.  Now, in your direct testimony, Mr. Kemmerer,

9    you said that you didn't consider the viral nature of online

10   piracy for purposes of your calculations that you showed the

11   jury, right?

12   A.  I considered it, but I didn't quantify -- I had no means of

13   quantifying it, and I didn't think it was appropriate to do so

14   either.

15   Q.  And I think you just told me the reason why you didn't

16   quantify it is because you had no means to quantity the viral

17   nature of online piracy, right?

18   A.  No, that's not what I said.  I said I didn't think it was

19   appropriate.

20   Q.  Well, you just told me -- told us a minute ago that you had

21   no means to quantify how much online viral piracy was occurring

22   on Grande's network, right?

23   A.  There's no evidence in this case about that, so one would

24   have to just speculate, if that was appropriate, which I have

25   repeatedly said I don't think it is appropriate.

1   Q.  So let's take a step back about your lost profit

2   calculations.  And first of all, you understand that when a

3   BitTorrent user is sharing an audio file on a BitTorrent

4   network, multiple other users have the ability to access that

5   file, right?

6           MR. HOWENSTINE:  Objection, foundation.

7   BY MR. GILMORE:

8   Q.  I'm asking do you have that understanding.

9   A.  That generally sounds correct.  I'm not an expert in

10  BitTorrent, as you pointed out, but that's consistent with my

11  general understanding.

12          MR. GILMORE:  Can we pull up the demonstrative,

13  please?

14  BY MR. GILMORE:

15  Q.  So your calculations counts the instances of infringement

16  that Rightscorp detected, right?  So that instance, the numbers

17  that you showed the jury, that's what your calculations and

18  that's all that your calculations contained, right?

19  A.  And that's all the evidence about instances of alleged

20  sharing are in this case.

21  Q.  Is that a yes -- it's a yes-or-no question.

22      Your calculations only included the infringement that

23  Rightscorp detected, yes or no?

24  A.  Yes.

25  Q.  Now, if this one person in the Grande network shared the

1    same file that Rightscorp detected with these three other

2    Grande subscribers, your calculations wouldn't capture any of

3    that file sharing there, right?

4    A.  Yes, that's correct.  Your question puts it precisely

5    right.  If --

6    Q.  That's just a yes-or-no question.

7    A.  No, it's not a yes-or-no question.

8    Q.  I'm sorry, sir, my question was simply:  Your calculations

9    don't include those three other people with whom the first

10   person shared the file, right, in this scenario?

11   A.  They do not.

12   Q.  Okay.  Now, those other three people could have shared with

13   untold number of other people on the Grande network.  That

14   could have happened, yes or no?

15   A.  Anything could have happened.  They could have shared with

16   nobody.  We don't know.

17   Q.  And given the nature of BitTorrent, it is unlikely that the

18   only time the person who Rightscorp first detected shared, was

19   with Rightscorp, right?

20          MR. HOWENSTINE:  Objection.  Foundation, calls for

21   expert testimony on how BitTorrent works.

22          THE COURT:  Yeah, you didn't lay a foundation that he

23   would have any --

24          MR. GILMORE:  I'll withdraw the question.

25   BY MR. GILMORE:

1   Q.  Your infringement calculations and the damages that are

2   derived from those calculations, the only time that you're

3   counting an infringement is the one instance where Rightscorp

4   detected that one person.  That's it, right?

5   A.  I focused only on the actual evidence present, yes.

6   Q.  And you did that because you don't think we can measure

7   the -- how far the virus spread, how far this viral online

8   piracy that happens with online BitTorrent sharing, how far

9   that occurs, right?

10  A.  No, I disagree.  I think that can be quantified, but that

11  sort of evidence is not present in this case.

12  Q.  Well, if the infringement that Rightscorp detects is just

13  the tip of the iceberg of the actual infringement, then your

14  lost profit calculations would only be the tip of the iceberg

15  of plaintiff's actual economic harm, right?

16  A.  I disagree.  Your question is "if."  As a damages expert, I

17  can't speculate.  I can only deal with the facts that are.

18  Q.  You are assuming that the only infringement that's

19  occurring, for purposes of your calculations, is the one time

20  that the BitTorrent user shares a file with Rightscorp.  That's

21  your assumption, right?

22  A.  No.  I'm assuming that that happened, yes.

23  Q.  You're assume -- that was my question.  You're assuming

24  that that's happened.  That is your assumption.  Your

25  assumption, for the purposes of your damages calculations, is

1    that that is the only instance of infringement.  That's the

2    only thing that you're using to calculate your damages, right?

3    A.  Which is the only evidence of a quantum of sharing of

4    songs, of course.  I can't do more than that.  No damages

5    expert can.

6    Q.  And I agree.  We agree.  Dr. Lehr agrees, right?

7       Now, let's shift topics.  You're aware that deterrence is

8    another factor for awarding statutory damages, right?

9    A.  Yes, I believe that's correct.  I believe that's one of the

10   factors that was on my slide -- or that's one of the factors

11   that I was pointing to in my slides, yes.

12   Q.  And the summary slide that you showed for the jury had a

13   range of different numbers, and I think they were all maybe

14   1.1 million and less, right?

15   A.  I think there was -- 1.2, 1.1 and less, yes.

16   Q.  But you were here in the room where we heard testimony from

17   Mr. Feehan, Grande's revenues over the 2012 to 2017 timeframe,

18   just that timeframe, were over 1.3 billion, right?

19           MR. HOWENSTINE:  Objection, Your Honor.  Counsel is

20   asking questions that go to the impact of an award on Grande,

21   and Mr. Kemmerer hasn't offered any opinions on that.

22           THE COURT:  That objection is sustained.

23   BY MR. GILMORE:

24   Q.  Is it your opinion that the range -- the summary that you

25   gave, would deter Grande and other ISPs?  Are you saying that

1    to the jury?  Is that your testimony?

2            MR. HOWENSTINE:  Same objection, Your Honor.  Your

3    Honor just ruled that deterrence was beyond the scope of his

4    testimony.  He hasn't offered any opinions about that.

5            THE COURT:  Yes, the objection is sustained.

6    BY MR. GILMORE:

7    Q.  All right.  Now, another factor for statutory damages is

8    the infringer's profits from the infringement.  That's your

9    understanding, right?

10   A.  Yes.

11   Q.  And on direct you offered the opinion that there's no

12   evidence Grande profited from the infringement engaged in by

13   certain of its subscribers.  That was your testimony, right?

14   A.  That seems like a proper paraphrase of it, yes.

15   Q.  Now, let's assume that Rightscorp does accurately detect

16   and notify copyright infringement.  That's what you have done

17   for purposes of your damages testimony, right?

18   A.  Yes.

19   Q.  And you know from the information that you've seen in this

20   case that Rightscorp sent hundreds of thousands of notices

21   about infringement concerning the works in suit to Grande,

22   right?

23   A.  Correct.

24   Q.  And you know that there were thousands of unique IP

25   addresses -- you reference this in your report -- for whom

1    Rightscorp had sent multiple notices to Grande about the

2    infringement, right?

3    A.  Correct.

4    Q.  And you're also aware from your work on this case that from

5    October 2010 until June 2017, Grande didn't terminate a single

6    customer for copyright infringement.  That's something you're

7    aware of, right?

8         MR. HOWENSTINE:  Objection.  Beyond the scope.  Now

9    we're going into Grande's termination policy.  He hasn't

10   testified about any of those things.

11        MR. GILMORE:  It goes directly to the profits that he

12   is saying Grande did not have any incentive.

13        THE COURT:  The objection is overruled.

14   BY MR. GILMORE:

15   Q.  You're aware Grande didn't terminate a single customer, no

16   matter how many notices they got for that person, from

17   October 2010 until June 2017.  Are you aware of that fact?

18   A.  Again, I think so.  If there's something you could point me

19   to that -- I'd appreciate that, but --

20   Q.  I think --

21   A.  I know that it's been a long time.

22   Q.  I understand.  And I think the jury has heard that enough,

23   so let's just work on that assumption, okay?

24       You're not aware of a single step Grande took over that

25   entire timeframe with respect to any of those Rightscorp

 1  notices, that Grande took to stop its customers from engaging

 2  in the infringing activity that Rightscorp was describing?

 3          MR. HOWENSTINE:  Objection.  Foundation, beyond the

 4  scope.

 5          THE COURT:  The objection is sustained.

 6  BY MR. GILMORE:

 7  Q.  All right.  Dr. -- I'm sorry, Mr. Kemmerer, it's logical

 8  that if Grande had terminated every subscriber about whom it

 9  had received, say, three or more infringement notices, Grande's

10  revenues would have decreased; isn't that logical?

11  A.  Grande's revenues?  Yes, that's logical.

12  Q.  You discussed costs that Grande supposedly incurred.  You

13  had a slide about the letter that Rightscorp sent to Grande in

14  your direct presentation, right?

15  A.  Yes.

16  Q.  And in that letter, Rightscorp was asking for a meeting to

17  discuss how Rightscorp and Grande could cooperate on addressing

18  copyright infringement, right?

19  A.  That's my recollection of the -- I don't think that was in

20  the excerpt -- excerpted -- the part I showed, but that's my

21  memory of the -- of what the gist of the letter was, yes.

22  Q.  But you're aware that Grande ignored that letter from

23  Rightscorp, right?

24  A.  I don't know what --

25          MR. HOWENSTINE:  Objection.  Now he's asking the

1   witness to comment on the evidence.

2           THE COURT:  Sustained.

3           MR. GILMORE:  I'm asking him about --

4           THE COURT:  No, that -- no, sustained.

5   BY MR. GILMORE:

6   Q.  Grande isn't in the business of providing Internet service

7   to subscribers if they aren't profitable, right?

8   A.  If who isn't profitable?

9   Q.  Was that a question?

10  A.  Yes, sir.  To answer that question, I have a question.

11  Q.  Sure.  Grande isn't in the business of providing Internet

12  service to subscribers if the subscribers aren't profitable?

13  A.  A particular one or in the aggregate?

14  Q.  Grande isn't in the business of providing Internet service

15  to subscribers unless the subscribers that they're giving that

16  service to are profitable?

17  A.  I mean, I would --

18  Q.  As a general proposition.

19  A.  I was going to say, I heard the testimony earlier today

20  about Grande and so forth from individuals that would know, but

21  just as an outsider, a business is in business to make a

22  profit.  I would agree with that.  That makes sense.

23  Q.  Now, all those customers about whom Grande received

24  multiple infringement notices, you haven't done any analysis to

25  show that those customers weren't profitable for Grande, have

1  you?

