UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

```
UMG RECORDINGS, INC., ET AL,    :
Plaintiffs,                     :
                                : Case Number:
vs.                             : 1:17-CV-00365-DAE
                                :
GRANDE COMMUNICATIONS           : Austin, Texas
NETWORKS, LLC, ET AL,           : October 27, 2022
Defendants.                     :
********************************************************
```

TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE DAVID A. EZRA
SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:
FOR THE PLAINTIFFS:

**Andrew H. Bart, Esquire**
**Jacob Tracer, Esquire**
Jenner & Block, LLP
1155 Avenue of the Americas
New York, NY  10036
(212)891-1600; abart@jenner.com

**Robert B. Gilmore, Esquire**
**Philip J. O'Beirne, Esquire**
Stein Mitchell Cipollone Beato & Missner LLP
1100 Connecticut Avenue, NW, Suite 1100
Washington, DC  20036
(202)601-1589; rgilmore@steinmitchell.com

**Paige Arnette Amstutz, Esquire**
Scott, Douglass & McConnico, LLP
303 Colorado Street, Suite 2400
Austin, Texas  78701
(512)495-6300; pamstutz@scottdoug.com

```
 1   FOR THE DEFENDANTS:

 2   Richard L. Brophy, Esquire
     Zachary C. Howenstine, Esquire
 3   Mark A. Thomas, Esquire
     Margaret R. Szewczyk, Esquire
 4   Armstrong Teasdale, LLP
     7700 Forsyth Boulevard, Suite 1800
 5   St. Louis, Missouri  63105
     (314)621-5070
 6   rbrophy@armstrongteasdale.com
     zhowenstine@armstrongteasdale.com
 7   mathomas@atllp.com
     mszewczyk@armstrongteasdale.com

 8

 9

10

11

12

13

14

15

16

17

18

19

20   COURT REPORTER:
     Angela M. Hailey, CSR, CRR, RPR, RMR
21   Official Court Reporter, U.S.D.C.
     262 West Nueva Street
22   San Antonio, Texas  78207
     Phone(210)244-5048
23   angela_hailey@txwd.uscourts.gov

24   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
25
```

1          **I N D E X**

2     **WITNESSES:**                                 **PAGE**

3     **VICTORIA SHECKLER(videotaped deposition)**

4     By Mr. Howenstine                        1676

5

6     **BRIAN COX(videotaped deposition)**        1709

7

8

9     **BARBARA FREDERIKSEN-CROSS**

10    By Mr. O'Beirne                          1713

11    By Mr. Brophy                            1726

12

13

14    **DR. GEOFFREY COHEN**

15    By Mr. Brophy                            1730

16    By Mr. O'Beirne                          1809

17

18

19

20

21

22

23

24

25

 1   (October 27, 2022, 8:46 a.m.)

 2                         *   *   *

 3            COURT SECURITY OFFICER:  All rise.

 4            THE COURT:  Good morning.  I feel like you folks

 5   provide me with the never-ending gift.  Every day I come in and

 6   I've got something new waiting for me under the tree.  I mean,

 7   this is like a very early Hanukkah.

 8            Please be seated.  All right.  Are we ready to go?

 9   Are you ready, counsel?

10            MR. BROPHY:  Yes, Your Honor.

11            THE COURT:  Why don't you call the case again.

12            COURTROOM DEPUTY CLERK:  Austin 17-CV-365, UMG

13   Recordings, et al, versus Grande Communications.

14            THE COURT:  Okay.  Good morning, counsel.  I would

15   note the presence of counsel, the parties that wish to be here.

16   I don't know who all the parties are in the back, and of

17   course, the absence of the jury.

18            Last night at some point -- I don't know when -- a

19   motion in limine was filed to preclude the deposition testimony

20   of a witness who is apparently a Cox Communications employee.

21   So who's going to argue this?  It's your motion.  And then I'll

22   hear from -- yes, sir.

23            MR. O'BEIRNE:  Good morning, Your Honor.  Phil

24   O'Beirne for plaintiffs.

25            Your Honor, the defendant is seeking to introduce

1    irrelevant evidence about notices from a different company sent

2    to Cox and Cox's testimony about that.  There is absolutely no

3    foundation for any relevance to any issue in this case.  Your

4    Honor has strictly policed the line between other companies and

5    other ISPs, and this evidence is the furthest afield of any

6    that has been attempted to be offered in this case.  Mr. Horton

7    was asked why did you institute the PGP policy?

8         THE COURT:  I have -- fortunately, I've got the

9    world's greatest court reporter here, and I've got the

10   testimony.

11        MR. O'BEIRNE:  He said nothing about Cox.  He said

12   nothing about IP-Echelon.  There is not a single piece of

13   evidence in the record that Grande was even aware of this.

14        THE COURT:  Well, he said, *"We required"* -- and I'm

15   quoting from the transcript.  Now, this is a rough transcript,

16   you have to understand.  *"We required the notices being sent to*

17   *us to be PGP signed,"* and then somebody asked him -- I don't

18   know who was querying him in that.  Who was it?

19        MR. BROPHY:  I was.

20        THE COURT:  You were, counsel?

21        *"What does that mean?"*

22        *"That PGP stands for pretty good privacy, and that's*

23   *an Internet standard around e-mails, sending and receiving*

24   *e-mails that allows the sender or receiver to essentially*

25   *encrypt the e-mails and confirm receipt that way."*

1        And then he goes on, *"Why did Grande require PGP*

2  *signature for e-mail accusations it receives?"*

3        And then he goes on, *"Well, since we kind of -- we had*

4  *a kind of heightened policy now --"*

5        And this was after the period of time that is for

6  liability purposes in this case.

7        *"We had a kind of heightened policy now that included,*

8  *you know, firmer termination we felt like it was very important*

9  *to have PGP-signed e-mails coming from the sender of those*

10 *alleged copyright violations."*

11       *"Why is it necessary to require PGP signatures from*

12 *your perspective?"*

13       *"It validates that the e-mail is encrypted based on*

14 *the key that was provided between the sender and receiver."*

15       And then he goes on.  The question, *"Are you aware of*

16 *instances in which an ISP has received fake notices of music*

17 *sharing?"*

18       The answer was *"Yes."*

19       *"And can you give an example of that to the jury?"*

20       *"There was one around a company called IP-Echelon*

21 *where fake notices were sent and processed."*

22       Now, Mr. Bart objected to that, and I sustained the

23 objection.  Mr. Brophy goes on, *"How did Grande communicate to*

24 *the requirement for PGP signatures?"*

25       *"Via our published policy on our website."*

1            *"Would you mind, James, pulling up Plaintiff's Exhibit*

2   *53.  And would you go to the second page, please, of this*

3   *document and blow up the bottom half beginning where it says*

4   *'Notification Requirement.'* Actually, before we do that, let's

5   just go back to the first page -- sorry, James."

6            "Mr. Horton, is this a copy of Grande's DMCA policy?"

7            *"Yes, it appears so."*

8            And then Mr. Brophy asked, *"James, let's go back to*

9   *the blown-up portion, if you don't mind.  What is this part of*

10  *the policy that's shown on the screen here?"*

11           *"Essentially, we're stating that PGP is required for*

12  *digital signature of the notices being e-mailed to us, and then*

13  *we provide our side of the public PGP key."*

14           And then the question was, *"And what is the block of*

15  *seemingly random characters and numbers at the bottom?"*

16           *"That is our side of the public key which is part of*

17  *the trusted provided information between the two parties for*

18  *doing the encryption for PGP."*

19                              *   *   *

20           So we have had testimony here about PGP.  We haven't

21  actually gotten into third parties, however, who utilized it

22  for whatever reason in a different scenario.

23           MR. O'BEIRNE:  And Your Honor already excluded

24  testimony about IP-Echelon from that witness.  We've also had

25  testimony, Your Honor, from Mr. Horton that at no time was it

1   ever suggested that a Rightscorp notice was spoofed.  So the

2   idea that Cox supposedly got allegedly spoofed notices from

3   IP-Echelon, that is not at issue in this case, has no bearing

4   on the Rightscorp notices.  The only purported relevance that

5   they offer in their opposition is the suggestion that we're

6   saying that the PGP implementation after the relevant time

7   period was somehow a pretext to block Rightscorp, and that's

8   not at all what Mr. Bart asked.  He merely asked did the

9   Rightscorp notices change, and before your policy change, were

10  you processing the Rightscorp notices.  This is a complete

11  sideshow.

12          I will note, IP-Echelon uses PGP, so it would lead to

13  a trial within a trial because apparently it didn't help Cox

14  determine whether these were spoof notices at the time, so it's

15  a completely irrelevant, hearsay-dependent sideshow within the

16  realm of other ISPs and other monitoring companies that have

17  been consistently excluded in this case, to include

18  Mr. Horton's testimony.

19          THE COURT:  All right.  Let me hear from --

20          MR. BROPHY:  Batter up before you, Your Honor.

21          THE COURT:  Right.  That's tomorrow.  The World Series

22  starts tomorrow.

23          MR. BROPHY:  Is that true?

24          THE COURT:  It is true.

25          MR. BROPHY:  I don't even know what day it is.

1           THE COURT:  The only reason I know is because I saw it

2    on the news this morning.

3           MR. BROPHY:  Do you have time to watch it?

4           THE COURT:  I'm trying to find out whether Putin has

5    blown the world up when I turn the TV on.

6           MR. BROPHY:  So this PGP issue, to frame it a little

7    bit for you, the plaintiffs in this case are taking the

8    position that our PGP process was a pretext to not process

9    Rightscorp e-mails, and that we simply put this process in

10   place because Rightscorp doesn't PGP sign, and by putting this

11   blockade in place, we wouldn't have to deal with their --

12          THE COURT:  I don't know.  Is that what you're going

13   to argue to the jury, that their PGP process is a pretext?

14          MR. BART:  Well, yes, to be candid, we are.

15          THE COURT:  Well, I need to know that.

16          MR. BART:  No, no, and I'm giving you the answer.  It

17   is for a different time period.  And beyond that, it still

18   doesn't set up the link that's necessary here, because there is

19   no foundation, and throughout the case we've been precluded

20   from introducing anything about other monitoring companies and

21   other ISPs.  We've had lots of evidence excluded.  Here it is

22   purely -- and that evidence was Rightscorp -- I mean, excuse

23   me, it was Grande with another monitoring company.

24          Here you have a different ISP, a different monitoring

25   company, no connection to this in the record, and we just think

1    it's consistent with your rulings.  It has to stay out.

2         MR. BROPHY:  May I be heard on this now?

3         THE COURT:  Absolutely.

4         MR. BROPHY:  Thank you.

5         THE COURT:  You have the floor.

6         MR. BROPHY:  Thank you, Your Honor.

7         THE COURT:  Uninterrupted.

8         MR. BROPHY:  So we have this situation where there's

9    an allegation about why we put these PGP requirements in place.

10   And the background of that is, as Mr. Horton has testified,

11   Grande was aware of IP-Echelon having these e-mails spoofed.

12   So the testimony that we want to bring in is simply testimony

13   from Cox, who discovered these spoofed e-mails.  There were

14   IP-Echelon e-mails that were being digitally signed, and then

15   they started receiving non-digitally signed e-mails, and so

16   this proves the necessity for the PGP-signed requirement,

17   because there are legitimate instances in which these e-mails

18   are faked.

19        My colleague made the point that someone testified,

20   well, we haven't been able to identify any Rightscorp's notices

21   that were spoofed.  We don't know one way or the other because

22   they don't PGP sign.  And so the reason we want to bring this

23   in is simply to establish the fact that this --

24        THE COURT:  Well, he just told me they do PGP sign.

25        MR. BROPHY:  Rightscorp does not PGP sign.

 1          THE COURT:  They don't?

 2          MR. BROPHY:  They never have.

 3          MR. O'BEIRNE:  IP-Echelon does, Judge.  That was my

 4   point.

 5          THE COURT:  Oh.

 6          MR. BROPHY:  So that's issue number one.  Issue number

 7   two is we think it's relevant that Rightscorp doesn't PGP sign,

 8   and we should be able to bring in a body of evidence of our own

 9   to explain why PGP signature is legitimate and proper to defend

10   against the allegation that we simply put this in place as a

11   way to --

12          THE COURT:  Do you have other evidence besides this on

13   what Grande did with regard to PGP?

14          MR. BROPHY:  Well, I tried to elicit that testimony

15   from Mr. Horton and I got objections about foundation, so --

16   and speculation or whatever the objection was.  So this is the

17   evidence we have of this issue because --

18          THE COURT:  Yeah, but it isn't Grande.  It's somebody

19   else.

20          MR. BROPHY:  Well, my witness was going to testify

21   that Grande --

22          THE COURT:  Well, I understand they were going to

23   testify about another Internet provider.  What I was talking

24   about, is there any Grande witness who will come and testify

25   or -- maybe I missed it somewhere -- or deposition testimony

1    where a Grande employee said or will say, We did not -- because

2    this is the best evidence of this -- We did not place any

3    credence and we couldn't place any credence on Rightscorp

4    because their notices were not PGP signed.

5            MR. BROPHY:  Well, we've had Mr. Horton say that we

6    have this PGP signature requirement and that Rightscorp doesn't

7    satisfy it, and that's why we didn't process their e-mail

8    accusations.

9            THE COURT:  And he did testify to that.

10           MR. BROPHY:  Yes, Your Honor.

11           THE COURT:  That came in.

12           MR. BROPHY:  Yes, Your Honor.  But it's more potent to

13   have an actual example of these things being spoofed.  It's not

14   our say-so.  It's this actually happened and we want to play

15   the deposition testimony of someone who caught them doing this.

16   I think it's --

17           THE COURT:  Well, didn't catch Rightscorp.

18           MR. BROPHY:  No.  Caught some other scam company

19   manufacturing fake notices.  That's all we want to get this in

20   for is the fact that this happens, it's real, and that's the

21   reason this PGP requirement was put in place.

22           And I think the other thing I'll say is --

23           THE COURT:  Well, it would have been okay if your

24   witness would or could testify to that fact.  I mean, the

25   reason why we didn't pay any credence to Rightscorp is because

1   in the industry there were instances of other people getting

2   spoofed and scammed e-mails.

3          MR. BROPHY:  Well, I tried to do that and I was shut

4   down, Your Honor.

5          THE COURT:  Well, you didn't ask that question.

6          MR. BROPHY:  Well, I asked if he is aware of instances

7   in which companies have spoofed these notices.  And when he

8   started answering, Mr. Bart objected.

9          THE COURT:  Yes, you're right.

10         MR. BART:  He is right, but the point is he doesn't

11  have any foundation for any of this.  He didn't write policy.

12  He didn't testify about being involved in the policy.  This is

13  all after the fact trying to shoehorn in evidence about a

14  different ISP and a different monitoring company which cannot

15  be reconciled with any of the prior rulings in this case.

16  We've been precluded from putting in evidence where one of the

17  parties, at least, is a party to this case.

18         Both of these are extrinsic to this case.  They tried

19  to get it in through a witness who didn't create the policy.

20  Now they're trying to get it in through a deposition of

21  somebody who's not a party to this case.  There's no

22  foundation, it's hearsay, and it's very prejudicial.  It would

23  require us -- and we're not able to do it -- to try the

24  accuracy of those claims and the impact on Grande, and there's

25  no testimony about that.

1          MR. BROPHY:  It's inconsequential whether he created

2     the policy.  I was merely trying to elicit from him the fact

3     that Grande employees know about the IP-Echelon issue.  And I

4     couldn't do it through him, so now we have someone else who's

5     going to say it.

6          THE COURT:  Well, you didn't ask exactly the question

7     that I was suggesting.  The question I was suggesting is

8     centered around the issue of why they did what they did.

9          What you were asking -- it says, *"Why was it necessary*

10    *to require PGP signatures?"*

11         *"It validates the e-mail that was provided between the*

12    *sender and receiver."*

13         So you actually got that testimony out of him without

14    objection.

15         MR. BROPHY:  But then -- I agree, Your Honor, but then

16    the next question --

17         THE COURT:  You could make that argument to the jury.

18    You could say, We didn't pay any attention to Rightscorp

19    because they didn't have PGP signatures and we have testimony

20    from Mr. Horton to that effect.

21         MR. BROPHY:  But the argument becomes more --

22         THE COURT:  And then you go, *"Are you aware of any*

23    *instances in which an ISP has received fake notices of music*

24    *sharing?"*  Then that took us into a totally different ballpark

25    involving other companies and other ISPs, of which there are

1    probably tens of thousands of these notices floating around.

2        MR. BROPHY:  The argument that we want to make becomes

3    more compelling when we establish that Grande personnel know

4    about instances in which these things have actually been

5    spoofed.  It's one thing to say, Well, you were trying to

6    protect against something that never happens.  It's quite

7    another to say, We know this happened.  And that's why it's a

8    legitimate requirement.

9        MR. BART:  Your Honor, you asked the right question,

10   which was:  What is the impact on Grande?

11       He wasn't involved in the policy.  He can't say that

12   we did this policy because of something I knew.  He is removed

13   from this.  They just want to take a witness and say, hey,

14   witness, do you know about something involving third parties?

15       That justifies a decision that you didn't make.  I

16   mean, it misses the connective link at every point.  The wrong

17   parties on both sides of it, a witness who didn't know and

18   wasn't involved in why the policy was done.  Your Honor is

19   right, they can certainly argue We did it because it prevents

20   spoofing.  They got that evidence.  We're not arguing that they

21   can't argue that.  We are arguing that they can't bring in

22   irrelevant third-party situations that we are not privy to and,

23   frankly, Grande wasn't privy to.  So there's no foundation.

24       THE COURT:  There's been other testimony in this case

25   that there was spoofing.

1          MR. BART:  Yes, and that's fine.

2          THE COURT:  And you have the right to argue to the

3    jury that your client required P --

4          MR. BROPHY:  PGP.

5          THE COURT:  I want to say PCP.

6          MR. BROPHY:  Yeah, quite a different thing, not

7    required.

8          THE COURT:  And back there, I was calling it -- what

9    was I calling it?  A company I once -- oh, PPG, because I once

10   did some legal work for Pittsburgh Plate Glass.

11         MR. BROPHY:  Your Honor, I'm not entirely sure

12   standing here that there is evidence in the record about actual

13   spoofing taking place.  That's why we're trying to get this in.

14         THE COURT:  Are you sure?  I thought there was.

15         MR. BROPHY:  I'm not aware of any standing here.

16         THE COURT:  Was there any?

17         MR. BART:  It's not about whether there's actual.

18   It's that Grande believed that there was spoofing and put in a

19   policy because of that.  So what he wants to do is he wants to

20   put in specific facts unrelated to this case, unrelated to the

21   witness, without foundation, to support an argument he can

22   already make.

23         MR. BROPHY:  So in this case, we have had references

24   to the Cox litigation to deal with the state of mind of Grande.

25         THE COURT:  Right.

1          MR. BROPHY:  And now we're trying to bring in evidence

2    from Cox to also talk about the state of mind of Grande, and

3    I'm hearing that that's not acceptable.

4          MR. BART:  It's not the state of mind --

5          MR. BROPHY:  Excuse me.  Excuse me.  We've also had

6    instances in this case where --

7          THE COURT:  Let's not get, as they say in sports,

8    chippy.

9          MR. BROPHY:  There have been instances in this case

10   where we have been, we'll say, admonished for not going out and

11   getting a third-party discovery on issues directly.  And now

12   here's an issue -- an instance in which we did go out and get

13   the third-party discovery and we're being punished for that

14   too.  So it's got to be one way or the other.  Either we went

15   out and got this discovery rightfully and we get to bring it in

16   and show it and if we can tie it up, great.  If we can't,

17   that's our problem, and he can argue that we can't tie it up,

18   but there's no reason why we shouldn't be able to bring in

19   evidence that these notices do get spoofed --

20         MR. BART:  Your Honor --

21         MR. BROPHY:  -- to lend legitimacy to the fact that we

22   have a policy to ensure we don't have spoofed e-mails.

23         THE COURT:  We are, I think, at a point where nobody

24   would deny that notices get spoofed, okay, on occasion.  I

25   don't think anybody would deny that.

1           MR. BART:  We're not arguing --

2           MR. BROPHY:  We'd be fine if they would stipulate to

3    that, Your Honor.  Then we wouldn't need this.

4           MR. O'BEIRNE:  And Grande never suspected a Rightscorp

5    notice was spoofed, sure.

6           MR. BROPHY:  That's not part of the stipulation.

7    That's not part of this fact.

8           THE COURT:  Just the general proposition that

9    notices -- that in the industry, that it is known --

10          MR. BART:  No.

11          THE COURT:  Just a minute, just a minute.  I feel like

12   sometimes I've got a lion on one side and a hyena on the other,

13   and they're not friends.

14          MR. O'BEIRNE:  Could you switch those, Judge?

15          MR. BROPHY:  Can I be the lion?

16          MR. O'BEIRNE:  Can I make one factual point about the

17   existing record, Judge?

18          THE COURT:  Hyenas have been known to kill lions.

19          MR. O'BEIRNE:  In groups.  That's why I travel with my

20   friends.

21          Can I make one point about the factual record that

22   hasn't been raised yet, Judge?

23          THE COURT:  Yes.

24          MR. O'BEIRNE:  They filed a motion in limine that the

25   Court granted to exclude communications between Rightscorp and

1    other ISPs.

2              THE COURT:  Right.

3              MR. O'BEIRNE:  They did not ask Mr. Boswell a single

4    question about --

5              THE COURT:  Because it's irrelevant.

6              MR. O'BEIRNE:  Well, right.  And remains irrelevant,

7    but they didn't ask Mr. Boswell a single question about PGP,

8    and I would have elicited testimony from him that other ISPs

9    spoke with Rightscorp and said, No problem, we know what your

10   IP address is, we don't need PGP.

11             So the idea that now at the end of trial they're going

12   to try at the last minute to put in an issue that they didn't

13   ask Boswell about, I could have asked Boswell about and we

14   could have had a much different record, is totally unfair.

15             We have been operating within the motions in limine

16   rulings, which excluded communications between Rightscorp and

17   other ISPs.  So the communications between other monitoring

18   companies and other ISPs are even further afield.

19             MR. BROPHY:  Your Honor, we disclosed depo

20   designations for all those PGP issues.  They have been on

21   notice of this PGP issue literally for years.  For years.  This

22   is not some surprise attack at the end of the case.  We

23   designated this deposition testimony that we wanted to play for

24   years.  So this is not a surprise attack at all.  We're just

25   trying to get in the evidence to prove our case.

1          THE COURT:  Well, yeah, I think -- that is true and --

2          MR. BART:  We're not contesting that, Your Honor.

3     It's not an argument about sandbagging.

4          THE COURT:  No.  Well, just a minute.  The question

5     is -- I mean, I have heard and ruled on a lot of motions in

6     limine that a lot of other judges would have said are just too

7     late, you can't do it.  You can't raise a motion in limine in

8     the middle of the trial.  Where I think -- and I may be wrong,

9     maybe the Appellate Court will say I'm wrong.  But where I

10    think that is not the correct way to approach it, because I

11    think a lot of judges would follow my practice because during

12    trial, frequently -- and this long and difficult and

13    complicated trial is absolutely no exception to this rule --

14    the landscape shifts.  And what may seem at the beginning of

15    the case to be a rather inconsequential matter, for both sides,

16    could turn out to be significantly more important in light of

17    what evidence has come in and what has happened.

18         So I don't -- I don't fault them for bringing the

19    motion.  I don't fault you for bringing the motions that you

20    have brought.  When I say "you," I'm talking about your side.

21    Because the landscape has shifted to some degree here because

22    of the availability of witnesses, what they testified to, other

23    things, motions that have been granted or denied, things that

24    have been sustained and overruled.  So I am not concerned.

25    Neither side has operated in this case in bad faith.

1          MR. BART:  Of course.  And we're not suggesting that.

2    I think the critical part here, aside from the fact that we've

3    been precluded from all evidence about Grande's -- the impact

4    on Grande of interactions with other ISPs and it would be

5    prejudicial to allow this to come in, is that there's no link

6    between this and Grande's state of mind on the point that they

7    are talking about.

8          Mr. Horton was not involved in the creation of the

9    policy.  It was created by the Legal Department.  They want to

10   put in a factual witness who is not involved in that, to give

11   testimony about -- originally, testimony, and now they just

12   want to do it without his testimony -- about interactions

13   between two third parties and say, Look, this must have had

14   some impact, even though there's no connection.  Right?

15         There is nobody who has testified here who implemented

16   the policy, who considered the policy and said, We did this and

17   the impact on us is because we were aware of X.

18         That's not in the record.

19         THE COURT:  Why don't you address this argument.

20   Address this argument that has been made.  And that argument is

21   that Mr. Horton provides the link, because he said -- the

22   question:  *Why did Grande require PGP signature for e-mail*

23   *accusation it received?*"

24         *"Well, since we had a kind of heightened policy now*

25   *that included, you know, firmer termination, we felt like it*

 1   *was very important to have PGP signed e-mails coming from the*

 2   *sender of those alleged copyright violations."*

 3              MR. BART:  That statement is fine.

 4              THE COURT:  Yeah.  Well, what he wants -- what the

 5   plaintiff wants is they want some -- they want to bolster his

 6   testimony.  They want some validation that, in fact, there was

 7   a concern here about that, and the concern can be shown by

 8   whatever occurred at Cox.  That's what this is being offered

 9   for.

10              MR. BART:  Well, of course it is, but the problem is

11   there is no link to that.  I mean, Mr. Horton was able to

12   say -- and without objection from me --

13              THE COURT:  I hate to say it, but every time you say

14   "Mr. Horton" -- because I get this raised to me all the time in

15   criminal cases -- the name Willie sticks in my head --

16              MR. BART:  Are you an old Detroit Tiger fan or

17   something?  Oh, no, the other Willie Horton.

18              THE COURT:  The other Willie Horton.

19              MR. BART:  So I'm sorry.

20              Yes, I think that the problem really is -- of course

21   they want to bolster their arguments.  We want to bolster our

22   arguments too, but we have to do it within the limits of the

23   rulings of the Court and what's appropriate in terms of

24   evidence.  And I think that what is getting lost here is, sure,

25   they want to bring this in and, sure, they think that this

 1    helps them.  I mean, it's like your Honor's comment about you

 2    want to keep something out because it's prejudicial because it

 3    hurts you, but you still have to, in any situation, satisfy the

 4    evidentiary foundations for bringing this evidence in.  And

 5    there really is none here because Mr. Horton is not able to

 6    provide the connective tissue between that -- and didn't -- and

 7    Your Honor sustained it to between --

 8            THE COURT:  I don't have this deposition in front of

 9    me.  What actually does this guy say?  First of all, who is he?

10            MR. O'BEIRNE:  Brian Cox.

11            MR. BROPHY:  He's an employee --

12            THE COURT:  His name is Cox?

13            MR. BROPHY:  Yes.

14            THE COURT:  Cox, from Cox Communications?

15            MR. BROPHY:  Yes, that's correct.

16            MR. O'BEIRNE:  Not a family member.

17            MR. BROPHY:  No, no not an owner.

18            THE COURT:  Okay.  I've got it in front of me,

19    counsel.  Why don't you sit down.  Let me just take a quick

20    look at this, okay?

21            I think we can get -- if this comes in, I think we

22    would certainly need to make it clear to the jury that this guy

23    is not related -- he's not a part of the Cox company.

24            MR. BROPHY:  He's the head of their electronic

25    security department or something.

1           (Pause.)

2           THE COURT:  I'm going to grant in part and deny in

3    part.  I will allow them to play just what I have highlighted,

4    only what I have highlighted.

5           MR. BART:  Your Honor, we would like an instruction to

6    the jury giving them some context for this, a limiting

7    instruction, because the problem here is that all of the

8    actions for liability in this case took place before their

9    policy --

10          THE COURT:  Yeah.  Why don't you go ahead and draft

11   something up, give it to me and I'll look at it, let counsel

12   look at it, and I'll be happy.  Because we don't want to waste

13   any more time.  Okay? All right.  I agree with you.  I do.

14          MR. BART:  Okay.

15          MR. HOWENSTINE:  Unfortunately, we have another issue,

16   Your Honor.

17          THE COURT:  Oh, no.

18          MR. HOWENSTINE:  Another package of two issues.

19          THE COURT:  No wonder you were jumping up.

20          MR. HOWENSTINE:  As background for this, I'd like the

21   Court to recall Mr. Feehan's testimony yesterday.  You recall

22   there was certain information that he didn't remember and Your

23   Honor thought that he should fairly provide that information.

24          THE COURT:  Yes.

25          MR. HOWENSTINE:  And so we quickly got him on the

 1   phone.  He gathered it, he produced it.  In contrast, we have

 2   the situation with the deposition of Jonathan Glass.  That was

 3   the one that concerned the Rightscorp -- the inflammatory

 4   Rightscorp article.  Do you recall that, Your Honor?

 5   *Breathtaking In Its Sleaze*?

 6            THE COURT:  Oh, yes.

 7            MR. HOWENSTINE:  And Your Honor said we could go and

 8   take the deposition of Mr. Glass --

 9            THE COURT:  Yes.

10            MR. HOWENSTINE:  -- about that article --

11            THE COURT:  Yes.

12            MR. HOWENSTINE:  -- just to confirm some basic facts.

13   So I'd like just to read into the record some of the things

14   that happened in this deposition.  My colleague, Mr. Thomas,

15   was taking the deposition.

16            *"Question:  Do you agree that it uses very pejorative*

17   *language to describe Rightscorp?"*

18            *"Mr. Gilmore:  Objection.  Beyond the scope.  Direct*

19   *the witness not to answer."*

20            "Question:  Do you agree that this article uses

21   strongly negative language to describe Rightscorp?"

22            "Mr. Gilmore:  Objection.  Outside the scope of the

23   Court's order.  Direct the witness not to answer."

24            "Mr. Glass, do you agree that this article is

25   describing Rightscorp's practices of communicating with people

1    who had received Rightscorp notices?"

2            *"Mr. Gilmore: Objection. Outside the scope. I*

3    *instruct the witness not to answer the question."*

4            THE COURT:  The first two I understand.  The last two,

5    I would disagree with.  The last one I would disagree with.

6            MR. HOWENSTINE:  *"Mr. Glass, do you agree that this*

7    *article criticizes what it alleges to be Rightscorp's practices*

8    *of communicating with people that have received notices?"*

9            *"Mr. Gilmore: Objection. Outside the scope. I*

10   *instruct the witness not to answer."*

11           And Mr. Thomas made a very clear record that this is

12   essentially taking the issue out of the Court's hands.  We

13   could ask the questions, we could get incrementally closer to

14   the issues, and Your Honor could decide what is in and what is

15   out, but instead, counsel for the plaintiffs instructed the

16   witness not to answer these questions, so we are left with, you

17   know, essentially nothing other than acknowledgment of the

18   article being critical.  And we don't think that's fair.  We

19   think that's contrary to Your Honor's ruling.

20           THE COURT:  Well, I didn't -- I certainly wouldn't

21   allow any testimony where somebody was describing that article,

22   describing the article, but I would have no problem with

23   somebody acknowledging that it was a negative article.  I mean,

24   that was the whole purpose.

25           MR. BART:  And he did, Your Honor.

```
 1              THE COURT:  No, I thought --

 2              MR. BART:  No.  Because he's selectively reading.  I

 3    mean, if I may respond?

 4              THE COURT:  Sure.

 5              MR. BART:  Are you through?  I don't want to interrupt

 6    you.

 7              MR. HOWENSTINE:  Well, you already have, but --

 8              THE COURT:  Okay, okay, okay.  No chippyness here.

 9              MR. BART:  That's why I asked you.

10              THE COURT:  This has been a long trial.  Everybody's

11    tired.  Everybody is living in hotels for longer than they

12    should have had to.  It's just one of those things, okay?

13              MR. BART:  Your Honor, the whole deposition, as Your

14    Honor realized, was a fishing expedition.  We allowed them to

15    do what Your Honor said.  Your Honor said that they're more

16    than entitled to get before the jury that there was a critical

17    article of Rightscorp, number one; that Warner -- I believe you

18    meant Mr. Singer -- saw the article, he felt the article was

19    significant enough that he copied it and any other actions that

20    Warner took as a result of it.

21              THE COURT:  That's what I said.

22              MR. BART:  That's what you said and that's what he

23    answered.  And there are deposition transcript references here

24    that -- you know, we just got the transcript in the last five

25    minutes, and --
```

1        THE COURT:  Who transcribed the deposition?  It wasn't

2   my reporter, obviously.

3        MR. BART:  *So do you agree, Mr. Glass, that this*

4   *article in Mr. Singer's e-mail casts Rightscorp in a very*

5   *negative light?"*

6        *"Answer:  It's critical of Rightscorp."*

7        *"Do you agree with me that the exhibit shows an*

8   *e-mail, the text of which is critical of Rightscorp?"*

9        *"Yes."*

10       *"And it appears to be an article about Rightscorp?"*

11       *"Yes."*

12       They never asked about any questions that Warner --

13   any actions Warner took because of it, because there were none.

14   The whole deposition -- and Mr. Glass was there for 40 minutes.

15   40 minutes.

16       THE COURT:  If that's what we've got, the only purpose

17   here was to get him put in a position where he could answer

18   that they had seen the article, the article was very critical

19   of Rightscorp, he testified to that.  That's all there is to

20   it.

21       The objection is overruled.

22       MR. BART:  Thank you.

23       MR. HOWENSTINE:  Thank you, Your Honor.  We just have

24   one more issue, and that concerns --

25       THE COURT:  I'll get chippy here.  Watch out.

1           MR. HOWENSTINE:  -- that concerns Ms. Frederiksen's

2   Audible Magic testimony.  You recall she's coming back today to

3   talk about Audible Magic?

4           THE COURT:  Yes, I remember, Audible Magic.

5           MR. HOWENSTINE:  And Your Honor ruled that we were

6   entitled to review the materials that she relied on, the source

7   code, et cetera --

8           THE COURT:  Of course, absolutely.

9           MR. HOWENSTINE:  -- and the plaintiffs were obligated

10  to produce that to us.

11          THE COURT:  They didn't?

12          MR. HOWENSTINE:  Well, what happened is essentially,

13  first of all, they just turned us over to Audible Magic's

14  attorneys to deal with this, which we didn't raise, we thought

15  we could work through it.  We engaged another expert, because

16  our expert is obviously busy with this case in his own job.  We

17  lined up another expert to review the source code --

18          THE COURT:  Yeah.

19          MR. HOWENSTINE:  -- an expert who has reviewed it in

20  previous cases and so he is familiar with it.

21          THE COURT:  Okay.

22          MR. HOWENSTINE:  He testified in another case in which

23  Ms. Frederiksen also testified.

24          THE COURT:  Okay.

25          MR. HOWENSTINE:  So he knew what to expect, although,

 1   you know, due to the protective order constraints, he still

 2   needed to get in and review it again for purposes of this case.

