```
 1                    UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF TEXAS
 2                          AUSTIN DIVISION

 3   UMG RECORDINGS, INC., ET AL,   :
     Plaintiffs,                     :
 4                                   : Case Number:
     vs.                             : 1:17-CV-00365-DAE
 5                                   :
     GRANDE COMMUNICATIONS           : Austin, Texas
 6   NETWORKS, LLC, ET AL,           : October 28, 2022
     Defendants.                     :
 7   ********************************************************

 8                TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                  BEFORE THE HONORABLE DAVID A. EZRA
 9                SENIOR UNITED STATES DISTRICT JUDGE

10   APPEARANCES:
     FOR THE PLAINTIFFS:
11
     Andrew H. Bart, Esquire
12   Jacob Tracer, Esquire
     Jenner & Block, LLP
13   1155 Avenue of the Americas
     New York, NY  10036
14   (212)891-1600; abart@jenner.com

15   Robert B. Gilmore, Esquire
     Philip J. O'Beirne, Esquire
16   Kevin Attridge, Esquire
     Stein Mitchell Cipollone Beato & Missner LLP
17   1100 Connecticut Avenue, NW, Suite 1100
     Washington, DC  20036
18   (202)601-1589; rgilmore@steinmitchell.com

19   Paige Arnette Amstutz, Esquire
     Scott, Douglass & McConnico, LLP
20   303 Colorado Street, Suite 2400
     Austin, Texas  78701
21   (512)495-6300; pamstutz@scottdoug.com

22

23

24

25
```

1  FOR THE DEFENDANTS:
   **Richard L. Brophy, Esquire**
2
   **Zachary C. Howenstine, Esquire**
3
   **Mark A. Thomas, Esquire**
4
   **Margaret R. Szewczyk, Esquire**
5  Armstrong Teasdale, LLP
   7700 Forsyth Boulevard, Suite 1800
6  St. Louis, Missouri  63105
   (314)621-5070
7  rbrophy@armstrongteasdale.com
   zhowenstine@armstrongteasdale.com
8  mathomas@atllp.com
   mszewczyk@armstrongteasdale.com
9

10

11

12

13

14

15

16

17

18

19

20 COURT REPORTER:
   Angela M. Hailey, CSR, CRR, RPR, RMR
21 Official Court Reporter, U.S.D.C.
   262 West Nueva Street
22 San Antonio, Texas  78207
   Phone(210)244-5048
23 angela_hailey@txwd.uscourts.gov

24 Proceedings reported by stenotype, transcript produced by
   computer-aided transcription.
25

```
 1    (October 28, 2022, 10:04 a.m.)

 2                          *   *   *

 3            THE COURT:  Good morning.

 4            COURT SECURITY OFFICER:  All rise.

 5            THE COURT:  Please be seated.  The Court would note

 6    the presence of the counsel, the absence of the ladies and

 7    gentlemen of the jury.  I don't know whether you have your

 8    representatives here, but if you do, they're welcome, but I

 9    doubt it.

10            All right.  So what we're going to do is -- let me

11    explain to you how I do this and it's worked for me really well

12    during my years.  I will read the first sentence or so of each

13    instruction, we always start with the plaintiff and then we

14    move to the defendant.  If you have no objection to that

15    instruction, you say -- and has to be the same lawyer.  I don't

16    want people popping up all over the place like

17    jacks-in-the-box.  Stand up and say No objection.  If there is

18    an objection, you say Objection.  And then I don't care who

19    argues the objection.  Okay.  But for her purposes if we have

20    different people popping up, it's hard for her to keep track of

21    it, okay.

22            The first instruction starts with "Members of the

23    jury, it is my duty and responsibility to instruct you on the

24    law."  And you don't need to stand up, just stay seated, just

25    say objection or no objection.
```

1          MR. BART:  No objection.

2          MR. HOWENSTINE:  No objection.

3          THE COURT:  The next instruction is *"The evidence you*

4  *are to consider consists of the testimony of witnesses, the*

5  *documents and other exhibits."*

6          MR. BART:  No objection.

7          MR. HOWENSTINE:  No objection.

8          THE COURT:  Instruction number three.  *"What is*

9  *evidence?  In reaching your verdict you may consider only the*

10 *testimony and exhibits received into evidence."*

11         MR. BART:  No objection.

12         MR. HOWENSTINE:  No objection.

13         THE COURT:  Instruction number four.  *"Ruling on*

14 *objections.  There are rules of evidence that control what can*

15 *be received into evidence."*

16         MR. BART:  No objection.

17         MR. HOWENSTINE:  No objection.

18         THE COURT:  Number five.  *"Witnesses.  You alone are*

19 *to determine the questions of credibility or truthfulness of*

20 *the witnesses."*

21         MR. BART:  No objection.

22         MR. HOWENSTINE:  No objection.

23         THE COURT:  The next one is impeachment.  *"In*

24 *determining the weight to give to the testimony of a witness,*

25 *consider whether there was evidence at some other time the*

1    *witness said or did something."*

2              MR. BART:  No objection.

3              THE COURT:  There's something here I don't like.  It

4    should say, *"In determining the weight to give to the testimony*

5    *of a witness..."*  It should say *"You may consider"*, instead of

6    *"consider."*  We don't tell the jury what they should or

7    shouldn't consider.  *"You may."*  Any objection to that?

8              MR. BART:  No, Your Honor.

9              MR. HOWENSTINE:  With that change, no objection.

10             THE COURT:  Okay.  Number seven, expert witnesses.

11   *"When knowledge of technical subject matter may be helpful to*

12   *the jury, a person who has special training or experience..."*

13             MR. BART:  No objection.

14             MR. HOWENSTINE:  No objection.

15             THE COURT:  Number eight, deposition testimony.

16   *"Certain testimony has been presented to you through a*

17   *deposition."*

18             MR. BART:  No objection.

19             MR. HOWENSTINE:  No objection.

20             THE COURT:  Should say *"certain testimony has been*

21   *presented to you through --"* strike the "a" and put

22   "depositions", in the first line, because there's been multiple

23   depositions.  Okay?  Any objection to that change?

24             MR. BART:  No.

25             MR. HOWENSTINE:  No objection.

1          THE COURT:  Okay.  Now, this is one I had some

2    question about, interrogatories.  Did we have any

3    interrogatories entered?

4          MR. BART:  No.

5          THE COURT:  Let's strike number nine.  Do you have any

6    objection to striking number nine?

7          MR. BART:  No.

8          THE COURT:  We'll renumber them.  I'm going to

9    continue on using the same numbers, but we're going to -- in

10   fact, I'm just going to stop using numbers.  Interrogatories

11   we're going to strike because I could not remember at all us

12   introducing any interrogatories or impeaching anybody with an

13   interrogatory.

14         MR. BROPHY:  There were none.

15         THE COURT:  There were plenty of impeachment by

16   deposition, but not interrogatory.

17         Limiting instruction.  *"When testimony or an exhibit*

18   *was admitted for a limited purpose..."*

19         MR. BART:  No objection.

20         MR. HOWENSTINE:  No objection.

21         THE COURT:  No inference from filing suit.  *"The fact*

22   *that a person brought a lawsuit and is in court seeking*

23   *damages..."*

24         MR. BART:  No objection.

25         MR. HOWENSTINE:  No objection.

1          THE COURT:  Okay.  I think we're done.

2          We're starting to get to the contentious ones.  Work

3     it out.  I'll send in some Lipton Soup.  I'll be a good guy.

4          All right.  Burden of proof, preponderance of the

5     evidence.  *"Plaintiffs have the burden of proving their case by*

6     *a preponderance of the evidence."*

7          MR. BART:  No objection.

8          MR. HOWENSTINE:  No objection.

9          THE COURT:  Okay.  I'm on a roll here, which will soon

10    stop.  The Digital Millennium Copyright Act.  *"You have heard*

11    *testimony and seen documents that refer to the Digital*

12    *Millennium Copyright Act, known as the DMCA."*

13         MR. BART:  No objection.

14         MR. HOWENSTINE:  No objection.

15         THE COURT:  Oh, I thought there would be an objection

16    to that one.  Okay.  Copyright definition.  *"A copyright is a*

17    *set of rights granted by federal law to the owner of an*

18    *original work of authorship."*

19         MR. BART:  No objection.

20         MR. HOWENSTINE:  We do object to this one, Your Honor.

21         THE COURT:  All right.  Let's get to it.  Just a

22    minute.  This is number 14.  All right, counsel.

23         MR. HOWENSTINE:  Your Honor, our principle objection

24    to this instruction is to the last sentence, because it refers

25    to the right of a copyright owner to reproduce and distribute.

1    And the issue of reproduction is no longer in this case.  Your

2    Honor granted summary judgment on that issue in document 268

3    which is why we had proposed an instruction that specifically

4    clarifies that there is no allegation remaining in this case of

5    a violation of the reproduction right.

6          THE COURT:  I think that is right, actually.  Go

7    ahead, counsel.

8          MR. BART:  I have no objection to striking those

9    words.

10         THE COURT:  Okay.  "Among other rights, the owner of a

11   copyright has the exclusive right to..."

12         MR. BART:  Distribute copies.

13         THE COURT:  Yeah, distribution copies.  Is that

14   satisfactory?  *"... distribute copies of the copyrighted work*

15   *to the public by sale or other transfer or ownership by rent,*

16   *lease or lending."*

17         MR. HOWENSTINE:  Right.  If we just change it to *"The*

18   *owner of a copyright has the exclusive right to distribute*

19   *copies of the copyrighted work..."* and then the rest of the

20   sentence, I think that would get us to where we need to be.

21         THE COURT:  Okay.  That's what I just did.  Okay.  So

22   no objection with the change.

23         Number 15, plaintiffs claim.  *"In this case,*

24   *plaintiffs contend that Grande is contributorily liable for the*

25   *unauthorized distribution of plaintiff's 1422 copyrighted works*

1    *by subscribers of Grande's Internet service."*

2          MR. BART:  No objection.

3          MR. HOWENSTINE:  We object to that one.

4          THE COURT:  Okay.  Just a minute, that's 15.

5          *(Pause.)*

6          Okay.  I believe that in the complaint the plaintiffs

7    didn't specify the exact number of copyrighted works, but

8    neither did the plaintiff in Sony versus Cox.  And the District

9    Court there did allow the specific number of copyrighted works

10   to be inserted into the instructions and that was not the

11   instruction that got the case reversed, it was the standard of

12   proof.  Go ahead, counsel.

13         MR. HOWENSTINE:  Your Honor, our objection isn't

14   necessarily to including the number, but rather to effectively

15   resolving the question of whether each of the 1422 songs are a

16   separate copyrighted work for purposes of statutory damages.

17   We contend that plaintiffs need to show that they are separate

18   works.

19         THE COURT:  But here I don't resolve it.  It says, *"In*

20   *this case, plaintiffs contend--"* contend, *"--that Grande is*

21   *contributorily liable for the unauthorized distribution of*

22   *plaintiff's 1422 copyrighted works."*

23         MR. HOWENSTINE:  Yeah, and our view --

24         THE COURT:  There wasn't any testimony that any of

25   these works weren't copyrighted.  I didn't hear one shred of

1    testimony in that regard.

2         MR. HOWENSTINE:  Right.  The issue, Your Honor, is

3    that we contend that certain of the songs are parts of

4    compilations that should be treated as one work for purposes of

5    statutory damages.

6         THE COURT:  There wasn't any testimony about that

7    either, that I remember.

8         MR. HOWENSTINE:  Well, it's our view that that is

9    plaintiff's obligation to prove and there is evidence in the

10   record in the form of the copyright registrations, certain of

11   which claim multiple songs.

12        THE COURT:  Like an album, in an album?

13        MR. HOWENSTINE:  Correct.  And we contend that those

14   are compilations that are only entitled to one award.  So in

15   our view --

16        THE COURT:  Well, I think they're claiming 1422 which

17   includes the compilations.  They're not treating the

18   compilations separate.  Am I right?

19        MR. BART:  We are treating each work as an individual

20   work and I think --

21        THE COURT:  Which means that in the album -- let's say

22   there's 12 songs.

