```
 1                  UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3   UMG RECORDINGS, INC., ET AL,    :
     Plaintiffs,                     :
 4                                   : Case Number:
     vs.                             : 1:17-CV-00365-DAE
 5                                   :
     GRANDE COMMUNICATIONS           : Austin, Texas
 6   NETWORKS, LLC, ET AL,           : November 1, 2022
     Defendants.                     :
 7   ********************************************************

 8             TRANSCRIPT OF JURY TRIAL PROCEEDINGS
               BEFORE THE HONORABLE DAVID A. EZRA
 9             SENIOR UNITED STATES DISTRICT JUDGE

10   APPEARANCES:
     FOR THE PLAINTIFFS:
11
```

**Andrew H. Bart, Esquire**
**Jacob Tracer, Esquire**
Jenner & Block, LLP
1155 Avenue of the Americas
New York, NY  10036
(212)891-1600; abart@jenner.com

**Robert B. Gilmore, Esquire**
**Philip J. O'Beirne, Esquire**
Stein Mitchell Cipollone Beato & Missner LLP
1100 Connecticut Avenue, NW, Suite 1100
Washington, DC  20036
(202)601-1589; rgilmore@steinmitchell.com

**Paige Arnette Amstutz, Esquire**
Scott, Douglass & McConnico, LLP
303 Colorado Street, Suite 2400
Austin, Texas  78701
(512)495-6300; pamstutz@scottdoug.com

```
 1   FOR THE DEFENDANTS:

 2   Richard L. Brophy, Esquire
     Zachary C. Howenstine, Esquire
 3   Mark A. Thomas, Esquire
     Margaret R. Szewczyk, Esquire
 4   Armstrong Teasdale, LLP
     7700 Forsyth Boulevard, Suite 1800
 5   St. Louis, Missouri  63105
      (314)621-5070
 6   rbrophy@armstrongteasdale.com
     zhowenstine@armstrongteasdale.com
 7   mathomas@atllp.com
     mszewczyk@armstrongteasdale.com

 8

 9

10

11

12

13

14

15

16

17

18

19

20   COURT REPORTER:
     Angela M. Hailey, CSR, CRR, RPR, RMR
21   Official Court Reporter, U.S.D.C.
     262 West Nueva Street
22   San Antonio, Texas  78207
     Phone(210)244-5048
23   angela_hailey@txwd.uscourts.gov

24   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
25
```

JURY TRIAL PROCEEDINGS                    1957

1                    **I N D E X**

2   **WITNESSES:**                              **PAGE**

3   **JONATHAN GLASS(videotaped deposition)**

4   By Mr. Howenstine                      1967

5   By Mr. Thomas                          1969

6

7   **CHRISTOPHER SABEC(videotaped deposition)**

8   By Mr. Brophy                          1973

9   By Mr. O'Beirne                        1974

10

11  **BARBARA FREDERIKSEN-CROSS**

12  By Mr. O'Beirne                        1979

13  By Mr. Brophy                          2005

14

15  **JURY INSTRUCTIONS**

16  By The Court(read by Alison Rogge)     2033

17

18  **CLOSING ARGUMENTS**

19  By Mr. Bart                      2053, 2140

20  By Mr. Brophy                          2095

21

22

23

24

25

```
 1   (Tuesday, November 1, 2022, 9:07 a.m.)

 2                          *   *   *

 3        COURT SECURITY OFFICER:  All rise.

 4        COURTROOM DEPUTY CLERK:  Austin, 17-CV-365, UMG

 5   recording et. al., versus Grande Communications Network, Inc.

 6        THE COURT:  Counsel, you can be seated.  The Court

 7   would note the presence of all counsel, the absence of the

 8   jury.  I have had my law clerk or -- I don't know whether

 9   Priscilla did it or Alison did it, somebody did it -- give you

10   a copy of what I consider to be the final jury instructions.

11   Okay?  So you have those?

12        MR. BROPHY:  Yes, Your Honor.

13        THE COURT:  I have one more thing I want to put on the

14   record, and it has to do with the 412 issue, so I'm going to do

15   that right now.

16        Over the weekend, the Court received supplemental

17   briefing on the issue of 17 U.S.C. 412, which authorizes

18   statutory damages for the work only if the work was first

19   infringed after the effective date of registration or a work

20   was infringed after first publication before registration so

21   long as registration occurred within three months of

22   publication.

23        Now, plaintiff's case is based on 1,422 sound

24   recordings.  In their briefing, plaintiffs allege that they

25   have introduced conclusive evidence that 1,409 of their sound
```

1   recordings meet the 412 criteria.  Now, to show publication and

2   registration dates, plaintiffs rely on PX 20 through 24, which

3   are the actual registration certificates for the sound

4   recordings organized by the company that issued the sound

5   recordings.  They were introduced through fact witnesses.

6           Now, to show the first and last date of infringement,

7   plaintiffs rely on PX 459, which was admitted into evidence.

8   And that was checked.  We checked the transcript over the

9   weekend.  PX 459 is a chart compiled by plaintiff's expert,

10  Dr. Bardwell, using a computer program to organize the

11  infringement notices associated with the songs asserted in this

12  case.  It would be burdensome to ask the jury to comb through

13  each individual registration certificate for the 4,022 sound

14  recordings and compare it with PX 459 to determine the

15  eligibility for statutory damages of each sound recording.

16  Additionally, this is a straightforward matter of dates in this

17  Court's view.

18          As on summary judgment in the Sony versus Cox case

19  where the judge ruled that a number of the recordings were not

20  eligible as a matter of date, it is appropriate here for the

21  Court to make the same ruling.  Having reviewed the evidence,

22  the Court has found a total of 31 recordings which do not meet

23  the 412 requirements and for which the jury could not

24  reasonably find that those requirements are met.  This includes

25  the 13 that plaintiffs conceded did not meet the requirements,

1    along with the additional six that defendants challenged in

2    their supplemental briefing.

3            For many of these recordings, the problem was that

4    there were multiple registration dates.  And having reviewed

5    the testimony of the experts in the case, there was no

6    information provided that would help the jury determine which

7    of those dates apply to statutory damages.  Accordingly, the

8    instructions have been updated to change 1,422 sound recordings

9    to 1,391 sound recordings.  These 1,391 are eligible under

10   section 412 as a matter of law because there has not been any

11   evidence whatsoever to challenge their eligibility.

12           So that is that ruling.  No further argument.

13           MR. BART:  Just a clarification?

14           THE COURT:  Oh, the great clarifier.

15           MR. BART:  The concern is that these are still works

16   in suit.  They're just works in suit that were not eligible for

17   statutory damages, Your Honor, so I think --

18           THE COURT:  But you have waived other damages in this

19   case.

20           MR. BART:  I understand.  But in terms of proving

21   infringement, they are still works in suit.  We're just not

22   entitled to damages on them.

23           THE COURT:  That's correct.

24           MR. BART:  So I think it should say that --

25           THE COURT:  There were two registrations, not no

1    registrations.

2          MR. BART:  On a couple of them, that's true, but I

3    think the jury instruction says that we contend that they're

4    liable for the unauthorized distribution of 1,391.  They are

5    liable for 1,422, but we are only entitled to damages --

6          THE COURT:  Well, we might be able to modify that to

7    reflect that -- yeah.  We can work on that.

8          MR. BART:  All right.  Thank you.

9          THE COURT:  All right.  Now --

10         MR. THOMAS:  Your Honor, I beg your pardon, if I

11   might.

12         THE COURT:  Don't try to argue with me.

13         MR. THOMAS:  I'm not arguing.

14         THE COURT:  This was a long weekend's worth of hard

15   work.

16         MR. THOMAS:  Understood, Your Honor.  And I understood

17   the Court has ruled on this.  Two things.  One would be can we

18   get the identification -- and forgive me if I haven't seen it

19   yet -- of the songs that are no longer eligible?

20         LAW CLERK:  I can give that.

21         THE COURT:  Yes.  She has them.

22         MR. THOMAS:  And I don't know if that has to be

23   immediate.

24         THE COURT:  She has them.

25         MR. THOMAS:  Oh, very good.

1          LAW CLERK:  I have them.  I have one for each.

2          MR. THOMAS:  And I believe we're on record already

3    from Friday as far as our position on this.

4          THE COURT:  I would say that from Friday to probably

5    the Friday before, probably from the very beginning of this

6    case with Judge Yeakel, okay.  So, you know, at some point the

7    Court has to make a decision.  I try to make the very best

8    decision I possibly can.  My job is to try to find the law --

9    we don't have a Fifth Circuit case directly on point.  We just

10   don't.  If we did, it would be easy, but we don't.  So I have

11   to extrapolate and look at other decisions from other Circuits

12   and District Courts and make the very best decision I can make.

13   My job is to attempt to make the same decision I believe the

14   Fifth Circuit would make if they were deciding this case.  Just

15   like the Fifth Circuit's job is to attempt to make the very

16   best decision they can make which they believe would comport

17   with Supreme Court precedent.

18          So that's the way it is.  And, you know, like any

19   other case, there are going to be people who are happy,

20   somewhat happy, and people who are not happy at all, and that

21   is the way it is.  So we just can't go on forever arguing about

22   this because we don't have either the time nor the resources.

23          MR. THOMAS:  Understood, Your Honor.  Just for the

24   sake of the record, I was just going to state that we stand on

25   our previous objections to this and to the compilation issue,

1    and that's -- I'm merely making that presentation.  I'm not

2    arguing at all.

3            THE COURT:  That has already been argued.  You've

4    already made your point.  I don't know how many times we need

5    to make that and put that on the record.

6            MR. THOMAS:  Understood, Your Honor.  Thank you.

7            THE COURT:  Okay.  Now, what is going on?

8            MR. HOWENSTINE:  Good morning, Your Honor.  One

9    housekeeping thing.  We're going to play two deposition videos.

10   Those are going to be the first pieces of evidence presented

11   today.  We had one housekeeping thing on an exhibit.  We're

12   moving DX 22 into evidence.  The parties have agreed on

13   redactions.  I understand there's no objection.

14           THE COURT:  All right.  Is that right, Mr. Bart, or

15   whoever?

16           MR. GILMORE:  That's correct.

17           THE COURT:  I don't know who's up at bat.

18           MR. BART:  I had to delegate the deposition.

19           THE COURT:  Yes, that's fine.

20           MR. HOWENSTINE:  So we have two --

21           THE COURT:  Just a minute, please.

22           COURTROOM DEPUTY CLERK:  Can you ask him if that's --

23   do we have that one already?  I don't think we have that.

24           THE COURT:  Do we have that?

25           MR. HOWENSTINE:  We're going to e-mail it to you.

```
 1            COURTROOM DEPUTY CLERK:  I just want to make sure --
 2    okay, so I need to delete the one we have.  Okay.
 3            THE COURT:  Okay.
 4            MR. HOWENSTINE:  Then, Your Honor, we have two
 5    deposition videos to play.  Those total about 15, 20 minutes
 6    between the two of them, and then we understand that plaintiffs
 7    may call a rebuttal witness.  That's the state of affairs for
 8    the morning.
 9            THE COURT:  They say they are, and I assume it's the
10    doctor.
11            MR. BART:  Yes.
12            THE COURT:  And I've already ruled on that.
13            MR. BART:  Yes.
14            THE COURT:  Now, when you call her, you must,
15    Mr. Bart, limit -- or whoever -- who is doing it?
16            MR. O'BEIRNE:  I will be, Your Honor.
17            THE COURT:  All right, sir.  You must limit yourself
18    very carefully to the testimony that was elicited on cross.
19    This is not an opportunity to launch off into some other area
20    you might have forgotten to get into or would like to get into,
21    all right?
22            MR. O'BEIRNE:  Understood, Judge.
23            THE COURT:  Okay.  Well, everybody says they
24    understand that, but it never happens.  Okay.
25            All right.  Yes, sir.
```

1          MR. BROPHY:  I think we're ready to begin, Your Honor.

2          THE COURT:  Okay.  By the way, you know today I have

3    to go back -- after court today -- off the record.

4          *(Discussion had off the record.)*

5                              *   *   *

6          COURT SECURITY OFFICER:  All rise for the jury.

7          *(9:18 a.m., the jury enters the courtroom.)*

8                              *   *   *

9          THE COURT:  Okay, please be seated.  By way of

10   information, ladies and gentlemen, you know how -- I'm so

11   transparent, I feel like a ghost up here, you know.

12         What's happening is we will have a full day here today

13   one way or the other, but what's going to happen is that

14   counsel are going to be putting on some additional testimony.

15   When they're done with their -- defendants, okay, when they're

16   done with their testimony, then there's going to be a very

17   brief rebuttal case by the plaintiff.  They have the right to

18   do that because they carry the burden of proof, and they will

19   put one witness on.  Shouldn't take long.  And when that is

20   done, the Court is going to instruct you on the law, and we're

21   going to go right into closing arguments.  We're that close.

22         Now, you're going to start your deliberations, I am

23   hopeful either late this afternoon or first thing tomorrow

24   morning.  Now, you should know that I have to go back to San

25   Antonio this afternoon after court because I've got some things

1    I've got to do there, but I'm going to turn right around and

2    come back on Wednesday, which is tomorrow afternoon.  By then

3    you should be deliberating anyway, okay?  But just in case, if

4    you were to send a note out in the morning or something, I

5    won't be here, so don't do it.  Wait.  And then, of course,

6    I'll be here all day Thursday.  And if you're still

7    deliberating and haven't reached a verdict by Thursday, we have

8    a problem because I will not be here on Friday.  I cannot be

9    here on Friday.

10           Now, you can continue to deliberate on Friday, but I

11   will not be here.  Now, we have a problem, because I have been

12   with this case for so long, and there are so many legal issues,

13   that I really can't have another judge come in and answer the

14   jury questions.  It would be impossible to do, so what would

15   happen is if you were to reach a verdict on Friday, then I

16   could -- and there's no question, just reach a verdict, then I

17   will talk to the lawyers.  We can probably have another judge

18   just receive the verdict.  Although I would like to be here for

19   that, but, you know, if it happens, it happens.

20           If you don't reach a verdict by Friday, you will come

21   back on Monday.  Okay?  This is a little different than what

22   we've been doing.  And the reason we can do that is because,

23   obviously, we don't need to be in court, and I don't need to be

24   here in front of you.  I can be doing my other things that I

25   need to be doing and I can skedaddle up here if I need to.

1   Okay?  All right.

2           Okay, counsel, are you ready?

3           MR. HOWENSTINE:  Yes, Your Honor.

4           THE COURT:  All right.

5           MR. HOWENSTINE:  Grande calls by videotaped deposition

6   Jonathan Glass, corporate representative of Warner Music Group

7   who was deposed on November 9, 2018 and October 26, 2022.

8               *(Videotaped deposition playing.)*

9                          *   *   *

10              *(JONATHAN A. GLASS, Witness, Sworn.)*

11          COURT REPORTER:  *Can you please state your full name*

12  *for the record?*

13          *THE WITNESS:  Sure.  Jonathan A. Glass.*

14                      EXAMINATION

15  *BY MR. HOWENSTINE:*

16  *Q.  What is your current position?*

17      *Well, before I get to that, who is your employer?*

18  *A.  Warner Music Group.*

19  *Q.  And what is your current position and title?*

20  *A.  I am senior vice president, digital legal affairs, yes.*

21  *Q.  In your role with the company, do you have any involvement*

22  *in antipiracy efforts?*

23  *A.  I do.*

24  *Q.  And what is the nature of that involvement?*

25  *A.  I generally give, you know, legal advice in connection with*

1   antipiracy issues that we face.

2   Q.  Are you familiar with a company called Rightscorp?

3   A.  I am.

4   Q.  And what is your understanding of the nature of

5   Rightscorp's business?

6   A.  From what I understand, Rightscorp is a service provider

7   that identifies infringing content on BitTorrent networks and

8   sends DMCA takedown notices on behalf of copyright owners whose

9   intellectual property is being infringed.

10  Q.  Warner has never hired Rightscorp to perform any services

11  on its behalf, correct?

12  A.  Correct.

13  Q.  When did Warner first become aware of Rightscorp, formerly

14  Digital Rightscorp?

15  A.  A number of years ago.  I'm not sure how long ago, in

16  particular.

17  Q.  Do you have knowledge of specific efforts by Rightscorp to

18  market its services to Warner?

19  A.  I know that -- in one instance, they tried to do so.

20  Q.  Roughly when did this occur?

21  A.  I don't recall.

22  Q.  In the last five years?

23  A.  Likely.

24  Q.  And who is it that you understand Rightscorp reached out to

25  within Warner?

1   A.   Paul Robinson, our general counsel.

2          MR. GILMORE:   Counsel, Mr. Glass has some more

3   information he'd like to add regarding some of your prior

4   questions.

5   BY MR. HOWENSTINE:

6   Q.   Go right ahead.   Surprise me.

7   A.   So I spoke to Mr. Robinson about the time that he was

8   contacted by Rightscorp that we discussed.   Mr. Robinson said

9   that Rightscorp was reaching out.   They were in some financial

10  difficulties, wanted to sell us data to be able to use in

11  infringement cases against ISPs.   And they made a proposal, and

12  we rejected that proposal and did not hire Rightscorp -- or did

13  not, excuse me, accept their offer for data.

14  Q.   When did you first become aware that Rightscorp had been

15  retained by the RIAA in connection with this case?

16  A.   In my deposition preparation.

17  Q.   So within the last week?

18  A.   Uh-huh.

19  BY MR. THOMAS:

20  Q.   Mr. Glass, hello?

21  A.   Hello.

22  Q.   Mr. Glass, you understand you're here to testify on behalf

23  of Warner?

24  A.   The Warner plaintiffs, yes.

25  Q.   Okay.   On what topic do you understand you're here to

1  testify?

2  A.  I understand I'm supposed to testify about the document in

3  question and the Warner plaintiff's knowledge of that document.

4  Q.  Are you prepared to testify as to the document you're

5  referring to on behalf of the Warner plaintiffs?

6  A.  I am.

7  Q.  Can you tell me what you did -- once again tell me what you

8  did to prepare?

9  A.  I spoke with my lawyers, I looked at my deposition

10  testimony, and I looked at the document in question that was an

11  exhibit to -- that I was just -- that I was asked about at my

12  deposition.

13  Q.  Mr. Glass, who is Howie Singer?

14  A.  Howie Singer is a former employee of Warner -- of Warner

15  Music.

16  Q.  Is it correct that Mr. Singer was responsible for

17  antipiracy, or at least digital antipiracy while he was at

18  Warner?

19  A.  He was.  That was one of his responsibilities.

20  Q.  Got it.  And do you recall having testified previously that

21  Mr. Singer would sometimes pull e-mails or send around articles

22  about antipiracy topics?

23  A.  Yes.

24  Q.  All right.  I've put up on the screen what in your prior

25  deposition was marked as Glass Exhibit 8.  Can you see it

1    *there, Mr. Glass?*

2    *A.   I can.*

3    *Q.   Do you recognize this document?*

4    *A.   I do.*

5    *Q.   Is this a document that you reviewed in preparation for*

6    *this deposition today?*

7    *A.   Yes, this is the document I reviewed.*

8    *Q.   So, Mr. Glass, this document that we're looking at is an*

9    *e-mail from Howie Singer to Howie Singer dated September 30,*

10   *2015, correct?*

11   *A.   That's what it says, yes.*

12   *Q.   And I believe you said that Mr. Singer had a practice of*

13   *sending around articles to the team that related to antipiracy;*

14   *is that correct?*

15   *A.   I did say that, yes.*

16   *Q.   And this particular e-mail has the text that's apparently*

17   *been cut and pasted from an article, correct?*

18   *A.   Oh, I don't know.*

19   *Q.   Do you agree that the subject line relates to Rightscorp?*

20   *A.   It's regarding Rightscorp.*

21   *Q.   Mr. Glass, do you see that the subject -- the text of the*

22   *subject line relating to Rightscorp is copied into the body of*

23   *the e-mail as well?*

24   *A.   Yes.*

25   *Q.   And then there is -- there are several paragraphs, about*

1   *five paragraphs of text, relating to Rightscorp.  Do you see*

2   *that?*

3   *A.   Yes.*

4   *Q.   Is it your understanding, Mr. Glass, that this is an e-mail*

5   *that Mr. Singer sent to himself containing text relating to*

6   *Rightscorp?*

7   *A.   That's what the e-mail says, yes.*

8   *Q.   Do you agree, Mr. Glass, that this article in Mr. Singer's*

9   *e-mail casts Rightscorp in a very negative light?*

10  *A.   It's critical of Rightscorp.*

11  *Q.   So what I'm asking is, Mr. Glass, do you agree that this*

12  *article has allegations that are critical of Rightscorp's*

13  *business practices?*

14  *A.   Yes.*

15  *Q.   Mr. Glass, do you agree that Mr. Singer saw this article*

16  *and felt it was significant enough that he copied it?*

17  *A.   Yeah, I don't know if he thought it was significant enough.*

18  *He sent this e-mail to himself.  That's all I know.*

19  *(Videotaped deposition stopped.)*

20  *          *   *   **

21  MR. HOWENSTINE:  Grande next calls by videotaped

22  deposition Christopher Sabec of Rightscorp.  Mr. Sabec was

23  deposed on August 7, 2018.

24  *(Videotaped deposition of Christopher Sabec playing.)*

25  *EXAMINATION*

1  BY MR. BROPHY

2  A.   I'm founder of Rightscorp, and we began Rightscorp in

3  January 2011.   January 21st, 2011, I believe.

4  Q.   So let's break that down a little bit.   During what periods

5  of time?

6  A.   I believe -- I'm not totally sure of the years, but from

7  the founding of the company until February 20, I want to say

8  2016, I was CEO.

9  Q.   Has there ever been a relationship, a contractual

10  relationship, between Rightscorp and any plaintiff in this

11  case?

12  A.   No.

13  Q.   So is it fair for me to say that no plaintiff has ever

14  approached Rightscorp and asked Rightscorp to monitor any of

15  the copyright properties that it owns?

16  A.   Can you rephrase that?

17  Q.   Well, is it fair for me to assume that, because there is no

18  contractual relationship between Rightscorp and any plaintiff

19  in this case, that no plaintiff has ever asked Rightscorp to

20  send notices on its behalf?

21  A.   Correct.

22  Q.   I understand that Rightscorp has provided certain data to

23  RIAA in relation to this case.   Is that correct?

24  A.   Correct.

25  Q.   That data existed before there was ever any relationship

1   *between RIAA and Rightscorp, correct?*

2   *A.   Correct.*

3   *Q.   And that data was not gathered at RIAA's request, correct?*

4   *A.   Correct.*

5   *Q.   And it was not gathered in the plaintiff in this case's*

6   *request; is that correct?*

7   *A.   Correct.*

8   *Q.   So it sounds like other than Robert Steele's potential*

9   *recollection, there is no evidence that we can identify of an*

10  *instance in which an ISP has been able to verify the Rightscorp*

11  *notices; is that correct?*

12  *A.   I would say a more accurate way is there's no instances of*

13  *an ISP ever being able to identify an inaccurate notice.*

14  *Q.   Well, that's kind of a different side of the same coin,*

15  *right?  Either there's an ability to verify that it's correct*

16  *or not, or there isn't an ability to verify that it's correct*

17  *or not.  And I'm trying to figure out is there any evidence*

18  *that you can point me to of an ISP being able to determine, one*

19  *way or another, whether the notice is accurate or inaccurate?*

20  *A.   No.*

21  *Q.   Is it fair for me to say that the process you just*

22  *described of identifying a file being made available from an IP*

23  *address, that Rightscorp, through that process, has not*

24  *actually detected anyone duplicating the file or downloading*

25  *the file; you just detect that it is available for download.*

Christopher Sabec - Examination          1975

```
 1   Is that fair to say?
 2   A.  We don't monitor -- we choose not to monitor for downloads.
 3   Q.  I'd like to talk a little bit about auditing.  Does
 4   Rightscorp employ any firm that audits its source code or
 5   processes to make sure that those source code and processes are
 6   working correctly?
 7   A.  I think you should bring that up with Greg.
 8   Q.  You're not aware of any auditing that's performed by
 9   Rightscorp?
10   A.  No.
11   Q.  We were discussing before the lunch break that Rightscorp
12   closed down its Call Center.  If a subscriber receives a notice
13   and wants to ask a question or believes that the notice was
14   sent incorrectly, what would they do?  How would they complain
15   to Rightscorp about that?
16   A.  I guess they would do it by e-mail now.
17   Q.  And I believe your testimony was you don't know who checks
18   that e-mail in-box anymore; is that right?
19   A.  Correct.
20   Q.  Are you aware of any opportunity that an accused infringer
21   has to appeal a Rightscorp determination or speak to some
22   independent party to have the -- to challenge the notice that's
23   been sent to them?
24   A.  While we had the Call Center running, they would contact
25   the Call Center, and then they would talk about it.
```

1   Q.  But the Call Center was run by Rightscorp employees, right?

2   A.  Correct.

3   Q.  So is there any way for a subscriber who's accused by

4   Rightscorp of conducting an infringement to turn to someone

5   other than Rightscorp to have that allegation independently

6   assessed -- that you're aware of?

7   A.  Not that I'm aware.

8   Q.  And you're aware of people who have called into

9   Rightscorp's Call Center and said that they didn't do what the

10  notice alleges they did, right?

11  A.  Yes.

12  Q.  So with all of that said, Exhibit 9, which has Bates

13  numbers BMG Grande 968 through 972, Mr. Sabec, have you seen

14  this document before?

15  A.  I believe I have.

16  Q.  What is this document?

17  A.  I believe it's a copy of the script that the agents used

18  out of some program.  We printed it -- they used a program on

19  their computer, and this is like a printed version of it.

20  Q.  Okay.  Is this a script that the Rightscorp Call Center

21  would use when it received phone calls from subscribers accused

22  of copyright infringement?

23  A.  At some point in time, yes.

24  Q.  I'll hand you what's been marked as Exhibit 11.  Exhibit 11

25  has Bates numbers Rightscorp 5717 through 5746.  Have you seen

1    *this document before?*

2    *A.  Yeah, this looks familiar even -- this does look familiar*

3    *to me.*

4    *Q.  What is this document?*

5    *A.  This is a -- like, a better printout of the script.*

6    *Q.  And this has a date on it, right?  October 23rd, 2014; do*

7    *you see that --*

8    *A.  Yes.*

9    *Q.  -- at the very top?*

10   *A.  I'm not -- I'm not sure if that's when this was produced or*

11   *when it was done.  I don't know.  I guess that must be the name*

12   *of the file, right?*

13   *Q.  That's my understanding.*

14   *A.  Yeah, it's probably -- it looks like a file name.*

15   *Q.  All right.  So is this a version of the Call Center script*

16   *that was used roughly during that time period for Rightscorp?*

17   *I'm sorry, was that a yes?*

18   *A.  Yes.*

19   *Q.  Does Rightscorp have a position on what ISPs should do when*

20   *they receive the notices that Rightscorp sends?*

21   *A.  They should verify in the way they feel comfortable of*

22   *verifying, and if it's accurate, they should send it -- they*

23   *should forward it.*

24   *Q.  Does that include forwarding the information about the --*

25   *including the pay link or just the notice without the pay link?*

1  A.  We'd prefer that they send the pay link.

2  Q.  Is it Rightscorp's position that ISPs should terminate

3  subscribers permanently after receiving two Rightscorp notices

4  for that IP address?

5  A.  No.

6  Q.  What about if they receive five notices?

7  A.  No.

8  Q.  Does any human, lawyer or otherwise, review the notices

9  that Rightscorp prepares before they are transmitted to an ISP

10  or subscriber?

11  A.  No.

12  BY MR. O'BEIRNE:

13  Q.  Are you aware of any time where Grande reached out to

14  Rightscorp and indicated that it had contacted one of its own

15  customers and the customer had disputed in any way the contents

16  of a Rightscorp notice?

17  A.  No.

18        MR. BROPHY:  Objection.  Calls for speculation.

19  BY MR. O'BEIRNE:

20  Q.  So the answer is no, you're unaware that that ever

21  happened, correct?

22  A.  Correct.

23  Q.  And is it fair to say you're unaware, sitting here today,

24  of a single instance of a false positive notice from

25  Rightscorp?

 1  *A.   I'm unaware, sitting here today, of any notice -- any false*

 2  *positive notice that's been brought to our attention.*

 3                *(Videotaped deposition stopped.)*

 4                          *   *   *

 5          MR. HOWENSTINE:  Your Honor, Grande moves to admit

 6  into evidence DX 58 and 59 that were addressed in that

 7  deposition testimony.

 8          MR. O'BEIRNE:  No objection.

 9          THE COURT:  Be received.

10          MR. BROPHY:  Your Honor, with that, Grande

11  Communications rests its case.  Thank you.

12          THE COURT:  Thank you, counsel.

13          MR. O'BEIRNE:  Your Honor, plaintiffs call Barbara

14  Frederiksen-Cross.

15          THE COURT:  Ma'am, you can just be seated, and I would

16  remind you that you remain under oath.

17          THE WITNESS:  Thank you, Your Honor.

18                          EXAMINATION

19  BY MR. O'BEIRNE:

20  Q.  Good morning, Ms. Frederiksen-Cross.

21  A.  Good morning.

22  Q.  How are you?

23  A.  Good.

24  Q.  You were here in the courtroom for Dr. Cohen's testimony,

25  Grande's expert, in this case; do you recall that, ma'am?

1   A.  Yes.

2   Q.  There were some topics that Dr. Cohen talked about, some

3   testimony he gave, that I specifically want to ask you about

4   and get your reaction to.

5           MR. O'BEIRNE:  Can you pull up the demonstrative,

6   please.

7   BY MR. O'BEIRNE:

8   Q.  The first thing I'm going to ask you about:  Do you recall

9   the testimony that Dr. Cohen gave when he sat at counsel table

10  and pulled up the code of the Rightscorp system and talked

11  about specific SQL entries or parts of the code that talked

12  about *do not preserve*; do you recall that?

13  A.  Yes, I do.

14  Q.  And specifically do you recall a question from Grande's

15  counsel, *"He put language in there to guarantee that there*

16  *would be no logging of this behavior"*?

17  A.  Yes.

18  Q.  And do you recall Dr. Cohen's answer:  *"Yeah, he explicitly*

19  *must have added that directive to make sure that this event*

20  *would not be logged in what's called the event table."*

21      Do you see that?

22  A.  Yes.

23  Q.  Do you agree with that assessment by Dr. Cohen?

24  A.  No, I do not.

25  Q.  Why not?  Please explain to the jury.

Barbara Frederiksen-Cross  -  Examination      1981

1    A.  First of all, when we do an event in MySQL, the language

2    involved here --

3            MR. BROPHY:  Your Honor, I'll object.  It's outside

4    the scope of her expert reports.

5            MR. O'BEIRNE:  Your Honor, it's squarely within her

6    rebuttal reports about --

7            THE COURT:  Objection's overruled.

8    A.  When you code an event in MySQL, the default behavior for

9    an event is that it not log the event.  The event is dropped

10   when it's done.  And that's normal behavior, because on a

11   routine, something you're running every few hours or every few

12   minutes or whatever, you don't need to see a whole list of log

13   entries saying I ran, I ran, I ran, I ran.  And that's

14   documented, as I show here in the documentation, for the MySQL

15   reference manual.  You'll see it says, *"Using 'ON COMPLETION*

16   *[NOT] PRESERVE' merely makes the default non-persistent*

17   *behavior explicit."*

18        So all he's saying is saying, I'm taking the default

19   behavior.

