# EXHIBIT A

## DECLARATION OF ROBERT B. GILMORE

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| UMG RECORDINGS, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No.  1:17-cv-00365-DAE |
| | ) | |
| GRANDE COMMUNICATIONS | ) | |
| NETWORKS LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DECLARATION OF ROBERT B. GILMORE
IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

I, Robert B. Gilmore, do solemnly swear as follows:

1.       I am a partner in the law firm of Stein Mitchell Beato & Missner, LLP ("Stein Mitchell") and counsel of record for Plaintiffs in the above-captioned matter. I submit this declaration, which specifically addresses the hours expended by Stein Mitchell in this litigation, in support of Plaintiffs' motion for an award of attorneys' fees. From the beginning of this matter, I oversaw the work done by all Stein Mitchell attorneys and support staff. I therefore have personal knowledge of the billing rates and hours expended by Stein Mitchell on this litigation, as set forth in this declaration.

2.       Stein Mitchell is one of three law firms representing Plaintiffs in this litigation (collectively, "Plaintiffs' Counsel"). Stein Mitchell, along with Scott Douglass McConnico, LLP serving as local counsel, have represented Plaintiffs since the inception of this litigation. In November of 2019, Jenner & Block, LLP was also retained by Plaintiffs. All three firms continue to represent Plaintiffs.

1

## I.     Overview of the Litigation

### A.     Filing of the Complaint

3.     Plaintiffs retained Stein Mitchell in late 2016 to address the ongoing infringement of their copyrights on Grande's network. In preparation for the filing of this lawsuit, several Stein Mitchell lawyers—in particular, myself, Philip O'Beirne, and Jonathan Missner—worked with Plaintiffs to conduct pre-suit analysis of Plaintiffs' claims in relation to the voluminous infringement on the Grande network. We worked diligently to review information and data provided by Plaintiffs and by a third-party online infringement detection company, Rightscorp, Inc. ("Rightscorp"), to support Plaintiffs' claims in the case. We also performed significant legal and factual research and analysis regarding the potential claims against Grande.

4.     On April 21, 2017, Stein Mitchell and Scott Douglass filed Plaintiffs' complaint against Grande Communications Networks LLC ("Grande") and Patriot Media Consulting, LLC ("Patriot") (Grande's management company) for contributory and vicarious copyright infringement of Plaintiffs' sound recordings.

### B.     Motions Practice

5.     Motions practice in this case was extensive. Ultimately, the parties briefed sixty substantive motions. Plaintiffs expected substantial motions practice given the magnitude and complexity of their copyright case. However, a significant portion of the motions-related fees incurred by Plaintiffs was driven by Grande's litigation strategy of re-litigating the same issues and attempting to deflect from its own willful conduct.

6.     The most glaring way in which Grande increased the time and expense of motions practice was its unsuccessful and meritless attempt to rely on its DMCA Safe Harbor defense. Grande pursued the Safe Harbor even though it knew that for a seven-year period it terminated zero customers from its network for copyright infringement and had adopted a policy for that same

time period whereby there was no possibility of a customer being terminated for infringement. *See* Dkt. 469 at 1020:22-1021:14 (S. Christianson). Nonetheless, numerous hours were expended opposing Grande's Safe Harbor position in motions practice. For example, Plaintiffs successfully moved for partial summary judgment on Grande's claim to the Safe Harbor, as the Court rejected Grande's claim. *See* Dkt. 268. But given that Grande should have dropped its pursuit of the Safe Harbor long before Plaintiffs moved for summary judgment on the issue, it was unreasonable for Plaintiffs to have to oppose this defense in the first place. Then, Grande made matters worse by objecting to Magistrate Judge Austin's Report and Recommendation dismissing its Safe Harbor defense, which necessitated that Plaintiffs undertake another round of briefing on the issue. *See* Dkt. 251 & 251 Grande's meritless attempt to claim the Safe Harbor also reared itself in multiple discovery motions and a motion *in limine*.

7.      Grande also caused Plaintiffs to devote significant time and expense to motions practice by objecting to or moving for reconsideration of the Court's orders on seven occasions when it received negative rulings. Grande lost all seven of its motions requesting that the Court reconsider its own well-reasoned opinions.[1] Plaintiffs incurred significant attorneys' fees in responding to Grande's meritless attempts to reconsider the Court's rulings.

