# Exhibit 1

```
                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
                         AUSTIN DIVISION

UMG RECORDINGS, INC., ET AL,     :
Plaintiffs,                      :
                                 : Case Number:
vs.                              : 1:17-CV-00365-DAE
                                 :
GRANDE COMMUNICATIONS            : Austin, Texas
NETWORKS, LLC, ET AL,            : October 12, 2022
Defendants.                      :
**********************************************************

            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
             BEFORE THE HONORABLE DAVID A. EZRA
             SENIOR UNITED STATES DISTRICT JUDGE
```

APPEARANCES:
FOR THE PLAINTIFFS:

**Andrew H. Bart, Esquire**
**Jacob Tracer, Esquire**
Jenner & Block, LLP
1155 Avenue of the Americas
New York, NY  10036
(212)891-1600; abart@jenner.com

**Robert B. Gilmore, Esquire**
**Philip J. O'Beirne, Esquire**
Stein Mitchell Cipollone Beato & Missner LLP
1100 Connecticut Avenue, NW, Suite 1100
Washington, DC  20036
(202)601-1589; rgilmore@steinmitchell.com

**Paige Arnette Amstutz, Esquire**
Scott, Douglass & McConnico, LLP
303 Colorado Street, Suite 2400
Austin, Texas  78701
(512)495-6300; pamstutz@scottdoug.com

```
FOR THE DEFENDANTS:

**Richard L. Brophy, Esquire**
**Zachary C. Howenstine, Esquire**
**Mark A. Thomas, Esquire**
**Margaret R. Szewczyk, Esquire**
Armstrong Teasdale, LLP
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri  63105
(314)621-5070
rbrophy@armstrongteasdale.com
zhowenstine@armstrongteasdale.com
mathomas@atllp.com
mszewczyk@armstrongteasdale.com
```

```
COURT REPORTER:
Angela M. Hailey, CSR, CRR, RPR, RMR
Official Court Reporter, U.S.D.C.
262 West Nueva Street
San Antonio, Texas  78207
Phone(210)244-5048
angela_hailey@txwd.uscourts.gov

Proceedings reported by stenotype, transcript produced by
computer-aided transcription.
```

...

**I N D E X**

| | |
|---|---|
| **OPENING STATEMENTS** | **PAGE** |
| By Mr. Bart | 47 |
| By Mr. Brophy | 77 |

**WITNESSES:**

**JEFF WALKER**
By Mr. Bart                                                    117
By Mr. Howenstine                                              163

**WADE LEAK**
By Mr. Bart                                                    175
By Mr. Howenstine                                              183

**JEREMY LANDIS**
By Mr. Tracer                                                  189
By Mr. Howenstine                                              213

