IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UMG RECORDINGS, INC, et al., | § | NO. 1:17-CV-365 |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| GRANDE COMMUNICATIONS | § | |
| NETWORKS, LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## ORDER DENYING GRANDE'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL

Before the Court is Defendant Grande Communications Networks, LLC's ("Grande") Renewed Motion for Judgment as a Matter of Law or a New Trial, filed February 27, 2023.  (Dkt. # 487.)  Plaintiffs UMG Records, Inc., et al., ("UMG" or "Plaintiffs") filed a Memorandum of Law in Opposition on March 20, 2023.  (Dkt. # 497.)  Grande filed a Reply on April 3, 2023.  (Dkt. # 505.)  Under Local Rule 7(h), the Court finds this matter suitable for disposition without a hearing.  For the reasons that follow, the Court **DENIES** Grande's Renewed Motion for Judgment as a Matter of Law or a New Trial.  (Dkt. # 487.)

1

## BACKGROUND

On April 13, 2017, Plaintiffs—a group of major record labels—commenced this action against Grande—the largest internet service provider in Texas—for secondary copyright infringement.  (Dkt. # 1.)  Plaintiffs claimed Grande allowed its users to illegally distribute Plaintiffs' copyrighted sound recordings on BitTorrent with impunity.  (Id.)  A jury was empaneled October 7, 2022, and a trial on the merits began on October 12, 2022.  (Dkt. # 416.)  On November 3, 2022, the jury returned a unanimous verdict finding the following:

1. Plaintiffs proved by a preponderance of the evidence that Grande is contributorily liable for copyright infringement.
2. The number of copyrighted works for which plaintiffs proved that Grande is liable for statutory damages is 1,403.
3. Plaintiffs proved by a preponderance of the evidence that Grande's contributory infringement was willful.
4. The total amount of statutory damages awarded to Plaintiffs is $46,766,200.00.

 (Dkt. # 458) (corresponding numbering to verdict form).  After briefing from both parties on the content of the order memorializing the jury's verdict, this Court entered judgment on January 30, 2023.  (Dkt. # 481.)

## LEGAL STANDARD

I.   <u>Renewed Motion for Judgment as a Matter of Law</u>

If a party makes a motion for judgment as a matter of law during trial, but the court does not grant the motion, the moving party may renew its motion no later than twenty-eight days after the entry of judgment.  FED. R. CIV. P. 50(b). Judgment as a matter of law may be granted when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  FED. R. CIV. P. 50(a)(1); <u>see also</u> <u>Guile v. United States</u>, 422 F.3d 221, 225 (5th Cir. 2005) (noting that the jury's verdict "can be overturned only if there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did").  A court must be "especially deferential" to the jury's findings in considering whether to grant a motion for judgment as a matter of law following a jury verdict.  <u>See</u> <u>Flowers v. S. Reg'l Physician Servs. Inc.</u>, 247 F.3d 229, 235 (5th Cir. 2001).

In reviewing the evidence, the court draws "all reasonable inferences in favor of the nonmoving party" and "may not make credibility determinations or weigh the evidence."  <u>Taylor-Travis v. Jackson State Univ.</u>, 984 F.3d 1007, 1112 (5th Cir. 2021), <u>cert. denied</u>, 142 S. Ct. 101 (2021) (quoting <u>Industrias Magromer Cueros y Pieles S.A. v. Louisiana Bayou Furs Inc.</u>, 293 F.3d 912, 918 (5th Cir. 2002), <u>decision clarified on denial of reh'g</u>, 310 F.3d 786 (5th Cir. 2002)). Therefore, judgment as a matter of law should be granted only if "the facts and

3

inferences point 'so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion.'" One Beacon Ins. Co. v. T. Wade Welch & Assocs., 841 F.3d 669, 675 (5th Cir. 2016) (quoting Baisden v. I'm Ready Prods., Inc., 693 F.3d 491, 498 (5th Cir. 2012)). "Courts in this district have considered post-trial motions relating to purely legal issues as motions for reconsideration." Intellectual Ventures II LLC v. FedEx Corp., No. 2:16-CV-00980-JRG, 2019 WL 2297048, at *12 (E.D. Tex. Mar. 29, 2019); see also OPTi, Inc. v. VIA Techs., Inc., 65 F. Supp. 3d 465, 475–76 (E.D. Tex. 2014) (treating a post-trial motion purportedly pursuant to Rule 50 and relating to the legal issue of indefiniteness as a motion for reconsideration).

II.   Motion for a New Trial

Rule 50 also provides that a party "may include an alternative or joint request for a new trial under Rule 59." FED. R. CIV. P. 50(b); Long v. Shultz Cattle Co., 881 F.2d 129, 132 (5th Cir. 1989) (An alternative motion for a new trial "may be granted even if the moving party is not entitled to judgment as a matter of law."). "A new trial may be granted if the trial court finds that 'the verdict is against the weight of evidence . . . the trial was unfair, or prejudicial error was committed.'" Seidman v. Am. Airlines, Inc., 923 F.2d 1134, 1140 (5th Cir. 1991) (quoting Smith v. Transworld Drilling Co., 773 F.2d 610, 613 (5th Cir. 1985)). The decision to grant or deny a motion for a new trial, including the determination

4

of whether a verdict is against the great weight of the evidence, is a question committed to the court's sound discretion.  Six Dimensions, Inc. v. Perficient, Inc., 969 F.3d 219, 230 (5th Cir. 2020).  A motion for a new trial "must clearly establish either a manifest error of law or fact or must present newly disclosed evidence." Simon v. United States, 891 F.2d 1154, 1159 (5th Cir. 1990) (quoting Fed. Deposit Ins. Corp. v. Meyer, 781 F.2d 1260, 1268 (7th Cir. 1986)).  The party seeking a new trial based on an erroneous evidentiary ruling has the burden of proving that the error prejudiced a substantial right of that party.  See Munn v. Algee, 924 F.2d 568, 571 (5th Cir.1991); FED. R. CIV. P. 61.

## DISCUSSION

To prove their claim of contributory copyright infringement, Plaintiffs were required to establish that: (1) Plaintiffs own valid copyright registrations in the 1,403 sound recordings at issue in the case; (2) users of Grande's internet service utilized that service to infringe Plaintiffs' right to distribute its copyrighted works; (3) Grande knew of specific instances of infringement or was willfully blind to such instances of infringement; and (4) Grande induced, caused, or materially contributed to the infringing activity.  (Dkt. # 449 at 18-19.)