2  A.  No.  With regard to that, I have not made that calculation.

3  An economic impact of those subscribers would be quantified by

4  the profits calculations that I made.

5  Q.  Yeah, so just so we're clear, you haven't done any analysis

6  to show that any of those customers about whom Grande received

7  multiple infringement notices, that any of those customers

8  weren't profitable for Grande.  You haven't done that analysis?

9  A.  No, I haven't.

10  Q.  And by not terminating the subscribers that Rightscorp

11  detected and sent notices to Grande about, Grande was able to

12  keep all of those subscribers fees that those subscribers were

13  paying to Grande, right?

14  A.  Right.

15  Q.  And Grande was able to keep those subscriber's fees not

16  just for the Internet service, but whatever other services

17  those subscribers were buying from Grande, right?

18  A.  I think that for damages purposes, the analysis is properly

19  focused on the Internet service, a properly apportioned

20  Internet service, which is the $57 that I talked about earlier.

21  And so I think I have quantified what I view as appropriate.

22  Q.  Can you turn to your deposition on page 207, lines 5

23  through 15.  Let me know when you're there.

24  A.  I'm there.

25          MR. HOWENSTINE:  Sorry, what were the lines?

1           MR. GILMORE:  Five through 15.

2    BY MR. GILMORE:

3    Q.  *"Question:  Well, let's assume Rightscorp does accurately*

4    *detect and notify copyright infringement."*

5           *"Answer:  As I have done."*

6           *"Question:  Right.  In that instance, by not terminating*

7    *those subscribers, Grande was able to keep those subscribers'*

8    *fees that they paid Grande for the Internet service and*

9    *whatever services they got?"*

10          *"Answer:  And maybe telephone service.  Maybe television*

11   *service."*

12          That was your testimony, right, sir?

13   A.  It was.

14   Q.  Now, you somehow came up with the 54.17 figure for the

15   revenue from infringing customers attributable to piracy.  That

16   was the number that you gave on direct, right?  The 54.17?

17   A.  It's the properly apportioned lifetime subscriber value,

18   yes.

19   Q.  If Grande terminated a subscriber for repeated copyright

20   infringement, Grande wouldn't have lost just that sliver of

21   lifetime subscriber value, would they?  That's not all that

22   they would be giving up?

23   A.  They're two separate questions.  Grande provided television

24   service and cable service to those customers, in fact, and

25   incurred those costs.

1       But for the question of damages, properly apportioned

2   damages analysis focuses on -- and can only focus on -- the

3   Internet service and the extent to which that related to

4   peer-to-peer activity.

5   Q.  Grande -- if they terminated a subscriber for infringement,

6   Grande would have lost all of the revenue and profits

7   associated with that infringing subscriber, at least going

8   forward, right?

9           MR. HOWENSTINE:  Objection.  Asked and answered.

10          THE COURT:  I believe it has.  The objection is

11  sustained.

12          MR. GILMORE:  All right.

13  BY MR. GILMORE:

14  Q.  Well, meaning by not terminating, Grande got to keep -- I'm

15  sorry.  By not terminating those infringing customers, Grande

16  got to keep all of the revenue and all of the profits that it

17  can make over the average lifetime of an infringing subscriber,

18  right?

19  A.  Yes.  And to incur the obligation to provide all the

20  services, including if -- if there were television and if there

21  were cable.

22  Q.  Do you have any opinions --

23  A.  I'm sorry.  I wasn't quite done.

24  Q.  I'm sorry, I think you answered my question.  If you have

25  more to say, counsel can ask you questions.

1    Sir, you're not giving any opinions on statutory factors
2    other than profits made by Grande and losses by labels; is that
3    right?
4             MR. HOWENSTINE:  Objection.  Calls for legal
5    conclusion.  The jury will give the witnesses the weight of the
6    testimony as they see fit according to the Court's
7    instructions.
8    BY MR. GILMORE:
9    Q.  Just asking the witness:  Are you giving any opinions on
10   any other statutory factors besides profits made by Grande and
11   losses by labels?
12            THE COURT:  Objection is overruled.
13   A.  Yes, I think I am.
14   Q.  Well, which statutory factors do you think you're giving
15   opinions on other than profits made by Grande and losses by
16   labels?
17   A.  There was a third factor, and that involved the market
18   share data that we discussed.
19   Q.  The market share data by Grande?
20   A.  Correct.
21   Q.  And that gets to how big Grande is and how much of an award
22   is necessary to deter Grande and other ISPs.  Is that what your
23   opinions are?
24   A.  No.
25            MR. HOWENSTINE:  Objection, Your Honor.  We've already

 1   been over this.  He's not offering opinions about deterrence or

 2   impact.

 3            THE COURT:  Sustained.  He said no anyway, so...

 4            MR. GILMORE:  I have no further questions for the

 5   witness.

 6            THE COURT:  All right.

 7            MR. HOWENSTINE:  Just a couple quick things.

 8                         REDIRECT EXAMINATION

 9   BY MR. HOWENSTINE:

10   Q.  Mr. Gilmore asked you some questions about some audio files

11   that you and your team looked at; do you recall that?

12   A.  Yes.

13   Q.  Did you and your team have any way of determining if

14   Rightscorp actually downloaded any audio files?

15   A.  No.  I accepted the representation that that's what they

16   were.

17   Q.  Likewise, your team didn't have any way of figuring out

18   when those audio files were downloaded?

19   A.  No.  I didn't have any way of doing that.  My team didn't,

20   no.

21   Q.  Did you have any way of figuring out from whom those files

22   were downloaded?

23   A.  No.

24   Q.  On another topic, you saw a demonstrative about computers

25   going out and downloading things from other computers.  In

1  assessing plaintiff's lost revenues, do you think it's

2  appropriate to consider alleged acts of infringement of

3  unasserted copyrights?

4  A.  Of unasserted copyrights?

5       MR. GILMORE:  Objection.  That calls for a legal

6  conclusion.

7       MR. HOWENSTINE:  I'll ask a different question.

8       THE COURT:  All right.

9  BY MR. HOWENSTINE:

10  Q.  As an expert in assessing the plaintiff's lost revenues, do

11  you think it's appropriate to consider alleged infringements of

12  songs that are not at issue in this case?

13  A.  No.  I've repeatedly said that.  I said that in my direct,

14  and I'm trying to say that in my answers to questions here.

15  Q.  Do you think it's appropriate in assessing plaintiff's lost

16  revenues to consider alleged acts of infringement by

17  subscribers and users of other ISP networks?

18       MR. GILMORE:  Objection.  Calls for a legal

19  conclusion.

20       THE COURT:  Well, he's -- I think you're asking him

21  whether he thought it was appropriate for him to consider --

22       MR. HOWENSTINE:  Exactly.

23       THE COURT:  -- not whether it's appropriate to

24  consider across the board, so the objection is overruled.

25  A.  Again, clearly, I didn't, and I don't think that that's

1  appropriate.  I said one of the things that distinguishes my

2  opinions from Dr. Lehr's opinions is that I do, and must, limit

3  my quantification of damages to the actual acts or copying of

4  the actual songs that are at issue in this case.

5              MR. HOWENSTINE:  I have no further questions.

6              MR. GILMORE:  Just a couple to follow up.

7                       RECROSS-EXAMINATION

8  BY MR. GILMORE:

9  Q.  You were asked questions about the viral infringement

10  demonstrative just now.  You haven't done any research into the

11  amount of viral infringement on BitTorrent, have you?

12              MR. HOWENSTINE:  Objection.  This was covered in the

13  previous examination.

14              THE COURT:  Well, I thought it was, but I'll let him

15  answer the question.

16              THE WITNESS:  Would you ask that again?  I'm sorry.

17  BY MR. GILMORE:

18  Q.  You haven't done any research into the amount of -- the

19  extent of viral infringement through BitTorrent?

20  A.  In fact, I have recently and found that it's decreasing.

21  Q.  At the relevant timeframe in this case, 2011 to 2017, you

22  haven't done any research into the extent of viral infringement

23  on BitTorrent.  You haven't done any research for that time

24  period, right?

25  A.  Of viral infringement?  I've done research to develop my

1    5 percent apportionment factor, which includes BitTorrent.

2    Q.  So the 5 percent -- your opinions are based on the idea

3    that 5 percent of traffic, Internet traffic, involves use of

4    BitTorrent.  Is that your testimony?

5    A.  No, it's not.  My testimony was, and is, that 5 percent

6    relates to peer-to-peer network application traffic.

7    Q.  Your opinions that you've given in this case, the lost

8    profit opinions, assume that the kind of viral infringement

9    that we saw in that demonstrative does not happen.  That is the

10   assumption baked into your damages opinions, right, sir?

11   A.  I disagree.

12           MR. HOWENSTINE:  Objection, Your Honor.  These

13   questions --

14           THE COURT:  Let him answer the question.

15   A.  I disagree.

16           MR. GILMORE:  No further questions.

17           THE COURT:  Anything else?

18           MR. HOWENSTINE:  No, Your Honor.

19           THE COURT:  I can tell from the shaking of the head

20   that your objection wasn't necessary.

21           Sir, you may step down.

22           THE WITNESS:  Thank you, Your Honor.

23           THE COURT:  Okay.  Now, where are we?

24           MR. BROPHY:  Your Honor, we have some testimony to

25   play, but we have one issue that we require Your Honor's

1   guidance on before we can play it.

2            MR. O'BEIRNE:  Your Honor, can we recall Mr. Feehan

3   before we go on to the next --

4            THE COURT:  Well, we can do that.  Let's do that.

5            MR. O'BEIRNE:  Thank you.

6            THE COURT:  Then we'll take our afternoon break, and

7   then we can deal with that issue.

8            MR. BROPHY:  Thank you, Your Honor.

9                              *   *   *

10           *(2:34 p.m.)*

11           THE COURT:  All right, sir.  You remain under oath.  I

12   think you know that.

13           THE WITNESS:  Yes.

14           THE COURT:  You may continue, sir.

15           MR. O'BEIRNE:  Thank you, Your Honor.

16                          EXAMINATION

17   BY MR. O'BEIRNE:

18   Q.  Mr. Feehan, earlier today we were talking about Grande's

19   historical revenue gross margin and operating cash flow numbers

20   and we looked at a chart.  Do you recall that?

21   A.  I do.

22           MR. O'BEIRNE:  Can we pull that chart up, please?

23   BY MR. O'BEIRNE:

24   Q.  And you'd agree with me that each of those numbers went up

25   over the years from 2012 through 2017, right, sir?