 3          THE COURT:  Of course.

 4          MR. HOWENSTINE:  So we jumped through the various

 5   hoops of setting up a remote review of the source code where

 6   they would basically use a Zoom platform and allow him to poke

 7   around in the code.  So that happened on Tuesday.

 8          THE COURT:  Okay.

 9          MR. HOWENSTINE:  And this expert, his name is

10   Mr. Chatterjee, C-H-A-T-T-E-R-J-E-E.  When he went in to look

11   at the source code, he saw that certain things were not there.

12   So we raised this with Audible Magic's counsel, and they said,

13   Okay, yes, we agree certain things were not there.  We'll fix

14   it.

15          We were given access again yesterday.  Mr. Chatterjee

16   went back in.  More things were there, but everything was still

17   not there.  And we raised this with Audible Magic's counsel,

18   and they said, Well, we'll look into it.

19          And then in the middle of the night, 12:30 a.m.,

20   Audible Magic's counsel said, We're going to make it available

21   to you one hour from now, starting at 1:30 a.m., and we'll make

22   it available until roughly 9:00 a.m.

23          So obviously, that review didn't happen, because this

24   happened during the middle of the night.  And so, essentially,

25   we have not had a full opportunity to review this Audible Magic

1  source code.  Our expert was prepared to do it, was prepared to

2  do it --

3              THE COURT:  Is he going to come and testify,

4  Mr. Chatterjee?

5              MR. HOWENSTINE:  Well, we hadn't made that decision,

6  Your Honor.  We were going to base that on, you know --

7              THE COURT:  So Audible Magic will not make that

8  additional material available to you today?

9              MR. HOWENSTINE:  Well, they --

10             THE COURT:  Where are they located?

11             MR. HOWENSTINE:  Somewhere in California, Your Honor,

12 I believe.  They made it available, so they say, you know,

13 during the middle of the night, but...

14             THE COURT:  That doesn't work.

15             MR. HOWENSTINE:  Right.  And that's the problem,

16 and --

17             THE COURT:  Only I get woken up in the middle of the

18 night.

19             MR. HOWENSTINE:  There are obviously protective order

20 constraints here with this other case, but you know, it

21 suffices to say that the expert was interested in seeing this

22 particular material that was not included and that is why we

23 pursued this issue multiple times.

24             THE COURT:  Well, it seems a little fishy, to be

25 honest with you, that they're giving you the -- they're giving

 1   you the incremental in the hopes that it satisfies you, but --

 2          MR. HOWENSTINE:  Exactly, Your Honor, and it never

 3   did.  And so we are left in this position where our expert

 4   hasn't had a full opportunity to review the code.

 5   Ms. Frederiksen is going on the stand this morning.  And from

 6   our --

 7          THE COURT:  No, she isn't going to go on the stand

 8   this morning.

 9          MR. HOWENSTINE:  Well, from our perspective, this

10   is -- this case can't drag on --

11          MR. O'BEIRNE:  That is absolutely not at all as a

12   matter of fact what occurred and I'd be happy to correct the

13   record.

14          MR. HOWENSTINE:  If I could finish.  Thank you.

15          MR. BART:  Well, he's making a ruling, so we have to

16   respond.

17          THE COURT:  Oh, I understand.  She's not going on the

18   stand until I rectify -- I'm not making a ruling.  This is like

19   a little bit of a TRO here.  I have to know what went on before

20   I make a ruling and I don't -- I mean, I have one side.  I

21   don't have the other and I might need to get more information.

22   The reason I asked is I was trying to decide whether these

23   people are within my subpoena power, which apparently they are

24   not.

25          MR. HOWENSTINE:  Your Honor, it is extremely

1   prejudicial to our client's case to allow this to drag on and

2   on, as we're trying to put on our defense case, but then the

3   idea that potentially discovery would be reopened, and then we

4   would have to go back to Audible Magic, and then additional

5   Audible Magic would come in in drips and drabs.

6         THE COURT:  Well, even if what you say is true and

7   they contest it, but assuming that what you say is true --

8   believe me, when I say that, I'm sure you believe what you are

9   saying is true.  Okay?  I am not questioning your integrity.

10  You're getting this from Mr. Chatterjee, I'm sure.

11        MR. HOWENSTINE:  And our co-counsel, who has been

12  coordinating the review with Mr. Chatterjee, because we're

13  here, obviously.

14        THE COURT:  I mean, they don't have control over

15  Audible Magic.  I mean, Audible Magic is not their client.

16        MR. HOWENSTINE:  Well, that's the thing, Your Honor.

17  The whole backdrop of this was that the plaintiffs, ostensibly,

18  had this information, and Ms. Frederiksen was relying on it in

19  connection with her opinions in this case.

20        THE COURT:  Well, do we know whether she actually saw

21  this missing link?

22        MR. HOWENSTINE:  I believe we do know that, Your

23  Honor, because this -- the previous case in which she reviewed

24  this material is the case in which Mr. Chatterjee was also

25  testifying.

```
 1              THE COURT:  So did Mr. Chatterjee see the same
 2    material in the previous case?
 3              MR. O'BEIRNE:  Yes.
 4              MR. HOWENSTINE:  I believe so, Your Honor.
 5              THE COURT:  Okay.  Does the plaintiff have any
 6    objection to his using that knowledge in this case?
 7              MR. HOWENSTINE:  Well, it's not --
 8              THE COURT:  Just a minute.  You're not the plaintiff.
 9              MR. O'BEIRNE:  Our understanding --
10              THE COURT:  No, no.
11              MR. O'BEIRNE:  I'm sorry.  I'm trying to answer your
12    question, Your Honor.  Using his knowledge to inform their
13    cross-examination of Ms. Frederiksen on her opinions,
14    absolutely not.  We did not understand Your Honor's ruling to
15    be they could go add an additional expert.  They moved to
16    exclude her opinions because they didn't have access to the
17    underlying materials.
18              THE COURT:  Right.
19              MR. O'BEIRNE:  You denied that, but gave them the
20    materials.
21              THE COURT:  Chatterjee alleges that there was a chunk
22    of information -- I don't know how big or how small or how
23    significant or insignificant.
24              I want both of you in your own spaces.  Okay?  As my
25    mother used to say, bright shiny faces all in their places.
```

 1   Let's keep it bright and shiny here.  You guys are ready to go

 2   at it here.  I don't want to be -- I don't want the clearing of

 3   the bench here.

 4         All right.  So if we have a situation in which this

 5   gentleman, Mr. Chatterjee -- I don't know if I'm pronouncing it

 6   correctly.  I think I am, though, because I had a student in my

 7   federal courts class whose last name was Chatterjee, spelled it

 8   the same way.  If Mr. Chatterjee is aware of this missing

 9   information, but the only reason he needs to see it is because

10   of some order existing in another case and, therefore, he feels

11   like he needs to see this in order to be able to use it in this

12   case, I will enter an order that will allow him to use that

13   information for the purposes of this case.

14         I don't think I'd be violating any type of protective

15   order by doing that because it is for a legitimate in-lawsuit

16   purpose and we're all under the same -- you know, I'll put a

17   protective order on that.  So we'll have a protective order on

18   a protective order.  Okay?

19         Now, if you say, no, then we have problems.

20         MR. O'BEIRNE:  Your Honor, we have no issue with that.

21   We don't understand that to be the factual scenario that

22   they're offering.

23         THE COURT:  Well, they're telling you that that is the

24   factual scenario from their point of view.  Let's let

25   Mr. Chatterjee use that information.  Then we have removed the

1    nail from the tire, patched it up, and we can drive down the

2    road without any further delay.

3            MR. O'BEIRNE:  We, of course, have no objection to him

4    having access to anything that Ms. Frederiksen had access to.

5    It's was our understanding that's been given.  Can I make a

6    couple factual points, Your Honor, to complete -- so Your Honor

7    has a complete understanding of the sequence here.

8            THE COURT:  Yes, of course.

9            MR. O'BEIRNE:  Thank you.  We have worked diligently

10   with defendant and with Audible Magic's counsel.

11           THE COURT:  I don't -- look, I'm not blaming anybody

12   here.  I can see where a company like Audible Magic -- you

13   know, look, you represent the record industry.  They're very

14   jealous of their intellectual property.  Right?

15           MR. O'BEIRNE:  We can agree --

16           THE COURT:  We can agree on that, I think.

17           MR. O'BEIRNE:  Yes, we can.

18           THE COURT:  I'm sure that Grande is jealous of their

19   own intellectual property.  In fact, we got into that a little

20   bit in this case.  Don't you think Audible Magic is jealous of

21   their intellectual property?  I'm quite sure they are.  And

22   they're probably reticent to have it blasted all over a federal

23   courtroom.  So here we are.  I don't ascribe any bad motive to

24   either side.

25           MR. O'BEIRNE:  I appreciate that, Judge.  That's not

1    what I was meaning to suggest.

2         THE COURT:  You know, as I told you at the very

3    beginning of this case, every lawyer in my courtroom starts out

4    with a presumption that they are an officer of this court and

5    that they will uphold the highest integrity of the United

6    States court system while they are in my courtroom.  And to be

7    honest with you, that has been the case in this litigation from

8    all counsel.  I don't have any concerns about the ethics, the

9    morality or the tactics of any lawyer.

10        I understand you're not happy with each other from

11   time to time, but I've been here in a different frame.  I'm the

12   umpire here.  I don't see bad motive from anybody.  I see

13   people trying to fight for their client.  You're zealous

14   advocates, and God bless you for doing it.  That's what this is

15   all about.  So was Abe Lincoln.

16        Go ahead.

17        MR. O'BEIRNE:  Absolutely, Judge.  We appreciate it.

18   I'm merely trying to address the chronology and how we find

19   ourselves Thursday seeking to rest with this still as an issue.

20   We asked the end of last week, Please give us the name of who

21   you want to --

22        THE COURT:  Well, I think Chatterjee, now that he has

23   this information, which he's already known for a long time,

24   should be able to get himself ready to advise them.

25        MR. BROPHY:  And Your Honor, to short-circuit this,

1  with your solution in mind, we have no problem proceeding.

2          THE COURT:  Okay.  There we go.

3          MR. O'BEIRNE:  There we go, Judge.

4          MR. HOWENSTINE:  Your Honor, I would just like to make

5  a record on one point.  I'm not -- I'm not rearguing anything.

6          THE COURT:  Please don't.

7          MR. HOWENSTINE:  I just want to make the record clear

8  on one point, that we accept Your Honor's ruling that we can

9  just use the information in Mr. Chatterjee's head that he knows

10 to --

11         THE COURT:  You claim that he -- I mean, your

12 co-counsel is shaking his head yes.

13         MR. HOWENSTINE:  Yes, yes.  We --

14         THE COURT:  He knows it.  He just couldn't use it.

15 And I appreciate his ethics.  He's not saying, Well, I know

16 this, the heck with the protective order.

17         MR. HOWENSTINE:  Your Honor, and we fully accept that.

18 I just want to make a record on the fact that if there is

19 information in that source code, you know, certain pieces of

20 code that we would want to cross-examine Ms. Frederiksen on, we

21 will not be able to do that because we don't have access to it,

22 so we --

23         THE COURT:  But Chatterjee does.  He knows what he

24 looked at.

25         MR. HOWENSTINE:  Well, I mean, he knows in his head

1   what he saw previously.  But the point I'm making, Your

2   Honor --

3           THE COURT:  Well, he can tell you, and then you can

4   cross-examine her on it.

5           MR. HOWENSTINE:  Exactly.

6           THE COURT:  She is a professional, she knows what

7   she's talking about.  Look, I doubt the woman is going to get

8   up here and perjure herself.  So I think let's not -- you know,

9   if you think that she has testified about something that is

10  blatantly false -- look, where is Chatterjee?  Where is this

11  man?  Lost him?

12          MR. BROPHY:  Not here, Your Honor.

13          THE COURT:  Not here.

14          MR. BROPHY:  Not here.

15          MR. HOWENSTINE:  Somewhere in the Pacific time zone.

16          MR. BROPHY:  Yeah.  We're fine just moving forward,

17  Your Honor.

18          THE COURT:  You're going to move forward with her --

19          MR. BART:  Yes.

20          THE COURT:  -- direct first.

21          MR. BART:  Yes.

22          THE COURT:  Okay.  Since Chatterjee isn't here, I will

23  allow a link-up, a secure link-up so Chatterjee can listen in

24  on her direct examination.  How's that?

25          MR. BROPHY:  That's very kind, Your Honor.  Very kind.

```
 1              THE COURT:  That should be helpful, right?

 2              MR. BROPHY:  Yes.  Thank you.

 3              THE COURT:  All right.  Let's do that.  We can do

 4   that, right?

 5              COURTROOM DEPUTY CLERK:  Not by Zoom.

 6              THE COURT:  I promised something --

 7              COURTROOM DEPUTY CLERK:  Not by Zoom.  It's an audio

 8   call.

 9              THE COURT:  It's an audio call, she'll just listen in.

10   I didn't say she's going to see the guy.  She doesn't need to

11   see -- I mean the woman.

12              COURTROOM DEPUTY CLERK:  It won't be a link.  It will

13   just be a phone call to the courtroom.

14              THE COURT:  Right.

15              MR. BROPHY:  Thank you, Your Honor.

16              THE COURT:  Okay.

17              MR. BROPHY:  I think as far as the schedule for today

18   is concerned, we have some deposition testimony to play, and

19   then we would propose calling Ms. Frederiksen to offer her

20   testimony, and then we'll be calling our expert, Dr. Cohen, to

21   offer his testimony.

22              THE COURT:  Okay.

23              MR. BART:  With permission, this is some language we

24   have proposed.  Shouldn't be controversial.

25              (Pause.)
```

1       MR. BROPHY:  Much better than mine.  This is a

2   pleasure.

3           *(Discussion off the record.)*

4                        *   *   *

5       THE COURT:  Are we ready?

6       MR. BROPHY:  Yes, Your Honor.

7       THE COURT:  You don't have any problems with the

8   instruction?

9       MR. BROPHY:  No, Your Honor.

10      THE COURT:  Are we ready?  Okay.  Bring the jury in.

11      COURT SECURITY OFFICER:  Please rise for the jury.

12          *(9:43 a.m., the jury enters the courtroom.)*

13                       *   *   *

14      THE COURT:  Please be seated.  Ladies and gentlemen,

15  we had another legal issue, as we frequently do in these cases,

16  so I apologize, but I didn't want you to have to sit here and

17  have us try to work this out at sidebar.  What a waste.

18      We're going to hear from another witness just now, so

19  I need to give you a what we call a limiting instruction, a

20  cautionary instruction.  Now, you're about to hear testimony

21  from an employee of a different ISP, okay, Cox Communications,

22  about infringement notices it received from a different

23  monitoring company called IP-Echelon.  This evidence is

24  relevant only to Grande's state of mind when developing and

25  implementing its DMCA policy in February 2017.  It has no other

JURY TRIAL PROCEEDINGS                    1675

1    relevance to this case.  Okay?  Thank you very much.

2           You can proceed, counsel.

3           MR. BROPHY:  Thank you, Your Honor.  I may have

4    miscommunicated this to you, but we're going to play a

5    different deposition first before that one.

6           THE COURT:  You are?

7           MR. BROPHY:  Yes, Your Honor.

8           THE COURT:  Well, this goes to the next deposition,

9    the Cox employee deposition.

10          MR. BROPHY:  Stay tuned.

11          THE COURT:  I'm not going to repeat it.  I don't think

12   I need to repeat it later.

13          MR. BROPHY:  Thank you, Your Honor.  We're going to

14   play the video deposition of a woman named Victoria Sheckler.

15   She's a corporate representative for RIAA, the Recording

16   Industry Association of America.

17          THE COURT:  Yes, the plaintiffs in this case.  Well --

18          MR. BROPHY:  The industry body.

19          THE COURT:  Yes, the industry body for the plaintiffs

20   in this case.

21          MR. BROPHY:  Thank you.

22          THE COURT:  The RIAA is actually not a plaintiff in

23   this case, the individual companies are.

24                        *   *   *

25          *(Videotaped deposition playing.)*

1  BY MR. HOWENSTINE:

2  Q.  Good morning, Ms. Sheckler.

3  A.  Good morning.

4  Q.  Could you please state your full name and address for the

5  record?

6  A.  Victoria Sheckler.

7  Q.  And could you please also state your employer and title?

8  A.  I work for the Recording Industry Association of America.

9  I'm the deputy general counsel.

10 Q.  And how long have you been in that role?

11 A.  Ten years.

12 Q.  Did you hold a position with RIAA prior to that?

13 A.  Yes.

14 Q.  And what was that?

15 A.  I was the assistant general counsel.

16 Q.  And for what period of time were you in that role?

17 A.  About a year.

18 Q.  And prior to that, was that your first position with RIAA?

19 A.  Yes.

20 Q.  Are you also a senior vice president right now?

21 A.  Yes.

22 Q.  Senior vice president and deputy general counsel?

23 A.  Yes.

24 Q.  Is -- have you been senior vice president and deputy

25 general counsel at the same time?

1   A.   Yes.

2   Q.   In your current role as deputy general counsel, do you have

3   a defined set of responsibilities for the RIAA?

4   A.   Yes and no, in that there is a defined set of

5   responsibilities, but I also do projects as directed by the

6   general counsel.

7   Q.   And what is your defined set of responsibilities?

8   A.   I am corporate counsel for RIAA.  I'm HR counsel for RIAA.

9   I'm lobbying ethics counsel for RIAA.  And that is, you know,

10  whatever needs doing at RIAA.

11  Q.   What type of entity is RIAA?

12  A.   It's a trade association.

13  Q.   Is that the legal type of entity that RIAA is?

14  A.   We're a 501(c)(6).

15  Q.   And that's a nonprofit corporation?

16  A.   Yes.

17  Q.   I'd like to switch gears a little bit and talk about

18  Rightscorp.  When did RIAA first become aware of Rightscorp?

19  A.   I don't know exactly, but probably sometime between 2007

20  and 2011.

21  Q.   And what is that understanding based on, that timeframe?

22  A.   They were a new P2P vendor, a new peer-to-peer scanning

23  vendor, and they reached out to tell us about their technology

24  at some point in those years.  I'm not exactly sure when.

25  Q.   Has RIAA ever been a party to an NDA with Rightscorp?

1   *A.   Yes.*

2   *Q.   And when was that NDA executed?*

3   *A.   I believe it was 2011.*

4   *Q.   And if you could describe for me at a high level what the*

5   *circumstances were that led to the execution of that NDA.*

6   *A.   If I remember properly, which I may not, I believe it was*

7   *in connection with a proposal to do some scanning work for us.*

8   *Q.   So Rightscorp was marketing its services to RIAA?*

9   *A.   Yes.*

10  *Q.   And in connection with that, the parties entered into an*

11  *NDA so that Rightscorp could provide some information to RIAA;*

12  *is that correct?*

13  *A.   Yes.*

14  *Q.   And what was the term of that NDA?*

15  *A.   I don't know.*

16  *Q.   What information did Rightscorp provide to RIAA pursuant to*

17  *that NDA?*

18  *A.   I don't recall.*

19  *Q.   Based on your own personal knowledge, when did the RIAA*

20  *next have any contact with Rightscorp?*

21  *A.   My recollection is that Rightscorp would reach out to us*

22  *periodically over the years, so I don't know if it was once a*

23  *year.  I don't know if it was every other year.  I don't know*

24  *if it was every six months, but they periodically reached out*

25  *to us.*

1   Q.   *To market their services?*

2   A.   *Yes.*

3   Q.   *Those services being the sending of notices to ISPs of*

4   *alleged infringement.   For example --*

5          COURT REPORTER:   *Services being what?   I'm sorry.*

6   BY MR. HOWENSTINE:

7   Q.   *Those services being, for example, the sending of notices*

8   *to ISPs concerning alleged infringement; is that correct?*

9   A.   *Their P2P scanning services.*

10  Q.   *And RIAA has never hired Rightscorp to send notices on*

11  *their behalf; is that correct?*

12  A.   *Yes.*

13  Q.   *This Exhibit 4 is a document that was produced in this case*

14  *with beginning Bates number RIAA_00059875, and that's the next*

15  *document in the Bates sequence from the e-mail, correct?*

16  A.   *Yes.*

17  Q.   *So presumably this letter is the attachment that's referred*

18  *to in Exhibit 3?*

19  A.   *Presumably.*

20  Q.   *So here Mr. Sabec is sending to Mr. Marks a proposal for*

21  *some language that Mr. Marks could then send to RIAA member*

22  *companies in the letter; is that correct?*

23  A.   *Yes, appears to be.*

24  Q.   *And this includes proposals that Mr. Sabec was suggesting*

25  *that Mr. Marks could recommend that RIAA member companies*

1    *adopt, correct?*

2    *A.  Yes, this is a Rightscorp proposal.*

3    *Q.  Did Mr. Marks accept this proposal?*

4    *A.  No.*

5    *Q.  Did Mr. Marks decide to forward this proposal on to any*

6    *RIAA member companies?*

7    *A.  Not to my knowledge.*

8    *Q.  And why not?*

9    *A.  That's attorney/client privilege.*

10   *Q.  Were you made aware of this proposal from Rightscorp to*

11   *RIAA when Mr. Marks received it?*

12   *A.  I don't recall.*

13   *Q.  So you didn't perform any analysis of whether or not RIAA*

14   *should accept the proposal, make a counter-proposal?*

15   *A.  I performed analysis on these type of activities.*

16   *Q.  And so you performed analysis about, for example, what*

17   *vendors RIAA should use to send notices of alleged infringement*

18   *to ISPs?*

19   *A.  Yes.*

20   *Q.  But you didn't perform any such evaluation with respect to*

21   *Rightscorp?*

22   *A.  We did some -- we at RIAA did some analysis of Rightscorp.*

23   *Q.  What timeframe are you speaking about?*

24   *A.  Had to be at least 2011.*

25   *Q.  So in 2011, it's your understanding that RIAA analyzed*

1    *whether to use Rightscorp as a vendor for sending notices of*

2    *alleged infringement to ISPs; is that correct?*

3              *(Videotaped deposition stopped.)*

4                          * * *

5              MR. HOWENSTINE:  I'm sorry, Your Honor.  We have a

6    little technical issue with the depo transcript.  We just want

7    to make sure that we're playing the right thing before we

8    continue.

9              THE COURT:  All right.  That's not a problem.

10             *(Pause.)*

11             MR. HOWENSTINE:  I apologize.  It's just going to be

12   another minute.

13             *(Pause.)*

14             Your Honor, we're okay to proceed.

15             THE COURT:  All right.

16             *(Videotaped deposition playing.)*

17   *A.  Sometime during the timeframe.  I don't exactly remember*

18   *when, yes, we received a proposal from Rightscorp and we*

19   *analyzed it.*

20   *Q.  And that was a proposal for what exactly?*

21   *A.  It was to do P2P scanning and notice sending.*

22   *Q.  Could you describe the proposal any more specifically than*

23   *that?*

24   *A.  No.*

25   *Q.  And you indicated this was roughly in the 2011 timeframe?*

1    A.   Sometime between 2011 and maybe a little later.  I'm not --
2    I don't remember off the top of my head.
3    Q.   And you were involved in that analysis?
4    A.   Yes.
5    Q.   Who else within RIAA was involved in that?
6    A.   I couldn't tell you.
7    Q.   You don't have any recollection?
8    A.   No.
9    Q.   And without getting into the substance of what you did,
10   your actual conclusions, did you analyze the capabilities of
11   Rightscorp's system?
12   A.   At RIAA we did.
13   Q.   And did you generate some sort of work product to sort of
14   set out what they could and couldn't do?
15   A.   No.
16   Q.   Did you then make a recommendation or presentation to
17   anyone within RIAA about Rightscorp?
18   A.   There was no presentation, but there was a recommendation.
19   Q.   And who was the recommendation made to?
20   A.   I don't recall specifically, but I imagine it would have
21   been to Steve Marks and to the labels.
22   Q.   And since that time, RIAA has never engaged Rightscorp to
23   send notices on its behalf, correct?
24   A.   That's right.
25   Q.   This Exhibit 6 is an e-mail that was produced with Bates

 1    *number RIAA_00059827, and this is an e-mail from Mr. Sabec to*
 2    *Mr. Marks, dated July 9, 2015, correct?*
 3    *A.   Yes.*
 4    *Q.   And this is where Mr. Sabec is responding and actually*
 5    *attaching those two presentations decks that we discussed*
 6    *before, correct?*
 7    *A.   Yes.*
 8    *Q.   And then Exhibit 7 and 8 are the two referenced*
 9    *presentation decks, correct?*
10    *A.   Yes.*
11    *Q.   Did you review these presentation materials in preparation*
12    *for your deposition today?*
13    *A.   Yes.*
14    *Q.   What other information about the capabilities of its*
15    *scanning system did Rightscorp provide at the time of this*
16    *proposal?*
17    *A.   I don't recall.*
18    *Q.   In connection with this proposal, did RIAA perform any*
19    *additional analysis of the capabilities or the limitations of*
20    *Rightscorp's system?*
21    *A.   I don't know.*
22    *Q.   Did you speak to Mr. Marks about these presentation decks?*
23    *A.   I may have at the time.*
24    *Q.   You don't recall?*
25    *A.   I don't recall.*

Victoria Sheckler - Examination                    1684

1   Q.  Do you recall speaking to anyone else within RIAA about the

2   proposal set forth in these presentation decks around the time

3   the proposal was made in 2015?

4   A.  I don't recall.

5   Q.  So someone may have come to you and asked you for your

6   input in view of your previous analysis of Rightscorp's system,

7   you just don't recall if that happened?

8   A.  I don't recall.

9   Q.  If you could flip forward two pages to the Bates page

10  59853, which is titled "Repeat Infringer Technology."  Do you

11  see that?

12  A.  Yes, uh-huh.

13  Q.  There's a reference here to "due process, avoids false

14  positives."  Do you see that?

15  A.  Yes.

16  Q.  What's your understanding of what Rightscorp does to afford

17  due process to individuals who receive its notices of alleged

18  infringement?

19  A.  I don't know.  And I'd like to take a break, please.

20  Q.  Sure.

21  A.  Thank you.

22  Q.  Does RIAA have an understanding of whether Rightscorp

23  maintains or monitors an e-mail in-box for receiving inquiries

24  about notices of alleged infringement?

25  A.  I don't know.

1   Q.   RIAA doesn't know one way or the other?

2   A.   With respect to a specific e-mail address, I don't know.

3   Q.   Or with respect to an e-mail address generally?

4   A.   I don't know.

5   Q.   So this presentation -- this set of presentation materials

6   in Exhibit 8 contains two different proposals to the RIAA and

7   its member companies, correct?

8        If it helps, I'll refer you specifically to Bates page

9   59846.

10   A.   Yes.

11   Q.   And RIAA did not adopt or recommend to its members either

12   of these two proposals, correct?

13   A.   To my knowledge, these were not communicated.

14   Q.   They were never communicated to the RIAA members?

15   A.   To my knowledge, they were not communicated.

16   Q.   This Exhibit 9 -- and I apologize, the Bates numbers are a

17   little bit cut off the bottom -- is a document that was

18   produced in this case with Bates number RIAA_00059818.  This is

19   the Litigation Support and Consulting Agreement dated

20   October 19, 2016 between RIAA and Rightscorp, correct?

21   A.   Yes.

22   Q.   And then if you look at paragraph one of this agreement, it

23   states:  "Consultant will provide to the company the services

24   (Services) described in parts C and D of Schedule A and the

25   deliverables (Deliverables) described in parts A and B of

1    Schedule A."

2        I'd like to first talk about the deliverables, so if we

3    could turn to that Schedule A.  This is on Bates page 59825.

4    Do you see Schedule A?

5    A.   Yes.

6    Q.   And in letters A and B, this describes the deliverables

7    Rightscorp owed to RIAA under this agreement, correct?

8    A.   Yes.

9    Q.   If you look at item C in this Schedule A -- this is turning

10   to the services -- and it states: "Consulting and litigation

11   support services through summary judgment."

12       Do you see that?

13   A.   Yes.

14   Q.   And the first item is "Ingest copyrights."  What does that

15   refer to?

16   A.   It refers to ingesting reference files of all members'

17   content.

18   Q.   Has Rightscorp ever done this on behalf of any RIAA

19   members?

20   A.   No, not under this agreement.

21   Q.   Or otherwise?

22   A.   To my knowledge.

23   Q.   Rightscorp -- let me back up.

24       No RIAA member company has provided information to

25   Rightscorp about its copyrights, correct?

1   A.   *I don't know.*

2   Q.   *To your knowledge, that's never happened?*

3   A.   *I don't know if the members have given information to*

4   *Rightscorp or not.*

5   Q.   *As you sit here today, you're not aware of any instance in*

6   *which any RIAA member company has provided a list of*

7   *copyrighted works to Rightscorp to monitor, correct?*

8   A.   *I am not aware.*

9   Q.   *This next bullet point in item C states:   "Send notices*

10  *provided that the notices are pre-approved by RIAA."*

11       *Rightscorp has never sent any notices on behalf of the RIAA*

12  *or its member companies, correct?*

13  A.   *To my knowledge, they have never sent any notices on behalf*

14  *of RIAA.*

15  Q.   *Or its member companies?*

16  A.   *To my knowledge, they have never sent notices through RIAA.*

17  *RIAA sends notices on behalf of its member companies, so I*

18  *don't know of any through our programs.   And I am not aware of*

19  *any others on behalf of our member companies.*

20  Q.   *Has Rightscorp ever submitted any proposed form of notices*

21  *to RIAA for approval?*

22  A.   *I have no idea.*

23  Q.   *To your knowledge, no?*

24  A.   *I honestly don't recall.*

25  Q.   *You can't identify any instance of that happening, correct?*

1    A.  I don't recall.

2    Q.  So to be clear, no?

3    A.  I don't recall.

4    Q.  And I'm just asking not whether you recall or not, but

5    whether you can identify for me any instance in which

6    Rightscorp provided a sample form notice to RIAA for approval?

7    A.  To my knowledge, there has never been a notice submitted to

8    us for approval.

9    Q.  This next item says, "Send weekly roll-up reports."

10       Those are roll-up reports sent to ISPs, correct?

11   A.  Yes.

12   Q.  Has Rightscorp ever sent weekly roll-up reports on behalf

13   of RIAA or any of its member companies?

14   A.  I believe these roll-up reports would be sent to RIAA and,

15   no, we did not receive any.

16   Q.  Okay.  So this is referring to the sending of roll-up

17   reports to RIAA?

18   A.  Yes.

19   Q.  But Rightscorp never did that?

20   A.  That's correct.

21   Q.  The next item is "Populate dashboard."  What does that

22   refer to?

23   A.  I believe it is putting information into what they call

24   their ISP dashboard.

25   Q.  But you don't know whether Rightscorp has ever done that or

1    *not?*

2    *A.  I don't believe they did.*

3    *Q.  The next item in this list is "Communicate with ISPs."  Has*

4    *Rightscorp ever communicated with any ISP on RIAA's behalf?*

5    *A.  I believe it has, in connection with this litigation.*

6    *Q.  And those -- and you're referring specifically to the*

7    *sending of e-mail notices?*

8    *A.  No.*

9    *Q.  What are you referring to then?*

10   *A.  I believe that you have or will be taking their depositions*

11   *at some point.*

12   *Q.  So this communication refers to participation in*

13   *depositions?*

14   *A.  No.*

15   *Q.  But that's the communication -- that's the only*

16   *communication with ISPs you're aware of?*

17   *A.  Yes.*

18   *Q.  The next item is, "Acquire sample files in the number and*

19   *quantity reasonably requested by RIAA."*

20       *Has RIAA asked Rightscorp to acquire any sample files on*

21   *its behalf?*

22   *A.  To my knowledge, not beyond the initial data that they*

23   *provided to us.*

24   *Q.  So you recall when we left off we were talking about this*

25   *Exhibit 9, which is the Litigation Support and Consulting*

1    *Agreement between Rightscorp and RIAA?*

2    *A.   Yes.*

3    *Q.   Just as a point of clarification, the term "company" in*

4    *this agreement, that refers to RIAA, correct?*

5    *A.   Yes.*

6    *Q.   If you could turn to paragraph eight of this agreement.*

7    *A.   Mm-hmm.*

8    *Q.   In the second sentence, it states:  "Company acknowledges*

9    *that the deliverables have been (With respect to the existing*

10   *data) and will be (With respect to new data) compiled from raw*

11   *data, which is then defined as, quote/unquote 'raw data'*

12   *collected by consultant in the course of its business*

13   *operations for itself, the company, and other clients and*

14   *trading partners of consultant."*

15       *Do you see that?*

16   *A.   Yes.*

17   *Q.   So here RIAA is acknowledging that there's certain raw data*

18   *that provides the basis for the deliverables that Rightscorp*

19   *was obligated to provide to RIAA, correct?*

20   *A.   Yes.*

21   *Q.   And this would include the data underlying the alleged*

22   *detections that are reported in Rightscorp's notices, correct?*

23   *A.   The data includes the data about the infringements.*

24   *Q.   Right.  And my question was, it's the data underlying the*

25   *notices sent to Grande by Rightscorp, correct?*

1    A.   To my knowledge, yes.

2    Q.   And then this agreement then provides that -- in this

3    paragraph eight -- that, "Rightscorp shall not make any use

4    whatsoever of the raw data (Including any derivatives thereof)

5    that could be reasonably anticipated to have any negative

6    impact on RIAA or with respect to the litigation," correct?

7    A.   Were you quoting from the -- yes, here.  It says, "The

8    consultant may not sell or transfer raw data or derivatives" --

9    Q.   And I'm referring to the preceding sentence.

10   A.   Oh, the preceding sentence?

11   Q.   Yes.

12   A.   Sorry.  So, "Consultant shall not make any use whatsoever

13   of the raw data (including any derivatives thereof) that could

14   be reasonably anticipated to have any negative impact on the

15   company or with respect to the litigation."

16   Q.   So this is saying that Rightscorp is not allowed to do

17   anything with the raw data that would negatively impact the

18   litigation, correct?

19   A.   Yes.

20   Q.   And then the agreement goes on to say, "For avoidance of

21   doubt, consultant--" and that means Rightscorp "--may not sell

22   or otherwise transfer any raw data or derivatives thereof to

23   target ISP--" and that means Grande "--under any

24   circumstances."

25        Correct?

1   A.   Yes.

2   Q.   So this is saying that under no circumstances is Rightscorp

3   to provide raw data from its system to Grande?

4   A.   It says that the consultant may not sell or otherwise

5   transfer any raw data or derivatives thereof to the target ISP.

6   Q.   And that means Grande?

7   A.   Yes.

8   Q.   Under any circumstances?

9   A.   Yes.

10  Q.   Is it your understanding that if Rightscorp provides any

11  witnesses to testify at trial in this matter, they will be paid

12  on an hourly basis.