23        MR. BART:  We're counting them as 12.  I think we're

24   going to get to that point, perhaps later.  I don't know that

25   it's appropriate -- we'll deal with it however Your Honor wants

 1    to deal with it.  I think you're right that in this case saying
 2    "plaintiffs contend" takes care of it in this context.  I think
 3    if you want to address the compilation issue, I'm prepared.
 4              THE COURT:  We have to later anyway.
 5              MR. BART:  That's fine, so if you want to do it now, I
 6    don't care when we do it.
 7              THE COURT:  I'm trying to remember if there was
 8    anybody on the stand that testified specifically as to the
 9    particular makeup of the 1422 works.
10              MR. BART:  Yes, each of the labels testified that
11    every one of the works was available individually which is
12    under the law of every circuit that's considered the issue,
13    sufficient for it to be an independent work.  And so we think
14    that that evidence has been unrebutted.  All of these songs are
15    available on Spotify, on Apple, on iTunes, everything, as
16    individually used, independent economic value.  That testimony
17    is part of the record, satisfies our burden of showing
18    individual works.
19              THE COURT:  Well, if you go on Apple Music, to the
20    extent that it still exists, I think it does --
21              MR. BART:  Oh, it does, definitely.
22              THE COURT:  -- and you want to download an album, you
23    have to pay for each work.  Now sometimes, sometimes you'll get
24    a discount if you do the whole album, but you certainly could
25    pick and choose.

1          MR. BART:  No, absolutely.  And all I'm saying is in

2    each case that's considered this issue, the Court has held that

3    when individual songs are made individually available for

4    purchase, regardless of whether they're also available as

5    albums, they have independent economic value and they count as

6    individual works.

7          THE COURT:  Well, today -- now, I am certainly not

8    into music like I was as a teenager, that's for sure, but today

9    unlike in those days when people bought 45s -- you know, the

10   little ones with the big hole in them.

11         MR. BART:  I had some.

12         THE COURT:  -- virtually every song that comes out,

13   not every song, but virtually every song that comes out, comes

14   out as part of an album.  There's a lot of them that come out

15   that aren't parts of albums.

16         MR. BART:  Actually that's less true now than it was

17   20 years ago.

18         THE COURT:  Yeah, I guess that's right.

19         MR. BART:  And everything, all songs -- and this is

20   the testimony.  All songs that are provided to the streaming

21   services by the feeds that are provided by the individual

22   labels are available for individual streaming and individual

23   downloads and that satisfies our burden under this test.  So I

24   don't believe that there's any authority to the contrary and I

25   believe that we are entitled to a work and there's been no

1  evidence to the contrary.  The only evidence they have is some

2  of these songs were on an album, and from our perspective

3  that's not probative.

4           MR. HOWENSTINE:  Your Honor, if I may, I could offer a

5  solution.

6           THE COURT:  I love solutions.  Don't always agree with

7  them, but I love them when they work.

8           MR. HOWENSTINE:  Irrespective of what the conclusion

9  is on this compilation issue, we can just kick it to the

10  statutory damages instruction.  And if we say "songs" here,

11  then the question of what the works are can be addressed in

12  connection with that later instruction.  To the points that

13  Mr. Bart made --

14           THE COURT:  Say "In this case, plaintiffs contend that

15  Grande is contributorily liable for the unauthorized

16  distribution of plaintiff's works by subscribers of Grande's

17  Internet service."  Is that what you're saying?

18           MR. HOWENSTINE:  I would say plaintiff's 1422

19  copyrighted songs.

20           THE COURT:  You want "songs" in there.

21           MR. HOWENSTINE:  Right.  And then we would decide the

22  issue of "works" in connection with the statutory damages

23  instruction.  That's how we had proposed it.

24           THE COURT:  I'm afraid that might be a little

25  confusing.

1          MR. HOWENSTINE:  If I could also respond to Mr. Bart's

2   points and explain why we believe this is an issue.  It may be

3   that individual songs in certain circumstances may be entitled

4   to a separate award, but the cases -- even the cases the

5   plaintiffs have cited stand for the proposition that that's

6   true when they're offered individually at the time of

7   infringement.

8          THE COURT:  Well, look, I'm no witness in this case,

9   but I have purchased myself or downloaded myself from Apple

10  Music to put on a CD so I could play it in my car -- hey, I

11  have the last car that I think might have a CD.  I have a '22

12  Lexus ES and it has a CD player, believe it or not.  The '23

13  does not, that's why I grabbed the '22.

14         MR. BROPHY:  They were also the last car to have a

15  cassette deck in it.

16         THE COURT:  Well, I don't have a cassette deck.

17         There are occasions where certain songs are only

18  available in special albums.  In other words, you can't buy

19  them individually, you have to buy the special albums.  And

20  Michael Buble`, I can tell you for sure, had one of those

21  because my daughter, one of my daughters, my youngest, is a big

22  Michael Buble` fan and I actually bought her the album as one

23  of her stocking stuffers for Christmas a few years ago.  And I

24  remember him saying that these songs were only available on

25  this special CD.  Available only at Target.  So that does

1   happen.  Rare.

2          MR. BART:  Yeah, and there was testimony about that

3   too, Your Honor.  We addressed all of this, there was one

4   Universal song where there was testimony, on his testimony that

5   that wasn't available during the relevant time as an individual

6   song.

7          THE COURT:  Right.

8          MR. BART:  So we addressed all of our works and, you

9   know, but the point about that song was there weren't any other

10  songs from that album anyway, so the compilation issue is not

11  really an issue.

12         THE COURT:  It didn't matter.

13         MR. BART:  But we addressed all of that in our

14  testimony.

15         THE COURT:  So what do you want?  You just want to

16  take this whole instruction out?

17         MR. HOWENSTINE:  No, we just want to say "songs"

18  instead of "works" and then have the jury decide in connection

19  with the statutory damages instruction whether individual songs

20  are, in fact, separate works for purposes of statutory damages.

21         THE COURT:  Well, you shouldn't have an objection to

22  that because you have considered the 1422 as separate songs.

23         MR. HOWENSTINE:  Right.  And then we could consider --

24         THE COURT:  I assume that there are less -- if we were

25  to use albums, it would be some number less.

1    MR. BART:  Well, that's why they're raising it

2    obviously, but yes.

3    THE COURT:  There would be some number less.

4    MR. BART:  Yes, it would.  I don't have a major

5    objection to this, even though I do believe it's our

6    contention, but I wouldn't say "songs" because that's ambiguous

7    and to refer to the composition, so I would say sound

8    recordings.

9    MR. HOWENSTINE:  That's fine.

10   THE COURT:  Sound recordings.

11   MR. BART:  They are different things, so I just

12   want --

13   THE COURT:  I do agree, but I don't know that we've

14   had any here that have been other than songs.

15   MR. BART:  There was testimony about the difference

16   between compositions and sound recordings and I just want to be

17   precise.

18   THE COURT:  Okay.  Sound recordings instead of works.

19   So the instruction would read, *In this case, plaintiffs*

20   *contend that Grande is contributorily liable for the*

21   *unauthorized distribution of plaintiff's 1422 copyrighted sound*

22   *recordings by subscribers of Grande's Internet service."*

23   You're okay with that?

24   MR. BART:  I am.

25   MR. HOWENSTINE:  No objection.

1          THE COURT:  Okay.  Somehow I feel like a mouse that's

2     somehow been lured into a trap.  I'm waiting for the trap to

3     fall.

4          *(Discussion off the record.)*

5                              *   *   *

6          THE COURT:  All right.  Instruction number 16,

7     infringement.  *"In order to prove contributory copyright*

8     *infringement, plaintiffs must first establish by a*

9     *preponderance of the evidence the following four elements."*

10         MR. BART:  No objection.

11         THE COURT:  Okay.

12         MR. HOWENSTINE:  We object.

13         THE COURT:  Why am I surprised?  I'm not surprised.

14     Okay.

15         MR. HOWENSTINE:  Your Honor, we have a few different

16     issues with this instruction, but I will focus most of my time

17     on the second element and --

18         THE COURT:  Okay.

19         MR. HOWENSTINE:  -- offering to distribute the

20     copyrighted work as being a basis for direct infringement.

21         THE COURT:  Basically, though, when I looked at this,

22     it appeared to me that you were basically trying to re-argue

23     the motion for summary judgment and the legal standard that the

24     Court adopted after looking at Fifth Circuit law, looking at

25     Seventh Circuit law, Second Circuit law, all the Circuits that

1  have ruled.  And I know you don't like it.  No Internet service

2  provider likes it, obviously, they didn't like Grokster either,

3  but that's the law.

4           MR. HOWENSTINE:  May I approach?

5           THE COURT:  Sure.  How about Mr. Bart?  I want you to

6  see what he's handing me.

7           MR. BART:  We have a copy of the decision.

8           MR. HOWENSTINE:  I'm sorry, I didn't cite the page

9  number for you.  It's page 34.

10          THE COURT:  Is this me?

11          MR. HOWENSTINE:  Yes.

12          COURTROOM DEPUTY CLERK:  It's you.

13          MR. TRACER:  Point us to what section of the opinion

14  it is.

15          THE COURT:  Page 34.

16          MR. HOWENSTINE:  He has the Westlaw version.  It's the

17  piece where the Court says whether the --

18          THE COURT:  It starts, *"Regardless of whether or*

19  *not..."*

20          MR. TRACER:  Thank you.

21          MR. HOWENSTINE:  So Your Honor did not in that summary

22  judgment order decide whether direct infringement requires

23  actual distribution or not.  The Court decided a separate

24  question of whether our subscribers' conduct could constitute

25  direct infringement at all.  We accept that Your Honor decided

1  that, but the issue of whether direct infringement requires

2  actual distribution was not decided and no Court of Appeals has

3  approved of this offering to distribute standard, not one.  The

4  only one that has ruled on it directly is the Eighth Circuit

5  which has held that it requires actual dissemination of a

6  copyrighted work.  And in the Sony case and in the BMG case,

7  the District Court in both cases instructed that it requires

8  actual dissemination.  Now, what the Court also held was that

9  the notices that were sent could be circumstantial evidence of

10  actual distribution and the Court acknowledged that, so those

11  cases proceeded on instructions that direct infringement does

12  require actual distribution.

13          THE COURT:  But the courts have held, the courts have

14  held that it is sufficient if a third party -- and for our

15  purposes that would be Rightscorp -- going on there and opening

16  up the right channels and being in position, then, to download

17  the copyrighted material was sufficient.  The courts have held

18  that.

19          MR. HOWENSTINE:  And Your Honor, I would say that that

20  is a separate issue.  This issue focuses on whether merely

21  showing that someone offered to share a work can be direct

22  infringement.  And the cases that we have cited, including the

23  cases we cited with our briefing, all hold that it is not.  The

24  notion that offering to share alone is direct infringement is a

25  minority view among District Courts, it's never been adopted by

1    any Court of Appeals.  And like I said, the Eighth Circuit has

2    directly held it requires actual dissemination.  So we feel

3    that's the proper instruction.

4                THE COURT:  Mr. Bart.

5                MR. BART:  Thank you, Your Honor.  First off, Your

6    Honor said in his decision, *For the reasons previously stated,*

7    *the Court concludes the theory of direct liability properly*

8    *applies to Grande's customers either through making infringing*

9    *materials available or through actual dissemination of*

10   *infringing materials."*

11               So this is a motion for reconsideration in the guise

12   of jury instruction argument.  Beyond that, there absolutely is

13   Circuit Court support for this.  Your Honor had cited the

14   Warner Brothers v. Payne case from Western District of Texas

15   which in turn cited the Ninth Circuit Napster decision which

16   also holds specifically that making available is sufficient to

17   support this claim.  I don't really think it's worth much more

18   argument than that.  Your Honor decided this point and I think

19   it's resolved as a matter of law.

20               MR. HOWENSTINE:  Your Honor, I think Mr. Bart's

21   argument just acknowledged what I was saying which is that no

22   Court of Appeals has adopted the standard that they're

23   proposing.

24               THE COURT:  No, Mr. Bart just said that the District

25   Court cited the Napster decision which is the Ninth Circuit.

1   And I hope that's the Court of Appeals.  I've been sitting on

2   it for 33 years.  Unless there's been some big spoof.  I feel

3   like that actor in that movie where he's in -- he doesn't know

4   he's being watched.

5            MR. BROPHY:  The Truman Show.

6            THE COURT:  Go ahead.

7            MR. HOWENSTINE:  Your Honor, we just feel based on

8   these authorities that we've cited that it's the great weight

9   of authority is that infringement requires actual distribution.

10  And the cases that they are cited are a minority view.  And

11  given the fact that there were two cases, two similar cases

12  against an ISP, Sony and BMG, and in both of those cases the

13  Court gave the instruction that we are proposing, that there

14  has to be an actual --

15           THE COURT:  That exact instruction?

16           MR. HOWENSTINE:  Yes, I can show Your Honor the Sony

17  instruction.

18           THE COURT:  Well, if I was wrong, I was wrong.  I have

19  to look.  I don't think I was wrong, but --

20           This is an important one, it may take some time to

21  look at this issue.