20   Q.  I think you just explained it, but this information on this

21   slide comes from where?

22   A.  It comes from the MySQL Version 5.7 Reference Manual in a

23   section called *"13.1.12 CREATE EVENT Statement."*

24   Q.  And do you agree with the statement there that "COMPLETION

25   [NOT] PRESERVE" is merely the default setting of a SQL event?

1   A.  Yeah.  And it's been that way for a long time.

2           MR. O'BEIRNE:  Next slide, please.

3   BY MR. O'BEIRNE:

4   Q.  As part of that testimony in going through the code, do you

5   recall Dr. Cohen describing certain tables that are cleared

6   that had bit field information in them?

7   A.  Yes.

8   Q.  And he offered the opinion that that information was

9   important to retain as part of Rightscorp's identification; do

10  you recall that?

11  A.  That was his opinion, yes.

12  Q.  Do you agree with that?

13  A.  I do not.

14  Q.  And do you have some examples in the code of why you

15  disagree with Dr. Cohen's opinion?

16  A.  Yes.

17  Q.  Could you please walk the jury through these examples of

18  the code starting with the top left corner?

19  A.  Okay.  This is an example from the 2013 code, this same

20  code with very little changes present in the 2015 code and the

21  2018 code.

22      So what we see in the top left-hand side, this is where

23  that bit field is interrogated.  So after a peer has handshaked

24  with the Rightscorp system and sends its bit field, this little

25  bit in the yellow here, you're looping through those bits in a

Barbara Frederiksen-Cross  -  Examination       1983

1   bit field one at a time and you're checking to see if they're

2   all ones.  And any of them -- if any of them is a zero, you set

3   this flag full load equal false.  And that flag is important,

4   because -- as we'll see as we walk through this code -- that

5   flag is what gets interrogated when you're preparing to send a

6   notice.  And so because you've got the flag, there's no need to

7   keep the entire bit field.

8   Q.  And is this process automatic when the bit field

9   information comes from the other user?

10  A.  Yeah, it's just a part of the code.  There's no way to

11  bypass it.  It's just that's how the code works to check the

12  bit field.

13  Q.  So is it your opinion that this part of the code is

14  automatically recording what bit field information the peer has

15  given to Rightscorp?

16  A.  Yes -- well, it's automatically recording whether it

17  received a full bit field or not.

18  Q.  And is it your opinion that the code can do so accurately

19  and reliably?

20  A.  Yes.

21  Q.  And then what is the next portion of code?

22  A.  This program that does the detection passes both the bit

23  field information and the full load, as I've highlighted here,

24  to the next piece of code, which will take that and record it

25  in the database.

Barbara Frederiksen-Cross  -  Examination        1984

1   Q.  And so you've got the language here *"Transferring."*  Is it

2   your opinion that the code is transferring the bit field

3   information it analyzed in this first portion to the next step

4   in the code?

5   A.  Yeah, this is in the same program a little bit further down

6   in the program where it's packaging all that up so it can be

7   sent to the program that does the write to the database.

8        MR. O'BEIRNE:  Next slide, please.

9   BY MR. O'BEIRNE:

10  Q.  And then in the upper left-hand corner, what's the next

11  portion of the code you'd like to explain to the jury?

12  A.  Well, you can see at the top here, line 113, this is

13  preparing to insert data into the torrent infractions database,

14  and so what you see is it's picking up those values that were

15  passed in from the other program.  So this is in the next

16  program, *"detected JSP,"* that the infringement finder

17  communicates with in order to save this in the database.

18  Q.  And will it only pass this information along if there was

19  100 percent of the bit fields in the analysis that we first

20  looked at?

21  A.  Yes.

22  Q.  So in your opinion, is the bit field information being

23  transferred through the code accurately?

24  A.  Yes.

25  Q.  And then the last step in the code, bottom right-hand

Barbara Frederiksen-Cross  -  Examination        1985

1   corner, what does that signify?

2   A.  This is selecting data from that torrent infractions table,

3   then, that was passed across.  And here the file, the full load

4   is called *"full file,"* but it's the same file; the full load

5   gets put in that data value.  And it's selecting the data out

6   of the torrent infractions.  And you see that it's testing to

7   see if the full file equals one.  That's the value that's true.

8   That means that there was the full bit field, and it's putting

9   that data, then, into -- you see at the bottom on that one --

10  into the expanded TI table, and that's the table that

11  eventually the actual records are drawn from when you get ready

12  to prepare a notice.

13      So there's a couple of steps after this where that data is

14  pulled out then and extracted and then merged in with a notice

15  and sent to the ISP.

16  Q.  And is this process also automatic?

17  A.  Yeah.  It's all part of the code.  It just steps through

18  it.

19  Q.  So is there any way in the code that we've just looked at

20  that a notice could be generated without this automatic

21  checking for a hundred percent bit fields?

22  A.  Not in this code.

23          MR. BROPHY:  Objection.  That's testimony that we've

24  already heard in her direct examination earlier in the case.

25          THE COURT:  I think so.  My recollection is -- the

Barbara Frederiksen-Cross  -  Examination      1986

1  objection is sustained.

2        MR. O'BEIRNE:  Fair enough, Your Honor.  I'll move on.

3  BY MR. O'BEIRNE:

4  Q.  Dr. Cohen testified it was his opinion that it's important

5  to retain the bit field information even though this code

6  exists.  Do you agree with that?

7        MR. BROPHY:  Your Honor, she has already testified in

8  her direct in the original case that it was not important to

9  obtain bit field information.  This is the same testimony we've

10  already heard.

11        MR. O'BEIRNE:  Your Honor, it's in light of his

12  testimony specifically about the tables that were clear on

13  the --

14        MR. BROPHY:  The rebuttal case is not about getting

15  the last word.

16        THE COURT:  Objection is sustained.

17  BY MR. O'BEIRNE:

18  Q.  All right, Ms. Frederiksen, let's move on to another topic

19  that Dr. Cohen talked about.

20  A.  Sure.

21        MR. O'BEIRNE:  Pull up DX 68, please.

22  BY MR. O'BEIRNE:

23  Q.  Do you recall Dr. Cohen's testimony about this document,

24  ma'am, a statement of work from another project between the

25  RIAA and a different monitoring company?

Barbara Frederiksen-Cross  -  Examination      1987

1    A.  I do.

2    Q.  Do you recall Dr. Cohen's testimony about this?

3    A.  Yes.

4    Q.  Without getting into details, are you familiar with the

5    MarkMonitor system and the kind of data it collects?

6    A.  Yes, I am.

7           MR. BROPHY:  Your Honor, this is getting into another

8    case.

9           MR. O'BEIRNE:  Your Honor, he put this exhibit up and

10   had Dr. Cohen talk all about it.

11          MR. BROPHY:  He's asking her about whether she knows

12   about the MarkMonitor system, which is not something that we

13   went into with Dr. Cohen.

14          MR. O'BEIRNE:  I'm just saying generally, Your Honor.

15   I won't ask her any more about the MarkMonitor.

16          THE COURT:  Why ask it at all?  The objection is

17   sustained.

18          MR. BROPHY:  Thank you, Your Honor.

19   BY MR. O'BEIRNE:

20   Q.  Let's turn to page three of this document.  Do you see

21   where it says *"supporting file-sharing networks"*?

22   A.  Yeah.  Can you blow it up?  Thank you.  Oops, we've lost

23   it.

24   Q.  And Ms. Frederiksen, I'd like to ask you some questions

25   about Dr. Cohen's testimony and your reaction to it about this

Barbara Frederiksen-Cross  -  Examination       1988

1    document, but first I want to point you to the *"supporting*
2    *file-sharing networks"* paragraph.  Do you see that?
3    A.  Yes.
4    Q.  What do you understand this to be describing as far as what
5    this statement of work is talking about?
6           MR. BROPHY:  Your Honor, this is outside the scope of
7    her expert reports.  Her expert reports say these documents are
8    irrelevant.  She's not expressed any opinions on any of these
9    materials.
10          MR. O'BEIRNE:  Paragraphs 27 through 54 of her
11   supplemental rebuttal report discusses Dr. Cohen's opinions
12   about what should have been retained vis-á-vis this article.
13          THE COURT:  Yeah, but this is not just Dr. Cohen's
14   opinions in his report.  This is Dr. Cohen's testimony.
15          MR. O'BEIRNE:  Exactly.
16          THE COURT:  So where -- did he testify about this?
17          MR. O'BEIRNE:  Yes, Your Honor.  They put up this --
18   they literally walked through the requirements of this
19   document.
20          THE COURT:  I think I remember.
21          MR. BROPHY:  Your Honor, she has not testified to this
22   in her expert reports.  It's not in.
23          MR. O'BEIRNE:  It's not true, Judge.
24          THE COURT:  The objection is overruled.
25   BY MR. O'BEIRNE:

1  Q.  Please explain to the jury what you understand *"supporting*

2  *file-sharing networks"* to be talking about in this document.

3  A.  Well, as it says here, *"The following peer-to-peer networks*

4  *will be supported as a part of the agreement,"* and it lists

5  BitTorrent and three other peer-to-peer networks:  Gnutella,

6  eDonkey and Ares.  Those are other file-sharing networks that

7  each have their own protocol and their own set of behaviors, so

8  this document is encompassing multiple peer-to-peer networks.

9  Q.  So let's now turn to page ten.

10       MR. O'BEIRNE:  Zoom in on the full content

11  verification in the next -- the two big paragraphs.

12  BY MR. O'BEIRNE:

13  Q.  Ms. Frederiksen, do you recall Dr. Cohen being shown this

14  document and testifying about his opinions about what

15  hash-based matching is being talked about in this document?

16  A.  Yes.

17  Q.  Okay.  Looking at the first paragraph, do you see anything

18  in this paragraph that would be relevant to which kind of

19  protocol is being detected under this statement of work?

20  A.  Yes, I do.

21  Q.  Could you please explain to the jury how the different

22  kinds of protocol would be reflected here?

23       MR. BROPHY:  Your Honor, this is completely new

24  opinion testimony that she's giving.  That's nowhere in her

25  expert reports.

1          THE COURT:  The objection is sustained.  I agree.

2          MR. O'BEIRNE:  Your Honor, it's absolutely in her

3    reports.  They showed Dr. Cohen's --

4          THE COURT:  It may be in her reports, but this is

5    rebuttal testimony.  The objection is sustained.

6          MR. O'BEIRNE:  Your Honor, if I may, Dr. Cohen was

7    shown this hash-based verification paragraph and asked what it

8    means, and it referenced the paragraph above, and

9    Ms. Frederiksen is going to give testimony rebutting

10   Dr. Cohen's characterization of this exact paragraph.

11         MR. BROPHY:  This is brand-new testimony that she has

12   never put in her expert reports and we're hearing for the first

13   time in the eleventh hour in this case with no ability to react

14   to it.

15         MR. O'BEIRNE:  Judge, this is not true.  These facts

16   were raised for the first time in Dr. Cohen's case in chief.

17         THE COURT:  All right.  I'm going to revise my ruling.

18   Objection is overruled.

19   BY MR. O'BEIRNE:

20   Q.  Looking at this first paragraph, Ms. Frederiksen, what

21   relevance does the fact that this could be detecting other

22   kinds of file-sharing protocols than BitTorrent have?

23   A.  Well, the other three protocols are principally whole file

24   protocols, or at the time of this document they were.  Two of

25   them still are.  And they don't have the use of a file like a

Barbara Frederiksen-Cross  -  Examination        1991

1    torrent file that is used to authenticate their content.  So in

2    that context, in order to verify what a download is, different

3    behaviors are required for the different networks.  And you can

4    see at the end of this paragraph that they make a specific

5    carve-out for a different behavior for BitTorrent.

6            MR. O'BEIRNE:  Could you highlight there starting *"the*

7    *complete torrent data."*

8    BY MR. O'BEIRNE:

9    Q.  Is this what you're referring to, ma'am?

10   A.  Yeah, that section of the paragraph is different than the

11   section above.  The section above they're talking about

12   downloading the file and creating a hash of the file.  But in

13   this section they say the complete torrent data should be

14   downloaded from the swarm, so downloaded from the general

15   population of users.

16       And the contents, then, should be verified via digital

17   fingerprinting.  And then the hash value of the torrent should

18   be used -- it would be helpful if we could keep that on the

19   screen.  Should be used to cross-reference and verify

20   information for the individual use cases.  So for use cases

21   where you're talking to an individual peer, use that hash

22   value, the info hash value, to validate what they're

23   exchanging.

24   Q.  Does Rightscorp do that?

25   A.  Yeah, yeah.

1    Q.  And looking down at the next paragraph, *"Hash-based*

2    *verification*," do you recall Dr. Cohen testifying that he does

3    not believe Rightscorp --

4              MR. O'BEIRNE:  Can you keep it up?

5    BY MR. O'BEIRNE:

6    Q.  Do you recall Dr. Cohen testifying that he does not believe

7    that Rightscorp does hash-based verification as described in

8    this paragraph?

9    A.  I recall his testimony to that effect.

10   Q.  In your opinion, is that correct?

11   A.  No, I do not agree with it.

12   Q.  Please explain to the jury, in your view, how Rightscorp

13   does do hash-based verification.

14             MR. O'BEIRNE:  Hold on.  Let's just switch over.  Can

15   we switch to the ELMO?

16   BY MR. O'BEIRNE:

17   Q.  Ms. Frederiksen, could you please explain to the jury in

18   your view how Rightscorp does do hash-based verification as

19   described in this paragraph?

20   A.  Yeah, you see that it refers to the paragraph we were just

21   talking about for the BitTorrent rules.  So BitTorrent rules,

22   download the torrent, identify the content, and then use the

23   info hash in subsequent interactions with peers.  And that's

24   exactly what the Rightscorp system does.

25   Q.  You see here it states, *"For the subsequent detected*

Barbara Frederiksen-Cross  -  Examination      1993

1   *instances of the same file matched by the identified hash,*

2   *selected respondent will download enough of the file to be able*

3   *to record the source and destination and to prove that the user*

4   *was offering the file, that the user is a valid P2P user, and*

5   *also to verify that the file is a valid P2P file."*

6       Do you see that?

7   A.  I do.

8   Q.  Does Rightscorp do that?

9   A.  Yes.  Rightscorp is verifying that a user is offering the

10  file when it performs the handshake.  And because in the

11  BitTorrent environment you have that torrent file that

12  identifies what the user is using, there's no need to do

13  further download beyond that handshake to be able to confirm

14  that the user is a peer-to-peer BitTorrent user, that they're

15  online, that they're offering that file, which is the language

16  here, *"prove that the user was offering the file,"* and then

17  communicate the IP address to the extent necessary.  And again,

18  that's done through the confirmation of the bit field in the

19  case where you're using that torrent file in the handshake.

20  Q.  You mentioned the other non-BitTorrent protocols that are

21  also talked about in this agreement.

22  A.  Yes.

23  Q.  Would downloading part of the file be necessary in the --

24  could it be necessary in the non-BitTorrent protocols?

25  A.  It would be, because the way that you locate those files in

Barbara Frederiksen-Cross  -  Examination      1994

```
 1   a non-BitTorrent protocol is by searching through super
 2   nodes --
 3          MR. BROPHY:  Your Honor, this is also way outside the
 4   scope of any expert report she's ever shown in this case.
 5          MR. O'BEIRNE:  It's just not, Judge.  It's a direct
 6   reaction to --
 7          THE COURT:  Overruled.
 8   A.  So in those instances, you would have to download the file
 9   to confirm what the file contains, because you search for
10   something like an artist name and title, and you get back a
11   file, but until you actually receive that file, you can't know
12   what it is.
13       In BitTorrent, you've got the confirmation of what's in the
14   file via the information that's in the torrent file that you're
15   using to communicate with another -- with another peer.
16   BY MR. O'BEIRNE:
17   Q.  So your opinion is Rightscorp does this hash-based
18   verification?
19   A.  Yes.
20   Q.  A couple pages later in this document we were shown this
21   data capture and storage.  See that, ma'am?
22   A.  Yes, I see it.
23   Q.  And do you recall counsel went through each of these items
24   and asked Dr. Cohen whether Rightscorp obtains and captures
25   this information; do you recall that?
```

Barbara Frederiksen-Cross  -  Examination        1995

1  A.  Yes, whether they capture it in their system.

2  Q.  I'd like to go through with -- and get your opinion as to

3  whether Dr. Cohen is correct as to Rightscorp retaining each of

4  these pieces of information.

5  A.  Okay.

6  Q.  Does Rightscorp retain the ISP name?

7  A.  Yes.  And you can see that in the notices.

8          MR. BROPHY:  Objection, Your Honor.  This isn't part

9  of Dr. Cohen's testimony.  He wasn't talking about these

10  elements.

11          MR. O'BEIRNE:  He literally walked through --

12          MR. BROPHY:  Your Honor, he went through the ones on

13  the next page, not these.

14          MR. O'BEIRNE:  Your Honor, it's this section of the

15  contract.  It's -- there's a list.  He picked a few out of the

16  list.  I'm going through each ones.

17          MR. BROPHY:  Your Honor, there are two distinct

18  sections.  One for information from the actual subscriber and

19  one that isn't, and they're pointing to the one that isn't, and

20  we focused on the one that is.  So if they're going to talk --

21          THE COURT:  This objection is sustained.

22  BY MR. O'BEIRNE:

23  Q.  Let's go to the next list.  Apparently, counsel concedes

24  that Rightscorp does this.

25      So let's go down to the *"Log listing all steps of the*

Barbara Frederiksen-Cross  -  Examination     1996

1  *investigation with date and time stamps."*  Do you see that,

2  ma'am?

3  A.  Yes.

4  Q.  What's your opinion as to whether Rightscorp has that

5  information?

6  A.  Well, the steps of the investigation can be determined by

7  looking at their source code.  It always goes through the same

8  steps in the investigation.  And it retains the time stamp from

9  the interaction with the peer.

10  Q.  Okay.  And then *"Log of all control communications with the*

11  *target."*  Do you see that?

12  A.  Yes.

13  Q.  In your opinion, does Rightscorp log all relevant control

14  communications?

15  A.  All relevant communication because it's the information

16  that's obtained in the handshake.

17  Q.  And which control communications did Dr. Cohen discuss

18  Rightscorp not obtaining?

19  A.  Choke data.

20  Q.  Is it your opinion that retaining choke data is a

21  relevant --

22      MR. BROPHY:  Objection, Your Honor.  This is part of

23  her direct testimony, she addressed choke data on her direct.

24      MR. O'BEIRNE:  It's rebutting Dr. Cohen's testimony.

25      THE COURT:  This objection is overruled.

Barbara Frederiksen-Cross  -  Examination        1997

1              THE WITNESS:  Sorry.  Could you ask the question

2    again?

3    BY MR. O'BEIRNE:

4    Q.  Could you explain to the jury why you don't believe the

5    choke data is a necessary control communication to obtain?

6    A.  If you've used BitTorrent at all or if you've even just

7    studied the protocol for BitTorrent or looked at the code, you

8    know that every peer starts choked, whether you're giving stuff

9    away or looking for stuff, you start choked.  And then as a

10   traffic control mechanism to control for congestion on the

11   network, you periodically unchoke a specific number of peers,

12   and you interact with them.  And then on kind of a round-robin

13   basis you will choke one of those peers and unchoke somebody

14   else.

15       So the choke data isn't in any way indicative of whether a

16   peer is willing to upload or download.  It's only indicative of

17   whether a peer is uploading and downloading at this exact

18   second.  And it changes, on the average, about every ten

19   seconds.  The optimistic choke changes every 30 seconds, and so

20   it's not relevant data because it's constantly changing, and it

21   doesn't indicate willingness to share.

22   Q.  Is every peer offering to share on BitTorrent choking?

23   A.  Choking and unchoking, yeah.

24   Q.  And is everyone downloading files on BitTorrent being

25   choked?

Barbara Frederiksen-Cross  -  Examination        1998

 1  A.  Choked and unchoked, yeah.

 2  Q.  *"Traceroute information."*  Do you see that?

 3  A.  Yes.

 4  Q.  Does Rightscorp obtain that?

 5  A.  Rightscorp does not retain traceroute information.

 6  Q.  Is that important?

 7  A.  I don't think so.  I mean, if you couldn't identify the ISP

 8  for some reason, then it might be helpful, but beyond that,

 9  there would be no reason to retain the traceroute information.

10  Q.  I think you testified, but the record is clear, by IP

11  address of the BitTorrent user, Rightscorp can obtain the ISP,

12  right?

13  A.  Right.  You look up against the ARIN records to identify

14  which ISP owns the IP address, so then you know who to send the

15  notice to.

16  Q.  Next one.  *"Bit fields from the BitTorrent users."*  Do you

17  see that?

18  A.  Yes.

19  Q.  Is that addressed by your testimony and the code we looked

20  at this morning?

21  A.  Yeah, we just talked about that.

22  Q.  And then *"Screen shots scanning the client software."*  Do

23  you see that?

24  A.  Yes.

25  Q.  Is that relevant to the Rightscorp system?

Barbara Frederiksen-Cross  -  Examination       1999

1   A.  Rightscorp doesn't have a human interface to have screen

2   shots, so that was something that they couldn't capture.

3   Q.  "Headless" is the term we've heard?

4   A.  Headless.

5   Q.  It's Halloween, I guess headless is a relevant concept

6   but --

7   A.  It's a term of art.

8   Q.  Right.  Okay.  *Detail of the shared file list."*  Does

9   Rightscorp retain that?

10  A.  Rightscorp sends a notice for each individual file that

11  it's hired to protect.  So if a torrent has five files it's

12  hired to protect, it sends a separate notice for each; unlike a

13  system that would send one notice and list all five.

14  Q.  So one file per notice means there wouldn't be a list?

15  A.  One file per notice means there wouldn't be a list.  You

16  could go to the database for a particular transaction ID and

17  see the list of files associated with that detection, but it

18  doesn't maintain a separate list in the notice it sends.  It's

19  just reflected in the database records, in association with

20  that TC number we talked about before.

21  Q.  And then *"peer or client ID."*  Is that the TC number you

22  mentioned?

23  A.  No, the peer or client ID, some BitTorrent clients actually

24  generate a peer ID as a part of their operation.  And it's just

25  used internally in that particular client.  It's not -- most of

1   them change every time you restart the program, so it's not

2   anything that would be persistent or valuable in identifying a

3   user in a particular situation.

4   Q.  And then for this last one, *"For RIAA evidence full*

5   *repertoire details, the artist name and track name."*  Does

6   Rightscorp retain that?

7   A.  Yes.  Just to be clear, it does so by matching the info

8   hash value and the specific bits against the list of works that

9   it's hired to protect and the identification of those works, so

10  it requires joining two tables.

11  Q.  Ms. Frederiksen, do you recall Dr. Cohen showing this Venn

12  Diagram reflecting his analysis of the downloads on the drive?

13  A.  I recall that, yes.

14  Q.  And you see there's various numbers he has there, *"Total*

15  *number of downloads, 59,000,"* what he calls *"distinct*

16  *infractions, unique files,"* etc., do you see that?

17  A.  Yes.

18  Q.  In your opinion, are there numbers that are relevant that

19  are missing here from this Venn Diagram?

20  A.  Yeah.

21  Q.  What number is missing that you think is relevant?

22  A.  For instance, the fact that 41,000 of those samples were

23  verified through Audible Magic by Mr. Landis's work as

24  belonging to the recording companies.

25  Q.  And why is it your view that the 41,000 matched copyrighted

Barbara Frederiksen-Cross  -  Examination        2001

1   works through Audible Magic are relevant?

2   A.  Well, it's --

3        MR. BROPHY:  Objection, Your Honor.  She's testifying

4   about songs that aren't even at issue in this case.

5        MR. O'BEIRNE:  It's verification of the system, Judge.

6   It's squarely in her report, and it's rebutting his analysis as

7   to the --

8        MR. BROPHY:  His analysis was about copyrighted works

9   at issue in this case.

10       THE COURT:  The objection is sustained.

11  BY MR. O'BEIRNE:

12  Q.  Ms. Frederiksen, do you believe that copyrighted works

13  validated by Audible Magic are relevant to the reliability of

14  the Rightscorp system?

15  A.  Sure.

16  Q.  Whether or not they're specifically being sued on in this

17  case?

18  A.  Well, yeah, because Rightscorp --

19       MR. BROPHY:  Your Honor, getting the same testimony

20  out by asking a different question.  She's testifying about --

21       THE COURT:  Objection is sustained.

22  BY MR. O'BEIRNE:

23  Q.  Setting aside the number of files, do you recall Dr. Cohen

24  saying repeatedly that there's downloads on this drive that are

25  duplicates; do you recall that?

Barbara Frederiksen-Cross  -  Examination      2002

1   A.  I recall his testimony about that.

2   Q.  Do you recall him offering opinions as to the significance

3   of duplicates being on this drive?

4   A.  Yeah, he seemed to be saying that somehow the presence of

5   duplicates on this drive should be discounted; that you should

6   just be looking at individual instances, so that little 3,692

7   that he has in the middle there.

8   Q.  Would you call any download on this drive a duplicate?

9   A.  No.  Each one was the result of the Rightscorp system going

10  out to a peer, asking for a file, and getting at least a part

11  of that file enough that it could be identifiable through

12  Audible Magic, and bringing that file back.

13      So if I went out to you a hundred times, that's a hundred

14  discrete instances that I went to that peer and downloaded that

15  file.  And I don't think that characterizing that as a

16  duplicate is really fair, because each time I've gone out

17  there, I've gotten the file again.  I mean, that's a

18  demonstration of repeat infringers.

19  Q.  Do you believe that the fact that there are multiple copies

20  of the same infringing work from the same user over time makes

21  the data on this drive show the Rightscorp system is more or

22  less reliable?

23  A.  Well, I think it's more reliable because when it keeps

24  going out there, it keeps getting what it's asking for, and

25  then that file was verified through Audible Magic.  So

Barbara Frederiksen-Cross  -  Examination       2003

1   Rightscorp verified it through AcoustID, Audible Magic verifies

2   it here.  It's a verification that the system is working as

3   designed.  It's identifying a file, going out to a peer, and

4   then getting that information back.

5   Q.  Would you call that repeated downloads from the same peer?

6   A.  In the instances where it went back to the same peer, yes.

7   Q.  What relevance do you believe repeated downloads from the

8   same peer has for this idea from Dr. Cohen that maybe these

9   peers are not willing to share?

10  A.  Well, it certainly refutes some of them aren't willing to

11  share, because they shared over and over and over.  When

12  Rightscorp went out to download the file, they gave it to them.

13  When it went out again, they gave it to them again.  That

14  certainly suggests that those peers were willing to share.

15  Q.  The last topic I want to ask you about, Ms. Frederiksen, is

16  Dr. Cohen's testimony that there may be peers on BitTorrent

17  that are lying about what they have and saying they have more

18  bit fields than they really do.  Do you recall that testimony?

19  A.  Yes, I recall he said that you could do that.

20  Q.  Is that consistent with your understanding of how

21  BitTorrent software works?

22  A.  No.  I mean, I've examined a lot of different BitTorrent

23  clients.  I've looked at the source code for many of them, and

24  I have never seen a BitTorrent client that allows an option for

25  a user to say, I'm going to overreport the pieces I have.  And

Barbara Frederiksen-Cross  -  Examination       2004

 1   that's contrary to the whole premise of how that piece

 2   reporting is used for BitTorrent, because BitTorrent is a

 3   tit-for-tat protocol.  You get preferential treatment under the

 4   BitTorrent protocol if you share with another peer.

 5       And in contrast, if you say you have a piece and a peer

 6   asks for it and you don't give it in a reasonable amount of

 7   time, that peer breaks its connection with you.  And so

 8   somebody who is saying, I have this, I have this, I have this,

 9   and doesn't have it, is going to end up getting shut out of any

10   transaction with the swarm.

11       Now, peers will underreport.  You know, it became widely

12   known that antipiracy companies were sending notices for peers

13   that were seeds; that is to say, peers that reported they had

14   all of the pieces.  And so there are options you can set to

15   underreport your bit field but not to overreport.

16   Q.  Based on your familiarity with the most common BitTorrent

17   software, is it your opinion that whatever bit fields that

18   users were reporting to Rightscorp they had, they at least had

19   those?

20   A.  Yes.  And I've confirmed that in my trace analysis of

21   BitTorrent traffic as well.  You know, when I actually tested

22   it and asked for pieces that peers said they had, I got those

23   pieces.

24           MR. O'BEIRNE:  That's all the questions I have, Judge.

25                         EXAMINATION

1   BY MR. BROPHY:

2   Q.  Ms. Frederiksen, you testified about this command, *"ON*

3   *COMPLETION [NOT] PRESERVED*."  Do you see that?

4   A.  Yes.

5   Q.  If Mr. Boswell had not put the "not" in there, the system

6   would have logged whenever the 10 percent bit field rule was in

7   operation; isn't that right?

8   A.  If you coded "ON COMPLETION PRESERVE," it would have logged

9   it.

10  Q.  And he typed in "not" there instead, and as a result, it

11  didn't log it, right?

12  A.  That's correct, but if he had typed nothing there, the same

13  thing would have happened.

14  Q.  But he went through all the trouble of typing in *"ON*

15  *COMPLETION PRESERVE,"* and if he would have just stopped there,

16  it would have logged all the instances of 10 percent bit field,

17  but then he typed "N-O-T" in addition, and it didn't log

18  anything, right?

19  A.  Yeah, he documented that he was taking the default, and

20  that seems to have been his pattern when setting up these

21  events is if he wanted it logged, he would say *"PRESERVE,"* and

22  otherwise he would document that he was taking the default.

23  Q.  And if the "not" wasn't there, it would have logged

24  everything, right?

25  A.  It would not have logged everything.  It would have logged

Barbara Frederiksen-Cross  -  Examination      2006

1    that that event had occurred, so you would know that on a

2    particular date/time, that event had run.  It wouldn't log the

3    details from what was going on, just that the event had

4    executed.

5    Q.  I may have been a little bit unclear about your testimony

6    earlier, but was it your testimony that Rightscorp does this

7    full download verification?

8    A.  It's my testimony that Rightscorp does the full download

9    verification that's contemplated where it talks about the

10   torrent a couple sentences later.  I think that the upper part

11   of this paragraph pertains to downloads from the other three

12   protocols where it would be necessary to download the file to

13   verify what you got.

14   Q.  Okay.  So this full verification, this entire paragraph,

15   your testimony isn't that Rightscorp performs all those steps,

16   right?

17   A.  No.  My testimony is that it performs the steps that are

18   relevant to BitTorrent, as described in this paragraph and the

19   succeeding paragraph.

20   Q.  But not all the steps required in that paragraph, right?

21   A.  Not the steps that would be required for a peer-to-peer

22   network where you had to download it to identify it.

23   Q.  And particularly I've highlighted this passage in the

24   middle.  Rightscorp doesn't do that, right?  It doesn't reach

25   out and download a file from an individual target computer,

1  does it?

2  A.  No, it does what's said below for torrent files --

3  Q.  That wasn't my question.

4  A.  -- it downloads from the torrent.

5  Q.  That wasn't my question.  I wanted to understand whether it

6  did that.  You've answered my question.

7        MR. O'BEIRNE:  It's asked and answered.

8        THE COURT:  If that's an objection, it's overruled.

9  BY MR. BROPHY:

10  Q.  My last question, if your testimony today is directly

11  inconsistent with Mr. Boswell's testimony, who is the jury

12  supposed to believe?