8.      Further, Grande routinely advocated positions that had no support in the law—yet required Plaintiffs to exhaust hours responding to the claims. One of many instances is when Grande moved to strike Plaintiffs' second summary judgment motion, arguing that Plaintiffs'

---

[1] These include six different Objections to Judge Austin's Report & Recommendations. *See* Dkt. 74 (denying Grande's Motion to Dismiss); Dkt. 251 (granting Plaintiffs' summary judgment motion on Grande's Safe Harbor Defense); Dkt. 252 (denying Grande's summary judgment motion for Liability, Damages, and Sanctions); Dkt. 285 (denying Grande's Motion to Strike Barbara Frederiksen-Cross's second supplemental report); Dkt. 286 (denying Motions to Exclude Expert Testimony), Dkt. 290 (denying Grande's Motion for Evidentiary Sanctions). Grande also unsuccessfully moved Judge Ezra to reconsider his ruling on three motions *in limine*. Dkt No. 348.

earlier summary judgment motion foreclosed them from filing a second. Dkt. 174. In addition to denying Grande's argument (which "puzzled" the Court),—the Court rebuked Grande, observing "[t]hat above pleadings—22 pages in all—address a single, straightforward question, one that could have been answered by a simple phone call[.]" Dkt. 198 at 1. Indeed, the Court shared Plaintiff's frustration with Grande's approach, characterizing Grande's motion as "annoying" and "silly" because it was a dispute that "did not need to happen." *Id.* at 2.

9.      On another occasion, Grande filed a motion to strike the rebuttal report of Plaintiffs' expert Barbara Frederiksen-Cross, claiming that the parties had not agreed to expert rebuttal reports. Dkt. 176. But the parties had previously agreed to expert rebuttal reports, which was unambiguously memorialized in the Scheduling Order and then confirmed in emails between counsel. Dkt. 66, ¶ 2. The Court not only agreed with Plaintiffs that "[t]he scheduling order makes this quite clear[,]" but explicitly stated that Grande's "argument is meritless" and based on a "fallacy". Dkt. 279 at 2. Notably, in the same Order denying Grande's request, the Court granted in part Plaintiffs' motion to strike the "supplemental" report of Grande's expert. Dkt. 279 at 13. And for the portions of the supplemental report for which the Court denied Plaintiffs' motion (despite that "Grande d[id] not have a good explanation"), the Court ordered "Grande to reimburse Plaintiffs for attorneys' fees and expert costs it expended in responding to the supplemental testimony on these topics. *Id.* at 12. This, among other things, required a deposition of Grande's expert, Dr. Geoff Cohen, and a supplemental expert report from Frederiksen-Cross. Grande has not yet paid these fees and costs, which totals $191,618.00, supported by the invoices attached hereto as Exhibit A-2.

10.     And even though there was no serious doubt that Plaintiffs were the owners or exclusive licensees of the copyrights to the works in suit, Grande refused to stipulate to that fact,

and instead forced Plaintiffs to prove up their ownership of each of the 1,400+ works during summary judgment. Moreover, after Grande refused to concede Plaintiffs' ownership in response to Plaintiffs' admission request during discovery, Grande raised on summary judgment that because 361 of the 782 copyright registrations produced in discovery did not list one of the Plaintiffs as the owner it was entitled to partial summary judgment "unless Plaintiffs can come forward with evidence that they own these copyrights". Dkt. 140 at 20. Plaintiffs, in response, undertook this arduous task, which resulted in the filing of three declarations detailing the chains-of-title, which attached the hundreds of supporting documents—including a number of recording agreements and transfer documents from decades ago—to prove ownership of each work in suit. Dkt. 172-1-3. Thereafter, Grande insisted that each Plaintiff provide a corporate representative for deposition on the topic of ownership, but then proceeded to ask those deponents virtually no questions on the topic. Ultimately, Grande did not seriously dispute Plaintiffs' ownership, which the Court found was established beyond dispute and instructed the jury so at trial.

### C.    Discovery

11.    Discovery was similarly extensive. This was a massive copyright case that required litigating technical issues arising from Rightscorp's computerized method of identifying infringement, developing the factual record of Grande's contribution to tens of thousands of infringers, and establishing Plaintiffs' rights to the copyrights of over 1,400 works in suit. As described by Grande in its April 2018 motion to amend the scheduling order, "this case presents highly complex issues at the intersection of copyright law and Internet technology that will require significant attention from the parties and their experts." Dkt. 79 at 8. To that end, discovery included 36 depositions, hundreds of written requests, millions of documents produced through 55 productions (including 38 productions by Plaintiffs, RIAA, and Rightscorp), and discovery into multiple sophisticated companies, including the source code of the Rightscorp system.

12.      Grande's litigation strategy significantly inflated attorney hours spent on discovery. This included Grande's meritless pursuit of the DMCA Safe Harbor, discussed above, which forced Plaintiffs to undertake significant discovery geared toward disproving that defense. Grande's posture caused extensive written discovery targeting facts revealing whether Grande qualified for its Safe Harbor defense; multiple Federal Rule of Civil Procedure 30(b)(6) depositions on the core factual issues surrounding the defense (which necessitated Plaintiffs' filing of motions to compel for Grande's lack of preparation of its witnesses); and attorney time spent on an expert to rebut Grande's Safe Harbor argument.