1   Recording Industry Association of America, or RIAA, the trade
2   association for the recording industry.
3           As I started to say a moment ago, this case is about
4   the actions and, more importantly, the inactions of the
5   defendant, Grande Communications, in enabling a flood of
6   copyright infringement on its network and then refusing to play
7   a role in stemming that flood.
8           Grande is what's known as an ISP, or Internet service
9   provider.  As the name suggests, an ISP provides customers with
10  high-speed broadband Internet service as well as some other
11  services such as TV and cable service.  You may know them as a
12  cable company, but whatever it's called, it's a very highly
13  profitable business.  And particularly the Internet component
14  of that business.
15          And as you'll hear at trial from their own witnesses,
16  Grande has an amazingly high profit margin on that Internet
17  service of up to 95 percent, a factor that played heavily into
18  many of Grande's worst decisions that resulted in this case.
19          What brings Grande to this court as a defendant is its
20  intentional decision to ignore a massive amount of copyright
21  infringement that it facilitated through this high-speed
22  broadband network; specifically, the illegal copying and
23  distribution of copyrighted song recordings -- sound
24  recordings.  As you'll hear during the trial, Grande recognized
25  the importance of addressing this infringement, and for a

```
 1                    UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF TEXAS
 2                          AUSTIN DIVISION

 3   UMG RECORDINGS, INC., ET AL,  :
     Plaintiffs,                    :
 4                                  : Case Number:
     vs.                            : 1:17-CV-00365-DAE
 5                                  :
     GRANDE COMMUNICATIONS          : Austin, Texas
 6   NETWORKS, LLC, ET AL,          : November 1, 2022
     Defendants.                    :
 7   ************************************************************

 8              TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                BEFORE THE HONORABLE DAVID A. EZRA
 9              SENIOR UNITED STATES DISTRICT JUDGE

10   APPEARANCES:
     FOR THE PLAINTIFFS:
11
     **Andrew H. Bart, Esquire**
12   **Jacob Tracer, Esquire**
     Jenner & Block, LLP
13   1155 Avenue of the Americas
     New York, NY  10036
14   (212)891-1600; abart@jenner.com

15   **Robert B. Gilmore, Esquire**
     **Philip J. O'Beirne, Esquire**
16   Stein Mitchell Cipollone Beato & Missner LLP
     1100 Connecticut Avenue, NW, Suite 1100
17   Washington, DC  20036
     (202)601-1589; rgilmore@steinmitchell.com
18
     **Paige Arnette Amstutz, Esquire**
19   Scott, Douglass & McConnico, LLP
     303 Colorado Street, Suite 2400
20   Austin, Texas  78701
     (512)495-6300; pamstutz@scottdoug.com
21

22

23

24

25
```

```
FOR THE DEFENDANTS:

Richard L. Brophy, Esquire
Zachary C. Howenstine, Esquire
Mark A. Thomas, Esquire
Margaret R. Szewczyk, Esquire
Armstrong Teasdale, LLP
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri  63105
(314)621-5070
rbrophy@armstrongteasdale.com
zhowenstine@armstrongteasdale.com
mathomas@atllp.com
mszewczyk@armstrongteasdale.com











COURT REPORTER:
Angela M. Hailey, CSR, CRR, RPR, RMR
Official Court Reporter, U.S.D.C.
262 West Nueva Street
San Antonio, Texas  78207
Phone(210)244-5048
angela_hailey@txwd.uscourts.gov

Proceedings reported by stenotype, transcript produced by
computer-aided transcription.
```

```
 1              I N D E X
 2   WITNESSES:                               PAGE
 3   JONATHAN GLASS (videotaped deposition)
 4   By Mr. Howenstine                        1967
 5   By Mr. Thomas                            1969
 6
 7   CHRISTOPHER SABEC (videotaped deposition)
 8   By Mr. Brophy                            1973
 9   By Mr. O'Beirne                          1974
10
11   BARBARA FREDERIKSEN-CROSS
12   By Mr. O'Beirne                          1979
13   By Mr. Brophy                            2005
14
15   JURY INSTRUCTIONS
16   By The Court (read by Alison Rogge)      2033
17
18   CLOSING ARGUMENTS
19   By Mr. Bart                          2053, 2140
20   By Mr. Brophy                            2095
21
22
23
24
25
```

1   given that Grande concededly never investigated the Rightscorp
2   system, never had any factual basis to conclude that any
3   notices were false.  In fact, the trial record shows the only
4   thing they knew about Rightscorp was that its notices were at
5   issue at the Cox trial.
6            And at the same time as these events were going on,
7   the Boston-based private equity firm was selling Grande to a
8   new private equity firm and pocketing $400 million in the
9   process.  But the people involved in managing Grande, the
10  Patriot bigwigs like Mr. Holanda, Mr. Kramp, Mr. Murphy and
11  Mr. Feehan, all remained connected to Grande through the
12  management company, and each pocketed millions from the
13  transaction.  So their willful blindness had paid off
14  handsomely.
15           But once the millions were safely in their pockets,
16  they realized that they still had to deal with the ticking time
17  bomb of its disregard for rampant piracy on its network.  And
18  that after the Cox verdict, it couldn't continue without a DMCA
19  policy and certainly couldn't maintain its existing policy of
20  willful blindness of never terminating a single repeat
21  infringer, even those who had received over 10,000 notices.
22           So they announced a new DMCA policy in 2017, months
23  before this suit was filed.  And that new policy exposes every
24  excuse and argument that you've heard from Grande in this trial
25  as a lie, that was manufactured after the lawsuit was filed.