"Any argument made in a renewed motion for judgment as a matter of law under Rule 50(b) must have been previously made in a motion for judgment as a matter of law under Rule 50(a)."  One Beacon, 841 F.3d at 676 (citations

5

omitted).  At the close of evidence, Grande moved for judgment as a matter of law under Rule 50(a).  (Dkt. # 475 at 2008-2012.)  The court denied the motion and submitted the case to the jury.  (Id. at 2016.)  Grande renews its motion for judgment as a matter of law, reiterating its argument at trial that Plaintiffs failed to present sufficient evidence of each element of their copyright claim.  Grande argues that Plaintiffs presented insufficient evidence of: (1) Grande's users committing direct infringement; (2) Grande's knowledge of or willful blindness to specific instances of direct infringement; (3) Grande inducing, causing, or materially contributing to the direct infringement; (4) the willfulness of Grande's contributory infringement; (5) each of the 1,403 sound recordings' eligibility for a separate award of statutory damages; and (6) ownership for the 1,403 sound recordings.  (Dkt. # 487.)  Because these arguments were raised in Grande's previous motion for judgment as a matter of law ("JMOL"), Grande is entitled to renew its motion.

Grande also re-urges several legal arguments that it raised at trial. While legal arguments are generally improper in a Rule 50(a) motion, the Court liberally construes them as arguments for a new trial.  See FED. R. CIV. P. 50(a)(1) (providing relief only when a jury has not been presented "a legally sufficient evidentiary basis" to find in a party's favor on an issue).  Thus, the Court evaluates whether the legal arguments and evidentiary objections that Grande re-raises are "a

manifest error of law or fact," given that Grande does not "present newly disclosed evidence."  <u>Simon</u>, 891 F.2d at 1159 (quoting <u>Fed. Deposit Ins. Corp.</u>, 781 F.2d at 1268); <u>see also</u> <u>Montgomery Ward & Co. v Duncan</u>, 311 US 243, 251 (1940) ("The motion for a new trial involves more discretion from the district court [than a renewed motion for judgment as a matter of law], as it may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury.").  Finally, Grande contends that the court made several errors in admitting evidence warranting a new trial.  The Court addresses each argument in turn.

I.    <u>Direct Infringement</u>

The Court instructed the jury that, to prove direct infringement, Plaintiffs had to establish that each work in suit was "infringed by distributing any part of the copyrighted work without Plaintiffs' authorization."  (Dkt. # 449 at 18; <u>see also</u> dkt. # 268 at 31.)  To find an unauthorized distribution, the jury could consider "direct or circumstantial evidence," including "evidence that copyrighted content was offered or distributed to a third party who is investigating or monitoring infringing activity."  (<u>Id.</u>)

A.    <u>Evidentiary Sufficiency for Direct Infringement</u>

Plaintiffs provided sufficient evidence for the jury to find that Grande's users committed direct infringement.  For each work in suit, Plaintiffs

7

introduced testimony and documentary evidence that (1) Rightscorp detected a Grande user offering to share the work; (2) Rightscorp sent Grande a notice of infringement documenting that activity; (3) Rightscorp re-approached Grande users who had previously offered the work for copying and downloaded at least one (and usually more than one) complete copy of the work; and (4) Audible Magic verified that Rightscorp in fact downloaded each work at issue. (PX 1-5, 13-16; Dkt. # 465 at 274:21-294:25; Dkt. # 464 at 209:5-210:2.)

Grande argues that because Plaintiffs did not introduce "copies of the original copyrighted sound recordings," the jury could not conduct a side-by-side comparison of the works, and thus could not find that the allegedly infringing works were substantially similar to the works owned by Plaintiffs. (Dkt. # 487 at 3.) The Court rejected this argument at summary judgment. The Court held that the cases cited by Grande "do not appear to stand for the proposition that a side-by-side comparison of the original and allegedly infringing works must be made in front of the jury, something that would prove beyond impractical in a case of this sort." (Dkt. # 468 at 26.) Instead, Plaintiffs needed to produce "evidence, beyond mere oral testimony, resulting from such a comparison that would permit a layman to view the two works as substantially similar." (Id. at 26-27.) Plaintiffs presented voluminous evidence at trial for the proposition that the sound recordings detected by Rightscorp were copies of Plaintiffs' copyrighted sound recordings.

8

A Rightscorp witness confirmed that Rightscorp "provided a hard drive of download files" in this case.  (Dkt. # 465 at 420:18-19.)  Plaintiffs introduced testimony from Recording Industry Association of America ("RIAA") witness Jeremy Landis that he ran the files on the Rightscorp hard drive through Audible Magic software and confirmed matches "for each of the sound recordings" to the works in question.  (Dkt. # 464 at 209.)   Plaintiffs put on exhaustive testimony about Audible Magic's ability to identify and match files to copyrighted content, principally through expert Barbara Frederiksen-Cross, who noted that Audible Magic's error rate is in the vicinity of one in three *billion*.  (Dkt. # 473 at 1715:8-1716:4.)  As the Court noted in its motion for summary judgment, Audible Magic has been "widely recognized" by courts for its reliable identification and matching of files to copyrighted content in other peer-to-peer infringement cases. (Dkt. # 468 at 26); see also Capitol Records, LLC v. Escape Media Grp., Inc., No. 12-CV-6646 (AJN), 2015 WL 1402049, at *23 (S.D.N.Y. Mar. 25, 2015) (collecting copyright infringement cases using Audible Magic's fingerprinting software).

Plaintiffs also elicited testimony that the processes Rightscorp used to generate notices and obtain downloads were both based on searching for the same underlying "hash value" by which the works in suit could be identified on BitTorrent.  (Dkt. # 465 at 268:9-281:16.)  Another witness explained to the jury

that the chances two files with the same hash value are in fact two different files is "one followed by 26 to 50 different zeros." (Dkt. # 466 at 573:11-18.) The jury was provided with PX 16, which summarized the metadata Rightscorp downloaded alongside the data provided by Audible Magic identifying the Rightscorp downloads as particular sound recordings. (See id. at 211:18-212:9; Dkt. # 465 at 365:21-367:2.) The jury was entitled to rely on PX 16 to conclude that the files the RIAA determined included copies of the works in suit were the same files that Rightscorp downloaded from Grande users and provided in this case. Finally, employee witnesses from each Plaintiff listened to a random sample of 50 Rightscorp downloads and confirmed to the jury that those files were in fact copies of works owned by their respective companies. (See, e.g., Dkts. ## 471 at 1315:11-1316:5 (A. McMullan for Universal); 464 at 159:2-19 (J. Walker for Sony); 469 at 1074:7-18 (T. Parry for Warner).) While Grande argues that Plaintiffs' reliance on hash value and download evidence was "unreliable and subject to error," such a determination was entirely up to the jury. (Dkt. # 505 at 4.) A reasonable jury could have found that the allegedly infringing files offered by users of Grande's network matched Plaintiffs' copyrighted sound recordings in

light of the extremely small Audible Magic error rate and the infinitesimal chance of two hashes matching without comprising the same sound recording.[1]

Grande next argues that Plaintiffs failed to show that any of the direct infringers were actually Grande subscribers, as opposed to unauthorized users of Grande's network.  Plaintiffs provided sufficient evidence for the jury to conclude that the direct infringers were Grande subscribers: Plaintiffs introduced evidence showing that Rightscorp could identify infringers by their IP addresses and match those IP addresses to their internet service providers ("ISPs"), like Grande.  (Dkt. # 465 at 272:2-273:10, 320:19-321:1-12.)  Grande's employees admitted that Grande could match the IP addresses in the Rightscorp notices to Grande subscribers.  (Dkt. # 468 at 851:16-854:1 (admitting that the program Grande developed to handle the notices extracted the IP address of the Grande subscriber who was the subject of that notice and then matched up the name of the subscriber), see also 931:4-20 (admitting that Grande's systems had the information required to match up the IP address and time stamp to who the subscriber was).)