1    A.  Yes.

2    Q.  And Grande -- that upward trend in revenue, gross margin

3    and operating cash flow has continued in the years since 2017,

4    right?

5    A.  I believe so, yes.

6    Q.  What was Grande's revenue last year?

7    A.  I do not remember.  I don't have that off the top of my

8    head.  It's part of a much bigger company now, and I don't

9    know.

10   Q.  More than $250 million?

11   A.  I believe so, yes.

12   Q.  Sitting here today, you can't give us a ballpark or

13   magnitude of what the Grande-specific revenue is because it's

14   part of a much bigger company?

15   A.  Yeah.  I don't -- I don't, off the top of my head, remember

16   where exactly Grande is for last year.

17   Q.  Fair to say you can't separate it out in order to determine

18   the scope and scale of Grande's revenue?

19           MR. HOWENSTINE:  Objection.  Asked and answered.

20           THE COURT:  I don't think -- first of all, I don't

21   think he said that.  I think he said he doesn't know.  I'm

22   sure -- can you go back and separate that?  Could you go into

23   Grande's individual accounting records and get what they're --

24   as a separate company --

25           THE WITNESS:  Yes, I could.  I just don't remember it.

1    BY MR. O'BEIRNE:

2    Q.  So the number exists.  You just don't have it off the top

3    of your head?

4    A.  That is correct.

5    Q.  So if Mr. Holanda asked you how much did Grande make last

6    year, you couldn't tell him at least 250, at least 300, 350?

7    A.  No.  I would go look at a report and get them the number.

8    Q.  More than 300, do you think?

9    A.  I don't -- I don't remember.

10   Q.  How about its operating cash flow?

11   A.  Again, I don't know those numbers off the top of my head.

12   Q.  Well, let's look at 2017.

13   A.  Okay.

14   Q.  250, to your recollection, is about right for 2017, right?

15   A.  Yes.

16   Q.  So sitting here, you can remember roughly what the revenue

17   was five years ago, but you can't remember what the revenue was

18   roughly last year?

19   A.  Because --

20          MR. HOWENSTINE:  Objection.  Argumentative.

21          THE COURT:  Just a minute.  Overruled.  Let him answer

22   the question.

23          THE WITNESS:  I looked at these numbers in preparation

24   for trial to make sure that I refreshed my memory, but I didn't

25   go back and look at the most recent numbers because of the time

```
 1    scope of the -- what I was told that was the time scope of the
 2    trial.
 3    BY MR. O'BEIRNE:
 4    Q.  Could it be twice that?  Could it be 500?
 5            THE COURT:  You're asking him to guess now, counsel.
 6    I'm sorry, you're asking him to guess.
 7            MR. O'BEIRNE:  I'm just trying to probe the witness's
 8    personal knowledge.
 9            THE COURT:  Could be 5 billion.  I mean, I think we
10    probably would say probably not, but I think that the problem
11    here is he said three different ways he doesn't remember.  He
12    didn't look at it because he wasn't asked to look at it.
13    BY MR. O'BEIRNE:
14    Q.  How quickly could you find that information out?
15    A.  From here?
16    Q.  Sure.  Talking to somebody at Grande.
17    A.  I would have to make some calls, and if I could -- if I
18    were able to get in touch with the right people, I could find
19    out the information.
20    Q.  In a phone call or two?
21    A.  Assuming that the people are available.
22    Q.  Let's talk about residential subscribers.  How many
23    residential subscribers does Grande have now, presently?
24    A.  Again, I don't know exactly where we are right now.
25            MR. O'BEIRNE:  Pull up PX 137, please.  Just for the
```

1    witness.

2    BY MR. O'BEIRNE:

3    Q.  I'm showing you Defense Exhibit 137, which is a calculation

4    of residential subscribers prepared by Mr. Kemmerer, your

5    expert in this case.

6    A.  Okay.

7    Q.  Would you take a look at the total column to the right?

8    A.  Yes.

9    Q.  It ends in the second quarter 2018.  Do you see that, sir?

10   A.  I do.

11   Q.  Do you recognize this to be, in your view, with your

12   knowledge today, a correct summary of the total residential

13   subscribers for Grande?

14   A.  After me reviewing and prepping for this, yes, it looks

15   roughly right.

16   Q.  Those numbers look right?

17   A.  Yes.

18          MR. O'BEIRNE:  Permission to publish DX 137 to the

19   jury?

20          MR. HOWENSTINE:  No objection.

21          THE COURT:  Go ahead.

22   BY MR. O'BEIRNE:

23   Q.  And just for our clarity sake, do you see there in the

24   middle, sir, cable and phone, and then cable and data,

25   Internet?

John Feehan - Examination                    1581

1    A.   Yes.

2    Q.   And it seems those numbers have been transposed, right?

3    You have a lot more -- at the bottom, the numbers go much lower

4    for cable, data, and Internet.  The 44,000 look like they

5    should be over to the right at the bottom of that column; is

6    that fair to say?

7    A.   I noticed that as well.  I think that is correct.

8    Q.   Fair to say it seems like Mr. Kemmerer made a mistake in

9    this chart?

10          MR. HOWENSTINE:  Objection, Your Honor.  I'm going to

11   object to all this is -- Mr. Feehan was brought back for a very

12   limited purpose, and now it appears that counsel is going off

13   on an entirely new tangent.

14          MR. O'BEIRNE:  This was the entire line of direct

15   questioning that I intended to ask the witness that I wasn't

16   permitted to, but I am now.  And I'm trying to establish

17   whether he can say how many subscribers they have and

18   whether --

19          THE COURT:  The objection is overruled.

20   BY MR. O'BEIRNE:

21   Q.   You would agree with me that second quarter 2018 number

22   looks about right to you, 156,000 subscribers?

23   A.   Yes, that looks about right.

24   Q.   And after 2018, Grande made various acquisitions expanding

25   its subscriber base, right?

John Feehan - Examination                    1582

1   A.   After '18, we did acquire two additional companies.

2   Q.   How many subscribers did that add?

3   A.   Roughly 40,000.

4   Q.   So you're confident that the current subscriber totals are

5   over 200,000 subscribers?

6   A.   For Grande itself?

7   Q.   Grande itself.

8   A.   Well, let me step back.  We didn't -- Grande didn't acquire

9   the companies.  We acquired the companies as part of an overall

10  larger company.  So Grande numbers, I don't have off the top of

11  my head, and those two companies that we acquired, we are still

12  tracking them standalone separately.

13  Q.   Grande has more residential subscribers -- had more

14  residential subscribers in 2021 than it did in 2018; is that

15  right, sir?

16  A.   Yes, I believe that is accurate.

17  Q.   Tens of thousands more?

18  A.   I don't know exactly how many more they had than they have

19  at this point.

20  Q.   So you're confident that it was 156,000 in 2018, but you

21  can't give us a ballpark of what it is this year?

22  A.   I know they grew.  I don't know the exact number.  I

23  don't -- within accuracy that I would give you a number that

24  I'm not sure is exactly right.

25  Q.   I'm not asking for exactly to the subscriber.  I'm saying

1    orders of magnitude.

2            MR. HOWENSTINE:  Objection.  Asked and answered.  He

3    says he doesn't know.

4            MR. O'BEIRNE:  Your Honor --

5            THE COURT:  The objection is sustained.  He said he

6    does not know.

7    BY MR. O'BEIRNE:

8    Q.  You're the CFO of Astound, right?

9    A.  Yes.

10   Q.  Without getting into the size, do you know the relative

11   size of the subscriber base of Grande and other parts of

12   Astound?

13   A.  Roughly.

14   Q.  And you know how big Astound is, right?  Do you know how

15   many subscribers Astound has?

16           MR. HOWENSTINE:  Objection, Your Honor.  Now this is

17   directly contrary.

18           THE COURT:  Yeah, I don't know what how big Astound is

19   has anything to do with this case.  It's how big Grande is.

20           MR. O'BEIRNE:  I'm trying to get at how big Grande is

21   using what the witness does remember, sitting here today.

22           THE COURT:  Well, he said he has a rough -- a

23   knowledge of it, so just ask him that question.

24   BY MR. O'BEIRNE:

25   Q.  What is your rough knowledge of how many subscribers --

1    A.  The subscribers have gone up.  I can't -- I don't know

2    exactly whether it's 5,000, 10,000, 15,000.  I don't know that

3    number that I could feel comfortable saying that this is a

4    number that I'm comfortable saying is right.

5    Q.  And you're the CFO of Astound and Grande and Patriot, and

6    you can't tell the jury what Grande's --

7              THE COURT:  That is an argumentative -- nope, nope.

8    That's an argumentative question.

9    BY MR. O'BEIRNE:

10   Q.  In your role as the CFO of Astound, Patriot, and Grande,

11   you have access to the full financial information of Grande,

12   right, sir?

13   A.  Yes.

14   Q.  And you can't tell the jury what Grande's revenue was last

15   year?

16             MR. HOWENSTINE:  Objection.  Argumentative.

17             THE COURT:  And it's been asked and answered.  He's

18   already told you why he can't.

19             MR. O'BEIRNE:  That's all I have, Judge.

20             THE COURT:  All right.

21             MR. HOWENSTINE:  I have nothing further.

22             THE COURT:  Okay.  We're going to take our afternoon

23   recess right now.  The jury can step out.  And I want to talk

24   to the lawyers.

25             COURT SECURITY OFFICER:  All rise for the jury.

 1              *(2:43 p.m., the jury exits the courtroom.)*

 2                              \*   \*   \*

 3         THE COURT:  Be seated.  I told you before that in my

 4    view, you know, I had long discussions with a judge named Bill

 5    Schwarzer, and at one point -- he was a District Judge in the

 6    Northern District of California and was a part of the -- headed

 7    the Judicial Conference educational arm for a while, but he was

 8    the moving force behind Rule 26.

 9         What was the whole purpose of Rule 26?  The whole

10    purpose was -- because I worked with him on it -- was to avoid

11    ambush in litigation, to make sure that people disclosed early,

12    you know, what the circumstances of discovery were and so

13    forth.  We all know that now.  Rule 26 is not new.

14         My view of this is as follows:  We -- or I guess not

15    we, the parties were operating -- well, one party was operating

16    under one set of understandings and the other party was

17    operating under a different set.  It called for me to make a

18    late ruling because it was only brought to my attention late --

19    I couldn't make a ruling on something that hadn't been

20    raised -- about the admissibility or non-admissibility of

21    certain testimony.

22         Now, the witness has testified that the reason he does

23    not remember numbers is because he was not asked to refresh his

24    recollection because he was confined, he thought, only to

25    specific years.  And it turns out that I have ruled -- and I

1   think that's a correct ruling -- that the plaintiffs can go

2   beyond those years for purposes of damages.