13  A.   It is my understanding that they will be paid for prep in

14  connection with the trial.

15  Q.   And their respective hourly rates for that prep are set out

16  in this Schedule B to this agreement?

17  A.   Yes.

18  Q.   And that's $500 an hour for Mr. Sabec?

19  A.   Yes.

20  Q.   And $350 an hour for Robert Steele?

21  A.   Yes.

22  Q.   $350 an hour for Greg Boswell?

23  A.   Yes.

24  Q.   $175 an hour for Tim Youmans?

25  A.   Yes.

1  Q.  And any other staff at $100 per hour?

2  A.  Yes.

3  Q.  Has RIAA ever engaged any vendors to send notices of

4  alleged infringement to ISPs?

5         MR. GILMORE:  Objection.

6  BY MR. HOWENSTINE:

7  Q.  To ISPs?

8  A.  Yes.

9  Q.  Has RIAA ever sent out requests for proposals to vendors to

10  solicit information -- to solicit proposals for sending notices

11  of alleged infringement?

12  A.  Yes.

13  Q.  Has RIAA ever requested that Rightscorp respond to such a

14  request for proposal?

15  A.  Yes.

16  Q.  Has RIAA received a response from Rightscorp as to any such

17  request for proposal?

18  A.  Yes.

19  Q.  Did you review Rightscorp's -- well, first of all, on how

20  many occasions did Rightscorp respond to a request for proposal

21  from RIAA?

22  A.  I don't know.

23  Q.  On more than one occasion?

24  A.  Yes.

25  Q.  On more than two occasions?

1   A.   Yes.

2   Q.   On more than three occasions?

3   A.   I don't know.

4   Q.   So you know that there was at least two, maybe more?

5   A.   Yes.

6   Q.   If I could refer you back to Exhibit 8 in your stack, which

7   is one -- one set of the 2015 presentation materials --

8   A.   Okay.

9   Q.   -- that Rightscorp provided to RIAA.

10  A.   Yes.

11  Q.   And we had previously discussed Bates page 59846 --

12  A.   Yes.

13  Q.   -- which lays out two specific proposals that Rightscorp

14  was making to RIAA?

15  A.   Yes.

16  Q.   In both of these proposals, RIAA wasn't going to be

17  obligated to pay Rightscorp any money to do anything, correct?

18  A.   I don't recall, but based on what's on this slide, it does

19  not appear to.

20  Q.   Under these -- under these proposals, the money would be

21  flowing solely in one direction, from Rightscorp to RIAA?

22  A.   That is what the slide suggests.

23  Q.   But as we discussed, RIAA declined both of these proposals,

24  correct?

25  A.   To my knowledge, we never took up either of these

1    *proposals.*

2    *Q.   We were talking a little bit earlier about RFPs sent to*

3    *Rightscorp by RIAA.  Do you recall that?*

4    *A.   Yes.*

5    *Q.   And you indicated that Rightscorp had responded to at least*

6    *two RFPs from RIAA; is that correct?*

7    *A.   They have responded to requests for proposals from us.*

8    *Q.   On at least two occasions?*

9    *A.   Yes.*

10   *Q.   Perhaps more?*

11   *A.   Yes.*

12   *Q.   When did the first of those RFP responses occur from*

13   *Rightscorp?*

14   *A.   I couldn't tell you the first time.*

15   *Q.   Roughly?*

16   *A.   I don't know.*

17   *Q.   Before 2012?*

18   *A.   I don't know.  No, that's not true.  I do know that there*

19   *was one before 2012.  I don't know if it was the first or not.*

20   *Q.   So that would be -- that RFP response would fall before the*

21   *date range for which RIAA collected potentially responsive*

22   *documents for this case, correct?*

23   *A.   Yes.*

24   *Q.   And what did that -- what was that RFP seeking from*

25   *Rightscorp?*

1   A.   It was in connection with P2P scanning.

2   Q.   And specifically what sort of proposal was RIAA seeking?  A

3   proposal to do what?

4   A.   It was P2P scanning and notice sending.

5   Q.   And that was the sending of notices to a specific set of

6   ISPs at that time?

7   A.   Yes.

8   Q.   Was this request for proposal sent to multiple vendors of

9   services for sending notices of alleged infringement?

10  A.   Yes.

11  Q.   And was one company selected as the recipient of an award

12  or contract after that RFP process?

13  A.   Yes.

14  Q.   And when did the next RFP to Rightscorp occur?

15  A.   I don't know.

16  Q.   After 2011?

17  A.   I don't know.

18  Q.   So is it your testimony that it may have been before 2011?

19  A.   I don't know.

20  Q.   Are you aware of any instances after 2011 in which RIAA

21  sent RFPs to vendors of services for sending notices of alleged

22  infringement to ISPs?

23  A.   RIAA did request quotes for sending notices to -- I mean,

24  sending P2P notices to infringers after 2011.

25  Q.   And to whom were those requests sent?

1    A.   We sent them to MarkMonitor and to Rightscorp.

2    Q.   So Rightscorp did receive a request for a quote after 2011?

3    A.   Yes.

4    Q.   And in approximately what year?

5    A.   The ones that I recall were 2018 and 2017.

6    Q.   But nevertheless, to date, RIAA has not engaged Rightscorp

7    to send any notices on its behalf, correct?

8    A.   Rightscorp -- RIAA is not sending P2P notices at this time.

9    Q.   This Exhibit 17 is a document that was produced in this

10   case, beginning Bates number MM_000001.  And I will represent

11   to you that the MM Bates number means that it was produced by

12   MarkMonitor.

13   A.   Okay.

14   Q.   Have you seen this document before?

15   A.   Yes.

16   Q.   And what is this?

17   A.   It's a master agreement between Detectnet and RIAA.

18   Q.   And Detectnet is now known as MarkMonitor?

19   A.   Yes.

20   Q.   And this agreement is dated December 20, 2011?

21   A.   Yes.

22   Q.   If you turn forward to the Bates page 15, there's reference

23   here to a statement of work number two.  Do you see that?

24   A.   Yes.

25   Q.   The statement of work number one doesn't appear to be

1   *included here, correct?*

2   *A.  I don't know.*

3   *Q.  Well, let me resolve that mystery.  This will be Sheckler*

4   *Exhibit 18.  So there was a request for proposal for RFP dated*

5   *August 12, 2011 that RIAA sent to MarkMonitor and others,*

6   *correct?*

7   *A.  It was sent on behalf of RIAA.*

8   *Q.  To MarkMonitor and Rightscorp?*

9   *A.  I believe so.*

10  *Q.  But you indicated earlier that Rightscorp submitted a*

11  *response to this August 12, 2011 RFP, correct?*

12  *A.  They submitted a response to an RFP that was issued in*

13  *2011.  I don't know off the top of my head if it was the*

14  *specific August 11th one or not.*

15  *Q.  Looking at this appendix B with respect to the various*

16  *requirements that are set forth here --*

17          MR. GILMORE:  Can we stop, please?

18          *(Videotaped deposition stopped.)*

19          MR. GILMORE:  This document isn't in evidence,

20  according to our information.

21          MR. BROPHY:  Your Honor, this document has been in

22  evidence for over a week now, 67 and 68.

23          MR. GILMORE:  Exhibit 67.

24          THE COURT:  It is in evidence.

25          COURTROOM DEPUTY CLERK:  Both of them are, as of

1    October 13th.

2          MR. GILMORE:  I'm looking at the report that Court

3    sent, says no.  For Defense 67 and 68, both saying no.

4          COURTROOM DEPUTY CLERK:  Are you looking at the one

5    from the 21st?

6          MR. GILMORE:  Yes.

7          COURTROOM DEPUTY CLERK:  Defense 67 and Defense 68?

8          MR. BROPHY:  Yes, ma'am.

9          COURTROOM DEPUTY CLERK:  They're admitted.

10          MR. BROPHY:  May we proceed, Your Honor?

11          THE COURT:  Yes.

12                        *   *   *

13          *(Videotaped deposition playing.)*

14   *Q.  -- can satisfy or has ever satisfied these requirements?*

15   *A.  I don't recall.*

16   *Q.  You don't know one way or the other?*

17   *A.  I don't recall.  You asked did they satisfy these*

18   *requirements and did we test to these requirements, if I*

19   *understood your question properly, and I don't remember the*

20   *scope of the analysis.*

21   *Q.  Yeah, and I believe my question was slightly different,*

22   *which was:  Are you aware of RIAA performing any assessment of*

23   *whether Rightscorp has ever satisfied or can satisfy the*

24   *requirements that are set forth in this appendix B?*

25   *A.  I don't know if the response that I'm contemplating was in*

Victoria Sheckler - Examination                1700

 1   *response to this August 11th, because I don't remember the*

 2   *August 11th RFP.  I know that we did look at data from*

 3   *Rightscorp around this timeframe and it involved me and others*

 4   *at RIAA.*

 5   *Q.  But to your knowledge, Rightscorp did provide a written*

 6   *response to an RFP in 2011?*

 7   *A.  I don't recall for sure, but I believe they did because I*

 8   *remember this analysis.*

 9   *Q.  Do you know who Howie Singer is?*

10   *A.  Yes.*

11   *Q.  Who is Howie Singer?*

12   *A.  He was the -- I don't know his exact title, but in my mind,*

13   *the chief technology officer at Warner.*

14   *Q.  He used to be?*

15   *A.  Yes.*

16   *Q.  What is Mr. Singer doing now?*

17   *A.  I believe he's consulting for Universal.*

18   *Q.  Have you ever had any discussions with Mr. Singer about*

19   *Rightscorp?*

20   *A.  Yes.*

21   *Q.  And what did you and Mr. Singer talk about concerning*

22   *Rightscorp?*

23   *A.  I don't recall.  I don't know.*

24   *Q.  Let's take a slightly different tack.*

25       *Could you pull out Exhibit 2 from that stack sitting in*

Victoria Sheckler - Examination          1701

1   front of you.  Exhibit 2 being the Rule 30(b)(6) notice with a

2   list of topics.

3   A.  I didn't close these out, so I forgot which one it is.

4   Okay.

5   Q.  If you could turn to page seven, topic 29.

6   A.  Yes.

7   Q.  And that topic states:  "The factual bases for the Sony

8   plaintiff's assertion that defendants have infringed any or all

9   of plaintiff's copyrighted sound recordings."

10      Is that the topic that you prepared to testify about today?

11                          (No answer.)

12                          *   *   *

13  Q.  Have plaintiffs conducted any assessment of the costs or

14  burdens imposed on Grande by BitTorrent activity on its

15  network?

16  A.  Plaintiffs are generally aware that there are costs borne

17  by ISPs in the provision of Internet access.

18  Q.  And my question was a little more specific.  My question

19  concerned costs or burdens imposed by network traffic

20  associated with BitTorrent activity.

21      Have plaintiffs performed any assessment of those costs or

22  burdens that Grande incurs as a result of BitTorrent activity

23  on its network?

24  A.  We are generally aware that BitTorrent traffic increases

25  the load on ISPs and that that could lead to additional cost.

 1  *Q.  And has RIAA performed assessments of what those costs are*

 2  *for ISPs?*

 3  *A.  Not to my knowledge.*

 4  *Q.  Has RIAA advised any of the plaintiffs about whether to use*

 5  *DRM to protect their music?*

 6  *A.  Yeah, I don't know.*

 7  *Q.  So you don't have any knowledge of any discussions between*

 8  *RIAA and the plaintiffs about the use of DRM to protect their*

 9  *music?*

10  (No answer.)

11                        *  *  *

12  *Q.  The MP3 files downloaded through the iTunes music store*

13  *certainly do not use any sort of DRM; is that correct?*

14  *A.  To my knowledge, MP3s don't have DRM.*

15       *(Videotaped deposition stopped.)*

16                        *  *  *

17       MR. BROPHY:  Your Honor, that's the end of

18  Ms. Sheckler's testimony.  If it's all right with Your Honor, I

19  propose we take our morning break now.

20       THE COURT:  Yes, it's a good time.  I was going to

21  suggest that.

22       Okay.  Morning recess.

23       COURT SECURITY OFFICER:  Please rise for the jury.

24       *(10:26 a.m., the jury exits the courtroom.)*

25                        *  *  *

```
 1            THE COURT:  Please be seated.  Now, where are we?
 2   We've got the contested depo, that's very short.
 3            MR. BROPHY:  Yes, Your Honor.  I think we'll prepare
 4   that over the break and play that and then we'll move right
 5   into Ms. Frederiksen, if that's all right with you.
 6            THE COURT:  How long do we anticipate she'll take?
 7            MR. O'BEIRNE:  Not long, Judge.  The additional direct
 8   should be less than half an hour.
 9            THE COURT:  Okay.  And then you'll have --
10            MR. BROPHY:  I don't think it will be very long at
11   all, Your Honor.
12            THE COURT:  Okay.  And then following that, do you
13   have any other witnesses?
14            MR. BROPHY:  Yes, Your Honor, we're going to call our
15   technical expert.
16            THE COURT:  Oh, that's right.
17            MR. BROPHY:  Bracing to be done today.
18            THE COURT:  I knew there was another one hiding out
19   there in the grass.
20            MR. BROPHY:  One more.
21            THE COURT:  Thank you very much.  Take your recess.
22   Thank you.
23            COURT SECURITY OFFICER:  Please rise.
24            MR. BROPHY:  Oh.
25            THE COURT:  Yes, sir.
```

1            MR. BROPHY:  I'm sorry, Your Honor.  I forgot to put

2    these on the record.  I apologize.

3            THE COURT:  All right.

4            MR. BROPHY:  Exhibits 14 and 15, Defense Exhibits 14

5    and 15, we would like to move those into evidence.

6            THE COURT:  What are they?

7            MR. BROPHY:  Those are the -- Ms. Sheckler just

8    discussed them, the RFP responses from the Rightscorp company

9    submitted to RIAA.

10           THE COURT:  Any objection?

11           MR. GILMORE:  Yes.  We object to them as hearsay.

12   They are not -- not business records from the RIAA.  They were

13   documents that were submitted to the RIAA.  They have not

14   established that those documents were otherwise non-hearsay

15   from any of the Rightscorp witnesses that testified here, so

16   we're not contesting the foundation, but it is a hearsay

17   document.  It's not a business record or a party admission or

18   anything like that, because it comes from a non-party to a

19   non-party.

20           MR. BROPHY:  Your Honor, we have Fifth Circuit case

21   law indicating that when you admit a document to prove

22   something other than the truth of it, it is not hearsay.  In

23   this case, we are introducing these materials to prove that

24   they are false.  Rightscorp claimed it could do things to the

25   RIAA that its system does not do, and for that reason this is

 1  not hearsay.

 2          It's also a business record because it was kept in the

 3  ordinary course of the RIAA's business.

 4          THE COURT:  The objection is overruled.  It will be

 5  received.

 6          MR. BROPHY:  Thank you, Your Honor.

 7          (10:29 a.m.)

 8                              *   *   *

 9          (11:07 a.m.)

10          COURT SECURITY OFFICER:  All rise.

11          THE COURT:  The Court would note the presence of the

12  parties and counsel and the absence of the jury.

13          So I need to put something on the record here.  One of

14  our -- you can be seated, counsel.  Thank you very much.

15          One of our jurors, unfortunately, had a personal

16  matter come up that was very, very upsetting to her and

17  prevented her from being able to concentrate this morning.  She

18  was quite candid.  I spoke with her in the presence of my

19  courtroom deputy just to determine -- I wanted to see if it was

20  a physical thing, if we needed to call an ambulance or what was

21  going on, and she described to me that she was having panic

22  attacks, she didn't sleep at all last night and that she was

23  unlikely to be able to concentrate at all.  And she hadn't been

24  concentrating this morning.

25          That's what she said, correct?

```
 1            COURTROOM DEPUTY CLERK:  Yes, Judge.
 2            THE COURT:  All right.  So I called counsel in and
 3    explained the situation to them and I gave counsel the option
 4    of my simply recessing the trial today and bringing her back on
 5    Tuesday or excusing her at this time and then moving forward
 6    with the remaining jurors.
 7            Obviously, this has been a very long trial.  A lot
 8    of -- I mean, counsel have been working very hard on a timeline
 9    that they have created.  I don't think counsel would suggest I
10    push them, but I have indicated that, you know, this case can't
11    go on forever, and they don't believe it should either.
12            I gave them the opportunity to consult with their
13    clients, as they must, and they have advised me that they would
14    prefer that I excuse her and that we move forward with the
15    remaining jurors, and which I will do.
16            Is there anything I have stated here that does not
17    comport with your recollection?
18            MR. BROPHY:  No, Your Honor.  On behalf of Grande, we
19    have no objection.
20            MR. BART:  Same.
21            THE COURT:  Okay.  I think it's important to remember
22    that in civil cases -- and counsel are experienced civil
23    lawyers in federal court, they know this -- that we have a
24    minimum, under the rules, of six jurors.  We can't go with less
25    than six, but this will leave us with three additional jurors.
```

1  We'll have nine.  All nine will deliberate.  We won't just send

2  six back.  All nine will deliberate and the verdict must be

3  unanimous, so I agree with counsel.  It's not like they're

4  losing the opportunity to have a larger panel and require a

5  unanimity among the jurors.

6         Okay.  With that, I am going to bring the jury back

7  in, those remaining.  Have we told the other young lady that

8  she's excused?

9         COURTROOM DEPUTY CLERK:  I will now.

10        THE COURT:  Go tell her that she's excused and tell

11  her I said thank you very much and the Court really

12  appreciates -- and the parties really appreciate her service

13  and not to worry about it.  Okay?

14        COURTROOM DEPUTY CLERK:  And bring the rest of the

15  jurors in.

16        THE COURT:  And bring the rest of the jurors in and I

17  will explain to them that for a personal reason we had to

18  excuse the juror and had nothing to do with the parties.

19        MR. BROPHY:  Your Honor, just to give you a preview,

20  we're going to play that very short clip --

21        THE COURT:  Yes.

22        MR. BROPHY:  -- and then we'll move into

23  Ms. Frederiksen.

24        THE COURT:  Yes, thank you for that.

25                        *  *  *

 1          COURT SECURITY OFFICER:  Please rise for the jury.

 2          *(11:11 a.m.)*

 3                          *   *   *

 4          THE COURT:  Please be seated.  The Court would note

 5     the presence of the jury.

 6          Obviously, as you can see, we're missing one of your

 7     colleagues on the jury.  She had a very serious personal issue,

 8     and that was preventing her from being able to concentrate.

 9     And the lawyers and I have agreed that under the circumstances

10     it would have been dramatically unfair to her to make her sit

11     here.  And it would be unfair, quite frankly, to the parties to

12     have a juror who could not, through no fault of her own,

13     concentrate on the evidence.  You know, this is not an

14     uncomplicated case.  Okay?  You know that.  So she has been

15     excused with the thanks of the Court.  It's why we do have

16     additional jurors.

17          Now, as I told you, I have to have a minimum of six

18     under the law.  We have now nine, so we're in good shape.  But

19     all of you will deliberate.  It's not like in a criminal case.

20     In a criminal case, I'll have two usually, sometimes four

21     alternates, and when we go to deliberate, those alternates have

22     to be excused.  They don't deliberate.  But you will

23     deliberate, all of you will.  So this has nothing to do with

24     the parties.  It has nothing to do with the case.  It has

25     nothing to do with -- the fact is this is one of those things

1    in life, okay, and it is the reason why we do have alternate

2    jurors, so that in case something happens --

3         Look, we really appreciate your jury service, but we

4    know that you're human beings, and so are we, and sometimes

5    life happens, right?  And so we don't want to punish somebody

6    for being on a jury.  These lawyers were very, very

7    accommodating and I appreciate it.  Both sides equally

8    accommodating.

9         Okay.  Are we ready to move forward?

10        MR. BROPHY:  Yes, Your Honor, thank you.

11        Your Honor, we're going to be playing a very brief

12   clip from the deposition of Mr. Brian Cox.

13        THE COURT:  Yes.

14        MR. BROPHY:  He's the executive director of

15   information security for Cox Communication.  There is no

16   relationship, no relation between Cox the company, and Cox the

17   witness.  He's just an employee.

18        THE COURT:  He just happens to have the same last

19   name, that's all.

20        MR. BROPHY:  Correct.

21                         *   *   *

22        (Brian Cox videotaped deposition playing.)

23   Q.  So the PGP signature is a way in which you can authenticate

24   that the e-mail is coming from the sender that it purports to

25   be coming from?

 1   *A.  Yes.*

 2   *Q.  Are you aware or were you aware at the time that IP-Echelon*

 3   *signs their notices with a PGP key?*

 4   *A.  Yes.*

 5   *Q.  But do you recall, in your investigation of the IP-Echelon*

 6   *fraudulent notice issue, if -- whether or not there was a PGP*

 7   *signature was a determining factor in whether a notice was*

 8   *fraudulent or legitimate from IP-Echelon?*

 9   *A.  So, no, that would not be --*

10                          *   *   *

11            MR. O'BEIRNE:  This is not the testimony that Your

12   Honor approved.

13            THE COURT:  What happened?

14            MR. BROPHY:  I'm not sure how that happened, Your

15   Honor.  I apologize.  I'll figure that out.

16            THE COURT:  Okay.

17            *(Pause.)*

18            MR. BART:  I think the appropriate thing is to move to

19   strike everything that just happened and for you to play the

20   proper portion.

21            MR. BROPHY:  I agree with that.  Your Honor, we're

22   happy to strike what we just played.

23            THE COURT:  Yes, that motion is granted.  You will

24   disregard what you just saw.  We'll start all over again.

25            MR. BROPHY:  Thank you, Your Honor.

1          THE COURT:  And if you have any notes on it, please

2    strike them.

3          MR. BART:  And Your Honor, if you wouldn't mind.

4          THE COURT:  Yes, sir.

5          MR. BART:  I'd appreciate if you would repeat the

6    limiting instruction in light of everything that happened at

7    the end of when they play this.

8          THE COURT:  I'm going to reread this limiting

9    instruction on this witness, okay?  I think you probably

10   remember it, but we've had a lot go on and some time has gone

11   by.

12         You are about to hear testimony from an employee of a

13   different ISP, Cox Communications, about infringement notices

14   it received from a different monitoring company called

15   IP-Echelon.  This evidence is relevant only to Grande's state

16   of mind when developing and implementing its DMCA policy in

17   February 2017.  It has no other relevance to this case.

18         MR. BART:  Thank you, Your Honor.

19         MR. BROPHY:  Round two.

20         THE COURT:  Okay.

21         MR. BROPHY:  Thank you, Your Honor.

22         THE COURT:  Sure.  These kinds of things happen, by

23   the way.  I don't blame anybody.  When you're cutting and

24   chopping with these on the fly, so to speak, it happens.

25                         *   *   *

1              *(Videotaped deposition playing.)*
2    *Q. Are you saying the PGP signature is a way in which you can*
3    *authenticate that the e-mail is coming from the sender that it*
4    *purports to be coming from?*
5    *A.  Yes.*
6    *Q. Are you aware or were you aware at the time that IP-Echelon*
7    *signs their notices with a PGP key?*
8    *A.  Yes.*
9    *Q. But do you recall, in your investigation of the IP-Echelon*
10   *fraudulent notice issue, if -- whether or not there was a PGP*
11   *signature was a determining factor in whether a notice was*
12   *fraudulent or legitimate from IP-Echelon?*
13   *A.  So, no, that would not be the only consideration.*
14   *Q. But is it one of the considerations that Cox considered?*
15   *A.  PGP is always considered.*
16              *(Videotaped deposition stopped).*
17                          *   *   ***
18         MR. BROPHY:  Thank you, Your Honor.
19         THE COURT:  Okay.
20         MR. O'BEIRNE:  Your Honor, plaintiffs recall Barbara
21   Frederiksen-Cross.
22         THE COURT:  All right.
23         You may remember, ladies and gentlemen, that she had
24   testified earlier and I told you she was going to be coming
25   back.  Well, she's coming back for just a limited purpose and

1   so she'll be -- this testimony shouldn't take very long.

2          You can be seated, ma'am, and you remain under oath.

3          THE WITNESS:  Thank you, sir.

4                            EXAMINATION

5   BY MR. O'BEIRNE:

6   Q.  Good morning, Ms. Frederiksen.

7   A.  Good morning.

8   Q.  Welcome back.

9   A.  Thank you.

10  Q.  Ms. Frederiksen, we mentioned the audio matching service

11  Audible Magic the other day when you were testifying; do you

12  recall that?

13  A.  Yes, I do.

14  Q.  You understand that Mr. Landis from the RIAA, who testified

15  in this case, used Audible Magic to analyze the downloads from

16  Grande subscribers and match them to works in suit.  That was

17  the testimony he gave; do you recall that?

18  A.  That's my understanding, yes.

19  Q.  I'd like to discuss with the jury your familiarity with

20  Audible Magic and your opinion about whether the results of

21  this Audible Magic analysis by Mr. Landis, in your view,

22  validates the reliability of the Rightscorp system.  Do you

23  understand the topic?

24  A.  Yes, I do.

25  Q.  All right.  Have you had a chance in the past -- without

Barbara Frederiksen-Cross  - Examination        1714

1   getting into the context -- to review the Audible Magic system,
2   the actual source code, of Audible Magic?
3   A.  Yes, I have.
4   Q.  Please explain to the jury your opinion regarding the
5   reliability of Audible Magic.
6   A.  Based on my review of the source code and other technical
7   materials and deposition testimony, I believe that it's an
8   extremely reliable technology for identifying musical clips and
9   movie clips.
10  Q.  And could you please give the jury a little more
11  information about what you had access to in this review to
12  reach that opinion?
13  A.  I had access to the source code for the Audible Magic
14  detection system.  I had the opportunity to interview the chief
15  scientist from Audible Magic.  I was provided with deposition
16  testimony from Audible Magic's 30(b)(6) witness and chief
17  scientist.  And I was provided the opportunity to test the
18  software myself.  And then I was also provided with the system
19  developer tool kit technical documentation for how one would
20  use the system and integrate it into a third-party product, as
21  well as other technical documents relating to the software.
22  Q.  Do you have an understanding of where Audible Magic obtains
23  the reference files that it uses for its comparisons?
24  A.  Yes.  The reference files that Audible Magic uses are
25  delivered to Audible Magic from the recording companies, or in

Barbara Frederiksen-Cross  - Examination          1715

1  the case of movies, from the movie studios.

2  Q.  So when Audible Magic does a comparison, it's comparing an

3  unknown file to the known file provided by the recording

4  companies?

5  A.  Right.  The recording companies provide the files and also

6  information that identifies, for instance, the artist and title

7  and album and that kind of information.

8  Q.  Do you have a sense of how often Audible Magic is used?

9  A.  In the timeframe when I was reviewing the code, they were

10  processing about 10 million transactions a day or a little

11  north of 3 billion transactions a year.

12  Q.  3 billion transactions a year?

13  A.  Billion, yes.

14  Q.  And do you have a sense for, with that volume of

15  transactions, how accurate the system is?

16  A.  Their chief scientist reported and also testified that they

17  received about one error a year where someone had identified a

18  file that was improperly identified.

19  Q.  Did they give you any insight into what would have caused

20  an error like that?

21  A.  The one specific instance that I was involved in

22  investigating, it related to metadata that had been provided by

23  a music company, so they had inadvertently switched the

24  identification of two tracks when they provided the information

25  about the recordings they were provided, and so those two

Barbara Frederiksen-Cross  - Examination        1716

1  tracks could be misidentified.

2  Q.  But that was one out of 3 billion in a year?

3  A.  That was what they were aware of is approximately one a

4  year.

5  Q.  Let's take a look, please, at PX 15.

6       MR. O'BEIRNE:  And this is in evidence already.

7  BY MR. O'BEIRNE:

8  Q.  Ms. Frederiksen, you just testified, but you're aware that

9  Mr. Landis conducted a comparison of the downloads from the

10  drive from Rightscorp and generated an exhibit listing the

11  conclusions from his comparison; do you recall that?

12  A.  Yes, I've seen this exhibit before.

13  Q.  And do you recognize -- what's this part of the exhibit?

14  A.  This part identifies who the owner of the music is, the

15  artist, the track title, the registration number, and then an

16  account of how many of those files was on the hard disk.  So

17  you see there was one copy of *Back In The Day* and eight copies

18  of *Genie In A Bottle*, etc., on the hard disk that he examined.

19  Q.  And that's how many Audible Magic matched to the known

20  recordings from plaintiffs?

21  A.  That's correct.

22       MR. O'BEIRNE:  Could you go to the second section of

23  the Landis spreadsheet, please?

24       THE WITNESS:  Can you blow that up just a little bit?

25       MR. O'BEIRNE:  Sorry, I mean 16, the Excel.  And if

1    you could zoom in on the top of the column to the left.

2    BY MR. O'BEIRNE:

3    Q.  Ms. Frederiksen, do you recall looking at PX 16?

4    A.  Yes.  That was the other half of his first exhibit.

5    Q.  And what is this?

6    A.  This was provided to me as a spreadsheet.  And it shows, as

7    you can see, reading across the top, the IP address, the

8    download file name that Rightscorp assigned to a file.  They

9    had downloaded from that IP address the Bates number, which is

10   the official production number in this case that's associated

11   with each file; the name of the Audible Magic XML file, that's

12   the response that's returned from Audible Magic when it was

13   submitted for identification; the Bates number associated with

14   that Audible Magic file name; the download artist and title

15   that were the initial identifications based on the file name of

16   the content, and then the Audible Magic artist and title that

17   were returned from the Audible Magic identification.

18   Q.  And in this context, that's the -- artist and title that

19   Mr. Landis is including in this declaration is what Audible

20   Magic identified the download to be?

21   A.  That is correct, yes.

22   Q.  Thank you.  I'd like now just to turn briefly to a

23   demonstrative and ask you about how your opinions about Audible

24   Magic fit into your opinions about the Rightscorp system.

25        MR. O'BEIRNE:  Pull up the demonstrative, please.

Barbara Frederiksen-Cross  - Examination       1718

```
 1   BY MR. O'BEIRNE:
 2   Q.  And we looked at these slides before.  I don't mean to
 3   belabor it, but I just want to orient the jury.  It's been some
 4   time since you last testified.
 5        So do you recall we looked at a demonstrative describing
 6   the infringement finder portion of the Rightscorp system?
 7   A.  Yes.
 8   Q.  And let's see if we can get the animations to work.  And
 9   you recall we talked about the infringement finder engaging in
10   a handshake with a IP address from a tracker, right?
11   A.  Correct, yes.
12   Q.  That Rightscorp suspected had a torrent that Rightscorp was
13   interested in?
14   A.  Right, a torrent that they had verified had copyrighted
15   content when they verified the -- when they downloaded and
16   verified the content.
17   Q.  And obtaining bit field information for the purpose of
18   generating a notice if that bit field information matched,
19   right?
20   A.  Correct.
21          MR. O'BEIRNE:  Let's go to the next slide, please.
22   BY MR. O'BEIRNE:
23   Q.  You recall we also looked at a slide about the Samplit part
24   of the Rightscorp system; do you recall that, ma'am?
25   A.  Yes.
```

Barbara Frederiksen-Cross  - Examination        1719

1    Q.  And this is the different part where Rightscorp gets an IP
2    address of someone that's received a notice, goes back, does a
3    second handshake, and attempts to download the file that's the
4    subject of the notice; do you recall that?
5    A.  That is correct, yes.
6           MR. O'BEIRNE:  And you can go up, please, Conner.
7    BY MR. O'BEIRNE:
8    Q.  And so again we have the handshake -- build.  We have the
9    confirming hash value  -- build.  And we have a download.
10          Do you recall that?
11   A.  Correct, yes.
12   Q.  Now, let's talk about your views about how Audible Magic
13   fits into that.
14          MR. O'BEIRNE:  Next slide, please.  Build.  All the
15   way out.
16   BY MR. O'BEIRNE:
17   Q.  Could you please explain to the jury your opinion about
18   what Audible Magic does to validate the Rightscorp system using
19   this slide?
20   A.   Okay.  So just kind of as a quick review here, when
21   Rightscorp had determined that a torrent file has a particular
22   payload through its initial ingestion of the torrent file and
23   submission to AcoustID to verify it, they then use that same
24   hash of that torrent file to get a list of peers, and then they
25   reach out and handshake with the peer for that specific hash --

Barbara Frederiksen-Cross  - Examination      1720

1   oops.

2   Q.  Please continue.

3   A.  And when they do that handshake, they analyze the bit field

4   to see if the peer is reporting that it has that file or what

5   parts of that file it's reporting.  And based on that, they can

6   then create an infringement record that is subsequently used to

7   send a notice.  So that's the left-hand column here.

8       Later in time -- not way later, but somewhat later in time,

9   the Samplit program comes back.  It will randomly select

10  records from the list of people who have received infringement

11  notices, and it goes out to that same peer -- so it uses the

12  data that was saved about the peer and the infringement

13  detection and the hash that was detected -- shakes hands with

14  that peer, and then asks to download the actual pieces of the

15  file all in that same peer.  So that's the second process in

16  the middle here.

17      Now, in a completely separate process, those downloads that

18  were downloads from Grande subscribers were copied to a hard

19  disk and provided to the Recording Industry of America, to

20  Mr. Landis, who then submitted those files for another

21  verification using Audible Magic and got back the Audible Magic

22  returns, and that's what was in the exhibit that we just looked

23  at, the spreadsheet format.

24  Q.  And what is your opinion about what the verification by

25  Audible Magic says about the accuracy of the notice?

1  A.  Well, kind of twofold.  For each file that was downloaded

2  from an individual peer where it was identified as that file,

3  those bits, that torrent information hash, this Audible Magic

4  process has reconfirmed the accuracy of that particular notice,

5  if the notice was for the same torrent hash and the same song.

6       But the other thing that is maybe less obvious is that

7  because a hash is a hash and it doesn't change over time, that

8  for any of those songs that were verified a second time by

9  Audible Magic, that would apply to any notice for the same hash

10  for the same song, because it's been verified now by Audible

11  Magic, the same hash, the same song.  And so any of those

12  notices that were using the same hash and the same song, in my

13  opinion, would also be verified.

14  Q.  So in your opinion, the Audible Magic analysis doesn't just

15  verify the accuracy of that notice, but any notice based on

16  that hash, because we've now separately reconfirmed what is in

17  that torrent file?

18  A.  That's correct, yes.

19  Q.  And lastly, Ms. Frederiksen, I'd just like to -- using that

20  explanation, I'd just like to take an example of each of these

21  different types of data and walk through it for the jury in

22  light of your opinion about Audible Magic.

23            MR. O'BEIRNE:  Pull up PX 2, please.

24  BY MR. O'BEIRNE:

25  Q.  Ma'am, do you recognize this as a summary of all of the

Barbara Frederiksen-Cross  - Examination      1722

1  notices on the hard drive that was PX 1?