22           MR. BART:  I may have to respond further.

23           THE COURT:  That's fine.  Mr. Bart, I've never cut you

24  off.  Well, I might have cut you off, once or twice.

25           MR. HOWENSTINE:  May I approach?

1              THE COURT:  Yes, of course.

2              MR. BART:  What are you showing him?

3              MR. HOWENSTINE:  I'm showing him the jury charge from

4    Sony versus Cox.

5              THE COURT:  I'll read it, counsel.

6              LAW CLERK:  Which instruction number?

7              THE COURT:  23.  Counsel, you don't have it in front

8    of you.  *"In order to prove contributory or vicarious copyright*

9    *infringement, plaintiff must establish by a preponderance of*

10   *the evidence that the users of Cox's Internet service used that*

11   *service to infringe plaintiff's copyrighted works.  Plaintiffs*

12   *are not required to prove the specific identities of the*

13   *infringing users.  A copyright owner's exclusive right to*

14   *distribute, reproduce and copy its copyrighted work is*

15   *infringed by the downloading or uploading of the copyrighted*

16   *work without authorization.  If you find that users of Cox*

17   *Internet service uploaded or downloaded all or part of*

18   *plaintiff's copyrighted works at issue without authorization,*

19   *then plaintiffs have established that users of Cox Internet*

20   *service have infringed plaintiff's copyrighted works."*  Okay.

21             MR. HOWENSTINE:  Right.  So this instruction

22   specifically says "downloading or uploading."  Because the

23   reproduction right is not at issue in this case, our

24   instruction just says "uploading."  But in either case, what's

25   clear from this instruction is that offering to upload is not

1    infringement.  There has to be an actual transmission of a file

2    from one person to another.  Just having it and making it

3    available to someone else is not infringement.  That's an

4    attempt to violate the copyright law and there's no attempt

5    liability under the statute.  So the District Court in Sony,

6    which was the same judge who presided over the BMG case who had

7    been through this issue many times --

8              THE COURT:  Who is this?

9              MR. HOWENSTINE:  Judge Grady.

10             MR. BART:  O'Grady.

11             MR. HOWENSTINE:  O'Grady.  Eastern District of

12   Virginia.

13             THE COURT:  I don't know him.

14             MR. HOWENSTINE:  In both cases --

15             THE COURT:  Which is unusual, I know all these judges.

16             MR. HOWENSTINE:  In both cases he held that there has

17   to be this actual distribution.  And that didn't kill the

18   plaintiff's case or anything because still, you know, it can be

19   the case that a notice of infringement is circumstantial

20   evidence that the file was actually transferred at some point,

21   but just the act of offering it, making it available, that's an

22   attempt.  So there's no infringement liability unless you can

23   prove -- unless the jury is convinced that at some point a file

24   was actually transmitted from one person to another.

25             THE COURT:  Mr. Bart.

1            MR. BART:  Thank you, Your Honor.

2            THE COURT:  You want to take a look at this?  I don't

3       know.

4            MR. BART:  I've seen that.

5            THE COURT:  I'm sure you have.

6            MR. BART:  Of course.  And Your Honor has surveyed

7       this subject and researched it in his decision carefully and

8       the -- there's another quote from your decision that says that

9       *"The reliance that they're placing on this theory --"* and this

10      is at page 764 *"-- appears to be contrary to the great weight*

11      *of case law including decisions of other courts in this*

12      *district."*  Then you cite Warner Brothers versus Payne.  Warner

13      Brothers vs. Payne sites the Ninth Circuit decision in Napster,

14      which specifically holds that making available is a sufficient

15      demonstration for purposes of direct infringement.  And that

16      decision was just recently followed this year by Judge Orrick

17      in the Northern District of California.

18            THE COURT:  Well, he had no choice.

19            MR. BART:  Understood, but by the same token --

20            THE COURT:  Bill Orrick is no fool.

21            MR. BART:  I have a case before him.  He is certainly

22      no fool, he's a very, very bright judge, Your Honor.  But

23      similarly, your decision has been followed by other cases.  So,

24      I mean, we can talk about Judge O'Grady which, frankly, is

25      against the weight of the majority of the decisions, but Judge

1  Ship in the District of New Jersey in a case pending against

2  Grande's sister company that we are litigating held that the

3  offer to share, the making available, was sufficient to state a

4  claim.  And Judge Orrick, as I said, did the same thing.

5          I will say that Your Honor also noted in quoting the

6  Warner Brothers decision, that the Supreme Court has equated

7  distribute with publication and that publication is defined

8  under 17 U.S.C. 101 as the offering to distribute.  So I think

9  that there is the overwhelming bulk of the case law, in

10 addition to Your Honor's prior decision which has been relied

11 on by other cases, as well as by us in trying this case as the

12 standards of the case.

13         THE COURT:  Somebody relied on my decision?

14         MR. BART:  Maybe just a little.  We submit that your

15 suggestion is appropriate.

16         THE COURT:  Let me tell you what, counsel, you don't

17 need to argue it further because what I'm going to do is take

18 this one under advisement.  All right?  I understand your

19 argument.  I really do.  You have made it quite clear, you were

20 quite -- is there something different you want to add?

21         MR. HOWENSTINE:  I just want to add one brief point

22 that the portion of Your Honor's summary judgment order that

23 Mr. Bart is referring to on the bottom of page 31 concerns a

24 different issue.  It does not concern this issue.  I just want

25 to make that clear.

1          THE COURT:  I will look at my own summary judgment

2     order.

3          MR. BART:  Your Honor, they had, before the Cox

4     decision, one District Court case from Arizona in 2008, that

5     Howell case, to support their position.  That was basically all

6     they had at that point.  And you said, *"To the extent that*

7     *Grande relies on Atlantic Recording for the proposition that*

8     *contributory infringement of the reproduction right is the only*

9     *viable theory against the party who makes infringing material*

10    *available to the public, that reliance is misplaced because*

11    *Atlantic Recording appears to be contrary to the great weight*

12    *of the case law including decisions of other courts in this*

13    *District."*  That's the full quotation.

14         THE COURT:  Look, I said I will take this under

15    advisement.  I will look at it this afternoon and you will have

16    my final word this weekend.  How about that?  So you can get

17    yourself ready for Tuesday morning.  No fooling, you will.  I'm

18    not going to sit on it.

19         MR. HOWENSTINE:  Just a couple more things on this

20    instruction.

21         THE COURT:  Aye!

22         MR. HOWENSTINE:  I will just list them in the interest

23    of making a record.  In the first element, we have the same

24    issue that we had in the previous instruction in terms of

25    whether we're saying "works" or "songs" or as the plaintiffs

1   suggested --

2          THE COURT:  We can change it to sound recordings.  I

3   don't care about that.  That's not the problem.

4          MR. HOWENSTINE:  And just so we're clear on the second

5   element, we believe it does need to specifically explain to the

6   jury that we're talking about uploads, so that they understand

7   in the factual context of this case what the conduct is that

8   could be the infringement versus just saying "distribution"

9   because just when you're thinking about someone using

10  BitTorrent using the Internet, it's not immediately clear what

11  that means.  So we think that should be clarified.

12         THE COURT:  I don't know whether you have to say

13  uploads, but I think most people think that if they're doing

14  something bad, they're downloading it to their computer, not

15  uploading it to BitTorrent, which then somebody can download to

16  their computer.  Right?  Am I right here?

17         MR. BART:  Yes, but I -- yes, I don't think that

18  addition is necessary at all.

19         THE COURT:  Okay.  Well, this instruction will be

20  given to you in its final form this weekend.  Okay?  Then the

21  next group to take a look at it will be the fine judges of the

22  Fifth Circuit.

23         MR. HOWENSTINE:  On the third element, Your Honor, the

24  parties agree that proof of knowledge requires proof of actual

25  knowledge or willful blindness.

1          THE COURT:  Yeah, that was where the Cox case went

2     awry because they were using negligence.  And I don't know how

3     they did that because the law was very clear even then.  I

4     think it was something that got skipped over and nobody thought

5     about it and -- little mistakes.

6          MR. HOWENSTINE:  And on the willful blindness

7     standard, the point that we believe needs to be clarified,

8     everyone also agrees that this willful blindness standard

9     incorporates this concept that someone believes that there's a

10    high probability of a fact existing and then they take steps to

11    avoid learning that fact.

12         THE COURT:  Right.

13         MR. HOWENSTINE:  And in our view, it's implicit in

14    that standard that if you did that thing, if you took those

15    steps, you could have unblinded yourself, you could have

16    figured it out, you could have verified the fact.  And so what

17    our proposed instruction does is make that clear, that we

18    had -- that it requires a subjective belief that there was a

19    high probability of something occurring.  Second, that if you

20    took steps, you could verify that fact.  And third, that you

21    deliberately avoided doing that.  We think that's a necessary

22    clarification, so that's what we proposed.  I'll just list my

23    issues and you can respond.

24         MR. BART:  Sure.

25         MR. HOWENSTINE:  And then finally on the fourth

1   element, I won't belabor this one because we've raised these

2   issues before, but we don't believe that material contribution

3   is a viable theory separate and apart from inducement as set

4   forth in Grokster.  If it were, if it were possible that there

5   is this separate standard of material contribution, necessarily

6   it is lower than what is set out in Grokster.  And in our view,

7   the operation of that, the effect of that would be to

8   effectively overrule Grokster and impose some lower standard

9   for contributory liability.

10          THE COURT:  Oh, I don't think it's a lower standard.

11          MR. HOWENSTINE:  Well, what Grokster says is there

12   need to be active steps to promote infringement, there needs to

13   be conduct that chose an intent to cause infringement.  And

14   material contribution on its face doesn't have any intent

15   component to it.  And that's what's missing from this

16   instruction.

17          THE COURT:  Well, but you have to read the instruction

18   as a whole, not just -- you can't just isolate.  Even the Court

19   of Appeals will tell you when you look at a set of

20   instructions, jury instructions, you don't just isolate one

21   out.  You have to look at the instructions as a whole.  And I

22   think that it's pretty clear that there has to be an intent.

23          MR. HOWENSTINE:  Right, we agree that there does have

24   to be intent in this instruction and so on this fourth element,

25   that's what we believe needs to be added and that is a

1    component of our proposed instruction --

2            THE COURT:  Let me see here.

3            MR. HOWENSTINE:  -- in a number of different ways.

4            THE COURT:  Just a second here.

5            *(Pause.)*

6            All right.  Mr. Bart.

7            MR. BART:  Thank you, Your Honor.  First, with regard

8    to the willful blindness, with all due respect, this is just an

9    argument being, you know, made out of whole cloth.  There is no

10   legal support for this notion that verification is a

11   requirement of willful blindness, not a single case.  They do

12   cite the Supreme Court in Global Tech from 2011 in the support

13   that they provide to you as support for this third requirement.

14   But if you go to that decision, it says, *"Willful blindness has*

15   *two basic requirements.  One, that the defendant must*

16   *subjectively believe that there's a high probability that a*

17   *fact exists.  And two, the defendant must take deliberate*

18   *actions to avoid learning that fact."*

19           So if that's the citation they have, there's no

20   support for that.  Frankly, it's a little ironic or comical,

21   however you want to look at it that a party that is willfully

22   blind needs a mechanism for verifying something, but regardless

23   of that, there's literally no support for that notion in Your

24   Honor's instruction on willful blindness.

25           THE COURT:  Well, in the third element I say *"whether*

*Grande knew of specific instances of infringement or was*
*willfully blind to such instances of infringement."* That's
what they have to find.  That term "willful blindness" means --
it's right out of the Supreme Court case.  Willful blindness
means that someone believes there is a high probability of a
fact, but deliberately, which means intentionally, takes steps
to avoid learning it.

        MR. BART:  Absolutely, Your Honor.

        THE COURT:  I mean, that's error.

        MR. BART:  Yes.  So let me go on to the Grokster
point.  Maybe forgive me for my weaknesses, but it's a point
that I actually enjoy talking about for a minute.

        THE COURT:  I'm the last person to say anything about
over-speaking.  My wife tells me I talk too much and she's
right.

        MR. BART:  I could probably give you a run for your
money if you ask my colleagues, but we'll put that to the side
for a moment.

        Grokster has to be understood in the context in which
it arose.  Grokster came up after the Betamax case, okay.  And
so in Betamax, the Supreme Court said that when you are
distributing a product and that product has non-infringing
uses, you're not liable.  Okay.

        THE COURT:  Right.

        MR. BART:  And so Napster, the defendant in Napster --

1   in Grokster trotted out that same argument and said we are

2   distributing software, there are other uses for our software

3   other than infringing.  We can rely on Betamax and we win the

4   case.