13        MR. O'BEIRNE:  Objection, Your Honor.

14        THE COURT:  That's an improper question.

15        MR. BROPHY:  I'm done.  Thank you.

16        MR. O'BEIRNE:  No further questions.

17        THE COURT:  All right, ma'am, you may step down.

18  Thank you very much.

19        THE WITNESS:  Thank you, Your Honor.

20        MR. BART:  Your Honor, plaintiffs rest.

21        THE COURT:  Okay.  Now, ladies and gentlemen, there

22  are some legal issues that I need to resolve with the

23  attorneys, and so I'm going to send you back to the jury room.

24  Just relax, and as soon as we're done, I will have you come

25  right back out again.  Okay?

1          COURT SECURITY OFFICER:  All rise for the jury.

2          *(10:16 a.m., the jury exits the courtroom.)*

3                         *   *   *

4          THE COURT:  Okay.  You can be seated.  All right.

5     We'll start with the defense.

6          MR. THOMAS:  Thank you, Your Honor.  Would you like us

7     to go issue by issue?  I just want to know where I should

8     pause.

9          THE COURT:  Just make your motion.

10         MR. THOMAS:  Very good, Your Honor.  Grande moves

11    under Rule 50 for judgment as a matter of law on direct

12    infringement.  First of all, there's been no evidence by which

13    a jury could determine substantial similarities; specifically,

14    the jury was not provided any copies for any sort of

15    side-by-side comparison of any of the sound recordings at

16    issue.

17         There is insufficient evidence that any of the alleged

18    direct infringers were actual Grande subscribers, as opposed

19    to, for example, folks that were using WiFi provided by an

20    unsecured router, that sort of thing.

21         The IP address assigned to a specific account is, at

22    best, circumstantial evidence that it was a subscriber doing

23    the infringing.  There's no evidence that any of the sound

24    recordings at issue was actually distributed.  Plaintiffs have

25    failed to prove ownership.  They have not provided a -- any

1   documents enough to prove a chain of title in the rights

2   asserted, including the specific rights relating to

3   distribution and/or the right to sue for past infringement.

4         Your Honor will recall that the Court granted a motion

5   in limine on this issue and prevented Grande from addressing

6   the ownership issue on the premise that there was an order at

7   summary judgment determining ownership, and Grande maintains

8   that that -- there is no such order on that issue.

9         On contributory infringement, the element of

10  knowledge.  Plaintiffs have not met their burden on knowledge

11  owing to the fact that there's no way, it's undisputed that

12  Grande cannot verify a notice, Grande cannot have actual

13  knowledge.  The notices at issue are insufficient to confer

14  actual knowledge.

15        There's no evidence that Grande knew of plaintiff's

16  copyrights.  That information was not in the notice.  The

17  notices identified BMG rather than plaintiffs.  There's no

18  evidence that Grande knew of the copyrights, because there were

19  no registration numbers.  The notices were not PGP signed, so

20  there was no way for Grande to determine they were legitimate.

21  Notices did not comply with DMCA.  They have been presented at

22  various times through trial as if they were DMCA takedown-type

23  notices.  There was no evidence in the notices underlying the

24  allegations, such as the bit field and the sorts of things that

25  have been discussed, nor was there identification of the event

1    of the specific time of infringement.

2         There's no evidence sufficient to demonstrate that

3    Grande had knowledge of alleged downloads.  Even if they had

4    knowledge, there was insufficient evidence that Grande had

5    knowledge of all of the works in suit.  That is to say

6    knowledge has not been demonstrated on a work-by-work basis.

7         There could be no willful blindness because, again,

8    there's no way for Grande to unblind itself, with respect to

9    these allegations.

10        And then as to -- the jury was presented with evidence

11   of -- that purported to show Grande's state of mind.  All of

12   that evidence was inadmissible under 17 U.S.C. 512(L).

13        For contributory infringement, there is insufficient

14   evidence for the jury to find in plaintiff's favor on material

15   contribution or inducement or basic measures.  There has been

16   no demonstration of a material contribution by Grande to the

17   alleged infringement.

18        The measures that appear to have been contemplated;

19   namely, terminating accounts, is not a basic measure to use the

20   language that we understand will be in the jury instructions.

21        Termination.  There's no evidence that termination

22   would stop infringement.  For example, in the case of free

23   Internet at a coffee shop or that sort of thing.

24        There's no evidence that Grande actually provided

25   evidence -- or, I'm sorry, provided access to infringing works

1    or, indeed, had access itself to the infringing works at issue.

2          Grande has no control -- and it's undisputed that

3    Grande has no control -- on what's available on BitTorrent.  It

4    will stay there, according to plaintiff's own evidence, whether

5    a particular customer has terminated or not.

6          On willfulness, plaintiffs have failed to meet their

7    burden to demonstrate that any contributory infringement was

8    willful.  Again, there is no knowledge on Grande's part of

9    actual specific instances of infringement.  There's no evidence

10   that Grande knew its alleged conduct was contributing to

11   infringement.  There's no knowledge, again, of the fact that

12   these were plaintiff's copyrights at issue.

13         There's this matter of recklessness as the willfulness

14   standard that we argued at the jury charging conference;

15   namely, that the conflation of the recklessness standard for

16   willfulness and for contributory infringement, which we'll

17   incorporate here in this motion.

18         On the matter of damages, statutory damages, we move

19   for -- as a matter of law that the compilation for the

20   calculation of statutory damages should be that a work is a

21   compilation as opposed to each individual sound recording being

22   a single work.

23         Many -- wherever there was a registration that was

24   registered as a compilation, that's a single work under the

25   statute.  Likewise, wherever there is a work made for hire,

1   that's a necessary compilation; therefore, a single work under

2   the statute for purposes of calculating damages.

3          There is insufficient evidence to establish

4   independent economic value of each of the sound recordings at

5   issue.  The only evidence that was provided was a conclusory

6   statement by a representative from each of the record labels.

7   This is insufficient to demonstrate independent economic value.

8          And finally, there's been no offering of eligibility

9   on a work-by-work basis.  I understand the Court has already

10  ruled on a variation of this issue, but in any event, we

11  maintain as a matter of law that plaintiffs have not carried

12  their burden to demonstrate eligibility for statutory damages

13  on a work-by-work basis.

14         Bear with me for ten seconds while I have a look at

15  the notes.

16         *(Pause.)*

17         That concludes our motion, Your Honor.

18         THE COURT:  Okay.  Who's going to be -- Mr. Bart.

19         MR. BART:  First off, with regard to defendant's

20  motion, I think all that needs to be noted is that it is an

21  attempt to re-argue every legal decision that's ever been made

22  in the case, which is completely improper as a matter of law in

23  terms of what a Rule 50 motion is supposed to be, everything

24  going from ownership to rulings that Your Honor has already

25  made.  I think the best response to everything that they've

 1   said is to make my own motion, which is to suggest that the

 2   record is --

 3          THE COURT:  Just a minute.  He does say that I never

 4   made a ruling or Judge Yeakel never made a ruling on ownership

 5   of the documents, the --

 6          MR. BART:  But you have repeatedly throughout this

 7   case.  You've made -- you've said that ownership has been

 8   resolved and is not an issue for trial in this case.

 9          THE COURT:  If I didn't do it before, I will now,

10   because there's not been one shred of evidence anywhere that

11   the plaintiff in this case did not -- plaintiffs in this case

12   don't own those copyrights.

13          MR. BART:  Right.  Well, I mean, Your Honor, I could

14   go through -- this was just a laundry list of literally

15   everything they could possibly have mentioned, including the

16   jury instructions and the rest.  I don't believe that it

17   warrants a response.  I think that the best response -- I'm

18   happy to address anything that Your Honor is seriously

19   considering.

20          THE COURT:  Just go ahead and do what you feel like

21   you need to do.

22          MR. BART:  Okay.  Well, what I want to do first is

23   move for judgment as a matter of law with regard to liability

24   in this case.  I think that the plaintiffs have demonstrated

25   every element in a way that it could not be ruled otherwise.

1          With regard to direct infringement of each work, the

2     downloads that have been obtained in this case are

3     categorically copies that have been made from Grande users and

4     are all, undeniably, distributions from that user to -- to

5     Rightscorp.  And they're all in the case and none have been

6     contradicted in any way.

7          Moreover, each one of those downloads contains a TC

8     number which tracks back to the prior notice, to the same user

9     about the same work.  So every single one of them, Grande was

10    on notice of that user infringing this work.  We have a copy of

11    that work.  It's been verified by Audible Magic and it proves

12    really without any -- without any question that there's been

13    direct infringement.  And then that direct infringement has

14    been corroborated in terms of knowledge both by the notice that

15    goes back to that Grande has received and by their overwhelming

16    willful blindness.

17         The willful blindness.  Everything that Mr. Thomas was

18    talking about in terms of not being able to verify and all of

19    the other questions that he raised in his laundry list of

20    points ignore the fact that for a period of six years, Grande

21    did zero.  It did nothing.  It admittedly had no concerns, no

22    information, no doubts about the information it was receiving.

23    It just made a policy that no matter how many notices anybody

24    got, they weren't going to do anything about it.

25         More classic case of willful blindness could not be

1    imagined, Your Honor.  And between that willful blindness and

2    the notice that was generated for each of the downloads, you

3    have direct infringement and the knowledge element resolved.

4           With regard to the material contribution, that

5    material contribution is continuing to provide Internet service

6    to people who are repeat infringers and giving them the tools

7    with which they continue to infringe.  The records reflect that

8    in 2016, Grande was aware that it had users who had received

9    over 10,000 notices each, and that there were 500 of them that

10   had 500 notices each, and they continued to provide Internet

11   service to all of them.

12          And as a matter of fact, Mr. Horton testified that

13   they would have continued to provide service no matter how many

14   notices anybody received.  So you have direct infringement.

15   You have knowledge of willful blindness.  You have material

16   contribution, all as a matter of law, and we believe that

17   judgment is warranted as a matter of law.

18          With regard to -- there's really two other points that

19   I want to make the motion on.  One is on the statute of

20   limitations.  We believe that there is no issue to go to the

21   jury on that point, that the only evidence that is in the

22   record is that all of the works that are at issue here were

23   infringed after April 21st, 2014.  All of the downloads here

24   were downloaded in that same time period.

25          This evidence is in the record at Plaintiff's 459 for

1    the notices and Plaintiff's 5 for the downloads, and we don't

2    believe that there's any issue of fact or evidence to the

3    contrary that could go to the jury on point of the statute of

4    limitations.

5           And finally, with regard to innocent infringer, we

6    believe that there is no way that in a contributory

7    infringement case where knowledge is required, that a party can

8    be an innocent infringer.  In this situation, there is either

9    actual knowledge or willful blindness; either one of which

10   would disqualify Grande as a matter of law from being an

11   innocent infringer.

12          I'm prepared to address any of the issues that

13   defendant raised.  I think they're all kind of frivolous on

14   their face, but I wanted to put on the record our motion, Your

15   Honor.

16          THE COURT:  All right.  First of all, the defendant's

17   motion for judgment as a matter of law is denied.  There is

18   sufficient evidence by which a jury could find by a

19   preponderance of the evidence that the defendants were, in

20   fact, aware of the infringing activity of their customers over

21   hundreds, if not thousands, of occasions, and that they -- if

22   they were not directly and absolutely aware in the sense that

23   it could be proven, that they were willfully -- the jury could

24   easily find that they were willfully blind.  So both of those

25   apply in this case.

1          With respect to the other aspects of the motion, these

2    are basically issues that the Court has already ruled on either

3    in writing or orally.  I certainly understand why they're being

4    re-raised, but the Court has already made rulings on those, and

5    generally, with extensive argument by counsel.  And none of

6    those other issues, in my view, warrant the Court taking this

7    case from the jury.

8          Now, moving on to the plaintiff's motion, that motion

9    is denied.  The Court does find that there are genuine issues

10   which -- with one exception, could be and were contested by the

11   defense sufficiently so that the jury properly is the one to

12   find whether, in fact, the infringements here were, in fact,

13   entitled to be considered to be intentional or reckless

14   disregard.  This goes to the innocence defense, and they did

15   raise a lot of issues during the trial, whether the jury

16   believes it or not, about the credibility and reputation of

17   Rightscorp and whether they were within their bounds to have

18   ignored Rightscorp's information.

19         Now, with respect to the statute of limitations, it

20   does not appear to me that there is any dispute with respect to

21   the statute of limitations.  So I am going to grant the

22   judgment to the plaintiffs on the statute of limitations issue

23   because there really hasn't been any dispute with respect to

24   that.  The numbers are what they are.

25         MR. HOWENSTINE:  Could I address that briefly, Your

JURY TRIAL PROCEEDINGS                    2018

1   Honor?

2        THE COURT:  Yes.

3        MR. HOWENSTINE:  The reason that we put that in the

4   instructions -- and it is in the current set of jury

5   instructions, Your Honor --

6        THE COURT:  And it's going to get removed.

7        MR. HOWENSTINE:  -- is just to frame the relevant time

8   period, because there has been evidence introduced about

9   Rightscorp notices that were sent in that earlier timeframe,

10  before April of 2014.

11       THE COURT:  Well, there's no question that we need to

12  make sure we have the relevant time period, but there is a

13  difference between that and my ruling as a matter of law that

14  the plaintiffs have missed the statute of limitations, which

15  they haven't.

16       MR. HOWENSTINE:  Right.  And Your Honor, the relevance

17  of that instruction, the utility, is just to make sure that the

18  jury understands that there's no recovery for infringements

19  before April of 2014.

20       THE COURT:  We'll take another look at that

21  instruction.  I think it's pretty clear.

22       MR. BART:  Yes.  Your Honor, this instruction is a

23  defense, and they're saying there is no defense to the claim of

24  infringement based upon the statute of limitations.  And the

25  information that is before 2014 is obviously relevant to issues

 1   other than that in this case of willfulness, of willful

 2   blindness, of state of mind, of all of those things.

 3        THE COURT:  Well, let's make sure -- let's take

 4   another look at that instruction and make sure it does that.

 5   But you're absolutely right.  There is absolutely no contrary

 6   evidence with respect to the issue of the statute of

 7   limitations.

 8        MR. BART:  No, Your Honor, and the --

 9        THE COURT:  The instruction says, *"Plaintiffs may only*

10   *recover damages for sound recordings that you find was"* -- it

11   should be were -- *"were infringed on or after April 21, 2014."*

12   It's that simple.

13        MR. BART:  Right, but the instruction is -- will not

14   have an impact.  If there's any instruction at all, it should

15   be that plaintiffs may recover for all of the sound recordings

16   asserted in this case, since they were all distributed or

17   infringed on or after April 21st, 2014.

18        There's no point in telling the jury that we can only

19   recover damages if you find it was infringed when there's no

20   issue about when it was infringed.  That's the whole point.

21   The point of a statute of limitations instruction is to tell

22   the jury that in their deliberations --

23        THE COURT:  I thought we had testimony, though, that

24   preceded 2014.  Didn't we have testimony about that?

25        MR. BART:  Of course we did.

 1          THE COURT:  Yeah.  So I want to make sure the jury

 2   doesn't think that they can base their recovery on something

 3   that occurred in 2012 or 2011.

 4          MR. BART:  Well, they certainly can't recover for a

 5   work that was only infringed before 2014.  But there are no

 6   works that were only infringed before 2014.  But it can't be

 7   used to exclude evidence that's relevant on other issues that

 8   came before 2014.  And that's what defendant is trying to do

 9   here.  This instruction is telling the jury that they are to

10   make a finding --

11          THE COURT:  Well, there should be that -- the

12   sentence, as it stands, is correct.

13          MR. BART:  Well, but there's no finding --

14          THE COURT:  Wait, Mr. Bart.

15          MR. BART:  I'm sorry, Your Honor.

16          THE COURT:  If you want to add a sentence that says,

17   *However, the jury may consider actions by the parties which*

18   *took place prior to 2014 for purposes of knowledge, intent,*

19   *purpose,* that kind of thing, that would do it, Mr. Bart.

20          MR. BART:  Well, I'm trying to think it through, Your

21   Honor, and respectfully --

22          THE COURT:  Think it through quickly.

23          MR. BART:  -- the problem with the sentence that's

24   here is that it's saying that you find it was infringed, which

25   suggests to the jury that they have to look at the evidence and

 1    see when it was infringed.  And it is an undisputed fact that

 2    every work was infringed during the relevant time period.

 3            It would be more appropriate to say that -- to have a

 4    separate instruction saying that evidence from before April 21,

 5    2014 is not admissible to show infringements from before that

 6    date, but only with regard to state of mind and willfulness or

 7    other issues like that.

 8            I mean, the point is there's a limitation that you're

 9    putting on the evidence before April 21st, 2014.  It can't be

10    used to set up a new work, right, because that new work would

11    have been barred by the statute of limitations.

12            THE COURT:  I understand that, but I just gave you an

13    out, which says, *You may consider evidence of infringement*

14    *alleged infringement prior to 2014 for purposes* -- which I have

15    already elucidated.

16            MR. BART:  I think that there's just an inherent

17    ambiguity in having an instruction that requires the jury to

18    find something that's not in dispute.  So that's my objection

19    to the sentence as it stands, is that it's saying that if you

20    find --

21            THE COURT:  Well, it may not be in dispute, but that

22    doesn't mean that I can't advise the jury that they can't award

23    damages.

24            MR. BART:  Okay.

25            THE COURT:  Let me give you an example.

1              Let's assume this was a car accident case.  All right?

2     And for purposes of showing the recklessness of the driver --

3     and let's say it's a rear-end hit, serious injuries, no

4     question about liability.  Okay?  But the driver is saying,

5     well, you know, this was an odd incident.  I must have passed

6     out or something else happened.  But two weeks before, he was

7     involved in a similar accident.  Okay?

8              MR. BART:  Right.

9              THE COURT:  And that evidence came in for purposes of

10    showing that -- you know, rebutting the testimony that he was

11    just, you know, blacked out or whatever.  This was not his

12    normal mode of driving.  Okay?  I would -- even though I might

13    and would in that case rule as a matter of law that the driver

14    was liable, I would also give a limiting instruction that they

15    couldn't give damages.  They could consider the earlier

16    accident, but they can't award any damages for the earlier

17    accident.  And basically that's what we have here.

18             MR. BART:  I think that when Your Honor granted --

19    just granted the motion for JMOL on the statute --

20             THE COURT:  Maybe I should withdraw it, and we'll get

21    right back to where we -- you know --

22             MR. BART:  I hear you, Your Honor, but the --

23             THE COURT:  What do they say?  What's the famous --

24             MR. BART:  I should just shut up and sit down is what

25    you're saying.

1          THE COURT:  No, no, no.  That's not what I was going

2     to suggest, but they say there's no reward for good-doing.

3          MR. BART:  That's right.  No good deed goes

4     unpunished.

5          THE COURT:  There you go.

6          MR. BART:  Right.  But I guess the point is that once

7     you grant the JMOL on the statute of limitations, I don't know

8     what the purpose of the instruction is.

9          THE COURT:  Well, because we had other testimony about

10    all kinds of activities that went on before 2014, for which the

11    jury is not entitled to award your client damages.

12         MR. BART:  Okay.

13         THE COURT:  So I am going to give some kind of --

14    guaranteed.  Okay?  You're not going to talk me out of that.  I

15    am going to give some sort of an instruction that they can't

16    award damages prior to April -- for anything that occurred

17    prior to April 21, 2014.

18         MR. BART:  That's fine, but -- that's fine, but what

19    needs to go in my opinion, after you say that, is that it's

20    undisputed that each work in suit -- or it's been held that

21    each work in suit was infringed or allegedly infringed during

22    this period, and evidence from before that period is admissible

23    for other purposes.

24         THE COURT:  I just denied that JMOL.

25         MR. HOWENSTINE:  Right, Your Honor, as you've

 1    observed --

 2              MR. BART:  What JMOL?

 3              THE COURT:  I said I wasn't going to rule as a matter

 4    of law that there had been an infringement.

 5              MR. BART:  Oh, no, I said alleged infringement.

 6              THE COURT:  Well --

 7              MR. HOWENSTINE:  Your Honor, if I could make a

 8    suggestion.  I mean, first of all, as you've observed, this

 9    statement in instruction Number 18 is indisputably correct.

10    What we could do alternatively is we could add a sentence to

11    the statutory damages instruction, instruction number 19, just

12    stating, *"The relevant time period for statutory damages begins

13    on April 21, 2014,"* period.

14              MR. BART:  I would rather have, what you have with the

15    evidence from before that period being admissible for other

16    purposes.  I mean, that's what you had suggested.

17              MR. HOWENSTINE:  If the evidence has been admitted,

18    the evidence was admissible.  We don't need to be instructing

19    the jury on what evidence they have already heard was

20    admissible.

21              MR. BART:  But we also don't need to be instructing

22    them about a ruling --

23              THE COURT:  No, no, look.  You can't have your cake

24    and eat it too on this one, counsel.  I know you'd like to,

25    but --

1          MR. BART:  So what if we just add, *"The evidence*
2   *before April 21st, 2014 can be considered for other purposes*
3   *including state of mind, knowledge and willfulness."*
4          THE COURT:  That's right.  That's what I just said.  I
5   thought I just said that ten minutes ago.
6          MR. BART:  Okay.
7          THE COURT:  That's what we're going to do.  That's
8   appropriate.  You get what you need.  And what is it, like
9   Liberty Mutual Insurance, you don't get what you don't need?
10  Right?  You are entitled to that, because I don't want them
11  thinking that they can go back to 2011 or 2010 or whatever it
12  was.  We had some testimony about that early on, about those
13  early things going on, and they heard it.  They're taking notes
14  like crazy over there, and I don't want them going back and
15  saying, well, you know, they were -- this happened way back
16  when, and we ought to figure that in too.  No.  No.
17         But it can be considered in terms of course of conduct
18  and, you know, those kinds of things.
19         You want to draft something up, Mr. Bart?
20         MR. BART:  Yes.
21         THE COURT:  Let them see it.  You know what my ruling
22  is, so don't say no -- you can have your 10,001 objection.
23  Okay?
24         MR. HOWENSTINE:  Thank you, Your Honor.
25         THE COURT:  But let him see it, all right?  Because

1    we've got to finalize this before I instruct the jury.  All

2    right?

3              MR. BART:  Okay.  We'll get them a draft within five

4    minutes.

5              THE COURT:  We'll take a short recess.

6              MR. THOMAS:  Your Honor, if I might --

7              THE COURT:  Oh, no, here we go.

8              MR. THOMAS:  While we're on the topic of jury

9    instructions.

10             THE COURT:  No, let's not.

11             MR. THOMAS:  Can we add -- can we add an instruction

12   that these are -- these songs are not eligible for statutory

13   damages?

14             THE COURT:  What songs?

15             MR. THOMAS:  The ones that the Court determined over

16   the weekend are not eligible.  They're 31, I believe.

17             MR. BART:  No.  We have the number, because they're

18   all works in suit.  They're still works in suit and the judge

19   has made a determination that we --

20             THE COURT:  Well, I don't want them looking at the

21   list and thinking, well, here we go.  Because, you know,

22   there's such a large -- we're talking about large numbers here,

23   so I agree that we should in some manner let the jury know that

24   there are 2000 and whatever the number was -- I don't remember.

25             MR. BART:  Oh, you mean originally?  There are 1422

```
1    works in suit.

2            THE COURT:  1422 works in suit; however, only --

3            MR. BART:  1391 were eligible.

4            THE COURT:  -- 1391, and the following are not

5    eligible.  The following ones are not eligible.  So that they

6    don't get that confused.  So draft up an instruction to that.

7    You draft up an instruction to that effect.  You're the one who

8    wants it.  Don't blame it on Mr. Bart.

9            MR. THOMAS:  Thank you, Your Honor.

10           (Discussion off the record.)

11                            *  *  *

12           MR. BART:  Your Honor, I do want to address the list

13   as you know.  I'll wait until I see their instruction.

14           THE COURT:  Okay.

15           COURT SECURITY OFFICER:  All rise.

16           (10:49 a.m.)

17                            *  *  *

18           (10:52 a.m.)

19           MR. ATTRIDGE:  This is Kevin Attridge for the

20   plaintiffs.  We move to seal Plaintiff's Exhibit 18,

21   Defendant's Exhibit 14, Defendant's Exhibit 15, Defendant's

22   Exhibit 16, Defendant's Exhibit 17, Defendant's Exhibit 21,

23   Defendant's Exhibit 24, defendant's Exhibit 25, Defendant's

24   Exhibit 30, Defendant's Exhibit 46, Defendant's Exhibit 53,

25   Defendant's Exhibit 54, Defendant's Exhibit 55, Defendant's
```

1   Exhibit 66, Defendant's Exhibit 67, Defendant's Exhibit 68,

2   Defendant's Exhibit 69 -- oh, I'm sorry.  Take that off.

3   Defendant's Exhibit 90, Defendant's Exhibit 97, Defendant's

4   Exhibit 104, Defendant's Exhibit 109, Defendant's Exhibit 155,

5   Defendant's Exhibit 156 and Defendant's Exhibit 157.

6            MS. SZEWCZYK:  Margaret Szweczyk for Grande

7   Communications, and we move to seal the following:  Plaintiff's

8   Exhibit 45, Plaintiff's Exhibit 57, Plaintiff's Exhibit 58,

9   Plaintiff's Exhibit 59, Plaintiff's Exhibit 60, Plaintiff's

10  Exhibit 61, Plaintiff's Exhibit 62, Plaintiff's Exhibit 80.

11  Plaintiff's Exhibit 81, Plaintiff's Exhibit 82, Plaintiff's

12  Exhibit 84, Plaintiff's Exhibit 90, Plaintiff's Exhibit 91,

13  Plaintiff's Exhibit 106, Plaintiff's Exhibit 108, Plaintiff's

14  Exhibit 109, Plaintiff's Exhibit 166, Plaintiff's Exhibit 169,

15  Plaintiff's Exhibit 180, Plaintiff's Exhibit 181, Plaintiff's

16  Exhibit 184, Plaintiff's Exhibit 206, Plaintiff's Exhibit 216,

17  Plaintiff's Exhibit 230, Plaintiff's Exhibit 233, Plaintiff's

18  Exhibit 248, Plaintiff's Exhibit 262, Plaintiff's Exhibit 272,

19  Plaintiff's Exhibit 274, Plaintiff's Exhibit 346, Plaintiff's

20  Exhibit 712, Plaintiff's Exhibit 186.

21            And Defendant Exhibit Number 9, Defendant's Exhibit

22  Number 27, Defendant's Exhibit 28, Defendant's Exhibit 77,

23  Defendant's Exhibit 78, Defendant's Exhibit 111, Defendant's

24  Exhibit 112, Defendant's Exhibit 113, Defendant's Exhibit 114,

25  Defendant's Exhibit 137.

```
 1            (10:55 a.m.)

 2                          *   *   *

 3            COURT SECURITY OFFICER:  All rise.

 4            THE COURT:  Please be seated.  Okay, I've given you

 5   the Court's jury instruction on the disputed issue.  You got

 6   that, right?

 7            MR. BART:  Yes.

 8            MR. BROPHY:  Yes, Your Honor.

 9            MR. BART:  Your Honor, I do want to address a couple

10   of things, at least to put them on the record.

11            THE COURT:  All right.

12            MR. BART:  First with regard to the number of works

13   that were taken out of the 1422, because the decision was made

14   based on the papers filed yesterday -- and I appreciate the

15   pressure and the need to make a decision that Your Honor did,

16   but out of the works that were taken out, 12 of them were

17   because they were duplicate registrations.

18            THE COURT:  Right.  There's no way the jury can tell

19   which --

20            MR. BART:  But as a matter of law, 12 -- those are

21   supplemental registrations, which do not change the effective

22   date of the original registration.  So we didn't have a chance

23   to respond to their papers.  I need to at least put on the

24   record that those 12 works did not change -- and they say

25   supplemental registrations, and the example that they put in
```

1    their paper says supplemental registration.  That does not

2    create an issue for 412.  That is simply a correction of some

3    information or an addition of some information.

4             THE COURT:  You know, for some reason, I'll be honest

5    with you, I never lie to counsel.  I missed that.

6             MR. BART:  Well, I think that's important, and I think

7    that, you know, if Your Honor would be willing to look at it,

8    it's on the record, and I think that --

9             THE COURT:  If it's just a supplemental registration.

10            MR. BART:  Yes.

11            THE COURT:  I didn't realize it was a supplemental

12   registration.

13            MR. BART:  Yes.

14            THE COURT:  It should be in there.

15            MR. BART:  Yes.  So that is the major point, Your

16   Honor.  I want to preserve my objection --

17            THE COURT:  No, you don't need to preserve your

18   objection, because if that's a supplemental registration, and

19   that's on the record --

20            MR. BART:  I can give them to you, Your Honor.  It

21   shows the supplemental registrations on the side.

22            THE COURT:  Okay.  Then I will put those back in.

23   Those should be in.

24            MR. BART:  Thank you, Your Honor.

25            THE COURT:  And I note your objection.

 1          MR. THOMAS:  I just want to make sure I understand.

 2    You're going to identify which -- you said there are 12?

 3          THE COURT:  Yes.

 4          MR. BART:  Why don't we -- we'll take a photo -- you

 5    want to take a photo of this, or we can take it --

 6          MR. THOMAS:  I just wanted to make sure I was clear.

 7          THE COURT:  If that was the only issue, then we'll

 8    make that change.  So that 12, what is it now?

 9          LAW CLERK:  It's now 1403.

10          THE COURT:  1403.  So here is what I propose to do,

11    counsel.  So we have now -- everybody agree we've settled the

12    instructions?  I know you've got objections, but we settled the

13    instructions.  No disagreement?

14          MR. BROPHY:  Yes, Your Honor.

15          THE COURT:  So now what we will do is I'm going to

16    have -- any objection to Alison reading the instructions for

17    me?

18          MR. BROPHY:  None whatsoever.

19          MR. BART:  No.

20          THE COURT:  Because if I read the instructions, it's

21    not going to be good.  Well, maybe it will be good for you.

22    I'll be croaking like a frog.  So she will read the

23    instructions.  I will let them know that they are my

24    instructions.  I'm also going to provide them with -- I usually

25    provide the jury with three copies so they know there's --

1    that's enough to take with them, so they don't have to take

2    any -- trying to be furiously taking notes.

3              Once that is done, we will recess for lunch.  When we

4    come back, we're going to go right into closing argument, all

5    right?  So hopefully we'll get that all done today and they can

6    either start -- well, my hope is they'll start their

7    deliberations this afternoon.

8              Have you got that change, Alison?

9              LAW CLERK:  Yes, I'm printing it now.

10             THE COURT:  All right.  Give her a minute to print it,

11   and we'll bring the jury in.

12             *(Discussion off the record.)*

13                                *  *  *

14             THE COURT:  Bring the jury in.

15             COURT SECURITY OFFICER:  All rise for the jury.

16             *(12:02 p.m.)*

17                                *  *  *

18             THE COURT:  Please be seated.

19             All right, ladies and gentlemen, we are now at that

20   portion of the trial where you've heard all of the evidence.

21   There's no more evidence to come in, and it is now the judge's

22   responsibility at any federal trial to instruct the jury.

23   Remember, I told you I'm the person who instructs you on the

24   law, and I am the judge of the law, whereas you are the judges

25   of the facts.

1            So what is going to happen now is that my law clerk,

2   Alison Rogge, is going to read you my jury instructions with

3   the consent of the parties.  You know about my vocal issues, so

4   it is just as if I was reading them to you.  Okay?  Please

5   don't sit there and try to scribble down all this stuff that

6   you're going to hear, because you will receive three copies of

7   my jury instructions, as she's reading them, in the jury room.