13.      It was readily apparent through its discovery actions that Grande was committed to deflecting from its willful infringement. Because Grande never intended to implement an effective repeat infringer policy or take any steps to keep its customers from engaging in widespread online infringement through the use of Grande's internet service, Grande attempted to cast Rightscorp as the defendant in this case, arguing that "Rightscorp wasn't in the business of accurately detecting and documenting instances of music sharing. Rightscorp was in the business of sending scam e-mails to make money […and] the record labels knew about it." Dkt. 464 at 100:6-11. In pursuit of this meritless and contrived defense, Grande served extensive written discovery on Rightscorp and deposed multiple Rightscorp witnesses, probing irrelevant issues, including Rightscorp's business practices and finances, all of which required Plaintiffs to incur additional attorney time related to such discovery.

14.      Grande even claimed that Rightscorp "spoliated" or "destroyed" evidence. But just like the other lawyer-driven arguments Grande relied on to attack Rightscorp, the facts simply did not support the contention. Based on its accusation, Grande moved for evidentiary sanctions, seeking to preclude Plaintiffs from relying on the copyright infringement notices generated by

Rightscorp's infringement detection system. *See generally* Dkt. 247 (Jan. 3, 2019). The Court rejected this argument at summary judgment, concluding that Plaintiffs did not spoliate or direct Rightscorp to spoliate any evidence, and that Grande presented no evidence Rightscorp acted in bad faith. Dkt. 268 at 29 n.4 (Mar. 15, 2019 Order on Summary Judgment). Magistrate Judge Austin then denied Grande's sanctions motion. Dkt. 289 (Sept. 27, 2019). Notably, Magistrate Judge Austin repeatedly held that Grande was not prejudiced by not having the additional data it claimed it needed. *See* Dkt. 289 at 4 n.1, 5 & 7.[2]

15.     Grande nonetheless persisted with this meritless line of attack, trying to persuade the jury that Rightscorp spoliated evidence.  But the jury likewise rejected Grande's claim that "[Rightscorp's Greg Boswell was] turning off the logging, because he knows he's being a bad boy." Dkt. 475 at 2122:1-2. As Plaintiffs and Rightscorp argued all along (which was supported by the jury's verdict at trial), Rightscorp in fact did collect and record ample evidence sufficient to confirm the infringement that it identified and brought to Grande's attention.

16.     Grande engaged in numerous other discovery fights that were objectively unreasonable. Grande, for example, continuously shifted its stance on discovery relating to other ISPs. At the start of the discovery phase, Grande insisted that discovery related to other ISPs was irrelevant. But after the parties briefed the issue and the Court granted Grande's request to preclude such discovery, Grande then disregarded the Court's ruling and moved to compel discovery from Plaintiffs related to other ISPs. Magistrate Judge Austin denied Grande's request. Dkt. 191, at 11 (Sept. 26, 2018).[3]  This is far from the only time that Plaintiffs were forced to brief discovery issues

---

[2] Grande's Rightscorp defense also required Plaintiffs to file a motion *in limine*. *See* Dkt. 314.
[3] Grande also sought discovery directly from a third-party ISP (Cox) and monitoring companies (MarkMonitor and IP Echelon). Notably, the pursuit of IP Echelon discovery resulted in motions practice. *See* Dkt. Nos. 94 & 96.

Grande raised with the Court (which were rejected).[4]

17.     Grande also substantially complicated document discovery by dumping hundreds of thousands of non-responsive documents on Plaintiffs. Grande refused to review about 737,000 custodial and other documents for relevance before it produced them to Plaintiffs. As a result, Grande saddled Plaintiffs with the responsiveness review of these documents. The vast majority of these documents were completely non-responsive to Plaintiffs' requests for production and entirely irrelevant to the issues in this lawsuit. Grande then further burdened Plaintiffs by filing a motion that baselessly claimed that Plaintiffs' document production process was inappropriate because Plaintiffs had reviewed their documents for responsiveness. Dkt. 110. The Court denied Grande's motion, agreeing with Plaintiffs' position all along that "Plaintiffs' handling of the emails identified by the search was proper." Dkt. 191 at 11.