1   And it goes beyond the labels to the entire music ecosystem.
2   Record stores close, pressing plants close, distribution
3   centers close, jobs disappear, artist royalties collapse, and
4   the revenues necessary for labels to invest in talent dries up.
5   We all suffer as a result.
6       Plaintiff's economic expert, Dr. Lehr, summarized the
7   research in the field and testified that virtually all the
8   research holds that the impact has been enormous.
9       Now, of course, Grande is not liable for all the harm
10  caused by this kind of piracy.  But Grande did play a material
11  role in creating thousands and thousands of new unauthorized
12  download stores.  And in this trial, Grande has not put forth
13  any evidence addressing the economics of piracy or its impact
14  on the music industry or attempting to rebut Dr. Lehr's
15  testimony in any way or any of the research on which it was
16  based, or the personal firsthand experience of the label reps
17  who have lived through this debacle in real time.
18      All they have done is to have attorneys hypothesize other
19  reasons for the implosion of the label's revenue base, but
20  those questions and speculation are not evidence, as well as
21  being wholly baseless.
22      Tracing Grande's profits from the infringement is also
23  difficult, but we do know that Grande has been extremely
24  profitable and that its revenues and profitability spike
25  noticeably once it opened the floodgates of unregulated piracy.

1  Not only did their financial results improve, but they were
2  able to increase the market value of the company during the
3  exact time they had a willful blindness policy by a remarkable
4  140 percent or $400 million.
5      The next statutory factor relates to the circumstances of
6  the infringement.  This deals with two separate points.  One
7  again is the massive viral and anonymous nature of BitTorrent,
8  but the other is the critical role that an ISP plays in the
9  BitTorrent ecosystem.
10     As I told you during the opening, only an ISP can connect
11 the IP address obtained from a monitoring company to a specific
12 Grande subscriber and to take action against that subscriber.
13 Only the ISP can do that.  No one else has that information.
14 Without active participation from an ISP, addressing piracy on
15 BitTorrent is simply impossible.  But Grande has brazenly
16 stated that it has no duty to do anything in response to
17 infringement notices.  But given its role in the BitTorrent
18 ecosystem, that position is illegal and, frankly, immoral and
19 Grande knows it.
20     Grande had a policy that recognized its responsibility to
21 address BitTorrent piracy before 2010.  And Grande's 2017
22 policy recognizes Grande's obligation under federal law to
23 implement a reasonable repeat infringer policy.  The problem
24 for Grande is that for the years 2010 to 2017, the years at
25 issue in this lawsuit, it admittedly had no policy.  It had a

1   don't have to say it.  They say it themselves.  In Grande's
2   opening statement, they told you that you can decide whether
3   termination programs like the one Grande implemented are
4   necessary.
5       Well, Grande and the ISPs are the only party that can
6   police piracy on BitTorrent at all.  And they are telling you,
7   you can free them from that obligation.  While Grande's Texas
8   employees like Mr. Bloch and Mr. Fogle understand the role that
9   ISPs play in addressing BitTorrent infringement, Grande's
10  management and legal team firmly believe that the law doesn't
11  apply to them, despite the fact that the ISP is the only party
12  that can play that role.  And despite the fact that the ISP is
13  providing the high-speed Internet necessary for the
14  infringements to occur in the first place.
15      This is a company that has made the intentional decision to
16  side with the infringers, to use its greed for additional
17  profits as a justification of trampling on the property rights
18  of the entire content ecosystem, from music to movies and
19  beyond.  They need to be deterred and it needs to be a strong
20  message.  And it will take a stiff award to deter Grande.  Its
21  owners made millions turning a blind eye to infringement and
22  Grande has generated over a billion and a half dollars during
23  the relevant time period.
24      Not only have their revenues been substantial, but their
25  gross profit margins are growing and are now around 200 million