---

[1] Grande mentions that 18,000 files downloaded by Rightscorp could not be matched to anything in Audible Magic's database.  (Dkt. # 505 at 4.)  But this could have bolstered the jury's confidence that Plaintiffs were only seeking renumeration for sound recordings that were *verifiable* matches; leaving out those that did not find a match would seem to be good practice.

Moreover, Grande undermined its theory about unauthorized users conducting infringement by admitting at trial that it holds its subscribers fully responsible for all conduct occurring on their accounts, whether they are authorized users or not.  (Dkt. # 471 at 1409:8-1410:3; PX 53 ("At all times it is the subscriber's responsibility to ensure that their account is not being used to conduct infringing activity."), 103.)  The jury was entitled to rely on the unrebutted evidence of the Grande IP addresses associated with the allegedly infirming activity to find that the infringement detected on a Grande IP address was in fact committed by the Grande subscribers who owned the IP address.  Accordingly, judgment as a matter of law is not proper on this ground.

B.    <u>Legal Arguments on Direct Infringement</u>

Grande argues that "the evidence must show an actual upload, not a mere offer to upload," to state a distribution claim.  (Dkt. # 487 at 4.)  Construing this argument liberally, it takes issue with the Court's jury instructions, which allowed jurors to rely on "evidence that copyrighted content was *offered or* distributed to a third party who is investigating or monitoring infringing activity." (Dkt. # 449 at 18.)  The Court's resolution of Grande's legal argument on this point, codified in the jury instructions, was not a "a manifest error of law," and thus does not support a new trial.  <u>Simon</u>, 891 F.2d at 1159 (quoting <u>Fed. Deposit Ins. Corp.</u>, 781 F.2d at 1268).

12

At summary judgment, the Court found that "the great weight of the case law" dictates that "actual dissemination" of the work is not required for direct infringement on a distribution theory: "offering to share under a 'making available' theory" suffices.  (Dkt. # 268 at 31-34.)    But even if actual dissemination were required, offers to upload would nonetheless "constitute circumstantial evidence of dissemination."  (<u>Id.</u> at 34.)  Plaintiffs provided ample evidence of Grande's users offering to share each sound recording at issue: in particular, testimony about the Rightscorp protocol, which (1) identifies users on BitTorrent offering to share the copyrighted sound recording, (2) confirms that the song is what the protocol believes it to be via AcoustID or Audible Magic fingerprinting and the exact match of the hash code, (3) goes out to those users and conducts a hard handshake indicating that they have and are willing to share the file, and (4) documents this match in notices.  (Dkt. # 465 at 268:9-281:16; PX 1 (hard drive containing all notices).)  The jury's reliance on the offers to upload was entirely consistent with the Court's legally sound instruction that "Plaintiffs are entitled to rely on, and you [jurors] are permitted to consider, evidence that copyrighted content was offered or distributed to a third party who is investigating or monitoring infringing activity" in deciding whether Grande's users distributed Plaintiffs' copyrighted works without authorization.  (Dkt. # 449 at 18.)

13

Beyond the evidence of offers to upload, Plaintiffs provided evidence of actual uploads by Grande users, and downloads by Rightscorp: Rightscorp re-approached Grande users who had previously offered the work for copying and downloaded at least one complete copy of the work.  (See Dkt. # 465 at 338-61 (Rightscorp was able to successfully obtain full copies of the works from Grande subscribers).)  This information was stored not only in the notices that went out, but also in the drive of downloaded files.  (Dkt. # 465 at 358 (testifying that PX 3 is a drive containing the downloaded files from the Rightscorp system), PX 3.)  Accordingly, a new trial is not warranted on this ground.

II.    <u>Knowledge and Willful Blindness</u>

Plaintiffs also had to demonstrate that Grande "knew of specific instances of infringement or was willfully blind to such instances of infringement," where willful blindness meant that Grande "believe[d] there [was] a high probability of a fact but deliberately [took] steps to avoid learning it."  (Dkt. # 449 at 19.)  The jury had a legally sufficient basis to find either knowledge or willful blindness.

A reasonable jury could have found that by receiving Rightscorp's notices,[2] Grande knew of specific instances of infringement.  As the Fourth Circuit

---

[2] Grande seems to concede these notices constitute circumstantial evidence of unauthorized file sharing. (Dkt. # 487 at 5.)

explained, "the proper standard requires a defendant to have specific enough knowledge of infringement that the defendant could *do* something about it."  BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc., 881 F.3d 293, 311-12 (4th Cir. 2018).  The jury was entitled to credit the Rightscorp notices as accurate reports of specific instances of infringement committed by Grande's users; therefore, a reasonable jury had sufficient basis to find that by receiving these 1.3 million notices, Grande had actual knowledge that specific users of its network were distributing copies of Plaintiffs' sound recordings without authorization.  See UMG Recording v. Sinnott, 300 F. Supp. 2d 993, 999 (E. D. Cal. 2004) (concluding that the defendant had actual knowledge of his vendors' sales of infringing CDs and cassettes because RIAA investigators "identified themselves to Sinnott, and explained that three MFM vendors were selling infringing CDs or cassettes . . ."); Monotype Imaging, Inc. v. Bitstream, Inc., 376 F. Supp. 2d 877, 886 (N.D. Ill. 2005) ("The knowledge element for contributory copyright infringement is met in those cases where a party has been notified of specific infringing uses of its technology and fails to act to prevent future such infringing uses, or willfully blinds itself to such infringing uses.").

Grande argues that these notices did not confer knowledge because "Grande had no way of knowing whether Rightscorp's accusations were true." (Dkt. # 487 at 5.)  But "a perfect knowledge standard[ ] is not required" for ISP

liability as a contributory copyright infringer.  <u>BMG Rights Mgmt. (US) LLC v.</u>
<u>Cox Commc'ns, Inc.</u>, 199 F. Supp. 3d 958, 979 (E.D. Va. 2016), <u>aff'd in part,</u>
<u>rev'd in part</u>, 881 F.3d 293 (4th Cir. 2018).  Moreover, Plaintiffs showed the jury
several ways Grande could have verified Rightscorp's allegations: (1) Rightscorp
offered to meet and discuss the infringement on Grande's network in January 2015
(Dkt. # 238 at 935); (2) provided detailed individual notices;[3] (3) created a
customized dashboard for Grande to look at the alleged infringement on its
network (Dkt. # 465 at 331); and (4) sent weekly "roll-up" emails documenting
repeat infringers.  (<u>Id.</u> at 335; PX 11-12).  Most tellingly, Grande's corporate
representative admitted that it was "correct" that if the jury found "that
infringements reflected in a notice actually occurred, then Grande was continuing
to provide Internet service to users who were in fact guilty of infringement of
which [Grande] had received copyright notices."  (Dkt. # 471 at 1418:12-18.)
Grande's argument boils down to a disagreement with the jury's decision to credit
the Rightscorp notices as legitimate statements of infringement.  But a reasonable
jury could find this overwhelming circumstantial evidence sufficient to confer

---

[3] Though Grande contends that the notices did not indicate the song and the
copyright holder of the song at issue, Plaintiff's Exhibit 40 tells a different story,
showing the name of the mp3 file allegedly infringing and clearly identifying BMG
(in this case) as the owner of the copyright.  (PX 40.)  Additionally, the dashboard
allowed Grande to "drill down by clicking on the IP addresses and see what songs
we had notified them for."  (Dkt. # 465 at 3313:15-17.)

actual knowledge upon Grande of its users' infringement, and thus find that

Grande knew of the specific instances of infringement documented in those

notices.