3           Now, in fairness, he's just going to walk off the

4   stand and go back to Princeton, New Jersey, and the plaintiffs

5   have really not had the opportunity to query him on these

6   issues for which he said he can get the answers.  They're easy.

7   It isn't prejudicial to the defendants.  They are what they

8   are.  So I am going -- and this is entirely up to you now.  I

9   will, in fairness, allow you to recall -- this is why I was

10  asking where he was from -- recall the gentleman to the stand

11  tomorrow after he's had an opportunity to attempt to get the

12  answers that -- to the questions that you have posed to him but

13  that he does not have the information.

14          Now, I'm not trying to take sides here.  I want you to

15  understand that this has nothing to do with sides.  This has to

16  do with flat-out basic fairness.  I mean, you're asking him

17  these questions.  He doesn't have the answer.  Why doesn't he

18  have the answer?  Because there's a late ruling because of late

19  motions that were made late, and therefore, he -- it's not

20  counsel's fault that they didn't prepare him for the testimony,

21  because they didn't know either.

22          So we're placed in a position where I let a witness

23  walk off the stand who has the -- has at his hand -- now, if

24  this would have been a situation where everybody would have

25  known about this from day one and you just didn't look into it

 1   or didn't ask him the question in his deposition or something

 2   else, that would be another story.  That's just lack of

 3   diligence, and I don't have any -- it's not for me to jump in

 4   and help one side versus the other.  And I'm not trying to do

 5   that here.  It's just a matter of fairness, so do you want to

 6   take advantage of that opportunity?

 7            MR. BROPHY:  Your Honor, may I make a point quickly

 8   before --

 9            THE COURT:  Sure.

10            MR. BROPHY:  And I have a proposal also.  But I want

11   to make it clear, this is not an expert witness.

12            THE COURT:  No, I know that.  If he was an expert

13   witness, I'd have much less concern about it.  He's a fact

14   witness, he's a percipient witness, and he has the information.

15   He -- you know, he is a man of some importance in this company,

16   and he said that he could get this information.  He was asked

17   why didn't you -- here you have the information from five years

18   ago, but you don't have the information from this year.  Why?

19   Well, I wasn't asked to look at this year.  The obvious

20   conclusion one draws from that is if he was asked to do that,

21   he would have been in a position to do it.

22            MR. BROPHY:  Just to make sure the record is clear, we

23   would object to this because we don't have an obligation to

24   prepare any of our fact witnesses to have information in their

25   heads.  And the fact that we elected to have him have certain

1    information in his head doesn't mean that he somehow failed an

2    obligation to have other information in his head.

3           THE COURT:  No, but he does -- this gentleman doesn't

4    want to look stupid on the stand.  I mean, he didn't know

5    anything about his companies up there.  That would not look

6    good for you.

7           MR. BROPHY:  I understand, Your Honor.

8           THE COURT:  And all I'm saying is that we had late

9    rulings in this case, very late rulings.  They had no

10   opportunity to send out -- well, obviously, couldn't send out

11   requests for admission or interrogatories and take his

12   deposition.  Well, he could take his deposition tonight.  But

13   he wouldn't have the answer.

14          MR. BROPHY:  Your Honor, subject to that objection

15   that I just mentioned, my understanding is the witness can get

16   this answer within 20 or 30 minutes.

17          THE COURT:  Really?

18          MR. BROPHY:  So if it's all right with you, rather

19   than have him stay for another day, get that information and

20   just pop him back up there to give that number.

21          MR. O'BEIRNE:  I think that works, Judge.  Can I

22   get --

23          THE COURT:  I would think you think it works.

24          MR. O'BEIRNE:  That will solve the problem, Judge.

25   2018, '19, '20, '21, if he's going to get the information.

1          MR. BROPHY:  Well, that's not what was asked, Your

2     Honor.  He asked what it was today, and we'll give that one

3     number on the stand.

4          MR. BART:  Your Honor, we did request -- and I think

5     Your Honor's reaction is the right one.  You made a ruling --

6     and we've served requests for this information.  They produced

7     that information.  They would have had an obligation to update

8     that information through trial if that ruling had been made and

9     it was clear that this was what was required.

10          THE COURT:  Right.

11          MR. BART:  There is no additional burden for them --

12          THE COURT:  I want him to have the information from

13     the dates from the end of the litigation period to the most

14     recent availability of that information, and I doubt it would

15     be today.  I remember enough from my business accounting to

16     know that they don't update that on a daily basis.  So he

17     probably will have the information from the end of the last

18     fiscal year.

19          MR. BART:  But they, I'm sure, have the end year

20     results, so --

21          THE COURT:  That's what I meant.

22          MR. BART:  Okay.  But, I mean, I -- Mr. Brophy will

23     correct me, I'm sure, if I'm wrong, but the same call that

24     requests the numbers for 2021 can get '18, '19 and '20.

25          THE COURT:  That's what I just said that he was to do.

1              MR. BART:  Okay.  Forgive me, Your Honor.  I'm sorry.

2              MR. BROPHY:  Your Honor, we would object to all of

3    this --

4              THE COURT:  I understand.  You've made your objection,

5    and your objection is on the record.  Maybe the Appellate Court

6    will say, you know, to hell with his fairness, you know.  But

7    this is a last-minute thing, and I -- you know, the witness

8    made clear that he understood and he could have gotten the

9    information, but he just wasn't asked.  Nobody asked him to do

10   it, because he was under a certain impression.  And quite

11   frankly, I think until this was brought to my attention, so was

12   I.

13             And, in fact, I said it was a tough call.  I had to go

14   research it.  The parties researched it.  On the time we had,

15   you couldn't find me any case directly on point because I don't

16   know that there is one.  Now there will be.

17             MR. BROPHY:  Your Honor, just to make sure I'm clear

18   about the request, so we are going to provide this witness to

19   answer just the questions --

20             THE COURT:  Just that question.

21             MR. BROPHY:  -- about how many subscribers for 2019,

22   2020, 2021; is that correct?

23             THE COURT:  And revenue.

24             MR. O'BEIRNE:  Revenue, gross margin, and OCF that

25   were on the chart.

1             MR. BROPHY:  Your Honor --

2             THE COURT:  Counsel, that's the Court's ruling.  I

3    understand you disagree with it, but I think in fairness -- I

4    have certain latitude to direct the admission of evidence.

5    Now, I have made -- if you count it up, I've made just as many

6    rulings for the defense as I have for the plaintiff.

7             MR. BROPHY:  There's no explanation as to --

8             THE COURT:  I'm not leaning toward the plaintiff.  And

9    if this would have happened to you, counsel, I promise you, you

10   would have gotten that opportunity as well.

11            MR. BROPHY:  I appreciate that.

12            THE COURT:  It's just because -- and maybe it will

13   when we get to the issue of -- the other issue which I ruled on

14   in your favor.

15            MR. BROPHY:  Your Honor, so just to make sure I

16   understand the process, we'll get the information hopefully

17   within the next half hour.  We will call him back.

18            THE COURT:  Right.

19            MR. BROPHY:  I want to make sure there aren't any

20   negative inferences drawn from this, so we'll just --

21            THE COURT:  I can instruct the jury.  I can tell the

22   jury that I specifically requested that the witness obtain the

23   information and come back so he could testify to it.

24            MR. BROPHY:  And perhaps because of the legal ruling

25   you made, the witness didn't have the information.

```
 1              THE COURT:  That's right.

 2              MR. BROPHY:  Thank you, Your Honor.

 3              THE COURT:  I will do that.  I'm more than happy to do

 4    that.  I think that's responsible.

 5              MR. BROPHY:  Thank you.

 6              THE COURT:  So it doesn't look like he was hiding

 7    something or he had some obligation.

 8              MR. BROPHY:  Or was forced to do something.

 9              THE COURT:  Right.  I will make sure that that's taken

10    care of.

11              MR. BROPHY:  Thank you, Your Honor.

12              THE COURT:  We will stand in brief recess so everybody

13    can use the restroom.

14              COURT SECURITY OFFICER:  All rise.

15              (2:55 p.m.)

16                               *   *   *

17              (3:35 p.m.)

18              COURT SECURITY OFFICER:  All rise.

19              THE COURT:  Okay, are we all set?

20              MR. BROPHY:  Yes, Your Honor.

21              THE COURT:  Very good.

22              COURT SECURITY OFFICER:  Please rise for the jury.

23              (The jury enters the courtroom.)

24                               *   *   *

25              THE COURT:  Good afternoon, ladies and gentlemen.  Let
```

1    me explain to you what's going on now.  We just had a witness

2    on the stand, and you may remember that the plaintiffs asked

3    the witness a number of questions regarding Grande's revenues

4    and so forth up to the present, but the witness was unable to

5    answer that because, through no fault of his own as he

6    testified, he had not thought that this current period was also

7    an issue in this case for specific reasons, which we'll get

8    into later.  And it's really nobody's fault, because we had

9    these late rulings in this case.  You know, the times that

10   you've had to go out, and I've had to rule?  There were some

11   late rulings that made this period of time important, but for

12   one specific purpose.

13          So what happened is he has gone and allegedly procured

14   the information -- that will be for you to decide -- and he

15   will be coming back on the stand to testify for that limited

16   purpose and that limited purpose only.  So it's not the

17   defendant's fault.  It's not the plaintiff's fault.  It's

18   nobody's fault.  It's just a matter of what happens sometimes

19   when we get these late rulings, evidentiary issues and the

20   landscape changes.  Okay.  All right.

21          All right, counsel.

22          MR. O'BEIRNE:  May I proceed, Your Honor?

23          THE COURT:  You may.

24                          EXAMINATION

25   BY MR. O'BEIRNE:

John Feehan - Examination                        1594

1    Q.   Thank you.  Hello again, Mr. Feehan.

2    A.   Hi.

3    Q.   You've had a chance to check back and get some updated

4    numbers for us, I understand?

5    A.   Yes.  I've gotten as much of them as I could, yes.

6    Q.   First of all, I think we had looked at a chart from

7    Grande's expert that Grande had about 156,000 customers in

8    2018, the second quarter; do you recall that?

9    A.   I do recall that.

10   Q.   And what's the current number now, residential customers?

11   A.   Through September of '22, about 169,600.

12   Q.   So picked up more than 13,000 customers since 2018?

13   A.   Yes, since the 156.

14   Q.   Can you give me the chart with the years, please.

15        And we looked at this chart previously that's listing

16   revenue, gross margin and operating cash flow; do you recall

17   that, sir?