2  A.  Yes, I've seen this document before.

3  Q.  Can we look at line 354,614 of that summary, please.  Do

4  you see there, ma'am, what the artist and title of that notice

5  is?

6  A.  Yes.  That particular notice was *Dark Horse* by Katy Perry.

7  Q.  And let's take a look at the TC number.  Do you see that TC

8  number?

9  A.  Yes, I do.

10  Q.  It's really long.  Let's just -- for our purposes, you see

11  it starts with 3b5?

12  A.  3b5e and ends in 9872.

13  Q.  9872.  Okay.  Now let's look at the individual notice that

14  corresponds to this line in the Exhibit 2.

15       MR. O'BEIRNE:  Can you pull up that?

16  BY MR. O'BEIRNE:

17  Q.  And this is the actual native file of the notice from the

18  hard drive.  And do you recognize that reference number, the TC

19  that we just looked at?

20  A.  Yes.

21  Q.  And what's the name of the file there?

22  A.  If you could highlight that, that's *Dark Horse*.

23  Q.  The same as the song title that we looked at in the sheet?

24  A.  Yes.

25  Q.  And now let's look at PX 5, which is the summary of the

Barbara Frederiksen-Cross  - Examination        1723

1  download files.  Can you please scroll to line 11,792.

2     Do you see there, ma'am, the infraction, the TC number, the

3  torrent hash and the file name?

4  A.  I do, yes.

5  Q.  And do you see that TC number starts with our 3b5e and ends

6  with 9872?

7  A.  I do see that, yes.

8  Q.  Does that seem to be the same TC number as the notice?

9  A.  Yes.

10  Q.  Now let's turn to PX 16, back to Mr. Landis's Audible Magic

11  analysis spreadsheet.  And let's look at line 1,676 of his

12  spreadsheet.

13     Do you see that?

14  A.  I see that with the blowup here, yes.

15  Q.  Is that our TC number for Katy Perry's *Dark Horse*?

16  A.  Yes, it is.

17  Q.  And you understand that Mr. Landis's Excel spreadsheet had

18  the TC number, it had what he identified it as, and then it had

19  the Bates number of the actual download file on our drive; do

20  you recall that?

21  A.  Yes.  And just for the jury's benefit, the TC number here

22  is the first half up to the underscore, and then there's

23  another thing appended to that, that's the actual file name.  I

24  don't know if anybody has explained those to you before.

25  Q.  Thank you for clarifying.  That extra -- extra appended

1  information is the specific information about the download,

2  right?

3  A.   Yes.

4  Q.   Because each download has a unique identifier that's based

5  on the notice identifier but has other information?

6  A.   Right.  They take the TC number, the download information,

7  and then the actual name of the file, and they string those

8  together separated by underscores so that you have that record.

9  Q.   And this is the download that Samplit got when it went back

10 to this user and tried to download the song from the notice,

11 right?

12 A.   Yes.

13 Q.   And Mr. Landis compared it to Audible Magic and concluded

14 it was Katy Perry --

15            MR. BROPHY:  Objection, Your Honor.  Leading.

16            THE COURT:  Sustained.

17            MR. O'BEIRNE:  Just trying to summarize each piece.

18            THE COURT:  I know, but you're testifying, so...

19 BY MR. O'BEIRNE:

20 Q.   What's your understanding about what this download file is?

21 A.   Well, this is the download file from the hard disk that

22 Mr. Landis received that he then submitted to Audible Magic to

23 get identified, and got back the response in the form of an XML

24 file that identified information like the artist and title and

25 album.

Barbara Frederiksen-Cross  - Examination        1725

1  Q.  What did it identify?  What did Audible Magic identify this

2  artist and song as?

3  A.  It identified it as *Dark Horse* as well by Katy Perry.

4  Q.  Can we please play the downloaded RCD_01352375?

5      *(Music playing.)*

6  BY MR. O'BEIRNE:

7  Q.  Can you raise your hand when you've had enough time to

8  listen?

9  A.  I'm familiar with it, yes.

10       MR. O'BEIRNE:  Your Honor, I have another example to

11  go through, but in the interest of time, if Your Honor would

12  like me to move on.

13       THE COURT:  You can.

14       MR. O'BEIRNE:  Okay.

15  BY MR. O'BEIRNE:

16  Q.  In your opinion, Ms. Frederiksen, do you recall how many

17  downloads Mr. Landis was able to match through Audible Magic

18  for the works in suit in this case?

19  A.  Little bit more than 19,000.  I don't remember the exact

20  number, but it was a little more than 19,000.

21  Q.  Please explain to the jury what you believed those 19,000

22  downloads for the works in suit means for the reliability of

23  the Rightscorp system?

24  A.  Well, again, because this was an independent outside

25  process, I believe that it provides further confirmation with

Barbara Frederiksen-Cross  - Examination        1726

1  respect to the accuracy of the identification of the Rightscorp

2  system of works -- or of the materials they were hired to

3  protect and the accuracy of the notices they sent based on that

4  identification when they interacted with peers.

5          MR. O'BEIRNE:  That's all I have, Your Honor.

6                        EXAMINATION

7  BY MR. BROPHY:

8  Q.  Welcome back.

9  A.  Thank you.

10  Q.  This is going to be very brief.  Your testimony is that

11  Audible Magic is extremely reliable; is that right?

12  A.  Based on everything I have seen, that is correct, yes.

13  Q.  Audible Magic was developed by different people from the

14  folks that developed the Rightscorp system, right?

15  A.  That is correct, yes.

16  Q.  And it's different software from the Rightscorp software?

17  A.  Yes.  It is completely separate.

18  Q.  And it was developed and sold by a different company from

19  Rightscorp, right?

20  A.  That's correct.

21  Q.  And it performs different functions from the functions that

22  the Rightscorp software performs, right?

23  A.  It's a music identification service, software used to just

24  identify music and movies.

25          MR. BROPHY:  No further questions.  Thank you, Your

 1    Honor.

 2              MR. O'BEIRNE:  Nothing further.

 3              THE COURT:  You can step down.  Thank you.

 4              THE WITNESS:  Thank you.

 5              MR. BROPHY:  Your Honor, we're going to be calling

 6    Dr. Cohen next.  Should we call him now -- or to be honest, I

 7    prefer to break for lunch and get set up, if that's okay with

 8    you.

 9              THE COURT:  Absolutely.

10              MR. BROPHY:  Thank you.

11              THE COURT:  Okay.  We're going to take a little bit of

12    an early lunch.  We'll see you back at the normal time.  They

13    have to set up and then they have to go to lunch.

14              COURT SECURITY OFFICER:  Please rise for the jury.

15              *(11:41 a.m., the jury exits the courtroom.)*

16                              *   *   *

17              THE COURT:  Please be seated.

18              MR. BART:  Your Honor, since we have you --

19              THE COURT:  Does this need to be on the record?

20              MR. BART:  No, none of this needs to be on the record.

21              THE COURT:  Okay.

22              *(Discussion off the record.)*

23                              *   *   *

24              MR. BROPHY:  Your Honor, may I preview one more thing

25    for you just so you're aware of it?

Barbara Frederiksen-Cross  - Examination        1728

```
1              THE COURT:  Of course.
2              MR. BROPHY:  The next expert is going to be testifying
3    about source code.  And with your permission, I was going to
4    invite him to go sit there with the microphone with the laptop
5    so he can go through it and put it up on the screen.  Is that
6    acceptable?
7              THE COURT:  Do you have any objection to that?
8              MR. O'BEIRNE:  No, Your Honor.
9              THE COURT:  Okay.
10             MR. BROPHY:  It's out of the ordinary.  I wanted to
11   make sure you're aware.
12             THE COURT:  No, I've done that before.
13             MR. BROPHY:  There is another issue of this source
14   code being confidential, and I am not sure how Your Honor feels
15   about closing the courtroom.  We're not going to spend lots of
16   time on it.
17             THE COURT:  I don't know.  Do we have anybody that's
18   been sitting here that would be --
19             MR. BROPHY:  There was an issue in another case, Your
20   Honor, where certain source code was disclosed that contained
21   IP addresses of the servers that were doing the detection work,
22   and that compromised the system.  We don't intend to show those
23   materials, but I just wanted to raise that issue.
24             THE COURT:  It's very difficult for me to close a
25   courtroom.  I have to go through a whole process to close a
```

 1   courtroom anymore.  I have to notify the media.  They're not

 2   even aware of this case right now.  I mean, this is a --

 3            COURTROOM DEPUTY CLERK:  You have to send a letter.

 4            THE COURT:  I have to send a letter to the media and

 5   it's a big pain in the okole.  And unfortunately, the bottom

 6   line is right now the media is not paying a lot of attention to

 7   this.  Now, obviously, the trade media will pick up in a hurry.

 8   You know that, but the local media isn't paying any attention.

 9   Let's not poke the bear.

10            MR. O'BEIRNE:  Understood.

11            MR. BROPHY:  We'll be very judicious with the use of

12   the source code.

13            THE COURT:  Okay.

14            *(11:46 a.m.)*

15                              *   *   *

16            *(1:22 p.m.)*

17            COURT SECURITY OFFICER:  All rise.

18            THE COURT:  Please be seated.  Okay, anything for me?

19            MR. BROPHY:  I don't believe so, Your Honor.

20            *(Discussion held off the record.)*

21                              *   *   *

22            THE COURT:  All right.  Let's bring the jury in.

23            COURT SECURITY OFFICER:  Please rise for the jury.

24            *(1:41 p.m., the jury enters the courtroom.)*

25                              *   *   *

Dr. Geoffrey Cohen - Examination                    1730

1          THE COURT:  Please be seated.  Hello, ladies and

2    gentlemen.  I hope you had a good lunch at lunchtime.  The

3    Court would note the presence of the ladies and gentlemen of

4    the jury as well as counsel as well as the party

5    representatives.  Counsel.

6          MR. BROPHY:  Thank you, Your Honor.  Grande

7    Communications calls Dr. Geoffrey Cohen.

8          THE COURT:  He's the one that's going to testify from

9    there?

10          MR. BROPHY:  For a portion of it, Your Honor.

11          THE COURT:  Just come up here, Doctor, and raise your

12    right hand.  Remain standing.

13          COURTROOM DEPUTY CLERK:  You do solemnly swear that

14    the testimony you're about to give in this case now before the

15    Court will be the truth, the whole truth and nothing but the

16    truth, so help you God?

17          THE WITNESS:  I do.

18                         *   *   *

19          (DR. GEOFFREY COHEN, Defense Witness, Sworn.)

20                         *   *   *

21          COURTROOM DEPUTY CLERK:  Have a seat, sir.

22                    DIRECT EXAMINATION

23    BY MR. BROPHY:

24    Q.  Hello, Dr. Cohen.

25    A.  Hello.

Dr. Geoffrey Cohen - Examination                    1731

1   Q.  Would you mind introducing yourself to the jury, please?

2   A.  Sure.  I'm Geoff Cohen.  I'm a Ph.D. in computer science.

3   Q.  Would you mind telling the jury why you are here today?

4   A.  Sure.  I was retained to analyze the Rightscorp software

5   system and its operations and its outputs.

6   Q.  Are you here to offer your opinions on the operation of the

7   Rightscorp system?

8   A.  Yes, I am.

9   Q.  If you could --

10          THE COURT:  Can you speak in the mike?

11          THE WITNESS:  Sure.  I thought I was.

12          MR. BROPHY:  Would you mind, please, bringing up, and

13   not publishing for the jury, Defense Exhibit 161?

14   BY MR. BROPHY:

15   Q.  Dr. Cohen, do you see a document on the screen in front of

16   you?

17   A.  Yes, I do.

18   Q.  Do you recognize that document?

19   A.  Yes.  It's my CV.

20   Q.  Is this a CV that you prepared?

21   A.  Yes.

22   Q.  And does it comprise the experience, both educational and

23   technical, that you've had over your career?

24   A.  Yes.

25          MR. BROPHY:  Your Honor, we would move to admit this

Dr. Geoffrey Cohen - Examination                1732

1   into evidence and also publish it to the jury.

2          MR. O'BEIRNE:  No objection.

3          THE COURT:  Be received.

4   BY MR. BROPHY:

5   Q.  Dr. Cohen, I'd like to start by having you tell the jury

6   about your experience with computers.

7   A.  Sure.  So I was using computers from a very young age.  My

8   dad got his Master's in computer science back in the '70s

9   pretty early on, you know, before CS was as big as it is now.

10  So I spent a lot of time around computers.  I got to use some

11  of the computers my dad had access to.  Of course, you know, in

12  those days, you had to dial it up and put the phone in the

13  coupler, and you had terminals, but I also got to go into the

14  machine rooms with him, so I learned to program them and

15  learned to love it.  And so from a very early age I've loved

16  using computers, working with computers, reading about computer

17  technology.

18  Q.  Where did you first go to college?

19  A.  So I went to college at Princeton University, and my degree

20  there was actually not a computer science degree, because I was

21  trying to be different from my dad, as I think many of us try

22  and fail to do.  And so I studied public policy, and I focused

23  on technology policy, so I looked at the impact of different

24  technologies on law and culture and political issues.

25         While I was there, I did take a number of computer science

Dr. Geoffrey Cohen - Examination                1733

1    and programming classes because it was something I enjoyed, but

2    that wasn't actually my major.

3    Q.  What did you do after you graduated with your undergraduate

4    degree?

5    A.  So after I graduated, I went and I worked for Congress.  I

6    worked for something called Congressional Budget Office, which

7    does budget analysis of government programs, in particular.  I

8    worked for the National Security Division, so we looked at

9    budget impacts of how many aircraft carriers to get or how many

10   Air Force wings, and so, in particular, I looked at technical

11   aspects of weapon systems and how much they would cost, how

12   effective they would be.  I did do some computer programming

13   there to run simulations of Air Force operations and things

14   like that.

15   Q.  How long did you hold that position?

16   A.  I was there for about two years.

17   Q.  What happened after that?

18   A.  Well, so I decided that trying to not be like my father was

19   maybe, you know, a fool's errand, because I was, and so I

20   decided I actually did want to go back to school and get a

21   degree in computer science.  So I went to Duke and entered a

22   Ph.D. program and I studied at Duke for a little more than five

23   years and studied computer science.  In particular, operating

24   systems, networks, software development methodologies, you

25   know, all the usual classes, but I focused mostly on operating

1    systems and software development.

2    Q.  What degree did you obtain from Duke?

3    A.  That was a Ph.D.

4    Q.  And while you were in grad school, did you have any

5    employment?

6    A.  Yeah, I did some part-time work, some summer internships,

7    which is, you know, encouraged in the computer science field to

8    get practical experience, so I worked for a company called Data

9    General, which has been bought by a company that got bought by

10   a company.  I'm not sure who they are.  I think they might be

11   part of Dell these days.  And I also work for IBM.

12   Q.  What did you do after you graduated with your Ph.D.?

13   A.  So after that, I got a job working for Ernst & Young doing

14   strategy consulting, specifically focusing on emerging

15   technologies.  This was in the dot-com boom days.  Everyone was

16   very interested in new technologies.  Wireless was, you know,

17   really coming online at those days.  People were just starting

18   to talk about peer-to-peer technologies and how that would

19   impact business or software architectures.  And so I worked

20   with a team that advised clients on the impact of emerging

21   technologies.

22   Q.  What about after Ernst & Young?

23   A.  So those were the dot-com boom days.  And as people may

24   remember, then came the dot-com bust days, so that entire

25   division I worked for ceased to exist and so I spent a number

1   of years as an independent consultant, so basically doing the

2   same kind of work, but on my own for a bunch of different

3   clients.

4        So, for example, I worked for the National Academy of

5   Sciences.  They were doing a study on the intersection of

6   computer science and biology and how that might change both

7   fields, and I helped research and write that.  I worked for a

8   program at MIT called the Communications Futures Program, which

9   was an industrial academic collaboration, so a lot of

10  companies, including original manufacturers like phone makers,

11  but also ISPs like Comcast.  Would work with professors and

12  students to try to do research on what was new, what was

13  coming.  Give more research opportunities to students to work

14  with industry.  Also give industry access to sort of

15  cutting-edge stuff.

16       So in particular, one of my jobs there was that I led the

17  Internet security and privacy working group.  So that was one

18  of the topics I focused on, but those were just two of the

19  clients that I had at the time.

20  Q.  How long were you an independent consultant?

21  A.  I guess two to three years, sort of depending on -- when

22  you're an independent consultant, it's harder to have clear

23  boundaries when to start and stop, but I would say more or less

24  through the end of 2005.

25  Q.  And what did you do on or around 2005 after you stopped

1  being an independent consultant?

2  A.  So I wanted a little bit more financial stability, so I

3  decided I needed a job with real W-2, and so I started working

4  for a company called Elysium Digital, which is a consulting

5  company that consults for companies involved in high-tech

6  litigation, so providing technical advice and expert testimony

7  to companies involved in a case that would involve software or

8  computers or evidence created or controlled by computers.

9  Q.  If you had to put a number on it, how many cases have you

10  been retained to work on during your tenure at Elysium?

11  A.  More than a hundred.  I haven't counted in a while, but a

12  very large number.

13  Q.  Can you give the jury a basic understanding of the breadth

14  of technologies you were exposed to during that tenure?

15  A.  Sure.  I mean, it was very broad, and we took lots of

16  cases.  Certainly including:  Networking, enterprise

17  architecture, databases, some on file sharing, some on GPS and

18  location technology, a lot of cases on software quality and

19  reliability.  Often there are disputes where one company will

20  hire another company to develop software for them and then it

21  ends up where the two parties are very unhappy with each other

22  at the outcome and so there's a dispute over whether the

23  software was good enough, whether the process was good enough.

24  Q.  Setting aside the technology component, what kinds of

25  issues did you deal with in that role?

Dr. Geoffrey Cohen - Examination                    1737

1   A.  So I would say most of the cases were some kind of IP,

2   patent, copyright, trade secret.

3   Q.  If I can pause -- I'm sorry.  Would you mind letting the

4   jury understand what "IP" means?

5   A.  Oh, sorry.  It means a couple different things in this

6   case.  So I apologize.  But in this instance, I mean

7   intellectual property, so patents, copyrights, trade secrets.

8        Also, as I mentioned, software disputes, disputes over

9   quality, so those would be the contract case.  Also, I worked

10  on a number of cases involving valuation of software, how

11  valuable it is.  I was employed -- or not employed, but

12  retained by the IRS in a number of cases where there was a

13  question about how much a particular piece of software might be

14  worth for purposes of taxes.

15  Q.  And you may have said this already, but just so we're

16  clear, how long were you at Elysium?

17  A.  I was there for about 15 years.

18  Q.  Fifteen years?

19  A.  Yeah.

20  Q.  And when did that sun set?

21  A.  So I left full-time employment at Elysium in 2020, but I

22  should say because a number of my cases I had been already

23  disclosed as an expert witness or I already submitted expert

24  reports, I retained a contract with my old employer so that

25  when cases continued, as is happening right now, right, then I

1    would continue to fulfill my obligations even though I'm not a

2    full-time employee.  I'm now a contractor, rounding out the

3    cases that have held over for this number of years.

4    Q.  Where are you currently employed?

5    A.  So right now I work for a government agency called the U.S.

6    Privacy and Civil Liberties Oversight Board.  It's an

7    independent agency whose mission is to provide oversight over

8    the intelligence agencies, so FBI, CIA, NSA, to ensure that

9    they are appropriately balancing the need to protect Americans'

10   privacy and civil liberties while they're pursuing their,

11   obviously, very important missions to also protect the national

12   security of the United States.

13   Q.  And just to make sure the record is very clear on this,

14   you're not here today testifying as a federal government

15   official?

16   A.  Absolutely not.  Right.  I am here as a private individual

17   that is serving under contract to my former employer that was

18   retained by the parties.  I'm actually taking leave without pay

19   this week from the government just so there's literally -- I

20   mean, there's a lot of ethical rules for government employees,

21   so just to make absolutely clear my opinions don't reflect on

22   the U.S. government, on the Privacy and Civil Liberties Board,

23   or any of its employees.

24       So, actually, I think I am legally obligated to say that,

25   so it's important to say.  And it is true.

Dr. Geoffrey Cohen - Examination                    1739

1    Q.  You've checked the box.

2    A.  Yes.

3    Q.  So let's talk about the areas of computer technology that

4    you have experience with.  Would you mind just explaining to

5    the jury at a high level what categories of technology you've

6    dealt with?

7    A.  Sure.  So like I said, when I worked for Elysium, we had a

8    lot of different kinds of cases, but computer networking,

9    computer software development, computer software quality and

10   analysis, security, routing and networking.  You know, there's

11   probably a lot more that aren't coming to mind now, but there's

12   been a very broad education.

13   Q.  What about computer languages?  Are you fluent in any

14   computer languages?

15   A.  Yeah.  I mean, there's so many languages, and I've

16   encountered most of the common ones in my time.  The most

17   common ones are Java, NC, C++, Python.  There are web-based

18   technologies like HTML, JSP, PHP.  There are things that I have

19   seen less of, but enough to be able to read like APL or C

20   Sharp, but I've seen almost everything in my time, I feel like.

21   Q.  Are you a named inventor on any patents?

22   A.  I am.  When I worked for IBM, as I mentioned back in grad

23   school, I was the inventor on five patents that IBM filed for

24   and were granted.

25   Q.  Can you, without digging into all the details, just give a

1   high-level explanation of what types of inventions?

2   A.   Generally they refer to kinds of networks applications,

3   client-server applications or software development for a

4   networked environment.

5   Q.   Are you a member of any professional organizations?

6   A.   I am a member of the Association for Computing Machinery or

7   ACM.

8        MR. BROPHY:  Your Honor, Grande would tender

9   Dr. Geoffrey Cohen as an expert in computer software, computer

10  networking.

11       MR. O'BEIRNE:  No objection.

12       THE COURT:  His testimony will so be received.

13       MR. BROPHY:  Thank you, Your Honor.

14  BY MR. BROPHY:

15  Q.   Now, Dr. Cohen, have you had the opportunity to review

16  documents and other materials related to this case?

17  A.   Yes, I have.

18  Q.   Would you mind describing for the jury what categories of

19  documents you have received and reviewed?

20  A.   Sure.  So most important, perhaps, is source code produced

21  in a number of different formats from Rightscorp, technical

22  documentation, outputs of the Rightscorp system such as

23  notices.  I've read deposition testimony, expert reports from

24  the other side, some technical documents from the Internet

25  describing certain protocols.

1  Q.  Is it your understanding that Rightscorp has produced a

2  hard drive of song files in this case?

3  A.  Yes.

4  Q.  Have you reviewed that?

5  A.  I have.

6  Q.  Have you reviewed the trial testimony offered in this case

7  by Mr. Boswell and Ms. Frederiksen?

8  A.  I have.  I was in the courtroom for some of that and I've

9  read the transcripts.

10  Q.  Before we dive into the main program today, were you in the

11  courtroom when Ms. Frederiksen gave her testimony on Audible

12  Magic?

13  A.  Earlier today?

14  Q.  Earlier today.

15  A.  Yes, I was.

16  Q.  Have you reviewed deposition transcripts that leave you

17  with an understanding of the time period during which

18  Rightscorp was using the Audible Magic software?

19  A.  Yes.

20  Q.  And based on your review of those materials, when did

21  Audible -- when did Rightscorp stop using Audible Magic

22  software?

23  A.  My understanding is sometime in 2014.

24  Q.  So for the period from 2014 through today, your

25  understanding is Rightscorp has not used Audible Magic; is that

1    right?

2    A.   Right.  They use a separate system called AcoustID.

3    Q.   And Ms. Frederiksen didn't testify at all about AcoustID

4    this morning, did she?

5    A.   I don't believe she did.

6         MR. O'BEIRNE:  Objection, Your Honor.  Just as to this

7    morning.  She did previously in her testimony address AcoustID,

8    for clarity.

9         MR. BROPHY:  My question was about this morning.

10   BY MR. BROPHY:

11   Q.   Based on your review of materials presented in this case,

12   have you developed an opinion regarding the reliability and

13   accuracy of the Rightscorp system?

14   A.   I have.

15   Q.   Do you believe the Rightscorp system can reliably and

16   accurately detect music sharing?

17   A.   I don't.

18   Q.   I'd like to begin by talking about the source code and

19   other Rightscorp materials that you've reviewed in this case.

20   A.   Sure.

21   Q.   Can you provide the jury with an explanation of the

22   materials that you received and the state they were in when you

23   received them?

24   A.   Sure.  So initially, the source code was produced in a

25   number of zip files with unclear names, Rightscorp source code

Dr. Geoffrey Cohen - Examination                1743

1  or things like that.  Sometimes they had dates.  I don't

2  remember the exact number, maybe 18 or so, but a large number

3  of zip files.  No clear identification of when they necessarily

4  were taken or what they represented.  Most of them were

5  protected by passwords.  We weren't always given the passwords,

6  so we had to work to get some of that information.

7  Q.  You had an opportunity to review the source code; is that

8  right?

9  A.  I did, yes.

10  Q.  What was your general impression of the quality of the

11  source code that you reviewed?

12  A.  The -- compared to -- you know, I've looked at a lot of

13  source code in my time, proprietary, confidential source code

14  from many different companies.  And I would say compared to

15  that, this was not professional level software.

16  Q.  Can you give the jury some examples of things that would

17  lead you to believe it wasn't professionally prepared?

18  A.  Sure.  So the first thing -- I think maybe we'll get into

19  the details of this later, but initially the -- they didn't use

20  any kind of version control system, so changes were just being

21  made sort of ad hoc, live and not recorded of when it was made

22  or what was made.  There were bugs in the system.  File names

23  and function names were often -- didn't provide any guidance to

24  what the function would do.

25       So, for example, one of the most important functions that

1    Ms. Frederiksen-Cross talked about was called Test5.  That

2    wasn't a test.  That was part of their production system.  It

3    was called Test5.  That's generally just poor practice.

4    Something that's important should be called what it is.  He

5    also named certain components after his pets, Memphis and

6    Pocket.  Those don't help someone reading the code know what

7    they are.

8    Q.  Was there a function named "do it"?

9    A.  Do it.  Right.  There was a function called "do it."  Not

10   always helpful in figuring out what it does.

11        So those are just some of the examples of things that, you

12   know, when I was in grad school and teaching undergrads, you

13   know, were not the sort of best practices for software.  Or

14   that I've seen produced in other cases.

15   Q.  Did the materials you were provided allow you to determine

16   what specific Rightscorp code was in operation at any given

17   time?

18   A.  No, no.  There wasn't really any way to determine what was

19   running at any given time.  There was a lot of code, a lot of

20   code could have been running at some time, but maybe not.  Code

21   could have been running different configurations based on how

22   it was invoked directly by Mr. Boswell, as I understand it.

23   But there's no way to know looking back on any given day what

24   the configuration of the software was, even aside from the fact

25   that Mr. Boswell was making changes that were not, through most

1    of the history, recorded.

2    Q.   You mentioned earlier a function named Test5.  Do you

3    recall that?

4    A.   Yeah.

5    Q.   Was it clear from the code when Test5 was run?

6    A.   No.  I mean, when specifically it was run, no.  There were

7    no records of when particular functions ran.

8    Q.   You mentioned revision control.  I believe your testimony

9    was that Rightscorp didn't use it until 2016.  Would you mind

10   just describing to the jury what revision control is and why

11   it's useful?

12   A.   Right.  So in professional software development, revision

13   control systems are really a basic tool.  They keep track of

14   what changes are made to what files on what dates, often why

15   they're made, who made them, and that allows you to go back in

16   time and say exactly what the state of the software was on a

17   given day should you need to know that.

18       It's a little bit -- if you use Microsoft Word, it's a

19   little bit like Track Changes, but sort of, you know, bigger,

20   more complicated version of Track Changes.

21   Q.   Did Rightscorp, in your opinion, use version control

22   reliably after 2016?

23   A.   Not really.  So they started using it in 2016, and over the

24   course of a couple days in May of 2016 checked in a lot of

25   code, some of which was older, and then didn't do any check-ins

Dr. Geoffrey Cohen - Examination                    1746

1  for another 17 months.

2  Q.  Before 2016 and before this revision control system was put

3  in place, did you see any indications in the source code that

4  it had been modified or changed over time?

5  A.  Yeah.  I mean, there's different versions of the same file

6  in different directories.  Often code -- there would be

7  multiple versions of the same line just commented out, so there

8  might be, like, five different versions of the single line

9  commented out as -- presumably Mr. Boswell was trying different

10  approaches or something, but I don't know which of those

11  comments were in play at any time or when they were added.

12  Q.  And so I believe you just testified it's your understanding

13  is reviewing code, even though there were commented-out lines,

14  you didn't know when those lines had been commented out or when

15  they had been added; is that right?

16  A.  Right.  There's no definitive way to know.  Maybe one of

17  them might have had a date or not, but in general there was a

18  lot of that had happened frequently through the code, and

19  there's just no way to know when any one given line was either

20  active or inactive.

21  Q.  Setting aside the issues with the source code itself, was

22  there anything else about the Rightscorp system and its overall

23  design that made it difficult to understand how it was

24  operating on any given day?

25  A.  So -- yes.  So, many of the functions of Rightscorp were

1    triggered manually.  So they were run from a command line,

2    perhaps, where someone sat down and typed a command that would

3    trigger something.  I think earlier in the case I heard an

4    analogy that someone made about a domino, sort of a little bit

5    like that, where you click one thing, and it would start

6    something, and it would start something, and it would start

7    something.  But we don't know when those commands were run.

8            And also those commands would have arguments and

9    configuration variables like how many of these things should I

10   run at once?  Should I run 50 at once or a hundred at once?  We

11   don't know.  And there's just -- there were no records of when

12   those were run or what configuration they were run.

13   Q.  I'm glad you're not trying to take credit for my domino

14   analogy.  Thank you.

15       So was it possible, given what you've said, to determine

16   what code was executed on any given day, like are we going to

17   right Test5.java or something else in the alternative?

18   A.  Not really.  I mean, there are -- I mean, not with

19   confidence.  I mean, I could guess, right?  And there are code

20   that, you know, as -- you know, I read through, as I mentioned,

21   I read through Ms. Frederiksen-Cross's report, and I've read

22   depositions of Mr. Boswell.  I attended one of the depositions

23   of Mr. Boswell, so I can understand there's a bunch of

24   potential paths that may have run and, I think to be fair,

25   almost certainly ran some of the time in some configuration,

Dr. Geoffrey Cohen - Examination                    1748

1   but to be definitive, to actually know what happened when is

2   very difficult.

3   Q.  Did Rightscorp retain or record any logs that reflected how

4   the system was executed on a given day?

5   A.  No, not that I saw.

6   Q.  Did Rightscorp keep any logs reflecting what configurations

7   it was placed into when it was run?  You had mentioned things

8   like how many of a certain bot or daemon to run.  Were any of

9   those specific configuration-type things recorded?

10  A.  If it happened to be recorded in a particular version of a

11  particular file that was in a directory, then maybe we could

12  say, well, on this day, it might have worked this way, but we

13  don't know if that's the version they used.  And certainly, in

14  general, we don't know, so there's -- you know, there's sort of

15  traces around that we could make guesses based on, but in terms

16  of what I would -- you know, to sort of back up, you know, the

17  work I do now, what we look at are whether or not systems have

18  sufficient evidentiary bases to make certain decisions that

19  might impact someone's privacy or civil liberties, and so there

20  are professional standards for how good --

21          MR. O'BEIRNE:  Your Honor, I object to the extent

22  we're introducing a different standard about civil liberties,

23  etc., apart from the instructions in this case as to the

24  standard of proof.

25          THE COURT:  The objection is sustained.

1  BY MR. BROPHY:

2  Q.  Let's just sum this up.  Is it possible for anyone to know

3  with any degree of certainty how the Rightscorp system operated

4  on any given day?

5  A.  I don't believe so --

6          MR. O'BEIRNE:  Objection as to "anyone know."  The

7  witness can testify to his own.

8          MR. BROPHY:  Well, he's testifying to his opinion

9  about the source code, Your Honor.

10         THE COURT:  He can continue.

11  A.  I mean, my understanding is that Barbara

12  Frederiksen-Cross's opening report came to one conclusion about

13  how the code worked in 2018, and then following a discussion

14  with Mr. Boswell changed her mind and pointed to a different

15  set of code that was functional in 2018.  And through no fault

16  of hers, there's no way to tell.

17      So I guess I can't say that no one could, but I couldn't,

18  and Ms. Frederiksen-Cross couldn't without Mr. Boswell making

19  certain statements and then having to take his word on it.

20  Q.  Right.  To be clear, you did, and Ms. Frederiksen did have

21  to take Mr. Boswell's word for it.  There weren't records that

22  pointed to, it was just him saying it?

23  A.  Yes.

24  Q.  Let's talk for just a moment about how the Rightscorp

25  system is arranged.  Are there different modules or kind of

Dr. Geoffrey Cohen - Examination          1750

1    logical subsets that you would describe as existing?

2    A.  Yeah.  I wouldn't say modules, because modules, I think,

3    implies a certain level of organization in software

4    development.  Module has a specific meaning and it was really

5    just a conglomeration of code, but I do think it's fair to say

6    there were three main -- that you could describe it as having

7    multiple sort of main functions.

8    Q.  Would you mind just describing for the jury what those

9    functions are?

10   A.  Sure.  So there's -- and I'll try to get the language right

11   because I know -- I know different people call it different

12   things.  But there's an ingestion process.  There's a detection

13   process.  I'm sorry.  I'm having trouble --

14   Q.  Neglecting the words for it, but there's this notion of

15   collecting songs.  What label would you use to call -- what

16   label would you ascribe to that?

17          MR. O'BEIRNE:  Your Honor, I think that's leading.

18   He's testifying for the witness.

19   BY MR. BROPHY:

20   Q.  What would you call the third component of that?

21   A.  There's a set of sampling processes.

22   Q.  And what do those do?

23   A.  They attempt to get copies of the audio files at issue from

24   different sources.

25   Q.  Let's start by talking about what I'll call function number

Dr. Geoffrey Cohen - Examination                    1751

1    one, which is this ingestion function.

2    A.  Sure.

3    Q.  Would you mind -- and I don't want to replow a bunch of

4    ground for the jury that they're maybe already aware of, but

5    just to orient them, at a high level, what's the ingestion

6    process do?

7    A.  So at a high level, this is the process where the

8    Rightscorp system goes out to the Web and finds what was called

9    a torrent file, right?  Meaning a description of the torrent.

10   Not the actual content, but a description of the torrent.  And

11   then using that information to find what's called a tracker, a

12   particular computer that's coordinating a BitTorrent process,

13   and then contacting the individual members of that BitTorrent

14   process called a swarm and communicating with them.