5           And rather that contracting the law of secondary

6   infringement, Grokster actually expanded it.  It recognized the

7   existing common law contributory infringement recognized in the

8   Gershwin case, which is cited in Grokster, and has centuries of

9   common law contributory infringement including material

10  contribution.  But went on to say that even with the

11  distribution of a product, there can be liability if the

12  defendant affirmatively goes out and induces people to use it

13  for infringing purposes.  So it created yet another branch of

14  contributory infringement that didn't exist before, that Grande

15  is trying to use Grokster as a limitation to write out hundreds

16  of years of common law defense through Grokster, but that's not

17  at all what the decision said and certainly not what the

18  follow-up has said as well.

19          So, I mean, there's been plenty of reliance on

20  Gershwin, the Fifth Circuit in Alcatel*(ph)* relied on Gershwin,

21  the Court in Grokster relied on it.  And since that time, there

22  have been a whole series of cases that reject the argument

23  about substantial non-infringing uses when there's an ongoing

24  continuous relationship between the defendant and its

25  subscribers.  So with a product, you sell it and it's gone,

1    right, that was like Betamax.  You sell the product, you don't

2    have an ongoing relationship.  But in cases from, again MP3

3    Tunes -- and forgive me, that was my case, that's why I keep

4    citing it -- when there's an ongoing relationship and there's

5    material contribution, there's liability.  So I think that the

6    bottom line --

7                THE COURT:  Material contribution has as an implicit

8    component, intent.

9                MR. BART:  Nobody is arguing that.

10               THE COURT:  Oh, I know that.  They are.

11               MR. BART:  They're arguing yet something else.

12   They're saying that because the Court found yet another type of

13   claim, the inducement claim with regard to the sale of a

14   product, that somehow narrows everything else.  And all we're

15   saying is Your Honor is right when you say that induced, caused

16   or materially contributed.  All of those are viable ways of

17   proving secondary infringement.

18               MR. HOWENSTINE:  Your Honor, a quick point on that.  I

19   believe Your Honor just recognized that even in your view,

20   material contribution requires intent.  And as things currently

21   stand --

22               THE COURT:  I said it's implicit.

23               MR. HOWENSTINE:  Right, but the jury doesn't know

24   that.

25               THE COURT:  Yeah, they do.

1          MR. HOWENSTINE:  Well, my view would be that it's not

2   in the instruction.

3          THE COURT:  The term "willful blindness" means that

4   someone believes there is a high probability of a fact, but

5   deliberately, which is intent, takes steps to avoid it.  That

6   is intent.

7          MR. HOWENSTINE:  Your Honor, I would submit that the

8   intent that we're talking about --

9          THE COURT:  I would be happy to add "but deliberately

10  and intentionally takes steps to avoid it."

11         MR. HOWENSTINE:  And our view of this is that the

12  intent relates to the fourth element and not the third.

13  Because under the third, in theory, Grande could have actual

14  knowledge instead of being willfully blind.  And if we go the

15  actual knowledge route, then even under your formulation, we're

16  avoiding this intent issue.  And that's why intent needs to be

17  part of this fourth element.  And even in your summary judgment

18  order, on page 39, it says *"whether labeled material*

19  *contribution or inducement or anything else, Grokster*

20  *recognized that where evidence goes beyond a product's*

21  *characteristics --"*

22         THE COURT:  So you would want me to change the last

23  sentence?  *"This standard is met when the defendant can take*

24  *simple measures to prevent further damages to copyrighted*

25  *works, yet intentionally continues to provide access to*

1    *infringing works."*

2         MR. HOWENSTINE:  Well, we would propose that we use

3    the language from Your Honor's summary judgment order, which is

4    how we formulated this in our proposed instruction, which is

5    *"statements or actions directed to promoting infringement."*

6    That's how you show intent.

7         THE COURT:  That was in conjunction with the way the

8    summary judgment motions were.  I was responding --

9         MR. BART:  And that's a facilitation inducement claim.

10   They're trying to backdoor in the inducement through this

11   concept of intent.  Intent is implicit throughout your entire

12   instruction, Your Honor.  I don't believe that it needs any

13   further elucidation.  And, frankly, if they had actual

14   knowledge, it's going to be willful and there's going to be

15   intent on top of that.  Intent is written throughout this and

16   Your Honor's simple statement of what's required for secondary

17   infringement is accurate as it stands.

18        MR. HOWENSTINE:  Your Honor, we believe intent needs

19   to be somewhere in the fourth element instruction.  If as you

20   say intentionally -- I think you had suggested adding "yet

21   intentionally continues to provide access to infringing works."

22   To be clear, to make our record we need to preserve our

23   objection to this instruction in general, but that is one

24   possible way of including this intent component.  But as things

25   stand, if it just says material contribution as an option in

1   the fourth element --

2          THE COURT:  I'll be honest with you, in this case I

3   could almost rule as a matter of law that in this case that

4   your client intentionally continued to provide Internet access,

5   they did.  I mean, number one, they knew about the

6   infringements or they -- wait a minute, they knew about the

7   alleged infringements.  Okay?  But there's no question that

8   they intentionally continued to provide Internet service.

9          The real question here in this case -- let's cut to

10  the chase.  Okay?  Let's cut through all the fat and get right

11  to the meat.  The question in this case is whether -- and this

12  is where the jury is going to decide whether you win or you

13  win, whether Rightscorp, whether your client had a legitimate

14  reason to question the reliability of Rightscorp and whether

15  Rightscorp's thousands or millions or whatever it is of notices

16  were legitimately ignored by your client because they were

17  unreliable.  That's where this case is going to get decided,

18  from my perspective.  And I'm not on the jury.  Because there's

19  no question there was infringement.  There's no question they

20  owned the songs.  There's no question your client got thousands

21  and thousands of these notices.  There's no question your

22  client didn't act on them until after the period of time.

23          So what is left?  What is left is did your client

24  intentionally or with reckless disregard know that these were

25  legitimate concerns and ignored them for essentially monetary

1   purposes is what they're going to argue, or did your client
2   legitimately ignore them because they were unreliable and your
3   client didn't want to violate the privacy of its customers,
4   which is what you're going to argue.  That's where we are in
5   this case after ten weeks.
6           MR. HOWENSTINE:  And Your Honor, I would just say on
7   this fourth element --
8           THE COURT:  Am I wrong here?  Am I missing the boat?
9           MR. HOWENSTINE:  I think this goes to exactly to what
10  you're saying.  As it's currently formulated, this instruction
11  says, this standard is met, etc., etc., yet continues to
12  provide access to infringing works.
13          THE COURT:  Counsel, I have no problem putting "yet
14  intentionally continues to provide access to --" not instead of
15  infringing works.  What did we change the word "works" to?
16          MR. BART:  Sound recordings.
17          THE COURT:  Sound recordings.  This isn't prejudicial
18  to the plaintiff.  The plaintiff can argue right around that.
19  And you can use that because it is a correct statement of law.
20          MR. HOWENSTINE:  Just --
21          THE COURT:  Now, this one I am going to rule on right
22  now.  That is number four.  Okay.  And you have said your
23  objection.  I have added the word "intentionally".  Number
24  three -- or number two, rather, I'm taking under advisement,
25  I'm looking at, okay.  Let's get on to the next instruction.

1          MR. HOWENSTINE:  If I could just add one more sentence

2   to preserve the record.  We do object to this "simple measures"

3   notion being in this instruction, but we understand that Your

4   Honor has ruled on that.  I just want to make clear that we

5   have that objection.

6          THE COURT:  I didn't like "simple" either.  I just

7   take "measures" is fine.

8          MR. BART:  I think "simple measures" was from your

9   summary judgment decision, Your Honor, and I think it's

10  appropriate.  It is simple measures and you identified what

11  they were in your decision.  I don't think you should be

12  watering down your summary judgment decision in a

13  reconsideration motion on jury instructions.  I wasn't going to

14  object to the inclusion of "intentional", but I think that

15  watering it down further is improper.  This is what Your Honor

16  found.

17         THE COURT:  The standard is met when the defendant can

18  take -- I just don't like the word "simple".  I know I used it

19  in my summary judgment.  I'm willing to substitute another word

20  for "simple".

21         MR. BART:  "Basic."

22         THE COURT:  Yeah.  "Basic" works.  "Basic" works.

23  Yeah.  I think that is an unambiguous term.

24         MR. HOWENSTINE:  Your Honor, I will just note that in

25  both parties' proposed instructions, neither side wanted to

1    have anything about this "simple measures" or "basic" measures

2    standard.  We object --

3          THE COURT:  You know, that's probably what happened in

4    Cox.  Neither side said anything about the standard, and guess

5    what happened?

6          Listen, one time I got reversed by the Ninth Circuit

7    in a case in which I used a brand new Ninth Circuit pattern

8    jury instruction exactly, but they softened it by saying *"The*

9    *learned District Judge adopted the Ninth Circuit, but on*

10   *careful re-examination, we find the instruction to be flawed."*

11   I like the "learned" part.

12         All right.  Let's go on to instruction number 17,

13   damages.  Mr. Bart, number 17.

14         MR. BART:  No objection, Your Honor, it's a joint

15   instruction.

16         THE COURT:  Yeah, I believe it is.  Counsel?

17         MR. HOWENSTINE:  Sorry, I got confused in my papers a

18   moment.

19         THE COURT:  That's damages, *"Consider damages only if*

20   *necessary."*

21         MR. HOWENSTINE:  No objection.

22         THE COURT:  Okay.  Damages, statute of limitations,

23   *"Plaintiffs may only recover damages for work --"* let's change

24   that to sound recording.  *"--that you find was infringed on*

25   *after April 21, 2014."*

1          MR. BART:  We had an objection, we won't assert the

2     objection.  We don't have an objection.

3          THE COURT:  Yeah, okay.

4          MR. HOWENSTINE:  No objection.

5          THE COURT:  Instruction number 19, statutory damages.

6     Mr. Bart.

7          MR. BART:  No objection, Your Honor.

8          THE COURT:  You note I changed that, as you had

9     requested.  If you read paragraph two, it says -- originally

10    the instruction read $750.  I said, *You must issue an award*

11    *between $200 and 30,000."*

12         MR. BART:  Well, actually, Your Honor, I did notice

13    it, but we should, for the record, object to the innocent

14    infringer instruction.  We think that in a secondary

15    infringement case where they have to either have actual notice

16    or be willfully blind, they can't be innocent infringers as a

17    matter of law.  We probably will be making one of the many

18    futile JMOL motions on this point next Tuesday, but we'll just

19    note our objection to that portion.

20         THE COURT:  I think they're entitled to this innocent

21    infringer instruction.

22         MR. BART:  At this stage before anything has been

23    ruled on, but we're just noting our objection for the record.

24         THE COURT:  All right.

25         MR. HOWENSTINE:  We do object to this instruction.

1          THE COURT:  Don't look a gift horse in the mouth,

2    believe me.

3          MR. THOMAS:  Good morning, Your Honor, Mark Thomas.

4    As my colleague notes, we do have a few discrete objections and

5    very weighty ones.  Your Honor, what we're doing here by

6    failing to instruct the jury on the statutory framework is

7    violating the statutory framework.  Nobody contests that

8    statutory damages have to be determined on a work-by-work

9    basis, we'll set aside for just a moment, I haven't seen any

10   contention from plaintiffs in that regard.  And we provided

11   case law in our briefing yesterday, Your Honor, on that point.

12   Nor does anybody contest that it's plaintiff's burden to

13   demonstrate eligibility for statutory damages under section

14   412.

15         THE COURT:  Well, they've selected statutory damages

16   versus actual damages, so I don't think they're going to make

17   that argument.  That's not their argument.

18         MR. THOMAS:  Correct, and so --

19         THE COURT:  I'm still having a hard time seeing where

20   you're at.

21         MR. THOMAS:  So it's really not anything in the

22   substance of this instruction as Your Honor has rendered it

23   here, rather it's what's missing from it.  And what was in our

24   instruction was the statutory requirement that they cannot

25   recover statutory damages for any work for which infringement

1    began before the work was registered.  For the most part, the

2    second category is for infringement that occurred between when

3    the work was published and the work was registered, if that gap

4    was three months or less.

5          THE COURT:  But there isn't any evidence in this case

6    put on by the plaintiffs that would suggest they're seeking to

7    do so.  They're seeking to recover damages only for copyrighted

8    works within the framework that has been laid out in terms of

9    years, except for the ensuing period, the later period of time

10   for the enhanced damages.