8   So you'll actually have copies.  I send them in.  A lot of

9   judges don't.  I do.  Because I don't want you in there

10  furiously trying to write them down.

11           And the fact of the matter is, when you do that -- I

12  don't know how good of a note-taker you are.  I'm not very

13  good, and you could actually mess up some words or get it

14  wrong.  So it's much better for me to give you the jury

15  instructions, and then there's no question about it.  Okay?

16           All right, Alison, probably better if you go to the

17  podium.  Unfortunately, I don't think we can turn that podium

18  sideways.

19           MS. ROGGE:  I can just look at them.

20           THE COURT:  You can start right now.

21           MS. ROGGE:  Instruction Number One.  Members of the

22  Jury, it is my duty and responsibility to instruct you on the

23  law you are to apply in this case.  The law contained in these

24  instructions is the only law you may follow.  It is your duty

25  to follow what I instruct you the law is regardless of any

1    opinion that you may have as to what the law ought to be.

2            If I have given you the impression during the trial

3    that I favor either party, you must disregard that impression.

4    If I have given you the impression during trial that I have an

5    opinion about the facts of this case, you must disregard that

6    impression.

7            You are the sole judges of the facts of this case.

8    Other than my instructions to you on the law, you should

9    disregard anything I may have said or done during the trial in

10   arriving at your verdict.  You should consider all of the

11   instructions about the law as a whole and regard each

12   instruction in light of the others without isolating a

13   particular statement or paragraph.

14           The testimony of the witnesses and other exhibits

15   introduced by the parties constitute the evidence.  The

16   statements of counsel are not evidence.  They are only

17   arguments.  It is important for you to distinguish between the

18   arguments of counsel and the evidence on which those arguments

19   rest.  What the lawyers say or do is not evidence.  You may,

20   however, consider their arguments in light of the evidence that

21   has been admitted and determine whether the evidence admitted

22   in this trial supports their arguments.

23           You must determine the facts from all the testimony

24   that you have heard and the other evidence submitted.  You are

25   the judges of the facts, but in finding those facts, you must

1   apply the law as I instruct you.

2           You are required by law to decide the case in a fair,

3   impartial, and unbiased manner, based entirely on the law and

4   on the evidence presented to you in the courtroom.

5           You may not be influenced by passion, prejudice, or

6   sympathy you might have for the plaintiff or the defendant in

7   arriving at your verdict.

8           Instruction Two, Evidence.  The evidence you are to

9   consider consists of the testimony of the witnesses, the

10  documents, and other exhibits admitted into evidence and any

11  fair inferences and reasonable conclusions you can draw from

12  the facts and circumstances that have been proven.

13          Generally speaking, there are two types of evidence.

14  One is direct evidence, such as testimony of an eyewitness.

15  The other is indirect or circumstantial evidence.

16  Circumstantial evidence is evidence that proves a fact from

17  which you can logically conclude another fact exists.  As a

18  general rule, the law makes no distinction between direct and

19  circumstantial evidence, but simply requires that you find the

20  facts from a preponderance of all the evidence, both direct and

21  circumstantial.

22          Instruction Number Three, What Is Not Evidence.  In

23  reaching your verdict, you may consider only the testimony and

24  exhibits received into evidence.  Certain things are not

25  evidence, and you may not consider them in deciding what the

1   facts are.  I will list them for you.

2           First, arguments and statements by lawyers are not

3   evidence.  The lawyers are not witnesses.  What they have said

4   in their opening statements, will say in closing arguments and

5   at other times, is intended to help you interpret the evidence

6   but it is not evidence.  If the facts as you remember them

7   differ from the way the lawyers have stated them, your memory

8   of them controls.

9           Second, questions and objections by lawyers are not

10  evidence.  Attorneys have a duty to their clients to object

11  when they believe a question is improper under the rules of

12  evidence.  You should not be influenced by the objection or by

13  the Court's ruling on it.

14          Third, testimony that is excluded or stricken or that

15  you have been instructed to disregard is not evidence and must

16  not be considered.  In addition, some evidence has been

17  received only for a limited purpose.  When I have instructed

18  you to consider certain evidence only for a limited purpose,

19  you must do so, and you may not consider that evidence for any

20  other purpose.

21          Fourth, anything you may have seen or heard when the

22  Court was not in session is not evidence.  You are to decide

23  the case solely on the evidence received at trial.

24          Instruction Number Four, Ruling On Objections.  There

25  are rules of evidence that control what can be received into

1    evidence.  When a lawyer asked a question or offered an exhibit

2    into evidence and a lawyer on the other side thought that it

3    was not permitted by the rules of evidence, that lawyer might

4    have objected.  If I overrule the objection, the question was

5    answered or the exhibit received.  If I sustained the

6    objection, the question was not answered and the exhibit was

7    not received.

8            Whenever I sustain an objection to a question, you

9    must ignore the question and must not guess what the answer

10   might have been.  Sometimes I order that evidence be stricken

11   from the record and that you disregard or ignore that evidence.

12   That means when you are deciding the case, you must not

13   consider this stricken evidence for any purpose.

14           Instruction Number Five, Witnesses.  You alone are to

15   determine the questions of credibility or truthfulness of the

16   witnesses.  In weighing the testimony of the witnesses, you may

17   consider the witness's manner and demeanor on the witness

18   stand, any feelings or interest in the case or any prejudice or

19   bias about the case that he or she may have had and the

20   consistency or inconsistency of his or her testimony considered

21   in light of the circumstances.

22           Has the witness been contradicted by other credible

23   evidence?  Has he or she made statements at other times and

24   places contrary to those made here on the witness stand?  You

25   must give the testimony of each witness the credibility you

1    think it deserves.

2          Even though a witness may be a party to the action and

3    therefore interested in its outcome, the testimony may be

4    accepted if it is not contradicted by direct evidence or by any

5    inference that may be drawn from the evidence, if you believe

6    the testimony.

7          You are not to decide this case by counting the number

8    of witnesses who have testified on opposing sides.  Witness

9    testimony is weighed.  Witnesses are not counted.  The test is

10   not the relative number of witnesses but the relative

11   convincing force of the evidence.

12         The testimony of a single witness is sufficient to

13   prove any fact, even if a greater number of witnesses testified

14   to the contrary if, after considering all of the evidence, you

15   believe that witness.

16         Instruction Number Six, Impeachment.  In determining

17   the weight to give the testimony of a witness, you may consider

18   whether there was evidence that at some other time the witness

19   said or did something or failed to say or do something that was

20   different from the testimony given at the trial.  A simple

21   mistake by a witness does not necessarily mean that the witness

22   did not tell the truth as he or she remembers it.  People may

23   forget some things or remember other things inaccurately.

24         If a witness made a misstatement, consider whether

25   that misstatement was an intentional falsehood or simply an

1    innocent mistake.  The significance of that may depend on

2    whether it has to do with an important fact or only -- or with

3    only an unimportant detail.

4          Instruction Number Seven, Expert Witnesses.  When

5    knowledge of technical subject matter may be helpful to the

6    jury, a person who has special training or experience in that

7    technical field is permitted to state his or her opinion on

8    those technical matters.  However, you are not required to

9    accept that opinion.  As with any other witness, it is up to

10   you to decide whether to rely on it.

11         Instruction Eight, Deposition Testimony.  Certain

12   testimony has been presented to you through depositions.  A

13   deposition is the sworn recorded answers -- a deposition is

14   their sworn recorded answer to a question a witness was asked

15   in advance of the trial.  Under appropriate circumstances, if a

16   witness cannot be present to testify from the witness stand,

17   that witness's testimony may be presented under oath in the

18   form of a deposition.

19         Sometime before this trial, attorneys representing the

20   parties in this case questioned these witnesses under oath.  A

21   court reporter was present and recorded the testimony.  The

22   questions and answers have been shown to you.  The deposition

23   testimony is entitled to the same consideration and weighed and

24   otherwise considered by you in the same way as if the witness

25   had been present and had testified from the witness stand in

1    court.

2          Instruction Number Ten, Limiting Instruction.  When

3    testimony or an exhibit was admitted for a limited purpose, you

4    may consider that testimony or exhibit only for the specific

5    limited purpose for which it was admitted.

6          Instruction Number 11, No Inference From Filing Suit.

7    The fact that a person brought a lawsuit and is in court

8    seeking damages creates no inference that the person is

9    entitled to a judgment.  Anyone may make a claim and file a

10   lawsuit.  The act of making a claim in a lawsuit by itself does

11   not in any way tend to establish that claim and is not

12   evidence.

13         Instruction Number 12, Burden of Proof, Preponderance

14   of the Evidence.  Plaintiffs have the burden of proving their

15   case by a preponderance of the evidence.  To establish by a

16   preponderance of the evidence means to prove something is more

17   likely so than not so.  If you find that plaintiffs have failed

18   to prove any element of their claim by a preponderance of the

19   evidence, then they may not recover on that claim.

20         In determining whether any fact in issue has been

21   proved by a preponderance of the evidence, unless otherwise

22   instructed, you may consider the testimony of all witnesses,

23   regardless of who may have called them, and all exhibits

24   received in evidence, regardless of who may have produced them.

25         Some of you may have heard the term "proof beyond a

1  reasonable doubt."  That is a stricter standard.  It only

2  applies to a criminal case, and it requires more proof than a

3  preponderance of the evidence.  The reasonable doubt standard

4  does not apply to a civil case like this one, so you should put

5  the reasonable doubt standard out of your minds.

6         Instruction Number 13, the Digital Millennium

7  Copyright Act.  You have heard testimony and seen documents

8  that refer to the Digital Millennium Copyright Act known as the

9  DMCA.  The DMCA provides that an Internet service provider,

10  like Grande, may have a defense, called a safe harbor defense,

11  to claims of secondary liability arising from infringement by

12  users on its network.  That defense is not available to Grande

13  in this case.

14         However, the fact that the safe harbor provision does

15  not apply does not bear adversely on the consideration of a

16  defense by Grande that Grande's conduct is not infringing under

17  The Copyright Act or any other defense.  Attempting to qualify

18  for the DMCA safe harbor is optional for Internet service

19  providers.  It is not a legal requirement.

20         Instruction Number 14, Copyright Definition.  A

21  copyright is a set of rights granted by federal law to the

22  owner of an original work of authorship such as a musical

23  composition or sound recording.  In this case, the copyrighted

24  works at issue all consist of sound recordings.  The term

25  "owner" includes the author of the work and assignee and an

1   exclusive licensee.  Among other rights, the owner of a

2   copyright has the exclusive right to distribute copies of the

3   copyrighted work to the public by sale or other transfer of

4   ownership or by rental, lease, or lending.

5           Instruction Number 15, Plaintiff's Claim.  In this

6   case, plaintiffs contend that Grande is contributorily liable

7   for the unauthorized distribution of Plaintiff's 1,422

8   copyrighted sound recordings by subscribers of Grande's

9   Internet service.

10          Instruction Number 16, Infringement.  In order to

11  prove contributory copyright infringement, plaintiffs must

12  first establish, by a preponderance of the evidence, the

13  following four elements.

14          First, that they owned copyrights in their sound

15  recordings and that the copyrights and their registrations in

16  each of the sound recordings is valid.  This issue has already

17  been resolved, and you do not need to decide it.  Plaintiffs

18  have already established that they are the owners of the 1,422

19  copyrighted sound recordings at issue in this case and that the

20  copyrights and their registrations in each of these 1,422 sound

21  recordings is valid.  However, you do need to determine the

22  other three elements.

23          Second element, whether users of Grande's Internet

24  service used that service to infringe plaintiff's right to

25  distribute their works.  A copyright owner's exclusive right to

1  distribute its copyrighted work is infringed by distributing

2  any part of the copyrighted work without plaintiff's

3  authorization.  Plaintiffs are not required to prove the

4  specific identities of the infringing users, and plaintiffs may

5  prove infringement through direct or circumstantial evidence.

6        As evidence of direct infringement, plaintiffs are

7  entitled to rely on, and you are permitted to consider,

8  evidence that copyrighted content was offered or distributed to

9  a third-party who is investigating or monitoring infringing

10  activity.

11        If you find that users of Grande's Internet service

12  distributed any of plaintiff's copyrighted works at issue or

13  any portion thereof without plaintiff's authorization, then

14  plaintiffs have established that users of Grande's Internet

15  service have infringed plaintiff's copyrights in those works.

16        Third element, whether Grande knew of specific

17  instances of infringement or was willfully blind to such

18  instances of infringement.  The term "willful blindness" means

19  that someone believes there is a high probability of a fact,

20  but deliberately takes steps to avoid learning it.

21        Fourth element, whether Grande induced, caused or

22  materially contributed to the infringing activity.  This

23  standard is met when a defendant can take basic measures to

24  prevent further damages to copyrighted works, yet intentionally

25  continues to provide access to infringing sound recordings.

1          Instruction Number 17, Damages.  Consider damages only

2    if necessary.  If the plaintiffs had proved some or all of

3    their claims against Grande by a preponderance of the evidence,

4    you must determine the damages to which plaintiffs are

5    entitled.  You should not interpret the fact that I am giving

6    instructions about the plaintiff's damages as an indication in

7    any way that I believe that plaintiffs should or should not win

8    this case.

9          It is your task, first, to decide whether Grande is

10   liable.  I am instructing you on damages only so that you will

11   have guidance in the event you decide that Grande is liable and

12   that the plaintiffs are entitled to recover money from Grande.

13         Instruction Number 18, Damages:  Statute of

14   Limitations.  Plaintiffs may only recover damages for a sound

15   recording that you find was infringed on or after April 21st,

16   2014.  You may consider evidence of events or recordings that

17   occurred prior to April 21st, 2014, but only for the purpose of

18   assessing the defendant's state of mind, knowledge, and/or

19   willfulness.

20         Instruction Number 19(a), Statutory Damages,

21   Generally.  Plaintiffs may elect to receive statutory damages

22   under the United States Copyright Act.  Statutory damages are

23   damages that are established by Congress in The Copyright Act

24   to compensate the copyright owner, penalize the infringer, and

25   deter future copyright infringements.

1        You must issue an award of between $200 and $30,000

2   for each eligible copyrighted work that you found to be

3   infringed.  You must not award statutory damages for any of the

4   19 copyrighted sound recordings listed at the end of this

5   instruction.  However, the other 1,403 copyrighted sound

6   recordings are eligible for statutory damages.

7        If plaintiffs prove that Grande acted willfully and

8   contributorily infringing plaintiff's copyrights, you may, but

9   are not required to, increase the statutory damage award to a

10  sum as high as $150,000 per eligible copyrighted work.

11       An instruction to finding willfulness will be given

12  next.

13       If you find that the infringement was innocent, then

14  you may, but are not required to, award as little as $200 for

15  each work innocently infringed.

16       An infringement is considered innocent if Grande

17  proved by a preponderance of the evidence that Grande was not

18  aware and had no reason to believe that its acts constituted an

19  infringement of copyright.

20       You should award as statutory damages an amount that

21  you find to be fair under the circumstances.  In determining

22  the appropriate amount to award, you may consider the following

23  factors:  The profits Grande earned because of the

24  infringement; the expenses Grande saved because of the

25  infringement; the revenues that plaintiffs lost because of the

1   infringement; the difficulty of proving plaintiff's actual

2   damages; the circumstances of the infringement; whether Grande

3   acted willfully, intentionally, or recklessly in contributorily

4   infringing plaintiff's copyrights; the need to deter Grande

5   from infringing again in the future; the need to deter others

6   from infringing in the future, and in the case of willfulness,

7   the need to punish Grande.

8          In considering what amount would have a deterrent

9   effect, you may consider Grande's total profits and the effect

10  the award may have on other Internet service providers in a

11  marketplace.

12         Plaintiffs are not required to prove any actual damage

13  suffered by plaintiffs to be awarded statutory damages.  Should

14  you choose to do so, you should award statutory damages whether

15  or not there is evidence of the actual damage suffered by

16  plaintiffs, and your statutory damage award need not be based

17  on the actual damages suffered by plaintiffs.

18         There is then a list of 19 works -- would you prefer I

19  read the 19 list of works?

20         THE COURT:  Yes.

21         MS. ROGGE:  Okay.  Bruno Mars, *Gorilla;* Bruno Mars, *If

22  I Know;* Bruno Mars, *Natalie;* Bruno Mars, *Show Me;* Bruno Mars,

23  *When I Was Your Man;* Bruno Mars, *Young Girls.*  Trey Songz,

24  *About You;* Foo Fighters, *The Pretender;* Wiz Khalifa,

25  *KK(Featuring Project Pat Juicy J);* Wiz Khalifa, *Still Down;* Wiz

1    Khalifa, *The Sleaze;* Wiz Khalifa, *True Colors;* Jennifer Lopez,

2    *Same Girl;* Katy Perry, *By The Grace of God;* Katy Perry, *Chose*

3    *Your Battles;* Katy Perry, *Dark Horse;* John Legend, *The*

4    *Beginning;* John Legend, *Who Do We Think We Are;* One Direction,

5    *Ready To Run.*

6            Instruction 19(b), Statutory Damages:  Willfulness.

7    Grande's contributory infringement is considered willful if

8    plaintiffs proved by a preponderance of the evidence that

9    Grande had knowledge that its subscribers' actions constituted

10   infringement of plaintiff's copyrights or that Grande acted

11   with reckless disregard for or willful blindness to the

12   plaintiff's rights.

13           Instruction Number 20, Limiting Instruction Regarding

14   BMG v. Cox.  You have heard evidence in another case, in

15   another court, with different parties, that there was a verdict

16   reached in a copyright litigation against a different Internet

17   provider.  This evidence may be considered by you only for the

18   purpose of evaluating the state of mind of Grande executives

19   and employees and the state of mind of plaintiff's executives

20   and employees at the time and nothing else.

21           It is not to be considered by you as evidence that

22   because a different Internet service provider was found liable,

23   that Grande in this case is liable.  Although the other case

24   involved Rightscorp, it involved different parties, different

25   lawyers, different facts, additional evidence, and different

1   instructions on the law.

2           In other words, it was a totally different case with

3   the exception of the involvement of Rightscorp.  Further, this

4   case went up on appeal and the final result of that case is not

5   before you and is not relevant.

6           Instruction Number 21, Duty To Deliberate.  It is now

7   your duty to deliberate and to consult with one another in an

8   effort to reach a verdict.  Each of you must decide the case

9   for yourself but only after an impartial consideration of the

10  evidence with your fellow jurors.

11          During your deliberations, do you not hesitate to

12  re-examine your own opinions and change your mind if you are

13  convinced that you were wrong, but do not give up on your

14  honest beliefs because the other jurors think differently or

15  just to finish the case.

16          Remember, at all times, you are the judges of the

17  facts.

18          You have been allowed to take notes during this trial.

19  Any notes that you took during the trial are only aids to

20  memory.  If your memory differs from your notes, you should

21  rely on your memory and not on the notes.

22          The notes are not evidence.  If you did not take

23  notes, rely on your independent recollection of the evidence

24  and do not be unduly influenced by the notes of other jurors.

25  Notes are not entitled to greater weight than the recollection

1    or impression of each juror about the testimony.

2           When you go into the jury room to deliberate, you may

3    take with you a copy of this charge, the exhibits that I have

4    admitted into evidence, and your notes.

5           You must select a foreperson to guide you in your

6    deliberations and to speak for you here in the courtroom.

7           Your verdict must be unanimous.  After you have

8    reached a unanimous verdict, your jury foreperson must fill out

9    the answers to the written questions on the verdict form and

10   sign and date it.

11          After you have concluded your service and I have

12   discharged the jury, you are not required to talk with anyone

13   about the case.

14          If you need to communicate with me during your

15   deliberations, the jury foreperson should write the inquiry and

16   give it to the court security officer.  After consulting with

17   the attorneys, I will respond either in writing or by meeting

18   with you in the courtroom.  Keep in mind, however, that you

19   must never disclose to anyone, not even to me, your numerical

20   division on any question.

21          You may now proceed to the jury room to begin your

22   deliberation.

23          THE COURT:  Actually, you won't.  You're going to hear

24   closing arguments, and that will be at 2:00, okay, because it's

25   12:30 now.  So at 2:00, you will come back from lunch and --

1    have we gotten them lunch today?

2              COURTROOM DEPUTY CLERK:  Starting today, they're

3    officially sequestered.

4              THE COURT:  So it starts today.  Okay.  Apparently you

5    get pizza today, on the Court.  The parties aren't paying.  No

6    concern about that.  The Court -- your taxpayer dollars are

7    paying for your pizza.  Okay?  And that will occur throughout

8    your deliberations.  All right?

9              I have to enter an order for that.  Some judges don't

10   do it.  I don't know why, but if you're here, you should get

11   your lunch paid for.  But it won't be pizza every day.  I

12   promise.

13             Thank you very much.  Come back at 2:00.  We'll see

14   you, and then we will go right into closing argument.  I'll

15   explain a little bit more about that as soon as you come back,

16   and then we're going to get the case to you to start your

17   deliberations.  Thank you.

18             COURT SECURITY OFFICER:  All rise for the jury.

19             *(12:27 p.m., the jury exits the courtroom.)*

20                            *  *  *

21             THE COURT:  Okay.  Be excused.  Have lunch.  Get

22   yourselves ready, and we'll see you back here at 2:00.

23             Counsel, before we leave, I need the two principal --

24   I need to do something on the record real quick.

25             *(Sidebar discussion, 12:28 p.m.)*

1              Here in the Fifth Circuit, I don't know whether you're

2    used to this, but this is the statutory time for objections to

3    the jury instructions and comments and other things to be

4    placed on the record.  I would propose that all comments,

5    rulings by the Court and objections and/or arguments in favor

6    of instructions be deemed to have been placed on the record at

7    this time.  And there's no objection?

8              MR. BART:  No objection.

9              MR. BROPHY:  No objection.

10             THE COURT:  Thank you.

11             *(Sidebar concluded 12:29 p.m.)*

12                            *   *   *

13             *(2:07 p.m.)*

14             COURT SECURITY OFFICER:  All rise.

15             THE COURT:  Please be seated.  Are you all ready,

16   counsel?

17             MR. BART:  Yes.

18             MR. BROPHY:  Yes, Your Honor.

19             THE COURT:  Okay.  Let's bring them in.

20             COURT SECURITY OFFICER:  All rise for the jury.

21             *(2:07 p.m., the jury enters the courtroom.)*

22                            *   *   *

23             THE COURT:  All right.  Please be seated.  All right.

24   Now, ladies and gentlemen, what we're going to do now -- and we

25   start with Mr. Bart for the plaintiff -- is what we call

1   closing argument or, if you were a lawyer on the East Coast,

2   summation.  Okay?  This is the time when the lawyers have the

3   opportunity -- and it's really the only time during a trial --

4   to talk to you about what they believe the weight of the

5   evidence is.  Okay?

6          Now, there's a big difference between opening

7   statement, which is, as I explained to you, their opportunity

8   to give you a road map of what they believe the evidence would

9   show.  This point in the trial, they have the opportunity to

10  not only tell you what they believe the evidence now has shown,

11  because you've seen all the evidence -- the testimony of

12  witnesses and all of the documents, but also, to use an

13  advertiser's term and I don't mean this in the derogatory way,

14  to put their spin on it.  Because you have to remember, lawyers

15  are advocates.

16         They have the right to tell you what they believe you

17  should pay attention to, what they believe is evidence that has

18  critical weight to it, and also what they believe -- which

19  evidence they believe has little or no importance.  And that's

20  their job, because a lawyer's responsibility, whether it be a

21  plaintiff's lawyer or a defense lawyer, is to be a zealous

22  advocate for their client.  That is their ethical duty.  So if

23  they do less than that, then they haven't served the interest

24  of their client and, quite honestly, they haven't served their

25  role as an officer in this court.

1          So there's nothing wrong with what they're doing.

2    They're doing what they're supposed to do.  They will recall

3    for you what the evidence is from their perspective.  You must

4    always remember that you are the finders of fact.  So if your

5    recollection of the evidence differs from theirs, of course

6    your recollection controls.  Okay?

7          Now, this is a very important part of the case for the

8    parties, so please -- you've been great.  I've watched -- you

9    know, part of my job is to watch the jury and you have been

10   extremely attentive over this past month and I know the lawyers

11   truly appreciate it and I know you'll give them your careful

12   attention during this very important part of the trial for

13   them.  Okay?

14         Remember, what the lawyers tell you is not evidence,

15   but they have every right to recall for you what they believe

16   the evidence has shown in this case.  Okay?

17         Mr. Bart.

18         MR. BART:  Thank you, Your Honor.  Good afternoon,

19   ladies and gentlemen of the jury.  Speaking on behalf of myself

20   and our entire trial team, we're very grateful for the personal

21   sacrifices that you've made to help us get to this end of the

22   journey.  Your patience and open-mindedness are essential for

23   this process to work.

24         It's now the part of the case where the lawyers try to

25   connect the dots, highlight critical evidence and testimony and

1    ask you to render judgment in their favor.  And to do that

2    properly, we have to start off by recognizing that this trial

3    has gone on since October 12th and that it's basic human nature

4    to remember the most recent events most clearly, but some, if

5    not most, of the important testimony happened weeks ago.  So I

6    want to start by going back to some of the crucial testimony

7    about Grande's policies and behavior that you heard at the

8    beginning of the case.

9         As I said during my opening, Grande's goal is to try

10   and scapegoat Rightscorp and make you think that Rightscorp is

11   the defendant here.  No matter how hard they try, Grande is the

12   defendant and it is their conduct that is at issue:  How Grande

13   intentionally opened the floodgates to massive infringement of

14   content on Grande's system by its subscribers; how Grande

15   turned a blind eye to well over 1.3 million notices of specific

16   infringement, but did nothing because Grande had a company

17   policy not to take any action to address repeat infringement.

18   One might call it a willful blindness policy; how Grande

19   benefited from that decision financially despite their ultimate

20   awareness that they have an obligation under federal law to

21   terminate repeat infringers.

22        Indeed, the story of Grande's conduct is so powerful

23   and uncontradicted that it compels a verdict for the

24   plaintiffs.  So first, let's revisit how Grande got here.

25        The critical decision in this case to abolish a robust

1   repeat infringer policy was made in 2010 by people -- none of

2   whom showed up in court -- the upper management and legal

3   departments of Grande's management companies.

4            As I told you in my opening, Grande once had a robust

5   policy for dealing with the devastating BitTorrent piracy that

6   was occurring on its network and took action on that policy.

7   But after it was purchased in 2009 by a Boston-based private

8   equity firm, it abolished that policy, and for the next seven

9   years allowed users to infringe without consequence on the

10  Grande network even if they were identified in thousands of

11  infringement notices.  As I said, the policy of willful

12  blindness.

13           I told you that Grande would not produce a single

14  witness to explained that decision, and they haven't.  And I

15  told you that if you follow the money, you'd see that the same

16  Boston private equity firm sold the company at the end of that

17  seven-year period and netted $400 million, and that the

18  absentee decision-makers who abolished the repeat infringer

19  policy netted millions personally, and most of them are still

20  running Grande today.

21           So how did we do on that one?  The undisputed facts

22  do, indeed, confirm that Grande once had a robust policy for

23  addressing BitTorrent piracy.  Mr. Bloch told you that before

24  private equity money took over Grande, he insisted on creating

25  a policy for dealing with infringement and that it was

1   important that that policy contain punitive measures to address

2   piracy.  He agreed that after receiving multiple notices,

3   Grande should terminate customers.

4           Mr. Horton told you that under its prior policy,

5   Grande did terminate subscribers for copyright infringement.

6   Other witnesses focused on suspensions, but there's no question

7   that Grande devoted resources to this issue, felt that they had

8   a responsibility to address it, and turned off service when it

9   was appropriate.

10          And there's also no dispute that the policy was

11  abolished by Grande's new management company in 2010.

12  Mr. Horton told you that the decision to abolish the policy

13  came from Atlantic Broadband company, or ABB, on the East

14  Coast.  It was replaced with a policy where no user would ever

15  be terminated for trampling on the rights of copyright owners.

16  Indeed, Mr. Horton confirmed that Grande never terminated a

17  single user for seven years, and then under the new ABB policy,

18  no one would be terminated even if they racked up a thousand

19  notices.

20          Remember, no one involved in making this decision

21  testified at the trial.  That decision was made in 2010, and

22  it's the reason that we are here.  And Grande hasn't said a

23  word about it, because they have nothing to say.  So instead of

24  putting up any defense, they put up sacrificial lambs, the

25  Texas-based employees of Grande, to take the heat for decisions

1    made 2000 miles away by people who pocketed millions but don't

2    have the courage to show their face on the witness stand.  And

3    then Grande has the nerve to say that its employees are good

4    people and weren't intending to cause piracy.  As if that's in

5    dispute or even marginally relevant.

6          And we don't disagree.  Mr. Horton, Mr. Bloch,

7    Mr. Fogle and Mr. Rohre all seem to be good people, but none of

8    them made the decisions that are at issue here.  But the fact

9    that Grande is spineless enough to present these witnesses to

10   take the heat for the decisions made by Grande's true

11   management underscores that they have no good faith excuse for

12   what they've done.  They wanted to maximize profits and reap

13   the benefits even though they knew that a substantial portion

14   of the profits were caused by turning a blind eye to the

15   massive piracy on its network that caused such profound damage

16   to copyright owners.

17         Remember the video testimony of Matt Murphy, who came

18   in with that new management in 2009, ran the company when it

19   steamrolled over the rights of content owners and pocketed a

20   cool $3 million in addition to his salary and bonus when the

21   company was flipped?  He couldn't even look straight into the

22   camera and admit that Grande should have done something about

23   it if they knew that a specific infringer was -- user was

24   infringing.  And the bounty didn't end with Mr. Murphy.

25         John Feehan, the CFO of Patriot, Astound and Grande

 1    told you that other members of management like the CEO, John

 2    Holanda, their general counsel, Jeff Kramp, and Mr. Feehan

 3    himself also profited to the tune of millions of dollars.  And

 4    we know that the legal decision made -- the Legal Department

 5    made all the decisions here.  But they either stayed in the

 6    gallery at the back of the courtroom or stayed home and let

 7    others dance around their decisions.

 8              So don't fall for their "we have good people" excuse.

 9    It's wholly irrelevant to the issues in the case and, frankly,

10    Grande should be ashamed to throw their people under the bus

11    like that.

12              Now, contrary to all the excuses and fictions that

13    Grande is telling you now, between 2010 and 2017, Grande knew

14    that the notices reflected actual copyright infringements but

15    just decided to turn a blind eye to them.  Grande's policy of

16    willfully ignoring powerful evidence of repeat infringement was

17    demonstrated throughout the trial.

18              Remember the testimony of Richard Fogle?  That he was

19    put on a project that required him to evaluate the handling of

20    infringement notices.  He was startled by what he saw.  He

21    wrote, *There are no limits here."  He said he -- he raised

22    warning flags that the policy didn't comply with the law, and

23    he said that there were some customers up to their 54th notice.

24    Then he wrote that, *Unlike some other ISPs, there's no

25    three-strike law and -- or anything that we follow."

1          Mr. Fogle's e-mail concluded that Grande had no

2     process or remedy in place.  Based on that evidence, Mr. Fogle

3     rightly questioned whether we were seeing a broken process.

4     And as you now know, it was a broken process.

5          In response, Roberto Chang said he asked Legal if we

6     need to do more and agreed that if Grande didn't do more, it

7     might lose its safe harbor status.  And that is exactly what

8     ultimately happened.  Like many whistleblowers, Fogle was

9     simply taken off the project.