18.     Further, Grande inflated fees associated with expert discovery. For example, Grande served a "supplemental" report from its expert, Dr. Cohen, long after serving Dr. Cohen's initial report. The supplemental report addressed a number of new topics not addressed in the initial report, and Plaintiffs accordingly moved to strike the report, arguing that "in reality it is a substantial do-over of Cohen's opinions concerning the Rightscorp system." Dkt. 271 at 1. The Court struck multiple portions of Dr. Cohen's supplemental report. Dkt. 279 at 6-12. And for the portions that the Court allowed, the Court ordered Grande "to reimburse UMG for the attorneys' fees and expert costs UMG expends in responding to the supplemental testimony that is permitted." *Id.* at 13. The award includes "UMG's costs of preparing for and deposing Cohen, and for having

---

[4] *See* Dkt. 59 (order denying Grande's Motion to Retain Designation of Documents as Confidential-Attorneys' Eyes Only); Dkt. 82 (order denying Grande's motion to extend Scheduling Order). On the other hand, Grande refused to provide information on issues central to the case, *e.g.*, information on their DMCA policies.  This required Plaintiffs to move to compel Grande, which the Court granted.  Dkt. 108.

Frederiksen-Cross (or another expert) respond to Cohen." *Id.* at 11. Grande has not reimbursed Plaintiffs for these costs, which Plaintiffs now request.

**D.   Trial**

19.     Trial in this case was extensive and hard-fought. It featured testimony from twenty-five witnesses over the course of ten trial days. Plaintiffs' counsel prepared for fifteen witnesses who were called live in Plaintiffs' case-in-chief; and prepared for the potential cross-examination of ten witnesses who appeared on Grande's witness list. The trial also included frequent oral argument over numerous evidentiary disputes.

20.     Accordingly, trial preparation required an enormous amount of work. In addition to preparing for the direct and cross-examination of witnesses, pre-trial submissions were voluminous. For instance, Plaintiffs spent extensive time responding to Grande's 16 motions *in limine* (while also filing five of their own). Further, along with submitting proposed *voir dire* questions, stipulated facts, a statement of claims, a witness list, and an exhibit list containing hundreds of documents, Plaintiffs filed deposition designations for 17 witnesses, *see* Dkt. 403-6, and Grande designated deposition testimony from 15 witnesses for which Plaintiffs needed to provide counter-designations, *see* Dkt. 402-6.

21.     There were several components of trial that made it particularly complex. First, there was extensive expert examination on the validity of Rightscorp's copyright infringement-detection technology. Second, it was necessary for Plaintiffs' counsel to establish Grande's contribution to massive copyright infringement through the cross-examination of numerous Grande employees. Finally, the overall massive scale of the copyright infringement at issue affected trial in numerous ways: from preparing and presenting exhibits with gigabytes of data to establishing rights to the 1,400+ works in suit through record label witnesses.

22.     At trial, as anticipated, there was extensive oral argument, including the final

pretrial hearing, charging conference, and numerous evidentiary motions. Even still, Grande's litigation conduct needlessly inflated fees. For example, Grande insisted that it was critically important for Grande to have the opportunity to depose Plaintiffs' expert, Frederiksen-Cross, on Audible Magic issues. Dkt. 465 at 240:18-242:3. The Court granted Grande's request. *Id.* As a result of Grande's request, Plaintiffs had to prepare Frederiksen-Cross for examination, and she was forced to travel back to Texas from her home on the West Coast. After all this, however, Grande never actually deposed Frederiksen-Cross on this issue. And after Grande required her to return to testify a third time at trial on this issue, Grande cross-examined her for less than a minute. Dkt. 473 at 1726:10-25. Compounding matters, at trial, Grande sought leave to rely on a brand-new expert never before disclosed (Sandeep Chatterjee)—only to never call him to testify, or even have him listen to Frederiksen-Cross's direct testimony through the secure dial-in line offered by the Court. Dkt. 473 at 1672:22-1673:16;

## II.   Stein Mitchell's Lodestar Calculations

23.      Stein Mitchell continuously represented Plaintiffs on this matter for over six years. During that time period, twelve attorneys and seven support staff from Stein Mitchell contributed to this case. However, as explained in more detail below, I have reduced the number of Stein Mitchell attorneys to five attorneys and four support staff for whom Plaintiffs are seeking fees, as reflected in the following chart ("Stein Mitchell Chart"). In support of the hourly rates listed in the Stein Mitchell Chart, in Section A, below, I provide an overview of Stein Mitchell and describe the Stein Mitchell attorneys and other professionals who worked on the case along with their qualifications and experience. In Section B, below, I provide an explanation of the hours expended to support the reasonableness of the hours for which fees are requested. This includes an explanation of the reductions that are reflected in the Stein Mitchell Chart to arrive at the total in the "Adjusted Fees" column, which constitutes the attorneys' fees from Stein Mitchell that are

included in Plaintiffs' fees request. I also include an explanation of significant hours expended by Stein Mitchell that are not reflected in the Stein Mitchell Chart. The Chart summarizes the daily time descriptions for each Stein Mitchell professional, which are attached as Exhibit A-1 to this declaration.