1  a year, and it's important to note that deterring Grande
2  doesn't mean deterring its Texas employees.  It means deterring
3  the decision makers from the management company and the Legal
4  Department, the suits who set the policies.
5       That takes us to the final critical factor, the need to
6  deter others from infringing in the future.  This case is not
7  just about Grande.  The entire ISP community is watching.
8  They're getting direct reports from this courtroom.  And a slap
9  on the wrist will be interpreted by the ISP industry as a
10 license to disregard evidence of piracy and to disregard the
11 rights of copyright owners just like Grande did.
12      My old friend Michael Elkin is sitting right there
13 representing Cox and watching this case right now.  There are
14 reports going out in realtime, but even more importantly, the
15 corporate overlords that run Grande and make all their policy
16 decisions now run the sixth largest ISP in the United States
17 and are hoping for a verdict that allows them to turn off all
18 enforcement for all of these related companies.
19      They want to be able to simply turn a blind eye, to apply
20 their willful blindness standard to all of these companies.
21 This statutory factor lets you send a message to their general
22 counsel in the back of the room, Jeff Kramp, and the others who
23 oversaw the lawlessness of Grande between 2010 and 2017, that
24 not only Grande, but all of Astound, has to comply with its
25 obligations under the law and respect all property rights and

1   not merely its own.
2       So where does that leave us?  With a defendant that has
3   clearly violated The Copyright Act, that knew of or was
4   willfully blind to specific infringements by its customers on
5   its network and that materially contributed to that
6   infringement; that did so willfully and intentionally and is
7   brazenly unapologetic about its conduct; that openly defends
8   infringers even when the infringers don't defend themselves.
9       This is not a mom-and-pop local company or a start-up.
10  This is a company run by magnates, big-money interest that
11  pocket the profits from the company and make all the legal and
12  policy decisions.  They need to receive the strongest possible
13  message that their conduct is legally and morally wrong and
14  simply unacceptable.
15      So what are we asking for in damages?  As you heard this
16  morning, The Copyright Act permits a statutory award between
17  750 and $30,000 per infringed work.  But if the infringements
18  are willful, as they clearly were here, that $30,000 per work
19  cap lifts and you can award up to $150,000 per infringed work.
20      You will decide the appropriate amount, but we submit that
21  given Grande's outrageous conduct, the award must be in the
22  willful category, that is north -- and we believe well north --
23  of $30,000 per work.  The willful and unapologetic, indeed
24  arrogant and aggressive posture that Grande's management have
25  taken, including blaming the victim and scapegoating anyone

1   no Spotify.  This is just more of Grande's basis of beliefs
2   that it's okay to profit at the expense of others, to mock and
3   blame the victim when the property is being stolen, and to side
4   with those who steal it instead of respecting the owner's
5   property rights.
6           But let's contrast that with how Grande acts when its
7   own property is at stake.  When users don't pay for service,
8   Grande terminates them.  When bars show content that Grande has
9   an exclusive license for, Grande sends trucks to the bars to
10  shut it down.  Grande's witnesses have consistently testified
11  that they believe that their intellectual property rights are
12  valuable and are aggressive in protecting them.
13          The bottom line is that Grande believes in property
14  rights but only when it applies to them.  If it's someone
15  else's property and it's a benefit to them, they're happy to
16  look the other way.
17          Ultimately, this is a case of right and wrong, and
18  Grande's upper management and corporate overlords were clearly
19  unequivocally wrong.  They abolished their repeat infringer
20  policy so they could reap the maximum revenue from the
21  explosion of piracy on BitTorrent.  They pocketed the revenue
22  of willful infringers.  They turned a blind eye to the
23  overwhelming evidence of specific infringement.  They flipped
24  the company for $400 million, pocketing millions individually
25  for all the people who made the decision to look the other way.