A reasonable jury could likewise conclude that Grande was willfully

blind, believing there was a high probability that its users were committing the

specific instances of infringement contained in the notices sent by Rightscorp, but

deliberately taking steps to avoid learning the truth.  (See Dkt. # 449 at 19.)

Plaintiffs put on evidence that in late 2009, one of Grande's primary goals was to

reduce churn, meaning the number of customers no longer using Grande's service.

(Dkt. # 468 at 926:21-927:2.)  And in October 2010, Grande established a policy

never to terminate any subscribers for copyright infringement, regardless of how

many notices it received about them.  (Dkts. ## 468 at 924:6-15; 469 at 982:6-

983:8, 1020:22-1021:14.)  Plaintiffs provided evidence that Grande did not decline

to process Rightscorp notices because it thought they had been spoofed, nor

because Grande had any factual basis to believe that the Rightscorp system was

inaccurate.  (Dkts. ## 469 at 1021:21-1022:1-3; 468 at 972-973, 984-985.)  Thus,

the jury was entitled to conclude that Grande believed it highly probable that

Rightscorp's notices were accurate, but avoided learning that fact.

Grande portrays its practice of not forwarding Rightscorp notices to

users as *ispo facto* evidence that it did not believe the notices to be legitimate.  But

Plaintiffs presented evidence that from March 2016 until February 2017, Grande did, in fact, forward Rightscorp notices to its customers.  (Dkts. ## 468 at 962:4-17; 471 at 1410:4-16 (testifying that Grande forwarded Rightscorp notices to its customers from roughly March of 2016 until the implementation of the February 2017 policy); PX 1-2.)  Plaintiffs provided evidence that this change was not attributable to any intervening scrutiny into Rightscorp's reliability or accuracy, since Grande admitted at trial that it made no effort to investigate Rightscorp's infringement detection system before the instant lawsuit was filed.  (Dkt. # 468 at 972:19-973:19.)  Furthermore, Grande's interest in the outcome of the BMG v. Cox litigation indicates that Grande recognized Rightscorp as potentially credible.  (Dkt. # 468 at 932; PX 166, 216.)  A reasonable jury was entitled to rely on Grande's behavior as circumstantial evidence of its belief that the Rightscorp notices *were* accurate or had a high probability of being accurate—at the very least because Grande would not have bothered its customers with what it believed to be inaccurate notices.  (See PX 169 (describing a notice from Rightscorp in terms of "downloading/sharing The Godfather: Part II," and instructing user to "find out who on their network has downloaded the video and is sharing it and remove it."); Dkt. # 468 at 860-861 (Q: And back in 2014, do you ever recall in response to questions from Mr. Murphy or Mr. Creel telling them that, "Believe me, they know

they downloaded the referenced content each time"? A: I do remember that).)

Accordingly, judgment as a matter of law is not proper on this ground.

III.   <u>Material Contribution</u>

To prove contributory liability, Plaintiffs had to prove that Grande "induced, caused, or materially contributed to the infringing activity." (Dkt. # 449 at 19.)  The Court specified that this standard "is met when a defendant can take basic measures to prevent further damages to copyrighted works, yet intentionally continues to provide access to infringing sound recordings." (<u>Id.</u>)

A.   <u>Evidentiary Sufficiency for Material Contribution</u>

Plaintiffs provided unrebutted evidence at trial that Grande did not terminate a single user for copyright infringement from October 2010 to May 2017, regardless of the source, content, or volume of notices provided to Grande about the user's infringing activity. (Dkt. # 468 at 981:10-983:13; 924:6-925:5.) Grande conceded it was "correct" that "Grande could have received a thousand notices about a customer, and it would not have terminated that customer for copyright infringement" during that period. (<u>Id.</u> at 925:1-5.) Grande also admitted that it had the capacity to terminate subscribers, given that it "would terminate [nonpaying users] 100% of the time." (Dkts. ## 471 at 1263:21-1264:5; 468 at 972:11-17.) It is undisputed that cutting off a user's internet service would disable

that user from distributing Plaintiffs' copyrighted works via Grande's internet service.[4]

Grande challenges the sufficiency of this evidence to prove material contribution.  But this is exactly the sort of evidence this Court invoked at summary judgment, finding that "Grande ha[d] at least one simple measure at its disposal—terminating the internet services of repeat infringers—to prevent further damages to copyrighted works."  (Dkt. # 268 at 42.)  Other courts have also found that failing to terminate infringing subscribers is enough to constitute material contribution.  See BMG Rights Mgmt. (US) LLC, 199 F. Supp. 3d at 979 ("There can be no question that the provision of high-speed internet service materially contributes to infringement via BitTorrent and that Cox had the means to withhold that assistance upon learning of specific infringing activity.")  aff'd in part, rev'd on other grounds, 881 F.3d 293 (4th Cir. 2018); see also Sony Music Entm't, 464 F. Supp. 3d at 816 (providing internet to repeat infringers despite notice of specific instances of infringement demonstrated that "Cox was indispensable to each instance of P2P infringement on its network," and thus "substantially assisted

---

[4] The fact that the internet is available from more than one ISP has no bearing on this undisputed fact.  See Sony Music Entm't v. Cox Commc'ns, Inc., 464 F. Supp. 3d 795, 816 (E.D. Va. 2020).

widespread infringement with actual knowledge of the conduct on specific

subscribers' accounts.").

Grande's argument that Plaintiffs failed to provide evidence that

Grande "was even aware of how, specifically, users of its network could use

BitTorrent to obtain 'access' to the unauthorized copies of sound recordings at

issue in this case," misses the point.  (Dkt. # 487 at 8.)  The question in this case

was one of distribution—the direct infringement consisted of Grande users

uploading works to others via BitTorrent.  Eliminating internet service disables a

person from uploading sound recordings on BitTorrent, which requires an active

internet connection.  Thus, Plaintiffs had no need to demonstrate Grande's

understanding of how users could "access" the sound recordings—merely, how

users used Grande internet to connect to BitTorrent and upload the sound

recordings.  (Dkt. # 465 at 342.)  And Plaintiffs made this showing repeatedly.

(See supra Section II (A).)