18   A.   I do.

19   Q.   And so if we take that chart to the right, Grande's revenue

20   in 2018 was what?

21   A.   247.7.

22   Q.   And then 2019?

23   A.   253.2.

24   Q.   2020?

25   A.   258.4.

John Feehan - Examination                    1595

1   Q.  2021?

2   A.  265.5.

3   Q.  And the current estimate for all of 2022, given the

4   information that you have available to you is what?

5   A.  Going to be roughly 260, 261.

6   Q.  So over 265 last year and over 260 this year?

7   A.  Yes, we went down.

8   Q.  The revenue went down?

9   A.  Revenue went down, yes.

10  Q.  Let's look at gross margin.  So the gross margin was 164.69

11  in 2017.  You see that, sir?

12  A.  Yes.

13  Q.  And then 2018, what was it?

14  A.  165.8.

15  Q.  2019?

16  A.  175.7.

17  Q.  2020?

18  A.  188.2.

19  Q.  '21?

20  A.  199.5; 200 million basically.

21  Q.  200 million in gross margin in 2021?

22  A.  Yes.

23  Q.  And the estimate is this year it will be about 200 million?

24  A.  Yes.

25  Q.  So the gross margin is going up faster than the revenue?

 1    A.   Yes, in this case.  In terms of pure dollars, yes.

 2    Q.   More profitable over time, fair to say?

 3    A.   From a gross margin perspective, yes.

 4              MR. O'BEIRNE:  That's all I have, Your Honor.

 5              MR. HOWENSTINE:  Nothing further.

 6              THE COURT:  Okay, sir.  You can step down and you can

 7    go back to Princeton, New Jersey.

 8              THE WITNESS:  Thank you, sir.

 9              THE COURT:  Okay.

10              MR. THOMAS:  Good afternoon, Your Honor.  Mark Thomas.

11    Grande calls Jeff Shockley.

12              THE COURT:  All right.

13              MR. TRACER:  Your Honor, for the record, we want to

14    note our objection to this testimony.

15              THE COURT:  Yeah, I think I've already ruled on this.

16              COURTROOM DEPUTY CLERK:  Please remain standing and

17    raise your right hand.  You do solemnly swear that the

18    testimony you're about to give in this case now before the

19    Court will be the truth, the whole truth and nothing but the

20    truth, so help you God?

21              THE WITNESS:  I do.

22                         *   *   *

23         *(JEFF SHOCKLEY, Defense Witness, Sworn.)*

24                         *   *   *

25              COURTROOM DEPUTY CLERK:  You can have a seat.

1                          DIRECT EXAMINATION

2     BY MR. THOMAS:

3     Q.   Good afternoon, Mr. Shockley.

4     A.   Good afternoon.

5     Q.   Please introduce yourself to the jury.

6     A.   My name is Jeff Shockley.

7     Q.   And will you kindy spell that for the court reporter?

8     A.   J-E-F-F, S-H-O-C-K-L-E-Y.

9     Q.   You work for Grande, correct, Mr. Shockley?

10    A.   Yes, sir.

11    Q.   And what's your present role at Grande?

12    A.   Broadband -- broadband engineer level one.

13    Q.   How long have you been in that role?

14    A.   Just a couple of months.

15    Q.   How long have you worked at Grande?

16    A.   Since February 2007.

17    Q.   So about 15 years?

18    A.   Yes, sir.

19    Q.   As a general matter, what was your role at Grande up until

20    this last couple of months?

21    A.   General, I started as tech support, residential tech

22    support and moved into a more senior role as a tier two

23    escalation group for -- called field support, or FST.

24    Q.   So tech support -- we'll get into that.  Tech support most

25    of the time, correct?

1  A.  Yes, sir, tech support.

2  Q.  So you interact with customers on behalf of Grande; is that

3  right?

4  A.  Yes, sir.

5  Q.  Very good.  You said you started in 2007; is that right?

6  A.  Yes, sir.

7  Q.  And you may have mentioned this already, but what was your

8  initial role at Grande?

9  A.  Residential tech support.

10  Q.  You said residential tech support?

11  A.  Yes, sir.

12  Q.  And then what about after that, what was your next role?

13  A.  I moved into a group called field support.  It was advanced

14  tech support for residential customers, and we helped field

15  technicians with installs and troubleshooting issues.

16  Q.  You said that's field support?

17  A.  Yes, sir.

18  Q.  And that's called the field support team?

19  A.  Yes, sir.

20  Q.  Got it.  So the field support team you said handles

21  interactions with Grande's techs who are out at customers'

22  homes or businesses; is that right?

23  A.  Yes, sir.

24  Q.  What else does the field support team do?

25  A.  Technical escalations for cable, phone, and Internet from

1    our residential tech support agents.

2    Q.  I beg your pardon, Mr. Shockley, let me invite you to slow

3    down just a bit.

4    A.  Sorry.

5    Q.  Thank you.  No, that's all right.

6    A.  So we took escalations in most cases for technical issues.

7    We would -- if the customers called in and they had problems

8    that the standard floor reps or tier one reps couldn't handle,

9    we would take those escalations, kind of do supervisor-level

10   stuff if we needed to, to help them get things working, if

11   needed.  If there are any additional advance troubleshooting

12   steps that were needed.

13   Q.  Got it.  So you handled the escalations; is that right?

14   A.  Yes, sir.

15   Q.  And then you also handle interactions with the field techs;

16   is that correct?

17   A.  Yes, sir.

18   Q.  Were there any other sort of responsibilities at the FST,

19   or field support team?

20   A.  We did handle the DMCA calls with customers as they came

21   in, or as we were given.

22   Q.  So the FST handled communications with customers relating

23   to copyright accusations?

24   A.  Yes, sir.

25   Q.  Got it.  We'll get back into that in a minute, but give us

1    an idea of sort of just a high-level idea of the types of

2    issues you've managed in that role.  And by that I mean in your

3    tech support role.

4    A.  Well, phone issues, cable issues, Internet.  If customers

5    are having problems, they couldn't get something working or --

6    and they talked to our standard first-tier reps and they

7    couldn't get it working and, you know, maybe we've gone out to

8    a customer's house a couple of times and things still aren't

9    working, we would investigate it further, see if there's

10   something deeper that we were missing kind of on the software

11   side of things, more or less.  We would troubleshoot, get into

12   it, maybe escalate to our engineers, if needed, if we really

13   had real trouble that needed to be looked into versus just

14   replacing a modem or something.

15   Q.  Fair to say you've managed a broad spectrum of issues under

16   the umbrella of tech support?

17   A.  Very much so, yes, sir.

18   Q.  Got it.  Ball-parking it, how many conversations would you

19   say you've had with Grande customers over the years?

20   A.  Tens of thousands.

21   Q.  You had mentioned a minute ago that you -- part of your

22   responsibility has been to manage calls with customers relating

23   to copyright accusations; is that right?

24   A.  Yes, sir.

25   Q.  And I'd like to talk about that a little bit and want to

1    focus on pretty much the -- from when you started up until

2    about 2018ish, as one of the time periods we've been focusing

3    on here.

4         So first of all, what's your understanding of where those

5    copyright infringement accusations have originated from?

6    A.  We were told they were coming from a third-party vendor.

7    Somebody would send it to us, and then we would forward them

8    over to the customers.

9    Q.  Sorry.  You said you somebody would --

10   A.  A third-party would send them to us, the accusations.  We

11   would take them and then forward them over to customers.

12   Q.  So would you call the customers or how do you get in

13   contact with them?

14   A.  Early on in the process, yes, sir, we would reach out to

15   customers and discuss what we had received.

16   Q.  So focusing on that early, say, like, 2010 time period,

17   you'd actually affirmatively call out to a customer?

18   A.  Yes, sir.

19   Q.  And did you call every customer that received an

20   accusation?

21   A.  No, sir.

22   Q.  Who did you call?

23   A.  Generally, when we receive multiple complaint letters, we

24   would reach out to them and let them know what we were seeing

25   or what we were getting.

Jeff Shockley - Examination                    1602

1  Q.  So if a given account had accumulated a few accusations,

2  then you might call out to them?

3  A.  Yes, sir.

4  Q.  I'd say call out -- an outbound phone call, right?

5  A.  Correct.

6  Q.  Got it.  And then what would you do if you weren't able to

7  get a hold of one of these accounts or customers?

8  A.  After multiple attempts to a customer, we would generally

9  suspend their account to force them to call into us so we could

10  discuss what we were receiving.

11  Q.  So if you can't get a hold of one of them, Grande suspends

12  their account, they call in, you say -- you have a conversation

13  with them.  What would you discuss?

14  A.  Just the context of the letter that we'd received saying

15  that it was a -- we got reports of some kind of download

16  happening.  We needed to discuss it with you, let you know what

17  we were receiving and kind of ask them to stop, kind of move

18  on.

19  Q.  Got it.  And then what would happen with that customer's

20  service?

21  A.  Somebody would reinstate their service.

22  Q.  Got it.  So they weren't permanently terminated during that

23  time period?

24  A.  No, sir.

25  Q.  And if I understand you correctly, you weren't calling a

Jeff Shockley - Examination                    1603

1   customer immediately after one notice, correct?

2   A.  No, sir.

3   Q.  Understood.  And so you said it was in the early going, you

4   would call them.  What about after say, like, 2010, '11?

5   A.  Eventually it turned to a letter notification.  Grande

6   would e-mail out -- or mail out an actual letter to the

7   customer letting them know what we had received.  They would

8   forward over what we were receiving.

9   Q.  And then how would you find yourself in contact with those

10  customers?

11  A.  There was a number on the account to contact our Technical

12  Support Center.  Once they contacted the Tech Support Center,

13  they were instructed to reach it -- or get it over to my team,

14  my field support team.

15  Q.  You said your field support team?

16  A.  Yes, sir.

17  Q.  So these calls -- Grande would send a letter, and the

18  letter had a number in there saying call Grande; is that right?

19  A.  Yes, sir.

20  Q.  And then those calls, when they came in, would get sort of

21  immediately escalated, so to speak, to field support?

22  A.  If we weren't immediately available, they would create a

23  ticket, like a supervisor call, to get back with the customer

24  as soon as possible.