15   Q.  And what is the purpose of the ingestion process reaching

16   out to the swarm?  What is it trying to do?

17   A.  I mean, it's trying to establish the set of peers that may

18   be involved in file sharing.

19   Q.  And is one function of the ingestion process downloading a

20   music file, potentially?

21   A.  Not directly from the peers.  That comes later.

22   Q.  But would you -- at the end of the ingestion process, has

23   the Rightscorp system acquired a song file?

24   A.  Yes.  So it does acquire -- or it attempts, attempts to

25   acquire a copy of the song, just sort of using vanilla

Dr. Geoffrey Cohen - Examination                    1752

1   BitTorrent, right?  Just asking BitTorrent, the swarm, to just
2   give me that file.  So that file could have come and almost
3   certainly mathematically, right, could have come from anywhere,
4   so might be dozens or hundreds of different computers all
5   around the Internet, and then pulling that together into a
6   single copy of that file, which is basically the way BitTorrent
7   is designed to work.
8   Q.  To be crystal clear about this, does the ingestion process
9   and the acquisition of the song you just mentioned have
10  anything to do with Grande or its subscribers?
11  A.  No.  At that point all that's happened is that it's talked
12  to the -- it's obtained the torrent file.  It's talked to the
13  tracker.  It's obtained a song from the swarm, but not from any
14  particular, you know, ISPs, subscribers, or anything like that.
15  Q.  Let's now move to the second functional piece, the
16  detection piece.  Is it true that you have a demonstrative that
17  you want to use to help the jury through this?
18  A.  Yes.  I think that would be helpful.
19          MR. BROPHY:  Your Honor, do we have permission to
20  publish the demonstrative to the jury?
21          THE COURT:  Yes.
22          MR. O'BEIRNE:  I haven't seen this.
23          MR. BROPHY:  These are things you've already --
24          MR. O'BEIRNE:  Oh.  Nevermind.  I have seen this.
25  BY MR. BROPHY:

Dr. Geoffrey Cohen - Examination                    1753

1  Q.  Dr. Cohen, would you mind just describing for the jury the
2  high-level process of the detection, what Rightscorp does with
3  a tracker and then the various computers?
4  A.  Sure.  So first the Rightscorp system contacts the tracker
5  and receives from that tracker a list of peers that are
6  participating in that what's called the swarm.
7  Q.  And what does it do with that list that it receives from
8  the tracker?
9  A.  It then attempts to contact each of those peers or possibly
10  some of those peers, depending on which ISPs that Rightscorp
11  was currently interested in, and it performs what they have
12  called a handshake.
13  Q.  And describe for the jury just again quickly what happens
14  during that handshake.
15  A.  So the Rightscorp system reaches out, it makes a connection
16  using the BitTorrent protocol.  And if the computer is running
17  and is on the Internet and is running BitTorrent, that that
18  remote peer computer will respond with certain kinds of what's
19  called control information, including a bit field and choke
20  data.
21  Q.  And what happens -- let me ask that differently.
22     Does the Rightscorp system allegedly collect that bit field
23  and choke data?
24     Let me ask -- I'm going to ask a different question.  Does
25  the Rightscorp system allegedly receive the bit field and choke

Dr. Geoffrey Cohen - Examination                1754

1   data?

2   A.   It certainly received its part of the communication using

3   the BitTorrent protocol.

4   Q.   And what's -- just again, I keep saying this, with a high

5   level, what is the purpose of the detection function as a

6   whole?

7   A.   I mean, from the Rightscorp system's point of view, it's to

8   identify a peer that they would like to send a notice to for

9   allegedly, you know, violating the intellectual property of --

10  for a particular song.

11  Q.   Are you aware of any set of requirements established by the

12  RIAA, the industry that oversees the record labels, that sets

13  forth requirements for detection, verification, and

14  preservation of data relating to alleged copyright

15  infringement?

16          MR. O'BEIRNE:  Objection, Your Honor.  Totally outside

17  the scope of his report and violates Your Honor's ruling about

18  the admissibility of the RFPs that we talked about before

19  trial.

20          MR. BROPHY:  Your Honor, this is all over his reports

21  and I can cite you many paragraphs that it appears.

22          THE COURT:  Objection is overruled.

23          MR. O'BEIRNE:  Your Honor, may we have a sidebar?

24          THE COURT:  No.

25          MR. BROPHY:  Let's bring up Defense Exhibit 68,

 1    please.  And this has already been admitted.  Can we publish it

 2    to the jury?

 3              THE WITNESS:  I should just say, I didn't get a chance

 4    to answer, which is, yes, I am aware of such requirements, just

 5    to make a clear record.

 6    BY MR. BROPHY:

 7    Q.  I'm going to do this a little differently.  Okay.  So what

 8    I'm showing you has been introduced into evidence as Defense

 9    Exhibit 68.  Do you recognize this document?

10    A.  Yes, I do.  This is a statement of work put forth by

11    another company called MarkMonitor to the RIAA to perform the

12    detection of P2P file sharing.

13    Q.  Did you review this document in the course of preparing

14    your opinions in this case?

15    A.  I did.

16    Q.  Why?

17    A.  Because, you know, as I talked about before with my

18    experience, I've done a lot of software dispute cases, and one

19    of the key things in software development is what the

20    requirements are for the software.  Right?  The customer has a

21    set of requirements that the software has to meet, and those

22    might be functional requirements like it has to be able to do

23    A, B and C.  It might be performance requirements.

24              MR. O'BEIRNE:  Your Honor, objection.  There's

25    absolutely no foundation for this and the record is clear that

1  Rightscorp code was not in response to this contract.  This is
2  wildly misstating the record.  This is an RFP from the RIAA to
3  a different company, and counsel knows it.  There's no evidence
4  in the record Rightscorp responded to this contract, and none
5  of this --

6          MR. BROPHY:  I'm not sure if he's testifying that
7  right now, Your Honor, but this is wholly inappropriate
8  objection.

9          THE COURT:  I don't think that's the scope of his
10  testimony.  You can continue.

11          MR. BROPHY:  Thank you, Your Honor.

12  BY MR. BROPHY:

13  Q.  Where were we?  So if I could summarize what you have just
14  said.  Essentially, this provides a set of requirements that
15  the RIAA has promulgated; is that right?

16          MR. O'BEIRNE:  Objection, Your Honor.  Foundation.

17          MR. BROPHY:  Your Honor, he just said that.

18          THE COURT:  Overruled.

19          MR. O'BEIRNE:  It's a contract, the document, Judge.
20  Requirements gets to the -- things that have already been
21  excluded in this case.

22          THE COURT:  He's testifying as an expert.  He's
23  entitled to his opinion.  Overruled.

24  BY MR. BROPHY:

25  Q.  Did I state that correctly?

1   A.   Yes.   Looking at this document, it sets forth a clear set

2   of functional and performance requirements that the RIAA

3   expects their client, MarkMonitor, to -- or their provider,

4   MarkMonitor, to be able to meet for this particular task.

5   Q.   Does the RIAA set forth two different categories of

6   verification that can be performed?

7   A.   They do.

8   Q.   And what are those two different categories?

9   A.   They call one "full download verification."

10  Q.   And what is that?

11  A.   Well, that's -- as the name would imply, that you download

12  the complete file from the peer and verify that, and so that

13  that's one way to verify an instance of an infringement.

14  Q.   In your opinion, does Rightscorp's software perform a full

15  download verification?

16  A.   It certainly does not before it sends the notice.  It, in

17  fact, makes no attempt to download it before.  I know there's a

18  separate question that we'll get into about other attempts to

19  download, but the notice, which is the notice of an alleged

20  infringement, happens without it.  So I would say this mode one

21  identified in this document doesn't apply to the Rightscorp

22  system.

23  Q.   What is the second mode described in this document?

24  A.   So it's called "hash-based verification."

25  Q.   What is that?

Dr. Geoffrey Cohen - Examination                1758

1  A.  So that is a partial version.  So you download part, but

2  not necessarily the complete version of the song.  And then you

3  use the hash, which I think has been described earlier as sort

4  of a unique signature that files have to verify that that

5  portion of the file is the file you're looking for.  But also

6  because part of it is downloaded, it verifies that the computer

7  actually had that and was willing to provide it.

8  Q.  Okay.  So just to make sure the jury is on the same page

9  here, this hash-based verification, is this a way for a system

10 to satisfy itself that a particular computer is willing to

11 share a song?

12         MR. O'BEIRNE:  Objection, Your Honor.  Leading.

13         THE COURT:  Sustained.

14 BY MR. BROPHY:

15 Q.  Would you mind describing at a high level and in a really

16 simple way what hash verification is supposed to be

17 accomplishing?

18 A.  It's supposed to be accomplishing -- I mean, as the name,

19 verification.  It's supposed to verify that that remote

20 computer actually has the file, the file that you're interested

21 in, and that it's willing to transmit it.

22 Q.  Does Rightscorp system, in your opinion, perform a

23 hash-based verification?

24 A.  It does not.

25 Q.  Why not?

1    A.  Because it doesn't attempt to download any of the song

2    before it sends the notice.

3    Q.  Is there language that you can point the jury to within

4    this document that describes that requirement to start

5    downloading a song?

6    A.  Yeah.  It's highlighted here, so I'll just quickly read it.

7    Says, *"Respondent will download enough of the file to be able*

8    *to record the source and destination and to prove that the user*

9    *was offering the file, that the user is a valid P2P user, and*

10   *also to verify that the file is a valid P2P file."*

11   Q.  And it's your opinion that Rightscorp doesn't do that,

12   right?

13   A.  No, it does not, because it doesn't download any of the

14   file before it sends the notice.

15   Q.  In your opinion, is that partial download an important part

16   of the detection process?

17   A.  It is, both I think in my personal opinion as well as in my

18   expert opinion, if you want to test that something is real, you

19   need to actually do it.  You can't just merely assume, but in

20   another sense, you know, if I think of this as a software

21   requirement, this is the client saying these are our

22   requirements.  Right?  This is the requirements that we're

23   expecting MarkMonitor to do and, thus, you know, we consider

24   this an important requirement.

25       In my expert, you know, experience working with software

Dr. Geoffrey Cohen - Examination                    1760

1  companies, they don't make requirements that aren't necessary

2  because that just raises the cost.

3          MR. O'BEIRNE:  Your Honor, objection.  I think it's

4  irrelevant and undisclosed testimony about other requirements

5  in other software contracts that weren't mentioned in his

6  report.

7          MR. BROPHY:  I'm moving on, Your Honor.

8          MR. O'BEIRNE:  Can we strike that answer, then?

9          THE COURT:  Yes.  I will strike the answer.

10 BY MR. BROPHY:

11 Q.  And Dr. Cohen, just to make sure the record is clear, maybe

12 omitting some of those last thoughts, is it your opinion that

13 it is important for a detection system to begin downloading the

14 song?

15 A.  It is, because that's the only way to know that the peer

16 actually has the file and is willing to transmit it.

17 Q.  And what is the consequence of not doing what the RIAA

18 requires, not starting to download that file?

19 A.  Well, you could end up in a situation where you are making

20 accusations based on not knowing whether the computer has the

21 file or is willing to share the file.

22 Q.  In other words, you're potentially making false

23 accusations, right?

24 A.  Certainly given the context of the Rightscorp system, it

25 would -- in that situation would still send out a notice

1  without having verified that the computer had the file or was

2  willing to share the file.

3  Q.  I want to move on to another section of this document.

4  Would you mind -- this is lower on the same page and I've blown

5  it up and highlighted it.  Would you mind describing what this

6  passage requires?

7  A.  So this passage requires the requirements for how the

8  evidence that is gathered during this process, you know, what

9  kinds of evidence need to be retained.  And so, in particular,

10 this passage is talking about the packets of data that are

11 received and exchanged between the local computer that's

12 performing the analysis and the remote computer, so --

13 Q.  And help the jury understand.  When you say "packets," just

14 what does that mean?

15 A.  This may have come up before, but in the Internet,

16 information is transmitted between computers in packets.  You

17 can think of them almost like an envelope that have data, and

18 so instead of, like, a phone call where it's always live and

19 you're talking, it's individual packets of data are flying back

20 and forth over the wires.  And so what this is saying is that

21 the requirement being placed in this particular system is that

22 all packets need to be preserved.

23 Q.  Earlier we had an animation with bit field and choke data

24 moving from a computer on the Internet to Rightscorp?

25 A.  That's right.

Dr. Geoffrey Cohen - Examination                    1762

1    Q.  Would the information in those bit field and choke packets

2    necessarily be saved based on the requirement that we see on

3    the screen?

4    A.  Sure.  I mean, all communication on the Internet is in

5    packets, so anything being exchanged in this protocol

6    necessarily would be in one of those packets.

7    Q.  In your opinion, does the Rightscorp system satisfy this

8    requirement set forth by the RIAA?

9    A.  It does not.  The Rightscorp system does not save the

10   packets that are exchanged.

11   Q.  What is the consequence of failing to save or not being

12   able to show the packets of information that traveled back and

13   forth between the two computers?

14        MR. O'BEIRNE:  Your Honor, I object.  This is getting

15   into an opinion that was excluded.

16        MR. BROPHY:  No, Your Honor, absolute -- that is

17   absolutely not true.

18        MR. O'BEIRNE:  Happy to show you the paragraphs, Your

19   Honor.

20        MR. BROPHY:  I'm happy to show you paragraphs where

21   it's not true, Your Honor.  I knew this was going to happen. I

22   have them all cited.

23        THE COURT:  The only one around here that's not happy

24   is me, because I have to deal with all this, but that's my job.

25        Ladies and gentlemen, rather than have you sit there,

```
 1    I'm going to let you go back for your afternoon break and then
 2    we'll pick up after I make a ruling, okay?
 3              COURT SECURITY OFFICER:  Please rise for the jury,
 4    please.
 5              (2:30 p.m., the jury exits the courtroom.)
 6                              *   *   *
 7              THE COURT:  First of all, the jury is gone.  You can
 8    step down, sir.
 9              MR. BROPHY:  They're gone.
10              THE COURT:  As to the earlier objection, counsel, you
11    were comparing apples and oranges.  Those were percipient
12    witnesses.  This is an expert witness.  An expert witness is
13    allowed considerably more latitude than a percipient witness
14    when it comes to considering and developing their opinions, but
15    let's get into this one.  What is this now?
16              MR. O'BEIRNE:  Would you like to hear the objection
17    first, Your Honor, or the response?
18              THE COURT:  Well, obviously, I need the objection.
19              MR. O'BEIRNE:  That's what I thought.
20              THE COURT:  Let's not put the caboose in front of the
21    engine here.
22              MR. O'BEIRNE:  If I can take the podium, I'm happy to
23    explain, Judge.
24              MR. BROPHY:  I've got my stuff set up.
25              MR. O'BEIRNE:  I can do it from here.  That's no
```

1    problem.

2            THE COURT:  Do it from there.  Do it from there.  I

3    can hear you.  The reporter can hear you.  It's good.

4            MR. O'BEIRNE:  Your Honor, I have a bench brief

5    just -- with detailing the reports and the Court's order -- the

6    opinions that were excluded by Magistrate Judge Austin's order,

7    just for Your Honor's reference, to make sure we're talking

8    about the same thing.  I could hand up a copy.

9            THE COURT:  Sure.  This is why Judge Austin retired.

10           MR. O'BEIRNE:  Counsel for Grande, on opening --

11           THE COURT:  Just a minute.

12           *(Pause.)*

13           Okay.  I've read this.

14           MR. O'BEIRNE:  Your Honor.

15           THE COURT:  Have you had a chance to review it?

16           MR. BROPHY:  I understand this issue completely, Your

17   Honor.

18           THE COURT:  All right.  Wait.  I just read this.

19           MR. O'BEIRNE:  Yes, Your Honor.  I want to explain

20   specifically the testimony that I believe was about to be

21   elicited and how it violates the Court's order.

22           THE COURT:  Okay.

23           MR. O'BEIRNE:  Counsel on opening said repeatedly that

24   choke data and BitTorrent indicates a willingness to share.  In

25   section 8, particularly 8(d) of the excluded opinions,

1    Dr. Cohen went into detail about his description of what choke
2    data means, that it indicates a lack of willingness to share,
3    and why it should have been retained.  There is one single
4    mention of the word choke in his initial report, which is the
5    only admissible opinion that he has on this, which is,
6    *"Connections start out choked until they are unchoked."*
7              That is the only admissible opinion he's allowed to
8    offer about choking in any way in this case.  We can read
9    through the detailed sections of his report that Judge Austin
10   excluded about what choke data would mean.  And even the
11   willingness to share, I did not object, he said twice --
12             THE COURT:  This was because it wasn't disclosed?
13             MR. O'BEIRNE:  Yes, Your Honor.  And to use Judge
14   Austin's words, they gave no reason, not even a bad one, for
15   why it was so late.  It is not in his initial report.  I did
16   not object the first two times he said "willingness" because my
17   goal was not to interrupt the presentation.
18             THE COURT:  Was there an appeal of that Magistrate
19   order?
20             MR. O'BEIRNE:  No, there was not, Judge.  And so --
21             THE COURT:  I remember now that I got this case later.
22             MR. O'BEIRNE:  I understood, Judge.  That's why I
23   wanted to summarize the issue and make sure you had the rulings
24   in front of you.  This is squarely in 8(d) of his excluded
25   opinions and is well within the impermissible testimony that

1    he's not allowed to offer.

2            THE COURT:  All right.  Now, let me hear from you,

3    counsel.

4            MR. BROPHY:  Thank you, Your Honor.  Sorry.  It's been

5    a long week.  There are two sections that have been stricken

6    from Dr. Cohen's supplemental report, sections six and eight.

7            THE COURT:  Right.

8            MR. BROPHY:  It's in the bench brief.  However, Dr.

9    Cohen also expressed his opinions in his opening report -- and

10   I'm happy to give you citations -- and in other parts of his

11   supplemental report which were not stricken.  And I can pass

12   you up a copy of his report if you'd like to see that.

13           THE COURT:  Yeah, you show me and point to me what we

14   are talking about here.

15           MR. BROPHY:  I want to be really cynical about this,

16   Your Honor, because this is obviously important testimony for

17   our case.

18           THE COURT:  I understand.  Just give it to me.  That's

19   why I sent the jury out and I'm looking at it.

20           Somebody hand that to me.  They did or they didn't?

21           MR. BROPHY:  I'm highlighting it for you if that's

22   alright.

23           THE COURT:  All right.

24           MR. O'BEIRNE:  You mind calling up the paragraphs,

25   counsel, so I can follow?

Dr. Geoffrey Cohen - Examination          1767

1           MR. BROPHY:  Sure.  Paragraph 159, in the original

2    report.  So Your Honor, this is, if I may, so this is one

3    example.

4           THE COURT:  Okay.  Just a minute.  Let me look.  Let

5    me read it.  If I can.  This is his first report now?

6           MR. BROPHY:  This is his first report, yes, Your

7    Honor.  In paragraph 157, it begins and moves through 159.

8           THE COURT:  Okay.

9           *(Pause.)*

10          Well, there's a typo here.  I think he meant to say

11   *"It is of paramount importance."*  It says, *"paramount*

12   *performance"*; is that right?

13          MR. BROPHY:  I'll have to ask him that when he gets

14   back on the stand, Your Honor --

15          THE COURT:  I think that's what he said.

16          MR. BROPHY:  -- but I think that's probably right.

17          *(Pause.)*

18          THE COURT:  Okay.  This wasn't stricken, was it?

19          MR. BROPHY:  No, Your Honor.  And then in addition to

20   that --

21          MR. O'BEIRNE:  Before we go on, Your Honor, I'll just

22   note there's no mention of choking, choke data, willingness to

23   share, or any of the testimony I'm trying to exclude.  And he's

24   already elicited testimony that they did not retain

25   information, and he's already talked to him about the

Dr. Geoffrey Cohen - Examination                1768

1    MarkMonitor RFP.  I did not object to that.

2           To be clear, my objection is it is actually false, as

3    a matter of the technology, that choke data indicates whether

4    someone is willing to share, as Ms. Frederiksen explained,

5    but --

6           THE COURT:  I know you believe Ms. Frederiksen.  He

7    believes the witness that's on the stand.  I mean, I'm not in a

8    position to make that call.  That's their call.

9           MR. O'BEIRNE:  Understood, Judge, but Judge Austin's

10   call was that his opinion about the significance of choke data

11   specifically, the opinion expressed in section eight about what

12   choke data does in BitTorrent and means and what the jury could

13   draw from it are --

14          THE COURT:  Counsel, just stay seated for a moment

15   okay, please?

16          MR. O'BEIRNE:  Yes, Your Honor.

17          THE COURT:  Now, where does he talk about choke data

18   here?  I don't see it.

19          MR. BROPHY:  I'm getting to that, Your Honor.  I don't

20   want to -- I will show you where the choke data is.  I wanted

21   to set up the stage for the fact that he's talking about these

22   documents.

23          THE COURT:  No, there's no question -- look, there is

24   no question he can testify about anything which is not

25   excluded.  What I'm asking you is to show me what is not

Dr. Geoffrey Cohen - Examination                     1769

1    excluded that you want to ask him about.

2          MR. BROPHY:  So now, if I may, this is his

3    supplemental --

4          THE COURT:  Because Judge Austin's order was never

5    appealed.

6          MR. BROPHY:  It was appealed, Your Honor.

7          THE COURT:  What?

8          MR. BROPHY:  It was appealed.

9          THE COURT:  It was appealed?

10         MR. BROPHY:  It was, yes, and we didn't have a

11   decision on that, so technically it's still open.

12         THE COURT:  Who was the judge?  Was it -- did it fall

13   between that period of time between Judge Yeakel and I?

14         MR. HOWENSTINE:  We filed objections to Judge Austin's

15   order that were never ruled on.

16         THE COURT:  Judge Yeakel didn't rule on it?

17         MR. BROPHY:  Not to our knowledge, Your Honor.  But,

18   frankly, it doesn't matter.

19         THE COURT:  I guess it doesn't really matter.

20         MR. BROPHY:  Because we have plenty of citations.

21         THE COURT:  Yeah, this has been subsumed.  It's still

22   the law of the case at the moment.

23         MR. BROPHY:  I understand.  Obviously, we would want

24   to keep track of that, but the other -- that supplemental

25   report I just showed you, there are pages and pages of

1   Dr. Cohen opining --

2           THE COURT:  This, in essence, is your appeal?

3           MR. BROPHY:  This is it.  But there are pages,

4   beginning on page 5, paragraph 15 and thereafter --

5           THE COURT:  All right.  I'm looking at that now.

6           MR. BROPHY:  This was not stricken.

7           THE COURT:  Yeah.

8           *(Pause.)*

9           Okay.  Well, he can testify to all of that.

10          MR. BROPHY:  So then I'll show you the choke

11  information.  If you go to page 39, paragraph 130 of the

12  supplemental report, also not stricken.

13          *(Pause.)*

14          THE COURT:  Okay.  I'm there.

15          MR. BROPHY:  Well, he says --

16          THE COURT:  Where?

17          MR. BROPHY:  Paragraph 130 at the very bottom: *"As I*

18  *wrote, a BitTorrent client can choke or refuse to upload to*

19  *peers.  Choking is a notification that no data will be sent*

20  *until unchoking happens."*

21          And then it goes on, *"Rightscorp did not produce*

22  *records of whether connections are marked as choked or not."*

23          MR. O'BEIRNE:  I don't object to that, Your Honor.

24  Just stating which -- the bit field description says *"choking*

25  *exists until unchoking."*  That the idea that choking represents

1  a willingness to share does not appear in his initial report,

2  and I'm concerned that he's about to testify to it because it's

3  on their slide, and he said "willingness to share" twice.  And

4  that is absolutely out.

5          I will note that while the report is organized into

6  sections five, six, seven, eight, and six and eight are out, he

7  also paraphrases those opinions in other paragraphs, so our

8  position, of course, is --

9          THE COURT:  Well, Judge Austin understood the

10  difference between the paragraphs, and if he didn't strike it,

11  I'm not going to strike it.

12          MR. O'BEIRNE:  No.  I am not asking for additional

13  striking, Judge.  I'm saying the opinions as they're set forth

14  are either out or they're in.

15          THE COURT:  All right.  Your objection -- everybody

16  sit down, because I don't want any jumping up like a

17  jack-in-the-box here.

18          The objection is overruled to the extent that his

19  opinions are reflected here.  I am troubled by the fact that

20  there was no ruling.  And I'm not criticizing Judge Yeakel in

21  any way, shape or form.  One of the finest judges I know, but

22  this is what happens when you get a huge, busy docket and

23  you're switching cases back and forth to try to get things

24  done.  I am troubled by that, because they were entitled to a

25  ruling.  But they don't feel like this prejudices them, so

Dr. Geoffrey Cohen - Examination                    1772

1    that's fine.

2            So he can continue to testify.  If he hits something

3    that you think crosses the line, you can object, and then I

4    have these documents in front of me.  He can call my attention

5    to where they are.  All right?  I'm not going to give a blanket

6    objection to any testimony about choke data.

7            MR. O'BEIRNE:  Understood, Judge.

8            THE COURT:  Okay?  All right.

9            MR. BROPHY:  Your Honor, to, I guess, get out ahead of

10   another objection, may I provide you with his second

11   supplemental report that also talks about choke?

12           THE COURT:  Yes.  Well, this is the one where --

13           MR. BROPHY:  This was also not stricken.

14           MR. O'BEIRNE:  That's after the opinions that were

15   stricken, Judge.  The striking happened after he issued it.

16           THE COURT:  Was there an appeal of this?  Was there

17   any ruling on this?

18           MR. BROPHY:  No, that's still admissible.

19           THE COURT:  Nobody filed?

20           MR. BROPHY:  No.

21           *(Pause.)*

22           MR. O'BEIRNE:  What paragraph are we citing to?

23           THE COURT:  Forty-five.  He's talking about choke

24   here.

25           MR. BROPHY:  And specifically, he's talking about the

1  fact that clients begin choked and have to be unchoked before

2  they will start sharing.

3         MR. O'BEIRNE:  Your Honor, my understanding, this is

4  after the ruling, but that the ruling controlled across the

5  opinions.

6         MR. BROPHY:  That's not true, Your Honor.

7         THE COURT:  No, that isn't correct.  I think that

8  somebody files a second -- if the second supplemental report

9  was provided in a timely fashion to counsel, they have the

10 obligation to raise the issue.

11        MR. O'BEIRNE:  Your Honor, the second supplemental

12 report wasn't addressed in the opinions that were excluded.  It

13 was addressing additional deposition of Boswell that they asked

14 for and got --

15        THE COURT:  Well, it's here.

16        MR. O'BEIRNE:  Your Honor, he just reiterated

17 opinions --

18        THE COURT:  I don't know what he's going to ask him.

19 I'm not going to rule in a vacuum.  I'm not going to give you a

20 blanket ruling -- I know you'd love to have a blanket ruling.

21 I'm not going to do it.

22        MR. O'BEIRNE:  I'm not asking for it, Judge.  I'm not

23 asking for it.  I'm merely pointing --

24        THE COURT:  Well, you are.  And I'm not going to do

25 it.  What I'm going to do is listen to the testimony.  You are

1    perfectly capable of standing up and objecting.  And I will

2    then address the objection when it is made.

3            MR. O'BEIRNE:  Understood, Your Honor.

4            THE COURT:  Okay.  Anything else?

5            MR. BART:  I've been very innocent sitting here.

6            THE COURT:  Okay.  I was waiting for the great

7    clarifier to get some clarification in the ruling.

8            All right.  Can we take a five-minute recess?

9            MR. BROPHY:  Sure.

10           THE COURT:  Because I feel like I'm choked out.

11           COURT SECURITY OFFICER:  All rise.

12            *(2:47 p.m.)*

13                        *   *   *

14            *(3:01 p.m.)*

15           COURT SECURITY OFFICER:  All rise.

16           THE COURT:  Let's go ahead and bring the jury in.

17           COURT SECURITY OFFICER:  Please rise for the jury.

18            *(3:04 p.m., the jury enters the courtroom.)*

19                        *   *   *

20           MR. BROPHY:  May Dr. Cohen retake the stand?

21           THE COURT:  Yes, of course.

22           All right.  You may continue, counsel.

23           MR. BROPHY:  Thank you, Your Honor.

24           THE COURT:  The Court would note the presence of the

25    ladies and gentlemen of the jury.  I have to say that on the

1    record because, you know, the record doesn't have eyes.

2    BY MR. BROPHY:

3    Q.  So Dr. Cohen, before the break, we were looking at this

4    language in front of you, and I believe the question that I

5    asked was, what are the consequences of failing to save the

6    packets exchanged with the target computer?

7    A.  Basically it would be impossible for later a recipient of a

8    notice or a third party to establish the veracity of the

9    notice, the basis for that notice.

10   Q.  Let's go to the next page in this document.  There's a

11   section here entitled *"Data Capture and Storage."*  Do you see

12   that?

13   A.  Yes.

14   Q.  Does this document from the RIAA establish a set of

15   evidence that is required to be collected, saved, and stored as

16   part of the detection process?

17   A.  Yes.  This is something they call "the evidence package."

18   Q.  So the RIAA calls the evidence an evidence package; is that

19   right?

20   A.  Yeah.

21   Q.  What is an evidence package?

22   A.  Evidence package is -- in this term, it hasn't quite

23   defined what's in it, but functionally, an evidence package is

24   the collection of data that has been collected in this process

25   of communicating that is necessary to establish the veracity of

1  the conclusion.

2  Q.  So is it fair for me to say that this is the evidence that

3  proves the e-mail accusation is legitimate?

4           MR. O'BEIRNE:  Your Honor, objection.  Foundation.

5  We're talking about different systems.

6           MR. BROPHY:  We're not talking about a different

7  system, Your Honor.  I'm talking about the Rightscorp system.

8           THE COURT:  Overruled.

9           THE WITNESS:  So broadly, it is the evidence that

10  allows the determination of a particular accusation that might

11  have been delivered by e-mail or otherwise.  But if a certain

12  allegation is made based on a set of communications, the

13  evidence package is the package of that communication's

14  associated information that establishes -- just like evidence

15  in -- any kind of evidence.  Right?  The evidence is the thing

16  that shows that something is true rather than is just an

17  unfounded allegation.

18  BY MR. BROPHY:

19  Q.  Does this document set forth what the evidence package

20  includes?

21  A.  It does, yes.

22  Q.  And if we move to the next page of this document, which is

23  page 12, Bates M000043, you'll see a list of eight items there.

24  What are those?

25  A.  So there's a -- as you say, there's eight.  There's a

1    number of them.  There's a log listing all the steps, a log of

2    all the control communication, trace route information, bit

3    fields from the BitTorrent users, screen shots detailed of the

4    shared file list, peer ID, and then they say *"for RIAA evidence*

5    *only,* a repertoire details" meaning artist name, artist track,

6    that sort of musical metadata.

7    Q.  Does Rightscorp have this evidence for a single e-mail that

8    they sent in this case?

9    A.  Not that I have seen.

10   Q.  I want to focus on two in particular.  The first I've

11   highlighted on the screen is the log of all control

12   communications with the target.  What is that?

13   A.  Well, we talked about that before.  That would be the

14   handshake, the bit field, the choke communications, the

15   communications between the computer and the peer that aren't

16   data, things that control the flow of information.

17   Q.  And I believe you've already testified that that's

18   important data, in your opinion; is that right?

19   A.  Absolutely.

20   Q.  The second one I want to focus on is the bit field.  What

21   is a bit field?

22   A.  So bit field, which, again, I think has been mentioned

23   before, is a representation of which pieces of the payload the

24   peer claims to have.

25   Q.  Now, I want to be really clear about this next question.

1    When I say "save," I mean permanently save.  And here is my
2    question:  In your opinion, is it important for a monitoring
3    company to collect and save bit field evidence?
4    A.  Absolutely.
5    Q.  Why?
6    A.  Because that is the evidence that shows that the remote
7    computer has the file under consideration.
8    Q.  Have you seen any bit field data for any of the e-mail
9    accusations that Rightscorp sent in this case?
10   A.  I've seen no bit field information.
11   Q.  Zooming out a little bit from this document, do you have an
12   opinion about whether Rightscorp meets the RIAA's own
13   requirements for detecting, documenting, and preserving
14   evidence of music sharing?
15   A.  Clearly not.
16   Q.  Dr. Cohen, are you aware of an instance in which Rightscorp
17   applied to do work for the RIAA?
18   A.  Yes.
19   Q.  I'm going to put on the screen what's been marked and
20   admitted as Defense Exhibit 15.  Have you seen this document
21   before?
22   A.  Yes, I have.
23   Q.  What is it?
24   A.  So the RIAA put out an RFP, a request for proposals;
25   meaning invitation to industry to set -- send in proposals to

Dr. Geoffrey Cohen - Examination                    1779

1    meet the set of requirements the RIAA has put forth.  And this

2    is Rightscorp's response to that, so this is their proposal to

3    meet the requirements the RIAA is putting forth.

4    Q.  I'd like to move to page 43 of this document.  I'll admit

5    it's blurry.  I'm going to blow it up in a minute.  But would

6    you mind -- first of all, have you seen this page of the RFP

7    response?

8    A.  Yes.

9    Q.  Would you mind just describing for the jury what we see

10   here?

11   A.  Sure.  So there's two columns here, one that you can read

12   and one in tiny, tiny print.  So the one on the left is from

13   the original RIAA RFP, so these are the RIAA's requirements in

14   the left column.  The right column is Rightscorp's response to

15   those requirements, so it's Rightscorp saying the ways in which

16   they meet the requirements in that left-hand column.

17   Q.  So we're going to blow up a portion of this.  And I've

18   highlighted one of the rows.  You see where it says *"bit fields*

19   *from BitTorrent users and other network users where*

20   *applicable"*?

21   A.  Yes, I do.

22   Q.  What does that reference to?

23   A.  So this is the bit fields we're talking about.  When the

24   Rightscorp system reaches out to a remote peer, receives a bit

25   field, that's the data that they are referring to there.

1   Q.  In this RFP response, did Rightscorp tell the RIAA that it
2   collects and saves bit field data?
3   A.  Well, as you can see --
4           MR. O'BEIRNE:  Objection -- I'm sorry.  Foundation as
5   to what Rightscorp told the RIAA.  The document speaks for
6   itself as to what the statements that are in there.
7   Mr. Boswell was not asked about this document.  The witness
8   can't speculate as to what Rightscorp told the RIAA in
9   connection with this RFP.
10          MR. BROPHY:  That's not the question I asked, but I'll
11  be happy to reframe it to make it clear, Your Honor.
12          THE COURT:  All right.
13  BY MR. BROPHY:
14  Q.  In your opinion, after reviewing this document, does it
15  indicate that Rightscorp told the RIAA that it collects and
16  permanently saves bit field data?
17  A.  Yes, absolutely.  It says at the bottom of that very
18  clearly, *"currently everything is retained indefinitely,"* and
19  so that includes the information above, including the bit
20  fields.
21  Q.  Is this representation that the Rightscorp company made to
22  the RIAA consistent with your understanding of how the
23  Rightscorp system works?
24  A.  Well, that's an interesting question, because there's a lot
25  of conflicting evidence about whether or not the bit field data

Dr. Geoffrey Cohen - Examination            1781

1  was kept or retained.