11         MR. THOMAS:  So what plaintiffs haven't done here,

12   Your Honor, is they haven't ever tied together for any of these

13   works these three key dates, publication, registration and

14   alleged infringement.  There are some documents that we've seen

15   that have some of these dates.  They never, for example, and

16   quite to our surprise, never had an expert go through, despite

17   all these summaries they had and say here are these three dates

18   and prove up for this jury that they meet the statutory

19   prerequisite.  And as Your Honor has seen, the Ninth Circuit

20   says this is an unyielding congressional standard, you have to

21   do this or you don't get these damages.

22         I'll note for the record, Your Honor, that this goes

23   beyond the damages issue.  In the event that plaintiffs

24   prevail, they're going to be seeking attorneys fees.  The same

25   prerequisite applies to the attorneys fees.  So this is a big

 1    sort of unresolved issue that is completely absent from the

 2    instructions as they are right now.  And it's not just a

 3    theoretical issue either.  For example --

 4            THE COURT:  Was the instruction that you've requested

 5    given in any case that you can cite to me?

 6            MR. THOMAS:  Well, Your Honor, I apologize, I'm not

 7    able to answer that question with certainty.

 8            THE COURT:  Well, I think if you're not, that means

 9    the answer is no.  Because I'm sure you would have cited it to

10    me.

11            MR. THOMAS:  We can verify that.  At the risk of

12    sounding a little bit sharp, Your Honor, the statute has the

13    requirement that that prerequisite, there's no question it's

14    their burden and therefore --

15            THE COURT:  But you're asking me to put it in a jury

16    instruction and I'm asking you whether anybody has ever put one

17    in a jury instruction, basically stuck the statute in a jury

18    instruction.

19            MR. THOMAS:  I will have to check, Your Honor.

20            THE COURT:  Well --

21            MR. THOMAS:  The issue --

22            THE COURT:  That's why I gave you time.

23            MR. THOMAS:  Your Honor, without respect to -- we

24    cited the statute, we cited the Fifth Circuit, we've cited the

25    Ninth Circuit.

1          THE COURT:  That's fine.  You have a Fifth Circuit or

2   Ninth Circuit case that where somebody put that in a jury

3   instruction?

4          MR. THOMAS:  I don't know that that issue was in

5   dispute in those cases, Your Honor.

6          THE COURT:  Everybody is able to get the jury

7   instructions from Cox, you can get the jury instructions,

8   they're public record.

9          MR. THOMAS:  Your Honor, one of the reasons that we

10  wouldn't expect to encounter this in jury instructions and

11  indeed wouldn't go looking for it is because we're not

12  typically dealing with this volume of works at issue.  That is

13  to say plaintiffs will typically have, say, a few photographs

14  or that sort of thing.

15         THE COURT:  These music cases, like Cox case, there

16  was a lot of works at issue.

17         MR. THOMAS:  It may be that the plaintiffs in those

18  cases in BMG or the Sony v. Cox case mooted that issue by

19  actually proving this up.  That it doesn't erase --

20         THE COURT:  Doesn't matter if they attempted to prove

21  it up, it would still be in an instruction.

22         MR. THOMAS:  Not if there were no -- if it was a

23  foregone conclusion that it didn't need to go in the

24  instructions.  For example --

25         THE COURT:  We have a lot of things here that are

1    foregone conclusions.

2         MR. THOMAS:  Well, that's exactly what they're asking

3    for here, Your Honor, is to say eligibility and if you look at

4    the briefing they filed last night, there's no authority there,

5    it just says we've proved this up, eligibility, we don't even

6    need an instruction on eligibility, that being 412, because

7    we've proved it up.  And our point here is no, they haven't

8    and, therefore, there's no erasure of the statutory

9    requirement.  And we would run far afoul of that statutory

10   requirement if we allowed plaintiffs to receive statutory

11   damages for works for which they have not demonstrated to the

12   jury that they meet that requirement with respect to timing.

13   And again, this isn't a theoretical issue.

14         I can cite Your Honor a couple of examples of the

15   exact songs they've been promoting and touting to the jury

16   throughout the case that are not eligible for statutory

17   damages.  And I don't know why they didn't tie this up, but

18   I'll be happy to show Your Honor a couple of the examples we're

19   talking about.  We've been hearing all about Bruno Mars.  The

20   only evidence that they're relying on, they being plaintiffs,

21   for these relevant dates are the registrations themselves.  And

22   if I might -- am I able to use the ELMO?  I guess I can just

23   approach here, Your Honor.

24         THE COURT:  Turn it on, it works.

25         COURTROOM DEPUTY CLERK:  You can turn it on.

1          MR. BART:  Your Honor, this isn't a jury instruction

2   argument.  This is a JMOL argument and we can make one on the

3   same point.

4          MR. THOMAS:  I agree in principle with that, Your

5   Honor, but what I'm trying to do here is put some substance to

6   it so that we recognize, A, the importance of it and, B, the

7   relevance of it.  So here we have Bruno Mars *Unorthodox*

8   *Jukebox,* date of first publication December 11, 2012, effective

9   date of registration February 9, 2013.  They're accusing us of

10  contributory infringement that began after the date of

11  publication, before the date of registration.  Therefore, for

12  example, for this registration, we've been hearing all about

13  Bruno Mars, for any of the songs on this album, they have not

14  proved that they are eligible and there are other examples as

15  well.

16         THE COURT:  Why haven't they proved they're eligible?

17         MR. THOMAS:  Because their alleged first date of

18  infringement -- and I recognize I didn't provide that one here.

19  Actually I'm not able to locate it, I believe their alleged --

20  I don't have the exhibit, and frankly, I'm assuming that

21  they're going to go with something one of their experts put in

22  for first date of infringement, but for this Bruno Mars they

23  have three songs, *Gorilla, Treasure, Young Girls,* all covered

24  by this registration.  They say our first date of infringement

25  was February 14, 2013, i.e., after the date of publication,

1    before the date of registration.

2         Your Honor, there are other snarls in these documents.

3    What they are trying to do is just put them in and say yup, we

4    qualify under 412.  They don't for some unknown number of

5    works.  They are relying on publication dates based solely --

6    the only publication date they've offered is what's on these

7    registrations and there are publication dates, for example,

8    Katy Perry *Dark Horse,* we heard that yesterday in court.  They

9    accuse -- they say the first infringement occurred before the

10   first date of publication that they're relying on.  And so

11   there's just no -- who knows how much of an issue there is?  We

12   don't because they never endeavored to actually tie these up.

13   That's why we need the instruction.

14        THE COURT:  All right.  Mr. Bart.

15        MR. BART:  This is a pretty remarkable situation, Your

16   Honor, because for probably six months before trial, we tried

17   to reach a stipulation with the defendants on this issue to

18   take it out of the case.  We provided them with a spreadsheet

19   that gave them all of this data.  We asked them whether they

20   disputed any of the data.  We put the data into evidence, the

21   registrations.  He said there's no expert.  Well, Dr. Bardwell

22   did, in fact, analyze the infringement notice data and provided

23   it into Exhibit 459.  There is no dispute about our

24   eligibility.  They haven't raised any, they didn't question him

25   on it.  Apparently they were just waiting for the end of the

 1  case and to raise out of context situations like this on an

 2  issue that we really tried to resolve before trial repeatedly

 3  and there was never an explanation of why they wouldn't accept

 4  our data, but that was obviously to be sandbagged now.

 5          But the bottom line for today, we'll be prepared to

 6  address this on Tuesday in depth with you on JMOL argument

 7  because we're going to be making the same argument.  We're

 8  going to be making the argument that we're entitled as a matter

 9  of law.  This whole 412 issue hasn't been presented to you

10  properly for your resolution.  For purposes of today's

11  discussion, this is not a jury issue that they need to be

12  instructed on.  There is no disputed issues of fact.  The dates

13  are all here before you and there's just nothing that's been

14  proposed that requires a jury instruction nor is there any

15  authority for this.

16          MR. THOMAS:  We will certainly be prepared to take

17  this up on JMOL, Your Honor.  As Your Honor I'm sure is aware,

18  the purpose of JMOL is to put the other side on notice of a

19  deficiency in their evidence.  But that's for JMOL.  As I say,

20  I presented this to substantiate that this is an issue.  I must

21  address the sandbagging notion.  It's plaintiff's burden,

22  nobody disputes that.  They have known at least by virtue of

23  the fact that we refused to stipulate to the eligibility issue

24  that we contest it.  We sat and waited for them to tie this up.

25          THE COURT:  I don't think there's any question that

1    they put the evidence in that would be sufficient to meet the

2    statutory requirements.  The question is whether we need an

3    instruction that will require the jury to parse out the dates.

4         MR. THOMAS:  So it's a fact issue as to whether they

5    meet the prerequisite of the statute.

6         THE COURT:  No, I'm talking about you earlier made the

7    comment that made it sound like they hadn't put any evidence in

8    on the statutory requirements, and they have.

9         MR. THOMAS:  Oh, yes, and to the extent that that was

10   what I communicated, let me revise that and say they never tied

11   it up.  Now, they've never -- of course we don't say that they

12   haven't proved -- we're not going to concede that they've

13   proved it, but the issue is you can't look at these and the

14   Fifth Circuit and the statute --

15        THE COURT:  The only question left is whether we need

16   an instruction that requires the jury to go back and parse out

17   particular dates.

18        MR. THOMAS:  That's correct, Your Honor.  We need to

19   say you have to, A --

20        THE COURT:  I think that's going to take a long time

21   for 1,000-and-some odd recordings.

22        MR. THOMAS:  Some of the dates don't add up, Your

23   Honor, and if we just send --

24        THE COURT:  That will be for the jury to decide

25   whether they add up.

1          MR. THOMAS:  I agree, Your Honor, and that's all we're

2   looking for today and we can have the argument with JMOL and

3   closing and what have you --

4          THE COURT:  Well, we have to have a jury instruction

5   decided here.  We can't just throw our hands up and go, well,

6   there's JMOL, we can just forget about --

7          MR. THOMAS:  That's my point is today let's focus on

8   the fact that we --

9          THE COURT:  Your jury instruction, as you have drafted

10  it, is confusing and I will not give it.  So if you have a

11  better jury instruction that is clear and concise, you can put

12  it together, you have the weekend to do it, get it to us by

13  Monday morning and to Mr. Bart's side by Monday morning.

14  Mr. Bart, you can look at it too and you might want to propose

15  an alternate.

16         MR. BART:  Well, we'll follow Your Honor's direction.

17  We think, frankly, there is no factual issue for the jury to

18  decide.  This is a legal issue.

19         THE COURT:  The only question I have here is I don't

20  want to lose this case on appeal -- I'm not losing it, I

21  mean --

22         MR. BART:  I hear you.

23         THE COURT:  I don't want it to have to be retried on

24  appeal.  We saw what happened in Cox.  I don't want to have to

25  have everybody -- this is an expensive case to try.  It took a

1    lot of time from the jury, it took a lot of court time.  It

2    took an enormous amount of time from the lawyers' lives and,

3    quite frankly, your client's expense to try this case.  We

4    don't want to have to retry it for something we could have

5    avoided if I put an instruction in which is not prejudicial but

6    covers the law.  Maybe it's overkill, but I'd rather have a

7    little overkill if it isn't prejudicial than under-kill which

8    then kills the case.  It isn't in the plaintiff's best interest

9    to have that happen either.

10           MR. BART:  No, of course not, Your Honor, and I'm

11   trying to react to things on the fly.

12           THE COURT:  I understand.  So what I would suggest to

13   you is I'm inclined to give some sort of instruction which does

14   cover these statutory requirements, but in a way that doesn't

15   make it so -- make it impossible for the jury to do.

16           MR. BART:  Right.

17           THE COURT:  So why don't you work on that.  Okay?  And

18   we'll look at it again, on Tuesday morning.

19           MR. THOMAS:  Thank you, Your Honor.  And I think it

20   goes without saying that this probably would be an appeal issue

21   if --

22           THE COURT:  Of course -- there are so many things in

23   here that everything is an appealable issue in this case.  I

24   don't know how I'm going to get through this case on appeal.  I

25   tried my best.  That's all I can do.  You know, that's the name

1    of the game.  Judge Costa once said, You know, when I was a

2    trial judge I made a lot of hard decisions and that's the best

3    a District Judge can do.

4          I mean, you just have to make the decisions.  The

5    appeals court is going to look at this as a whole.  They're not

6    going to pick some little puny thing out and reverse it on that

7    basis.  If there's obviously something like in Cox where you

8    misstate the burden of proof, that has to be a reversal, but I

9    don't see that we've misstated the burden of proof here.  All

10   right.  Let's go to the next instruction.

11         MR. THOMAS:  Two other points real quick, Your Honor,

12   on number 19.  One is that the list of factors to be considered

13   in statutory damages omits the value of the copyright which is

14   commonly frequently used in this district, in other courts

15   within the Fifth Circuit.