10         Nor is there any evidence that Grande ever doubted the

11    accuracy of any of the infringement notices during that time

12    period.  Mr. Horton confirmed that Grande never investigated

13    the truth or falsity of any copyright notice, not just

14    Rightscorp, any of them.  And had no information suggesting

15    that any notice was false or that any monitoring company didn't

16    have the tools to detect infringement.

17         Remember that Mr. Bloch testified that he told Matt

18    Murphy, Grande's president, that Grande subscribers knew that

19    they had downloaded the content reflected in the notice every

20    time.  And what did Grande say in the form letter when they

21    forwarded a second infringement notice to the same user?  They

22    said that the notice identified an unauthorized download or

23    distribution of copyrighted material.  There was no allegation

24    of -- they never said it was an allegation.  They referred to

25    the incidents as "infractions," and they told the user to

1    destroy the infringing material and to contact them within two

2    days to confirm compliance with that request.

3            This contemporaneous language is what Grande actually

4    believed before they paid lawyers and experts to come up with

5    retroactive excuses for their disregard of the rights of

6    copyright owners.  And it corroborates what Mr. Fogle thought

7    in 2013, that Grande had a broken system and that Grande was

8    not in compliance with the law.

9            And their conduct with regard to Rightscorp was even

10   worse, if that's possible.  Let's start with one important

11   fact.  Grande never even sent a single Rightscorp notice to one

12   of its customers until March of 2016.  How do we know that?

13   Well, first, Mr. Horton admitted as much, and Grande's own

14   records show it.

15           DX 111 is a Grande spreadsheet reflecting every

16   infringement notice Grande sent on to its customers.  One of

17   the columns identifies the company that sent the notice, and

18   Rightscorp doesn't appear until March 1st, 2016; thus for five

19   full years, they did absolutely nothing with Rightscorp

20   notices.  They're now telling you a fictional story when they

21   forwarded notices that they tried to inform and educate their

22   customers.  Well, they didn't do it with Rightscorp notices,

23   and not because they had any objections to Rightscorp.  They

24   were ignoring Rightscorp.  Mr. Horton admitted that they never

25   investigated Rightscorp or had any facts showing that any of

1    the notices were wrong.

2           But Rightscorp did come into their focus in 2014 when

3    another music company, BMG, sued another ISP, Cox, based on

4    Rightscorp notices.  Mr. Horton and Robert Creel, Grande's

5    director of network and technical support, noted the filing and

6    stated that if BMG won, it would cause changes in the way the

7    industry operated.  Mr. Horton testified that he was aware back

8    then that the BMG lawsuit was based on Rightscorp notices.

9           During that same period, Grande received letters from

10   Rightscorp directly advising them of specific repeat

11   infringements and offering to provide Grande with access to a

12   dashboard to review the evidence.  It was only a click away,

13   but Grande looked the other way.  Rightscorp also sent them

14   weekly roll-up reports of infringement on the Grande network,

15   but unsurprisingly, that was also ignored.

16          And finally, Rightscorp sent them a formal letter

17   offering to meet so that Rightscorp could explain its system

18   and answer any questions that Grande might have so the parties

19   could work collaboratively to address the massive piracy on

20   Grande's network.  But, of course, Grande turned a blind eye

21   and never even bothered to respond.

22          Grande's conduct after it learned of the Cox verdict

23   further confirms that Grande knew that Rightscorp notices were

24   legitimate.  The day after BMG won a trial verdict against Cox

25   based on the Rightscorp notice in December 2015, Mr. Creel sent

 1   an e-mail to Mr. Horton saying that, We may need to revisit
 2   this process at some point, regarding copyright infringement.
 3          Then on Thursday, February 18, 2016, Grande's Legal
 4   Department, which was run by Jeff Kramp, the GC of Patriot and
 5   RCN and Grande, asked to speak to Matt Rohre.  Ostensibly,
 6   Mr. Kramp wanted to talk about a letter he had received a year
 7   earlier from Rightscorp offering to meet and talk about ways
 8   the companies could work collaboratively.  But in the wake of
 9   the BMG verdict, based on Rightscorp notices, there's no
10   question why Mr. Kramp was really asking this.
11          Mr. Rohre, in turn, looped in Mr. Horton and asked him
12   for his take.  Mr. Horton's immediate response, Send Mr. Rohre
13   a link about the Cox verdict and Rightscorp's role in that
14   case.
15          So they all knew that there was a ticking time bomb in
16   the file cabinet.  Between that Thursday and the following
17   Monday, there was frantic activity at Grande, after five years
18   investigating how many infringement notices they had and how
19   many came from Rightscorp.  In the preceding five years, they
20   had no idea, but now they needed to know.
21          And then they learned that Grande had received 700,000
22   notices in 2013, '14 and '15, over 400,000 of which came from
23   Rightscorp.  What was Mr. Horton's reaction?  *Wow.*
24          Perhaps even more of a wow was the fact that two
25   customers had received over 10,000 Rightscorp notices, 40 had

1    received over a thousand, and 500 customers had received over

2    500 notices.  Wow, indeed.  But the news for Grande got even

3    worse because they also learned that Grande had never forwarded

4    a single Rightscorp notices to any of its customers over any of

5    these years because of what they called a "technical glitch."

6    And they hadn't noticed it for all these years.  Why?  Because

7    they couldn't care less about copyright infringement and didn't

8    even note that their automated system wasn't working properly,

9    for the company that was sending them more than half of their

10   notices for five years.

11          But then something curious and telling happened.  When

12   the glitch was fixed on that very same Monday -- it was a busy

13   weekend at Grande -- and Grande could move forward and now

14   forward Rightscorp notices to its customers, Mr. Horton

15   directed the tech person to suppress implementing the fix so

16   that it could be discussed internally.  But after Grande

17   provided all this information to the Legal Department of its

18   corporate overlords, it was instructed to start sending letters

19   to customers based on Rightscorp notices, and that's what they

20   did.  Between March and December of 2016, Grande forwarded more

21   than 6,000 Rightscorp notices to its customers using the same

22   form letters that we were just talking about.

23          That decision destroys any argument that Grande

24   believed that there was an issue with the reliability of the

25   Rightscorp evidence.  And that conclusion is hardly surprising,

1    given that Grande concededly never investigated the Rightscorp

2    system, never had any factual basis to conclude that any

3    notices were false.  In fact, the trial record shows the only

4    thing they knew about Rightscorp was that its notices were at

5    issue at the Cox trial.

6            And at the same time as these events were going on,

7    the Boston-based private equity firm was selling Grande to a

8    new private equity firm and pocketing $400 million in the

9    process.  But the people involved in managing Grande, the

10   Patriot bigwigs like Mr. Holanda, Mr. Kramp, Mr. Murphy and

11   Mr. Feehan, all remained connected to Grande through the

12   management company, and each pocketed millions from the

13   transaction.  So their willful blindness had paid off

14   handsomely.

15           But once the millions were safely in their pockets,

16   they realized that they still had to deal with the ticking time

17   bomb of its disregard for rampant piracy on its network.  And

18   that after the Cox verdict, it couldn't continue without a DMCA

19   policy and certainly couldn't maintain its existing policy of

20   willful blindness of never terminating a single repeat

21   infringer, even those who had received over 10,000 notices.

22           So they announced a new DMCA policy in 2017, months

23   before this suit was filed.  And that new policy exposes every

24   excuse and argument that you've heard from Grande in this trial

25   as a lie, that was manufactured after the lawsuit was filed.

1          How do we know that?  Because under the new policy,

2    the new policy recognized Grande's obligation under federal law

3    to reasonably implement a repeat infringer termination policy

4    and act in response to notices of infringement.  And it also

5    expressly said that the notices they received reflected

6    copyright infringement.

7          Mr. Rohre testified that once Grande began terminating

8    customers for copyright infringement, it was the right thing to

9    do under its policy.  Even though almost all of those

10   terminations -- and there were only 12 -- were based on

11   Rightscorp notices.  But they didn't do it before -- and he

12   also admitted that they could have done the same thing in the

13   previous seven years, but they didn't do it because they had a

14   different management philosophy, a philosophy of willful

15   blindness.

16         But then Grande is sued and manufactures a fictional

17   litigation strategy.  Call the notices allegations, claim

18   helplessness, take the side of infringers and blame the record

19   companies.

20         In my opening statement, I suggested by the time the

21   evidence came in, you might be wondering why Grande was so

22   aggressive here, why it refused to play any constructive role

23   in protecting copyrights, even though it was the only party

24   capable of addressing the piracy on the network, why it refused

25   to even meet with Rightscorp when Rightscorp proposed working

1    together instead of being adversaries, why it insists on taking

2    the side of the infringer instead of the side of the artist,

3    particularly in a music capital like Austin.

4            Well, again, it's the old story of follow the money.

5    They knew that it only cost them three or four cents in direct

6    cost to generate a dollar of revenue from their Internet

7    customers, so they wanted -- and still want -- as many

8    customers as possible, even if those customers are rampant

9    pirates, as long as those customers are paying for Grande's

10   services.  And if they were damaging the music industry and

11   trampling on property rights by turning a blind eye to

12   infringement on their network, that was an easy call for them;

13   particularly the management companies that were the puppet

14   masters here.

15           So they hired lawyers and experts to manufacture

16   retroactive excuses for Grande's willful blindness.  But as

17   Mr. Horton admitted, Grande never asserted any of the arguments

18   or defenses it has presented at trial until after it was sued.

19           So those undisputed facts bring us to the courtroom

20   and to this trial.  And now you're being asked to determine if

21   they're sufficient to hold Grande liable for contributory

22   infringement.  And the answer to that question is emphatically

23   yes.  Given the unchallenged record, this is an open-and-shut

24   case of contributory infringement.

25           In essence, there are three requirements for

1    contributory infringement and you heard them in the

2    instructions this morning.  Direct infringement by Grande's

3    users, Grande's material contribution to the infringement and

4    Grande's knowledge of or willful blindness to specific acts of

5    infringement.  While I'll address all three, the only one that

6    really requires much discussion is the direct infringement by

7    Grande's users.

8          While Grande has tried to make this issue sound

9    complicated by suggesting all sorts of hypothetical situations

10   where there might have been errors in Rightscorp notices, you

11   don't have to parse the source code.  You don't have to see a

12   detailed analysis to see proof positive that Grande infringed

13   all 1422 works in suit.  That proof resides in the downloads

14   that Rightscorp obtained for each work.  Simply put, every

15   single work at issue here was directly downloaded from one or

16   typically more Grande subscribers and is in evidence before

17   you, every one.  Indeed, there are 19,000 infringing files are

18   the works in suit and evidence before you that were obtained

19   directly from Grande's customers.  Each of whom was, in turn,

20   distributing these files to countless other users every time he

21   or she was connected to BitTorrent.

22         In Grande's opening statement, you were told that

23   there's no evidence that Grande ever downloaded a song -- that

24   Rightscorp ever downloaded a single song from a Grande user.

25   But Grande's own expert admitted that there were 19,000 songs

 1   downloaded from Grande subscriber.  Our label witnesses and

 2   Mr. Landis of the RIAA listened to 175 of them and confirmed

 3   they match the label sound recordings.  You've listened to some

 4   of them, and you can listen to as many as you want, but there's

 5   no need to do so, because every one of them is confirmed to be

 6   an infringing copy of one of plaintiff's works by Audible

 7   Magic, an industry standard music-matching service that

 8   compared the downloads to the official feeds that the labels

 9   provide to its digital partners.

10         Both Mr. Landis and our expert, Barbara Frederiksen,

11   testified about the reliability of Audible Magic.  You recall

12   that Ms. Frederiksen testified that Audible Magic software is

13   used more than 3 billion times a year, and there's about one

14   error per year.  And tellingly, there was absolutely no

15   testimony or evidence to the contrary from Grande.  Even

16   Grande's own technical expert, Dr. Cohen, testified that if

17   Audible Magic is right, there are tens of thousands of

18   downloads from Grande's users' computers.

19         Grande has said nothing about these downloads because

20   they know that each one of them obtained from a Grande

21   subscriber using BitTorrent is a recording owned by plaintiffs

22   and their artists.  In other words, they're proof positive of

23   direct infringement.

24         The downloads are actually more than proof positive

25   that a Grande subscriber infringed every work at issue.  They

1    also validate the Rightscorp notices, because every one of

2    those downloads contains a TC number or tracking number.

3    Remember, those TC numbers are internal Rightscorp tracking

4    numbers for the notices.  And the same TC numbers appear on the

5    downloads; so, therefore, you can trace each download track

6    back to a prior notice that Rightscorp put Grande on notice

7    that this very user had infringed that same track.

8           So now you have a three-step irrefutable proof of

9    infringement of every work in suit, first for each of the works

10   in suit as an infringing download that Rightscorp obtained

11   directly from a Grande user.  Second, there's an Audible Magic

12   confirmation that the download is plaintiff's recording.  And

13   finally, these two steps confirm the accuracy of Rightscorp

14   prior notice to Grande identifying the user as having infringed

15   this recording.

16          Grande has no evidence to even suggest that the firm

17   evidentiary chain from notice to download to Audible Magic to

18   this courthouse was wrong for a single one of these 1422 works.

19   So don't fall for hypothetical after-the-fact excuses.  Grande

20   has had the data and downloads for years, and if there were

21   errors, you would have heard about them during this trial.

22          So when you hear theoretical issues manufactured after

23   the lawsuit was filed, ask yourself, where is any evidence that

24   any of these speculative situations ever occurred?

25          Ladies and gentlemen, one of the cardinal rules of

1    this process is don't leave your common sense at the door.

2    Every one in this room knows that every single download is an

3    infringement of one of the works in suit, and this evidence

4    resolves any dispute about direct infringement by Grande's

5    users.

6           While it's not necessary given the downloads, the

7    notices sent by Rightscorp are a separate, powerful

8    circumstantial basis for finding direct infringement since

9    every single user who is interacting with Rightscorp is also

10   interacting with endless other users out in the Internet.

11   That's the way BitTorrent works.

12          Every technical expert has agreed that the Rightscorp

13   system can accurately engage with BitTorrent users on Grande's

14   network who are offering torrent hashes, confirm the hash of

15   the torrent that the user is offering to share, compare the

16   content of that with the copyrighted works that Rightscorp is

17   monitoring, and convert that information to a notice sent to

18   Grande.

19          Moreover, Ms. Frederiksen, who is an expert on how

20   file sharing using BitTorrent works, tested the Rightscorp

21   system directly by sharing works on BitTorrent and confirmed

22   that Rightscorp accurately detected her activity.  Grande could

23   have chosen to run a test of Rightscorp's system, but it chose

24   not to, because it knows at the end of the day that the process

25   works.

1           And at the end of the day, the downloads and

2    three-step confirmation I described earlier provides simple,

3    irrefutable confirmation of direct infringement.

4           The second component of contributory infringement is

5    whether the defendant materially contributed to the

6    infringement.  In this case, the answer is so clear that Grande

7    hasn't even addressed the issue.  Grande provided its

8    high-speed Internet network for Grande's repeat infringers to

9    use, the very mechanism and tools that allowed its customers to

10   continue to infringe and, even worse, continue to provide these

11   tools when it documented that the user had hundreds and even

12   thousands of infringements.  But rather than deal with that,

13   throughout the case, Grande has asked questions about whether

14   anyone at Grande intended to encourage infringement.

15          The plaintiffs don't need to prove inducement or

16   encouragement of infringement.  All they need to prove is that

17   Grande materially contributed to the infringement, regardless

18   of Grande's motive.  Although we know what Grande's motive was,

19   and that is beyond dispute.

20          The third component of contributory infringement is

21   whether Grande had knowledge of specific infringements or was

22   willfully blind to them.  Again, the answer is yes.  While

23   willful blindness is the ultimate answer since that is the

24   policy that defined the company, as an initial matter, the

25   317,000 notices that Grande received from Rightscorp about the

 1   works in suit are powerful circumstantial evidence of knowledge

 2   of specific infringements for the same reason that I told you

 3   before.

 4          Every one of the users identified in those notices was

 5   out on the Internet, out on BitTorrent, making the same songs

 6   available and to be copied by thousands of other users that

 7   Rightscorp detected.  Grande doesn't dispute receipt of these

 8   notices or contend that any of them are false.  All they say is

 9   they don't know.  But that's simply not an adequate response,

10   since Grande admits, as it must, that it never asserted any

11   flaws in notices nor did anything to verify, test, or ask

12   questions about any of them.

13          Grande's employee, Stephanie Christenson, admitted

14   that she couldn't point to a single instance in which Grande

15   concluded that the activity reflected in the Rightscorp notice

16   did not occur.

17          But more importantly, as I said to you before, Grande

18   willfully blinded itself, not simply to the infringements on

19   the Rightscorp notices, but to the infringement in all of the

20   notices it received over a seven-year period from numerous

21   other monitoring companies for music, for movies, for all sorts

22   of content.  It basically had a policy of willful blindness,

23   documented by Mr. Fogle, where they just sent out notices, took

24   no action, had no human interaction, didn't monitor the

25   notices, didn't notice when notices hadn't been sent for five

 1   years.  They put their head in the sand, ignored the mountain

 2   of evidence, and took no action whatsoever.

 3           Now, I've used the term "willful blindness" many

 4   times, and it is a critical term, because it is another way and

 5   the primary way to demonstrate Grande's knowledge of the

 6   infringement.  As you heard this morning, willful blindness

 7   basically means that someone, here Grande, believes that

 8   there's a high probability of a fact that specific

 9   infringements are occurring on its network, but deliberately or

10   recklessly take steps to avoid learning it.

11           Grande's entire approach to copyright infringement

12   from 2010 to 2017 was a policy of willful blindness.  Grande's

13   decision specifically to ignore 1.3 million infringement

14   notices from Rightscorp, to fail to even forward a single

15   Rightscorp notice, which could have put its users in a position

16   to challenge them if they wanted to, and to fail to respond to

17   Rightscorp's invitation to discuss the system, its dashboard,

18   its weekly roll-up reports, are a textbook case of willful

19   blindness.

20       Again, that's just a small part of the willful blindness,

21   because they're receiving notices for all kinds of content from

22   all kinds of monitoring companies and their company policy was

23   the same in each.  Indeed, it's hard to even imagine a party

24   being more willfully blind to infringements on its network than

25   Grande.

1        And now that we've covered Grande's conduct and legal

2    standards for holding it liable for that conduct, it's time to

3    turn to the calculation of damages to be awarded for Grande's

4    massive infringements and violations of the copyright act.

5        There are two preliminary topics that I'd like to discuss

6    with you about damages.  First, plaintiffs have elected to

7    receive what's called "statutory damages."  There are two

8    primary reasons why the law gives a plaintiff the right to seek

9    statutory damages.

10       First, it's extremely difficult, if not impossible, to

11   accurately assess actual damages in a case of viral

12   infringement like this.  At its core, the problem arises from

13   the fact that when a Grande customer uses BitTorrent to

14   distribute copies of copyrighted content, he or she is doing

15   far more than enabling one illegal download.  He or she is

16   becoming a distribution node for the unlimited future

17   distribution of countless infringing copies of that work.

18       In essence, an unlicensed download store on the web.  In

19   other words, it's like an unlicensed iTunes music store without

20   having to make a payment.  And for each work in suit, we don't

21   just have one infringement.  There are multiple infringements,

22   each creating multiple new unauthorized distribution nodes.

23       To compound the problem, in the closed, anonymous world of

24   BitTorrent, all anyone can see are the infringements found by

25   Rightscorp, where they were searching for specific works.  We

1    can't see any interactions between any of the millions of other
2    BitTorrent users who were sharing pieces of files with each
3    other.  Thus what Rightscorp uncovers is a tiny fragment of the
4    infringements that are going on from these same users of these
5    same works.  The tip of the iceberg, if you will.  Because when
6    BitTorrent offers one of plaintiff's recordings, a BitTorrent
7    user, they can distribute the recording to hundreds or
8    thousands or more of other users who in turn each become
9    further unauthorized download stores.

10       This type of viral infringement is the very reason that the
11    testimony of Mr. Kemmerer is of no value whatsoever.  He does a
12    simple but irrelevant mathematical calculation, as any CPA
13    would, who has no expertise as to how BitTorrent actually works
14    of the specific number of infringements detected by Rightscorp
15    times the cost of the download.  But the damage to the
16    plaintiffs in this case is not the loss of a single download,
17    it's the fact that BitTorrent users are then uploading these
18    files to countless others whenever they connect to BitTorrent.

19       Mr. Kemmerer based his calculation on what Rightscorp did
20    to discover the infringement and not on what the BitTorrent
21    users actually do with the files; namely, to distribute them to
22    other people, endless numbers of other people.  No record
23    company ever has or would authorize that.  And if they did, the
24    price would be astronomical, because it would be competing with
25    their authorized distribution channels.  So since nobody knows

1   the extent of the distributions directly caused by Grande's

2   BitTorrent users, limiting plaintiff's recovery to the type of

3   simple calculation Mr. Kemmerer proffered dramatically

4   understates the damage to plaintiffs.  To remedy that problem,

5   the law provides statutory damages.

6       The second reason that the law provides an option of

7   statutory damages is because the law wants you to consider

8   other factors in addition to actual damages.  Indeed, as you

9   heard this morning, plaintiffs are not required to prove any

10  actual damages to receive an award of statutory damages.

11  However, the statutory damages includes factors that relate to

12  actual damages.  So let's deal with them first.

13      One of them is, that it's so difficult to quantify actual

14  damages.  We've already talked about that.  Given the inability

15  to quantify how much business each unauthorized distribution

16  node has done and how far the viral distribution of plaintiff's

17  works has spread to create additional download stores, it's

18  impossible to know the degree to which plaintiffs have been

19  harmed, but what we do know is that the impact of digital

20  piracy on the plaintiffs has been massive.

21      Each of the label witnesses has testified to the impact,

22  citing research and personal experience.  You've seen the

23  50 percent drop in revenue, the closing of labels, the firing

24  of thousands of employees.  Grande itself admitted that it

25  couldn't survive that type of savaging of its revenue base.

 1  And it goes beyond the labels to the entire music ecosystem.

 2  Record stores close, pressing plants close, distribution

 3  centers close, jobs disappear, artist royalties collapse, and

 4  the revenues necessary for labels to invest in talent dries up.

 5  We all suffer as a result.

 6      Plaintiff's economic expert, Dr. Lehr, summarized the

 7  research in the field and testified that virtually all the

 8  research holds that the impact has been enormous.

 9      Now, of course, Grande is not liable for all the harm

10  caused by this kind of piracy.  But Grande did play a material

11  role in creating thousands and thousands of new unauthorized

12  download stores.  And in this trial, Grande has not put forth

13  any evidence addressing the economics of piracy or its impact

14  on the music industry or attempting to rebut Dr. Lehr's

15  testimony in any way or any of the research on which it was

16  based, or the personal firsthand experience of the label reps

17  who have lived through this debacle in real time.

18      All they have done is to have attorneys hypothesize other

19  reasons for the implosion of the label's revenue base, but

20  those questions and speculation are not evidence, as well as

21  being wholly baseless.

22      Tracing Grande's profits from the infringement is also

23  difficult, but we do know that Grande has been extremely

24  profitable and that its revenues and profitability spike

25  noticeably once it opened the floodgates of unregulated piracy.

1    Not only did their financial results improve, but they were

2    able to increase the market value of the company during the

3    exact time they had a willful blindness policy by a remarkable

4    140 percent or $400 million.

5        The next statutory factor relates to the circumstances of

6    the infringement.  This deals with two separate points.  One

7    again is the massive viral and anonymous nature of BitTorrent,

8    but the other is the critical role that an ISP plays in the

9    BitTorrent ecosystem.

10       As I told you during the opening, only an ISP can connect

11   the IP address obtained from a monitoring company to a specific

12   Grande subscriber and to take action against that subscriber.

13   Only the ISP can do that.  No one else has that information.

14   Without active participation from an ISP, addressing piracy on

15   BitTorrent is simply impossible.  But Grande has brazenly

16   stated that it has no duty to do anything in response to

17   infringement notices.  But given its role in the BitTorrent

18   ecosystem, that position is illegal and, frankly, immoral and

19   Grande knows it.

20       Grande had a policy that recognized its responsibility to

21   address BitTorrent piracy before 2010.  And Grande's 2017

22   policy recognizes Grande's obligation under federal law to

23   implement a reasonable repeat infringer policy.  The problem

24   for Grande is that for the years 2010 to 2017, the years at

25   issue in this lawsuit, it admittedly had no policy.  It had a

1    policy of willful blindness.

2        Tellingly, John Feehan, the CFO for Grande's management

3    companies, admitted that if Grande knew that its users were

4    using and stealing copyrighted content and kept giving them

5    Internet service to do it, that would not be consistent with

6    Grande's values.  That's why they had the policy before 2010.

7    That's why they have the policy after 2017.  The policy and

8    actions in the interim were illegal and immoral, and they know

9    it.

10       And that takes us to the next statutory factor, whether

11   Grande acted willfully, intentionally, or recklessly in

12   contributorily infringing plaintiff's copyrights.  On this

13   record, there's only one correct answer.  Yes.

14       Grande abolished its policy for addressing repeat

15   infringers willfully and intentionally.  Grande refused to

16   terminate any user, even after 10,000 notices, and that

17   decision was willful and intentional.  Grande ignored

18   1.3 million notices.  Didn't even notice that they weren't

19   being forwarded.  Willfully and intentionally and recklessly.

20       Grande did not even -- the willfulness is obvious here.

21   And once you find willfulness, the law expressly gives you the

22   right to punish Grande for its willful behavior.

23       The next critical factor is the need to deter Grande from

24   infringing again.  There can be no doubt that Grande's just

25   chomping at the bit to eliminate any termination policy.  I

 1   don't have to say it.  They say it themselves.  In Grande's

 2   opening statement, they told you that you can decide whether

 3   termination programs like the one Grande implemented are

 4   necessary.

 5       Well, Grande and the ISPs are the only party that can

 6   police piracy on BitTorrent at all.  And they are telling you,

 7   you can free them from that obligation.  While Grande's Texas

 8   employees like Mr. Bloch and Mr. Fogle understand the role that

 9   ISPs play in addressing BitTorrent infringement, Grande's

10   management and legal team firmly believe that the law doesn't

11   apply to them, despite the fact that the ISP is the only party

12   that can play that role.  And despite the fact that the ISP is

13   providing the high-speed Internet necessary for the

14   infringements to occur in the first place.

15       This is a company that has made the intentional decision to

16   side with the infringers, to use its greed for additional

17   profits as a justification of trampling on the property rights

18   of the entire content ecosystem, from music to movies and

19   beyond.  They need to be deterred and it needs to be a strong

20   message.  And it will take a stiff award to deter Grande.  Its

21   owners made millions turning a blind eye to infringement and

22   Grande has generated over a billion and a half dollars during

23   the relevant time period.

24       Not only have their revenues been substantial, but their

25   gross profit margins are growing and are now around 200 million

1   a year, and it's important to note that deterring Grande

2   doesn't mean deterring its Texas employees.  It means deterring

3   the decision makers from the management company and the Legal

4   Department, the suits who set the policies.

5       That takes us to the final critical factor, the need to

6   deter others from infringing in the future.  This case is not

7   just about Grande.  The entire ISP community is watching.

8   They're getting direct reports from this courtroom.  And a slap

9   on the wrist will be interpreted by the ISP industry as a

10  license to disregard evidence of piracy and to disregard the

11  rights of copyright owners just like Grande did.

12      My old friend Michael Elkin is sitting right there

13  representing Cox and watching this case right now.  There are

14  reports going out in realtime, but even more importantly, the

15  corporate overlords that run Grande and make all their policy

16  decisions now run the sixth largest ISP in the United States

17  and are hoping for a verdict that allows them to turn off all

18  enforcement for all of these related companies.

19      They want to be able to simply turn a blind eye, to apply

20  their willful blindness standard to all of these companies.

21  This statutory factor lets you send a message to their general

22  counsel in the back of the room, Jeff Kramp, and the others who

23  oversaw the lawlessness of Grande between 2010 and 2017, that

24  not only Grande, but all of Astound, has to comply with its

25  obligations under the law and respect all property rights and

1    not merely its own.

2        So where does that leave us?  With a defendant that has

3    clearly violated The Copyright Act, that knew of or was

4    willfully blind to specific infringements by its customers on

5    its network and that materially contributed to that

6    infringement; that did so willfully and intentionally and is

7    brazenly unapologetic about its conduct; that openly defends

8    infringers even when the infringers don't defend themselves.

9        This is not a mom-and-pop local company or a start-up.

10   This is a company run by magnates, big-money interest that

11   pocket the profits from the company and make all the legal and

12   policy decisions.  They need to receive the strongest possible

13   message that their conduct is legally and morally wrong and

14   simply unacceptable.

15       So what are we asking for in damages?  As you heard this

16   morning, The Copyright Act permits a statutory award between

17   750 and $30,000 per infringed work.  But if the infringements

18   are willful, as they clearly were here, that $30,000 per work

19   cap lifts and you can award up to $150,000 per infringed work.

20       You will decide the appropriate amount, but we submit that

21   given Grande's outrageous conduct, the award must be in the

22   willful category, that is north -- and we believe well north --

23   of $30,000 per work.  The willful and unapologetic, indeed

24   arrogant and aggressive posture that Grande's management have

25   taken, including blaming the victim and scapegoating anyone

1    else it can while it rides roughshod over the property rights

2    of content owners justifies a substantial award, and we trust

3    you to find the right place and the willful range to place

4    that.

5         Given the simplicity of the case ultimately and the lack of

6    any credible evidence to the contrary on any of the three

7    requirements to prove contributory infringement, it's not

8    surprising that most of Grande's case focuses on issues that

9    have nothing to do with the determination of contributory

10   infringement or the damages that should be awarded for that

11   infringement. I'd like to call them smokescreens, things to

12   distract you from what's really at issue.  So let's take them

13   on briefly and show why they have nothing to do with the issues

14   you have to decide.

15        First off, they present themselves as protectors of their

16   users' privacy.  They say we don't snoop on users.  We don't

17   monitor them.  You've even heard counsel asking questions about

18   ISPs kicking down users' doors and suggesting that the labels

19   are asking them to be some sort of secret police.  But this

20   argument is not only insulting, it's an empty rabbit hole

21   because nobody is asking them to do any of that.

22        As Grande itself recognizes in its DMCA policy, all they

23   need to do is log infringement notices, pass them on to

24   consumers, and take responsible actions if the infringements

25   continue.  Mr. Horton put Grande's entire argument to rest when

 1    he admitted that no one from the labels ever asked Grande to

 2    monitor its users, intercept information, or review the

 3    customers' activities.  But then they ask:  How can we vet the

 4    reliability of the monitoring company or the notices?  Again,

 5    nobody is asking them to do that.

 6        All they need to do is to log the infringement notices,

 7    pass them on to consumers, and take actions if the

 8    infringements continue.  Then they say, how can we decide who's

 9    right if the consumer disputes the allegations in a notice?  To

10    begin with, they haven't identified a single instance where

11    that ever happened; particularly with Rightscorp, because they

12    never forwarded any Rightscorp notices for five years.

13        But even if they did, no one is asking them to make that

14    decision.  All they need to do is log infringement notices,

15    pass them on to consumers, and take responsible action if the

16    infringements continue.  If they choose to exclude notices that

17    are challenged by consumers, fine, but they didn't do that.

18    Instead, they completely ignored all notices for seven years.

19    Moreover, this verification excuse is not only irrelevant, it's

20    demonstrably wrong.