| Attorney Name | Position (Years in Practice[5]) | Rate (per hour) | Total Hours | Total Fees | Adjusted Hours | Adjusted Fees |
|---|---|---|---|---|---|---|
| Jonathan Missner | Partner (24) | $680-800 | 413.2 | $282,316.00 | 287.25 | $197,060.00 |
| Robert Gilmore | Partner (18) | $520-640 | 2,717.2 | $1,537,864.00 | 1697.2 | $1,002,218.40 |
| Philip O'Beirne | Partner (17) | $650-640 | 2,315.5 | $1,265,992.00 | 1506.7 | $842,960.80 |
| Michael Petrino | Partner (15) | $520 | 531.2 | $279,024.00 | 202.2 | $107,944.00 |
| Kevin Attridge | Associate / Partner (12) | $280-540 | 1,282.1 | $545,840.00 | 909.2 | $441,115.00 |
| Jonathan Zischkau | Paralegal | $160-200 | 981.7 | $174,328.00 | 731.4 | $134,280.00 |
| Linda Aguirre | Paralegal | $140-200 | 335.5 | $47,974.00 | 164.1 | $23,453.00 |
| Joseph Cipollone | Paralegal | $200 | 140.5 | $28,100.00 | 140.5 | $28,100.00 |
| Ben Yeo | Paralegal | $140 | 108.2 | $15,196.00 | 42.0 | $5,880.00 |
| Other Atty/ Staff | Partner/ Associate/ Paralegal | $434 (avg) | 139.1 | $60,354.00 | 0.0 | $0.00 |
| **TOTAL** | | | 8,964.2 | $4,236,988.00 | **5,681.1** | **$2,783,011.20** |

### A.    Billing Rates

24.    Pursuant to our agreement with the Plaintiffs, the rates charged in this case were discounted by 20% from Stein Mitchell's customary rates.[6] The rates included in the chart above

---

[5] "Years in Practice" is calculated by the number of years between first bar admission and the time of trial.

[6] In exchange for the 20% discount on fees, Stein Mitchell agreed with Plaintiffs on a success bonus if Plaintiffs' verdict is upheld on appeal. Plaintiffs reserve the right to seek recovery of that bonus post-appeal.

reflect this 20% discount. The discount offered in this case underscores the reasonableness of the rates Plaintiffs are seeking to collect, as our clients generally accept Stein Mitchell's customary rates (without discounts) as reasonable for the types of complex cases for which Stein Mitchell represents its clients.

25.     Stein Mitchell is a multi-disciplinary law firm located in Washington, D.C. The Stein Mitchell team representing Plaintiffs in this case consisted of a number of talented lawyers from the firm's commercial litigation practice, almost all of whom I have worked closely with on other litigation matters for nearly a decade. As the case proceeded, additional team members were added as needed to assist as the burdens of discovery and motion practice increased.

26.     Given the success in early stages of this litigation, Plaintiffs retained Stein Mitchell as counsel to file a similar lawsuit against Grande's sibling company, RCN, in 2019. *See UMG Recordings, Inc. et al v. RCN Telecom Services, LLC*, No. 19-17272 (D.N.J.).

27.     In the following paragraphs I describe the Stein Mitchell attorneys and other professionals who worked on the case along with their qualifications and experience, in order of the number of hours spent on this litigation.

<u>Robert Gilmore</u>

28.     I am a partner in Stein Mitchell's commercial litigation practice. I received my J.D. from the George Washington University Law School in 2004, and my B.A. from University of Maryland, Baltimore County in 1998. I am an active member of the District of Columbia bar. I am also admitted to multiple federal District and Appellate Courts, including the United States Supreme Court, the Second, Fourth, and Ninth Circuit Courts of Appeals, and the District Courts of the Southern District of Texas and District of Columbia, and the U.S. Court of Federal Claims. I have also been admitted *pro hac vice* to District Courts throughout the country. Throughout my

nearly two-decade career, I have had a broad litigation-focused practice that involves the prosecution and defense of complex cases involving media and entertainment, banking and finance, healthcare and life sciences, construction, and insurance. Before joining Stein Mitchell in 2013, I was a partner at the international law firm, Kirkland & Ellis, LLP.

29.     I have been heavily involved in this litigation since the pre-litigation phase beginning in October 2016. I was closely involved in the supervision of the various Stein Mitchell team members working on this case. Given the scope and breadth of the case, I was assisted with case oversight and attorney supervision by Jonathan Missner and Philip O'Beirne—along with our co-counsel Jenner & Block who joined the case in November of 2019. I oversaw the litigation strategy and the implementation of that strategy. Specifically, I coordinated all aspects of the written and fact discovery with Philip O'Beirne, and conducted a number of important fact and expert depositions. I was also closely involved in the extensive motions practice beginning in fact discovery and through trial. I also worked closely with various Plaintiffs' experts and in challenging and deposing various Grande experts. I oversaw all aspects of trial, oversaw trial roles among Stein Mitchell lawyers, prepared and examined witnesses and prepared and argued several motions before and during trial.