Plaintiffs provided sufficient evidence for a reasonable jury to find

that Grande materially contributed to its users' direct infringement by failing to

terminate users after learning of their specific, often repeated, infringement.

Accordingly, judgment as a matter of law is not proper on this point.

B.    Legal Arguments for Material Contribution

Grande next argues that the Court should not have included material contribution in its jury instructions on contributory infringement.  (Dkt. # 487 at 7.) At summary judgment, the Court explained that ISPs like Grande "can be held contributorily liable if [they] ha[ve] *actual* knowledge that specific infringing material is available using its system, and can take simple measures to prevent further damages to copyrighted works, yet continue[] to provide access to infringing works."  (Dkt. # 268 at 41-42 (quoting Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1172 (9th Cir. 2007) (internal citation omitted)).)  The Court's jury instruction distills this understanding that "continuing provision of internet services to customers who engage in repeated copyright infringement substantially facilitates access to and the distribution of infringing materials," and that "Grande has at least one simple measure at its disposal—terminating the internet services of repeat infringers—to prevent further damages to copyrighted works."  (Dkt. # 268 at 41-42.)

Grande points to Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 936–37 (2005) to argue that contributory infringement must be premised on "clear expression or other affirmative steps taken to foster infringement."  (Dkt. # 487 at 7.)  But the Court's jury instruction is entirely consistent with Grokster.  As the Court explained at summary judgment, Grokster did not abrogate the common law on contributory liability, which confers liability

22

to "one who, with knowledge of the infringing activity, induces, causes or *materially contributes* to the infringing conduct of another."  Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc., 443 F. 2d 1159, 1162 (2d Cir. 1971) (emphasis added).  Rather, Grokster confirmed that the purveyor of a technology capable of both infringing and non-infringing uses cannot hide behind the technology's non-infringing uses to shield itself from liability when the purveyor has induced, caused, or materially contributed to the infringer's activity. 545 U.S. at 935.  The Court's resolution of Grande's legal argument on this point, codified in the jury instructions, was not a "a manifest error of law," and thus does not support a new trial.  Simon, 891 F.2d at 1159 (quoting Fed. Deposit Ins. Corp., 781 F.2d at 1268).

IV.   Willfulness

The Court next instructed the jury that to find Grande's conduct was willful for the purposes of statutory damages, the evidence had to show that "Grande had knowledge that its subscribers' actions constituted infringement of Plaintiffs' copyrights or that Grande acted with reckless disregard for or willful blindness to the Plaintiffs' rights."  (Dkt. # 449 at 25.)

A.    Evidentiary Sufficiency for Willfulness

Plaintiffs provided sufficient evidence for a reasonable jury to find either knowledge or reckless disregard.  Plaintiffs adduced evidence that Grande established a policy in October 2010 never to terminate a subscriber for copyright

infringement and maintained that policy until 2017.  (Dkts. ## 468 at 924:6-15; 469 at 982:6-983:8, 1020:22-1021:14.)  Grande failed to forward Rightscorp notices to its users[5] or to investigate the validity of the Rightscorp system even after becoming aware that another ISP, Cox, had been held liable for contributory copyright infringement based on evidence from Rightscorp.  (Dkt. # 468 at 924:6-925:5, 932:12-935:3, 982:6-983:8, 1020:22-1021:14.)  A reasonable jury could infer that Grande knew that it would be liable for contributory copyright infringement based on its failure to forward any notices from Rightscorp, or to terminate any infringers for almost a decade.

A reasonable jury could likewise conclude that Grande acted with reckless disregard for or willful blindness to Plaintiffs' rights in their copyrighted work by (1) failing to forward Rightscorp notices; (2) failing to investigate Rightscorp via the custom dashboard, the offer to meet and review the system, or the roll-up notices; and (3) failing to terminate any subscribers for copyright infringement from 2010-2017.[6]

---

[5] Until March of 2016.  (Dkts. ## 468 at 962:4-17; 471 at 1410:4-16.)

[6] Grande states that "[t]here was no evidence at trial that Grande had any knowledge, before this lawsuit was filed, that Plaintiffs' copyrights were in anyway implicated by Rightscorp's copyright complaints," given that "none of [the Rightscorp notices] identified a Plaintiff or related entity as the copyright owner."  (Dkt. # 487 at 12.) Grande provides no supporting law for the proposition that Plaintiffs needed to show Grande was aware of the effect of its conduct on *Plaintiffs* in particular (as opposed to other copyright owners).  And as Plaintiffs point out, such a requirement would

B.    <u>Legal Argument for Willfulness</u>

Grande contends that the Court should not have included reckless disregard as a mental state for willfulness.  At summary judgment, the Court recognized that under Fifth Circuit law, a jury could find Grande's infringement to be willful if Grande "acted with reckless disregard of Plaintiffs' rights as copyright holders."  (Dkt. # 268 at 43.)  Nevertheless, the Court heard arguments from Grande about this issue at the jury charge conference and directed the parties to brief the relevant law in support of their positions before deciding on a final jury instruction.  (Dkt. # 474 at 1931:17-1940:17.)

Plaintiffs cited Fifth Circuit authority holding that the willfulness inquiry can be satisfied when a defendant's infringing conduct is "reckless." <u>Graper v. Mid-Continent Cas. Co.</u>, 756 F.3d 388, 395 (5th Cir. 2014).  While the "Supreme Court has not directly addressed the definition of 'willful' under the Copyright Act," both decisions throughout the Fifth Circuit and the "common law meaning" of the term indicate that willfulness under the Copyright Act "cover[s] situations where 'the defendant <i>has recklessly</i> disregarded the plaintiff's rights . . .'" <u>Id.</u> (emphasis original).  Plaintiffs also pointed to numerous circuit courts having

---

be illogical in this case, since Grande admitted to having a policy of ignoring the copyright infringement notices provided by <i>any</i> rights-noticing company, about <i>any</i> copyright holder's works, under its blanket policy of never terminating users for infringement.

reached the same conclusion.[7]  (See Dkt. # 438 at 3 (collecting cases).)  The Court finds no error in its decision to instruct the jury that "reckless disregard of Plaintiffs' rights as copyright holders" satisfies the *mens rea* requirement of willfulness for statutory damages.[8]

Grande also re-raises its objection at the jury charge conference that Plaintiffs should be required to prove that Grande "knew its own conduct constituted copyright infringement," rather than knowing the same about the conduct of Grande's users.  (Dkt. # 487 at 11.)  The Fourth Circuit expressly rejected this argument when raised by Cox in BMG.  881 F. 3d at 312.  The Court agrees with the Fourth Circuit that contributorily infringing "with knowledge that *one's subscribers* are infringing is consistent with at least reckless disregard for the copyright holder's rights."  Id. (emphasis added); see also Sony v. Cox, No. 1:18-cv-950 (E.D. Va.) Dkt. # 671 (Jury Instruction # 29).  Because the Court properly

---

[7] Furthermore, "reckless disregard of a copyright holder's rights" was approved as an appropriate instruction on the Fourth Circuit's review in BMG, 881 F. 3d at 312-13.