25  Q.  Got it.  So either you would answer that call when it came

```
 1   in or you would call them back?
 2   A.  Yes, sir.
 3          MR. TRACER:  Objection.  Leading.
 4          THE COURT:  Sustained.
 5   BY MR. THOMAS:
 6   Q.  I'll move on.
 7       So you mentioned, I believe, that Grande would send letters
 8   to some of these customers; is that right?
 9   A.  Yes, sir.
10   Q.  What would you have conversations about with these
11   customers when they called in, as a general matter?
12          MR. TRACER:  Objection.  Hearsay.
13          MR. THOMAS:  I asked the witness what he talked to
14   them about.
15          THE COURT:  What he talked to them about?  He can say
16   what he said.  He can't say what they said.
17          MR. THOMAS:  Let's maybe find a way along here, if you
18   please, Your Honor.
19   BY MR. THOMAS:
20   Q.  Mr. Shockley, you would speak to some of these customers
21   when they called in, correct?
22   A.  Yes, sir.
23   Q.  And what was the subject matter that you addressed with the
24   customers?
25   A.  What was in the DMCA letters.
```

1   Q.  Could you give us any more context as far as that goes?

2   A.  Just that we had received a complaint or a letter from a

3   company and we were forwarding it over to them.  I would

4   explain what was in the letter.  Once we explained what was in

5   the letter, customers would then, you know, usually would ask

6   what was going on, how do I --

7             MR. TRACER:  Objection.  He's now talking about what

8   the customers said to him.

9             MR. THOMAS:  Your Honor, we're not offering this for

10  the truth of it.

11            THE COURT:  Overruled.

12            MR. THOMAS:  Thank you.

13  A.  Just that they would, you know, how -- what is this, how --

14  how is it happening to me?  Why is it happening?  We would then

15  work with the customer or try to guide them to working with

16  their routers, their Internet equipment, their computers,

17  trying to see if they could find it, stop it, work with it,

18  change their router passwords.  Just general kind of knowledge

19  of what was going on and how to help them with it.

20  BY MR. THOMAS:

21  Q.  So you, when you took these calls would sort of restate

22  what's in the letter that they had received from Grande; is

23  that correct?

24  A.  Yes, sir.

25  Q.  And then you would discuss the subject matter of the letter

Jeff Shockley - Examination                    1606

1    with the customer; is that correct?

2    A.   Yes, sir.

3    Q.   And then I believe you mentioned something about routers?

4    A.   Well, yes, customers would, you know, want to know why it's

5    happening or how to stop it from happening.  We would instruct

6    them to maybe resecure their wireless router, if they had one,

7    work with their -- if they didn't know how to do it, find --

8    help them find ways to get into their router.  Look at their

9    user's manuals, go online to their -- go online to their -- the

10   router manufacturer and let them know that they could find

11   those manuals to secure the routers, change their passwords,

12   things like that.

13   Q.   Got it.  And does Grande typically supply the router that a

14   customer has in their home?

15   A.   Not early on.  We did later.

16   Q.   You said, *"not early on"*?

17   A.   Yes, sir.

18   Q.   And so when there was a non-Grande equipment in the

19   customer's home, how would you manage that, if they asked for

20   it?

21   A.   We would have to direct the customer to their user manual

22   that comes with the -- that comes with their router so that

23   they could read the instructions on how to change their

24   router -- or how to change router wireless password.  There's

25   also an admin password in the router so that when you -- you

1  have to log into it to change that information.  Kind of direct
2  them towards that.  Sorry.
3  Q.  I beg your pardon.  I interrupted you.
4     So you point them in the right direction to maybe secure
5  their router or address the issue they had asked you about?
6            MR. TRACER:  Objection.  He's leading the witness.
7            THE COURT:  No.  He's just repeating what the witness
8  had to say.  Overruled.
9            THE WITNESS:  Yes, sir.
10 BY MR. THOMAS:
11 Q.  Excuse me.  And then you say later on -- what would you do
12 later on if they had an actual Grande router?
13 A.  If it was a Grande router, I direct them to technical
14 support.  I was instructed to just discuss the letter and
15 assist them in that case, but then I would direct them to our
16 residential tech support, our team so that they could actually
17 log into the equipment and help them with it.
18 Q.  Got it.  And I believe you mentioned that it was your
19 understanding that these customers would be wondering what was
20 happening.  Was that your understanding of it?
21            MR. TRACER:  Objection.  Hearsay.
22            MR. THOMAS:  I'm asking him for his understanding.
23 Doesn't matter whether the statements are true.
24            THE COURT:  Why don't you repeat your question.
25            MR. THOMAS:  Sure.

Jeff Shockley - Examination                    1608

1   BY MR. THOMAS:

2   Q.  What was your understanding of what these customers

3   expressed to you on these calls?  And I'm alluding back to what

4   you mentioned a moment ago about -- I believe something about

5   confusion.

6          THE COURT:  I will allow the question under the

7   circumstances.

8   A.  Generally confusion, misunderstanding.  They didn't really

9   know what they were looking at.  So we would have to try to

10  just kind of explain what the context of the letter was.

11  BY MR. THOMAS:

12  Q.  So in the early going, Grande would reach out to customers

13  affirmatively, and then -- by phone, it sounds like, and then

14  sometime around 2010, 2011 you switched to a system where

15  Grande would send letters; is that correct?

16         MR. TRACER:  Objection.  Leading.

17         MR. THOMAS:  I'm attempting to summarize for the sake

18  of efficiency here.

19         THE COURT:  But it is a leading question.  Why don't

20  you just re-ask the question, how they do it.

21         MR. THOMAS:  We'll move on.

22  BY MR. THOMAS:

23  Q.  After the phase that you just have been describing to us,

24  did your role change at all with respect to these

25  communications with customers about copyright accusations?

1   A.  No, sir.  I've been working with these for most of my
2   career at Grande.
3   Q.  Got it.  You've had quite a number of conversations with
4   these folks, correct?
5   A.  Yes, sir.
6   Q.  Now, as compared with all of the issues and topics that you
7   manage communications with customers, would you say --
8   relatively how much of it is these calls about copyright
9   issues?
10  A.  Very small part.  It's not my main priority at my job, no,
11  sir.
12  Q.  Is it your understanding that later on Grande began to
13  terminate customers relating to these issues?  I think you can
14  answer.
15  A.  Yes.  We did start terminating customers at one point.
16  Q.  And do you have a ballpark idea when that was?
17  A.  2016, 2017.
18  Q.  And how did you come to that understanding?
19  A.  Stephanie Christenson started managing the -- I guess
20  managing that letter or how we got the letters and what we were
21  doing with them, and she told me we would start terminating
22  customers at that point.
23  Q.  And did you ever have conversations after that 2017ish time
24  period with customers whose accounts had been terminated?
25  A.  Yes, sir.

Jeff Shockley - Examination                    1610

1   Q.  Do you have a ballpark idea of how many?

2   A.  I don't know, sir.  Hundreds.

3   Q.  Hundreds?

4   A.  Well, I mean, it was over a several -- or a few-year

5   period.

6   Q.  I'm talking about in that last -- that last post-2017 time

7   period.

8   A.  Oh, no.  I couldn't tell you specifically how many.  Four

9   or five a month.

10  Q.  You say four or five a month?

11  A.  Yes, sir.

12  Q.  So over about 13 -- 12, 13 years, you -- one of your

13  responsibilities was to manage communications with customers

14  that had received copyright infringement notices, correct?

15  A.  Yes, sir.

16  Q.  In your experience in all that time, did Grande take these

17  issues seriously?

18  A.  Yes, sir, very.

19  Q.  Did you ever either overtly or by implication or in any way

20  get a sense that you were supposed to kind of brush aside these

21  issues or not take them seriously?

22  A.  No, sir.

23  Q.  Did anyone at Grande ever indicate to you that you should

24  encourage copyright infringement?

25  A.  No, sir.

Jeff Shockley - Examination                1611

1  Q.  Did anyone ever suggest to you that you should ignore

2  copyright infringement?

3  A.  No, sir.

4  Q.  Were you ever aware of whether or not a customer had

5  actually done what they were accused of?

6  A.  No, sir, I was not.

7  Q.  Are you aware of anyone at Grande ever having encouraged

8  subscribers or anyone else to share files like music files

9  online?

10         MR. TRACER:  Objection.  Foundation.

11         THE COURT:  The objection is sustained.

12  BY MR. THOMAS:

13  Q.  Are you aware of anyone at -- in your experience, at

14  Grande, ever having encouraged anyone to share music files?

15         MR. TRACER:  Same objection, Your Honor.

16         THE COURT:  No.  He can testify about what -- in his

17  experience whether he was aware.  No, that's not objectionable.

18  A.  No, sir.

19  Q.  And you were, for a time, the primary person, the only

20  person who had these conversations with Grande customers; is

21  that correct?

22  A.  That is correct.

23  Q.  Did you understand customers to -- back to your

24  understanding of what the customers would say, did customers

25  ever tell you, make any claims to you about whether or not the

Jeff Shockley - Examination                    1612

1    accusations were true?

2            MR. TRACER:  Objection.  Hearsay.

3            MR. THOMAS:  We're not offering it for the truth of

4    it --

5            MR. TRACER:  Yes, he is.

6            MR. THOMAS:  May I finish?  We're offering this,

7    Judge, to -- for the exact purposes that we previously

8    discussed.  I'd be happy to get into here.  It doesn't matter

9    whether or not these statements are true.  What we're talking

10   about here is the position Grande was in listening to the

11   statements and we have the person here who was the ear -- the

12   ears and the mouthpiece for Grande.

13           THE COURT:  No, this does -- I think I've already

14   ruled on this, actually, and this goes to the state of mind of

15   Grande.  So the objection is overruled.  I won't allow him to

16   get into specific conversations he had with customers, but he

17   can testify as to general tenor.

18           MR. THOMAS:  Thank you, Your Honor.

19   BY MR. THOMAS:

20   Q.  If you please, Mr. Shockley, describe for us how customers

21   would react?

22   A.  Again --

23           MR. TRACER:  Objection.  That's a different question,

24   Your Honor.  I think that's --

25           MR. THOMAS:  You can read back the prior question.

1          THE COURT:  Well, how they would react is not calling

2    for hearsay, how somebody reacts.  It's what they said.  Now,

3    if he tries to get -- elicit from them what specific customers

4    were saying, that's hearsay.

5          MR. TRACER:  Well, these were telephone calls, Your

6    Honor.  I think the customers' reactions were the same thing as

7    what they were saying.

8          MR. THOMAS:  Your Honor, again, we're just trying --

9          THE COURT:  No, he's trying -- the tenor, like,

10   somebody's outraged or they're compliant.  There's a

11   difference.  It's not the actual words.  I'm not going to let

12   him get into the actual words.

13   BY MR. THOMAS:

14   Q.  Without getting into any attempted quotations or anything

15   of that nature, how did customers react on these calls?