2  Q.  To your knowledge, has any bit field data been produced in

3  this case?

4  A.  No.  I have seen no bit field data produced from

5  Rightscorp.

6  Q.  You haven't seen a single piece of bit field information

7  for a single Rightscorp notice sent in this case; is that

8  right?

9  A.  No, not a single piece.

10  Q.  And in this document, Rightscorp is stating to the RIAA

11  that they do save it?

12  A.  That's my interpretation of the plain language of the

13  document, yeah.

14  Q.  Do you know where the bit field data is?

15  A.  Sorry.  Do I know where it is?

16  Q.  Do you know where it is?

17        MR. O'BEIRNE:  Your Honor, objection.  It's been asked

18  and answered, and it's getting argumentative.

19        THE COURT:  I don't think so.

20  A.  I have no idea.

21  Q.  Do you know whether it exists or not?

22  A.  I don't.

23  Q.  But you haven't seen any in this case?

24  A.  I have not.

25  Q.  I'm going to give a preview to something we're going to

Dr. Geoffrey Cohen - Examination                    1782

1   talk about in a minute.  In your opinion, does the Rightscorp
2   source code indicate the bit field data is saved and backed up?
3   A.  Yes, to the extent to which we can understand the
4   Rightscorp source code, everything I've seen is consistent with
5   the bit field data being received, stored, and backed up
6   permanently.
7   Q.  But no bit field in this case that you've seen?
8   A.  No.
9   Q.  Let's switch gears and talk about choke data for a minute.
10   We've talked about that earlier today.  Would you mind just
11   refreshing the jury's memory as to what choke data is?
12          MR. O'BEIRNE:  Objection, Your Honor.
13          THE COURT:  Overruled.
14   A.  So choke is one of the messages that different BitTorrent
15   peers will send each other.  And choke indicates that no
16   further data will be transmitted from that peer until the
17   connection is unchoked.
18   Q.  We've heard some testimony in this case about choke data
19   and the notion that it operates on a packet-by-packet basis or
20   a song-by-song or something like that.  Would you mind just
21   clarifying exactly what choke data does in that regard?  Is it
22   a global off switch or something else?
23   A.  In the BitTorrent protocol document, it's very clear that
24   choke on a connection merely means no further data will be
25   transmitted on that connection until it's unchoked.

Dr. Geoffrey Cohen - Examination                1783

1  Q.  Does the Rightscorp system, in your understanding of how it

2  works, take choke data into consideration when deciding whether

3  to send an e-mail accusation?

4  A.  It does not.

5  Q.  So your understanding of the Rightscorp system is that it

6  ignores the choke data; is that right?

7  A.  Yes.

8  Q.  In your opinion, is that a flaw in the Rightscorp system?

9  A.  Yes.

10 Q.  In your opinion, does the RIAA require monitoring companies

11 to save the choke data?

12 A.  Yes.

13 Q.  Is it possible for a computer to remain choked and

14 therefore refuse to share music files?

15 A.  Certainly.

16 Q.  Under what circumstances does that occur?

17       MR. O'BEIRNE:  Your Honor, objection.  This is plainly

18 within his opinion 8(d) and is not -- nowhere in his report.

19       MR. BROPHY:  Your Honor, I can show you the passage

20 where it's not excluded.

21       THE COURT:  Objection overruled.

22 A.  So a BitTorrent user who would like to gain the benefits of

23 BitTorrent in the sense of being able to download music but for

24 whatever personal reasons doesn't want to share with anyone

25 can -- and different BitTorrent clients work in different ways,

Dr. Geoffrey Cohen - Examination                    1784

1    but they have settings or configurations that allow you to turn

2    the maximum connection to zero or total upload speed to zero so

3    that all connections made from that will remain choked forever,

4    because the user has basically indicated, I don't want to share

5    anything, unwilling to share anything.

6    Q.  Under those circumstances you just described where the

7    connection is choked and refusing to share, will the Rightscorp

8    still send an e-mail accusing that computer of sharing a file?

9         MR. O'BEIRNE:  Objection.  Foundation, calls for

10   hypothetical.  There's no facts in evidence about that.

11        THE COURT:  He studied it.  The objection is

12   overruled.  He's giving his opinion.  That's what it is.

13   A.  Yeah, absolutely.  If all the other steps happen, if it

14   reaches out and talks to the peer, it's going to send a notice

15   whether or not it was choked or would have remained choked

16   forever.

17   Q.  And that's because Rightscorp ignored the choke data,

18   right?

19   A.  That's right.

20   Q.  Let's talk about downloads, the third functional component.

21   A.  Yes.

22   Q.  You understand Rightscorp claims that it collected a hard

23   drive of files from Grande customers; is that right?

24   A.  Yes.

25   Q.  Have you reviewed the portions of the Rightscorp source

1    code responsible for downloading those files?

2    A.  Yes.

3    Q.  Does the source code record instances in which the system

4    attempts to download a file, but can't?

5    A.  It does not.

6    Q.  Is it your opinion that that's a problem?

7    A.  Absolutely.

8            MR. O'BEIRNE:  Objection, Your Honor.  This is opinion

9    six in the excluded opinions.

10           MR. BROPHY:  I can show you the parts that aren't

11   excluded, Your Honor, if you'd like me to.

12           MR. O'BEIRNE:  It's set forth in the Magistrate Judge.

13           THE COURT:  Well, it's awfully close.

14           MR. BROPHY:  If I may, Your Honor?

15           THE COURT:  Yes.

16           MR. BROPHY:  I'm trying to find the right part here.

17           *(Pause.)*

18           May I approach, Your Honor?

19           THE COURT:  Of course.

20           MR. BROPHY:  That page.

21           MR. O'BEIRNE:  What paragraphs were those, counsel?

22           MR. BROPHY:  131 and on.

23           MR. O'BEIRNE:  Of the supplemental or the original?

24           MR. BROPHY:  The supplemental.

25           MR. O'BEIRNE:  Your Honor, that's the summary section

1    restating the opinions, and therefore is covered by the Court's

2    order.

3            MR. BROPHY:  Your Honor, those sections are not

4    stricken from his report.

5            THE COURT:  Well, the summary is starting at 134.

6            MR. BROPHY:  Those paragraphs that I cite are not

7    stricken, Your Honor.

8            THE COURT:  No, I know.  I said the summary.  He said

9    it was a summary section.  I don't know that this is a summary

10   section.

11           MR. BROPHY:  I don't believe it is, Your Honor.

12           THE COURT:  The objection is overruled.

13   BY MR. BROPHY:

14   Q.  Is it a problem that Rightscorp ignores choke data?

15   A.  Do you mean failures of downloads?

16   Q.  I'm sorry.  Failure to download, excuse me.

17   A.  Yes, it is.

18   Q.  It ignores choke data too, doesn't it?

19   A.  That's also a problem.

20   Q.  Why is not keeping track of failed downloads a problem?

21   A.  Because if you try to download and you can't, that

22   indicates that there could be a problem with the evidence.  Try

23   it a bunch of times and you keep falling, that indicates

24   there's a problem with the system and how it's making

25   allegations.

1   Q.   Have you heard the phrase "false positive"?

2   A.   I have.

3   Q.   What does that mean?

4   A.   So when you test for something, there's basically four

5   possibilities.  Right?  You might get positive or negative.

6   But within each of those, you might be right or wrong, so you

7   might get a true positive, meaning you've accurately identified

8   it.  You might get a false positive, meaning you think it's

9   positive, but you're wrong.  You might get a true negative,

10  meaning it really is.  You may get a false negative, meaning

11  you thought it was negative, but it's not.

12  Q.   Is the instance we just discussed where a notice is sent

13  out, but then Rightscorp tries to get the file and can't,

14  evidence of a false positive?

15  A.   It certainly could be, yes.

16  Q.   And Rightscorp didn't keep track of instances in which it

17  had false positives.  Is that your opinion?

18  A.   It didn't keep evidence of any failures, and so it wouldn't

19  even be able to determine which of those were false positives.

20  Q.   In your opinion, is it possible that the Rightscorp system

21  sent out 50,000 e-mail notices and then tried to download songs

22  for 50,000 of those notices and failed every time and we

23  wouldn't ever know?

24  A.   There's really no way to know how often it tried, how often

25  it failed.  We know something like how often it succeeded if we

1  take the hard drive sort of at face value, but for the hundreds

2  of thousands of other notices, we have no way of knowing how

3  often they tried or how often they tried and failed.  The

4  history of the source code and the lack of logging means

5  there's no way for me to assess that.

6  Q.  Can you provide an example of an instance or something you

7  know about the Rightscorp system that would yield a false

8  positive?

9  A.  So certainly, if someone had configured their client to not

10 upload, that connection would be choked.  Rightscorp system

11 would send a notice.  It would possibly attempt to download a

12 song and would fail to download a song.  And so that would be a

13 false positive in the sense of was it actually willing to

14 share.  It clearly wasn't willing to share because it did not

15 share.  And so in that situation, that would be a false

16 positive.

17 Q.  We've heard testimony about 10 percent bit field.  Do you

18 know what that is?

19 A.  Yes.

20 Q.  Without getting into that yet, is the 10 percent bit field

21 another instance in which you could yield a false positive from

22 the Rightscorp system?

23 A.  Absolutely.

24 Q.  Let's talk for a minute about the Rightscorp downloads.

25 A.  Okay.

Dr. Geoffrey Cohen - Examination          1789

1   Q.  You reviewed the hard drive; is that what your testimony

2   was?

3   A.  I did.

4   Q.  Have you performed an assessment of the number of

5   subscribers for which Rightscorp was allegedly able to

6   consummate a download?

7   A.  Yes.

8   Q.  What I've put on the screen, I believe, is taken from your

9   expert report.  Would you mind, please, just explaining to the

10  jury what the calculation is that you performed and what the

11  result was?

12  A.  Sure.  So we started with the total number of notices that

13  correspond to the downloads.  Right?  So approximately 59,000

14  notices, and then the downloads, but those notices, many of

15  them went to the same users.  So it's not 59,000 users that are

16  being sent notices, but closer to 9,000 users.

17  Q.  Do you recall off the top of your head how many, like, if

18  there was an example of how many times it went and downloaded

19  the same song allegedly from the same user?

20  A.  I think there was one case where it just downloaded the

21  same song from the same user off the same notice -- so this

22  isn't even different notices -- I think 1200 times, so just

23  repeatedly grabbing it over and over and over again.

24  Q.  How many Grande customers was Rightscorp able to

25  successfully download a file from, as far as they claim?

1   A.   Based on the hard drive, fewer than 500.

2   Q.   And how many Rightscorp -- pardon me.

3        How many Grande customers did Rightscorp accuse of sharing

4   files during that period?

5   A.   Is it -- so that's 9,000, so I think I may have misspoken

6   earlier to say that the 9,000 associated only with the

7   downloads, but that was associated with the set of notices, so

8   they're sending out hundreds of thousands of notices, but that

9   was the same 9,000 people over and over again.

10  Q.   So just to make sure the record is clear on this, there are

11  a lot of Rightscorp notices out there?

12  A.   Yes.

13  Q.   Those Rightscorp notices are focused on roughly 9,000

14  Grande customers?

15  A.   Yes.

16  Q.   Is that your calculation?

17  A.   Yes.

18  Q.   But the hard drive only contains songs downloaded from 500

19  of them?

20  A.   Yeah.

21  Q.   So roughly 95 percent of the customers that were accused of

22  sharing songs Rightscorp has no song from; is that right?

23  A.   That's my understanding.

24  Q.   Did you perform an analysis to determine how many unique

25  instances of a download occurred for the works at issue in this

1  case?

2  A.  I did, yes.

3  Q.  This next slide, one of my favorite things, a Venn diagram,

4  would you mind describing -- first of all, did you prepare this

5  Venn diagram?

6  A.  I did.

7  Q.  Would you mind describing what it shows to the jury?

8  A.  Sure.  And it -- I'll walk through it in stages.  It does

9  look like a lot at first, and so --

10 Q.  Just to -- let me -- I don't mean to interrupt you, but

11 let's keep it brief.

12 A.  I'll do my best.

13     So this is an attempt to try to characterize how much

14 duplication there is on that hard drive, so that outer circle

15 is the 59,000 samples.  And specifically, we're looking at

16 samples that have notices, because some of those samples on the

17 hard drive actually didn't have associated notices, just a few

18 hundred, but we're excluding that for this analysis.

19     So there's a sort of next level in, if you think of this as

20 like a bull's eye target, that says *distinct infractions,*" and

21 that's 28,000.  So what that means is that from the 59,000 to

22 the 28,000, what we've removed is the same notice, the same

23 infraction and ID, just getting downloaded over and over and

24 over again.  So there's, like I said, 1200 times for just one

25 user.  Same file, same notice.

1      Once you remove all that duplication, we're down to 2800

2   infractions.

3   Q.   You mean 28,000?

4   A.   28,000, yes, excuse me.

5   Q.   How many of those relate to works actually at issue in this

6   case?

7   A.   So now we can look at that sort of oval that sort of goes

8   to the upper right, has a little copyright sign on it, so

9   that's the subset of all this that talk just about songs at

10   issue in this case, since the hard drive actually had many

11   songs that were not at issue in this case.

12   Q.   So how many are at issue in this case?

13   A.   So on the hard drive, there were 22,000 downloads.  And

14   that once we de-duplicate the same song over and over again,

15   there were a little bit less than 13,000.

16   Q.   What is that inner number, 3,692?

17   A.   So now we're looking at whether it's the same song even

18   against multiple notices.  So the same song by the same user

19   might get new notices every day or even more often than every

20   day, so a song might get -- I think as Mr. Boswell testified,

21   as often as the Rightscorp system was operating, you would

22   reach out, talk to it, and generate another notice and generate

23   another notice.  So if we just look at, independent of which

24   notice it was, is it the same file from the same user, there

25   were less than 10,000 total.  And for songs at issue in this

Dr. Geoffrey Cohen - Examination                1793

1    case, there were about 3,700 songs.

2    Q.  So if you were to take what you just said and distill it

3    down into a sentence, how would you describe those 3,692?

4    A.  I would say 3,692 unique files that were successfully

5    downloaded of songs that were at issue in this case.

6    Q.  During your analysis of the Rightscorp hard drive, did you

7    come across files that were not songs?

8    A.  Yes.

9    Q.  Roughly how many?

10   A.  There were, I believe, about 1200 image files, JPEGs or

11   PNGs, things like that.

12   Q.  So I've got a notice up on the screen with the accusation

13   blown up.  This is a Nirvana song.  Is this one of the photo

14   files that you found?

15   A.  Yeah, it's -- I believe it's the cover of an album.

16   Q.  If I understand your testimony, this is an instance in

17   which Rightscorp sent out a notice accusing someone of sharing

18   a song, but when Rightscorp went out and tried to get that

19   song, it got a picture?

20   A.  Yes, that's right.

21   Q.  And that happened how many times?

22   A.  I think about 1200 times on -- I should say just on that

23   hard drive, the hard drive that they provided as evidence of

24   how well their system worked, 1200 of those files were actually

25   images and not songs at all.

Dr. Geoffrey Cohen - Examination                    1794

1   Q.  So let's go back and talk about bit fields for just a

2   minute.  I think you've already testified the Rightscorp system

3   claims it goes out and gathers bit field data from individual

4   computers; is that right?

5   A.  That's right.

6   Q.  Does the Rightscorp source code store the bit field data it

7   collects from those computers?

8   A.  It does.  It stores it in a table called torrent

9   infractions, which I think both Mr. Boswell and

10  Ms. Frederiksen-Cross referred to.

11  Q.  What does the Rightscorp source code do with that bit field

12  data?

13  A.  So it scans through -- just to refresh, that bit field is a

14  set of ones and zeros representing which pieces of the payload

15  the peer has.  So the Rightscorp system then runs through and

16  figures out whether or not all of those bits in the bit field

17  are one.  And if it is, that's another field in the database

18  called full file to one, meaning you have the full file.

19  Q.  What happens if the bit field isn't all ones?

20  A.  Then it's --

21  Q.  What's the full file get set to?

22  A.  It gets set to zero, meaning not the full file is there.

23  Q.  What's the ultimate effect in the system of setting the

24  full file flag to one?

25  A.  A notice will be sent.

1   Q.  Just one notice?  Let me ask a preliminary question.

2       What if there are multiple music files in the payload.  How

3   many e-mails will the Rightscorp system send if that full file

4   flag is set to one?

5   A.  It will send one for every song in the payload that is, you

6   know, in their system as a copyrighted system that they're

7   tracking.

8   Q.  So if the full file flag is one, Rightscorp sends out an

9   e-mail for every single song in that payload; is that right?

10  A.  That's copyrighted, yeah.

11  Q.  What happens -- what's the ultimate effect if the full file

12  flag is at zero?

13  A.  It won't send any.

14  Q.  No e-mails?

15  A.  Right.

16  Q.  Are you aware of any source code that goes into the

17  Rightscorp database and manipulates the full file flag?

18  A.  Yes.

19  Q.  Would you mind explaining what that source code is?

20  A.  Yes.  So there's a SQL -- database procedure called

21  *"re-evaluate full files being zero,"* and it's similar to what I

22  talked before where it goes through the bit field and looks at

23  the ones and zeros.  But instead, it looks to see whether the

24  number of ones, the proportion of ones, is at least 10 percent.

25  So if there are a hundred bits in a particular bit set, at

Dr. Geoffrey Cohen - Examination                    1796

1  least ten of those bits are ones.  It then will change the full

2  file flag from zero, which it would have been before, it would

3  change it from zero to one.

4  Q.  And what is the net result of that, the effect of flipping

5  that from zero to one?

6  A.  So just like we said before, it would result in notices

7  being sent out for every song in that payload that Rightscorp

8  was tracking.

9  Q.  Can that cause the Rightscorp system to send e-mails to

10  customers who don't even have the songs in question?

11  A.  Absolutely.  If the bits for those songs were zero, if they

12  did not have that song, they would still get a notice for it.

13  Q.  And that would be a false notice in your opinion; is that

14  right?

15  A.  Absolutely.

16  Q.  In your opinion, is it important for monitoring companies

17  to collect and save bit field information?

18  A.  Absolutely.

19  Q.  What are the consequences of not saving bit field evidence?

20  A.  It means after the fact, you can't determine the truth or

21  falsity of a particular allegation, because that's the basis of

22  it.

23  Q.  So I'm going to ask this question carefully.  Does the

24  Rightscorp system's source code indicate that bit field data is

25  saved?

Dr. Geoffrey Cohen - Examination                1797

1   A.  My analysis of the Rightscorp source code shows that bit

2   field data being saved, yes.

3   Q.  Would you mind going back to your computer and showing us

4   the source code that saves that bit field data?

5   A.  Sure.

6           MR. BROPHY:  Your Honor, may he take a wander?  Thank

7   you.

8           THE WITNESS:  All right.  So what we're looking at is

9   a source code that was produced by Rightscorp in this case.  In

10  particular, it is an export from their revision control system,

11  so it's actually a giant log of all the stuff concatenated

12  together, so it looks a little weird -- and I've added line

13  numbers on the left.  That was not -- those aren't original.

14          So I'm going to start here a little bit in the middle

15  of a larger thing, but this is code that I think

16  Ms. Frederiksen-Cross talked about, and Mr. Boswell, of the

17  torrent infractions table.  So this is right after the

18  handshake.  The Rightscorp system has reached out, gotten

19  information from that peer and it's storing it into a database

20  table called *"torrent infractions."*

21  Q.  Can you show where that is stored in the torrent

22  infractions?

23  A.  Yeah, so you can see here -- I'm going to try to highlight

24  it.  Is that going to show up?  Yeah.

25          So it's preparing a database statement here.  You can see

1    prepared statement.  It says, *"Insert into torrent*

2    *infractions."*  And then it gives a big list of information that

3    it's adding.  The torrent hash, the GUID, the tracker, the IP,

4    et cetera, et cetera., and then you can see here *"bit set,"*

5    which is the word they used for bit field at this point in the

6    code.

7    Q.  So what is the ultimate impact of that line of code?

8    A.  So that line of code creates a query which then, a little

9    bit farther down, will get executed on the database.  And that

10   line, that record, will be added to the database.

11   Q.  So we've just stored bit field data received from a

12   computer on the Internet into the Rightscorp database; is that

13   right?

14   A.  That's right.  We haven't really talked about databases,

15   but the point of databases is to store this information

16   persistently.  That's what databases are sort of designed to

17   do.  So it's in a database, that unless there's an explicit

18   deletion or what's called a "drop," drop of the table, that

19   table is going to persist, and the information in it is going

20   to persist.

21   Q.  Does the Rightscorp source code ever further act on that

22   torrent infractions database?

23   A.  It does.  And so I believe we talked about this a little

24   bit earlier, but there is an event -- so an event is a database

25   statement that you can sort of insert into the database and

1   will run, called *"cleave the table."* And so we're looking at

2   this -- and this is going to be a little dense, but I'll walk

3   through it line by line.  So it's just one line long, actually.

4         And so it's creating an event.  So an event is something

5   that's going to happen in the database, and it's called *"cleave*

6   *the table."* You can see the name here.  And it says, *"On*

7   *schedule every one day."* So it's going to create an event

8   that's going to run every day, and it says when it starts.  So

9   you can see this will start executing on November 11, 2014,

10  3:30 in the afternoon.

11        Now, this kind of statement does allow you to say, stops,

12  if you wanted to schedule an event to start, run for a while

13  and then stop.

14  Q.  Does the Rightscorp source code have any indication of when

15  this stopped running?

16  A.  No.  I was going to point out, there is no stop.  So this

17  is going to start an event that is going to run every day

18  indefinitely, you know, until something stops it, but this code

19  will not stop it.

20        And then I also just want to -- so it does -- I'm going to

21  skip to the end.  So what it's going to do, it's going to call

22  in another function called *"torrent infractions cleave."* So

23  basically this is an event to call a particular function.

24        And I just want to point out this thing in the middle where

25  it says, *"on completion, not preserve,"* and -- sorry that it's

1   wrapping in the line there, but you can see the *"preserve"*

2   starts at the end of the line.

3   Q.  What does that piece of the code do?

4   A.  So that's a particular directive in the SQL language that

5   says -- that sort of guarantees, don't log this event.  So it

6   says, on completion, don't preserve a record of this event.

7   Q.  So Mr. Boswell, to your understanding, wrote this code; is

8   that right?

9   A.  That's my understanding.

10  Q.  He put language in there to guarantee that there would be

11  no logging of this behavior?

12  A.  Yeah.  He explicitly must have added that directive to make

13  sure that this event would not be logged in what's called the

14  event table.

15  Q.  So no one can go back and see when this happened or when it

16  didn't happen because things aren't logged?

17  A.  That's right.  Okay.  So now what we know is that it's just

18  calling a function called *"torrent infractions cleave,"* but we

19  don't necessarily know what that is, so let's look for that.

20      So that's where it's getting called.  We just looked at

21  that, and here it is.  So here's the function, torrent

22  infractions cleave, and it does two things --

23  Q.  Sorry, Dr. Cohen.  Would you mind highlighting where

24  that --

25  A.  Oh, yeah, sure.  So it's these -- actually, this is all

Dr. Geoffrey Cohen - Examination                    1801

1    metadata saying when it happened, so it's really just in these
2    five lines.
3         So define -- there's its name.  And it does two things.  So
4    it's calling two functions.  And it's actually calling the same
5    function, but two arguments.  It's calling table cleave on
6    torrent infractions, and then it also calls table cleave on
7    expanded TI.
8    Q.  And what do those two functions do?
9    A.  So let's follow torrent cleave -- I'm sorry, table cleave.
10   And so remember it's passing the name of the table.  Torrent
11   infractions is being passed to this function, table cleave.
12        So where is table cleave?
13        We have to look for a little bit.  And here it is.  So here
14   is the function table cleave.  And it's a little bit longer,
15   and we're going to step through it a little bit slower.  Not
16   too slow.
17        So just remember that it's taking an argument of the table
18   name.  So the table name that it's operating on is being held
19   in.
20   Q.  Dr. Cohen, just to make sure the jury is oriented, that
21   information that's passed into that function, that includes the
22   bit field data that was collected and saved?
23             MR. O'BEIRNE:  Objection, Your Honor.  Leading.
24             THE WITNESS:  It includes the name --
25             THE COURT:  Just a minute.  Sustained.

1          MR. BROPHY:  I'll re-ask it, Your Honor.

2    BY MR. BROPHY:

3    Q.  What is in the data that is passed to this *table cleave*

4    function?

5    A.  So what's being passed is the name of the table torrent

6    infractions, which as we talked about before, is a table that

7    includes, among other things, the bit field data that has been

8    collected and stored from the individual peers.

9    Q.  What happens next?

10   A.  Okay.  So then it does a thing that may sound a little

11   weird until we step through it.  So it does three things.  So

12   the first thing is it creates a new table.  It creates a new

13   table, and it's going to call it *"temp2."*  Why, temp2?  I don't

14   know.  It's called temp2.  And it says, *"like table name."*  So

15   it's going to create a new table like *torrent infractions,* but

16   it's going to be blank.

17   Q.  Can you give the jury an understanding what that "like"

18   function does, quickly?

19   A.  It just says, like, using the same format.  So it wouldn't

20   have the same data.  It's going to be empty, but it's going to

21   have the same columns.  You can think of maybe a spreadsheet

22   where you just take the columns and you copy that into a new

23   sheet, but you don't have any of the rows.

24        So then what?  So then it's going to rename the original

25   table, so torrent infractions.  It's renaming it here to what?

Dr. Geoffrey Cohen - Examination                1803

1  It's going to rename it to *"torrent infractions,"* that's table

2  name, plus the function "now", which is the date and the time.

3  So it's taking torrent infractions, and it's renaming it

4  *"torrent infractions,"* and, you know, 2014, '11, '12, and then

5  some time, and it will do that every day.

6  Q.  So I want to pause there for a moment, because I think this

7  is the crux of the issue.  Say, if you wouldn't mind, very

8  concisely what that *"table name comma now"* function does.

9  A.  So this is actually an argument to the concat -- to

10  concatenate.  It means stick together.  So it's sticking

11  together the name *"torrent infractions"* and the date and time

12  into a bigger name, *"torrent infractions, date and time,"* and

13  it's renaming the table torrent infractions to that new name.

14  So it hasn't changed the table in any way.  It hasn't deleted

15  it.  All it's done is it's changed its name to give it the date

16  and time at the end of the name.

17  Q.  So if you were to assign a phrase or a term to what's going

18  on here, what would you call what this is doing?

19  A.  I mean, it's essentially backing it up.  It's making a

20  daily backup of the torrent infractions database.

21  Q.  If I understood your testimony correctly, the backup has

22  the name of the table, "torrent infractions," plus the date and

23  time that it was saved?

24  A.  That's right.

25  Q.  So torrent infractions, and then January 14, 2017, 8:42

Dr. Geoffrey Cohen - Examination                    1804

1    p.m.?

2    A.   Yes.

3    Q.   And that's -- is that saved?

4    A.   Yeah.  I mean, it's a table in the database, and tables and

5    databases, like I said before, persist until they are

6    explicitly deleted or dropped.

7    Q.   Have you seen any source code, in all the source code you

8    reviewed from the Rightscorp system that subsequently deletes

9    those backups?

10   A.   No, I haven't.  And I've looked.

11   Q.   Do you have an explanation based on the source code that

12   you have available to you for why Rightscorp claims it doesn't

13   have the bit field data?

14   A.   I don't.

15        MR. O'BEIRNE:  Sorry, Your Honor.  Objection as to

16   what Rightscorp claims.  I'm confused.  The question is

17   confusing.

18        THE COURT:  It is confusing.

19   BY MR. BROPHY:

20   Q.   Do you have an opinion, sitting here today, that you can

21   articulate about why Rightscorp doesn't apparently have a bit

22   field data when the source code indicates it saves it?

23        MR. O'BEIRNE:  Same objection, Judge.

24        MR. BROPHY:  I asked for his opinion, Your Honor.

25        MR. O'BEIRNE:  Has an opinion of the code, but what

Dr. Geoffrey Cohen - Examination                    1805

1   Rightscorp is claiming or --

2           THE COURT:  Yeah, you're asking him to speculate.

3   There may be a --

4           MR. BROPHY:  I'll ask it a different way.

5           THE COURT:  -- reason in the code why it doesn't have

6   something.  He can explain that, if that's his opinion, but he

7   can't put his head in Rightscorp's head.

8           MR. BROPHY:  I'll ask it a different way, Your Honor.

9   BY MR. BROPHY:

10  Q.  Would it be speculation for you to come up with any

11  explanation for why Rightscorp doesn't have the bit field data,

12  given what you know about the source code?

13  A.  Yes.  Based on my source code, analysis of the source code,

14  clearly, this bit field data is intentionally preserved, backed

15  up every day, and there's no deletion.  There's no function

16  that would drop those tables.

17  Q.  Okay.  Earlier we were talking about the 10 percent bit

18  field re-evaluate full files being zero.  Do you recall that?

19  A.  Yes.

20  Q.  Are you able to go where that is executed in this code?

21  A.  I can show you where the event is scheduled.

22  Q.  Would you mind doing that?

23  A.  So you can see it right here.  It's called *"full file fix,"*

24  and just like the *"cleave table"* before, this is an event

25  that's getting scheduled by the system.  And so, again, we're

Dr. Geoffrey Cohen - Examination                    1806

1   creating it.  This event, we're creating an event called *"full*
2   *file fix."*  Again we're scheduling it, now we're scheduling it
3   for every 15 minutes, so this event is going to start every 15
4   minutes, and it starts December 2nd, 2014, at 9:15.
5   Q.  Now, you said you reviewed the testimony from Mr. Boswell
6   and Ms. Frederiksen in this case; is that right?
7   A.  Yes.
8   Q.  Is this a schedule that starts the function that looks at a
9   hundred thousand entries every 15 minutes?
10  A.  Yes, that's right.
11  Q.  And this started being scheduled on what date?
12  A.  December 2nd, 2014.
13  Q.  You reviewed Mr. Boswell's testimony in this case and
14  deposition, haven't you?
15  A.  I have.
16  Q.  Is that date consistent with the date Mr. Boswell testified
17  it started from?
18  A.  I believe he said November.
19  Q.  And that can't be if the date is December, right?
20  A.  Yeah.
21  Q.  Let's look at the next piece, *"on completion not preserve."*
22  A.  Yes.
23  Q.  Remind the jury, what does that do again?
24  A.  That explicitly forces, guarantees that the system will not
25  log the running of this event.  I'm sorry.  Just to sort of be

Dr. Geoffrey Cohen - Examination          1807

1  clear that, the event that we're -- the function that's being

2  executed at this very end, *re-evaluate full files being zero,*

3  that's the thing that calculates the 10 percent and changes

4  full file to one, if it gets -- at least 10 percent of the bit

5  fields are being set.

6        MR. O'BEIRNE:  Your Honor, I object.  There's no

7  opinion in his report about this *not preserve.*  I think he

8  gets into totally separate issues that the Court ruled on

9  separately in connection with other discovery issues.

10        MR. BROPHY:  Your Honor, I can cite many, many places

11  where Dr. Cohen has said Rightscorp does not preserve this

12  information.

13        THE COURT:  The objection is overruled.

14  BY MR. BROPHY:

15  Q.  So Dr. Cohen, is it your opinion that Mr. Boswell

16  affirmatively typed in words into this source code to guarantee

17  that there would be no record of how often he was changing the

18  full file flag?

19  A.  I mean, that's what this code --

20        MR. O'BEIRNE:  Objection to speculation, Your Honor.

21        THE COURT:  That's true.  Sustained.

22  BY MR. BROPHY:

23  Q.  The code indicates that the programmer, Mr. Boswell, put

24  purposeful functionality in there to make sure there was no

25  log.  I'll say it again.  Purposefully.  He typed it -- I am

 1  going to ask that question.

 2      The code indicates that the programmer intentionally placed

 3  functionality in the line of the code to make sure there was no

 4  log of how often that full file flag is flipped; isn't that

 5  right?

 6              MR. O'BEIRNE:  Leading.

 7              MR. BROPHY:  He's already testified to that, Your

 8  Honor.

 9              MR. O'BEIRNE:  He's putting words in the witness's

10  mouth, Judge.  He's leading.  He's testifying.

11              MR. BROPHY:  I'll ask it a different way.

12  BY MR. BROPHY:

13  Q.  Is it your opinion that Mr. Boswell actually put language

14  in this source code to ensure that the database did not

15  preserve logs --

16              MR. BROPHY:  I'm sorry.  I'm trying to fashion the

17  question.  I'm hearing you talking.  Do you mind letting me --

18              MR. BART:  Are you testifying?

19              THE COURT:  Okay, gentlemen.

20              MR. BROPHY:  I've made my point.  I've made my point.

21              THE COURT:  Let's just move forward.

22              MR. O'BEIRNE:  Move to strike the question because

23  there's no answer.

24              MR. BROPHY:  I don't have any objection to that, Your

25  Honor.

```
 1              THE COURT:  It will be stricken.
 2    BY MR. BROPHY:
 3    Q.  Given -- well, have you seen any logs of how often the
 4    "re-evaluate full files being zero" is run?
 5    A.  No.
 6    Q.  Or how many entries the full file flag will flip from zero
 7    to one?
 8    A.  No.
 9    Q.  Would you have any way, given the information you have
10    today, to determine how many Rightscorp notices were impacted
11    by this code?
12    A.  No.
13    Q.  You can't do that because Mr. Boswell claims all the bit
14    field data is gone, right?
15              MR. O'BEIRNE:  Objection, leading.
16              MR. BROPHY:  That's fine, Your Honor.  I'm finished.
17    Thank you.
18              I'll pass the witness.
19              MR. O'BEIRNE:  Your Honor, I could use a few minutes
20    to get situated with my materials.  Could I have a moment?
21              THE COURT:  Yes.
22              (3:53 p.m.)
23                        CROSS-EXAMINATION
24    BY MR. O'BEIRNE:
25    Q.  Dr. Cohen, how are you?
```

Dr. Geoffrey Cohen - Examination          1810

1    A.  Good.  How are you?

2    Q.  Fine, thanks.  We met before at deposition, right?

3    A.  We have.

4    Q.  Can we at least agree the Grande customer who -- from which

5    Rightscorp downloaded 1200 copies of the same song, that's a

6    repeat infringer, right?