16         THE COURT:  Did we leave that out?  Should have been

17   in there.

18         MR. THOMAS:  I think you did, Your Honor.  And forgive

19   me if --

20         THE COURT:  *"The profits Grande earned because of the*

21   *infringement, the expenses Grande saved, the revenues that*

22   *plaintiffs lost, the difficulty of proving plaintiff's actual*

23   *damages, the circumstance whether willfully, intentionally or*

24   *recklessly and contributory infringing, the need to deter*

25   *Grande from infringing again further, the need to deter others*

1   *from infringing in the future and in the case of willfulness,*

2   *the need to punish Grande."*

3              It says, *"Plaintiffs are not required to prove any*

4   *actual damage suffered by plaintiffs."* And that's the law for

5   the award of statutory damages.

6              MR. THOMAS:  Right, so what we're looking is to add

7   the value of the copyright to that list of factors to be

8   considered by the jury and in arriving at the statutory damages

9   figure.  And as I say, it's one of the standard factors that's

10  included that's considered by numerous courts in this Circuit

11  and others.  And I, frankly, don't see and there's neither

12  certainly no authority going against it and I don't know of any

13  rationale for leaving out that factor.

14             THE COURT:  We've had lots of testimony about how

15  valuable these things are to Sony.

16             MR. THOMAS:  That's exactly right.  And then of

17  course, not every one of these has the same value.  We've also

18  heard testimony that they lose money on a lot of their songs

19  and a lot of their work and they kind of sought some sympathy

20  for that fact, *We don't even recoup what we advance these*

21  *artists.*

22             And so given the wealth of testimony already in the

23  record about the variance among the value of these --

24             THE COURT:  I don't think the law requires them to

25  bring in a spreadsheet with how much money they earned or lost

1    for each recording.

2          MR. THOMAS:  Certainly not, Your Honor.  However, we

3    do think that it makes sense and it's backed up with authority

4    that the value of the copyright should be considered in

5    assessing the statutory damages.

6          THE COURT:  Mr. Bart.

7          MR. BART:  Do you have one other point?  I'm happy to

8    respond to this.  It is really very little authority on this

9    point.  It's a factor that is included in some courts and not

10   in others.  The only concern that we have with the value of the

11   copyright, Your Honor, is the fact that it suggests an economic

12   value as opposed to what you were just saying that these are of

13   great value to us.  And in fact, most of the cases that cite

14   the factor, the actual testimony at the trial was it was of

15   great value to the plaintiff.  The reason that we didn't put it

16   in is because we thought that in order for it to go before the

17   jury and not be confusing, you would have to say the value of

18   the copyright, but the value is not limited to economic value.

19   You know, or to precise economic value.  Because I think what

20   we're trying to avoid is the inference that we have a burden or

21   that they can consider like a profit/loss or the absence of an

22   economic value.  They kept on asking our witnesses, you know,

23   did you produce these numbers or not.

24          So if there's some way of qualifying it and just

25   saying the value, but not necessarily a precise economic value

1   or something like that, we thought it was too confusing to get

2   into which is why we omitted it.  And I think, frankly, is why

3   it's omitted from a number of the cases where these factors --

4           THE COURT:  See, one of the problems is it's very

5   difficult at an early stage to quantify the value.

6           MR. BART:  Yeah.

7           THE COURT:  And a good example of that is songs which

8   when they first are recorded by a particular artist, for

9   instance, my recollection is some obscure artist recorded the

10  song *16 Tons*.  And then Tennessee Ernie Ford sometime later

11  recorded it and it became a classic and huge moneymaker.  There

12  was a Burl Ives song, I can't remember, that was recorded by

13  somebody and then Burl Ives did it and it became a huge hit.

14          MR. BART:  We actually had testimony to that effect

15  that the value is a constantly fluctuating value.

16          THE COURT:  It is.

17          MR. BART:  All of a sudden the song is put into a

18  motion picture, gets iconic value and quadruples or more in

19  value.

20          THE COURT:  The great example of that is *Sleepless in

21  Seattle*.  The artist, who I happen to know, Israel Ka'ano'i,

22  he's passed away.  Israel Kamakawiwo'Ole, big, big guy, and he

23  sang an iconic song that was *Over The Rainbow*.  And I can

24  assure you that before that hit, that movie, as part of the

25  soundtrack, it was not a huge seller.  After that, it was

1    massive.

2         MR. BART:  The same thing can happen if an artist

3    passes away and there's a retrospective on the artist and all

4    of those songs become very, very valuable again.  So I think

5    there's just so much ambiguity with the term "value" that it's

6    just hard to put that in as a factor that it won't confuse the

7    jury about what it is that you're looking for.

8         So, I mean, again if they want to propose something

9    that could address it other than just throwing the word "value"

10   out there, we would consider it, but --

11        THE COURT:  Yeah, I'm afraid that this will lead the

12   jury to overlook the intrinsic value of these songs which is

13   what was testified to and say, Well, you know, they didn't put

14   a dollar figure on it -- which they're not required to do --

15   which therefore means that they're not entitled to anything.

16        So if you want to propose something else, I will let

17   you think about it over the weekend.

18        MR. THOMAS:  Thank you, Your Honor.  And just to

19   quickly frame it, what we're looking for here is not to have

20   the jury -- all they've heard is the hits, right, they haven't

21   heard the rest and we want --

22        THE COURT:  I've heard a few songs here that didn't

23   sound to me like hits.  I wouldn't have bought the songs.

24        MR. THOMAS:  The hits in some circles.

25        THE COURT:  I got a headache out of one.  I had to go

1   back and take an Aspirin.

2          MR. THOMAS:  The last issue here, Your Honor, with

3   respect to instruction 19 is this works issue that we sort of

4   touched on earlier.

5          THE COURT:  We'll put in there --

6          MR. THOMAS:  This I think may require just a bit more,

7   Your Honor, because again the statutory -- there's very clear

8   authority that we cited as the statute itself and the Calum*(ph)*

9   Fifth Circuit case from, for example, from 2012 that

10  established that statutory damages are on a work-by-work basis.

11  And the statute defines a compilation in such a way that it is

12  a work.  504(c) says, *"For purposes of the statutory damages, a*

13  *compilation is one work."*

14          Many, most perhaps of the registrations at issue are

15  compilation registrations.  And Your Honor, we cited the Second

16  Circuit authority, Bryant, we cited the Fifth Circuit citing

17  Bryant with approval for this idea that an album, for purposes

18  of statutory damages, is a work.  And of course, that is in

19  turn rooted in the language of the statute itself.

20          17 U.S.C. 101 has a list of definitions.  Compilation,

21  collective work they cover.  Doesn't say music albums, but

22  that's where they fall.  These works are registered as

23  compilations.  I could pull it up, Bruno Mars back up, for

24  example, they're registered as compilations.  The plaintiffs,

25  to meet their 412 burden are depending solely on the

1  compilation publication date, on the compilation registration

2  date in many instances.  And so in every respect, statutorily,

3  according to Fifth Circuit precedent, Second Circuit precedent

4  and plaintiff's own evidence, work equals compilation.  And so

5  it's important, again, because this has to be determined on a

6  work-by-work basis, it's important that the jury understands

7  that for purposes of statutory damages where there's a

8  compilation that is considered one work.

9          THE COURT:  Well, we have evidence in the record of

10  which are compilations and which aren't.

11          MR. BART:  We do, but that's not the standard, Your

12  Honor.  It's not the standard in the Fifth Circuit, it's not

13  the standard in the Second Circuit, it's not the standard in

14  the First Circuit, it's not the standard in the Seventh, Ninth,

15  11th and D.C. Circuits either.  So that's just not true.  He

16  cited the Bryant case, but four, five years thereafter in the

17  MP3 Tunes case that I keep on mentioning, the Second Circuit

18  adopted a test that if the individual songs in a case that's

19  very much on point with this case, if they're exploited

20  individually, as we have proven and there's no counterproof to

21  that, you're entitled to separate awards.

22          The two cases that he cites, the Fifth Circuit case in

23  Calum related to a book of photographs that were not only

24  released as a collection, but marketed as a collection.  They

25  weren't available individually and so it's not even the issue

1    that we're talking about.

2         The Zanthax *(ph)* case that they also cited is complete

3    red herring because it doesn't even deal with the number of

4    works, it just states unremarkable proposition that the number

5    of infringements doesn't matter, it's the number of works.  But

6    what the Second Circuit has said, the First, Ninth, 11th and

7    D.C. Circuits, if there's independent economic value to the

8    individual works, and that is uncontested on the record right

9    now for every one of these works --

10        THE COURT:  Okay, I am inclined to agree with

11   Mr. Bart, but here is what I want to have happen.  I want a

12   one-page, one-page citation of cases and to the page in the

13   case which you believe supports your proposition.  Get it to me

14   by the end of the day today.  End of story.  No more argument.

15        MR. THOMAS:  Thank you, Your Honor.  Understood, but

16   for the sake of the record --

17        THE COURT:  No, you've already made your record.

18        MR. THOMAS:  I'm sorry, there's a separate issue that

19   I wanted to make the record on.  Forgive me.  There is a work

20   made for hire aspect of our instruction that we believe should

21   be submitted.  I'll leave it at that.

22        THE COURT:  Work made for hire?  What does that mean?

23   Work made for hire?  Work made for hire?  I already have in the

24   instruction that the work has to be, you know, for sale, I

25   think was for rental or whatever it is.

1      MR. HOWENSTINE:  Your Honor, there's -- this is an

2  issue that we included in our proposed instruction.  We don't

3  need to belabor it.  We just want to make sure it's preserved,

4  but there's a statutory argument that because plaintiffs

5  register their songs as works made for hire, under the

6  copyright law, effectively that necessarily means that they are

7  parts of a compilation which also brings in this compilation

8  issue.

9      THE COURT:  Doesn't mean that they're a compilation.

10  You can register a song that isn't a part of a compilation for

11  hire.  Why does it have to be a compilation?

12      MR. HOWENSTINE:  Well, a work made for hire is

13  specifically defined under Section 101 as being either, number

14  one, a work that's made by an employee in the course and scope

15  of their employment, which these works were not, or a part of a

16  collective work or a compilation.

17      THE COURT:  I would disagree with that.  Depends upon

18  what your definition is.  If an artist has a record deal with

19  Sony, for instance, when they're making that song or writing

20  the song or performing the song, they are, in effect, being

21  hired by Sony.  It's a contract.

22      MR. HOWENSTINE:  I don't believe that any of the

23  labels would say that the artist who record music for them are

24  employees.

25      THE COURT:  I don't mean employees, I said under

 1  contract.
 2          MR. HOWENSTINE:  And that is -- but what the statute
 3  says is employees under the course and scope of their
 4  employment or the other alternative is a work that's
 5  commissioned to be part of a collective work or compilation.
 6  So necessarily in this situation when they check the box and
 7  call it a work made for hire, it's one of those two things.
 8  And because it's not something that's made by an employee,
 9  therefore, it is part of a compilation.  This is the issue that
10  we have raised --
11          THE COURT:  Regardless of whether it's an album, they
12  haven't suggested that many of these aren't parts of albums.
13  The question is are they individually available for download.
14  And if they're individually available for download, then they
15  fall under another rubric.  Okay.  You made your point.  So we
16  will get back to this one.
17          Instruction number 19B, willfulness.
18          MR. BART:  No objection.
19          MR. HOWENSTINE:  We object to this one, Your Honor.
20          THE COURT:  Okay.  What's your objection?
21          MR. HOWENSTINE:  Two discrete things.  Your Honor's
22  summary judgment order.
23          THE COURT:  Just a minute.  Let me get to this.
24          MR. HOWENSTINE:  Page 43.
25          THE COURT:  19B, it's not broken up as "B" here.

1    Okay.  Let me look at this.

2         Okay.  What's your problem?

3         MR. HOWENSTINE:  So there are two prongs to this

4    willfulness standard.  What Your Honor's summary judgment order

5    says correctly is that willfulness requires a showing that

6    Grande knew its conduct constituted contributory copyright

7    infringement.  What this proposed instruction says is that

8    Grande's conduct was willful if Grande had knowledge that its

9    subscribers' actions constituted copyright infringement.  So

10   effectively what this does is equate willfulness with knowledge

11   and so essentially if plaintiffs --

12        THE COURT:  That's because this instruction goes to

13   contributory infringement, not direct infringement.  It would

14   be different if Grande itself was out making copies or

15   something of that kind.