21        The record is clear that Rightscorp directly reached out to

22    them to meet so they could explain their process and

23    reliability.  Let's look at the letter that Rightscorp sent to

24    Grande in 2015 that we talked about earlier.  It expressly

25    said -- and this is important language -- *"We understand,*

1   *however, that you have a supremely valid interest in responding*

2   *only to accurate allegations of infringement.  That is one of*

3   *the reasons why we want to have a face-to-face meeting."*

4       Rightscorp wanted to explain its system to Grande so Grande

5   could trust it.  It's clear why Grande wants to say they don't

6   have a way to verify it, but it clearly did.  They were simply

7   willfully blind to the information that they had on their

8   fingertips, because they didn't want to know.  But while no one

9   forced them to verify, they did need to do something.

10      You can't ignore all notices for seven years, in most cases

11  fail to pass them on to consumers, not take any actions when

12  the infringements continue, and simply make up excuses after

13  you get sued.  That is willful, malicious conduct that must be

14  called out for what it is and must be punished, because it

15  simply isn't right.

16      Grande tries to refocus your attention from its

17  indefensible conduct to Rightscorp's business practices.  Yes,

18  Rightscorp offered infringers the option to pay a small

19  settlement fee to resolve the notice of infringement.  That's

20  neither illegal nor relevant to whether their system accurately

21  identified and documented infringements.  It's merely an

22  attempt to sway you to decide the case on issues that are

23  unrelated to the case.

24      There's nothing in the record to suggest that Rightscorp

25  business practices played any role in Grande's conduct.  And,

1    indeed, the conduct and policy that were said back in 2010

2    happened before Grande was even a company or -- Rightscorp was

3    even a company or sending notices to Grande.

4        Grande also harps on the fact that Rightscorp doesn't

5    maintain all the data that Grande wishes it had maintained, but

6    none of that matters in the presence of the downloads, proving

7    the actual infringements by the actual Grande subscriber.

8        You've also heard Ms. Frederiksen testify about her review

9    of the Rightscorp source code and testing of the Rightscorp

10   system and how it can do what it says it will do:  Identify

11   infringers through reliable hash-matching, engage in

12   handshakes, and document the connections.  This was not

13   disputed by Grande's expert testimony.

14       Further, Rightscorp's decision not to maintain some

15   redundant data cited by Grande has a practical basis that

16   applies to both Grande and Rightscorp.  Rightscorp has sent out

17   over a billion notices over its existence.  Maintaining the

18   extra data that Grande pretends it would like to see is

19   enormously expensive, and given the downloads, all that data is

20   redundant.  Grande complained to you during this case about the

21   cost of maintaining its own data.  Well, the same is true for

22   Rightscorp for the same reason.

23       Beyond all that, remember that Grande decided to forward

24   Rightscorp notices in March 2016 in the wake of the Cox

25   verdict.  That decision confirms the challenges to Rightscorp

 1   data are just after-the-fact excuses to deflect your attention

 2   from what really matters, Grande's conduct.

 3       Since Grande has no rebuttal to the powerful fact that

 4   there were 19,000 actual downloads of the works in suit from

 5   Grande subscribers, it makes two irrelevant arguments about the

 6   download process.

 7       First, Grande points out that in some of the other

 8   downloads that Rightscorp did beyond the 19,000, that they

 9   don't contain a song at issue.  Well, that's true, it actually

10   underscores the accuracy of the Rightscorp system.  As you

11   heard during this trial, in every case where Rightscorp

12   downloaded something other than the song at issue, that other

13   material was contained in the same torrent payload that

14   contained the song at issue.  And we know that for certain

15   because the torrent hash, or the file that Rightscorp

16   downloaded, is the same as the torrent hash that includes that

17   song.

18       So when Rightscorp downloaded any file from that torrent

19   payload, it was documenting that that BitTorrent user had a

20   torrent that included the song at issue.  None of those

21   downloads have been presented here as evidence of infringement,

22   but they certainly don't reflect errors.  They reflect

23   additional proof that the user has the torrent at issue and was

24   distributing infringing content without permission.

25       Grande also complains about the uncontroversial fact that

1    Rightscorp wasn't always able to get a download from a

2    particular user.  But of course, Rightscorp could only get a

3    download when the user was online with BitTorrent open, which

4    was obviously not all the time.  Grande's argument here is no

5    more persuasive than saying that if you knock on someone's door

6    and they're not there, that means they don't live there.

7        Grande's prize argument is based on the fact that for a

8    limited period of time, Rightscorp lowered its bit field

9    requirement from 100 percent to 10 percent.  But that has no

10   impact on the basic chain of liability that I mapped out for

11   you before.  Every single work in suit was actually downloaded,

12   generally many times, by Rightscorp from a Grande user, and

13   that download has been forensically confirmed by Audible Magic.

14       The transmission of that download to Rightscorp by a Grande

15   user was undeniably an act of infringement.  Every one of those

16   downloads can be traced back to a prior specific notice

17   relating to that same user, and in each of those cases, the bit

18   field setting was wholly irrelevant since the user undeniably

19   had the entire work.  And the proof is here in the courthouse

20   in the actual work that was downloaded in its entirety.  So for

21   all the recordings at issue, the 10 percent bit field is simply

22   not an issue.

23       But their biggest sideshow is to blame Greg Boswell's

24   story.  How many times have we heard Grande's mantra that to

25   believe plaintiff's case, you need to trust Mr. Boswell.  Well,

1    we firmly believe that Mr. Boswell's testimony about how the

2    system operated was honest and credible and was corroborated by

3    Ms. Frederiksen.  Indeed, even Grande's expert, Dr. Cohen,

4    conceded that the code worked.

5         But all you really need to know to believe plaintiff's case

6    is that the Rightscorp system downloaded every work in suit

7    from a Grande user.  And for every single download, there's a

8    previous notice identifying that same user as infringing that

9    same work.  Grande doubled down on this attack at the end of

10   their case with the testimony of Dr. Cohen who admitted that he

11   didn't have any experience in either the music industry or file

12   sharing using BitTorrent, so it's no surprise that Mr. --

13   Dr. Cohen's objections are theoretical ivory tower judgments

14   that ignore important parts of the code and the downloads and

15   connected notices.

16        Furthermore, it's important to understand the nature of his

17   testimony.  He's a guy who audits the computer systems of major

18   corporations and government on a best-practices basis.

19   Rightscorp isn't a major corporation.  It's a start-up.  And

20   the issue is not whether its internal procedures should be more

21   organized, but rather whether it's capable of doing what its

22   source code says it can do.  And for all his criticisms,

23   Dr. Cohen couldn't deny that the Rightscorp system is capable

24   of doing what it says it can do.

25        While Grande has hypothesized situations where Rightscorp

1   might have been wrong, they have not identified any actual

2   errors, and more importantly, can't contest that the Rightscorp

3   system is capable of accurately identifying and documenting

4   infringements by Grande's users.

5        In our opening statement, we promised to tell you about how

6   the recording industry operates; how it was profoundly damaged

7   by Grande's actions, how it's one of the great American

8   industries, an industry that takes risks, invests in artists

9   and their careers and tries to adapt to changes in technology

10  and consumer demand to give us the music that enriches our

11  lives; how it plunged into economic free-fall in 1997 with the

12  introduction of the MP3 file that caused the industry revenues

13  to drop by 50 percent in the next 15 years, and ultimately

14  destroyed the business model that the industry had relied on

15  since its inception.

16  How Grande's decision to abolish its repeat infringer

17  policy came right in the heart of that collapse before there

18  was the faintest inkling that streaming might create a new

19  business model based on access rather than ownership, and how

20  Grande's decision interfered with transitions to that new

21  model.

22       We delivered extensive testimony about all of that,

23  particularly the devastating effects of piracy on the industry,

24  and it has all gone undisputed.  There is literally not one

25  document or line of testimony that contradicts anything that we

1    have said.  You all know the power of music.  You all know the

2    importance of the recorded music industry, both in Austin and

3    around the world.  You know about the jobs lost and the

4    economic and personal disruption caused by piracy.  Many of you

5    may once have shared pirate files yourself, but my guess is

6    that most of you now use licensed streaming services and

7    recognize that music isn't free and that piracy is not a

8    victimless crime.

9        This suit is not, as it was insultingly suggested, a

10   lottery ticket.  This an effort to address a core basic threat

11   to the industry, a threat that nearly destroyed the industry

12   during the very time that Grande was trampling on labels'

13   property rights and is still a threat today, and to send a

14   message to the only people who are capable of restricting and

15   controlling that piracy, that they have to play their part and

16   can't turn the other way.

17       I do need to comment, though, on some of the remarkable

18   things I've heard from Grande's counsel during this trial.

19   We've heard them today, without any evidence, that the collapse

20   of the CD market was caused by consumer demand for individual

21   songs instead of albums.  But that's really just a flawed

22   attempt to blame the victim.  The record companies have adapted

23   for decades to these kinds of changes.  What's different in

24   this case is not a change in format, but the fact that rampant

25   piracy was driving that format.

1    Overnight in 1997 and 1999, every single song in the world

2  was available for free on the Internet.  That's not a situation

3  that the labels were controlling, directing, and they had to

4  respond to a world that had changed before they had a chance to

5  even get involved.  And here Grande was not an innocent

6  bystander.  It enabled the pirates and provided them with the

7  tools.

8    The industry tried to respond in any way that it could.  It

9  tried to create a digital download market, but its efforts were

10  undermined by piracy.  Why would people buy downloads when all

11  the downloads were available for free?

12    As Mr. McMullan from Universal told you, piracy deprived

13  the labels of the ability to develop a legitimate digital

14  market because it was all available for free overnight.  Once

15  that happened, the labels' model imploded --

16          COURT CLERK:  Counsel, three minutes.

17          MR. BART:  Thank you.

18          -- and whether they tried to sell albums or singles

19  didn't matter.

20          We've also heard them say without evidence that

21  streaming -- subscription streaming is a better deal for

22  consumers than buying CDs, as if they're saying, see, piracy is

23  a good thing.  But that's a malicious response to the

24  disruption caused by piracy.  When Grande abolished its repeat

25  infringer policy, there was no streaming market and there was

1     no Spotify.  This is just more of Grande's basis of beliefs

2     that it's okay to profit at the expense of others, to mock and

3     blame the victim when the property is being stolen, and to side

4     with those who steal it instead of respecting the owner's

5     property rights.

6              But let's contrast that with how Grande acts when its

7     own property is at stake.  When users don't pay for service,

8     Grande terminates them.  When bars show content that Grande has

9     an exclusive license for, Grande sends trucks to the bars to

10    shut it down.  Grande's witnesses have consistently testified

11    that they believe that their intellectual property rights are

12    valuable and are aggressive in protecting them.

13             The bottom line is that Grande believes in property

14    rights but only when it applies to them.  If it's someone

15    else's property and it's a benefit to them, they're happy to

16    look the other way.

17             Ultimately, this is a case of right and wrong, and

18    Grande's upper management and corporate overlords were clearly

19    unequivocally wrong.  They abolished their repeat infringer

20    policy so they could reap the maximum revenue from the

21    explosion of piracy on BitTorrent.  They pocketed the revenue

22    of willful infringers.  They turned a blind eye to the

23    overwhelming evidence of specific infringement.  They flipped

24    the company for $400 million, pocketing millions individually

25    for all the people who made the decision to look the other way.

1            But ultimately, the Cox case happened, and they knew

2    there was a time bomb in their files, so they belatedly adopted

3    a DMCA policy that proves beyond any doubt that they had been

4    willfully blind between 2010 and 2017.

5            So as I ask Mr. Horton, *"If the jury finds that*

6    *infringement alleged in a notice actually occurred, then that*

7    *means you were providing Internet service to users who are*

8    *guilty of infringement, of which you had notice."* He honestly

9    said, *"Yes."*

10           Think about that answer.  It's a clear admission of

11   liability.  Not only is liability clear, but the offenses were

12   willful and demand a strong, clear response.

13           We trust all of you to do what is right and to send a

14   message that trampling on property rights is wrong and won't be

15   tolerated.  Thank you for your patience and your focus and your

16   moral compass.

17           THE COURT:  We'll take about a five-minute recess, let

18   counsel set up, and let you have an opportunity to use the

19   restroom, and we'll come back.  All right.

20           COURT SECURITY OFFICER:  All rise for the jury.

21           *(3:13 p.m., the jury exits the courtroom.)*

22                              *   *   *

23           *(3:29 p.m.)*

24           COURT SECURITY OFFICER:  All rise.

25           THE COURT:  Please be seated.

1                          *   *   *

2          COURT SECURITY OFFICER:  All rise for the jury.

3          *(3:30 p.m., the jury enters the courtroom.)*

4          THE COURT:  Ladies and gentlemen, it is now defense

5    counsel's opportunity to make his closing argument on behalf of

6    his client.  He only has one opportunity to address you, so

7    please pay careful attention just like you did for Mr. Bart.

8          MR. BROPHY:  Thank you, Your Honor.

9          Hello, again.  It's been a while since I've been able

10   to speak with you directly.  It's nice to see you.  I wanted to

11   start today with the phrase I started my opening with.

12   *"Knowing about an accusation is not the same thing as knowing*

13   *that an accusation is true."*  That is a very important phrase

14   for this case, and it's going to be a very important phrase for

15   you to think about when you're conducting your deliberations

16   and, most importantly, when you're reading the actual jury

17   instructions.

18         That's not something you've seen yet.  You've heard

19   the instructions.  You haven't seen it.  I'm going to show you

20   those during my presentation.  This case is about whether the

21   plaintiffs can prove their case pursuant to those jury

22   instructions, so you're going to be paying careful attention to

23   that.

24         You may recall way back when, at the beginning of the

25   month I gave you this hypothetical.  It's frankly, a little bit

1  of a rude one, the notion that I would accuse one of your

2  neighbors of engaging in a red light violation.  I posed this

3  hypothetical where I would come in and send one of you an

4  e-mail and say, I'm going to send you an e-mail, I'm going to

5  accuse one of your fellow jurors of running a red light, right

6  outside at Eighth and Congress.  I think I chose 8:25 a.m.  And

7  I said, okay, what if I sent you that e-mail or I sent you ten

8  of those e-mails or a hundred of those e-mails.  And the

9  question is, does that mean that you know that the juror

10 sitting to your left or right actually ran the red light or

11 not?  And of course the answer is no.  Right?

12      That means that you know I accused them of running the

13 red light.  You don't have actual knowledge that that person

14 ran the red light.  And I explained in order for you to know,

15 you either have to be at the intersection looking at that car

16 zooming through the intersection or you have to be presented

17 with evidence that you can review, that you can bet,

18 understand, and decide for yourself whether it's legitimate or

19 not.  And perhaps after reviewing that evidence, you can come

20 to the conclusion that it actually happened.  You can have

21 actual knowledge.  But the e-mail alone doesn't give you actual

22 knowledge.

23      And I think what we've proven to you -- I hope we

24 have -- during this case, is that Rightscorp doesn't have any

25 actual evidence to present.  They sent a boatload of e-mails.

 1    There's no denying it.  Grande got tons and tons and tons of

 2    e-mail accusations just like the e-mail I postulated suggesting

 3    someone ran a red light.  But those are just accusations.  And

 4    the question is:  Where is all the evidence?  There isn't any.

 5    And when you go back there to deliberate, you're not going to

 6    see any.  We're going to talk about that today.

 7            But first I'd like to talk about what the record

 8    labels think is required to prove a case of copyright

 9    infringement.  You may recall a couple of times throughout this

10    trial we've put some documents in front of you from the actual

11    record labels and from their industry association, the RIAA.

12    And those documents set forth a set of requirements for what

13    needs to be collected and saved, forensically, as evidence to

14    support an accusation of music sharing.

15            Now, unlike the Rightscorp accusation and unlike the

16    evidence in this case where there is no evidence, the RIAA and

17    the record labels require a specific evidence package.  We

18    talked about this before.  It requires a log of all the

19    investigations, recordation of all those packets of data that

20    transmit back and forth.  Control communications back and forth

21    between the two computers that they negotiate them, BitTorrent

22    protocol connection.  The all-important bit field data.  You

23    guys are probably never going to want to hear the word "bit

24    field" again, but the bit field data is super important.  It's

25    what indicates -- and I said this the very first day we met --

 1     it's what indicates whether the computer has a song or not.

 2             The traceroute data that shows the packets and the

 3     route they take between the detection computer and the computer

 4     out on the Internet, alleged to be engaging in the music

 5     sharing.  And then we'll talk about this too, independent

 6     review records.

 7             So when you go back -- I think you're going to be

 8     getting it electronically -- you'll have access to all the

 9     exhibits that have been admitted in this case.  And one of the

10     exhibits that I'd ask you to take a look at is this one,

11     Defense Exhibit 68.  Defense Exhibit 68 is that RIAA

12     requirements document.

13             Now, I went through this extensively with Dr. Cohen

14     last week, and on cross-examination the plaintiff's attorneys

15     suggested this was a one-off, that this is -- we plucked some

16     document out of the bevy of options available and all the

17     contractors that work with the RIAA, and we just chose this

18     one.  We cherry-picked it.  First, you haven't seen any others.

19     If there was another document that said something else or had

20     different requirements, you would have seen it.  None of those

21     exist.  There are only these requirements.

22             But take a look at Defense Exhibit 67 at the same

23     time.  Defense Exhibit 67 is an earlier version from 2011 of

24     the same requirements and includes all the same requirements,

25     that same list of things I mentioned before, the log of all the

1   control communications and the steps of the investigation and

2   the bit field data.  This is not a one-off.  The RIAA and the

3   record labels have required these company's packages to be

4   collected and saved for years and years and years.

5           So when you go back and deliberate, I'd ask you to

6   take a look at this document 68 and go to page 11.  That's

7   where you're going to find the phrase "evidence packages."

8   That's where it first shows up.  And if you flip two pages

9   over, on page 13, you're going to see an explanation of what

10  those evidence packages are used for.  They are considered

11  legal documentation.  They are the things that prove the e-mail

12  accusations are legitimate.  No evidence package, no evidence.

13          Now, this document also sets forth two different types

14  of verification that can be performed for detections of music

15  sharing.  Number one is a full download verification.  And you

16  heard some testimony about that today.  Confusingly, the

17  suggestion was that Rightscorp does that full download

18  verification, but I think you recognized from my

19  cross-examination, it requires an actual song to be downloaded

20  from every target computer.  It says it right in the middle of

21  the text where I highlighted earlier this morning.  Rightscorp

22  doesn't do that.  So Rightscorp doesn't do a full download

23  verification, that's just not true.

24          The second one, the hash-based verification.  That's

25  closer to what Rightscorp claims it does.  Rightscorp claims

1   that it downloads a song from the swarm and it gets this hash,

2   that magical hash the plaintiffs love to talk about.  And once

3   it gets that hash, it looks for other songs on the Internet,

4   but it never downloads those songs, and it never downloads even

5   a part of these songs.  And the problem is that's a specific

6   requirement from the RIAA.

7          Now, Ms. Frederiksen testified today that Rightscorp

8   does this, that they download those songs.  Well, that's weird,

9   because Mr. Boswell says they don't.  So I asked her earlier

10  today, who are we supposed to believe, you or Mr. Boswell?  But

11  the fact of the matter is there's no download.

12         Dr. Cohen said the same thing.  There's no download.

13  There's no part of a download.  And the consequence of this is

14  that the Rightscorp system sends out e-mails having never

15  initiated a download of a file.  And that means they don't know

16  whether that computer is actually offering the file or not.

17  They don't care.  They want to send out e-mails with the pay

18  link so they can get paid.  They don't meet the RIAA's

19  requirements for downloading a file.  And the reason you have

20  to download a file -- and it's right here in black and white --

21  is threefold.

22         *"The respondent will download enough of the file to be*

23  *able to record the source and destination and to prove, number*

24  *one, that the user was offering the file; number two, that the*

25  *user is a valid peer-to-peer user; and number three, to verify*

1 | *the file is a valid peer-to-peer file."*

2 |         That's why you start the download, to verify those

3 | three things to make sure that your accusations are legitimate;

4 | that you're not creating false positives; that you're not

5 | accusing people of engaging in music sharing when they actually

6 | aren't sharing any music.

7 |         If you scan down that page ten, right below the part I

8 | just talked about, you're going to see another section that

9 | I've highlighted here at the top of the screen.  And that

10 | section says, *"As described in the section below, captioned*

11 | *Data Capture and Storage, all evidence will be saved,*

12 | *including, without limitation, packets of data that are*

13 | *received and exchanged during the process."*

14 |         You got to save the packets that go back and forth

15 | between the two computers.

16 |         You may recall Ms. Frederiksen, and this was

17 | referenced earlier, did some testing of her own.  And you may

18 | remember, you may not, but I slapped her expert report onto

19 | this ELMO, and I showed you the bit field data that was

20 | attached to the back of her report.  She kept the packets of

21 | data.  She kept the evidence.  And the reason she did that is

22 | because she wanted to prove to you that she actually did the

23 | test.  And she wanted to prove to you what the results of that

24 | test were, what information was exchanged.  That's evidence.

25 | And that's exactly what the RIAA and the record labels require

 1   to be collected and forensically saved.  Rightscorp doesn't do

 2   that.

 3             You can see Mr. Boswell's testimony here from this

 4   trial.  They don't save it.  They don't even capture it.

 5             Dr. Cohen says the same thing.  They don't capture it.

 6   They don't save it.

 7             Now, you are probably sick of seeing this list of

 8   things as well, but it's really important.  If you flip to page

 9   12 of Exhibit 68, you're going to see this list of all the

10   things that are required to be saved in the evidence package.

11   And curiously, earlier today, the plaintiffs had

12   Ms. Frederiksen up there testifying that Rightscorp saves this

13   stuff.  Mr. Boswell doesn't think that they save that stuff.

14   Here he is admitting they don't contain -- that their system

15   does not save step-by-step logs of everything they do.  They

16   don't do that.  The control communications, he doesn't even

17   know what those are.

18             He admits they don't save traceroute information.  And

19   while he agrees that bit field information is very important to

20   the detection process, he claims they don't save it.  Now,

21   we're going to talk more about that later.

22             A very bizarre part of this case is where the heck

23   those bit fields are, but there aren't any in evidence in this

24   case, and when you go back to deliberate, you're not going to

25   see any.  You're going to have access to all the evidence

1    that's been admitted in this case, no bit field data, not a

2    single shred of it for a single notice.

3        Dr. Cohen looked at every single one of these elements and

4    concluded that Rightscorp doesn't save a single one of them.

5    Eight requirements, from the RIAA, required to be saved as

6    evidence packages to prove up your case in court, and they've

7    got bupkis, they have zero of the eight.

8        The last thing I want to talk about in this document is

9    this requirement for an independent review program.  And I

10   think it's telling.  The RIAA says that this is most important.

11   They say, *"Also, and most importantly, the evidence packages*

12   *which are held for verified infringements must be accessible*

13   *online by approved representatives of the organizations*

14   *selected to deliver the independent review program which is*

15   *required for implementation of the program."*

16       Now, when you look at this document, if you look at this

17   document -- please do -- you're going to find that the

18   MarkMonitor system doesn't send out notices that have pay links

19   in it.  It's just a notification system.  And notwithstanding

20   that fact, the RIAA requires there to be an independent review

21   of the process and the evidence to make sure that it's

22   legitimate, to make sure the evidence is collected properly,

23   maintained properly, not manipulated, not changed.

24       In this case, Rightscorp is sending out notices with pay

25   links in them.  They're motivated to manufacture as many of

1   these e-mails as possible.  Even more of a reason to have

2   third-party oversight, to make sure the accusations are

3   legitimate; that there's no funny business going on.  Greg

4   Boswell admitted in this case, no independent auditing for the

5   Rightscorp system.

6           So that leads to the big question.  And I hope it's a

7   big question you ask back when you're deliberating.  Where is

8   all the evidence?

9       You're going to have access to notices back there.  If you

10  get them in paper, slap one of those things on the table and

11  ask your fellow jurors, What evidence did you see that supports

12  this notice that this person with this IP address actually

13  shared some song with someone else?  Where is the evidence?

14      These e-mails are nothing more than me sending an e-mail to

15  you accusing your neighbor there of running a red light.  There

16  is no evidence at all to support them, not one bit.

17      Now, the record labels knew this, and that's one of the

18  really bizarre things about this case is that until they filed

19  this lawsuit, the record labels didn't want anything to do with

20  Rightscorp.  They weren't working with Rightscorp for years and

21  years.

22      You just heard from my colleague, Mr. Bart, this

23  impassioned speech, but Rightscorp was never involved with

24  these parties, and these parties never contacted Grande.  They

25  bought the data before they filed the lawsuit.

1      What did the record labels think about the Rightscorp

2   system before this lawsuit was filed?  There are three major

3   record labels in this case.  The first one is Sony.  This is

4   what Sony thought about Rightscorp.  Rightscorp was working

5   with companies to milk consumers.  Sony wanted to block the

6   activity to stop them from doing what they were doing and at a

7   bare minimum to distance themselves so that no one thought the

8   stink of Rightscorp would get on Sony Music.

9      This is what Sony thought about Rightscorp before this

10   lawsuit.  They're in here telling you Rightscorp is the

11   greatest thing since sliced bread.  That's not what they

12   thought before the lawsuit, before they stood to get some money

13   out of this deal.

14      What about Universal, the second of the three record

15   labels?  They declined to enter into a business relationship

16   with Rightscorp out of concerns about their methods.  No

17   kidding.  They have no problem asking you to award them money

18   in this case, but they didn't ever want to work with Rightscorp

19   because they knew the methods were hugely problematic.

20      What about the third of the big three, Warner?  You heard

21   some of this testimony this morning via video deposition.

22   Mr. Glass told you Rightscorp was having financial trouble and

23   came to Warner with this package deal.  Hey, we've got this

24   data.  Let's sell it to you, make ourselves a deal here.  You

25   can go out and file some lawsuits.  Warner said no.  And the

1    representative from Warner, John Glass, didn't find out this

2    case was happening until he was preparing for his deposition in

3    this case.

4        The record labels couldn't care less about Rightscorp.

5    They never cared about Rightscorp.  All they care about now is

6    making a quick buck.  That's what this case is.

7        So what happened?  You haven't seen any evidence that the

8    record labels suddenly had this epiphany, they learned the

9    Rightscorp system was the greatest thing in the world.  There's

10   no evidence of that whatsoever.  What happened is they came up

11   with a scheme, along with the RIAA, to make some money.  And so

12   they scribbled a contract with Rightscorp that required

13   Rightscorp to dump a bunch of data and they filed this lawsuit.

14   And they came up with this narrative for the lawsuit.  The

15   record labels have lost a bunch of business and it's all

16   Grande's fault.  It's all because of music sharing.

17       You've heard testimony from the record labels about that.

18   These are three of the largest companies in the United States,

19   multi billion-dollar companies.  When you go back there, let me

20   know if you see a single document that talks about music

21   sharing harming their business.  One document.  Look for it.

22   There aren't any.

23       All we've heard is some very polished witnesses who have

24   been asked to come here as part of this lottery ticket to make

25   money to talk about damage.  They want you to buy off on that

1   so you award a boatload of cash.

2       But you remember that big graph with all those orange bars

3   with all those CD sales.  Technology has passed the record

4   labels by.  It used to be when I was a kid I would go to

5   Blockbuster Music -- if you remember that -- and I'd want a

6   song.  I'd have to buy a whole CD for 15 or $20 to get that

7   song.  And a couple weeks later I would want a different song

8   and have to buy another CD.  The reason the record labels were

9   making so much money is because they were bundling their

10  products.  They bundled something you wanted with a whole bunch

11  of stuff you didn't, and that let them make more money because

12  you were buying 15 songs when you wanted one.

13      But technology improved, and then we got downloads, and you

14  can go on the iTunes store and you can spend a buck-29 and get

15  just the song you want or you can pay $9.99 a month for Spotify

16  and listen to all the music you want for $9.99 a month.  So

17  it's not surprising that the record labels aren't making as

18  much profit as they used to because they can't bilk us

19  consumers the way they used to.  You're getting just what you

20  want and you're getting it at a better price.  That's why the

21  record labels' business has shifted.  That's why it's changed.

22      This happens all the time.  All kinds of companies have a

23  technology shift that renders them irrelevant.  They don't go

24  off filing lawsuits against Grande demanding money.  They

25  innovate.  They deal with it.  They come up with a new program.

1    But the new program for the record labels is just filing

2    lawsuits, trying to make money.  Blaming everyone else for

3    their failure to stay relevant.

4        And so as part of their case here, they hired a guy named

5    Dr. Lehr to come in and talk about dollars.  And they wanted to

6    put the biggest dollar number they could in front of you.  And

7    the way they did that was they had Dr. Lehr look at every

8    single notice that was sent in this case to Grande, not just

9    the Rightscorp notices, not just the Rightscorp notices focused

10   on the copyrights at issue in this case.  Every single notice

11   he could get his hands on.

12       And then he found all those subscribers and he calculated

13   how much Grande makes on average on a subscriber over the

14   lifetime that they stayed with the service, $2,448, roughly.

15   And he did some math where he multiplied all that money times

16   the number of people who received any notice and he got

17   $50 million, this big number.  That number is ridiculous.  It

18   assumes that Grande doesn't provide any service and that the

19   user doesn't do anything with the Internet but share music 24

20   hours a day, seven days a week, every single bit of data was

21   nothing but music sharing.  So they could put that big number

22   out there, hopefully to convince you to award some big number

23   in this case, but it's nonsensical.

24       When you think about it, think about all the things that

25   you do on the Internet.  Grande provided legitimate service to

 1   those customers.  They checked their e-mail, they participated

 2   in Zoom calls, they streamed Netflix, all kinds of things that

 3   they do.  But the record labels didn't want you to think about

 4   that.  They wanted to put a big number in front of you, so they

 5   threw up $50 million.

 6       We hired an expert to come and actually assess the damages

 7   at issue in this case.  And I'm going to pause for a moment and

 8   talk about that.

 9       There's been a lot of hand-waving in this case about viral

10   infringement and harm to industries and all this stuff, but

11   this case is about a discrete set of notices we received, a

12   discrete set of copyrights that are at issue in this case.  And

13   if you even believe there was infringement and if you believe

14   Grande was responsible for it, what amount should compensate

15   them for that discrete set of issues.

16       And that's what our expert did.  Our expert looked at the

17   notices that were actually at issue in this case and said let's

18   turn those notices into actual iTunes downloads and see how

19   much money the record labels lost.  And the answer is no more

20   than $1.2 million.  And then he said, well, gosh, what if

21   instead the notices were streaming revenues?  No more than

22   $270,000.  And what if instead of taking the whole pie and

23   eating it, we think about this rationally and we apportion out

24   only the portion of the Internet usage that might have been

25   used for infringement.  Then that value drops from 50 million

1    down to 1.1 million.  These are actual damages numbers.

2        This is just an attempt to put a big number in front of you

3    to hopefully award a big amount of money.  But let's get back

4    to Rightscorp.  I've harped on this a lot because it's really

5    important, because these e-mails are the only evidence in this

6    case that Grande received.  That's all they have to show you.

7    These e-mails make three accusations:  Download, upload, offer

8    to upload.  I asked Mr. Boswell about this in this courtroom,

9    and he admitted that not a single one of the notices Rightscorp

10   sent was based on Rightscorp detecting a download, not a single

11   one.

12       What about the upload?  I asked him when Rightscorp sent

13   this notice, had it detected anyone uploading a song?

14       No, it had not.

15       Rightscorp accuses people of uploading and downloading

16   songs.  It doesn't detect people uploading and downloading

17   songs.  It makes that assertion in its e-mail to scare people

18   into paying money, but it's not true.