<u>Philip O'Beirne</u>

30.     Philip O'Beirne is a partner in Stein Mitchell's commercial litigation practice. He received his J.D. from the Notre Dame Law School in 2004, and his B.A. from Princeton University in 2001. Mr. O'Beirne is an active member of the bars of Virginia and the District of Columbia. He is also admitted to multiple federal Courts, including the District Courts for the Districts of Eastern Virginia and the District of Columbia. Mr. O'Beirne has also been admitted *pro hac vice* to District Courts throughout the country. He has served as lead counsel, on both the

plaintiff and defense sides, for corporations and individuals in complex commercial disputes, intellectual property disputes, construction litigation, products liability, white collar criminal defense, and other matters. Before joining Stein Mitchell in 2013, Mr. O'Beirne practiced law at Williams & Connolly, LLP. Prior to private practice, he served on active duty as a judge advocate in the U.S. Army where Mr. O'Beirne served as lead counsel in more than a dozen courts-martial and was repeatedly selected by the Military District of Washington to prosecute high profile senior officer misconduct cases. Mr. O'Beirne also clerked for the Hon. Thomas M. Hardiman in the U. S. District Court for the Western District of Pennsylvania.

31.     Mr. O'Beirne was heavily involved in this litigation since the pre-litigation phase. Among other things, he was involved in motions practice, took the depositions of Grande's witnesses, oversaw expert reports, and argued the three pre-trial motions before Judge Yeakel and Magistrate Judge Austin. Notably, one of Mr. O'Beirne's areas of responsibility on this case was his work associated with the technical issues relating to Rightscorp's system for identifying infringement on Grande's network. He was involved in all aspects of trial, including examining witnesses and presenting argument.

<u>Kevin Attridge</u>

32.     Kevin Attridge is a partner in Stein Mitchell's commercial litigation practice.[7] He received his J.D. from the University of Maryland School of Law in 2010, and his B.A. from Vanderbilt University in 2007. He is an active member of the bars of Maryland, Pennsylvania, and the District of Columbia. Mr. Attridge has been admitted to multiple federal Courts, including the U.S. Court of Appeals for the Fourth Circuit and the U.S. Court of Federal Claims. He has also

---

[7] Mr. Attridge was promoted to partner on January 1, 2020, which post-dated the summary judgment briefing and pre-dated trial.

been admitted *pro hac vice* to District Courts throughout the country. Mr. Attridge has spent over a decade litigating a range of complex commercial cases involving copyright infringement, data security, construction, defamation, professional liability, government contracting, and health care fraud. Before joining Stein Mitchell in 2013, Mr. Attridge practiced law at Kellogg, Hansen, Todd, Evans & Figel, PLLC.

33.     Mr. Attridge began work on this case in 2018 during the summary judgment phase and continuously worked on this case through the post-trial briefing. He was heavily involved in Plaintiffs' summary judgment briefing, leading Plaintiffs' establishment of rights in the works in suit. He also worked extensively during the pretrial phase, including drafting witness examination outlines and taking the lead preparing Plaintiffs' exhibit list. Mr. Attridge served as trial counsel, where he, among other things, prepared Plaintiffs' witnesses, prepared outlines for cross-examination of Grande's witnesses, drafted trial motions, and managed exhibits.

<u>Michael Petrino</u>

34.     Michael Petrino is a partner in Stein Mitchell's commercial litigation practice. He received his J.D. from the George Mason University School of Law in 2008, and his B.A. from Amherst College in 2003. Mr. Petrino is an active member of the bars of Virginia and the District of Columbia. He is also admitted to multiple federal Courts, including the Third, Fourth, Fifth, Sixth, and District of Columbia Circuit Courts of Appeals, the U.S. Court of Appeals for Veteran Claims, and the District Courts for the Eastern District of Michigan, District of Columbia, and Eastern District of Virginia. He has also been admitted *pro hac vice* to District Courts throughout the country. Mr. Petrino litigates complex commercial cases having represented clients from a broad range of industries including vehicle manufacturing, oil and gas, medical devices, power generation and transmission, aerospace, and professional consulting services. Before joining Stein

Mitchell in 2018, Mr. Petrino was a litigation partner at international law firm Kirkland & Ellis, LLP. Before he entered private practice, Mr. Petrino clerked for Hon. Edith H. Jones on the U.S. Court of Appeals for the Fifth Circuit.

35.     Mr. Petrino began working on this case in 2018 during the summary judgment phase and continued to work on this case through December 2021. He defended fact and expert depositions, worked on expert reports and discovery, and contributed to Plaintiffs' summary judgment briefing. Mr. Petrino's work on this matter concluded before trial.  He was, however, instrumental in Plaintiffs' preparation for trial, handling a number of pre-trial filings, including preparing deposition designations, and also prepared outlines for witness examination.