[8] While there is logical merit to Grande's argument that including reckless disregard here means imposing a lower mental state requirement for increased statutory damages from "willfulness" than the mental state required to prove liability (willful blindness), the Court recognized that the first inquiry is liability, and the second is the aggravating damages factor of willfulness.  Based on the jury form, there is no way the jury could have returned a *liability* finding based on "recklessness" alone. (See Dkt. # 449 at 18.)

instructed the jury with respect to willfulness, the Court did not commit a "a

manifest error of law," and thus a new trial is not appropriate.  <u>Simon</u>, 891 F.2d at

1159 (quoting <u>Fed. Deposit Ins. Corp.</u>, 781 F.2d at 1268).

V.     <u>Evidence of Ownership</u>

              Grande argues that Plaintiffs provided insufficient evidence of its

ownership of the 1,403 copyrighted works.  Grande incorrectly claims that this

Court never ruled on ownership, such that the Court improperly instructed the jury

that "[t]his issue has already been resolved, and you do not need to decide it."

(Dkt. # 449 at 16.)  In fact, the Court ruled on ownership in direct response to

Grande's first JMOL: "If I didn't [make a ruling on ownership] before, I will now,

because there's not been one shred of evidence anywhere that the plaintiff in this

case did not — plaintiffs in this case don't own those copyrights."  (Dkt. # 475 at

2013:9-12.)  The Court's ruling on ownership remains correct in post-trial

hindsight.  Plaintiffs presented unrebutted evidence of ownership, including

employee witness' testimony that their respective companies owned or exclusively

controlled the works in suit, and explanations of how their companies came to own

or exclusive control each of the works in suit.  (<u>See</u> Dkts. ## 464 at 178:8-22 (W.

Leak for Sony); 469 at 1071:7-18 (T. Parry for Warner); 471 at 1310:15-1311:9

(A. McMullan for Universal).)  This evidence supports the Court's ruling on

ownership.  Thus, judgment as a matter of law is improper on this ground.

VI.    <u>Evidence of Eligibility for Statutory Damages</u>

Grande also argues that the Court incorrectly found that 1,403 of Plaintiffs' copyrighted sound recordings were eligible for statutory damages under 17 U.S.C. §§ 412, 504(c).  (Dkt. # 487 at 12-13.)  Section 412 requires consideration of the dates of (1) the infringement, (2) the first publication of the work, and (3) the effective registration of the work.  <u>Id.</u>  The Court rejects Grande's summary argument that "Plaintiffs did not offer evidence sufficient to carry this burden."  (Dkt. # 487 at 13.)  The Court found the 1,403 sound recordings eligible for statutory damages as a matter of law based on Plaintiffs' unrebutted evidence that the dates aligned as required by Section 412.

For each of the 1,403 sound recordings, Plaintiffs produced, through fact witnesses for each record company, a copy of the copyright registration certificate or a printout from the Copyright Office website showing the relevant copyright publication and registration dates, as well as summary exhibits reflecting the same.  (<u>See</u> PX 19-24; Dkts. ## 464 at 181:8-182:5 (W. Leak for Sony); 469 at 1072:9-1073:15 (T. Parry for Warner); 471 at 1312:24-1313:8 (A. McMullan for Universal).)  Plaintiffs' expert witness, Dr. Robert Bardwell, introduced the date ranges of infringement—in particular, the first date of infringement—for each sound recording, based on the 1.35 million Rightscorp notices at issue.  (<u>See</u> PX 459; Dkt. # 471 at 1291:7-1292:11; 1294:10-1296:18.)  This undisputed evidence

28

rendered Section 412 eligibility of the 1,403 sound recordings "a straightforward matter of dates" that the Court appropriately ruled on as a matter of law.  (Dkt. # 475 at 1958:13-1960:11.)

Grande also argues that "the Court erred in concluding that Plaintiffs could satisfy [S]ection 504(c)'s 'one award per work' rule based on evidence that the songs in suit had 'independent economic value' because Plaintiffs sold them separately (for example, through iTunes)."  (Dkt. # 487 at 13.)  This objection was raised at the jury charge conference, the Court indicated that it was "inclined to agree" with Plaintiffs, but allowed additional briefing before making its final decision.  (See Dkt. # 474 at 1929:10-14.)

Following the additional briefing, the Court found that the majority of case law holds that when individual sound recordings are available as individual works, a plaintiff can recover one statutory damages award per recording consistent with 17 U.S.C. § 504.  See Sony, 464 F. Supp. 3d at 824 (E.D. Va. 2020) (finding that there was no reason to modify the number of works based on "compilations" where defendant ISP did not put facts in evidence to recharacterize or rebut the individual characterization of these works which plaintiffs testified were available on a per-song basis);  EMI Christian Music Group, Inc. v. MP3tunes, LLC, 844 F.3d 79, 101 (2d Cir. 2016) (affirming jury verdict because "there was evidence at trial that all the songs in question were made available as

singles on the date of infringement," and "the focus is on whether the plaintiff— the copyright holder—issued its works separately, or together as a unit."); <u>BMG Rights Mgmt. (US) LLC</u>, 199 F. Supp. 3d at 983, <u>aff'd in part, rev'd in part</u>, 881 F.3d 293 (4th Cir. 2018) (providing commentary on what constitutes a work for statutory damages in this context).  Plaintiffs provided uncontroverted testimony that they made all the works in suit but four available to the public on an individual basis during the relevant time period of 2011 to 2017.  (Dkts. ## 464 at 182:8-183:2 (W. Leak for Sony); 469 at 1073:16-1074:6 (T. Parry for Warner); 471 at 1313:9-24 (A. McMullan for Universal).)

        The Court's logic with respect to the eligibility of the 1,403 copyrighted sound recordings remains sound post-trial.  The Court's resolution of Grande's legal arguments on this issue was not a "a manifest error of law," and thus does not support a new trial.  <u>Simon</u>, 891 F.2d at 1159 (quoting <u>Fed. Deposit Ins. Corp.</u>, 781 F.2d at 1268).

VII.   <u>Evidentiary Objections</u>

        Grande asserts a litany of errors in this Court's admission of evidence. To begin with, Grande argues that the Court improperly admitted evidence: (1) that Cox was contributorily liable for copyright infringement based on evidence provided by Rightscorp; and (2) regarding the safe harbor provision of the Digital Millennium Copyright Act ("DMCA") and Grande's failure to qualify for that safe

harbor was inadmissible.  (Dkt. # 487 at 9.)  Grande also offers a laundry list of seven other evidentiary issues.  (Id. at 15-16.)