16   A.  Again, general confusion.  Most customers didn't know what

17   they were receiving.  You know, you're getting a letter saying

18   you're doing something wrong and the reaction in most cases was

19   just what's going on?  Why is this happening?  How come -- I'm

20   not doing this.  What's going on?  How do I get this fixed?

21   Q.  In your conversations with these customers, did --

22         THE COURT:  Overruled.  Sit down.

23   BY MR. THOMAS:

24   Q.  In your conversations with these customers, did they deny

25   having committed what they were accused of?

Jeff Shockley - Examination                    1614

1          MR. TRACER:  Objection.  He's asking if the customers

2     denied it.  That's getting into what they're saying.

3          MR. THOMAS:  Your Honor, I don't know a better way to

4     come at it.

5          THE COURT:  Overruled.

6          MR. THOMAS:  Thank you, Your Honor.

7     A.  Yes, sir, everybody denied it.  It was never a question.

8     It was always, What is this?  Why is this happening?  This

9     isn't something I did.

10    Q.  Thank you, Mr. Shockley.

11         MR. THOMAS:  I pass the witness.

12         THE COURT:  Okay.  Next.

13         *(4:03 p.m.)*

14                      CROSS-EXAMINATION

15    BY MR. TRACER:

16    Q.  Good afternoon, Mr. Shockley.

17    A.  Afternoon.

18    Q.  Now, I believe you testified that you started working at

19    Grande in 2007; is that right?

20    A.  Yes, sir.

21    Q.  And so you've been with Grande for about 15 years, correct?

22    A.  Yes, sir.

23    Q.  And you also testified that as part of your job duties, you

24    spoke to Grande customers who called in to discuss receiving

25    copyright infringement notices; do you recall that testimony?

1    A.  Yes, sir.

2    Q.  Now, you didn't set Grande's policies on how to handle

3    those calls, did you?

4    A.  No, sir.

5    Q.  Someone else told you how to handle those calls?

6    A.  Yes, sir.

7    Q.  And I'd like to go back to some of those early calls you

8    had before the fall of 2010.  Are you with me on the timeline?

9    A.  Yes, sir.

10   Q.  You remember that prior to the fall of 2010, you personally

11   reached out to Grande customers for whom Grande had received

12   multiple infringement notices to discuss their infringements

13   with them, right?

14   A.  Yes, sir.

15   Q.  And at that time, you had access to a system that let you

16   see what works were at issue in the notices, didn't you?

17   A.  There was -- yes, sir.  It was a website where it would --

18   we could look up the customer's name or account that would show

19   what we had received from the copyright companies.

20   Q.  And, again, this is before the fall of 2010?

21   A.  Yes, sir.

22   Q.  Grande received -- when Grande received more than one or

23   two notices at a time about a customer, Grande would reach out

24   to the customer to explain what was going on, right?

25   A.  Yes, sir.

Jeff Shockley - Examination                    1616

1  Q.  And when that happened, you would reach out because there

2  was the possibility that Grande would disable the customer's

3  services, right?

4  A.  Well, we're reaching out because we received complaint

5  letters.  If we could not get a hold of them, then, yes, at

6  that point, we would go through and suspend their account.

7  Q.  Right.  So at the time you reached out, there was a

8  possibility that you would disable the customer's services,

9  right?

10 A.  Yeah, I guess so.

11 Q.  Because if you couldn't get in touch with the customer, you

12 would, in fact, disable the customer's services, right?

13 A.  Somebody would, yes, sir.

14 Q.  And you did that so that the customer would then contact

15 you so you could discuss it with them, right?

16 A.  Yes, sir.

17 Q.  So just so we're clear, before the fall of 2010, Grande

18 would disable its customers' services to discuss infringements

19 with them, right?

20 A.  Yes, sir.

21 Q.  And when they called you back, you explained to them that

22 Grande had disabled their services because it received notices

23 of copyright infringement about them, right?

24 A.  Yes, sir.

25 Q.  And you told them they had to stop for Grande to turn their

1  services back on, right?

2  A.  I would discuss the context of what we received from the

3  copyright companies.

4  Q.  And you told them that they had to stop for Grande to turn

5  their services back on?

6  A.  Not necessarily.  I would explain that we received

7  complaint letters, that we were trying to inform them of what

8  we had received, and we would, you know, then turn their

9  services back on.  It wasn't necessarily that we're telling

10  them to go through and stop everything, because we didn't know

11  what we were really receiving.  We were just explaining the

12  letter that we had received.

13  Q.  Mr. Shockley, do you recall being deposed in this case?

14  A.  Yes, sir.

15  Q.  And do you recall that you were under oath when you were

16  deposed?

17  A.  Yes, sir.

18          MR. TRACER:  Your Honor, permission to approach?

19          THE COURT:  Yes.

20  BY MR. TRACER:

21  Q.  I'd like to direct --

22          MR. THOMAS:  Is this impeachment?

23          MR. TRACER:  Yes.

24          MR. THOMAS:  This is not inconsistent with the

25  testimony.

1    BY MR. TRACER:

2    Q.  Mr. Shockley, I'd like to direct your attention to page 46

3    of your deposition, lines 16 to 18.

4    A.  Okay.

5    Q.  And you were asked -- you were -- well, in this portion of

6    your deposition, you were discussing these early conversations

7    with customers, and you were asked the question, *"And you need*

8    *to stop, and we'll turn your service back on?"*

9        And your answer was:  *"Yes, sir."*

10   A.  Okay.  I agree with that.  I mean, I may have said that at

11   the time.  My recollection at this point is that we would --

12   you know, we'd discuss what was in the letters.

13   Q.  But at the time of your deposition, your understanding was

14   that you had told the Grande customers to stop?

15   A.  That's possible.

16   Q.  And just to be clear, your deposition was taken closer in

17   time to the conversations you had than your testimony today,

18   correct?

19   A.  Yes, sir.

20   Q.  Now, I'd like to ask you some questions about the time

21   period after the fall of 2010.

22   A.  Okay.

23   Q.  Now, do you understand -- I believe you just testified that

24   at some point Grande stopped disabling its customers' services

25   based on copyright infringement notices, right?

Jeff Shockley - Examination                    1619

1    A.  Yes, sir.

2    Q.  And you had no role in making that decision, right?

3    A.  No, sir.

4    Q.  But after that change was made, when you spoke to customers

5    about the letters they received from Grande based on

6    infringement notices, you didn't have access to the actual

7    letters they received, right?

8    A.  No, sir.  Well -- no, sir.

9    Q.  And you didn't have access to any information in Grande's

10   system that generated the letters, right?

11   A.  No, sir.

12   Q.  So after the Fall of 2010, you couldn't pull up any

13   information to see what work the customer specifically

14   infringed on, right?

15   A.  Not that I remember.

16   Q.  And Grande did not make any kind of resource available to

17   provide information to you when you were communicating with

18   customers about their infringement notices, right?

19   A.  Again, not that I remember.

20   Q.  For example, Grande didn't generate any FAQ for you to

21   provide information to customers about notices, right?

22   A.  No, sir.

23   Q.  And Grande didn't create an outline for you to follow,

24   right?

25   A.  No, sir.

1  Q.  And there was no script or anything like that, correct?

2  A.  No, sir.

3  Q.  Now, at any moment in time, you never kept track of how

4  many calls you received about copyright letters; isn't that

5  right?

6  A.  That is correct.

7  Q.  And you're not aware of any records that Grande could

8  search to determine how many phone calls it ever received

9  regarding copyright infringement letters, correct?

10  A.  Correct.

11  Q.  And sometimes customers would leave you voice mails that

12  you listened to about infringement letters, right?

13  A.  Later on in the process, yes, sir.

14  Q.  And you deleted those voice mails, right?

15  A.  Yes, sir.

16  Q.  You also don't know where Grande received infringement

17  notices from, right?

18  A.  I was told they were coming from a third-party company.

19  That was the extent of it.

20  Q.  And Grande never gave you any information about the

21  relative companies being used or the relative systems being

22  used by those companies that sent the notices, right?

23  A.  No, sir.

24  Q.  Therefore, Grande never gave you any information that you

25  could provide to customers based on what entity sent you the

1  notice that generated the letter, right?

2  A.  If it wasn't listed in the letter, no.

3  Q.  So it's fair to say that you never told a customer any

4  specific information about any company that sent a notice to

5  Grande, right?

6  A.  No, sir.

7  Q.  And it's also fair to say that you can't point to any

8  instance where anyone at Grande, in a communication with a

9  customer about a notice, made any differentiation among the

10  companies that were sending notices, right?

11  A.  Correct.

12  Q.  You don't know anything about any notices that Rightscorp

13  sent to Grande, right?

14  A.  Not specifically, no, sir.

15  Q.  And you have no idea what Rightscorp's capabilities are,

16  right?

17  A.  I do not.

18  Q.  You don't know anything at all about Rightscorp, right?

19  A.  Aside from this -- aside from all of this, no, sir.

20  Q.  And you have never spoken with a Grande customer about

21  Rightscorp, right?

22  A.  No, sir.

23  Q.  Rightscorp never came up in any of your discussions with

24  customers, right?

25  A.  No, sir.

1  Q.  And, in fact, you can't recall the specific details of any

2  particular discussion you've had with a customer about an

3  infringement notice, right?

4  A.  Just generalities, but no specifics.

5  Q.  So just for the benefit of the jury, Grande has no written

6  records of any of the calls you've testified about today,

7  right?

8  A.  Not that I know of.

9  Q.  And Grande has no logs of the calls, right?

10  A.  Not that I know of, no, sir.

11  Q.  And you have no memory of any specific calls, right?

12  A.  No, sir.

13  Q.  So we're just relying on your memory about these calls in

14  general, correct?

15  A.  Correct.

16  Q.  Now, going back to the time period after the Fall of 2010,

17  Grande familiarized you with its template letter that it sent

18  to customers advising them of its receipt of infringement

19  notices, right?

20  A.  Yes, sir.  I had seen them a couple of times.

21  Q.  You didn't write that letter, right?

22  A.  No, sir.

23  Q.  You had no role in writing the letter, right?

24  A.  No, sir.

25  Q.  You were just provided with a copy of that template letter,

Jeff Shockley - Examination                   1623

1  correct?

2  A.  Yes, sir.  I saw a template a couple of times.  I didn't

3  carry anything with me specifically, no.  I'd seen it a few

4  times over the years.

5  Q.  And you were given no other information other than what was

6  contained in the four corners of that letter, right?