7           MR. BROPHY:  Objection, Your Honor.  Outside the scope

8    of his expert report, calling for speculation.

9           THE COURT:  Sustained.

10          MR. O'BEIRNE:  Okay.  I thought we would agree on

11   that.

12   BY MR. O'BEIRNE:

13   Q.  Dr. Cohen, this is your first case providing any expert

14   opinion about BitTorrent, right, sir?

15   A.  Yeah.  None other come to mind specifically on BitTorrent.

16   Q.  Well, none come to mind because this is the first case in

17   which you've provided opinions as a testifying expert related

18   to BitTorrent, right?

19   A.  I believe that's right.

20   Q.  In fact, this is the first case that you've ever worked on

21   as an expert where BitTorrent played a central role in the

22   case?

23   A.  I mean, depends on how you mean "central."  I have

24   certainly worked on cases that involve file sharing.  But, yes,

25   this one is about BitTorrent more than anything else.

Dr. Geoffrey Cohen - Examination          1811

1   Q.  Well, I'll ask you again.  You would agree with me that

2   this is the only case that you've been involved in where

3   BitTorrent played a central role?

4   A.  I think that's fair, yeah.

5   Q.  Okay.  You have never created a torrent file, have you,

6   sir?

7   A.  No, I have not.

8   Q.  You have never downloaded a file over BitTorrent, have you?

9   A.  I have not.

10  Q.  You've never shared a file over BitTorrent, have you?

11  A.  I have not.

12  Q.  Including in connection with your expert work in this case?

13  A.  That's right.

14  Q.  You have never even observed someone share a file over

15  BitTorrent?

16  A.  I mean, I've read logs of BitTorrent, including

17  Ms. Frederiksen-Cross's, so I'm certainly familiar with

18  observing the records of it.

19  Q.  Are you talking about the test that Ms. Frederiksen did?

20  A.  As an example.

21  Q.  I mean, neither you -- well, you've never sat in front of a

22  computer and used BitTorrent?

23  A.  I don't think so.

24  Q.  You would agree with me that hasn't happened?

25  A.  I don't recall doing it.

Dr. Geoffrey Cohen - Examination                    1812

1   Q.   Okay.  And by that, you never sat next to someone while

2   they're using BitTorrent either?

3   A.   Not to my recollection, no.

4   Q.   And you've never taken any of the predicate steps necessary

5   to share a file over BitTorrent, right?

6   A.   I'm not sure what you mean by "predicate steps," but I

7   haven't shared a file, if that's what you're asking.

8   Q.   You've never even downloaded BitTorrent software to your

9   computer, ever?

10         THE COURT:  I think you already asked him that

11   question, and he answered.  He said no.

12         MR. O'BEIRNE:  I didn't -- I didn't about the

13   software, Your Honor, but...

14         THE COURT:  If he hasn't done anything with

15   BitTorrent, he certainly couldn't have done that without the

16   software.

17   BY MR. O'BEIRNE:

18   Q.   Have you ever downloaded the software, sir?

19   A.   I have never downloaded BitTorrent, no.

20   Q.   You made some mention of reviewing logs of BitTorrent

21   traffic produced by plaintiffs, specifically Ms. Frederiksen's

22   test.  Do you recall that, sir?

23   A.   Yes.

24   Q.   You understand that Ms. Frederiksen conducted tests

25   including offering files for sharing over BitTorrent and then

1   observing whether Rightscorp can accurately detect that file

2   sharing.  You understand that, right?

3   A.  I am not sure I would accept the characterization of

4   "accurately," but I understood that that was the goal of the

5   exercise.

6   Q.  That's why I said, "whether."  The goal of the test was, in

7   her opinion, to determine whether, based on the test, she could

8   conclude Rightscorp was accurately detecting sharing?

9   A.  Without endorsing the test, yes, I understand that that was

10  the intention.

11  Q.  We'll talk about whether you endorsed the test in a minute,

12  but you understand that she performed that test?

13  A.  Yes.

14  Q.  Okay.  You've received her report, including the

15  description of the testing that she performed?

16  A.  Yes.

17  Q.  And you understand the opinion she reached based on that

18  testing?

19  A.  Yes.

20  Q.  And namely, in her view, the testing data that she

21  generated and reviewed confirms in her mind that the Rightscorp

22  system accurately detects file sharing over BitTorrent.  You

23  understand she has that opinion?

24  A.  I understand that that's her opinion.

25  Q.  You did not conduct any such test involving setting up your

Dr. Geoffrey Cohen - Examination                    1814

1  own machine to share files over BitTorrent, did you?

2  A.  I did not.

3  Q.  You could have performed the test like Ms. Frederiksen did,

4  right?

5  A.  Well, I think it's easier when you're working for the

6  labels, and they're letting you use BitTorrent to transfer

7  music.  I'm not sure the labels would have been as happy for me

8  to do that.

9  Q.  Is your sworn testimony that you made any request at any

10 time in this case to conduct any such test and get permission

11 of the labels to do so?

12 A.  No.

13 Q.  Okay.  So to be clear, the lack of permission from the

14 labels didn't enter into your failure to test at all, right?

15 A.  Certainly, in our discussion -- concern over, like, we did

16 not want to break the law, you know, our experiments was

17 something we considered for -- you know, I'm not saying that

18 was the only reason, but, I mean, certainly when we talked

19 about, like, what should we do, the -- well, we could use

20 BitTorrent.  You know, let's not.  The last thing we want to do

21 is be accused of infringement ourselves.

22 Q.  Fair to say most BitTorrent traffic you know is breaking

23 the law by sharing copyrighted works, right?

24 A.  I haven't done inventory of what most BitTorrent traffic

25 is.  I understand there's plenty of illegitimate BitTorrent

1  traffic, and I understand that there are -- there is legitimate
2  BitTorrent traffic.  I don't know the relative proportion of
3  those.
4  Q.  You're here testifying about BitTorrent, right?
5  A.  Yes.
6  Q.  You're aware that there are studies, numerous studies, that
7  the substantial majority of BitTorrent traffic is illegal
8  trading of copyrighted works, right?
9  A.  I'm aware of some such studies, but I haven't reviewed them
10 for their accuracy or their methodology, but I am aware that
11 claims have been made.
12 Q.  You know that those studies are out there and that's what
13 they say?
14        THE COURT:  Counsel --
15        Just a minute.  Don't answer the question.
16        -- you've asked him that question three different
17 ways.  Let's move on to the next question.
18 BY MR. O'BEIRNE:
19 Q.  I want to go back to your point about after Ms. Frederiksen
20 presented her testing results to you, did you ask counsel, *Hey,*
21 *that would be a good test to do.  Can we get permission from*
22 *the plaintiffs to make sure that I can do it too?*
23 A.  I don't specifically recall.  We talked about a lot of
24 things that we might do in this case.  I don't specifically
25 remember asking whether we should ask permission for something.

Dr. Geoffrey Cohen - Examination                    1816

1    Q.  Doing BitTorrent testing was one of the things you could do
2    and you chose not to do it, fair?
3    A.  Sure.
4    Q.  There was no technical barrier.  You just chose not to?
5    A.  Was that a question?
6    Q.  Yes.
7    A.  I don't think we got as far as investigating whether there
8    were technical barriers, but it was not something that we
9    decided was a priority, given the issues of the case and how
10   much time and resources we had available.
11   Q.  You didn't have time to do it?  Is that what you're saying?
12   A.  I mean, it was a busy time.  There's only so much work you
13   can do, and so you make decisions and prioritize over what
14   evidence you analyze and how much time to spend on source code.
15   I mean, there's budgets, there's limited staffing.  I mean, in
16   any case, you have to make priority decisions.  And so we
17   considered testing, and we then -- testing was not something
18   that we decided to do as being necessary for putting on our
19   case.
20   Q.  I'm just going to read you a statement and ask you if you
21   agree with it.  *"I can't think of a reason technically that we
22   couldn't have done an experiment with running BitTorrent."*
23       You agree with that, right?  You can't think of a reason?
24   A.  No.  As I sit here, no, I can't think of a reason.
25   Q.  And to be clear, you have no basis to contest that the

1   testing Ms. Frederiksen performed led to the data that she

2   summarized in her report?

3   A.   I'm sorry.  Can you ask that again?

4   Q.   Sure.  You have no basis to contest that the data she says

5   she detected in her test is what her test detected?

6   A.   I have no basis for contesting that, if I'm getting that

7   right.

8   Q.   And you have no basis for contesting -- actually, she ran

9   multiple tests, but any test that she ran, you're not here to

10  contest and say, *I don't think that that accurately describes*

11  *the data she detected*.

12  A.   No.  I mean, I don't think I -- trust this in my expert

13  reports.  She did the work, and the data is what it is.

14  Q.   That includes choke testing, right, sir?  You're aware that

15  Ms. Frederiksen did multiple types of choke testing in the

16  firsthand, setting up a machine that was sharing and observing

17  packets and choke data, and then in another test, a machine in

18  parasite mode.  You understand that, right?

19  A.   I vaguely remember -- it's been a long time since I

20  reviewed that portion of her test, but I'll accept your

21  representation.

22  Q.   Well, she testified about it last week.  You just told the

23  jury you reviewed her testimony from this case, right?

24  A.   Yeah.

25  Q.   Okay.  So last week she testified all about her choke

1    testing.  You read that, right?

2    A.  I did.  I guess it didn't stick so much.  I would have to

3    go back and look again, but I understand that she did the

4    testing and she tested a bunch of configurations.

5    Q.  And you're not here to contest the result of the choke

6    testing that she did?

7    A.  I don't think I entered any opinions about it.

8    Q.  And you're not here to do so, right?

9    A.  I mean, you've heard my direct.

10   Q.  I just want to be clear.  You don't have any basis to

11   contest the choke testing that she did, the accuracy of it or

12   that it is what she says it is?

13          MR. BROPHY:  Objection.  Asked and answered.

14          THE COURT:  Sustained.

15   BY MR. O'BEIRNE:

16   Q.  You agree, Mr. -- Dr. Cohen, I'm sorry.  You agree that the

17   Rightscorp system is capable of detecting offers to share files

18   over BitTorrent, don't you, sir?

19   A.  Potentially, under some circumstances.

20   Q.  You would agree with the statement *"The Rightscorp system*

21   *is capable of detecting when a file is being made available for*

22   *sharing,"* right?

23   A.  I mean, I guess I would say no, because it isn't

24   investigating choke, and therefore, it cannot come to a final

25   determination about whether or not it's being made available

Dr. Geoffrey Cohen - Examination          1819

1   other than the instances in which it attempted to make a

2   download.

3   Q.  You obviously issued an expert report in this case, right,

4   sir?

5   A.  I did.

6          MR. O'BEIRNE:  May I approach, Your Honor?

7          THE COURT:  Of course.

8          MR. O'BEIRNE:  Can I use the ELMO, please?  Give me

9   paragraph 25 of his report.  I don't need the ELMO.

10   BY MR. O'BEIRNE:

11   Q.  You would agree with me on paragraph -- well, first of all,

12   could we go to the first page of your report, sir.

13          MR. O'BEIRNE:  Go to the top of the first page,

14   please, Conner.  The note, the header of the top of the first

15   page.

16   BY MR. O'BEIRNE:

17   Q.  Sir, you would agree with me, we received this, and it

18   says, *"Highly Confidential, Attorneys Eye's Only.  Draft.  Do*

19   *Not Distribute."*  You see that?

20   A.  Yes.

21   Q.  We got this even though it still had that information on

22   it?

23   A.  I think that was an oversight of not removing the header at

24   the last minute.

25   Q.  Little sloppy?

Dr. Geoffrey Cohen - Examination                1820

1      You testified about Greg's code, I just wanted to ask:  Was
2  it a little sloppy to leave the *"Draft, Attorney Work Product,*
3  *Do Not Distribute"* on the top of your report?
4  A.  I think we could have removed it.
5  Q.  It doesn't have page numbers either, does it, sir?
6  A.  No.  They had paragraph numbers.
7  Q.  Was that inadvertently, the page numbers, left out?
8  A.  I don't remember making a decision about page numbers.  I
9  just typically number the paragraphs.
10 Q.  Let's look at paragraph 25, please.  In the summary of your
11 opinions, you say, *"The Rightscorp system is incapable of*
12 *detecting uploads, downloads, or actual sharing on peer-to-peer*
13 *networks."*
14     We'll turn to that statement later.  But you say, *"My*
15 *analysis of the system and related software conclusively finds*
16 *that the Rightscorp system is only capable of detecting when a*
17 *file is made available for sharing."*
18     See that?
19 A.  Yes.
20 Q.  That's what you said in your report, because that's your
21 opinion, right?  It's capable of detecting, making available
22 for sharing?
23 A.  Yes, but to be clear, capable, at most.  Right?  Capable
24 doesn't mean always successful.
25 Q.  It's capable of doing it?  It can do it.

1  A.  Like I said, when you first asked me this question many

2  questions ago, potentially, yes.  Potentially capable, under

3  certain circumstances.

4  Q.  I thought your answer a minute ago was, *"I guess I would*

5  *say no,"* but the record will speak for that.

6      You certainly haven't reached the opinion that the

7  Rightscorp system's code is incapable of detecting offers to

8  share files over BitTorrent, have you?  That the code can't do

9  it?

10  A.  I have -- trying to get the double negatives.  It is not my

11  opinion that it is never capable, potentially capable, of doing

12  so; only that I am not in a position to be able to determine

13  when it succeeded and when it did not.

14  Q.  You're not saying it's incapable.  You're just not willing

15  to --

16  A.  I'm saying that I can't tell when it succeeded and when

17  it's not.

18  Q.  Okay.  Let's examine each step of the process.  You

19  understand there's been a lot of testimony in the case about

20  the steps that it takes?

21  A.  There sure has, yep.

22  Q.  Okay.  You understand Mr. Boswell described how the

23  Rightscorp system gets IP address information from trackers to

24  determine which peers to handshake with, right?

25  A.  That's right.

Dr. Geoffrey Cohen - Examination          1822

1  Q.  That was on the slide you looked at where the arrows coming

2  down from the tracker, right?

3  A.  Yes.

4  Q.  And you understand that Ms. Frederiksen reviewed that

5  portion of the code, right?

6  A.  Yes.

7  Q.  And she testified that the code can reliably do that, reach

8  out to trackers and get IP addresses of people reporting that

9  they have certain torrents, right?

10  A.  I understand that that was her opinion, yes.

11  Q.  Well, you don't deny that the Rightscorp system can do

12  that?

13  A.  I don't deny that potentially it's capable of doing that.

14  I just can't confirm whether or not or when it did it based on

15  the lack of evidence.

16  Q.  Right, but capable is potentially, right?

17  A.  Sure.  Exactly.  It might be, might not be capable.  That's

18  exactly right.

19  Q.  Right.  But the code can do that?

20  A.  Possibly.

21  Q.  Well, you could look at code that can't -- I mean, I can't

22  write code that would do that.  So the code you looked at can

23  do that, right?

24  A.  It could potentially do it under certain circumstances,

25  yes.

Dr. Geoffrey Cohen - Examination                    1823

1  Q.  If it operates how it's written to work is what I'm saying.
2  You wouldn't have to do anything new to it, right?  If it
3  operates in accordance with how the code is laid out, it can do
4  that?
5  A.  Yes.  As I said, potentially, based on the circumstances.
6  Q.  To speed things along for purposes of our testimony, when I
7  say "capable," I am not asking you to confirm that did it at
8  any specific time.  So I think "capable" and "potentially" are
9  sort of doing the same work here and I just want to make sure
10 the testimony is clear.  So when I say, "capable" I just mean
11 can do it if the code operates; is that fair?
12       MR. BROPHY:  Your Honor, I object to creating a
13 lexicon for the cross-examination.
14       MR. O'BEIRNE:  I was trying to --
15 A.   Yeah, I mean, I think I would say sometimes that's true
16 and sometimes it's not, depending on particular configuration
17 of the Rightscorp system at different times.  It's not that
18 clear-cut.
19 Q.  You've looked at the part of the code that Greg says does
20 that, right?
21 A.  Yes.
22 Q.  And that code can do it if it occurs?
23 A.  Potentially.
24 Q.  All right.  You understand Mr. Boswell then described how
25 the Rightscorp system reaches out to individual peers whose IP

Dr. Geoffrey Cohen - Examination                    1824

1   address it got from the tracker and does a handshake with that

2   peer, right?

3   A.   Yes.

4   Q.   And you understand Ms. Frederiksen reviewed that portion of

5   the code, right?

6   A.   Yeah.

7   Q.   And she testified that it can reliably do that.  You

8   understand that, right?

9   A.   I understand that that's her opinion.

10   Q.   You do not deny that the Rightscorp code can do that, can

11   go out and engage in a handshake with a specific peer by IP

12   address, right?  It's capable of it?

13   A.   Yes.

14   Q.   Then you understand Mr. Boswell described how the system

15   would inquire about a torrent file in that handshake and get a

16   hash and analyze the match of that hash, right?  Using the

17   BitTorrent protocol?

18   A.   Yes.

19   Q.   And you don't contest that it can do that, right?

20   A.   It could.

21   Q.   It can.  The code -- if the code works, it can do

22   BitTorrent handshakes and get hash information, right?

23   A.   Yes.

24   Q.   Okay.  In fact, you yourself concluded that *"The Rightscorp*

25   *infringement finder records a detected IP address of a peer*

Dr. Geoffrey Cohen - Examination                    1825

1    *participating in the particular swarm and associated*

2    *information such as the bit field returned by that peer."*

3    That's what it does, right?

4    A.   Yes.   That's what it's designed to do.

5    Q.   And it does what it's designed to do?

6    A.   As far as I can determine, based on the state of the source

7    code at any given time, but yes.

8    Q.   And you would agree the Rightscorp -- well, let's look at

9    paragraph 137 of your initial report.

10        You state:   *"Records in the Rightscorp system indicate*

11   *points in time which the notice -- with which the Rightscorp*

12   *system recorded that a peer was making some portion of a*

13   *torrent payload available."*   Right?

14   A.   Yes.

15   Q.   And those records, you mean those were the notices that

16   they sent, right?

17   A.   Well, I think I would say that that's the Rightscorp

18   characterization of those notices, right?   The Rightscorp is

19   saying at this point in time a peer is making a portion of a

20   torrent available.

21   Q.   You say the Rightscorp system recorded that a peer was

22   making it available, right?   That's what your report says.

23   A.   The Rightscorp system makes that claim.

24   Q.   Okay.

25        MR. O'BEIRNE:   You can take it down, please.

1  BY MR. O'BEIRNE:

2  Q.  You understand that Mr. Boswell and Ms. Frederiksen

3  testified about the portion of the code that can capture the

4  bit field information being shared by the other peer in the

5  handshake, right?

6  A.  Yes.

7  Q.  And record that in a table for comparison as to whether to

8  send a notice, right?

9  A.  Yes.

10  Q.  Okay.  And you do not deny that the Rightscorp system can

11  do that, can get bit field information that the peer is

12  reporting and analyze it, match it to bit field information in

13  Rightscorp's own system?

14  A.  As far as I can, you know, determine on the basis of what

15  source code existed at any given time.  But, yes, in general,

16  that is true.

17  Q.  Well, that function existed in every portion of the code

18  you ever looked at, right?

19  A.  Yes, but I don't have a complete history of the code, which

20  is the point.  But the parts I looked at, yes.

21  Q.  You looked at code from '14, '15 and '18, right?

22  A.  Yes, primarily '15 and '18, but yes.

23  Q.  You were given code from '14, '15 and '18, correct?

24  A.  Yes.

25  Q.  And the '14 code, the '15 code and the '18 code all include

Dr. Geoffrey Cohen - Examination                    1827

1   a function where you get the bit field information and you

2   compare it to what's in the Rightscorp system, right?

3   A.   Sure.

4   Q.   And it can do that.  Each three versions of the code you

5   saw can do that?

6   A.   Potentially.

7   Q.   Reliably?

8   A.   I'm not sure I've assessed "reliably," but that's what the

9   code is designed to do.

10  Q.   Well, you're not here to say it's unreliable, like it would

11  miss and get the wrong bit field information.  That's not your

12  opinion.

13  A.   That's not my opinion.

14  Q.   So peer gets the bit fields, Rightscorp reads it and does

15  something with it.  It can do that, right?

16  A.   As far as I can determine, yeah.

17  Q.   You've testified about this 10 percent bit field

18  experiment.  You recall that, sir?

19  A.   I mean, I don't think I called it an experiment, but the

20  10 percent bit field issue, yes.

21  Q.   So you've talked about -- you understand that Greg

22  testified under oath that it was an experiment that was put in

23  place temporarily due to various factors they were testing at

24  Rightscorp.  That's his explanation?

25  A.   That's how I recall his testimony.

Dr. Geoffrey Cohen - Examination          1828

1   Q.  You said his testimony was false because he said it

2   happened in November, but the code says December 2nd, 2014?

3   A.  I mean, I think I just answered the question of he said

4   November, and it says December.

5   Q.  I thought your testimony is it can't be true what he said

6   because it was December 2nd, not November 30th?

7   A.  I mean, the date is what the date is.  And so I testified

8   it was November.  I understand November and December are next

9   to each other.

10  Q.  Right -- December 2nd right next to November, right?  Eight

11  years later, fair to say he was describing the same point in

12  time?

13  A.  No, I understand that his memory -- he seemed to be

14  struggling with his memory.  So, yeah, I agree with that.

15  Q.  You might not be able to name every date from eight years

16  ago within a week --

17  A.  No.  No.  I think I would probably have reviewed the

18  relevant source code before I testified, if that were relevant.

19  Q.  Putting aside the 10 percent, that SQL portion that does

20  the 10 percent full flag flip that you were talking about, the

21  portion of the code that requires a hundred percent match in

22  the bit fields before it generates a notice was always in the

23  code that you reviewed, right?

24  A.  In various different formats, but yes.

25  Q.  Thank you.  And I think we can clarify.  So there was a

1   time after October 2015 where they would do specific hundred

2   percent matching of works within a torrent rather than just the

3   hundred percent match of the whole torrent.  Is that the

4   different manifestations you're talking about?

5   A.  I recall Ms. Frederiksen-Cross's testimony to that.  I

6   don't remember specifically being able to determine that date,

7   because that's not in the revision control system, and it's not

8   in, I think the 2015 versus 2018 code.  So I am not sure how

9   she was able to determine that, but I recall that testimony,

10  that that change was made.

11  Q.  And setting aside the time, you would agree that before

12  that change, hundred percent matching of the entire torrent;

13  after that change, hundred percent matching of whatever songs

14  within the torrent are going to be in the notice, hundred

15  percent on both sides of that change?

16  A.  The 10 percent issue aside, yes.

17  Q.  Yes.  Setting aside the 10 percent.

18  A.  I understand.  Yes, that's my understanding.

19  Q.  And so the code always had the language in there to do a

20  hundred percent match?  Either --

21  A.  Yeah, that was one of the configurations of the code.

22  Q.  Other than the 10 percent, which would be on top of that

23  2014 code, '15 code, '18 code, all had hundred percent bit

24  fields matching?

25  A.  Yes.  That was one of the components present in the code.

1   Q.  So you would agree that every Rightscorp notice based on a
2   hundred percent bit field matching was accurately reporting
3   what bit fields appeared was saying it had in the handshake?
4   A.  Well, I remember Mr. Boswell talking about lazy bit fields
5   and that there were some concern on the part of Rightscorp that
6   maybe peers weren't reporting bit fields accurately.  I don't
7   have any direct knowledge to that, but...
8   Q.  Okay.  So you don't know anything about lazy bit fields?
9   A.  I understand there's been testimony about lazy bit fields.
10  I understand that they exist.  What I don't know is how often
11  it happened in Rightscorp's operations or how it would have
12  affected it.
13  Q.  Well, that's not a Rightscorp thing.  That's peers lying
14  about how much they have to avoid detection.  That's what lazy
15  bit field is, right?
16  A.  Right.
17  Q.  Right.  So lazy bit fields is a peer pretends to have less
18  than they do because they don't want to get caught by people
19  like Rightscorp?
20  A.  Well, also -- I mean, peers also can lie about having more
21  than they do, maliciously.  So I guess all I'm saying is as I
22  have seen in testimony, bit field data is not always reliable,
23  but putting that aside --
24  Q.  You expressed no opinions as to with what frequency or for
25  what reason a BitTorrent peer would lie about having more of

Dr. Geoffrey Cohen - Examination          1831

1  the file than it says it has, have you?

2  A.  No.

3  Q.  Okay.  Let's put aside --

4  A.  I was just trying to answer your question.

5  Q.  Sure.  Let's put aside the peer lying about what they have.

6  A.  Okay.

7  Q.  The peer's BitTorrent is functioning normally?

8  A.  Okay.

9  Q.  It's reporting what it has?

10  A.  Yep.

11  Q.  Okay.  So when we're set to a hundred percent, Rightscorp

12  can accurately see what it has, compare it, and generate a

13  notice, right?  It can do that?

14  A.  It can generate a notice based on the bit field, yes.

15  Q.  So provided that the Rightscorp system was doing what the

16  code can do, which is look at a hundred percent bit fields and

17  then send a notice, any notice based on that detection was

18  accurately reporting a hundred percent of the bit fields that

19  the peer said they had?

20  A.  Well, I mean, notices don't report bit fields, right?

21  Notices make allegations.  And so it's not sufficient that

22  there's a hundred percent match, because they also don't look

23  at choke data.

24  Q.  We're not talking about the choke data.  I am just asking

25  you whether the notices are accurately reporting that the peer

Dr. Geoffrey Cohen - Examination                1832

1    said they had a hundred percent of those bit fields?

2    A.  I mean, I don't think the notices talked about bit fields

3    or a hundred percent.  The notices are making allegations.

4    Q.  What they do is convert the bit fields that the peer

5    reported with -- they compare it to bit fields in the system

6    that they have, and then if the match -- if they match, then

7    they send a notice for the song that is in the torrent that

8    they know by hash they were talking about, right?

9    A.  Yes.

10   Q.  And you've seen nothing that says the code can't do that

11   accurately, can't accurately take bit fields, look at the bit

12   fields and the hash that we know about, yes, bit fields are the

13   same, and then translate that into a song name and send it.  It

14   can do that, right?

15   A.  Right.

16   Q.  Accurately?

17   A.  Yes.  I mean, without talking about the validity of the

18   notice, I have seen nothing that says it can't compare bit

19   fields accurately.

20   Q.  Right.  And then based on the comparison of the bit fields

21   and accurately say which songs it knows are those bit fields in

22   that torrent, right?

23   A.  Yes, that's right.

24   Q.  So it can accurately get the bit fields from the person,

25   right?  Accurately compare them, accurately convert it into a

Dr. Geoffrey Cohen - Examination                    1833

1  song, and send that notice to the ISP of that IP address.  It

2  can do that, right?

3  A.  There are components that do that, yes.

4  Q.  But you've seen nothing to say they can't do that reliably

5  and accurately?

6  A.  I don't believe so.

7  Q.  So any notice sent when the bit field matching was set to

8  100 percent was reliably and accurately detecting what the peer

9  was reporting, converting it to a song name, and sending that

10 to the ISP?

11 A.  I mean, again, without conceding that that is a valid

12 notice and understanding this is only one component, and we're

13 talking about, you know, without the 10 percent, which

14 dramatically affects the validity of the discussion we're

15 having, yes, that component, in isolation -- I don't know of

16 any reason that component would fail if it wasn't being

17 overwritten by another function.

18 Q.  Sir, you just added in things about the 10 percent again

19 and other components of the system.  I'm not asking you about

20 that.  I'm asking you something different.

21     When the matching is set to 100 percent --

22          MR. BROPHY:  Objection, Your Honor, asked and

23 answered.

24          THE COURT:  Sustained.

25          MR. O'BEIRNE:  Your Honor, I got nonresponsive

1   portions in the answer, but fine, I'll move on.  I think the

2   testimony is clear.

3   BY MR. O'BEIRNE:

4   Q.  Let's talk about the other functions of the system.

5   SampleIt 2, you understand is the correct name, or the name for

6   the portion of the code that goes back to a peer that got a

7   notice and tries to download the song from that peer, right?

8   A.  That's right.

9   Q.  And you understand that Ms. Frederiksen reviewed that

10  portion of the code, right?

11  A.  That's my understanding.

12  Q.  Okay.  And you have no testimony that you're going to give

13  this jury that SampleIt 2 can't do that, can't do a handshake

14  with somebody by an IP address that they've already detected

15  and try to get a song.  It can do that, right?

16  A.  And try, yes.

17  Q.  Right.  Well, I believe the words you used on your direct

18  were, *We know how many times it was successful because we have*

19  *the drive*.  Right?

20  A.  Right.  Although I should say many of those times that I

21  was counting successfully, even those are partial, like only a

22  few seconds of data.  But counting those as successful, yes, I

23  understand the SampleIt 2 can -- in some situations is able to

24  get at least a portion of a song.

25  Q.  Okay.  You didn't provide any testimony on direct about

Dr. Geoffrey Cohen - Examination                    1835

1  which percentage of those downloads were more than 50 percent,

2  more than 75 percent or anything, did you?

3  A.  Not on my direct.  It's in my expert report.

4  Q.  Right.  But they didn't offer that, though, did they?

5  A.  Didn't come up.

6  Q.  Okay.  So setting aside whether some of them are half

7  files, right, you do agree Samplit can go back to somebody that

8  got a notice, do a handshake, ask for part of that torrent

9  file, and download it, right?

10  A.  It can ask for it, and sometimes it gets some, yes.

11  Q.  Right.  Well, you understand the plaintiffs compared the

12  works that they got and 19,000 of them match in Audible Magic

13  to copyrighted works in this case, right?

14  A.  Yeah, about a third, right.

15  Q.  19,000 match, right?

16  A.  That's my understanding.

17  Q.  Right.  And actually another 20,000 matched copyrighted

18  works that we're not suing on, right?

19  A.  That might be right.  I don't remember about the

20  non-asserted copyrighted songs, but it's possible.

21  Q.  When Rightscorp goes back, does a handshake with a peer and

22  gets a copyrighted file, that's proof of infringement, right?

23  That's a copy of a copyrighted work?

24  A.  I mean --

25          MR. BROPHY:  I'll object as drawing a legal

 1    conclusion, Your Honor.

 2            THE COURT:  Yes.

 3            MR. O'BEIRNE:  I just need -- I'll rephrase, Your

 4    Honor.

 5    BY MR. O'BEIRNE:

 6    Q.  Let's look at paragraph 25 of your report.  Summary of your

 7    opinions, paragraph 25.

 8        *"The Rightscorp system is incapable of detecting uploads,*

 9    *downloads, or actual sharing."*

10        Do you see that?

11    A.  Yes.

12    Q.  That's wrong, right, sir?  Because Rightscorp goes, does

13    the handshake, and actually gets a file, so somebody uploads it

14    to Rightscorp.  Rightscorp downloads it from them, right?

15    A.  My opinion was speaking of activity outside of Rightscorp

16    was not clear in this sentence, I agree, but cannot -- is

17    incapable of detecting downloads and is capable of detecting

18    uploads only instigated by Rightscorp, is more accurate.

19    Q.  You're not aware that Rightscorp has ever claimed that it

20    can detect what two non-Rightscorp peers are doing.  They never

21    said they could do that?

22    A.  You know, Rightscorp sent out notices that said you're

23    being accused of uploading or downloading.  It's not clear to

24    me what Rightscorp was implying if they're saying you're being

25    accused of downloading if you just said Rightscorp never

Dr. Geoffrey Cohen - Examination          1837

1   claimed that they could figure out what two peers are doing.

2   Q.  Well, it also says "or offering to upload," right?

3   A.  Right.  It gives three options, one of which Rightscorp

4   can't detect, and is an example of what you just asked me

5   about, activities between other computers other than

6   Rightscorp.

7   Q.  Do you think the Rightscorp notices say anything about

8   having detected two other people doing something that didn't

9   involve Rightscorp?

10  A.  I mean, it says "download."

11  Q.  Rightscorp is downloading it from the person, right?

12  A.  Then that person didn't download.  That person uploaded.

13  Q.  Right.  Yeah.  The upload comes to me, comes down to me.

14  It comes up from them, down to me?

15  A.  Right.  So they didn't download it.  You downloaded it.

16  Q.  Rightscorp downloaded it?

17  A.  Right.  So they didn't.

18  Q.  Right.  But somebody is uploading and somebody is

19  downloading?

20  A.  Right.  But you're asking about an accusation of

21  downloading.

22  Q.  Well, no, there's "or", sir, it says, "Download, upload, or

23  offer to share."  And you would agree with me Rightscorp can

24  detect uploads and offers to share, right?

25  A.  So I disagree on offers to share because of choke.  It

1  is -- I agree that is able to detect uploads to Rightscorp at

2  Rightscorp's own instigation.  But, you know, I think when you

3  say you're being accused of A or B or C, that my reading of

4  that is that the system is capable of detecting A or B or C.

5  It doesn't say you're being accused of uploading, downloading,

6  offering to share or, you know, eating an endangered specious.

7  And you're like, "Well, it said 'or.'"

8      You say downloading.  It's incapable of detecting

9  downloading.

10 Q.  I'm not sure --

11 A.  And I don't think "or" makes that a reasonable statement.

12 Q.  Every upload that Rightscorp received from another peer,

13 Rightscorp started out choked, right?

14 A.  All connections start choked.

15 Q.  Right.  So every time Rightscorp got a full copy or even a

16 half copy of a file, it started choked, right?

17 A.  That's right.

18 Q.  You were shown a demonstrative, Dr. Cohen, about label art,

19 and your testimony was about 1200 of the files on the 59,000

20 were label art, right, sir?

21 A.  That's right.

22 Q.  How many torrent files did you go back and check to see

23 whether, in fact, the first file of the payload of that torrent

24 file is the label art of the album?

25 A.  I don't remember doing a systematic analysis of that.

Dr. Geoffrey Cohen - Examination                    1839

1    Q.  Did you do a non-systematic analysis?

2    A.  I mean, I think I looked at a couple to see whether that

3    plausible.

4    Q.  And it is, right?  Because a lot of them have label art on

5    them?

6    A.  Yes.

7    Q.  Okay.  So -- and you understand Greg's explanation,

8    Mr. Boswell's explanation, that if there's a character, a

9    match, a problem in the database, they may go ask for different

10   bit fields from the same torrent and instead of getting a song

11   down in the middle, they might get the first thing, which is

12   the label art, right?

13   A.  Right.  They might not get the song that is associated with

14   the notice.

15   Q.  Right.  But what they would get is a part of the payload of

16   that torrent?

17   A.  You would get a different file from the torrent, yes.

18   Q.  But it's from the torrent that has the same hash, right?

19   A.  Presumably.

20   Q.  Well, not presumably.  You looked at the code and the hash

21   is a hash, right?  So the code functions.  It does proper

22   hash-matching.  So that's the same torrent, right?