16        MR. HOWENSTINE:  Right, but willfulness, Your Honor --

17        THE COURT:  Which happens, I mean, you know, Internet

18   service providers put out advertisements, you know, and if they

19   were to take one of the -- some Sony song without permission

20   and put it in an advertisement, it wouldn't have anything to do

21   with the subscriber, it would have to do with them.

22        MR. HOWENSTINE:  But willfulness, Your Honor, is a

23   heightened standard beyond liability and what the summary

24   judgment order --

25        THE COURT:  Willfulness has everything to do with

1    liability.  That's the whole issue.

2          MR. HOWENSTINE:  Grande has to know that its own

3    conduct is infringement.  That's where you get to willfulness.

4    That's something more than just regular liability.

5          THE COURT:  I think that's implicit here.

6          MR. HOWENSTINE:  No, but what it says here --

7          THE COURT:  Grande's contributory -- this only has to

8    do with contributory infringement.  *"Grande's contributory*

9    *infringement is considered willful if plaintiffs prove by a*

10   *preponderance of the evidence that Grande had knowledge that*

11   *its subscribers' actions constituted infringement of*

12   *plaintiff's copyrights--"* okay, that's number one, *"--or that*

13   *Grande acted with reckless disregard for or willful blindness*

14   *to the plaintiff's rights."*  That's exactly the correct

15   statement of the law.

16         MR. HOWENSTINE:  And Your Honor, we disagree.  What we

17   read this instruction as saying is that if plaintiffs satisfy

18   the knowledge component of their contributory infringement

19   claim, then they also satisfy the standard for willfulness

20   because it's the same in this instruction as in the

21   contributory infringement instruction.  So our point is that --

22         THE COURT:  No, because we have a separate

23   contributory infringement instruction on willfulness here.

24   It's a separate instruction.

25         MR. HOWENSTINE:  But they are the same standards in

1  the contributory infringement instruction as in the willfulness

2  instruction.  And because willfulness leads to heightened

3  damages, it needs to be something more to trigger that

4  heightened finding.

5          THE COURT:  So what are you saying that your client

6  must know?

7          MR. HOWENSTINE:  Knew that its own conduct constituted

8  contributory copyright infringement.  And that's what Your

9  Honor said in the summary judgment order.

10         THE COURT:  That's confusing because that's going to

11 lead the jury to believe that they must find that Grande itself

12 was somehow infringing by publishing the works.  That isn't the

13 law.  That's not contributory infringement.  That's direct

14 infringement.

15         MR. HOWENSTINE:  No, what I'm saying is that Grande

16 knew that its conduct constituted contributory infringement.

17 We knew that we were secondary infringers.  That's what

18 willfulness requires.  It's something more --

19         THE COURT:  That's what this says.

20         MR. HOWENSTINE:  No, this says it's willful if Grande

21 had knowledge that its subscribers' actions were infringement

22 and that's the same --

23         THE COURT:  Well, it would not be able to know that

24 its subscribers' actions were infringement if it didn't

25 understand that doing what the subscribers were doing was also

1    wrong on their part.

2           MR. HOWENSTINE:  Right.  And what the willfulness

3    standard requires --

4           THE COURT:  How would you redraft this?

5           MR. HOWENSTINE:  I would redraft this to say exactly

6    what Your Honor said in the summary judgment order.

7           THE COURT:  Which was?

8           MR. HOWENSTINE:  *"Willfulness thus requires a showing*

9    *that Grande knew its conduct constituted contributory copyright*

10   *infringement."*  And then the jury can simply refer to the

11   contributory infringement instruction.  If we knew that what we

12   were doing was contributory infringement, then we were willful.

13   And separately then --

14          THE COURT:  Maybe I'm missing something here.

15          MR. BART:  Can I address this, so we don't go back and

16   forth on different points.  The problem really is that there is

17   nothing else to contributory infringement other than them

18   providing material contribution, which of course, as you said,

19   they knew they were doing.  So I think introducing the notion

20   of contributory infringement is confusing and asks the jury to

21   look at a different standard when what Your Honor said right

22   here is the standard.  This is the secondary infringement

23   standard that they knew that their subscribers' actions

24   constituted -- that's the knowledge, right, that is the

25   knowledge that's required for willfulness.  There's no

1    willfulness in terms of their providing material contribution,

2    that was already happening, that's not a dispute.  We're

3    referring back to another standard that doesn't add anything.

4    I think Your Honor is right the way that he phrases this.

5         MR. HOWENSTINE:  And just to make this point

6    absolutely clear, Your Honor, we believe that as the

7    instructions are currently formulated, each and every time if

8    the jury were to find that there was contributory infringement,

9    they would necessarily also find that it was willful.  Because

10   the standards are the same in the two instructions and that's

11   the core issue.  And then separately --

12        THE COURT:  I think you put it the other way.   In

13   order to find contributory infringement, they would have to

14   find that there was willfulness.

15        MR. BART:  Yes, I was going to say they've actually

16   raised the standard on the contributory infringement so high.

17        THE COURT:  I think you conflated the two.

18        MR. HOWENSTINE:  Well, either/or, but it can't be the

19   case that both standards are the same, because willfulness is

20   something more than just regular contributory infringement.

21        MR. BART:  Not in this case because what you've done

22   is you, through argument and citation, you have raised the

23   standard of knowledge on the contributory infringement so high

24   that you can't just go back and say now you have to jump

25   through an even higher hoop.  I mean, where is the authority

1   for that?

2         THE COURT:  I think you have to remember that for

3   contributory infringement, willful blindness also works.

4   Willful blindness.

5         MR. HOWENSTINE:  Yes, Your Honor, but the point

6   remains -- it remains the case that currently the standards are

7   the same.  For liability and for willfulness.  And I don't

8   really follow the argument that somehow we have argued

9   ourselves into that because these standards are being drawn

10  from the BMG/Cox opinion from the Fourth Circuit, which went to

11  the issue of what is the standard for knowledge.  Knowledge

12  requires knowledge of specific instances of infringement and

13  that's also what this willfulness instruction requires.  And

14  that's our issue with it.

15        Separately, on the issue of recklessness, we kind of

16  have the same problem because it says *"or that Grande acted*

17  *with reckless disregard for or willful blindness to the*

18  *plaintiff's rights."*  So in the same way, if they check the

19  willful blindness box on the contributory instruction, they

20  have also checked the box on the willfulness instruction and

21  the standards cannot be the same.  Willfulness is heightened,

22  it can't be the same as contributory infringement.

23        Relatedly, there's also the component in here of

24  "reckless disregard for".  And by introducing on the facts of

25  this case reckless disregard, reckless disregard is actually

1   even lower than willful blindness, so effectively we have a

2   willfulness standard --

3            THE COURT:  Well, there was tons of evidence by which

4   the jury could find, if they so found, that your client was

5   recklessly disregarding the evidence.  There was tons of

6   people, we had lots of testimony about that.

7            MR. HOWENSTINE:  But if recklessness is the standard

8   here, then essentially our standard for willfulness is even

9   lower than the standard for liability, so we have ourselves in

10  a situation where again every time the liability box gets

11  checked --

12           THE COURT:  I can't remember where reckless came from.

13           MR. BART:  Your summary judgment decision, among other

14  places.  It came from the Fifth Circuit decision in Graber*(ph)*

15  versus --

16           THE COURT:  Yes, I would like to say that David Ezra

17  is a great authority.  Only when I write for the Ninth Circuit

18  in a published opinion.

19           MR. BART:  When I'm sitting in your courtroom on your

20  case, that's the first I'm going to say.

21           THE COURT:  Okay.  I think the Fifth Circuit is more

22  authoritative.

23           MR. HOWENSTINE:  I don't hear the plaintiffs to be

24  disputing the point which I am making which is that as things

25  currently stand, the contributory standard and the willfulness

1  standard are the same.  And in every instance where there would

2  be contributory infringement, there would also be willfulness.

3  And again, Your Honor, that just can't be the case because

4  willfulness requires a heightened showing, it leads to

5  heightened damages, it leads to attorneys fees potentially, so

6  there has to be something more to get to willfulness.  And as

7  things currently stand, that's just not the case.

8          MR. BART:  This should be brief.  Your Honor stated

9  the law properly.  They are in a position where because they

10  have, in our view and hopefully the jury's, completely

11  disregarded what's out there, they are willfully blind.

12  Willful blindness is willfulness.  There is no real difference.

13  I think if you are willfully blind, you will qualify for

14  willfulness.

15          The standard is at a point where if the jury decides

16  that they knew that these infringements were happening and just

17  continued to allow it to happen or were willfully blind to it,

18  they're entitled to issue a willful verdict and I don't think

19  there's anything wrong with that nor have they cited any

20  authority that suggested that there's anything wrong with that.

21  It's a very high standard for us to satisfy.  Hopefully we can

22  do that, but I think that the mere fact that you can play --

23  you know, make these syllogisms that if A equals B, but B has

24  to be higher than A, you're really looking at conduct here that

25  is alleged to be from the beginning pretty egregious.  They had

1  a million-three in notices here, they turned the other way,

2  they ignored everything --

3          THE COURT:  Here is what I'm going to suggest.  Other

4  than David Ezra on my summary judgment order, David Ezra is not

5  conclusive authority, all right.  Let me just put it that way.

6          MR. BART:  The Fifth Circuit hopefully is.

7          THE COURT:  The Fifth Circuit is conclusive authority,

8  as far as I am concerned because I sit in this Circuit as a

9  District Judge.  And what I would like to see by this

10 afternoon, 6:00 p.m. is -- this evening at 6:00 p.m. -- well,

11 since it's Friday, I'll give you until 7:00 -- is any authority

12 which you rely on for the proposition that this jury

13 instruction should I, number one, remain the same or, number

14 two, change.  One page, the authority, very short.  Okay?

15         MR. BART:  Okay.

16         THE COURT:  Where it's wrong.  Just give me the

17 authority.  Next.  Limiting instruction versus BMG versus Cox,

18 I don't think there's any objection.

19         MR. BART:  There is, Your Honor, only because the

20 quotation here is from the first time this came up and you gave

21 the limiting instruction, but we had a sidebar during

22 Mr. McMullan's direct testimony where I said that the relevance

23 of Cox also applied to the state of mind of my clients as well

24 as Grande.  And you said, *I told the jury time and time again*

25 *in this case that the outcome of the other litigation has no*

1    *bearing on this case other than for state of mind."*

2           And so what I would propose doing is *"This evidence*

3    *may be considered by you only for the purpose of evaluating the*

4    *state of mind of Grande's executives and employees and the*

5    *state of mind of plaintiff's executives and employees at the*

6    *time and nothing else."* And that goes back to the

7    October 25th, 2022 trial transcript.

8           THE COURT:  The last paragraph has to stay there

9    though.

10          MR. BART:  No comment about that.

11          THE COURT:  State of mind is right.  He's right on

12   state of mind.  That was why it came in.

13          MR. HOWENSTINE:  Our only question is what plaintiff's

14   state of mind is relative to.

15          THE COURT:  I say here, *"The evidence may be*

16   *considered by you only for the purpose of evaluating the state*

17   *of mind of Grande executives and employees at the time and*

18   *nothing else."*

19          MR. HOWENSTINE:  Right, but they want to add the

20   notion that it's also relevant to the plaintiff's state of mind

21   and I'm not following what that's relevant to in this case.

22          THE COURT:  Yes.  Why do you care?

23          MR. BART:  Because we had this whole argument about

24   why Mr. McMullan used Rightscorp.  And he said that he used it

25   because of the result in Cox.  And we had a sidebar about

1    this --

2            THE COURT:  Who was Mr. McMullan again?  Refresh me.

3            MR. BART:  He's the last witness that we had from

4    Universal.

5            THE COURT:  Oh, yeah, he was from Universal.

6            MR. BART:  And I said the relevance is why he's using

7    Rightscorp information, it's his state of mind.

8            THE COURT:  He's right.  So we'll add the plaintiff.

9    We have to stick that in there, but you don't have any

10   objection other than sticking the plaintiff in there.

11           MR. HOWENSTINE:  Correct.

12           THE COURT:  And number -- just send that language over

13   that you want because you didn't include it in your draft.

14           And number one, duty to deliberate.  You don't have

15   any objection to that.

16           MR. BART:  No objection.

17           MR. HOWENSTINE:  No objection.

18           THE COURT:  So you know what your marching orders are,

19   right?

20           MR. HOWENSTINE:  Yes, Judge.

21           THE COURT:  And I will look at that over the weekend

22   and we will get you a final copy and your objections are

23   already noted for the record, such as they are.

24           MR. HOWENSTINE:  Your Honor, we also had some issues

25   to talk about with the verdict form.  Did you want to take

1    those up as well.