19       What about the offer for upload?  Two important things to

20   talk about here.  Number one, this sentence, *Your ISP account*

21   *has been used to download, upload, or offer for upload*

22   *copyrighted content in a manner that infringes on the rights of*

23   *the copyright owner."*

24       Rightscorp was telling people that offering to upload a

25   song was copyright infringement.  Not true.  When you get the

1   jury instructions, it's not going to say that.  The jury

2   instructions are going to say, *"A copyright owner's exclusive*

3   *right to distribute its copyrighted work is infringed by*

4   *distributing any part of the copyrighted work."*  You got to

5   share the file.  Offering to share isn't infringement.

6   Rightscorp told people it was, to scare them into paying money.

7   They're making false statements about the law.

8       Now, remember, the RIAA requirements set forth this need to

9   actually start to download the song to prove that someone is

10  offering to share the song.  But I asked Mr. Boswell about this

11  during the trial.  And what did he say?  We don't try to

12  download the song.

13          They're telling people they were caught offering to

14  upload a song, and they didn't even test that.  They didn't

15  even test it.  They just sent the e-mail accusing someone of

16  infringement anyway.

17      But it gets worse.  All these notices are the same, so pick

18  any one of them.  You'll find the same language.  Rightscorp

19  says in these e-mails, *We represent the copyright owner.  You*

20  *will receive a legal release from the copyright owner if you*

21  *pay.  I swear under penalty of perjury I'm authorized to act on*

22  *behalf of the owner of the exclusive rights that have been*

23  *infringed.*

24      Does Rightscorp check to see if the clients it works for

25  even own the copyrighted works its scanning for?  Boswell says,

1    no, we don't.  Does Rightscorp even verify the songs are

2    registered with the Copyright Office and eligible for statutory

3    damages before sending these e-mails?  No, we don't.

4        They're making statements that they represent the copyright

5    owner under penalty of perjury, and they haven't even checked.

6    They don't even bother to check.  That's the kind of company

7    that Rightscorp is.

8        Now, what about the evidence?  Maybe there's some evidence

9    hidden somewhere inside these e-mails.  Not so.  I told you at

10   the beginning of this case that series of letters and numbers

11   didn't come from a Grande customer.  There isn't a single piece

12   of evidence from anything having to do with the conversation

13   Rightscorp claims to have with a Grande customer that finds its

14   way into these notices, not a single shred.  This set of

15   characters and numbers, randomly generated.  Greg admits didn't

16   come from a Grande customer.

17       The file name, same thing.  He admits didn't come from a

18   Grande customer.  What's more, they knew about it, days, weeks

19   or months before this e-mail was sent.  Not evidence.

20       The other interesting thing you may recall -- and I was

21   puzzling over this.  I made a big deal out of bit fields and,

22   in fact, Rightscorp doesn't have them, and they know that's a

23   big issue in this case, and so when Mr. Boswell was on the

24   stand, he sold you this yarn about how the bit field is in the

25   file name, whatever that means.  And I asked, is it in the

1    letter A?  Like, where is it?  What are you talking about?  And

2    this just proves the point that that's not true.  They had this

3    file name -- in his own words -- days, weeks, or months before

4    this e-mail was sent.  How does it have the bit field data in

5    it if they had it before they ever contacted, allegedly, that

6    computer?  There's no bit field data in this file name.  That's

7    bunk.  That's made up to try to confuse you.  There's no bit

8    field data.

9        The IP address.  That doesn't come from a Grande customer

10   either.  Greg Boswell says, no, Rightscorp did not learn about

11   that IP address from a Grande customer.  What about this date

12   and time?  That didn't come from a Grande customer either, and

13   more gallingly, this isn't the date and time of any file

14   transfer.  I asked Mr. Boswell those very questions.  Is this

15   the date and time of the download or an upload?  Nope, sure

16   isn't.

17       What the heck is that about?  So let's assume for a moment

18   that Grande could investigate these things.  It can't.  We'll

19   talk about that.  You've already heard from Mr. Horton and

20   others about that, but let's assume for the moment that they

21   could.  They're going get this notice.  They're going to go

22   back in their magical archives of data, which doesn't exist,

23   but let's say they could, and they're going to look at this

24   date and time and see if there was a file transfer.  Are they

25   going to find one?  No.  Because none happened.  The e-mail is

1   totally manufactured.

2       And that's a big main point here.  When you go back to

3   deliberate, please ask that question.  Can the record labels

4   prove that any individual accusation is legitimate?  There is

5   no evidence.  What they want to do is have you assume

6   infringement happens on the Internet and then just gloss over

7   all the actual requirements for the law.  They want you to

8   assume the notices are right, but that's not what your job is

9   here.

10      Your job is to look at those notices and determine whether

11  they've met their burden of proving that any one of those

12  notices is legitimate.  And that means they have to show you

13  evidence.  Just like the red light.  You got to see evidence.

14  And there isn't any evidence to show you because Rightscorp

15  either never had it or deleted it.

16      I've already talked about these notices.  I'm going to move

17  past this slide, but please take a look at these when you're

18  deliberating.  The notices are crazy.  There's no evidence to

19  support them.

20      Now, the plaintiffs have the burden of proving these

21  notices are legitimate, and so it would be enough for us to sit

22  back and say, Rightscorp doesn't have any evidence.  They can't

23  prove their case, job done.  But we've shown you evidence,

24  affirmatively, of notices being manufactured that are false.

25  And one of those is the 10 percent bit field problem.  This is

1   a major issue in this case.

2       I used this hypothetical with Ms. Frederiksen where someone

3   pulls two songs out of the payload, but the rest of it is

4   empty.  And I talked to her about this 10 percent bit field

5   manipulation that Mr. Boswell developed that goes into the

6   database and affirmatively flips switches to change the

7   evidence that they claim they collected.

8       And I want to pause there.  Remember, harken back to that

9   RIAA document about the auditing of the evidence, right, to

10  make sure it's forensically sound.  In this case, we have

11  Mr. Boswell going in and changing the data.  He's not auditing.

12  He's going in and affirmatively manipulating it.  And so I

13  asked Ms. Frederiksen about this 10 percent bit field thing,

14  and she agrees, because in this hypothetical I gave, two songs

15  are present, more than 10 percent.  What's the system going to

16  do?  Well, the 10 percent bit field rule is going to change all

17  those Xs to check marks.  The Rightscorp system is going to

18  assume that user has all those files when they don't even have

19  them.

20      Then I asked her, well, then what's going to happen after

21  that?  And she admitted it's going to send out a bunch of

22  letters.  So Rightscorp is going to send a letter on every

23  single song in that payload when the computer doesn't even have

24  it.  It's eight e-mails, false.  This one user, this one day,

25  and they're going to do that every single day.  Eight a day, 56

1    a week, if my math is right, firing out the door from

2    Rightscorp, totally false, totally fabricated, totally

3    illegitimate.

4        So that poses the next question.  How many of these e-mails

5    were affected?  Maybe there was just one of them.  We can

6    forgive that.  Now, there's no evidence, of course, of how many

7    entries in the database were impacted by this, because

8    Rightscorp doesn't log anything.  And Rightscorp doesn't save

9    any evidence, so there's no way to actually know.  But when he

10   was deposed by me, Mr. Boswell said, well, 10 percent,

11   10 percent bit field affects 10 percent of the entries in the

12   database.  Now, of course, there's no way to verify that,

13   right?  Because there's no facts.  There's no evidence.  This

14   is the whole problem with the Rightscorp system.  You can make

15   up whatever facts you want because you can't be second-guessed

16   with the actual evidence.  You can just say whatever you want.

17       So he said whatever he wants, 10 percent.  Now, he has a

18   motivation to make that number small, right, because he wants

19   the Rightscorp system to seem legitimate because he's on this

20   gravy train where he gets paid to prepare and testify in these

21   cases, so he says 10 percent.  It's probably more.  We have no

22   idea.

23       I asked Ms. Frederiksen about how many are processed at a

24   time, and you may recall it's a hundred thousand every 15

25   minutes.  They had to put a cap on it because if they left it

1  uncapped, it would crash the computer.  That's how many times

2  this thing was buzzing around in the database changing and

3  manipulating the data.  So if we do the math on that, assuming

4  Mr. Boswell's 10 percent, that's 10,000 extra e-mails every 15

5  minutes.  That's 40,000 every hour.  Okay.  Well, maybe they

6  were only doing it for a couple hours.  That wouldn't be so

7  bad.  How long was Rightscorp doing this for?  How long was

8  Rightscorp going into the database manipulating the data and

9  sending out extra e-mails?

10      Before I get to that, I'm going to have a little side note

11  here.  When Ms. Frederiksen was here testifying, I asked her a

12  first question, and it was:  *Would you agree with me that your*

13  *opinion is only as good as the information you have to rely*

14  *on?*"  And she said, *"That's a fair statement."*

15      It is a fair statement, right?  One of the experts for the

16  other side had this phrase.  I don't remember which one it was,

17  but it was *"Garbage in, garbage out."*  I don't know if you

18  remember that.  I like that phrase.  *"Garbage in, garbage out."*

19  Let's talk about some garbage.

20      In this case, Mr. Boswell testified under oath, in front of

21  all of you that this 10 percent bit field rule was only in

22  effect for two weeks.  Quick experiment.  Just flip the switch

23  a couple times, no big deal.

24      But in July of 2015, he gave a deposition in another case.

25  And in July of 2015, he testified the 10 percent bit field rule

1   had been in effect since 2015.  Seven, eight months of activity

2   with the 10 percent bit field, and as he was sitting in that

3   chair giving that deposition, it was still running.

4       Now, when I impeached him with that testimony, what was his

5   excuse for the change?  It's highlighted at the bottom.  *"If I

6   said since 2015, it was a slip of the tongue at that

7   deposition."*  A slip of the tongue.  I have never said this

8   before in a trial, but this man lied to you and he lied to you

9   two different times right here.

10      Number one, he lied when he said that the bit field rule

11  was only in effect for two weeks in 2014, and then he lied to

12  you when he told you that the other answer he gave was just a

13  slip of the tongue.  Those are false statements under oath.

14      How do we know it?  Ms. Frederiksen was also in that other

15  case.  Everybody is on the gravy train.  And in that case,

16  Ms. Frederiksen issued an expert report, couple weeks after

17  Mr. Boswell testified.  Her expert report said the same thing.

18  She looked at the source code, she looked at the production,

19  and she said used a hundred percent bit field before

20  December 2014, now uses 10 percent bit field.  This is now the

21  end of July 2015.

22      The bit field 10 percent rule is still in effect.  That

23  wasn't a slip of the tongue from Mr. Boswell.  And these expert

24  reports, they don't just get spit out willy-nilly.  There was a

25  ton of time and attention put into manicuring these expert

1   reports, having experts look at it, lawyers look at it.  The

2   witnesses who contribute facts to it, they look at it.  This

3   was not a slip of the tongue.

4        But the fact of the matter is, in this case, that

5   10 percent bit field problem is smack dab in the middle of the

6   liability period, and it's a big, ugly problem for Rightscorp

7   and the record labels.  So Mr. Boswell has to do something to

8   minimize that issue.  Because it's right in the middle of this

9   case.  So what does he do?  He says, Oh, it's just a couple

10  weeks.  And he thought he could get away with it because

11  there's no evidence.  There's no records.  There's no logs of

12  anything.  So whatever he says goes, because Rightscorp's

13  system is not legitimate, it doesn't document anything.  There

14  are absolutely no records.  So Mr. Boswell can say whatever he

15  wants and he thinks he can get away with it.

16       And then Ms. Frederiksen has to follow suit.  She issued an

17  expert report in this case that said the same thing Mr. Boswell

18  did.  Oh, well, they relax the rule for one or two weeks.  It

19  was an experiment, but then, man, they turned it right back to

20  a hundred percent, don't you worry.  What?  She issued an

21  expert report in 2015 that said the exact opposite thing.

22       Mr. Boswell says something in 2015, her report mimics it.

23  Mr. Boswell says something in this case, the report mimics it.

24  Now, I don't even fault Ms. Frederiksen for this because

25  there's no evidence for her to look at.  The only thing she has

 1    to go on is Mr. Boswell's say-so.  Whatever he says goes.

 2        I cross-examined Ms. Frederiksen about this at this trial.

 3    And I introduced these two contrary answers, and she admits, I

 4    observed that here.  I observed that change in testimony.  And

 5    then she admits she changed her opinion based solely on his

 6    changed testimony.  Garbage in, garbage out.

 7        We also know that Mr. Boswell didn't just have a slip of

 8    the tongue because Ms. Frederiksen confirmed in this case he's

 9    changed his testimony.  He lied under oath in a court of law

10    regarding the bit field story.  And because there's no

11    Rightscorp records, he's the only source of information about

12    how the system works.  You've heard loads of testimony about

13    that.

14        So the person we're supposed to rely on to understand that

15    this Rightscorp system is legitimate is the same person we've

16    caught lying under oath.  And Ms. Frederiksen admitted during

17    this trial that the result of that lie under oath is that it

18    minimized the impact of the 10 percent bit field rule.  It

19    minimized the amount of time that these false e-mails were

20    being sent.  And of course, I asked her about that.  Goes

21    without saying, the longer the 10 percent bit field rule is in

22    place, the more harm it's doing, the more data it's

23    manipulating, the more false e-mails it's sending.

24        So back to the big question.  How long has this 10 percent

25    bit field data rule been in place?  The answer is, we have no

1    freaking idea.  During this trial, the witnesses have tried to

2    say, well, it couldn't have lasted past October of 2015.  There

3    was this Memphis and Pocket code and things changed, but that's

4    all based on Mr. Boswell's say-so too.

5        And when I impeached Ms. Frederiksen about this, her

6    testimony admits she would be speculating.  She has no idea

7    when it stopped.  She doesn't see anything, sitting here, that

8    tells her dispositively when or if it ever stopped.

9        When Dr. Cohen was here, I asked him to come off the stand.

10   He went back there, and he looked at the source code.  He

11   showed you a couple of things.  For example, where the bit

12   field data was backed up.  We can talk about that in a bit.

13   But he also showed you this code.  This is the code that

14   executes that re-evaluate full file being zero, the thing that

15   goes in and sets off the 10 percent bit field rule and

16   manipulates all the data.

17       And he pointed out that this command, *"ON COMPLETION [NOT]*

18   *PRESERVE"* turns off logging.  Mr. Boswell could have typed less

19   letters and had logging on, could have just not typed that

20   "not," and then we'd have logs.  We would know how often this

21   ran.  We would know how many notices were potentially impacted.

22   We could get some actual answers, but Mr. Boswell took the

23   affirmative step of typing that "not," so there was no logging.

24   Who does that?

25       This is a system designed to take money from people and

 1   accuse them of doing something illegal, and he's turning off

 2   the logging, because he knows he's being a bad boy.

 3   Mr. Boswell knows, and the plaintiffs in this case know, the

 4   10 percent bit field is a big, big problem.  And that's why

 5   Mr. Boswell didn't log what was going on in the database when

 6   he was doing all this funny business and that's why he tried to

 7   change his testimony to minimize the impact.

 8       Let's talk about something related, but different.  I call

 9   this the mystery of the missing bit field data.  So also during

10   this trial, I asked Ms. Frederiksen if the bit field data would

11   help us resolve this 10 percent bit field mystery.  Right?

12   Trying to figure out how many notices were affected by the

13   10 percent bit field rule.  Well, she admits the bit field data

14   is the key.  I call it the secret decoder ring.  And she agreed

15   it would tell you which specific pieces of the payload a

16   particular computer had.  And I asked, And we could back out

17   from that how many notices Rightscorp sent based on the

18   10 percent bit field rule?  She said, Yup.

19           If you have the bit field data, you can figure out

20   what's going on.  The bit field data is the secret decoder

21   ring.  It's the master truth data.  That's why the RIAA

22   documents require it to be saved in an evidence package, by the

23   way.

24       I forgot I had this slide.  There it is.  Now, when

25   Dr. Cohen was talking to you, he also showed you the source

1    code that backs up the bit field data.  And I know not everyone

2    is a computer programmer.  Probably for the better of the

3    world.  But Dr. Cohen showed you this *"table name comma now,"*

4    appears right there.  Blown up at the bottom.  What that does,

5    Dr. Cohen explained, is it makes a copy of the table that has

6    all the bit field data in it and then it puts a date and

7    timestamp at the back of it, and it saves that table to the

8    database, so it does this every single day.  Every day the

9    Rightscorp system is designed -- designed -- to save these

10   tables as backups.

11       Now, during her deposition, Ms. Frederiksen first thought,

12   no, the system just deletes the bit fields.  But I asked her to

13   look more carefully at the source code, and she then agreed

14   with me, it creates a backup.  She says, yes, a copy is made of

15   torrent infractions -- which is where bit field is saved --

16   before the table is deleted.

17       During Dr. Cohen's testimony, you also saw this Rightscorp

18   RFP response.  So back in 2011 when the RIAA put out an RFP,

19   request for proposal, to do this monitoring, right, and set

20   forth these requirements for evidence packages, saving all this

21   data, saving all the packets, independent monitoring and

22   auditing, Rightscorp was one of the companies that responded to

23   that RFP with a proposal.  And as part of that proposal,

24   Rightscorp submitted information about how its system works.

25       And you can look at this.  It's Defense Exhibit 15.  It's

1   going to be back there with you.  If you flip to page 40, you

2   will see this information.  Page 40 has information from

3   Rightscorp stating that the bit field data is retained

4   indefinitely by the system.

5       But we don't have any bit field in this case.  There's no

6   evidence of it, so where the heck did it go?  The source code

7   backs it up.  Rightscorp told the RIAA it's preserved

8   indefinitely, and yet no bit field data.  When you go back to

9   deliberate, you're not going to see a single shred of it, so

10  where did it go?

11      Both the experts in this case, Ms. Frederiksen and

12  Dr. Cohen, have scoured the source code, and there is zero

13  source code that deletes those backup tables.  The only other

14  explanation is that someone deleted the tables manually, went

15  in and removed them.  And Mr. Boswell is the one who has

16  access.

17      Now, Ms. Frederiksen wasn't given access to the database.

18  She's the plaintiff's expert.  You think she'd be given free

19  reign to look at all the stuff in the Rightscorp system, see

20  what's going on, get the answers to legitimize their case.  But

21  I asked her whether she had independently searched the

22  Rightscorp system for any trace of bit field information, and

23  she said no.  And the answer was a curious one.  *"I have not*

24  *independently gained access to their system."*

25      What does that mean?  Did they not let her see it?  *"I have*

1  *not independently gained access."*

2      Are the bit fields still sitting there and she just can't

3  see them?  Ms. Frederiksen said she had no choice but to take

4  Boswell's word for it.  Mr. Boswell says they don't exist.  He

5  says he searched for it and couldn't find them.  Gosh darn, I

6  guess there's no bit field data.

7      But the only person we have to rely on to know that the bit

8  field data doesn't exist is Mr. Boswell, the same guy who lied

9  under oath in front of you in this very courtroom.

10     Now, I think it's worth noting here Ms. Frederiksen holds

11 herself out as the director of forensic services for the

12 company she works for.  And a computer forensics person is the

13 kind of person who is hired to dig into an old closet with some

14 old computer back there that someone had deleted all the data

15 off of, and they get that computer, and they take the hard

16 drive out of it, and they recreate the data.  They are

17 tenacious people at finding things, and yet she didn't even

18 look at the database.  She just took Mr. Boswell's word for it.

19 That is inconsistent with her position.  That is not how a

20 forensic computer scientist operates.  Something fishy is going

21 on here.  And I will tell you, sitting here today in this

22 courtroom, I've been working on this case for a long time.  I

23 don't even know whether the bit field data exists or not, and

24 that's crazy.

25     The source code says it's backed up.  Rightscorp told the

1   RIAA they save it indefinitely and yet we don't have it in this

2   courtroom.  And it's the key data that would answer the

3   question about the bit fields, it would answer questions about

4   which of Rightscorp's notices are legitimate and which ones

5   aren't.  It's the truth data and it's not here, and there's no

6   evidence it was ever deleted electronically.  The only possible

7   conclusion is that Mr. Boswell either deleted it or told

8   everyone it was gone so we couldn't see it in this case.

9       This is the evidence.  This is the system that the record

10  labels bought and are trying to convince you to give them money

11  for.  It's preposterous, frankly.  The labels and the

12  Rightscorp system folks do not want you to see any of this bit

13  field data because it would reveal just how problematic these

14  notices are.  And you heard during Mr. Bart's closing argument

15  that we haven't identified a single instance of a notice that

16  was sent out wrongly.  Well, no kidding.  How are we supposed

17  to do that when there's no evidence?  If we have the bit

18  fields, we could look at them, and we could know.  But they're

19  using the fact that the evidence is all gone against us.

20  That's backwards.  They should have to produce the evidence to

21  prove their case.  But instead, they're trying to use the lack

22  of evidence to win their case.

23      Let's talk about downloads.  The record labels like to

24  point to downloads and say that the downloads are the reason

25  they win this case.  The downloads are the reason that the

1    Rightscorp system is legitimate.  I showed you this slide in my

2    opening statement, these three different steps of the download

3    process.

4        First, the Rightscorp system claims it reaches out -- or

5    identifies a list of targets, rather -- that it's going to go

6    after to try to download songs from.  And then Rightscorp

7    claims it reaches out to those computers and has conversations

8    with them.  Packets of data that the RIAA requires their own

9    detection company to keep.  And Rightscorp will admit they're

10   failures.  They reach out, and they can't get the song.

11       You were here when I asked Mr. Boswell about this download

12   process.  And he admitted Rightscorp doesn't have any evidence

13   to show how often it tried and failed to download songs.  And I

14   proposed these hypotheticals.  Could it have failed a hundred

15   times?  This is true.  10,000 times?  This is true.  50,000

16   times?  This is true.

17       And he admitted Rightscorp has zero evidence from which you

18   can determine which of those numbers is correct.  Could be a

19   hundred thousand, could be a million.  We have no idea because

20   Rightscorp didn't save any evidence, didn't save any of its

21   logs, didn't save a list of the targets it was going after or

22   the instances in which it reached out and failed or any of the

23   packets of data that went back and forth.  Zero evidence of the

24   downloads.  All we have is this hard drive of songs.

25       Guess where that hard drive of songs came from?

1   Mr. Boswell, once again.  No one else pulled that stuff.  No

2   one else saw the database.  Mr. Boswell handed over a hard

3   drive and said, Here's the songs.

4            There is no trace of evidence for where any of those

5   songs came from.  You won't see a single shred of it when you

6   go back there, not one shred.  Their burden of proof.  They've

7   got to prove where those songs came from.  They can't do it.

8   There's no evidence.  All this evidence, if it ever existed,

9   right in the trash can.

10           Rightscorp accused 9,000 subscribers of sharing the

11  music at issue in this case.  But even if we assume for a

12  moment the songs came from Grande customers -- and there's no

13  evidence of that again -- they only got songs from 492 of them,

14  5 percent.  And the record labels want to hold out this as

15  evidence that that Rightscorp system is rock solid.

16      But ladies and gentlemen, that's missing half of the

17  puzzle.  It's only rock solid if they only tried to get songs

18  from those 492 people.  But as I've already talked about,

19  Mr. Boswell admitted they didn't keep track of how many times

20  they failed.  They could have tried to get songs from all

21  9,000.  There's no evidence.  And so once again, the record

22  labels are using the lack of evidence against us.  Well, you

23  can't show how many times Rightscorp failed, so we got songs,

24  we're all good here.

25      If Rightscorp tried and failed 50,000 times to get 50,000

1    songs, that's a 50 percent success rate.  50 percent of the

2    notices are wrong.  They're missing half the puzzle and they're

3    trying to ask you to conclude from only the half that their

4    evidence is rock solid.  That is not logically sane.

5        And we have evidence of instances in which the downloads

6    were affirmatively failures.  There are instances where

7    Rightscorp would send out an accusation, accuse someone of

8    sharing a song, would reach out to try to get it, and get a

9    picture.  And you heard from Mr. Bart, they consider that a

10   success.

11       The notice accuses someone of sharing a song file, and when

12   Rightscorp itself went out to try to get it, all they got was a

13   picture.  That's not a success.  That's a false accusation of

14   infringement and we found 1200 of those.  We don't have logs,

15   we don't have records.  This is just the tip of the iceberg.

16   You saw that iceberg picture they showed.  Yeah, under the

17   surface is a whole much more of this, but they destroyed all

18   the evidence so we can't see it.  And they're using the lack of

19   evidence against us.

20       Well, Grande can't prove there were false accusations.

21   Grande can't prove we didn't download the file when we tried.

22   They deleted all the evidence.  Of course we can't.

23       Now, the other important thing to remember about the

24   downloads is we were never told about them.  We got a whole

25   bunch of notices accusing people of sharing songs.  Rightscorp

1    never sent us this hard drive of downloads and they certainly

2    never sent us any evidence of where those downloads came from

3    because, of course, there isn't any.

4        And so this case is a secondary liability case.  That means

5    we didn't do the infringing directly.  We have to know about

6    the infringement to be liable.  But we never got this hard

7    drive of songs and we never got any evidence about where they

8    came from.

9        During this trial, Mr. Boswell tried to suggest we did.

10   And he gave testimony for the first time at this trial that it

11   was in the dashboard link.  Typically, the dashboard link

12   includes song files that they got from the swarm, from some

13   other group of people.  But during this trial, Mr. Boswell

14   testified for the first time on that stand that that dashboard

15   also included the files that were downloaded directly from

16   Grande customers.  That was new.

17       But conveniently, because he was out of town, he shut down

18   the server, so we couldn't click on the link to go in there and

19   cross-examine him on that fact.  He turned off the Web server

20   so we couldn't go prove him wrong.  This is 2022.  He can't

21   maintain a Web server from somewhere else?  It's a Web server.

22   It's connected to the Internet.  Why is that off?

23       Let's switch gears and talk about Grande for a minute.  I

24   mentioned this is a secondary liability case, and there's a

25   requirement for knowledge.  And that's focused, for the most

1    part, on Grande.

2        During this trial, I hope we've convinced you Grande has no

3    way to investigate these accusations.  Now, the record labels

4    have given testimony suggesting that the only time we should

5    terminate someone is if the notices accurately reflect the

6    facts that the users had, in fact, infringed.  That requires

7    Grande to know those things.

8        You learned a little bit about Grande's business, about all

9    the computers and how they communicate, cable modems, wireless

10   routers, and Grande is just a big fancy message-passing

11   machine.  Its job is to move packets of data back and forth as

12   fast as it possibly can.  You heard from Mr. Horton that Grande

13   moves four and a half petabytes of data every single day.  That

14   is a huge, huge amount of data.  He gave that example of the

15   row of books wrapping around the earth twice.  That's every day

16   that's how much data moves through Grande's system.

17       It is impossible, it is impossible for Grande to know what

18   its customers are doing and it is impossible for Grande to

19   investigate these accusations itself.

20       You heard from Mr. Horton.  He said we have no way to know

21   whether individual Rightscorp accusations are true or false.

22   And remember, the information in the Rightscorp e-mail isn't

23   even true.  That date and time, if we were to go look, that's

24   not even when a file was shared.  So even if we could

25   investigate it, it would still be impossible.  But we can't

1    even start because we can't look at any of the data.  There's

2    too much of it.  A computer can't accept it all and process it.

3    That's not how it works.

4        So Mr. Horton said they have no way of knowing whether

5    Rightscorp accusation is true.  Mr. Bloch said the same thing.

6    Mr. Fogle said the same thing.  Mr. Rohre said the same thing.

7    I know a lot of people think because they're sending their data

8    to the Internet service provider that the Internet service

9    provider knows everything.  They don't.  They can't.  And these

10   people genuinely were telling the truth that Rights --

11   pardon -- that Grande does not know what its customers are

12   doing, doesn't know what you're searching for.  It doesn't know

13   advertisements you're looking at, doesn't know what videos you

14   watch on YouTube.  They have no idea.  They're doing everything

15   they can to get that data moving through the network as fast as

16   possible.

17       Mr. Horton said this directly.  I asked, *"Does Grande*

18   *unpack and read any of the data that it sends back and forth on*

19   *behalf of Grande customers?"*

20       *"Absolutely not."*

21       And I've heard people think -- as I talk about this case a

22   lot.  I've heard people think, Oh, well, there is some screen

23   at the ISP and they can just turn that screen on and see what's

24   on your screen.  Absolutely not.  Grande can't do that.

25           COURTROOM DEPUTY CLERK:  Fifteen minutes.

1          MR. BROPHY:  Grande also admits, through Mr. Horton,

2   they don't have any logs.  You heard Mr. Boswell, say, Oh, the

3   ISP usually keeps logs.  There's no logs.  There are no logs

4   that show this stuff.

5          Mr. Horton explained that the way that this works

6   because of cable modems and the DOCSIS standard talking to

7   these CMTS machines, you can't just pluck one bit of data out

8   of the stream.  You've got to absorb all of it.  That's how the

9   CMTS and DOCSIS data works.  So to save any data, to collect

10  and look at any data, you've got to grab all four and a half

11  petabytes a day.  Can't do it.

12         So Grande doesn't know what its customers are doing

13  online.  Grande can't know what its customers are doing online,

14  and Grande has no way to investigate whether these Rightscorp

15  accusations are true or false, so what does Grande do?  It

16  flounders, it flops around, it doesn't know what the right

17  answer is.  It's getting accusations on one side.  It's hearing

18  from its subscribers that say they didn't do it on the other

19  side.  There's no good answer because Grande is stuck in the

20  middle.

21         You heard from Mr. Shockley.  He's the

22  boots-on-the-ground person who actually talks to these

23  customers when they call in.  And he said the customers call in

24  and say, *Why is this happening?  I'm not doing this.  What's*

25  *going on?*  He said everybody denies this.  Grande has no way of

1    knowing whether they're telling the truth.  Just like Grande

2    has no way of knowing whether Rightscorp is telling the truth.

3         I used this graphic at the beginning.  Grande is stuck

4    in the middle.  We have no idea who's telling the truth and

5    not.  We have no way of investigating this stuff.  So Grande

6    did what it could.  It educated customers.  It sent out letters

7    saying you have this accusation against you.  If you need help,

8    call us.  We've got people who are going to help you figure

9    this out.  People like Mr. Shockley.  Give them a call, he'll

10   try to help.  Those are not the words of a copyright infringer.

11        Mr. Shockley explained that they would -- even if it

12   wasn't their hardware, they'd go out on the Internet and find

13   user manuals and try to help people change their WiFi

14   passwords.  Is that the behavior of a copyright infringer,

15   trying to help their customer to secure their network so there

16   is no infringement?

17        This approach Grande has adopted is working.

18   Mr. Bardwell, the labels' expert, testified that the average

19   Grande customer engaged in alleged infringement.  That alleged

20   infringement lasted 46 days.  They're not on here forever

21   sharing music.  Forty-six days.  That's it.

22        And another one of the record labels' experts

23   concluded that the average customer stays with Grande for 3.2

24   years.  You do that math, they're only allegedly infringing for

25   4 percent of the time.  Grande is educating its customers and

1    helping them make it stop if it's actually happening.  You

2    don't have to terminate people.  There are other solutions to

3    the problem.  4 percent.  That's it.  But the record labels'

4    entire case is built on this notion that we should just blindly

5    terminate people.