Jonathan Missner

36.     Jonathan Missner is the Managing Partner at Stein Mitchell and serves as Chair of the firm's Global Practices and Corporate Strategy Groups. He received his J.D. from the Georgetown University Law Center in 1998, and his B.A. from Johns Hopkins University in 1995. Mr. Missner is an active member of the bars of Maryland, Illinois, and the District of Columbia. He is also admitted to multiple federal Courts, including Fourth Circuit Court of Appeals and District Court for the Northern District of Illinois. He has also been admitted *pro hac vice* to District Courts throughout the country. In addition to his roles at Stein Mitchell, Mr. Missner is also an Adjunct Professor of Law at Georgetown University Law Center, a position he has held since 2000. During his decades-long career, Mr. Missner has successfully served as lead counsel on a number of complex cases. He has also held numerous high-profile positions outside the practice of law, including his time as the Managing Director of National Affairs at American Israel Public Affairs Committee ("AIPAC").

37.     Mr. Missner was involved in pre-litigation assessment and in litigation strategy.

He took a deposition of one of Grande's key fact witnesses, Matthew Rohre.

<u>Support Staff</u>

38.      Several members of our legal support staff also played an important role in the Plaintiffs' success in this case. I am only including hours expended from support staff who provided continuous work on this case: paralegals Jonathan Zischkau, Ben Yeo, Linda Aguirre, and Joe Cipollone. As reflected in the Chart, these professionals billed at a rate of $140 to $200 per hour. They have ample experience supporting the litigation of complex cases. Jonathan Zischkau, for instance, has worked as a litigation paralegal for over a decade. Linda Aguirre had several decades of experience as a legal assistant and paralegal at the time she provided support on this case in 2018. We also relied on contributions from Ben Yeo and Joseph Cipollone, who provided support during discovery and trial preparation, respectively. And although Mr. Yeo in his third year as a paralegal and Mr. Cipollone in his first were not as experienced as Mr. Zischkau and Ms. Aguirre, they were abundantly capable to perform the work assigned by attorneys.

**B.      Time Spent on this Case**

39.      The hours expended by Stein Mitchell were reasonable and necessary to successfully litigate Plaintiffs' claims in a massive copyright infringement case featuring dozens of witnesses and numerous technological aspects. The result obtained by Plaintiffs—an award of $46.7 million from the jury—justifies the hours expended by Stein Mitchell. In addition to the reductions set forth below, it is a normal practice for my firm to review and remove any excessive hours before the invoices are sent such that the client is not charged for such time.

40.      As provided in the Stein Mitchell Chart above, Plaintiffs request recovery for a total of **5,681.1** hours expended by Stein Mitchell, amounting to **$2,783,011.20**. These amounts, as detailed below, demonstrate that Plaintiffs only seek fees for a portion of the reasonable and necessary hours expended by Stein Mitchell in this litigation.

## Reductions

41.     Plaintiffs are <u>not</u> seeking recovery of fees for **2,867.9 hours** of Stein Mitchell's time that was subject to a fees cap; Plaintiffs and Stein Mitchell agreed to place a $1 million cap on fees incurred by Plaintiffs through the summary judgment phase of this litigation. Consequently, ***Plaintiffs eliminated more Stein Mitchell hours expended through summary judgment than they included in their fees request.*** The removal of these hours—which were reasonable and necessary—would have totaled **$1,235,934.00** in discounted fees.

42.     The total amounts requested by Plaintiffs for Stein Mitchell's time were further reduced as a result of our careful, line-by-line review of Stein Mitchell's non-capped time entries— an exercise that led our firm to remove an additional **415.2 hours**, which further reduced Plaintiffs' fee request pertaining to Stein Mitchell's hours by **$218,042.80**, or an additional **7.2%**. These reductions—along with the amount attributable to the capped fees amount—are the reason that the "TOTAL" for the "Adjusted Fees" column is lower than the "TOTAL" for the "Total Fees" column. I reduced the Plaintiffs' current request in relation to Stein Mitchell's fees in whole or in part for hours associated with the following work.

43.     **Hours of Attorneys and Support Staff Who Performed Limited Work:** First, I reduced 100% of the hours expended by attorneys and support staff who did not provide continuous work on this case. For instance, I removed the hours expended by our former lead counsel, Pat Cipollone, who in late 2018 withdrew as counsel of record after taking a position with the federal government. I also removed the hours of two other partners, four associates, a law clerk, and three members of our support staff who were brought on the case at different times during this nearly six-year litigation when the core team needed support. In total, this amounted to a reduction of **61.8 hours** and **$25,986.00** in fees.