    A.    <u>The Cox Litigation</u>

        At trial, the Court held that evidence "that the defendants were aware of" the outcome of the Cox litigation was admissible because Grande's knowledge of the Cox verdict informed actions that Grande took or failed to take with regard to Rightscorp during the relevant time period.  (Dkt. # 467 at 583:7-586:8.)  Those actions were relevant to, among other things, Grande's motivation, knowledge, willfulness, and recklessness regarding the validity of Rightscorp's notices.  (Id. at 599:22-600:11.)  The Court was clear that Plaintiffs should not mention the amount of the verdict or use the <u>Cox</u> verdict to insinuate that this case should come out the same way.  This evidence was relevant for the purpose of proving that there was at least an issue of liability raised by the Rightscorp notices, but Grande chose to ignore that possibility and did not investigate the validity of the software.  That goes directly to the issue of willful blindness.  (Dkt. # 468 at 828:1-5 "I'm allowing you the opportunity to extract the testimony regarding the Cox case, to a point, over the objection of the defendants, because that does involve Rightscorp, and it does go directly to the issue of their willful blindness, if any." )  The validity of the Rightscorp software was to be elicited only by testimony at trial, not the jury's decision in <u>BMG v. Cox</u> to credit the software.

31

The Court finds that the testimony on the Cox litigation was properly cabined to the issues of notice and knowledge: Grande's employee testified that he was aware in November of 2014 that "a music company called BMG had sued Cox for copyright infringement," that he had "discussed it with another employee," and that the suit was "based on Rightscorp notices," and that at the same time, Grande was receiving Rightscorp notices, but "did not do any research into the Rightscorp system" even after "in December of 2015, a jury ruled in favor of BMG in its case against Cox." (Dkt. # 468 at 932.) Plaintiffs also elicited testimony sufficient to introduce emails sent between Grande employees about the Cox litigation, including one email indicating that as a result of the Cox litigation, "[w]e may need to revisit this process at some point regarding copyright infringement." (Dkt. # 468 at 934-935; PX 106.) These emails go directly to whether Grande willfully blinded itself to what it understood to be a high possibility that the notices reflected infringement. (See also Dkt. # 468 at 935:9-942:7 (discussing an email between about whether Grande should take Rightscorp up on its offer to meet with them and discuss their system two months after the Cox verdict); PX 108.) To address Grande's arguments regarding prejudice, the Court also issued two limiting

instructions to the jury related to this evidence, once when it was first introduced[9]

and again when the case was submitted to the jury.[10]

    B.    The DMCA Safe Harbor

          Grande next argues that the court erred in admitting evidence

regarding the safe harbor provision of the DMCA and Grande's failure to qualify

for that safe harbor.  (Dkt. # 487 at 8-9.)  Before trial, the Court denied Grande's

motion *in limine* to exclude this evidence because it was relevant.  (Dkt. # 347 at

16-17.)  Grande then moved for reconsideration of that ruling, which the Court

denied because Grande's motion was "unpersuasive," resting on Plaintiffs'

representation that "they do not intend to argue at trial that Grande is liable

_____

[9] The first instruction was as follows: "Now, ladies and gentlemen, I'm going to give you what we call a limiting instruction, and it's important that you understand and follow this instruction. Now, you have heard evidence in another -- evidence that in another case, in another court, with different parties, there was a verdict reached in a copyright litigation against a different Internet provider. This evidence may be considered by you only for the purpose of evaluating the state of mind of Grande executives and employees at the time and nothing else. It is not to be considered by you as evidence because a different Internet service provider was found liable that Grande in this case is liable. Although the other case involved Rightscorp, it involved different parties, different lawyers, different facts, additional evidence and different instructions on the law. In other words, it was a totally different case with the exception of the involvement of Rightscorp. Further, this case went up on appeal and the final result of that case is not before you and is not relevant."  (Dkt. # 468 at 978:8-979:1.)

[10] A nearly identical second instruction was given during jury instructions.  (Dkt. # 475 at 2047:13-2048:5.)

because it failed to qualify for a DMCA safe harbor."  (Dkt. # 358 at 8.)  Grande

raised this argument again during the pre-trial conference, at which point the Court

determined it had "heard enough" on this issue and would affirm and rely on its

prior written rulings.  (Dkt. # 463 at 31:5-12.)  The Court understood, and

communicated to counsel, that it would be improper for Plaintiffs use testimony

about the DMCA safe harbor to argue that because Grande did not qualify for the

safe harbor, Plaintiffs had necessarily proved the underlying copyright

infringement case.  Plaintiffs' counsel indicated that they would "never argue that

the absence of the safe harbor means that they're liable for contributory

infringement."  (See id. at 29, 31.)  The Court found that the DMCA safe harbor

was potentially relevant to the willfulness of Grande's behavior in adopting its

2010 policy to not terminate any infringers because it had a DMCA-compliant

policy before and after that period.  (Dkt. # 464 at 16:16-21.)  Plaintiffs still had to

prove their case, and could not use the fact that Grande did not qualify for the safe

harbor as evidence of the elements of contributory infringement: that Grande users

committed direct infringement, Grande knew of specific instances of infringement

and was willfully blind to them, Grande materially contributed to its users'

infringement.

   Grande points to only two instances in which the DMCA safe harbor

was mentioned at trial.  In its closing argument, Grande noted twice that its

compliance with the safe harbor provision was "optional" and alluded to having made the choice to not "take advantage of that optional defense." (Dkt. # 475 at 2136:9-19.) To rebut this argument, Plaintiffs accurately noted that Grande in fact sought the safe harbor as a defense in this action but "lost."[11] (Id. at 2143:24.) And the one line of testimony that Grande points to outside of that does not even mention the DMCA by name, stating only that the record services company expected ISPs to act when they became aware of infringement because they had "negotiated and lobbied for a safe harbor protection in the law." (Dkt. # 471 at 1331.) The objection to this question was sustained. (Id.)

Grande raises 17 U.S.C. § 512(l), which provides that failure to qualify for the safe harbor "shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense." But the Court issued a limiting instruction to the jury tracking this language exactly. (Dkt. # 449 at 13.) The limiting instruction also made clear that the DMCA safe harbor is only a "optional" defense for internet services providers to claims of secondary liability arising from infringement by users on its network, "not a legal requirement." (Dkt. # 449 at

---

[11] Grande's motion also takes the quoted passage out of context, which was clearly a transition to recapping each element needed to prove the underlying case, not an imposition of liability because Grande did not meet the safe harbor. (See Dkt. # 475 at 2144.)

35

13.)  And Plaintiffs, in opening, stated that its claim of contributory infringement "rises and falls depending on whether plaintiffs can prove the standards that you'll hear from Judge Ezra, and the issue of whether Grande qualified for the safe harbor is not a factor in deciding whether plaintiffs have proven their case."  Plaintiffs explained to the jury that the DMCA safe harbor was only mentioned to eliminate the issue of fairness in deciding whether to hold Grande liable, because the DMCA "specifically addressed the issue of whether it's fair to apply this doctrine of contributory infringement to ISPs."  (Dkt. # 464 at 57-59.)  The Court's admission of evidence regarding the DMCA safe harbor was not a prejudicial error and thus does not warrant the extraordinary relief of a new trial.  See Seidman, 923 F.2d at 1140.