7  A.  Correct.

8  Q.  And you were told that when you spoke to customers about

9  the letters they had received, you should discuss what's in the

10  content of the letter and let the customers know that it was

11  a -- it was for a violation of copyright infringement, right?

12  A.  Correct.

13  Q.  And you tried to do what you were told, right?

14  A.  Yes, sir.

15  Q.  So, in fact, you were not providing any information to the

16  customer other than what was in the letter, right?

17  A.  That is correct.

18  Q.  And generally speaking, if customers asked you a question

19  about the letter, you would point them to statements that were

20  in the letter, right?

21  A.  Correct.

22  Q.  And if customers asked you information that was not

23  contained in the letter, you couldn't tell them, because that

24  wasn't part of the letter, right?

25  A.  Aside from helping them with their wireless equipment,

1    letting them know how to secure routers, no.

2    Q.  So you never told the customer that the notice Grande had

3    received was not proof that the customer had illegally

4    downloaded copyright content, right?

5    A.  Was not proof?

6    Q.  Correct.  You never told the customer that this letter you

7    received is not proof of copyright infringement?

8    A.  No, I did not.

9    Q.  Now, again, after 2010, after the Fall of 2010, if a

10   customer received multiple notices, Grande would forward them

11   along, but if the customer never responded by affirmatively

12   calling Grande, Grande did nothing else in response to the

13   notices, correct?

14            MR. THOMAS:  Objection, Your Honor.  Foundation.

15            THE COURT:  Yeah, you're asking him --

16            MR. TRACER:  So I'll rephrase the question.

17   BY MR. TRACER:

18   Q.  So after 2010, after the Fall of 2010, if a customer

19   received multiple copyright infringement notices and never

20   reached out to Grande, you're not aware of Grande ever doing

21   anything else in response to those notices, correct?

22   A.  Correct.

23   Q.  Even if the customers kept getting notices upon notices?

24   A.  Correct.

25   Q.  Now, I believe you testified earlier that everybody denied

1   engaging in copyright infringement when you spoke to them; do

2   you recall that testimony?

3   A.  Yes, sir.

4   Q.  But on occasions, customers asked you, "Should I delete

5   this information," didn't they?

6   A.  Not entirely.  I mean, if customers found it after doing

7   their own investigation or looking into stuff, then they would

8   ask to delete it, but if the letter said to do so, then, yeah,

9   we would let them know to do so.

10  Q.  I am not asking you what the letter said to do.  I'm asking

11  did customers on occasion call Grande and ask you, "Should I

12  delete this information?"  Didn't that happen?

13  A.  Not that I remember specifically.

14  Q.  Can you please turn to page 128 of your deposition, line 16

15  to 18.

16  A.  Okay.

17  Q.  You see where I asked, *"Question:  Did customers ever ask*

18  *you 'should I delete this information'?"*

19      And you answered, *"On occasions."*

20  A.  Yes, sir.

21  Q.  So that happened, right?

22  A.  If they were -- yes, if they called and they said that they

23  found it or if they had been looking for it or they were doing

24  research and tried to see if they could find the files, then,

25  yes, we would explain it.

Jeff Shockley - Examination                    1626

1   Q.  That's not quite my question.  My question is, *"Did*
2   *customers call asking if they should delete this information?"*
3   And you answered, *"On occasions."*
4   A.  At this point in time I can't remember a specific
5   timeframe.  At that point, maybe they did.
6   Q.  It did happen on occasions?
7   A.  I can say probably.
8   Q.  Well, not probably.  You testified to that, didn't you?
9   A.  At that time, yes, sir.  I don't specifically remember it
10  now.
11  Q.  You have no reason to doubt the accuracy of your prior
12  testimony, do you?
13  A.  No, sir.
14  Q.  And when that happened, you told the customers -- this is,
15  again, after the Fall of 2010 -- you told the customers that it
16  was their choice whether to delete the content or not, didn't
17  you?
18  A.  Yes, sir.
19  Q.  After the Fall of 2010, you didn't tell them that they
20  should delete it, right?
21  A.  It was always their choice.
22  Q.  And unlike the time period before the Fall of 2010, during
23  this later time period, you didn't tell customers to stop, did
24  you?
25  A.  Not entirely.  I would explain what the letter was, let

Jeff Shockley - Examination                    1627

1   them know that it was -- that we were receiving the complaints,

2   and just discussed what was in the context of the letter.

3   Q.  So you agree that you did not tell them to stop after the

4   Fall of 2010, right?

5   A.  I don't remember actually telling anybody to stop doing

6   anything, no.

7               MR. TRACER:  No further questions.

8               THE COURT:  Anything else?

9               MR. THOMAS:  Just a couple, Your Honor.

10                        REDIRECT EXAMINATION

11  BY MR. THOMAS:

12  Q.  Mr. Shockley, counsel asked you about a template; is that

13  correct?

14  A.  Yes, sir.

15  Q.  What's a template in the way you're using it there?

16  A.  It was just a base format of how the letter would be

17  comprised that we were sending to actual customers.

18  Q.  So you would have a form, like a template format --

19  A.  Format.

20  Q.  -- and then you plug in particulars for a given customer?

21  A.  That was my understanding, yes, sir.

22  Q.  Grande would?

23  A.  Yes, somebody would.

24  Q.  And those particulars would include, for example, the

25  company or the outfit that was making the accusation?

1   A.  I'm not entirely sure.  Like I said, later on, I know that

2   it was including some of that information, just based on what I

3   was told.

4   Q.  Might it include, for example, instructions for deleting

5   the -- if they had it, deleting the file at issue; is that

6   correct?

7   A.  I believe it did.

8   Q.  Did it have information about the song or the files or

9   whatever it was that they were being accused of?

10  A.  Yes, sir.  We were told that it would list the file that

11  the complaint was received with.

12  Q.  So Grande would send this letter to the customer, and it

13  had all this information, the details specific to that

14  customer, correct?

15          MR. TRACER:  Objection.  Foundation, and leading.

16          MR. THOMAS:  I'm asking the same letter --

17          THE COURT:  No, you asked him -- no.  Overruled.

18  BY MR. THOMAS:

19  Q.  So it would have these details of -- specific to that

20  accusation; is that correct?

21  A.  Yes, sir.

22  Q.  Based on -- to the best of your understanding, in 13 years

23  of managing these calls, that's how you understood it?

24  A.  Yes, sir.

25  Q.  And I believe you said the letter, to the best of your

Jeff Shockley - Examination                1629

1    recollection, told them to delete the information if they had

2    it, correct?

3    A.  I believe it did, yes, sir.

4    Q.  Right.  Do you recall, Mr. Shockley, in all those

5    conversations whether you encountered a letter that encouraged

6    infringement?

7    A.  No, sir.

8    Q.  How would you say the letter's tone was with respect to

9    potential infringement?

10   A.  Professional.  It would explain what we had received and

11   instruct customers as to what they could do to try to look into

12   it more if they didn't -- if they didn't understand what the

13   letter was about.

14   Q.  Mr. Tracer asked you about FAQs or special training, that

15   sort of thing; is that right?

16   A.  Yes, sir.

17   Q.  How many years did you say you handled these calls?

18   A.  Twelve, 13.

19   Q.  Were you ever sitting there -- and you say thousands of

20   these calls; is that right?

21   A.  Yes, sir, probably, over the time.

22   Q.  You were promoted to the FST, the supervisory role, in the

23   escalation team within your first year, correct?

24   A.  Yes, sir.

25   Q.  Did you ever feel like, Gee, I wish I had FAQs so I could

1  handle these calls?

2  A.  No, sir.

3  Q.  Did you ever think, Gee, I wish I had more information than

4  what's in the letter that Grande sent to this customer?

5  A.  No, sir.

6         MR. THOMAS:  No more questions.

7         MR. TRACER:  Very briefly, Your Honor.  Extremely

8  briefly.

9         THE COURT:  Heard that before.

10                        RECROSS-EXAMINATION

11 BY MR. TRACER:

12 Q.  Mr. Shockley, you had access to the template letter that

13 Grande would send to customers, right?

14 A.  It was shown to me a couple times.

15 Q.  But you didn't have access to any of the actual letters

16 that were sent to customers, did you?

17 A.  No, sir.

18        MR. TRACER:  Nothing further, Your Honor.

19        MR. THOMAS:  Nothing further, Your Honor.

20        THE COURT:  All right, sir.  You can step down.

21        THE WITNESS:  Thank you, sir.

22        THE COURT:  I think it's a little too late to start

23 anybody else here.  We've got five minutes to go.  Don't rely

24 on that clock.  That's off.  You can't read it.  Isn't that the

25 worst clock you've ever seen?  And I'm a watch collector and a

1   clock collector, and I look at that clock, and it just

2   infuriates me.  Somebody paid good money for that.  You can't

3   read it.  I look up at it and it's just -- what?  I always have

4   to look at my watch.

5           Okay.  Ladies and gentlemen, thank you very much for

6   your time this afternoon.  Full day tomorrow, so we'll see you

7   tomorrow.  Okay?  Remember, no court on Friday.  Got it?  Okay.

8           COURT SECURITY OFFICER:  All rise for the jury.

9           *(4:23 p.m., the jury exits the courtroom.)*

10                          *   *   *

11          THE COURT:  Okay.  You can be seated, please.  So

12  tomorrow, who do we have?  What do we have?

13          MR. BROPHY:  Your Honor, tomorrow we have

14  Ms. Frederiksen coming back.

15          THE COURT:  Yes, that's right.

16          MR. BROPHY:  We have our technical expert, Dr. Cohen.

17          THE COURT:  Right.

18          MR. BROPHY:  And then we have some deposition

19  testimony to play.

20          THE COURT:  So we've got a good full day tomorrow.

21          MR. BROPHY:  I think so.  I don't know how much

22  time --

23          THE COURT:  I don't know about -- the one that I'm

24  more -- Ms. Frederiksen, I'm not that concerned about.  Her

25  testimony is going to be rather limited in scope.  But I am

JURY TRIAL PROCEEDINGS                    1632

1   more concerned about how much time the expert will take.

2           MR. BROPHY:  We will be judicious.

3           THE COURT:  Okay.  We all want to be judicious, right?

4   Thank you very much.  We will see you tomorrow morning.

5           COURT SECURITY OFFICER:  All rise.

6           *(4:24 p.m.)*

7                           *   *   *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    *    *    *    *    *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5         I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.  I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  November 20, 2022

12

13   /s/ Angela M. Hailey

14   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
15   262 West Nueva Street
     San Antonio, Texas  78207
16   (210)244-5048

17

18

19

20

21

22

23

24

25