23   A.  Yes, as far as I can tell.

24   Q.  Okay.  That is part of the payload, that torrent, right?

25   A.  It's part of it.

Dr. Geoffrey Cohen - Examination                    1840

```
1    Q.  Right.  So any time the download system went and got part
2    of the torrent, it may not have gotten the file it was looking
3    for, but it got proof that that person has that torrent
4    payload, right?
5            MR. BROPHY:  Objection, Your Honor.  Mischaracterizing
6    the law.
7            THE COURT:  Yes, the objection is sustained.  Rephrase
8    your question.
9    BY MR. O'BEIRNE:
10   Q.  Even if Rightscorp's Samplit system did a handshake for a
11   torrent, didn't get the song in the notice, but got a different
12   part of the payload, that is evidence that that peer was
13   sharing that torrent or at least part of it at that time?
14           MR. BROPHY:  Objection.  Same objection.
15           THE COURT:  Yeah, I don't know where you're going with
16   this.  The objection is sustained.
17           MR. O'BEIRNE:  I'm sorry, Your Honor.
18           THE COURT:  I'm totally confused by your question.  I
19   don't know what you're asking.  And if I'm confused, the jury
20   is going to be confused.
21           MR. O'BEIRNE:  Your Honor, it's 4:30.  How do you want
22   to proceed?
23           THE COURT:  Well, I don't know how much longer you
24   have.
25           MR. O'BEIRNE:  Longer enough that I'm asking, Judge.
```

Dr. Geoffrey Cohen - Examination                    1841

 1          THE COURT:  Well, that doesn't tell me anything.

 2          MR. O'BEIRNE:  I would say probably another half an

 3  hour.  Not hours, I mean --

 4          THE COURT:  And then you're going to have redirect?

 5          MR. BROPHY:  Not at this point, Your Honor.

 6          MR. BART:  We're not finishing today anyway.

 7          MR. O'BEIRNE:  Well, we have deposition testimony that

 8  remains to be --

 9          THE COURT:  Oh, I understand, but we make this man

10  come back.

11          MR. BROPHY:  And we're not sure about that, whether

12  we'll play the deposition testimony.  We're not even sure we're

13  going to play that depo testimony.

14          THE COURT:  Yeah.  We have to make this man come back

15  four days from now.

16          MR. O'BEIRNE:  Understood, Judge.

17          THE COURT:  Ladies and gentlemen, would it be all

18  right if we continued on to get this done?  All right.

19          MR. O'BEIRNE:  Your Honor, could we take a five-minute

20  break?

21          THE COURT:  No.

22          MR. O'BEIRNE:  I was going to say I could try to

23  consolidate and --

24          MR. BART:  Your Honor, could we have a representation

25  if we're doing this, they're not going to put on the deposition

 1   testimony?  Because I think that this is very unfair.

 2           THE COURT:  No, no, no.  I'm not worried about them

 3   putting another witness on.  That's perfectly fine.

 4           MR. BART:  But we've had witnesses who have had to

 5   stay for four, five, six days.  He passed the witness at about

 6   4:00 this afternoon, maybe ten to 4:00.  I think we have an

 7   entitlement to do --

 8           THE COURT:  I want to not have this man sit around to

 9   finish his testimony for half an hour four days from now.

10   That's all there is to it.

11           MR. O'BEIRNE:  Understood, Your Honor.  I'll proceed.

12           THE COURT:  Well, since we're going to stay, I'll give

13   you five minutes, let the jurors use the restroom, and then

14   we're going to come back and we're going to finish this witness

15   up.

16           COURT SECURITY OFFICER:  Please rise for the jury.

17           *(4:33 p.m., the jury exits the courtroom.)*

18                          *   *   *

19           *(4:46 p.m.)*

20           THE COURT:  All right.  You may continue, sir.

21           MR. O'BEIRNE:  Thank you, Your Honor.

22   BY MR. O'BEIRNE:

23   Q.  Dr. Cohen, I want to go back to what I was trying to ask

24   you before the break and see if we can do this an easier way.

25   A.  Sure.

Dr. Geoffrey Cohen - Examination               1843

1   Q.  When Samplit goes and gets label art, that can still be a

2   file from the torrent that is the subject of the notice, right?

3   A.  Yes.

4   Q.  Setting aside whether it was the file Samplit was going to

5   get, it would have gotten data confirming that that peer was

6   sharing that torrent, at least part of it, at the time of the

7   secondhand shake?

8   A.  At least that one image file, but not necessarily anything

9   else.

10  Q.  You were asked some questions on direct about the

11  10 percent bit field, whatever time period that 10 percent bit

12  field experiment was in place.  Do you recall that?

13  A.  I don't think it was an experiment, but yes.

14  Q.  I understand you disagree with that, but you understand

15  what I mean, right?

16  A.  Yes.

17       MR. O'BEIRNE:  Could you pull up paragraph 117 of

18  Dr. Cohen's original report.  Near the bottom.

19  BY MR. O'BEIRNE:

20  Q.  Talking about the 10 percent bit field, and you state,

21  *"Further, since the torrent can and often does contain multiple*

22  *files, a peer could contain 10 percent of a torrent and still*

23  *might contain literally zero percent of any given file."*

24       Did you mean a peer could have 10 percent or -- the peer

25  doesn't contain the torrent, right?

Dr. Geoffrey Cohen - Examination                    1844

1   A.  I mean, the peer -- sure, you could say "have."  I'm not

2   sure contained is--

3   Q.  You're saying, in other words, the 10 percent does not

4   necessarily come from a discrete section of the torrent.

5   That's your opinion, right?

6   A.  Yes.

7   Q.  But, typically, 10 percent of a torrent album, for example,

8   would result in small pieces from all across the album?

9   A.  It certainly could.

10  Q.  That would be the most frequent reason to have only

11  10 percent?

12          MR. BROPHY:  Objection.  Calls for speculation,

13  outside the scope of the report.

14          MR. O'BEIRNE:  It's their BitTorrent expert.

15          THE COURT:  The objection is overruled.

16          THE WITNESS:  That's certainly one potential scenario

17  is it's downloading, and it's getting scattered pieces

18  arriving, you know, randomly.  That's one scenario.

19          MR. O'BEIRNE:  Can we look at the demonstrative?

20  BY MR. O'BEIRNE:

21  Q.  Like that.  You have torrent, a bunch of songs in the

22  torrent and you're getting it while you give it, so the pieces

23  are scattered around, right?

24  A.  Sure.  That seems like a possible scenario.

25  Q.  Okay.  In fact, more common than just having discrete

Dr. Geoffrey Cohen - Examination                    1845

1  sections, right?  You, in your report, said it's not typically
2  discrete sections.  Typically, it's small pieces from around,
3  right?
4  A.  I mean, if a client is only trying to download specific
5  songs, then it's not this random process, but I agree that this
6  is one potential scenario.  If the client is trying to get an
7  entire torrent, it could look like that.
8  Q.  Well, if the client is trying to get the whole torrent, it
9  would look like that, right?  It would get random pieces from
10  the swarm at that point?
11  A.  Some iteration of that, some randomness.
12  Q.  No opinions in your reports about how frequently people
13  would try to go only get individual songs, is there?
14  A.  I don't have opinions in my report about how frequently
15  that happens.  I am aware that it was a capability.
16  Q.  Well, you don't actually talk about that it was a
17  capability or how you would do it in your reports, do you?
18  A.  No.  I recall that from Ms. Frederiksen-Cross's testimony.
19  Q.  So you haven't looked at all at the idea if someone toggles
20  the options and changes the normal get the whole torrent
21  randomly to just go getting two songs?  You have no idea?
22  A.  I mean, I'm aware of it.  You asked if it was in my report.
23  It's not, but I also am aware of it, and I heard
24  Ms. Frederiksen-Cross testify that it was available in 2015.
25  Q.  But that's a marginal case.  That's not the normal use of

1    BitTorrent, right?

2    A.  I don't have an opinion about whether it's a marginal or

3    normal case.  It's a functionality that was available.

4    Q.  You can't say how frequently --

5    A.  I can't say how frequently.

6          MR. O'BEIRNE:  Take it down, please.

7    BY MR. O'BEIRNE:

8    Q.  You were asked some questions about SampleIt 2 not being

9    able to accomplish a download when it does a second handshake

10   with a peer that got a notice.  You recall that, right, sir?

11   A.  Yes.

12   Q.  Okay.  And I think you used the term "false positive" in

13   connection with something that might occur when SampleIt 2 goes

14   out and tries to get a file, right?

15   A.  Yes.

16   Q.  Okay.  So to be clear, you understand the notice is going

17   off based on information from the first handshake?

18   A.  Yes.

19   Q.  Right.  Okay.  So if Samplit goes back -- tries to go back

20   to that peer and that peer is not online --

21   A.  Yes.

22   Q.  -- can't do a handshake if the peer is not online, right?

23   A.  That's correct.

24   Q.  That's not a false positive, is it?

25   A.  It's neither.  It's absence of evidence.

1   Q.  Right.  False positive doesn't come into play.  There's

2   nothing false about the idea that the notice went out and then

3   when SampleIt 2 went back, the person is not online anymore?

4   A.  Well, I mean, I -- it is neither a false positive or true

5   positive.  You don't know.

6   Q.  I'm not saying that --

7       You were asked about an inability to download a file, and

8   you were asked some questions suggesting that would prove that

9   there's false positives, right?

10  A.  I think I said in some circumstances or something like

11  that.  So, yes, if it's offline, I wouldn't have considered

12  that a false positive.  That's neither a confirmation nor an

13  unconfirmation.  It's an absence of evidence about whether or

14  not that notice was accurate.

15  Q.  I think we're on the same page.

16  A.  Okay.

17  Q.  Person is not online anymore, not a false positive, right?

18          MR. BROPHY:  Objection, Your Honor.  Mischaracterizes

19  the testimony.  Also asked and answered.

20          THE COURT:  The objection is sustained.

21  BY MR. O'BEIRNE:

22  Q.  Okay.  Let's do another example.  Person is online, not

23  running BitTorrent.

24  A.  Uh-huh.

25  Q.  You can't handshake with someone who's not running

Dr. Geoffrey Cohen - Examination                1848

1   BitTorrent, right?

2   A.   That's right.

3   Q.   That's not a false positive?

4   A.   Again, it's neither a false positive nor a true positive.

5   It's absence of evidence either way.

6   Q.   Right.  A person's running BitTorrent, doesn't have the

7   torrent open that is the subject of the notice.  That's not --

8   that handshake is not going to happen, right?

9   A.   Yes.  In the same way, not a determination of whether it's

10  a false positive or a true positive.  It's not evidence.

11  Q.   No false positive in that scenario?

12  A.   It's not -- it's not a verification nor a false positive.

13  Q.   Okay.  And you're aware that -- I think you testified about

14  it, that some percentage of the files on the download, the

15  drive -- some percentage of the downloads on the drive are not

16  full.  You recall that?

17  A.   That's right.

18  Q.   A majority or more than half, right?

19  A.   I think that's right.  I would have to look at my report

20  for the exact statistics.  I don't remember them.

21  Q.   You counted them up, right, sir, in one of your reports?

22  A.   Yeah.

23  Q.   Actually, in your report you state that 18 percent or

24  smaller than half, which means, if you follow the math,

25  82 percent are more than half?

Dr. Geoffrey Cohen - Examination                    1849

1    A.   Okay.

2    Q.   You would agree with that?

3    A.   Yeah, if that's what I said.  I don't remember.

4    Q.   So more than 80 percent of the download files are at least

5    half of the songs, right?

6    A.   Yeah.

7    Q.   Okay.  So Samplit goes back, does a handshake, gets the

8    first half of the song and then the person turns off their

9    computer.  That's not a false positive, is it?

10   A.   No, I wouldn't -- I mean, turns off.  I'm trying to

11   understand your hypothetical.  Turns off their computer in the

12   middle of the operation, no, I would not -- it's not a false

13   positive in the sense of did they have at least that much.

14   Right?  It's a false positive if what you're trying to

15   establish is they had the complete song.

16   Q.   Well, isn't it more consistent with them having the

17   complete song if they have the first half?  You would say it's

18   not a reasonable inference if they had the first half and they

19   were actively sharing?

20   A.   Might or might not.  I guess I'm trying to refine -- when

21   you say "false positives," what's the hypothesis that we're

22   testing?  If the hypothesis we're testing is they have the

23   complete file, then receiving half the file might be

24   suggestive, but it's not proof that they, in fact, have the

25   whole file.

Dr. Geoffrey Cohen - Examination                    1850

1    Q.  Sure.

2    A.  If what you want to say is, we're testing the proposition

3    that they have at least one, you know, second of it, then yes,

4    that would be a confirmation they have at least one second.

5    Q.  What if we're testing the proposition do they have at least

6    half?  Having half, test that proposition.

7    A.  Sure, right.  So if the proposition is you have half, then

8    if you get half, you verify that.  And if you have less than

9    half, then you have not verified it.

10   Q.  Let me come at this a different way.  I think you disagreed

11   obviously if somebody loses their Internet connection during a

12   handshake where they're providing a file to Rightscorp, that

13   handshake is over and they can't keep giving the file to

14   Rightscorp, fair?

15   A.  Sure.

16   Q.  Or if they turn off their computer?

17   A.  Sure.

18   Q.  Or if they lose their Internet connection?

19   A.  I think you said that, but yeah.

20   Q.  Sorry.  Lose their power?

21   A.  Sure.

22   Q.  Computer dies, lose their Internet.  All these are reasons

23   why the handshake would stop?

24   A.  Yup.

25   Q.  None of those are flaws in the Rightscorp system or some

1    problem with Rightscorp, but it's they can't talk to the other

2    person on the other side anymore, right?

3    A.  Well, I guess I would say it's not a question of a flaw in

4    the Rightscorp system itself, but it's still an inability to

5    verify an allegation made in the notice.

6    Q.  Okay.  But I'm not -- no one is suggesting that you can go

7    back and get a file from somebody whose computer has been

8    destroyed, has no Internet, and isn't sharing files anymore,

9    right?

10   A.  It's not a question of claiming that you can.  It's a

11   question of whether or not you can verify the original

12   allegation.  So if you allege that someone has a file, and then

13   their computer catches on fire, it's not anyone's fault that

14   you can't prove it, but you can't prove it.

15   Q.  Well, that's only because you don't believe the original

16   notice is evidence of offering to share, right?

17   A.  Yes.

18   Q.  Put that aside.  I'm just talking about SampleIt 2.  It's

19   not a flaw of SampleIt 2 that it can't get a file from --

20          MR. BROPHY:  Objection, Your Honor.  Asked and

21   answered.

22          THE COURT:  It's also a narrative question.  The

23   objection is sustained.

24          MR. O'BEIRNE:  Okay.

25   BY MR. O'BEIRNE:

1  Q.  You understand that Mr. Boswell testified that he exported

2  the contents of Rightscorp downloads for all downloads from

3  Grande customers from the database, right?

4  A.  Yes, I recall him testifying to that.

5  Q.  And then Rightscorp saves these downloads in the database

6  with the IP address information that it got from the peer,

7  right?

8  A.  Yes, I recall.

9  Q.  You understand that Ms. Frederiksen reviewed the data

10 associated with the downloads as an output of that database,

11 right?

12 A.  Yes.

13 Q.  And the code to export the download from that database?

14 A.  Yes.  I mean, I don't specifically remember what code she

15 said she reviewed, but I recall that being mentioned.

16 Q.  You certainly haven't looked at the database export code

17 and concluded it can't do what Ms. Frederiksen says it can,

18 have you?

19 A.  Well, I looked at the database download code and there's

20 like four different versions of it, so it's not clear to me

21 which was executing at any one time, including to export --

22 allegedly export the hard drive for this case.  So I think

23 there's a question when you say "the source code" that does it,

24 there was not a way for me to determine which multiple

25 incarnations that were produced are the source code that

Dr. Geoffrey Cohen - Examination                1853

1  produces the code.  Other than that, yes, I understand that

2  people have talked about looking at the source code that does

3  this work.

4  Q.  The source code that can export all the Grande downloads

5  from the database exists in the code?

6  A.  Multiple different implementations of it exist.

7  Q.  Right.  The code that can say "give me all the Grande

8  downloads," exists?

9  A.  Yeah.

10  Q.  If you want to do that, you can do it?

11  A.  In multiple ways.

12  Q.  Right.  But successful ways, where you would get all the

13  Grande downloads out?

14  A.  That were in the database.

15  Q.  Yes.  That's the only place we're talking about.

16  A.  Okay.

17  Q.  So you can successfully use the code to go get all the

18  Grande downloads out of the database, right?

19  A.  Sure.

20  Q.  You understand Mr. Boswell testified that he did that,

21  right?

22  A.  Yes.

23  Q.  And Ms. Frederiksen reviewed that code, right?

24  A.  Yes.

25  Q.  If Ms. Frederiksen is right that that data was exported

1  from the Rightscorp downloads database, and Mr. Landis's

2  Audible Magic analysis is right, you would agree that those

3  downloads include more than 19,000 files, matching works that

4  the plaintiffs have brought this lawsuit about, that Rightscorp

5  downloaded from Grande IP addresses, right?

6  A.  Would you ask that again or break it down?  There were a

7  lot of pieces to it.

8  Q.  There were.  I want to make sure we're on the same page

9  because specific point.

10  A.  Yeah.

11  Q.  Let's take them one at a time.  If Ms. Frederiksen is right

12  that the data that was exported is all the Grande downloads.

13  You with me so far?

14  A.  Yes.

15  Q.  Okay.  And Mr. Landis's Audible Magic analysis is right,

16  matching 19,000 of them to the works that are in this lawsuit,

17  then that evidence is evidence of 19,000 files matching the

18  works in this lawsuit that Rightscorp got from Grande IP

19  addresses, right?

20  A.  Many of which are duplicates, but 19,000 copies of some

21  smaller number of files.

22  Q.  19,000 files matching the works in suit from Grande IP

23  addresses, yes?

24  A.  Yes.  So if we accept your various chain of hypotheses,

25  then there's 19,000 duplicates of a smaller number of files of

1    songs that are at issue downloaded from Grande subscribers.

2    Q.  There were just two links in the chain, right?  The export

3    from the database and the Audible Magic to compare?

4    A.  Yes.

5    Q.  If that's true, that's 19,000 files of our copyrights that

6    are at issue in this case from Grande IPs?

7    A.  19,000 duplicates, yes.

8    Q.  You were shown DX 68.

9            MR. O'BEIRNE:  Can you pull up DX 68, please.

10   BY MR. O'BEIRNE:

11   Q.  So this is a contract between MarkMonitor, a monitoring

12   company, and the RIAA.  You understand that, sir?

13   A.  Yes.

14   Q.  What year is this contract from?

15   A.  I believe it was 2011.  Or 2014, sorry 2014.

16   Q.  Where do you see that?

17   A.  Very first line of text says, *"Dated as of March, blank,*

18   *2014."*

19   Q.  Okay.  So you understand this is a 2014 document relating

20   to a monitoring company call MarkMonitor, right?

21   A.  Yes.

22   Q.  You did not discuss this contract with anybody at

23   MarkMonitor, did you?

24   A.  I did not.

25   Q.  You did not discuss this contract with anybody at the RIAA,

Dr. Geoffrey Cohen - Examination                1856

1    did you?

2    A.  I did not.

3    Q.  Is this agreement expired?

4    A.  I don't remember.

5    Q.  You don't know whether it's expired?

6    A.  I don't know, yeah.  I have not looked at that question or

7    investigated it.

8    Q.  How long was it in effect?

9    A.  I don't know.

10   Q.  Did MarkMonitor actually do the work set forth in this

11   contract?

12   A.  I don't have any personal knowledge about that.

13   Q.  You have no idea whether actually the information that was

14   described in here was performed by MarkMonitor for the RIAA, do

15   you?

16   A.  I don't.

17   Q.  You didn't look at any other contracts between the RIAA and

18   the other monitoring companies, did you?

19   A.  There's a very similar one for Detect, but I don't recall

20   others.

21   Q.  So to be clear, you talked about the RIAA's requirements.

22   You used the word "requirements," right?

23   A.  Yeah.

24   Q.  You're not getting that from some part of the RIAA website

25   or interviews with RIAA people, are you?

Dr. Geoffrey Cohen - Examination                1857

1   A.   No.   I'm getting it from the statement of work.

2   Q.   This is an agreement, a contract, between RIAA and a

3   monitoring company from 2014 --

4   A.   Yes.

5   Q.   -- that describes a project?

6   A.   Yes.

7   Q.   And the terms of the project are in this contract?

8   A.   Yes.

9   Q.   You have no idea how many other times the RIAA might have

10  contracted with other monitoring companies for other projects

11  with different requirements, do you?

12  A.   No, I don't.

13  Q.   So you can't sit here and say you know those are the RIAA's

14  requirements for Internet monitoring.   There could be

15  innumerable other contracts that they signed with different

16  requirements, right?

17  A.   Well, they are the requirements set forth in this -- for

18  this engagement.

19  Q.   This one contract for this one project?

20  A.   Yes.

21  Q.   Okay.   Did you ask to see the BMG contract with Rightscorp,

22  pursuant to which Rightscorp --

23          MR. BROPHY:   Objection, Your Honor.   This is getting

24  into the other litigation.

25          MR. O'BEIRNE:   Your Honor, he was asked whether

1   Rightscorp satisfies requirements in a contract they're not a

2   party to.  I'm asking whether he tried to see if they satisfied

3   the requirements in the contract they were a party to.

4          MR. BROPHY:  There's been no discovery of that, Your

5   Honor.

6          THE COURT:  The objection is sustained.

7   BY MR. O'BEIRNE:

8   Q.  Fair to say you have no opinion that what Rightscorp did in

9   the design and the deployment of its system was not exactly

10  what BMG asked them to do?

11         MR. BROPHY:  Same objection.  He's getting into the

12  other lawsuit, and there's been no discovery.

13         THE COURT:  The objection is sustained.

14         MR. O'BEIRNE:  Your Honor, if he's asking about --

15         THE COURT:  The objection is sustained.

16  BY MR. O'BEIRNE:

17  Q.  So you don't have any experience in the music industry, do

18  you?

19  A.  No.

20  Q.  And you have no understanding of how this statement of work

21  was negotiated or what it was based on, do you?

22  A.  No, just the four corners of the document.

23  Q.  You were also shown an RFP response submitted by Rightscorp

24  to an RIAA RFP for monitoring work; do you recall that?

25  A.  Yes.

Dr. Geoffrey Cohen - Examination                    1859

1   Q.   Before we talk about that, you were asked some questions

2   about what you think is important for monitoring companies to

3   do and not do, upon your direct testimony; do you recall that,

4   sir?

5   A.   Yes.

6   Q.   This is the first time you've ever testified anywhere about

7   copyright monitoring software over the Internet, right?

8   A.   It's the first time I've testified, yes.

9   Q.   Okay.  So your basis of what monitoring companies should do

10  is based on the fact that you looked at that one contract that

11  counsel gave you for a different company, right?  That was the

12  full basis of what monitoring companies should do?

13  A.   I mean, the first time I've testified doesn't mean it's the

14  first time I've researched the question or worked on cases as a

15  non-testifying expert.  I have worked on other copyright cases

16  and file-sharing exercises, but I haven't testified, not in

17  those.

18      So my opinion is informed on the basis of my professional

19  work in IP litigation, including copyright work over 15 years.

20  Q.   Whatever basis you've had to review other monitoring

21  companies is nowhere in the report supporting your opinions in

22  your case, is it, sir?

23  A.   Just my expert experience and my education, and -- but I

24  did not cite to specific documents other than the ones that

25  were in evidence in this case.

Dr. Geoffrey Cohen - Examination                    1860

1    Q.  That one, that contract?

2    A.  Yes.

3    Q.  Okay.  Now, you testified -- you were asked some questions,

4    and you testified about a RFP response that Rightscorp made

5    back to the RIAA; do you recall that?

6    A.  Yes.

7    Q.  And it's your understanding that the RIAA did not accept

8    Rightscorp's proposal, right?

9    A.  That is my understanding, yeah.

10   Q.  In fact, in paragraph 20 of your supplemental report, you

11   say, *"In any event, it's my understanding that RIAA*

12   *subsequently declined Rightscorp's 2011 proposal and did not*

13   *retain Rightscorp for any purpose prior to the case."*  Right?

14   A.  That's my understanding.

15   Q.  Okay.  So that RFP was from 2011, right?

16   A.  Yes.

17   Q.  About a particular project back then --

18   A.  Yes.

19   Q.  -- about possible capabilities going forward for whoever

20   did get the contract to do?

21        MR. BROPHY:  Objection, Your Honor.  Mischaracterizes

22   the document.

23   A.  Yeah, I would say.

24        THE COURT:  I'm going to overrule the objection.  He

25   can answer the question if he can understand it.

1   A.  Yeah, I would reject the premise that it was possible

2   future things.  The language I think clearly said, this is what

3   we currently do, implying that they're describing an ongoing

4   activity at that moment in time, not merely aspirational

5   capabilities.

6   BY MR. O'BEIRNE:

7   Q.  You understand that an RFP is prospective.  It's a proposal

8   to do certain work in the future, right?

9   A.  I do.

10  Q.  Okay.  You were here for Mr. Boswell's testimony, right?

11  A.  I was.

12  Q.  And counsel did not show Mr. Boswell that RFP response, did

13  he?

14  A.  Not as far as I recall.

15  Q.  Didn't ask him any questions about whether Rightscorp was

16  describing capabilities that, were it hired, it could satisfy

17  in the contract?

18  A.  Okay.

19  Q.  You would agree with me?  There's no testimony about that,

20  right?

21  A.  I don't recall that testimony, so yeah.

22  Q.  Okay.  You didn't fill that out for Rightscorp, right?  The

23  RFP response, you were not involved in preparing it, right?

24  A.  No, of course not.

25  Q.  Okay.  So you have no basis to dispute that they were

Dr. Geoffrey Cohen - Examination                1862

1  responding prospectively to an RFP discussing possible

2  capabilities in an unawarded contract in that document, do you?

3  A.  I think the basis would be I read the plain meaning of the

4  words in the document that say, we currently do X, so that's my

5  basis.  My basis is the plain meaning of the words that

6  Rightscorp chose to use in that document in explaining their

7  capabilities.

8  Q.  Sitting here today, can you point to a single Rightscorp

9  notice that's been demonstrated to be unreliable?

10 A.  Not exactly.  I can't provide -- I can't determine whether

11 any of them are reliable or not.  I think that's the core of my

12 opinion.

13 Q.  Okay.  So you haven't determined any of them are

14 unreliable?

15 A.  I have no way to do it given the absence of the underlying

16 evidence.

17 Q.  Well, I'm just asking you, sir -- you can have an

18 explanation why you haven't done it.  You claim you couldn't

19 have.  I'm just clarifying.  You've used the term "false

20 positive."

21 A.  Yes.

22 Q.  You're not pointing to a single Rightscorp notice that was

23 generated and saying that's false positive, right?

24        MR. BROPHY:  Objection, Your Honor.  Asked and

25 answered three times now.

Dr. Geoffrey Cohen - Examination                    1863

```
 1              THE COURT:  I think so.  Sustained.

 2    BY MR. O'BEIRNE:

 3    Q.  My last question, sir.  The Rightscorp system is capable of

 4    identifying offers to share and actually obtaining files from

 5    BitTorrent users, right?

 6    A.  Are you considering just the downloads?

 7    Q.  Downloads are actual files from BitTorrent users, right?

 8    A.  I think the instance of downloads are examples of a

 9    willingness to share a file.

10    Q.  File sharing over BitTorrent?

11    A.  Yes.

12    Q.  Accurately detected by Rightscorp?

13    A.  In those instances where there was a successful file, I

14    don't dispute that those files -- you know, again, as far as I

15    know, based on whether that export actually happened as

16    described by Mr. Boswell.  But assuming, as your hypothetical

17    earlier, I don't have a basis to say that those downloads

18    representing those, you know, 800 users represent files that

19    were downloaded over BitTorrent by Rightscorp.

20    Q.  Those are evidence of file sharing by Grande IP addresses

21    on BitTorrent, yes?

22    A.  Assuming the whole chain of evidence leading up to it is

23    true, which I have to rely on the words of Mr. Boswell, or --

24    but if I rely on the words of Mr. Boswell, yes.  I can't come

25    to that conclusion independently, but other than not having the
```

Dr. Geoffrey Cohen - Examination                    1864

1  evidence to actually prove it end to end, I don't have any

2  reason to dispute that those download files were downloaded

3  over BitTorrent.

4  Q.  Through a system that each stage of which in the code

5  you've confirmed it can do what Mr. Boswell says it does?

6         MR. BROPHY:  Objection, Your Honor.  Asked and

7  answered.

8         MR. O'BEIRNE:  This is my last question, Judge.

9         THE COURT:  No.  Your last two questions ago was your

10 last question.

11        MR. O'BEIRNE:  Sorry.  Your Honor.  I got a little bit

12 of a narrative answer there that I didn't think was responsive.

13 I'm just trying to make sure the testimony is clear.

14        THE COURT:  One more question.  That's it.

15 BY MR. O'BEIRNE:

16 Q.  Each stage of the Rightscorp code that Barb Frederiksen and

17 Mr. Boswell described can do what they say it can, right?

18 A.  Potentially, in some configurations.

19 Q.  Yes?

20 A.  Potentially in some configurations.

21        MR. O'BEIRNE:  That's all I have.

22        MR. BROPHY:  We have nothing further, Your Honor.

23 Thank you.

24        THE COURT:  All right, sir.  You can step down and go

25 home.

```
 1              THE WITNESS:  Thank you, sir.  I do appreciate it.
 2              THE COURT:  Ladies and gentlemen, thank you so very
 3    much for your indulgence.  I really do appreciate it.  I know
 4    that it's an extra imposition on you, but since we were going
 5    to be breaking for the four days so we could work tomorrow here
 6    and do the things we need to do and then, of course, on Monday,
 7    doing sentencings all day long in San Antonio, I didn't want
 8    the witness to have to wait four days here for half an hour of
 9    testimony.  So I do appreciate that.
10              Please remember my admonitions about not discussing
11    this matter with anyone you come in contact with or your
12    friends, your family, or anything.  There will be plenty of
13    time for you to do that.  We're getting very close to the end
14    of this case.  Very close.  We're a bit ahead of schedule, I
15    think, actually.
16              MR. BART:  Maybe we should talk about that.
17              THE COURT:  Okay.  Well, I think we're on schedule.
18              MR. BART:  But we are very, very close.
19              THE COURT:  Okay.  So you are excused.  We will see
20    you on Tuesday morning.  Okay?  And then Tuesday morning, I am
21    very hopeful that we'll have what little bit of evidence we
22    might have, if we have any additional evidence, but then we're
23    going to go immediately into jury instructions and into closing
24    argument as soon as that evidence is done, okay.
25              All right.  Thank you very much.  And, of course, you
```

 1    can go to work tomorrow if you wish and just as you have --

 2    whatever you're doing on Monday.  Okay?

 3           *(5:14 p.m., the jury exits the courtroom.)*

 4                          *   *   *

 5           THE COURT:  So are you going to have any additional

 6    witnesses, do you know, counsel?

 7           MR. BROPHY:  Your Honor, we don't.  We're going to

 8    take a very careful look at the deposition testimony we have

 9    identified and probably hack a lot of it, to be honest with

10    you.  So my hope and expectation is that Tuesday morning we

11    have little, if anything, left to accomplish.

12           MR. BART:  We may have some rebuttal testimony.

13           THE COURT:  You may.

14           MR. BART:  We may.  It would be very short, but we

15    may.

16           THE COURT:  From your expert?

17           MR. BART:  Yes.

18           THE COURT:  She wasn't sitting here in order to listen

19    intently to my comments off the record.  My ad hominem

20    comments.

21           MR. BROPHY:  Your Honor, to be clear, our position is

22    that there is no appropriate rebuttal testimony for the reasons

23    that I --

24           THE COURT:  Well, we'll see.  We'll take it up.  If

25    you have an objection, I'll hear it at the time.

 1          MR. BROPHY:  Thank you, Your Honor.

 2          MR. BART:  So just to clarify --

 3          THE COURT:  9:00 tomorrow morning.  Have you turned in

 4   the materials yet?

 5          MR. BART:  We did --

 6          COURTROOM DEPUTY CLERK:  I told them to turn it in by

 7   6:00.  Just so it's not by midnight.

 8          MR. BART:  No, we can get them in within a couple of

 9   hours.  We were saying by 7:00, I think.

10          COURTROOM DEPUTY CLERK:  Yes, 6:00 or 7:00.

11          MR. BART:  Well, I mean, probably, honestly.  I don't

12   want to put extra burden on Richard, but I think because Jake

13   wasn't here, we could probably get it in by 6:00.

14          THE COURT:  Well, as soon as you possibly can, please,

15   because I'm the one that's going to be reading all this this

16   evening and I want to be able to -- you know, I would like not

17   to be up all night long.

18          MR. BROPHY:  Your Honor, we can -- it goes without

19   saying.  We can be flexible in the morning, if you'd like to

20   arrange --

21          THE COURT:  Well, let's see how we're going.  Let's

22   have you back here at 9:00.  But, I mean, it may be that you

23   can relax a while if I'm not entirely done.  You want me to

24   make the best judgment I can regardless of whether you agree

25   with it or not.

 1              MR. BART:  I don't know that I want the best judgment

 2   if it's not in my favor.

 3              THE COURT:  I told you the story, right?

 4              MR. BART:  That's what I was alluding to.

 5              THE COURT:  Okay.  We're off the record.

 6         (5:17 p.m.)

 7                               *   *   *

 8         (5:19 p.m.)

 9              THE COURT:  Back on the record.  We have the judgment

10   matter of law motions, and I can't do that until the testimony

11   is closed, so if we're not done, then we'll have to do that

12   Tuesday.  I mean, as soon as we're done with the testimony.

13              MR. BART:  Of course.

14              THE COURT:  I don't think it will take me long to rule

15   on those motions.

16              MR. BART:  I wouldn't be surprised.

17              MR. BROPHY:  I was estimating seven minutes.

18              MR. BART:  So we're just doing the jury instructions

19   tomorrow?

20              THE COURT:  I believe we'll just do the jury

21   instructions.

22              MR. BART:  Fair enough.

23              MR. BROPHY:  If it would expedite things, we could

24   file paper JMOLS if you prefer that.

25              THE COURT:  No, it's okay.  Just make them orally and

1   it will be fine.

2           MR. BROPHY:  Okay.

3           *(5:20 p.m.)*

4                              *   *   *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5        I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.  I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  November 23, 2022

12

13   /s/ Angela M. Hailey

14   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
15   262 West Nueva Street
     San Antonio, Texas  78207
16   (210)244-5048

17

18

19

20

21

22

23

24

25