2              THE COURT:  Yes, absolutely.  What are your issues

3    with the verdict form?  Do you have a copy of it, Mr. Bart?

4              MR. BART:  I do.

5              THE COURT:  See, we only ask about contributory

6    infringement because there's no evidence in this case

7    whatsoever that Grande directly contributed.

8              MR. HOWENSTINE:  Correct.  There's only contributory

9    infringement claim.

10             THE COURT:  Right.

11             MR. HOWENSTINE:  One issue with the verdict form, Your

12   Honor, is question five.

13             THE COURT:  Question five?

14             MR. HOWENSTINE:  Question five.

15             THE COURT:  All right.

16             MR. HOWENSTINE:  *"What amount of statutory damages do*

17   *you award for each work?"*  This -- by including this question,

18   it takes away from the jury the ability to award a different

19   amount of statutory damages for different works.  And our

20   proposed instruction omitted this and just allowed for a total

21   amount to allow the jury to make that determination themselves.

22   Since the statutory damages instruction tells the jury how to

23   calculate the award and the jury is presumed to follow that

24   instruction, it doesn't seem necessary here to separately

25   require that.  They can make that determination themselves if

1  they want to award different amounts for different works they

2  can do that and, you know, reach a total amount, but this

3  instruction does not allow them to do that, or this verdict

4  form.

5      MR. BART:  I'm not really sure what basis would be on

6  this record for the jury to award anything other than the per

7  work award.

8      THE COURT:  I guess we could take number five out.  It

9  doesn't really need to be there.

10      MR. BART:  Well, I think, you know, one of the

11  problems is, and I don't know that it necessarily works against

12  my client, I mean, it leads to the possibility of just a

13  number, right?  I mean, this --

14      THE COURT:  Well, they're going to come up with a

15  number.

16      MR. BART:  I think that's right.

17      THE COURT:  Nobody is suggesting that they need to --

18  how much do you award for Rihanna's work?

19      MR. BART:  That was my point.  There's no separate

20  testimony about any songs as opposed to any other.

21      THE COURT:  You're lucky I'm not on the jury with

22  regard to Bruno Mars.  I happened to see him when he was

23  little, I was not a big fan when he was doing Elvis.

24      MR. HOWENSTINE:  Your Honor, in addition to the

25  jury --

1          THE COURT:  Don't tell me in addition.  What you're

2    saying is you don't want number five?

3          MR. HOWENSTINE:  That's right, Your Honor.  And just

4    to respond to what Mr. Bart said, it's also conceivable that

5    the jury could look at the time period at issue and say, for

6    example, that a higher award is appropriate after Grande

7    learned of Cox and a lower award is appropriate before.  So

8    that would be another way that the jury could decide to award

9    different amounts of statutory damages for different works.

10   And again five doesn't allow them to do that.  And then just in

11   addition to that --

12         THE COURT:  You would put something in place of five

13   or would just get rid of five?

14         MR. HOWENSTINE:  Just get rid of it as in our proposed

15   instruction.

16         THE COURT:  Yeah, I don't see any need for five.  I

17   agree, I don't see any need for five.  Let's just get rid of

18   five.

19         MR. BART:  I don't feel strongly about it.

20         THE COURT:  We'll get rid of five.  Six will be five.

21         MR. BART:  A modification of six will be five.

22         THE COURT:  Yes, right.

23         MR. BART:  Six without the subpart.  It will be six

24   without 6a.  It will just be *What is the total amount of

25   statutory damages you award the plaintiffs?*  Because what's

1    below it now is a mathematical calculation based on the answer

2    to number five.

3            THE COURT:  Right, that's right.  So it should be

4    actually What is the total amount of statutory damages, if any.

5            MR. BART:  It can't be "if any".  If we get to this

6    point, it's not "if any".

7            THE COURT:  Okay.  That's right.  You're right.

8            MR. HOWENSTINE:  Right.  And our formulation was

9    similar.  We just said What is the total amount of statutory

10   damages.

11           THE COURT:  Okay.  You're right.  We'll do it that

12   way.  That's fine.

13           MR. HOWENSTINE:  And then just -- I'm not entirely

14   certain on this point, but we had raised the issues about the

15   412 issue and the compilation issue.  I don't believe --

16           THE COURT:  The 412 issue?

17           MR. BART:  Eligibility for statutory award.

18           MR. HOWENSTINE:  Right, the eligibility for statutory

19   damages and the compilation issue, whether each song is a

20   separate work.

21           THE COURT:  I told you I'm going to rule on that, so

22   you're going to submit something to me.  My inclination is that

23   each song is, but they don't have to come up with -- that's

24   something they would do back there.  They just give us a total

25   number.

1          MR. HOWENSTINE:  And we would just reserve the right

2   based on how things shake out in terms of Your Honor looking at

3   that and deciding what to do, to propose some tweak to the

4   verdict form to address that.  As we stand here right now, I

5   don't think that's going to be necessary.  I just want to make

6   a clear record.

7          THE COURT:  That's fine.  Look, I told you I'm not an

8   Opihi.  And for purposes of my esteemed colleagues on the Fifth

9   Circuit, to the extent that I'm a colleague because they are of

10  a higher court, Opihi means somebody who doesn't change their

11  mind in the face of uncontroverted evidence they're wrong.  I

12  change my mind if I think I'm wrong or I could be wrong.  Okay.

13  Nothing else today?

14         MR. BART:  I think there's one thing.  Rich and I were

15  talking, Mr. Brophy and I were talking about the length of the

16  summations.

17         THE COURT:  Can you provide us with a copy of the Cox

18  versus BMG original jury instructions so that we -- you keep

19  referencing them, so I'd like to look at them.  Somebody's got

20  a copy of it.

21         MR. BART:  You mean the entire set?

22         THE COURT:  Yeah, that you've been referring to.

23         MR. HOWENSTINE:  I believe I handed up the Sony.

24         THE COURT:  I want Mr. Bart's greatest hits.

25         MR. BART:  I wasn't in that case.  I was in the MP3

1    Tunes case.

2             THE COURT:  You're like Judge Bill Gray, you only put

3    out your winners.

4             MR. BART:  I'm not a fool.

5             THE COURT:  That's what he said.

6             MR. BART:  So we were talking about the length of

7    summations -- closing argument.  Forgive me.

8             THE COURT:  You're in the West now.

9             MR. BART:  I'm trying to train myself, Your Honor.

10   And I think we are more or less in the same place.

11            THE COURT:  Where are you?

12            MR. BART:  We were talking about an hour, hour and a

13   quarter, somewhere in that range.  I'm going to ask the Court

14   for permission to reserve some of my time for rebuttal and my

15   guess would be that I would do a maximum of an hour and 15

16   minutes, an hour and 15 minutes, and Mr. Brophy can have his

17   whole allotment in the middle, if that works.

18            MR. BROPHY:  That's the program I'm on for.

19            THE COURT:  Let's agree upon an hour and 15 minutes.

20   And then when would you like -- Mr. Brophy, when would you like

21   her to tell you that you're getting close to the end?

22            MR. BROPHY:  I don't know that I need that.  I'll have

23   my own capability of timing.  Five minutes warning.

24            THE COURT:  Are you going to make the closing

25   argument, Mr. Bart?

1          MR. BART:  Yes, I am.

2          THE COURT:  When would you like to be alerted, at an

3     hour?  She does it discreetly.

4          MR. BART:  I'd say ten minutes before the end of the

5     hour.

6          THE COURT:  Ten minutes before the end of the hour.

7     Okay.

8          MR. BART:  And then a loud gong can go off at the end

9     of the rebuttal, that's okay.

10          THE COURT:  We don't -- you remember The Gong Show?

11          MR. BART:  Yes, I do.

12          THE COURT:  We don't do that.

13          MR. BROPHY:  Your Honor, there's one other matter and

14     it relates to the rebuttal case.  I'm not sure if you're

15     planning on putting one on, but as I mentioned yesterday, we

16     have an objection to a rebuttal case and I'd like to understand

17     what the basis of that request is so that we can react to it

18     and not on Tuesday morning.

19          MR. BART:  Well, we're still evaluating it.  I think

20     that there's a lot that came out in their expert's testimony.

21          THE COURT:  Their expert's testimony took issue in a

22     number of different places with --

23          MR. BART:  Ms. Frederiksen.

24          THE COURT:  Ms. Frederiksen something.

25          MR. BART:  Cross.

1          THE COURT:  Ms. Frederiksen-Cross, her testimony.  So

2    I assume that they should generally be entitled.  As long as

3    that is all they address.

4          MR. BART:  That's what we're looking at, Your Honor.

5    We haven't made a final determination, but I would expect that

6    we will have maybe half hour of testimony on that subject.

7          MR. BROPHY:  Your Honor, my understanding of the law

8    is that they're only permitted to bring in a rebuttal case if

9    there are new facts adduced that weren't part of the case in

10   chief.  And I'm not aware of what those facts are and I think

11   it's fair for us to know what the basis of their request for a

12   rebuttal case is.

13         MR. BART:  I don't agree at all.  I don't think that

14   we have a duty in our affirmative case to pre-but everything

15   in --

16         THE COURT:  No, I think that the new facts would be

17   that this witness got up and he challenged in a very direct way

18   her testimony.  So I think that a rebuttal case would encompass

19   her coming back up and attempting to rebut that.

20         MR. BART:  Yeah.

21         MR. BROPHY:  Our position on that is that anything

22   that she's going to get up and say is just a rehash of things

23   she said in her --

24         THE COURT:  No, she can't do that.  She has to only

25   directly -- and I'm sure, Mr. Brophy, you'll get up like a

1   jack-in-the-box.

2            MR. BART:  You can rely on it.

3            THE COURT:  We can count on it, I'm sure.  Very little

4   gets by you, Mr. Brophy, I've been watching.  Mr. Bart is the

5   same way.  I told you, I've said this many times, I don't throw

6   these kind of compliments out.  My staff will tell you I don't.

7   I've got very good lawyers in this case and I recognize that

8   and it's a blessing, even though I gripe about it.

9            *(Discussion off the record.)*

10                          *   *   *

11           THE COURT:  Go ahead and state that on the record.

12           COURTROOM DEPUTY CLERK:  Exhibits P-1, P-3, P-11 and

13   P-13 were previously moved into evidence.  The plaintiffs have

14   now updated placeholders for P-1, P-3 and P-11 to include a

15   directory or content list of what is on those hard drives and

16   thumb drives.  P-13 has been fully extracted, so all those

17   individual PDFs are available for upload into JERS.  I just

18   need to confirm that defense has seen that e-mail and those

19   extractions and lists and then they can be formally replaced

20   into JERS.

21           MR. ATTRIDGE:  Just one correction with that.

22           THE COURT:  Who are you?

23           MR. ATTRIDGE:  It's taken three weeks for this.

24           THE COURT:  We used to have a famous DJ in Honolulu,

25   his name was Ron Jacobs, he's passed away now, he used to call

```
 1    himself "Who-the-guy".  So who are you, sir?
 2            MR. ATTRIDGE:  I'm Kevin Attridge, Your Honor.
 3            THE COURT:  And you are from?
 4            MR. ATTRIDGE:  I'm from Washington, D.C., from Stein
 5    Mitchell.
 6            THE COURT:  That's a good firm.  We know a few of
 7    those fellows.
 8            MR. ATTRIDGE:  Just one clarification.  PX-11 is
 9    actually a PDF printout of the content of the actual exhibit.
10            COURTROOM DEPUTY CLERK:  That is what you uploaded to
11    box, right?
12            MR. ATTRIDGE:  Correct.
13            THE COURT:  Okay.  So those will all be received.
14            MR. BART:  So now he gets to be paid.
15            THE COURT:  That's right.  He made his appearance
16    officially, he can say he was counsel of record.
17            MR. BROPHY:  We don't have any objections to this.
18            THE COURT:  I would have heard you, Mr. Brophy.  Now
19    there was something else?
20            MR. BART:  Not from me.
21            MR. BROPHY:  No, Your Honor.
22            COURTROOM DEPUTY CLERK:  Just that they know about the
23    sealed exhibit situation and they're going to get us a list.
24            THE COURT:  Yeah, we do have some sealed exhibits that
25    have to do with code and so forth.
```

1          MR. BROPHY:  We'll get that to you today.

2          COURTROOM DEPUTY CLERK:  That's even better.

3          THE COURT:  We can go off the record at this point.

4          *(12:03 p.m.)*

5                              *   *   *

1                    *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5        I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.  I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  November 23, 2022

12

13   /s/ Angela M. Hailey

14   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
15   262 West Nueva Street
     San Antonio, Texas  78207
16   (210)244-5048

17

18

19

20

21

22

23

24

25