6         You heard from Mr. Walker.  The question was, *"So in

7    your view, Grande is obligated to take all those notices it

8    receives at face value?"* He says, *"I guess so, yes."*

9         At the beginning of this case, I talked about the way

10   this is supposed to work.  There's an accusation.  The accuser

11   presents evidence.  That's that evidence package that

12   Rightscorp doesn't have.  Then the defendant gets to defend

13   itself.  Maybe they say they didn't do it and they hand over

14   their computer to be scanned to prove it, and the Court weighs

15   that evidence and decides whether they're innocent or guilty

16   and, if so, what the punishment is.

17        The record labels' program, skip all that.  You've got

18   an accusation, start punishing people.  Don't get the courts

19   involved.  Don't let anyone actually defend themselves.  Just

20   start punishing people.  So they spent a ton of time in this

21   case -- you heard Mr. Bart's closing -- a ton of time talking

22   about this repeat infringer policy and the notion that Grande

23   shirked its obligations by failing to terminate people based on

24   accusations.  Accusations.

25        You saw e-mails from tons of employees talking about

1    safe harbor and you heard them say over and over that we

2    were -- I don't know all the words Mr. Bart used, but they were

3    harmful words about Grande based on the notion that we hadn't

4    done what was right by blindly terminating people based on mere

5    accusations.  But all of that is a complete and total sideshow.

6          When you go back in there to deliberate, please read

7    Instruction 13, that DMCA safe harbor, which arguably requires

8    terminating people blindly based on accusations, that's

9    something we call an affirmative defense.  It's optional.  And

10   the fact that we didn't take advantage of that optional defense

11   does not make us liable.  They want you to think that.  They

12   want you to think there's this binary option.  Either we did a

13   repeat infringer policy or we're liable for copyright

14   infringement.  That is not the law.  Please read the

15   instructions.

16         Everything about this safe harbor has been a complete

17   distraction and a complete sideshow because they think it's

18   going to persuade you that we were bad actors.  Read the

19   instruction.  Attempting to qualify for the safe harbor is

20   optional.  It is not a legal requirement and the fact that

21   Grande decided not to do that, not to blindly terminate

22   customers, does not make us liable.

23         I think it's interesting Mr. Bart -- during Mr. Bart's

24   closing, he didn't show you the jury instructions.  They want

25   you to focus on that safe harbor that doesn't apply, but this

1   case has to be decided based on the jury instructions, the

2   actual requirements for copyright infringement.

3            There are three elements that matter.  The first one

4   is that they own the copyrights.  Court decided that there's no

5   dispute.  The second, third, and fourth elements of copyright

6   infringement are key.  The second element requires them to

7   prove that Grande's customers actually shared music.  And the

8   only evidence they have is those Rightscorp notices and there

9   is no evidence to back them up.  They're also going to point to

10  the downloads and say, Well, there's evidence.

11           Well, there's no evidence to back those up either.

12  Mr. Boswell is handing out these things like candy on

13  Halloween.  There's no evidence of where any of it came from.

14  It's their burden of proof.

15           Now, the third element -- second one I'm talking

16  about, but the third element in the instructions, as far as I'm

17  concerned, you can look at this element, you can decide this

18  case in Grande's favor and you can go home.  Because this

19  element requires knowledge.

20           This specific language of the instruction is Grande

21  has to know of specific instances of infringement or be

22  willfully blind to them.  Let's talk about each of those in

23  part.

24           Knowing about specific instances means you -- Grande

25  actually knows.  This isn't the e-mail sent about the person

1  running the red light.  You have to actually know in your brain

2  that these specific instances of infringement occurred.  All

3  Grande got were notices.  All Grande got were accusations.

4  You've heard tons of evidence about the fact that Grande can't

5  know, it can't investigate these things, it doesn't know what

6  its customers are doing.  Grande doesn't know and can't know

7  about specific instances of music copying.

8          The only other option here is willful blindness.

9  Mr. Bart used that word a whole bunch in his closing.  He used

10 it incorrectly.  Willful blindness is when there's a fact right

11 in front of you, and you close your eyes and decide not to

12 look.  But willful blindness requires you to be able to open

13 your eyes and learn the fact.  Grande can't be willfully blind

14 because it can't open its eyes and learn the fact.  We don't

15 know what our customers are doing.  We don't know whether these

16 accusations are true or not.  Willful blindness requires you to

17 be able to unblind yourself and that can't happen in this case.

18 We can't know whether a single accusation is true or false.

19          This third element is the reason Grande wins this

20 case, period, end of story.  We don't know and we can't know.

21 That's why I love this phrase so much:  *"Knowing about an*

22 *accusation is not the same thing as knowing that it's true."*

23          We know about a boatload of accusations.  We don't

24 know that a single one of them is true and we have no way of

25 figuring that out.

1          The last element requires, in their words, "material

2     contribution."  We weren't materially contributing.  We had a

3     Call Center.  We were sending out letters.  We were helping

4     people stop it, if it was happening.  That's not material

5     contribution.

6          And the instruction says there have to be basic

7     measures Grande can take.  Basic measures aren't blindly

8     terminating customers.  By that logic, Grande might as well

9     just shut off everyone's Internet and go home.  You have to be

10    precise about it, you have to be accurate, and that means you

11    have to know.  You've got to be able to do some investigation

12    to figure out whether the accusations are true or not so you're

13    not blindly terminating people.  There are no basic measures

14    that you can engage in to accomplish that, none.  Grande is not

15    materially contributing either.

16         Please look at the jury instructions and don't pay

17    attention to the sideshow, which is the DMCA safe harbor.

18    They're hoping to use that against us.  That's an affirmative

19    defense.  It is optional.  The only way Grande is liable is if

20    they can check these boxes on these requirements, and they

21    can't, because Grande doesn't know and Grande can't know.

22         So at the end of this case, you're going to get a

23    verdict form.  I would very much like you to check that "No"

24    box.  There is no evidence to support the allegations in this

25    case.  Thank you.

```
 1            THE COURT:  Thank you, counsel.  You can go right into
 2   your --
 3            MR. BART:  May I have five minutes, Your Honor?
 4            THE COURT:  Yes.  We'll take a quick five-minute
 5   recess.
 6            COURT SECURITY OFFICER:  All rise for the jury.
 7            (4:42 p.m., the jury exits the courtroom.)
 8                              *  *  *
 9            (4:51 p.m., the jury enters the courtroom.)
10            COURT SECURITY OFFICER:  All rise for the jury.
11            THE COURT:  Please be seated.  All right, ladies and
12   gentlemen.  It's now Mr. Bart's opportunity on behalf of the
13   plaintiff to make his rebuttal argument.  As I told you, it's
14   not a question of fairness.  It's because the plaintiff carries
15   the burden of proof.
16            So Mr. Bart has 15 minutes, and then that will be the
17   close of all matters other than your deliberations.  Okay?
18            All right, Mr. Bart.
19            MR. BART:  Thank you, Your Honor.  And hello again.
20   So when I was talking to you a little while ago, I said
21   everything that you're going to hear is manufactured after the
22   fact; that between 2010 and 2017, Grande had a policy of
23   willful blindness where they didn't look at anything.  They
24   didn't care to look at anything.  They didn't forward
25   Rightscorp notices.  They didn't take any action with regard to
```

1    any other notice other than passing them on.

2           And the very detailed response that you've heard from

3    Grande's counsel just proves that point, that basically what

4    they've done is they trampled on the property rights of

5    copyright owners for seven years.  They've hired somebody to

6    come in and do a retroactive audit and try to argue all the

7    different reasons why Grande might not have known about

8    infringement at the time, if they were paying attention.  But

9    the fact is that they weren't paying attention.  Nothing was

10   happening at Grande between 2010 and 2017 other than silence.

11          They're trying now to make a big deal about this Call

12   Center.  The Call Center was something that we heard very, very

13   little testimony about.  And, in fact, what Mr. Shockley

14   testified about was that he didn't call anybody, that Grande

15   didn't call anybody.  He responded when people called him.  He

16   had no idea how many times that this happened.  He had no

17   details of any specific conversations, and he gave you a

18   general answer.  That's the best they got.  These are the

19   people that want details, they want logs, they want dates, they

20   want times, they want people.  But when they're trying to

21   justify their willful blindness of seven years, they pop

22   somebody on the stand and go, *Oh, yeah, everybody complained.*

23   And that's supposed to be good enough.

24          What we do know is that for seven years they got

25   notices, not just from Rightscorp, but from all other types of

1  companies and they just did nothing.  They either just

2  forwarded them to their customers, or in the Rightscorp case,

3  they didn't even do that, so when you talk about all of these

4  things that they're saying, how can we know whether it was

5  right or -- they didn't care at all.  They were completely

6  blind to the fact that there was lots and lots of specific

7  infringement that they were getting notices about and just

8  ignored it completely.

9         Now, let's talk about those notices just for a minute

10  because they said there's no information that's provided to you

11  in these notices, but in fact, Rightscorp proves exactly what

12  Grande says it does.  The notice has the IP address, which is

13  just like the Grande license plate.  It has the port and the

14  time, which is just like being at this intersection.  And most

15  importantly, it has the torrent hash.  The torrent hash is the

16  hash matching that gives you the certainty that this notice is

17  doing what it's supposed to be doing.

18         It has forensically matched, the system has

19  forensically matched the hash value for the torrent with the

20  hash value on the user's computer.  And it's done that every

21  time.  And we have two experts who have looked at this and they

22  both agree, yes, it does.  So we have undisputed evidence that

23  the Rightscorp system is programmed to and, in fact, operates

24  to identify infringements accurately and passes those notices

25  on.

1          Everything that you've heard here is an after-the-fact
2     excuse that nobody at Grande ever knew.  We asked Mr. Horton,
3     *"So before this lawsuit was filed, Grande had no awareness of*
4     *any factual basis that the Rightscorp system was inaccurate;*
5     *isn't that correct?"*
6          *"We had no knowledge of that."*
7          *"And before this lawsuit was filed, Grande had no*
8     *awareness of any facts to support an assertion that Rightscorp*
9     *system was incapable of detecting copyright infringement; isn't*
10    *that correct?"*
11         *"We had no knowledge on any of the systems sending us*
12    *notifications, including Rightscorp."*
13         They didn't look, they didn't care, but they could
14    have if they wanted to, because Rightscorp invited them to.
15    Rightscorp sent them a letter saying, Please work together with
16    us.  Please be our partner in all of this, because there's
17    massive infringement going on out there, and you're the only
18    party that can put these pieces together.
19         And, in fact, that's why the DMCA was created was to
20    try and create some sort of partnership between the content
21    owners and the ISPs.  And Mr. Brophy just talked extensively
22    about the DMCA and misled you quite a bit in saying they chose
23    not to seek it.  They pled it as an affirmative defense in this
24    case and they lost.  So the notion that they were just opting
25    to go a different way, not true at all.

1        And what the DMCA was meant to do was to make these

2  parties work in partnership.  Just like Rightscorp was trying

3  to make them work in partnership, but Grande and its corporate

4  parents don't want to work in partnership.  They want to be

5  able to ignore it.  They want to be able to come back after the

6  fact and try and pick holes, because they want the subscription

7  fees from every one of those infringing consumers, and they

8  don't care about what they're doing to the property rights of

9  other people.  And that is the bottom line.

10        They could have done something about it.  They could

11  have availed themselves.  That safe harbor was meaningful.  Why

12  do you think it exists?  It exists because ISPs wanted it.

13  They wanted it because they didn't want to be in a courtroom

14  like this facing evidence like this and saying, Well, we need a

15  way out of this.  We don't want to be the judge.  We don't want

16  to be the jury.

17        And the DMCA gave them that option.  It said if you

18  take that simple step of terminating repeat infringers, and one

19  or two other minors points, you can get on safe harbor.  You

20  don't have to do anything further.  Okay?  But they chose not

21  to do it.

22        And so now they are responsible because they were

23  willfully blind.  They materially contributed by giving all of

24  this Internet service to known subscribers.  And with regard to

25  the infringement by their users, Mr. Brophy read a very

1  interesting subset of the instruction on infringement.  He said

2  to you that *"A copyright owner's exclusive right to distribute*

3  *its copyrighted work is infringed by distributing any part of*

4  *that copyrighted work."*

5           What he didn't read was the next paragraph, which

6  says, *"Plaintiffs are entitled to rely on and you are permitted*

7  *to consider evidence that copyrighted content was offered or*

8  *distributed to a third party who is investigating or monitoring*

9  *infringement activity."*

10          Pretty important words to be leaving out when they're

11 telling the jury what the instruction is.  And that happened

12 with almost every other quote that you heard today.  There was

13 selective quotations from people out of context.  And don't

14 believe the testimony that you've heard because it's just like

15 this.  The law is that we are entitled to rely on the fact that

16 copyrighted content was offered to a monitoring company as

17 evidence of direct infringement.  And that's exactly what

18 happened here.  You have knowledge, you have direct

19 infringement and you have material contribution.

20          Forgive me if I'm not quite as organized as I was when

21 I was giving my original speech, but that's the way that

22 rebuttals sometimes work.

23          So in addition to the accuracy of the notices, we also

24 had a bit of discussion about whether or not these Rightscorp

25 notices were accurate when they said that we've detected users

 1    downloading, uploading, and offering to upload.

 2           Now, clearly, the offering to upload is correct.  But

 3    every one that is on BitTorrent is, in fact, at that same time,

 4    uploading and downloading content.  As a matter of fact, that's

 5    what you're doing in that swarm.  You are part of that process.

 6    So they made a big deal out of this as though we need to prove

 7    all three.  We've proven the uploading.  And every one of these

 8    users was, in fact, downloading and uploading at the same time.

 9    That's what BitTorrent is all about and that's the way it's

10    always worked.

11           Now, with regard to the -- and one other thing about

12    the instructions.  When they were talking about -- the same way

13    that there was an error in terms of the direct infringement

14    point.  When we get to the knowledge point, it says, *"The term

15    'willful blindness' means that there's a high probability of a

16    fact that they deliberately take steps to avoid learning it."*

17    And that's precisely what happened here.  There was a very high

18    probability from the millions of notices that were being sent,

19    and all of the notices being sent by everybody else, that there

20    was a specific infringement going on, and they took steps to

21    avoid knowing it.

22           Now, Mr. Brophy added another element.  Willful

23    blindness requires an ability to know.  Well, that's not in the

24    instruction and that's what willful blindness is.  That is

25    Brophy on knowledge.  And that's not what the law is before

1    you.  You have to decide this case based on the instructions

2    that are in front of you.  And what you have here is a paradigm

3    of willful blindness.

4              You have a decision made in 2010 to just allow piracy

5    to go rampant on the network and to take no action against it

6    whatsoever.  And they admit it.  They admit that for those

7    seven years they did nothing.  They terminated no users and

8    they didn't even follow up on them.  They didn't even notice

9    for five years that they weren't sending the Rightscorp notices

10   at all.  This came as a major shock to them because they just

11   figured they could turn it off.  They could put some poor guy

12   into a Call Center to answer some phone calls.  But if people

13   don't call up, what do they do about it?  They let people run

14   up tens of thousands of infringements and then they hire a

15   lawyer after the fact and say, Can you figure out some way that

16   I can get out of this?

17             Well, that's not the way the law works.  They knew

18   what was going on on their system.  They provided the

19   mechanisms for it, and the best evidence of that is what they

20   did before and after this time period.

21             Before this period, they had a very robust policy for

22   dealing with infringement.  They would terminate and suspend

23   users.  They would speak to the user.  And afterwards,

24   afterwards, in 2017, what do they say?  You've heard before the

25   DMCA is a sideshow, it's a distraction.  What does Grande say

1    in the 2017 policy that they enact?  *It is our obligation*

2    *under federal law to implement a repeat infringer policy."*

3    They want to run away from that as far as they can, but they

4    know what the law is, and the law is the way that it's

5    presented to you.  So don't let all of this sideshow get in the

6    way.

7           Now, the most important thing, perhaps, although there

8    are many important things and misstatements that were made in

9    that presentation, are the downloads.  Because the downloads

10   ultimately kill them.  Right?  They're talking about how is

11   there any proof of infringement that we -- on our system?

12   Well, we have the actual tracks that were pulled down from

13   their users.

14          And this isn't Boswell saying this.  Their own experts

15   said it.  Cohen said these are files that were extracted from

16   Grande's users.  Ms. Frederiksen said it.  The source code

17   tells you how it's done.  And all of this is before you in

18   evidence in Plaintiff's Exhibit 5.  It has the data.  *They*

19   *could have just made it up.*  Well, they made up an awful lot,

20   because this data has the IP address, the date, the time, the

21   TC number that I told you about, and it was extracted pursuant

22   to specific instructions within the source code.  It's been in

23   the source code as long as there's been a Rightscorp.

24          So the facts are here.  And there is no answer to the

25   downloads.  And that's what I told you when I first gave you --

 1  spoke to you earlier today, that at the end of the day, the

 2  downloads are proof of infringements by their users, and

 3  they're also proof of their knowledge because every single one

 4  of those downloads has a TC number which tracks back to a

 5  specific notice which is, in fact, an accurate notice, as

 6  undoubtedly 99 percent of these notices were.

 7          This was an operational system that worked

 8  effectively.  They can point out all the hypotheticals in the

 9  world, but their expert and our expert both say the Rightscorp

10  system does what it's supposed to do.

11          COURTROOM DEPUTY CLERK:  Two minutes.

12          MR. BART:  Two minutes?

13          It's able to engage in handshakes, do a torrent match,

14  and send out notices.  So at the end of the day, we have the

15  downloads.  We have the notices.  They're all forensically

16  accurate and the rest of this is a lot of noise.  The claim

17  about -- well, I've already addressed it in the -- the claim

18  that because there are failed attempts means that -- you know,

19  it's the old you knock on the door and nobody is home.  You try

20  to get a download as many times as you want.  It doesn't prove

21  that there's an error.  He's drawing a correlation between a

22  failed download attempt and an error in a notice, and that's

23  just fallacious.

24          What happens here is, when they're able to get in

25  touch with a user, they're able to confirm the torrent hash,

1   because the whole system works on the torrent hash.  And when

2   they're able to draw through an actual download, they do that.

3        So at the end of the day, we can actually sum up this

4   case in the words of their own witnesses, because that's really

5   where it comes up.  Colin Bloch testified that back in the

6   mid-2000s he advocated for a policy to apply punitive measures

7   to anybody who infringed on Grande's network and that he would

8   disagree with changing that policy.

9        In 2009, Lamar Horton testified that ABB took over and

10  implemented a policy change, and under that new policy Grande

11  could have received a thousand notices about a customer and it

12  wouldn't have terminated that customer for copyright

13  infringement.

14       The great Jeff Shockley, who was their one hope for

15  dealing with anything, testified that after the policy change,

16  he didn't even tell people to delete content.  He said, *"It's*

17  *your choice."*

18       And the people, when you saw the repeat infringer

19  notices, the repeat infringer notice said, *"Delete all the*

20  *content on your server and call us within two days to confirm*

21  *that you're doing it."*

22       And then Fogle found out that users were up to their

23  54th notice and was seeing a broken process.  And during that

24  time, their own internal e-mails were talking about

25  unauthorized downloads and distribution and not infractions.

1              And then you get to the final two pieces that I want

2     to bring to your attention, which are -- if I can turn the page

3     and they don't tell me to shut up -- are a quote from

4     Mr. Horton, which I mentioned to you before, that *"If the jury*

5     *finds that the infringements reflected in a notice actually*

6     *occurred, then Grande was continuing to provide Internet*

7     *service to users who were, in fact, guilty of infringement of*

8     *which you had received copyright notices; isn't that correct?"*

9              *"I suppose that's correct."*

10             There are the elements of contributory infringement

11    conceded on the record.  And the final answer from Mr. Feehan

12    saying that, *"If you knew that your users were stealing*

13    *copyrighted content, that would be inconsistent with Grande's*

14    *values"* -- *"would that be consistent with Grande's values?"*

15             *"I don't believe so."*

16             This is a case where they're looking for an

17    opportunity to disregard any responsibility for the type of

18    harm that only ISPs can address.  Only ISPs can address piracy,

19    and they're saying, Oh, no, not us.  The record companies, you

20    can suffer all the piracy you want as long as we can continue

21    to pocket the money from repeat infringers, then we've done our

22    business.

23             So -- can I have 30 seconds?  Twenty seconds?

24             THE COURT:  I'll give you ten seconds.

25             MR. BART:  Okay.  I was running around Lady Bird Lake

1    the other day and I saw the Willie Nelson statue.  And I could

2    swear he said to me, *Don't let these people get away with this.*

3    *They're trampling on our rights here in the live music capital*

4    *of America.*

5              Thank you.

6              THE COURT:  All right.  Ladies and gentlemen, you have

7    now heard the closing arguments of both counsel.  So it is now

8    going to be your duty and responsibility to deliberate

9    together, something I told you you couldn't do.  Remember that

10   when you do deliberate together, you have every right to

11   discuss whatever it is that you feel is pertinent and

12   appropriate about this case, as long as it's evidence from the

13   case and it has relationship to the law.

14             If you've taken notes, remember those notes are yours

15   and yours alone.

16             Now, I'm not going to make you go back and start your

17   deliberations now.  It's just too late in the afternoon.  We're

18   after 5:00, so I'm going to send you home.  Now, the first

19   thing that happens tomorrow morning is you come in and you

20   select one of your number as your foreperson.  When you've done

21   that, you begin your deliberations.  If somebody gets up and

22   has to use the restroom or something like that, then you have

23   to stop your deliberations until that person comes back.  Okay?

24   And you don't talk about the case, you know, when you walk home

25   in the evening or anything of that kind.  All right?

1           Now, let me give you a little bit about the

2   schedule -- or my schedule so that you know.  You are going to

3   deliberate every day until you reach a verdict.  Okay?  That is

4   the way it is.  Because you're sequestered and so you need to

5   do that.  And as I told you, the Court is going to provide you

6   lunch, so you do not need to bring lunch with you.  I think

7   they have snacks in there.

8           COURTROOM DEPUTY CLERK:  They have good snacks.

9           THE COURT:  They have good snacks?  Probably better

10  snacks than we have in San Antonio.

11          So we will have times when I won't be able to be here,

12  like tomorrow morning.  Like right when we're done, I have to

13  get in the car and drive, unfortunately, in the traffic, the

14  three hours it's going to take me to get to San Antonio instead

15  of an hour and ten minutes.  Because I have to be in court

16  tomorrow morning, but I'm coming back just as soon as that's

17  done.  Okay?  So I'll be here tomorrow afternoon.

18          I'll be here all Thursday.  Right?

19          COURTROOM DEPUTY CLERK:  Yes.

20          THE COURT:  If you haven't reached a verdict by

21  tomorrow afternoon, I'll be here Thursday, but I will not be

22  here Friday, unfortunately.  I'm not playing games.

23  Unfortunately, a very, very dear friend of mine's daughter

24  passed, and I have to go to the funeral.  I will not pass that

25  funeral up.  She was a disabled child, let me put it that way.

1    I don't think you'd think very highly of me if I skipped this

2    funeral.  As soon as the funeral is done, I will come here.

3            What does this mean for you?  If you reach a verdict

4    during a period of time when I am gone, one of the other judges

5    can accept the verdict and take your verdict.  Okay?  However,

6    if there's a question -- and there really shouldn't be many

7    questions because the jury instructions really cover all those

8    answers.  But if there are any questions, you're going to have

9    to wait until I get back to get those questions answered.

10   Okay?  Because it would be an impossibility to bring another

11   judge in.  The lawyers would end up having to try to educate

12   that judge, and by the time you got your answer, I'd be back

13   here anyway.  So it would be a fool's errand.

14           Obviously, if something happens on Friday and we need

15   an answer right away, I can get on the telephone with a judge

16   and discuss it with the lawyers, because the lawyers will be

17   here, or some of them -- most of them -- somebody better be

18   here.  And then we will proceed that way.  Okay?  And then if

19   you haven't reached a verdict by Friday, then you're going to

20   come back Monday.  Okay?

21           But then you got to watch out because we're running

22   into Thanksgiving.  All right?  I don't think it's going to

23   take you that long, but I don't control your deliberations.

24   People ask me frequently, *Judge, did we deliberate long enough*

25   *or not deliberate or too long?*  I say, Look, there is no set

1    time to deliberate, a jury.

2            I had a case that was almost two months long and the

3    jury came back with what I thought was a perfectly fine

4    verdict, and so did the Appellate Court, by the way, in about

5    three hours.  Because they heard all the testimony.  They had

6    their minds made up.  They looked again at the documents and

7    they were ready to go.  I've also had a trial that lasted three

8    days, it took the jury two weeks to come back with a verdict.

9    So I don't have any set time.  Nobody is going to be saying,

10   *Oh, they didn't deliberate long enough or they deliberated too*

11   *long.*  Nobody's -- that question doesn't get asked.  Okay?  So

12   don't worry about that.  Nobody is second-guessing you.

13           So go home tonight, get a good night's rest and come

14   back at your normal time tomorrow.  You'll start your

15   deliberations and I should be back here by, I'm hoping,

16   noontime.  Doesn't matter to you because I don't come in your

17   deliberations.  Nobody gets to invade your deliberations.  All

18   right?

19           Okay.  Thank you very much.  You're excused.  Have a

20   good evening.

21           COURT SECURITY OFFICER:  All rise for the jury.

22           THE COURT:  Can you folks get in here by 8:30?  We

23   don't have anybody driving in from God knows where?  No?

24           Where are you driving in from?

25           JUROR:  Bertram.

1          THE COURT:  Can you still get here at 8:30?  Okay.

2    We'll start at 8:30.  That will give you a little more time.

3    Thank you.

4          (5:15 p.m., the jury exits the courtroom.)

5                              *   *   *

6          THE COURT:  Please be seated.

7          All right, counsel.  You heard me talk -- well, you

8    knew.  I told you ahead of time what my schedule was.  I will

9    be available by telephone.  Priscilla will be here.

10         COURTROOM DEPUTY CLERK:  I will be here.

11         THE COURT:  She will be here and she can get me.  I'm

12   very responsive.  I mean, unless I'm, you know, in the dentist

13   chair at the moment, which is what I have to do first thing

14   tomorrow morning.  But then I'm going to run by court because

15   there's some things I got to do and then I'm going to come

16   right here.  Traffic should be done, so I should be able to get

17   here in an hour, little over an hour.  I don't expect a verdict

18   tomorrow.  I'd be surprised, very surprised, but I've been

19   surprised before.

20         But we might well get a verdict by Thursday afternoon.

21   If not, then I won't be here until probably late Friday, so if

22   a question comes in or something like that, we'll just have to

23   hold it.  If this service goes on long enough, I might not come

24   up at all, if it looks like the jury is not going to reach a

25   verdict, there's no sense.  But we'll play it by ear.  I'll do

1    what is necessary to get back here.  I mean, if we get a

2    verdict -- it looks like a verdict is coming in at 4:00, and I

3    get out of the service at 2:30 or something like that, I'll hop

4    right in the car and come.

5            Lastly -- I always say this now because at the end of

6    the case when a verdict comes in, one side is very happy to

7    listen, the other side is not happy to listen.  I want to thank

8    each and every one of you for your many courtesies during this

9    case.  Really, I told my law clerk, I said, *"You have had a*

10   *wonderful opportunity"* -- and she'll verify this -- *"a*

11   *wonderful opportunity to see superb lawyers in action in a*

12   *federal courtroom."*  And, you know, that's not something that

13   young lawyers get to see very often.  I said, *"If you joined*

14   *one of these gentlemen or lady's law firms, you'd be doing doc*

15   *review somewhere in the basement,"* like I did when I first

16   started.  And here she gets this opportunity to see really,

17   really fine lawyers.  And it was a real pleasure to watch you

18   in action, because you really are very good lawyers.  And in

19   spite of the fact that we had a few little instances where

20   people got a little aggravated, that's understandable.  By and

21   large, the attorneys in this case were, in fact, a hundred

22   percent of the time professional, ethical, and responsible.

23           And I can't tell you that today in the federal

24   courtroom -- you know, when I was a young lawyer, if you did

25   anything squirrely in the federal courtroom, you were in big,

 1   big trouble, and nobody would dare do it.

 2        That isn't the way it is today.  I go to meetings with

 3   other federal judges from all over the country, D.C.  I've got

 4   Royce Lamberth is one of my closest friends, he's a federal

 5   judge in D.C.  And they tell me stories, hair-raising stories,

 6   stuff that goes on in their courtrooms that would just shock

 7   you.  And when I get really fine lawyers in who do a good job

 8   for their client and do it in a professional way and are

 9   cordial, what a joy that is for me.  And what a great

10   experience for her.

11        So I have a rule, 15 minutes.  You need to be within

12   15 minutes of the courthouse at all times with the exception,

13   of course, at lunch.  You're entitled to go have lunch.

14   They're going to be provided lunch.  They'll have about an hour

15   for lunch, from 12:00 to 1:00, so you've got 15 minutes on

16   either side of that.  Okay?  The reason for that, of course, is

17   if we do get a question, and I'm here, we want to get it

18   answered.  And we don't want to go lofting off trying to find

19   people who are on the other side of Lake Austin or something

20   doing God knows what.  I think I told you the story -- maybe I

21   didn't -- of two --

22             COURTROOM DEPUTY CLERK:  You have.

23             THE COURT:  That may be the only story I haven't told

24   you.

25        I had two lawyers -- this was a criminal case now.  It

 1   was a major case.  This was a state senator that was under

 2   indictment, it was a very powerful man.  And we had a long

 3   trial and these two characters decided, it was a Friday, that,

 4   eh, they're not going to get a verdict.  So they jump -- one of

 5   them goes on Aloha Airlines, the other one goes on Hawaiian

 6   airlines.  They get a 4:00 flight, and they're off to the outer

 7   islands.  In the meantime, the jury comes in at 4:30.  And, you

 8   know, all the conspiracy theories, you know, were like swirling

 9   around the courthouse.  Why has the judge sealed the verdict?

10   Well, we couldn't find them.  I mean, literally.  We couldn't

11   find the lawyers.  And when somebody came in and told me,

12   Judge, one of them is on the Big Island and the other one is

13   over in Maui, I said, Holy mackerel.

14        So, I don't think we have that problem.  Nobody here

15   is going to go to the Big Island or Maui in between.  Okay.

16   You all don't have to be available, obviously, as long as

17   somebody is available.

18        Now, do all of you intend to stay or -- you're going

19   to send some of your staff back, I would assume?

20        MR. BROPHY:  I think that's probably true, Your Honor.

21        THE COURT:  Yeah, because that starts to get very

22   expensive to just have people sitting around here.  There

23   aren't going to be major legal issues decided here, but that's

24   entirely up to you.  That's not my call.  The courthouse will

25   be locked at night, but it will be open for your use during the

1    day.  Okay?

2          Make sure that's right.

3          COURTROOM DEPUTY CLERK:  That's right.

4          THE COURT:  Make sure they can come in here.  So if

5    you need to work or you need to do something.  Aren't there

6    attorney rooms here?

7          COURTROOM DEPUTY CLERK:  They've been working in an

8    attorney work room.

9          THE COURT:  Okay.  Well, let me not keep you any

10   longer.  Have a nice evening, and I will see you at some point.

11   I don't know when.  I will see you at some point.

12         COURT SECURITY OFFICER:  All rise.

13         *(5:24 p.m.)*

14                          *   *   *

15

16

17

18

19

20

21

22

23

24

25

JURY TRIAL PROCEEDINGS                    2161

1                    *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5        I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.  I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  November 28, 2022

12

13   /s/ Angela M. Hailey

14   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
15   262 West Nueva Street
     San Antonio, Texas  78207
16   (210)244-5048

17

18

19

20

21

22

23

24

25