44.     **Hours Expended on Dismissed Defendant:** I reduced hours expended on work associated with the dismissed defendant, Patriot. Patriot successfully moved for dismissal of the claims against it.  There were several undertakings that were unique to Patriot before its dismissal on October 15, 2018, *see* Dkt. 208, for which I reduced all applicable hours by 100%. These included responding to Patriot's motion to dismiss, Dkt. 29, objecting to the Report & Recommendation granting Patriot's motion to dismiss, Dkt. 72, and Plaintiffs' motion for leave to file an amended complaint, Dkt. 85, in which Plaintiffs requested leave to re-plead their claims against Patriot. Again, I removed 100% of the **160.8 hours** expended on these tasks, which totaled **$84,861.00**. There were also hours expended that were applicable to both our opposition to Patriot's and Grande's respective motions to dismiss. I reduced those **174.0 hours** by 50%, which decreases the lodestar request by **$46,774.00**. Finally, to account for Patriot-associated work while preparing Plaintiffs' lawsuit, I reduced all **216.9 hours** expended before the filing of the April 21, 2017 complaint by 10%, which accounted for a **$12,038.80** reduction.

45.     **Hours Expended on Dismissed Claim:** I next reduced hours to account for Plaintiffs' dismissed vicarious liability claim against Grande. There are two projects involving the vicarious liability claim for which I have already reduced all hours by 100% because they related to Patriot: objecting to the Report & Recommendation granting Patriot's motion to dismiss (and Grande's in part), and Plaintiffs' motion for leave to file an amended complaint, where Plaintiffs also requested leave to re-plead their vicarious liability claim against Grande. I also already reduced pre-suit hours to account for Patriot, which also involved preparing Plaintiffs' vicarious liability claim against Grande. Therefore, the only reduction to hours that is purely due to the dismissed vicarious liability claim is work expended on responding to Grande's motion to dismiss, for which I reduced all **34.0 hours** by 10%, amounting to a **$1,768.00** reduction.

46.     **Travel Time:** It is my understanding that it is typical for this Court to reduce requests by 50% for travel when the relevant time entries reveal no evidence of work. After careful review of these entries, **81.5** hours of travel provide no additional details reflecting work performed simultaneously.[8] Therefore, I reduced these hours by 50%, resulting in a **$22,539.00** reduction. In addition, I reduced **17.6** hours spent on coordinating hotel arrangements for trial by 100%, which resulted in a **$10,896.00** reduction.

47.     **Attendance at *Sony v. Cox* Trial:** Given the similarities between this case and *Sony Music Entertainment v. Cox Commc'n, Inc.*, 1:18-cv-950-LO-JFA (E.D. Va.), Philip O'Beirne and I attended several days of the trial in that case in late 2019, which were billed to the Plaintiffs. I reduced all **22.2 hours** of these hours by 100%, resulting in a **$13,180.00** reduction.

48.     All of the reductions above are identified on the line-by-line time descriptions provided in Exhibit A-1, which are based on Stein Mitchell's daily time entries. Entries subjected to reductions, as set forth above, are shaded gray.

### III.     Comparison to *BMG v. Cox*

49.     The hours expended by all Plaintiffs' Counsel in this case—even before reductions—represent efficient litigation. The hours expended by plaintiff's counsel in *BMG v. Cox* serves as an apt comparison. That litigation also featured a music company that brought contributory and vicarious[9] copyright infringement claims against an internet service provider after Rightscorp detected massive copyright infringement of its sound recordings on the internet service

---

[8] The travel time incurred on October 23, 2017 through October 25, 2017 is not counted in this total. That time is already subject to a 50% reduction through the Dismissed Defendant category.

[9] The jury did not find Cox liable for vicarious copyright infringement, and the court accordingly applied a 10% discount on BMG's attorneys' fees request. In this litigation, Plaintiffs' vicarious liability claim was dismissed at summary judgment. I therefore reduced Plaintiffs' attorneys' fees request by 10% for all time associated with Plaintiffs' vicarious liability claim before it was dismissed.

provider's network. The lawsuit even involved a similar number of sound recordings (1,397 in that case versus 1,403 here). The comparisons did not end there. In fact, BMG featured the same number of depositions and essentially the same number of expert witnesses. Despite the marked similarities, Plaintiffs' counsel in this case expended far fewer hours than hours expended by BMG's attorneys, whether measured before or after reductions:

| Reduction | BMG Counsel | Plaintiffs' Counsel | Difference |
|---|---|---|---|
| Pre-Reductions | 21,749.9 hrs | 12,729.6 hrs | **- 41.5%** |
| Post-Reductions | 20,020.1 hrs | 9,204.5 hrs | **- 54.0%** |

Therefore, Plaintiff Counsel's hours represent exceedingly efficient litigation in comparison to *BMG v. Cox*.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 17, 2023, Washington, D.C.

    /s/ *Robert B Gilmore*

    Robert B. Gilmore