C.    Remaining Evidentiary Issues

Finally, Grande offers a laundry list of seven evidentiary issues for which it provides no factual argument or legal support.  (Dkt. # 487 at 15-16.) Courts regularly deny motions under Rule 59 when the movant "cites no authority to support [its] argument" that evidentiary rulings were incorrect.  Wilkerson v. Univ. of N. Texas, No. 15-cv-540, 2019 WL 2716779, at *9 (E.D. Tex. June 28, 2019).  Nonetheless, the Court discusses each evidentiary objection on the merits.

Grande contends that the Court admitted evidence regarding copyright complaints and alleged instances of copyright infringement not at issue in this case.

36

(Dkt. # 487 at 9.)  Grande does not cite any time in the record when this occurred.

Assuming that Grande means the evidence demonstrating that Grande received

notices of infringement from companies other than Rightscorp, the Court denied

Grande's motion *in limine* to exclude this evidence because it was relevant. (Dkt.

# 347 at 14-16.)  Then, as now, Grande's handling of such notices directly bears on

Grande's willful blindness to *all* copyright infringement on its network, and

undermines its claim that it did not pass on notices from Rightscorp because of

some error inherent in its technology.  At trial, the Court explained that Grande's

receipt of such notices "goes to whether [Grande] was aware that their service . . .

was being used generally by individuals who were, in fact, allegedly violating

copyright law." (Dkt. # 468 at 821:14-19.)  The probative value of this evidence is

not substantially outweighed by its prejudicial effect, and thus it was admissible.

FED. R. EVID. 403.

       Grande next claims that the Court admitted "evidence regarding the

Audible Magic software and outputs from the software for which no proper

foundation was laid" is unsupported by the record.  (Id. at 16.)  Audible Magic was

a critical part in Plaintiffs' case about the reliability of the Rightscorp notices, and

a proper foundation was laid through several experts for discussion of the software

and its outputs.  The Court admitted evidence from a seventeen-year employee of

the RIAA that Audible Magic is "the industry standard" for analyzing audio files

and comparing those files to a database of known recordings.  (Dkt. # 464 at 196:1-8.)  This witness testified to using the software "[l]iterally millions of times" including "almost on a daily basis" in his antipiracy role at RIAA.  (Id. at 196:9-17.)  A proper foundation for the output files from Audible Magic was presented through the RIAA witness, who personally ran the software on the files received from the Rightscorp hard drive and generated output files that the RIAA maintains in its regular course of business.  (Id. at 204:9-208:17.)

Grande's objection to the expert testimony of Barbara Frederiksen-Cross about the reliability of Audible Magic "that was not properly disclosed in discovery" is similarly off-base.  (Dkt. # 487 at 16.)   The Court assumes that this argument references the denial of Grande's Motion to Exclude Certain Opinions of Barbara Frederiksen-Cross.  (Dkt. # 417.)  The Court's basis for denying that motion was well-reasoned and stands up to post-trial scrutiny: to avoid any prejudice to Grande from Ms. Frederiksen-Cross' testimony about Audible Magic's reliability that was first disclosed in her Second Rebuttal Report, the Court made a detailed ruling about how to proceed with her testimony.  The Court allowed Ms. Frederiksen-Cross to testify at trial about Audible Magic, then required her to disclose (under a substantive protective order) the basis for her Audible Magic conclusions, then permitted Grande to depose her about the basis of

38

that conclusion, and allowed Ms. Frederiksen-Cross to return to finish her testimony on Audible Magic.  (Dkt. # 465 at 240-43.)

   Next, Grande contends that the Court erred in admitting evidence regarding Grande's total profits, revenues, and overall value, as well evidence regarding the collective size and revenues of Grande and affiliated companies that are not defendants in this case.  The probative value of this evidence outweighed its prejudicial effect.  "[S]tatutory damages under § 504(c)" express "an intent to deter, not just compensate."  Energy Intelligence Group, Inc. v. Kayne Anderson Capital Advisors, L.P., 948 F.3d 261, 276 (5th Cir. 2020).  Accordingly, "[t]he overall size and wealth of the defendant is a valid consideration for a statutory damages award" because of its impact on the deterrence effect.  Sony Music Entm't, 464 F. Supp. 3d at 842; see also Playboy Enterprises, Inc. v. Webbworld, Inc., 991 F. Supp. 543, 560 (N.D. Tex. 1997), aff'd, 168 F.3d 486 (5th Cir. 1999). see also Psihoyos v. John Wiley & Sons, Inc., 2012 WL 5506121 at * 4 (S.D.N.Y. 2012) (allowing the jury to consider the fact that the defendant was a "$300 million a year division of a $1.7 billion company").  The probative value of this evidence is not substantially outweighed by its prejudicial effect, and thus it was admissible. FED. R. EVID. 403.

   Grande also objects to testimony from Dr. William Lehr about Grande's economic incentives for permitting infringement.  (Dkt. # 487 at 16.)

This testimony had probative value both for demonstrating Grande's motivations for its policy of never terminating subscribers from 2010-2017, and in evaluating statutory damages—principally, "[t]he profits Grande earned because of the infringement" and the "expenses Grande saved because of the infringement." (Dkts. ## 449 at 22; 470 at 1121.)  Again, the probative value of this evidence is not substantially outweighed by its prejudicial effect, and thus it was admissible. FED. R. EVID. 403.

Next, Grande takes issue with the Court's admitting evidence from Rightscorp employee Gregory Boswell regarding the origin of music files Rightscorp downloaded from users of Grande's network—"evidence that was ostensibly based on underlying data not produced in discovery or offered into evidence at trial." (Dkt. # 487 at 16.)  The Court disagrees with this characterization of the Rightscorp downloads.  Mr. Boswell agreed in testimony that PX 3 was a "drive containing . . . the download files that [he] provided to [Plaintiffs] from the Rightscorp system." (Dkt. # 465 at 21-24.)  He then described in detail how those files had been downloaded into the Rightscorp system from users of Grande's network.  (Id. at 338-348, 360:1-361:5.)  This was more than adequate foundation for the evidence to be admitted.

Lastly, Grande argues that the Court "admitt[ed ]Rightscorp's copyright complaints without proper foundation and over Grande's hearsay and

40

Fed. R. Evid. 1002 objections." (Dkt. # 487 at 16.) The Court rejects this contention. The Court admitted the notices after a proper foundation was laid to qualify the notices as business records. (Dkt. # 292-317.) As to the Rule 1002 objection, the Court properly ruled that given the fact that Rightscorp is not a party to this litigation, even if the "original" evidence was destroyed by Rightscorp, other evidence of content—the notices—is admissible unless the destruction was the result of "the proponent acting in bad faith." (Dkt. # 268 at 29); FED. R. EVID. 1004. In the absence of such evidence, the Court had no reason to reject the Rightscorp notices under Rule 1002.

CONCLUSION

Neither Grande's legal nor evidentiary arguments warrant judgment as a matter of law or a new trial. Accordingly, the Court **DENIES** Grande's Renewed Motion for Judgment as a Matter of Law or a New Trial. (Dkt. # 487.)

**IT IS SO ORDERED.**

**DATED**: Austin, Texas, May 11, 2023.

_____
David Alan Ezra
Senior United States District Judge

41